## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## DOCKET NO.: 24-11126-B

---

DAVITA KEY,

PLAINTIFF – APPELLANT,

v.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,
HYUNDAI ENG AMERICA, INC., AND
DYNAMIC SECURITY, INC.,

DEFENDANTS – APPELLEES.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2:19-cv-0767-ECM

---

## BRIEF OF APPELLANT

---

COUNSEL FOR APPELLANT:

Heather Newsom Leonard
HEATHER LEONARD, P.C.
2105 Devereaux Cir, Ste 111
Birmingham, AL 35234
Phone: (205) 977-5421
Heather@HeatherLeonardPC.com

Leslie A. Palmer
PALMER LAW, LLC
104 23rd St. S., Ste 100
Birmingham, AL 35233
Phone: (205) 285-3050
Leslie@PalmerLegalServices.com

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

| | |
|---|---|
| Davita M. Key | Plaintiff – Appellant |
| Hyundai Motor Manufacturing of Alabama, LLC ("HMMA") | Defendant – Appellee |
| Hyundai ENG America, Inc. ("HEA") | Defendant – Appellee |
| Dynamic Security, Inc. | Defendant – Appellee |
| Whitney Ryan Brown | Counsel for Appellee HMMA |
| David Middlebrooks | Counsel for Appellee HMMA |
| Lehr Middlebrooks Freeland & Thompson, PC | Counsel for Appellee HMMA |
| Matthew T. Miller | Counsel for Appellee HEA |
| Sarahanne Vaughn | Counsel for Appellee HEA |
| Scott Burnett Smith | Counsel for Appellee HEA |
| Cortlin Bond | Counsel for Appellee HEA (no appearance on Appeal) |

i

| Bradley Arant Boult Cummings LLP | Counsel for Appellee HEA |
| Wesley C. Redmond | Counsel for Appellee Dynamic Security |
| Susan W. Bullock | Counsel for Appellee Dynamic Security |
| FordHarrison, LLP | Counsel for Appellee Dynamic Security |
| Heather Newsom Leonard | Counsel for Appellant |
| Heather Leonard, P.C. | Counsel for Appellant |
| Leslie A. Palmer | Counsel for Appellant |
| Palmer Law, LLC | Counsel for Appellant |
| Hon. Emily C. Marks | US District Court Judge |
| Hon. Stephen M. Doyle | US Magistrate Judge |

Respectfully submitted this 27th day of November, 2024.

/s/ Leslie A. Palmer
Leslie A. Palmer
*Attorney for Appellant*

OF COUNSEL:
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205)285-3050
leslie@palmerlegalservice.com

## STATEMENT REGARDING ORAL ARGUMENT

Key requests oral argument to address multiple issues with the Court. First, the district court held Key responsible for the errors of third parties, over which she had no control. Administrative issues within the EEOC are not uncommon. This issue is capable of repetition, especially given the agency's shift to digital notice (via portal/e-mail) and the difficult surrounding those notices for charging parties and charging party counsel. Additionally, this case gives the Court the opportunity to revisit *Catastrophe Management* in light of the Supreme Court's analysis and holding in *Bostock v. Clayton County, GA.*

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..............................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................ iii

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES ..............................................................vi

STATEMENT OF JURISDICTION ......................................................1

    Subject Matter Jurisdiction ........................................................... 1

    Appellate Jurisdiction .................................................................. 1

STATEMENT OF THE ISSUES ..........................................................3

STATEMENT OF THE CASE .............................................................5

    Course of the proceedings and Disposition Below ........................ 5

    Statement of the Facts ................................................................. 6

        Davita Key's Employment with Dynamic and Assignment to Hyundai .......... 6

        Day One – Key's Pregnancy ...................................................... 7

        Day Two – Key's Discrimination Complaints ............................. 9

        Defendants-Appellees Remove Key from Hyundai ..................... 12

        Dynamic Learns Key is Pursing her EEOC Rights and Does not Reassign Her. ......... 12

        Key Completes a Detailed EEOC Questionnaire and Requests a Charge. .......... 13

        The EEOC Makes Errors in Processing Key's Charge ................. 14

STANDARD OF REVIEW ................................................................16

SUMMARY OF THE ARGUMENT ...................................................16

ARGUMENT .................................................................................17

I.    Key had valid Title VII claims against HEA ................................17

II.    The district court's dismissal of Key's Title VII claims against Dynamic
improperly weighed the evidence ..................................................28

III.    The district court erred by dismissing the disparate impact claims against
HEA and HMMA. ........................................................................35

IV.    A grooming policy that precludes the wearing of natural dreadlocks but
allows styled dreadlocks constitutes intentional race discrimination .....................37

V.    The district court's dismissal of retaliation claims against HEA and HMMA were contrary to the evidence and application of Rule 56. ......................................42

CONCLUSION ....................................................................................44

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A) ...................... I

CERTIFICATE OF SERVICE..................................................................II

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1330 (11th Cir. 2023) ................38, 42

*Bostock v. Clayton Cty.*, 590 U.S. 644 (2020) ...................................................41, 42

*Chavers v. Sec'y Fla. Dep't of Corr.*, 468 F.3d 1273 (11th Cir. 2006)...................39

*EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016).....35, 39, 40, 41

*Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir. 1981) ...................................................................................................21, 25

*Franks v. Bowman Transp. Co.*, 495 F.2d 398 (5th Cir. 1974)................................31

*Garcia v. Gloor,* 618 F.2d 264 (5th Cir. 1980) ......................................................40

*Gonzalez Packing Co. v. East Coast Brokers & Packers, Inc.*, 961 F.2d 1543 (11th Cir. 1992)...................................................................................................29

*Gundy v. City of Jacksonville*, 50 F.4th 60 (11th Cir. 2022) ...................................16

*Kerr v. McDonald's Corp.*, 427 F.3d 947 (11th Cir. 2005) .............................29, 30

*Lewis v. Conners Steel Co.*, 673 F.2d 1240 (11th Cir. 1982)............................30, 34

*Love v. Pullman Co.*, 404 U.S. 522 (1972) .............................................................21

*McClure v. Oasis Outsourcing II, Inc.,* 674 F. App'x 873 (11th Cir. 2015)......26, 27

*Powers v. Ala. Dep't of Educ.*, 854 F.2d 1285 (11th Cir. 1988).............................35

*Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863 (11th Cir. 2020) ...................30, 31

*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970).....................19, 22

*Sims v. MacMillan,* 22 F.3d 1059 (11th Cir. 1994)................................................18

*Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522 (11th Cir. 1991) .33, 34

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir 2023) ...............................38

*Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350 (11th Cir. 1994). ......................21, 23

*Watts v. Florida International University*, 495 F.3d 1289 (11th Cir. 2007)..........35

*Wilkerson v. Grinnell Corp.*, 270 F.2d 1314 (11th Cir. 2001) ..........................18, 19

*Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975)...................40

*Yelling v. St. Vincent's Health Sys.*, 83 F.4th 1329 (11th Cir. 2023) .......................37

**Statutes**

28 U.S.C. § 1291 ....................................................................................................2

28 U.S.C. §§1331 ...................................................................................................1

42 U.S.C. § 1331 ....................................................................................................1

42 U.S.C. § 1367 ....................................................................................................1

42 U.S.C. § 1981 ....................................................................................................1

42 U.S.C. §2000e-5(f)(1) ....................................................................................28

42 U.S.C. 2000e-3(a) ............................................................................................1

**Rules**

Eleventh Circuit Rule 26.1-1 ..................................................................................i

Fed. R. App. P. 32 ..................................................................................................I

Fed. R. App. P. 4 ...................................................................................................2

Fed. R. Civ. P. 56 .................................................................................................33

## STATEMENT OF JURISDICTION

## Subject Matter Jurisdiction

This Court has federal question subject matter jurisdiction. Davita Key ("Key") sued her former employers and those acting in an employment capacity alleging violations of Title VII of the Civil Right's act of 1964, 42 U.S.C. § 2000e, et seq. (Title VII), and 42 U.S.C. § 1981 (Doc.28). Subject matter jurisdiction was based on 28 U.S.C. §§1331, 1343, and 42 U.S.C. §2000e-5(f)(3). (Doc.28).

## Appellate Jurisdiction

The district court entered a final order in this case on March 11, 2024 (Doc. 212). The United States District Court for the Middle District of Alabama partially granted HEA's Motion to Dismiss on all Title VII claims as to that Defendant-Appellee on August 31, 2021. (Doc.38). On February 10, 2023, the court granted summary judgment in full on Key's remaining claims against HEA and HMMA, and granted partial summary judgment on Key's claims against Dynamic Security. (Doc.138). After a jury trial on Key's soul remaining count against Dynamic Security, the court entered an order disposing of the last post judgment motion on March 11, 2024. (Doc.212). Defendant-Appellee Dynamic Security filed its Notice of Appeal on April 5, 2024.[1] (Doc.217). Key filed her Notice of Appeal on April

---

[1] Dynamic Security's Appeal is docketed at Appeal No. 24-11069-B.

10, 2024. (Doc.221). Key's appeal is timely under Fed. R. App. P. 4(a)(3) and Fed. R. App. P. 4(a)(4)(A) as it was filed within 14 days of another party's notice of appeal and within 30 days of the last order disposing of post judgment motions. Appellate jurisdiction exists under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

Did the District Court err when it dismissed all Title VII claims against HEA before allowing discovery into whether HEA had sufficient notice to effectuate the purpose of Title VII?

Can the EEOC's internal handling of EEOC charging documents affect the exhaustion of administrative remedies to act as a bar to any remedy when a pro se charging party had no control over the internal process?

Did the District Court misapply the motion to dismiss standard with regard to HEA?

Did the District Court err by applying the three-day mailing rule contrary to the weight of the evidence where the record was void of any proof that the EEOC mailed the requisite document to Appellant-Plaintiff?

Did the District Court err by concluding that a grooming policy that applied specifically to prevent the wearing of natural dreadlocks did not constitute intentional race discrimination?

Did the District Court err by dismissing retaliation claims against HEA and HMMA where the evidence viewed in the light most favorable to Appellee-Plaintiff showed a basis for a reasonable belief that the grooming policy was used as a proxy for race discrimination.

Did the District Court err by dismissing all claims against HEA and HMMA?

Did the District Court misapply the summary judgment standard?

## STATEMENT OF THE CASE

### Course of the proceedings and Disposition Below

Appellant, Davita Key ("Key") sued Hyundai Motor Manufacturing of Alabama, LLC ("HMMA"), Hyundai ENG America, Inc. ("HEA") (collectively "Hyundai"), and Dynamic Security, Inc. ("Dynamic"), alleging that each, as an employer, violated her rights under Title VII and 42 U.S.C. § 1981. (Doc.28). All Defendants-Appellees moved to dismiss the claims. (Doc.30 HMMA) (Doc.31 HEA) (Doc.32 Dynamic). Key opposed the motions. (Doc.34). After briefing, the District Court denied the motions as to Dynamic and HMMA, but granted the motion, in part, to HEA, as to all Title VII claims against it. (Doc.38 p1-2, 9). In dismissing the Title VII claims against HEA, the court found Key failed to exhaust her administrative remedies against HEA because HEA was not specifically named in the EEOC charge. (Doc.38 p9-12). After the close of discovery, Appellees-Defendants moved for summary judgment on all remaining counts. (Doc.66-67 HMMA) (Doc.69-70 HEA) (Doc.73-74 Dynamic). Key opposed the motions (Doc.82). On February 10, 2023, the District Court granted summary judgment on all remaining counts against HEA and HMMA, and on all but the §1981 retaliation claim against Dynamic (Doc.138 p43). Trial on the remaining count against Dynamic resulted in a Plaintiff's verdict and post-trial motions that are the subject

of a separate appeal filed by Dynamic. This appeal stems from the pretrial

dismissals. (Doc.221).

## Statement of the Facts

### *Davita Key's Employment with Dynamic and Assignment to Hyundai*

Davita Key applied for and was hired for a mailroom position on the

HMMA property, in Montgomery Alabama.[2] (Doc. 68-12, 18:4-19:12, 30:2-6;

Doc. 81-10). Key's job, to receive and deliver mail throughout the facility, was at

the direction of and for the benefit of HEA and HMMA, or Hyundai. (Doc. 81-19

¶2-5). Davita Key is a Black female with naturally course textured hair that falls

into dreadlocks without the use of chemicals. (Doc. 81-19 ¶6).

During her interview with Gloria Robinson and Cassandra Williams, some

questions arose about her dreadlocked hair and the applicable policies. (Doc. 81-19

¶6-7, Doc. 68-12, 133:3-133:8). Key showed them a photo of an updo style

maintain her natural dreadlocks and they approved it, but did not tell Key she was

required to put her hair up. (Doc. 81-19 ¶6 Doc. 68-12, 128:19-128:25, 133:9-

---

[2] HMMA owns and operates the Hyundai plant in Montgomery, Alabama. HMMA contracted
with HEA to provide certain services on the plant grounds, including mail and security.
"Hyundai" appears throughout the facility. Initially, HEAs corporate representative testified
HEA was a subsidiary of HMMA but later changed her testimony. Both companies operate at
700 Hyundai Blvd. HEA contracted with Dynamic Security to provide staff for the mail/security
contract. Cassandra Williams, who was over the security division used an hmma.com email
address with the HMMA logo. *See* Doc. 82 pp17-26, Key Opposition to Summary Judgment,
Statement of Facts, for multiple record citations).

133:12; Doc. 68-6, 84:1-14). Key started at the Hyundai plant on July 31, 2017, with her hair in the same natural dreadlocks. (Doc. 68-12, 26:12-26:15, 268:8-21; Doc. 81-19 ¶7). Williams and Robinson saw Key at the beginning of her shift and did not raise any issue about her hair. (Doc. 81-19 ¶9).

### _Day One – Key's Pregnancy_

Before Key left the training security office to start her day, she reported to Robinson she was pregnant and provided a release noting no restrictions. (Doc. 68-12, 140:21-140:22, Doc. 81-19 ¶10). Robinson took the release into the office she shared with Williams. (Doc. 68-12, 38:6-39:4; 140:21-141:24, Doc. 81-19¶10). Within ten minutes of Robinson taking the release into the office with Williams, Williams came out, looked at Key and said, "What's wrong with your hair?" "Why is it like that?" (Doc. 68-12, 117:3-117:5, 140:25-141:2). Having left her interview with the understanding that Dynamic's policy controlled, Key responded her hair was within Dynamic's policy. (Doc. 68-12, 141:3-141:4; 269:5-17). Williams stated she did not care about Dynamic's policy and Dynamic could send her somewhere else and then walked back into the office with Robinson. (Doc. 68-12, 141:5-141:7). Within minutes, Robinson walked by Key, twice, without speaking and only looked at her in an agitated manner. (Doc. 68-12, 142:13-143:4). Key then left with her trainer to begin training on the mailroom job. (Doc. 68-12, 141:8).

Robinson had Key brought back to the office where she and Williams were together, after about 45 minutes, she asked her what was wrong with her hair. (Doc. 68-12, 139:14-146:25). Key again said her hair complied with Dynamic's policy, but Robinson told her she could not wear it like that at "Hyundai." (Doc. 68-12, 145:7-145:14). Key asked if she could see the policy and Williams responded she did not have to show Key anything. (Doc. 68-12, 145:18-145:20). Robinson said, "How dare you ask my supervisor that question?" (Doc. 68-12, 145:21-145:22). Williams ultimately showed Key a portion of a document on her computer applying a no-dreadlocks policy to uniformed female officers. (Doc. 68-12, 50:20-51:1).

Robinson and Williams agreed that Key could wear a hat that covered her hair until she could style it to hide the natural dreadlocks and sent her home for the day. (Doc. 68-12, 147:23-148:3, 150:20-151:1). Just a few minutes after Key left the facility, Robinson called Key to ask when her baby was due, and whether her doctor was aware of her job requirements. (Doc. 68-12, 119:20-23, Doc. 81-19, Ex 19 15¶). Key responded her due date was in January (5 months away), that her doctor was aware of the duties, and that she had worked as a postal worker through an entire other pregnancy without limitations. (Doc. 68-12, 119:20-23, Doc. 81-19 ¶15).

Several hours later, Robinson e-mailed Dynamic noting she had just found out about Key's pregnancy, she took "issue with her working in the mailroom," and was upset Key did not disclose the pregnancy during her interview (Doc. 81-20). The e-mail mentioned the misunderstanding regarding Key's dreadlocks but stated they had agreed she would return with a hat the next day, then asked, "what recourse do I have with her?" (Doc. 81-20). Continuing to express her frustration about the pregnancy, Robinson wrote, "If she is due in five (5) months, unless I cannot count (which I can't) she is already four (4) months – and didn't know it?" (Doc. 81-20). Tracy Peoples, Dynamic's VP of Operations at the time replied, essentially instructing Robinson how to terminate Key and make it look like it was not related to her pregnancy, stating "if the officer they hired is not a fit (because she was pregnant) when they hired her the only way I can see her being removed is if she does not comply with rules and regs regarding hair." (Doc. 81-20). In a subsequent e-mail Dynamic notified Williams she had "every right to send her to [Dynamic] either for termination, or an assignment elsewhere." (Doc. 81-8).

### _Day Two – Key's Discrimination Complaints_

Unaware of these communications, or any concerns about her pregnancy, Key returned to work at the Hyundai facility the next morning with a hat, as agreed, and told Robinson she had an appointment over the weekend to style it around her natural dreadlocks. (Doc. 68-12, 261:1-9, 218:22-15). To alter her hair

from its natural dreadlocked style to an updo that hid the natural texture takes about two to two- and one-half hours with a stylist. (Doc. 68-12, 245:14-21).

When Key began her day with her trainer, her trainer asked why she left early the day before. (Doc. 68-12, 153:18-153:20). Key told her they said something was wrong with her hair and she was being treated unfairly but still wanted to work there. (Doc. 68-12, 153:21-154:9, Doc. 81-19, Ex 19 ¶16, Doc. 81-8). Howell, Key's trainer, understood Key to be complaining about discrimination and reported that complaint to Williams stating Key felt "discriminated against." (Doc. 81-5).

In Williams's own words, she had Robinson question Key after Key reported she had been discriminated against. (Doc. 68-6, 95:7-96:19). Robinson confronted Key aggressively, leaning in and pointing, questioning her about whether she felt "discriminated against." (Doc. 81-7, Doc. 68-6, 95:23-96:07, Doc. 68-12, 121:16-121:19). Robinson understood Key felt she was being discriminated against and then stated she should not have asked Williams for the dreadlock policy but that "the Koreans were a different breed of animals" that "send little memos" and do not want African Americans wearing their hair in dreadlocks

because of the VIP clientele like Mayor Todd Strange.[3] (Doc. 68-12, 158:18-160:23). Key responded that she complied by saying she had worn a hat as instructed, but Robinson cut her off saying "this isn't about that." (Id.) Robinson asked Key if she was going to be "this way until—" and pointed to Key's stomach indicating concern about Key's pregnancy. (Id.) Robinson inched toward Key and in a loud voice asked, "Have you been discriminated against?" (Id.) Key responded "I wore a hat" but Robinson stopped her again and said, "This is not about that. This is going to be a problem." (Id.) Robinson dismissed Key to return to the mailroom. (Doc. 68-12 162:4-162:5).

Once Key returned to the mailroom Howell confirmed she had reported that Key felt discriminated against, with both Key and Howell using the word "discriminated". (Doc. 81-5). Around fifteen minutes later, Key told her supervisor Chambliss, that she wanted to speak to someone in human resources. (Doc. 68-12, 164:8-164:23). Chambliss responded by telling Key she could talk to Robinson and Williams and called Robinson to report that Key wanted to "file a complaint" against Williams and Robinson. (Doc. 81-7). Robinson had Chambliss direct Key

---

[3] Williams created the grooming policy for HEA based on information she received from HMMA at the beginning of her employment. One motive behind the policy was to prevent African American employees from having dreadlocks when working in positions visible to the public. Williams, who is black, held negative beliefs about dreadlocks unless they were styled in a manner that hid their natural texture so as to not be identified as dreadlocks. (Doc. 68-6, 39:17-39:22; 44:3-44:10; 45:5-46:4).

to leave the facility and discuss her complaint to Ray Cureton and Dynamic Security. (Doc. 81-7).

### *Defendants-Appellees Remove Key from Hyundai*

Sometime between Robinson's meeting with Key where she made the statement about Koreans not wanting African Americans to wear their hair in dreadlocks, and Key reporting to the Dynamic office, Robinson and Williams decided to remove Key from the Hyundai assignment and communicated that decision with Cureton. (Doc. 68-6, 94:11-95:10, 99:6-99:16). Williams noted she could see "an issue down the road" with Key and discussed her dreadlocks, that she had worn a hat and requested the policy, and that they were not aware of her pregnancy during the interview. (Doc. 81-8).

### *Dynamic Learns Key is Pursing her EEOC Rights and Does not Reassign Her.*

Cureton greeted Key at the Dynamic office by asking "Are you going to sue us?" and then spoke with her in the lobby. (Doc. 68-12, 168:4-168:14). Key told Cureton about Robinson's attitude after she notified her of her pregnancy, when she started to discuss her naturally dreadlocked hair, Cureton cut her off to tell her Robinson was not like that but then said "what do I know? I'm just a big fat white man." (Doc. 68:12, 172:14-173:19). Cureton had Key's written complaint that alleged discrimination because of her dreadlocked hair and pregnancy and the creation of a hostile environment by Williams and Robinson. (Doc. 75-32 p36).

12

Cureton had Key turn over her badge stating they didn't want her out there because of her hair and "something else" but that he did not want to get into it. (Doc. 68-12, 41:24-42:15, 123:25-124:4).

Key told Cureton she planned to file a "formal" complaint against Williams, Robinson, and Hyundai. (Doc. 81-11, 36:14-17). After Key left, Cureton forwarded her complaint to Dynamic's home office and stated he could "attempt to reassign [her] to a different site" but he didn't think that was "advisable at this time, especially if she is to carry through with her 'official complaint' of discrimination against Hyundai, Ms. Williams, and Ms. Robinson." (Doc. 75-25 97:19-98:2).

### *Key Completes a Detailed EEOC Questionnaire and Requests a Charge.*

The next day, Key completed an EEOC intake form at the Birmingham EEOC office to file a charge of discrimination. (Doc. 11-2). Key has never filed an EEOC charge before and has not since. (Doc. 81-19 ¶23). On the form she marked she'd been discriminated against by her "Employer" and "Other" she identified Cassandra Williams and Gloria Robinson under "Other" and identified "Hyundai" under the "Organization". (Id.) The form directed Key to attach more sheets if more than one employer is involved, Key attached a detailed factual statement. She specified she reported her pregnancy and was sent home "because of [her] hairstyle (dreadlocks) of which [she] was questioned and criticized by Robinson and

Cassandra Williams, but mainly because [she] informed the employer [she] was pregnant." (Id.) Further in the charge, Key identified the persons responsible for her discrimination as "Ms. Cassandra Williams, AMCO & Ms. Gloria Robinson". (Doc. 11-2 p3). Key signed the questionnaire and marked the box indicating she wanted to file a charge of discrimination and authorized the EOOC to look into her charge with the understanding they would notify the employer. (Doc. 11-2 p5). Key, not experienced in EEOC charges, relied on the advice and guidance of the EEOC intake officer regarding what documents, forms, and information was needed. (Doc. 81-19 ¶ 23).

### *The EEOC Makes Errors in Processing Key's Charge*

The EEOC formalized Key's questionnaire into a charge listing only Dynamic Security, Inc. and notified Dynamic on or around August 11, 2017. (Doc. 13-2). After receiving the charge, Dynamic never contacted Key again or reassigned her to another staffing position, with Cureton stating multiple times he did not want to offer her any position because of her "current complaint" or "threats to sue HMMA". (Doc. 75-25,119:13-119:18,103:3-14).

Throughout the EEOC process, which was over one-year, Key stated in contact with the investors assigned to her case. (Doc. 81-19 ¶28). In November of 2018, the EEOC had Key sign additional papers specifically naming HMMA, Key was not aware this was a separate EEOC charge and had not asked the EEOC to

file multiple charges, believing everything was handled through the completion of her questionnaire. (Doc. 81-19 ¶28, Doc. 68-12, 185:4-185:18). Key had no control over the EEOC's processing of her charge and only completed the Questionnaire and signed the documents the investigators told her to sign. (Doc. 81-19 ¶28).

The EEOC issued a charge to HMMA on October 24, 2018, citing administrative errors in the delay. (Doc. 81-14). When HMMA received the charge, it notified HEA through Cassandra Williams (Doc. 81-16). Williams, who understood that the charge specifically named her, participated in the investigation, forwarded the charge to her supervisors within HEA, and executed a declaration which was submitted to the EEOC. (Doc. 81-16, Doc. 75-24, 121:4-134:1).

Apparently, the EEOC issued a Dismissal and Notice of Rights on the Dynamic charge sometime around March 1, 2019, but Key never received a copy of that dismissal before this lawsuit. (Id., Doc. 13-3). The dismissal received by Dynamic contained two separate dates and a third US postmark. (Doc. 13-3, Doc. 75-31). The EEOC had Key's proper address on file and Key regularly checked the mail.

The EEOC continued to investigate the Hyundai charge and Key continued to communicate with the EEOC. The EEOC issued a cause finding and ultimately entered a dismissal on July 12, 2019, after conciliation failed with HMMA. (Doc. 81-17, Doc. 75-2). Key, without the assistance of an attorney, filed her lawsuit

15

within 90 days of receipt of the July 12, 2019 dismissal, which she understood to apply to her initial, August 2017 questionnaire (Doc. 1, Doc. 81-19 ¶28029, Doc. 68-12,191:19-192:9). The record does not contain any evidence that the EEOC mailed the March 2019 dismissal to Key and Dynamic admitted it had "no knowledge" of that as a fact. (Doc. 68-3 171:12-20).

## STANDARD OF REVIEW

The district court's rulings on HEA's motion to dismiss and the collective Defendants'-Appellees' motions for summary judgment are subject to a *de novo* review. *Gundy v. City of Jacksonville*, 50 F.4th 60, 69-70 (11th Cir. 2022). When reviewing the ruling on the motion to dismiss, the Court accepts the complaint's factual allegations as true and construes all reasonable inferences in the light most favorable to the plaintiff. *Id.* at 69. Similarly, when reviewing the summary judgment ruling, the Court construes all facts and reasonable inferences in favor of the non-moving party and resolves any conflicts in favor of the non-moving party. *Id.* at 70.

## SUMMARY OF THE ARGUMENT

The district court erred by dismissing Key's Title VII claims against HEA on a motion to dismiss where Key's questionnaire named HEA, the EEOC omitted HEA from Key's formal charge of discrimination, but HEA had actual knowledge of the EEOC charge and participated in another named party's investigation. By

dismissing the Title VII claims against HEA without discovery to determine if HEA had notice to effectuate the purpose of the statute, the district court frustrated the goal of Title VII and prejudiced Key for acts of third parties over which she had no control.

The district court misapplied the summary judgment standard when it viewed the evidence about whether Key received the Notice of Right to Sue in the light most favorable to Dynamic and dismissed all Title VII claims against Dynamic.

The the district court erred by dismissing Key's disparate impact claim and holding that a grooming policy that applied specifically to prevent the wearing of natural dreadlocks did not constitute intentional race discrimination.

In light of the evidence that the Defendants-Appellees understood Key's complaint to be race based, and the evidence supporting a reasonable basis for the belief that the grooming policy was being used as a proxy for discrimination, the district court erred by dismissing Key's retaliation claims against HEA and HMMA.

## ARGUMENT

### I. Key had valid Title VII claims against HEA.

Davita Key's EEOC Charge was sufficient to maintain judicial claims under Title VII. Her charge put HEA on notice of her claims. Key should not be

prejudiced by the EEOC's omission of HEA, an action over which she had no control.

### A. Key exhausted her administrative remedies against HEA.[4]

The district court erred by dismissing Key's Title VII complaint against HEA on a motion to dismiss where Key plausibly alleged (1) an HEA employee discriminated against her, and (2) she completed a detailed EEOC questionnaire outlining those facts. Courts are "reluctant to condition an action for discrimination on the EEOC's performance of its duties. *See Sims v. MacMillan,* 22 F.3d 1059, 1063 (11th Cir. 1994). Though the courts do not treat questionnaires as charges "willy-nilly," the court must do so where the charging party's intent is made clear, so as to not prevent her claims. *Wilkerson v. Grinnell Corp.*, 270 F.2d 1314, 1320 (11th Cir. 2001).

The record considered by the district court on HEA's motion to dismiss included Key's detailed questionnaire. A verified intake questionnaire that includes

---

[4] In its failure to exhaust analysis, the district court stated Key had not asserted she filed an EEOC complaint against HEA, but only that she plead enough facts to put HEA on notice to be consistent with the purpose of Title VII. This position, however, ignores certain facts plead by Key as detailed in this section, namely that she experienced employment discrimination by Cassandra Williams, and completed an EEOC questionnaire stating such. Additionally, Key's response addressed Key's Title VII claims against all defendants jointly (Doc. 34 p3-16) and parsed out an additional argument about the purpose of administrative exhaustion to HEA individually (Doc. 34 p16-17).

the basic information necessary to trigger an investigation my constitute a charge for statute of limitations purposes. *Id.* at 1321.

Key's EEOC intake questionnaire identified "Hyundai" as an employer located at 700 Hyundai Blvd.[5] Key detailed the factual allegations in a lengthy, attached, written statement. Key, a non-lawyer, marked on her questionnaire that she had been discriminated against by her "Employer" who she listed as "Hyundai" and "Other" who she listed "Cassandra Williams" and "Gloria Robinson". In two other locations on the questionnaire, where asked to list "Name and Title of Persons(s) Responsible", Key listed "Ms. Cassandra Williams, AMCO & Ms. Gloria Robinson". Key signed and dated the questionnaire and marked the box stating she wanted to file a charge with the EEOC and authorized the EEOC "to look into the discrimination [she] described above."

Key's questionnaire satisfied Key's only procedural requirement. *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462-63 (5th Cir. 1970). The signed questionnaire that authorized the EEOC to investigate, contained facts sufficient to trigger an investigation into Hyundai at 700 Hyundai Blvd, Cassandra

---

[5] It has been Key's position that HEA and HEA intentionally mislead individuals as to the identity of entities and employment/contractor/subsidiary relationships. Key testified that that facility displays the word Hyundai and there are no conspicuous references to HEA. The security vehicle badging says "HMMA Security" and the mailroom employees wore shirts with the Hyundai logo used by HMMA and "Hyundai Alabama" embroidered on them. The mailroom where Key worked is housed in the administrative building with the HMMA administration. Doc. 68-12, 282:7-282:24, Doc. 81-19; Doc. 68-6, 68:7-69:1, 92:19-23).

Williams, AMCO[6], and Gloria Robinson. Excluding Gloria Robinson, each of the other three should have resulted in an investigation into HEA. Despite her detailed questionnaire, the EEOC did not formalize Key's complaint against any Hyundai entity until October 16, 2018, more than a year after Key filed her questionnaire. *Compare* Doc. 11-2 *with* Doc. 13-1. Her claims, however, against both Hyundai defendants-appellees were proper.

Key made her intent clear by completing the detailed questionnaire and marking the box that stated she intended the EEOC to act. Accordingly, Key met her requirements to trigger an investigation – against HEA – Cassandra Williams's employer. The circumstances in this case, viewed in the light most favorable to Key, reveal a plausible claim that Key initiated the EEOC process against HEA by filing her questionnaire. The district court erred by dismissing Key's Title VII claims against HEA for failure to exhaust administrative remedies.

**B. Key's complaint plead plausible allegations that HEA, through its relationship with HMMA had notice of Key's EEOC charge and participated in the EEOC Process.**

The district court erred by concluding that Key's EEOC charge did not provide sufficient notice to HEA of a Title VII claim. A party not named in an EEOC Charge may maintain a judicial claim under Title VII when the ultimate

---

[6] When deciding HEA's motion to dismiss, the court had record evidence that HEA was formerly known as "Hyundai AMCO America, Inc." (Doc. 11-5).

purpose of Title VII is met. *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994). The purpose of the charge filing requirement under Title VII is to provide the employer with notice of the alleged violation and allow the EEOC to effectuate voluntary compliance. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 905-06 (7th. Cir. 1981) (internal citations omitted). Courts liberally construe the naming requirement recognizing a judicial action may be maintained where an unnamed party has adequate notice to be given the opportunity to voluntarily comply. *Id.* Holding otherwise, requiring procedural exactness in the charge filing process, would frustrate the purpose and goals of Title VII. *Love v. Pullman Co.*, 404 U.S. 522, 526-27 (1972) (reversing the dismissal of an EEOC claim that failed to comply with exact technical "filing" procedures because the facts supported a finding that in this instance the technical requirement served no real purpose).

The Supreme Court has recognized that requiring technical exactness "in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process" would be "particularly inappropriate." *Id.* at 619. Because Title VII serves a remedial purpose, the Court construes the charges in the most liberal manner and judicial claims may be held against "parties sufficiently named or alluded to in the factual statement." *Eggleston*, 657 F.2d at 905-906. The precedent in this Circuit has stated unequivocally that "the crucial element of a charge of discrimination is

the *factual* statement contained therein." *Sanchez*, 431 F.2d at 462-63, 465 (5th Cir. 1970)[7] (finding the charging party's failure to check a box was not fatal to his claim where his facts detailed the claims) (emphasis in original). Because "it is inconceivable that a charging party's rights should be cut off merely because [s]he fails to articulate correctly the legal conclusion emanating from [her] factual allegations", "the only procedural requirement which should confront a Title VII complainant is the requirement that [she] state, within the [180-day] period, *facts* sufficient to trigger a Commission investigation." *Id.* (emphasis in original).

Key appeared at the EEOC unrepresented by counsel. Employees of the EEOC assisted Key in formalizing her charges based on the information she put forth in her intake questionnaire. The only charge immediately formalized named Dynamic in the "Employer" section, but the factual allegations provide reporting her pregnancy, she was sent home "because of [her] hairstyle (dreadlocks) of which [she] was questioned and criticized by Robinson and Cassandra Williams, but mainly because [she] informed the employer [she] was pregnant." The factual statement identified Cassandra Williams as a responsible party. Additionally, over one year later, the EEOC issued a second formalized charge naming HMMA in the

---

[7] The Eleventh Circuit has adopted all binding precedent of the Fifth Circuit predating September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

"Employer" section but containing detailed facts about Williams' wrongful conduct in the factual allegations. *See* I.A. *supra*.

Though there is no rigid test to determine whether the purpose of Title VII is met by allowing a claim against an unnamed party, the court can look to several factors, including similar interests between the named and unnamed parties, whether a plaintiff could have ascertained the identity, whether the unnamed party received notice, whether the unnamed party was prejudiced, and other unnamed factors depending on the specific facts of the case. *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1359 (11th Cir. 1994). At the early motion to dismiss stage, the evidence on these factors was limited. However, under the low threshold of plausibility, Key plead enough facts to show that dismissal of Key's claims against HEA would interfere with the purpose of Title VII. Key identified "Hyundai" as her employer located at 700 Hyundai Blvd., an address HEA and HMMA both operate out of. Key pled common and confusing training, policies and procedures, and e-mail usage, all showing that there was a plausible argument that HMMA and HEA operate jointly, creating a similar interest among HMMA and HEA.

The Court considered a declaration executed by Cassandra Williams submitted to the EEOC during the agency's investigation and conciliation with

HMMA.[8] Because Williams, an HEA employee, participated in the conciliation process, it is plausible that HEA had notice of the charge and its potential liability, and had the opportunity participate. It is difficult to ascertain how HEA could have been prejudiced by the EEOC's omission of its name on the charge. Three of the factors considered in *Virgo*, weigh in favor of a plausible claim against HEA. The only factor weighing against Key is whether she could have ascertained the identity of HEA. *See* FN5 *supra.* Considering the facts in the light most favorable to her, and putting assigned the EEOC's administrative errors, she did. Key named Williams and AMCO in her questionnaire and Williams as an employee of HMMA in her charge. However, as noted above, the charge was prepared by the EEOC, not by Key, and not with the assistance of an attorney.

Finally, and perhaps most telling, because this case continued on Title VII grounds against other defendants-appellees, later discovery revealed additional evidence of actual knowledge by HEA of the charge and, *in-depth involvement* in the investigation, conciliation, AND Title VII litigation – beyond just signing a

---

[8] The EEOC formalized the Hyundai charge on October 16, 2018. Williams executed her declaration on May 8, 2019, for submission to the EEOC. After the investigation, the EEOC attempted conciliation with HMMA. When the Conciliation failed, the EEOC issued the Dismissal and Notice of Rights on July 12, 2019. (Doc. 1-1). It is plausible under the facts of this case that HEA, through Williams' participation in the Conciliation process

declaration.[9] Where a party has a close relationship to a named respondent, like HEA and HMMA, and has actual notice of the EEOC charge, as shown by Williams' EEOC declaration, it should not cry "foul" when it is later sued. *See Eggleston*, 657 F.2d at 907. Though the evidence was limited before the district court on a motion to dismiss, later discovery revealed the following timeline:

| **Date** | **Action** | **Doc #** |
|---|---|---|
| 10/16/18 | EEOC Formalized charge from Key's questionnaire against HMMA | 13-1 |
| 10/24/18 | HMMA Receives notice of Charge via digital filing system | 81-14 |
| 11/13/18 | Cassandra Williams (HEA) receives charge and forwards to Dynamic for assistance with response – appearing to act on behalf of HMMA to facilitate the EEOC response. | 81-16 |
| 11/13/18 | Williams forwards E-mail to other HEA employees, her supervisors – verifying HEA's knowledge of the allegations | 81-16 |

During Williams' deposition, the flood gates opened, and details emerged showing she received the EEOC charge, she forwarded the charge to her project manager *and* corporate office, she understood the charge named her, she worked with HMMA to respond, and she had knowledge that the EEOC was recommending a cause finding based on the allegations against her..[10]

---

[9] Key presented this evidence to the district court for consideration during summary judgment briefing at Doc. 81-14, Doc. 81-16, Doc. 75-24, 121:4-134:1 and specifically requested the court reconsider its earlier dismissal at Doc. 82 p7 FN1.

[10] Interestingly, throughout discovery, Key uncovered that Dynamic, despite doing business for years with HMMA and Williams, had no understanding of the employment relationship or

Had the district court applied the correct plausibility standard to HEA's motion to dismiss, or allowed for limited discovery as to HEA's notice, these facts would have proven that HEA had actual notice and had the opportunity to and did in fact participate with the EEOC investigation and conciliation. In responding to summary judgment, Key raised this issue with the district court noting that the district court's reliance on HEA's contention it was severely prejudiced by not being included in the EEOC process was in error because in part, discovery clarified that HEA not only knew of Key's EEOC charge complaining about Cassandra Williams' actions but participated in providing a response. Plaintiff requested the court revisit the dismissal because its holding that there was "nothing to suggest that HEA was on notice of [Key's] charge" was contradicted by the record evidence. (Doc. 82 p7 FN1).

In *McClure v. Oasis Outsourcing*, the Circuit, found no error where the district court dismissed Oasis, as unnamed, for the plaintiff's failure to exhaust. *McClure v. Oasis Outsourcing II, Inc.,* 674 F. App'x 873, 875 (11th Cir. 2015). In its analysis, the Court stated the plaintiff had not named Oasis and had not provided any factual allegations concerning conduct by Oasis, *or* its employees. *Id.*

---

structure between HMMA and HEA and believed Williams worked directly for HMMA. Doc. 75-25, 130:3-131:4, 159:2-:16; Doc. 68-4, 75:22-76:7; Doc. 68-3, 74:10-20, 139:3-13, Do. 81-13).

The Court discussed that the failure to include any of this information did not provide Oasis with the opportunity to "participate in the reconciliation process" because it did not notify the EEOC of "the need to investigate" Oasis. *Id.* The circuit noted there was "nothing" in the plaintiff's federal court complaint or Holiday Inn's response to the EEOC that could be construed as proof that Holiday Inn had forwarded the charge to Oasis. *Id.* To the contrary, the record before the district court on the motion to dismiss in this matter included sufficient evidence to show that HEA had knowledge – by and through Williams – of Key's EEOC charge. Accordingly, the district court erred by dismissing the Title VII claims against HEA.

Under these circumstances, HEA cannot support any position that it was prejudiced by not being named directly in the "Employer" section of Key's charge. The record evidence in this case on reveals that the district court frustrated the purpose of Title VII by failing to construe Key's charge liberally and failing to consider all known facts and inferences in her favor under the low plausibility standard. In doing so, the district court barred Key from maintaining valid Title VII claims and allowed HEA to escape unscathed on a series of technicalities, prejudicing only Key.

**II. The district court's dismissal of Key's Title VII claims against Dynamic improperly weighed the evidence.**

The district court's application of the three-day mailing rule to Key's Title VII claims against Dynamic improperly weighed the evidence and invaded the province of the jury. Title VII creates a 90-day statute of limitations which begins "after receipt of notice of right to sue." 42 U.S.C. §2000e-5(f)(1). When there is no evidence of the date the plaintiff received the dismissal, the court may initiate a three-day mailing rule, which the plaintiff can rebut.

The district court concluded that the EEOC mailed the right to sue to Key on March 1, 2019, presumably, because that is the date it stamped the right to sue Dynamic received. However, the date stamp on the notice does not support that conclusion as a fact. Instead, it merely supports that the EEOC *issued* the notice on that date (for some reason after initially stamping it on February 27, 2019)*.* The envelope attached with the right to sue received by Dynamic, also shows a US Mail postmark of February 28, 2019 – before the date of issuance. Nothing in Document 75-31 or 75-30 shows the EEOC mailed a copy of the right to sue to Key.

However, even if the EEOC mailed the dismissal to Key, she is not subject to the three-day mailing rule presumption. In presuming Key received the right to sue within 3 days of the "issue" date, the district court relied on *Kerr v. McDonald's Corp.*, and made a factual determination that Key failed to present

28

evidence that there could have been a flaw in the mailing process. (Doc. 138 p21-22). However, the factual circumstances in this case differ from *Kerr* and warrant a different holding. In *Kerr,* the charging parties communicated regularly with the EEOC, learned that the EEOC was planning to issue rights to sue, and requested the notices orally and in writing. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 949 (11th Cir. 2005). Charging parties alleged they did not receive the notices until February 15. *Id.* at 948. To rebut the alleged delayed receipt, the employer presented evidence from the EEOC concerning the usual procedure in issuing notices and specific details about the notices in this case. *Id.* at 950. "Testimony concerning specific office procedures for preparing and mailing notices in addition to evidence of mail received from the purported sender at the same address (and by other designated recipients in the normal course) is sufficient to raise a presumption of properly mailed documents." *Kerr*, 427 F.3d at 952 (citing *Gonzalez Packing Co. v. East Coast Brokers & Packers, Inc.*, 961 F.2d 1543, 1544-46 (11th Cir. 1992)).

Importantly, the appeals panel in *Kerr* recognized that even with this testimony, there *was* a dispute as to when the notices were mailed and first received, and that summary would be "improper if facts assumed as to these issues were material to the analysis." *Kerr,* 427 F.3d at 951. The case, however, did not turn on that issue, and instead turned on when the charging parties had adequate

notice, imputing some minimum responsibility on the charging parties. *Id.* at 952. Because the charging parties were aware of the EEOC's filings, had requested the rights to sue, had later received packages containing previously dated notices, and had failed to follow-up or inquire as to the inconsistencies, the Court found some fault on the charging parties in the failure to receive the first letters. *Id.* at 953.

Following a similar analysis, the Circuit, also affirmed a summary judgment dismissal where there was a dispute as to the receipt date of the dismissal notice but the plaintiff could not show that the delay was because of factors outside his control. *Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863, 869 (11th Cir. 2020). Notably, the court in *Robbins* recognized that viewing the facts in the light most favorable to the plaintiff, the date of receipt was the date the notice was actually received by the plaintiff's counsel, and to hold otherwise would be contrary to Rule 56. *Id.* at 867-68. However, because the three-day mailing rule is presumed unless the delay was through no fault of the plaintiff, the case turned on whether plaintiff's counsel was at all at fault for the delay in receipt. *Id.* at 868 (citing *Lewis v. Conners Steel Co.*, 673 F.2d 1240, 1243 (11th Cir. 1982)).

If the plaintiff takes reasonable steps to ensure delivery of the notice, including keeping the EEOC abreast of their current address, the timer begins to run on the date of *actual* receipt, not the presumed three-days. *Robbins,* 819 F. App'x at 869. In *Robbins*, there was no evidence as to the date the notice was

delivered to Robbins' address on file – his attorneys former mailing address. Robbins counsel moved office and though he had his mail forwarded, he failed to update the EEOC. *Id*. Additionally, Robbins' counsel waited 90-days from discovering the letter to file suit, despite knowing the letter had been issued a full month before it was discovered. *Id.* Considering the facts unique to the case, the Court found that the delay was not completely out of the plaintiff's control and therefore the three-day mailing presumption applied. *Id.*

The facts in *Robbins* and *Kerr* share district court's analysis, applying the three-day mailing presumption to determine when the 90-day filing period begins to run. However, those facts are not comparable to the facts in Key's case. Because there is no evidence that the EEOC mailed the dismissal, and there is no evidence of wrongful conduct on Key's part, the actual dispute is an evidentiary one, not ripe for summary judgment. The court misconstrued the dispute relevant to this issue by stating "the parties dispute when Key received her right-to-sue letter, but there is no dispute as to when the EEOC mailed the letter." Key does, however, directly dispute that the EEOC ever mailed the letter to *her*. When there is a legitimate dispute as to when the plaintiff receives the notice, the courts have considered it received on the date it was *actually* received. *Franks v. Bowman Transp. Co.*, 495 F.2d 398, 404 (5th Cir. 1974) (reversed on other grounds). The district court presumed Key received the dismissal within three days of the

EEOC's mailing, without any evidence that the EEOC did in fact mail it to Key, finding as fact that the EEOC mailed Key's right to sue on March 1, 2019. (Doc. 138 p19-24). This finding of fact by the district court improperly weighed the evidence and discredited Key's testimony. To get to the conclusion that the EEOC mailed Key the right to sue on March 1, 2019, the district court had to infer that the EEOC mailed Key and Dynamic copies on the same date. Because this application requires an inference to be drawn in favor of Dynamic, the inference is improper, and the district court's application of the three-day mailing rule is improper.

Instead, considering the evidence in the light most favorable to Key, and drawing all reasonable inferences in her favor, Key did not receive a copy of the right to sue until it was filed in this lawsuit. Key testified during her deposition that despite checking her mail regularly, she did not receive a dismissal and notice of right to sue on her Dynamic charge. She originally believed the charge was combined with the Hyundai charge. Key provided the EEOC with her correct mailing address and checked in by e-mail regularly with the EEOC during the investigation. No one from the EEOC informed Key that her charges had been bifurcated, that the Dynamic charge had been issued, or even that separate dismissals would be mailed.

Key was not represented by counsel and relied on the EEOC for assistance through the process. She provided the EEOC with her correct mailing address. She

regularly checked her mail. She communicated regularly with the EEOC seeking

updates on her charge. No one from the EEOC notified Key that her charges had

been bifurcated, or that the EEOC had issued the dismissal on the Dynamic charge.

Key filed her lawsuit within 90 days of receiving the Hyundai Charge, despite

being required to file the suit without the assistance of an attorney. Additionally,

unlike the above cases, there *is* a dispute as to whether Key *ever* received the

notice and Dynamic presented no evidence of the EEOC's process to refute Key's

testimony. Instead, Dynamic's receipt of the dismissal and Key's testimony as to

non-receipt merely raises a question as to whether Key's testimony should be

believed, a question beyond the scope of the district court's authority under Rule

56 to resolve that question. Fed. R. Civ. P. 56.

Instead, Key's case is more similar to *Stallworth v. Wells Fargo Armored

Servs. Corp.*, where the court found the plaintiff had taken reasonable steps to

ensure she learned of the notice and therefore she was not tied to the three-day

presumption. In *Stallworth* the plaintiff filed her lawsuit within 90-days of

receiving what turned out to be a second dismissal from the EEOC. *Stallworth v.

Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524-25 (11th Cir. 1991).

Unknown to the plaintiff, the EEOC sent the first letter to her family home, an

address she temporarily moved away from, and was signed for by her nephew but

never provided to her. However, because she was able to present evidence that she

checked the mail at least six times during the month in question, and because it is not unreasonable to continue to receive mail at a permanent address during a temporary absence, the appeals court reversed finding that Stallworth "satisfied the minimum burden imposed upon her by the law of [the Eleventh Circuit] and was not imputed with the three-day presumption. *Id.* at 525. In its analysis, the Court noted that the EEOC failed to mail a copy of the dismissal to Stallworth's attorney and therefore the EEOC was primarily at fault for the failed delivery. *Id.*

The EEOC's failure to notify Stallworth's attorney of the dismissal can be equated to the EEOC's failure to communicate the bifurcation of the charges or the status of the Dynamic charge upon Key's questioning. Additionally, given the other EEOC administrative errors in this case (failing to name all the parties, failing to notify any Hyundai entity of the charge) it is not unreasonable to infer that the EEOC just failed to mail Key the dismissal. Because Key took all reasonable steps to ensure the EEOC provided her notice of any dismissal, and because Dynamic has no evidence to rebut her testimony that she never received the dismissal, Key is not subject to the three-day mailing rule. To impute constructive receipt to Key would interfere with the remedial purpose of Title VII and shoehorn Key into deadlines she had no way of meeting. *Lewis v. Conners Steel Co.*, 673 F.2d at 1242. and the district court erred by dismissing her Title VII claims against dynamic as untimely.

**III.    The district court erred by dismissing the disparate impact claims against HEA and HMMA.**

The allegations in Key's Amended Complaint sufficiently allege racially disparate impact claims to withstand a motion to dismiss. To survive a motion to dismiss, Key's complaint need only contain enough factual allegations to make a racially disparate impact claim plausible. *See Watts v. Florida International University*, 495 F.3d 1289, 1295-96 (11th Cir. 2007). Disparate impact claims target employment practices that have "an actual, though not necessarily deliberate, adverse impact, on protected group." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016). Therefore, Key's complaint, when construed broadly, must include enough facts that are suggestive enough to show the grooming policy could have a disparate impact on Black employees. *Id.*

The district court's finding that Key failed to allege any facts to support the disparate impact of the dreadlocks policy is error. (Doc. 38 p23-24). Even though disparate impact claims do not require intent, the facts alleged to support Key's disparate treatment also support a cause of action for disparate impact of a facially neutral policy. *Powers v. Ala. Dep't of Educ.*, 854 F.2d 1285, 1292 (11th Cir. 1988). Key's complaint contained the following specific allegations:

- Williams informed Key she could not maintain her hair in the natural dreadlocked style because it was against policy. (Doc. 28 ¶66).

- Williams showed Key a grooming policy listed for uniformed officers that prevented the wearing of dreadlocks but allowed braids. (Doc. 28 ¶66, 68).

- Williams said braids were better because the scalp is visible. (Doc. 28 ¶68).

- Robinson told Key the Koreans that run the company were a "different breed of animals and they send little memos saying they do not want African-Americans wearing their hair in dreadlock hairstyles" because they have VIP clients. (Doc. 28 ¶82).

- Dreadlocks are a common among African Americans. (Doc. 28 ¶117, 131).

- Defendants identified dreadlocks as a negative racial characteristic. (Doc. 28 ¶118, 132).

- Defendants' policy created a disparate impact on African Americans. (Doc. 28 ¶121, 135).

Because Key's complaint alleged that Defendants had a grooming policy and associated that grooming policy with what Defendants considered a negative racial characteristic and specifically African Americans, it is reasonable to infer that the policy had a disparate impact on African Americans. Viewing the factual statements above liberally, in the light most favorable to Key, and drawing all

reasonable inferences in Key's favor, she sufficiently plead a disparate impact claim under Title VII and §1981 and the district court erred by dismissing the claims on a motion to dismiss.

## IV.    A grooming policy that precludes the wearing of natural dreadlocks but allows styled dreadlocks constitutes intentional race discrimination.

The district court erred by dismissing Key's race discrimination claims on summary judgment. First considering the evidence in this case in the light most favorable to Key, a reasonable juror could find that race was a motivating factor in the application of the grooming policy. Second, the evidence creates a trial issue as to Defendants' intent with the policy. Third, Defendants-Appellees cannot escape liability because strict comparators do not exist. Finally, nothing in the text of Title VII or § 1981 limits race to an immutable characteristic.

### A. Key's race was a motivating factor in the decision to remove her from Hyundai.

The district court erred by dismissing Key's Title VII claims where Key's protected racial characteristics motivated Defendants-Appellees. Motivating factor is a lessened causation standard requiring Key to only show her race played some part, even if not a causal one. *Yelling v. St. Vincent's Health Sys.*, 83 F.4th 1329, 1338 (11th Cir. 2023). The record evidence, which must be viewed in the light most favorable to Key, includes Robinsons statement linking the dreadlocks policy to African Americans because of a negative racial trait. On the direct evidence of

37

Robinson's statement, Key established a link between race and the adverse

employment decision.

**B. The evidence in this case, viewed in the light most favorable to Key, created a triable issue as to whether the Defendants-Appellees had discriminatory intent.**

The district court erred by dismissing Key's race claims. To survive

summary judgment, Key needed only to present enough circumstantial evidence to

create a triable issue of discriminatory intent. *Tynes v. Fla. Dep't of Juv. Just.*, 88

F.4th 939, 946 (11th Cir 2023). The district court analyzed Key's claims parsing

apart each fact Key alleged supported her allegations, weighing them, instead of

viewing them in totality, as Key's story. (Doc. 138 p27- 31). *Berry v. Crestwood*

*Healthcare LP*, 84 F.4th 1330, 1331 (11th Cir. 2023) (stating to survive summary

judgment, the employee must present a story, supported by evidence, that would

allow a reasonable jury to find that the employer engaged in unlawful [conduct]

against the employee.) Regarding race, Key's story is not complex. Defendants-

Appellees took an adverse employment action against Key claiming she violated a

grooming policy. The grooming policy had been reduced to writing by Williams,

an HEA employee based in information received from HMMA at the beginning of

her employment. One motive behind the grooming policy was to prevent African

American employees from having dreadlocks when working in positions visible to

the public. Key presented evidence that Williams, who is Black, and the decision

maker, held negative beliefs about dreadlocks unless they were pulled back and freshly done so as to not be identified as dreadlocks.

The district court's requirement that Key show the policy was not applied to White employees is misplaced. There is no requirement that Key present comparator evidence to establish a circumstantial case of discrimination. Not only is the comparator requirement not a statutory requirement, but if the courts required proof that the policy had not been applied to someone outside the class, Defendants-Appellees would be able to escape liability by always dodging that one issue. Key should not be prevented from asserting her rights against race discrimination simply because Defendants-Appellees have not had the opportunity to decide whether a White employee's dreadlocks are appropriate.

## C. Key's claim is not barred by precedent.

The district court's application on *Catastrophe Mgmt.* to Key's facts is misplaced. In *Catastrophe Mgmt.*, the EEOC did not allege that the charging party wore dreadlocks because if an immutable characteristic, and instead, noted she chose the hairstyle as "historically, physiologically, and culturally associated with their race." *Catastrophe Mgmt.,* 852 F.3d at 1030. It is well known that the holdings of a prior decision are necessarily tied to the unique facts of the case. *Chavers v. Sec'y Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006). Unlike the charging party in *Catastrophe Mgmt.*, Key testified that her hair is dreadlocked

because of the texture of her hair, and she would be required to chemically treat her hair in order to not have dreadlocks. Because Key testified specifically to the texture of her hair, she has likened her dreadlocks to an immutable characteristic, and is not tied *Catastrophe Mgmt.*

Additionally, the Circuit's reliance on "immutable characteristics" and the analysis supporting it, do not withstand the plain text of Title VII and the Supreme Court's but for causation analysis. In the *Catastrophe Mgmt.*, analysis, the Circuit panel relied on two prior decisions for the immutable characteristic requirement. *Catastrophe Mgmt*, 852 F.3d at 1028-1030.

In *Willingham v. Macon Tel. Publ'g Co.*, the 5th Circuit, sitting *en banc*, found that a grooming policy that only prohibited men from having long hair was a neutral policy because it did not address an immutable characteristic, such as race or national origin, and did not create a discriminatory hiring policy based on a fundamental right. *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1091 (5th Cir. 1975). In *Garcia v. Gloor* the court relied on the immutable characteristic foundation to hold that a company's English-only policy was not discriminatory where a Mexican-American employee was bilingual and chose to speak English or Spanish. *Garcia v. Gloor,* 618 F.2d 264, 267-69 (5th Cir. 1980)*.* Though the Court in *Catastrophe Mgmt.* recognized the criticisms and difficulties associated with immutable characteristics, it noted it was "not free, as a later panel, to discard the

immutable/mutable distinction they set out." *Catastrophe Mgmt.*, 852 F.3d at 1030. We are, however, free to discard the principle when it is contracted by the United States Supreme Court.

In 2020, the United States Supreme Court held that sexual orientation discrimination is discrimination because of sex and therefore subject to Title VII protections. *Bostock v. Clayton Cty.*, 590 U.S. 644, 660 (2020). In its discussion, the Court outlined that to determine if a decision was because of a protected characteristic, you "change one thing at a time and see if the outcome changes." *Id.* at 656. Applying this analysis to what the 5th Circuit referred to as immutable characteristics, a but for cause of the decision was a protected trait. If *Garcia* had been a national origin other than Mexican-American, or if the employee in *Willingham* were a female with long hair, the result may have changed, making the policy "because of national origin" or "because of sex." In Key's case, if you change whether the dreadlocks are natural or not, the result changes. Key presented evidence that Defendants-Appellees allowed styled dreadlocks of two individuals after her employment ended. Accordingly, if you change the texture of Key's hair from one that naturally forms locks, to a different texture, the result changes. Key's race was a but for cause.

Additionally, and not unimportantly, the majority in *Bostock* makes no mention of immutable characteristic. Instead, writing for the Court, Justice

Gorsuch states if an employment decision is made because the employee is homosexual or transgender, the decision is made "for traits or actions" that would not have been questioned in others. *Bostock*, 590 U.S. at 650. The recognition of traits or actions as protected from discrimination is directly contrary to this Circuit's immutable characteristics requirement.

Considering all the evidence and viewing all inferences in the light most favorable to Key, the district court erred by dismissing her race claims. She had sufficient evidence to allow a jury to determine that her dreadlocked hair was a racial trait and Defendants-Appellees took an adverse action against her because of that racial trait.

## V. The district court's dismissal of retaliation claims against HEA and HMMA were contrary to the evidence and application of Rule 56.

The district court's dismissal of Key's race retaliation claims against HEA and HMMA misconstrues the facts and relies on flawed analysis. The district court viewed only Key's statement to Howell the morning of her termination when considering whether Key complained of race discrimination. (Doc. 138 p39-42). Key, however, presented more circumstantial evidence of retaliation.

Key is not limited to a prima facie case, and instead can survive summary judgment on retaliation by showing circumstantial evidence that raises a reasonable inference or retaliatory intent. *Berry,* 84 F.4th at 1310. The evidence in this case shows that after Key complained to Howell, Howell reported to the office

that Key felt "discriminated against." Howell issued a written statement confirming that Key felt she was "discriminated against" and that Howell reported the "discrimination" complaint to Williams. Robinson called Key in to question her and specifically asked if she felt discriminated against and reported to her that when she learned an employee made a complaint of discrimination, she had to investigate it. Key returned to work and worked until she requested to leave and file a formal complaint. Williams testified she had Robinson question Key after Howell reported to her that she felt she was being discriminated against. Williams testified that she and Robinson had a conversation and decided to reassigned Key "sometime after Ms. Key left the office." Williams specifically confirmed in her testimony that the conversation when she determined she would reassign Key was after Howell notified her that Key had complained of discrimination.

On a motion for summary judgment, the court must view all disputed facts and reasonable inferences in favor of Key. Fed. R. Civ. P. 56. It does not appear from the record that Robinson or Williams took any effort to understand the content of Key's discrimination complaint, but both individuals, plus Howell referred to her complaint as one of discrimination. Because HEA was aware Key complained of discrimination and made the decision to reassign her extremely close in time to the complaint (the same day), Key has presented circumstantial evidence that a reasonable juror could conclude HEA and HMMA retaliated

43

against her because of her complaint. Accordingly, the district court's dismissal of Keys retaliation claims was in error.

## CONCLUSION

After just hours of employment, Key experienced race and pregnancy discrimination. She exercised her right to complain about the illegal conduct and Defendants-Appellees too that opportunity to terminate/reassign her from her mailroom position. The employers in this case used a grooming policy both as a proxy for race discrimination and as pretext for pregnancy discrimination, then hid behind numerous errors committed by the EEOC to avoid liability for over seven years. Removing the barriers created through no fault of her own, Key satisfied the requirements of complaining internally, to the EEOC, and in this litigation. The district court's dismissal and summary judgment imputed the conduct of others onto Key and invaded the province of the jury. Key plausibly pled a disparate impact claim, Key satisfied her administrative conditions with the EEOC, and Key presented circumstantial evidence of pregnancy and race discrimination and retaliation. The district court's prior dismissals (Doc. 38, Doc. 138) should be reversed, and the case remanded.

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 9967 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) as calculated by the word-counting feature in Microsoft Office 365.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point-font, Times New Roman.

Dated: November 27, 2024                    /s/ Leslie A. Palmer
                                            OF COUNSEL

I

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2024, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the following:

Counsel for Hyundai Motor Manufacturing Alabama, LLC ("HMMA")
David Middle Brooks
Whitney Ryan Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.
dmiddlebrooks@lehrmiddlebrooks.com
wbrown@lehrmiddlebrooks.com

Counsel for Hyundai ENG America, Inc. ("HEA")
Matthew T. Miller
Sarahanne Vaughn
Scott Burnett Smith
Bradley Arant Boult Cummings, LLP
mmiller@bradley.com
svaughan@bradley.com
ssmith@bradley.com

Counsel for Dynamic Security, Inc.
Wesley C. Redmond
Susan W. Bullock
FordHarrison, LLP
wredmond@fordharrison.com
sbullock@fordharrison.com