Nos. 24-11126

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

DAVITA KEY,

      Plaintiff-Appellant,

v.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC;
HYUNDAI ENGINEERING AMERICA, INC.; and
DYNAMIC SECURITY, INC.,

      Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Middle District of Alabama

_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE IN SUPPORT OF
APPELLANT AND IN FAVOR OF REVERSAL

_____

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ANNE NOEL OCCHIALINO
Assistant General Counsel

GEORGINA C. YEOMANS
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2748
Georgina.yeomans@eeoc.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, the Equal Employment

Opportunity Commission (EEOC) as amicus curiae certifies that, in

addition to those listed in the certificates filed by plaintiff-appellant and

defendants-appellees, the following persons and entities may have an

interest in the outcome of this case:

1.    Equal Employment Opportunity Commission (Amicus Curiae)

2.    Gilbride, Karla (General Counsel, EEOC)

3.    Goldstein, Jennifer S. (Associate General Counsel, EEOC)

4.    Occhialino, Anne Noel (Assistant General Counsel, EEOC)

5.    Yeomans, Georgina C. (Attorney, EEOC)

Pursuant to Federal Rule of Appellate Procedure 26.1, the EEOC, as a

government agency, is not required to file a corporate disclosure statement.

The EEOC is not aware of any publicly traded corporations or companies

that have an interest in the outcome of this case or appeal.

s/ *Georgina C. Yeomans*
GEORGINA C. YEOMANS

# TABLE OF CONTENTS

Certiciate of Interested Persons and Corporate Disclosure Statement ........ c-i

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................. iv

Statement of Interest .................................................................................1

Statement of the Issues .............................................................................1

Statement of the Case ...............................................................................2

   A.  Statement of Facts ..........................................................................2

   B.  District Court's Decisions ............................................................10

       1.   Motions to dismiss ...........................................................11

       2.   Summary judgment ..........................................................13

Summary of Argument ...........................................................................15

Argument ...............................................................................................16

   I.   Key pled a plausible disparate-impact claim. .......................................16

   II.  The district court wrongly presumed Key received the Dynamic NRTS three days after the EEOC mailed it....................................................21

   III.  A jury could reasonably find the no-dreadlocks policy was motivated by racial animus and thus constituted disparate treatment. ......................27

IV. When appropriate, this Court should reconsider its precedent

imputing knowledge of case law to retaliation plaintiffs............................29

Conclusion............................................................................................................32

Certificate of Compliance ....................................................................................34

Certificate of Service ............................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Flowers Hosp., Inc.*,

   33 F.3d 1308 (11th Cir. 1994) …………………………….……………16, 17

*Berry v. Crestwood Healthcare LP*,

   84 F.4th 1300 (11th Cir. 2023) …………………………….………………30

*Bloom v. Shinseki*,

   No. 11-CV-972, 2012 WL 4009751 (M.D. Ala. Sept. 12, 2012) ……………26

*Bolden-Hardge v. Off. of Cal. State Controller*,

   63 F.4th 1215 (9th Cir. 2023) …………………………….……………...19

*Bonner v. City of Prichard*,

   661 F.2d 1206 (11th Cir. 1981) …………………………….………………22

*Bostock v. Clayton Cnty.*,

   590 U.S. 644 (2020) …………………………….……………..................27

*Boyer-Liberto v. Fontainebleau Corp.*,

   786 F.3d 264 (4th Cir. 2015) (en banc) …………………………….……...31

*Boykin v. Fenty*,

   650 F. App'x 42 (D.C. Cir. 2016) …………………………….……………19

*Butler v. Ala. Dep't of Transp.*,

536 F.3d 1209 (11th Cir. 2008) ……………………….……………….31

*Carson v. Lacy*,

856 F. App'x 53 (8th Cir. 2021)…………………………….…………...19

*Chaidez v. Ford Motor Co.*,

937 F.3d 998 (7th Cir. 2019) ……………………….…………….....18

*Chapter 7 Tr. v. Gate Gourmet, Inc.*,

683 F.3d 1249 (11th Cir. 2012) ……………………….……………...1

*EEOC v. Catastrophe Mgmt. Sols.*,\*

852 F.3d 1018 (11th Cir. 2016) …………………………..12, 20, 21, 27, 28

*EEOC v. Catastrophe Mgmt. Sols.*,

876 F.3d 1273 (11th Cir. 2017) ……………………….……………..3, 32

*EEOC v. Rite Way Serv., Inc.*,

819 F.3d 235 (5th Cir. 2016) ……………………….……………....31

*Franks v. Bowman Transp. Co.*,\*

495 F.2d 398 (5th Cir. 1974) ……………………….…………….21, 22, 25

*Frappied v. Affinity Gaming Black Hawk, LLC*,

966 F.3d 1038 (10th Cir. 2020) ……………………….…………...17, 18

*Furcron v. Mail Ctrs. Plus, LLC*,

843 F.3d 1295 (11th Cir. 2016) ……………………….………….30

*Green v. Union Foundry Co.*,

   281 F.3d 1229 (11th Cir. 2002) …………………………….………………21

*Harper v. Blockbuster Ent. Corp.*,

   139 F.3d 1385 (11th Cir. 1998) …………………………….………………31

*Hayes v. N.J. Dep't of Hum. Servs.*,

   108 F.4th 219 (3d Cir. 2024) …………………………….……………….....25

*Kengerski v. Harper*,

   6 F.4th 531 (3d Cir. 2021) …………………………….……………..........31

*Kerr v. McDonald's Corp.*,*

   427 F.3d 947 (11th Cir. 2005) …………………………..13, 22, 23, 24, 26, 27

*Legg v. Ulster Cnty.*,

   820 F.3d 67 (2d Cir. 2016) …………………………….……………........29

*Lewis v. City of Chicago*,

   560 U.S. 205 (2010) …………………………….……………...................17

*Murray v. UBS Sec., LLC*,

   601 U.S. 23 (2024) …………………………….……………....................27

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,

   903 F.3d 415 (4th Cir. 2018…………………………….……………........18

*Robbins v. Vonage Bus., Inc.*,

    819 F. App'x 863 (11th Cir. 2020) …………………………….……….23, 24

*Reznik v. inContact, Inc.*,

    18 F.4th 1257 (10th Cir. 2021) …………………………….……………….31

*Sevillano v. Orange Cnty.*,

    No. 19-cv-1461, 2021 WL 2431847 (M.D. Fla. May 26, 2021) ……………...26

*Stallworth v. Wells Fargo Armored Servs. Corp.*,

    936 F.2d 522 (11th Cir. 1991) …………………………….……………...22

*UAW v. Johnson Controls, Inc.*,

    499 U.S. 187 (1991) …………………………….……………...................27

*Wang v. Hoffman*,

    694 F.2d 1146 (9th Cir. 1982) …………………………….……………...19

*Williams v. Radford*,

    64 F.4th 1185 (11th Cir. 2023) …………………………….……………25

*Winsor v. Home Depot U.S.A., Inc.*,

    743 F. App'x 335 (11th Cir. 2018) …………………………….………...24

*Zillyette v. Capital One Fin. Corp.*,

    179 F.3d 1337 (11th Cir. 1999) …………………………….…………...22, 23

**Statutes**

42 U.S.C. § 1981…………………………….……………….............................9

42 U.S.C. § 2000e-2(k)(1)(A)(i) ………………………….………………...17

42 U.S.C. § 2000e-3(a) ………………………….………………................30

42 U.S.C. § 2000e-5(f)(1) ………………………….……………….......21, 22

**Other Authority**

29 C.F.R. § 1601.28(e)(1) ………………………….……………….............22

EEOC Dec. No. 72-979,

   1972 WL 3999 (Feb. 3, 1972) ………………………….……………….....20

EEOC Dec. No. 74-25,

   1973 WL 3919 (Sept. 10, 1973) …………………………….……………20

EEOC Enforcement Guidance on Retaliation and Related Issues,

   2016 WL 4688886 (Aug. 25, 2016) …………………………….………30, 32

## STATEMENT OF INTEREST

Congress charged the Equal Employment Opportunity Commission (EEOC) with administering and enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. This appeal presents important questions about Title VII's protections and its administrative prerequisites to suit. It also implicates 42 U.S.C. § 1981, which, as relevant here, has the same proof requirements and analytical framework as Title VII. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012). Because the EEOC has a substantial interest in the proper interpretation of Title VII, it files this brief pursuant to Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES[1]

1.  Whether the district court incorrectly dismissed the plaintiff's disparate-impact challenge to defendants' no-dreadlocks policy.

2.  Whether the district court's presumption that the plaintiff received a notice of right to sue (NRTS) three days after its mailing was error.

---

[1] We address only Key's appeal of the district court's interlocutory orders; we do not address Dynamic's appeal of the jury verdict, nor do we take a position on any other issue.

3. Whether the district court erred when it required evidence that defendants applied the no-dreadlocks policy unequally to sustain a disparate-treatment challenge to the ban.

4. Whether this Court should reconsider its precedent that precludes retaliation plaintiffs from having a reasonable, good-faith belief that conduct is discriminatory if circuit case law has found such conduct nondiscriminatory.

## STATEMENT OF THE CASE

### A.   Statement of Facts

In mid-July 2017, Defendant Dynamic Security, Inc. interviewed and hired Plaintiff Davita Key to work as a mail room clerk at Defendant Hyundai Motor Manufacturing Alabama's (HMMA) plant in Montgomery, Alabama. Dynamic was a sub-contractor engaged by Defendant Hyundai Engineering America (HEA) to fulfill its contracted duties to provide security services at the HMMA plant. R.75-28 at 6. HEA previously went by AMCO America. R.68-7 at 5.

2

At the time of her interview, Key, who is Black, wore her hair in dreadlocks.[2] R.81-19 at 4. Dynamic, Key's direct employer, had a grooming policy that required a "neat hairstyle," but said nothing specific to dreadlocks. R.71-4 at 3. HMMA, which owned the plant where Key worked, also did not specifically prohibit dreadlocks. R.68-1 at 3. HEA, for whom Dynamic subcontracted, however, had a grooming policy that specifically forbade dreadlocks. R.75-5 at 2, R.71-13 at 78.

Key interviewed for the mailroom position with Dynamic employees Gloria Robinson and Maurice Chambliss. During Key's interview, Robinson said Key's hair "might be a problem." R.75-1 at 34. Robinson called Cassandra Williams, HEA's Manager of Security Services, into the room to confer. R.73-13 at 23. Williams confirmed that Key's hair was not acceptable, but ultimately agreed that Key could keep her dreadlocks if she styled them in an up-do. R.71-13 at 24.

Two days after her interview, Key, who had not yet been to a salon to style her dreadlocks, came into the HMMA security building for training

---

[2] In conformance with Key's pleadings and brief, we use the term "dreadlocks" rather than "locs." We recognize the term is controversial, given its origins as a disparaging descriptor of Black slaves' hair. *See EEOC v. Catastrophe Mgmt. Sols.*, 876 F.3d 1273, 1286 (11th Cir. 2017) (Martin, J., dissenting from denial of rehearing en banc).

with Nicole Scavella, Dynamic's office manager. Key asked Scavella whether there was anything wrong with her un-styled dreadlocks. Scavella told her there was not. R.75-1 at 34-35.

Key accordingly arrived for her first day of work on July 31 at the HMMA plant with her dreadlocks un-styled. R.81-19 at 2-3. While waiting at the security building for her trainer, LaTonya Howell, to arrive, Key saw both Williams and Robinson, neither of whom commented on her hair. R.81-19 at 3. A few minutes later, Key pulled Robinson and Chambliss aside, told them she was pregnant, and gave them a note from her doctor clearing her to work without restrictions. R.75-1 at 30. Shortly after that, Robinson went into her office, which she shared with Williams. About ten to twenty minutes later, Williams emerged and asked Key, "What's wrong with your hair?" R.75-1 at 31. Key explained that Dynamic's policy did not prohibit dreadlocks. Williams responded that she did not care what Dynamic's policy said. R.75-1 at 37. Howell then arrived and took Key to the mailroom, in a different building, for training. *Id.*; R.68-6 at 24.

After about forty-five minutes of training, Robinson summoned Key back to the security building, where she and Williams told Key that her dreadlocks were unacceptable. Key responded that Dynamic's handbook

4

simply required a neat hairstyle. Robinson and Williams told her that she could not have her hair in dreadlocks "at Hyundai," and, at Key's insistence, Williams showed her HEA's policy banning dreadlocks. R.75-1 at 38. Williams said Key would need to either cover her hair or go home until she could have her hair styled. Key said she had a hat at home, thirty minutes away. Robinson told Key to "[j]ust go home." *Id.* at 31, 38-39.

Later that day, Robinson called Key to ask her due date and whether Key's doctor knew she would be lifting heavy boxes. *Id.* at 31. Key said her doctor was fully aware of her work duties and that she had lifted heavy boxes while pregnant in her previous employment with the United States Postal Service (USPS). R.81-8 at 3-4; R.71-8 at 1.

That afternoon, Robinson wrote Ray Cureton, Dynamic's district manager, detailing several problems with "the new mailroom person." R.81-8 at 3. Robinson took "issue with [Key] working [i]n the mailroom" because of her pregnancy and expressed frustration that Key did not disclose her pregnancy during her interview. *Id*. She also complained that Key took "it upon herself to NOT change her hairstyle" after speaking with Scavella during her training. Robinson ended by asking, "[W]hat recourse do I have with her? . . . If she is due in five (5) months . . . she is already

5

four (4) months—and didn't know it?" *Id.* Tracy Peoples, Dynamic's Vice President of Operations, forwarded Robinson's email to others at Dynamic, adding: "If the officer they hired is not a fit (because she was pregnant) when they hired her the only way I can see her being removed is if she does not comply with rules and regs regarding her hair." R.81-20 at 2.

Key returned to work the next day with a hat covering her dreadlocks. R.75-1 at 41. She worked for a short amount of time in the mailroom with Howell, who asked Key why she left early the day before. Key responded that she was sent home because of her hair and that she felt she was being treated unfairly. *Id.* at 40. Howell notified Williams of this comment by phone. Williams told Robinson and Chambliss that Key "felt she was being discriminated against," adding that Robinson "needed to get ahead of it." R.71-13 at 27. Chambliss then summoned Key to meet with Robinson in the security building. 75-1 at 41.

During that meeting, Robinson asked Key whether she felt she was being discriminated against, to which Key responded, "[N]o comment." *Id.* Robinson told Key she should not have asked Williams to show her the HEA grooming policy the day before. She also told Key, "The Koreans were a different breed of animals and . . . they send little memos and they

don't want African Americans, you know, wearing their hair like this because of the clientele they have." *Id*. Robinson mentioned that the Mayor of Birmingham was a client of Hyundai's and "may not want to see [Key] with" dreadlocks. *Id*. Key responded that she was wearing a hat, as Williams and Robinson had instructed her to do. Robinson replied, "This is not about that," and asked Key whether she was "going to be this way until," gesturing to Key's stomach. Robinson then scooted her chair closer to Key and, in a "loud, hostile voice," asked: "Have you been discriminated against?" *Id*. Key repeated that she had worn a hat, as requested. Robinson said, "This is not about that. This is going to be a problem," which Key understood to refer to her pregnancy. *Id*. Robinson then dismissed Key to the mailroom. *Id*. at 42.

Robinson and Williams conferred and decided Key should not stay at the HMMA assignment. Williams emailed Cureton (Dynamic's district manager) at 8:50 a.m. on August 1, saying, "I foresee an issue down the road with this person. Rather than let it fester I'm asking that she be moved to another site." R.81-8 at 2. She commented that Key's hat was "not necessarily what I thought was appropriate," and that "she is already stating she can't lift boxes." *Id*.

7

Ten to fifteen minutes later, Key asked Chambliss if she could speak with human resources. R.75-1 at 42. Chambliss called Robinson, who told Chambliss to have Key speak with Cureton. *Id.* at 43. Key drove to meet with Cureton in Dynamic's Montgomery office. Upon her arrival, Cureton asked Key, "Are you going to sue us?" *Id.* Key did not directly respond, but said she wanted to speak with human resources. *Id.* She then told Cureton about her brief time with Dynamic. *Id.* at 43-45. Key said she felt she had been discriminated against because of her hair and because she was pregnant. *Id.* at 45. She gave Cureton a written complaint to that effect, naming Hyundai, Williams, and Robinson. R.71-9 at 26. Scavella was also in the meeting and told Key, "You haven't really been discriminated against"; Scavella had "been called the N-word and that's real discrimination." R.75-1 at 45. Cureton explained that HMMA did not want Key back, that "Robinson didn't want [Key] out there . . . because of [Key's] hair and something else," but declined to explain what "something else" referred to. *Id.* He asked for Key's badge and told her that Dynamic would call her when another assignment became available. R.81-19 at 6.

Over the next few days, Cureton sent two emails to Dynamic human resources employees questioning whether Dynamic should reassign Key to

another position, given Key's opposition to what she viewed as

discrimination. R.75-25 at 27; R.75-33 at 25; R.75-32 at 39. Key filed for

unemployment benefits, which Dynamic contested, claiming that it had

offered Key other positions, but that she turned them down. R.81-19 at 6.

Key denies that Dynamic ever offered her an assignment after she was

dismissed from the HMMA plant. R.75-1 at 45.

Key completed an EEOC intake questionnaire on August 2, claiming

that Hyundai, Robinson, and Williams discriminated against her based on

race and pregnancy and retaliated against her. R.71-7 at 20-23. She listed

the HMMA plant address and Cureton of Dynamic as the point of contact.

On August 3, 2017, the EEOC had her sign a formal charge against

Dynamic. R.71-8 at 4. The EEOC sent the charge to Dynamic, which

responded with a position statement. R.81-13 at 2. On October 16, 2018, the

EEOC had Key sign a separate charge against HMMA and notified the

company that the delay was due to its own administrative error. R.71-8 at

6; R.81-14 at 2. Upon receipt of the charge, HMMA contacted HEA to

confer about how to respond. R.75-28 at 65; R.71-13 at 35-36.

The EEOC closed its investigation as to Key's Dynamic charge and

issued an NRTS on February 27, 2019, mailing it either the next day or

9

March 1. R.75-30 at 2; R.75-31 at 2. Key did not receive the NRTS regarding

Dynamic. R.81-19 at 7; R.75-1 at 48, 59. Dynamic received its February-28-

postmarked copy on March 20. R.75-26 at 33; R.75-30 at 2; R.75-31 at 2.

On June 10, 2019, the EEOC issued a cause finding against HMMA

and invited the parties to conciliate. R.71-10 at 7-8. After conciliation failed,

the EEOC notified Key of her right to sue on July 12. R.71-10 at 9-11. Key

assumed that the HMMA NRTS encompassed the entire charge process

that she initiated with her intake questionnaire on August 2, 2017, and thus

assumed it served as her Dynamic NRTS as well. R.75-1 at 49. She sued

Dynamic, HMMA, and HEA on October 10, within 90 days of the HMMA

NRTS, but out of time as to the Dynamic NRTS that she never received.

The EEOC never had Key sign a separate charge against HEA or AMCO

and did not notify HEA of Key's charge, though HEA employees were

contemporaneously aware of Key's charge against HMMA. R.75-28 at 65;

R.71-13 at 35-36.

## B.   District Court's Decisions

Key sued, alleging each defendant engaged in pregnancy

discrimination under Title VII; race-based disparate treatment and

disparate impact under Title VII; race discrimination under 42 U.S.C. § 1981; and retaliation under Title VII and § 1981.

### 1. Motions to dismiss

All defendants moved to dismiss Key's First Amended Complaint. The district court dismissed Key's Title VII claims against HEA, holding that Key failed to satisfy administrative prerequisites as to that entity because she did not name HEA in either of her charges. R.38 at 9-12. But the court allowed Key's § 1981 claims against HEA to proceed.

The court declined Dynamic's bid to dismiss Key's Title VII claims against it on timeliness grounds because Key pled that she first received her Dynamic NRTS when Dynamic filed it in the district court. The court also denied HMMA's motion to be dismissed from the suit, finding that Key pled sufficient facts "to plausibly show HMMA had enough control of her employment to support an employment relationship." R.38 at 19.

The court dismissed as to all defendants Key's race-based disparate-impact challenge to the no-dreadlocks policy under Title VII, characterizing as bare-bones her allegations that she "wore her hair neat, within policy, and in a manner commonly worn by African Americans," and that "the

11

alleged policy used to terminate[] Key creates a disparate impact on African Americans." R.38 at 23-24.

As to the substance of Key's race-discrimination claims, the district court acknowledged *EEOC v. Catastrophe Management Solutions*, 852 F.3d 1018 (11th Cir. 2016), which held that application of a race-neutral grooming policy forbidding dreadlocks is not disparate treatment. But the court distinguished Key's claim, finding that Key's allegations that the defendants were inconsistent regarding whether Key's dreadlocks were acceptable and in what form, as well as the allegation regarding "Koreans" "not want[ing] African-Americans wearing their hair in dreadlock hairstyles," plausibly suggested the grooming policy was a proxy for race discrimination. R.38 at 22-23, 29-31.

The court allowed Key's Title VII disparate-treatment and retaliation claims against Dynamic and HMMA; her § 1981 disparate-treatment and retaliation claims against all defendants; and her Title VII pregnancy-discrimination claims against Dynamic and HMMA to proceed to summary judgment.

12

### 2. Summary judgment

After discovery, all defendants moved for summary judgment on Key's remaining claims. The court dismissed Key's Title VII claims against Dynamic, holding they were untimely because Key filed suit more than ninety days after she presumptively received her Dynamic NRTS. The court assumed Key received her letter three days after the copy that Dynamic received was stamped as mailed, relying on *Kerr v. McDonald's Corp.*, 427 F.3d 947 (11th Cir. 2005), despite Key's testimony that she never received it. R.138 at 21-24.

The court rejected Key's § 1981 race-based disparate-treatment claim against all defendants and Key's Title VII race-based disparate-treatment claim against HMMA. Starting from the premise that, under *Catastrophe Management*, a grooming policy prohibiting dreadlocks is not in and of itself intentional discrimination, the court rejected Key's arguments that she nonetheless experienced discrimination because of the way HEA's policy applied to her. The court faulted Key for failing to show that the policy was unequally applied and specifically highlighted as indicative of race-neutrality Key's evidence that two Black employees were allowed to wear their dreadlocks in a "tight bun" after Key filed her EEOC charge.

13

R.138 at 27-28. The court held that Robinson's statement regarding "Koreans" did not support Key's claim because—even if it were not inadmissible hearsay (which the court did not decide)—it was not "evidence of unequal application of the appearance standard" and therefore not probative of "intentional racial animus." R.138 at 29-30.

The court granted summary judgment to HMMA on Key's Title VII pregnancy-discrimination claim, holding that she failed to present evidence that anyone at HMMA knew of her pregnancy or was a decisionmaker in her termination. R.138 at 17.

Finally, turning to Key's retaliation claims, the court held that Key's § 1981 retaliation claim against Dynamic could move forward to trial, but her § 1981 retaliation claim against HEA and her Title VII and § 1981 retaliation claims against HMMA could not. As to Dynamic, the court held that a jury could reasonably conclude that Key's complaint about the no-dreadlocks policy was protected activity, given Robinson's comments hours earlier about "Koreans" not liking "African Americans" wearing dreadlocks. R.138 at 35. But as to HEA and HMMA, the court said, *Catastrophe Management* precluded any reasonable, good-faith belief that the no-dreadlocks policy was discriminatory on its face, without the

14

"context" of Robinson's comments about animus and absent any allegation that the policy was being discriminatorily applied based on race. *Id*. at 40-42.

Only Key's § 1981 retaliation claim against Dynamic went to trial; all other claims had been dismissed either based on the complaint or at summary judgment. After trial, a jury found Dynamic retaliated against Key in violation of § 1981. Dynamic appealed that jury verdict. Key appealed the district court's motion to dismiss and summary judgment decisions.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Key's disparate-impact challenge to HEA's dreadlocks ban, which Dynamic employees enforced against Key at HMMA's plant. Key plausibly alleged that the defendants' proscription of a hairstyle closely associated with her race had a foreseeable, disproportionate racial impact; no more is required at the complaint stage.

At summary judgment, the district court erred in at least two respects. First, the court should not have presumed Key received her Dynamic NRTS three days after its purported mailing, given contrary

record evidence. Second, the court was wrong to insist on evidence that

defendants unequally enforced the dreadlocks ban to prove discrimination,

given evidence that HEA adopted the ban for a discriminatory purpose.

Finally, this case implicates this Court's precedent, which conflicts

with other courts of appeals, precluding retaliation plaintiffs from

complaining reasonably and in good faith about conduct that this Court

has held to be nondiscriminatory. When appropriate, this Court should

reevaluate that unduly restrictive standard.

## ARGUMENT

### I.   Key pled a plausible disparate-impact claim.

Key plausibly alleged that the defendants' enforcement of a no-

dreadlocks policy would foreseeably disparately impact Black individuals.

Nonetheless, the district court dismissed Key's disparate-impact challenge

to the no-dreadlocks policy at the Rule 12(b)(6) stage, holding that the

operative complaint "fail[ed] to plead any factual allegations to support the

claim that the dreadlocks policy resulted in a disparate impact on African

Americans." R.38 at 24. In so holding, the court relied on *Armstrong v.*

*Flowers Hosp., Inc.*, 33 F.3d 1308 (11th Cir. 1994), a summary-judgment

decision, for the proposition that Key had to "establish causation by

offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination." R.38 at 24 (quoting *Armstrong*, 33 F.3d at 1314). That was error.

Title VII prohibits employment practices that "cause[] a disparate impact on the basis of race, color, religion, sex, or national origin" and where the employer does not show the challenged practices are "job related . . . and consistent with business necessity." *Lewis v. City of Chicago*, 560 U.S. 205, 212 (2010) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). At summary judgment or trial, a plaintiff may establish a prima facie disparate-impact case under Title VII "by showing that the employer 'uses a particular employment practice that causes a disparate impact' on one of the prohibited bases." *Id.* (emphasis omitted). At the pleading stage, however, a disparate-impact plaintiff need only allege facts supporting a reasonable inference that the challenged practice caused a disparate impact. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1054 (10th Cir. 2020).

Beyond the baseline requirements of Rule 8(a)(2), there is no precise formula that a disparate-impact plaintiff must replicate to plead a plausible claim. Courts have mapped at least two distinct paths to a successful

17

disparate-impact complaint. First, a plaintiff could identify an employment practice and plead an actual disparity in the employer's workforce, giving rise to a plausible inference that the employer's policy caused the disparity. *See, e.g.*, *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1007 (7th Cir. 2019) (using photograph of recent hires to allege workforce did not reflect the racial demographics of the surrounding area); *see also Frappied*, 966 F.3d at 1054-56 (allegations regarding the number of employees laid off over the age of forty, compared to the number of individuals laid off under the age of forty, "ma[d]e plausible" plaintiff's allegation that termination policies had a disparate impact based on age). This path will be available to plaintiffs with pre-discovery access to relevant information about the employer's workforce.

A plaintiff who lacks such information pre-discovery can take an alternative path by identifying the challenged practice and pleading facts from which one could reasonably infer that the practice will disproportionately affect the protected group. *See, e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428-29 (4th Cir. 2018) (plausibly alleging mobile-home park's requirement that all occupants provide documentation of legal status disproportionately ousted Latino families

18

from their rental homes based on allegation that undocumented individuals were disproportionately likely to be Latino); *Carson v. Lacy*, 856 F. App'x 53, 54 (8th Cir. 2021) (allegation that felony-conviction ban disproportionately excluded Black applicants from custodial job was plausible based on allegation that Black people are incarcerated at a higher rate than White people in Arkansas); *accord Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (complaint failed to state disparate-impact claim that closing low-barrier housing shelters had a disparate impact based on disability because it "did not, for instance, include an allegation that disabled homeless individuals are more likely to rely on low-barrier shelters than non-disabled homeless individuals"). And, of course, statistics are not necessary where a policy's disparate impact is obvious. *See Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227-28 (9th Cir. 2023) (pleading that oath conflicts with Jehovah's Witness's religious beliefs plausibly alleges disparate-impact claim); *see also Wang v. Hoffman*, 694 F.2d 1146, 1148-49 (9th Cir. 1982) (disparate-impact claim sufficiently pled where it was obvious a language-skills requirement would disproportionately affect minority applicants).

Key satisfied this second method by plausibly alleging that the proscription of a hairstyle closely associated with race has a foreseeable disproportionate racial impact. Specifically, she pled (1) the challenged policy—that the defendants prohibited dreadlocks, and (2) facts from which the court could reasonably infer that the policy will disproportionately affect the protected group—that dreadlocks are commonly worn by African Americans. R.28 ¶¶ 117, 118, 141. That is enough for plausibility. *See* EEOC Dec. No. 72-979, 1972 WL 3999, at *1 (Feb. 3, 1972) (finding ban on Afro hairstyle would have a disparate impact based on race); *see also* EEOC Dec. No. 74-25, 1973 WL 3919, at *8 (Sept. 10, 1973) ("Respondent's facial hair policy is discriminatory in that beards, goatees and moustaches are substantially more prevalent among Black males than among White males[.]").

This Court's decision in *Catastrophe Management* is not to the contrary. In that case, this Court held that a facially race-neutral ban on dreadlocks was not in and of itself *intentional* discrimination. 852 F.3d at 1030. The opinion specifically carved out the question whether such a policy could give rise to a disparate-impact claim, however, noting the EEOC did not

20

pursue a disparate-impact theory and that the two theories differ as to both

their proof and what they are meant to eradicate. *Id.* at 1024.

Because Key plausibly alleged that banning dreadlocks will

disproportionately affect Black individuals, the district court erred in

dismissing her disparate-impact claim.

## II. The district court wrongly presumed Key received the Dynamic NRTS three days after the EEOC mailed it.

The district court granted summary judgment to Dynamic on Key's

Title VII claims, holding they were untimely based on its presumption that

Key received the Dynamic NRTS three days after the date that the copy

Dynamic received was stamped as mailed, despite Key's testimony that she

never received it. That was error.

Under Title VII, a charging party has ninety days from the NRTS to

file suit. 42 U.S.C. § 2000e-5(f)(1).[3] In keeping with its liberal construction of

Title VII, and in accord with the EEOC's view, this Court generally counts

this ninety-day period from the day the charging party actually receives

the NRTS, not the day the EEOC mailed it. *See Franks v. Bowman Transp.*

---

[3] The plaintiff bears the burden to demonstrate that suit was timely filed under the ninety-day rule. *Green v. Union Foundry Co.*, 281 F.3d 1229, 1234 (11th Cir. 2002).

*Co.*, 495 F.2d 398, 404 (5th Cir. 1974), *rev'd on other grounds*, 424 U.S. 747 (1976)[4]; *see also* 29 C.F.R. § 1601.28(e)(1) (suit may be brought within ninety days of "receipt" of NRTS). Doing otherwise by, for instance, attributing constructive notice to a plaintiff who did not actually receive her NRTS, would not effectuate § 2000e-5(f)(1)'s purpose to prevent plaintiffs from sleeping on their rights and instead would unfairly deprive them of unknown rights. *Franks*, 495 F.2d at 404.

This Court has, however, placed guardrails around this actual-receipt rule to prevent it from creating an "open-ended time extension," by imposing "some 'minimum responsibility [on the plaintiff] for an orderly and expeditious resolution of their claims.'" *Kerr*, 427 F.3d at 952 (quoting *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1340 (11th Cir. 1999) (alterations omitted)). The court takes "a case-by-case approach [to] determining what constitutes receipt and when the time is triggered." *Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524 (11th Cir. 1991). But typically, a plaintiff fails the "minimum responsibility" test when the plaintiff, or her representative, has failed to inform the EEOC of

---

[4] *Franks* is binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

an address change; has failed to follow up on notices from the post office regarding attempted deliveries of certified mail from the EEOC; or had some knowledge that her case was being closed, but failed to follow up when she did not timely receive the NRTS. *See, e.g.*, *Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863, 869 (11th Cir. 2020) (counsel failed to notify EEOC of change of address, did not regularly check mail at old address, and, despite knowing NRTS was issued one month before receipt, waited full ninety days to file suit); *Kerr*, 427 F.3d at 950-53 (plaintiffs requested NRTS and did not timely follow up when they did not receive it); *Zillyette*, 179 F.3d at 1341 (plaintiff's failure to timely follow up on delivery notice that listed EEOC as sender failed "minimal burden" requirement).

This Court also imported a three-day mailing rule into this analysis. Under that rule, this Court generally presumes receipt of the NRTS three days after the mailing date. The three-day mailing rule first arose in *Zillyette*, where this Court held that it was reasonable to accord a plaintiff three days to retrieve their NRTS upon receipt of a notice of attempted delivery from the USPS. 179 F.3d at 1342. In a footnote six years later, the *Kerr* court cited *Zillyette* for the materially different proposition that "[w]hen the date of receipt is in dispute, this court has applied a

23

presumption of three days for receipt by mail." 427 F.3d at 953 n.9; *see also Winsor v. Home Depot U.S.A., Inc.*, 743 F. App'x 335, 337 (11th Cir. 2018). The three-day rule is hard to harmonize with the longstanding "actual receipt" rule; subsequent decisions have sought to do so by recognizing an exception to the three-day rule "if the plaintiff can show that receipt of the notice was delayed 'through no fault of his own.'" *Robbins,* 819 F. App'x at 867.

The district court presumed Key received her Dynamic NRTS three days after the mailing date stamped on Dynamic's copy of the NRTS. In doing so, it failed to credit contrary record evidence. Key testified that, despite providing the EEOC with her correct mailing address, she never received her copy of the NRTS that was postmarked February 28 and that Dynamic received three weeks later, on March 20. R.75-1 at 48; R.81-19 at 7. The apparent delay in Dynamic's receipt alone renders a three-day presumption as to Key entirely unreasonable. What is more, there is no evidence that the postal service attempted delivery and Key failed to follow up. And the EEOC never told Key that it was closing her charge against Dynamic. R.81-19 at 6-7. In the absence of any evidence that Key remained willfully oblivious to the fact that the EEOC had closed her

24

charge against Dynamic, the district court should have credited her sworn testimony that she never received the NRTS and allowed her Title VII claims against Dynamic to be evaluated on the merits. *Cf. Williams v. Radford*, 64 F.4th 1185, 1198 (11th Cir. 2023) (sworn testimony, even when characterized as "self-serving," is sufficient on its own to create a material factual dispute). The Third Circuit, which also applies a three-day rule, recently held that sworn statements from the plaintiff and her lawyer's office manager that neither received the mailed NRTS constituted "enough evidence to rebut the three-day presumption and defeat summary judgment." *Hayes v. N.J. Dep't of Hum. Servs.*, 108 F.4th 219, 224 (3d Cir. 2024). And this Court's binding precedent has accommodated a plaintiff's non-receipt of an NRTS in circumstances far less sympathetic than Key's. *See Franks*, 495 F.2d at 403 (finding Franks did not "receive" his NRTS until over a year after it was originally sent *and delivered* to Franks's home, where Franks's nine-year-old nephew signed for the letter and lost it).

The district court discounted Key's sworn testimony that she did not receive the NRTS, pointing to two district court opinions that, the court said, establish that such "testimony alone is insufficient to defeat the presumption of proper mailing and receipt within three days." R.138 at 22.

25

But both cases contain other facts indicating the plaintiffs failed the "minimal responsibility" inquiry. In *Sevillano v. Orange County*, the plaintiff was "undisputed[ly] . . . on notice that a letter was being sent by certified mail," and USPS left a notice at his house. No. 19-cv-1461, 2021 WL 2431847, at *2-3 (M.D. Fla. May 26, 2021). After receiving a re-issued notice, the plaintiff waited over two months to sue. *Id.* at *3. And in *Bloom v. Shinseki*, a case involving the Department of Veterans Affairs, the USPS left two notices of its attempted delivery of the Department's Final Agency Decision at the plaintiff's house and attempted delivery at his attorney's address. No. 11-CV-972, 2012 WL 4009751, at *2 (M.D. Ala. Sept. 12, 2012). The attorney had failed to notify the EEOC or the Department of an address change, and the plaintiff claimed to not have received the attempted delivery notices. *Id.* at *4-5. Ultimately, the Department hand-delivered the notice over a month later and the plaintiff still waited almost a full ninety days after the hand delivery to file suit. *Id.* at *2.

The district court also relied on *Kerr* for the proposition that "[r]eceipt is presumed when a complainant is unable to show that her failure to receive an RTS letter was in no way her fault." 427 F.3d at 952. *Kerr* is distinguishable, however, in that the *Kerr* plaintiffs knew the EEOC had

closed its investigation, had asked for an NRTS, and did not follow up when they did not receive it for several weeks. *Id.* at 949-50. None of those circumstances is present here. Indeed, the *Kerr* court acknowledged that "[t]he date of actual receipt is material to the summary judgment analysis . . . if," as here, "there was no adequate notice prior to actual receipt." *Id*. at 952.

Because the precedent the district court relied on is distinguishable, and because it was error for the district court to disregard Key's testimony, the court's presumption that Key received her Dynamic NRTS three days after the postmark date on Dynamic's copy, and its dismissal of Key's Title VII claims against Dynamic on that basis, were error.

## III.  A jury could reasonably find the no-dreadlocks policy was motivated by racial animus and thus constituted disparate treatment.

The court was also wrong to grant summary judgment to all defendants on Key's § 1981 race-based disparate-treatment claim and to HMMA on Key's Title VII race-based disparate-treatment claim, which both challenged the no-dreadlocks policy as racially discriminatory.

This Court held in *Catastrophe Management*, 852 F.3d at 1030, that a no-dreadlocks policy on its own is not facially discriminatory. But Key

27

presented evidence that HEA's particular policy, which employees of Dynamic enforced against Key at the HMMA plant, was adopted based on racial animus. Key testified that Robinson explained the policy to her by saying, "The Koreans were a different breed of animals and . . . they send little memos and they don't want African Americans, you know, wearing their hair like this because of the clientele they have." R.75-1 at 41. Assuming Robinson's statement could be admissible at trial, it is evidence that the no-dreadlocks policy was created to target Black employees or prospective employees. And being subjected to a policy that is adopted with racial animus constitutes disparate treatment. *See, e.g.*, *Catastrophe Mgmt.*, 852 F.3d at 1026 (plaintiff can show disparate treatment by proving race motivated employer's policy, practice, or decision).[5]

The district court disregarded Robinson's comment, finding it irrelevant unless Key also presented "evidence of unequal application of the appearance standards on the basis of race." R.138 at 29-30. That was

---

[5] A Title VII disparate-treatment claim requires no showing of "animus." *See Murray v. UBS Sec., LLC*, 601 U.S. 23, 33-34 (2024) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 663 (2020), and *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991), to conclude, in context of Sarbanes-Oxley Act case, that "a lack of 'animosity' is 'irrelevant' to a claim of discrimination under Title VII"). Evidence that a policy was adopted with animus is a sufficient, though not necessary, condition of proving disparate treatment.

28

incorrect. Evidence of unequal application is primarily important in cases where the employer's discriminatory motive is not apparent or is difficult to uncover. But in a case like this one, where the policymaker has stated its discriminatory motive, that is the end of the matter and summary judgment must be denied. *See Legg v. Ulster Cnty.*, 820 F.3d 67, 71, 72-74 (2d Cir. 2016) (reversing district court's holding that light-duty policy excluding pregnant women could not be intentional discrimination because it was applied uniformly). To hold otherwise would sanction facially neutral policies adopted because their application will disproportionately disadvantage persons of a particular race.

## IV. When appropriate, this Court should reconsider its precedent imputing knowledge of case law to retaliation plaintiffs.

The district court granted summary judgment to HMMA and HEA on Key's § 1981 retaliation claim and to HMMA on Key's Title VII retaliation claim, holding that Key could not have held a reasonable, good-faith belief that a policy forbidding dreadlocks, without other evidence of discriminatory application or motivation, was actionable discrimination. R.138 at 40-43. Key argues there was additional circumstantial evidence the court should have considered. Key Appellant Br. 42-44. The EEOC takes no

position on that argument. We do urge this Court to rethink, when appropriate, the precedent the district court relied on in holding that Key could not have a reasonable good-faith belief that a dreadlocks ban, standing alone, was actionable discrimination.

Title VII prohibits employers from discriminating against any employee "because he has opposed any practice made an unlawful employment practice" under the statute. 42 U.S.C. § 2000e-3(a). Title VII's opposition clause is expansive and applies to a range of activity. *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016); EEOC Enforcement Guidance on Retaliation and Related Issues (Retaliation Guidance) § II.A.2.a, 2016 WL 4688886, at *7 (Aug. 25, 2016). Importantly, a retaliation "plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful," so long as the conduct opposed was "close enough to support an objectively reasonable belief that it is." *Furcron*, 843 F.3d at 1311 (citations omitted). A § 1981 retaliation claim "require[s] the same proof and analytical framework." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).

Despite the breadth of the statutes' protection against retaliation, this Court precludes retaliation claims premised on opposition to conduct that

circuit law has held is non-discriminatory. *See Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008); *see also Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388-89 (11th Cir. 1998). Because this Court held in *Catastrophe Management*, 852 F.3d at 1021, 1030, that a no-dreadlocks policy is not by itself facially discriminatory, the district court held that Key could not have had a reasonable, good-faith belief that the no-dreadlocks policy at issue in this case was in and of itself discriminatory.

While this panel is not authorized to depart from circuit precedent, we note that this Court's precedent in *Butler* and *Harper* is inconsistent with case law from other circuits, which does not require lay people to know the precise state of the law to engage in protected opposition conduct. *See Reznik v. inContact, Inc.*, 18 F.4th 1257, 1262-63 (10th Cir. 2021); *Kengerski v. Harper*, 6 F.4th 531, 540 (3d Cir. 2021); *EEOC  v. Rite Way Serv., Inc.*, 819 F.3d 235, 242 (5th Cir. 2016); *cf. Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 290 (4th Cir. 2015) (en banc) (Wilkinson, J., concurring in part and dissenting in part) ("An employee is not an expert in hostile work environment law.").

The unduly restrictive nature of this Court's precedent is particularly striking here, where Key challenged a policy that the EEOC had also

31

recently challenged as racially discriminatory. *See* Retaliation Guidance § II.A.2.c, 2016 WL 4688886, at *10 ("It is reasonable for an employee to believe conduct violates the EEO laws if the Commission, as the primary agency charged with enforcement, has adopted that interpretation."). The EEOC took the position throughout the litigation in *Catastrophe Management*, beginning in 2013 and continuing until this Court's 2016 and 2017 decisions, that no-dreadlocks policies are racially discriminatory. Three judges of this Court agreed with that position. *See Catastrophe Mgmt.*, 876 F.3d at 1278, 1285-86 (Martin, J., dissenting from denial of rehearing en banc). Reasonable minds could thus disagree about whether such policies are racially discriminatory.

When appropriate, this Court should reconsider its restrictive view of what constitutes protected opposition conduct.

## CONCLUSION

For the foregoing reasons, the judgment of the district court as it relates to the issues addressed herein should be vacated and the case remanded for further proceedings.


Respectfully submitted,

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ANNE NOEL OCCHIALINO
Assistant General Counsel

s/*Georgina C. Yeomans*
GEORGINA C. YEOMANS
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2748
georgina.yeomans@eeoc.gov

December 4, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Book Antiqua 14 point.

> s/*Georgina C. Yeomans*
> GEORGINA C. YEOMANS
> Attorney
> EQUAL EMPLOYMENT
> OPPORTUNITY COMMISSION
> Office of General Counsel
> 131 M St. N.E., 5th Floor
> Washington, D.C. 20507
> 202-921-2748
> georgina.yeomans@eeoc.gov

December 4, 2024

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.

s/*Georgina C. Yeomans*
GEORGINA C. YEOMANS
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2748
georgina.yeomans@eeoc.gov