## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### DOCKET NO.: 24-11126

---

DAVITA M. KEY,

Appellant

v.

HYUNDAI MOTOR MANUFACTURING OF ALABAMA, et al,

Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2:19-CV-00767-ECM-SMD

---

### BRIEF OF APPELLEE
### HYUNDAI MOTOR MANUFACTURING OF ALABAMA, LLC

---

OF COUNSEL:

Whitney R. Brown ASB-4431-H71B
David J. Middlebrooks ASB- 8553-D58D
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
wbrown@lehrmiddlebrooks.com
dmiddlebrooks@lehrmiddlebrooks.com

## APPELLEE HYUNDAI MOTOR MANUFACTURING OF ALABAMA, LLC'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 through 26.1-3, the undersigned counsel for Appellee Hyundai Motor Manufacturing Alabama, LLC, certifies that the following have an interest in the outcome of this appeal:

Bae, Yurie Yeoul—counsel for Appellee Hyundai ENG America, Inc.

Bond, Cortlin—counsel for Appellee Hyundai ENG America, Inc.

Bradley Arant Boult Cummings, LLP—counsel for Appellee Hyundai ENG America, Inc.

Brown, Whitney R.—counsel for Appellee Hyundai Motor Manufacturing of Alabama, LLC

Bullock, Susan W. —counsel for Appellee Dynamic Security, Inc.

Burney, Schyler B.—counsel for Appellee Hyundai ENG America, Inc.

Company Australia PTY Ltd.—affiliate of Appellee Hyundai ENG America, Inc.[1]

Construtora Egestao de Projetos Ltda.—affiliate of Appellee Hyundai ENG America, Inc.

---

[1] The undersigned filer incorporates here the affiliates and corporate parent entity disclosed by Hyundai ENG America, Inc., in its CIP.

i

DeWeese & Bae, LLC –counsel for Appellee Hyundai ENG America, Inc.

DeWeese, Richard L., Jr. – counsel for Appellee Hyundai ENG America, Inc.

Doyle, The Honorable Stephen M.—U.S. Magistrate Judge

Dynamic Security, Inc.—Appellee

Equal Employment Opportunity Commission—Amicus Curiae

FordHarrison, LLP—counsel for Appellee Dynamic Security, Inc.

Galing Power & Energy Construction Co. Inc.—affiliate of Appellee Hyundai ENG America, Inc.

Gilbride, Karla—General Counsel for Amicus Curiae the Equal Employment Opportunity Commission

Goldstein, Jennifer S.—Associate General Counsel for Amicus Curiae the Equal Employment Opportunity Commission

Heather Leonard, P.C.—Counsel for Appellant Davita M. Key

HEC India LLP—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai ENG America, Inc.—Appellee

Hyundai Engineering Brasil—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Chennai Private Ltd.—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Co., (not publicly traded)

Hyundai Engineering Co., Ltd.—the parent company of Hyundai ENG America, Inc. (not publicly traded)

Hyundai Engineering Czech S.R.O.—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Deutschland GMBH—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering India Private Limited—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Insaat Turizm—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Malaysia SDN BHD—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Mexico, S. DE R.L. DE C.V., affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Pakistan (Private) Limited—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Poland S. Zoo—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering RUS L.L.C., affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Singapore PTE. Ltd.—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Engineering Slovakia S.R.O.

Hyundai Engineering—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Hyundai Engineering China (Beijing) Co. Ltd.—affiliate of Appellee Hyundai ENG America, Inc.

Hyundai Motor America—single member of Appellee Hyundai Motor Manufacturing of Alabama, LLC.

Hyundai Motor Company, Ltd. (HYMTF, OTC U.S. Stock Market Ticker)[2]—parent of Hyundai Motor America

Hyundai Motor Manufacturing of Alabama, LLC—Appellee

Hyunen Canada Ltd.—affiliate of Appellee Hyundai ENG America, Inc.

Indonesia Facility Management—affiliate of Appellee Hyundai ENG America, Inc.

Key, Davita M.—Appellant

Lehr Middlebrooks Vreeland & Thompson, PC—counsel for Appellee Hyundai Motor Manufacturing of Alabama, LLC

---

[2] Hyundai Motor Company, Ltd. is publicly traded on the Korean Stock Exchange.

Leonard, Heather Newsom—counsel for Appellant Davita M. Key

Marks, Emily C.—U.S. District Court Judge

Middlebrooks, David J.—counsel for Appellee Hyundai Motor Manufacturing of Alabama, LLC

Miller, Matthew T.—counsel for Appellee Hyundai ENG America, Inc.

Occhialino, Anne Noel-- Assistant General Counsel for Amicus Curiae the Equal Employment Opportunity Commission

Palmer Law, LLC—counsel for Appellant

Palmer, Leslie A.—counsel for Appellant

Pt. Hein Global Utama—affiliate of Appellee Hyundai ENG America, Inc.

PT. Hyundai Engineering SSA—affiliate of Appellee Hyundai ENG America, Inc.

Pt. Hyundai Engineering—affiliate of Appellee Hyundai ENG America, Inc.

Redmond, Wesley C.—counsel for Appellee Dynamic Security, Inc.

Rizhao Amco Property Service Co., Ltd., affiliate of Appellee Hyundai ENG America, Inc.

Sanayi ve Ticaret Limited Sirketi, affiliate of Appellee Hyundai ENG America, Inc.

Smith, Scott Burnett—counsel for Appellee Hyundai ENG America, Inc.

Vaughn, Sarahanne—counsel for Appellee Hyundai ENG America, Inc.

Yeomans, Georgina C.—counsel for Amicus Curiae the Equal Employment Opportunity Commission

Yundai Engineering India Private Limited—affiliate of Appellee Hyundai ENG America, Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellee states as follows:

Hyundai Motor Manufacturing Alabama, LLC is a single member limited liability company. Its single member is Hyundai Motor America, whose parent company is Hyundai Motor Company, Ltd., which is listed on the Korean Stock Exchange.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee Hyundai Motor Manufacturing Alabama, LLC (HMMA) respectfully submits that oral argument is unnecessary to resolve the issues presented by this appeal. This case primarily requests review of a straightforward application of the summary judgment standard to employment claims brought under Title VII and 42 U.S.C. §1981. The District Court's grant of summary judgment to HMMA could alternatively be affirmed because HMMA was not her employer and wielded neither potential or actual control over her work for her employer. There is no dispute that Plaintiff was exclusively the employee of Appellee Dynamic Security, Inc. (DSI); no HMMA employee requested or required her removal; HMMA did not provide her pay, benefits, day-to-day supervision, or her job-specific orientation; and HMMA did not author or apply any appearance standard to her. These undisputed facts compel the conclusions that HMMA did not have an employment relationship with Plaintiff, or, if it did, that it is nonetheless not liable to her as it did not influence any employment decisions or policies at issue in this litigation. To the extent that a primary feature of Plaintiff-Appellant's appeal and the EEOC's amicus brief is the desire to overturn the Court's prior decision in *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016), that decision is less than ten years old, supported by well-established precedent, and is not undercut by the U.S. Supreme Court's decision in

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020). However, if the Court determines that oral argument would aid its decision in this matter, HMMA welcomes the opportunity to further present its case.

## **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ............................................ vii

TABLE OF CONTENTS...................................................................... ix

TABLE OF CITATIONS .................................................................. xiii

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES APPLICABLE TO HMMA ...............................1

STATEMENT OF THE CASE ...........................................................3

I.    Statement of the Facts Relevant to Plaintiff-Appellant's Claims Against HMMA.........................................................................................3

    A.    About the Parties ...........................................................3

    B.    Plaintiff's Employment with DSI..........................................5

        1.    Selection by DSI and Orientation ..................................5

        2.    July 31 and August 1, 2017.........................................6

        3.    HMMA had no input or involvement in DSI's decision to end Plaintiff's assignment on August 1, 2017. .......................................8

    C.    Grooming or appearance standards in effect at the time of Plaintiff's employment at DSI..........................................................9

        1.    HMMA had no general prohibition on dreadlocks and no appearance standard applicable to Plaintiff as a DSI employee. .....9

        2.    DSI did not prohibit dreadlocks. ...................................9

        3.    HEA's Appearance Standard, created and revised by Williams, prohibited unstyled dreadlocks and applied to DSI employees.....10

    D.    HMMA did not control or supervise DSI's mailroom workers..........11

II.   Course of Proceedings and Disposition With Respect to Claims Against HMMA........................................................................................13

A.    Plaintiff did not timely file a Charge against HMMA with the EEOC. ..................................................................................13

B.    Key Proceedings Before the District Court.........................................14

III.    Standard of Review.......................................................................................15

A.    The Court reviews *de novo* the District Court's grant of summary judgment to HMMA, and can also affirm the District Court's grant of summary judgment on any basis apparent from the record. ..............15

B.    The *de novo* standard of review also applies to the District Court's dismissal of Plaintiff's disparate impact claims..................................17

SUMMARY OF ARGUMENT ...............................................................................18

ARGUMENT ..........................................................................................................21

I.    This Court should affirm the District Court's grant of summary judgment to HMMA because HMMA was not Plaintiff's employer. ...............................21

A.    The Joint Employer Standard ..............................................................21

B.    There was no evidence sufficient to establish HMMA as Plaintiff's joint employer...........................................................................................22

C.    Williams and HEA were not HMMA's agents. ...................................25

D.    Regardless of the test applied, HMMA never exercised control over Plaintiff's employment with DSI. ........................................................26

II.    The District Court correctly concluded that there was no evidence that HMMA took any action against Plaintiff-Appellant based on her race.........26

A.    Plaintiff's new direct evidence argument is untimely, unavailing, and relies on inadmissible hearsay...........................................................28

B.    The District Court correctly concluded that Plaintiff did not present a convincing mosaic of race discrimination...........................................30

1.    The District Court correctly concluded that there was no evidence that HMMA discriminated against Plaintiff because of her race...30

2.     The District Court correctly concluded that a policy prohibiting dreadlocked hairstyles, if one existed, did not constitute intentional race discrimination. ........................................................31

      a)     In EEOC v. Catastrophe Management, this Court correctly held that although dreadlocks are "a natural outgrowth" of Black hair texture, they are a styling choice and not an immutable racial characteristic. ...............................................31

      b)     Plaintiff misunderstands Bostock, and misapplies its "change one thing" analytical framework...............................32

      c)     The EEOC errs in arguing a disparate treatment discrimination claim can prevail in the absence of disparate treatment. ..........34

C.     The District Court could also have granted summary judgment to HMMA on Plaintiff's race discrimination claims because HMMA did not contribute to the decision to terminate Plaintiff's assignment or the policy restricting her hairstyle............................................................35

III.     The District Court correctly concluded that there was no evidence that HMMA took any action against Plaintiff-Appellant based on any protected activity she had engaged in (which was unknown to HMMA). ....................36

A.     This Court should decline Plaintiff's invitation to allow retaliation claims to proceed in the absence of a legally protected complaint.....37

B.     This Court should reject the EEOC's invitation to overturn longstanding precedent requiring that a complainant's belief that she is complaining of unlawful discrimination is objectively reasonable as measured against substantive law. ......................................................38

C.     The District Court could also have granted summary judgment to HMMA on Plaintiff's retaliation claims because the evidence established HMMA's complete ignorance of Plaintiff's alleged protected conduct. ...............................................................41

IV.     Dismissal of Plaintiff-Appellant's disparate impact theory claim was proper because Plaintiff-Appellant did not plead any facts which would establish a plausible claim for relief................................................................42

A.    Plaintiff's disparate impact allegations consist of 23 words in two sentences, are entirely conclusory, and simply do not come close to meeting *Ashcroft v. Iqbal*'s plausibility requirement. .........................42

V.    The District Court could have dismissed Plaintiff's Title VII Claims against HMMA because she did not timely file a Charge against it. .......................47

CONCLUSION .......................................................................................49

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A).....................50

CERTIFICATE OF SERVICE ...............................................................51

## TABLE OF CITATIONS

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................... 16, 17

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).... 17, 18, 42, 44

*Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287 (11th Cir. 2007).............. 28, 34

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007).....................................17

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1300 (11th Cir. 2023) .....................38

*Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215 (9th Cir. 2023) .....44

*Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) ...............................38

*Booker v. Brown & Williamson Tobacco Co.*, *Inc.*, 879 F.3d 1304 (6th Cir. 1989) ....................................................................................................39

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020)........................... passim

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) ...................40

*Boykin v. Fenty*, 650 Fed. Appx. 42 (D.C. Cir. 2016) ...........................................45

*Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209 (11th Cir. 2008) .................... 36, 37

*Cannon v. Canteen Servs. of N. Mich*, 657 Fed. Appx. 438 (6th Cir. 2016)..........49

*Carson v. Lacy, 856 Fed. Appx. 53 (8th Cir. 2021)* ...............................................45

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) ........................................38

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ......................................................16

*Charles v. Geo Grp. Inc.*, 2022 U.S. Dist. LEXIS 250434 (M.D. Fla.) .................46

*Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001)*.......................................39

*Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999) .................... 37, 42

*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354 (11th Cir. 1999) .. 28-29

*Davis v. Infinity Ins. Co.*, 2022 U.S. App. LEXIS 10456 (11th Cir.) ..................... 42

*de Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415 (4th Cir. 2018) .......... 45

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000) ..................... 42

*EEOC v. Catastrophe Mgmt. Sols. ("Catastrophe Mgmt. II"),* 876 F.3d 1273 (11th Cir. 2017) (*denying reh'g en banc*) ................................................................. 33, 35

*EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016) ............. passim

*EEOC v. Rite Way Serv.*, 819 F.3d 235 (5th Cir. 2016) ......................................... 40

*Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005) ................................................... 17

*Furcon v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295 (11th Cir. 2016) .......................... 36

*Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361 (2nd Cir. 2006) .......................... 25

*Henderson v. JP Morgan Chase Bank, N.A.*, 436 Fed. Appx. 935 (11th Cir. 2011) ........................................................................................................................ 42

*Hung Ping Wang v. Hoffman*, 694 F.2d 1146 (9th Cir. 1982) ................................ 45

*Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352 (11th Cir. 2011) ........................................................................................................................ 17

*Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321 (11th Cir. 1998) ............. 28

*Kengerski v. Harper*, 6 F.4th 531 (3rd Cir. 2021) ................................................. 40

*Legg v. Ulster Cnty.*, 820 F.3d 67 (2nd Cir. 2016) ................................................ 35

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997) ... 39

*Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236 (11th Cir. 1998) ........... 22, 25, 36

*Lyes v. Riviera Beach*, 166 F.3d 1332 (11th Cir. 1999) ..........................................26

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)...................................................49

*Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999) ................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............16

*Morrison v. Magic Carpet Aviation*, 383 F.3d 1253 (11th Cir. 2004) ...................25

*Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342 (N.D. Fla.) (quoting 11th Cir. Pattern Jury Instr. 4.25 (2020))), *adopted by* 2020 U.S. Dist. LEXIS 138445 (N.D. Fla.), *aff'd on joint employment theory*, 856 Fed. Appx. 807 (11th Cir. 2021) ................................................................................................ 22, 24

*Parker v. Esper,* 856 Fed. Appx. 807 (11th Cir. 2021) ............................ 22, 24, 25

*Peppers v. Cobb County*, 835 F.3d 1289 (11th Cir. 2016) ......................................21

*Pouyeh v. Bascom Palmer Eye Inst.*, 613 Fed. Appx. 802 (11th Cir. 2015) ..........46

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)................................................33

*Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489 (11th Cir. 1996) ...16

*Reznik v. inContact, Inc.,* 18 F.4th 1257 (10th Cir. 2021) .............................. 40, 41

*Ries v. McDonald's USA, LLC*, 2021 U.S. Dist. LEXIS 233070 (W.D. Mich.) .....25

*Rodgers v. Horsley*, 39 F.3d 308 (11th Cir. 1994) ....................................................3

*Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253 (11th Cir. 2001) ..........................41

*Spivey v. Beverly Enters.*, 196 F.3d 1309 (11th Cir. 1999) ....................................46

*Standard v. A.B.E.L. Servs.*, 161 F.3d 1318 (11th Cir. 1998) ................................29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ...................................................................................33

*Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) .........................15

*TWA v. Thurston*, 469 U.S. 111 (1985) ....................................................35

*U.S. v. Ledford*, 443 F.3d 702 (10th Cir. 2005) .........................................29

*U.S. v. Little*, 829 F.3d 1177 (10th Cir. 2016) .........................................29

*Vaughan v. City of Sandy Springs*, 2011 U.S. Dist. LEXIS 161461 (N.D. Ga.), *adopted by* 2012 U.S. Dist. LEXIS 197079 (N.D. Ga.) .......................................39

*Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350 (11th Cir. 1994) ............... 48, 49

*Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275 (11th Cir. 2001) .............16

*Wards Cove Packing Co. v. Atonio,* 490 U.S. 642 (1989).......................................43

*Warner v. Sch. Bd. of Hillsborough Cnty.*, 2024 U.S. App. LEXIS 11239 (11th Cir.)..................................................................................38

*Watts v. Ford Motor Co.*, 519 Fed. Appx. 584 (11th Cir. 2013)............................18

*Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307 (11th Cir. 2002) ........................ 40, 41

*Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329 (11th Cir. 2023) ......................37

*Young v. UPS*, 575 U.S. 206 (2015) .......................................................34

**Statutes**

28 U.S.C. §1291 ..........................................................................1

28 U.S.C. §1331 ..........................................................................1

28 U.S.C. §1343 ..........................................................................1

42 U.S.C. §1981 .................................................................... passim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*.............. passim

**Other Authorities**

Eleventh Circuit Rule 26.1-1 - 26.1-3 ................................................... i, vi

Fed. R. App. P. 26.1 ................................................................................ i, vi

Fed. R. App. P. 32 ..................................................................................... 50

Fed. R. Civ. P. 56 ................................................................................. 15-17

Fed. R. Civ. P. 8 .................................................................................. 18, 21

Fed. R. Evid. 801 ...................................................................................... 29

Fed. R. Evid. 803 ...................................................................................... 29

**JURISDICTIONAL STATEMENT**

The District Court had subject-matter jurisdiction over Plaintiff's claims, brought pursuant to Title VII and 42 U.S.C. §1981, pursuant to 28 U.S.C. §§1331, 1343, and 42 U.S.C. §2000e-5(f)(3).

Appellate jurisdiction is proper under 28 U.S.C. §1291.

HMMA does not dispute the timeline Plaintiff offers in this section of her brief, except that Plaintiff neglects to mention that any disparate impact claims were also dismissed against all defendants by the District Court's August 31, 2021, Order.

HMMA does not dispute that Plaintiff's appeal in this matter was filed timely.

**STATEMENT OF THE ISSUES APPLICABLE TO HMMA**

1. Should summary judgment in HMMA's favor be affirmed because there is no genuine dispute of material fact that HMMA did not have an employment relationship with Plaintiff?

2. Did the District Court correctly conclude that there was no genuine dispute of material fact that HMMA did not discriminate against Plaintiff?

3. Did the District Court correctly determine that Plaintiff had failed to articulate a plausible basis to claim that an alleged grooming policy of Hyundai

ENG America, Inc. (HEA) prohibiting unstyled dreadlocks had a disparate impact on Black employees or applicants due to their race?

4.  Did the District Court correctly conclude that even if a grooming policy existed for the purpose of prohibiting Black workers from wearing dreadlocked hairstyles, that if such a policy was neutrally written and neutrally enforced, it was not discriminatory?

5.  Did the District Court correctly conclude that Plaintiff did not engage in protected activity as a matter of law when she complained that she felt discriminated against because of her hair?

6.  Can HMMA be liable for such policies that it did not author, request, or enforce, and employment assignment decisions it did not make or recommend?

7.  Additionally or alternatively, should summary judgment in HMMA's favor on Plaintiff's Title VII claims be affirmed because Plaintiff did not file an EEOC Charge against HMMA until 14 months after DSI terminated her assignment?

## STATEMENT OF THE CASE

I. **STATEMENT OF THE FACTS RELEVANT TO PLAINTIFF-APPELLANT'S CLAIMS AGAINST HMMA**[3]

### A.    About the Parties

HMMA is an automobile manufacturer headquartered in Montgomery, Alabama. (D.E. 68-1, p. 2, ¶2;[4] D.E. 68-10, p. 2). HMMA has robust non-discrimination, non-harassment, and non-retaliation policies, and it is committed to not discriminating against employees due to protected statuses, including race, and not retaliating against employees who engaged in protected conduct. (D.E. 68-2, pp. 50-51, 190:19-192:12, 195:10-23, pp. 225-226, ex. 7). Contractors provide some supporting services for HMMA's facility, including security (which includes mailroom) services. (*Id.*, p. 46, 173:4-10, 175:5-10). Contractors and their employees are not HMMA employees. (*Id.*, p. 48, 182:15-21).

Hyundai ENG America, Inc. (HEA), previously known as Hyundai AMCO America, Inc. (AMCO) provides construction, security, janitorial, landscaping, and perhaps other services to multiple customers, including HMMA. (*Id.*, p. 6, 16:10-15; D.E. 68-6, p. 6, 14:6-15:4; D.E. 68-7, p. 5, RFA #2; D.E. 68-8, pp. 2-3). HEA

---

[3] HMMA states disputed material facts in the light most favorable to Plaintiff: "[a]s a result, the 'facts' for purposes of reviewing rulings on summary judgment motions may not, in reality, be the facts." *Rodgers v. Horsley*, 39 F.3d 308, 309 (11th Cir. 1994).

[4] HMMA cites to items referenced in this brief not included in Plaintiff's appendix by Docket Entry number used by the District Court, and the page number stamped by the District Court's cmECF system. If the referenced document may be described with additional precision by pinpoint citation, the pinpoint citation shall follow.

is headquartered in California. (D.E. 68-9, p. 2). There are no common owners, common policies, or shared bank accounts between HMMA and HEA. (D.E. 68-2, p. 6, 16:23-17:5, p. 41, 154:13-22). Since 2010, HEA has employed Cassandra Williams as a manager; she manages HEA's contracts with HMMA, Glovis Alabama, and Glovis America. (D.E. 68-6, p. 12, 40:3-8; D.E. 68-14, pp. 2-3, ¶2). Williams is Black. (D.E. 68-12, p. 11, 37:16-17). Williams does not report to any HMMA employee; she reports to an HEA Project Manager who is supervised by other HEA employees. (D.E. 68-6, pp. 6-7, 16:21-17:12, p. 39, 148:8-23). Prior to working for HEA, Williams worked for two other entities that provided security services at HMMA. (D.E. 68-6, p. 13, 41:5-42:16). HMMA has never employed Williams. (D.E. 68-2, p. 72, 280:5-13; D.E. 68-3, p. 49, 185:7-21, 186:21-187:1; D.E. 68-4, p. 21, 76:12-17; D.E. 68-6, p. 39, 146:8-10, p. 62, ex. 1).

Dynamic Security, Inc., (DSI) provides security officers for many businesses in seven states; it has about 1,300 employees. (D.E. 68-3, p. 6, 13:9-21, 14:1-7). HEA contracted with DSI to provide security services, including mailroom staffing, at HMMA's facility; DSI did not have any contract with HMMA. (*Id*., p. 51, 193:19-197:14, p. 105, ex. 2; D.E. 68-4, p. 21, 75:17-21; D.E. 68-6, p. 16, 56:12-17). DSI employed Gloria Robinson as its on-site manager at the HMMA facility servicing the HEA contract. (D.E. 68-3, p. 22, 78:3-8). Robinson is Black. (D.E. 68-5, p. 3, ¶14).

4

Plaintiff is a Black woman who has chosen to style her hair in dreadlocks since she was about 18 years old. (Doc. 37, p. 37, ¶2; D.E. 68-12, p. 62, 243:7-9). When she worked for DSI, Plaintiff held a Bachelor's Degree and a Master's Degree. (*Id.*, pp. 23-24, 85:11-86:8). Plaintiff's immediate supervisor at DSI was Maurice Chambliss, who is Black. (*Id.*, p. 6, 18:23-24, p. 9, 31:10-13, p. 11, 37:14-15). Throughout her employment, Plaintiff also regularly reported to Robinson. (*Id.*, p. 9, 31:20-23, p. 12, 41:4-6). Plaintiff sought Human Resources support directly from DSI. (*Id.*, pp. 9-10, 32:25-33:15). Plaintiff was paid exclusively by DSI for her work in the mailroom. (*Id.*, p. 8, 27:12-21, 28:1-4, p. 77, ex. 3).

**B.    Plaintiff's Employment with DSI**

1.    <u>Selection by DSI and Orientation</u>

Plaintiff applied with DSI for a mailroom job. (D.E. 68-12, p. 6, 19:10-24). Robinson and Chambliss interviewed her on July 19, 2017. (*Id.*, p. 6, 18:15-24). At that time, they consulted Williams about Plaintiff's dreadlocked hair. (*Id.*, p. 33, 127:1-25). Plaintiff showed Robinson an up-do hairstyle and they agreed she would wear her hair like that. (*Id.*, p. 33, 128:19-25). After being selected by DSI, Plaintiff attended orientation at a DSI facility with DSI employees. (*Id.*, p. 35, 135:2-20). There, she received a DSI employee handbook. (*Id.*, p. 35, 135:18-20). Also, DSI's office manager, Nicole Scavella, told Plaintiff that her hair complied with DSI's policies. (*Id.*, p. 10, 34:23-35:1, p. 34, 129:1-11).

### 2.    July 31 and August 1, 2017

Plaintiff worked for DSI at HMMA's facility on two days: July 31 and August 1, 2017. (*Id*., p. 6, 17:21-18:1). On July 31, Plaintiff did not wear her hair in the agreed-on up-do style because of her conversation with Scavella. (*Id*., p. 34, 129:1-11). Also on that day, Plaintiff told Robinson and Chambliss that she was pregnant. (*Id*., pp. 30-31, 115:18-25, 116:8-12, 117:14-20). After that, Robinson went to her office, and Williams confronted Plaintiff about her hair. (*Id*., pp. 30-31, 116:15-117:5, pp. 36-37, 140:16-141:8, 141:25-143:4). Then, LaTunya Howell, a DSI employee who is Black, trained Plaintiff. (*Id*., p. 7, 23:10-13, p. 10, 35:24-25, pp. 36-37, 138:13-139:18, 141:9-12). After about an hour of training, Plaintiff met again with Robinson and Williams, who told her that her hair did not comply with HEA's policy. (*Id*., p. 38, 145:3-146:4, pp. 78-80, ex. 8). Robinson told Plaintiff to go home for the day, and they agreed she could wear a hat the next day. (*Id*., p. 31, 118:13-21, pp. 38-39, 147:20-148:6, 150:5-151:1). After Plaintiff went home, Robinson called Plaintiff to find out when her due date was and if her doctor was aware of her job requirements. (*Id*., p. 31, 119:20-120:2).

On August 1, Plaintiff returned to work and told Howell she thought she was being treated unfairly because of her hair. (*Id*., pp. 39-40, 151:25-154:6). After that, Robinson asked her if she was going to continue to act this way until—and then pointed to her stomach; asked her if she felt discriminated against; stated that

"this" was going to be a problem, though Plaintiff does not know what "this" Robinson was referring to; and said that Koreans were a different breed of animals and sent memos that they did not want Black employees wearing hair like hers. (*Id.*, pp. 31-32, 119:13-17, 120:13-122:3, p. 41, 158:21-160:20). Plaintiff does not know what "Koreans" Robinson was referring to. (*Id.*, pp. 17-18, 63:24-65:1, p. 21, 78:9-79:7). Plaintiff has never seen this memo; no evidence of this alleged memo has been produced; and neither Robinson, nor Williams, nor HMMA is aware of such a memo. (*Id.*, p. 18, 67:8-10; D.E. 68-5, p. 3, ¶¶11-12; D.E. 68-14, p. 4, ¶5; D.E. 68-1, p. 3, ¶10). Robinson dismissed Plaintiff, and Chambliss took her back to the mailroom for more training. (D.E. 68-12, p. 42, 162:4-12). Chambliss later returned to the mailroom and Plaintiff told him she wanted to speak to someone in human resources. (*Id.*, p. 42, 164:17-23). Robinson told Chambliss to have Plaintiff speak with Ray Cureton, DSI's Montgomery branch manager, who is white. (*Id.*, p. 10, 35:22-23, p. 43, 165:10-20; D.E. 68-3, p. 22, 78:10-13). Plaintiff left the job site to go to DSI's Montgomery office. (D.E. 68-12, p. 43, 166:14-17, 167:8-13). Before Plaintiff arrived, Williams had requested or affirmed Robinson's recommendation for Plaintiff's reassignment verbally and by e-mail to DSI. (D.E. 68-6, p. 27, 100:12-21; D.E. 82, p. 33). The first thing Cureton asked Plaintiff was if she was going to sue DSI. (D.E. 68-12, p. 43, 168:11-14). Plaintiff responded that she just wanted to talk to someone in HR. (*Id.*, 168:15-18). Plaintiff told

Cureton what had happened on July 31, that she had told Robinson and Chambliss she was pregnant and was sent home, that she was sent home for her hairstyle even though it complied with DSI policies, and that Robinson was "demeaning and hostile" to her. (*Id.*, pp. 44-45, 172:16-173:10). At the end of the meeting, Cureton asked for her badge, saying that "they" or Robinson, or Robinson and Williams, did not want her there because of her hair "and something else." (*Id.*, p. 12, 41:24-42:18, p. 33, 125:13-126:6, p. 45, 174:11-22, p. 58, 226:16-227:6).

### 3.    HMMA had no input or involvement in DSI's decision to end Plaintiff's assignment on August 1, 2017.

DSI states it removed Plaintiff from the assignment to its contract with HEA based on Williams' request. (D.E. 68-3, pp. 50-51, 192:3-193:5; D.E. 68-4, p. 22, 79:8-13). No one from HMMA requested that Williams ask for Plaintiff's removal. (D.E. 68-6, p. 39, 146:11-13). No HMMA employee ever objected to Plaintiff's appearance or hairstyle. (D.E. 68-2, p. 64, 247:1-6). HMMA does not know who decided to remove Plaintiff from its property, but HMMA had no involvement in that decision. (D.E. 68-2, p. 64, 245:4-18; D.E. 68-6, p. 39, 146:11-13). In Plaintiff's opinion, the individuals responsible for discriminating against her were Robinson, Williams, and their employers. (D.E. 68-12, p. 17, 62:5-17). Plaintiff is not aware of anyone other than Robinson (DSI), Williams (HEA), Cureton (DSI), Howell (DSI), Chambliss (DSI), or Scavella (DSI), being involved in the termination of her assignment. (*Id.*, p. 20, 75:1-15; D.E. 68-13, pp. 93-124, ex. 16).

Plaintiff never saw an HMMA policy that prohibited dreadlocks; during her employment at DSI she saw only an HEA policy and Dynamic's policy; and she cannot dispute that HMMA allowed dreadlocks. (D.E. 68-12, pp. 13-16, 48:24-53:22, 57:1-3, pp. 20-21, 76:15-77:11, pp. 78-81, exs. 8 and 9).

### C.  Grooming or appearance standards in effect at the time of Plaintiff's employment at DSI.

#### 1.  HMMA had no general prohibition on dreadlocks and no appearance standard applicable to Plaintiff as a DSI employee.

HMMA did not maintain any appearance or grooming policies other than a personal protective equipment (PPE) safety matrix, which did not apply to the area Plaintiff was assigned to. (D.E. 68-2, p. 40, 149:19-22, p. 62, 237:21-23, 238:15-17, 239:17-20). HMMA's matrix does not prohibit dreadlocks. (*Id*., p. 227, exh 8; D.E. 68-12, pp. 14-15, 52:11-53:22, p. 81, ex. 9). In fact, HMMA employees and other contractors' employees at HMMA wear their hair in dreadlocked styles. (D.E. 68-14, pp. 3-4, ¶4). No one has been disciplined by or on behalf of HMMA for wearing dreadlocks. (D.E. 68-2, p. 63, 242:15-244:15).

#### 2.  DSI did not prohibit dreadlocks.

DSI did not have a company-wide appearance standard prohibiting dreadlocks. (D.E. 68-3, p. 12, 39:18-40:4, p. 24, 86:11-16).

### 3. HEA's Appearance Standard, created and revised by Williams, prohibited unstyled dreadlocks and applied to DSI employees.

HEA's Appearance Standards for Security Personnel, which applied to Plaintiff, stated that women must have clean, well-groomed, and neat hair, not extending more than three inches below the collar; that hairstyles must fit under a security-issued ball cap or PPE headgear; that well-groomed braids were permitted; and that dreadlocked hairstyles were prohibited. (D.E. 68-12, p. 14, 50:5-51:21, pp. 78-80, ex. 12). When Williams wrote this policy, designed for security officers, she worked from a 2004 HMMA policy, which did not expressly prohibit dreadlocks, and she also drew from her own experience with the Montgomery Police Department, and she chose to add a specific prohibition against dreadlocks because she did not consider them professional. (D.E. 68-6, p. 12, 39:17-22, p.13, 42:10-43:8, 43:13-44:10, p. 39, 146:21-147:1; D.E. 68-14, p. 3, ¶3).

Williams created, revised, and maintained HEA's Appearance Standard without HMMA's involvement. No one from HMMA reviewed Williams's various edits to HEA's Appearance Standard. (D.E. 68-6, pp. 13-14, 44:11-45:4, p. 39, 147:11-148:7). No one told Williams that HMMA had any issue with Black people wearing dreadlocks. (*Id*., p. 39, 147:2-6). Williams' decision to include a specific dreadlocks prohibition in HEA's policy and to maintain it there was based on her personal negative opinion about the hairstyle and was consistent with prevailing

police and military practices. (D.E. 68-6, p. 39, 146:21-147:1; D.E. 68-14, p. 3, ¶3; https://www.army.mil/article/181080/turbans_beards_dreadlocks_now_permissible_for_some_soldiers (accessed Feb. 10, 2025)).

Following Plaintiff's separation, Williams and DSI allowed the assignment of two other Black females DSI employees with dreadlocked hairstyles to HMMA. (D.E. 68-6, pp. 14-15, 46:17-51:15).

### D.    HMMA did not control or supervise DSI's mailroom workers.

HEA performed its work at HMMA under contracts or scope of service agreements. (*Id.*, p. 16, 53:16-54:1, 54:20-55:7). HMMA provided basic directions to HEA on mail processing and delivery. (*Id.*, p. 17, 57:10-15). HMMA established an initial schedule for mailroom personnel (a single shift operation), but Williams changed it on her own and informed HMMA of the change. (*Id.*, pp. 17-18, 57:10-13, 63:13-64:9, p. 40, 150:16-151:4).

Except for the safety training and safety handbook HMMA provided to all contractors, subcontractors, and their employees, DSI and its employees solely provided Plaintiff orientation training and on-site instructions on how to do her job. (D.E. 68-12, p. 7, 23:10-13, pp. 9-10, 29:20-25, 35:24-25, p. 13, 47:10-22, pp. 35-37, 135:2-20, 138:13-139:18, 141:9-12, pp. 39-40, 151:25-154:6, p. 42, 162:4-12; D.E. 68-2, pp. 45-46, 172:11-173:3). No HMMA manager provided hands-on instruction or day-to-day supervision to DSI employees. (D.E. 68-1, p. 4, ¶18). If

HMMA wanted mailroom workers to perform additional work, it would bring that request to HEA, and not to the mailroom workers. (D.E. 68-2, p. 74, 285:5-21). HMMA did not supervise, evaluate, or discipline DSI's employees. (D.E. 68-1, p. 4, ¶17). Plaintiff received a DSI employee handbook, but never an HMMA employee handbook, only its safety manual. (D.E. 68-12, p. 13, 47:10-16, p. 16, 58:16-18, p. 35, 135:18-20). HMMA never maintained any type of employee file or employee report for Plaintiff. (D.E. 68-1, p. 4, ¶16). HMMA could not have directly requested DSI remove a DSI employee; rather it would have gone through Williams to do that. (D.E. 68-6, p. 11, 35:14-17). HMMA doesn't investigate the actions of contractor's or subcontractor's employees or specify disciplinary responses a contractor or subcontractor ought to impose. (D.E. 68-2, p. 3, ¶11; D.E. 68-2, p. 48, 181:15-21, 182:1-22).

HMMA did not set the wage rate for the mailroom workers employed by DSI. HMMA's contract with HEA sets an hourly rate of pay from HMMA to HEA intended to include "all costs to Contractor for every aspect of the Services including without limitation, materials, labor, equipment, testing, clean-up…, insurance, fees, taxes, travel, transportation, and import fees or duties." (D.E. 68-1, p. 4, ¶12; D.E. 68-2, pp. 164, 187, ex. 2). HMMA did not issue paychecks or provide any benefits (including but not limited to leave, vacation, insurances, worker's compensation) to DSI's employees in the mailroom. (D.E. 68-1, p. 4,

¶14; D.E. 68-12, pp. 7-8, 21:24-22:7, 27:10-21, exh. 3). HMMA didn't pay taxes for DSI workers or receive tax benefits from their employment. (D.E. 68-1, p. 4, ¶15).

Other than saying hello to the person who took her badge picture, Plaintiff never spoke to anyone at the HMMA facility other than Robinson (DSI), Howell (DSI), Chambliss (DSI), and Williams (HEA). (D.E. 68-12, p. 11, 39:18-40:4). Plaintiff could not even name anyone employed by HMMA. (*Id*., 40:13-17).

## II. COURSE OF PROCEEDINGS AND DISPOSITION WITH RESPECT TO CLAIMS AGAINST HMMA

### A. Plaintiff did not timely file a Charge against HMMA with the EEOC.

Plaintiff completed an Intake Questionnaire at the EEOC on August 2, 2017, one day after her assignment ended. (D.E. 68-12, pp. 82-85, ex. 13). In the Intake Questionnaire, she twice identified Williams as "Ms. Cassandra Williams, AMCO." (*Id*., p. 83). She indicated that Williams and Robinson and their employers were the only individuals responsible for the conduct she complained of. (*Id*., p. 17, 62:2-17). As a result of that intake process, Plaintiff signed a Charge against DSI only on August 3, 2017. (*Id*., pp. 90-91, ex. 14).

Fourteen months later, an EEOC investigator told Plaintiff there was an additional document she needed to sign: a Charge against HMMA. (*Id*., p. 19, 70:13-17, p. 47, 184:11-25; D.E. 68-13, p. 92, ex. 15). Plaintiff did not initiate this

additional Charge filing. (D.E. 68-12, p. 19, 70:13-19). Prior to that, HMMA had been unaware of Plaintiff's EEOC Charge against DSI. (D.E. 68-2, pp. 64-65, 248:20-249:11). On July 12, 2019, the EEOC issued its notice of right to sue to Plaintiff.

### B.    Key Proceedings Before the District Court

Plaintiff filed suit against DSI, HEA, and HMMA on or about October 10, 2019. (Doc. 37, pp. 22-28). All three Defendants timely moved to dismiss Plaintiff's Complaint. (D.E. 8 (HEA), D.E. 11 (HMMA), D.E. 13 (DSI)).

On June 1, 2020, Plaintiff filed an Amended Complaint. (Doc. 37, pp. 36-63). On June 2, 2020, the District Court denied Defendants' pending motions to dismiss as moot. (D.E. 29). All three Defendants timely moved to dismiss Plaintiff's Amended Complaint. (D.E. 30 (HMMA), D.E. 31 (HEA), D.E. 32 (DSI)).

On August 31, 2021, the District Court granted Defendants' motions in part and denied them in part. (Doc. 37, pp. 64-97). The District Court filed a corrected memorandum opinion and order which corrected the caption and specified that Plaintiff's disparate impact claim was dismissed as to HMMA. (D.E. 39-1, pp. 23-24, 33).

After completing discovery, HMMA and the other defendants moved for summary judgment on October 12, 2022. (D.E. 66 (HMMA), D.E. 69 (HEA), and

D.E. 73 (DSI)). Following briefing (D.E. 67 (HMMA), D.E. 70 (HEA), D.E. 74 (DSI); D.E. 82 (Plaintiff); and D.E. 85 (HMMA), D.E. 86 (HEA), and D.E. 87 (DSI)), on February 10, 2023, the Court granted HMMA's and HEA's motions in full, and DSI's motion in part. (Doc. 37, pp. 181-224).

With respect to HMMA, Plaintiff's appeal seeks to overturn the District Court's dismissal of her disparate impact race claims under Title VII and Section 1981, and the District Court's grant of summary judgment to HMMA on Plaintiff's disparate treatment race and retaliation claims under Title VII and Section 1981. Plaintiff does <u>not</u> seek to reverse the District Court's grant of summary judgment to HMMA on her pregnancy discrimination claim.

## III.   STANDARD OF REVIEW

### A.   The Court reviews *de novo* the District Court's grant of summary judgment to HMMA, and can also affirm the District Court's grant of summary judgment on any basis apparent from the record.

This Court reviews *de novo* a district court's order granting a motion for summary judgment. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). This Court may affirm the District Court's judgment on any ground that appears in the record, even if it was not applied by the District Court. *Id*. at 1364.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The movant "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56). This responsibility includes identifying those portions of the record illustrating an absence of a genuine dispute of material fact, or, for a movant who does not bear the burden of production of evidence at trial, to show that the nonmovant "cannot produce admissible evidence to support" a requisite material fact. *Id.*; Fed. R. Civ. P. 56(c)(1)(B) and Advisory Committee Notes thereto. A dispute of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275 (11th Cir. 2001). An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must support her assertion as to the existence of a genuine dispute of

material fact by citing to the record or showing that the materials cited do not actually establish the absence of a genuine dispute of fact or that there is no admissible evidence that supports the movant's key factual allegations. Fed. R. Civ. P. 56(c)(1)(A) & (B). All evidence should be viewed in the light most favorable to the nonmovant, and evidence-based inferences drawn in her favor. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam); *Anderson*, 477 U.S. at 255.

### B.    The *de novo* standard of review also applies to the District Court's dismissal of Plaintiff's disparate impact claims.

This Court reviews *de novo* a district court's order granting a motion to dismiss. *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1359 (11th Cir. 2011).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 555 (internal citations omitted). While specific factual allegations, especially of the "who, what, when and where variety" are accorded this assumption of truth, that assumption does not

17

extend to conclusory statements that a plaintiff can establish the various elements of her claim. *Watts v. Ford Motor Co*., 519 Fed. Appx. 584, 587 (11th Cir. 2013); *Iqbal*, 556 U.S. 662, 678-680.

## SUMMARY OF ARGUMENT

The District Court properly dismissed Plaintiff's disparate impact claims, which were too cursory to meet even the low threshold of plausibility under Fed. R. Civ. P. 8. The District Court correctly determined that even Plaintiff's Amended Complaint contained no particularized factual allegations that Black individuals were disadvantaged by the policy. (D.E. 39-1, pp. 23-24). Plaintiff and the EEOC ultimately acknowledge in this appeal that the Amended Complaint only invited an inference of disparity (Doc. 32, p. 44; Doc. 36, p. 29) but still request that the District Court's decision be reversed so that this entirely speculative claim can proceed. This Court should affirm the District Court's decision as a correct application of the Fed. R. Civ. P. 8 standard generally and consistent with its caselaw concerning the minimal pleading standards for disparate impact cases.

The District Court properly granted summary judgment to HMMA on Plaintiff's claims of race discrimination, in which three of the five tiles in Plaintiff's convincing mosaic—showing that "styled" dreadlocks were permitted under HEA's policy, an option Plaintiff refused but two other Black DSI employees embraced—"actually strike[] against" her convincing mosaic theory,

and a fifth tile was merely a speculative hypothesis. (Doc. 37, pp. 208, 211). Plaintiff centers her appeal on the fourth tile, an alleged and disputed statement by DSI's supervisor Robinson that unknown "Koreans" disfavored Black individuals wearing dreadlocks. Plaintiff and the EEOC argue that if one assumed this multiple-hearsay and disputed statement referred to the policy's creation, a claim for intentional discrimination could survive, even in the absence of disparate enforcement. (Doc. 32, pp. 46-47; Doc. 36, pp. 37-38). But the District Court followed Eleventh Circuit precedent when it held, "[a]bsent evidence of unequal application of the appearance standard on the basis of race …, Key fails to show that the statement, even if it was made, reveals intentional racial animus." (Doc. 37, pp. 210-11). Plaintiff also errs in arguing that the *Bostock* decision demands overturning *Catastrophe Management* (Doc. 32, pp. 49-50); *Bostock* cautioned against expanding protected classes, and Plaintiff has mis-applied its "change one thing" analysis in her appeal.

The District Court correctly awarded summary judgment to HMMA on Plaintiff's retaliation claims. The District Court found that because Williams (assuming she was HMMA's agent) requested the termination of Plaintiff's assignment to DSI when her understanding of Plaintiff's supposed protected activity consisted of Plaintiff telling Howell she'd been discriminated against because of her hair, then Plaintiff could not have had an objectively reasonable

belief that she was complaining of race discrimination. (Doc. 37, pp. 221-224). Plaintiff contends on appeal that since she used the word "discriminate" to Howell, there was adequate evidence for a jury to find retaliation (Doc. 32, p. 51), but such a magic-word standard would radically alter retaliation protections to depend solely on the intent of the decisionmaker, without the necessity of the plaintiff opposing anything unlawful. The District Court's decision here rests on decades-long binding precedent that protected conduct must concern actual or near-actual violations of the law, consistent with the language of Title VII itself, and thus it should be affirmed, and the EEOC's invitation to reexamine that standard should be declined.

Finally, the District Court's grant of summary judgment to HMMA could be affirmed because HMMA exercised no control over DSI's mailroom employees generally, or Plaintiff specifically; and it additionally had no role in the creation, maintenance, or enforcement of the Appearance Standard to which Plaintiff was held. The dismissal of Plaintiff's Title VII claims against HMMA could also be affirmed on the grounds that Plaintiff's Charge against HMMA was untimely.

# ARGUMENT

## I. THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT TO HMMA BECAUSE HMMA WAS NOT PLAINTIFF'S EMPLOYER.

In its motion to dismiss Plaintiff's Amended Complaint, HMMA argued it was not Plaintiff's employer. The District Court denied the motion under Fed. R. Civ. P. 8, concluding that "Plaintiff pleads enough facts—barely—to plausibly show that HMMA had enough control of her employment to support an employment relationship." (D.E. 39-1 p. 19; Doc. 37, p. 83). As HMMA argued at summary judgment, discovery failed to yield evidence that HMMA controlled any aspect of Plaintiff's assignment to the degree required for liability under Title VII or Section 1981.

### A. The Joint Employer Standard

To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of the plaintiff's employment. Courts examine "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016). Factors that may be considered include: interrelations of operations; centralized control of labor relations; common management; common ownership or financial control; the nature and degree of control over the

worker and who exercises that control; the degree of supervision over the worker's work and who exercises that supervision; who exercises the power to determine the worker's pay rate or method of payment; who has the right to hire, fire, or modify the employment relationship; who prepares payroll and pays wages; who pays taxes; who provides employee benefits; who invests in the equipment and facilities the worker uses; who can profit or loss from the worker's work; the worker's permanence or exclusiveness; the degree of skill the job requires; who owns the property where the worker works; and whether the worker's work is integral to the alleged employer's core business. *Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342, *12 (N.D. Fla.) (quoting 11th Cir. Pattern Jury Instr. 4.25 (2020))), *adopted by* 2020 U.S. Dist. LEXIS 138445 (N.D. Fla.), *aff'd on joint employment theory*, 856 Fed. Appx. 807 (11th Cir. 2021). The joint employment inquiry focuses on the employment decision at issue. *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242, 1244-45 (11th Cir. 1998).[5]

### B. There was no evidence sufficient to establish HMMA as Plaintiff's joint employer.

Plaintiff was DSI's employee. (D.E. 68-12, pp. 6-7, 19:10-24, 21:24-22:7). DSI and HMMA were not interrelated, did not have centralized labor relations, had

---

[5] HMMA did not influence Plaintiff's loss of assignment to the HEA contract and it also did not generally control DSI employees at its facility. So, whether the focus is on DSI's removal of Plaintiff from the mailroom assignment specifically or DSI's mailroom employees generally, there was no evidence that HMMA exercised an employer's control.

no common management, and no common ownership or financial control. HMMA supervisors didn't provide day-to-day management of DSI staff. (D.E. 68-1, p. 4, ¶¶17-18). DSI had an arms' length business relationship with HEA, and HEA could and did change security contractors on the HMMA contract from time to time. (D.E. 68-6, p. 13, 42:10-16; D.E. 75-25, p. 10, 30:21-22; D.E. 68-5, p. 3, ¶8). HEA in turn had an arms' length business relationship with HMMA: there was no common ownership between the two, no common policies, no common managers, and Williams reported to an HEA supervisor and served as an HEA manager for multiple job sites. (D.E. 68-2, pp. 6-7, 16:23-17:5, p. 41, 154:13-22; D.E. 68-6, pp. 6-7, 16:21-17:12; D.E. 68-14, pp. 2-3, ¶2).

HMMA didn't pay or provide benefits to DSI employees, including Plaintiff. (D.E. 68-1, p. 4, ¶14; D.E. 68-12, pp. 7-8, 21:24-22:7, 27:10-21, p. 77, ex. 3). It didn't pay taxes for DSI's employees or receive tax benefits from their employment. (D.E. 68-1, p. 4, ¶15). DSI's services are ancillary to HMMA's core business of manufacturing automobiles. (*Id.*, p. 2, ¶2; D.E. 68-12, pp. 11-12, 40:18-41:6).

Other than safety and security presentations it conducted with all contractors, no HMMA employee told Plaintiff how to deliver the mail; Howell was Plaintiff's primary trainer. (D.E. 68-12, p. 7, 23:10-13, p. 10, 35:24-25, pp. 35-37, 135:2-20, 138:13-139:18, 141:9-12). Plaintiff also received a general

23

orientation from DSI at its offices. (*Id.*, p. 35, 135:2-20). DSI also provided two on-site supervisors; and Plaintiff regularly interacted with Williams. (*Id.*, p. 6, 18:23-24, p. 9, 31:10-13, 31:20-23, p. 12 41:4-6; D.E. 68-1, p. 4, ¶¶17-18; D.E. 68-2, p. 74, 285:5-21). HMMA couldn't request any DSI employee to perform their job differently; such a request would have to go through HEA and Williams. (D.E. 68-2, p. 74, 285:5-21). HMMA couldn't hire or fire DSI's employees. (D.E. 68-1, p. 4, ¶17).

HMMA didn't author HEA's Appearance Standard; and, during July 2017, it did not restrict its own employees from wearing dreadlocks. (D.E. 68-6, p. 12, 39:17-22, pp. 13-14, 44:11-45:4, p. 39, 147:11-148:7; D.E. 68-2, p. 227, ex. 8). No HMMA employee requested the end of Plaintiff's assignment. (D.E. 68-6, p. 39, 146:11-13). Plaintiff could not even name any HMMA employee, and the only HMMA employee she interacted with was the person who took her badge picture. (D.E. 68-12, p. 11, 39:18-40:17).

Where a single entity provides all compensation and benefits of employment, and exclusively monitors, evaluates, and disciplines employee performance, then that weighs against finding that any other entity is also the worker's employer. *Parker*, *supra.*, 2020 U.S. Dist. LEXIS 139342, **17-18, *aff'd at* 856 Fed. Appx. 807, 808-809. This is especially true where the second entity has no authority to hire or fire the first entity's workers. *Id*. at *18. It is even more true

when the second entity takes no action with respect to the contested employment decision. *Llampallas*, 163 F.3d 1236, 1242, 1244-45; *see also Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004). Though Plaintiff performed her work for DSI on HMMA's premises, that simply does not make HMMA a joint employer. *E.g., Parker v. Esper*, 856 Fed. Appx. 807, 809.

### C.    Williams and HEA were not HMMA's agents.

Williams and HEA were also not HMMA's agents. Although agency theory may be applied to determine who may be aggregated with or held liable as a Title VII employer, Plaintiff mis-applied it, and tardily raised it, in her Response to Defendants' Motion for Summary Judgment. Title VII introduces the idea of agent-liability as an extension of the *actual employer's* liability; in other words, agency could only arise from DSI's delegation of its authority all the way to HMMA, of which there is no evidence. *See Ries v. McDonald's USA, LLC*, 2021 U.S. Dist. LEXIS 233070, **17-18 (W.D. Mich.); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 379 (2nd Cir. 2006); 42 U.S.C. 2000e(b).

### D.    Regardless of the test applied, HMMA never exercised control over Plaintiff's employment with DSI.

Integrated enterprise,[6] joint employment, agency: these all look to exercises and delegations of <u>control</u>. *Lyes v. Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999). And that is what this case comes down to. HMMA didn't have actual or reserved control over DSI employees, including Plaintiff, and thus HMMA can't be liable to Plaintiff as a mere bystander.

## II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THERE WAS NO EVIDENCE THAT HMMA TOOK ANY ACTION AGAINST PLAINTIFF-APPELLANT BASED ON HER RACE.

Plaintiff opposed Defendants' motions for summary judgment on her race discrimination claims by arguing she had presented a convincing mosaic[7] of discrimination. (Doc. 37, p. 208). Plaintiff's mosaic consisted of five tiles: (1) the Appearance Standard was not applied uniformly; (2) two other Black DSI employees were allowed to wear dreadlocks that were "styled," in contrast to Plaintiff's dreadlocks "worn naturally;" (3) Plaintiff was allowed to wear dreadlocks if styled differently by putting them in a bun or covering them with a hat; (4) the intention of the appearance standard was to prevent Black individuals

---

[6] Plaintiff does not appeal the District Court's finding that Plaintiff did not plead facts adequate to show that HEA and HMMA were an integrated enterprise. (D.E. 39-1 p. 17 n. 4; Doc. 37, p. 81 n.4).

[7] Plaintiff does not appeal the District Court's grant of summary judgment on her race discrimination claims under a mixed motive theory. (Doc. 37, pp. 205-206, 211-212).

from wearing their hair in natural dreadlocks, as evidenced by Robinson, DSI's supervisor, allegedly[8] telling Plaintiff that "the Koreans[9] were a different breed of animals and that they send little memos and they don't want African Americans … wearing their hair [in dreadlocks] because of the clientele they have;" and (5) the appearance standard was not applied to all races because no White employee had ever attempted to wear dreadlocks. (*Id*., pp. 208, 210). The District Court correctly concluded that the first three tiles, which showed differential application of the Appearance Standard based on styling among three Black DSI employees, "actually strikes against her convincing mosaic theory." (*Id*.). As to the fourth tile, that Robinson allegedly[10] told Plaintiff that "the Koreans[11] were a different breed of animals and that they send little memos and they don't want African Americans … wearing their hair [in dreadlocks] because of the clientele they have," the District Court correctly held that even if the statement was admissible, it did not actually indicate intentional racial animus if the facially-neutral policy wasn't

---

[8] Robinson denied having made the statement. (Doc. 37, p. 210).

[9] There is no evidence as to the identity of "the Koreans," their employers (if any), or these alleged unknown individuals' ability (if any) to influence policies or decisionmaking at DSI, HEA or HMMA. (D.E. 68-12, pp. 17-18, 63:24-65:1, p. 21, 78:9-79:7).

[10] Robinson denied having made the statement. (Doc. 37, p. 210).

[11] There is no evidence as to the identity of "the Koreans," their employers (if any), or these alleged unknown individuals' ability (if any) to influence policies or decisionmaking at DSI, HEA or HMMA. (D.E. 68-12, pp. 17-18, 63:24-65:1, p. 21, 78:9-79:7).

disparately enforced. (*Id.*, pp. 210-211). With respect to the fifth tile, the District Court correctly reminded Plaintiff that it was Plaintiff's burden to prove disparate enforcement, and not the burden of Defendants to prove that White employees had violated the Appearance Standard's prohibition on dreadlocks and been disciplined for it.

### A.    Plaintiff's new direct evidence argument is untimely, unavailing, and relies on inadmissible hearsay.

Plaintiff now contends that Robinson's statement about Koreans writing memos disfavoring dreadlocks constitutes direct evidence of race discrimination. (Doc. 32, pp. 45-46). Because she did not raise this theory before the District Court, her argument is untimely. *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1308, n.2 (11th Cir. 2007).

Even if this Court did consider Plaintiff's argument, Robinson's alleged statement cannot serve as direct evidence, generally, nor as direct evidence of HMMA's motivations, specifically. Direct evidence is "evidence which, if believed, proves the existence of the fact in issue without inference or presumption." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, n.2 (11th Cir. 1998). The Eleventh Circuit has maintained strict limits around the kinds of allegations which may be treated as direct evidence. *Id.* Generally, direct evidence consists of statements by the decisionmaker acknowledging a discriminatory motive for the decision. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196

F.3d 1354, 1358-59 (11th Cir. 1999); *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Robinson's alleged and disputed statement is thus not direct evidence because it cannot be attributed to a decisionmaker in Plaintiff's termination of assignment, as none of the alleged decisionmakers were Korean (or HMMA employees).

Whether as direct or circumstantial evidence, Robinson's alleged and disputed statement is not admissible against HMMA. Robinson was DSI's employee, not HMMA's, and there is no evidence that HMMA authorized her to make this statement or to enforce the HEA Appearance Standard that it didn't author, that it didn't know about, and that it did not apply to its own employees or anyone else. Therefore, Robinson's alleged and disputed statement is not a statement of a party-opponent under Fed. R. Evid. 801(d)(2). It is also not a statement concerning Robinson's state of mind, because she is describing statements she believes were made by still-unidentified Koreans, not her own beliefs or intentions. Fed. R. Evid. 803(3); *U.S. v. Ledford*, 443 F.3d 702, 709 (10th Cir. 2005) ("[A] witness may testify to a declarant saying, 'I am scared,' but not 'I am scared because the defendant threatened me.'"), *overruled on other grounds, U.S. v. Little*, 829 F.3d 1177 (10th Cir. 2016). As inadmissible hearsay, Robinson's statement cannot be considered against HMMA at summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999).

**B.** **The District Court correctly concluded that Plaintiff did not present a convincing mosaic of race discrimination.**

> 1. The District Court correctly concluded that there was no evidence that HMMA discriminated against Plaintiff because of her race.

Plaintiff argues that she presented a triable issue of discriminatory intent because she alleged the HEA grooming policy applied to her, while facially neutral and not disparately enforced, was motivated by discriminatory animus. (Doc. 32, pp. 46-47). For this proposition, she relies on the Robinson statement, and the assertion that Williams, the author and enforcer of the grooming policy, who is Black, "held negative beliefs about dreadlocks unless they were pulled back and freshly done so as to not be identified as dreadlocks." (*Id*.).

Even when viewed as circumstantial evidence, the multiple-hearsay alleged and disputed Robinson statement is not probative as to the grooming policy's formation, about which there is actual evidence. When Williams wrote this policy she drew from an HMMA policy in existence in 2004 (over a decade before Plaintiff's employment at DSI), which did not explicitly prohibit dreadlocks, and her own experience with the Montgomery Police Department; she chose to add a specific prohibition against dreadlocks because she did not consider them professional, and the prohibition was typical for military and law enforcement at the time. (D.E. 68-6, pp. 12-13, 39:17-22, 42:10-43:8, 43:13-44:10, p. 39, 146:21-147:1; D.E. 68-14, p. 3, ¶3; D.E. 68-14, p. 3, ¶3;

https://www.army.mil/article/181080/turbans_beards_dreadlocks_now_permissible_for_some_soldiers (accessed Feb. 10, 2025)). The District Court thus correctly concluded that Plaintiff's "factual showing does not create a triable claim of race discrimination." (Doc. 37, pp. 208, 211).

2.   <u>The District Court correctly concluded that a policy prohibiting dreadlocked hairstyles, if one existed, did not constitute intentional race discrimination.</u>

a)   *In* EEOC v. Catastrophe Management, *this Court correctly held that although dreadlocks are "a natural outgrowth" of Black hair texture, they are a styling choice and not an immutable racial characteristic.*

Plaintiff argues that the District Court improperly applied the *Catastrophe Management* decision to determine that a policy prohibiting dreadlocks is not inherently racially discriminatory. (Doc. 32, pp. 47-50).

First, Plaintiff inaccurately argues that *Catastrophe Management* decided only the issue of whether a policy prohibiting characteristics "historically, physiologically and culturally associated" with a protected status would violate Title VII. (Doc. 32, p. 47). As part of answering that question, this Court did in fact hold that just because dreadlocks were "a 'natural outgrowth' of the texture of [B]lack hair[, that] does not make them an immutable characteristic of race." *Catastrophe Mgmt.*, 852 F.3d 1018, 1030 (emphasis added). Dreadlocks are not the only natural outcome of the texture of Black hair; nor is any employee entitled to work in a fully "natural" and completely unstyled state. *Id.* (distinguishing cases

holding that discriminating against applicants or employees on the basis of neat "Afro" hairstyles were unlawful).

Plaintiff argues her case is distinguishable from *Catastrophe Management* because she has testified that she would be required to chemically treat her hair in order not to have dreadlocks. (Doc. 32, pp. 47-48). This is untrue; what Plaintiff attested to was, "I do not chemically treat my hair and wear it in natural but neat dreadlocks." (D.E. 81-19, p. 3, ¶6). Common sense dictates that Plaintiff has available to her a number of hairstyles not involving chemicals or dreadlocks: a closely-cropped hairstyle, an Afro, braids, a hair covering in compliance with HEA's or DSI's policies. Further, Plaintiff and Williams had agreed that Plaintiff could keep her dreadlocks, if they were worn in a tight bun. (Doc. 37, p. 210, n.9).

> b)     *Plaintiff misunderstands* Bostock*, and misapplies its "change one thing" analytical framework.*

Second, Plaintiff argues that the Supreme Court's decision in *Bostock v. Clayton Cty.* dictates setting aside the focus on immutability in *Catastrophe Management* decision and the prior panel decisions on which it relies. (Doc. 32, p. 50). But *Bostock* is expressly a decision about <u>not</u> broadening the definition of any protected characteristic. *Bostock*, 590 U.S. 644, 662 (discrimination against employees because of sex "has always been prohibited by Title VII's plain terms – and that should be the end of the analysis.") (internal quotation and citation omitted). That the majority opinion in *Bostock* does not use the words *mutable* or

32

*immutable* does not indicate a rejection of the premise that laws and constitutional protections against discrimination are generally addressed to immutable characteristics of protected classes. *See, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 276-77 (2023) (Concurrence by Thomas, J., Gorsuch, J., Kavanaugh, J.) (immutable characteristics, like race, do not "conclusively determine a person's ideology, beliefs, and abilities.").

Next, Plaintiff misapplies the *Bostock* decision's "change one thing" test. Under this rubric, if an employer fires a man for failing to fulfill traditional masculine stereotypes but does not fire a woman who behaves in a similarly non-masculine manner, it has discriminated against the male employee because of his sex. *Bostock*, 590 U.S. 644, 662.[12] But, Plaintiff doesn't follow the *Bostock* rationale, which would require her to show that if she changed her race, but still wore unstyled dreadlocks, she would have retained her employment and assignment. Instead, she argues that the two other Black DSI employees who were permitted to wear styled dreadlocks proves that if her hair did not naturally lock, she would have retained her employment with DSI. (Doc. 32, p. 49). But, that's expanding the definition of protected class, which the *Bostock* decision instructs us

---

[12] *Bostock* is entirely consistent with this Court's decision not to consider *en banc* the EEOC's position in *Catastrophe Management*: "So, unlike the situation in *Price Waterhouse* [*v. Hopkins*, 490 U.S. 228 (1989)], the policy against the allegedly stereotypical characteristic (dreadlocks) is unmoored from the protected category (Ms. Jones' race)." 876 F.3d 1273, 1277 (11th Cir. 2017) ("*Catastrophe Mgmt. II*").

not to do. Instead of proving Plaintiff's case, DSI's employment of these two other employees actually proves two things fatal to that argument: (1) the policy at issue was applied so as not to completely ban dreadlocks, but addressed only the styling of those dreadlocks; (2) hair texture suitable for dreadlocks is not coextensive with race.

        *c)*    *The EEOC errs in arguing a disparate treatment discrimination claim can prevail in the absence of actual differential treatment.*

The EEOC argues that if a policy is adopted with discriminatory intent, then disparate treatment discrimination has occurred, even if the policy was neutrally enforced. (Doc. 36, pp. 36-38). In this argument, the EEOC inaccurately summarizes the referenced portion of *Catastrophe Mgmt.*: the decision does not state that being subjected to a policy adopted with discriminatory intent is *per se* unlawful discrimination; rather it notes that disparate treatment can be proven by circumstantial evidence or by direct evidence that " 'a workplace policy, practice, or decision <u>relies expressly on</u> a protected characteristic.' " 852 F.3d 1018, 1026 (quoting *Young v. UPS*, 575 U.S. 206, 213 (2015)) (emphasis added). As noted above, a direct evidence theory cannot be raised for the first time on appeal, *Baldwin, supra.*; the alleged statement fails to meet the definition of direct evidence; and Robinson's alleged statement is not admissible against HMMA. Not only this, but the EEOC's argument misses the mark of "relies expressly on."

34

"Relies expressly on" means the same thing with respect to policies as it does with respect to employment decisions: if the policy or practice contains unambiguously discriminatory language, it is direct evidence of discrimination; if it is facially neutral, it is not direct evidence of discrimination, and the plaintiff must use circumstantial evidence to establish her case. *E.g., TWA v. Thurston*, 469 U.S. 111, 121 (1985) (policy that conditioned transfer rights on employee age was direct evidence of age discrimination); *Legg v. Ulster Cnty.*, 820 F.3d 67, 74 (2nd Cir. 2016) (policy that light duty would be provided only to employees injured on the job was not direct evidence of pregnancy discrimination) (cited by EEOC, Doc. 32, p. 38). In *Catastrophe Mgmt. II*, this Court rejected the same argument that any "race-neutral policy that applies with equal force to men and women (and hairstyles) of all races" could be discriminatory because "the policy against the allegedly stereotypical characteristic (dreadlocks) is unmoored from the protected category ([race])." 876 F.3d 1273, 1277.

### C.    The District Court could also have granted summary judgment to HMMA on Plaintiff's race discrimination claims because HMMA did not contribute to the decision to terminate Plaintiff's assignment or the policy restricting her hairstyle.

No one from HMMA objected to Plaintiff's appearance or hairstyle or requested Plaintiff's removal. (D.E. 68-2, p. 64, 245:4-18; 247:1-6; D.E. 68-6, p. 39, 146:11-13). No one from HMMA reviewed or approved Williams's Appearance Standard, and HMMA itself had no prohibition on dreadlocks during

the relevant time. (D.E. 68-6, pp. 13-14, 44:11-45:4, p. 39, 147:11-148:7; D.E. 68-2, p. 40, 149:19-22, p. 62, 237:21-23, 238:15-17, 239:17-20, p. 227, ex. 8). Even if HMMA were considered an employer of Plaintiff, it still cannot be liable for employment conditions and decisions it had no part in. *Llampallas*, 163 F.3d 1236, 1242, 1244-45.

III.  **THE DISTRICT COURT CORRECTLY CONCLUDED THAT THERE WAS NO EVIDENCE THAT HMMA TOOK ANY ACTION AGAINST PLAINTIFF-APPELLANT BASED ON ANY PROTECTED ACTIVITY SHE HAD ENGAGED IN (WHICH WAS UNKNOWN TO HMMA).**

As the District Court correctly observed, in its grant of summary judgment to HMMA on Plaintiff's retaliation claims, the definition of statutorily protected activity under the opposition clause of Title VII consists of a subjective and an objective component: a plaintiff must act with a subjectively good-faith belief that she is reporting a violation of the law, and that belief must be objectively reasonable in light of the conduct she experienced where legality is " 'measured by reference to controlling substantive law.' " (Doc. 37, p. 213) (quoting *Furcon v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016)). " 'Where binding precedent squarely holds that particular conduct is not an unlawful practice…and no decision of this Court or of the Supreme Court has called that precedent into question…, an employee's contrary belief that the practice is unlawful is unreasonable.' " (*Id*., pp. 221-222) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)).

**A.    This Court should decline Plaintiff's invitation to allow retaliation claims to proceed in the absence of a legally protected complaint.**

Plaintiff argues, without citation, that because HEA's and DSI's employees allegedly using the word *discriminate* to describe her internal complaint, this indicated that they believed her complaint of hairstyle bias described a violation of the law, and, if they were motivated by that belief to take adverse action against her, then Plaintiff experienced retaliation, without ever having made a protected complaint. (Doc. 32, pp. 50-52). Plaintiff's inability to find caselaw support for this position is understandable, because her position violates Eleventh Circuit precedent that requires that a legally protected complaint must concern conduct which the <u>complainant</u> could <u>have reasonably believed</u> was illegal, as measured against existing substantive law. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Butler*, 536 F.3d 1209, 1214. That Plaintiff presses this claim using a convincing mosaic framework only removes the formality of burden shifting and the emphasis on identifying a comparator, but it does not relieve Plaintiff of her obligation to prove that <u>but for her protected activity</u>, she would not have experienced an adverse action. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). And it certainly does not remove the objective, substantive-law-based yardstick against which her allegedly protected activity is measured.

37

**B.    This Court should reject the EEOC's invitation to overturn longstanding precedent requiring that a complainant's belief that she is complaining of unlawful discrimination is objectively reasonable as measured against substantive law.**

For its part, the EEOC urges this Court to "rethink, when appropriate,[13]" its longstanding precedent that a complainant must have an objectively reasonable belief, as measured against existing law, that she is complaining about a violation of the law to have engaged in protected activity. (Doc. 36, pp. 38-41). The EEOC's arguments and the facts of this case fail to compel the conclusion that this Circuit has misunderstood the law.

The opposition clause of Title VII plainly states that it reaches only complaints of actual violations of the statute: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this title." 42 U.S.C. 2000e-3(a).[14] Courts, including this one, have concluded that to effectuate the purposes of Title VII, this protection should extend to individuals who have a good faith and objectively reasonable belief as measured by existing

---

[13] As the Commission appropriately acknowledges, a prior panel decision can only be overruled by the Court sitting *en banc* or the U.S. Supreme Court. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981); *e.g.*, *Warner v. Sch. Bd. of Hillsborough Cnty.*, 2024 U.S. App. LEXIS 11239, *7 (11th Cir.).

[14] Section 1981 does not contain an express anti-retaliation provision, but has been construed to include a protection against retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008). Title VII and Section 1981 retaliation claims are normally analyzed jointly as applying the same burdens of proof and analytical frameworks. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).

law that the condition about which they complain is unlawful (even if it is not actually unlawful), but nothing in the statute suggests a still-more expansive judicial standard was contemplated by Congress. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-72 (2001) (assuming without deciding that opposition clause applied to not only complaints about actual Title VII violations but also complaints about conduct which an employee could reasonably believe violated Title VII, but finding "no reasonable person" could have believed a single sexual discussion violated Title VII's severity and pervasiveness standard established in caselaw). That Congress intended the doorway to the opposition clause's protections to be narrow is evident by the "exceptionally broad" coverage Congress provided in the participation clause to employees who participate "in any manner" in formal Title VII proceedings. 42 U.S.C. 2000e-3(a); *Vaughan v. City of Sandy Springs*, 2011 U.S. Dist. LEXIS 161461, *58 (N.D. Ga.) (citing *Booker v. Brown & Williamson Tobacco Co.*, *Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (finding from the narrower scope of Title VII's opposition clause Congress' "manifest desire not to tie the hands of employers in the objective selection and control of personnel") (internal quotation and citation marks omitted)), *adopted by* 2012 U.S. Dist. LEXIS 197079 (N.D. Ga.).

Lacking statutory support, the EEOC argues decisions from the Third, Fourth, Fifth, and Tenth Circuit Courts of Appeal, are inconsistent with this Circuit's approach. But, on examination, the implied Circuit split is exaggerated. The cases from the Third and Fifth Circuit Courts of Appeal concern employee complaints of harassment where the conduct complained of falls into a "zone of conduct that falls short of an actual violation, but could be reasonably perceived to violate Title VII." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 242 (5th Cir. 2016); *see also Kengerski v. Harper*, 6 F.4th 531, 540 (3rd Cir. 2021). The Fourth Circuit decision presents no basis for revisiting this Court's precedent: it found that a few instances of racial slurs constituted a hostile work environment as a matter of law, and thus a complaint about such conduct necessarily concerned unlawful activity. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015). None of these decisions reject the necessity of evaluating the objective reasonableness of an employee's belief that they are opposing unlawful conduct in light of substantive law.

In *Reznik v. inContact, Inc.*, 18 F.4th 1257 (10th Cir. 2021), the Tenth Circuit took aim at the particulars of this Court's decision in *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307 (11th Cir. 2002). In *Reznik*, the plaintiff was terminated after she complained about racial harassment suffered by alien employees working in a foreign country for her American company, a circumstance which Title VII

specifically excludes from its coverage. *Reznik*, 18 F.4th 1257, 1264; 42 U.S.C. §2000e-1(a). The Tenth Circuit found that the plaintiff could have had an objectively reasonable belief that Title VII applied to the alien employees in the foreign workplace, because a reasonable employee without specialized legal training would not be aware of the statutory exception. *Reznik*, 18 F.4th 1257, 1265. The *Reznik* decision is at odds with the plain text of Title VII. In contrast, this Court hewed faithfully to the statutory text and got things right when it concluded that complainants can be charged with reading the statute and knowledge of significant and well-reported caselaw developments in existence for close to a decade. *Weeks*, 291 F.3d 1307, 1315 (11th Cir. 2002) (plaintiffs could be charged with knowing that compulsory arbitration agreements were permissible, and not an unlawful employment practice). Therefore, this Court should decline the EEOC's invitation to overturn *Weeks v. Harden*.

**C.    The District Court could also have granted summary judgment to HMMA on Plaintiff's retaliation claims because the evidence established HMMA's complete ignorance of Plaintiff's alleged protected conduct.**

The District Court correctly awarded summary judgment to HMMA on Plaintiff's pregnancy discrimination claim because she "has not presented sufficient evidence that anyone at HMMA knew of Key's pregnancy or was a decision-maker in her termination." (Doc. 37, p. 198). Relying on *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001), the District Court

41

rejected Plaintiff's argument that she could impute Williams' knowledge of Plaintiff's pregnancy to HMMA. The same actual knowledge requirement applies to retaliation claims. *Clover*, 176 F.3d 1346, 1355. Thus, for the same unchallenged reason—HMMA's ignorance of Plaintiff's allegedly protected complaint and its total absence from Plaintiff's assignment termination—this Court could affirm the District Court's grant of summary judgment to HMMA on Plaintiff's retaliation claims.

**IV.** **DISMISSAL OF PLAINTIFF-APPELLANT'S DISPARATE IMPACT THEORY CLAIM WAS PROPER BECAUSE PLAINTIFF-APPELLANT DID NOT PLEAD ANY FACTS WHICH WOULD ESTABLISH A PLAUSIBLE CLAIM FOR RELIEF.**

   **A.** **Plaintiff's disparate impact allegations consist of 23 words in two sentences, are entirely conclusory, and simply do not come close to meeting *Ashcroft v. Iqbal*'s plausibility requirement.**

A *prima facie* case of disparate impact discrimination consists of (1) a specific facially-neutral employment policy or practice with a disparate impact on a protected class; (2) statistical evidence proving the policy or practice resulted in discrimination. *Davis v. Infinity Ins. Co.*, 2022 U.S. App. LEXIS 10456, *7 (11th Cir.) (citing *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274-75 (11th Cir. 2000)). Even if Plaintiff need not present statistical evidence to survive a motion to dismiss, she still faces the general obligation to allege enough specific facts that suggest her claims are plausible and not simply possible. *Henderson v. JP Morgan Chase Bank, N.A.*, 436 Fed. Appx. 935, 937 (11th Cir. 2011).

In the present appeal, Plaintiff provides a list of allegations she contends relate to her disparate impact claim; however, on inspection, most of them are relevant to only a disparate treatment theory, not a disparate impact theory, and they fail to even allege the disputed policy had an adverse impact on Black individuals or that the disproportionate impact was statistically significant such that the policy could be found to be the cause of discrimination. (Doc. 32, pp. 43-44). In the first bullet point, Plaintiff does allege the existence of a neutral policy, which is the first half of the first step of the *prima facie* burden. The next two bullet points describe that the alleged neutral policy against dreadlocks allowed braids, which has no apparent bearing (or at least not one favorable to Plaintiff) on the remaining questions of disparate impact and statistical evidence. (*Id*., pp. 43-44). The fourth bullet point alleges the existence of discriminatory intent, which is unnecessary and irrelevant to this theory. (*Id*., p. 44); *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645-46 (1989), *superseded by statute on other grounds*. The sixth bullet point is not accurately summarized by Plaintiff, as paragraphs 118 and 132 allege intentional and individual discriminatory enforcement of a policy towards Plaintiff, and not the existence of a neutral policy predictably delivering biased results. (Doc. 37, pp. 52, 55).

That leaves only two conclusory statements in the fifth and seventh bullet points:

43

¶¶117 and 131: Plaintiff wore her hair in a manner commonly worn by African-American[s].

¶¶121 and 135: Additionally, Defendants['] purported policy creates a disparate impact on African Americans.

(Doc. 36, p. 44). The District Court found Plaintiff's allegations underwhelming (Doc. 39-1, p. 24), and correctly disregarded them under *Ashcroft v. Iqbal* as entirely conclusory. Contrary to the EEOC's argument (Doc. 36, p. 29), the conclusory assertion that Black individuals "commonly" wear dreadlocks does not create a reasonable inference, and certainly not an obvious conclusion, that Black individuals would be disproportionately affected by a ban against certain types of dreadlocked hairstyles. One flaw is that the proportion of Black individuals wearing dreadlocks—which common experience would easily peg at less than 50%, and probably less than 25%--is irrelevant. Arguing (weakly) the commonality of dreadlocks among Black individuals would be relevant only if a judicially-recognizable overwhelming proportion (*i.e.*, nearly all) of Black individuals also had dreadlocks. This is the fact pattern present in the primary "obvious" case cited by the EEOC, *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227-28, n. 5 (9th Cir. 2023), which accepted as true and relied in part on other similar litigation brought by its members, that all or substantially all Jehovah's Witnesses are prohibited from taking oath required for government

employment, and so would be disproportionately impacted if refusing to take such an oath of allegiance disqualified them from employment.[15]

The relevant question is, instead, what proportion of dreadlock wearers are Black? *See, e.g.*, *Boykin v. Fenty*, 650 Fed. Appx. 42, 44 (D.C. Cir. 2016) (cited in EEOC amicus brief, Doc. 36, p. 32). Plaintiff doesn't hazard a guess and the EEOC doesn't proffer any evidence on the matter either. Yet that's exactly the type of evidence that the plaintiffs in *de Reyes v. Waples Mobile Home Park L.P.* pleaded to convince the Fourth Circuit Court of Appeals to overturn the district court's dismissal of their disparate impact claim. 903 F.3d 415, 421 (4th Cir. 2018) (plaintiffs supported their complaint that a policy that would be adverse to undocumented immigrants would be disproportionately adverse to Latinos by citing statistics, including showing that Latinos made up 64.6% of the undocumented immigrant population in Virginia). The plaintiff in *Carson v. Lacy* likewise referenced statistical data indicating that Black people had a higher rate of incarceration in Arkansas, permitting the court to make a reasonable inference that

---

[15] The *Hung Ping Wang v. Hoffman* decision does not specify what allegations or evidence, if any, plaintiff may have alleged in support of his disparate impact claim. 694 F.2d 1146, 1148-49 (9th Cir. 1982). Further, the brief decision does not even identify whether the protected status at issue is national origin, race, something else, or a hybrid theory, only referring to plaintiff's "minority" status. Finally, the Ninth Circuit remanded the case for proper consideration under a disparate impact framework; its statement that "a language skills requirement *seems* on its face to have a disparate impact on minority applicants" is more of a musing and less of a mandate. *Id*. at 1149 (emphasis added).

a policy prohibiting the hiring of felons could plausibly have a disparate impact on Black applicants. 856 Fed. Appx. 53, 54 (8th Cir. 2021).

The second statement, alleging without factual basis that a policy prohibiting dreadlocks has a disproportionate impact on African Americans, is equally conclusory and due to be disregarded. Plaintiff provides no support for this allegation, other than the prior conclusory, indefinite, and immaterial statement that dreadlocks are "commonly" worn by Black individuals, which only concerns, albeit indefinitely, the proportion of Black individuals who wear dreadlocks, and does not address at all the essential questions of what proportion of individuals with dreadlocks are Black, and whether Black applicants are disproportionately screened out by the alleged policy (*i.e.*, are unable to style their dreadlocks in a manner consistent with the policy, as Plaintiff alleged was possible). (Doc. 37, p. 42, ¶48)); *Pouyeh v. Bascom Palmer Eye Inst.*, 613 Fed. Appx. 802, 811 (11th Cir. 2015) (Rule 12(b)(6) dismissal of disparate impact claim based on allegation that two foreign-born doctors were denied employment based on rule against hiring foreign medical school graduates failed to establish a claim of disparate impact, "since it gives no insight into statistical information.") (citing *Spivey v. Beverly Enters.*, 196 F.3d 1309, 1314 (11th Cir. 1999)); *Charles v. Geo Grp. Inc.*, 2022 U.S. Dist. LEXIS 250434, **8-9 (M.D. Fla.) (plaintiff failed to adequately plead disparate impact discrimination claim where she did not allege facts, like statistics

46

showing a discriminatory impact, and even failed to allege the relevant protected characteristics of allegedly more-favored co-workers).

Plaintiff has not provided workplace-specific or general population statistics to support the contention that a policy prohibiting some types of dreadlocked hairstyles would disproportionately exclude Black applicants or employees. She has not even alleged an anecdotal basis—like the existence of excluded Black applicants—to support her theory of disparate impact discrimination. Because Plaintiff failed to allege facts sufficient to make it plausible that a partial or complete dreadlocks ban resulted in a disparate impact on any protected class, the District Court correctly dismissed Plaintiff's disparate impact allegation as to all Defendants.

Further, even if the District Court had not dismissed the claim pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff would have still had to prove that HMMA was responsible for HEA's policy, which HEA had sole and direct authority to revise, and which was obviously long-divorced from HMMA's policies, which did not prohibit dreadlocks.

## V. THE DISTRICT COURT COULD HAVE DISMISSED PLAINTIFF'S TITLE VII CLAIMS AGAINST HMMA BECAUSE SHE DID NOT TIMELY FILE A CHARGE AGAINST IT.

HMMA argued before the District Court that Plaintiff had not timely filed an EEOC Charge against it. (D.E. 67, pp. 21, 33-35). The District Court did not rule

on this argument but granted summary judgment to HMMA on all claims on other grounds. (Doc. 37, pp. 182-224).

Plaintiff completed an Intake Questionnaire at the EEOC on August 2, 2017. (D.E. 68-12, pp. 82-85, ex. 13). In the Intake Questionnaire, she twice identified Williams as "Ms. Cassandra Williams, AMCO." (*Id.*). She indicated that Williams and Robinson and their employers were the only individuals responsible for the conduct she complained of. (*Id.*, p. 17, 62:2-17). As a result of that intake process, Plaintiff signed a Charge against DSI only on August 3, 2017. (*Id.*, exh. 14). Fourteen months later, a new investigator summoned Plaintiff to sign a new Charge against HMMA. (*Id.*, p. 19, 69:11-70:12, 70:16-19, p. 47, 184:11-25; D.E. 68-13, p. 92, exh. 15). Prior to this, HMMA had no notice of Plaintiff's EEOC Charge against DSI. (D.E. 68-2, pp. 161-224, exh. 2, pp. 64-65, 248:20-249:11).

"Ordinarily, a party not named in the EEOC charge cannot be sued in a subsequent civil action." *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994). However, if the purposes of the Act are otherwise met, an unnamed Respondent can become a Defendant to a Title VII claim. *Id.*, 1358-59. In making this determination, a Court should consider the following:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity

> to participate in the reconciliation process; and (5)
> whether the unnamed party actually was prejudiced by its
> exclusion from the EEOC proceedings.

*Id.*, 1359. In this case, four of the five factors point towards the failure of administrative exhaustion: there is no commonality of ownership, operations, or finances between HMMA and DSI; Plaintiff, who held a Master's Degree, was certainly capable of identifying any missing entity on the Charge she signed; fourteen months' delay impaired adequate notice; while HMMA did have opportunity to receive the extreme minimal level of conciliation required by *Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015), of the EEOC, it was still prejudiced by the lost opportunity to timely investigate her claim with the third parties and their employees who interacted with her during her few days of employment with DSI. Moreover, even though she signed, at the EEOC's prompting, a new Charge identifying HMMA as a Respondent, Plaintiff has never identified any wrongdoing by HMMA or any of its employees. *See Cannon v. Canteen Servs. of N. Mich*, 657 Fed. Appx. 438, 441 (6th Cir. 2016) (hostile work environment claim was not exhausted against alleged joint employer where plaintiff hadn't alleged to the EEOC that that employer had caused a hostile environment).

## **CONCLUSION**

HMMA had no involvement in any facts at issue in this action. Its facility is merely the backdrop for Plaintiff's claims. HMMA had no contract or business

relationship with Plaintiff or her employer, DSI. HMMA is separated by two arms' length contracts from Plaintiff's actual employer, DSI. Other than safety rules applicable to all HMMA employees and on-site contractors and subcontractors which did not impact Plaintiff's employment with DSI, HMMA set no restrictions on her, made no requests of her, and most importantly, made no requests and gave no directives about her. There is no premises liability under Section 1981 or Title VII. Accordingly, for any of the reasons articulated above, this Court should affirm the Court's grant of summary judgment to HMMA. Additionally, the District Court's dismissal of Plaintiff's cursorily-drafted disparate impact claim was properly granted, and should also be affirmed, as described above.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

This brief complies with the type-volume requirement of Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,646 words, as determined by the word-count function of Microsoft Word, excluding the sections of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word (Office 365) in 14-point Times New Roman font.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the February 10, 2025, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit via the CM/ECF filing system, which will effect service on all counsel of record.

/s/Whitney R. Brown
Whitney R. Brown

Attorney for Appellee Hyundai Motor
Manufacturing Alabama, LLC

814988.docx