**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**DOCKET NO.: 24-11126**

---

DAVITA M. KEY,

Appellant

v.

HYUNDAI MOTOR MANUFACTURING OF ALABAMA, et al,

Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2:19-CV-00767-ECM-SMD

---

**APPENDIX TO BRIEF OF APPELLEE
HYUNDAI MOTOR MANUFACTURING OF ALABAMA, LLC**

**VOLUME I**

---

OF COUNSEL:

Whitney R. Brown ASB-4431-H71B
David J. Middlebrooks ASB- 8553-D58D
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
wbrown@lehrmiddlebrooks.com
dmiddlebrooks@lehrmiddlebrooks.com

**INDEX TO APPENDIX**

| Vol. | Tab/D.E. | Date | Title |
|---|---|---|---|
| I | 8 | 01/27/2020 | Defendant HEA's Motion to Dismiss Plaintiff's Complaint and Jury Demand |
| | 11 | 01/30/2020 | Motion to Dismiss (HMMA) |
| | 13 | 01/30/2020 | Motion to Dismiss by Defendant Dynamic Security, Inc. |
| | 29 | 06/02/2020 | Order regarding Defendants' Motions to Dismiss |
| | 30 | 06/12/2020 | Defendant HMMA's Motion to Dismiss Plaintiff's First Amended Complaint |
| | 31 | 06/15/2020 | Defendant HEA's Motion to Dismiss Plaintiff's First Amended Complaint |
| | 32 | 06/15/2020 | Motion to Dismiss Amended Complaint by Defendant Dynamic Security, Inc. |
| | 39-1 | 08/30/2021 | Memorandum and Opinion Order regarding Defendants' Motions to Dismiss First Amended Complaint |
| | 67 | 10/12/2022 | Defendant HMMA's Brief In Support of Motion for Summary Judgment |
| | 68-1 | 10/12/2022 | Exhibit 1 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Declaration of Robert Burns |
| | 68-2 | 10/12/2022 | Exhibit 2 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Robert Burns and referenced exhibits |
| II | 68-3 | 10/12/2022 | Exhibit 3 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Kristal Riddle and referenced exhibits |
| | 68-4 | 10/12/2022 | Exhibit 4 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Sherry Spiers |
| | 68-5 | 10/12/2022 | Exhibit 5 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Declaration of Gloria Robinson |
| | 68-6 | 10/12/2022 | Exhibit 6 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Cassandra Williams and referenced exhibits |

|  | 68-7 | 10/12/2022 | Exhibit 7 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Response to Plaintiff's First Requests for Admission, Interrogatories and Requests for Production to HEA |
|---|---|---|---|
|  | 68-8 | 10/12/2022 | Exhibit 8 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Secretary of State Records for Hyundai ENG |
|  | 68-9 | 10/12/2022 | Exhibit 9 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Secretary of State Records for HEA |
|  | 68-10 | 10/12/2022 | Exhibit 10 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Secretary of State Records for HMMA |
|  | 68-12 | 10/12/2022 | Exhibit 12 (Part 1) to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Plaintiff and referenced exhibits |
|  | 68-13 | 10/12/2022 | Exhibit 12 (Part 2) to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Deposition of Plaintiff and referenced exhibits |
| III | 68-14 | 10/12/2022 | Exhibit 13 to Defendant HMMA's Brief In Support of Motion for Summary Judgment: Declaration of Cassandra Williams |
|  | 70 | 10/12/2022 | Defendant HEA's Memorandum of Law in Support of Its Motion for Summary Judgment |
|  | 74 | 10/12/2022 | Defendant Dynamic Security, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment |
|  | 75-25 | 10/12/2022 | Exhibit 25 to Defendant Dynamic Security, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment: Deposition Transcript of Ray Cureton |
|  | 82 | 11/03/2022 | Plaintiff's Opposition to Defendants' Motions for Summary Judgment |
|  | 85 | 11/10/2022 | Defendant HMMA's Reply Brief in Response to Plaintiff's Brief |
|  | 86 | 11/10/2022 | Defendant HEA's Reply Brief In Support of Its Motion for Summary Judgment |
|  | 87 | 11/14/2022 | Defendant Dynamic Security, Inc.'s Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the February 14, 2025, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit via the CM/ECF filing system, which will effect service on all counsel of record.

/s/Whitney R. Brown
Whitney R. Brown

Attorney for Appellee Hyundai Motor
Manufacturing Alabama, LLC

816254

# TAB / DOCKET ENTRY NO. 8

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **2:19-cv-767-ECM-SMD** |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC;** | ) | |
| **HYUNDAI ENGINEERING AMERICA, INC.;** | ) | |
| **and DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANT HYUNDAI ENG AMERICA INC.'S MOTION TO DISMISS
### PLAINTIFF'S COMPLAINT AND JURY DEMAND

Defendant Hyundai ENG America, Inc. ("HEA"), incorrectly identified in Plaintiff's Complaint and Jury Demand (the "Complaint") as "Hyundai Engineering America, Inc.," by and through its attorneys, moves the Court to dismiss the claims asserted against HEA in the Complaint by Plaintiff Davita M. Key in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of this Motion, HEA states as follows:

### I. INTRODUCTION

The Complaint alleges that the Defendants have unlawfully discriminated against the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). In particular, the Complaint alleges that: (i) Plaintiff was treated differently than her white and male co-workers in that she was prohibited from wearing her natural hair; (ii) that Plaintiff was unlawfully discharged due to her pregnancy; and (iii) that Plaintiff was unlawfully retaliated against as a result of exercising legal rights. (Compl. ¶¶ 13, 22-24, and 27).

The Complaint should be dismissed for two reasons. First, the Complaint fails to properly allege that HEA employed the Plaintiff, which is a prerequisite for recovery under Title VII, and, in fact, fails to allege any actionable misconduct at all against HEA. The Complaint's conclusory assertion that HEA is an employer within the meaning of Title VII of the Civil Rights Act is insufficient to establish any employment relationship between HEA and Plaintiff. (Compl. at ¶ 7). This unsupported legal conclusion is also the only allegation made by Plaintiff in the Complaint that specifically refers to HEA in any respect. The Complaint neither alleges any unlawful acts on the part of HEA nor advances any theory of vicarious liability under which HEA may be held responsible for the acts or omissions of its co-defendants. Even if Plaintiff were able to show that a joint-employment arrangement between HEA and another defendant existed in this action, Plaintiff must still allege actionable conduct on the part of each defendant to establish a viable claim. Accordingly, Plaintiff's claims against HEA are due to be dismissed for failure to state a claim.

Second, the Complaint fails to state a claim against HEA because it does not contain any allegations demonstrating that the Plaintiff exhausted her administrative remedies with respect to HEA. Administrative exhaustion is a precondition for recovery under Title VII. The Complaint alleges only that the Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission (the "EEOC") and received a right-to-sue letter from the EEOC on or around July 15, 2019. (Compl. ¶¶ 3-4). Plaintiff specifically does not (and cannot, truthfully) state that she filed a charge of discrimination against HEA or that she received a right-to-sue letter with respect to HEA, and the right-to-sue letter attached to Plaintiff's complaint references only Hyundai Motor Manufacturing of Alabama, LLC ("HMMA"), rather than HEA. (Doc. 1-1).

Given that the Complaint fails to allege an employment relationship with HEA or any actionable misconduct on HEA's part and fails to demonstrate that the Plaintiff has satisfied the prerequisites for filing claims under Title VII, the Court should dismiss Plaintiff's claims against HEA in their entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## II. <u>LEGAL STANDARD</u>

To state a viable claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, stating a claim requires more than a "the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings offering labels, legal conclusions, or naked assertions devoid of further factual enhancement (such as this Complaint with respect to HEA) do not state a claim upon which relief may be granted. *Id.*; *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) ("plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions….") (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. But courts need not accept legal conclusions as true, nor will a formulaic recitation of the elements of a cause of action do. *Id*. Claims have factual plausibility only when they contain sufficient factual content to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Though a *pro se* plaintiff is held to less stringent standards than formal pleadings drafted by lawyers, he or she must still adhere to the Federal Rules of Civil Procedure. *Brown v. ATG, Inc.*, 2:15-cv-00161- AKK, 2015 U.S. Dist. LEXIS 73467, at *2-3 (N.D. Ala. June 8, 2015), *citing Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).

## III. **ARGUMENT**

A.   **The Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(6) Because It Does Not Sufficiently Allege that the Plaintiff Was Employed by HEA or that HEA Engaged in Actionable Misconduct.**

For a plaintiff to obtain relief under Title VII, he or she must properly allege the requisite employment relationship. *Reeves v. DSI Sec. Servs.*, 331 F. App'x 659, 661 (11th Cir. 2009), *citing Hishon v. King Spalding*, 467 U.S. 69 (1984) and 42 U.S.C. § 2000e-2.

Here, however, the Complaint fails to properly allege that HEA employed Plaintiff. All of Plaintiff's factual allegations relating to her employment either involve defendants HMMA and Dynamic Security, Inc ("Dynamic Security") or unnamed "supervisors," "trainers," and other passive-voiced actors. The Complaint states that Plaintiff was hired by HMMA through Dynamic Security as a mail clerk. (Compl. ¶ 12). Plaintiff alleges that she informed Ms. Gloria Robinson and Mr. Maurice Chambliss (Dynamic Security employees) of her pregnancy. (Compl. ¶ 14). Plaintiff alleges that she was told by an unnamed supervisor that her hairstyle violated an HMMA policy. (Compl. ¶ 19). Plaintiff alleges that she was told by an "HR representative for HMMA and Dynamic Security" that she was not wanted back at the work site (Compl. ¶ 25). There are no facts alleged in Plaintiff's Complaint from which a relationship of any kind between Plaintiff and HEA may be fairly inferred, much less the employer-employee relationship required by Title VII.

Because the Complaint contains no allegation of employment by HEA, the Complaint should be dismissed as a matter of law for failure to state a claim under Title VII. *Brown* at *8-9 (dismissing plaintiff's Title VII and ADA claims against defendant under Fed. R. Civ. P. 12(b)(6) because plaintiff failed to show that defendant was an employer); *Arrington v. Ala. Power Co.*, No. 2:16-cv-01355-JEO, 2017 U.S. Dist. LEXIS 6679, at *8 (N.D. Ala. Jan. 18, 2017) (ruling that

party was not a proper defendant under Title VII or ADA when plaintiff failed to show that party

employed her and instead alleged that party was parent company).

      In addition to Plaintiff's failure to plead an employment relationship between herself and

HEA, Plaintiff fails to allege that HEA is directly responsible for any discriminatory or retaliatory

acts, any adverse employment actions, or any other action that might give rise to liability under

Title VII. Nor has Plaintiff pled any facts from which joint employer status with or vicarious

liability for its co-defendants on the part of HEA may be plausibly inferred. Given the absence of

any factual allegations pertaining to HEA, Plaintiff's claims against HEA should be dismissed

pursuant to Fed. R. Civ. P. 12(b)(6).

**B.**    **Plaintiff's Claims Against HEA Should Be Dismissed Under Fed. R. Civ. P. 12(b)(6) Because Plaintiff Failed to Exhaust Her Administrative Remedies Against HEA.**

      It is well-settled law that before a plaintiff may file a lawsuit under Title VII, he or she

must first file a charge with the EEOC alleging a Title VII violation. *Virgo v. Riviera Beach

Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994); *Arrington*, 2017 U.S. Dist. LEXIS 6679, at *8 ("it

is well-settled that before an individual may pursue a Title VII claim or an ADA claim, she must

first exhaust her administrative remedies by filing an EEOC charge"). Generally, a party not

named in the EEOC charge may not be sued in a later civil action. *Virgo*, 30 F.3d at 1358;

*Arrington*, 2017 U.S. Dist. LEXIS 6679, at *8-9 (dismissing party from action because it was not

identified in plaintiff's charge). That naming precondition "serves to notify the charged party of

the allegations and allows the party an opportunity to participate in conciliation and voluntarily

comply with the requirements of Title VII" or the ADA. *Virgo*, 30 F.3d at 1358.

      A party not named in an EEOC charge may be sued, however, if doing so fulfills the

purposes of Title VII or the ADA. *Lewis v. Asplundh Tree Expert Co.,* 402 Fed. Appx. 454 (11th

Cir. 2010). Courts will consider several factors when determining whether the purposes of Title VII or the ADA have been met:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation [sic] process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Id*. at 456-57. Courts may also analyze whether an investigation of the unnamed party "could have reasonably grown out of [the EEOC] charge." *Id*. at 457 (citing *Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 650 (11th Cir. 1983)).

As discussed above, the Complaint alleges only that the Plaintiff filed a charge of employment discrimination with the EEOC within 180 days of the alleged unlawful employment practices, and that Plaintiff received a right-to-sue letter on or around July 15, 2019. (Compl., ¶¶ 3-4). The Complaint is silent as to against whom the charge was filed and the letter issued. The only additional factual background provided by Plaintiff with regard to the administrative process is the attachment of a right-to-sue letter issued by the EEOC against HMMA.

There is no allegation in the Complaint that HEA was named in Plaintiff's EEOC charges. There is nothing in Plaintiff's Complaint to suggest that permitting the Plaintiff to sue HEA despite her failure to name it as a party in her EEOC charges would further the purposes of Title VII. Indeed, the Complaint offers no reason to believe that any of the above-referenced factors weigh in the Plaintiff's favor. Plaintiff has provided no facts demonstrating any similarity of interests between HEA and any other defendant named in Plaintiff's EEOC charges. Nor does the

Complaint allege that the Plaintiff or the EEOC attempted to include or invite HEA to participate in the investigation or conciliatory process.

Furthermore, the Complaint does not allege that HEA had notice of the Plaintiff's charges or any potential claims against it. Even now, after Plaintiff has filed her Complaint, it remains impossible to determine the precise nature of the claims Plaintiff desires to pursue against HEA. HEA should not be required to "fac[e] a lawsuit without notice from [the Plaintiff] that [she] would seek to impose Title VII liability against [it] and without an adequate opportunity to participate in the conciliation process." *Lewis*, 402 F. App'x at 457 (affirming district court's decision to grant summary judgment in defendant's favor when plaintiff failed to name defendant in charge of discrimination); *Waltz v. Dunning*, No. 2:13-cv-00517-JEO, 2014 U.S. Dist. LEXIS 178660, at *16 (N.D. Ala. Dec. 31, 2014) (dismissing plaintiff's claims against party who was not identified in EEOC charge because "[a]llowing plaintiff to pursue a dilatory claim against [the party] would not advance the purposes of Title VII or the EEOC").

Because the Complaint fails to demonstrate that Plaintiff exhausted her administrative remedies with respect to HEA, Plaintiff's claims against HEA are due to be dismissed.

## V. <u>CONCLUSION</u>

For the foregoing reasons, HEA respectfully asks the Court to grant this Motion and dismiss Plaintiff's Complaint in its entirety.

DATED:  January 27, 2020.

Respectfully submitted,

*/s/ Yurie Yeoul Bae*
Yurie Yeoul Bae (ASB-3264-J96L)
Richard L. DeWeese, Jr. (ASB-0448-K16H)
*Attorneys for Defendant Hyundai ENG America, Inc.*

OF COUNSEL:

**DEWEESE & BAE, LLC**
8191 Seaton Place
Montgomery, AL  36116
Telephone: (334) 239-7994
Email:  yurie@deweesebae.com
       richard@deweesebae.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 27th day of January, 2020, the foregoing was filed with the Clerk of the Court via the CM/ECF system, and a true and correct copy has been furnished by U.S. First Class Mail for service upon the following parties and/or counsel of record:

Davita M. Key
6940 Wrangler Rd, Apt. C
Montgomery, AL 36117
(334) 200-7078

Hyundai Motor Manufacturing Alabama LLC
700 Hyundai Blvd
Montgomery, AL 36105

Dynamic Security, Inc.
1102 Woodward Ave
Muscle Shoals, AL 35661

*/s/ Yurie Yeoul Bae*
Of Counsel

# TAB / DOCKET ENTRY NO. 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:19-cv-00767-ECM-SMD** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, HYUNDAI** | ) | |
| **ENGINEERING AMERICA, INC. and** | ) | |
| **DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION TO DISMISS (HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC)

Plaintiff's Complaint contains three counts, but two distinct causes of action. Counts One and Three are for retaliation under Title VII and Count Two is for pregnancy discrimination under the Pregnancy Discrimination Act (PDA) which amended Title VII. *See* Complaint, Doc. 1, ¶¶1; 29-41. As explained below, these claims are due to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because HMMA never employed Plaintiff and because they fail to state a claim as a matter of law.

## HMMA never employed Plaintiff.

Plaintiff did not sign a Charge of Discrimination until well one year after her termination. (Exhibit A, Charge). Therefore, her Charge is valid only as an amendment to her Intake Questionnaire signed by Plaintiff on August 2, 2017, the day after her termination. (Exhibit B); 29 C.F.R. §1601.12(b). In Plaintiff's Intake Questionnaire, she states that she desires to file a claim against "Hyundai," "Ms. Casandra Williams," and "Ms. Gloria Robinson." (Exhibit B). There is no corporation doing business in Alabama, registered with Alabama's Secretary of State, operating simply under the name "Hyundai." (Exhibit C, Secretary of State Search

Results). Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), is simply one of dozens of companies with the word Hyundai in its name that have registered with the Alabama Secretary of State. So is Hyundai ENG America, Inc. ("HEA"). (*Id.*). It is important to note that HEA is a wholly separate company from HMMA. (Exhibit D, Burns Declaration, ¶7). HEA is not a parent or subsidiary of HMMA; nor is HMMA a parent or subsidiary of HMMA. (*Id.*). The two entities do not share employees, policies, executives, or resources with each other. (*Id.*, ¶¶7-8).

In July and August 2017, HMMA had a contractual relationship with HEA, formerly named Hyundai AMCO America, Inc. (Exhibit D, Burns Declaration, ¶6; Exhibit E, Secretary of State business entity record for HEA). Upon information and belief, HEA contracted with Dynamic Security, Inc., which was Plaintiff's sole employer. (*Id.*, ¶¶9-10). Dynamic Security is a wholly separate entity from HMMA. (*Id.*, ¶¶12-13; *see also* Exhibit F, Secretary of State business record for Dynamic Security). Dynamic Security is not a parent or subsidiary of HMMA; nor is HMMA a parent or subsidiary of Dynamic Security. (Exhibit D, ¶13). The two entities do not share employees, policies, executives, or resources with each other. (*Id.*, ¶¶12-13).

No one named in Plaintiff's EEOC Charge or Complaint[1] was employed by HMMA. Based on its investigation, HMMA determined that Gloria Robinson, Maurice Chambliss, and Tonya Howell were employed by Dynamic Security, Inc. (Exhibit D, Burns Declaration, ¶9). Cassandra Williams was employed by HEA. (*Id.*; Exhibit G, Williams Declaration). When the employers of Ms. Robinson, Mr. Chambliss, Ms. Howell, and Ms. Williams are properly identified, as they are above, then it becomes abundantly clear that HMMA had nothing to do with Plaintiff's employment and termination and so should be dismissed from this Complaint.

---

[1] In paragraph 25 of her complaint, Plaintiff obliquely refers to an unnamed "HR Representative for Hyundai Motor Manufacturing Alabama and Dynamic Security." HMMA employs no personnel jointly with Dynamic Security. (Exhibit D, ¶12). In her Charge, the sole person associated with grooming instructions is Ms. Williams, the HEA employee.

**Plaintiff's Complaint fails to state a cause of action for which relief can be granted.**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain a viable legal theory and sufficient factual allegations to support a plausible claim for relief under that theory. *See AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011); *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1309-1310 (11th Cir. 2006); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").

Even if the Court sets aside Plaintiff's attempts to obscure the identity of her employer, Plaintiff's Complaint suffers from fatal, incurable deficiencies. Specifically, an employer prohibition against dreadlocked hair has repeatedly and conclusively been found not to constitute a racially discriminatory practice. In fact, the law is so clear on this point that it would not be objectively reasonable for an employee to believe that such hairstyle discrimination was unlawful, such that opposing such a rule would not amount to protected conduct. And, Plaintiff's Complaint does not contain allegations that would render her claim of pregnancy discrimination plausible, not merely possible.

**I.     It is well settled as a matter of law that there is no cause of action for racial discrimination restricting the wearing of dreadlocks.**

As noted above, no claim can survive summary judgment if it fails to allege a violation of law. *See AFL-CIO v. City of Miami*, *supra.*; *Glover v. Liggett Group, Inc.*, *supra*. To the extent that Plaintiff's Complaint contains a cause of action for race discrimination,[2] it is ultimately one

---

[2] Plaintiff's Complaint occasionally references its intent to include a claim for race discrimination under Title VII, despite the fact that none of its three counts include such a claim. *Compare* Complaint, doc. 1, ¶1 and ¶10 *with* ¶¶29-41 (two counts for retaliation, one for Pregnancy Discrimination).

for discrimination against a mutable hair style, which is not prohibited by Title VII or any other law.

In her Complaint, Plaintiff attempts to obscure the nature of her hairstyle which she alleges initiated criticism by Ms. Williams. However, in her Charge (Exhibit A), she is more exact: the hairstyle in question is dreadlocks. The Eleventh Circuit has conclusively and categorically concluded, first, that dreadlocks are not a natural hair growth pattern but an elective, mutable style; and, second, that as such, an employer prohibition against dreadlocks is not racially discriminatory. *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030, 1032-33 (11th Cir. 2016). Therefore, regardless of whom Plaintiff's employer is and regardless of which entity or entities allegedly established a rule against dreadlocks, there is no cause of action for race discrimination for such a workplace grooming rule. *Id.*; *see also Eatman v. UPS*, 194 F.Supp.2d 256, 262 (S.D.N.Y. 2002) ("it is beyond cavil that Title VII does not prohibit discrimination on the basis of locked hair...Thus, even if [the employer]'s policy [which prohibited "unbusinesslike" hairstyles] explicitly discriminated against locked hair, it would not violate Title VII on its face."); *Pitts v. Wild Adventures, Inc.*, 2008 U.S. Dist. LEXIS 34119, *19 (M.D. Ga.) ("Dreadlocks and cornrows are not immutable characteristics, and an employer policy prohibiting these hairstyles does not implicate a fundamental right."); *Carswell v. Peachford Hospital*, 1981 U.S. Dist. LEXIS 14562, **5-6 (N.D. Ga.) ("There is no evidence, and this court cannot conclude, that the wearing of beads in one's hair is an immutable characteristic, such as national origin, race, or sex. Further, this court cannot conclude that the prohibition of beads in the hair by an employer is a subterfuge for discrimination."); *Cooper v. American Airlines, Inc.*, 1998 U.S. App. LEXIS 10426, **2-3 (4th Cir.) (upholding district court's 12(b)(6) dismissal of claims based on a grooming policy requiring that braided hairstyles

be secured to the head or at the nape of the neck). As such, even if the Complaint were construed to contain a claim of racial discrimination, that count would be due to be dismissed for failing to state a viable legal theory.

## II.   Relatedly, Plaintiff could not have had a reasonable belief that the alleged hairstyle restriction was unlawful.

To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). In this case, Plaintiff has failed to establish statutorily protected activity.

According to Plaintiff, her supervisors (none of whom were employed by HMMA, (Exhibit D, ¶9)), asked her about her dreadlocked hairstyle, then later the same day told her that the hairstyle was against the rules of a defendant. (Complaint, doc. 1, ¶¶16, 19). When she requested to see the policy, she was refused. (*Id*. at ¶20). After a call ascertaining her due date and confirming she could work without restrictions, Plaintiff was terminated. (*Id*. at ¶¶22-24).[3]

For conduct to be protected under Title VII, a plaintiff must have had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little*, 103 F.3d 956, 960. The plaintiff must show not only her own subjective belief that the employer's practices were unlawful, but must also show that that belief was objectively reasonable, as measured against substantive law. *Id*.; *Clover v. Total Sys. Svcs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Anduze v. Florida Atlantic Univ.*, 151 Fed. Appx. 875, 878 (11th Cir. 2005). Even before the *Catastrophe Management* decision above, the caselaw regarding hairstyle discrimination was well-established. *See McBride v. Lawstaf, Inc.*, 1996 U.S. Dist. LEXIS

---

[3] While Plaintiff's Complaint is not a model of clarity with its two retaliation claims, Plaintiff does not allege that she engaged in any nominally-protected conduct related to her pregnancy before her termination.

16190, \*\*6-7 (N.D. Ga.), *adopted by* 1996 U.S. Dist. LEXIS 16188 (dismissed a retaliation claim pursuant to Rule 12(b)(6) because the plaintiff could not have had a reasonable belief that she was objecting to unlawful discrimination where she objected to the employer's policy against placing women with braided hair); *see also Harper v. Blockbuster*, 139 F.3d 1385, 1388 (11th Cir. 1998) (opposing grooming policies regarding male hair length was not protected conduct). But certainly since the Eleventh Circuit's well-publicized decision in *Catastrophe Management,* no individual could reasonably believe that having a dreadlocked hairstyle put one in a protected class.

### III.    Plaintiff's pregnancy discrimination claim fails to breach the threshold of possibility to plausibility.

Plaintiff alleges that she requested to see a policy on restricted hairstyles and that she was refused, and she was then instructed to wear a hat covering her dreadlocks. (Complaint, doc. 1, ¶¶20-21). About five minutes later, Plaintiff contends she received a call from her supervisor, asking for her due date and confirmation that she was cleared to continue working. *Id*. at ¶22. Plaintiff responded that her due date was January 2018 and that she had no restrictions. *Id.* at ¶23. After that, according to Plaintiff, she was terminated and told that "Hyundai" and Dynamic Security did not want her at their work site due to "her hair and something else." *Id*. at ¶¶24-25. In other words, the factual matter supporting Plaintiff's pregnancy discrimination claim amounts to the allegations that she was pregnant and that she was terminated.

However, to state a claim of discrimination, it is not sufficient to allege merely one's membership in a protected class and that one experienced an adverse action. *E.g.*, *Edwards v. Prime Inc*., 602 F.3d 1276, 1301 (11th Cir. 2010) (dismissing claims for racial harassment where factual allegations did not indicate negative action was taken because of complainant's race); *Durham v. Ascension Parish Sch. Bd.*, 624 Fed. Appx. 237, 238 (5th Cir. 2015); *Sanders v.*

*Grenadier Realty, Inc.*, 367 Fed. Appx. 173, 175 (2nd Cir. 2010) (merely alleging "facts consistent with a discrimination claim, i.e., that non-black residents were granted subsidies," the complaint "nevertheless 'stops short of the line between possibility and plausibility of entitlement to relief' because plaintiffs do not allege any facts supporting an inference of racial animus.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (other quotation and citation marks omitted)).

From the above allegations, there is an obvious alternative explanation—other than pregnancy discrimination—for the reason for Plaintiff's dismissal: her hairstyle and her request to see the policy that prohibited her hairstyle. Where an obvious alternative explanation exists that would render the Defendant's objective conduct lawful, then dismissal is appropriate. *See Heard v. Hannah*, 51 F.Supp.3d 1129, 1143 (N.D. Ala. 2014) (citing *Iqbal*, 556 U.S. 662, 681-82); *Henley v. Turner Broad. Sys.*, 267 F.Supp.3d 1341, 1353 (N.D. Ga. 2017) (in something of a reverse situation from this complaint, African-American plaintiff's race discrimination claim was dismissed where she experienced a change in treatment after her return from maternity leave).

## **CONCLUSION**

As explained above, Plaintiff's claims are without merit and fail to establish violations of Title VII, as amended. These inadequacies call for a complete dismissal of Plaintiff's claims. Additionally, Defendant HMMA is not a proper defendant in this suit, having never employed Plaintiff or any of the key individuals she names in this suit.

Respectfully Submitted,

s/ David J. Middlebrooks
David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B

7

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
     wbrown@lehrmiddlebrooks.com

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on January 30, 2020, I have served a copy of the foregoing on the following by placing same in the United States Mail, properly addressed and first class postage prepaid

         Ms. Davita M. Key
         6940 Wrangler Rd, Apt. C
         Montgomery, AL 36117


          s/ David J. Middlebrooks
          OF COUNSEL


665034.docx

# Exhibit A

Page: 25 of 425     Date Filed: 02/14/2025     Document: 58-1     USCA11 Case: 24-11126

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2019-00128 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Davita M. Key | (334) 200-7078 | 1985 |

| Street Address | City, State and ZIP Code |
|---|---|
| 6940 Wrangler Rd Apt C, Montgomery, AL 36117 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| HYUNDAI MOTOR MANUFACTURING ALABAMA | 500+ | (334) 387-8000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 700 Hyundai Blvd., Montgomery, AL 36105 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 08-01-2017  Latest: 08-01-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began employment with the above-named employer on or about July 31, 2017, through Dynamic Security, Inc., and I was last employed as a Mailroom Clerk. On or about July 19, 2017, I was interviewed by Gloria Robinson (Dynamic Security, Inc.) and Lt. Maurice Chambliss. Cassandra Williams (Hyundai Motor Manufacturing) also participated. On or about July 31, 2018, I showed up for my first day of work, and Ms. Williams asked me why I had not changed my hairstyle (dreadlocks) as she had instructed me to do during my job interview. Per my request, Ms. Williams showed me a grooming policy on her computer, for female uniformed officers. Subsequently, I was sent home for the day. Additionally, I received a phone call inquiring as to the due date for my pregnancy, as I had informed both my employers of my pregnancy that morning. On or about August 1, 2018, I returned to work with a hat that covered my hair completely, per Ms. Williams instructions. My co-worker and trainer in the mailroom, Tanya Howell, asked me why I had been sent home the day before; I explained to her the situation regarding the grooming policy and my dreadlocks. Subsequently, Tanya informed Ms. Williams that I said I was being discriminated against. After being questioned, I submitted an official written complaint of discrimination against Hyundai, Ms. Robinson and Ms. Williams on the basis of my dreadlocks and pregnancy. That same day, I was informed by Dynamic Security, Inc. that Ms. Williams did not want me to return to work.

I was informed that the reason I was discharged was because of my hair and something else.

I believe that I was discriminated against due to my race, African-American, my sex, female (pregnancy), and in retaliation for making a protected internal complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10-16-18 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

RECEIVED EEOC
OCT 17 2018
Birmingham District Office

# Exhibit B

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**INTAKE QUESTIONNAIRE**

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)

**1. Personal Information**

Last Name: Key    First Name: Davita    MI: M.

Street or Mailing Address: Redacted    Apt or Unit #: Redacted

City: Montgomery    County: Montgomery    State: AL    Zip: 36117

Phone Numbers: Home: ( ) Redacted    Work: ( ) Redacted

Cell: Redacted    Email Address: Redacted

Date of Birth: _____    Sex: ☐ Male ☑ Female    Do You Have a Disability? ☐ Yes ☑ No

Please answer each of the next three questions.   i. Are you Hispanic or Latino? ☐ Yes ☑ No

ii. What is your Race?   Please choose all that apply. ☐ American Indian or Alaskan Native   ☐ Asian   ☐ White

☑ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? _____

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: Quartez Key    Relationship: husband

**(b) (7)(C) 1 Line Redacted**

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)    Ms. Gloria Rodriser

☑ Employer   ☐ Union   ☐ Employment Agency   ☑ Other (Please Specify) Ms. Cassonda Williamst

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: Hyundai

Address: 700 Hyundai Blvd    County: Montgomery    Birmingham District Office US EEOC

City: Montgomery    State: AL Zip: 36105    Phone: ( 334 )

Type of Business: Car supplier    Job Location if different from Org. Address: for Dynamic Security

Human Resources Director or Owner Name: Dr. Ray Cureton (Security)    Phone: ( 334 )

**Number of Employees in the Organization at All Locations:** Please Check (✓) One    RECEIVED

☐ Fewer Than 15   ☐ 15 – 100   ☐ 101 – 200   ☐ 201 – 500   ☑ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** ☐ Yes ☑ No

Date Hired: July 21, 2017    Job Title At Hire: mail clerk

Pay Rate When Hired: $13.0 /hr    Last or Current Pay Rate: $13.00 /hr

Job Title at Time of Alleged Discrimination: mail clerk    Date Quit/Discharged: Aug. 1, 2017

Name and Title of Immediate Supervisor: Maurice (title unknown)

If Job Applicant, Date You Applied for Job _____    Job Title Applied For _____

1

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☑ Race ☐ Sex ☐ Age ☐ Disability ☐ National Origin ☐ Religion ☑ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

_____

Other reason (basis) for discrimination (Explain): _____

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed.
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

A. Date: July 31, 2017 Action: See attached

Name and Title of Person(s) Responsible: Ms. Cassandra Williams AMCO + Ms. Gloria Robinson

B. Date: Aug 1, 2017 Action: See attached

Name and Title of Person(s) Responsible Ms. Cassandra Williams, AMCO + Ms. Gloria Robinson

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.

See attached

_____

**7. What reason(s) were given to you for the acts you consider discriminatory?** By whom? His or Her Job Title?

No reasons given except I was told the Koreans who own the company didn't want Blks where their business certain.

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|-----------|---------------------------------------------------------|-----------|--------------------------|
| A. | | | |
| B. | | | |

2

Of the persons in the same or similar situation as you, who was treated *worse* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. _____

B. _____

Of the persons in the same or similar situation as you, who was treated the *same* as you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. _____

B. _____

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**
☐ Yes, I have a disability
☐ I do not have a disability now but I did have one
☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

_____

_____

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
☐ Yes ☐ No
If "Yes," what medication, medical equipment or other assistance do you use?

_____

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
☐ Yes ☐ No

If "Yes," when did you ask? _____ How did you ask (verbally or in writing)? _____

Who did you ask? (Provide full name and job title of person)

_____

Describe the changes or assistance that you asked for: _____

_____

How did your employer respond to your request? _____

_____

13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|-----------|-----------|------------------------|-----------------------------------------------|

A.

B.

14. Have you filed a charge previously on this matter with the EEOC or another agency?  ☐ Yes  ☑ No

15. If you filed a complaint with another agency, provide the name of agency and the date of filing: _____

Dynamic Security    Aug 1, 2017)

16. Have you sought help about this situation from a union, an attorney, or any other source?  ☑ Yes  ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

I filed a complaint w/ Dynamic Security (the agency I was
hired through) w/ D Ray Curton on Aug 1, 2017)

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire. If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

BOX 1  ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

BOX 2  ☑ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_____
Signature

8  2  17
Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974. Public Law 93-579. Authority for requesting personal data and the uses thereof are
1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08) 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626, 42 U.S.C. 12117(a)
3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8.c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Davita M. Key
6940 Wrangler Road
Apt C
Montgomery, Alabama 36117
(334) 200-7078

**Place of Employment**
Hyundai
Ms. Cassandra Williams, Ms. Gloria Robinson
700 Hyundai Boulevard
Montgomery, Alabama 36105
(334)387-8909


     I began working for Hyundai (Dynamic Security) on July 31, 2017.  On the first day of working I was sent home because of my hairstyle (dreadlocks), and also because I informed my employer that I was pregnant..  I had given Ms. Gloria Robinson and Maurice a letter from my doctor which indicated that I had no work restrictions.

     I was dismissed on Tuesday, August 1, 2017 after filing an official complaint with Dr. Ray Cureton (the HR Department of Dynamic Security).

     I wish to file a charge of discrimination for race and gender, pregnancy discrimination and retaliation due to my exercise of protected activity by filing a complaint of discrimination with my employer.


**Incident Detailed:**
On Wednesday, July 19, 2017, I was interviewed for a position as a mail clerk at the Hyundai Plant in Montgomery, Alabama by Ms. Gloria Robinson and Maurice. I went through the entire interview; with no mention of my hairstyle (I currently have neat locs (dreadlocks)). Ms. Robinson went and got her manager Cassandra Williams to ask if my hairstyle was okay and Ms. Williams turned up her nose and asked if I could take my hair down and I replied no unless I were to cut it. Ms. Williams also asked Ms. Robinson what was the policy of Dynamic Security, since this was the agency that my employment would go through and Ms. Robinson did not give an answer, but simply said she did not think I could have them. I showed both Ms. Williams and Ms. Robinson a picture on my phone of an updo style I had my locs in and they said that was ok. On Friday, July 21, 2017, I received an email from Ms. Gloria Robinson saying that I was hired for the position of mail clerk. On, Thursday, July 27, 2017, I had training at the Dynamic Security office and after that training, I asked an employee at Dynamic Security, Nicole, if my hairstyle was okay for their company's policy (as I was told throughout my initial interview, that I was employed by Dynamic Security for Hyundai and that Dynamic Security were the individuals who (direct quote) "signed my checks." Nicole informed me that my hair was neat and that there was nothing wrong with my hairstyle and she was not sure why anyone would have said anything to me concerning it. On July 31, 2017, I reported for my first day of work. While I was waiting to receive my badge, Ms. Cassandra Williams came into the building, spoke with me and saw me and that my hair was the same as in my interview and said nothing about me changing my hairstyle. After seeing Ms. Gloria Robinson and getting instructions from her, I pulled her (Ms. Gloria Robinson) and Maurice (who I was told was my immediate supervisor) to the side and informed them that I was pregnant. I handed them a note from my doctor, Dr.

Latoya Clark, stating that I had no restrictions and was able to fulfill all duties and also I handed them a paper that had my next scheduled doctor's appointment on it so they would know in advance. I went back to wait for further instruction. Ms. Robinson went to her back office, which she shares with Ms. Cassandra Williams, maybe 10 minutes later, Ms. Williams came out twice, the second time she came out she asked me what about my hair. I informed her that the topic of my hairstyle came up at my training at Dynamic Security and they informed me that as long as my hair was neat that my style was appropriate. She then in a loud and agitated voice said well it's not what they say it's what I say and even their handbook says no dreads. I then informed her that the handbook says that females hair have to be neat. She then stormed off. I was taken by Tanya, to be trained and maybe 30-45 minutes after being with Tanya, she received a call to bring me back to the office. I went into the office with Ms. Cassandra Williams, Maurice and eventually Ms. Gloria Robinson joined. Ms. Williams in a stern voice said, "You can't have your hair like that and work here because that's what our policy says." I then asked if I could see the policy and she then replied, I don't have to show you anything. She said that statement twice and then said I will show you but I do not have to. I went to her computer and the policy was in a Microsoft word document on her desktop and at the top it said n bold female uniformed officers. I explained to her that I would be working in the mailroom and was not an officer and she said that does not matter. She then asked me again what I was told at Dynamic Security and I told her they said that my hairstyle was ok. She informed me that well Dynamic has plenty of jobs so if they want to send you to another job then they can but you can't be here with your hair like that. She said the only thing in the policy that had changed was that females could wear braids and I asked her what was the difference in braids and my locs and she said the name and professionalism. Ms. Robinson said that with braids, one can see the person's scalp. I then asked, if you are able to see my scalp, will my hair be okay as such. Ms. Williams and Ms. Robinson just looked at me. Ms. Williams said that I needed to call my stylist and get my hair changed and I informed her that my stylist doesn't work on Tuesdays and today, I was unsure if she was available and also that I would have to drive to Auburn, Alabama because that's where she was located. I then asked Ms. Williams, what did she want me to do for today, go home or stay and she said she was not going to tell me to go home. I said the only alternative, if I cannot be here is to go home and Ms. Williams said I am not saying go home with her hands in the air. I then said, well, I choose to stay and Ms. Williams then said unless you want to wear a hat, all day, every day, but strictly said ALL of my hair had to be covered. I then reiterated what she said and asked so I can wear a hat, and Ms. Robinson said well it can't have a logo. I told them that I had a gray casual hat at home and that I could get it but I stayed 30 minutes away, that is when Ms. Robinson said, well why don't you go home for the day and contact your stylist and we will take it from there. I said okay and went to my car and left. Maybe 5 minutes after I left, Ms. Robinson called from ▮▮▮▮▮▮▮▮and asked me when my child was due, I informed her in January and she said does your doctor know you will be lifting boxes? I let Ms. Robinson know that I informed my doctor, Dr. Latoya Clark, of all the job responsibilities that I was to have and she cleared me to do those duties, hence the note she wrote to my employer. I also informed Ms. Robinson, that while I worked for the United States Post Office, I worked until I was nine months pregnant doing the same work. She said ok and hung up the phone. I am filing this charge for both racial discrimination and pregnancy discrimination. My hair to me is what a hijab symbolizes to a Muslim, it is a part of my identity and who I am. Ms. Williams saw my hairstyle when she first saw me and did not say anything was wrong with it, she did not approach me until after I told Ms. Robinson that I was pregnant and Ms. Robinson went to their office.

I returned to work on Tuesday, August 1, 2017 and I complied with Ms. Cassandra Williams request and I wore a hat in which all of my hair was covered. After arriving to work, I went to my job site with my trainer Tanya. Tanya and I made our rounds and when we reached the security building, we went into the office of Ms. Gloria Robinson and Ms. Cassandra Williams and neither acknowledged me. Ms. Robinson kept her head down and Ms. Williams just gave me a cold look. On the ride back to the mailroom, my co-worker/trainer, Tanya, asked me why they sent me home on yesterday (Monday, July 31, 2017) and I told her because of my hair and that I did not think that was right but I could still work with them. Maybe 20 minutes after returning to the mailroom, Tanya received a call that Maurice was coming to get me. Once Maurice came, I gathered my things and we went to the security building, where Ms. Robinson and Maurice met with me in the conference room. Ms. Robinson asked if anything was wrong with me and unsure of what she was referring to, I said no that I was fine. I then went on to explain that I wore a hat today as Ms. Williams said I could because I was unable to get a hair appointment. Ms. Robinson informed me that this meeting was not about my hat and readjusted herself in her chair and said so you feel discriminated against and I just looked at her. I told her I had no comment and she then said so you do and I said I did not say that. I asked if she had a recording or proof that I said that and she then said that Tanya told her that I felt that way. I wanted to say yes, I feel discriminated against but all I could think about was how on yesterday (Monday, July 31, 2017) and the short time I was there today, (August 1, 2017), how these women had treated me and did not want to cause anymore problems for myself so I said I did not say that. Ms. Robinson went on to inform me that the Koreans were a different breed of animals and that they send little memos saying that they do not want African-Americans wearing their hair in the dreadlock hairstyle because they have VIP clients, such as the mayor of Montgomery, Alabama and it is not a good look. She then said that me asking to see the policy on yesterday was a bit off but she understood why but still I should not have gone to Ms. Williams like that. I then said that I only wanted to see the policy because I wanted to see it written what I was to adhere to and that by law they should let me see the employee handbook, so I am aware of the rules and regulations. Ms. Robinson then said the handbook was posted and I informed her that I was not told anything of Hyundai's policies because in my interview, it was stressed that I work for Dynamic Security. She then said that I do work for Dynamic Security but I have to go by Hyundai's criteria and I told her I was never given a copy of their criteria. Ms. Robinson then said that I was going to be a problem and that this situation was going to be a problem. And she asked if this was how it was going to be until (referring to me having my child). I asked Ms. Robinson what the solution was and did she want me to remove my hat and she is a loud and agitated voice said this meeting is not about your hat. After meeting with Ms. Robinson, I felt even more threatened by her and Ms. Williams attempts to intimidate me as an African-American woman who chooses to wear her nature hair and as a pregnant employee. Once at the mailroom, I asked Tanya what she had said and she confirmed that she told them I felt discriminated against and Tanya called Ms. Robinson and spoke with her but I had stepped out of the office. I was overcome with emotional stress to think that in 2017, I would be treated as such and that I would be judged because of my natural hair and because I am with child. I came back to the mailroom and I wrote up an official complaint against Hyundai, Ms. Cassandra Williams and Ms. Gloria Robinson and they sent Maurice to the office and I handed him the complaint. I told Maurice that I would like to file an official complaint against them with the Human Resource department and he said you can talk with Ms. Williams or Ms. Robinson. I thought of the encounters that I had already had with them and told him that I would feel more comfortable talking directly with HR because I thought the way the talked to me and handled me where demeaning, disrespectful and created a hostile environment for me and emotional/mental anguish. Maurice then told

me that I would have to go to Dynamic Security and speak with Ray Cureton. I asked if I left would I be able to return to work after the meeting and he said well that's up to you. Maurice gave me permission to leave the job to speak with Dr. Cureton and he assured me that after my meeting I would be able to return to work, I said ok and left. Once I reached the Dynamic Security office, I spoke with Dr. Cureton and I told him what has transpired just as I have outlined above. Dr. Cureton, had Nicole sit in on the meeting, throughout the meeting, Nicole made remarks to the effect that I was fighting a downhill battle and did I really think that I would be fruitful at the end. Nicole, even stated that filing a discrimination claim is a a serious offense, which I took as to discouraging me to follow through with my complaint. Dr. Cureton then told me that Ms. Williams informed him that they did not want me at the job site anymore. I asked Dr. Cureton why and he replied because of your hair and something else but I do not want to put words in their mouth so I will wait until they send over the paperwork. Dr. Cureton, apologized for how I was treated and asked for my Hyundai badge and then informed me that he would send the copy of the complaint that I wrote up and gave to Maurice, Ms. Gloria Robinson and Ms. Cassandra Williams to the Dynamic Security HR department in Birmingham and that he would get back with me in a couple of days so I can review the documents saying why I was dismissed from Hyundai. As I left the office, Nicole walked me to the car and told me that she had "really" been discriminated against and kept trying to tell me that unless I was going through with this complaint just because, that I was fighting a losing battle, again having me feel as if she were attempting to discourage me from filing an official complaint.

**Date of Incident**
Monday, July 31, 2017 and Tuesday, August 1, 2017

**Reason for Discrimination**
I believe I was discriminated against both racially and due to me being pregnant, and I was retaliated against for exercising protected activity, i.e. filing a complaint with HR.


Davita M. Key
August 1, 2017

# Exhibit C

 **Alabama Secretary of State**    

| Entity ID | Entity Name | City | Type | Status |
|---|---|---|---|---|
| 924 - 972 | Hyundai AMCO America, Inc. | IRVINE, CA | Foreign Corporation | Previous Name |
| 939 - 078 | Hyundai America Technical Center, Incorporated | SUPERIOR TOWNSHIP, MI | Foreign Corporation | Exists |
| 610 - 106 | HYUNDAI AUTOEVER AMERICA, LLC | FOUNTAIN VALLEY, CA | Foreign Limited Liability Company | Exists |
| 893 - 509 | Hyundai Capital America | FOUNTAIN VALLEY, CA | Foreign Corporation | Exists |
| 893 - 509 | Hyundai Capital America, Inc. | FOUNTAIN VALLEY, CA | Foreign Corporation | Registered Name |
| 617 - 851 | Hyundai Capital Insurance Services, LLC | IRVINE, CA | Foreign Limited Liability Company | Exists |
| 944 - 425 | Hyundai Electric Systems Alabama, Inc. | BIRMINGHAM, AL | Foreign Corporation | Previous Name |
| 944 - 425 | Hyundai Electrical Systems Alabama, Inc. | BIRMINGHAM, AL | Foreign Corporation | Previous Name |
| 924 - 932 | Hyundai Elevator Co., Ltd. | SOUTH KOREA, OC | Foreign Corporation | Exists |
| 924 - 932 | Hyundai Elevator Co., Ltd. Corporation | SOUTH KOREA, OC | Foreign Corporation | Registered Name |
| 924 - 972 | Hyundai ENG America, Inc | IRVINE, CA | Foreign Corporation | Exists |
| 924 - 972 | Hyundai Engineering America, Inc. | IRVINE, CA | Foreign Corporation | Previous Name |
| 288 - 930 | HYUNDAI EP ALABAMA CORPORATION | OPELIKA, AL | Domestic Corporation | Dissolved |
| 019 - 748 | Hyundai Indus LLC | Not Provided | Domestic Limited Liability Company | Dissolved |
| 610 - 106 | Hyundai Information Service North America, LLC | FOUNTAIN VALLEY, CA | Foreign Limited Liability Company | Previous Name |
| 046 - 141 | HYUNDAI KEFICO CORPORATION | MONTGOMERY, AL | Foreign Corporation | Exists |
| 073 - 732 | Hyundai Korean Market, Inc. | Not Provided | Domestic Corporation | Exists |
| 340 - 879 | Hyundai L&C USA LLC | ATLANTA, GA | Foreign Limited Liability Company | Exists |
| 932 - 088 | Hyundai Lease Titling Trust | FOUNTAIN VALLEY, CA | Foreign Corporation | Exists |
| 932 - 088 | Hyundai Lease Titling Trust, Inc. | FOUNTAIN VALLEY, CA | Foreign Corporation | Registered Name |

| Entity ID | Entity Name | City | Type | Status |
|---|---|---|---|---|
| 820 - 009 | Hyundai Marine & Fire Insurance Company Ltd (US Branch) | COSTA MESA, CA | Foreign Insurance Corporation | Exists |
| 895 - 138 | Hyundai Motor America, Inc. | FOUNTAIN VALLEY, CA | Foreign Corporation | Exists |
| 923 - 246 | Hyundai Motor Company, Inc. | JAMESBURG, NJ | Foreign Corporation | Withdrawn |
| 893 - 509 | Hyundai Motor Finance Company, Inc. | FOUNTAIN VALLEY, CA | Foreign Corporation | Previous Name |
| 604 - 088 | Hyundai Motor Manufacturing Alabama, LLC | MONTGOMERY, AL | Foreign Limited Liability Company | Exists |

**1**   2   3   Next >>

New Search

 # Alabama Secretary of State



| Entity ID | Entity Name | City | Type | Status |
|---|---|---|---|---|
| 243 - 687 | Hyundai of Auburn, Inc. | AUBURN, AL | Domestic Corporation | Previous Name |
| 243 - 687 | HYUNDAI OF AUBURN INC. DBA GENESIS OF AUBURN | AUBURN, AL | Domestic Corporation | Exists |
| 527 - 533 | Hyundai of Auburn Inc. dba Genesis of Auburn | AUBURN, AL | Domestic Corporation | Dissolved |
| 478 - 944 | Hyundai of Daphne, LLC | FOLEY, AL | Domestic Limited Liability Company | Previous Name |
| 242 - 429 | Hyundai of Decatur, Inc. | HUNTSVILLE, AL | Domestic Corporation | Exists |
| 238 - 772 | Hyundai of Gadsden, Inc. | ORLANDO, FL | Domestic Corporation | Exists |
| 242 - 231 | Hyundai Polytech America Company, Inc. | EUFAULA, AL | Domestic Corporation | Exists |
| 944 - 425 | Hyundai Power Transformers USA, Inc. | BIRMINGHAM, AL | Foreign Corporation | Exists |
| 034 - 226 | Hyundai Protection Plan, Inc. | IRVINE, CA | Foreign Corporation | Exists |
| 584 - 913 | HYUNDAI RIGGING USA LLC | Not Provided | Domestic Limited Liability Company | Exists |
| 045 - 738 | Hyundai Rotem Alabama corporation | MONTGOMERY, AL | Foreign Corporation | Registered Name |
| 045 - 738 | Hyundai Rotem Company | MONTGOMERY, AL | Foreign Corporation | Exists |
| 924 - 847 | Hyundai Steel America, Inc. | GREENVILLE, AL | Foreign Corporation | Exists |
| 311 - 661 | HYUNDAI STEEL COMPANY | GREENVILLE, AL | Foreign Corporation | Withdrawn |
| 311 - 661 | HYUNDAI STEEL COMPANY., INC. | GREENVILLE, AL | Foreign Corporation | Registered Name |
| 927 - 045 | Hyundai Sungwoo Auto USA Corporation | MONTGOMERY, AL | Foreign Corporation | Exists |
| 350 - 904 | Hyundai Translead | SAN DIEGO, CA | Foreign Corporation | Exists |
| 350 - 904 | Hyundai Translead, Inc. | SAN DIEGO, CA | Foreign Corporation | Registered Name |
| 585 - 236 | Hyundai Transys America, Inc. | West Point, GA | Foreign Corporation | Exists |
| 307 - 732 | HYUNDAI WIA Corporation | MONTGOMERY, AL | Foreign Corporation | Exists |
| 321 - 018 | Barkley Hyundai Real Estate, LLC | GALLION, AL | Domestic Limited Liability Company | Exists |
| 119 - 702 | Capitol Hyundai, Inc. | Not Provided | Domestic Corporation | Previous Name |

| Entity ID | Entity Name | City | Type | Status |
|---|---|---|---|---|
| 501 - 079 | Capitol Hyundai, Ltd. | MONTGOMERY, AL | Domestic Limited Partnership | Exists |
| 238 - 772 | Dave Menegay Hyundai, Inc. | ORLANDO, FL | Domestic Corporation | Previous Name |
| 943 - 730 | Decatur Hyundai, Inc. | ORLANDO, FL | Foreign Corporation | Exists |

<< Prev   1   **2**   3   Next >>

New Search

arc-sos.state.al.us/cgi/corpname.mbr/output?s=26&search=HYUNDAI&type=ALL&status=ALL&place=ALL&city=&order=default&hld=&dir=&page=Y

2/2

 # Alabama Secretary of State 

| Entity ID | Entity Name | City | Type | Status |
|---|---|---|---|---|
| 478 - 944 | Eastern Shore Hyundai, LLC | FOLEY, AL | Domestic Limited Liability Company | Exists |
| 241 - 937 | Family Hyundai, Inc. | FLORENCE, AL | Domestic Corporation | Previous Name |
| 031 - 653 | Hightower Hyundai, Inc. | BIRMINGHAM, AL | Domestic Corporation | Dissolved |
| 697 - 038 | Hoover Hyundai, LLC | BIRMINGHAM, AL | Domestic Limited Liability Company | Dissolved |
| 115 - 830 | Jerry Damson Hyundai, Inc. | HUNTSVILLE, AL | Domestic Corporation | Merged |
| 111 - 000 | Joe Bullard Hyundai, Inc. | MOBILE, AL | Domestic Corporation | Merged |
| 118 - 526 | Joe Bullard Hyundai/Suzuki, Inc. | MOBILE, AL | Domestic Corporation | Dissolved |
| 261 - 847 | Lynn Layton Hyundai, Inc. | DECATUR, AL | Domestic Corporation | Dissolved |
| 196 - 054 | Midtown Hyundai-Suzuki, Inc. | MOBILE, AL | Domestic Corporation | Merged |
| 475 - 867 | Mitchell Hyundai, L.L.C. | ENTERPRISE, AL | Domestic Limited Liability Company | Exists |
| 231 - 100 | Sandy Sansing Hyundai, Inc. | MONTGOMERY, AL | Domestic Corporation | Dissolved |
| 114 - 108 | Serra Hyundai, Inc. | BIRMINGHAM, AL | Domestic Corporation | Merged |
| 501 - 154 | Tameron Hyundai, Ltd. | BIRMINGHAM, AL | Domestic Limited Partnership | Exists |
| 114 - 108 | Team Hyundai, Inc. | BIRMINGHAM, AL | Domestic Corporation | Previous Name |
| 120 - 317 | Tuscaloosa Hyundai, Inc. | TUSCALOOSA, AL | Domestic Corporation | Exists |
| 200 - 945 | Victor Hyundai, Inc. | MADISON, AL | Domestic Corporation | Dissolved |
| 115 - 830 | West Side Hyundai, Inc. | HUNTSVILLE, AL | Domestic Corporation | Previous Name |
| 115 - 830 | Westside Hyundai, Inc. | HUNTSVILLE, AL | Domestic Corporation | Previous Name |

<< Prev   1   2   **3**

New Search

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

DAVITA M. KEY,                              )
                                           )
          Plaintiff,                       )
                                           )
v.                                         )          **CIVIL ACTION NUMBER:**
                                           )          **2:19-cv-00767-ECM-SMD**
                                           )
HYUNDAI MOTOR MANUFACTURING                )
ALABAMA, LLC, HYUNDAI                       )
ENGINEERING AMERICA, INC. and              )
DYNAMIC SECURITY, INC.                     )
                                           )
          Defendants.                      )

## DECLARATION OF ROBERT BURNS PURSUANT TO 28 U.S.C. § 1746

My name is Robert Burns. I am a resident of the State of Alabama, over twenty-one (21) years of age, and give this Declaration of my own free will. I have personal knowledge of the information contained in this Declaration.

1.      From December 2016-October 2018, I was the Director of Team Relations, Public Relations, General Affairs, and Human Resources for Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). In October 2019, I was promoted to Vice President of Human Resources and Administration for HMMA.

2.      In this role, I have access to HMMA's employment records.

3.      I also have access to certain contractual arrangements between HMMA and third parties, including but not limited to as would be required to defend EEOC Charges or other accusations involving non-employees.

4.      HMMA has never employed Davita Key.

5.      HMMA has also never employed Cassandra Williams, Gloria Robinson, Maurice Chambliss, or Tonya Howell.

6.     In July and August 2017, HMMA had a contractual relationship with Hyundai ENG America, Inc. ("HEA") where HEA agreed to provide certain security and other services.

7.     HEA is a wholly separate company, and upon information and belief is based in Irvine, California.  HEA is not a subsidiary or parent of HMMA. Nor is HMMA a subsidiary or parent of HEA. HMMA does not share policies, executives, or resources with HEA.

8.     HMMA employs no personnel jointly with HEA.

9.     In investigating Ms. Key's EEOC Charge which is the basis of this suit, HMMA determined that Ms. Williams was employed by HEA; and Ms. Key, Ms. Robinson, Mr. Chambliss, and Ms. Howard were all employed by Dynamic Security, Inc.

10.     Dynamic Security, Inc., provides certain services to HEA.

11.     HMMA has never had a contractual relationship with Dynamic Security, Inc.

12.     HMMA employs no personnel jointly with Dynamic Security, Inc.

13.     Dynamic Security, Inc. is not a subsidiary or parent of HMMA. Nor is HMMA a subsidiary or parent of Dynamic Security, Inc. HMMA does not share policies, executives, or resources with Dynamic Security, Inc.

*I declare under penalty of perjury that the foregoing is true and correct.*

*Executed on* Jan. 29, 2020

Robert Burns

Robert Burns

665244.docx

2

# Exhibit E

1/30/2020

Case 2:19-cv-00767-ECM-SMD Business Entity Records | Alabama Filed 01/30/20 Page 2 of 3
USCA11 Case: 24-11126    Document: 58-1    Date Filed: 02/14/2025    Page: 45 of 425

 

# Alabama Secretary of State

| Hyundai ENG America, Inc | |
|---|---|
| Entity ID Number | 924 - 972 |
| Entity Type | Foreign Corporation |
| Principal Address | 111 PETERS CANYON RD<br>IRVINE, CA 92606 |
| Principal Mailing Address | 111 PETERS CANYON RD<br>IRVINE, CA 92606 |
| Status | Exists |
| Place of Formation | California |
| Formation Date | 4-22-2003 |
| Qualify Date | 6-16-2003 |
| Registered Agent Name | NATIONAL REGISTERED AGENTS INC |
| Registered Office Street Address | 2 NORTH JACKSON STREET, SUITE 605<br>MONTGOMERY, AL 36104 |
| Registered Office Mailing Address | 2 NORTH JACKSON STREET, SUITE 605<br>MONTGOMERY, AL 36104 |
| Nature of Business | |
| Stock Authorized | |
| Stock Paid In | |

| Annual Reports | |
|---|---|
| Annual Report information is filed and maintained by the Alabama Department of Revenue.<br>If you have questions about any of these filings, please contact Revenue's Business Privilege Tax Division at 334-242-1170 or www.revenue.alabama.gov. The Secretary of State's Office cannot answer questions about or make changes to these reports. | |
| Report Year | 2002 2003 2004 2005 2006 2007 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 |

| Transactions | |
|---|---|
| Transaction Date | 6-15-2009 |
| Principal Office Changed From | 81 BUNSEN<br>IRVINE, CA 92618 |
| Transaction Date | 6-23-2009 |
| Registered Agent Changed From | KIM, SUNG DO<br>416 SEATON CIR<br>MONTGOMERY, AL 36116 |
| Transaction Date | 1-29-2010 |
| Legal Name Changed From | AMCO America, Inc. |
| Transaction Date | 8-16-2011 |

### Hyundai ENG America, Inc

| | |
|---|---|
| Registered Agent Changed From | NATIONAL REGISTERED AGENTS INC<br>150 S PERRY ST<br>MONTGOMERY, AL 36104 |
| Transaction Date | 8-16-2011 |
| Agent Mailing Address Changed From | Not Provided |
| Transaction Date | 6-6-2013 |
| Registered Agent Changed From | SIM, KWANGSEOK<br>2900 20TH AVE<br>VALLEY, AL 36854 |
| Transaction Date | 6-6-2013 |
| Agent Mailing Address Changed From | SIM, KWANGSEOK<br>2900 20TH AVE<br>VALLEY, AL 36854 |
| Transaction Date | 10-16-2014 |
| Legal Name Changed From | Hyundai AMCO America, Inc. |
| Transaction Date | 10-16-2014 |
| Legal Name Changed From | Hyundai Engineering America, Inc. |

| **Scanned Documents** | |
|---|---|
| Purchase Document Copies | |
| Document Date / Type / Pages | 6-16-2003    Certificate of Formation    1 pg. |
| Document Date / Type / Pages | 6-15-2009    Principal Address Change    1 pg. |
| Document Date / Type / Pages | 6-23-2009    Registered Agent Change    1 pg. |
| Document Date / Type / Pages | 1-29-2010    Legal Name Change    1 pg. |
| Document Date / Type / Pages | 8-16-2011    Registered Agent Change    2 pgs. |
| Document Date / Type / Pages | 8-17-2011    Registered Agent Change    2 pgs. |
| Document Date / Type / Pages | 6-6-2013    Registered Agent Change    2 pgs. |
| Document Date / Type / Pages | 10-16-2014    Articles of Amendment    5 pgs. |
| Document Date / Type / Pages | 10-16-2014    Articles of Amendment    9 pgs. |
| | |

Browse Results    New Search

# Exhibit F

1/30/2020

Case 2:19-cv-00767-ECM-SMD Document 118-3 Filed 01/30/20 Page 2 of 3
USCA11 Case: 24-11126    Document: 58-1    Date Filed: 02/14/2025    Page: 48 of 425

 **Alabama Secretary of State** 

| Dynamic Security, Inc. | |
|---|---|
| Entity ID Number | 050 - 568 |
| Entity Type | Domestic Corporation |
| Principal Address | MUSCLE SHOALS, AL |
| Principal Mailing Address | Not Provided |
| Status | Exists |
| Place of Formation | Colbert County |
| Formation Date | 4-4-1978 |
| Registered Agent Name | RIDDLE, SCOTT A |
| Registered Office Street Address | 1102 WOODWARD AVE<br>MUSCLE SHOALS, AL 35661 |
| Registered Office Mailing Address | Not Provided |
| Nature of Business | SECURITY |
| Stock Authorized | $1,000 |
| Stock Paid In | $1,000 |
| **Incorporators** | |
| Incorporator Name | RIDDLE, JOHN |
| Incorporator Street Address | Not Provided |
| Incorporator Mailing Address | Not Provided |
| Incorporator Name | ATWELL, MARY NELL |
| Incorporator Street Address | Not Provided |
| Incorporator Mailing Address | Not Provided |
| Incorporator Name | MCADAMS, LINDA |
| Incorporator Street Address | Not Provided |
| Incorporator Mailing Address | Not Provided |
| **Annual Reports** | |
| Annual Report information is filed and maintained by the Alabama Department of Revenue. If you have questions about any of these filings, please contact Revenue's Business Privilege Tax Division at 334-242-1170 or www.revenue.alabama.gov. The Secretary of State's Office cannot answer questions about or make changes to these reports. | |
| Report Year | 1988  1989  1990  1991  1992  1993  1994  1995  1996  1997  1998<br>1999  2000  2001  2002  2003  2004  2005  2006  2007  2008<br>2009  2010  2011  2012  2013  2014  2016  2017  2018 |
| **Transactions** | |
| Transaction Date | 3-3-1999 |

**Dynamic Security, Inc.**

| Registered Agent Changed From | Not Provided |
|---|---|
| Transaction Date | 4-6-2006 |
| Registered Agent Changed From | THE CORPORATION COMPANY 2000 INTERSTATE PARK DR STE 204 MONTGOMERY, AL 36109 |
| Transaction Date | 3-17-2010 |
| Registered Agent Changed From | KENNEMER, RUSSELL 1102 WOODWARD AVE MUSCLE SHOALS, AL 35661 |

| **Scanned Documents** | |
|---|---|
| Purchase Document Copies | |
| Document Date / Type / Pages | 3-3-1999   Registered Agent Change   1 pg. |
| Document Date / Type / Pages | 4-6-2006   Registered Agent Change   1 pg. |
| Document Date / Type / Pages | 3-17-2010   Registered Agent Change   1 pg. |
| | |

Browse Results    New Search

# Exhibit G

## DECLARATION OF CASSANDRA WILLIAMS

My name is Cassandra Williams. I am a resident of the State of Alabama, over twenty-one (21) years of age, and give this Declaration of my own free will. I have personal knowledge of the information contained in this Declaration.

1.      I am currently employed with Hyundai Engineering America, Inc.  I was also employed with Hyundai Engineering America, Inc. in July and August of 2017.

2.      I am not now, nor have I ever been, employed by Hyundai Motor Manufacturing Alabama, LLC.

*I declare under penalty of perjury that the foregoing is true and correct.*

*Executed on* 5/8/2019

Cassandra Williams

# TAB / DOCKET ENTRY NO. 13

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:19-cv-767-ECM |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING | ) | |
| ALA., LLC, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO DISMISS BY DEFENDANT DYNAMIC SECURITY, INC.**

Pursuant to Federal Rules of Civil Procedure 8(a), 9(c), and 12(b)(6), Defendant Dynamic Security, Inc. ("Dynamic"), by and through undersigned counsel, respectfully moves this Court to dismiss Plaintiff Davita Key's ("Plaintiff") claims against it on grounds set forth below.

**I.     SUMMARY OF GROUNDS FOR DISMISSAL**

Plaintiff's claims against Dynamic, all brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), must be dismissed because Plaintiff failed to plead satisfaction of conditions precedent with regard to Dynamic and because she failed to file a lawsuit against Dynamic within the statutory period prescribed by Title VII.     While Plaintiff pled generally that she satisfied administrative

prerequisites, she did not plead that she did so with regard to Dynamic (See Doc. 1, ¶¶ 3, 4). Further, while she had filed EEOC Charges against both Dynamic and Hyundai Motor Manufacturing of Alabama, LLC ("HMMA") and had received notices of right to sue from both, she attached to her Complaint only the Notice of Right to Sue with regard to the EEOC Charge against HMMA (See Doc. 1-1). Plaintiff omitted from her Complaint any reference to the Dismissal and Notice of Rights to Plaintiff with regard to her EEOC Charge against Dynamic. Had Plaintiff attached the Notice of Rights against Dynamic, she would have revealed that she missed the filing deadline by over 100 days and that she could not in good faith have pled that she satisfied administrative prerequisites to filing suit under Title VII. The EEOC mailed the Dismissal and Notice of Rights regarding Defendant Dynamic on March 1, 2019,[1] and she received the Dismissal and Notice of Rights on or before March 4, 2019. In order to pursue Title VII claims in federal court, Title VII requires a plaintiff to file those claims on or before 90 days following receipt of the Notice of Rights, which in this case was June 3, 2019. Plaintiff did not meet the June 3, 2019, deadline, waiting instead until October 10, 2019, to file any lawsuit against Dynamic, failing to satisfy administrative prerequisites. Plaintiff's claims against Defendant Dynamic must therefore be dismissed.

---

[1] See Exhibit C to this motion.

## II.   RELEVANT FACTUAL ALLEGATIONS[2]

1.     Plaintiff's Complaint alleges, "Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the commission of the unlawful employment practice alleged in this claim." (Doc. 1, ¶ 3)

2.     Plaintiff's EEOC Charge against HMMA, filed in October of 2018, is identified as Charge No. 420-2019-00128 and is attached to this Motion as Exhibit A (hereinafter referred to as the "HMMA Charge").[3]

3.     Plaintiff's EEOC Charge against Dynamic, filed on August 3, 2017, is identified as Charge No. 846-2017-32787 and is attached to this Motion as Exhibit B (hereinafter referred to as the "Dynamic Charge").[4]

---

[2] Defendant Dynamic does not admit Plaintiff's factual allegations as true; rather Defendant considers them as true only for purposes of this Rule 12(b)(6) motion. Defendant's act of filing this Rule 12(b)(6) motion does not waive any defenses to Plaintiff's Complaint.

[3] For purposes of a 12(b)(6) motion, consideration is limited to the four corners of the complaint, which encompasses the complaint, itself, and any documents referenced therein or attached thereto that are central to the Plaintiffs' claims. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009).  Because the EEOC Charge is referenced in Plaintiff's Complaint, it may be attached as an exhibit to a motion to dismiss without converting the motion to dismiss to a motion for summary judgment.  Plaintiff's EEOC Charge against HMMA is attached as Exhibit A to this Motion.

[4] Because Plaintiff referenced an EEOC Charge in the Complaint, filed the Complaint against two defendants, and did not specify that her reference to an EEOC Charge applied to one defendant, Defendants must assume she intended to reference Charges as to both defendants. Defendant Dynamic therefore attaches the Dynamic EEOC Charge as an exhibit to this motion to dismiss without converting the motion to dismiss to a motion for summary judgment. See Exhibit B.

4.      Plaintiff alleges she "received notification of the right-to-sue letter from the EEOC on or about July 15, 2019 and has filed this complaint within 90 days of receiving the EEOC's notice of the right to sue." (Doc. 1, ¶ 4)

5.      Plaintiff attached as an exhibit to her Complaint the Notice of Right to Sue as to the HMMA Charge ("HMMA Notice of Rights") (Doc. 1-1), and the mailing date stamped on that Notice is July 12, 2019.

6.      Plaintiff failed to attach as an exhibit the Dismissal and Notice of Right to Sue as to the Dynamic Charge ("Dynamic Notice of Rights"); therefore Defendant attaches that notice to this motion as Exhibit C.[5]

7.      The mailing date stamped on the Dynamic Notice of Rights is March 1, 2019 (Ex. C).

8.      Presuming three days for receipt after mailing by the EEOC, receipt of the Dynamic Notice of Rights is attributed to Plaintiff on March 4, 2019.

9.      Ninety days after March 4, 2019, is June 3, 2019.[6]

_____

[5] Plaintiff's Complaint did not specifically reference a right-to-sue letter with regard to Defendant Dynamic; however, the Middle District of Alabama's Pro Se instructions for filing employment lawsuits instruct plaintiffs as follows:  "[w]hen filing your complaint with the Clerk's Office, you must present the Right to Sue Notice which will be included as part of your case." www.almd.uscourts.gov/faq/there-special-information-about-employment-discrimination-cases. Plaintiff failed to attach the Right to Sue Notice with regard to her claims against Defendant Dynamic; therefore, Defendant Dynamic may attach it without converting the motion into a motion for summary judgment.

[6] June 2, 2019, was a Sunday, thus, the deadline for filing moved to Monday, June 3, 2019.

10.    Plaintiff filed the Complaint on October 10, 2019, which was well over 200 days after she presumptively received the Dynamic Notice of Rights and over 100 days after the limitations period expired.

## III.  LAW AND ARGUMENT

### A.  <u>Legal Standards</u>.

Federal Rule of Civil Procedure 8 requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P.* 8(a)(2). The Supreme Court elaborated on this standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), affirming that a plaintiff's complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Fed. R. Civ. P. 9(c) requires that a plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled."

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests whether a cognizable claim has been adequately stated in the complaint in compliance with Rule 8(a).  *See Twombly*, 550 U.S. at 555.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* at 679.  "All reasonable inferences are drawn in favor of the plaintiff; however, unsupported conclusions of law or of mixed fact and law have long been recognized

not to prevent a Rule 12(b)(6) dismissal." *Mims v. Monroe Cty. Bd. of Educ.*, No. 13-643-KD-M, 2014 U.S. Dist. LEXIS 76456, at *4-5 (S.D. Ala. May 20, 2014) (citing *Abraham v. Greater Birmingham Humane Soc'y, Inc.*, No. 2:11-CV-4358-SLB, 2014 U.S. Dist. LEXIS 34174, 2014 WL 1043230, *1 (N.D. Ala. Mar. 17, 2014) (*citing Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003)(citation omitted)).

The lack of any law upon which to base a claim against a defendant requires dismissal for failure to state a claim under *Fed. R. Civ. P.* 12(b)(6). *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).  Further, dismissal for failure to file a lawsuit within 90 days after receipt of the notice-of-right-to-sue letter from the EEOC is also grounds for dismissal pursuant to Rule 12(b)(6). *Roach v. AKAL Sec., Inc.,* 2008 U.S. Dist. LEXIS 81869, at *4 (M.D. Ala. Oct. 15, 2008); *Keith v. Talladega City Bd. of Educ.*, No. 1:18-CV-1311-KOB, 2019 U.S. Dist. LEXIS 66311, at *12 (N.D. Ala. Apr. 17, 2019) (where, upon a Rule 12(b)(6) motion to dismiss, a defendant contests that the plaintiff filed the complaint within 90 days of receiving the EEOC's right-to-sue letter, the plaintiff must show that the complaint was timely filed or face dismissal).

B.    **Legal Analysis.**[7]

    1.    <u>Plaintiff's claims against Dynamic must be dismissed because Plaintiff failed to plead that she satisfied administrative prerequisites with regard to Defendant Dynamic</u>.

To proceed with her case, Plaintiff must plead and establish that she has met conditions precedent prior to filing this lawsuit. *See Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1010 (11th Cir. 1982) (citing Fed. R. Civ. P. 9(c) and noting that "a plaintiff must generally allege in his complaint that 'all conditions precedent to the institution of the lawsuit have been fulfilled.'") For a plaintiff to maintain an action under the Title VII, she must have alleged and established administrative prerequisites: that she filed the Complaint within ninety days of receiving the EEOC's Notice-of-Right-to-Sue letter.  *Kerr v. McDonald's Corp.,* 333 F. Supp. 2d 1352, 1358 (N.D. Ga. 2004) (citing *Green v. Union Foundry Co.,* 281 F.3d 1229 (11th Cir.), *cert. denied*, 537 U.S. 953, 123 S. Ct. 422, 154 L. Ed. 2d 302 (2002)). Further, where there are multiple defendants, a plaintiff must establish that she has met administrative prerequisites with regard to each defendant. *Reguero v. Airport Terminal Serv.,* No. 2:13-cv-97-FtM-38DNF, 2013 U.S. Dist. LEXIS 84064, at *4

---

[7] At present, there may be various additional grounds for dismissal under Rule 12; however, Dynamic does not wish to unduly burden the Court or the parties by filing motions to dismiss claims that are not in fact asserted in the Complaint or are too vague for Defendant to respond. Defendant reserves the right to file any and all other required motions pursuant to Rule 12(b) after this Court rules on the instant motion. The filing of the instant motion should not be interpreted to, nor does it waive, Defendant's right to file additional motions under Rule 12(b) if necessary. Moreover, the absence of subject matter jurisdiction is never waived.

(M.D. Fla. June 14, 2013)(requiring plaintiff to attach supporting documentation showing that he received a notice-of-right-to-sue letter with regard to each defendant).

Here, Plaintiff failed to plead that "all conditions precedent to the institution of the lawsuit have been fulfilled" with regard to Defendant Dynamic. Her allegation that she satisfied administrative prerequisites referenced only the date she received the HMMA Notice of Rights, and thus her allegations were limited to Defendant HMMA. (Doc. 1, ¶ 4). Plaintiff alleges that she received notification of the right-to-sue letter from the EEOC on or about July 15, 2019, and that she has filed this Complaint within 90 days of receiving the EEOC's notice of the right to sue (Doc. 1, ¶ 4). Plaintiff attached to her Complaint the HMMA Notice of Rights, and it is dated as having been mailed on July 12, 2019, which comports with the date Plaintiff alleges she received it (Doc. 1-1). The HMMA Notice of Rights gave Plaintiff 90 days to file a Title VII lawsuit against HMMA seeking to remedy the allegations included in the HMMA EEOC Charge.

Plaintiff's Complaint is devoid of any reference to the Dynamic EEOC Charge or the Dynamic Notice of Rights. By omission, Plaintiff failed to plead that she satisfied administrative prerequisites for her claims against Dynamic, failed to plead the date she received the Dynamic Notice of Rights, and failed to attach the Dynamic Notice of Rights as an exhibit. These pleading omissions alone require dismissal of

Dynamic as a defendant in this lawsuit.

> 2.   <u>Plaintiff's claims against Dynamic must be dismissed because Plaintiff failed to file the Complaint within 90 days after receiving the Notice of Suit Rights as to the EEOC Charge against Dynamic.</u>

The indisputable evidence shows that Plaintiff missed the filing deadline as to Dynamic by over 100 days, which is an additional and independent reason for this Court to dismiss Plaintiff's lawsuit against Defendant Dynamic.  When a defendant contests this issue, as Dynamic is doing here, the plaintiff bears the burden of establishing satisfaction of the ninety-day filing requirement. *Mims,* 2014 U.S. Dist. LEXIS 76456, at *6-7 (citing *Green*, 281 F.3d at 1234 (*citing Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982))). The determination of what constitutes "receipt" of a notice of right to sue must be decided based on "the individual characteristics of a given fact pattern." *Henderson v. NCO Fin. Sys.*, No. CA-09-769-CG-C, 2010 U.S. Dist. LEXIS 32462, 2010 WL 1382737, at *4 (S.D. Ala. Mar. 12, 2010); *see also Bell v. Eagle Motor Lines, Inc.*, 693 F.2d 1086 (11th Cir. 1982)(determination of when an EEOC letter is received is on a case-by-case basis and ninety day clock started running upon the arrival of the letter to the address provided by the would-be plaintiff).  Where there is no evidence to the contrary, the court will assume that the plaintiff received the right-to-sue letter three days after it was issued. *Kerr*, 427 F.3d at 953, n. 9; *Winsor v. Home Depot U.S.A., Inc.*, 743 F. App'x 335, 335-36 (11th Cir. 2018) (where the date of receipt by mail is in dispute,

the court presumes that the plaintiff received the right-to-sue-letter three days after it was issued, which meant that the plaintiff was deemed to have filed his complaint on the 98th day, making it untimely).

Here, the Dynamic Notice of Rights, attached to this motion as Exhibit C, forecloses any possibility for Plaintiff to establish satisfaction of the ninety-day filing requirement. The Dynamic Notice of Rights reflects that the EEOC mailed it to Plaintiff on March 1, 2019. Plaintiff's Complaint does not allege that she received the Dynamic Notice of Rights on a certain date. Therefore, the presumptive three-day rule applies, requiring this Court to presume that Plaintiff received the Notice on March 4, 2019.  Ninety days after March 4, 2019, was June 2, 2019, which was the last day Plaintiff could have filed a timely lawsuit arising out of her EEOC Charge against Dynamic.  Since Plaintiff did not file her Complaint until over 100 days later, on October 10, 2019 (Doc. 1), her lawsuit against Dynamic is untimely and must be dismissed.

WHEREFORE, for these reasons set forth above, this motion to dismiss all claims against Defendant Dynamic Security is due to be granted.

Respectfully submitted,

*/s/Susan W. Bullock*
Wesley C. Redmond
Susan W. Bullock
FordHarrison LLP

10

420 20th Street North, Suite 2560
Birmingham, AL  35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: 205-244-5905
         205-244-5904
Facsimile: 615-709-3139


Counsel for Defendant Dynamic Security,
Inc.


## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on 28th day of January,

2020, he electronically filed a true and correct copy of the foregoing with the Clerk

of Court using the CM/ECF System, and a true and correct copy to the following by

U.S. Mail:

Davita M. Key (Pro Se)
6940 Wrangler Road, Apt. C
Montgomery, AL 36117
(334) 200-7078

Plaintiff, *pro se*


                                 */s Susan W. Bullock*
                                 Of Counsel

WSACTIVELLP:11250071.1

11

FEDEX OFFICE                                PAGE 02/02

Exhibit A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 420-2019-00128 |

and EEOC

**State or local Agency, if any**

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Davita M. Key | | 1985 |
| Street Address | City, State and ZIP Code | |

Named is the employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| HYUNDAI MOTOR MANUFACTURING ALABAMA | 500+ | (334) 387-8000 |
| Street Address | City, State and ZIP Code | |
| 700 Hyundai Blvd., Montgomery, AL 36105 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |
| Street Address | City, State and ZIP Code | |

**DISCRIMINATION BASED ON** (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE |  |
|---|---|
| Earliest | Latest |
| 08-01-2017 | 08-01-2017 |

☐ CONTINUING ACTION

**THE PARTICULARS ARE** (If additional paper is needed, attach extra sheet(s)):

I began employment with the above-named employer on or about July 31, 2017, through Dynamic Security, Inc., and I was last employed as a Mailroom Clerk. On or about July 19, 2017, I was interviewed by Gloria Robinson (Dynamic Security, Inc.) and Lt. Maurice Chambliss. Cassandra Williams (Hyundai Motor Manufacturing) also participated. On or about July 31, 2018, I showed up for my first day of work, and Ms. Williams asked me why I had not changed my hairstyle (dreadlocks) as she had instructed me to do during my job interview. Per my request, Ms. Williams showed me a grooming policy on her computer, for female uniformed officers. Subsequently, I was sent home for the day. Additionally, I received a phone call inquiring as to the due date for my pregnancy, as I had informed both my employers of my pregnancy that morning. On or about August 1, 2018, I returned to work with a hat that covered my hair completely, per Ms. Williams instructions. My co-worker and trainer in the mailroom, Tanya Howell, asked me why I had been sent home the day before; I explained to her the situation regarding the grooming policy and my dreadlocks. Subsequently, Tanya informed Ms. Williams that I said I was being discriminated against. After being questioned, I submitted an official written complaint of discrimination against Hyundai, Ms. Robinson and Ms. Williams on the basis of my dreadlocks and pregnancy. That same day, I was informed by Dynamic Security, Inc. that Ms. Williams did not want me to return to work.

I was informed that the reason I was discharged was because of my hair and something else.

I believe that I was discriminated against due to my race, African-American, my sex, female (pregnancy), and in retaliation for making a protected internal complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10-16-18 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [ ] FEPA<br>[X] EEOC | 846-2017-32787 |
| | | and EEOC |

| State or local Agency, if any | | |
|---|---|---|

| Name (indicate Mr., Ms., Mrs.)<br>**Davita M. Key** | Home Phone (Incl. Area Code) | Date of Birth<br>**1985** |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**DYNAMIC SECURITY INCORPORATED** | No. Employees, Members<br>**500 or More** | Phone No. (Include Area Code)<br>**(334) 395-7722** |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **5510 Wares Ferry Road, Suite S, Montgomery, AL 36117** | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **07-21-2017**   Latest **08-01-2017**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

My race is Black. I am a pregnant female. I was hired by the above-named employer on July 21, 2017, as a mail clerk assigned to the Hyundai Plant. I was interviewed on July 19, 2017, by Gloria Robinson and Maurice (last name unknown). On July 27, 2017, I participated in the required training and completed safety training at Hyundai.

On July 31, 2017, I informed Supervisor Maurice, in the presence of Ms. Robinson, of my pregnancy and presented a medical notice ensuring that I could perform my job without restrictions. Later that morning I was sent home, partially because of my hairstyle (dreadlocks) of which I was questioned and criticized by Robinson and Cassandra Williams, but mainly because I informed the employer that I was pregnant.

On August 1, 2017, I reported to training with Tonya (last name unknown) in the administrative building. Shortly thereafter I was summoned to the office and picked up by Maurice. Upon our arrival to the office I was confronted by Robinson in a hostile and aggressive manner about my conversation of feeling discriminated against with the trainer.

Further on August 1, 2017, I requested to file a formal complaint through Supervisor Maurice for the discriminatory treatment. After providing him with a written statement as requested, I was told I would have to file through Human Resources in Birmingham AL. I asked Supervisor Maurice if I go to file a complaint will I be allowed to return to work. He would not give me an answer without making a call, then he confirmed I could leave and return.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>AUG 3 2017<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)<br>U.S. EEOC<br>Birmingham District Office |
| **Aug 03, 2017**        *(signature)* | |
| Date                    Charging Party Signature | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | 846-2017-32787 |
| | | and EEOC |

*State or local Agency, if any*

Later, August 1, 2017, I filed a complaint to District Manager Dr. Ray Cureton, in the presence of Nicole Scavello, to no avail. Cureton immediately asked me whether I said I was going to sue the company. He then listened to my complaint and responded to my allegations regarding pregnancy, that Ms. Robinson is not like that. Scavello commented that what I was complaining of was not discrimination and that she has been racially harassed before. Cureton finished by stating they said this was not why but that they don't want me to come back. He advised, "I'm just a fat White man and I don't know what you all go through."

I believe that I was discriminated against based on my race, sex (pregnancy) and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT   RECEIVED |
| **Aug 03, 2017**      *Date*      *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE AUG 3 2017 *(month, day, year)* <br><br> U.S. EEOC <br> Birmingham District Office |

EEOC Form 161 (11/16)   **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**   Exhibit C

## DISMISSAL AND NOTICE OF RIGHTS

| To: **Davita M. Key** | From: | **Birmingham District Office**<br>**Ridge Park Place**<br>**1130 22nd Street**<br>**Birmingham, AL 35205** |
|---|---|---|

| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **846-2017-32787** | **ALICIA E. MARTIN-SCHUTZ,**<br>**Investigator** | **(205) 212-2072** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

~~FEB 2 7 2019~~

Enclosures(s)

**BRADLEY A. ANDERSON,**
**District Director**

*(Date Mailed)*

MAR 1 - 2019

cc:   **Kristal Riddle**
**Legal Affairs Coordinator**
**DYNAMIC SECURITY INC.**
**5510 Wares Ferry Road, Suite S**
**Montgomery, AL 36117**

# TAB / DOCKET ENTRY NO. 29

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVITA M. KEY,                          )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        CASE NO.: 2:19-cv-767-ECM
                                        )
HYUNDAI MOTOR                           )
MANUFACTURING ALABAMA, LLC,             )
*et al.*,                               )
                                        )
        Defendants.                     )

## ORDER

Pending before the Court are the Defendants' Motions to Dismiss. (Doc. 8); (Doc. 11); (Doc. 13). On June 1, 2020, the Plaintiff filed an amended complaint (doc. 28), thus superseding her original complaint. Because the Defendants' motions to dismiss are directed to the Plaintiff's original complaint, and an amended complaint has been filed, the Court concludes that the motions to dismiss are due to be denied as moot. Accordingly, it is

ORDERED that the Defendants' motions to dismiss (doc. 8); (doc. 11); (doc. 13), are DENIED as moot.

DONE this 2nd day of June, 2020.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

# TAB / DOCKET ENTRY NO. 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:19-cv-00767-ECM** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, HYUNDAI** | ) | |
| **ENGINEERING AMERICA, INC. and** | ) | |
| **DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Hyundai Motor Manufacturing Alabama, LLC ("HMMA") moves to dismiss Plaintiff's Amended Complaint (Doc. 28) for the reasons below.

**I.    To survive a Rule 12(b)(6) motion to dismiss, Plaintiff must have pleaded facts sufficient to state a claim for relief that is facially plausible.**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 555 (internal citations omitted). As the Supreme Court explained in *Ashcroft v. Iqbal*, the assessment of the sufficiency of the complaint begins with the elements of the claim. *Iqbal* instructs a court to apply two working principles when considering a motion to dismiss for failure to state a claim: first, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth;" second, after disregarding those conclusory statements, the complaint must

state a <u>plausible</u> claim for relief, one that goes beyond establishing "the mere possibility of misconduct." 556 U.S. 662, 678-680 (2009); *see also Watts v. Ford Motor Co*., 519 Fed. Appx. 584, 587 (11th Cir. 2013) (plaintiff must provide "non-conclusory descriptions of specific, discrete facts of the who, what, when, and where variety."). While lengthy, Plaintiff's First Amended Complaint simply does not contain non-conclusory factual allegations sufficient to establish that HMMA was her joint employer or that HMMA had any role in her termination whatsoever; and, further, her complaint for hairstyle discrimination must fail as a matter of law, consistent with very recent Eleventh Circuit precedent.

II.   **Plaintiff's Amended Complaint fails to establish that HMMA had an employment relationship with Plaintiff or interfered in an employment relationship with Plaintiff.**

A.   <u>Joint Employer Standard</u>

To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of the plaintiff's employment. Courts examine "(1) the means and manner of the plaintiff's work performance; (2) the terms, conditions, or privileges of the plaintiff's employment; and (3) the plaintiff's compensation." *Kaiser v. Trofholz Techs., Inc.*, 935 F.Supp.2d 1286, 1293 (M.D. Ala. 2013) (citing *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1245 (11th Cir. 1998)).

B.   <u>Plaintiff never specifically alleges that HMMA had any role in her hire, assignment, training, pay, internal complaint procedure, or termination.</u>

In her First Amended Complaint, Plaintiff admits she was employed by Dynamic Security, Inc. ("Dynamic"), which contracted with Hyundai ENG America, Inc. ("HEA"), which contracted with HMMA, the site where Plaintiff was to be assigned. (Doc. 28, ¶¶38-39, 41-42; *see also* Doc. 11-4, ¶¶6, 10-11).

1.    *Plaintiff has never identified a single HMMA employee as having a role in her employment.*

Plaintiff identifies the following individuals as having a role in her employment or the events leading to the termination of her employment with Dynamic: Gloria Robinson, Maurice Chambliss, Cassandra Williams, Nicole Scavella, Tanya [no last name provided, but likely Tonya Howell, a Dynamic employee (Doc. 11-4, ¶9)], and Ray Cureton. Plaintiff concedes that Ms. Scavella was a Dynamic employee. (Doc. 28, ¶51). Plaintiff indicates that Mr. Cureton is a Dynamic employee. (*Id.*, ¶¶26, 84-86). As in her initial Complaint, Plaintiff attempts to disguise the identities of Ms. Robinson, Lt. Chambliss, Ms. Howell, and Ms. Williams. HMMA previously identified their employers as Dynamic (Ms. Robinson, Lt. Chambliss, Ms. Howell) and HEA (Ms. Williams). (Doc. 11, p. 2; Doc. 11-4, ¶9; Doc. 11-7, ¶1). Plaintiff's failure to dispute HMMA's identification of the employers of these individuals in either her Response to Defendants' Motion to Dismiss (Doc. 24) or her First Amended Complaint (Doc. 28) is a tacit admission that no HMMA employee directed or interfered with her employment.[1]

2.    *Plaintiff admits that every step of her employment was predominated by Dynamic and its employees and/or HEA and its employee, Ms. Williams.*

Plaintiff admits that she applied for employment with Dynamic. (Doc. 28, ¶42). She admits she trained for the position at Dynamic's facility. (*Id.*, ¶50). She was paid by Dynamic. (*Id.*, ¶92). The people and entity whom Plaintiff alleges communicated and administered the supposed policy against dreadlocks were Ms. Williams (HEA), Ms. Robinson (Dynamic), Ms. Scavella (Dynamic), and Dynamic. (*Id.*, ¶¶46-47, 51, 59-62, 66-71, 91). When she wanted to complain about how Ms. Robinson and Ms. Williams treated her, she complained to Dynamic

---

[1] Additionally, in her Intake Questionnaire, Plaintiff identified "Maurice" [Chambliss] as her immediate supervisor and "Tanya" [Howell] as her trainer. (Doc. 11-2, pp. 6-9).

3

employees. (*Id.*, ¶¶84, 89). When her assignment was ended, Plaintiff alleges that Mr. Cureton (Dynamic) told her it was because Ms. Williams (HEA) did not want her there. (*Id.*, ¶88). Plaintiff's interaction with HMMA was limited to being on its premises and receiving a safety manual, not an employee manual. (*Id*, ¶¶41-42, 53).

3. *Plaintiff's conclusory aggregations of Defendants is due to be disregarded as conclusory pursuant to the* Iqbal *analysis.*

Plaintiff, without any basis in fact other than the shared use of the word "Hyundai,"[2] aggregates HEA and HMMA as "Hyundai," "HMMA and/or HEA" and "HMMA and HEA," throughout her First Amended Complaint. (*E.g.*, *Id.*, ¶¶, 20-23, 62, 94, 113-116, 118-120, 129-130, 132-134, 142, 145, 153, 157). However, these aggregations are without any factual support, real or alleged. Because these alleged aggregations are unsupported by any specific factual allegations, they are not due any deference as the Court considers this Rule 12(b)(6) motion.[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Lawrence v. Int'l Bus. Mach. Corp.*, 2017 U.S. Dist. LEXIS 120804, *15 (S.D.N.Y.) ("[G]roup pleading [conclusorily pleading that actions were taken by "defendants"] will not suffice to hold a parent corporation[4] liable under either the joint employer or single employer

---

[2] As identified in Exhibit C to HMMA's Motion to Dismiss Plaintiff's initial complaint, there are dozens of corporations with the word "Hyundai" in the entity name listed with the Alabama Secretary of State's office. (Doc. 11-3). This shared word is simply not probative of a coordinated or integrated relationship generally or with respect to Plaintiff specifically.

[3] The same fate befalls Plaintiff's conclusory statements based "[u]pon information and belief" and her jointly referencing "Defendants" in her Statement of Plaintiff's Claims (*e.g.*, Doc. 28, ¶¶9-13, 96-102, 104-111, 121-122, 126-128, 135-140, 147-148, 150, 152, 154, 159-162).

[4] Of course, in this case, no parent, subsidiary, or affiliate relationship exists between HMMA and HEA or Dynamic. (Doc. 11-4, ¶¶7-8, 11-13).

doctrines.");[5] *Ivery v. RMH Franchise Corp.*, 280 F.Supp.3d 1121, 1128-30 (N.D. Ill. 2017) (collecting cases and dismissing FLSA case against defendant where joint employment relationship was based only on conclusory allegations); *Wilkens v. Toyotetsu Am. Inc.*, 2010 U.S. Dist. LEXIS 87394, **11-15 (applying *Iqbal/Twombly* pleading standard to allegations of joint employer liability); *Boateng v. Ret. Corp. of Am. Partners, L.P.*, 2013 U.S. Dist. LEXIS 197898, **14-18 (N.D. Ga.). Similarly, the Court should reject Plaintiff's implied invitation to speculate that Ms. Williams was referring to both HEA and HMMA when she allegedly stated that "the Koreans" were "a 'different breed of animals'" and did not like dreadlocked hairstyles included HMMA. (*Id.*, ¶82). Plaintiff cannot skirt the requirement to plead HMMA's role as her employer by lumping all or some Defendants together without any basis in fact.

C.   Plaintiff has not plausibly alleged that HMMA was a joint employer of Plaintiff.

As noted above, the only allegations specific to HMMA are that it provided the ultimate work setting and a safety manual. This is inadequate to establish that HMMA was Plaintiff's employer, joint or otherwise,[6] or that it interfered in her employment with Dynamic in any way that was unlawful. *Boutin v. Exxon Mobil Corp.*, 730 F.Supp.2d 660 (S.D. Tex 2010) (Owner of

---

[5] The Eleventh Circuit recently remanded a tortious interference claim brought by body shops against auto insurers where the auto insurers were referred to collectively as "defendants," which the district court had found insufficient under the group pleading doctrine. *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F.3d 1249, 1274-76 (11th Cir. 2019). Importantly, that case involved the alleged actions of insurance companies allegedly steering insured customers away from the plaintiff body shops because plaintiffs had not agreed to the insurers' price ceilings and other practices, and the Magistrate Judge's dismissal was because collective references to plaintiffs, defendants, and unnamed customers failed to put defendants on notice as required by Rule 8. The Eleventh Circuit found the lower court had misapplied group pleading rationale because defendants did have fair notice of the conduct they were alleged to have engaged in. The Eleventh Circuit did not reject the principle that in some cases, like this one, group pleading would fail to satisfy the *Twombly/Iqbal* standard. The instant case against HMMA should be dismissed not because the practice of group pleading fails to provide HMMA with fair notice, but because group pleading is being used to hide the absence of factual support to conclude that HMMA employed or affected the employment of Plaintiff.

[6] Plaintiff must establish the existence of an employment relationship to proceed with her Title VII claims. 42 U.S.C. 2000e-2.

facility where contractor's employee worked found not to be a joint employer of contractor's employee for Title VII purposes; owner did not hire or fire employee, did not directly discipline contractor's employees, did not maintain records of hours, handle the payroll, or provide insurance for contractor's employees, did not participate in contractor's collective-bargaining process, and supervised employee only to the extent of ensuring that the contract with contractor was performed as required.); *Banks v. St. Francis Health Ctr., Inc.*, 2016 U.S. Dist. LEXIS 161229, **37-4 (D. Kan.) (no joint employer relationship where site employer could not fire employee from the assigning agency and employee actually did obtain another position with same staffing agency). It seems plain that a plaintiff cannot successfully plead a joint employer relationship without alleging that employees of the alleged joint employer took some action against her. *See, e.g.*, *Kaiser, supra*. (plaintiff's joint employment claim survived motion to dismiss where she alleged that the joint/site employer's supervisors had significant control over her employer).

In a footnote in Plaintiff's Response to Defendants' Motions to Dismiss Plaintiff's Initial Complaint, Plaintiff cited to a case from the Western District of Washington to argue that she should be given the opportunity to conduct discovery on the issue of which entity employed her. (Doc. 24, p. 8). However, that case (which of course is not binding precedent) begins with allegations very different from what Plaintiff alleges here. In the *Edmonds v. Amazon.com, Inc.* case, the plaintiff contended that Amazon could be held liable as a joint employer even though the plaintiff was actually employed by a third party that contracted with Amazon, alleging that Amazon had the power to discipline and terminate drivers employed by the third party, that Amazon dictated most of the rules of employment, that drivers had to report directly to Amazon and its supervisors, that Amazon maintained an employee file on third party drivers, and that

drivers performed a core part of Amazon's business plan and model, among other factors.  2020 U.S. Dist. LEXIS 66562, **11-17 (W.D. Wash.).   By contrast, Plaintiff alleges none of these factors in her First Amended Complaint: Plaintiff has admitted she was paid by Dynamic; she does not allege she ever even met, much less was subject to the supervision of any HMMA employee, but instead alleges that she communicated exclusively with HEA and Dynamic employees; she does not allege that any HMMA employee trained her or told her how to do the job of a mail clerk, which of course is not a core part of HMMA's business model; and she was an employee of a contractor (Dynamic) to a contractor (HEA) to HMMA. (Doc. 28, ¶¶39, 42, 46-47, 50, 51, 59-62, 66-71, 84, 88, 89, 91, 92). There is simply no basis to subject HMMA to even the burden of limited discovery when there is no allegation that it has records, witnesses, or authority relevant to Plaintiff's termination. *E.g.*, *Lopez v. Assurance Quality Grp., Inc.*, 2013 U.S. Dist. LEXIS 196324, **11-16 (N.D. Ga.) ("The facts alleged by plaintiffs, however, do not allow the Court to draw a reasonable inference that Assurance and EES were 'highly integrated…,' but only that EES engaged in contractual transactions with Assurance by placing Lopez and Rodas there on a temporary assignment. Mere allegations of 'mutually convenient arrangements' and 'arms-length' contractual relations between entities, however, are insufficient to establish joint employer status….Lopez may not rely on discovery to remedy her failure to state a claim….") (internal citation omitted); *Katz v. DNC Servs. Corp.*, 2019 U.S. Dist. LEXIS 167647, **10-19 (E.D. Penn.) (dismissing complaint against alleged joint employer that was supported by more factual detail than what Plaintiff alleges against HMMA, including that the alleged joint employer contributed money to her employer, provided guidance and training to her direct employer, and provided some work instructions to her direct employer); *Lawrence v. Int'l Bus. Mach. Corp.*, 2017 U.S. Dist. LEXIS 120804, **15-17 (In a Dodd-Frank and False Claims

7

Act case against IBM as the parent to plaintiff's employer, the court dismissed IBM on Rule 12(b)(6) grounds even though the complaint alleged the parent-subsidiary relationship, frequent employee transfers between the groups, and regular communications with IBM employees.).

Because Plaintiff has failed to establish that HMMA participated in her employment or was in a joint-employment relationship with Plaintiff's actual employer, Dynamic, much less Dynamic's contractual partner, HEA, all counts against HMMA should be dismissed.

**III.   Hairstyle discrimination is not a legally cognizable theory of discrimination and is so discredited that complaints of hairstyle discrimination are not protected activity.**

A.   No court applying federal law has recognized a prohibition against dreadlocks as per se racially discriminatory.

As explained in HMMA's motion to dismiss Plaintiff's original Complaint, prohibitions against dreadlocked hair have repeatedly and conclusively been found not to constitute a racially discriminatory practice. (Doc. 11, pp. 3-5). There is absolutely no caselaw in existence that has found that a neutrally-applied policy against dreadlocks constitutes unlawful race discrimination. To the contrary, every court to consider the question has found that employers may lawfully prohibit dreadlocks, provided enforcement is equally applied to all races. *See Eatman v. UPS*, 194 F.Supp.2d 256, 262 (S.D.N.Y. 2002) ("it is beyond cavil that Title VII does not prohibit discrimination on the basis of locked hair...Thus, even if [the employer]'s policy [which prohibited "unbusinesslike" hairstyles] explicitly discriminated against locked hair, it would not violate Title VII on its face."); *Pitts v. Wild Adventures, Inc.*, 2008 U.S. Dist. LEXIS 34119, *19 (M.D. Ga.) ("Dreadlocks and cornrows are not immutable characteristics, and an employer policy prohibiting these hairstyles does not implicate a fundamental right."); *Carswell v. Peachford Hospital*, 1981 U.S. Dist. LEXIS 14562, **5-6 (N.D. Ga.) ("There is no evidence, and this court cannot conclude, that the wearing of beads in one's hair is an immutable

8

characteristic, such as national origin, race, or sex. Further, this court cannot conclude that the prohibition of beads in the hair by an employer is a subterfuge for discrimination."); *Cooper v. American Airlines, Inc.*, 1998 U.S. App. LEXIS 10426, **2-3 (4th Cir.) (upholding district court's 12(b)(6) dismissal of claims based on a grooming policy requiring that braided hairstyles be secured to the head or at the nape of the neck).

To the extent that Plaintiff is attempting to extend, modify, or reverse this well-established body of law, the Eleventh Circuit has already considered this question just four years ago and ruled that dreadlocks are an elective, mutable style and that an employer rule against dreadlocks is not racially discriminatory. *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030, 1032-33 (11th Cir. 2016), *reh'g en banc denied*, 876 F.3d 1273 (11th Cir. 2017).[7] There is simply no reason to believe that no-dreadlocks policies are going to be recognized as racially discriminatory under existing federal law at all, but especially in this Circuit in light of *EEOC v. Catastrophe Management* case. Plaintiff acknowledges as much in her reference to CROWN legislation[8] which makes certain types of hairstyle prohibitions unlawful <u>in the jurisdictions where that legislation exists</u>. (Doc. 28, ¶141). Plaintiff's claims are not brought pursuant to such legislation and no such legislation applies to her claims.

   B.   <u>The addition of the phrase "disparate impact" is insufficient to state a disparate impact claim and, even if it were, would not change the outcome.</u>

Plaintiff claims that an alleged policy against dreadlocks "creates a disparate impact on African Americans." (Doc. 28, ¶¶121, 135). This is inadequate under Rule 8 for two main

---

[7] The individual employee subjected to the alleged prohibition against dreadlocks filed a motion to intervene to file a writ of certiorari with the U.S. Supreme Court, which was denied. 2018 U.S. LEXIS 2978.

[8] California's CROWN Act, the first enacted CROWN Act to the undersigned's knowledge, includes the following language, "Federal courts accept that Title VII of the Civil Rights Act of 1964 prohibits discrimination based on race, and therefore protects against discrimination against afros." Cal. Senate Bill 188, Section 1(e) (2019)

reasons. First, because dreadlocks is a <u>choice</u>, and not an immutable characteristic, there is no

case of disparate impact. *Garcia v. Gloor*, 618 F.2d 264, 270 (5th Cir. 1980) ("However, there is

no disparate impact if the rule is one that the affected employee can readily observe and

nonobservance is a matter of individual preference."), *cited in EEOC v. Catastrophe Mgmt.*, 852

F.3d 1018, 1029-30; *Lynch v. Graul's Mkt.*, 2007 U.S. Dist. LEXIS 106289, *10 (D. Md. 2007)

(Granting summary judgment to employer on disparate impact claim related to no-cornrows rule:

"Title VII does not protect mutable characteristics, such as hairstyle, that can be changed at

will.").

Second, nowhere does Plaintiff allege facts that would tend to show "the existence of a

statistically significant disparity among members of different groups affected by employment

decisions." *Davis v. Infinity Ins. Co.*, 2016 U.S. Dist. LEXIS 115433, *19 (N.D. Ala.) (citing

*Bryant v. Johnny Kynard Logging, Inc.*, 930 F.Supp.2d 1272, 1297 (N.D. Ala. 2013)); *Pouyeh v.*

*Bascom Palmer Eye Inst.*, 613 Fed. Appx. 802, 812 (11th Cir.) (upholding dismissal of disparate

impact claim because there was no allegation of statistical disparity among different protected

class groups). Plaintiff has not pleaded that African Americans are more likely to have

dreadlocks or that African Americans are more likely to refuse to re-style their hair to obtain

employment. *See Carswell*, 1981 U.S. Dist. LEXIS 14562, *6 (granting summary judgment on

disparate impact claim based on a prohibition against beads in hair: "there is no proof that any

other black people were discharged or denied employment because of the refusal to remove

beads from their hair, or even that black people are more likely to wear beads in their hair than

white people."); *Bowers v. Bd. of Regents of the Univ. Sys. of Ga.*, 509 Fed. Appx. 906 (11th Cir.

2013) (Title IX case in which male plaintiff claimed he had been denied admission to medical

school because the university included undergraduate math grades in its calculation of

10

undergraduate GPA, which—according to Plaintiff—disadvantaged him as a male because men were more likely to take math courses and math courses are more likely to lower one's GPA. The Eleventh Circuit affirmed the dismissal of Bowers' suit because it was pure conjecture that math courses are more likely to lower a student's GPA.). And it is well-recognized and observed that dreadlocks are not a uniquely African-American hairstyle. *See Eatman*, 194 F. Supp. 2d 256, 262 ("According to Eatman's own expert, African-Americans are not the only persons who lock their hair.").

Because they fail to state a claim as a matter of law, Counts II and III of Plaintiff's First Amended Complaint should be dismissed.

## IV.   Plaintiff could not have had a reasonable belief that a prohibition against wearing dreadlocks was unlawful.

To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). Even in her First Amended Complaint, Plaintiff has failed to establish statutorily protected activity.

In her First Amended Complaint, Plaintiff admits that she relies on her internal complaint to Dynamic personnel about the alleged dreadlock policy as her supposed protected conduct. (Doc. 28, ¶140[9]). For conduct to be protected under Title VII, a plaintiff must have had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little*, 103 F.3d 956, 960. The plaintiff must show not only her own subjective belief that the

---

[9] Plaintiff alleges her complaints to Dynamic employees were about having to wear a hat over her hairstyle. (Doc. 28, ¶76)

employer's practices were unlawful, but must also show that that belief was objectively reasonable, as measured against substantive law. *Id.*; *Clover v. Total Sys. Svcs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Anduze v. Florida Atlantic Univ.*, 151 Fed. Appx. 875, 878 (11th Cir. 2005). Even before the *Catastrophe Management* decision above, the caselaw regarding hairstyle discrimination was well-established. *See McBride v. Lawstaf, Inc.*, 1996 U.S. Dist. LEXIS 16190, **6-7 (N.D. Ga.), *adopted by* 1996 U.S. Dist. LEXIS 16188 (dismissed a retaliation claim pursuant to Rule 12(b)(6) because the plaintiff could not have had a reasonable belief that she was objecting to unlawful discrimination where she objected to the employer's policy against placing women with braided hair); *see also Harper v. Blockbuster*, 139 F.3d 1385, 1388 (11th Cir. 1998) (opposing grooming policies regarding male hair length was not protected conduct). But certainly since the Eleventh Circuit's well-publicized decision in *Catastrophe Management,* no individual could reasonably believe that having a dreadlocked hairstyle put one in a protected class.

Because they fail to state a claim as a matter of law, Counts IV and V of Plaintiff's First Amended Complaint should be dismissed.

## V.     **Plaintiff does not allege the existence of an HMMA policy or practice of excluding pregnant workers.**

Plaintiff's First Amended Complaint consists of the following statements in support of her claim for pregnancy discrimination: Plaintiff told Ms. Robinson and Lt. Chambliss (Dynamic employees) that she was pregnant and had no restrictions. (Doc. 28, ¶¶56-57). Ms. Robinson took this news to Ms. Williams (HEA's employee). (*Id.*, ¶58). Ms. Williams *immediately*— "within minutes"—renewed her issues with Plaintiff's hairstyle. (*Id.*, ¶¶59, 101). Plaintiff's First Amended Complaint simply does not contain a single shadow of an allegation that HMMA in any way even knew of Plaintiff's pregnancy, much less that it influenced the remaining

allegations and actors relevant to this claim. As with her initial Complaint, these allegations are woefully insufficient to maintain plausible—not just possible—claims against HMMA. *Ashcroft.*, 556 U.S. 662, 678-79 (2009); *Edwards v. Prime Inc*., 602 F.3d 1276, 1301 (11th Cir. 2010) (dismissing claims for racial harassment where factual allegations did not indicate negative action was taken because of complainant's race); *Durham v. Ascension Parish Sch. Bd.*, 624 Fed. Appx. 237, 238 (5th Cir. 2015); *Sanders v. Grenadier Realty, Inc.*, 367 Fed. Appx. 173, 175 (2nd Cir. 2010) (merely alleging "facts consistent with a discrimination claim, i.e., that non-black residents were granted subsidies," the complaint "nevertheless 'stops short of the line between possibility and plausibility of entitlement to relief' because plaintiffs do not allege any facts supporting an inference of racial animus.") (quoting *Ashcroft*, *supra.*, at 677) (other quotation and citation marks omitted)).

Because Plaintiff fails to allege that HMMA had any role in the specific actions related to her claim of pregnancy discrimination or even knowledge of her pregnancy, Count I should be dismissed against HMMA.

## **CONCLUSION**

The entirety of Plaintiff's First Amended Complaint—with respect to HMMA—hinges on the allegations that it operated the facility that her employer assigned her to and that it issued her a safety manual (appropriate for a manufacturing facility). No other actions are attributed specifically to HMMA, and no HMMA employee is ever even referenced in this First Amended Complaint. These allegations simply do not come close to satisfying the standard of joint employment or to providing a basis for holding HMMA liable for having any role in Plaintiff's termination. Additionally, Plaintiff's race and retaliation counts are independently due to be

dismissed for failure to state a claim as a matter of law. For these reasons, HMMA respectfully

requests this Court dismiss it from Plaintiff's First Amended Complaint.

Respectfully Submitted,

s/ Whitney R. Brown
David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Email: dmiddlebrooks@lehrmiddlebrooks.com
       wbrown@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Heather Newsom Leonard, Esq.          Wesley C. Redmond, Esq.
Leslie Palmer, Esq.                   Susan W. Bullock, Esq.
Heather Leonard, PC                   FordHarrison LLP
2105 Devereux Circle, Suite 111       420 20th Street North, Suite 2560
Birmingham, AL 35243                  Birmingham, AL 35203


Yurie Yeoul Bae, Esq.
Richard L. DeWeese, Jr., Esq.
DeWeese & Bae, LLC
8191 Seaton Place
Montgomery, AL 36116


s/ Whitney R. Brown
OF COUNSEL

677008.docx

14

# TAB / DOCKET ENTRY NO. 31

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **DAVITA M. KEY,** )  | |
| )  | |
| **Plaintiff,** )  | |
| )  | |
| **v.** )  | **Civil Action No.:** |
| )  | **2:19-cv-767-ECM** |
| **HYUNDAI MOTOR MANUFACTURING** )  | |
| **ALABAMA, LLC;** )  | |
| **HYUNDAI ENG AMERICA, INC.;** )  | |
| **and DYNAMIC SECURITY, INC.** )  | |
| )  | |
| **Defendants.** )  | |

## DEFENDANT HYUNDAI ENG AMERICA INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Hyundai ENG America, Inc. ("HEA"), by and through its attorneys, moves the Court to dismiss the claims asserted against HEA in Plaintiff Davita M. Key's First Amended Complaint (the "Amended Complaint") in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of this Motion, HEA states as follows:

## I. INTRODUCTION

The Amended Complaint alleges that the Defendants have unlawfully discriminated against the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 USC § 1981 ("Section 1981"). In particular, the Amended Complaint alleges that: (i) Plaintiff was unlawfully discriminated against on the basis of pregnancy (Compl. ¶ 97) in violation of Title VII; (ii) that Plaintiff was unlawfully discriminated against on the basis of her race in violation of Title VII and Section 1981 (Compl. ¶¶ 110 and 126); and (iii) that Defendants unlawfully retaliated

against Plaintiff for complaining of racial discrimination in violation of Title VII and Section 1981 (Compl. ¶¶ 140 and 152).

The Amended Complaint should be dismissed for three reasons. First, the Amended Complaint fails to allege a legally cognizable claim for race discrimination and fails to allege a plausible claim for sex discrimination. Plaintiff's racial discrimination claims arise out of the prohibition of her chosen hairstyle, namely dreadlocks. It is, however, well settled law in the Eleventh Circuit that such grooming policies do not violate Title VII or Section 1981. Plaintiff's factual allegations pertaining to pregnancy discrimination are insufficient to state a plausible, rather than merely possible, entitlement to relief under Title VII. Plaintiff attempts to characterize enforcement of the appearance policy in question as both a pretext and a cause of action, which is not merely implausible, but logically impossible.

Second, Plaintiff's Amended Complaint does not plausibly allege an employment relationship with HEA. Plaintiff does not allege that she was hired by HEA, that she was trained by HEA, that she was supervised or directed in her duties by any HEA personnel, or that she was disciplined or terminated by HEA personnel. Plaintiff alleges no direct interaction with any HEA employee other than being told by Cassandra Williams that her hair was not consistent with the appearance policy applicable to security personnel at HMMA's facility, which is insufficient to demonstrate the control necessary to give rise to joint employer liability.

Finally, the Amended Complaint fails to state a claim against HEA because it does not demonstrate that the Plaintiff exhausted her administrative remedies with respect to HEA. Administrative exhaustion is a precondition for recovery under Title VII. Plaintiff does not, and cannot, allege that she filed a charge against HEA with the Equal Employment Opportunity

Commission (the "EEOC") or that she received a right-to-sue letter from the EEOC, and allowing Plaintiff to assert her claims would not further the purposes of Title VII.

Because the Complaint fails to state an actionable claim, fails to allege an employment relationship with HEA, and demonstrates that Plaintiff has failed to fulfill the prerequisites for filing claims under Title VII, the Court should dismiss Plaintiff's claims against HEA in their entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## II. <u>LEGAL STANDARD</u>

To state a viable claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, stating a claim requires more than a "the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings offering labels, legal conclusions, or naked assertions devoid of further factual enhancement do not state a claim upon which relief may be granted. *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions….") (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. But courts need not accept legal conclusions as true, nor will a formulaic recitation of the elements of a cause of action do. *Id.* Claims have factual plausibility only when they contain sufficient factual content to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

## III. <u>ARGUMENT</u>

### A.   <u>The Amended Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(6) Because It Does Not State a Claim Upon Which Relief Can Be Granted.</u>

1. <u>Prohibition of Dreadlock Hairstyles Does Not Violate Title VII or Section 1981.</u>

All of Plaintiff's race discrimination and retaliation claims arise out of Defendants' alleged prohibition of Plaintiff's hairstyle, which is described in the Amended Complaint as a "neat dreadlocks style". (Compl. ¶ 45). It is well-settled law in the Eleventh Circuit that prohibition of such hairstyles does not constitute actionable racial discrimination under either Title VII or Section 1981[1]. The Eleventh Circuit Court directly addressed this issue in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016). In *Catastrophe Management Solutions*, the Eleventh Circuit Court upheld the district court's dismissal of Title VII race discrimination claims arising from the defendant's rescindment of plaintiff's job offer after she refused to cut off her dreadlocks. *Id.* at 1020 -1021. Citing *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975), the Court reaffirmed that Title VII bars only discrimination against employees on the basis of immutable characteristics, such as race and national origin. *Id.* at 1028. The Court expressly stated that the fact that dreadlocks are a "natural outgrowth of the texture of black hair" does not make them an immutable characteristic of race. *Id.* at 1030. Plaintiff's race discrimination claims set forth in Count Two and Count Three of the Amended Complaint are not meaningfully distinguishable from those made by the EEOC in *Catastrophe Management Solutions* and are therefore due the same fate, dismissal for failure to state a claim.

Nor may Plaintiff "plead around" the *Catastrophe Management Solutions* holding via the addition of the conclusory assertion that the appearance policy creates a disparate impact on African Americans. (Compl. ¶¶ 121 and 135). To sustain a disparate impact claim, a plaintiff must

---

[1] Discrimination claims pursuant to Title VII and Section 1981 share the same requirements of proof and use the same analytical framework. *See Pitts v. Wild Adventures, Inc.*, No. 7:06-CV-62-HL, 2008 WL 1899306, at *8-9 (M.D. Ga Apr. 25, 2008) *citing Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

(i) identify the specific employment practice that allegedly has the disproportionate impact, and (ii) demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination. *See Spivey v. Beverly Enters, In*c., 196 F.3d 1309, 1314 (11th Cir. 1999); *see also Pouyeh v. Bascom Palmer Eye Inst.*, 613 F.App'x 802, 812 (11th Cir. 2015) (upholding dismissal of plaintiff's disparate impact claim where plaintiff failed to allege statistical evidence showing that defendant's practice of not hiring graduates of non-American medical schools resulted in prohibited discrimination). Plaintiff offers no factual content of any kind that would permit this Court to infer that the appearance policy in question in this action has resulted in an adverse employment impact with respect to any person, other than Plaintiff herself, much less the statistical analysis required by Eleventh Circuit precedent.

Because Defendants' alleged conduct did not constitute actionable discrimination, her claims for retaliation under Title VII and Section 1981 must necessarily fail as well. In order to state a claim for retaliation under Title VII or Section 1981, a plaintiff must plausibly allege that (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) there was a causal relation between the two events. *Goldsmith v. Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). To satisfy the first element, it is sufficient for a plaintiff to demonstrate a good faith, objectively reasonable belief that the activity in question was protected by statute. *Standard v. A.B.E.L. Services, Inc.* 161 F.3d 1318, 1328 (11th Cir. 1998), citing *Clover v. Total Sys. Servs., Inc.*, 157 F.3d 824, 827 (11th Cir. 1998) (employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); and *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA). In this action, the protected

expression alleged by Plaintiff is Plaintiff's complaint regarding Defendants' allegedly racially disparate grooming policy. (Compl. ¶¶ 140 and 152). As stated above, U.S. courts have uniformly rejected plaintiffs' claims arising from appearance policies prohibiting dreadlocks, and Plaintiff could not, therefore, have possibly had an objectively reasonable belief that HEA's alleged enforcement of such a policy was unlawful. Because Plaintiff cannot plausibly allege a reasonable belief that her employer engaged in unlawful conduct, Counts IV and V of Plaintiff's Amended Complaint are due to be dismissed for failure to state a claim.

2.  Plaintiff Does Not Plead Sufficient Facts to Support a Plausible Pregnancy Discrimination Claim.

According to Plaintiff's Amended Complaint, on the morning of July 31, 2017, Cassandra Williams spoke with Plaintiff for an unidentified length of time about an unidentified subject and did not say anything to her about her hairstyle. (Compl. ¶ 54). Plaintiff's pregnancy discrimination claim against HEA rests entirely upon this solitary unremarkable fact. Nowhere does Plaintiff allege that HEA implemented any discriminatory policy against pregnant women, that HEA knew or should have known about any discriminatory practice of any of its co-defendants, or even that there was any communication of any kind concerning pregnant women or Plaintiff's pregnancy between Plaintiff and HEA.

Rather, Plaintiff invites this Court to speculate that, although Ms. Williams had informed Plaintiff during her initial interview that her hairstyle was not consistent with the applicable appearance policy and would therefore have to be covered or changed, Ms. Williams did not intend to actually enforce this policy until Plaintiff informed Dynamic that she was pregnant. "[C]ourts may infer from factual allegations in the complaint 'obvious alternative explanation[s]' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer". *American Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010), citing

*Iqbal*, 556 U.S. at 682 and *Twombly* 550 U.S. at 567. In this case, the obvious alternative explanation for Ms. Williams' conduct is that, rather than using the issue as a pretext to hide her discriminatory intent with regard to pregnancy, Ms. Williams decided to bring Plaintiff's continuing disregard of the appearance policy to the attention of the supervisor designated by her actual employer, Gloria Robinson, instead of immediately addressing the issue with Plaintiff herself. The facts alleged in support of Plaintiff's pregnancy claim are simply inadequate to demonstrate the plausible, rather than merely possible, entitlement to relief required by *Twombly*. Accordingly, Count I of the Amended Complaint is due to be dismissed for failure to state a claim.

**B.**     **Plaintiff's Title VII Claims Should Be Dismissed Because Plaintiff Does Not Plausibly Allege an Employment Relationship with HEA.**

For a plaintiff to obtain relief under Title VII, he or she must properly allege the requisite employment relationship. *Reeves v. DSI Sec. Servs.*, 331 F.App'x 659, 661 (11th Cir. 2009) *citing Hishon v. King Spalding*, 467 U.S. 69 (1984); *Lewis v. Asplundh Tree Expert Co.*, 402 F.App'x 454, 457 (11th Cir. 2010) (noting that an "employer-employee relationship" is necessary to "trigger liability under Title VII"). Plaintiff admits that Dynamic Security was the entity who directly hired her. (Compl. ¶ 26). The Eleventh Circuit has recognized three instances in which an employee may assert a Title VII claim against an entity that is not his or her direct employer: (i) a single employer theory where two nominally separate entities are highly integrated with respect to ownership and operations; (ii) a joint employer theory where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of the other company's employees; and (iii) an agency theory where an employer delegates sufficient control of some traditional rights over employees to a third party. *See Lyes v. City of Rivera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999). The joint employer theory is the only one of the three that is even arguably relevant to the present case based on facts alleged in the

Amended Complaint. In determining whether two or more entities are joint employers for the purpose of Title VII, courts should consider: (i) how much control the alleged employer exerted on the employee, and (ii) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment. *Boyd v. Medtronic, PLC*, 2:17-cv-01588-LSC, at *10-11 (N.D. Ala. June 12, 2019) *citing Peppers v. Cobb Cty., Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016).

Setting aside Plaintiff's conclusory statements, legal conclusions, unfounded "upon information and belief" assertions, and unsupported aggregate references to "Hyundai" and the "Defendants" (none of which are entitled to any deference under *Iqbal*), Plaintiff asserts only two ways in which HEA impacted her employment with Dynamic. Namely, Plaintiff alleges (i) that Cassandra Williams, an HEA employee, determined that her hairstyle did not comply with the security personnel appearance policy, and (ii) that Ray Cureton (a Dynamic Security employee) informed her that Cassandra Williams did not want her back at the Hyundai facility. (*E.g.*, Compl. ¶¶ 46 - 48; Compl. ¶ 88).

Neither of these facts, on their own, is sufficient to demonstrate that HEA exercised enough control over Plaintiff to be deemed Plaintiff's joint employer for purposes of Title VII. Ms. Williams' determination that Plaintiff's hairstyle was not permitted under the appearance policy was made to ensure Dynamic Security performed its obligation to provide security services in accordance with applicable standards. Ms. Williams did not subject Plaintiff to any disciplinary measures, and, in fact, Plaintiff admits she refused to tell Plaintiff to go home when prompted, leaving that decision to her Dynamic Security supervisor, Ms. Robinson. (Compl. ¶¶ 69 -70). Plaintiff's allegation with respect to her conversation about her dismissal with Ray Cureton is similarly unpersuasive. HEA inarguably had no right to terminate Plaintiff's employment with

Dynamic; HEA had only the authority to remove access to the HMMA facility, which (if it is believed to have been exercised at all in this case) was only allegedly exercised in response to a Dynamic Security employee who failed to comply with one of the explicitly stated conditions of such access. Finally, even assuming that Plaintiff accurately characterized her discussion with Mr. Cureton, and that Mr. Cureton, in turn, accurately characterized his conversation with Ms. Williams, Ms. Williams' alleged statement is one of mere preference, *i.e.*, that she did not want Plaintiff back at the facility. Mr. Cureton is not alleged to have said that Ms. Williams demanded Plaintiff's removal from HMMA's facility or asserted any right to control the conditions of Plaintiff's employment at Dynamic Security.

More telling is that the kinds of allegations that would be expected to be made in an actual joint employment situation are not to be found in the Amended Complaint. Plaintiff does not allege that HEA played any role in hiring Plaintiff, and no HEA personnel participated in her initial interview, other than Ms. Williams offering her opinion that Plaintiff's hairstyle did not comply with the appearance policy. Plaintiff does not allege any facts that would permit this Court to infer that HEA had any input into determining her compensation, that HEA trained Plaintiff, that HEA supervised her work, or that HEA exercised any control whatsoever over the duties Plaintiff was assigned or the manner in which those duties were performed. There are no allegations in Plaintiff's complaint that any HEA employee had the authority to subject Plaintiff to disciplinary action or to alter the terms or conditions of her employment with Dynamic Security. The only control HEA could have exercised over Plaintiff that can be fairly inferred from the Amended Complaint was that over the terms and conditions of Plaintiff's access to the HMMA facility. If control over premises access alone is sufficient to find the existence of a joint

employment relationship, it is difficult to imagine how a property owner could hope to escape liability for any on-site contractor's employment practices.

Because Plaintiff fails to plausibly allege an employment relationship with HEA, Plaintiff's Title VII Claims in Counts I, II, and IV should be dismissed.

**C.**     **Plaintiff's Title VII Claims Should Be Dismissed Because Plaintiff Failed to Exhaust Her Administrative Remedies Against HEA.**

It is well-settled law that before a plaintiff may file a lawsuit under Title VII, he or she must first file a charge with the EEOC alleging a Title VII violation. *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994); *Arrington v. Ala. Power Co.*, No. 2:16-cv-01355-JEO, 2017 U.S. Dist. LEXIS 6679, at *8 (N.D. Ala. Jan. 18, 2017 ("it is well-settled that before an individual may pursue a Title VII claim or an ADA claim, she must first exhaust her administrative remedies by filing an EEOC charge"). Generally, a party not named in the EEOC charge may not be sued in a later civil action. *Virgo*, 30 F.3d at 1358; *Arrington*, 2017 U.S. Dist. LEXIS 6679, at *8-9 (dismissing party from action because it was not identified in plaintiff's charge). That naming precondition "serves to notify the charged party of the allegations and allows the party an opportunity to participate in conciliation and voluntarily comply with the requirements of Title VII." *Virgo*, 30 F.3d at 1358.

A party not named in an EEOC charge may only be sued if doing so fulfills the purposes of Title VII. *Lewis*, 402 F.App'x at 456 *citing Virgo*, 30 F.3d at 1358. Courts will consider several factors when determining whether the purposes of Title VII have been met:

(1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to

participate in the reconciliation [sic] process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Id*. at 456-57 *citing Virgo*, 30 F.3d at 1359. Courts may also analyze whether an investigation of the unnamed party "could have reasonably grown out of [the EEOC] charge." *Id*., at 457 *citing Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 650 (11th Cir. 1983).

The only administrative exhaustion allegations in the Amended Complaint that can even arguably be applied to HEA are those set forth in Paragraphs 25 and 35 of the Amended Complaint. Namely, Plaintiff: (i) alleges that she filled out an EEOC intake questionnaire detailing her discrimination charges against "Hyundai", located at 700 Hyundai Blvd., and (ii) asserts the conclusory statement that she meets all administrative prerequisites for filing suit on her Title VII claims. Nowhere does Plaintiff allege that HEA's principal or registered office are located at 700 Hyundai Blvd., and neither, in fact, are. The only information in the intake questionnaire that can be construed to relate to HEA is the identification of HEA employee Cassandra Williams (Doc. 11-2, pg. 1). Ms. Williams is also identified twice in the intake questionnaire as an employee of AMCO (the former name of HEA). (Doc. 11-2, pg. 2).

There is no allegation in the Amended Complaint that HEA was formally named in the Plaintiff's EEOC charges.  As set forth above, the failure to file an EEOC charge is fatal to a Title VII claim unless allowing the claim to proceed would fulfill the purposes of Title VII. The factors cited in Eleventh Circuit precedent to determine this issue, however, weigh heavily in favor of dismissal. There is virtually no similarity of interest between HEA and its co-defendants. Despite sharing the Hyundai name, HEA and HMMA are not affiliates, have no shared executives, and no shared policies. The relationship between HEA and its co-defendants is that of independent contractors and nothing more.

Plaintiff was, as demonstrated by her EEOC intake questionnaire, fully aware that Ms. Williams was an employee of HEA (formerly AMCO). Plaintiff cannot plausibly argue that she was confused by the shared use of the Hyundai moniker when she clearly demonstrated the ability to differentiate the two entities in the first document she filed in connection with her claims.

Plaintiff does not allege that either she or the EEOC ever provided notice of any kind to HEA with respect to Plaintiff's EEOC charge. Even if HEA was fully aware of Plaintiff's charge against HMMA, it would not have put HEA on notice that it faced potential liability as the employer of Plaintiff. *See Lewis*, 402 F. App'x at 457. HEA was not invited to participate in or included in any way in the EEOC conciliation process.

HEA has been significantly prejudiced by Plaintiff's failure to file an EEOC charge against it. HEA is facing a lawsuit without notice from Plaintiff or the EEOC, and without an opportunity to participate in the conciliation process, which have, on their own, been held by the Eleventh Circuit to be significant enough to justify summary judgment. *See id.* HEA has been deprived of any protection offered by the statutes of limitation built into Title VII procedures, which have likely already operated to bar Plaintiff's claims against her actual employer, Dynamic Security. Plaintiff's EEOC intake questionnaire was marked received as of August 3, 2017. (Doc. 11-2, pg. 1).  HEA did not receive Plaintiff's original complaint until after over 28 months had elapsed, in January, 2020. In the meantime, potential witnesses have moved away, relevant documents may have been lost or destroyed, and the memories of witnesses to the events in question in this action have undoubtedly deteriorated.

Finally, it cannot be said that Plaintiff's claims against HEA reasonably could have grown out of Plaintiff's intake questionnaire or her EEOC charges. The EEOC investigated Plaintiff's charges for nearly two years and does not appear to have ever thought to include HEA within the

scope of its investigation. The attenuated employment relationship between Plaintiff and HEA alone sufficiently explains the EEOC's failure to investigate HEA, demonstrating that Plaintiff's claims are not within the scope of a reasonable EEOC investigation. *See id*.

Because the Complaint fails to demonstrate that the Plaintiff exhausted her administrative remedies with respect to HEA, Plaintiff's claims against HEA are due to be dismissed.

## V. <u>CONCLUSION</u>

For the foregoing reasons, HEA respectfully asks the Court to grant this Motion and dismiss Plaintiff's Amended Complaint in its entirety.

DATED:  June 15, 2020.

Respectfully submitted,

/s/ Yurie Yeoul Bae
Yurie Yeoul Bae (ASB-3264-J96L)
Richard L. DeWeese, Jr. (ASB-0448-K16H)
*Attorneys for Defendant Hyundai ENG America, Inc.*

OF COUNSEL:

**DEWEESE & BAE, LLC**
8191 Seaton Place
Montgomery, AL  36116
Telephone: (334) 239-7994
Email:  yurie@deweesebae.com
        richard@deweesebae.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 15th day of June, 2020, the foregoing was filed with the Clerk of the Court via the CM/ECF which will send notification of such filing to the following counsel of record:

Heather Newsom Leonard, Esq.
Heather Leonard, PC
2105 Devereux Circle, Suite 111
Birmingham, AL 35243

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

Wesley C. Redmond, Esq.
Susan W. Bullock, Esq.
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL 35203

David J. Middlebrooks, Esq.
Whitney R. Brown, Esq.
Lehr Middlebrooks Vreeland & Thompson, P.C.
P.O. Box 11945
Birmingham, AL 35202

<u>/s/ Yurie Yeoul Bae</u>
Of Counsel

# TAB / DOCKET ENTRY NO. 32

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:19-cv-767-ECM |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING | ) | |
| ALA., LLC, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS AMENDED COMPLAINT BY DEFENDANT DYNAMIC SECURITY, INC.

Pursuant to Federal Rules of Civil Procedure 8(a), 9(c), and 12(b)(6), Defendant Dynamic Security, Inc. ("Dynamic"), by and through undersigned counsel, respectfully moves this Court to dismiss all counts of Plaintiff Davita Key's ("Plaintiff") Amended Complaint on grounds set forth below.

## I.    SUMMARY OF GROUNDS FOR DISMISSAL

Counts One, Two, and Four of Plaintiff's Amended Complaint claims against Defendant Dynamic, all brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), must be dismissed because Plaintiff failed to file a lawsuit against Dynamic within the statutory period prescribed by Title VII. While Plaintiff had filed EEOC Charges against both Dynamic and Hyundai Motor Manufacturing of

1

Alabama, LLC ("HMMA") and the EEOC had issued Notices of Right to Sue for both at different time, she plead that she did not receive the Notice of Right to Sue as to the Dynamic Charge and that she had assumed the EEOC had combined the two charges. When a defendant challenges whether the plaintiff satisfied administrative prerequisites, the plaintiff bears the burden to establish compliance, and this Plaintiff cannot meet her burden with subjective speculation and conjecture.

Dynamic also moves to dismiss Plaintiff's Title VII and § 1981 race and retaliation claims against Dynamic and adopts the arguments set forth in Defendant HMMA's original motion to dismiss and its motion to dismiss the Amended Complaint. (Doc. 11 at 3 – 5; Doc. 30 at 8 – 10). This includes the arguments that a policy against dreadlocks is not racially discriminatory, that no disparate impact claims can arise from such an allegation, and that Plaintiff could not have had a reasonable belief that a prohibition against unlawful dreadlocks is discriminatory.

Finally, as HMMA points out in its motion to dismiss the Amended Complaint, the use of the plural "Defendants" to refer to actions and legal conclusions against specific individual defendants does not state a proper claim against each named and identified Defendant, requiring dismissal of those claims.

## II.    RELEVANT FACTUAL ALLEGATIONS[1]

### A.    <u>Plaintiff Filed an EEOC Charge against Dynamic Security.</u>

1.    Plaintiff filed an EEOC Charge against Dynamic on August 3, 2017, identified as Charge No. 846-2017-32787 ("Charge No. 846-2017-32787" or the "Dynamic Charge") (Doc. 13-2).

2.    On March 1, 2019, the EEOC's District Director mailed to Plaintiff a Notice of Right to Sue as to Charge No. 846-2017-32787, sending a "cc" copy of the Notice to Dynamic Security, which ended the investigation into Plaintiff's Charge against Dynamic and found "no cause" for discrimination as to Dynamic. (Doc. 13-3)

3.    This began the 90 day statutory period during which Plaintiff must have filed a lawsuit arising out of the Dynamic Charge.

### B.    <u>Plaintiff Filed a Different EEOC Charge against Hyundai.</u>

4.    On August 3, 2017, Plaintiff submitted an Intake Questionnaire to the EEOC stating she wanted to file an EEOC Charge against Hyundai. (Doc. 28, ¶ 25).

5.    Plaintiff wrote in her Intake Questionnaire that she had "filed a complaint w/ Dynamic Security/the agency I was hire through . . ." (*sic*.) (Doc. 28, ¶ 26).

---

[1] Defendant Dynamic does not admit Plaintiff's factual allegations as true; rather Defendant considers them as true only for purposes of this Rule 12(b)(6) motion. Defendant's act of filing this Rule 12(b)(6) motion does not waive any defenses to Plaintiff's Amended Complaint.

6.      Plaintiff signed an EEOC charge against HMMA on October 16, 2018, and the EEOC opened an investigation under Charge No. 420-2019-00128. (Doc. 28, ¶ 28; Doc. 13-1).[2]

7.      Plaintiff alleged that the EEOC made a "cause finding" against HMMA and issued a Notice of Rights as to Charge No. 846-2017-32787 and that conciliation failed. (Doc. 28, ¶ 29; Doc. 1-1).

8.      Plaintiff does not allege that the EEOC made a "cause finding" against Dynamic or attempted conciliation with Dynamic.

9.      In fact, after the EEOC dismissed the Dynamic Charge and issued a Notice of Rights as to Charge No. 846-2017-32787, it would not have referenced Dynamic as a Respondent in any further communications with Plaintiff.

10.     On July 12, 2019, the EEOC mailed to Plaintiff a "cause finding" and Notice of Right to Sue as to Charge No. 420-2019-00128 against Respondent HMMA and sent a "cc" to HMMA; again, this Notice of Right to Sue clearly did not identify Dynamic as a Respondent. (Doc. 28, ¶ 29; Doc. 1-1).

---

[2] For purposes of a 12(b)(6) motion, consideration is limited to the four corners of the complaint, which encompasses the complaint, itself, and any documents referenced therein or attached thereto that are central to the Plaintiffs' claims. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009).  Because the EEOC Charge and other EEOC documents are referenced in Plaintiff's Complaint, they may be attached as an exhibit to a motion to dismiss without converting the motion to dismiss to a motion for summary judgment.  Plaintiff's EEOC Charge against HMMA is Doc. 13-1.  Plaintiff's Notice of Right to Sue as to Charge 846-2017-32787 is Doc. 13-3.

C.    **Plaintiff Cannot Rebut Receipt by Plaintiff on or before March 4, 2019, of the Notice of Right to Sue as to Charge No. 846-2017-32787 against Dynamic.**

11.    Plaintiff pled that she never received the Notice of Right to Sue with regard to the Dynamic Charge and that she "believed and understood" that her claims against Dynamic had been incorporated with the Hyundai Charge. (Doc. 28, ¶¶ 31-32).

12.    She pled that "[a]fter a failed conciliation, the EEOC issued a Cause Finding and Notice of Right to Sue stamped July 12, 2019." (Doc. 28, ¶29; Doc. 13-3).

13.    Plaintiff pled that, when she received the "Notice of Right to Sue" relating to the Hyundai charge, she believed it applied to Dynamic." (Doc. 28, ¶ 33; Doc. 13-3).

14.    In fact, Charge No. 846-2017-32787 against Dynamic Security had been dismissed and mailed on March 1, 2019, which Plaintiff admits. (Doc. 28, ¶ 30; Doc. 13-3).

15.    Plaintiff has not alleged or identified any correspondence from the EEOC dated after the March 1, 2019, issuance of Notice of Right to Sue as to Charge No. 846-2017-32787 that referred to Charge No. 846-2017-32787 or that referenced any party besides Hyundai as a Respondent.

16.     Specifically, Plaintiff does not allege that correspondence from the EEOC regarding Charge No. 420-2017-00128 regarding the "cause finding," conciliation failure, or Notice of Right to Sue issued July 12, 2019, named Dynamic as a respondent or that it indicated it applied to Charge No. 846-2017-32787.

17.     With regard to the Notice of Right to Sue as to Charge No. 846-2017-32787, presuming three days for receipt after mailing by the EEOC, receipt of the Dynamic Notice of Rights is attributed to Plaintiff on March 4, 2019.

18.     Ninety days after March 4, 2019, is June 3, 2019.

19.     Plaintiff filed the original complaint against Dynamic on October 10, 2019, which was well over 200 days after she received the Notice of Rights as to Charge No. 846-2017-32787 against Respondent Dynamic and over 100 days after expiration of the limitations period.

## III.   LAW AND ARGUMENT

### A.   <u>Legal Standards.</u>

Federal Rule of Civil Procedure 8 requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P.* 8(a)(2). The Supreme Court elaborated on this standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), affirming that a plaintiff's complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); see also

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Fed. R. Civ. P. 9(c) requires that a plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled."

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests whether a cognizable claim has been adequately stated in the complaint in compliance with Rule 8(a). *See Twombly*, 550 U.S. at 555. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* at 679. "All reasonable inferences are drawn in favor of the plaintiff; however, unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Mims v. Monroe Cty. Bd. of Educ.*, No. 13-643-KD-M, 2014 U.S. Dist. LEXIS 76456, at *4-5 (S.D. Ala. May 20, 2014) (citing *Abraham v. Greater Birmingham Humane Soc'y, Inc.*, No. 2:11-CV-4358-SLB, 2014 U.S. Dist. LEXIS 34174, 2014 WL 1043230, *1 (N.D. Ala. Mar. 17, 2014) (citing *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003)(citation omitted)).

The lack of any law upon which to base a claim against a defendant requires dismissal for failure to state a claim under *Fed. R. Civ. P.* 12(b)(6). *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). Further, dismissal for failure to file a lawsuit within 90 days after receipt of the notice-of-right-to-sue letter from the EEOC is also grounds for dismissal pursuant to Rule 12(b)(6). *Roach v. AKAL Sec.,*

*Inc.,* 2008 U.S. Dist. LEXIS 81869, at *4 (M.D. Ala. Oct. 15, 2008); *Keith v. Talladega City Bd. of Educ.*, No. 1:18-CV-1311-KOB, 2019 U.S. Dist. LEXIS 66311, at *12 (N.D. Ala. Apr. 17, 2019) (where, upon a Rule 12(b)(6) motion to dismiss, a defendant contests that the plaintiff filed the complaint within 90 days of receiving the EEOC's right-to-sue letter, the plaintiff must show that the complaint was timely filed or face dismissal).

**B.**   **Legal Analysis.**[3]

1.   Plaintiff's claims against Dynamic must be dismissed because Plaintiff failed to plead facts sufficient to show that she satisfied administrative prerequisites with regard to Defendant Dynamic and cannot rebut the presumption of receipt of the Notice of Rights in March 2019 as to Charge No. 846-2017-32787.

To proceed with her case, Plaintiff must plead and establish that she has met conditions precedent prior to filing this lawsuit. *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982) (citing Fed. R. Civ. P. 9(c) and noting that "a plaintiff must generally allege in his complaint that 'all conditions precedent to the institution of the lawsuit have been fulfilled.'") For a plaintiff to maintain an action under the Title VII, she must have alleged and established administrative

---

[3] At present, there may be various additional grounds for dismissal under Rule 12; however, Dynamic does not wish to unduly burden the Court or the parties by filing motions to dismiss claims that are not in fact asserted in the Amended Complaint or are too vague for Defendant to respond. Defendant reserves the right to file any and all other required motions pursuant to Rule 12(b) after this Court rules on the instant motion. The filing of the instant motion should not be interpreted to, nor does it waive, Defendant's right to file additional motions under Rule 12(b) if necessary. Moreover, the absence of subject matter jurisdiction is never waived.

prerequisites: that she filed the Complaint within ninety days of receiving the EEOC's Notice-of-Right-to-Sue letter. *Kerr v. McDonald's Corp.,* 333 F. Supp. 2d 1352, 1358 (N.D. Ga. 2004) (citing *Green v. Union Foundry Co.,* 281 F.3d 1229 (11th Cir.), *cert. denied*, 537 U.S. 953, 123 S. Ct. 422, 154 L. Ed. 2d 302 (2002)). Further, where there are multiple defendants, a plaintiff must establish that she has met administrative prerequisites with regard to <u>each defendant</u>. *Reguero v. Airport Terminal Serv.,* No. 2:13-cv-97-FtM-38DNF, 2013 U.S. Dist. LEXIS 84064, at \*4 (M.D. Fla. June 14, 2013)(requiring plaintiff to attach supporting documentation showing that he received a notice-of-right-to-sue letter with regard to each defendant)(emphasis added).

Here, Plaintiff failed to plead facts to establish that "all conditions precedent to the institution of the lawsuit have been fulfilled" with regard to Defendant Dynamic. Instead, she pled without including any specific facts that she did not receive by mail the Notice of Right to Sue as to Charge No. 846-2017-32787 bearing the mailing date of March 1, 2019. When a defendant contests the issue of timely receipt of a Notice of Right to Sue, as Dynamic is doing here, the plaintiff bears the burden of establishing satisfaction of the ninety-day filing requirement. *Kerr v. McDonald's Corp*., 427 F.3d 947, 951 (11th Cir. 2005); *Mims,* 2014 U.S. Dist. LEXIS 76456, at \*6-7 (citing *Green*, 281 F.3d at 1234 (*citing Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982))). The determination of

what constitutes "receipt" of a notice of right to sue must be decided based on "the individual characteristics of a given fact pattern." *Henderson v. NCO Fin. Sys.*, No. CA-09-769-CG-C, 2010 U.S. Dist. LEXIS 32462, 2010 WL 1382737, at *4 (S.D. Ala. Mar. 12, 2010); *see also Bell v. Eagle Motor Lines, Inc.*, 693 F.2d 1086 (11th Cir. 1982)(determination of when an EEOC letter is received is on a case-by-case basis and ninety day clock started running upon the arrival of the letter to the address provided by the would-be plaintiff).  Where there is no evidence to the contrary, the court will assume that the plaintiff received the Notice of Right to Sue letter three days after it was issued. *Kerr*, 427 F.3d at 953, n. 9; *Winsor v. Home Depot U.S.A., Inc.*, 743 F. App'x 335, 335-36 (11th Cir. 2018) (where the date of receipt by mail is in dispute, the court presumes that the plaintiff received the right-to-sue-letter three days after it was issued, which meant that the plaintiff was deemed to have filed his complaint on the 98th day, making it untimely). *See also Brenda Hood v. Walmart Store #5904, Raven Sartain, et. al.*, 3:19-cv-559-ECM-SMD (M.D. Ala., June 11, 2020)(recommendation that Court grant the defendant's motion to dismiss ADEA claim where a *pro se* Plaintiff failed to present evidence to rebut the defendant's presumption that she failed to file suit within 90 days after receipt of Notice of Right to Sue) (Recommendation attached as Exhibit A).

Plaintiff has not pled any evidence to show she did not receive the Dynamic Notice of Right to Sue in March 2019. The evidence shows that the EEOC mailed a

copy of the Notice of Right to Sue regarding Charge No. 846-2017-32787 to Dynamic Security on March 1, 2019, and Dynamic indeed received its copy (Doc. 13-3). There is no evidence that would allow any objectively reasonable conclusion that Plaintiff did not also receive her copy of the Notice of Right to Sue in the mail on or around the same date.

Nor has she plead any facts to support a reasonable belief that the EEOC had combined Charge No. 846-2017-32787 against Dynamic and Charge No. 420-2019-00128 against Defendant HMMA. Plaintiff alleges that she filed two separate EEOC charges, Charge No. 846-2017-32787 against Dynamic and Charge No. 420-2017-00128 against HMMA; she admits that the EEOC dismissed the charge against Dynamic on March 1, 2019; she does not allege that the EEOC's "cause finding" named both Dynamic and HMMA as respondents; she does not allege Dynamic participated in conciliation; and the Notice of Right to Sue mailed on July 12, 2019, identified only Respondent HMMA. (Doc. 28, ¶ 27-30; Doc. 13-1, 13-2, Doc. 1-1). Certainly, after the EEOC's March 1, 2019, dismissal of Dynamic, all communications from the EEOC to Plaintiff would have named only HMMA as Respondent and related only to Charge No. 420-2019-00128 against HMMA. It is unreasonable for Plaintiff to believe the two charges had merged and that all correspondence and decisions as to HMMA in Charge No. 420-2019-00128 also applied to the separate charge against Dynamic.

Indeed, the HMMA Notice of Rights gave Plaintiff 90 days to file a Title VII lawsuit against HMMA seeking to remedy the allegations included in the HMMA EEOC Charge. It did not give Plaintiff 90 days to file a Title VII lawsuit against Dynamic, as the EEOC had issued that Notice of Right to Sue on March 1, 2019. Here, ninety days after March 4, 2019, was June 3, 2019, which was the last day Plaintiff could have filed a timely lawsuit arising out of her EEOC Charge against Dynamic. Since Plaintiff did not file her complaint until over 100 days later, on October 10, 2019 (Doc. 1), and she has failed to plead and cannot present evidence to rebut the presumed mailing date of her Notice of Right to Sue as March 1, 2019, with regard to Charge No. 846-2017-32787, Plaintiff's Title VII claims against Dynamic are untimely and must be dismissed.

**C.**    **Plaintiff Does Not State a Cognizable Claim for Race Discrimination or Retaliation, Requiring Dismissal of Her Title VII and § 1981 Race and Retaliation Claims (Counts II, III, IV, and V).**

Alternatively, Plaintiff's Title VII race and retaliation claims (Counts II and IV) – along with her 42 U.S.C. § 1981 claims (Counts III and V) - fail to state a claim for either disparate treatment or disparate impact.  For the reasons set forth in HMMA's original motion to dismiss and its motion to dismiss the Amended Complaint, Dynamic also seeks to have the Plaintiff's Title VII and § 1981 race and retaliation claims against Dynamic dismissed.  (Doc. 11 at 3 – 5; Doc. 30 at 8 – 10). This includes the arguments that a policy against dreadlocks is not racially

discriminatory, that no disparate impact claims can arise from such an allegation, and that Plaintiff could not have had a reasonable belief that a prohibition against unlawful dreadlocks is discriminatory.

Furthermore, as HMMA points out in its motion to dismiss the Amended Complaint, the use of the plural "Defendants" to refer to actions and legal conclusions against specific defendants does not state a proper claim against each Defendant named and identified. *See Collier v. Buckner*, CASE NO 2:15-CV-256-WKW, 2016 U.S. Dist. LEXIS 55882 *5 – 6 (M.D. Ala. April 27, 2016).

WHEREFORE, for these reasons set forth above, this motion to dismiss all claims against Defendant Dynamic Security is due to be granted.

Respectfully submitted,

*/s/Susan W. Bullock*
Wesley C. Redmond
Susan W. Bullock
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: 205-244-5905
Phone: 205-244-5904

*Counsel for Defendant Dynamic Security, Inc.*

13

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on 15th day of June, 2020, she electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF System, and a true and correct copy to counsel of record:

Heather Leonard
Heather Leonard, P.C.
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243

Leslie A. Palmer, LLC
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL  35233

*Counsel for Plaintiffs*

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.
P.O. Box 11945
Birmingham, AL  35202

*Counsel for Hyundai Motor Manufacturing Alabama, LLC*

Yurie Yeoul Bae
Richard L. DeWeese, Jr.
Deweese & Bae, LLC
8191 Seaton Place
Montgomery, AL 36116

*Counsel for Hyundia ENG America, Inc.*

*/s Susan W. Bullock*
Of Counsel

WSACTIVELLP:11562796.1

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BRENDA HOOD, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:19cv559-ECM-SMD |
| | ) |
| WALMART STORE #5903, | ) |
| RAVEN SARTAIN, *et. al.*, | ) |
| | ) |
|       Defendants. | ) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

*Pro se* Plaintiff filed a Complaint (Doc. 1) alleging that Defendants discriminated

against her based upon her age.[1] Generally, Plaintiff alleges that Defendants harassed her

because of her age and threatened her with termination, which forced her to retire.[2] (Doc.

1) at ¶ 4, 6, 8, 9. Prior to filing her Complaint with this Court, Plaintiff filed a charge with

the Equal Employment Opportunity Commission ("EEOC") and was issued a right-to-sue

---

[1] The undersigned interprets Plaintiff's Complaint to allege a constructive discharge claim under the Age Discrimination in Employment Act ("ADEA").

[2] To the extent that it can be construed from Plaintiff's vague reference of "harassment" within her Complaint that she is attempting to file a hostile environment claim as well, the undersigned notes that there is no indication that Plaintiff filed an EEOC charge based upon such conduct. *See* (Doc. 11-1) (noting that Plaintiff's EEOC charge states that she believes she has been subjected to discrimination because of her age in violation of the ADEA and does not mention anything about a hostile working environment). The undersigned further notes that, although Plaintiff did not attach a copy of the EEOC charge along with her Complaint, the Court may consider the document, which was provided by Defendants, without converting Defendants' Motion to Dismiss into a motion for summary judgment. *See Sessom v. Wellstar Hosp.,* 2009 WL 1562876, at *3 n. 1 (N.D. Ga. May 29, 2009) ("The EEOC charge is properly considered on the motion to dismiss because Plaintiff has not disputed its authenticity and refers to it in her Complaint."); *Judkins v. Saint Joseph's Coll. of Me.,* 483 F. Supp. 2d 60, 62 (D. Me. 2007) ("EEOC documents are central to Plaintiff's claims of sex and age discrimination."); *Secrist v. Burns Int'l Sec. Servs.,* 926 F. Supp. 823, 825 (E.D. Wis. 1996) (examining EEOC charge when determining motion to dismiss).

letter. *See* (Doc. 1); (Doc. 1-1).

Pending before the Court is a Motion to Dismiss Employees Raven Sartain and Lindzi Simpson as Defendants (Doc. 9) and a Motion to Dismiss Complaint by Defendants Alan Fonville and WalMart Stores East, L.P. (Doc. 10). On August 12, 2019, and August 16, 2019, the undersigned entered orders directing Plaintiff to show cause why the Motions should not be granted. (Docs. 10, 13). Plaintiff's responses were due August 26, 2019, and September 14, 2019, respectively. *Id*. The docket indicates that Plaintiff was served with the Court's show cause orders on September 14, 2019, and September 18, 2019, (Docs. 17, 18); however, she did not file oppositions to the Motions.

On December 11, 2019, the undersigned entered an order directing Plaintiff to file written notice with the Court indicating whether she intended to proceed with her suit. (Doc. 19). It further ordered Plaintiff, if she intended to proceed, to show cause as to why Defendants' Motions to Dismiss should not be granted. *Id*. The order warned Plaintiff that her

> **failure to file a written notice with the Court in accordance with this Order will be interpreted by the undersigned as Plaintiff's abandonment of her claims and will result in the undersigned's recommendation that this case be dismissed for failure to prosecute and abide by orders of the court. Further, Plaintiff is warned that her failure to show cause as to the Motions to Dismiss will be interpreted by the undersigned as Plaintiff's lack of opposition to the Motions and will result in the undersigned's recommendation that this case be dismissed.**

*Id*. (emphasis in original).

On December 23, 2019, Plaintiff filed a one-page response to the undersigned's December 11th order. (Doc. 21). Plaintiff's response seems to indicate that she wishes to

proceed with the suit, but in no way substantively responds to Defendants' Motions to Dismiss. *Id*. While the undersigned could recommend dismissal based upon Plaintiff's failure to oppose the motions to dismiss, the undersigned will nonetheless address the merits of Defendants' arguments.

## I.    The ADEA Does Not Provide Liability Against Individuals.

Defendant Raven Sartain, Defendant Lyndzi Simpson, and Defendant Alan Fonville ask the Court to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) because "there is no provision for individual liability under the ADEA and thus Plaintiff fails to state a claim against them[.]" (Doc. 9) at 1; (Doc. 11) at 1..

The ADEA makes it unlawful for an employer "to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623. Under Eleventh Circuit precedent, individuals cannot be held liable under the ADEA. *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (noting that the defendants, sued in their individual capacities, could not be held liable under the ADEA because they were not the plaintiff's employer); *Griswold v. Ala. Dep't of Indus. Relations*, 903 F. Supp. 1492, 1496 (M.D. Ala. 1995) ("Eleventh Circuit law supports the view that employees are not individually liable for ADEA violations.")

Plaintiff's Complaint alleges that Defendant Sartain was the store manager for Defendant WalMart during the relevant timeframe and that Defendant Simpson and Defendant Fonville were assistant managers. (Doc. 1) at 3. Plaintiff cannot state claims for constructive discharge under the ADEA against these Defendants as a matter of law

because they were her managers, not her employer. Accordingly, they are due to be dismissed as Defendants.

## II.    Plaintiff's ADEA Claim Against Defendant Walmart is Untimely.

In order to maintain an ADEA claim, a plaintiff must file a complaint within ninety days of receiving the EEOC's right-to-sue letter. *Browning v. AT&T Paradyne*, 120 F.3d 222, 224 (11th Cir. 1997) (ADEA suits "must be filed within 90 days of the plaintiff's receipt of a notice of the termination of administrative proceedings from the EEOC"). The 90 days commence at the time the "complainant has adequate notice that the EEOC has dismissed the Charge." *Santini v. Cleveland Clinic Fla.,* 232 F.3d 823, 825 (11th Cir. 2000). When a defendant contests the timeliness of the plaintiff's complaint, the plaintiff bears the burden of establishing satisfaction of the ninety-day filing requirement. *Kerr v. McDonald's Corp*., 427 F.3d 947, 951 (11th Cir. 2005).

Here, Plaintiff's Complaint alleges that she filed charges with the EEOC regarding the alleged discriminatory conduct on or about April 15, 2019. (Doc. 1) at 4. While she alleges that she received the right-to-sue letter on the same day she filed the EEOC charge, the EEOC dismissal and notice-of-rights letter, which Plaintiff attaches to her Complaint, is dated May 1, 2019. The Court assumes that Plaintiff received the notice on May 4, 2019, and Plaintiff does not dispute this in her response to the Court. *See Winsor v. Home Depot U.S.A., Inc*., 743 F. App'x 335, 335-36 (11th Cir. 2018) (where the date of receipt by mail is in dispute, the court presumes that the plaintiff received the right-to-sue letter three days after it was issued).

Plaintiff's Complaint was filed on August 5, 2019, *see* (Doc. 1), which is ninety-three days after Plaintiff received notice from the EEOC on May 4, 2019. Because Plaintiff filed her Complaint more than ninety days after receipt of her right-to-sue notice, her Complaint is untimely and is due to be dismissed.

## III.     Conclusion.

For the reasons set forth above, it is the

RECOMMENDATION of the undersigned Magistrate Judge that the Motions filed by Defendants (Docs. 9, 10) be GRANTED and that this case be DISMISSED with prejudice. It is further

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before June 25, 2020. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

5

DONE this 11th day of June, 2020.

/s/ Stephen M. Doyle
UNITED STATES MAGISTRATE JUDGE

# TAB / DOCKET ENTRY NO. 39-1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:19-cv-767-ECM |
| | ) | (WO) |
| HYUNDAI MOTOR MANUFACTURING, | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

Davita Key ("Plaintiff" or "Key") filed the operative complaint in this action on June 1, 2020, (doc. 28), in which she alleges Defendants Hyundai Motor Manufacturing Alabama, LLC, ("HMMA"), Hyundai ENG America, Inc., ("HEA"), and Dynamic Security, Inc., ("Dynamic") (collectively "the Defendants") discriminated against her because of her pregnancy and race. Specifically, Key brings claims against all Defendants for pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (count one); race discrimination under Title VII (count two); race discrimination pursuant to 42 U.S.C. § 1981 (count three); retaliation under Title VII (count four); and retaliation pursuant to 42 U.S.C. § 1981 (count five). (Doc. 28).

Now pending before the Court are the Defendants' motions to dismiss the Plaintiff's first amended complaint. (Docs. 30–32). For the reasons that follow, the Defendants' motions (docs. 30, 31 and 32) are due to be GRANTED in part and DENIED in part.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the jurisdictional grant found in 42 U.S.C. § 2000e-5(f)(3).  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*., at 678.  Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56.  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  Indeed, "[a] pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"
*Id*.

## IV.  FACTS AND PROCEDURAL HISTORY[1]

Key applied for and was offered an interview with Dynamic Security, an employment agency, for a mail clerk position at the Hyundai Plant in Montgomery, Alabama.  At the interview, she met with Gloria Robinson, a Dynamic employee, Maurice Chambliss,[2] and Cassandra Williams, an HEA employee.

For the interview, Key wore her hair in "a neat dreadlocks style."  At the end of the interview, Robinson asked Williams if Key's hairstyle was "okay."  Williams "turned up her nose" and asked Key if she could take her hair down.  Key responded that she could take her hair down only if she cut it.  Williams then asked Robinson about the hair policy at the plant.  Robinson did not think Key's hairstyle was allowed.  In response, Key showed Robinson and Williams that she could wear her hair "up."  Both approved of the style. Two days later, Robinson hired Key for the mail clerk position at Hyundai.

The next week, Key trained and completed paperwork at Dynamic's facility.  After training, Key asked Nicole Scavella, Dynamic's office manager, whether her hairstyle was consistent with company policy.  Scavella told Key she did not think there would be an issue because her hair was neat and consistent with policy.

---

[1] This recitation of the facts is based upon the Plaintiff's complaint.  At this stage of the proceedings, for purposes of ruling on the motions to dismiss, the facts alleged in the complaint and reasonable inferences drawn therefrom are set forth in the light most favorable to the Plaintiff.

[2] The complaint does not specify which entity employed Maurice Chambliss or in what capacity he was employed.

On July 31, 2017, Key arrived at the Hyundai plant for her first day of work.  She wore her hair in the same manner as in her interview and approved by Scavella.  During her training at the plant, Key received a safety manual marked "Hyundai Motor Manufacturing of Alabama, LLC."

Both Robinson and Williams spoke with Key.  Although Key's hair was fully visible, neither commented on it.

After receiving instructions from Robinson, Key told Robinson and Chambliss that she was pregnant.  Key informed Robinson and Chambliss of her pregnancy to notify them of upcoming doctor appointments.  She also gave them a note from her doctor that indicated that Key "was pregnant, had no restrictions, and would be able to fulfill all her duties."

Robinson took the note to the office she shared with Williams.  About ten minutes later, Williams twice came to Key's area.  Williams asked Key "what she was going to do about her hair." Key responded that Dynamic told her that her hair was neat and in compliance with policy.  Williams "aggressively" and "loudly" told Key that it was "what she [Williams] said that mattered" and "not what Dynamic had told [Key]."

Shortly thereafter, Key was called to the office where she met with Williams, Robinson, and Chambliss.  Williams sternly informed Key that she could not keep her hairstyle because it violated policy.  Key asked to see the policy.  They showed Key a policy for a female uniformed officer—not Key's position.  Williams told Key that Dynamic could send her to other facilities if it approved of her hairstyle; but she could not wear her current hairstyle at the Hyundai plant.  Williams explained women could wear braids, which were different because of the "name and professionalism" and the scalp was

visible. Key asked if her hairstyle would be appropriate if her scalp was visible, but Robinson and Williams would not answer her question.

Williams told Key she would have to get her hair restyled and gave Key the option of "wearing a hat all day every day if all her hair was covered." Key responded she had a hat at home that could cover all her hair. After telling Key to contact her stylist, Robinson sent Key home for the day and said they "would go from there." Key left the plant, having worked approximately 3.5 hours.

Within minutes of leaving the Hyundai plant, Robinson called Key and asked her baby's due date and whether "her doctor knew she would be lifting boxes." Key said she was due in six months and that her doctor had cleared her to perform her work responsibilities.

The next day, August 1, 2017, Key reported to the Hyundai plant. In compliance with Williams' instructions, she wore a hat that completely covered her hair. As Key and her trainer made their rounds, they encountered Robinson and Williams. Neither said anything about Key's hat or hairstyle. On the way back to the mailroom, her trainer asked Key why she was sent home the previous day. Key explained she was sent home because of her hair. Key said, "she did not think it was right," but she still wanted "to work with them."

After returning to the mailroom, Key was summoned to the security building to meet with Robinson and Chambliss. Robinson asked Key "if anything was wrong with her." Although Key did not know the reason for the question, she replied she was fine and explained that she wore a hat because she had not yet gotten a hair appointment. Robinson

told her the meeting was not about the hat and asked, "so you feel discriminated against?" When Key replied that "she had no comment," Robinson responded, "so you do." Robinson also stated that Key's trainer said Key felt that she was being discriminated against. Robinson told Key that the Koreans "were a different breed of animals and they send little memos saying that they do not want African-Americans wearing their hair in dreadlock hairstyles." Robinson said Key and her situation were going to be problematic. Nonetheless, Key returned to work.

When Key returned to the mailroom, she wrote a formal complaint against Hyundai, Robinson, and Williams. She told Chambliss she wanted to file a complaint with human resources. He told her to speak with Williams and Robinson. Key was concerned about speaking directly with Williams and Robinson, so Chambliss told her to go speak with Ray Cureton at Dynamic's facility. Key immediately left the Hyundai plant and went to the Dynamic facility.

Key met with Cureton and Scavella who told Key that her efforts would be "fruitless and that filing a discrimination complaint is a serious offense." Cureton then added that "Williams did not want [Key] at the Hyundai plant anymore because of her hair and 'something else.'" Cureton told Key he would forward her complaint to the HR office in Birmingham. He also told Key he would contact her in a few days to review the dismissal paperwork from Hyundai. "Scavella walked Key to her car and told [Key] that she (Scavella) had 'really' been discrimination (sic) against and that what Key experience[d] (sic) was not discrimination and she was fighting a losing battle."

The next day, Robinson, using a HMMA email address, emailed Cureton and others at Dynamic to specify that Hyundai's policy did not permit women to have "cornrows or dreads." She specifically "asked that Key not return to the plant." Dynamic did not place Key in any other assignments. When Key received a paycheck from Dynamic for her partial days of work, HMMA was listed as the customer.

On August 3, 2017—the day after Key was terminated—she completed an EEOC intake questionnaire setting forth her allegations against Dynamic and "Hyundai." She described "Hyundai" as being located at 700 Hyundai Blvd., Montgomery, Alabama. The EEOC created two charges: one against HMMA and another against Dynamic.

Although the EEOC dismissed her charge against Dynamic on March 1, 2019, Key alleges that she did not receive the right to sue letter until Dynamic filed it in this action.

On July 12, 2019, the EEOC issued a cause finding and notice of right to sue against HMMA. Key alleges that she believed her claims against Dynamic had been "incorporated with the Hyundai charge." She further asserts that when she received the notice of right to sue on her Hyundai charge, she believed that it also applied to the charge against Dynamic. On October 10, 2019, Key filed suit against HMMA, HEA, and Dynamic. Key filed this action within 90 days of her receipt of the EEOC charge determination against "Hyundai."

## V. DISCUSSION

The Defendants move to dismiss the Plaintiff's claims of pregnancy discrimination, race discrimination and retaliation under Title VII and race discrimination and retaliation claims under § 1981. The Defendants argue that the Plaintiff has not stated a plausible claim for relief against them under any of the causes of action. In response, the Plaintiff

argues that she pleaded sufficient facts to withstand the Defendants' motions to dismiss. The Court turns first to the Defendants' motions to dismiss the Plaintiff's Title VII claims.

## A. Title VII

In addition to their arguments that the Plaintiff has failed to state a claim under Title VII, the Defendants also argue that the Plaintiff's Title VII claims are barred for several procedural deficiencies as well. HEA argues that Key's Title VII claims against it are due to be dismissed because the Plaintiff did not specifically name HEA in her EEOC charge. Thus, she did not exhaust her administrative remedies against HEA with the EEOC. (Doc. 31 at 1). HEA and HMMA also argue that the claims against them should be dismissed because they had no employment relationship with the Plaintiff. (Doc. 30 at 2–8; doc 31 at 7–8).

Dynamic argues that Key failed to file her lawsuit against Dynamic within the prescribed statutory period after receiving a determination from the EEOC, so her Title VII claims against Dynamic should be dismissed. (Doc. 32 at 1).

The Court first considers the preliminary issues of whether the claims are procedurally barred for failure to satisfy administrative prerequisites and whether the Plaintiff has adequately pleaded facts to show that HEA or HMMA were Key's joint employers. The Court will then turn to whether the Plaintiff has stated claims for relief under Title VII or § 1981.

### 1. *Procedural prerequisites*

### a. **Plaintiff failed to exhaust her administrative remedies as to HEA**

HEA argues that the Plaintiff failed to exhaust the EEOC administrative remedies by not naming HEA in her EEOC charge. (Doc. 31 at 1). HEA points out that nowhere in the Plaintiff's complaint does she identify HEA as the "Hyundai" entity located at 700 Hyundai Blvd, and the only connection that the Plaintiff makes with HEA is in her intake form identifying Cassandra Williams—specifically identified as an employee AMCO, the former name of HEA. (*Id*. at 11). Further, in her EEOC charge against HMMA she identified Williams—an HEA employee— as an employee of HMMA.[3] (Doc 13-1). HEA argues that allowing the Title VII claims to proceed against HEA, a party not named in Key's EEOC charge, would not fulfill the purpose of Title VII. (Doc. 31 at 11).

---

[3] Although the Plaintiff did not attach a copy of her EEOC charges to her complaint, defendants HMMA and Dynamic attached copies to their motions to dismiss the complaint. (Doc. 11-1; Doc. 13-1 and 2). In general, the Court considers matters outside the pleadings on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the motion is converted into a motion for summary judgment. The Court may consider exhibits attached to a motion to dismiss in certain circumstances, however, without converting the motion to dismiss into a motion for summary judgment.

> Our Rule 12(b)(6) decisions have adopted the "incorporation by reference" doctrine, *see In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999), under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed. *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir.1999). "Undisputed" in this context means that the authenticity of the document is not challenged. *See, e.g., Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 16–17 (1st Cir.1998); *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997); *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

*Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002).

> Although Key did not attach her EEOC charges to her amended complaint, she references them; they are central to her claims; and she does not dispute its contents or authenticity.

Key responds that she listed "Hyundai" in her EEOC charge as her employer at 700 Hyundai Blvd, and that HEA operates at that facility. (Doc. 34 at 17). The Plaintiff asserts that HEA and HMMA "operate out of the same facility, for the same interest, share policies, and act as joint employees," (*id.*), so notice to HMMA was sufficient as to HEA.

HEA argues that neither the Plaintiff nor the EEOC provided it notice about Plaintiff's EEOC claim. (Doc. 31 at 12). Even if it was aware of Plaintiff's charge, HEA suggests that the charge would not have put HEA on notice that it faced potential liability as an employer of the Plaintiff. (*Id.*). HEA also claims that it was not invited to participate or included in the EEOC conciliation process, and that they were prejudiced by this exclusion from the proceedings. (*Id.*). In response, the Plaintiff does not assert that she filed an EEOC complaint against HEA but instead argues that she pleaded enough facts to show that including HEA would be consistent with the purposes of Title VII. (Doc. 34 at 16).

Before bringing a Title VII claim, a plaintiff is required to exhaust administrative remedies which includes first filing a charge with EEOC. *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994) (referencing 42 U.S.C. § 2000e-5). Generally, a plaintiff must name a defendant in an EEOC charge before proceeding against it in subsequent litigation under Title VII. *Id.* However, "courts liberally construe this requirement." *Id.* Although the naming requirement "serves to notify the charged party of the allegations and allows the party an opportunity to participate in conciliation and voluntarily comply with the requirements of Title VII," courts allow claims against unnamed parties to proceed if doing so would fulfill the purposes of Title VII. *Peppers v.*

*Cobb Cty., Georgia*, 835 F.3d 1289, 1296 (11th Cir. 2016).   To determine whether the

purposes of Title VII have been met, a court considers:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Peppers*, 835 F.3d at 1296 (citing *Virgo*, 30 F.3d at 1358–59).

Here, allowing Title VII claims to proceed against HEA would not advance the

purpose of Title VII.   The Plaintiff demonstrated in her EEOC charge that she was aware

of the distinction between her employers when she brought separate charges against

HMMA and Dynamic.   In addition, she showed that she could distinguish between the two

Hyundai entities when she identified Williams as an AMCO (HEA) employee in her intake

questionnaire and an HMMA employee in her charge. *Compare* Doc. 11-2 and Doc. 13-1.

Further, simply directing her discrimination charge against at "Hyundai" located 700

Hyundai Blvd. did nothing to put HEA on notice that Key asserted a claim against it.

Indeed, Key asserts in the complaint that "HMMA contracted with HEA in 2017 for HEA

to provide services at HMMA's Montgomery, Alabama location." (Doc. 28 at 2).   These

allegations illustrate that HEA and HMMA are distinct entities which contracted with one

another for the provision of services.   Unlike in *Virgo*, 30 F.3d at 1359, where the plaintiff

used the name under which her actual employer did business, the Plaintiff alleged in her

complaint that HEA and HMMA are separate corporate entities.   Although the Plaintiff

implies that HMMA received notice of the EEOC complaint, (doc. 28 at 5), she alleges nothing to suggest that HEA was on notice of her charge. She argues that because HEA and HMMA are an integrated enterprise, notice to both was unnecessary. In contrast to *Virgo* where named and unnamed defendants shared executives who knew of the charge, there is no indication that HEA was ever on notice of the Plaintiff's EEOC charge. 30 F.3d at 1359. Although Key alleges "[u]pon information and belief, HEA and HMMA are joint employers and/or an integrated enterprise," (doc. 28 at 3), she fails to allege sufficient facts to support this vague assertion. The failure to name HEA in the EEOC charge, thereby depriving it of an opportunity to participate in the conciliation process, constitutes prejudice to HEA. Because the Plaintiff does not plead sufficient facts to demonstrate that proceeding against HEA would advance the purposes of Title VII, her Title VII claims against HEA are due to be DISMISSED for her failure to exhaust her administrative remedies against that entity.

### b. Plaintiff's claims against Dynamic

Dynamic argues that the Plaintiff did not plead that "all conditions precedent to the institution of the lawsuit have been fulfilled" pursuant to Fed. R. Civ. P. 9(c), so the Court must dismiss all of the Plaintiff's Title VII claims against Dynamic. Specifically, the Defendant asserts the Plaintiff failed to bring her lawsuit within the statutory period prescribed by Title VII. (Doc. 32 at 1). Dynamic contends that, on March 1, 2019, the EEOC District Director mailed to the Plaintiff a notice of right to sue, (*id.* at 3), of which Dynamic received a copy. (Doc. 13-3). Plaintiff had 90 days within which to file a lawsuit in district court. Because the Plaintiff filed her suit on October 10, 2019—more than a

hundred days after the June 3, 2019 deadline—the Plaintiff's Title VII claims are untimely. Further, Dynamic argues that the Plaintiff did not plead any specific facts that she did not receive the notice of right to sue on March 1, 2019, or that the EEOC had combined her Dynamic claim with her Hyundai claim. (Doc. 32 at 9, 11).

In response, the Plaintiff asserts that she did not receive the Dynamic right to sue letter until it was filed by one of the defendants in this case. (Doc. 28 at 5). She further contends that she thought the charges were handled together and her claims against Dynamic were included in the right to sue notice against HMMA. So, according to the Plaintiff, it was enough for her to set forth that she received the right to sue letter only when it was attached to a filing in the case. (Doc. 34 at 18). Because of this, she argues, she is not required to plead more specific facts of when she received the right to sue letter. (*Id.*). Instead, she argues that the "three-day" rule applied by the Defendant is only applicable when there is no alternative proof of when the Plaintiff received the right to sue letter. (*Id.* at n.8).

Title VII provides that "[w]ithin ninety days after the giving of . . . notice [of dismissal of the charge] a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved . . . ." 42 U.S.C § 2000e–5(f)(1). When a defendant contests whether the complaint was timely filed, the plaintiff bears the burden of showing that the plaintiff has met the timeliness requirement. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005); *Green v. Union Foundry Company,* 281 F.3d 1229, 1233–34 (11th Cir. 2002). The Eleventh Circuit further explained that determinations on when notice was received, and thus the start of the 90-day limitation period, are to be

considered, "on a case-by-case basis to fashion a fair and reasonable rule for the circumstances of each case, one that would require plaintiffs to assume some minimum responsibility . . . without conditioning a claimant's right to sue . . . on fortuitous circumstances or events beyond [her] control." *Kerr*, 427 F.3d at 952 (citing *Zillyette v. Capital One Fin. Corp.,* 179 F.3d 1337, 1340 (11th Cir. 1999)) (alternations in original). However, when there is a dispute about when the plaintiff received notice of the EEOC determination, the Eleventh Circuit has applied a "presumption of three days for receipt by mail." *Kerr,* 427 F.3d at 953 n.9; *Zillyette,* 179 F.3d at 1342.

"Because courts must make findings of fact regarding when a plaintiff . . . received [notice] in order to determine whether an action was timely filed, courts tend to this issue at summary judgment or after holding an evidentiary hearing." *Blair v. Brennan*, 2017 WL 2538564, at *2 (M.D. Fla. June 12, 2017). *See also Kerr,* 427 F.3d at 951–52 (summary judgment); *Zillyette*, 179 F.3d at 1341 (summary judgment); *Lewis v. Conners Steel Co.*, 673 F.2d 1240, 1243 (11th Cir. 1982) (reversing dismissal and remanding for an evidentiary hearing). When courts have considered the issue at the motion to dismiss stage, two general trends have emerged. If the plaintiff does not dispute receiving notice or does not plead any facts about when notice was received, courts apply the three-day receipt presumption and will dismiss the claim if it is untimely. *See Hood v. WalMart Store #5903*, 2020 WL 3555226, at *2 (M.D. Ala. June 11, 2020), *report and recommendation adopted*, 2020 WL 3549992 (M.D. Ala. June 30, 2020);  *Howard v. Sec'y of the Army*, 2015 WL 4496129, at *5 (M.D. Fla. July 23, 2015) ("Howard has not contested the date Defendants contend she received the letter, nor has she attempted to refute the presumption of

receipt."); *Mims v. Monroe Cty. Bd. of Educ.*, 2014 WL 2508732, at \*3 (S.D. Ala. June 4, 2014) (finding that even though the plaintiff did not offer any evidence of when she received the right to sue letter, the court assumed she received it three days after mailing and her claim was timely filed). However, if a plaintiff disputes when or if she received a right to sue letter and pleads sufficient supporting facts, courts have either denied the motion to dismiss without prejudice or allowed limited discovery to the issue of when the plaintiff received notice of the determination. *Blair*, 2017 WL 2538564 at \*2 (allowed limited discovery about receipt when plaintiff argued "that USPS must have misdelivered [the determination] addressed to his attorney's office because his attorney did not receive [the determination] on November 12 (a Saturday) or November 14 (the next business day)") (brackets added); *Themm v. Tervis Tumbler Co.,* 2015 WL 1293120, at \*1, 4 (M.D. Fla. Mar. 23, 2015) (denied motion to dismiss without prejudice when the plaintiff argued she only received notice of the right to sue letter when her lawyer requested the letter and was told it had been sent almost three months before).

Here the Plaintiff argues that she only received notice of the Dynamic right to sue letter when it was filed as an attachment to the Defendants' motions to dismiss, and she had never received a copy from the EEOC in the mail. She further argues that she thought when she received the HMMA right to sue letter that it had integrated her charges against Dynamic. (Doc. 34 at 18). Because the Plaintiff disputes when she received the Dynamic right to sue letter and pleads facts, which taken as true as to when she received notice, it would be premature to dismiss her Title VII claim as untimely at this time. This case is distinguishable from other cases that were dismissed for untimeliness at the motion to

dismiss stage because in those cases, the plaintiffs either did not contest receipt or did not plead any facts of when they received notice. The Plaintiff here pleads enough facts that she did not receive notice until she received the Dynamic right to sue letter from Dynamic. (Doc. 28 at 5). Therefore, the motion to dismiss the Plaintiff's Title VII claims against Dynamic on timeliness grounds is due to be DENIED without prejudice.

### 2.  *Joint employer theory*

Because the Plaintiff did not file an EEOC charge against HEA and the Court has concluded that the Title VII claims against HEA should be dismissed, the Court only addresses whether HMMA had an employment relationship Key.

### a.  **The Plaintiff has pleaded enough facts to support a plausible employment relationship between HMMA and Key**

HMMA claims that the Plaintiff has not plausibly pleaded that HMMA was a joint employer of the Plaintiff. (Doc. 30 at 2-8). According to HMMA, because every step of the Plaintiff's employment was predominated by employees of Dynamic and HEA, no HMMA employee played any role in the Plaintiff's employment. (*Id.* at 3). As alleged in the complaint, the Plaintiff applied for employment with Dynamic; the grooming policy was enforced by employees of HEA or Dynamic; and an HEA employee (Williams) did not want Key to return the Hyundai plant. (Doc. 28 at 6–7, 12). HMMA argues that the Plaintiff, without factual support, combined HMMA and HEA in her pleadings. (Doc. 30 at 4). The only claims specific to HMMA were that it provided the work site and a safety manual. (*Id.* at 5). HMMA asserts that, because these two instances would be insufficient to provide a factual basis that HMMA was Key's joint employer, the allegations are conclusory and, therefore, should not be considered under 12(b)(6). (*Id.* at 4-5).

Because Plaintiff alleged various facts that support the interrelationship between the Defendants, the Plaintiff asserts she pleaded enough facts to show the Defendants are joint employers or involved in an integrated enterprise.[4] (Doc. 34 at 5-7). Because the Plaintiff alleges a plausible employment relationship, she argues her claims against HMMA should survive the motion to dismiss. (*Id.* at 8).

"A Title VII . . . discrimination claim can only be brought by an employee against [her] employer." *Peppers*, 835 F.3d at 1297 (alteration added). However, courts have interpreted the term "employer" liberally in line with the remedial purpose of Title VII. *Id.* The Eleventh Circuit has explained the existence of an employer relationship turns on the question of "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Id.* (citing *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (en banc)). To answer this question, courts consider "the totality of the employment relationship." *Peppers*, 835 F.3d at 1297 (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)). Courts consider: "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Id.* (citing *Welch*, 57 F.3d at 1011). In the joint employer context, courts

---

[4] The Plaintiff has not pleaded facts, however, to show that Defendants HEA and HMMA are an integrated enterprise. An integrated enterprise exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer." *Long v. Aronov Realty Mgmt., Inc.*, 645 F. Supp. 2d 1008, 1029 (M.D. Ala. 2009) (quotation marks omitted). "The single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise. . . ." *Id.*, (citing *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997)). Beyond conclusory assertions, the Plaintiff has not pleaded enough facts to show the sufficient level of interrelation between HEA and HMMA to be an integrated enterprise.

examine the alleged employer's control over: "(1) the means and manner of the plaintiff's work performance; (2) the terms, conditions, or privileges of the plaintiff's employment; and (3) the plaintiff's compensation." *Kaiser v. Trofholz Techs., Inc.,* 935 F. Supp. 2d 1286, 1293 (M.D. Ala. 2013). The Eleventh Circuit has explained that "the focal point of the inquiry is not which entity controlled the specific aspect of the relationship giving rise to a discrimination claim, but rather which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole." *Peppers,* 835 F.3d at 1301.

Courts usually determine whether a defendant is a joint employer at the summary judgment stage because such a determination requires a factual determination. Therefore, at the motion to dismiss stage, the Court is limited to considering whether a plaintiff has alleged sufficient facts that the defendant had enough control to plausibly be a joint employer. *Caver v. Help at Home LLC*, 2019 WL 2024265, at *2 (N.D. Ala. 2019). For example, in *Kaiser*, 935 F. Supp. 2d at 1293, the court found that the plaintiff had pleaded sufficient factual allegations to support the inference of an employment relationship when she alleged that the alleged employer employed her supervisors who could report on her job performance and her supervisors precipitated her termination by threatening to terminate her employer's contract. Similarly, a court found a plausible employment relationship existed when the plaintiff pleaded that the alleged employer provided feedback, oversaw day-to-day employment, work hours, and could discipline and remove employees. *Linzy v. Alabama Dep't of Pub. Health*, 2020 WL 6205848, at *2 (M.D. Ala. Oct. 22, 2020). The *Linzy* court further noted that the plaintiff need not allege that the

employer controlled every aspect of employment. *Id.* Further, in *Caver*, the court concluded that the plaintiff had plausibly alleged facts supporting the existence of an employment relationship when the employer's name was used on internal records, the plaintiff's paychecks, and the plaintiff's termination email. 2019 WL 2024265 at *2. However, a court found there was no plausible employment relationship when the plaintiff only pleaded that he "worked under the supervision" of the alleged employer, attended a meeting called by the alleged employer, and reported harassment to the alleged employer by one of its employees. *Isaacs v. Felder Servs., LLC*, 2014 WL 2806128, at *3 (M.D. Ala. 2014). And another court found there not to be a plausible employment relationship in light of only pleading "[t]here existed an employer-employee relationship between Plaintiff and Defendants" without specific factual support beyond "[m]ere shadowy allegations." *Craighead v. Austal USA, LLC*, 2017 WL 6559917, at *4 n.7 (S.D. Ala. 2017).

Here, the Plaintiff pleads enough facts—barely—to plausibly show that HMMA had enough control of her employment to support an employment relationship. After disregarding conclusory and speculative "upon information and belief" statements,[5] the Plaintiff has pleaded that she worked at a facility owned by HMMA, (doc. 28 at 2*)*, received a safety manual "marked Hyundai Motor Manufacturing, LLC", (*id.* at 8), an HEA employee emailed Dynamic from an HMMA email address stating dreadlocks were not allowed, (*id.* at 13), and HMMA was the customer identified on the Plaintiff's check from Dynamic. (*Id.*). The Plaintiff also alleges that she was told that the Koreans were a

---

[5] The Court is not required to accept as true the Plaintiff's conclusory "upon information and belief" statements without more factual information. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551 (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to take that statement plausible)).

"different breed of animals and they send little memos saying that they do not want African-Americans wearing their hair in dreadlock hairstyles. . .." (*Id.* at 11–12). Although the Plaintiff does not plead that HMMA had the same amount of control to directly supervise or set work hours as in *Kaiser* or *Lenz,* she has alleged that she worked at facility owned by HMMA and, similar to *Caver*, that HMMA's name was used on her paycheck and emails about Key came from an HMMA email address. Although the Plaintiff's complaint contains conclusory statements about the nature of the employment relationship, there are enough factual allegations to distinguish the instant case from the cases where courts concluded that statements could not be considered more than mere allegations. Therefore, at this point, HMMA's motion to dismiss on the basis that it was not the Plaintiff's employer is due to be DENIED.

### 3. *Title VII claims against HMMA and Dynamic*

Because the Plaintiff failed to exhaust the administrative remedies against HEA, the only Title VII claims that remain are against Dynamic and HMMA. The Court first considers whether the Plaintiff has pleaded sufficient facts to proceed on her race discrimination and the pregnancy discrimination claims. The Court will then turn to whether the Plaintiff has alleged sufficient facts to support her claims of retaliation.

#### a. **Race Discrimination**

HMMA argues that the Plaintiff cannot state a claim for race discrimination because enforcing a ban on dreadlocks is not a racially discriminatory practice, and, therefore, does not fall within the ambit of Title VII. (Doc. 30 at 8). HMMA points to the Eleventh Circuit's holding in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Solutions*,

20

852 F.3d 1018 (11th Cir. 2016) that a no-dreadlock grooming policy is not racially discriminatory. (Doc. 30 at 9). The Plaintiff responds that she pleaded a plausible claim under Title VII for both disparate treatment and disparate impact.

I.       Disparate treatment

HMMA argues the Plaintiff cannot plausibly plead a race discrimination claim based on the enforcement of Hyundai's dreadlock ban because dreadlocks are not an immutable characteristic of race but is an "elective, mutable style." (Doc. 30 at 9). The Plaintiff responds that the grooming policy was used to target her because she was African American and distinguishes the instant case from *Catastrophic Mgmt. Solutions, supra*. (Doc. 34 at 9–11). In *Catastrophic Mgmt. Solutions,* the court said there was no disparate treatment claim when a company applied a race neutral grooming policy. 852 F.3d at 1030. But in the instant case, the Plaintiff alleges that discrimination occurred when she was reprimanded for wearing her hair in dreadlocks based on a policy she was not shown and after she was given approval to wear her hair in that manner. (Doc. 28 at 11). In addition, she was told that the policy against dreadlocks was specific to African Americans and that her dismissal was "because of her hair and something else." (*Id.* at 11–12). She argues that these facts distinguish her case from *Catastrophe Mgmt. Solutions,* because they plausibly show that the grooming policy was used as proxy for intentional race discrimination. (Doc. 34 at 11–12).

Because the Supreme Court has explained that to survive a motion to dismiss a plaintiff is not required to plead facts to establish a prima facie case under the *McDonnell*

*Douglas*[6] framework, Key is only required to plausibly set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511–12 (2002) (citing Federal Rule of Civil Procedure 8(a)(2)). "The question in a disparate treatment case is 'whether the protected trait actually motivated the employer's decision.'" *Catastrophe Mgmt. Solutions,* 852 F.3d at 1026 (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)). Therefore, at the motion to dismiss stage, the Court must determine whether the Plaintiff has plausible pleaded sufficient facts that the Defendants discriminated against her because of a *protected trait*.

Although the *Catastrophe Mgmt. Solutions* court found that dreadlocks were not immutable traits, and, therefore, not protected under Title VII, there is some daylight between *Catastrophe Mgmt. Solutions* and this case. In that case, the court found that not hiring an employee because she would not cut her dreadlocks in compliance with the company's grooming policy did not violate Title VII. 852 F.2d at 1021–1022. The court reasoned that "Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices." *Id*. at 1030. However, the Court noted the allegations before it did not suggest that the dreadlock policy was used as a proxy for intentional race discrimination. *Id.*

The allegations in this case are distinguishable from *Catastrophe Mgmt. Solutions* because there are allegations that the enforcement of the dreadlock policy was a proxy for

---

[6] The Court, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), set forth the now familiar test for establishing a prima facie case of discrimination by presenting circumstantial evidence.

race discrimination.[7]  The Plaintiff alleges that the basis of her termination was more than

her just having dreadlocks.  Unlike in *Catastrophe Mgmt. Solutions* where the company

told the plaintiff it would be unable to hire her because she would not cut her dreadlocks,

the Plaintiff here was first told that her hairstyle was fine if worn in a certain manner. When

this was later corrected at the Hyundai plant, she was given the option to cover her hair in

a hat until she could get her hair restyled.  When her supervisors became aware that she

felt that she was being discriminated against because she had to wear a hat to cover her

hair, they confronted her.  In this encounter, the Dynamic employee told Key, "the Koreans

… were a 'different breed of animals and they send little memos saying that they do not

want African-Americans wearing their hair in dreadlock hairstyles.'" (Doc. 28 at 11–12).

This statement suggests that the enforcement of the dreadlock policy, as applied to Key,

was not solely about her hair—but was instead a proxy for her race.  The comment

combined with the back and forth about what the dreadlock policy actually required support

a plausible claim for intentional race discrimination, so the Defendants' motions to dismiss

the race discrimination claim based on disparate treatment are due to be DENIED.

## II.   Disparate impact

HMMA also asserts that the Plaintiff cannot plead around *Catastrophe Mgmt.*

*Solutions* by reframing her claim as a disparate impact claim.  (Doc. 30 at 9–10).  For her

disparate impact claim, the Plaintiff argues that she fulfilled the pleading requirements by

alleging "she wore her hair neat, within policy, and in a manner commonly worn by African

---

[7] It is important to clarify that this Court is not contravening Eleventh Circuit precedent that dreadlocks are
not an immutable characteristic under Title VII.  This Court's holding at this juncture has nothing to do
with the mutable nature of dreadlocks.  Instead, in this case, the Plaintiff has pleaded sufficient facts to
show that the use of grooming policy was a proxy for underlying race discrimination.

Americans" and "the alleged policy used to terminated [sic] Key creates a disparate impact on African Americans." (Doc. 34 at 10).

To establish a disparate impact claim, a plaintiff must first identify the specific employment practice that allegedly has a disproportionate impact," and then "establish causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994). To support her disparate impact claim, the Plaintiff solely pleads, "Defendants (sic) purported policy creates a disparate impact on African Americans." (Doc 28 at 17). Although the Plaintiff identified a specific employment practice that allegedly has a disparate impact, she fails to plead any factual allegations to support the claim that the dreadlocks policy resulted in a disparate impact on African Americans. Because the Plaintiff fails to plead anything beyond conclusory allegations of the disparate impact of the Defendants' dreadlock policy, the Plaintiff fails to state a plausible claim for relief for disparate impact discrimination. Therefore, Defendants' motions to dismiss the race discrimination claim based on disparate impact are due to be GRANTED.

### b. Pregnancy Discrimination

HMMA argues that Plaintiff has not plausibly pleaded enough facts to support a claim of pregnancy discrimination. HMMA asserts that the Plaintiff did not adequately allege that it knew of her pregnancy or that HMMA influenced any other defendants. (Doc. 30 at 13-14). Dynamic does not move for dismissal of the Plaintiff's pregnancy discrimination count on any basis other than the failure to comply with administrative prerequisites prior to filing suit. *See* Doc. 32.

The Plaintiff responds by arguing that she pleaded enough facts that the Defendants discriminated against her because of her pregnancy. (Doc. 34 at 12). She argues that it can be inferred that pregnancy "was a motivating factor in the employment decision by the mere mention of her pregnancy in close proximity to her discipline." (*Id.* at 13). She alleges that her hairstyle only became a problem after she told her supervisors she was pregnant. (Doc. 28 at 14). She also alleges that the Court can infer discriminatory motive from the fact that Robinson called and asked about her baby's due date. (Doc. 34 at 13).

"The PDA amended Title VII to add that discrimination because of sex or on the basis of sex, includes discrimination on the basis of pregnancy, childbirth, or related medical conditions." *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017) (internal quotations omitted); *Valentine v. Legendary Marine FWB, Inc.*, 2010 WL 1687738, at *4 (N.D. Fla. Apr. 26, 2010) ("Discrimination on the basis of sex includes discrimination on the basis of pregnancy or childbirth."). Courts use the same framework for a pregnancy discrimination claim as other claims of discrimination. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). To state a prima facie case for pregnancy-discrimination, the Plaintiff must allege that "(1) she [was pregnant]; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) employment or disciplinary policies were differently applied to her." *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1195 (N.D. Ala. 2019) (brackets in original). However, like her Title VII race discrimination claim, the Plaintiff is not required to plead facts sufficient to establish a prima facie pregnancy discrimination claim, only that she pleads enough facts upon which relief may be plausibly granted.

25

Here, the Plaintiff alleges that her supervisors began to discriminate against her immediately after she notified them of her pregnancy. (Doc. 28 at 10). The Plaintiff further asserts that although the Defendants did not question the manner in which she wore her hair in previous encounters—including that day—Williams, an HEA employee whom the Plaintiff alleges was also employed by HMMA, told the Plaintiff that she could not wear her hair in dreadlocks. The Plaintiff asserts that "minutes" after she was sent home, Robinson called and asked when her baby was due and if her doctor knew she would be lifting boxes. (*Id.*). The Plaintiff has plausibly pleaded enough facts to demonstrate that the very close temporal proximity of her disclosing her pregnancy was linked to the beginning of the Defendants' alleged discriminatory conduct. The extremely close temporal proximity alleged here is enough to survive a motion to dismiss. *See Brungart v. Bellsouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Therefore, HMMA's motion to dismiss Key's pregnancy discrimination claim is due to be DENIED.

### c. Retaliation

HMMA asserts that the Plaintiff failed to allege a plausible claim of retaliation. Dynamic seeks to dismiss the Plaintiff's retaliation claim against it for the reasons asserted by HMMA. (Doc. 32 at 12). In light of Eleventh Circuit precedent in *Catastrophe Mgmt. Solutions*, the Defendants argue that it was unreasonable for the Plaintiff to believe that the enforcement of the dreadlocks ban was discriminatory and therefore her complaining about it was not a protected activity.

In response, the Plaintiff argues that her complaint was about race discrimination and not just about her hairstyle, and that the Defendants knew this. The Plaintiff alleges

she pleaded enough facts to show that Defendants subjected her to discrimination based on her race.  She points to two examples that support an inference that she was targeted based on her race.  She points to the statement that the "Koreans" did not want "African Americans" to wear their hair in dreadlocks, and no supervisor could point to any policy that applied to Plaintiff. (Doc. 34 at 14).  She also alleges that she was summoned to speak with her supervisors after she complained about discrimination.  (*Id.*).  In her complaint, Key alleges that in the meeting with the Defendants' employees, she was told that she and her situation were going to be problematic.  (Doc. 28 at 12).  And she was later told by Dynamic employees that her filing a complaint was a serious offense. (*Id.*).

To establish a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 959 (11th Cir. 1997).  To establish a causal connection, a plaintiff only has to demonstrate "that the protected activity and the adverse action were not wholly unrelated." *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336 (11th Cir. 2021) (citing *Shortz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)). In cases in which plaintiffs attempt to establish causation through temporal proximity, the temporal proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

In this case, the Plaintiff's allegations support a plausible retaliation claim. Although the Defendants are correct that the Plaintiff initially complained to her trainer about how she was treated regarding her hair, which precipitated a meeting with her supervisors, it

was only after this meeting with her supervisors that she was told that the Koreans "do not want African-Americans wearing their hair in dreadlock hairstyles" and that the Plaintiff and her situation were "going to be a problem." (Doc. 28 at 12).  After this meeting, the Plaintiff wrote a formal complaint against Hyundai, Robinson, a Dynamic employee, and Williams, an HEA employee, and stated she wanted to file it with human resources. (*Id*). The Plaintiff has pleaded sufficient facts to show that her complaint, which was shortly followed by her termination, was not just about her hair because she complained after she was told that the dreadlock ban was specific to African Americans.  While at the Dynamic facility to file her complaint, Dynamic employees told her that a complaint "would be fruitless and that filing a discrimination complaint was a serious offense." (*Id*.) While at Dynamic, Key was also told that Williams did not want her back at the Hyundai plant because of her "hair and 'something else.'" (*Id*.)

In addition, the Plaintiff argues that the HEA and HMMA conflate "reasonable belief" with a "correct belief." (Doc. 34 at 15).  She asserts that the correct standard is a "'reasonable form of good faith belief' that the conduct complained of is unlawful" and not that an employee "need to be correct in her beliefs or consult a lawyer for expert analysis for her complaint." (*Id.*).  The Plaintiff does not need to prove the conduct about which she complained "was actually unlawful in order to establish a prima facie case." *Little,* 103 F.3d at 960.  Based on the nature of her complaint which was made after her meeting with staff at the Hyundai plant, and the close temporal proximity of her termination of employment at the Hyundai plant, the Plaintiff has pleaded enough facts to support a

plausible claim of race retaliation upon which relief might be granted, so the Defendants'

motions to dismiss the retaliation claim are due to be DENIED.

### B.  42 U.S.C. § 1981

Although this Court found that the Plaintiff had not exhausted her administrative

remedies against HEA as to  her Title VII claims, section 1981 has no such administrative

prerequisites.

#### a.  Race Discrimination

Although the Defendants do not differentiate their Title VII arguments from their

§1981 arguments in their briefs, the arguments appear to be the same—namely that

hairstyle discrimination is not cognizable under either statute.  In response, the Plaintiff

argues that she has pleaded enough facts to support a disparate treatment claim[8] because

she identifies statements where the Defendants described her hairstyle in the negative

context of race.

Section 1981 provides, "[a]ll persons within the jurisdiction of the United States

shall have the same right in every State and Territory to make and enforce contracts . . . as

is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  The statute's prohibition against

race discrimination in the making and enforcement of contracts includes employment

contracts.  *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).

> To state a claim for race discrimination under § 1981, plaintiffs
> must allege facts establishing: (1) that the plaintiff is a member
> of a racial minority; (2) that the defendant intended to
> discriminate on the basis of race; and (3) that the discrimination

---

[8] The Plaintiff also argues she brought a disparate impact § 1981 race discrimination claim.  However, disparate impact claims are not cognizable under § 1981. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.").

concerned one or more of the activities enumerated in the statute.

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004).

"The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discrimination treatment cases." *Ferrill*, 168 F.3d at 472. In this case, by pleading that she is Black and was discriminated against "on the basis of her race in the terms and conditions of her employment," Key satisfies the first and third requirements for a § 1981 race discrimination claim. However, like her Title VII claim, the Defendants argue that Plaintiff fails to show intentional race discrimination because hairstyle discrimination is not a protected characteristic. And because of this, the Defendants argue that the Plaintiff cannot show that the Defendants discriminated against her by terminating her employment. Nevertheless, the Plaintiff has pleaded enough facts to show that her claim for race discrimination goes beyond a neutral application of the dreadlocks policy to her. The Plaintiff instead argues that the Defendants used the policy to target her because of her race and in support of this, the Plaintiff points to the statement that the Koreans "do not want African-Americans wearing their hair in dreadlock hairstyles." (Doc. 28 at 12). Further, when asked by the Plaintiff, the Defendants could not produce a policy that squarely applied to her. (*Id.* at 9). Because the Plaintiff has pleaded sufficient facts to plausibly show that the Defendants terminated her employment based on

race discrimination, the Defendants' motions to dismiss on that basis are due to be DENIED.[9]

### b. Retaliation

Even though the Defendants do not distinguish their arguments under § 1981 and Title VII for retaliation, the Courts construes them as the same.  Namely, the Defendants argue that the Plaintiff cannot show that she reasonably thought she participated in a protected activity by complaining about how she was treated based on how she wore her hair. The Plaintiff responds that her complaint was not just about hairstyle discrimination but that the Defendants had revealed to her that the policy was based on racial stereotypes.

In addition to prohibiting race discrimination in the formation of employment contracts, § 1981 also prohibits retaliation against workers who engage in statutorily protected activity.  *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008). The same standard applies to retaliation claims under Title VII and § 1981.  Therefore, to prevail on § 1981 retaliation claim, a plaintiff must show that she "engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events." *Moore v. Grady Mem. Hosp. Corp.*, 834 F.3d 1168, 1176 (11th Cir. 2016).  "A complaint about discrimination is protected if the plaintiff could "reasonably form a good faith belief that the alleged discrimination existed." *Jefferson v.*

---

[9] Section 1981 is broad enough to include situations where parties do not "occupy a direct employment relationship" affect the Plaintiff's employment. *See Zaklama, M.D. v. Mt. Sinai Medical Center,* 842 F.2d 291, 294–295 (11th Cir. 1988). Therefore, the Court does not have to determine if an employment relationship existed between HMMA or HEA and the Plaintiff—only whether the Plaintiff has pleaded enough facts that there was sufficient interference by the Defendants of her contractual rights. Because the Plaintiff alleges each of the parties participated in the alleged discriminatory actions and policies that were applied to her, the Plaintiff has met this burden.

*Sewon Am., Inc.*, 891 F.3d 911, 925 (11th Cir. 2018) (quoting *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999). Similar to the pleading stage under Title VII, a plaintiff is only required to plead enough facts to establish a plausible claim of retaliation pursuant to § 1981.

Here the Plaintiff has pleaded enough facts to support a plausible claim of § 1981 retaliation. Although the Defendants argue that the Plaintiff could not have reasonably thought that hairstyle discrimination was protected, the Plaintiff is correct that she could maintain a retaliation claim she acted on a good faith reasonable belief in complaining about conduct prohibited by § 1981. The Plaintiff has pleaded enough facts that she was retaliated against for complaining about race discrimination. The Defendants' argument about hairstyle discrimination is unavailing because the Plaintiff decided to file a formal complaint against her employer *after* she met with her supervisors and they explained to her that the Koreans did not want African Americans to wear their hair in dreadlocks. The Plaintiff also pleaded that she was terminated from her employment at the Hyundai plant on the same day she submitted her complaint about race discrimination. Accordingly, the Plaintiff has alleged sufficient facts to support a claim of § 1981 retaliation, and the Defendants' motions to dismiss the retaliation claim are due to be DENIED.

# VI. CONCLUSION

Accordingly, for the reasons as stated, it is

ORDERED as follows:

1.  Defendant HMMA's motion to dismiss, (doc. 30), is GRANTED with respect to the Plaintiff's disparate impact discrimination claims under Title VII and § 1981. The motion is DENIED in all other respects.

2.  Defendant HEA's motion to dismiss, (doc. 31), is GRANTED with respect to the Plaintiff's Title VII claims contained in Counts 1, 2, and 4 and with respect to the Plaintiff's disparate impact discrimination claims under Title VII and § 1981.  The motion is DENIED with respect the Plaintiff's § 1981 claims contained in Counts 3 and 5; and

3.  Defendant Dynamic's motion to dismiss, (doc. 32), is GRANTED with respect to the Plaintiff's disparate impact discrimination claims under Title VII and § 1981. The motion is DENIED in all other respects.

DONE this 31st day of August, 2021.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

# TAB / DOCKET ENTRY NO. 67

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:19-cv-00767-ECM-SMD** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, HYUNDAI** | ) | |
| **ENGINEERING AMERICA, INC. and** | ) | |
| **DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF IN SUPPORT OF DEFENDANT HMMA'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was employed by Dynamic Security, Inc. ("DSI"), which provided security personnel to Hyundai ENG America, Inc. ("HEA"). HEA provided construction, maintenance, janitorial, and security services to corporate customers, including Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). DSI assigned Plaintiff to its contract with HEA, which was to be performed at HMMA's facility. When Plaintiff refused to modify her hairstyle to meet HEA's standards, an HEA employee requested Plaintiff's assignment be ended, and DSI complied. During her assignment, Plaintiff never interacted with any HMMA employees beyond the individual who photographed her for a badge to access the property. Plaintiff has sued DSI, HEA, and HMMA, alleging the termination of her assignment was discriminatory on account of her race or pregnancy, or retaliatory. HMMA moves this Court to grant it summary judgment on any or all of the following grounds: (i) HMMA was not Plaintiff's employer, (ii) HMMA did not require any policy against dreadlocks be implemented at all and certainly did not require that it be implemented maliciously, (iii) HMMA had no knowledge of Plaintiff's complaint or any

i

protected activity by Plaintiff, and (iv) Plaintiff did not administratively exhaust her Title VII claims against HMMA.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... v

STATEMENT OF UNDISPUTED FACTS ................................................... 1

I.    ABOUT THE PARTIES.......................................................................... 1

    A.    About HMMA .................................................................................. 1

    B.    About Dynamic Security, Inc. (DSI), and its employees........................ 2

    C.    About Hyundai ENG America, Inc. (HEA), its employees, and its relationship to HMMA.................................................................................. 2

    D.    About Plaintiff ................................................................................. 4

II.   About Plaintiff's Employment with DSI ............................................... 5

    A.    Plaintiff's employment relationship with DSI generally. .................... 5

    B.    Specific Events During Plaintiff's Employment with DSI ................... 6

III.  About Various Grooming Policies and Practices..................................... 9

    A.    HMMA had no general prohibition on dreadlocks and had no appearance standard at all which applied to Plaintiff. ............................................... 9

    B.    DSI did not have a general prohibition on dreadlocks........................ 10

    C.    Cassandra Williams revised and maintained appearance policies prohibiting dreadlocks on behalf of HEA applicable to DSI's employees............................. 10

IV.   HMMA maintained certain safety and property security rules and performance expectations that would have applied to Plaintiff's assignment at a very baseline level.  11

    A.    HMMA was not responsible for DSI's mail room worker control, supervision, training (other than safety training), or pay. ...................................... 11

    B.    HMMA maintained certain security and other property-related policies for all contractors and their employees.......................................................... 12

    C.    The contract between HMMA and HEA established certain staffing and scheduling baselines, but these could be negotiated or modified by HEA.......... 12

V.    HMMA had no influence on Plaintiff's assignment or removal by DSI. ........ 13

VI.   Plaintiff did not timely file a Charge against HMMA with the EEOC............ 14

VII.    Miscellaneous ................................................................................................ 15

ANALYSIS......................................................................................................... 15

I.      In the absence of a genuine, evidence-based dispute of material fact, summary judgment
        should be granted. .................................................................................... 15

II.     Following a period of written discovery and party and other depositions, there is no
        evidence to support a finding of a joint employment relationship between Plaintiff and
        HMMA. .................................................................................................. 17

        A.      Joint Employer Standard ................................................................... 17

        B.      The vast majority of factors, and the most important factors, dictate a conclusion
                that HMMA wasn't Plaintiff's employer. ............................................... 19

        C.      That HMMA initially scheduled mail room hours and manpower, provided the
                physical space and equipment for the work and the associated safety training to
                prevent injury in that space, and could indirectly request DSI workers perform
                additional duties does not dictate a different outcome.......................... 21

III.    Not only is there no evidence that HMMA took any employment action with respect to
        Plaintiff, there is a consequential absence of evidence that HMMA was motivated by race
        in any respect. ....................................................................................... 24

IV.     Plaintiff has failed to establish that any employee of HMMA knew of her pregnancy or
        any protected activity on her part................................................................... 25

V.      Additionally, Plaintiff did not exhaust her Title VII claims against HMMA. ................. 26

CONCLUSION.................................................................................................. 28

CERTIFICATE OF SERVICE .............................................................................. 29

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................ 16

*Banks v. St. Francis Health Ctr., Inc.*, 2016 U.S. Dist. LEXIS 161229, \*\*54 (D. Kan.) ............ 22

*Boutin v. Exxon Mobil Corp.*, 730 F.Supp.2d 660, 681 (S.D. Tex. 2010) .................................. 23

*Cannon v. Canteen Servs. of N. Mich* ................................................................ 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ............................................ 16

*Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) ...................... 18

*Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) .......................... 17

*Diaz v. U.S. Century Bank*, 2013 U.S. Dist. LEXIS 68399 (S.D. Fla.) ........................ 22

*E.E.O.C. v. Skanska USA Bldg., Inc.*, 2011 U.S. Dist. LEXIS 172222, \*10 (W.D. Tenn.) .......... 22

*EEOC v. Catastrophe Mgmt.*, 852 F.3d 1018, 1029-30 (11th Cir. 2016), *reh'g en banc denied*, 876 F.3d 1273 (11th Cir. 2017) ................................................................ 25

*Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ...................................... 17

*Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, 683 F.3d 462, 471 (3rd Cir. 2012) ........................................................ 20

*Foy v. Pat Donalson Agency*, 946 F.Supp.2d 1250, 1267, 1268 (N.D. Ala. 2013) ...................... 20

*Freeman v. Wal-Mart Stores East, L.P.*, 2009 U.S. Dist. LEXIS 150133, \*9 (N.D. Ala.) .......... 26

*Gremillion v. Cox Communs. La.*, 2017 U.S. Dist. LEXIS 50941, \*\*15-16 (E.D. La.) .......... 22-23

*Hall v. Arkema, Inc.*, 2020 U.S. Dist. LEXIS 241488, \*\*9-11 (S.D. Tex.) ........................... 20, 23

*Horowitz v. AT&T, Inc.*, 2018 U.S. Dist. LEXIS 69161, \*40 (D.N.J.) ........................................ 23

*Jerome v. Hertz Corp.*, 15 F.Supp.3d 1225, 1237 (M.D. Fla. 2014) ............................................ 20

*Layton v. PERCEPTA, LLC*, 2018 U.S. Dist. LEXIS 108268, \*\*10-11 (M.D. Fla.) .................. 23

*Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242, 1244-45 (11th Cir. 1998) .............. 19, 20

*Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) .......................................................... 21

*Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003)................. 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ........................... 16

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) ......................... 16

*Mohammed v. GHX Glob. Healthcare Exch. Inc.*, 2022 U.S. App. LEXIS 13847,
    \*\*5-6 (11th Cir.) ....................................................................................................................... 25

*Moise v. Miami-Dade Cty.*, 2018 U.S. Dist. LEXIS 143667, \*\*30-31 (S.D. Fla.)...................... 18

*Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004)......................... 22, 24

*Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342, \*12 (N.D. Fla.).................................. 18, 20, 22

*Parks v. Lyash*, 2022 U.S. Dist. LEXIS 165892, n. 3 (E.D. Tenn.)............................................. 23

*Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016) ........................................... 17, 19

*Quintanilla v. A&R Demolition, Inc.*, 2005 U.S. Dist. LEXIS 34033,
    \*\*26-27, 33-35 (S.D. Tex.)......................................................................................................... 22

*Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996).............. 16

*Rodgers v. Horsley*, 39 F.3d 308, 309 (11th Cir. 1994)................................................................. 1

*Roper v. Verizon Communs., Inc.*, 2020 U.S. Dist. LEXIS 227766, n. 18 .................................. 23

*Scott v. Sarasota Doctors Hosp., Inc.*, 673 Fed. Appx. 878, 887 (11th Cir. 2017) ..................... 18

*Shaffer v. Wexford Health Sources, Inc.*, 2018 U.S. Dist. LEXIS 115983, \*12 (W.D. Penn.)..... 22

*Sims v. EQT Corp.*, 2014 U.S. Dist. LEXIS 122894, \*\*13-14 (W.D. Penn.).............................. 22

*Tuck v. Off Shore Inland Marine & Oilfield Co.*, 2013 U.S. Dist.
    LEXIS 1764, \*\*7-8 (S.D. Ala.) ................................................................................................ 27

*U.S. v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) .................................................................. 19

*Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994)................................. 27

*Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)........................ 16

*Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)................................................................. 17

*Williams v. Hoover City Bd. of Educ.*, 2019 U.S. Dist. LEXIS 84076, \*15 (N.D. Ala.).............. 18

*Williamson v. Adventist Health Systems/Sunbelt, Inc.*, 372 Fed. Appx. 936, 939 (11th Cir. 2010)
(acknowledging both NLRB and economic realities test apply), *adopted at* 2020 U.S. Dist.
LEXIS 138445 (N.D. Fla.), *aff'd at* 856 Fed. Appx. 807 (11th Cir. 2021) ............................ 18

**Statutes**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 17

Fed. R. Civ. P. 56 .............................................................................................. 16

Fed. R. Civ. P. 56(a) ................................................................................... 15, 17

Fed. R. Civ. P. 56(c)(1)(A) .............................................................................. 16

Fed. R. Civ. P. 56(c)(1)(B) .............................................................................. 16

**Other Authorities**

11th Cir. Pattern Jury Instr. 4.25 (2020) ......................................................... 18

## STATEMENT OF UNDISPUTED FACTS[1]

### I.   ABOUT THE PARTIES

#### A.   About HMMA

1.      In 2017, HMMA operated an automobile manufacturing facility in Montgomery, Alabama, that produced the Hyundai Sonata, Elantra, and Santa Fe automobiles.  HMMA's facility included a Stamping Shop, a Welding Shop, a Paint Shop, a General Assembly Shop, three Engine Shops, and a two-mile test track. (Burns Dec., Exh. 1, ¶2).

2.      HMMA currently employs approximately 3,000 Team Members.[2] (Burns Dep., Exh. 2, 174:8-11).  HMMA has robust non-discrimination, non-harassment, and non-retaliation policies, and it is committed to not discriminating against employees due to protected statuses, including race and pregnancy, and not retaliating against employees who engaged in protected conduct. (Burns Dep., Exh. 2, 190:19-192:12, 195:10-23, exh. 7).

3.      Some services at HMMA's campus are provided by contractors, including security (which includes mailroom), electrical, plumbing, and construction contractors. (Burns Dep., Exh. 2, 173:4-10, 175:5-10).

4.      Contractors and their employees are not HMMA Team Members. (Burns Dep., Exh. 2, 182:15-21).

5.      HMMA expects its contractors to adhere to federal law, including principles of non-discrimination and non-retaliation with respect to their employees. (Burns Dep., Exh. 2, 87:5-11, exh. 2, §10.1 (HMMA000021)).

---

[1] For purposes of summary judgment, Defendant states facts in the light most favorable to Plaintiff.  *Rodgers v. Horsley*, 39 F.3d 308, 309 (11th Cir. 1994) ("As a result, the 'facts' for purposes of reviewing rulings on summary judgment motions may not, in reality, be the facts.").

[2] HMMA refers to its employees as Team Members.

B.       <u>About Dynamic Security, Inc. (DSI), and its employees.</u>

6.       DSI operates in seven states and has about 1,300 employees. (Riddle Dep., Exh. 3, 13:9-21).

7.       DSI's business is providing security officers at the facilities of other businesses. (*Id.*, 14:1-7).

8.       HMMA has never had direct business dealings with DSI. (Burns Dep., Exh. 2, 155:5-11).

9.       DSI has no contract or proposal with HMMA to provide security services; its contract is with HEA and it invoices HEA. (Riddle Dep., Exh. 3,  193:19-197:14, exh. 2; Spiers Dep., Exh. 4, 75:17-21).

10.      DSI employed Gloria Robinson as its on the ground manager at the HMMA facility servicing the HEA contract. (Riddle Dep., Exh. 3, 78:3-8).

11.      Ms. Robinson is Black. (Robinson Dec., Exh. 5, ¶14).

12.      HMMA never employed Ms. Robinson. (Burns Dep., Exh. 2, 280:21-281:11).

C.       <u>About Hyundai[3] ENG America, Inc. (HEA), its employees, and its relationship to HMMA.</u>

13.      HEA is a contractor used by HMMA to provide various services. (Burns Dep., Exh. 2, 16:10-15).

14.      HEA provides construction, security, janitorial, landscaping, and perhaps other services to multiple customers, including HMMA and Kia. (Williams Dep., Exh. 6, 14:6-15:4).

---

[3] *Hyundai* means *modern* in Korean. (Burns Dep., Exh. 2, 168:6-10). The word Hyundai is used in approximately 77 current and prior business names registered with the Alabama Secretary of State. (Exh. 11, Sec. of State records, word search "Hyundai") (accessed Oct. 7, 2022).

2

15.     HEA was previously known as Hyundai AMCO America, Inc. (Exh. 7, HEA's response to Plaintiff's Requests for Admission, RFA #2 (Doc. 726897); Exh. 8, Sec. of State Records for Hyundai ENG America, Inc., p. 3).

16.     HEA is headquartered in California. (Exh. 9, Sec. of State Records for HEA).

17.     HMMA is headquartered in Montgomery, Alabama. (Exh. 10, Sec. of State Records for Hyundai Motor Manufacturing Alabama, LLC).

18.     There is no common ownership between HMMA and HEA. (Burns Dep., Exh. 2, 16:23-17:5, 154:13-16).

19.     There are no common policies between HMMA and HEA. (Burns Dep., Exh. 2, 154:17-20).

20.     There are no shared bank accounts between HMMA and HEA. (Burns Dep., Exh. 2, 154:21-22).

21.     Since August 2010, HEA has employed Cassandra Williams as a manager in the Facilities Management Department. (Williams Dep., Exh. 6, 40:3-8).

22.     Ms. Williams also manages contracts for security services between HEA and Glovis Alabama and Glovis America. (Williams Dec., Exh. 13, ¶2).

23.     Ms. Williams is Black. (Pltf. Dep., Exh. 12, 37:16-17).

24.     Prior to working for HEA, Ms. Williams worked for two other agencies that provided security services at HMMA, Don Terry Associates and American Citadel Guard Security. (Williams Dep., Exh. 6, 41:5-42:16).

25.     Ms. Williams reports to HEA Project Manager, Ki Sung Kim. (Williams Dep., Exh. 6, 16:21-17:12).

26.     Mr. Kim is supervised by other HEA employees; at times relevant to this action, his direct supervisor was Mr. Kwak. (Williams Dep., Exh. 6, 148:8-23).

27.     HEA provides Ms. Williams with a company cell phone. (Williams Dep., Exh. 6, 25:21-26:5).

28.     HMMA provided a desk phone line to Ms. Williams. (*Id*., 26:6-8).

29.     Hyundai Autoever America, Inc. (HAEA) provides IT services for HMMA and it issued an hmmausa.com email address to Ms. Williams prior to her working for HEA, which she kept after she began working for HEA. (*Id*., 105:17-106:22).

30.     Ms. Williams designed her email signature independently, and it reflected her role as an HEA Manager and assignment to HMMA, with "Manager of Security Services/Hyundai Engineering America, Inc." appearing immediately below her name, and "Hyundai Motor Manufacturing Alabama, LLC" appearing in smaller font beneath that. (*Id*., 108:15-110:18, exh. 41).

31.     HMMA never employed Ms. Williams. (Burns Dep., Exh. 2, 280:5-13; Riddle Dep., Exh. 3, 185:7-21, 186:21-187:1; Spiers Dep., Exh. 4, 76:12-17; Williams Dep. Exh.6, 146:8-10, DX-1).

32.     HEA was DSI's client, not HMMA. DSI invoiced HEA exclusively. (Riddle Dep., Exh. 3, 193:16-194:23).

D.      About Plaintiff

33.     Plaintiff is a Black woman. (Amended Complaint, Doc. 28, ¶2).

34.     Plaintiff chose to style her hair in dreadlocks beginning when she was about 18 years old. (Pltf. Dep., Exh. 12, 243:7-9).

35.     Plaintiff has a Bachelor's Degree in Humanities and Social Sciences from Auburn University and a Master's Degree from Troy University in Social Sciences, both obtained before working at DSI. (*Id.*, 85:11-86:8).

36.     Plaintiff was pregnant at all times relevant to this action. (*Id.*, 115:1-9, 277:21-25).

## II.   About Plaintiff's Employment with DSI

A.   <u>Plaintiff's employment relationship with DSI generally.</u>

37.     Plaintiff initiated an application to obtain a mailroom job with DSI through Indeed, knowing she was applying to work for DSI. (Pltf. Dep., Exh. 12, 19:10-24). She never applied for employment with HMMA. (*Id.*, 23:16-26:7, exh. 2).

38.     Gloria Robinson, a DSI employee, assigned Plaintiff to the mail room. (*Id.*, 40:18-41:6).

39.     DSI provided Plaintiff with information about the pay and benefits that it would provide her. (*Id.*, 21:24-22:7).

40.     Plaintiff's immediate supervisor was Maurice Chambliss, a DSI employee who is Black. (*Id.*, 18:23-24, 31:10-13, 37:14-15).

41.     Plaintiff always reported to Gloria Robinson, another DSI employee. (*Id.*, 31:20-23, 41:4-6).

42.     When Plaintiff wanted Human Resources support, she went to Ray Cureton, a DSI employee, at DSI's offices. (*Id.*, 32:25-33:15).

43.     Plaintiff was paid exclusively by DSI and was not paid by any other entity for her assignment relevant to this Complaint. (*Id.*, 27:12-21, 28:1-4, exh. 3).

44.     When Plaintiff filed for unemployment, she identified DSI as her employer. (*Id.*, 44:10-12).

45.     HMMA did not employ Plaintiff. (Burns Dep., Exh. 2, 279:20-21).

B.      Specific Events During Plaintiff's Employment with DSI

46.     Plaintiff went to work for DSI at HMMA's plant on two days: July 31 and August 1, 2017. (Pltf. Dep., Exh. 12, 17:21-18:1).

47.     As part of the application process, Plaintiff was interviewed by Ms. Robinson and Mr. Chambliss, DSI employees, on July 19. (*Id.*, 18:15-24).

48.     Ms. Williams was consulted at that time, in Plaintiff's presence, about Plaintiff's hair, which was styled in dreadlocks. (*Id.*, 127:1-25). Plaintiff showed Ms. Robinson an up-do hairstyle and they agreed she would wear her hair like that. (*Id.*, 128:19-25).

49.     Plaintiff attended an orientation session at DSI's Montgomery office prior to beginning her assignment at HMMA. (*Id.*, 135:2-20).

50.     When Plaintiff reported to work the first day, she did not wear her hair in that up-do style because she had consulted with DSI's office manager at that orientation, who told her that her hair was not in an issue and in compliance with DSI's grooming policy. (*Id.*, 129:1-11). Plaintiff also believed her hair complied with DSI's handbook. (*Id.*, 129:12-16).

51.     On July 31, Plaintiff told Ms. Robinson and Mr. Chambliss that she was pregnant and showed her a doctor's note that she did not have any restrictions. (*Id.*, 115:18-25, 116:8-12, 117:14-20).

52.     After Plaintiff told them about her pregnancy, Ms. Robinson went to her office, and then Ms. Williams confronted Plaintiff about her hair. (*Id.*, 116:15-117:5, 140:16-141:8, 141:25-143:4).

6

53.     Following this confrontation, LaTunya[4] Howell, a DSI employee who is Black, trained Plaintiff. (*Id*., 23:10-13, 35:24-25, 138:13-139:18, 141:9-12).

54.     After about an hour, Mr. Chambliss picked up Plaintiff to meet with Ms. Robinson. (*Id*., 144:4-145:2).

55.     Plaintiff met with Ms. Robinson and Ms. Williams, who told her hair was not acceptable. Plaintiff asked to see the policy, and Ms. Williams initially refused, then showed her an HEA policy on her computer. (*Id*., 145:3-146:4, exh. 8 (51:6-13)).

56.     Ms. Robinson told Plaintiff to go home for the day, and they agreed she could wear a hat the next day. (*Id*., 118:13-21, 147:20-148:6, 150:5-151:1).

57.     After Plaintiff went home, Ms. Robinson called Plaintiff to find out when her due date was and if her doctor was aware of her job requirements. (*Id*., 119:20-120:2).

58.     On August 1, Plaintiff returned to work and waited for her trainer, Ms. Howell, and Plaintiff told Ms. Howell she thought she was being treated unfairly because of her hair. (*Id*., 151:25-154:6).

59.     After that, also on August 1, Ms. Robinson aggressively asked her if she was going to continue to act this way until—and then pointed to her stomach, asked her if she felt discriminated against, and stated that "this" was going to be a problem, though Plaintiff does not know what Ms. Robinson was referring to, said that Koreans were a different breed of animals that sent memos that they did not want Black employees wearing hair like hers. (*Id*., 119:13-17, 120:13-122:3, 158:21-160:20).

---

[4] Ms. Howell is occasionally referred to as LaTunya, Tonya, LaTonya, and Tunya in various documents and depositions. HMMA believes, based on documents produced by DSI as Ms. Howell's personnel file, that LaTunya is the correct spelling and so uses that.

60.     Plaintiff does not know what Koreans Ms. Robinson was referring to. (Pltf. Dep., Exh. 12, 63:24-65:1, 78:9-79:7).

61.     No evidence of such an alleged memo has been produced, and neither Ms. Robinson, Ms. Williams, nor HMMA is aware of such a memo. (Robinson Dec., Exh. 5, ¶¶11-12; Williams Dec., Exh. 13, ¶5; Burns Dec., Exh. 1, ¶10).

62.     Plaintiff has never seen such a memo. (Pltf. Dep., Exh. 12, 67:8-10).

63.     Ms. Robinson dismissed Plaintiff and Mr. Chambliss took her back to the mail room for more training. (*Id.*, 162:4-12).

64.     Mr. Chambliss later returned to the mailroom and Plaintiff told him she wanted to speak to someone in human resources. (*Id.*, 164:17-23).

65.     Ms. Robinson then told Mr. Chambliss to have Plaintiff speak with Ray Cureton, the Montgomery DSI branch manager, who is white. (*Id.*, 35:22-23, 165:10-20; Riddle Dep., Exh. 3, 78:10-13).

66.     Plaintiff left the job site to go to DSI's office in Montgomery. (Pltf. Dep., Exh. 12, 166:14-17, 167:8-13).

67.     The first thing Mr. Cureton asked Plaintiff was if she was going to sue DSI. (*Id.* 168:11-14). Plaintiff responded she just wanted to talk to someone in HR. (*Id.*, 168:15-18).

68.     Plaintiff told Mr. Cureton everything that had happened on July 31 and August 1. (*Id.*, 168:18-24).

69.     At the end of the meeting, Mr. Cureton asked for her badge, saying that they or Ms. Robinson did not want her there because of her hair "and something else." (*Id.*, 41:24-42:18, 174:11-22, 226:16-227:3). Mr. Cureton may have also relayed Ms. Williams did not want Plaintiff on site. (*Id.*, 125:13-126:6, 227:4-6).

70.     To Plaintiff's knowledge, the only individuals working at HMMA's site who were aware of her pregnancy were Ms. Howell, Ms. Robinson, Mr. Chambliss, and Ms. Williams. She is not aware of any HMMA employee who knew she was pregnant. (*Id.*, 29:8-17, 48:16-23).

71.     DSI states it removed Plaintiff from her assignment to HEA based on the request of Ms. Williams. (Riddle Dep., Exh. 3, 192:3-193:5; Spiers Dep., Exh. 4, 79:8-13).

72.     No one from HMMA requested Ms. Williams ask that Plaintiff be removed. (Williams Dep., Exh. 6, 146:11-13).

**III.   About Various Grooming Policies and Practices**

A.    <u>HMMA had no general prohibition on dreadlocks and had no appearance standard at all which applied to Plaintiff.</u>

73.     HMMA did not maintain any appearance or grooming policies other than a PPE safety matrix, which did not apply to the area where Plaintiff was assigned. (Burns Dep., Exh. 2, 149:19-22, 237:21-23, 238:15-17, 239:17-20).

74.     HMMA's matrix does not prohibit dreadlocks. (Burns Dep., Exh. 2, exh 8;  Pltf. Dep., Exh. 12, 52:11-53:22, exh. 9).

75.     HMMA Team Members and other contractors' employees at HMMA wear their hair in dreadlocked styles. (Williams Dec., Exh. 13, ¶4).

76.     No one has ever been accused by an HMMA employee of or disciplined for violating a (nonexistent) ban on dreadlocks. (Burns Dep., Exh. 2, 242:15-244:15).

77.     No one has been disciplined by or with knowledge of HMMA for wearing their hair a certain way unless the style didn't follow safety rules, such as having long hair not beneath a cap in a production area. (Burns Dep., Exh. 2, 243:7-244:15).

B.    DSI did not have a general prohibition on dreadlocks.

78.    DSI did not have a company-wide appearance standard prohibiting dreadlocks. (Riddle Dep., Exh. 3, 39:18-40:4, 86:11-16).

C.    Cassandra Williams revised and maintained appearance policies prohibiting dreadlocks on behalf of HEA applicable to DSI's employees.

79.    Williams created HEA's (and her prior employers') appearance policies for security personnel in effect at HMMA, including the policy in effect during Plaintiff's assignment. (Williams Dep., Exh. 6, 39:17-22).

80.    In doing this, she relied on an HMMA policy in effect when she began working at Don Terry and Associates Security in 2004. (*Id*., 42:10-43:8).

81.    That 2004-and-before policy did not contain an explicit prohibition against dreadlocks, though Ms. Williams interpreted it as such. (*Id*., 43:13-44:10).

82.    No one from HMMA reviewed Ms. Williams' various edits to the Appearance Standards. (*Id*., 44:11-45:4, 147:11-148:7).

83.    No one ever told Ms. Williams that HMMA had an issue with Black people wearing dreadlocks. (*Id*., 147:2-6).

84.    The City of Montgomery (Ms. Williams' former employer) prohibited dreadlocks on its police force. (*Id*., 146:21-147:1).

85.    Dreadlocks had also been prohibited by the U.S. Army until January 2017, when the prohibition was lifted with respect to dreadlocks of uniform dimension, of no more than ½" in diameter, and presenting a neat appearance. https://www.army.mil/article/181080/turbans_beards_dreadlocks_now_permissible_for_some_s oldiers (accessed Oct. 6, 2022).

**IV.    HMMA maintained certain safety and property security rules and performance expectations that would have applied to Plaintiff's assignment at a very baseline level.**

A.    HMMA was not responsible for DSI's mail room worker control, supervision, training (other than safety training), or pay.

86.    Other than HMMA's safety training and safety handbook, all of Plaintiff's instruction for how to her job and orientation training were provided by DSI. (Pltf. Dep., Exh. 12, 135:2-20, and ¶¶49, 53, 58, 63 above).

87.    Plaintiff received a DSI employee handbook at her orientation. (*Id.*, 135:18-20).

88.    HMMA doesn't investigate the actions of contractor's employees or specify disciplinary responses a contractor ought to impose; such employee management belongs to the employing contractor itself. (Burns Dec., Exh. 1, ¶11; Burns Dep., Exh. 2, 181:15-21, 182:1-22).

89.    HMMA did not set the wage rate for mail room workers who were DSI employees. HMMA's contract with HEA sets an hourly rate of pay from HMMA to HEA intended to include "all costs to Contractor for every aspect of the Services including without limitation, materials, labor, equipment, testing, clean-up…, insurance, fees, taxes, travel, transportation, and import fees or duties." (Burns Dec., Exh. 1, ¶12; Burns Dep., Exh. 2, exh. 2, section 3 and exh. B (HMMA0000016 and 39)).

90.    HMMA did not issue paychecks or provide any benefits (including but not limited to leave, vacation, insurances, worker's compensation) to mail room workers who were DSI employees. (Burns Dec., Exh. 1, ¶14; Pltf. Dep., Exh. 12, 21:24-22:7, 27:10-21, exh. 3).

91.    HMMA didn't pay taxes for DSI workers or receive tax benefits from their employment. (Burns Dec., Exh. 1, ¶15).

92.    HMMA has never maintained any type of employee file or employee report for Ms. Key. (Burns Dec., Exh. 1, ¶16).

93.    HMMA did not supervise, evaluate, or discipline DSI's employees. (Burns Dec., Exh. 1, ¶17).

94.    No HMMA manager provided ongoing hands-on instruction or day-to-day supervision to DSI employees. (Burns Dec., Exh. 1, ¶18).

95.    HMMA didn't impose any sort of non-compete on any DSI employees or try to restrict them from other jobs or opportunities. (Burns Dec., Exh. 1, ¶19).

96.    Plaintiff never received an employee handbook from HMMA. (Pltf. Dep., Exh. 12, 47:10-16, 58:16-18).

B.    HMMA maintained certain security and other property-related policies for all contractors and their employees.

97.    HMMA provides to all contractors and their employees a safety handbook. (Burns Dep., Exh. 2, 172:11-173:3).

98.    Plaintiff received a safety handbook from HMMA at a safety training session it conducted. (Pltf. Dep., Exh. 12, 29:20-25, 47:10-22).

C.    The contract between HMMA and HEA established certain staffing and scheduling baselines, but these could be negotiated or modified by HEA.

99.    HEA performed its work at HMMA under contracts or scope of service agreements. (Williams Dep., Exh. 6, 53:16-54:1, 54:20-55:7).

100.    In 2017, HEA was providing services to HMMA under the terms of a 2013 agreement. (Burns Dep., Exh. 2, 44:12-45:7, 46:6-11, 48:10-18).

101.    HEA agreed to follow HMMA's rules for business invitees pertaining to safety, security, identification, vehicles, and parking; and to comply with employment laws, including Title VII. (Burns Dep., Exh. 2, 86:12-90:19).

102.   HMMA, with HEA's input, established standards for projected manpower in its agreement with HEA. (Williams Dep., Exh. 6, 20:16-21; Burns Dep., Exh. 2, 107:19-113:16).

103.   HMMA establishes the shifts for security personnel. (Williams Dep., Exh. 6, 21:15-22:5; *but see* Burns Dep., Exh. 2, 116:2-16).

104.   HMMA established an initial schedule for mail room personnel (a single shift operation), but Ms. Williams changed it on her own and informed HMMA of the change. (Williams Dep., Exh. 6, 57:10-13, 63:13-64:9, 150:16-151:4).

105.   HMMA also provided basic directions on mail processing and delivery. (Williams Dep., Exh. 6, 57:10-15).

**V.   HMMA had no influence on Plaintiff's assignment or removal by DSI.**

106.   No HMMA employee ever objected to Plaintiff's appearance or hairstyle. (Burns Dep., Exh. 2, 247:1-6).

107.   HMMA does not know who decided to remove Plaintiff from its property, but HMMA was not involved in that decision whatsoever. (Burns Dep., Exh. 2, 245:4-18; Williams Dep., Exh. 6, 146:11-13).

108.   HMMA could not have directly requested DSI remove a DSI employee; it would have gone through Williams (HEA's manager) to do that. (Williams Dep., Exh. 6, 35:14-17).

109.   If HMMA needed additional tasks from mail room workers, it would not assign those directly, but would bring the request to HEA. (Burns Dep., Exh. 2, 285:5-21).

110.   In Plaintiff's opinion, the individuals responsible for discriminating against her were Ms. Robinson, Ms. Williams, and their employers. (Pltf. Dep., Exh. 12, 62:5-17).

111.   Plaintiff is not aware of anyone other than Ms. Robinson (DSI), Ms. Williams (HEA), Mr. Cureton (DSI), Ms. Howell (DSI), Mr. Chambliss (DSI), or Ms. Scavella (DSI's

Office Manager), being involved in the termination of her assignment. (Pltf. Dep., Exh. 12, 75:1-15, exh. 16).

112.    Plaintiff believed they may have been carrying out an HMMA hairstyle policy, but she has no basis to say that any such policy exists; she only saw an HEA policy and Dynamic's policy and she cannot dispute that HMMA's PPE matrix allowed dreadlocks. (Pltf. Dep., Exh. 12, 48:24-53:22, 57:1-3, 76:15-77:11, exhs. 8 and 9).

**VI.    Plaintiff did not timely file a Charge against HMMA with the EEOC.**

113.    Plaintiff completed an intake questionnaire at the EEOC on August 2, 2017, one day after her assignment ended. (Pltf. Dep., Exh. 12, exh. 13).

114.    In the Intake Questionnaire, she twice identified Ms. Williams as "Ms. Cassandra Williams, AMCO." (*Id.*).

115.    She indicated that Ms. Williams and Ms. Robinson and their employers were the only individuals responsible for the conduct she complained of. (*Id.*, 62:2-17).

116.    As a result of that intake process, Plaintiff signed a Charge against DSI only on August 3, 2017. (*Id.*, exh. 14).

117.    Plaintiff filed her Charge against HMMA in October 2018, over 14 months after DSI ended her assignment at HMMA. (*Id.*, 69:11-70:12, exh. 15).

118.    Plaintiff had not specifically asked the EEOC to initiate a charge against HMMA at that time; the investigator just told her there was an additional document she needed to sign. (Pltf. Dep., Exh. 12, 70:16-19, 184:11-25).

119.    Prior to that, HMMA had been unaware of Plaintiff's EEOC Charge against DSI. (Burns Dep., Exh. 2, 248:20-249:11).

## VII.   Miscellaneous

120.   Plaintiff is not aware of any males or white people wearing dreadlocks at HMMA. (Pltf. Dep., Exh. 12, 270:21-271:3).

121.   Following Plaintiff's separation, Ms. Williams and DSI allowed the assignment of two other Black females with dreadlocked hairstyles to HMMA. (Williams Dep., Exh. 6, 46:17-51:15).

122.   Other than saying hello to the person who took her badge picture, Plaintiff never spoke to anyone other than Ms. Robinson, Ms. Howell, Mr. Chambliss, and Ms. Williams at the HMMA plant. (Pltf. Dep., Exh. 12, 39:18-40:4). Since Ms. Howell, Ms. Robinson, and Mr. Chambliss were employed by DSI and Ms. Williams was employed by HEA, this means that Plaintiff never even spoke to any HMMA employee, except the person who took her badge picture.

123.   Plaintiff couldn't even name anyone employed by HMMA. (Pltf. Dep., Exh. 12, 40:31-17).

124.   No documents support any relationship between Ms. Key and HMMA. (Exh. 14, Plaintiff's Second Supplemental Responses to HMMA's Requests for Production, #8).

## ANALYSIS

**I.   In the absence of a genuine, evidence-based dispute of material fact, summary judgment should be granted.**

Under Fed. R. Civ. P. 56(a), a reviewing court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

15

together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56). This responsibility includes identifying those portions of the record illustrating an absence of a genuine dispute of material fact, or, for a movant who does not bear the burden of production of evidence at trial, to show that the nonmovant "cannot produce admissible evidence to support" a requisite material fact. *Id.*; Fed. R. Civ. P. 56(c)(1)(B) and advisory committee notes thereto. A dispute of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must support its assertion as to the existence of a genuine dispute of material fact by citing to the record or showing that the materials cited do not actually establish the absence of a genuine dispute of fact or that there is no admissible evidence that supports the movant's key factual allegations. Fed. R. Civ. P. 56(c)(1)(A) & (B). All evidence should be viewed in the light most favorable to the nonmovant, with all inferences drawn in their favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *Anderson*, 477 U.S. at 255. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture

and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (internal quotation omitted); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

**II.    Following a period of written discovery and party and other depositions, there is no evidence to support a finding of a joint employment relationship[5] between Plaintiff and HMMA.**

HMMA previously moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiff's claims against it due to the lack of a plausible employment relationship between it and Plaintiff. (Docs. 11 and 30). Following Plaintiff's first amended complaint, the Court denied HMMA's second motion, finding that such decisions are generally determined at the summary judgment stage and that, at the pleading stage, "Plaintiff pleads enough facts—barely—to plausibly show that HMMA had enough control of her employment to support an employment relationship." (Doc. 39-1, pp. 18-19). Not only are Plaintiff's claims now subject to Fed. R. Civ. P. 56's burden of propounding admissible evidence, and not just allegations, to support her claims, but the completion of discovery has only eroded Plaintiff's joint employer theory, not strengthened it.

A.    <u>Joint Employer Standard</u>

To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of the plaintiff's employment. Courts examine "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016) (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)). Factors that may be considered include: interrelations of operations;

---

[5] The Court has already found that Plaintiff had not pleaded that HMMA was an integrated employer with HEA. (Doc. 39-1, p. 17, n. 4).

centralized control of labor relations; common management; common ownership or financial control; the nature and degree of control over the worker and who exercises that control; the degree of supervision over the worker's work and who exercises that supervision; who exercises the power to determine the worker's pay rate or method of payment; who has the right to hire, fire, or modify the employment relationship; who prepares payroll and pays wages; who pays taxes; who provides employee benefits; who invests in the equipment and facilities the worker uses; who can profit or loss from the worker's work; the worker's permanence or exclusiveness; the degree of skill the job requires; who owns the property where the worker works; whether the alleged employer can assign the worker other work; who decides when or how long to work; whether the worker's work is integral to the alleged employer's core business; whether the contractor can hire or pay others to do the work; and whether the work to be performed by the contractor is part of its regular business. *Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342, *12 (N.D. Fla.) (quoting *Scott v. Sarasota Doctors Hosp., Inc.*, 673 Fed. Appx. 878, 887 (11th Cir. 2017) (quoting 11th Cir. Pattern Jury Instr. 4.25 (2020))); *Williamson v. Adventist Health Systems/Sunbelt, Inc.*, 372 Fed. Appx. 936, 939 (11th Cir. 2010) (acknowledging both NLRB and economic realities test apply), *adopted at* 2020 U.S. Dist. LEXIS 138445 (N.D. Fla.), *aff'd at* 856 Fed. Appx. 807 (11th Cir. 2021); *see also Moise v. Miami-Dade Cty.*, 2018 U.S. Dist. LEXIS 143667, **30-31 (S.D. Fla.) (applying a hybrid economic realities test to Title VII claims); *Williams v. Hoover City Bd. of Educ.*, 2019 U.S. Dist. LEXIS 84076, *15 (N.D. Ala.) (citing *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) (finding economic realities test was appropriate to apply to Title VII claims)). The joint employment inquiry

focuses on the employment decision at issue. *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242, 1244-45 (11th Cir. 1998).[6]

    B.    <u>The vast majority of factors, and the most important factors, dictate a conclusion that HMMA wasn't Plaintiff's employer.</u>

DSI and HMMA were not interrelated, did not have centralized labor relations, had no common management, and no common ownership or financial control. HMMA supervisors didn't provide day-to-day management of DSI staff (Burns Dec., Exh. 1, ¶¶17-18), and Plaintiff in fact attested that she never even met an HMMA employee other than the person who took her photograph for a badge. (Pltf. Dep., Exh. 12, 39:18-40:4). HMMA couldn't directly request Plaintiff or any DSI employee to perform their job differently or take on additional tasks; any such request had to be mediated at least through HEA and Ms. Williams. (Burns Dep., Exh. 2, 285:5-210). Plaintiff received a general orientation from DSI at its offices and received on-the-job training by Ms. Howell, a DSI employee, at HMMA's plant. (*See*, Facts, ¶¶¶¶49, 53, 58, 63). HMMA didn't determine her rate of pay. (Burns Dec., Exh. 1, ¶12; Burns Dep., Exh. 2, exh. 2, section 3 and exh. B (HMMA0000016 and 39)). HMMA didn't pay Plaintiff or any DSI employee, and it didn't provide Plaintiff or any DSI employee any benefits. (Burns Dec., Exh. 1, ¶14; Pltf. Dep., Exh. 12, 21:24-22:7, 27:10-21, exh. 3). It didn't pay taxes for DSI's employees or receive tax benefits from their employment. (Burns Dec., Exh. 1, ¶15) Because DSI controlled Plaintiff's rate of pay and benefits, it was in the best position to profit—or not—from providing

---

[6] In *Peppers*, *supra.*, the Eleventh Circuit held that in a joint employment inquiry, the focus should be on "which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole." 835 F.3d at 1300. Where two panel decisions are in conflict, the earlier decision controls. *U.S. v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (*en banc*). So, we should indeed look to these factors with particular focus on Plaintiff's assignment. However, because it is undisputed that HMMA had no influence on Plaintiff's termination of assignment by DSI, we also analyze the record of HMMA's purported control over DSI employees assigned to its mail room generally. Whichever viewpoint is used, the outcome is the same: HMMA was not in an employment relationship with Plaintiff.

Plaintiff's labor to HEA, and then HEA had an opportunity for profit or loss based on its negotiations with DSI before billing HMMA. Also, that HEA had the ability to use a staffing agency, DSI, to fulfill its contractual obligation to HMMA also speaks to HMMA's lack of interest in controlling these workers. HMMA had no authority to select DSI's employees. (Burns Dec., Exh. 1, ¶17). Nor could it fire or discipline those employees. HMMA enjoyed no authority to evaluate DSI's employees. (*Id.*).  It didn't impose any sort of non-compete on any DSI employees or try to restrict them from other jobs or opportunities. (Burns Dec., Exh. 1, ¶19). And, DSI was a large company with many other placements that Plaintiff could have qualified for, over which HMMA had not even a scintilla of influence. Finally, in the mail room, Plaintiff was not directly engaged in the line work to build HMMA's primary product, automobiles.

Where a single entity provides all compensation and benefits of employment, and exclusively monitors, evaluates, and disciplines employee performance, then that weighs against finding that any other entity is also the worker's employer. *Parker*, 2020 U.S. Dist. LEXIS 139342 at **17-18 (citing *In re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, 683 F.3d 462, 471 (3rd Cir. 2012) and *Foy v. Pat Donalson Agency*, 946 F.Supp.2d 1250, 1267, 1268 (N.D. Ala. 2013)). This is especially true where the second entity has no authority to hire or fire the first entity's workers. *Id.* at *18 (citing *Jerome v. Hertz Corp.*, 15 F.Supp.3d 1225, 1237 (M.D. Fla. 2014)); *see also Hall v. Arkema, Inc.*, 2020 U.S. Dist. LEXIS 241488, **9-11 (S.D. Tex.). It is even more true when the second entity actually took no action with respect to the contested employment decision. *Llampallas*, 163 F.3d 1236, 1242, 1244-45.

C.     That HMMA initially scheduled mail room hours and manpower, provided the physical space and equipment for the work and the associated safety training to prevent injury in that space, and could indirectly request DSI workers perform additional duties does not dictate a different outcome.

In denying HMMA's motion to dismiss, the Court relied on the following factors in determining that Plaintiff had "barely" cleared Rule 12's lenient pleading standard: HMMA's ownership of the site, HMMA's provision of its safety manual, Ms. Williams' apparent use of HMMA's email system, a multiple-hearsay statement that unidentified Koreans wrote memos that they didn't like certain hairstyles, and the fact that HMMA's name was somewhere on Plaintiff's paycheck. (Doc. 39-1, pp. 19-20). These factors entitled Plaintiff to further discovery on the joint employment issue, but that discovery has turned up no meaningful support that an employment relationship existed between HMMA and Plaintiff. So, following discovery,[7] Plaintiff is left with HMMA's ownership of the physical plant and equipment, reasonable safety rules and orientation to that plant and equipment, initial projections for manpower and scheduling (though Ms. Williams changed these unilaterally without prior approval or pushback by HMMA), Ms. Williams' use of HMMA's email system, and DSI's unilateral decision to write "HMMA" as the customer ID on Plaintiff's paycheck. Presumably Plaintiff will also contend that HMMA could have theoretically requested the removal of a DSI employee, though there's no evidence that's ever actually occurred, and it is undisputed that such a request would have been mediated through HEA as well as DSI. Moreover, it's undisputed that no one from HMMA ever requested Plaintiff's particular removal. This simply isn't enough to establish that HMMA was the joint employer of Plaintiff specifically or DSI's mail room workers generally.

---

[7] The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

First, the customer's provision of a physical workspace is a constant in nearly all disputed joint-employment cases, and is thus a weak and non-determinative factor. *See Shaffer v. Wexford Health Sources, Inc.*, 2018 U.S. Dist. LEXIS 115983, \*12 (W.D. Penn.) ("an entity's control over its own premises does not, by itself, translate into control over *the employees* that happen to work on the premises."). Issuing safety standards for visitors and contractors in the safe operation of that site is another weak factor. *Quintanilla v. A&R Demolition, Inc.*, 2005 U.S. Dist. LEXIS 34033, \*\*26-27, 33-35 (S.D. Tex.) (general contractor's safety oversight of subcontractor did not create joint employment relationship); *Banks v. St. Francis Health Ctr., Inc.*, 2016 U.S. Dist. LEXIS 161229, \*\*54 (D. Kan.) ("Supervision that is limited and focuses on workplace safety issues typically will not be considered the type of supervision indicating joint employers."); *E.E.O.C. v. Skanska USA Bldg., Inc.*, 2011 U.S. Dist. LEXIS 172222, \*10 (W.D. Tenn.) (general contractor may implement policies to ensure the safety of a job site without becoming a joint employer); *Sims v. EQT Corp.*, 2014 U.S. Dist. LEXIS 122894, \*\*13-14 (W.D. Penn.) (maintaining safety standards for job site didn't make property owner a joint employer). HMMA's potential authority to request that DSI employees perform additional duties is not the type of control to render it Plaintiff's employer. Similar exercises or reservations of such rights have not been found adequate to establish a joint employment relationship. *Parker*, 2020 U.S. Dist. LEXIS 139342, \*17 (citing *Diaz v. U.S. Century Bank*, 2013 U.S. Dist. LEXIS 68399 (S.D. Fla.) ("infrequent assertions of minimal oversight do not constitute the requisite degree of supervision") (quoting *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003))). Nor could HMMA's theoretical ability to pressure HEA or DSI into discontinuing Plaintiff's assignment render it her employer. *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004); *Gremillion v. Cox Communs. La.*, 2017 U.S. Dist. LEXIS 50941,

**15-16 (E.D. La.) (the customer's ability to deauthorize a contractor's employees from working on the customer's project was not tantamount to the authority to terminate, even where the contractor had no other customers in the state); *Parks v. Lyash*, 2022 U.S. Dist. LEXIS 165892, n. 3 (E.D. Tenn.). Ms. Williams' HMMA email address was a matter of convenience, and not an exercise of control. *See Layton v. PERCEPTA, LLC*, 2018 U.S. Dist. LEXIS 108268, **10-11 (M.D. Fla.) (finding use of Ford's domain name and logo on worker's email account, among other factors, wasn't adequate to render Ford the worker's joint employer at the motion to dismiss stage), *adopted and confirmed*, 2018 U.S. Dist. LEXIS 107126; *Roper v. Verizon Communs., Inc.*, 2020 U.S. Dist. LEXIS 227766, n. 18 ("'Courts have found that common marketing image, common branding, common email domain, and joint use of trademark logs, fail to render entities' joint employers 'if they maintain completely separate day-to-day activities.'") (quoting *Horowitz v. AT&T, Inc.*, 2018 U.S. Dist. LEXIS 69161, *40 (D.N.J.)). Finally, DSI could have written "Disney World" on Plaintiff's paychecks, and it wouldn't have changed the fact that DSI issued those paychecks, nor would it have made Disney World Plaintiff's employer. DSI's unilateral categorizations can't create a genuine issue of material fact as to what HMMA actually did, or didn't, do. *See Hall*, *supra.*, at **12-13 (where there was no evidence that alleged joint employer actually controlled pay or benefits, that undermined the contention that a joint employment relationship existed) (citing *Boutin v. Exxon Mobil Corp.*, 730 F.Supp.2d 660, 681 (S.D. Tex. 2010) (where alleged joint employer's supervisor reviewed and approved time sheets, this was not evidence of joint employment because direct employer actually kept records and maintained sole responsibility for paying the worker)); (*See also* Pltf. Dep., Exh. 12, 79:17-23) (Plaintiff doesn't know the significance of "HMMA" being listed as Customer ID on her DSI paycheck).

Further, as the Eleventh Circuit held in *Morrison*, that HMMA secured the provision of certain conditions (such as uniforms, or laborers to work a particular schedule) by contract with a service provider does <u>not</u> establish that the service provider's employees are the employees of HMMA. 383 F.3d 1253, 1256 ("Consequently, there is no evidence that [customer] had direct control over [plaintiff], rather than the indirect control over a service provider's employees that a customer may obtain by contracting with that service provider. Such indirect control does not amount to an employment relationship because the customer is in privity of contract with the service provider…and not the service provider's employees."). And, in this case, HMMA (the customer) had any alleged control further diluted by the additional arms-length contractual relationship between HEA and DSI, with whom HMMA had <u>no</u> contract or particular authority whatsoever.

**III.    Not only is there no evidence that HMMA took any employment action with respect to Plaintiff, there is a consequential absence of evidence that HMMA was motivated by race in any respect.**

Because no HMMA employee played any role in Plaintiff's assignment by DSI to fulfill its contract with HEA to provide security and mailroom services at HMMA, it is difficult to envision how, exactly, Plaintiff even states a prima facie case. There's no evidence of any HMMA decision or request to remove Plaintiff, and therefore there's no HMMA decisionmaker who could harbor any animus against Plaintiff on any basis.

Since no HMMA employee made any particular decision or request with respect to Plaintiff, it seems her only conceivable route forward is to argue that HMMA (i) required the no-dreadlocks policy maintained by HEA and authored by Ms. Williams, and (ii) that HMMA intended this policy to be enforced on a discriminatory basis. There is no evidence that either proposition is true.

24

First, HMMA allows its employees to wear dreadlocks. It doesn't give its contractors instructions to allow or disallow dreadlocks, allowing them to set appropriate appearance standards. Ms. Williams unequivocally stated that she authored the Appearance Policy and has maintained it. HMMA hasn't reviewed or revised it. A ban against dreadlocks is legally appropriate as long as it's enforced fairly. *EEOC v. Catastrophe Mgmt.*, 852 F.3d 1018, 1029-30 (11th Cir. 2016), *reh'g en banc denied*, 876 F.3d 1273 (11th Cir. 2017).

To that end, no one has identified any instance of this policy being enforced in a discriminatory manner.[8] Two people, both Black females like Plaintiff, have been identified as being permitted by DSI to wear dreadlocks. That doesn't lend any support to Plaintiff's race discrimination claim at all. Thus, Plaintiff's race discrimination claims against HMMA must be dismissed.

**IV.    Plaintiff has failed to establish that any employee of HMMA knew of her pregnancy or any protected activity on her part.**

Plaintiff's retaliation claims should fail generally because there is no evidence that HMMA took or requested any adverse action against Plaintiff. Further, it is well established that a defendant's decisionmaker must have *actual knowledge* of protected conduct for a retaliation claim to stand. *Mohammed v. GHX Glob. Healthcare Exch. Inc.*, 2022 U.S. App. LEXIS 13847, **5-6 (11th Cir.). Plaintiff made no complaint to HMMA, and no HMMA employee was aware of Plaintiff's internal complaints to DSI or her questions to Ms. Williams about HEA's Appearance Policy at the time DSI discontinued her assignment. It would be absurd to allow Plaintiff's retaliation claim to proceed against an entity that didn't receive any complaint, know of any complaint, or take any action after a complaint.

---

[8] Again, the hearsay about "Koreans" and "little memos" has not been shown to be credible or admissible.

25

Similarly, a pregnancy claim cannot survive where a defendant is unaware of the pregnancy, and Plaintiff has identified no employee of HMMA whom she told or whom she contends is otherwise aware of her pregnancy. *Freeman v. Wal-Mart Stores East, L.P.*, 2009 U.S. Dist. LEXIS 150133, *9 (N.D. Ala.).

## V.      Additionally, Plaintiff did not exhaust her Title VII claims against HMMA.

On August 2, 2017, Plaintiff went to the EEOC. She completed an intake questionnaire, where she identified Ms. Robinson and "Ms. Cassandra Williams, AMCO," as responsible for all discriminatory events she experienced. (Pltf. Dep., Exh. 12, exh. 13 at Key00050). On August 3, 2017, Plaintiff signed a Charge, listing as the Respondent "Dynamic Security Incorporated." (*Id.*, exh. 14). There is a place for additional respondents to be added, but this is not filled out. The Charge states that Plaintiff was assigned to the "Hyundai Plant," but it does not identify any actions taken by HMMA other than providing safety training. (*Id.*). It names Ms. Robinson, Ms. Williams, Ms. Howell, Mr. Chambliss, Mr. Cureton, and Ms. Scavella, but not any HMMA employees.[9] (*Id.*). Plaintiff never filed a Charge against HEA. (*Id.*, 61:22-62:1). On October 16, 2018, Plaintiff signed a Charge against HMMA because her newly-assigned investigator, Alicia Martin-Schutz, told her there were documents she needed to sign. (*Id.*, 70:6-71:17, 184:11-18, exh. 15). Prior to this, HMMA had no knowledge of Plaintiff's Charge against DSI. (Burns Dep., Exh. 2, 248:20-249:11).

---

[9] The Charge didn't identify the employers of these individuals, though the intake questionnaire had done so. Importantly, at the time the DSI Charge was perfected and up through October 2018, fourteen months after DSI ended her assignment, there was no allegation of wrongdoing by any HMMA employee, no allegation that any HMMA policy was to blame in Plaintiff's assignment ending, and no allegation of joint employment between HMMA and DSI and/or HEA.

While courts are hesitant to penalize a plaintiff for the EEOC's alleged mis-handling[10] of a claim, when a party goes unnamed, a Court is to consider if the charge can be said to have encompassed the unnamed party and put it on notice by considering the following:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994).

Similarity of interest is determined by looking at commonality of ownership, operations, control or finances, and there is none between HMMA and DSI. *See Tuck v. Off Shore Inland Marine & Oilfield Co.*, 2013 U.S. Dist. LEXIS 1764, **7-8 (S.D. Ala.) (finding that even a contractual relationship on the same project—which was not present as between HMMA and DSI—was insufficient to establish similarity of interest). As to the second factor, it is obvious that Plaintiff, who had already attained a Master's Degree at this time, could easily identify HMMA, and notice its absence on the Charge she signed. As to the third factor, HMMA contends its notice was inadequate, as having occurred over a year after the events complained of. As to the fourth factor, HMMA concedes that after Ms. Martin-Schutz railroaded the late Charge and cause finding against it through its processes, it received the minimum conciliation maneuvering that *Mach Mining* requires of the EEOC. As to the fifth element, HMMA was prejudiced by the lost opportunity to timely investigate Plaintiff's claims.

---

[10] Though it's not at all clear that the initial investigator's decision not to name HMMA as a Respondent was an error.

Additionally, in the absence of evidence of an employment relationship between HMMA and Plaintiff, an adverse action taken by HMMA, or an effective administrative exhaustion of Plaintiff's claims against HMMA, Plaintiff's claims should be dismissed not only because her only timely Charge named only DSI as a Respondent, but also because she failed to timely contend to the EEOC that HMMA had done anything wrong. *See Cannon v. Canteen Servs. of N. Mich*, 657 Fed. Appx. 438, 441 (6th Cir. 2016) (hostile work environment claim was not exhausted against alleged joint employer where plaintiff hadn't alleged to the EEOC that that employer had caused a hostile environment).

## <u>CONCLUSION</u>

At the summary judgment stage, a party must have admissible evidence to support its claims. In this case, there is absolutely no evidence that HMMA had any control of the fundamental aspects of the employment relationship generally or the specific events giving rise to Plaintiff's claim. HMMA provided no compensation to Plaintiff, no benefits, and no job-specific training. It maintained no record of her as an employee. It didn't dictate, draft, or even review the appearance policy that resulted in Plaintiff's end of assignment. It didn't employ any of the decisionmakers in that separation of assignment. Rather than exercising control or supervision over Plaintiff, the simple truth is that HMMA didn't know when she was there and it didn't know when (or why) she was gone, until 14 months later when it received an untimely EEOC Charge. Accordingly, HMMA respectfully requests that it be dismissed from this action, with prejudice.

Respectfully Submitted,


s/ Whitney R. Brown
David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B


OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
        wbrown@lehrmiddlebrooks.com


## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Heather Newsom Leonard, Esq.
Heather Leonard, P.C.
2105 Devereux Circle, Suite 1111
Birmingham, AL 35243

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

Wesley C. Redmond, Esq.
Susan W. Bullock, Esq.
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL 35203

T. Matthew Miller, Esq.
Cortlin Bond, Esq.
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

Kurt S. Fischer, Esq.
U.S. Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL  35205


s/ Whitney R. Brown
OF COUNSEL

746399.docx

# TAB / DOCKET ENTRY NO. 68-1

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| DAVITA M. KEY,               ) | |
|             ) | |
|      **Plaintiff,**       ) | |
|             ) | **CIVIL ACTION NUMBER:** |
| **v.**                  ) | **2:19-cv-00767-ECM-SMD** |
|             ) | |
| **HYUNDAI MOTOR MANUFACTURING** ) | |
| **ALABAMA, LLC, HYUNDAI**     ) | |
| **ENGINEERING AMERICA, INC. and** ) | |
| **DYNAMIC SECURITY, INC.**      ) | |
|             ) | |
|      **Defendants.**     ) | |

## <u>DECLARATION OF ROBERT BURNS PURSUANT TO 28 U.S.C. § 1746</u>

My name is Robert Burns. I am a resident of the State of Alabama, over twenty-one (21) years of age, and give this Declaration of my own free will. I have personal knowledge of the information contained in this Declaration.

1.     From December 2016-October 2018, I was the Director of Team Relations, Public Relations, General Affairs, and Human Resources for Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). In October 2019, I was promoted to Vice President of Human Resources and Administration for HMMA.

2.     In 2017 HMMA operated an automobile manufacturing facility in Montgomery, Alabama, that produced the Hyundai Sonata, Elantra, and Santa Fe automobiles. HMMA's facility included a Stamping Shop, a Welding Shop, a Paint Shop, a General Assembly Shop, three Engine Shops, and a two-mile test track.

3.     In my role, I had access to HMMA's employment records, its employment policies, and certain contracts with service providers for services which fall under "administration," including security, mail room, janitorial, cafeteria and medical services.

4.     The review and management of HMMA's defense of EEOC Charges is also within the scope of my position.

5.     In July and August 2017, HMMA had a contractual relationship with Hyundai ENG America, Inc. ("HEA") where HEA agreed to provide certain security and other services.

6.     HEA is not an affiliate, subsidiary, or parent of HMMA. Nor is HMMA an affiliate, subsidiary, or parent of HEA. HMMA does not share policies, executives, or resources with HEA. HMMA does provide an office and meeting room for use by HEA and certain equipment necessary to meet their obligations to HMMA. Also, HMMA does require all persons on the premises to comply with safety and security rules as well as its substance abuse and weapons policies.

7.     HMMA employs no personnel jointly with HEA.

8.     HMMA does not prohibit its Team Members (which is what it calls its employees) from wearing dreadlocks.

9.     In 2017, which is when Davit Key was employed by Dynamic Security, Inc., HMMA did not dictate what hairstyle standards HEA could allow or not allow of its various personnel, except that hair had to comply with safety standards in our PPE Matrix.

10.     I have never seen or heard about any memo by HMMA management that expresses a dislike for African-Americans wearing certain hairstyles or dreadlocked hairstyles.

11.     With respect to our service-providing contractors like HEA, HMMA doesn't investigate the actions of contractor's employees or specify disciplinary responses of a contractor; such management responsibilities belong to the contractor as the employer. HMMA reserves the right to have any person excluded from its premises.

2

12.     HMMA did not set the wage that mail room workers would receive under its contract with HEA. The contract set an hourly rate that HMMA would pay to include all of HEA's expenses and profit in providing the personnel.

13.     HMMA also did not prohibit HEA from using a third party, like Dynamic Security, Inc. ("DSI"), to actually meet the labor needs of the contractual arrangement between HMMA and HEA.

14.     HMMA did not issue paychecks or provide any benefits (including but not limited to leave, vacation, insurances, worker's compensation) to mail room workers who were DSI employees.

15.     HMMA didn't pay taxes for DSI workers or receive tax benefits from their employment.

16.     HMMA has never maintained any type of employee file or employee report for DSI employees, including Ms. Key.

17.     HMMA did not supervise, evaluate, or discipline DSI's employees.

18.     No HMMA manager provided ongoing hands-on instruction or day-to-day supervision to DSI employees.

19.     HMMA didn't impose any sort of non-compete on any DSI employees or try to restrict them from other jobs or opportunities.

20.     HMMA has never employed Davita Key.

21.     HMMA has also never employed Cassandra Williams, Gloria Robinson, Maurice Chambliss, or Tonya Howell.

22.     In investigating Ms. Key's EEOC Charge which is the basis of this suit, HMMA determined that Ms. Williams was employed by HEA; and Ms. Key, Ms. Robinson, Mr. Chambliss, and Ms. Howard were all employed by Dynamic Security, Inc.

23.     Dynamic Security, Inc., provides certain services to HEA.

24.     HMMA has never had a contractual relationship with Dynamic Security, Inc.

25.     HMMA employs no personnel jointly with Dynamic Security, Inc.

26.     HMMA did not instruct HEA to use Dynamic Security, Inc., for any services.

27.     Dynamic Security, Inc. is not an affiliate, subsidiary, or parent of HMMA. Nor is HMMA an affiliate, subsidiary, or parent of Dynamic Security, Inc. HMMA does not share policies, executives, or resources with Dynamic Security, Inc.

*I declare under penalty of perjury that the foregoing is true and correct.*

*Executed on* Oct. 7, 2022

Robert Burns
Robert Burns

746709.docx

4

# TAB / DOCKET ENTRY NO. 68-2

# Exhibit 2

# Deposition of Robert Burns

June 22, 2022

Key v. Hyundai Motor Manfacturing
Alabama LLC., et al.

2:19-CV-767-ECM-SMD



866.993.0207
info@citedepos.com
www.citedepos.com

Robert Burns

Case 2:19-cv-00767-ECM-SMD    Document 68-2    Filed 10/12/22    Page 3 of 227
USCA11 Case: 24-11126    Document: 58-1    Date Filed: 02/14/2025    Page: 201 of 425

6/22/2022
1 (1 - 4)

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3         NORTHERN DIVISION

4         CASE NUMBER

5       2:19-CV-767-ECM-SMD

6

7  DAVITA M. KEY,

8     Plaintiff,

9  V.

10 HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC;

11 HYUNDAI ENGINEERING AMERICA, INC.; and DYNAMIC

12 SECURITY, INC.,

13     Defendants.

14

15

16      DEPOSITION TRANSCRIPT OF

17      ROBERT ANTHONY BURNS

18

19

20         JUNE 22, 2022

21         9:33 A.M.

22

23

**Page 2**

1      The deposition of ROBERT ANTHONY

2  BURNS was taken before Tanya D. Cornelius, CCR,

3  on June 22, 2022 by Heather Leonard, commencing

4  at approximately 9:33 a.m., at RSA Dexter, 445

5  Dexter Avenue, Suite 405, Montgomery, Alabama

6  pursuant to the stipulations set forth herein.

7

8      S T I P U L A T I O N

9      IT IS STIPULATED AND AGREED by and

10 between the parties through their respective

11 counsel that the deposition of ROBERT ANTHONY

12 BURNS may be taken before Tanya D. Cornelius,

13 CCR and Notary Public, State of Alabama at

14 Large, at RSA Dexter, 445 Dexter Avenue, Suite

15 405, Montgomery, Alabama, on June 22, 2022,

16 commencing at approximately 9:33 a.m.

17      IT IS FURTHER STIPULATED AND AGREED

18 that the signature to and the reading of the

19 by the witness is not waived, the deposition to

20 have the same force and effect as if full

21 compliance had been had with all laws and rules

22 of Court relating to the taking of depositions.

23      IT IS FURTHER STIPULATED AND AGREED

**Page 3**

1  that it shall not be necessary for any

2  objections to be made by counsel to any

3  questions, except as to form or leading

4  questions and that counsel for the parties may

5  make objections and assign grounds at the time

6  of trial or at the time said deposition is

7  offered in evidence, or prior thereto.

8      IT IS FURTHER STIPULATED AND AGREED

9  that notice of filing of the deposition by the

10 Commissioner is waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1      A P P E A R A N C E S

2

3

4  APPEARING ON BEHALF OF THE PLAINTIFF:

5     HEATHER LEONARD, P.C.

6     BY:  Heather Leonard, Esq.

7     2105 Devereux Circle, Suite 111

8     Birmingham, Alabama  35243

9

10    PALMER LAW, LLC

11    BY:  Leslie A. Palmer, Esq.

12    104 23rd Street South, Suite 100

13    Birmingham, Alabama  35233

14

15

16 APPEARING ON BEHALF OF THE DEFENDANTS:

17    LEHR MIDDLEBROOKS VREELAND

18       & THOMPSON, P.C.

19    BY:  David J. Middlebrooks, Esq.

20    P.O. Box 11945

21    Birmingham, Alabama  35202

22

23

Robert Burns

Case 2:19-cv-00767-ECM-SMD    Document 68-2    Filed 10/12/22    Page 4 of 227
USCA11 Case: 24-11126    Document: 58-1    Date Filed: 02/14/2025    Page: 202 of 425

6/22/2022
2 (5 - 8)

Page 5

```
 1          APPEARANCES (Continued)

 2

 3   FORD HARRISON

 4      BY:  Wesley C. Redmond, Esq.

 5      2105 Devereux Circle, Suite 111

 6      Birmingham, Alabama  35243

 7      (Via Zoom)

 8

 9   BRADLEY ARANT BOULT CUMMINGS LLP

10      BY:  T. Matthew Miller, Esq.

11      1819 5th Avenue North

12      Birmingham, Alabama  35203

13

14

15   ALSO PRESENT:  Chris Whitehead, General Counsel,

16          Hyundai Motor Manufacturing

17          Alabama, LLC

18

19

20

21

22

23
```

Page 6

```
 1            I N D E X

 2

 3       EXAMINATION INDEX

 4   ROBERT ANTHONY BURNS

 5      BY MS. LEONARD          9

 6

 7

 8      * * * * * * * * * * * * * *

 9

10       EXHIBIT INDEX

11   Plaintiff's Exhibit

12   1  Notice of Deposition        24

13   2  Contract            40

14   3  Responses to Interrogatories    144

15   4  Diagram           155

16   5  Handbook           164

17   6  EEOC Charges & Lawsuits     216

18   7  Pages from Handbook      176

19   8  Dress Code Matrix       228

20   9  Appearance Standards     231

21  10  E-mail          232

22  11  Response to EEOC        234

23  12  Documents         248
```

Page 7

```
 1        EXHIBITS (Continuing)

 2

 3   13  EEOC Charge          252

 4   14  Position Statement       260

 5   15  Letter           261

 6   16  Letter           263

 7   17  Determination         265

 8   18  CV             14

 9   19  Job Description         26

10   20  Mailroom Duties        283

11   21  E-mail          287

12   22  E-mail          294

13   23  E-mail          299

14   24  Invoices          301

15   25  Invoices          301

16

17

18

19

20

21

22

23
```

Page 8

```
 1      I, Tanya D. Cornelius, a Certified

 2   Court Reporter, and a Notary Public for the

 3   State of Alabama at Large, acting as

 4   Commissioner, certify that on this date,

 5   pursuant to the Federal Rules of Civil

 6   Procedure, and the foregoing stipulation of

 7   counsel, there came before me at RSA Dexter, 445

 8   Dexter Avenue, Suite 405, Montgomery, Alabama,

 9   commencing at approximately 9:33 a.m. on June

10   22, 2022, ROBERT ANTHONY BURNS, witness in the

11   above cause, for oral examination, whereupon the

12   following proceedings were had:

13

14

15        ROBERT ANTHONY BURNS,

16      being first duly sworn, was examined

17      and testified as follows:

18

19      THE REPORTER:  Will this be usual

20   stipulations?

21      MR. MIDDLEBROOKS:  We would like to

22   read and sign, however.

23      MS. LEONARD:  Yes.
```

Robert Burns
6/22/2022

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 5 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 203 of 425

3 (9 - 12)

Page 9

1      EXAMINATION
2 BY MS. LEONARD:
3      Q.   Mr. Burns, my name is Heather
4 Leonard.  I'm going to speak a little bit loudly
5 because I'm wearing a mask.  Don't take from that
6 I'm angry or yelling at you.  I just want to make
7 sure I can be heard.
8           Will you please state your full name
9 for the record?
10     A.   Full name, Robert Anthony Burns.
11     Q.   Who is your employer?
12     A.   Hyundai Motor Manufacturing Alabama.
13     Q.   And I notice on your shirt there's
14 something that has the logo Hyundai, and it says
15 Hyundai.  To whom does that refer?
16     A.   That refers to, again, Hyundai Motor
17 Manufacturing Alabama.
18     Q.   What does HMMA do?
19     A.   HMMA is an automotive assembly plant
20 that produces vehicles for the North American
21 market.
22     Q.   Where is it located?
23     A.   In Montgomery, Alabama at 700 Hyundai

Page 10

1 Boulevard.
2      Q.   Does it have any other addresses in
3 Montgomery, Alabama?
4      A.   It does not.
5      Q.   What is the size of the Hyundai
6 facility in Montgomery -- I'm sorry.  There are a
7 lot of Hyundais, so I'm going to try and use
8 reference to Hyundai Motor Manufacturing America
9 as HMMA.  Can we agree to that?
10     A.   Well, Hyundai Motor Manufacturing
11 Alabama.
12     Q.   Alabama.  And it would be HMMA?
13     A.   That is correct.
14     Q.   What is the size of the HMMA campus
15 or facility?
16     A.   Okay.  So the campus represents
17 seventeen hundred acres of land.  About
18 thirty-two million square feet of under roof,
19 yeah.
20     Q.   What have been your dates of
21 employment with HMMA?
22     A.   From April 2007 to present.
23     Q.   What is your current job title?

Page 11

1      A.   I am chief administrative officer and
2 vice-president of HR and administration.
3      Q.   How long have you been in those
4 roles?
5      A.   In the chief administrative officer
6 role since July 2021.
7      Q.   How long have you been the
8 vice-president of HR administration?
9      A.   Since October of 2018.
10     Q.   Who was your predecessor as the VP of
11 HR administration?
12     A.   That would be Rick Neal.  He was the
13 senior vice-president, but anyway, still over
14 administration.
15     Q.   Can you spell his last name?
16     A.   N-e-a-l.
17     Q.   And what is his title?
18     A.   Again, senior vice-president HR
19 administration.
20     Q.   Do you know what his dates were in
21 that role?
22     A.   Not exactly.  I apologize.  Just
23 through October of 2018.  I do not know the exact

Page 12

1 dates.
2      Q.   Would he have been the senior
3 vice-president of HR administration in July and
4 August 2017?
5      A.   Yes.
6      Q.   Why is he no longer in that role?
7      A.   He retired.
8      Q.   Do you know how long he held the role
9 of senior vice-president HR administration?
10     A.   I do not know off the top of my head.
11 I do not.
12     Q.   What do you do as chief
13 administrative officer?
14     A.   I'm responsible for all the
15 administration functions at Hyundai Motor
16 Manufacturing Alabama, which includes HR, general
17 affairs, which is facilities management,
18 cafeteria, restaurant -- I'm sorry -- restrooms,
19 team relations, public relations, and then also
20 environment, health and safety.
21     Q.   What is team relations?
22     A.   That is a function that serves as a
23 liaison for the company to address any issues

Page 13

1  that may come up with the team members' concern
2  about policies or procedures.
3      Q.   What do you do as vice-president
4  human resources administration?
5      A.   Again, primarily, I oversee those
6  functions I just mentioned and manage that team,
7  which has a variety of heads of departments that
8  are responsible for those functions.  So lead the
9  strategies and manage the processes.
10     Q.   All right.  Before you held these
11 roles of chief administrative officer and
12 vice-president humans resources administration
13 with HMMA, what did you do?
14     A.   I'll get my cheat sheet out.
15     Q.   It may make it easier.  One of the
16 documents we requested that you bring to the
17 deposition was a resume.  Do you have a resume or
18 a CV?
19     A.   Not a formal resume, just kind of a
20 chronological order of the positions I've had
21 with Hyundai and then also prior to Hyundai.
22     Q.   I'm going to make this -- I've
23 pre-numbered some exhibits to your deposition, so

Page 14

1  this is going to be a little out of order, but
2  I'm going to mark this as Plaintiff's Exhibit 18.
3         (Whereupon, Plaintiff's Exhibit 18
4  was marked for identification and a copy of same
5  is attached hereto.)
6         MR. MIDDLEBROOKS:  18?
7         MS. LEONARD:  18.
8         MR. MIDDLEBROOKS:  You're just about
9  through with your deposition.
10     Q.   (BY MS. LEONARD:)  And is this a
11 document that you prepared?
12     A.   It is a document I prepared myself,
13 yes.
14     Q.   And is the information on it true
15 and accurate representation of the positions that
16 you have held with HMMA?
17     A.   Yes, it is.
18     Q.   Have you worked for anyone else from
19 2007 to the present other than HMMA?
20     A.   I have not worked for any other
21 employer except for HMMA.
22     Q.   To whom do you report in your current
23 roles?

Page 15

1      A.   My current role, I report to the
2  president of HMMA, Ernie Kim.
3      Q.   How long has Ernie Kim been the
4  president of HMMA?
5      A.   January 2021, I believe.
6      Q.   Who was the president of HMMA in July
7  and August of 2017?
8      A.   We have -- they rotate often, so I --
9  oh, that's going to be a great question.  It may
10 have been a Mr. Jin, and I do emphasize may have
11 been, because they all kind of run together.
12 Jin, J-i-n.  I think that's right.  If not, it
13 may have been a Dave Kim, but that's that gray
14 area.
15     Q.   And you said that the president role
16 rotates often.  Walk me through what you meant by
17 that.
18     A.   They could be assigned to HMMA from
19 one to three or four years.  It really varies.
20     Q.   And when you say they may have been
21 assigned to HMMA, who would assign them to HMMA?
22     A.   Hyundai Motor Company.
23     Q.   What is the relationship between

Page 16

1  Hyundai Motor Company and HMMA?
2      A.   HMMA is a -- I guess we'll say it's
3  an LLC of that larger company that was formed in
4  Delaware.
5      Q.   So it's Hyundai Motor Company, a
6  company that has been incorporated in Delaware?
7      A.   No, Hyundai Motor Manufacturing
8  Alabama incorporated in Delaware.  Hyundai Motor
9  Company is based in Seoul, Korea.
10     Q.   Okay.  What relationship, if any,
11 exists between Hyundai Motor Company and Hyundai
12 Engineering America, Inc., or HEA?
13     A.   HEA is a contractor employed by
14 Hyundai Motor Manufacturing Alabama to provide
15 various services as defined in their contract.
16     Q.   I know HEA owns a lot of companies,
17 like it owns Hyundai Power Transformers, HPT.
18         MR. MILLER:  Object to the form.
19         MR. MIDDLEBROOKS:  Object to the
20 form.
21         MS. LEONARD:  Well, it does.  It's on
22 its website.
23     Q.   (BY MS. LEONARD:)  Is there a

**Page 17**

1 business relationship in terms of ownership
2 affiliation between HEA and either HMMA or
3 Hyundai Motor Company?
4    A.   Not between HMMA and Hyundai
5 Engineering, no, no.
6    Q.   Do you have any knowledge as to
7 whether there's any type of ownership
8 relationship between HEA and Hyundai Motor
9 Company?
10    A.   No, I don't have any clear knowledge
11 on that relationship.
12    Q.   In your role as -- in your current
13 roles as VP of HR and chief administrative
14 officer, who do you have direct supervisory
15 responsibility over? In other words, who are
16 your direct reports?
17    A.   So, again, the heads of department
18 for general affairs, team relations, environment,
19 health and safety, and human resources.
20    Q.   Is the structure of the human
21 resources department as it exists today any
22 different than it was in July and August of 2017?
23    A.   No.

**Page 18**

1    Q.   How is it structured today and then?
2    A.   Again, there's -- at the time, we'll
3 say -- we already mentioned Rick Neal being
4 responsible for the HR and admin division, and
5 the head of department for that group reported to
6 him at that time as well as the other heads of
7 the department. I think I was in a director
8 role.
9        I've got to look at my resume again,
10 so I'll make sure I'm being accurate here.
11    Q.   Oh, wait. You're looking at what
12 would be Exhibit 18?
13    A.   Yeah. So December '16 to '18. So
14 depending on the timeframe we just referred to,
15 the HR role reported to me beginning in December
16 of '16. So that's why I needed to do that double
17 check.
18        So Scott Gordy, the head of HR, would
19 have been reporting to me at that time, yeah.
20    Q.   And what was Scott Gordy's --
21    A.   He was --
22    Q.   -- title?
23    A.   -- the senior manager of human

**Page 19**

1 resources.
2        MR. MIDDLEBROOKS: Let her finish her
3 question.
4    A.   I apologize.
5        MR. MIDDLEBROOKS: It's difficult for
6 the court reporter to get it all.
7    A.   Thank you.
8    Q.   And do you spell Mr. Gordy's name,
9 G-o-r-d-i-e?
10    A.   G-o-r-d-y.
11    Q.   All right. And what did he do --
12 what were his duties and responsibilities as
13 senior manager of HR?
14    A.   Just as you described. He was the
15 senior manager of human resources.
16    Q.   And what do he do in that role? What
17 was he supposed to do as senior manager of HR?
18    A.   The group is responsible for hiring.
19 The group is responsible for payroll and
20 benefits, as well as learning and development
21 activities.
22    Q.   What are learning and development
23 activities?

**Page 20**

1    A.   Training, primarily, for team
2 members.
3    Q.   Training on what?
4    A.   Anything from safety -- coordinating
5 safety training, coordinating development
6 training, coordinating training of any kind. It
7 just could be a gamut of any variety.
8    Q.   Would the training responsibilities
9 that HR had include training on avoiding
10 discriminatory conduct?
11    A.   The -- any training of that variety
12 was coordinated and/or prepared by the legal
13 department, and then HR and/or our team relations
14 group would help make sure that the team members
15 would be able to participate in that training by
16 scheduling the training. So HR is more of a
17 scheduling function in that case.
18    Q.   And when you say scheduling the
19 training, was this live training or was it
20 computer-based learning?
21    A.   It was a combination of live and/or
22 video presentations.
23    Q.   Were the video presentations

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 8 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 206 of 425

6/22/2022
8 (21 - 24)

Page 21

1  recorded?
2      A.  They were recorded, yes.
3      Q.  Who presented the video
4  presentations?
5      A.  The legal department prepared the
6  content, and the individuals were primarily legal
7  department and in some functions in HR as well
8  and TR.
9      Q.  Who by name?
10      A.  The -- I believe -- I'm trying to
11  think in the time of 2017.  So it may have been,
12  you know, again, legal counsel within the legal
13  department, and probably the HOD of team
14  relations.  But it's been a few years, so I can't
15  be certain exactly who was in the video at that
16  time.
17      Q.  Who was the HOD of team relations?
18      A.  In that window, it would have been
19  Larry Curry.
20      Q.  And who would have been the legal
21  counsel that would have been in the video?
22      A.  I'm going to assume it was Chris
23  Whitehead.

Page 22

1      Q.  Who presented the live training?
2      A.  So, again, it could have been the
3  legal department most of the time doing the live
4  training if that was what was required, the legal
5  department.
6      Q.  Do you know who within the legal
7  department presented the live training?
8      A.  I don't recall.  That's -- it's been
9  a few years.
10      Q.  Does HMMA still have the videos that
11  were presented as it might relate to
12  discrimination?
13      A.  I would think so.
14      Q.  Does HMMA have any written materials
15  that were used during that time to present the
16  training?
17      A.  I would defer to the legal department
18  on that.  I don't know for sure.
19      Q.  Were there written materials used in
20  the live training?
21      A.  There may have been rosters to
22  document their participation.  I don't know what
23  else.  I don't know for sure of anything else

Page 23

1  right offhand.
2      Q.  But you don't know whether or not
3  there were handouts?
4      A.  I do not.
5      Q.  Do you know if the live training was
6  done through some type of visual presentation,
7  like a PowerPoint?
8      A.  So, again, video -- what I'm familiar
9  with is a video that was prepared and presented
10  every couple of years, prepared by the legal
11  department and presented to the team members.
12      Q.  And with respect to the video, do you
13  know if there were any handouts or materials that
14  the attendees were able to keep to use as a
15  reference?
16      A.  I do not know for sure at that time.
17  I do not know.
18      Q.  Okay.  I'm going to show you now what
19  has been previously marked as Plaintiff's Exhibit
20  1, and I have e-mailed copies of these to all of
21  the lawyers to save a few trees.
22          And every exhibit that I give you Ms.
23  Cornelius is going to get at the end of the

Page 24

1  deposition to attach to your deposition to show
2  what we talked about.
3      A.  Okay.
4      Q.  Plaintiff's Exhibit Number 1 is a
5  notice of 30(b)(6) deposition.
6          (Whereupon, Plaintiff's Exhibit 1 was
7  marked for identification and a copy of same is
8  attached hereto.)
9      Q.  Have you seen this document before?
10      A.  Yes.
11      Q.  And is it your understanding that --
12          MR. MIDDLEBROOKS:  You should look at
13  every page before you say that.
14          THE WITNESS:  All right.  Thank you,
15  sir.
16          MR. MIDDLEBROOKS:  Not that they
17  would slip in any pages, but I think it's always
18  good to do that before you say it.
19          THE WITNESS:  Sure.  I'm looking at
20  it now to make sure it's the same as the document
21  that I reviewed.
22          MR. MIDDLEBROOKS:  Does it have the
23  same date?

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 9 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 207 of 425

6/22/2022
7 (25 - 28)

Page 25

1    THE WITNESS: Yeah, I'll double check
2  here.
3    **A.   Based on my quick glance, it does**
4  **appear to be the same document that I reviewed.**
5    Q.   (BY MS. LEONARD:)  And you are here
6  today to testify on behalf of HMMA in response to
7  this notice, correct?
8    **A.   That is correct.**
9    Q.   And you understand the testimony
10  today, you're giving on behalf of HMMA as the
11  voice of the company?
12    **A.   Yes, I understand that.**
13    Q.   The last page of Exhibit 1 contains
14  some document requests.  You've already presented
15  us with Plaintiff's Exhibit 18.  Did you bring
16  any other documents to the deposition responsive
17  to these requests?
18    **A.   I did not.**
19    Q.   All right.  Request Number 2 asks for
20  the production --
21    MR. MIDDLEBROOKS: You had a job
22  description, didn't you?
23    THE WITNESS: I did.

Page 26

1    MS. LEONARD: I said other than --
2    **A.   I do.**
3    Q.   (BY MS. LEONARD:)  Oh, you have a job
4  description?
5    **A.   I did.  It wasn't -- I didn't know it**
6  **was requested.  That's why I didn't say that.**
7  **Okay.**
8    Q.   Let's make that Exhibit 19 to your
9  deposition just because I think that will give us
10  a clear reference in the future for your job.
11    (Whereupon, Plaintiff's Exhibit 19
12  was marked for identification and a copy of same
13  is attached hereto.)
14    Q.   In Exhibit 1 on Page 10, the second
15  request was for you to bring any materials that
16  were used by you to prepare for your deposition.
17  What documents, if any, did you use to prepare
18  for your deposition?
19    **A.   The documents that are right here in**
20  **this folder (indicating).**
21    Q.   And what are those documents?
22    **A.   It is a variety of documents ranging**
23  **from policies to handbooks to the information**

Page 27

1  **prepared by counsel to respond to this request or**
2  **the case, I guess may be a way to put it.**
3    MR. MIDDLEBROOKS: This 30(b)(6)
4  notice has Bates numbers.
5    MS. LEONARD: Okay.  Are there any
6  documents in there other than what's in the
7  30(b)(6) notice, other than what's identified in
8  the 30(b)(6) notice?
9    MR. MIDDLEBROOKS: I don't believe
10  so.
11    Q.   (BY MS. LEONARD:)  All right.  Other
12  than the materials that are in the folder next to
13  you, are there any other documents that you
14  reviewed to prepare for your deposition?
15    **A.   No.**
16    MR. MIDDLEBROOKS: I did show him a
17  couple of HEA documents.
18    Q.   Do you remember what any of those HEA
19  documents were that you saw?
20    THE WITNESS: The one this morning?
21    MR. MIDDLEBROOKS: Well, no, that
22  would be yesterday.
23    THE WITNESS: Oh, yesterday.

Page 28

1    **A.   Yeah, I guess there might have been.**
2  **There's so many, I apologize for not recalling**
3  **exactly.**
4    MR. MIDDLEBROOKS: I can tell you
5  what they are.
6    MS. LEONARD: Okay.
7    MR. MIDDLEBROOKS: There are things
8  you identified in your e-mail that prompted.
9    THE REPORTER: I'm sorry?
10    MS. LEONARD: He said, There are
11  things you identified in your e-mail that
12  prompted.
13    MR. MIDDLEBROOKS: The Appearance
14  Standard of Security Personnel produced by HEA,
15  HEA 1 through 3, and there's an organizational
16  chart from HEA they produced, HEA 167.  A couple
17  of e-mails, HEA 173 and 174.  There's a picture,
18  HEA 205.  Some additional e-mails, HEA 215, 216,
19  217, 218, 219, 220, and then there's some
20  invoices, HEA 221 through 234.
21    MS. LEONARD: All right.
22    Q.   (BY MS. LEONARD:)  Did you meet with
23  counsel to prepare for your deposition?

|  | Page 29 |
|---|---|
| 1 | A.  Yes, I did. |
| 2 | Q.  When did you meet with counsel? |
| 3 | A.  Yesterday. |
| 4 | Q.  Approximately how long? |
| 5 | A.  Three hours. |
| 6 | Q.  Other than meeting with counsel |
| 7 | yesterday for approximately three hours, is there |
| 8 | anything else you did to prepare to give |
| 9 | testimony today? |
| 10 | A.  I just further reviewed the documents |
| 11 | at my home last night. |
| 12 | Q.  And those would be the documents |
| 13 | we've already discussed? |
| 14 | A.  Yes, the documents we've discussed. |
| 15 | Q.  Okay.  Do you feel adequately |
| 16 | prepared to testify today? |
| 17 | A.  I do feel adequately prepared to |
| 18 | testify today. |
| 19 | Q.  Have you ever given a deposition |
| 20 | before? |
| 21 | A.  Yes, I have. |
| 22 | Q.  How many times? |
| 23 | A.  I believe three times before today. |

|  | Page 30 |
|---|---|
| 1 | Q.  Were any of those three prior |
| 2 | depositions given as it related to anything for |
| 3 | HMMA? |
| 4 | A.  Yes, each of those were related to |
| 5 | HMMA. |
| 6 | Q.  When was the most recent time you |
| 7 | gave a deposition? |
| 8 | A.  Oh, boy. |
| 9 | Q.  Would it have been pre-pandemic or |
| 10 | post-pandemic? |
| 11 | A.  Pre-pandemic. |
| 12 | Q.  What type of case was it? |
| 13 | A.  Yeah, I believe it was an EEO case, I |
| 14 | believe. |
| 15 | Q.  Okay.  Do you remember the name of |
| 16 | the plaintiff who brought the lawsuit? |
| 17 | A.  Yes, I do. |
| 18 | Q.  And what was that person's name? |
| 19 | A.  Mike Keller. |
| 20 | Q.  And what did Mr. Keller allege HMMA |
| 21 | had done wrong? |
| 22 | A.  I believe it would be termed as a |
| 23 | wrongful discharge, I assume. |

|  | Page 31 |
|---|---|
| 1 | Q.  Do you have any recollection of what |
| 2 | he complained about in terms of what was wrong |
| 3 | about his discharge? |
| 4 | A.  That he felt like he should not have |
| 5 | been discharged.  That's about it. |
| 6 | Q.  Did he allege that he felt his |
| 7 | discharge had been discriminatory or retaliatory? |
| 8 | A.  I believe it was termed as |
| 9 | discriminatory, yeah. |
| 10 | Q.  Do you have any memory of what he |
| 11 | claimed was the basis of discrimination, such as |
| 12 | age, disability, race, gender, religion, national |
| 13 | origin? |
| 14 | A.  I believe in the end it was age |
| 15 | related. |
| 16 | Q.  Did you have any involvement in the |
| 17 | termination of Mr. Keller? |
| 18 | A.  I was -- personally signed off on the |
| 19 | document that included his termination, yes. |
| 20 | Q.  And when you say that you signed the |
| 21 | document related to his termination, does that |
| 22 | mean that you simply just assigned a -- you |
| 23 | signed a document to approve it or did you have a |

|  | Page 32 |
|---|---|
| 1 | more active involvement in making the decision to |
| 2 | let him go? |
| 3 | A.  I reviewed the content of the |
| 4 | document and then approved the document. |
| 5 | Q.  And your deposition that you gave in |
| 6 | that action, was it related to the decision to |
| 7 | terminate Mr. Keller? |
| 8 | A.  Yes. |
| 9 | Q.  Did that deposition speak to how |
| 10 | Hyundai or HMMA interpreted and applied its |
| 11 | policies prohibiting discrimination? |
| 12 | A.  I'm sure that topic was reviewed |
| 13 | during that deposition. |
| 14 | Q.  Did that deposition explore the |
| 15 | relationship between HMMA and HEA or Dynamic |
| 16 | Security? |
| 17 | A.  Not at all. |
| 18 | Q.  Do you remember the name of the |
| 19 | lawyer who took your deposition in that case? |
| 20 | A.  Shinbaum, I believe, yeah.  I'm |
| 21 | trying to think of the first name. |
| 22 | Q.  Was it either Julian McPhillips or |
| 23 | was it Lewis Shinbaum? |

Page 33

1    A.   Yeah, I believe that's right.
2    Q.   But it was somebody from the
3  McPhillips Shinbaum law firm?
4    A.   Yeah, that firm.
5    Q.   How did that case end?  Was it
6  resolved by a court or resolved by the parties?
7    A.   I believe by the parties.
8    Q.   Okay.  Prior to giving the deposition
9  in Mr. Keller's case, what deposition did you
10 give before that?
11   A.   Again, we're going back in time.  I
12 believe it -- I'm sorry.  I think it was a team
13 member, again, released for -- I think it was --
14 I believe it was released because of excessive
15 absence or something like that.  I'm trying to
16 remember exact, but anyway.
17   Q.   Do you remember the name of that team
18 member?
19   A.   Not right offhand.  That's what I'm
20 trying to remember.  It's been a little bit.
21   Q.   Part of the reason I ask this, any
22 lawsuit where you may have given a deposition was
23 likely filed in federal court, so it's public

Page 34

1  record.  So I can go look it up, but there are a
2  lot of cases that are out there, and a lot of
3  times I might not know what the right one is.  So
4  part of this lets me know and try to focus where
5  to look.
6        This team member who was discharged,
7  did they allege that they felt that their
8  discharge was discriminatory or retaliatory?
9    A.   Again, that one is going back a
10 little bit.  That's why I'm struggling with the
11 name.  So I don't recall.  I'm sorry.
12   Q.   That's okay.
13   A.   Yeah.
14   Q.   If you don't remember something, I
15 don't want you to guess.
16   A.   Yeah.  I would rather not.
17   Q.   Just tell me.  Do you remember who
18 may have taken your deposition in that case?
19   A.   No.  I can only picture the location
20 being in our security building.  That's about it.
21   Q.   Okay.  Other than knowing that that
22 case dealt with a team member challenging his or
23 her discharge, is there anything else you

Page 35

1  remember about that case in terms of what you
2  might have testified to?
3    A.   Just that I -- the only thing I
4  recall is following our process, and that was
5  about it.  I know I've said that many times.
6  Just followed our process.
7    Q.   And when you say following our
8  process, we're in Alabama, and so when people
9  invoke that, the first thing we all see is Nick
10 Saban in our heads, or at least a lot of people
11 in our state that's what they see.  And
12 understand, I think my co-counsel just vomited a
13 little, because she's a rabid Auburn fan.
14        But when you say follow our process,
15 what do you mean?
16   A.   Just means that we reviewed all the
17 facts related to the individual's attendance and
18 whether or not there was any, I guess we'll say,
19 situation where maybe that wasn't justified to
20 have the individual released from HMMA.  So,
21 again, following our process to confirm that we
22 are making the right decision.
23   Q.   All right.  And what was the first

Page 36

1  deposition that you gave?
2    A.   We're going backwards in time.  Now,
3  this is going way back.  It's not related to
4  HMMA.  Let me say that.
5    Q.   Okay.
6    A.   It was related to a case in the state
7  of Mississippi.
8    Q.   Was it a case that related to any
9  type of employment matter?
10   A.   It was not.
11   Q.   Okay.  But it was a case where you
12 gave sworn testimony under oath?
13   A.   That is correct.
14   Q.   Other than those three circumstances,
15 have you ever given testimony under oath before?
16   A.   No.
17   Q.   Because of your familiarity -- I
18 usually go through a lot of rules in the
19 beginning -- I probably won't go through those as
20 much right now, but I'm taking your deposition
21 today for a couple of reasons.
22        The first one is to find out what
23 information HMMA has on the topics in the notice

Page 37

1  we sent.  And we're going to rely on that
2  information in evaluating the case and advising
3  our client and representing to the Court what the
4  evidence in the case is.  So it's important we
5  have clear communication.
6          If you don't understand one of my
7  questions, will you either let me know or ask me
8  to rephrase it?
9      A.   Yes, I will.
10     Q.   Okay.  This is not a memory contest
11 either.  You have next to you the folder of
12 documents that you reviewed to prepare for your
13 deposition.  I don't have any problem at all with
14 you referring to those documents to assist you
15 with your testimony, but can we agree if you do
16 that, you will at least reference for us on the
17 record, I'm looking at this document, and let us
18 know the Bates number so that the record will
19 reflect what is assisting you with your
20 testimony?
21     A.   I will do my best to do just that,
22 yeah.
23     Q.   And, finally, HMMA has a lawyer here

Page 38

1  to represent the company for this deposition, and
2  you have an absolute right to speak to him at any
3  point during the deposition.  If you need to take
4  a break to confer with him, will you let me know?
5      A.   I will let you know.
6          MR. MIDDLEBROOKS:  Or if he needs to
7  take a break to go to the bathroom.
8      A.   That, too.  Okay.
9      Q.   At any point in time, while this is a
10 formal process, we can be very flexible.  So if
11 you need a break to stretch your legs, to keep
12 your mind fresh, that is perfectly fine.  Just
13 let me know, and we can stop.
14         The only thing I would ask is if
15 there's a question that's pending on the table,
16 if you can, finish answering it, with one
17 exception.  If it's a question you think you may
18 need to speak with counsel about to see if you
19 can answer it, as long as you can say for the
20 record, I need to take a break to refer with
21 counsel about whether I can answer this question
22 so that the record is clear that you may have
23 spoken with counsel before providing that answer,

Page 39

1  then we're good to go.
2      A.   I'll try.
3      Q.   That may come up, because you may
4  have something that you may be concerned is
5  protected by attorney/client privilege or some
6  trade secrets.  I don't think I'm going to get
7  into trade secrets, but if something like that
8  comes up and you're not sure that you can provide
9  that information without it creating a problem,
10 some type of legal problem, then as long as you
11 can say, I need to confer with Mr. Middlebrooks
12 to see if I can answer this question, as long as
13 that's clear on the record, we're fine.
14     A.   All right.
15     Q.   Did you have any personal involvement
16 with anything related to Davita Key's assignment
17 to work at HMMA?
18     A.   I did not.
19     Q.   The next thing I want to look at is
20 what I've marked as Plaintiff's ==Exhibit 2==, which
21 is the contract for services between Hyundai
22 Motor Manufacturing Alabama, LLC and Hyundai AMCO
23 America, Inc., Bates Numbers HMMA 000013 through

Page 40

1  76.
2          (Whereupon, Plaintiff's ==Exhibit 2== was
3  marked for identification and a copy of same is
4  attached hereto.)
5          MR. MIDDLEBROOKS:  13 through what?
6          MS. LEONARD:  76.
7      Q.   (BY MS. LEONARD:)  Did you review
8  Plaintiff's ==Exhibit 2== to prepare for your
9  deposition?
10     A.   I'm sorry.  Exhibit which?
11     Q.   I'm sorry.  And that's another thing.
12 If you don't hear me, it's my job to communicate
13 clearly with you.  You do not have to guess what
14 I've said.  Tell me to speak up, talk louder,
15 talk slower.
16     A.   Okay.
17     Q.   You just let me know.  Have you
18 reviewed -- did you review Plaintiff's ==Exhibit 2==
19 to prepare for your deposition?
20     A.   Yes, I did.
21     Q.   Okay.  What is Plaintiff's ==Exhibit 2==?
22     A.   Plaintiff's ==Exhibit 2== is the contract
23 for services between Hyundai Motor Manufacturing

Page 41

1   Alabama, LLC and Hyundai AMOCO America, Inc.
2   Dated February 4th, 2013.
3       Q.   What are the dates this contract was
4   active?
5       A.   Let's see here.  I believe it's on
6   the fourth page.  I probably went right by it,
7   because it's all small print.  There it is.  I
8   knew I went right by it.
9           So the dates on Page Number 4 of the
10  document is February 4th, 2013, terminating
11  February 3rd, 2015, with an optional third year
12  at HMMA's discretion.
13      Q.   Was Plaintiff's Exhibit 2 in effect
14  in July and August of 2017?
15      A.   While the document says option third
16  year after February 3rd, 2015, it's my
17  understanding that they continued to apply or
18  operate under the conditions of the contract
19  until the new contract was established at a later
20  date.
21      Q.   When was that new contract
22  established?
23      A.   I don't have a firm date in front of

Page 42

1   me, so I can't answer that question.
2       Q.   Is that new contract the contract
3   that is currently in place?
4       A.   No.  There's a different contract in
5   place to support the security services through
6   Hyundai Engineering.
7       Q.   But you don't know when that contract
8   went into place?
9       A.   I do not.  I don't have that
10  information.
11      Q.   Do you know what, if anything, is
12  different between the current contract and
13  Plaintiff's Exhibit 2?
14      A.   No, because I don't have that
15  document to be able to refer to.  I do not.
16      Q.   Even though the language of Exhibit 2
17  provides that this contract would expire as late
18  as 2016, you said you had an understanding that
19  HEA and HMMA were operating under the conditions
20  of this contract in 2017.  How did you come to
21  have that understanding?
22          MR. MIDDLEBROOKS:  Object to the
23  form.

Page 43

1       THE WITNESS:  I'm sorry.  What?
2       MR. WHITEHEAD:  You can answer.
3       A.   Again, just based on conversations
4   that I've had with counsel, that's how that
5   was --
6       MR. MIDDLEBROOKS:  Well, you don't
7   reveal --
8       THE WITNESS:  I'm sorry.
9       MR. MIDDLEBROOKS:  -- privileged
10  data.
11      THE WITNESS:  Thank you.
12      Q.   (BY MS. LEONARD:)  How would HMMA
13  have the understanding that HEA and HMMA were
14  operating under the terms of this contract in
15  2017?
16      A.   Because to the best of my knowledge,
17  because I've been at the facility, you know, I
18  was working at the facility at that time, that
19  the security and/or contract services were still
20  being provided.
21      Q.   Are there any documents that reflect
22  that this contract was either extended or that
23  the parties agreed to continue to operate under

Page 44

1   its terms despite its explicit expiration through
2   the language of the contract?
3       A.   I don't have access to any specific
4   information other than possibly invoices or what
5   have you that show they were still being billed
6   for the services.
7       Q.   Do you know if there's been any
8   search for any documents that would reflect this
9   contract remained in effect in 2017?
10      A.   I'm not aware of a specific search,
11  no.
12      Q.   Other than the fact that there were
13  security services being provided in 2017, is
14  there anything that shows that there was an
15  agreement between and/or among HMMA, HEA to
16  provide security services in 2017?
17      A.   Again, just based on the document in
18  front of me and the fact that the service was
19  continued to be provided, there must have been
20  some degree of understanding to continue to
21  provide those services under the contract that's
22  dated in this exhibit.
23      Q.   Is it HMMA's position that this

Page 45

1  contract and its terms were still applicable in
2  2017 despite its expiration through the language
3  of the contract?
4      **A.   That is my understanding, because,**
5  **again, the services were continuing to be**
6  **provided, and they billed HMMA accordingly was my**
7  **understanding.**
8      Q.   And the reason I ask this is I don't
9  want later Hyundai to say, well, that contract
10  wasn't in effect in 2017, so you can't rely on
11  it.
12          Can you think of any reason that HMMA
13  would contend that the terms of this contract
14  were not in effect in 2017?
15      **A.   At this point, I cannot.**
16      Q.   What -- and you say at this point.
17  What could change to where that position would
18  change?
19      **A.   If some other information came to**
20  **light.  But I'm going to say based on the**
21  **information provided to me, that this document**
22  **was considered to be the guides to be able to**
23  **continue to provide the services.**

Page 46

1      Q.   And in preparing for your deposition
2  today, you knew that one of the questions that
3  you would be presented with would have been that
4  the dates that this contract was active, correct?
5      **A.   Yes, that is correct.**
6      Q.   So in terms of preparing to know
7  whether or not we could rely on the terms of this
8  contract for 2017, your preparation would have
9  included knowing whether the terms of this
10  contract applied in 2017?
11      **A.   That is correct, yeah.**
12          MR. MIDDLEBROOKS:  That is certainly
13  possible, but I don't know that the hourly rates
14  could have changed.  I'm sure Mr. Miller and HEA
15  can offer their perspective.
16      Q.   Are there any other documents
17  clarifying the terms to reflect this contract as
18  it existed in July or August of 2017?
19      **A.   Not that I'm aware of.**
20      Q.   Is there anything missing from
21  Plaintiff's Exhibit 2 that was contained in the
22  agreement between Hyundai Motor Manufacturing and
23  HEA?

Page 47

1      **A.   Not that I'm aware of.**
2      Q.   Who prepared Plaintiff's Exhibit 2?
3      **A.   Well, I guess our legal department.**
4          MR. MIDDLEBROOKS:  Don't guess.
5          THE WITNESS:  Thank you for saying
6  that.
7      **A.   Based on the information presented, I**
8  **would say the legal department prepared these**
9  **documents for my deposition today.**
10      Q.   (BY MS. LEONARD:)  Do you know which
11  party to the contract or both parties prepared
12  Plaintiff's Exhibit 2?
13      **A.   I'm going to say the legal department**
14  **prepared this document based on our records.**
15      Q.   And that would be HMMA's legal
16  department?
17      **A.   Yes.  Thank you.  HMMA's legal**
18  **department prepared these documents for the**
19  **deposition today.**
20          MR. MIDDLEBROOKS:  Not for the
21  deposition today.  She's talking about who
22  prepared this way back in 2000 --
23      **A.   Oh, HMMA.  I'm sorry.  I**

Page 48

1  misrepresented that.
2      Q.   That's okay.  That, again, goes back
3  to it's important we have clarity.  Your lawyer
4  understood where my question was going, and so
5  that's exactly it.
6      **A.   Yep.**
7      Q.   So HMMA prepared Plaintiff's Exhibit
8  2, and that's yes?
9      **A.   Yes.  That is yes.**
10      Q.   The contract says it's between HMMA
11  and Hyundai AMOCO America, Inc.  Who or what is
12  Hyundai AMOCO America, Inc.?
13      **A.   Hyundai AMOCO America, Inc. is a**
14  **company that currently, I think, is referred to**
15  **as Hyundai Auto -- Hyundai Engineering.**
16      Q.   Is it your understanding then that
17  Hyundai AMOCO America, Inc. is the same as HEA?
18      **A.   That is my understanding, yes.**
19          MR. MILLER:  Object to the form.
20      Q.   So even though HEA is not identified
21  by name in Plaintiff's Exhibit 2, it is HMMA's
22  understanding that Plaintiff's Exhibit 2 applied
23  to HEA?

Page 49

1   A.   Yes.

2   Q.   And this is a contract for services.

3 What are those services?

4   A.   The contract specifies security

5 services in this case.

6   Q.   And what are security services?

7   A.   Items including having manpower at

8 gates to control access to the facility, having,

9 I guess, personnel in our security building to be

10 able to clear individuals to receive badges to

11 access our facility, and also mailroom services.

12 I believe that covers all -- the big, larger

13 scope of the services.

14   Q.   Do you know why HMMA chose to

15 contract for these services rather than hiring

16 people directly to provide them?

17   A.   No, I'm not part of that

18 decision-making process, so no.  I don't know

19 exactly why they chose to go that route.

20   Q.   All right.  If you can turn to the

21 second page of the document, which is Bates

22 Number HMMA 14.  There are some handwritten

23 initials in the bottom right-hand corner of this

Page 50

1 page.  We see it on several other pages in this

2 document.

3   A.   Okay.

4   Q.   The initials appear to be WG and JH.

5 Do you know why these initials are on pages

6 throughout this document?

7   A.   No, I don't know exactly why.  I

8 don't know that I should assume either, but --

9        MR. MIDDLEBROOKS:  You shouldn't

10 assume.

11   A.   No.

12   Q.   Do you have any understanding of why

13 these initials appear on this document?

14   A.   Again, I would be making an

15 assumption.

16   Q.   What is your assumption?

17   A.   Okay.  Maybe it's the individuals

18 that were double checking the content of the

19 document and signed each corner saying they

20 acknowledge the content of the document.

21   Q.   Do you know who these whose

22 initials these are?

23   A.   I do not, no.  I was going to see if

Page 51

1 there was any reference here or anything that

2 would give me a clue.

3   Q.   It may help if you turn to Bates

4 Number 26, which are the signature pages.  For

5 some reason, the name for the contractor is

6 redacted, and that's a matter we'll take up with

7 HEA.  But it appears there's a name Warren,

8 Gappa, G-a-p-p-a, for HMMA, and that seems to

9 track with the WG initial.  Do you know if the WG

10 may represent Warren Gappa?

11   A.   I think the odds are good that that's

12 what it represents, because that -- obviously,

13 his first name starts with a W, last name with a

14 G.

15   Q.   Do you know who the project manager

16 was who signed this document for HMMA -- or on

17 behalf of HEA?

18   A.   No, I do not.

19   Q.   Does the copy of the document that

20 you have have that name unredacted?

21   A.   It does not.

22   Q.   Does HMMA have a copy of this

23 contract where that name is not redacted?

Page 52

1   A.   I do not know.

2        MR. MIDDLEBROOKS:  I don't know why

3 we redacted that.  Usually it's a personal

4 identifier, but it's just the name.  I don't

5 know --

6        MS. LEONARD:  I think it's important,

7 because it could go to some of the factors on

8 joint employers as it relates to common officers,

9 things like that.  I can't understand why we

10 don't have this.  This is something I took up

11 with Yurie before she withdrew from the case, and

12 then it just got kind of continued.

13        Can you guys tell us who this name

14 is?

15        MR. WHITEHEAD:  Let me talk to David

16 about that.

17        MS. LEONARD:  Okay.  Because I can't

18 imagine why that should be redacted.  Because I

19 would think HEA has got a copy, too, and we

20 should be able to get it one way or the other.

21        But anyway, if during the break y'all

22 can see who that is so that we can understand who

23 the JH is and see if it's somebody we need to

Page 53

1   talk to.
2       Q.   (BY MS. LEONARD:)  We've been going
3   almost an hour.  Are you good to keep going or do
4   you need a break?
5       A.   I'm fine at this time.
6       Q.   If you can turn to Page 4 of the
7   document or Page 4 of the contract or Bates
8   Number HMMA 16.
9       A.   Okay.  I'm looking at that page now.
10      Q.   Okay.  Below the section that says
11  witness, the first whereas clause reads:
12           Whereas, HMMA owns and operates a
13  state-of-the-art motor vehicle manufacturing
14  facility, herein the project, on approximately
15  one thousand seven hundred forty-four acres of
16  land in Montgomery, Alabama (herein the site).
17           With respect to that, is that site
18  the location where Ms. Key would have performed
19  work?
20      A.   Yes.  It was on the site of Hyundai
21  Motor Manufacturing Alabama or HMMA.
22      Q.   The next whereas clause reads:
23           Whereas, HMMA desires to engage contractor to

Page 54

1   perform services in connection with the project
2   and contractor desires to perform such services.
3           My question is:  What is the project
4   identified in this whereas clause?
5       A.   As I'm reading this, I would term the
6   site is equivalent to being the project, because
7   it's the place where we build vehicles.
8       Q.   So what is the project with which the
9   contractor is being contracted to perform?
10      A.   In this particular contract, it's for
11  security services.
12      Q.   And so when it says -- I guess -- I
13  want to make sure it's clear, because I guess I'm
14  probably asking this in probably too minute a
15  way, but it basically says HMMA is -- wants to
16  hire the contractor to perform services in
17  connection with the project.
18           Is the project the overall production
19  of cars or something else?
20      A.   I think what -- the way I interpret
21  it is that they're providing services at the site
22  where vehicles are being built, which happens --
23  the project being where the site -- where the

Page 55

1   vehicles are being built.
2       Q.   And the services that are going to be
3   provided by HEA are in connection with that
4   project of the vehicles being built, it's to help
5   further that --
6       A.   I keep going back to they're
7   providing the services at the site where the
8   vehicles are being built.
9       Q.   The reason I ask is one of the topic
10  areas that we looked at in Exhibit 1 that we
11  identified was -- as it related to this document
12  was to ask you to identify what is the project
13  identified in that whereas clause.
14           And so that's ultimately what my
15  question is:  What is that project?
16      A.   I see it as providing services at the
17  location where the vehicles are being built.
18      Q.   Okay.  And does Section 1 of the
19  contract define the scope of services that are to
20  be provided by HEA to HMMA?
21           MR. MILLER:  Object to the form.
22  When you're saying HEA, do you mean --
23      A.   I'm confused.

Page 56

1           MR. MILLER:  -- Hyundai AMOCO?
2           MS. LEONARD:  Well, it's my
3   understanding from what Yurie represented when we
4   clarified --
5           MR. MILLER:  Let's not talk about
6   what was represented between counsel.
7           MS. LEONARD:  Is there a
8   difference -- is HEA --
9           MR. MILLER:  Let's do it this way:  I
10  just object to the form.
11          MS. LEONARD:  Well, I think it's
12  important for us to -- is HEA going to contend
13  it's not the same entity or it's not a successor
14  to Hyundai AMOCO America, Inc.?
15          MR. MILLER:  I'm not going to testify
16  on the record.
17          MS. LEONARD:  It's a fair question.
18  It's something we sought clarity from you guys
19  before, and it would keep us from wasting time.
20  So if you guys are going to argue you're not a
21  party to this contract, then there's no point in
22  me deposing HMMA's 30(b)(6) on it.
23          The only reason I'm pursuing this

Page 57

1 line of questioning is to help understand the
2 relationship between HMMA and HEA. I think it's
3 a very straightforward question.
4 MR. MILLER: Object to the form. I
5 don't testify on the record. That's just not my
6 practice. We can talk about it later, though.
7 MS. LEONARD: Okay. What was
8 improper with my question so I can rephrase it?
9 MR. MILLER: All I have to do is
10 object to the form.
11 MS. LEONARD: I know, but I'm asking
12 you so I can cure your objection.
13 MR. MILLER: The contract itself.
14 You said the contract between HEA. The actual
15 contract says it's between a different entity.
16 That's the basis for my objection.
17 Q. (BY MS. LEONARD: Mr. Burns, is it
18 HMMA's position that in 2017, HEA was performing
19 services under Plaintiff's Exhibit 2?
20 **A. Based on the document in front of me,**
21 **which is between Hyundai AMOCO America, Inc. and**
22 **Hyundai Motor Manufacturing Alabama.**
23 Q. That doesn't answer my question. My

Page 58

1 question is: Is it HMMA's position in this
2 lawsuit that in 2017, HEA was performing services
3 for HMMA pursuant to this contract?
4 **A. I'm going to say --**
5 MR. MIDDLEBROOKS: We would stipulate
6 that that's Hyundai's position, HMMA's position,
7 that in 2017, we had an agreement with HEA to
8 provide security services.
9 MS. LEONARD: And that agreement is
10 Plaintiff's Exhibit 2?
11 MR. MIDDLEBROOKS: A derivative of
12 that. Our position is it's a derivative of
13 Plaintiff's Exhibit 2. We didn't have a separate
14 written contract in place by that time, but we
15 still operated under the same relationship.
16 Q. (BY MS. LEONARD:) Did HMMA provide a
17 copy of Plaintiff's Exhibit 2 to HEA prior to
18 2017?
19 **A. I have no knowledge of that.**
20 Q. What documents, if any, exist that
21 show what was communicated to HEA in terms of
22 what the terms of the agreement between it and
23 HMMA were as they would have existed in 2017? In

Page 59

1 other words, what documents are out there that
2 show the agreement between HEA and HMMA as it
3 existed in 2017?
4 **A. All I have is what's in front of me**
5 **and the documents that were prepared for today's**
6 **deposition that tells me what the agreement was**
7 **or the contract was between the two**
8 **organizations, and that's all I have in front of**
9 **me.**
10 **I don't have any knowledge of any**
11 **other content or -- I'm sorry -- any other**
12 **documents at all. I have no knowledge of any**
13 **other documents.**
14 MR. WHITEHEAD: Heather, give us a
15 second. We can probably clear this thing up.
16 MS. LEONARD: Okay. And I'm not
17 trying to be difficult.
18 MR. MIDDLEBROOKS: No, you're fine.
19 MR. WHITEHEAD: You're representing
20 your client just like everybody else is.
21 (Whereupon, a brief recess was
22 taken.)
23 MR. MIDDLEBROOKS: Heather, let me

Page 60

1 give you a bit of information. When we have a
2 longer break, we'll get the name of the project
3 manager that was redacted. I imagine my
4 paralegal, since it was not an HMMA executive or
5 manager, she probably automatically did them.
6 We'll get you that.
7 Secondly, and, again, Matt will speak
8 for his client as appropriate, if he feels he
9 needs to, but we have produced to you all, it's
10 in the documents that have been exchanged in this
11 case, the secretary of state report about the
12 entities or defendants in this action. And
13 you'll see that the predecessor to HEA -- we use
14 that for short, Hyundai Engineering America,
15 Inc., anyway, HEA is Hyundai AMOCO.
16 So our position is this would have
17 continued to be the operating agreement that set
18 the relationship between the parties, and it's
19 our position, HMMA, that until we got another
20 written agreement, we continued to operate under
21 this agreement, possibly changes in pay rates and
22 things of that nature, but this formed the
23 operating relationship.

Page 61

```
 1        And there continued to be invoices
 2  that we continuously got from HEA for security
 3  services, as well as some other services they
 4  provided, if that helps.
 5        MS. LEONARD:  All right.  Is that
 6  going to be HEA's position?
 7        MR. MILLER:  So I agree that Hyundai
 8  AMOCO America, Inc. is the predecessor to HEA,
 9  and I think that's what you were trying to do
10  with your question.  And the reason I objected is
11  because you said the contract was between HEA,
12  but technically it's not.  It's with its
13  predecessor entity.  And even though the
14  secretary of state records will show the
15  relationship and AMOCO's predecessor, that was
16  the basis for my objection.
17        MS. LEONARD:  This was ultimately my
18  question:  Is HEA going to contend this contract
19  didn't apply to the services that were being
20  provided in 2017?
21        MR. MILLER:  I don't want to answer
22  that on the record.  I'll let my client.
23        MS. LEONARD:  All right.
```

Page 62

```
 1   Q.   (BY MS. LEONARD:)  Well, let's go
 2  back to Section Number 1.  Does Section Number 1
 3  define the services that HMMA expected HEA to
 4  provide in 2017?
 5   A.   Yes, it does reflect the security
 6  services required.
 7   Q.   While the document spells it out more
 8  fully, can we agree that Section 1 essentially
 9  says that it's HEA's responsibility to deliver
10  workers to the locations described in the
11  contract by HMMA to provide security services?
12   A.   To Hyundai AMOCO's requirement, yes,
13  at that time.
14   Q.   And so in 2017, per this contract,
15  HMMA would have expected HEA to deliver workers
16  to the locations described by HMMA?
17   A.   Yes.
18   Q.   In Section 1, when we go to the end
19  of the third line, it reads:  The scope of work
20  included within the services may be amended only
21  by written directive from HMMA to contractor.
22        Are there any documents that reflect
23  an amendment to the scope of work included within
```

Page 63

```
 1  the services?
 2   A.   Not that I'm aware of.
 3   Q.   Do you know if the scope of work was
 4  ever amended without a written directive?
 5   A.   Not that I'm aware of.
 6   Q.   The next sentence reads:  The
 7  services shall be performed by qualified
 8  employees or subcontractors of contractor in
 9  compliance with HMMA's requests and instructions
10  at such time so as not to interfere with HMMA's
11  business operations.
12        Who made the determination as to
13  whether employees were qualified?
14   A.   The scope of work.  I'll double
15  check.  Yes, I'm double checking.
16        The scope of work includes the list
17  of summary of services, specifications for each
18  one of the jobs, et cetera, et cetera.  So those
19  details is what determined whether someone was
20  qualified.
21   Q.   So the term specified by HMMA in the
22  contract determine what is a qualified employee
23  or subcontractor?
```

Page 64

```
 1   A.   As provided by the scope of work,
 2  yes.
 3   Q.   If we go one, two, three, four lines
 4  from the bottom of that paragraph, the contract
 5  reads:  Contractor shall be liable and
 6  responsible for all damages of every kind or
 7  nature to HMMA or HMMA's property arising from or
 8  relating to any acts, omissions, errors, or
 9  negligence of contractor or its employees or
10  subcontractors in the performance of the service
11  herein.
12        Pursuant to that language, has HMMA
13  made a determination as to whether HEA would be
14  liable or responsible to it for any damages it
15  may incur as it arises from the treatment of
16  Davita Key?
17   A.   I'm going to have to have you repeat
18  that.
19   Q.   Sure.  Since the provision in the
20  services section that we talked about ultimately
21  says the contractor is going to be liable to any
22  injury suffered by HMMA or its property relating
23  from any acts, omissions, errors, or negligence
```

Page 65

1  of the contractor, its employees or its
2  subcontractors, has HMMA determined whether HEA
3  is going to be responsible to it if it suffers
4  any injury in this lawsuit as the result of the
5  way Davita Key was treated?
6      A.   Well, we were not -- Davita Key was
7  not an employee of HMMA, so we would not be held
8  accountable for any damages associated with her
9  case before us today.
10     Q.   I'm going to object to your response
11 as being nonresponsive to my question.  And my
12 question may have been confusing, so I'm going to
13 rephrase it.
14          This language seems to imply or state
15 that HMMA is going to hold its subcontractor or
16 its contractor HEA responsible for any injury
17 that Hyundai may experience as a result of
18 something HEA did or didn't do.
19          So to the extent that HMMA suffers an
20 injury as a result of the way Davita Key was
21 treated, in other words, if HMMA were found to be
22 liable, does HMMA contend that HEA is liable to
23 it under this language in its contract?

Page 66

1      A.   Based on that reading, and I think
2  there's also a hold harmless clause in here as
3  well.
4      Q.   I'll rephrase.  Pursuant to the
5  language that I read from Section 1, is HEA
6  liable or responsible to HMMA for any of the
7  treatment or for any injury HMMA may have
8  experienced as the result of what Davita Key
9  alleges in this lawsuit?
10     A.   HMMA will not be liable for any of
11 the damages that may occur, because she's not an
12 employee of HMMA.
13     Q.   And I'm going to object again,
14 because that's -- my question is a little
15 different.
16          MR. MIDDLEBROOKS:  Well, it calls for
17 a bit of a legal analysis, and I don't know that
18 he's able to testify to that.
19     Q.   Do you know if HMMA has made a
20 determination as to whether HEA has any
21 obligation or responsibility to it to pay for any
22 damages HMMA may have suffered as a result of
23 this lawsuit?

Page 67

1      A.   I'm not aware of any determination at
2  this time, no, I am not.
3      Q.   If we can turn to the next page,
4  which is Bates Number HMMA 17 or Page 5 of the
5  contract, if we can look at Section 5, it deals
6  with invoices.
7      A.   I see that.
8      Q.   Okay.  Do you know whether the
9  services performed by Ms. Key on HMMA's property
10 are reflected on any invoices that may have been
11 submitted to HEA pursuant to this section?
12     A.   If she was paid by the contract --
13 the subcontractor with HEA, then it likely would
14 have shown up on an invoice as a line item for
15 the services rendered, not necessarily specific
16 name, okay, just services rendered.  So is it
17 security, mailroom, et cetera, but not by name.
18     Q.   With that understanding, are there
19 any invoices that reflect services performed by
20 Ms. Key at HMMA's property?
21     A.   Again, because there's no line item
22 detailed by individual, I can't confirm whether
23 or not she was included on an invoice for the

Page 68

1  time she worked.
2      Q.   Do you dispute whether she was
3  included on any invoice?
4      A.   I will not dispute that her -- the
5  pay may have been reflective for the services
6  provided in her role, but, again, I don't -- her
7  name would not be specifically shown on the
8  invoice.
9      Q.   Okay.  We can go to the next page,
10 which is Page 6 of the contract or Bates Number
11 HMMA 18.
12     A.   Okay.  I'm on Page 6.
13     Q.   Okay.  I want to look first at
14 Section 6.4.  In this, it reads:  Contractor
15 represents and warrants to HMMA that it will
16 perform background checks on all of the employees
17 and subcontractors and will comply fully with
18 HMMA's supplier/contractor badge policy, which is
19 attached hereto as Attachment 6.4, including all
20 employees of any subcontractors utilized by
21 contractor.
22          Contractor agrees that it shall not
23 employ any employees or subcontract -- or any

Page 69

1  subcontractors whose presence on HMMA's property
2  is objected to by HMMA.
3      Under this provision, does HMMA have
4  the authority and ability to remove from service
5  anybody that HEA or any of its contractors placed
6  on HMMA's property?
7      A.   Yeah, we do have the discretion to
8  ask for individuals to be removed from property,
9  yes, we do.
10     Q.   And the contract and the terms of it
11 that HEA was operating under in 2017 provided in
12 Section 6.4 that HEA could direct HEA -- in 2017,
13 HMMA could direct HEA to remove somebody it had
14 placed on the property, correct?
15     A.   That is correct.
16     Q.   Okay.  Let's look at the next
17 section, which is 6.5.  The first sentence reads:
18 HMMA is committed to the inclusion of
19 minority-owned business enterprises ("MBE") and
20 women-owned business enterprises ("WBE")
21 subcontractors on its project.
22     Why is this included in this
23 contract?

Page 70

1      A.   Included in this contract and other
2  contracts, because HMMA likes for our business
3  partners to make a reasonable effort to access
4  minority-owned business enterprises or
5  women-owned business enterprises as a part of
6  doing business with HMMA.
7      Q.   And why is that something HMMA likes?
8      A.   Because we believe in diversity of
9  sourcing for our services that we need to support
10 our operation.
11     Q.   What is diversity of sourcing?
12     A.   As I -- I'll repeat, the
13 minority-owned business enterprises or
14 women-owned business enterprises that fall in
15 that category.
16     Q.   Why does HMMA believe in having
17 minority-owned business enterprises and
18 women-owned business enterprises?
19     A.   Because, again, we felt like it
20 provided a variety of businesses who could
21 provide services for our operations.
22     Q.   Why would you want a variety of
23 businesses to provide services for your

Page 71

1  operations?
2      A.   Variety creates competition, which
3  also creates possibly better services.
4      Q.   Okay.  What efforts did -- what
5  efforts did HEA make to comply with Section 6.5
6  of this contract?
7      A.   I don't have any specific knowledge
8  how well they adhered to this reasonable practice
9  to be able to provide MBE or WBE contractors.
10     Q.   Does HMMA have any knowledge of any
11 efforts HEA made to comply with Section 6.5 of
12 the contract?
13     A.   I personally don't have any
14 knowledge.  That doesn't mean that there was not
15 a -- some form of a benchmark for them to comply
16 to.
17     Q.   One of the topic areas that was in
18 Plaintiff's Exhibit 1 was what efforts HEA made
19 to comply with Section 6.5 of the contract and
20 what HMMA did to show its commitment to the
21 inclusion of minority-owned business enterprises
22 and women-owned business enterprises.
23     Did you prepare for that topic area?

Page 72

1      A.   I reviewed this section of the
2  contract, that's true.  And as I've stated, that
3  was just a best practice or best past practice of
4  Hyundai Motor Manufacturing Alabama to request
5  all contractors to consider minority-owned
6  business enterprises and women-owned business
7  enterprises while conducting business with HMMA.
8      Q.   Sitting here today speaking as the
9  voice of HMMA, what efforts, if any, did HEA --
10 or what does HMMA know of any efforts HEA made to
11 comply with Section 6.5?
12     A.   As, again, as the voice of the
13 company in 2017, I have no specific knowledge of
14 what -- how they adhered to or attempted to make
15 a reasonable effort to have MBE or WBE
16 subcontractors.
17     Q.   Considering that HMMA states it's
18 committed to the inclusion of MBEs and WBEs and
19 puts it in this contract, what did HMMA do to
20 make sure HEA was including MBEs and WBEs as
21 subcontractors for the performance of services?
22     A.   I'm -- again, not having specific
23 knowledge in 2017, it's hard for me to answer

Page 73

1  that question, other than to say they may have
2  **provided HMMA the names of the subcontractors and**
3  **their affiliation as either minority-owned**
4  **business or a woman-owned business.**
5      Q.   Have you seen any documents, are you
6  aware of the existence of any documents that show
7  that?
8      A.   **I am not aware of any documents.**
9      Q.   Are you aware of anything that exists
10  that show HMMA made any efforts to see if HEA was
11  utilizing MBEs or WBEs?
12      A.   **At the time we're referring to, I do**
13  **not have any knowledge or information to share,**
14  **no.**
15      Q.   For any time do you have that
16  knowledge?
17      A.   **I do not related to this contract, I**
18  **do not.**
19      Q.   What did HMMA do to show its
20  commitment to the inclusion of minority-owned
21  business enterprises and women-owned business
22  enterprises?
23      A.   **The organization, similar to this**

Page 74

1  **contract, and HMMA, similar to this contract,**
2  **makes an effort to contract with minority-owned**
3  **businesses or women-owned businesses in a variety**
4  **of ways to support our operation.**
5      Q.   Specifically, what has HMMA done for
6  that?
7      A.   **Well, HMMA may have employed**
8  **minority-owned or women-owned businesses for**
9  **parts supplies or maybe it was general supplies**
10  **for the facility.  It could be anything from**
11  **office supplies to parts on a car.**
12      Q.   What are those businesses by name?
13      A.   **That, I wouldn't have -- know**
14  **specific names.  I just know that there was an**
15  **effort.  I'm not part of that organization, which**
16  **is parts development and/or general purchasing.**
17      Q.   Are you aware of any specific MBEs or
18  WBEs that HMMA has contracted with?
19      A.   **I believe, but I'm not certain, but I**
20  **believe EnovaPremiere is a minority-owned**
21  **business that HMMA does contract with as a parts**
22  **development contractor -- parts development**
23  **supplier.**

Page 75

1      Q.   Do you know if HMMA contracted with
2  that parts supplier in 2017?  In other words, was
3  there a contract in 2017?
4      A.   **It's possible we had a contract with**
5  **EnovaPremiere in 2017.**
6      Q.   How could I find out?
7      A.   **I guess ask the question of our**
8  **counsel --**
9      Q.   Okay.
10      A.   **-- to supply.**
11          MR. MIDDLEBROOKS:  That would be
12  including Korean subcontractors and --
13          MS. LEONARD:  I don't know.  You guys
14  are the ones who used the language minority-owned
15  business enterprises, so that's how I'm using it.
16  That's how it's in your contract.
17      Q.   (BY MS. LEONARD:)  And that's a fair
18  question.  How -- the term in here,
19  "minority-owned business enterprises," what does
20  that include?
21      A.   **I would say it includes any -- well,**
22  **if you want to classify minority-owned, anything**
23  **from African-American to women to Korean to**

Page 76

1  **Italian to Spanish.  You name it.**
2      Q.   What I'm asking is:  This is a term
3  that is used in this contract.  When HMMA wrote
4  this term into the contract, what did it mean by
5  minority-owned business enterprise?
6      A.   **Again, I just gave my interpretation**
7  **of that.**
8      Q.   Okay.  So this is a Korean-owned
9  company, correct?
10      A.   **Hyundai Motor Manufacturing Alabama,**
11  **yes.  It's owned by Hyundai Motor Company.**
12      Q.   And its parent company is located in
13  Seoul, Korea, correct?
14      A.   **That is correct, located in Seoul,**
15  **Korea.**
16      Q.   Would it be seen as self-serving then
17  for a Korean company to include Korean-owned
18  companies as part of engaging in work with
19  minority-owned business enterprises?
20      A.   **I interpret anyone that may be a part**
21  **of a minority class to be qualified as a**
22  **minority-owned business.**
23      Q.   In Korea, Seoul, Korea, are Koreans a

Page 77

1  minority?

2      A.  No, they're not, but we're in the

3  United States in Montgomery, Alabama.

4      Q.  All right.  Is there anything within

5  the contract that defines what a minority-owned

6  business enterprise is?

7      A.  No, there's not.

8      Q.  Okay.  Are there any

9  African-American-owned businesses with which

10  Hyundai had contracts in 2017?

11      A.  Again, I could be wrong, but I think

12  EnovaPremiere is an example of that, the company

13  I just mentioned.

14      Q.  And EnovaPremiere is owned by an

15  African-American or a group of African-Americans?

16      A.  To the best of my knowledge, yes, it

17  is.

18      Q.  In 2017, did Hyundai have any

19  contracts with any women-owned businesses?

20      A.  I do not know that.

21      Q.  Other than you saying Hyundai would

22  try to contract with minority-owned businesses or

23  women-owned businesses, what, if anything, else

Page 78

1  did HMMA do to show its commitment to the

2  inclusion of MBE and WBE?

3      A.  I'm not aware of any other specific

4  activities, no.

5      Q.  If we can look to the next page,

6  which is Page 7, and this is Bates Number HMMA

7  19, at the top is Section 7 that deals with

8  confidentiality.

9      A.  I see that.

10      Q.  Okay.  With respect to Section 7,

11  what does this -- what are the terms of this

12  provision?  What does it apply to?

13      A.  As I'm reading through this, Item 7.1

14  under Confidentiality, that any information

15  shared with the contractor, whether it be

16  drawings, specifications, technical data, in

17  connection with the agreement shall remain the

18  sole property of HMMA, and if the contract was

19  terminated, those items would be returned back to

20  HMMA.

21      Q.  Does Section 7 place any

22  confidentiality obligations on people who may be

23  -- who are employed by HEA to perform work at

Page 79

1  HMMA?

2      MR. MIDDLEBROOKS:  Can you say that

3  question again?

4      MS. LEONARD:  Sure.

5      Q.  (BY MS. LEONARD:)  Does Section 7

6  relating to confidentiality put any

7  confidentiality obligations on people HEA may

8  have placed at HMMA?

9      A.  I don't see a reference to

10  confidentiality on there.  I only see a reference

11  to keeping confidential all information of

12  drawings, specifications, technical data

13  furnished by HMMA.  So I would imply that.

14      Q.  What is Section 7 titled?

15      A.  Confidentiality.

16      Q.  Okay.  Does Section 7 relating to

17  confidentiality place any confidentiality

18  obligations on subcontractors HEA may have used,

19  such as Dynamic Security?

20      A.  I do not see a reference to

21  subcontractors, but it says disclose to third

22  parties.

23      Q.  And explain what you mean when you

Page 80

1  point that out.  What do you mean that would do

2  in terms of confidentiality?

3      A.  Third parties could be defined as a

4  subcontractor.

5      Q.  And what you're referring to is the

6  language that says:  Contractor shall keep

7  confidential information, and it goes through it,

8  and it says you shall not copy it, reproduce it,

9  and it says:  Or disclose to third parties or

10  used in any manner detrimental to the interest of

11  HMMA.

12      Doesn't that reference say that HEA

13  is not to disclose to third parties confidential

14  information?

15      A.  Contractor in any way in connection

16  with the performance hereunder or disclose to

17  third parties or use in any manner detrimental to

18  the interest of HMMA.  That's the impression I

19  get, yes.

20      Q.  Okay.  So does the confidentiality

21  provision provide any confidentiality obligations

22  to third parties such as Dynamic?

23      A.  I -- that's somebody's

Page 81

1  interpretation, and I'm not -- I'm only reading
2  what I'm reading right here.
3     Q.   Who makes a determination as to
4  whether Section 7 was violated?
5     A.   Probably HMMA and -- between HMMA and
6  the contractor.
7     Q.   And would that be the legal team for
8  HMMA to make that determination or someone else?
9     A.   I believe it would be the legal team.
10    Q.   Okay.  I want to skip down to Section
11  9 that talks about insurance, and this is on that
12  same page, Bates Number HMMA 19.
13    A.   Uh-huh (positive response).  I see
14  it, Section 9.1.
15    Q.   And this is going to be married in
16  with topic area 13(a)(vii) from the deposition
17  notice.  Is there employment practices liability
18  insurance -- let me rephrase it.
19         Does this contract require HEA to
20  carry employment practices liability insurance?
21    A.   Yes.
22    Q.   What proof, if any, did HEA provide
23  to HMMA that it was carrying employment practices

Page 82

1  liability insurance that would apply to events in
2  2017?
3     A.   All I can say is that in order for
4  the contractor, HEA or Hyundai AMOCO, to enter in
5  the contract with HMMA, they have to provide a
6  certificate of insurance to be able to do that.
7  That's required as part of the process.
8     Q.   Does HMMA have that certificate of
9  insurance?
10    A.   The legal department likely has a
11  copy of that certificate of insurance.
12    Q.   Do you know if it was provided to
13  HMMA before or after Davita Key's EEOC charge was
14  filed?
15         MR. MIDDLEBROOKS:  Object to the
16  form.
17    Q.   Let me rephrase.  Do you know when
18  that certificate was provided?
19         MR. MIDDLEBROOKS:  Object to the
20  form.  He's answered that.
21    Q.   You can answer.
22         THE WITNESS:  I didn't hear that.  I
23  apologize.

Page 83

1         MR. MIDDLEBROOKS:  I said object to
2  the form.  You answered that already.
3         THE WITNESS:  Yes, okay.
4     Q.   (BY MS. LEONARD:)  And you can answer
5  it again.  Sometimes I may not always hear
6  something, so I might ask a question twice.
7     A.   Say the question again.
8     Q.   Sure.  Do you know when that
9  certificate was provided, if ever, by HEA to
10  HMMA?
11    A.   Okay.  So as I stated earlier, in
12  order for the contractor to enter a contract with
13  HMMA and fully execute the contract, they have to
14  provide a certificate of insurance.
15    Q.   Do you know if that was ever done by
16  HEA?
17    A.   Again, in order for them to provide
18  -- in order to be -- enter into the contract,
19  they had to provide that contract to us.
20    Q.   I understand that's how it's supposed
21  to work.  My question, though, is in actuality,
22  did HEA provide a certificate of insurance to
23  HMMA?

Page 84

1     A.   Again, as I've stated a couple of
2  other times, I wasn't in this role to be able to
3  know exactly what contract.  I didn't sign this
4  contract.  So, therefore, I can't guarantee
5  whether it was provided, but that is part of our
6  process, as I've already stated, as part of being
7  able to enter into a contract with HMMA.
8     Q.   And if HEA provided that certificate
9  of insurance to HMMA, HMMA should still have it?
10        MR. MIDDLEBROOKS:  Object to the
11  form.
12    A.   Yes.
13    Q.   And HMMA should still have any
14  documents that would show when that was
15  transmitted or given to HMMA, correct?
16        MR. MIDDLEBROOKS:  Object to the
17  form.
18    A.   I've already answered it.  Yes, I've
19  answered that.
20    Q.   And so that's something if we were to
21  ask HMMA to provide, it would not be hard or
22  difficult for it to provide it to us?
23        MR. WHITEHEAD:  Well, let me object

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 24 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 222 of 425

6/22/2022
22 (85 - 88)

Page 85

1 and say this contract was dated in 2013. That's
2 nine years ago. I can't be sure whether or not
3 that's something we'd still retain nine years
4 later, but I'm not saying yes or no. If we've
5 got it, we'll get it.
6      MR. MIDDLEBROOKS: We'll look for it.
7   Q.  (BY MS. LEONARD:) Other than what
8 you've described for me in the process that would
9 have required HEA to provide that certificate of
10 insurance to perform work, is there anything else
11 that HMMA would have done to ensure HEA's
12 compliance with the insurance provision in
13 Section 9?
14   A.  Not that I'm aware of.
15   Q.  If we can turn to Page 9 of the
16 contract or Bates Number HMMA 21, I want to look
17 at Section 10.
18      MR. MIDDLEBROOKS: I meant to tell
19 you the name of the project manager.
20      THE REPORTER: I'm sorry. I didn't
21 hear you.
22      MR. MIDDLEBROOKS: The name of the
23 project manager that she wanted to know that was

Page 86

1 redacted.
2      MR. WHITEHEAD: Jaehong Choi.
3      MS. LEONARD: Do you mind spelling
4 that?
5      MR. WHITEHEAD: Of course, I will.
6 J-a-e-h-o-n-g, all together. Choi is spelled
7 C-h-o-i.
8      MS. LEONARD: Thank you.
9   Q.  (BY MS. LEONARD:) All right. Are
10 you doing good? Do you need a break?
11   A.  I'm good.
12   Q.  I know you're looking going, How many
13 sections are there to this contract. Let's look
14 at Section 10, which talks about compliance with
15 laws and rules.
16   A.  Okay. I'm at Section 10.
17   Q.  Okay. What is required through this
18 section of the contract by the -- what is HMMA
19 requiring through this section of the contract?
20      MR. MIDDLEBROOKS: It speaks for
21 itself, but he can read it for the record if you
22 want to.
23   Q.  In plain English, what is HMMA

Page 87

1 seeking to require? And this is one of the topic
2 areas that's identified in Exhibit 1, the
3 30(b)(6) notice. It was something that you were
4 given an opportunity to prepare for.
5      What is required through Section 10
6 of the contract?
7   A.  So in general terms, the contractor
8 shall comply with federal, state, and local laws,
9 and also Title VII, and whatever Executive Orders
10 12 -- 11246, 11375, which are incorporated
11 herein.
12      And as I mentioned earlier,
13 contractor agrees to save HMMA harmless from and
14 against any and all liabilities, liens, claims,
15 costs, losses, expenses, and judgments arising
16 from or based on actual or asserted violations by
17 the contractor.
18      Of course, also be in compliance with
19 OSHA. Again, that's just a broad term, and
20 that's Section 10.2.
21      And 10.3 is then the contractor being
22 required to comply with the safety rules,
23 regulations, policies, and programs of HMMA as

Page 88

1 may be implemented from time to time by HMMA.
2      And if any contractors -- well,
3 contractor shall comply with all work rules and
4 regulations as well in this agreement.
5   Q.  And would those be HMMA's work rules?
6   A.  Yes, that's correct.
7   Q.  Okay.
8      MR. MIDDLEBROOKS: Read 10.4 also.
9      THE WITNESS: Yes, I'm about to. I'm
10 just catching my breath.
11      MS. LEONARD: I'm not rushing him,
12 David. We're going to talk about it all.
13   A.  Contractor, and all those working for
14 or on behalf of the contractor, shall comply with
15 HMMA rules for business invitees on the premises,
16 including those pertaining to safety, plant
17 protection, security, identification, and the
18 operation and parking of vehicles. And
19 contractor agrees to promptly remove from owner's
20 premises any workers who fail or refuse to comply
21 with owner's rules for business invitees and
22 replace them as -- replace them at contractor's
23 sole cost and expense.

Page 89

1    That's kind of the big picture.

2    Q.   What are Executive Orders Number

3    11246 and 11375?

4    A.   I do not know.

5    Q.   Do you know if copies of those were

6    provided to HEA?

7    A.   I do not have knowledge if they were

8    provided to HEA.

9    Q.   How could I find out what those

10   executive orders say?

11   A.   I'm sure the legal counsel would find

12   that.

13   Q.   Do you know if they relate to

14   employment discrimination since they immediately

15   follow a reference to Title VII of the Civil

16   Rights Act of 1964 in the contract?

17   MR. MIDDLEBROOKS:  They apply to

18   federal contractors.

19   MS. LEONARD:  I wouldn't know.  I

20   haven't seen them.  I don't know what they are.

21   MR. MIDDLEBROOKS:  I'm very familiar

22   with them.

23   MS. LEONARD:  Okay.  Can you guys

Page 90

1    send us copies of that?

2    MR. MIDDLEBROOKS:  Of executive

3    orders?

4    MS. LEONARD:  Are these governmental

5    executive orders or are they executive orders

6    within Hyundai?

7    MR. MIDDLEBROOKS:  These are

8    governmental executive orders that apply to

9    federal contractors, which actually I don't think

10   they are.

11   MR. WHITEHEAD:  I don't want to jump

12   in and testify for him, but that wasn't attached

13   to the contract.  It's referenced, but it wasn't

14   attached to the contract.

15   MS. LEONARD:  I don't want to make

16   assumptions that they were federal executive

17   orders versus something that may have been

18   internal.

19   MR. MIDDLEBROOKS:  They're federal.

20   Q.   (BY MS. LEONARD:)  What, if anything,

21   did HMMA do to enforce Section 10 of this

22   contract?

23   A.   Well, in general, we make sure, as

Page 91

1    it's stated here, that all the contractors or

2    subcontractors adhere to OSHA standards, safety

3    policies, et cetera.  If there was any issue

4    where they were not in compliance, then we would

5    take action as appropriate, but it just depends

6    on the situation.  It's on a case-by-case basis.

7    Q.   Anything else?

8    A.   No.  I can't think of anything else.

9    Q.   What is the penalty for breaching

10   Section 10?

11   A.   Well, could be simple reprimand up to

12   terminating a contract.  It could be.  It just

13   depends on the severity of the violation of this

14   section of the contract.

15   Q.   Has HMMA made any determination as to

16   whether Dynamic and/or HEA did anything to breach

17   Section 10?

18   A.   Not that I'm aware of.

19   Q.   Does that mean HMMA determined --

20   looked at this and said there is no violation or

21   HEA has not even made an evaluation?

22   A.   I'm not aware of any -- I say --

23   because, obviously, we've not terminated the

Page 92

1    contract, so they have not made any egregious

2    violation of these rules or compliance sections,

3    so that's all I can say at this time.

4    Q.   Are you aware of anybody at HMMA

5    evaluating whether HEA or Dynamic violated

6    Section 10 of the contract?

7    A.   I'm not aware.

8    Q.   Has anybody on behalf of HMMA

9    evaluated whether HEA or Dynamic did anything to

10   evaluate -- or to violate Title VII of the Civil

11   Rights Act of 1964?

12   A.   I'm not aware.

13   Q.   Has anyone on behalf of HMMA

14   evaluated whether HEA or Dynamic did anything to

15   violate any federal anti-discrimination laws?

16   A.   Not that I'm aware of.

17   Q.   If you can give me a second, I can't

18   read my writing.  I'm trying to figure out what I

19   meant here.

20   With respect to the filing of a

21   charge of discrimination with the EEOC, what

22   effect, if any, does it have on Section 10?

23   In other words, would HEA or Dynamic

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 26 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 224 of 425

6/22/2022
24 (93 - 96)

Page 93

1   be obligated to notify HMMA if it received a
2   charge of discrimination from somebody it had
3   placed on HMMA's property?
4       **A.   No, because it's not an employee of**
5   **HMMA.**
6       Q.   Considering that the contract
7   requires compliance with the federal
8   anti-discrimination laws, would HMMA make any
9   request that Dynamic or HEA notify it if it has
10   been accused of violating those federal
11   discrimination laws?
12       **A.   They may make that request, but I**
13   **guess it would determine whether that was a valid**
14   **charge or not.  I guess at some point when it**
15   **became valid, then they would be notified.**
16       Q.   Who determines if it's valid?
17       **A.   I guess the EEO commission.**
18       Q.   What makes a charge valid?
19       **A.   Whether the EEO commission believes**
20   **that there's some --**
21       MR. MIDDLEBROOKS:  Object to the
22   form.  If you know.
23       **A.   I don't -- yeah, I don't really know,**

Page 94

1   no.  That's true.
2       Q.   Considering that the contract directs
3   in 10.1 that all services provided herein shall
4   comply with all applicable federal, state, and
5   local codes and goes on to reference some of
6   the -- at least one federal anti-discrimination
7   law, who for HMMA makes the determination as to
8   whether the contractor is complying with those
9   laws?
10       **A.   HMMA evaluates if there is some --**
11   **again, depending on the severity of the issue,**
12   **whether or not there is a violation of this**
13   **section.**
14       Q.   Who does that?
15       **A.   It depends on which group.  What I**
16   **mean by that is if this -- this particular one is**
17   **under the general affairs team, oversees -- I'm**
18   **sorry -- works with Hyundai Engineering on these**
19   **contracts, but that's the only group I think**
20   **would evaluate that.**
21       Q.   Has anyone evaluated whether this
22   section was violated as it related to the way
23   Davita Key was treated?

Page 95

1       **A.   Not to my knowledge.**
2       Q.   If we can go to Page 11 of the
3   contract or Bates Number 23.
4       **I'm on Page 11.**
5       Q.   Okay.  This is outside of some of the
6   specific questions I listed, so this may not be
7   something you can answer.
8       Section 20 uses the term "independent
9   contractor."  What does HMMA mean by the term
10   "independent contractor"?
11       **A.   Well, let me read through this**
12   **section.**
13       MR. MIDDLEBROOKS:  I object.  It
14   calls for a legal definition.
15       MS. LEONARD:  I'll rephrase.
16       Q.   (BY MS. LEONARD:)  Do you have any
17   understanding of what this term means as it's
18   used within the contract?
19       **A.   Again, let me read through the**
20   **contract.**
21       **As I interpret it, I'll just say it's**
22   **someone who is a subcontractor of the contractor.**
23       Q.   What's the difference between a

Page 96

1   subcontractor of a contractor and an employee as
2   you understand that term in this contract?
3       MR. MIDDLEBROOKS:  Again, it calls
4   for a legal conclusion.  Object to the form.
5       **A.   I can't -- like I said, I just**
6   **interpret it as a subcontractor, someone that is**
7   **not a part of the contractor in this contract**
8   **with Hyundai AMOCO.**
9       Q.   As the vice-president of human
10   resources and the chief administrative officer,
11   do you have an understanding of what the
12   difference is between a contractor and an
13   employee or an independent contractor or
14   subcontractor and an employee?
15       MR. MIDDLEBROOKS:  Object to the
16   form.  It calls for a legal analysis and
17   conclusion.  You can answer if you know.
18       **A.   I don't have any -- I gave my**
19   **interpretation already.**
20       Q.   And what is that?
21       **A.   Again, as it states in this contract,**
22   **the subcontractor is basically someone who works**
23   **for the contractor in the case of this particular**

Page 97

1  contract between Hyundai Motor Manufacturing
2  Alabama and Hyundai AMOCO.
3      Q.   And when you say works for, what do
4  you mean by that?
5      A.   Works for Hyundai Engineering.
6      Q.   Exactly.  When you say they work for
7  Hyundai Engineering, what does it mean to work
8  for Hyundai Engineering as opposed to --
9      A.   They're a contractor.  They provide
10  services.
11     Q.   And the services that -- the
12  people HEA placed at HMMA, for what company's
13  benefit were they?
14         MR. MIDDLEBROOKS:  Object to the
15  form.
16         THE WITNESS:  I'm sorry.  I didn't
17  hear what you said.
18         MR. MIDDLEBROOKS:  If I object to the
19  form, you can still answer.
20         THE WITNESS:  Okay.  I'm sorry.
21         MR. MIDDLEBROOKS:  If I say you don't
22  answer, don't answer.  If I object to form, you
23  can answer.

Page 98

1      A.   I'm sorry.  I'm misinterpreting
2  things here.  So, again, please ask the question
3  again.
4      Q.   (BY MS. LEONARD:)  Sure.  The people
5  that HEA would have placed at HMMA, the work
6  those individuals performed, for what company's
7  benefit was that work?
8      A.   Work performed for Hyundai AMOCO or
9  Hyundai Engineering was for the benefit of that
10  company.  That's who the contract was with.
11     Q.   Who derived the benefit of the
12  security services provided at the Hyundai gates?
13     A.   The Hyundai Engineering would have
14  benefited from the services provided, and
15  secondarily, we did, too.  Hyundai Motor
16  Manufacturing Alabama did as well.
17     Q.   What do you mean by secondarily?
18     A.   Because they were not directly
19  employed by Hyundai Motor Manufacturing Alabama.
20     Q.   How did HEA benefit from people
21  guarding HMMA's property?
22     A.   Because they were paying for the
23  services provided by the subcontractor,

Page 99

1  independent contractor on behalf of Hyundai AMOCO
2  or Hyundai Engineering.
3      Q.   How did HEA benefit from people
4  working in HMMA's property?
5         MR. MILLER:  Object to the form.
6      A.   They provided mail services.
7      Q.   For whom?
8      A.   For the -- the mail delivered to the
9  site, which is 700 Hyundai Boulevard, to Hyundai
10  Motor Manufacturing Alabama, or if there was
11  someone else receiving goods -- I'm sorry -- not
12  goods, packages or mail at that site, that's who
13  benefited from the mailroom services.
14     Q.   But it would be fair to say that
15  generally the mail coming into and going out of
16  the mailroom was HMMA's mail?
17         MR. MIDDLEBROOKS:  Object to the
18  form.
19     A.   That's hard to determine, because
20  there are a number of subcontractors and
21  independent contractors that work on our site in
22  general that may say, I need a part or component
23  delivered to Hyundai Motor Manufacturing Alabama,

Page 100

1  700 Hyundai Boulevard with their name on it.
2      Q.   And that would be a part that's
3  ultimately going to be used to benefit the
4  production of HMMA's vehicles?
5      A.   It may be something to repair a part
6  or repair something that's a building, not
7  necessarily building of a vehicle.
8      Q.   But the buildings that are at -- on
9  that property are HMMA's buildings, correct?
10     A.   That is correct.
11     Q.   And the equipment that is -- that is
12  at that property is used ultimately to
13  manufacture vehicles that are HMMA vehicles?
14     A.   There's a wide variety of activities
15  on the site that does include manufacturing
16  vehicles, but there are other activities as well.
17         So it's hard to determine exactly
18  what products were being delivered or what mail
19  was being sent out by a variety of contractors or
20  subcontractors on-site.
21     Q.   If you can turn to Page 15 or Bates
22  Number 27, which is Exhibit A, Scope of Service.
23  Is Exhibit A, Scope of Service, part of this

Page 101

1 contract?

2    A.   I would assume that it is, and that's

3 28.  Yes, it's all the -- as I was talking about

4 earlier, all the details of the job descriptions,

5 et cetera, yes, yes.

6    Q.   And if you turn to the next page,

7 which is page Bates Number 28?

8    A.   Okay.  I have 28.

9    Q.   Okay.  When was this scope of

10 services drafted?

11    A.   Based on the information in front of

12 me, it looks like a date of June 18, 2010.

13    Q.   Was this drafted by HMMA?

14    A.   Let's see here.  Bear with me as I

15 look through the document to make sure.  I was

16 trying to see if there was an additional name

17 beside the names prepared, because I cannot read

18 prepared by and HOD and coordinator.  I'm

19 assuming that's an approval process versus who

20 may have developed it.

21        MR. MIDDLEBROOKS:  Don't assume.

22        THE WITNESS:  Thank you very much.

23    A.   So the -- yeah, I just can't tell who

Page 102

1 the prepared by was.  So I don't want to make an

2 assumption of exactly who prepared the document.

3    Q.   (BY MS. LEONARD:)  Seeing that the

4 document is dated June 18th, 2010, do you know

5 with whom HMMA was contracting for security

6 services in 2010?

7    A.   I do not know at all.

8    Q.   Was it Hyundai AMOCO America?

9    A.   I do not know at all.

10    Q.   Considering that Exhibit A defines

11 the work that HMMA is contracted to have

12 performed, is it reasonable to assume that the

13 statement of work reflects what HMMA wanted the

14 contractor to do?

15    A.   Yes.  I would say it does reflect

16 what the contractor -- what services the

17 contractor was expected to provide, yes.

18    Q.   And in the bottom right corner on

19 several of these pages, we see the letters WG and

20 JH.  Do you know why those are on these

21 documents?

22    A.   As I stated earlier, I assume --

23        MR. MIDDLEBROOKS:  Don't assume.

Page 103

1    A.   Don't assume.  I keep using that

2 word.  Anyway, based on the information and the

3 general knowledge, I would say the parties that

4 reviewed this statement of work were

5 acknowledging each page's content by initialing

6 it.

7    Q.   Okay.  If you can turn to Page HMMA

8 30.

9    A.   I'm on Page HMMA 30, yes.

10    Q.   And at the top you're going to see a

11 Letter A, and it says Description of Work.  Do

12 you see where I am?

13    A.   Yes, I see A.

14    Q.   Take a moment to read that paragraph.

15 I want to ask you some questions about it.

16    A.   (Witness reviews document.)  Okay,

17 I've reviewed Item A.

18    Q.   In looking at that, is this saying

19 that HMMA is going to define what work to be done

20 and that the contractor is to provide the people

21 to carry out that --

22        MR. MIDDLEBROOKS:  Object to the

23 form.  The contract, the document speaks for

Page 104

1 itself.

2    A.   Yeah, I'm reading it.  It just says

3 contractor shall provide all management,

4 supervision, labor, training, equipment, et

5 cetera.

6    Q.   And towards the end of it, it says

7 it's going to provide what's necessary to, quote,

8 fulfill all aspects of the contract to provide

9 uniform security services as herein outlined and

10 specified, close quote.  Did I read that

11 correctly?

12    A.   Yes, you've read it correctly.

13    Q.   And HMMA defines what is necessary to

14 fulfill those terms of the contract, correct?

15    A.   The description of work says what is

16 required for the contract.

17    Q.   And that's what's required by HMMA?

18    A.   Jointly prepared, I guess, between

19 HMMA and the contractor.

20    Q.   But you don't know who prepared this

21 document?

22    A.   I do not.

23    Q.   So you don't know if it was jointly

Page 105

1  prepared?

2      A.  I do not know, that's correct.

3      Q.  And let's look at the next section,

4  Location of Work.

5      A.  All right.  Location of Work.

6      Q.  Let me know when you've had an

7  opportunity to review that paragraph.

8      A.  (Witness reviews document.)  Okay.

9  I've reviewed Location of Work.

10     Q.  What is a federal foreign trade zone?

11     A.  I'm familiar with what a foreign

12 trade zone represents.  It is an area designated

13 by U.S. Customs that allows for certain treatment

14 of duties relative to parts moving in and out of

15 the facility.  That's about all I know, though.

16     Q.  Does that designation affect the way

17 employees are to be treated in any way?

18     A.  No.  It's purely related to the

19 movement of goods in and out of the facility.

20     Q.  I want to talk next about Section C,

21 Projected Staffing Requirements.

22     A.  All right.

23     Q.  Okay.  The first thing I want to look

Page 106

1  at is there is a statement within this that the

2  schedule and manpower is subject to change based

3  on the business needs of HMMA.  What do you

4  understand that to mean?

5      A.  My understanding is that if the

6  facility was operating in a different time,

7  meaning producing vehicles or not producing

8  vehicles, shut down for maintenance, et cetera,

9  that's where it would change.

10     Q.  Okay.  And do you agree that whoever

11 was providing services under this contract, be it

12 HEA or Dynamic, it was to provide protection --

13 or to provide sufficient security personnel and

14 supervision to ensure the protection of team

15 members and the property at HMMA?

16     A.  Yeah, the contract stipulates that --

17 I'm sorry, the security services they would

18 provide for the plant site, yes.

19     Q.  And so the goal of the contract is to

20 ensure the protection of team members and

21 property at HMMA?

22     A.  Yes.

23     Q.  So you would agree then that the

Page 107

1  party that derives the ultimate benefit from the

2  services provided by the people placed by Dynamic

3  or HEA would be the property and team members of

4  HMMA that are being secured?

5          MR. MIDDLEBROOKS:  Object to the

6  form.

7      A.  As I said earlier, the Hyundai

8  Engineering was benefiting from the services

9  provided by whichever security firm they

10 contracted with.  And yes, HMMA benefited,

11 because the property was protected by Hyundai

12 Engineering's subcontractor.

13     Q.  There is a chart below Section C.

14 Does this set the minimum coverage that HMMA is

15 requiring the contractor to provide?

16         MR. MIDDLEBROOKS:  At that time.

17     A.  At the time of this document being

18 prepared, I would say yes.

19     Q.  Did this coverage schedule that we

20 see below -- and I'm calling it a coverage

21 schedule, the chart.  Does this minimum

22 requirement for coverage, did it change by the

23 end of July 2017?

Page 108

1      A.  This coverage chart could change from

2  week to week depending on the operational status

3  of Hyundai Motor Manufacturing Alabama.  As I

4  said earlier, depending on shutdowns, et cetera.

5      Q.  So would there be a chart -- let me

6  rephrase it.

7          So would somebody at HMMA then

8  generate this chart and provide it to HEA or

9  Dynamic to say this is the staffing we need?

10     A.  Based on this scope of work in front

11 of us, that would be, as we've stated, maybe

12 we'll call it the minimum or projected staffing

13 requirements to operate the facility or to

14 provide the services for the facility.

15     Q.  So would there be charts of this

16 nature that I could request either from HMMA,

17 HEA, or Dynamic that would show the minimum

18 staffing requested by HMMA in July and August of

19 2017?

20         MR. MIDDLEBROOKS:  Object to the

21 form.  If you know.

22     A.  I don't know for sure, but I'm sure

23 you could check with Dynamic Security.

Page 109

1    Q.   Well, when you say this changes, what
2  documents would show that there have been any
3  changes in the minimum staffing other than what
4  is in this chart on Bates Number 30?
5    A.   So let me just clarify.  Projected
6  staffing requirements sets probably the baseline,
7  whoever developed this document, and then if
8  there was a change because of a shutdown or
9  whatever, maybe this would not be the staffing
10  requirement on that day or that week.  That's
11  what I'm referring to.
12       So there's probably this baseline,
13  but it may fluctuate based on operating
14  conditions.
15    Q.   Was the baseline that we see on Bates
16  Number 30 in place at the end of July 2017,
17  beginning of August of 2017?
18    A.   I do not have specific knowledge if
19  this was in place at that time other than what's
20  in front of me.
21    Q.   How could I find out what the
22  baseline was then?
23       MR. MIDDLEBROOKS:  Object to the

Page 110

1  form.
2    A.   You're welcome to touch base with
3  Dynamic Security.
4    Q.   Doesn't HMMA set the baseline of what
5  it needs?
6       MR. MIDDLEBROOKS:  Object to the
7  form.
8    A.   So, again, this was in the scope of
9  work, but you would have to check with Dynamic
10  Security what the actual staffing was at the time
11  that you just specified.
12    Q.   And I apologize, and I think we're
13  saying the same thing, but we may just not be
14  communicating.
15       Would you agree that the chart we're
16  saying basically says this is what HMMA sets as
17  the minimum of what we think we're going to need
18  in terms of --
19       MR. MIDDLEBROOKS:  The record speaks
20  for itself.
21    Q.   You can answer.
22    A.   And I'm repeating what I said.  The
23  projected staffing requirements at the time was

Page 111

1  in this document, so that's all I can reference.
2    Q.   And would the projected -- the
3  projected staffing requirements, how could I find
4  out what HMMA projected the staffing requirements
5  to be under this contract as it would have been
6  implemented or as it would have been followed in
7  July, August of 2017?
8       MR. MIDDLEBROOKS:  Object to the
9  form.
10    A.   I've already answered that you could
11  check with Dynamic Security.
12    Q.   And how would they know what the
13  minimum staffing requirements were?
14       MR. MIDDLEBROOKS:  Calls for
15  speculation.  Object to the form.
16    A.   I'm just saying that's who you need
17  to check with.
18    Q.   Well, would Hyundai communicate to
19  Dynamic, This is how many people we think we'll
20  need?
21    A.   The scope of work that's outlined
22  here set the projected staffing requirements at
23  that time, and that's all I can say.  I don't

Page 112

1  know.
2    Q.   Okay.  So was Dynamic free to send
3  over however many people they wanted to?
4       MR. MIDDLEBROOKS:  Object to the
5  form.  He's asked and answered your question.
6    Q.   You can answer.
7    A.   I have.  I don't have any other
8  information besides what's in front of me to
9  determine what the projected staffing was at that
10  time.
11    Q.   Yes or no, was Dynamic free in July
12  and August of 2017 to send over whatever number
13  of people it wanted?
14       MR. MIDDLEBROOKS:  Dynamic wasn't
15  their contractor.
16    Q.   You need to answer.
17    A.   I'm confused anyway, but all I'm
18  saying is this -- I don't know what staffing they
19  had on any particular day or any particular month
20  other than what the projected staffing
21  requirements that are in front of me right now.
22    Q.   Would you agree the projected
23  staffing requirements would have been created by

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 31 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 229 of 425

6/22/2022
29 (113 - 116)

Page 113

1  HMMA?
2      A.   I can only say that they were
3  probably determined in conjunction with the
4  Hyundai Engineering team or Hyundai AMOCO at the
5  time the scope of work was prepared.
6      Q.   And this was in 2010, correct?
7      A.   This has 2010 on the front of the
8  document.
9      Q.   And you don't know if there was any
10 agreement in 2010 between HEA or any of its
11 predecessors and HMMA?
12     A.   I do not.
13     Q.   So you have no knowledge of HEA
14 having any input into the projected staffing
15 requirements?
16     A.   I do not have specific knowledge, no.
17     Q.   We see looking at the projected
18 staffing requirements chart that there's seven
19 days identified.  Does production run for seven
20 days at HMMA?  In other words, is it open every
21 day of the week?
22     A.   The -- you refer to production, and
23 the production can run six days or seven days in

Page 114

1  some areas, not all areas.
2      Q.   Okay.  Is the plant open seven days a
3  week?
4      A.   There's access to the plant seven
5  days a week.
6      Q.   It appears that there are three
7  shifts identified for each day.  What are the
8  hours of each shift?
9      A.   Well, I'm looking at this, and it
10 says eight hours, so I would assume each shift --
11         MR. MIDDLEBROOKS:  Don't assume.
12         THE WITNESS:  I'm sorry.  I get hung
13 up on that word.
14         MR. MIDDLEBROOKS:  Only testify to
15 what you know.
16     Q.   (BY MS. LEONARD:)  What are the hours
17 for first shift at HMMA?
18         MR. MIDDLEBROOKS:  You mean
19 production?
20     Q.   I don't know.  Is there a first shift
21 at HMMA?
22     A.   There is a first shift at HMMA.
23     Q.   And what are the hours that the first

Page 115

1  shift runs?
2      A.   Are we referring to production?
3      Q.   Is there a difference between first
4  shift for production and any other first shift?
5      A.   There are differences in production
6  schedules by area.  So we will refer to
7  automotive assembly specifically, and that would
8  be first shift starting at 6:30 and ending at
9  2:45.
10     Q.   Okay.  Are there any other hours for
11 other first shifts?  In other words, are there
12 first shifts that operate at different hours than
13 6:30 to 2:45?
14     A.   The engine shop first shift starts at
15 6:00 a.m., yeah, 6:00 a.m., and can run up until
16 4:30 in the afternoon.  But as a straight
17 eight-hour shift, it would be 2:00 -- 2:30 in the
18 afternoon.  2:00 or 2:30.
19     Q.   Are there any other first shifts that
20 run at different hours?
21     A.   Administrative building has your
22 normal 8:00 to 4:45, but that's only -- that's
23 not a shift operation.  It's a day work, daily

Page 116

1  work operation.
2      Q.   Here where we see each day is broken
3  into three eight-hour shifts, do you know what
4  the hours are that are defined by the shifts in
5  this chart?
6      A.   I do not have any specific details of
7  when their start time and end time for the
8  security staffing.  That would be determined by
9  Dynamic and Hyundai Engineering, not by HMMA.
10     Q.   Are you aware of any documents that
11 would say those hours are set by Dynamic or HEA?
12     A.   No.
13     Q.   What is your basis then for saying
14 that Dynamic or HEA would set those hours?
15     A.   Because I don't have any knowledge of
16 their shift change schedules at all.
17     Q.   Do you know if HMMA has ever
18 communicated to HEA or Dynamic what it would want
19 the shift hours to be for the people identified
20 on this chart?
21     A.   Nope.
22     Q.   All right.  If you can turn to the
23 next page, which is Bates Number 31, and it's

Page 117

1  Summary of Services.
2       And we're right at 11:30.  Are you
3  still good to go?
4       A.   I'm still fine for the moment.
5       MR. MIDDLEBROOKS:  I'm good for about
6  another half hour.
7       A.   Yeah, I'm saying we'll shoot for the
8  noon hour.
9       Q.   Okay.
10      A.   I'm looking at D, Summary of
11  Services.
12      Q.   All right.  Does this accurately
13  reflect the services that are to be provided
14  under this contract?
15      A.   It does appear to be an accurate
16  representation of the services provided.
17      Q.   Under Section E where we see
18  specifications, under 1E, we see that contractor
19  shall provide daily, weekly, monthly reports to
20  HMMA manager, safety, security, and medical.
21  What are the contents of those reports to be?
22      A.   I am only aware of the content in a
23  daily report, and that would be all.  And that

Page 118

1  daily report just shows any activities that may
2  have been performed by the security services.
3       Q.   Would it reflect all the activities
4  performed or are there specific types of
5  activities that would be reported?
6       A.   Simple example would be just a
7  parking violation that I would see, that's the
8  only report I see personally.
9       Q.   Do you know what the contents are of
10  the weekly and monthly reports?
11      A.   I do not.  I've never seen those
12  reports.
13      Q.   Do you know if there are any daily,
14  weekly, and monthly reports that were received
15  pursuant to this contract that covered the dates
16  of July 31st and August 1st, 2017?
17      A.   I do not.
18      Q.   Would HMMA have those reports if they
19  had been sent?
20      A.   I don't know.  I've not seen the
21  reports.
22      Q.   Who receives those reports?
23      A.   If I'm reading the contract, it would

Page 119

1  be the HMMA managers, safety, security, and
2  medical.
3       Q.   Do you know if there are any
4  references to Davita Key on any reports, be they
5  daily, weekly, or monthly, that were sent to
6  HMMA?
7       A.   I do not know.
8       Q.   Under Section 2 where we see minimum
9  standards, and this is at the bottom of Page HMMA
10  31, are these the minimum qualifications that we
11  talked about before that HMMA has set for people
12  to be placed to perform work pursuant to this
13  contract?
14      MR. MIDDLEBROOKS:  It goes on to the
15  next page.
16      THE WITNESS:  Thank you.
17      A.   It appears these are the minimum
18  standards that were set forth between HMMA and
19  Hyundai Engineering or Hyundai AMOCO.
20      Q.   (BY MS. LEONARD:)  And, again, we go
21  back to you don't know if HEA had any
22  contribution into this document since it was
23  created in 2010?

Page 120

1       A.   As we talked about earlier, the
2  initials on the bottom right-hand corner indicate
3  that two individuals, which we've now determined
4  represent the project manager, agreed on these
5  minimum standards.
6       Q.   Okay.  And these are standards that
7  HMMA put into the contract?
8       A.   That HMMA and Hyundai AMOCO or
9  Engineering agreed to put into the scope of work
10  or contract.
11      Q.   Well, we know that, again, what we're
12  looking at, the Section A, was created in 2010,
13  correct?
14      A.   Yes.
15      Q.   And you don't know if HEA or any of
16  its predecessors were part of negotiating this
17  document in 2010?
18      A.   No, I do not have any specific
19  knowledge.
20      Q.   And you don't even know if Exhibit A
21  that we're looking at right now was part of a
22  negotiation or something that HMMA created and
23  presented to be part?

Page 121

1    A.   No, I do not have specific knowledge.

2    Q.   But what we do know is that as of the

3 time this contract was signed in 2013, nothing

4 within Exhibit A was negotiated further?

5    A.   I have no knowledge if it was

6 negotiated or not.

7    Q.   Would it be fair to assume that HMMA

8 established the minimum qualifications that -- or

9 the minimum standards that somebody had to meet

10 in order to perform work under this contract?

11       MR. MIDDLEBROOKS:  Object to the

12 form.

13    A.   I've already answered the question

14 that the minimum standards were developed by two

15 parties based on initials on the lower right-hand

16 corner, whoever those two parties may have been.

17    Q.   But those initials that you said

18 before, you said you can't assume what they mean

19 earlier, correct?  In fact, every time you

20 pointed to that, your lawyer has cautioned you

21 not to assume, and you said, Yeah, I don't want

22 to assume, right?

23       MR. MIDDLEBROOKS:  I don't know if

Page 122

1 I've said it about that.

2       MS. LEONARD:  You want him to assume

3 that?

4       MR. MIDDLEBROOKS:  I said don't make

5 assumptions.  I told him not to assume about

6 things specifically.  Object to the form.

7    A.   You asked me what I thought they

8 were.  I've told you what I thought they were.

9    Q.   (BY MS. LEONARD:)  But do you know

10 what they are, the initials are?

11    A.   We've determined those are initials

12 of Warren Gappa and another individual, who both

13 represent a project manager as well as a -- I

14 think his title -- I apologize.  Maybe it's

15 purchasing manager, whatever the title is

16 underneath for Warren Gappa.

17       So there's two parties that have

18 signed this document.  That's how I've now gotten

19 to that point versus assuming anything.

20    Q.   Okay.  And what we know is the

21 document that we're looking at now where the

22 initials are contained was drafted in 2010?

23    A.   Yes.

Page 123

1    Q.   And the title of the document is

2 Statement of Work, Hyundai Motor Manufacturing

3 Alabama, LLC Contract Security Services.

4       MR. WHITEHEAD:  Can we take a break

5 for just a second?

6       MS. LEONARD:  Sure.

7       (Whereupon, a brief recess was

8 taken.)

9    Q.   (BY MS. LEONARD:)  All right.  We are

10 back from a break.  We're still looking at

11 Plaintiff's Exhibit 2.  I want to look at Bates

12 Number 32, Section 3, Training.

13    A.   I'm on -- yep, Page 5, Section 3,

14 Training.

15    Q.   You got it.  Do you know what

16 training, if any, was provided by HEA and/or

17 Dynamic to the people they placed at HMMA?

18    A.   I have no specific knowledge of what

19 training was provided, no.

20    Q.   Do you know what training, if any,

21 was required under this contract to be provided

22 to the people who were going to be placed by

23 Dynamic or HEA at HMMA?

Page 124

1    A.   I can only determine what's listed

2 here under the training for preplacement, and

3 looks like in-service and refresher training is

4 outlined in this scope of work.

5    Q.   So HMMA would require in-service and

6 refresher training for anybody that's being

7 placed on its property by Dynamic or HEA?

8    A.   HEA or Hyundai AMOCO to be in

9 compliance with the contract would require the

10 security firm to complete this training to be

11 able to effectively provide the services.

12    Q.   What is in-service training?

13    A.   I'm sorry.  One more time?

14    Q.   What is in-service training?

15    A.   I'm looking here.  C, if I've got my

16 page number, on Page 6:  Contractor shall

17 schedule and conduct monthly training sessions,

18 one to two hours, for the purpose of reviewing

19 general post orders and instructions of the

20 contractor and HMMA.  Sessions should be

21 supplemented with professional security officers

22 training videos.

23       All gate security officers shall be

Page 125

1  trained on the proper data entry skills necessary
2  to log, key, scan, and otherwise properly handle
3  inbound materials and parts arrival at HMMA.
4        Promptly upon request of HMMA,
5  contractor shall also conduct training sessions
6  to address specific procedures, deficiencies, et
7  cetera, as specified by HMMA.
8     Q.   So the substance of in-service
9  training would be the things that are identified
10 in Numbers 1, 2, and 3 of Section 3C as reflected
11 on Bates Number 33?
12    A.   Yes.
13    Q.   Okay.  When we look at Number 3, it
14 says promptly upon request of HMMA, contractor
15 could have to do these other types of trainings.
16       Did HMMA make any requests to HEA or
17 Dynamic to conduct any training sessions to
18 address specific procedures, deficiencies, et
19 cetera, as specified by HMMA?
20    A.   I have no specific knowledge of HMMA
21 requesting Hyundai Engineering to conduct any
22 training sessions for procedures, deficiencies.
23    Q.   Do you have any general knowledge of

Page 126

1  HMMA making that request to HEA or Dynamic?
2     A.   I have no general knowledge of HMMA
3  making the request to Hyundai Engineering.
4     Q.   So you have no knowledge of HMMA
5  making a request to the contractor to conduct
6  training sessions to address specific procedures,
7  deficiencies, et cetera as specified by HMMA?
8     A.   No, I am not.
9     Q.   Is there any type of documentation
10 that's been provided to HMMA from HEA or Dynamic
11 showing the training it has provided to the
12 people they have placed on HMMA's property?
13    A.   I have no knowledge of the
14 information being provided.
15    Q.   Is that something that is required by
16 HMMA, to see the training materials used by its
17 contractors?
18    A.   I have no knowledge if it's required.
19    Q.   In Section D on Bates Number 33, we
20 see that the contractor is required to provide
21 annual refresher training to recertify the
22 training officers who have been working there for
23 more than twelve months.

Page 127

1        Is that documentation provided to
2  HMMA?
3     A.   I do not have any knowledge that that
4  is provided to HMMA.
5     Q.   In any of the training that the
6  contractor is required to provide through these
7  sections we've looked at, does any of that
8  training relate to avoiding discrimination or
9  retaliation?
10    A.   I do not have any knowledge of
11 exactly what is covered in the refresher
12 training.
13    Q.   Do you have knowledge of anything
14 that is covered in the annual refresher training?
15    A.   I do not have any knowledge of what's
16 covered in the annual refresher training.
17    Q.   Does anything within this contract,
18 Exhibit 2, require the contractor to provide
19 training on federal anti-discrimination laws?
20    A.   I do not see any information --
21       MR. MIDDLEBROOKS:  Take your time and
22 look at the whole contract.
23    A.   Yeah, I've looked through the whole

Page 128

1  thing.  I'm not aware that there's anything
2  specific to that.
3        MR. MIDDLEBROOKS:  The contract
4  speaks for itself.
5     Q.   If you can turn to the next page,
6  which is HMMA 34, I want to look at Section 6
7  that talks about conduct.
8     A.   I see Section 6, Conduct.
9     Q.   When we look at that, under Section
10 A, it says the contractor has to ensure that the
11 security officers carry out their duties and
12 comply with the contract, and then it gives some
13 examples of things that would be noncompliant.
14 And the first thing listed is unacceptable
15 appearance.  What is that?
16    A.   The appearance of the security
17 officer's uniform.
18    Q.   Okay.  Who determines whether the
19 appearance is unacceptable?
20    A.   Hyundai Engineering or the security
21 contractor.
22    Q.   Does HMMA have any input into what is
23 considered unacceptable appearance?

Page 129

1  A. No. I'm not aware of any guidelines
2  or anything on unacceptable appearance, no.
3  Q. If HMMA has no input into what is
4  determined unacceptable appearance, then why is
5  this a provision within the contract in terms of
6  conduct where the contractor is responsible for
7  making sure that the employer maintains
8  acceptable appearance?
9  A. I believe, and I do not -- there it
10  is. I had to find here, I believe -- yes. So
11  going to Section 5, Uniforms, this is -- it
12  specifically states about the contractors will
13  provide uniforms. Let's see. Uniforms shall be
14  worn at all times by security officer engaged in
15  the performance of their duties. The uniform
16  shall be the same color and style.
17      That's where I believe they're
18  referring to appearance, that they have the right
19  uniform on with all the right specific
20  appearance, meaning same color, same style,
21  patches, et cetera.
22  Q. But my ultimate question is if HMMA
23  has no say in what is considered unacceptable

Page 130

1  appearance, why is it identified as something in
2  this contract?
3  A. Because it appears to tie back to the
4  uniforms that are provided or supposed to be
5  provided as a part of the service.
6  Q. So HMMA does have some input in what
7  is considered unacceptable appearance, at least
8  as it would relate to uniforms?
9      MR. MIDDLEBROOKS: He's answered the
10  question.
11      MS. LEONARD: No, he hasn't.
12      MR. MIDDLEBROOKS: Do you want him to
13  repeat it?
14  A. I can say, again, I'm looking at
15  Section 5, Uniforms. It details what the
16  security officer is supposed to wear, and if the
17  security officer is wearing what is detailed in
18  Item 5, then their appearance would probably
19  comply with the item -- sorry. I'm getting all
20  these pages mixed up. Was that Page 34?
21  Conduct, yeah -- sorry. It's 34, Conduct, right
22  there. Item 6, Conduct, Unacceptable Appearance.
23  Q. We're going to show you on the screen

Page 131

1  a document that's produced as HEA 205. And it's
2  a picture of someone wearing a gray golf shirt
3  with the name Elijah on it, and it's got a logo
4  on it. Is this the golf shirt that is referred
5  to in the uniform section?
6  A. Yes, I would -- based on the five
7  golf style shirts, that that looks like a golf
8  style shirt, yes.
9  Q. And there's a patch that under the
10  section says has to be affixed on the shirt or
11  whatever. What is the patch affixed on that
12  shirt?
13  A. The cloth patches may refer to the
14  name of the subcontractor maybe.
15  Q. Well, looking at the golf shirt that
16  you said is representative of what is required
17  under the contract, what does the patch on that
18  say?
19  A. On this photo, it says Hyundai
20  Alabama on the -- let's see. Is that left-hand
21  side? And then the name of the individual on the
22  right-hand side.
23  Q. And to what company does Hyundai

Page 132

1  Alabama refer?
2  A. Probably not referring to any company
3  at all. There's not a Hyundai Alabama company.
4  Q. Why is that -- do you know why that
5  then is the patch that's on the shirt?
6  A. It specifies in Section 5, Uniforms,
7  site manager, five golf shirts -- let's see.
8  Contractor shall provide, in addition to uniforms
9  described above, for the site manager, five golf
10  shirts, with appropriate embroidered logo and
11  name. So I'm seeing that as appropriate
12  embroidered logo and name.
13      So this would be for that specific
14  role and for, I guess, representing the
15  contractor, yeah.
16  Q. Do you know what name was on the
17  uniform provided to Ms. Key to wear?
18      MR. MIDDLEBROOKS: Object to the
19  form.
20  A. I mean, Ms. Key? I don't know her,
21  so I don't know -- what's her name?
22  Q. When you come and go to work every
23  day, what patch is on the uniform for the

Page 133

1  security guards that meet you at the gate?
2      A.   The security guards, if we're
3  specifically referring to the security guards,
4  the security guard wears a uniform that looks
5  like a police officer's uniform that has a patch
6  on its shoulder that represents the name of the
7  company in which they work for.
8      Q.   And what does that patch say?
9      A.   In the case of the current
10 contractor, I think it's DSI.  I don't know what
11 DSI stands for, but DSI.
12     Q.   And when they ride around the
13 property in a vehicle, what does it say on the
14 side of the vehicle?
15     A.   It says Security Services.
16     Q.   Does it say HMMA Security?
17     A.   Maybe.  I don't really pay attention
18 to the vehicles, so I apologize.  But I do not
19 recall exactly the words.  But if you have a
20 picture, I can say yea or nay.
21     Q.   It was one that we saw Monday when we
22 were at the security building, and it was parked
23 out front, and it had a logo on the side.

Page 134

1      MR. MIDDLEBROOKS:  You're under oath.
2      MS. LEONARD:  Yep, sure, I will swear
3  to the fact under oath that I saw a vehicle
4  parked in front of the security building.
5      MR. MIDDLEBROOKS:  I'll stipulate
6  that you saw a vehicle like that.
7      A.   Again, I'm not disputing.  I'm not
8  going to dispute that, because -- but I just
9  haven't paid that close attention.  That's all
10 I'm saying.
11     Q.   (BY MS. LEONARD:)  Does HMMA have
12 security separate from what is provided for under
13 its contract for security services?
14     A.   No.
15     Q.   So to the extent that there's
16 somebody driving a vehicle that says HMMA
17 Security, that is a contract employee?
18     A.   Yes.
19     Q.   And it's your testimony that HMMA has
20 no say-so whatsoever on what is acceptable
21 appearance for anybody that is doing work through
22 a contractor or subcontractor on its premises?
23     MR. MIDDLEBROOKS:  Object to the

Page 135

1  form.
2      A.   I've already stated as long as they
3  follow the guidelines of uniforms and they're
4  meeting the acceptable appearance as part of the
5  conduct, Section 6.
6      Q.   And HMMA does have some say in what's
7  acceptable as it relates to that?
8      A.   HMMA has jointly agreed at the time
9  of this document what would qualify or determine
10 what is appropriate attire for a security officer
11 or its site manager.
12     Q.   Did that change from when this
13 document was created in 2010 to 2017?
14     A.   I have no idea.
15     Q.   What was acceptable appearance for a
16 contractor --
17     A.   To wear the uniform --
18     MR. MIDDLEBROOKS:  You mean the
19 contractor for security or --
20     MS. LEONARD:  I wasn't finished with
21 my question.
22     Q.   (BY MS. LEONARD:)  What was
23 acceptable appearance in 2017 for somebody

Page 136

1  working in the mailroom?
2      A.   In the what?
3      Q.   Mailroom.
4      A.   Okay.  For an individual working in
5  the mailroom, this doesn't specify what uniforms
6  they would wear, so I'm going to say they had a
7  uniform the same style and color or issued by the
8  contractor.  Because it doesn't specify mailroom
9  uniform in here.
10     Q.   Is there any document that you're
11 aware of from HMMA that delineates what is
12 acceptable appearance from someone working in the
13 mailroom?
14     A.   No.  I'm not aware.
15     Q.   Looking at schedule -- or Exhibit B,
16 which is on Page HMMA 39, what does this hourly
17 rate represent?  Is that -- let me know when
18 you're there.
19     A.   I'm getting there.  I'm just trying
20 to keep this organized.
21          Okay.  I'm looking at Page 16 or HMMA
22 39.  Fee schedule.
23     Q.   Does that hourly rate represent what

Page 137

1 would be paid to somebody working -- like if we
2 look at mailroom and it shows the hourly rate is
3 sixteen seventy-six, does that represent what is
4 paid to someone working in the mailroom, what
5 HMMA pays to the contractor under the contract
6 for someone working in the mailroom or something
7 else?  What does that represent?
8     A.   I don't have the details of what
9 encompasses this total amount.  So it would be
10 hard to determine if I'm going to be accurate in
11 my statement.
12         So let me be very clear.  It could
13 possibly be the amount plus a fee from the
14 Hyundai AMOCO or Hyundai Engineering for the
15 services provided in the mailroom or shift
16 supervisor or rover officer.
17     Q.   Do you know what these hourly rates
18 represent on Schedule B or on Exhibit B, Fee
19 Schedule, which is Bates Number 39?
20     A.   They're an hourly rate for each one
21 of the services provided.
22     Q.   I understand that.  I guess where I'm
23 going is:  Do you understand if that's the hourly

Page 138

1 rate to the employee, is that the hourly rate for
2 billing, or is it something else?
3         MR. MIDDLEBROOKS:  Object to the
4 form.  Asked and answered.
5     A.   So, again, just based on limited
6 information that's in front of me, I can't
7 determine how much is the rate for the individual
8 or is it a rate plus a markup fee by the Hyundai
9 AMOCO or Hyundai Engineering at the time of the
10 contract.
11     Q.   So you don't know what the rate
12 represents other than it just says it's an hourly
13 rate?
14     A.   Yes, that's right.
15     Q.   Let's look at the other attachment to
16 this agreement, which is the Hyundai Motor
17 Manufacturing Alabama Contractor Safety,
18 Security, and Fire Protection Handbook, which is
19 Bates Numbers --
20         MR. MIDDLEBROOKS:  4.2.  You're
21 skipping over that, right?
22         MS. LEONARD:  Yep.  I was going to
23 say that wasn't in my notice.  I'll happily go

Page 139

1 through it.
2         MR. MIDDLEBROOKS:  It's about taxes.
3         MS. LEONARD:  I don't want you to get
4 all upset about it.
5     A.   All right.  I have that document in
6 front of me.  The handbook HMMA -- well, Page
7 HMMA 00043.  So is it -- okay.  I'm ready.
8     Q.   (BY MS. LEONARD:)  What is the
9 purpose of the Contractor Safety, Security, and
10 Fire Protection Handbook?
11     A.   So, basically, I would say that it
12 provides guidelines, procedures, protocols for
13 everything, I'm assuming -- I don't want to use
14 that word, for the safety, security, and fire
15 protection.
16     Q.   If we look at the page in its
17 landscape form, on the left side of the document
18 about a third of the way down, we see the numbers
19 10/07.  Do you know what that represents?
20     A.   You could interpret it two different
21 ways, I guess.  Is it October of '07 or is it
22 July of 2010?  Because people do it different
23 ways.

Page 140

1     Q.   I'm not sure.  That's why I was
2 asking you.
3     A.   I don't know.
4     Q.   Okay.  Is this handbook part of the
5 contract?
6     A.   I'm not sure if it's defined as part
7 of the contract.
8     Q.   And if we look at this document on
9 the left-hand side, we see WG in handwriting, and
10 on the right side JH in handwriting.  Do you know
11 why we see these letters throughout this
12 document?
13     A.   Okay.  So I'm going to go back to
14 when we were reviewing the contract itself --
15         MR. MIDDLEBROOKS:  Object to the
16 form.  There's a bit of a mischaracterization
17 there.  You see it on this first page, but after
18 that, you only see WG.
19     Q.   Okay.  Do you know why we're seeing
20 any of these letters on Bates Numbers 43, 44, and
21 then it picks up, I think, at the end of the
22 handbook when there's another attachment?  Do you
23 know why these letters are handwritten onto pages

Page 141

1  of this document?
2      A.   I was going to say before, based on
3  discussions we had regarding the contract itself,
4  it appears that Warren Gappa and this other
5  individual reviewed this handbook and possibly
6  agreed that this -- well, that this should be the
7  guidelines for them to follow related to safety,
8  security, fire protection, in fulfilling the
9  services that Hyundai AMOCO or Hyundai
10  Engineering was going to provide for HMMA.
11     Q.   Who drafted the Contractor Safety,
12  Security, and Fire Protection Handbook?
13     A.   Okay.  I would say that Hyundai Motor
14  Manufacturing developed this handbook.
15     Q.   Okay.  We see on Bates Number 43, it
16  says emergency phone numbers, and it says to
17  report any emergency, fire, medical, safety,
18  security, environmental, call HMMA Security, and
19  then it lists a phone number.
20     A.   Yes, I see that.
21     Q.   Okay.  Who pays for that phone
22  number?
23     A.   Hyundai Motor Manufacturing Alabama.

Page 142

1      Q.   Okay.  And what is HMMA Security?
2      A.   I would say this is a general term
3  for the security location of the security office.
4      Q.   Then on the right side of the page,
5  we see, For permit authorization or general
6  information, call -- who does it say to call?
7      A.   Where are we looking at right now?
8      Q.   The right side of Bates Number 43.
9      A.   Oh, I'm sorry.  I was looking down
10  instead of up.
11     Q.   It says, For permit authorization or
12  general information, call, and then who does it
13  direct to call?
14     A.   Call HMMA Security.
15     Q.   And then it lists another number,
16  nonemergency.  Who pays for that phone number?
17     A.   More than likely Hyundai Motor
18  Manufacturing Alabama pays for the phone service.
19     Q.   Then it says, Have a safety concern?
20  Call the contractor safety tip line, and it gives
21  a phone number.  Who was responsible for the
22  contractor safety tip line?
23     A.   It possibly is the responsibility --

Page 143

1  I'm sorry.  Yeah, I guess the responsibility of
2  our safety department, because it says safety --
3  contractor safety tip line.
4      Q.   Okay.  Do you know if appearance,
5  grooming, or dress code, any of those things are
6  considered to fall within the purview of safety
7  regulations or procedures?
8      A.   Only when it's tied to safety
9  protocols at the facility.
10     Q.   Are you aware of anything that would
11  apply to people who work in security or in the
12  mailroom where their appearance, be it dress
13  code, grooming, hairstyle, would be considered a
14  safety procedure, protocol, or rule?
15     A.   The safety protocols are primarily
16  focused on the production areas, not admin
17  building.  For an example, where the mailroom is
18  located.
19     Q.   All right.  We're going to come back
20  to that one in a little bit, but I want to go
21  over a few other things first before we hit the
22  12:30 lunch break time everybody said they
23  wanted.

Page 144

1      I want to look at Plaintiff's Exhibit
2  Number 3, which are Defendants' Responses to
3  Plaintiff's Interrogatories.
4      A.   Okay.
5      MR. MIDDLEBROOKS:  She's going to
6  give it to you right there.
7      Q.   You're welcome to look at your copy,
8  but for everything, I'll have a copy for you.
9      A.   All right.  Very well.
10     (Whereupon, Plaintiff's Exhibit 3 was
11  marked for identification and a copy of same is
12  attached hereto.)
13     Q.   All you need is Exhibit 3.
14     A.   Okay.  All right.  I have Exhibit 3
15  in front of me.
16     Q.   If you can turn to Page 3 of this
17  document, in response to Interrogatory 1, you're
18  identified as the person furnishing information
19  to answer these interrogatories.  Is that a true
20  statement?
21     A.   That is a true statement.
22     Q.   If you can turn to Page 6, which is
23  the verification of the interrogatory answers, is

Page 145

1   that your signature?

2      A.   That is my signature on Page 6.

3      Q.   And did you understand that when you

4   were providing this information and signing these

5   interrogatories, you were doing so on behalf of

6   HMMA?

7      A.   Yes, I knew that I was providing this

8   on behalf of HMMA.

9      Q.   Okay.  I skipped over one thing.  I

10  wanted to go back.  Are you aware of any

11  insurance policies that have been invoked or put

12  on notice about Ms. Key's claims for any other

13  type of insurance coverage related to this case?

14     A.   No, I'm not aware of that.

15     Q.   Is that something that you prepared

16  for to answer in your deposition?

17     A.   Only --

18         MR. MIDDLEBROOKS:  Well, we did --

19     A.   I was about to say, the only thing

20  that was -- as part of the preparation, I was

21  shown the --

22         MR. MIDDLEBROOKS:  Binder.

23     A.   Yeah, the binder for the personal --

Page 146

1         MR. MIDDLEBROOKS:  Which we produced.

2      A.   -- liability.  I'm sorry.  I don't

3   know the name of the insurance document, but

4   yeah, I was provided a copy of that insurance

5   binder, yes.

6         You said notified, and that's what --

7   I don't know anything about notified, but I've

8   seen the document.

9         MR. MIDDLEBROOKS:  Do you want him to

10  get that out?

11         MS. LEONARD:  I wasn't going to go

12  through it.

13     Q.   (BY MS. LEONARD:)  If you want to

14  talk about insurance --

15     A.   No, I don't want to talk about

16  insurance.

17     Q.   With respect to Exhibit 3, the

18  interrogatory answers, the second interrogatory,

19  we asked HMMA to identify witnesses and contact

20  information for people who might have knowledge

21  of the facts at issue in either Ms. Key's amended

22  complaint or defenses and denials raised by HMMA

23  in its answers.

Page 147

1         Objections were raised, and the

2   defendant said that they might rely on people

3   identified by other parties in this case, but

4   then referred us to the initial -- its initial

5   disclosures.

6         In those initial disclosures, HMMA

7   identified three people:  Ms. Key, you, and

8   Cassandra Williams.  Are you aware of anybody

9   else who may have knowledge about Ms. Key's

10  placement at HMMA, her treatment while there, or

11  why she is no longer there?

12     A.   No.

13     Q.   Is Steven Tunnell still employed at

14  HMMA?

15         MR. MIDDLEBROOKS:  Steve what?

16     A.   Tunnell.

17     Q.   Tunnell.

18     A.   Yes, Steven Tunnell is still employed

19  at HMMA.

20     Q.   T-u-n-n-e-l-l.  And is he still the

21  assistant manager of safety?

22     A.   He is now the senior manager

23  environment, health, and safety.

Page 148

1      Q.   Interrogatory 4, to which he was

2   responded, says, Identify the persons who made

3   the decision as to what would be included in the

4   defendants' grooming policy that was in effect in

5   2017.  And the answer was Steven Tunnell.

6         What grooming policy or policies were

7   in effect in 2017?

8      A.   The policies in '17 likely reflected

9   requirements related to safety protocols in our

10  production areas.

11     Q.   Is that policy in writing anywhere?

12     A.   Yes.

13         MR. MIDDLEBROOKS:  It addresses you

14  to it.

15     A.   Yes, I was going to say HMMA 00003,

16  wherever that document is, yes, it's outlined as

17  a matrix.  It shows what we call personal

18  protective equipment and other safety protocols

19  for the specific production shops.

20     Q.   Are there any other documents that

21  reflect what HMMA found to be acceptable

22  appearance in 2017?

23     A.   Not that I'm aware of, no.

Page 149

1  Q.  Is that something that you looked
2  for?
3  A.  I'm sorry.  One more time?
4  Q.  Is that something that you looked
5  for?
6  A.  No, I didn't look for it, because I
7  had the matrix that showed the safety protocols
8  for each one of the shops.
9  Q.  Did you look to see if there were
10  documents beyond what you already had in your
11  possession?
12  A.  No, I did not.
13  Q.  Is it possible there may be documents
14  that reflect what may have been considered to be
15  acceptable grooming in 2017 other than what you
16  already had in your possession?
17  A.  No.
18  Q.  Why do you say that?
19  A.  Because the only related grooming, we
20  call it grooming policies, by your terms is
21  related to safety protocols.  There's no other
22  grooming requirements at HMMA.
23  Q.  Did you look to see if there were any

Page 150

1  e-mails that may have been sent that reflected
2  this is how we want people to wear their hair or
3  to dress or in terms of visible tattoos,
4  earrings, anything like that?
5  A.  No.
6  Q.  Are you aware of anybody at HMMA
7  making that type of e-mail search?
8  A.  No, I'm not.
9  Q.  In response to Interrogatory Number 7
10  that asks the defendant to identify what type of
11  software or programs or applications it was using
12  for communication in 2017, the response was
13  Microsoft Outlook.
14  A.  Yes, that was my response, yes.
15  Q.  At that time -- let me rephrase that.
16  Do you know if the Outlook account was a server
17  or cloud-based account?
18  A.  Server based.
19  Q.  Does HMMA still have the server data
20  from 2017 that would show the e-mails sent and
21  received through Outlook?
22  A.  I do not know the retention policy
23  related to e-mails.  No, I don't know.

Page 151

1  Q.  Do you know who would know that?
2  MR. MIDDLEBROOKS:  Object to the
3  form.
4  A.  I'm not certain the department
5  responsible for Microsoft Outlook retention of
6  e-mails and what that length of time that they're
7  required to retain them, no.
8  Q.  Does HMMA have an information
9  governance officer or something of that
10  equivalent?
11  A.  We have record retention document
12  control people by department, but not necessarily
13  specific to Microsoft Outlook, and I'm referring
14  to written documents, not Outlook e-mailed
15  documents or e-mailed data.
16  Q.  If I wanted to find out how long HMMA
17  kept e-mails, how could I do that?
18  MR. MIDDLEBROOKS:  Object to the
19  form.
20  A.  Contact our attorney and see if they
21  want to provide information.
22  Q.  Okay.  Are there any policies that
23  you're aware of or practices as it relates to

Page 152

1  keeping e-mails in your personal e-mail box in
2  terms of are you allowed to delete e-mails, are
3  you required to keep them for a certain period of
4  time, do you have to archive them?
5  A.  Again, I'm not aware of a specific
6  record retention related to e-mails.
7  Q.  And HMMA does not have a specific
8  information governance officer?
9  A.  No.
10  Q.  What level of Outlook account was
11  being used?  Was it an E5 or an E3?
12  A.  Define E5 or E3.
13  Q.  They're the two different levels of
14  descriptions that you can have that relate to
15  searchable and retention.
16  A.  I'm not an IT expert, so I don't
17  know.  That's why I was confused what you meant
18  by that.
19  Q.  Have you personally looked through
20  your e-mail -- well, actually, you weren't
21  involved with Ms. Key, so you wouldn't have had
22  any e-mails relating to her, right?
23  A.  I do not have any e-mails related to

---

**Page 153**

1   Ms. Key.

2        Q.   Do you know if Hyundai or do you know

3   if HMMA has done any search of its e-mail server

4   to see if it has any e-mails that reference Ms.

5   Key?

6        A.   It's possible that our legal

7   department did a search based on this request.

8        Q.   That's one of the topic areas that we

9   had was the efforts to find information

10  responsive to our request for production.

11            Do you know if HMMA in response to

12  our request for production did anything to see if

13  it had e-mails that were sent or received to it

14  that referenced Ms. Key?

15       A.   Again, I suspect that our legal

16  department did the search based on this request.

17       Q.   What is your e-mail address?

18       A.   Well, I can provide it, but hopefully

19  nobody is going to send me any spam e-mail.

20       Q.   We won't.  We can redact it if this

21  is filed with the Court.

22       A.   RBurns, B-u-r-n-s, @HMMAUSA.com.

23       Q.   And who provided you with that e-mail

---

**Page 154**

1   address?

2        A.   That is set up by AutoEver, the IT

3   service that's provided to HMMA.

4        Q.   And who gets e-mail addresses that

5   say -- that are whatever@HMMAUSA.com?

6        A.   Those approved for establishing

7   e-mail by the department making the request.  So

8   I'm referring to a department at HMMA.

9        Q.   Okay.  Does HMMA own the domain

10  HMMAUSA.com?

11       A.   I suspect they do, because that's the

12  way it's been since I got there.

13       Q.   All right.  Are there any common

14  owners between HEA and HMMA?

15       A.   Not -- no, not that I'm aware of,

16  nope.

17       Q.   Are there any shared policies?

18       A.   Shared?

19       Q.   Policies.

20       A.   No.

21       Q.   Shared bank accounts?

22       A.   No.

23       Q.   Other than what we've looked at in

---

**Page 155**

1   Exhibit 2, the contract, are there any other

2   business dealings or interactions between HMMA

3   and HEA?

4        A.   Not that I'm aware of.

5        Q.   Does HMMA have any business dealings

6   with Dynamic Security?

7        A.   No.

8        Q.   Has HMMA ever had any business

9   dealings with Dynamic Security?

10       A.   No, no direct business dealings,

11  nope.

12       Q.   Where did Ms. Key perform work at

13  HMMA?

14       A.   It is my understanding that she was

15  mail -- what was the -- what do they call it,

16  mail something in the contract, mailroom

17  attendant.

18       Q.   I'm going to show you what's been

19  marked as Plaintiff's Exhibit 4, which is Bates

20  Number HMMA 77 that appears to be a diagram.

21            (Whereupon, Plaintiff's Exhibit 4 was

22  marked for identification and a copy of same is

23  attached hereto.)

---

**Page 156**

1        A.   Yes, I see the diagram in front of

2   me.  It looks like the first floor of the

3   administration building, HMMA administration

4   building.

5        Q.   Does Plaintiff's Exhibit 4 accurately

6   represent the area or the building in which Ms.

7   Key was assigned to work?

8        A.   If Ms. Key was assigned mailroom

9   attendant, clerk, whatever the right term, then

10  yes, that's where the individual would have

11  worked is in that space on the west side of the

12  building labeled Mailroom.

13       Q.   And what building is represented in

14  Plaintiff's Exhibit 4?

15       A.   It is the Hyundai Motor Manufacturing

16  Alabama administration building, what it's

17  commonly referred to.

18            MR. MIDDLEBROOKS:  It's only the

19  first floor.

20       A.   First floor, as I said earlier, yes,

21  first floor.

22       Q.   Does HMMA agree that Plaintiff's

23  Exhibit 4 is a true and accurate and authentic

---

Page 157

1 representation of the first floor of that
2 building as it would have looked in 2017?
3        A.   That's what I was going to clarify,
4 that at that moment in time, it does look to be
5 accurate.
6        Q.   Do you know how Plaintiff's Exhibit 4
7 was created?  And I guess where I'm going is:  Do
8 y'all have diagrams that are accessible or is
9 this something that was created specifically for
10 production to us?
11        MR. MIDDLEBROOKS:  We don't know if
12 that's anything different in 2017.  This is --
13 all we could do was create one that was current
14 for the litigation.
15        MS. LEONARD:  Are y'all going to give
16 us grief and object to authenticity or whatever
17 if we try to use this?
18        MR. MIDDLEBROOKS:  Oh, no, no.
19        MR. WHITEHEAD:  I can tell you this:
20 That's where the mailroom is located.  Have they
21 moved a wall here or there or something, I don't
22 know.
23        MS. LEONARD:  I was just going to go

Page 158

1 through a line of questions to make sure we could
2 use it as evidence.
3        MR. WHITEHEAD:  As to what this is,
4 the fire code requires you to have like a placard
5 on the wall.  That's what it is.
6        MS. LEONARD:  But y'all aren't going
7 to object if we try to use this at trial and say
8 we can't authenticate it?
9        MR. WHITEHEAD:  No, that's -- if it's
10 not a hundred percent accurate, it's ninety-nine
11 percent accurate.
12        A.   Yeah, because that is the location of
13 the mailroom, and yeah, they may have moved a
14 couple of walls a little bit, but that is where
15 the mailroom is today.
16        Q.   (BY MS. LEONARD:)  Okay.  What other
17 departments were housed in the administration
18 building?
19        MR. MIDDLEBROOKS:  The whole
20 building?
21        MS. LEONARD:  Yeah.
22        A.   Oh, my goodness.  Okay.  So public
23 relations and AutoEver, the IT service provider,

Page 159

1 general purchasing, parts development on the
2 second floor.  What I just described, both of
3 those entities are on the second floor.
4        Now --
5        THE WITNESS:  I'm trying to remember
6 when we added a third floor, Chris, but anyway.
7        MR. WHITEHEAD:  I think that was '9,
8 '9 or '10.
9        A.   So anyway.  So then the third floor
10 is legal and compliance, finance, team relations,
11 environment, health, and safety on the west side
12 of the building on the third floor.  And the east
13 side of the building on the third floor is
14 general affairs and human resources and the
15 executive office.
16        I think that's it, I hope.  I think I
17 got them all.
18        MR. MIDDLEBROOKS:  The showroom.
19        MR. WHITEHEAD:  You left one out.
20 Quality.
21        A.   That's right.  I sure did.  On the
22 second floor on the east side, quality, which is
23 where the parts development and general

Page 160

1 purchasing, yep, that's right.
2        Q.   I've got some questions based on the
3 way the diagram looks.  If you look to where the
4 mailroom is, to the left of the mailroom we see a
5 long rectangle.  Is that a loading dock?
6        A.   Oh, okay.  So the two long rectangles
7 at that -- well, no, we're not talking about the
8 same thing.  Tornado shelters are there outside
9 of the building.  Between the tornado shelters,
10 yes, is a loading dock.
11        Q.   And that would be when mail is being
12 brought in from whatever carrier, be it the
13 postal service, UPS, DHL, whatever, they would
14 bring it in there so it could be brought into the
15 mailroom?
16        A.   Yes, if it's an item that can be
17 unloaded at that location, yes.
18        Q.   What are the mailroom hours?
19        A.   General mailroom hours are 8:00 a.m.
20 to 4:45 p.m.
21        Q.   Who set those hours?
22        A.   They are just consistent with the
23 administration building's normal operating hours.

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 43 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 241 of 425

6/22/2022
41 (161 - 164)

Page 161

1  Nobody really sets anything, just consistent with
2  our regular operating hours in the administration
3  building.
4  Q.   Do employees who work in the mailroom
5  have to have a badge in order to get into the
6  building or anything like that?
7  A.   They do have to have a badge to get
8  into the building.
9  Q.   And who provides that badge?
10  A.   The Hyundai Engineering in
11  conjunction with the security service issues
12  those badges to these contractors or
13  subcontractors.
14  Q.   Are the badges used by the people in
15  the mailroom any different than the badges used
16  by the people who receive a paycheck from HMMA
17  that work in that building?
18  A.   There are certain parameters, and I
19  couldn't be specific, because it can vary from
20  individual to individual, that limit access based
21  on the roles and responsibilities of the
22  individual.
23  Q.   Right.

Page 162

1  A.   So it can be varied.
2  Q.   Are these like proximity cards or
3  barcoded badges that let you into certain areas?
4  A.   I don't know how they exactly word
5  it, but the badge has, I guess, something within
6  it that talks to a system that says, okay, this
7  individual can go through this door, but this
8  individual cannot go through that door.
9  Q.   Okay.  Do you know if the badge
10  contains any writing on it?  Like is there any
11  visible writing on the badge or is it just like a
12  white card?
13  MR. MIDDLEBROOKS:  All badges or
14  badges that she would have worn?
15  Q.   The badges that somebody would have
16  had in the mailroom.
17  A.   So mailroom individual badges, I
18  guess, at least had their picture and name on it,
19  yes.
20  Q.   Does it have a company name on the
21  badge?
22  A.   Very likely, and I'm trying to
23  picture, but it's very likely.

Page 163

1  MR. WHITEHEAD:  Don't guess, Robert.
2  MR. MIDDLEBROOKS:  Don't guess.
3  THE WITNESS:  Okay.  Thank you for
4  correcting me.  We'll just leave it at that.
5  Q.   (BY MS. LEONARD:)  Does HMMA have any
6  knowledge of what company name, if any, was on
7  the badge given to Ms. Key?
8  A.   I've not ever seen Ms. Key's badge,
9  so I can't comment on that.
10  Q.   For the period of July to August
11  2017, what were the duties and responsibilities
12  for the people assigned to work in the mailroom?
13  A.   Mailroom personally would go to the
14  post office to either pick up or drop off mail.
15  They're also responsible for delivering mail
16  and/or packages site-wide if appropriate or other
17  times call a department to let them know a
18  package has arrived to have them come pick it up.
19  That's a general idea what they do.
20  Q.   Does HMMA provide a paycheck to
21  anybody that works in the mailroom?
22  A.   No.
23  Q.   Typically, how many people work in

Page 164

1  the mailroom, if you know?
2  A.   Based on the document we reviewed
3  earlier, it looked like there was two.
4  MR. MIDDLEBROOKS:  The document you
5  reviewed earlier was what?
6  A.   I'm sorry.  It was part of the
7  contract and the scope of work.
8  Q.   You're referring to Exhibit 2?
9  A.   Exhibit 2.
10  MS. LEONARD:  We're right at 12:30.
11  Are you good to still keep going?
12  MR. MIDDLEBROOKS:  I would like to
13  get some lunch.
14  A.   Yeah, we can take a break if it's a
15  good time.
16  (Whereupon, a discussion off the
17  record was held.)
18  (Whereupon, a lunch recess was
19  taken.)
20  Q.   (BY MS. LEONARD:)  All right.  We are
21  back from lunch, and I want us to look at
22  Plaintiff's Exhibit 5, which is Bates Numbers
23  HMMA 135 to 235.

Page 165

1      (Whereupon, Plaintiff's Exhibit 5 was
2  marked for identification and a copy of same is
3  attached hereto.)
4      Q.   And this is a document identified as
5  Contractor Safety, Security, and Fire Protection
6  Handbook.
7      A.   Uh-huh (positive response).  I have
8  it in my hand.
9      Q.   All right.  At the top of all of the
10  pages, we see there's a few bars, and it's got
11  the Hyundai or an H logo and the word Hyundai,
12  and then it says Contractor Handbook, and then
13  next to it HR-AL-EHS-SF-External, do you see
14  that?
15      A.   Yes, I see that.
16      Q.   What does this bar represent?  Why is
17  it on this document?
18      A.   This is what I would term as the
19  standard format for our documents related to the
20  business management system, so there's
21  consistency across all documents and the way that
22  they are presented in that system.  That's the
23  best way I can put it, yeah.

Page 166

1      Q.   And when we see the H logo and then
2  the word Hyundai in the top right corner of that
3  box, what does that represent or who does that
4  identify?
5      A.   It represents, in this case, Hyundai
6  Motor Manufacturing Alabama.
7      Q.   Is that symbol, the H symbol, and the
8  word Hyundai used to refer to any other company
9  other than HMMA?
10      A.   There are a number of Hyundai
11  companies that may use the Hyundai logo or name,
12  but it's not necessarily directly associated with
13  Hyundai Motor Manufacturing Alabama.
14          I hope I'm answering your question
15  right.
16      Q.   Okay.  Does HEA to your knowledge use
17  that H logo or that word "Hyundai" to identify
18  itself?
19      A.   I've not seen their logo, but Hyundai
20  Engineering, that's kind of obvious, they use the
21  word "Hyundai."
22      Q.   I guess where I'm going is:  Like
23  when we went to Ms. Key's deposition on Monday,

Page 167

1  we were in the security building on the Hyundai
2  campus.  And when you walk into that building --
3      MR. MIDDLEBROOKS:  Hyundai Motor
4  Manufacturing Alabama campus.
5      Q.   Right.  And when you walked into that
6  building, there was the big blue wall that had
7  the H that we see here and the word "Hyundai" on
8  it, and that H and that word "Hyundai" was
9  outside of the plant that you can see from I-65.
10      Are you aware of anybody using that H
11  and the word "Hyundai" to brand itself other than
12  Hyundai Motor Manufacturing Alabama?
13      A.   So, again, there's a number of
14  entities that use the word "Hyundai," like
15  Hyundai Motor America.
16      MR. MIDDLEBROOKS:  She's talking
17  about this brand.
18      A.   But this -- so the brand, the Hyundai
19  logo, is the corporate identity standard for
20  Hyundai as an entity, and we're Hyundai Motor
21  Manufacturing Alabama.
22      Q.   And when you say it's the corporate
23  brand for Hyundai as an entity, what are you

Page 168

1  referring to when you say Hyundai as an entity?
2      A.   In our case, it's Hyundai Motor
3  Manufacturing, LLC.  If it's Hyundai Motor
4  America, they're using it as the Hyundai org
5  company or the overall group that says Hyundai.
6      Q.   Does the word "Hyundai" have a
7  specific meaning in Korean?
8      A.   I believe it -- years ago, and it's
9  still probably true, it would mean Modern.
10  Hyundai means Modern.
11      Q.   And the reason I ask is, like you
12  said, there are other businesses that have the
13  word "Hyundai" in it.  Hyundai Electrical,
14  Hyundai Power Transformers.
15      The fact that they all have the word
16  "Hyundai" in it, is there any connection that
17  allows them to all have the same name?
18      A.   I think they're all standalone
19  entities.
20      Q.   Do you know if HMMA or its parent
21  company have taken any steps to either trademark
22  or to have exclusive use of the word "Hyundai" in
23  branding?

Page 169

1    A.   I don't have any specific knowledge
2  about how they may or may not defend their mark,
3  you know.
4    Q.   Is there anything that you're aware
5  of where they may have licensed the name Hyundai
6  or permitted its use by other companies?
7    A.   Again, I don't have any knowledge of
8  that.
9    Q.   On the contractor handbook where it
10 says owner, Orlando Harris, what does that mean?
11   A.   Orlando Harris is a HMMA team member
12 who is responsible for checking or making sure
13 the revision level or whatever it may be of this
14 particular document.
15   Q.   All right.  And next to his name, we
16 see Revision Level 1.  What does that mean?
17   A.   Usually that's like the first
18 revision.  In this case, Level 1 means like the
19 first revision since its origination.  It may
20 have been -- Revision Level 0 would be like the
21 original document.
22   Q.   And so when we were looking earlier
23 at the contract, I believe it had an earlier --

Page 170

1  we saw on it, it had a date that looked like
2  10/07, either July 2010 or October 2007.  Would
3  that have been the first version of this
4  handbook?
5    A.   I can't say with certainty.  So all I
6  can say is it was a version, a version of the
7  document at that time, and then we have this
8  version in front of me today.
9    Q.   Okay.  On the first page in small
10 print, it says, Uncontrolled document when
11 printed.  Reference only.  The controlled version
12 is electronically maintained.  Do you know what
13 that means?
14   A.   Well, based on our business
15 management system standards for document control,
16 this is a boilerplate item that goes on the
17 document.  Regardless if it's the contractor
18 handbook or any other document within the BMS
19 system, that's a boilerplate item.
20   Q.   Do you know, though, why it's on
21 there?  What does it mean to say it's
22 uncontrolled when printed?
23   A.   For distribution.

Page 171

1    Q.   What is uncontrolled document?
2    A.   So if it's electronically, if they
3  have it in our BMS system, then that document is
4  controlled by the owner and can be updated, et
5  cetera.  But once it is printed, someone may
6  modify maybe.  I don't know.  But that's what I
7  would predict is the rationale for that
8  boilerplate item being on all the documents.
9    Q.   All right.  What is the purpose of
10 Plaintiff's Exhibit 5, the safety, security, and
11 fire protection handbook?
12   A.   So in general terms, this document is
13 provided to contractors so they understand the
14 safety, security, and fire protection protocols
15 and/or guidelines and standards that they need to
16 follow or adhere to as a part of their activities
17 on our site inside our gate line.
18   Q.   I want to go back before I forget to
19 clarify.  Orlando Harris is employed by HMMA,
20 correct?
21   A.   That is correct.
22   Q.   So any revisions that were made to
23 Plaintiff's Exhibit 5 were made exclusively by

Page 172

1  HMMA?
2    A.   In the -- if it was in the controlled
3  document that we referred to, yeah, those changes
4  would be made by our safety staff, because
5  Orlando Harris is part of the safety department.
6    Q.   And the policies and procedures that
7  we see contained in Exhibit 5 are set by HMMA's
8  safety department?
9    A.   This document was -- is owned and
10 created by the safety department, yes.
11   Q.   Do all contractors receive
12 Plaintiff's Exhibit 5?
13   A.   I can't confirm if all do, but I know
14 that's -- past practice is to provide this to
15 those contractors so, again, they understand
16 roles, responsibilities, protocols, et cetera, if
17 they're going to operate on our site.
18   Q.   Other than the people that would be
19 provided pursuant to the contract we looked at
20 earlier, Exhibit 2, are there any other
21 contractors who perform work at HMMA that would
22 receive Exhibit 5?
23   A.   I would say it is practice that all

Page 173

1 contractors who perform any kind of work on our
2 site follow this handbook for safety, security,
3 and fire protection.
4     Q.   Other than the people HMMA identifies
5 as the security contractors, what other
6 contractors, if any, work at HMMA?
7     A.   You could have electrical
8 contractors, pipe fitters, construction
9 contractors.  Just any kind of work that may be
10 done on-site.
11     Q.   Are there any contractors other than
12 the people who are working pursuant to the
13 security contract that are at HMMA for a period
14 of six months or longer?
15     A.   It's possible that there may be.
16     Q.   Are the only long-term employees that
17 are working -- are the only long-term people
18 working pursuant to a contract at HMMA the ones
19 in the security contract?
20     MR. MIDDLEBROOKS:  Object to the
21 form.
22     A.   I don't have any knowledge about
23 specific lengths of contracts for all the

Page 174

1 different contractors on-site, because that's not
2 my area of responsibility.
3     Q.   At any given time, approximately how
4 many contractors are performing work on HMMA's
5 property?
6     A.   I have no clue how many at any one
7 time.
8     Q.   There are approximately, what, three
9 thousand employees at HMMA?
10     A.   There are approximately three
11 thousand employees at HMMA, yes.
12     Q.   Is the number of contractors
13 performing work at the HMMA property greater
14 than, equal to, or less than the number of W-2
15 employees working on the property?
16     A.   I don't want to -- I mean, it's like
17 speculation to know how many contractors are
18 on-site at any one time, because it will vary
19 from day to day depending on what work is being
20 performed and who is entered into some form of an
21 agreement to have them come out and do work
22 there.  So it can change from day to day.
23     So that's why it's hard to give you a

Page 175

1 hard and fast -- I understand what you just told
2 me, higher or lower than, but there are -- I
3 would feel comfortable, let's go there, saying
4 hundreds.
5     Q.   Does Plaintiff's Exhibit 5 apply
6 equally to all people working at HMMA through a
7 contract regardless of what job they are doing?
8     A.   Yeah.  The expectation is they follow
9 the safety, security, and fire protection
10 guidelines, et cetera, inside this handbook.
11     Q.   And do the policies and procedures in
12 Exhibit 5 apply equally and in the same way to
13 all people performing work pursuant to a contract
14 at HMMA regardless of their work experience or
15 disciplinary history?
16     A.   What's that last part?
17     Q.   Disciplinary history.
18     A.   I don't know if disciplinary history
19 has any relevance, but the expectation is anyone
20 performing any work as a contractor or otherwise
21 on HMMA property follow these safety, security,
22 and fire protection protocols for safety.
23     Q.   So regardless of their length of

Page 176

1 service, work history, job title, everybody who
2 works at a contract -- works under a contract at
3 HMMA is subject in the equal way to the contents
4 of Exhibit 5?
5     MR. MIDDLEBROOKS:  Object to the
6 form.
7     A.   I just think that the expectation is
8 they understand the, I guess we'll say again,
9 guidelines, rules, et cetera of this handbook as
10 they perform any services on our site.
11     Q.   I want to show you what's been
12 previously marked as Exhibit 7, which is HMMA 1
13 through 2.
14     (Whereupon, Plaintiff's Exhibit 7 was
15 marked for identification and a copy of same is
16 attached hereto.)
17     MR. MIDDLEBROOKS:  You said 7?
18     MS. LEONARD:  7.  I've skipped 6.
19 We're coming back to 6.
20     MR. MIDDLEBROOKS:  Okay.
21     A.   Okay.  I have Exhibit 7 in front of
22 me.
23     Q.   (BY MS. LEONARD:)  And this is a

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 47 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 245 of 425

6/22/2022
45 (177 - 180)

Page 177

1  two-page document that's Bates Numbers HMMA 1
2  through 2, but it bears page numbers at the
3  bottom of each one, 2, 3, 8, and 9.  From what
4  book or source did these pages come from?
5      A.  I don't have any clarity, because
6  there's no marking on here to confirm where it
7  may have come from.  So it's hard for me to say.
8          It has the appearance, appearance of
9  a handbook, because it says, in fact, This
10  handbook, as well as any policies or procedures,
11  is not a contract of employment, under Employment
12  Statement.  I just picked that out on Page 2.
13          So it must be a handbook of some
14  variety that has these details.
15      Q.  Do you know what version of handbook
16  this came from or even if the pages are from the
17  same handbook?
18      A.  No markings would tell me which
19  version it is, so I can't answer that question.
20      Q.  Sitting here today, can you, speaking
21  on behalf of HMMA, say with any certainty where
22  the pages in Exhibit 7 came from?
23      A.  No, not with certainty, but it looks

Page 178

1  like a team member handbook, as I continue to
2  read through the information in here.
3      Q.  How many versions of a team member
4  handbook has HMMA had?
5      A.  I don't have specific knowledge on
6  how many revisions to the team member handbook
7  have occurred over -- since the plant was started
8  or the handbook was originally created.
9      Q.  Do you have any knowledge as to
10  whether the source of the pages that are in
11  Exhibit 7 was a handbook that was being used in
12  2017?
13      A.  Again, there's no markings to
14  indicate that -- what timeframe this applies to,
15  but it looks like standard information in our
16  team member handbook.
17      Q.  Do you know what the section is that
18  proceeds on Page 2 or Bates Number 1?  It looks
19  like it starts in the middle of the sentence and
20  the paragraph above employment statement.  Do you
21  know what that dealt with?
22      A.  All right.  We're saying Page 2?
23      Q.  Sure.  There's some --

Page 179

1      A.  Oh, employment statement.  Okay.  So
2  on Page 2?
3      Q.  Right.  Bates Number HMMA 1, Page 2
4  of whatever source document this was taken
5  from --
6          MR. MIDDLEBROOKS:  If it helps, we'll
7  stipulate that's an employee handbook.
8          MS. LEONARD:  I would like the whole
9  handbook if you don't mind.
10          MR. MIDDLEBROOKS:  Do what?
11          MS. LEONARD:  I would like the whole
12  handbook.  I think it would make it easier.
13  That's a document --
14          MR. MIDDLEBROOKS:  That's just
15  something we chose to do, not anything that was
16  requested.
17          MS. LEONARD:  We asked for policies
18  that you guys had.
19          MR. MIDDLEBROOKS:  That's not a
20  policy applicable to the contractors.  That's the
21  handbook.
22          MS. LEONARD:  Our position being if
23  you guys are going to use this, we should be able

Page 180

1  to see the whole handbook through doctrine or
2  completeness and to ensure --
3          MR. MIDDLEBROOKS:  I don't know if
4  we're going to use it or not.
5          MS. LEONARD:  Again, that's going to
6  be our position.
7          MR. MIDDLEBROOKS:  Well, you can
8  issue a request.
9          MS. LEONARD:  Okay.  I think it's
10  responsive to our earlier request.  I'll go back
11  and send you a letter on it.
12          MR. MIDDLEBROOKS:  But that doesn't
13  apply to Ms. Key.
14      Q.  (BY MS. LEONARD:)  To the extent that
15  Exhibit 7 -- if it's the position of Hyundai,
16  HMMA's lawyer, that Exhibit 7 doesn't apply to
17  Ms. Key, does Exhibit 7 have any relevance to
18  this case?
19      A.  That's for someone else to determine.
20  As I've read through this, I see that it is a
21  team member handbook, because I see references to
22  team members many times.  So it's a version,
23  unknown version, but it's a version of our team

Page 181

1 member handbook, HMMA team member handbook.
2    Q.   Does the team member handbook have
3 any information in it that is applicable to the
4 conduct expected from contractors?
5    A.   No, it does not.  Based on my
6 recollection of the content, because it is
7 several pages, but it is focused on team member
8 related policies, procedures, et cetera.
9    Q.   Does HMMA expect -- are there any
10 differences in HMMA's expectations in the conduct
11 of its employees when they're at work on the HMMA
12 campus compared to what is expected from the
13 conduct of contractors performing work on the
14 HMMA campus?
15    A.   Well, HMMA's handbook is specifically
16 addressing team members who are employed by HMMA.
17 This does not apply to contractors who are
18 employed by some other entity who has their own,
19 I assume -- sorry.  I shouldn't use that word.
20 Has a handbook or other guidelines to manage
21 their individual employees.
22    MS. LEONARD:  I'm going to object and
23 move to strike as nonresponsive.

Page 182

1    Q.   (BY MS. LEONARD:)  My question is a
2 little different.  In terms of the conduct that
3 HMMA finds to be acceptable or its expectations
4 on how people will conduct themselves while they
5 are performing work on its property, does HMMA
6 have different expectations for the people that
7 it directly employs as compared to those who are
8 performing work through a contract?
9    A.   So there are expectations, yes, for
10 conduct while working on HMMA property,
11 performing their daily duties, et cetera.  And if
12 a contractor, whoever that may be, whose conduct
13 is not acceptable, then we do have the right to
14 make the decision to or recommend, rather, that
15 they be removed from property or something like
16 that, but that's about it.
17    We don't control them.  We do have
18 the right to make a complaint known to the
19 contractor, and they can follow up with the
20 complaint that's been raised and then get back to
21 us and see if that has been addressed properly or
22 not been addressed properly.
23    Q.   May persons who are performing work

Page 183

1 on the HMMA campus through a contract engage in
2 conduct which is expressly prohibited of HMMA
3 employees?
4    A.   Say that one more time.
5    Q.   Sure.  May contractors who are
6 performing work at HMMA's property engage in
7 conduct that would be prohibited by somebody
8 employed directly by HMMA?
9    A.   No.  A good example, and just because
10 I'm reading right here on Page 9 of the document,
11 workplace threats and violence would not be
12 acceptable regardless if you're a team member or
13 a contractor.
14    Q.   Is there any conduct which is
15 prohibited for an HMMA employee that a contractor
16 would be approved to engage in while performing
17 work on HMMA's property?
18    A.   Not that I'm aware of.
19    Q.   Are individuals performing work on
20 HMMA's contract through -- are individuals
21 performing work on HMMA's property through a
22 contract expected to comply with and abide by the
23 rules of conduct for HMMA employees?

Page 184

1    A.   The contract employees are only
2 required to follow the direction of their
3 employer, but, again, if HMMA observes or sees
4 any kind of conduct or activity that is not
5 considered acceptable, and this all could be
6 relevant, but I just don't know for sure how I
7 would characterize it.  It would be a
8 case-by-case basis, and then we would ask them to
9 address the issue.
10    Q.   When you say that individuals
11 performing work through a contract are expected
12 to follow the directions of their employer, does
13 HMMA communicate to that employer what is
14 expected in terms of what is acceptable and
15 unacceptable conduct on HMMA property?
16    A.   No, no.  We don't direct the
17 contractor or their subcontractors.  We only
18 acknowledge when something has occurred, whatever
19 that may be, that it's considered unacceptable
20 and ask the contractor to address the issue.
21    Q.   How would an employer contractor know
22 what is unacceptable?
23    A.   That's, again, at the discretion of

Page 185

1 the contractor, but if we observe something that
2 may not be acceptable, we would inform them of
3 such and ask them to address it.
4     Q.   Has HMMA ever asked HEA or Dynamic
5 Security to remove an employee from HMMA's
6 property?
7         MR. WHITEHEAD:  Heather, I'm sorry, a
8 security employee or any employee?
9         MS. LEONARD:  Any employee.
10     Q.   (BY MS. LEONARD:)  And I want to
11 clarify.  I'm not asking like HMMA tells
12 security, Go get rid of this person.  I'm
13 basically saying has HMMA communicated to HEA or
14 to Dynamic, You've sent this person to perform
15 work here, and we don't want them here anymore?
16     A.   I'm going to say I don't have
17 specific knowledge of that, but it's consistent
18 with what I said just a moment ago.
19         If someone were -- and I'm just using
20 an example, workplace threat or violence
21 occurred, then we would recommend to HEA or any
22 contractor that they investigate the situation
23 and then find a remedy that they would present to

Page 186

1 us.
2     Q.   One of the issues that the parties
3 are going to be disputing and arguing about in
4 this case is how much control, if any, HMMA had
5 over Ms. Key's assignment and what she could and
6 couldn't do while on HMMA's property.
7         So some of the evidence that we're
8 going to be looking for in order to flesh that
9 out would be evidence that shows what direction
10 HMMA may have given to contractors like HEA if
11 they found somebody's conduct was unacceptable.
12         You had testified earlier that HMMA
13 might acknowledge when unacceptable conduct
14 occurred and ask the employer to address the
15 situation.
16         What do I need to ask for to get
17 documents that would reflect that type of
18 communication or direction?
19         MR. MIDDLEBROOKS:  Object to the
20 form.
21     A.   There may or may -- there may be some
22 form of communication, I don't know what type of
23 communication it may be, that when an employee of

Page 187

1 the contractor did something that was
2 unacceptable, but I don't know what source that
3 would be exactly, because who knows exactly how
4 that particular event occurred, again, because I
5 don't have any specific knowledge.  I can't say,
6 Oh, well, yeah, you can go to this point and
7 place to be able to find specific examples.
8     Q.   Do you know who might be a better
9 source I could ask about that?
10         MR. MIDDLEBROOKS:  Object to the
11 form.
12     A.   All I can say is that you would
13 probably be best to touch base with Hyundai
14 Engineering, because they have the responsibility
15 for the employee.  And if they have any
16 documentation where HMMA made a specific request,
17 I think that would be your source.
18     Q.   Is there a specific point of contact
19 at HMMA who is responsible for monitoring or
20 taking care of the HEA contract?
21         MR. WHITEHEAD:  Can I stop you,
22 Heather?  I just want to make sure I understand
23 the question.  Are you asking have we ever asked

Page 188

1 HEA to remove anybody from site, any contractor
2 or employee from site or one of the security
3 employees from site?
4         MS. LEONARD:  The security employee.
5         MR. WHITEHEAD:  The security
6 employees, whether it was Dynamic or BSI, who it
7 is now, or whoever it was at the time.  The
8 security.  I understand the question now.  I'm
9 sorry.  Go ahead.
10     A.   Even with that clarity, I have no
11 knowledge of that taking place.  I'm not saying
12 it didn't.  I just don't have knowledge of that.
13     Q.   (BY MS. LEONARD:)  And my question
14 was:  Who, if anyone, is the point of contact at
15 HMMA who would have responsibility for managing
16 the HEA contract?
17     A.   So as I stated much earlier in this
18 deposition, the general affairs head of
19 department is who has direct conversations with
20 Hyundai Engineering relative to the security
21 services, but that's about it.
22     Q.   Okay.
23     A.   That's who they would communicate

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 50 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 248 of 425

6/22/2022
48 (189 - 192)

Page 189

1  with.
2      Q.   So the direction you talked about
3  before, that if HMMA found conduct to be
4  unacceptable and they would ask the contractor to
5  address it, would that communication go through
6  general affairs?
7      A.   It's possible.
8      Q.   If not through general affairs, what
9  would be the other generating source of that
10 communication at HMMA?
11     A.   It depends on the situation that
12 occurred.  You know, what was the issue that
13 would have triggered that in the first place?
14 That may have been related to some other -- and
15 we're talking about the security guards, right?
16 We're still talking about the security guards?
17     Q.   Anybody working pursuant to the
18 security contract, so it could include any of the
19 people that we saw on that matrix in Exhibit 2.
20     A.   I think if it's limited to our
21 discussion about security guards, I feel that it
22 would be the general affairs team.
23     Q.   And this is why I'm asking.  The

Page 190

1  lawyers may fight over this, but I'm giving you
2  my interpretation on it.
3          I would want to see all of those
4  communications, because it could be indicative of
5  the type of control that HMMA could exert over
6  what is being done by the people placed at its
7  facility, and I would want to see that so I could
8  see what control exists or doesn't exist.
9          And so that's why I'm asking what the
10 sources are so that we can craft a request to
11 send to HMMA to say, Hey, go look at these
12 custodians' or these individuals' e-mails or talk
13 to them to see if they have that information.
14         And so you're thinking it's general
15 affairs?
16     A.   Yep.
17     MR. MIDDLEBROOKS:  Object to the
18 form.
19     Q.   Who is responsible at HMMA for
20 enforcing the equal employment opportunity policy
21 we see in Exhibit 7 on HMMA 1?
22     A.   Oh, so, again, this is in the HMMA
23 team member handbook, and so essentially the

Page 191

1  entire company is basically responsible for
2  enforcing or making sure that we provide work
3  places that prohibits discrimination, harassment,
4  retaliation against team members, et cetera.
5      Q.   What actions were taken in 2017 to
6  enforce the EEO policy by HMMA?
7      A.   Well, I wouldn't go -- enforce is one
8  word that maybe doesn't apply in the sense that
9  we -- every day we are trying to make sure we
10 have a workplace that prohibits discrimination,
11 harassment, retaliation, et cetera for our team
12 members, et cetera.
13     Q.   Are there any things specifically
14 that you're aware that HMMA did in 2017 or in the
15 years leading up to it to ensure that everyone
16 working at the company adhered to and followed
17 the EEO policy?
18     MR. MIDDLEBROOKS:  Except what he's
19 already testified to?
20     Q.   I want a clear answer, because I
21 don't want to have to go back and refer.  So what
22 are you aware leading up to 2017 and in 2017 that
23 was done at HMMA to enforce or make sure people

Page 192

1  are following the EEO policy?
2      A.   So in 2017, the -- consistently
3  throughout the time of HMMA, to my knowledge, is
4  upon hiring, when they go through orientation,
5  they're explained about the EEO policy with HMMA.
6  And then depending on the timing, whether the
7  individual joined at whatever point in time,
8  every two years, regardless, every two years
9  there's an EEO training or refresher training
10 that goes on for all team members.
11         And that's managed by the legal
12 department with assistance from team relations.
13     Q.   Anything else?
14     A.   Not that I'm aware of.
15     Q.   When you say that in orientation the
16 policy is explained, how much time is spent
17 explaining the EEO policy in orientation?
18     A.   I don't know the exact timeframe, but
19 it is definitely covered.
20     Q.   What is done to cover it?
21     A.   Review the policy as a whole.
22     Q.   What does that mean?
23     A.   The same thing that's in the

Page 193

1  handbook.
2  Q.   Is it just read to individuals?  Is
3  the policy read out loud?  Is the policy
4  explained?  Or people just said, Hey, there's an
5  EEO policy, look at it?
6  A.   It's reviewed.
7  Q.   That's what I'm saying.  What does it
8  mean to say it's reviewed?
9  A.   In the context of the handbook.
10 Q.   I don't think we're communicating.
11 I'm not following what you're saying.
12 A.   So an individual sits through
13 orientation, and they are given -- they're
14 reviewed -- at the time of this, maybe it was
15 literally a hard copy handbook, but now it's in
16 the form of a presentation.
17 But at this time, it was literally a
18 handbook provided to the individual which reviews
19 that policy.
20 Q.   When did it go from being a hard copy
21 of the handbook that was put in their hands that
22 they're pointed to to it being a presentation?
23 A.   I'm not exactly sure what year that

Page 194

1  it went through as an electronic version of it.
2  At this time, I'm not sure.
3  Q.   Do you know what it would have been
4  like leading into 2017, which version?
5  A.   Again, I'm just not certain of that.
6  That's why I don't want to be --
7  MR. MIDDLEBROOKS:  Can we take a
8  break when you get a chance?
9  MS. LEONARD:  Sure.  Let me ask one
10 more question.
11 Q.   (BY MS. LEONARD:)  When you look at
12 the last paragraph on the EEO policy where it
13 says the head of HMMA human resources department
14 monitors HMMA's equal employment opportunity
15 efforts and reports regularly to HMMA's executive
16 management, who is the head of HMMA's human
17 resources department?
18 A.   Something I mentioned earlier, the
19 senior manager of human resources.
20 Q.   And so that would be -- in 2017, who
21 would that have been?
22 A.   At that time, it would have been
23 Scott Gordy.

Page 195

1  Q.   Okay.
2  MS. LEONARD:  All right.  We can take
3  a break.
4  (Whereupon, a brief recess was
5  taken.)
6  Q.   (BY MS. LEONARD:)  Okay.  We are back
7  from a break.
8  MR. MIDDLEBROOKS:  I think he wanted
9  to clarify his answer.
10 A.   Yeah.  I kind of misinterpreted on my
11 part, but the key thing is, as I was saying
12 before, orientation, it turns out -- as I was
13 corrected, 2012ish is when we transitioned from
14 handbook to a video that actually goes through
15 all the EEO policy and has a wide variety of
16 topics related to what should not take place
17 relative to harassment and discrimination, et
18 cetera, and that video has been in place since
19 2012 as part of orientation.
20 And as I was saying before, we do
21 refresher training every two years with a similar
22 content.  And it's updated on a regular basis
23 based on current law.

Page 196

1  Q.   And is the video that is played in
2  training the video we talked about before at the
3  beginning of your deposition?
4  A.   Yeah, I did refer to that video early
5  on in the deposition, but the timeline of when we
6  started using it is what I had wrong.
7  Q.   In Exhibit 7 under the EEO policy
8  that provides that the head of HR is going to
9  monitor the EEO efforts and report regularly to
10 HMMA's executive management, who constitutes
11 executive management?  Who receives that report?
12 A.   Anyone above the senior manager level
13 in the organization.
14 Q.   Do you receive that report?
15 A.   I would receive a report, yes.
16 Q.   Okay.  Are the reports made pursuant
17 to this policy of the monitoring of the EEO
18 efforts, are those reports made orally or in
19 writing?
20 A.   When they're made, they are in a
21 written form sometimes, yeah.
22 Q.   When was the last time a report of
23 that nature was made?

Page 197

1    A.   Well, we've been without a head of HR
2  for a little bit, but the fact is that those
3  reports can be generated upon request.
4    Q.   What are the contents of the report?
5  What's contained in them?
6    A.   It would look at the team member
7  population in the sense of diversity of the
8  population more than anything else.
9    Q.   Other than reporting the demographics
10 of the workforce, is there anything else that is
11 contained in the report on the monitoring of the
12 EEO efforts?
13   A.   No.  It just usually shows what our
14 team member population makeup looks like.
15   Q.   In reporting on the equal employment
16 opportunity efforts, does the head of human
17 resources report about the number of complaints
18 internally received about discrimination or
19 harassment or conduct that would be contrary to
20 the EEO policy?
21   A.   No.  We don't report that.
22   Q.   Do you know why that is not reported?
23   A.   Because those complaints actually, I

Page 198

1  guess we'll say, are monitored, collected by the
2  team relations department in conjunction with the
3  legal and compliance department.
4    Q.   Do those complaints not reflect on
5  the EEO efforts of HMMA?
6    A.   They may reflect on our efforts, but
7  it's not -- that particular part of it is not
8  collected by the human resources department.
9    Q.   What, if anything, does reporting the
10 demographics of the workforce reflect in terms of
11 the EEO efforts of HMMA?
12   A.   It shows that we try to hire and
13 based -- not based on race, color, religion, sex,
14 et cetera.
15   Q.   What does reporting the demographics
16 reflect in terms of how employees are treated
17 once they've been hired in terms of equal
18 employment opportunity?
19   A.   Again, our team relations and the
20 legal department tracks any complaints that may
21 have been logged by individuals for -- related to
22 EEO.
23   Q.   What does team relations and legal do

Page 199

1  to track those complaints?
2    A.   If a team member raises a concern,
3  they will bring that to their team relations
4  representative or assistant manager or manager,
5  and then it would be investigated by a team
6  relations representative, depending on the
7  position of the individual making the complaint.
8    Q.   Does team relations and legal track
9  the number of complaints that are filed in a
10 given period of time?
11   A.   Yes, they do.
12   Q.   And how do they document that?  Is
13 that in some type of document?
14   A.   I suspect there is a document --
15   MR. MIDDLEBROOKS:  Don't suspect.
16 Tell her what you know.
17   THE WITNESS:  Thank you.
18   A.   There is a, I guess we'll say,
19 spreadsheet or other document that tracks any of
20 those complaints that may be logged.
21   Q.   Is that spreadsheet a living document
22 or is it something that I could request now to
23 get a snapshot of what it might have looked like

Page 200

1  in a given point in time in 2017?
2    MR. MIDDLEBROOKS:  Object to the
3  form.  You've asked the question.
4    MR. WHITEHEAD:  Step outside.
5    (Whereupon, a brief recess was
6  taken.)
7    MR. MIDDLEBROOKS:  He needs to
8  clarify, because the characterization of the
9  document that you said you were interested in
10 obtaining there's an issue with.  Go ahead.
11   A.   Yes.  So it's important to point out
12 that the legal department directs those
13 investigations when a complaint is raised by a
14 team member.  Because the legal department
15 directs those investigations, it's a privileged
16 document.
17   MS. LEONARD:  And I'm going to object
18 to that, because that's not necessarily always
19 the case.  I think that might be what your
20 lawyers are telling you to say, but --
21   MR. MIDDLEBROOKS:  We just told him
22 to tell the truth.
23   MS. LEONARD:  Well, that's, again, a

Page 201

1  legal conclusion.  And the issue of privilege is
2  often used to shield a lot of discoverable
3  information.
4        MR. MIDDLEBROOKS:  No, that's not --
5  Q.   (BY MS. LEONARD:)  What you're
6  telling me is that there is a document, whether
7  it's privileged or not, that exists that without
8  burden or problem would allow you to look at it
9  and identify all of the internal complaints of
10 discrimination that have been brought to HMMA's
11 attention; is that correct?
12 **A.   It's a privileged document prepared**
13 **by the legal department.**
14 Q.   What makes it privileged?
15 **A.   Because they direct -- and that is a**
16 **fact.  They direct team relations to investigate**
17 **any complaints brought forth by a team member.**
18 Q.   And is that a matter of practice and
19 policy for every internal complaint?
20 **A.   That is correct.**
21 Q.   And that's a matter of practice and
22 policy for every complaint that is made pursuant
23 to the EEO and anti-harassment policies we see in

Page 202

1  Exhibit 7, correct?
2  **A.   For team members.**
3  Q.   So that's part of the normal business
4  operations of how the EEO and anti-harassment
5  policy is implemented and followed at HMMA,
6  correct?
7        MR. MIDDLEBROOKS:  He said for team
8  members.
9  **A.   For team members.**
10 Q.   And so if I were to ask HMMA to
11 identify the internal complaints it's received of
12 race discrimination, pregnancy discrimination,
13 gender discrimination, or retaliation in a given
14 period of time, it has a document that provides
15 it with the information identifying those
16 internal complaints?
17 **A.   The legal department controls the**
18 **document that dictates what investigations have**
19 **been directed by them to be investigated by our**
20 **team relations department.**
21 Q.   Okay.
22       MS. LEONARD:  And, David, I'm going
23 to ask, because we never got a privilege log from

Page 203

1  you, and we did make a request specifically for
2  all complaints, including internal complaints.
3  All we got were EEOC charges and some lawsuits,
4  which we're going to go over in a minute, but we
5  didn't have any internal complaints identified,
6  which is responsive to our request.  And we
7  didn't have this document identified on a
8  privilege log.  So we would ask that you amend
9  the responses so that we can --
10       MR. MIDDLEBROOKS:  We probably
11 objected to it, because these are our team
12 members.  These aren't contract employees.
13       MS. LEONARD:  These are things,
14 though, that we're entitled to know, because you
15 guys, A, have raised a defense about
16 discrimination, and it relates to potential
17 comparator issues.
18       One of the issues here is whether or
19 not you guys -- we're not conceding that the fact
20 that our client was performing work through a
21 contractor means that you guys don't have to tell
22 us about other complaints.
23       MR. MIDDLEBROOKS:  We're not

Page 204

1  conceding we have to.
2        MS. LEONARD:  The practical matter is
3  we've been denied an opportunity to even work
4  through this because of that lack, so we're going
5  ask that you guys supplement.  If not, we can
6  meet after this so we can take the issue to the
7  Court, because I think it is something that's
8  important.
9        MR. MIDDLEBROOKS:  Just put that in a
10 letter to me.
11       MS. LEONARD:  Well, I would rather
12 communicate about it now rather than put it in a
13 letter.
14       MR. MIDDLEBROOKS:  It's too broad to
15 appear for deposition.  It needs to be
16 communicated between the two of us.
17       MS. LEONARD:  Can we talk about it
18 when the deposition is over so that we don't have
19 to take that additional step and we can actually
20 meet and confer?
21       MR. WHITEHEAD:  We can talk about it,
22 but this really sounds like something we're going
23 to need to take up with the Court if it gets that

Page 205

1   far.
2        MS. LEONARD:  Well, the need to
3   confer is necessary for us to take it to the
4   Court.
5        MR. WHITEHEAD:  I understand that.
6        MS. LEONARD:  But the case law is
7   pretty clear that we are entitled to --
8        MR. MIDDLEBROOKS:  Let's do the
9   deposition, and then we can have a meet and
10  confer.
11       MS. LEONARD:  Okay.
12       Q.   (BY MS. LEONARD:)  Have you received
13  training or direction on the EEOC policy and the
14  anti-harassment policy?
15       A.   Yes, I have.  That's every -- well,
16  when I joined the company and then every two
17  years as part of the refresher training.
18       Q.   Based on the training that you've
19  received and your understanding of the EEO and
20  anti-harassment policy, do you think you could
21  identify conduct that violates the policy?
22       A.   I mean, any harassment, sexual
23  harassment, to be more specific.  Certainly, any

Page 206

1   form of retaliation would fall in that category,
2   and then any form of discrimination.
3        Q.   What is discrimination as you
4   understand it from your training and your
5   understanding of this policy and your obligation
6   to comply with the policy?
7        A.   Discriminating an individual may be
8   because of a disability.  That would be
9   discriminating, because they -- maybe they had
10  just some form of disability.  That's the best
11  way I can put it.  And anything related to their
12  race or their creed, ethnicity.
13       Q.   What does it mean when you say
14  discriminating would be anything relating to
15  their race, their creed, or their ethnicity.
16  What -- based on your training, your
17  understanding of this policy, and your obligation
18  to follow it, what does it mean if some -- what
19  is discrimination based on creed, disability,
20  ethnicity?
21       A.   So for race, if I treated an
22  individual in a disparate way versus an
23  individual of another race, an individual who

Page 207

1   maybe, let's say, they may have -- again, just
2   some form of disability, not being specific, and
3   I treated them differently from someone who
4   didn't have that disability, so --
5        Q.   In 2017, who was responsible for
6   determining when conduct might be discriminatory
7   or the type of conduct that violates the EEO or
8   anti-harassment policy?
9        A.   Going back to what I've already said,
10  if a complaint was raised by a team member to a
11  team relations rep or someone else, then the
12  legal department, based on the initial complaint
13  details, would ask team relations or another
14  party, depending on the level of the individual
15  making the complaint, to direct an investigation.
16       Q.   My question is a little different,
17  though.  Who ultimately calls balls and strikes
18  and says, yes, this violates our EEO policy, or
19  yes, this violates our anti-harassment policy, or
20  no, it doesn't?
21       A.   Okay.  So let's say that the
22  complaint directed by the legal department is
23  completed by the team relations department or

Page 208

1   other party, depending on the level of the
2   individual.  Then that doc -- the investigation
3   itself would come before the EEO committee,
4   policy committee to review, which includes a
5   representative from the legal department, and
6   they would review all the facts as presented.
7   And then after the facts have been reviewed, then
8   a decision would be made whether or not it
9   actually violated our policy.
10       Q.   How many people serve on the -- is it
11  EEO policy committee or EEO committee?
12       A.   EEO policy committee.
13       Q.   How many people serve on that?
14       A.   Well, I don't sit in that room, so I
15  don't know the exact number.
16       Q.   How long does somebody serve on that
17  committee?
18       A.   Well, there are certain roles or
19  maybe -- what's the right word?  Position is
20  better.  Positions.  So there's a member of HR,
21  there's a member of legal, and probably members
22  of -- because I don't serve on it, so I'm having
23  difficulty picking out the different positions.

Page 209

1  But definitively, HR, TR, and legal.
2      Q.   And TR is team relations?
3      A.   Team relations, yes, because they,
4  again, if they were the ones conducting the
5  investigation, would be able to provide
6  information to the committee while they're
7  reviewing an EEO complaint.
8      Q.   Who sits on the committee from HR?
9      A.   In most cases, it's the senior
10  manager of HR.  It may be a manager of HR, but
11  most of the time it's senior manager of HR.
12     Q.   Do you know who sat on that committee
13  in 2017?
14     A.   Scott Gordy was the senior manager of
15  HR at that time, so he would have been on that
16  committee.
17     Q.   After he retired, do you know who
18  replaced him?
19     A.   Manager of HR.
20     Q.   And what is their name?
21     A.   Delecia McIntyre.
22     Q.   Since 2017, has anyone other than Mr.
23  Gordy or Ms. McIntyre served in an HR role on

Page 210

1  that committee?
2      A.   No.
3      Q.   Do you know who from legal serves on
4  that committee?
5      A.   I'm not in the room, so I would defer
6  to Mr. Whitehead to make sure, because in 2017,
7  I'm not sure.
8          MR. WHITEHEAD:  I don't want to
9  testify here, but you're not barking up the wrong
10  tree.
11     Q.   Who from team relations serves on the
12  committee?
13     A.   2017, probably, and I know you don't
14  want me to -- you're asking me to remember things
15  from five years ago, but maybe a Rob Clevenger.
16     Q.   Do you know if there's some type of
17  document that I could request or HMMA could
18  access that would let us see who has served on
19  the EEO policy committee from 2017 forward?
20     A.   I don't know if it has the names of
21  the committee members with clarity, but there may
22  be a document.
23     Q.   Does the EEO policy committee meet in

Page 211

1  person, virtually, electronically?
2      A.   They meet in person.
3      Q.   With what frequency do they meet in
4  person?
5      A.   It's based on when there is an
6  investigation.  There's no set time that they
7  meet.
8      Q.   Are there any records or documents
9  that reflect when the EEO policy committee meets?
10     A.   Say that one more time.
11     Q.   Sure.  Are there any records or
12  documents that reflect when the EEO policy
13  committee meets?
14     A.   The only thing I could say is that
15  when an investigation is completed, then there
16  would probably be a document that said that
17  that --
18         MR. MIDDLEBROOKS:  Probably?
19         THE WITNESS:  Thank you.
20     A.   There's a document that closed the
21  investigation.
22     Q.   Okay.  Does anyone -- and you said
23  there was a document that closes the

Page 212

1  investigation.  What does that document reflect?
2      A.   The document would reflect the
3  decision of the EEO policy committee.
4          MR. WHITEHEAD:  Can I say one thing?
5  It's not the EEO policy.  It's just the EEO
6  committee.
7      A.   I'm sorry.  Again, I don't serve on
8  it, so I apologize for getting the name wrong.
9          MR. WHITEHEAD:  That's fine.
10     Q.   That document that closes the
11  investigation and reflects the decision of the
12  committee, what happens to it?
13     A.   It's retained by legal department.
14     Q.   Do you know where legal retains it or
15  how they retain it in terms of the organization?
16     A.   No.
17     Q.   But with respect to every time
18  there's been an investigation where HMMA's EEO
19  policy committee has been asked to make a
20  determination as to whether conduct violated its
21  EEO or anti-harassment policy, there would be a
22  document reflecting the final decision?
23     A.   Yes, there would.

Page 213

1   Q.   Who is responsible for making the
2   interpretations required by the legal compliance
3   section of these documents?
4   **A.   Say that one more time.**
5   Q.   Sure.  There's a section in here that
6   talks about determinations that would be made by
7   the legal compliance section.  I'm just trying to
8   figure out, is that the legal department?
9         MR. WHITEHEAD:  Where are you?
10  **A.   Page 3.**
11  Q.   Sure.  If you look at Page 3, it says
12  Legal Compliance, and it reads:  All policies,
13  procedures, and guidelines in the HMMA Team
14  Member Handbook will be interpreted to comply
15  with the provisions of the state and federal
16  employment and labor laws, including, but not
17  limited to, the National Labor Relations Act.
18        My question is:  Who is responsible
19  for making the interpretations that are required
20  by that section?
21  **A.   Okay.  So team relations manages the**
22  **policies.  The legal and compliance department**
23  **will regularly review those policies to make sure**

Page 214

1   **they're consistent or comply with the provisions**
2   **of state and federal employment and labor laws.**
3   Q.   Are you aware of any review from 2017
4   to the present to determine if the policies and
5   procedures and guidelines are consistent with the
6   federal anti-discrimination laws?
7   **A.   I know that the legal department**
8   **reviews the policies every two years, but I'm not**
9   **sure if it occurred in '17, '19.  But definitely**
10  **occurs on a regular basis.**
11  Q.   And are the policies that legal
12  reviews contained within the handbook or is it
13  broader than that?
14  **A.   It's broader.  It's -- there's**
15  **multiple policies that are reviewed during that**
16  **every two-year window.  Some of them are in line**
17  **with the handbook.**
18  Q.   Okay.  We had talked earlier about
19  some training materials, the videos that we
20  talked about.  Are there any other training
21  materials that have been used by HMMA from 2017
22  to the present relating to discrimination or
23  retaliation?

Page 215

1   **A.   I'm only familiar with the video**
2   **that's shown every two years in the refresher**
3   **training as a part of our new hire orientation.**
4   Q.   What has HMMA done to evaluate the
5   effectiveness of its policies prohibiting
6   discrimination and retaliation?
7   **A.   I'm not sure -- evaluating?  What do**
8   **you mean by evaluating?**
9   Q.   Figure out if their policies are
10  working.
11  **A.   Well, we discuss, you know, whether**
12  **or not investigations or complaints come forward,**
13  **so that would be a benchmark for showing how well**
14  **we communicate with our team members about the**
15  **importance of the EEO policy and following it.**
16  Q.   So the complaints received would be a
17  benchmark as to whether or not the policy is
18  working?
19  **A.   I believe that would be a way of**
20  **determining how well we are performing as an**
21  **organization.**
22  Q.   Okay.  Anything else?
23  **A.   Nope.**

Page 216

1   Q.   Has HMMA made a determination as to
2   whether its policies prohibiting discrimination
3   and retaliation are effective?
4   **A.   No.**
5   Q.   Exhibit 6 is Bates Number HMMA 78
6   through 134, which these are some EEOC charges
7   and lawsuits that have been produced in this
8   action by HMMA.
9         (Whereupon, Plaintiff's Exhibit 6 was
10  marked for identification and a copy of same is
11  attached hereto.)
12  Q.   In preparing for your deposition, did
13  you have an opportunity to review the documents
14  contained within this exhibit?
15  **A.   I did review the documents contained**
16  **in Exhibit 6.**
17  Q.   Okay.  Who at HMMA would be made
18  aware when an EEOC charge is received like the
19  EEOC charges we see contained in Exhibit 6?
20  **A.   Legal and compliance department.**
21  Q.   Who specifically, if you know, in
22  legal?
23  **A.   Our general counsel would probably**

Page 217

1 be provided this charge.

2     MR. MIDDLEBROOKS: Probably?

3     THE WITNESS: Sorry.

4     **A.   Our general counsel would be provided**

5 **this, Chris Smith.**

6     Q.   And when you say legal and

7 compliance, is that -- is it one department is

8 legal and one department is compliance or is it a

9 department that's title is legal and compliance?

10     **A.   HMMA legal and compliance department**

11 **is one department.**

12     Q.   Okay.  Other than Chris Smith, is

13 there anyone else at HMMA who is notified about a

14 complaint of discrimination -- an external

15 complaint of discrimination, be it a lawsuit or

16 an EEOC charge?

17     **A.   No.**

18     Q.   Who is responsible for responding to

19 EEOC charges?

20     **A.   HMMA legal and compliance department.**

21     Q.   With respect to the legal complaint

22 raised by Elrick Harris, how was that resolved?

23     **A.   I don't have any information in here**

Page 218

1 **to tell me how it was resolved.**

2     Q.   One of the topic areas, which was

3 Topic 13C, asks for each of the complaints as

4 identified in this ==Exhibit Number 6==.  We were

5 asking for someone who could testify to the

6 resolution of these complaints.

7     MR. MIDDLEBROOKS: We prepared him

8 for that.  He may not remember.

9     MR. WHITEHEAD: That was a pretty

10 extensive 30(b)(6) notice.  He might not remember

11 it.

12     MS. LEONARD: Not extensive.

13 Specific.  I guarantee you nobody has given you

14 the questions the way I gave you the questions so

15 that he actually knew what he was going to be

16 asked.

17     MR. MIDDLEBROOKS: Yeah.  Well, he

18 just don't remember.

19     **A.   Oh, yeah, I had a lot of information.**

20     MR. MIDDLEBROOKS: We can tell you

21 what the outcomes were.

22     Q.   (BY MS. LEONARD:) Sure.  What was

23 it?

Page 219

1     **A.   Again, I have information in front of**

2 **me that shows what charges were presented, or at**

3 **the same time, I'm --**

4     MR. WHITEHEAD: Elrick Harris was a

5 race discrimination claim that was ultimately a

6 lawsuit zoned into it, and summary judgment was

7 granted on all counts by Myron Thompson.

8     MS. LEONARD: Yeah.  Wasn't this the

9 one -- was it Mark Montiel that represented him?

10     MR. WHITEHEAD: Yes.

11     MS. LEONARD: How was Jerry West's

12 case resolved?

13     MR. WHITEHEAD: That was a pro se

14 case that was resolved at a mediation before a

15 magistrate.

16     MS. LEONARD: And the remaining EEOC

17 charges, did any of those proceed to litigation?

18     MR. WHITEHEAD: No.

19     MS. LEONARD: Were any of those

20 resolved at mediation?

21     MR. WHITEHEAD: No.

22     MS. LEONARD: Or privately?

23     MR. WHITEHEAD: No.

Page 220

1     Q.   (BY MS. LEONARD:) From 2017 to the

2 present, what internal complaints of race

3 discrimination or retaliation or gender

4 discrimination made that were not elevated

5 to the EEOC or lawsuit level?

6     **A.   Say that again.**

7     Q.   Sure.  One of the topic areas

8 identified in 13C was for you to be able to

9 testify to the internal complaints made from 2017

10 to the present of race discrimination, gender

11 discrimination, those things that were not

12 elevated to the EEOC or lawsuit level.

13     **A.   So that goes back to where we were**

14 **discussing earlier if a complaint was brought**

15 **forth by a team member and then directed to be**

16 **investigated by legal and compliance, right?**

17 **That's what we're talking about.**

18     Q.   Exactly.  So what are those

19 complaints?

20     **A.   Are you expecting me to give you a**

21 **number?**

22     Q.   Yeah.  I would like to know how many

23 there are.

Page 221

1    A.   No.
2        MR. WHITEHEAD:  We objected to that
3   in discovery.  That's far too burdensome.
4        MR. MIDDLEBROOKS:  We've objected as
5   a 30(b)(6) as well.
6        MS. LEONARD:  You can object, but
7   it's still information we're entitled to.  And
8   you put your objection on the record, but nothing
9   under -- nothing within that objection allows him
10  to refuse to answer the question if he has
11  knowledge.
12       MR. MIDDLEBROOKS:  You can ask him if
13  he knows the answer to it, but he's not going to.
14   Q.   (BY MS. LEONARD:)  Are you aware of
15  any complaints of race discrimination, gender
16  discrimination, or retaliation from 2017 to the
17  present internally?
18   A.   Yes.
19   Q.   Okay.  How many?
20   A.   Again, that's -- I don't have any
21  idea how many at all.
22   Q.   Are you aware of the names of any of
23  the people who would have brought those

Page 222

1   complaints?
2    A.   No.
3    Q.   Are you aware if HMMA found in
4   response to any of those complaints that its EEO
5   policy or anti-harassment policy was violated?
6    A.   I'm going to have you repeat that
7   again.
8    Q.   Sure.  Did HMMA make a determination
9   in evaluating those complaints that its EEO or
10  anti-harassment policy had been violated?
11   A.   I'm confused about what you're asking
12  me, because we already said that if it did not
13  elevate -- you first asked me did it elevate to
14  the level of an actual charge versus a complaint
15  that was investigated.
16   Q.   Right.
17   A.   So yes, an investigation took place,
18  determined not to be a violation of HMMA's EEO
19  policy, and that's it.  I'm confused.
20   Q.   This is my point:  Somebody could
21  complain internally.  HMMA could say, oh, yeah,
22  what they're complaining about is right, somebody
23  did discriminate against them, but that employee

Page 223

1   may not file an EEOC charge.  They may decide not
2   to pursue anything.
3        And that's ultimately what I'm asking
4   is:  When HMMA got these internal complaints, did
5   they determine, in any of those circumstances,
6   the complaints we're talking about from 2017 to
7   the present, did they determine that there had
8   been discrimination or harassment or retaliation?
9    A.   So if an individual upon
10  investigation determined that someone violated
11  HMMA's EEO policy and that committee that I don't
12  sit on makes that determination, then they will
13  address the situation with the individuals
14  involved.
15   Q.   And that's ultimately my question,
16  is:  Speaking on behalf of HMMA, are you able to
17  tell me whether from 2017 to the present when
18  HMMA has received an internal complaint of
19  discrimination or retaliation, has it determined
20  that there was discrimination or retaliation?
21   A.   If during the investigation they
22  determined that it violated HMMA's EEO policy,
23  which includes discrimination, race, et cetera,

Page 224

1   then they would -- if it has been determined,
2   then they would address that with the individuals
3   involved in the investigation.
4    Q.   And I get that's what they would do
5   if that happened.  My question is:  Has there
6   been a determination that there was
7   discrimination or retaliation through the
8   investigation of any of those complaints?
9    A.   I already answered that question
10  three times.
11   Q.   Is it yes or no?
12   A.   It is -- I just said if they
13  determined there was some violation of the EEO
14  policy, then that would be addressed with the
15  individual that violated the policy.  I just
16  answered that three times.
17   Q.   I'm still not clear.  So is that yes,
18  there has been a finding there was discrimination
19  in response to one or more complaints?
20   A.   I just answered that four times now.
21  The answer is if it's determined that there's a
22  violation --
23       MR. MIDDLEBROOKS:  Do you know if

Page 225

1  they ever put down that, yes, there was a

2  violation?

3      **A.   Again, if there was one, then it was**

4  **addressed.**

5      Q.   And I understand that, but my

6  question is trying to figure out if there was

7  one.  Has there been a time --

8      **A.   Well, I wouldn't be telling you that**

9  **there wasn't one if I didn't say if there was**

10 **one, because I would say there never was one.**

11     Q.   I'm confused by your answer.  I'm not

12 trying to be difficult, but I'm going to be

13 relying on this record, and one of the things

14 we're going to be fighting about later is whether

15 there's stuff that I need to get from them or

16 not, and it's going to come from this answer.

17     MR. WHITEHEAD:  Let's take a breather

18 for a second, you want to?

19     MS. LEONARD:  Okay.  Well, I would

20 like --

21     MR. WHITEHEAD:  You're going to get

22 an answer to that question, I promise you, okay?

23 That's why we're taking a break.

Page 226

1      (Whereupon, a brief recess was

2  taken.)

3      MR. MIDDLEBROOKS:  Hopefully, we're

4  going to be able to bring this issue for now to a

5  close.  We want to have a dispute about whether

6  this information will be discoverable, and we'll

7  take it to the Court if necessary, but hopefully

8  we can work it out, but I don't know that we can.

9      But just go ahead and move to your

10 point we're on.  We will stipulate that within

11 the course of the five and a half years or five

12 years from 2017 up until now, in the course of

13 these investigations, there has been at least

14 one, could be more, occasions where

15 discrimination was found through the internal

16 investigation and action was taken.

17     MS. LEONARD:  And we can meet and

18 confer about this --

19     MR. MIDDLEBROOKS:  Yeah.

20     MS. LEONARD:  -- afterwards, and then

21 we'll come back to it.  To the extent that the

22 Court agrees with us that it is discoverable, I

23 do want to leave this portion of the 30(b)(6)

Page 227

1  open so that we can come back if I have questions

2  after you produce those.

3      And I will send a notice similar to

4  this where I identify the page numbers and say,

5  Here are the questions I have on that topic.

6      MR. MIDDLEBROOKS:  If we have to

7  produce it, but we won't be producing it unless

8  there is indeed a Court order.

9      MS. LEONARD:  All right.

10     Q.   (BY MS. LEONARD:)  Are you -- has

11 HMMA received any complaints that its policies

12 relating to grooming or dress code are

13 discriminatory?

14     **A.   Not that I'm aware of.**

15     Q.   Is that something that you prepared

16 to testify to today?

17     **A.   Yes, I was prepared to testify, and**

18 **I'm not aware of any complaints from HMMA team**

19 **members for grooming policy.**

20     Q.   And I'm not trying to parse words,

21 but for lawyers, sometimes there's a difference

22 between not that I'm aware of and no --

23     MR. MIDDLEBROOKS:  There have been

Page 228

1  none.

2      **A.   And I'll be glad to say there have**

3  **been none.**

4      Q.   And that's what I was trying to ask.

5      **A.   Okay.**

6      Q.   Has anyone acting on behalf of HMMA

7  evaluated or determined whether the way Davita

8  Key was treated when she performed work at HMMA

9  was consistent with HMMA's EEO policy and/or

10 federal laws?

11     **A.   No.**

12     Q.   Exhibit 8 to your deposition is HMMA

13 Bates 3.

14     (Whereupon, Plaintiff's Exhibit 8 was

15 marked for identification and a copy of same is

16 attached hereto.)

17     Q.   And this is a document identified as

18 PPE and Dress Code Matrix.

19     **A.   Yes, I have it in front of me.**

20     Q.   Was this document in use in July or

21 August of 2017?

22     **A.   Based on revision date of 2013, based**

23 **on the document in front of me, and it looks**

Page 229

1 consistent with what our policies for PPE and
2 dress code are today, so I'll say yes.
3    Q.   To whom does this document apply?
4    A.   It applies to anyone entering the
5 production areas at HMMA.
6    Q.   What are considered the production
7 areas at HMMA?
8    A.   Consistent with what's on this
9 matrix, stamping, weld, paint, general assembly,
10 and engine shops.
11    Q.   The area where the mailroom is, is
12 that considered a production area?
13    A.   It is not.  It is a part of the
14 administration building.
15    Q.   Is there any type of dress code
16 matrix or guidelines as it relates to appearance
17 for people who work in that area?
18    A.   No.
19    Q.   What is the purpose of Exhibit 8?
20    A.   The primary purpose of Exhibit 8 is
21 to make sure that individuals entering the
22 production areas have the proper safety
23 equipment -- we call it personal protective

Page 230

1 equipment, that's what PPE stands for -- based on
2 potential safety hazards in those respect shops,
3 and whatever their job duties may be.  That's
4 where it gets into a little more detail.
5         But your general PPE would be safety
6 glasses, a simple example.  But where someone
7 would have a protective sleeve or a hard hat,
8 that would be more specific to a shop and the job
9 being performed in the shop.  That's why you see
10 in here JS would be job specific.
11    Q.   Would someone who works in the
12 mailroom be required to enter the production
13 floor as part of their duties?
14    A.   They may have to enter production
15 floor, and if they were, they would be required
16 to wear safety glasses at a minimum.
17    Q.   To the extent somebody who worked in
18 the mailroom had to enter the production floor,
19 other than wearing PPE, like safety glasses, are
20 there any other portions of the dress code or
21 personal hygiene sections that would apply to
22 that employee?
23    A.   I'm reviewing the dress code just to

Page 231

1 make sure before I answer the question.  On dress
2 code, lanyard for badges, that may apply to them,
3 but not likely.  That's just -- and then hygiene,
4 no, because if they're not performing a job in
5 the production areas, I mean physically
6 performing, assembling a car or whatever, then
7 those would not apply to an individual.
8    Q.   When we're looking at the dress code
9 and the personal hygiene, what I'm guessing from
10 this is it's basically trying to avoid things
11 that could get caught in a machine, be it a long
12 fingernail, long hair, earrings, things of that
13 nature?
14    A.   That's correct.  That's why I said if
15 they were not performing a job in any of these
16 shops, it would not apply to them.
17    Q.   Exhibit 9 is a document that's been
18 produced in this action by HEA.  And it's Bates
19 Numbers HEA 1 through 3.
20         (Whereupon, Plaintiff's Exhibit 9 was
21 marked for identification and a copy of same is
22 attached hereto.)
23    Q.   And this was something I e-mailed to

Page 232

1 counsel for HEA as well as the other lawyers in
2 the case Monday afternoon.  Did you have an
3 opportunity to look at this document when you
4 were preparing for your deposition?
5    A.   Briefly, I had an opportunity to look
6 at this this morning, very briefly.
7    Q.   Okay.  Before this morning, were you
8 aware that Exhibit 9 existed?
9    A.   No, I was not.
10    Q.   Do you have knowledge of whether or
11 not HMMA had any input into the content of
12 Exhibit 9?
13    A.   I do not have any knowledge.
14    Q.   I want to look briefly at Exhibit 10,
15 which is another document I sent out before the
16 deposition, which is HEA 52.
17         (Whereupon, Plaintiff's Exhibit 10
18 was marked for identification and a copy of same
19 is attached hereto.)
20    Q.   And this appears to be an e-mail
21 exchange among Gloria Robinson and Ray Cureton.
22 The reason why I ask you about it is there's some
23 reference here to HMMA.

Page 233

1  If you look at the bottom of the
2  page, which appears to be an e-mail sent Monday,
3  July 31st from Ray Cureton to Gloria Robinson, in
4  the second paragraph he makes a reference to:
5  However, the hair standards at HMMA are
6  non-negotiable.  And in the last paragraph he
7  writes:  Bottom line, if her hair is not up to
8  HMMA standards.
9  Looking at this, are you aware of any
10  HMMA standards or do you have any knowledge of
11  what HMMA standards Mr. Cureton may be referring
12  to in this e-mail?
13  MR. MIDDLEBROOKS:  I don't think he's
14  read that, because I don't know if I realized
15  that was one of the documents you sent.
16  MS. LEONARD:  It was in the e-mails
17  that I sent you when I laid out what the exhibits
18  were, and you said --
19  MR. MIDDLEBROOKS:  Well, I know you
20  list it, but it didn't have -- I can't see the
21  Bates Number -- oh, HEA 52.  The e-mail didn't
22  identify HEA.  That's why I was a little
23  confused.  Let him read it.  He's not seen that

Page 234

1  before.
2  Read it.
3  THE WITNESS:  Okay.  So I'm reading
4  it.
5  MR. MIDDLEBROOKS:  Read who it was to
6  and from.
7  THE WITNESS:  Yes, from Ray Cureton,
8  I guess, Cureton.
9  A.  So I've read it.  So ask your
10  question again.
11  Q.  (BY MS. LEONARD:)  Sure.  Do you have
12  any knowledge about what HMMA standards Mr.
13  Cureton is referring to in his e-mail sent on
14  July 31st, 2017 at 3:20 p.m.?
15  A.  I do not have any idea what standards
16  he's referring to, not at all.
17  Q.  I want to look next at Plaintiff's
18  Exhibit 11, which is the response Dynamic
19  Security presented to the EEOC in response to Ms.
20  Key's EEOC charge, and this is Bates Numbers HEA
21  53 through 56.
22  (Whereupon, Plaintiff's Exhibit 11
23  was marked for identification and a copy of same

Page 235

1  is attached hereto.)
2  Q.  Have you seen this document before?
3  MR. MIDDLEBROOKS:  He saw it this
4  morning.
5  A.  That's what I was going to say.  I
6  think this is the one I saw just this morning.
7  Q.  Okay.
8  MR. MIDDLEBROOKS:  It's just a copy.
9  A.  I reviewed a copy of this document
10  this morning with Mr. Middlebrooks, so that's
11  when I first saw this document.
12  Q.  Let me know when you're ready for
13  questions.
14  A.  Okay.
15  MR. MIDDLEBROOKS:  Read through it.
16  THE WITNESS:  Yeah, that's what I'm
17  doing, I'm reading through it, because it is now
18  the second time I've seen it.
19  A.  (Witness reviews document.)  Okay.
20  I've had a chance to review the entire document.
21  Q.  (BY MS. LEONARD:)  On the first page
22  of Exhibit 11, which is Bates Number HEA 53, in
23  the second to the last paragraph, right above

Page 236

1  where we see some italicized words --
2  A.  I see that.
3  Q.  -- it says:  The client's grooming
4  policy is posted in the security officer roll
5  call room.  Is there a security officer roll call
6  room on the HMMA property?
7  A.  There is a security officer roll call
8  room.
9  Q.  Is there a grooming policy posted in
10  the security officer roll call room?
11  A.  I do not know.  I've not been in that
12  room to be able to see that document or how it
13  was posted.  I've never seen it.
14  Q.  Do you know if in 2017 there was a
15  grooming policy posted in a security officer roll
16  call room?
17  A.  I do not know.
18  Q.  Does HMMA have a copy of any grooming
19  policy that may have been posted in the security
20  officer roll call room in its facilities?
21  A.  No.
22  Q.  Where is the security officer roll
23  call room located?

Page 237

1     A.   Inside the security building at
2 Entrance 3 at HMMA.  That's adjacent to Entrance
3 3 at HMMA.
4     Q.   If you turn to the next page, which
5 is Page 54, in the second full paragraph, Dynamic
6 writes to the EEOC:  Ms. Key had then decided she
7 could simply ignore the instructions to restyle
8 her dreads to comply with HMMA policy.
9          And then if you skip down a paragraph
10 below that, it reads:  After reviewing a copy of
11 the HMMA policy regarding the company's grooming
12 standards, Ms. Key was sent home.
13          What policy did HMMA have that would
14 have been communicated to Ms. Key about the
15 company's grooming standards?
16          MR. MIDDLEBROOKS:  Object to the
17 form.
18     A.   I don't know, because it says
19 client's grooming policy.  Well, who's the
20 client?  Hyundai Engineering.  Then it comes back
21 and says HMMA policy.  The only HMMA policy that
22 relates to length of hair is our safety protocol
23 policy.

Page 238

1     Q.   I want to clarify.  You just said,
2 Who's the client?  Hyundai Engineering.  Anywhere
3 in this Exhibit 11 does Dynamic identify the
4 client as HEA?
5          MR. MIDDLEBROOKS:  Object to the
6 form.
7     A.   It doesn't identify HMMA.
8     Q.   Doesn't it identify the grooming
9 policy at issue to be HMMA's grooming policy?
10     A.   They can imply that.  It doesn't make
11 it fact.
12     Q.   Well, doesn't Dynamic state in this
13 document that HMMA's grooming policy is the one
14 that's at issue?
15     A.   If they're referring to our safety
16 protocol, this would not apply to Ms. Key.  It's
17 only for on-site production areas.
18     Q.   You would agree with me this document
19 only makes reference to HMMA's grooming policy?
20     A.   It makes reference to a client's
21 grooming policy first.
22     Q.   And when we look on Page 54, whose
23 grooming policy do they identify?

Page 239

1     A.   Are they implying that the client's
2 grooming policy is HEA's?
3     Q.   That's not my question.  On Page 54,
4 who do they identify to be the one -- who's
5 grooming policy are they --
6          MR. MIDDLEBROOKS:  The document
7 speaks for itself.
8     A.   Yeah.
9     Q.   And what does the document say?
10     A.   It says:  After reviewing a copy of
11 the HMMA policy regarding company's grooming
12 standard.
13     Q.   Do you know what policy that
14 references?
15     A.   No, because I wasn't -- I can't
16 interpret what this individual is referring to,
17 because the only policy that has reference to
18 length of hair is our safety protocol policy.  It
19 has nothing to do with mailroom or security
20 personnel.
21     Q.   Do you have any knowledge as to
22 whether or not HMMA may have communicated a
23 grooming policy to Dynamic as to what it expected

Page 240

1 for people in Ms. Key's role?
2     A.   No.
3     Q.   Let's go to the bottom of the page.
4 And below the bullet points HMMA -- or Dynamic
5 writes to the EEOC:  It was agreed by Dynamic and
6 HMMA management that Ms. Key would be removed
7 from the work site.
8          Who at HMMA management agreed with
9 Dynamic that Ms. Key would be removed from the
10 work site?
11     A.   No one.
12     Q.   Is that an untrue statement?
13     A.   No, it's -- that's an untrue
14 statement?  Are you talking about my statement
15 being untrue?
16     Q.   No, no.  Is Dynamic making an untrue
17 statement to the EEOC when it represented it was
18 agreed by Dynamic and HMMA management that Ms.
19 Key would be removed from the work site?
20     A.   Yes, it must be untrue, because no
21 one at HMMA made this decision to remove Ms. Key
22 from the work site.
23     Q.   Did Dynamic make an untrue statement

Robert Burns

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 63 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 261 of 425

6/22/2022
61 (241 - 244)

Page 241

1 to the EEOC when it said HMMA's grooming
2 policy -- or HMMA had a grooming policy that
3 would have applied to Ms. Key's dreadlocks?
4    **A.   I understand what it says in the**
5 **document here, but I believe there's a**
6 **misinterpretation of HMMA policy, because, again,**
7 **the only policy that refers to length of hair is**
8 **our safety protocols.**
9    Q.   So you would say Dynamic's
10 representation to the EEOC that HMMA had a
11 grooming policy relating to Ms. Key's hairstyle
12 is untrue?
13    **A.   I would have to say, because we don't**
14 **have one that applies to the mail clerks.**
15    Q.   So it would be HMMA's position then
16 that Dynamic provided untrue information to the
17 EEOC?
18        MR. MIDDLEBROOKS:  Asked and answered
19 numerous times.
20    Q.   You can answer it again.
21        MR. MIDDLEBROOKS:  You're badgering
22 the witness.
23        MS. LEONARD:  Hardly.

Page 242

1    Q.   (BY MS. LEONARD:)  You can answer.
2    **A.   Yes, I believe that is an untrue**
3 **representation.**
4    Q.   With respect to any person who was
5 employed or assigned through a contract to HMMA
6 through HEA or Dynamic for the period of 2017 to
7 the present, are you aware of anyone that was
8 accused of having a hairstyle inconsistent with
9 grooming standards?
10    **A.   I apologize, but counsel was talking**
11 **to me, so I wasn't able to give you my --**
12        MR. MIDDLEBROOKS:  I was trying to
13 move these exhibits out of the way that you were
14 finished with.
15    Q.   I'm looking at topic area 3 from
16 ==Exhibit 1==, the 30(b)(6) notice.  With respect to
17 any person who is employed by HMMA or assigned to
18 HMMA through HEA or Dynamic for the period of
19 2017 to the present, has anyone been accused of
20 having a hairstyle that was inconsistent with the
21 company's grooming standards for having
22 dreadlocks?
23    **A.   Not that I'm aware of.**

Page 243

1    Q.   And that's something that you would
2 be aware of since you were prepared on that topic
3 area?
4    **A.   That's true, I guess.  Based on**
5 **information I've been provided, no, there's not**
6 **been anybody.**
7    Q.   Okay.  Would it be fair to say then
8 you're also not aware of anyone who has received
9 discipline for the way that they wore their hair
10 on HMMA property?
11    **A.   No.  Are -- we're referring to**
12 **security personnel?  I just want to clarify that.**
13 **Is that what you're referring to?**
14    Q.   We'll start with security personnel.
15 Are you aware of any security or mailroom
16 personnel that have received any type of
17 discipline, corrective action, or been requested
18 by HMMA to be removed from the site because of
19 their hairstyle?
20    **A.   No.**
21    Q.   Have there been any employees -- or
22 has HMMA fired or disciplined anyone that worked
23 directly for it for their hairstyle?

Page 244

1    **A.   No.**
2    Q.   So regardless of their category, HMMA
3 hasn't done anything to anybody about their hair?
4    **A.   No.**
5        MR. MIDDLEBROOKS:  That's beyond the
6 scope of the 30(b)(6).
7        MR. WHITEHEAD:  Can I just say, I
8 mean, look, if somebody is walking around with a
9 ponytail that fell out of their hat, I'm sure a
10 supervisor is going to say, hey, put it back up
11 in your hat.
12        THE WITNESS:  Yeah, that's not -- you
13 said terminated, or whatever she just said.
14    **A.   Yeah, if someone is not following the**
15 **safety protocols --**
16        MR. MIDDLEBROOKS:  That's still
17 beyond the scope of 30(b)(6).
18        MS. LEONARD:  Actually, it's part of
19 topic area 3 that dealt with comparatives.
20        MR. MIDDLEBROOKS:  3?
21        MS. LEONARD:  Yeah.
22        MR. MIDDLEBROOKS:  It says -- okay.
23 He's answered the question.

Page 245

1    MS. LEONARD:  I just want to make
2  sure it's clear.  You're telling me I'm going
3  outside my notice, and I know my notice.
4    Q.   (BY MS. LEONARD:)  Who made the
5  decision that Davita Key would not be performing
6  work on HMMA's property?
7    A.   Someone with Hyundai Engineering or
8  Dynamic Security, not HMMA.
9    Q.   Well, I understand that.  Do you know
10  who made the decision?
11    A.   No.
12    Q.   So would it be fair to say HMMA's
13  position is it does not know who made the
14  decision for Ms. Key to stop performing work on
15  HMMA's property?
16    A.   HMMA did not know who made the
17  decision to --
18    Q.   Okay.
19    MR. MIDDLEBROOKS:  We've heard a lot
20  in this litigation about who supposedly did, but
21  before this lawsuit was filed, the answer would
22  be no.
23    Q.   You testified earlier that Chris

Page 246

1  Smith, who is general counsel for HMMA, is the
2  person who would receive the EEOC charges.  Do
3  you have any knowledge of what he does once he
4  receives those EEOC charges?
5    A.   No, I don't have any knowledge of the
6  process they take, no.
7    Q.   Is there any reason that Ms. Key
8  would be disqualified from working at HMMA?  Now,
9  I understand jobs may not be available or she may
10  not be qualified for a job, but other than
11  reasons of qualification or not having a job
12  available, is there any reason she would not be
13  eligible to work at HMMA?
14    A.   Not that I'm aware of.
15    Q.   Is she eligible to seek employment at
16  HMMA?
17    A.   She's -- I don't know why she would
18  not be eligible.
19    Q.   And other than not being the most
20  qualified person for the job for which she
21  applies, is there any other reason she would not
22  be hired at HMMA?
23    A.   No.

Page 247

1    Q.   Did anyone at HMMA object to Ms.
2  Key's appearance?
3    A.   No.
4    Q.   Did anyone at HMMA object to Ms.
5  Key's hairstyle?
6    A.   No.
7    MR. MIDDLEBROOKS:  When you say at
8  HMMA, you mean employed by HMMA?
9    MS. LEONARD:  Let me go back and look
10  at my question.
11    MR. MIDDLEBROOKS:  Well, the point
12  is -- here's my point:  There may be people
13  physically located on the premises of HMMA who
14  may have raised an issue, but not HMMA.
15    MS. LEONARD:  And I'm speaking about
16  the people who work for HMMA.
17    THE WITNESS:  As long as we're clear,
18  yeah.
19    MS. LEONARD:  I think we were clear,
20  but you're well taken that somebody could be
21  standing at the HMMA facility --
22    MR. MIDDLEBROOKS:  Yeah, that's the
23  distinction.  I think his answer is the same.

Page 248

1    Q.   (BY MS. LEONARD:)  Has HMMA learned
2  anything through this lawsuit about Ms. Key that
3  if she were to seek employment with the company
4  would disqualify her from being employed?
5    A.   No.
6    Q.   Is HMMA aware of any job
7  opportunities that Ms. Key has failed to
8  reasonably take advantage of since August 1st of
9  2017?
10    A.   I have no knowledge.
11    Q.   I'm going to show you now what's been
12  marked as Exhibit 12 to your deposition, which
13  are Bates Numbers Key 57 through 61.
14    (Whereupon, Plaintiff's Exhibit 12
15  was marked for identification and a copy of same
16  is attached hereto.)
17    Q.   Have you seen these documents before?
18    A.   Yes, I did review this document
19  yesterday.
20    Q.   Okay.  Prior to HMMA receiving
21  Exhibit 12, which begins with a letter dated
22  October 24th, 2018 from the EEOC to Chris Smith,
23  prior to that point in time, had HMMA heard from

Page 249

1 any source that Davita Key had complained about
2 discrimination or retaliation?
3      A.   No.  We had not heard about this case
4 prior to this notice.
5      Q.   Had HEA or Dynamic informed HMMA that
6 Ms. Key had made either a complaint to Dynamic or
7 that Ms. Key had filed an EEOC charge?
8           MR. MIDDLEBROOKS:  Prior to that
9 date?
10          MS. LEONARD:  Yes.
11     A.   No.
12     Q.   (BY MS. LEONARD:)  What did you do to
13 determine that HMMA's first notice of Ms. Key's
14 complaint was Plaintiff's Exhibit 12?
15     A.   Based on conversations with legal and
16 compliance, they informed me that they became
17 aware of the case once they received this letter
18 from the enforcement supervisor.  And once they
19 received the information, then they contacted
20 Hyundai Engineering to learn more about the
21 situation.
22     Q.   Who in legal and compliance made you
23 aware of that?

Page 250

1      A.   You mean of what I just described?
2      Q.   Yes.
3      A.   Mr. Chris Whitehead.
4      Q.   Okay.  Considering that general
5 affairs would be the point of contact for the
6 security services contract, in preparing for your
7 deposition, did you make any effort to obtain
8 information from general affairs as to whether
9 they had received notice from HEA, Dynamic, or
10 any other source about Ms. Key's complaints?
11     A.   No.
12     Q.   Do you know what efforts, if any,
13 legal and compliance made to determine if any
14 other points of contact at HMMA other than Mr.
15 Whitehead had knowledge of Ms. Key's complaints
16 prior to October 24th?
17     A.   No.
18     Q.   Do you know if Plaintiff's Exhibit 12
19 was received by HMMA through the mail or
20 electronically through an e-mail?
21     A.   The appearance on the document
22 doesn't really confirm one way or the other.
23     Q.   If you turn to the second page of

Page 251

1 Exhibit 12, which is Bates Number Key 58, it
2 appears to be a notice of charge of
3 discrimination, which is referenced as an
4 attachment to the first page, and that appears to
5 bear an e-mail address.  And that's why I was
6 asking is, looking at these, I couldn't tell if
7 this was sent via mail or e-mail.  Does HMMA not
8 have any recollection which way it came through?
9      A.   I don't have specific knowledge how
10 it was delivered, no.
11     Q.   Okay.  On Page 59 of Exhibit 12 at
12 the top of the page is a preservation of records
13 requirement.  When did HMMA first take steps to
14 preserve information or documents that would
15 relate to Ms. Key's allegation that she
16 experienced discrimination when she was removed
17 from doing work on HMMA's property?
18     A.   Normal practice, once a charge is
19 presented to HMMA, is to require anyone that may
20 have connection with the case to do just what you
21 said, preserve records.
22     Q.   Was any type of litigation hold
23 letter sent out to anyone at HMMA relating to Ms.

Page 252

1 Key's claims?
2      A.   That, I wouldn't know.  I would defer
3 to legal and compliance.
4      Q.   Did HMMA receive any type of
5 litigation hold from Dynamic or from HEA?
6      A.   I would have to defer to legal and
7 compliance.
8      Q.   On the next page, which is Key 60, it
9 gives direction on a position statement, and it
10 indicates that a position statement should be
11 signed by an officer, agent, or representative of
12 the respondent.
13          Did HMMA understand that that would
14 be what was required when it was responding to
15 the EEOC?
16     A.   I believe our legal and compliance
17 department would follow the directive of the
18 EEOC.
19     Q.   All right.  I want to look next at
20 Exhibit 13, which is Ms. Key's EEOC charge.
21          (Whereupon, Plaintiff's Exhibit 13
22 was marked for identification and a copy of same
23 is attached hereto.)

Page 253

1    Q.    Who did HMMA notify that it had
2  received Ms. Key's EEOC charge, which is Exhibit
3  13 or Bates Number Key 47?
4    **A.    One more time.  Say that one more**
5  **time.**
6    Q.    Sure.  Who did HMMA notify that it
7  had received this charge of discrimination?
8        MR. MIDDLEBROOKS:  You're kind enough
9  to write your question at the top of the
10  document.
11    Q.    Oh, I gave you mine.  You can answer.
12  Go ahead.
13    **A.    I'm a little bit confused about who**
14  **notified who.  I mean, EEO notified HMMA.**
15    Q.    No, no.  When HMMA got this document,
16  who did they tell, Hey, Davita Key has filed an
17  EEOC charge?
18    **A.    Oh, okay.  So as I said earlier, once**
19  **we received the notification, legal and**
20  **compliance contacted Hyundai Engineering to learn**
21  **more information about the charge.**
22    Q.    And do you know who that was?
23    **A.    Who contacted Hyundai Engineering?**

Page 254

1    Q.    Yes.
2    **A.    Maybe it was Chris Whitehead.  That's**
3  **why I said legal and compliance, because I don't**
4  **know exactly who contacted them.**
5    Q.    How did you come to learn that
6  someone from legal and compliance contacted
7  Hyundai Engineering once HMMA received Exhibit
8  13?
9    **A.    Because during my preparation**
10  **yesterday, Mr. Whitehead gave me that information**
11  **about the timing of when they received this**
12  **charge.**
13    Q.    Do you know if there are any
14  documents that reflect communications between
15  HMMA and HEA about Ms. Key's EEOC charge?
16    **A.    I don't know if it was in the form of**
17  **a phone call or what.  I do not -- obviously,**
18  **there was communication, because Mr. Whitehead**
19  **acknowledged that he contacted Hyundai**
20  **Engineering to learn more about it.  I don't know**
21  **exactly how that communication took place.**
22    Q.    So it would be fair to say that HEA
23  had notice of Ms. Key's complaints that she had

Page 255

1  experienced discrimination through her assignment
2  at HMMA, and HEA had that notice before Ms. Key
3  filed her lawsuit?
4        MR. MILLER:  Object to the form.
5        MR. MIDDLEBROOKS:  Object to the
6  form.
7    Q.    Let me rephrase it.  Before Ms. Key
8  filed her lawsuit, it's fair to say that HMMA
9  notified HEA about Ms. Key's EEOC charge?
10        MR. MILLER:  Object to the form.
11    **A.    You're mixing -- you're confusing me**
12  **on who went first, because, again, we received --**
13    Q.    Ms. Key's lawsuit was filed in 2019.
14    **A.    Okay.**
15    Q.    You would agree with me that sometime
16  after October 24th, 2018, HMMA notified HEA about
17  Ms. Key's EEOC charge?
18        MR. MILLER:  Object to the form.
19    **A.    Well, at least now I'm clear on the**
20  **question in the sense that it was at least**
21  **fourteen, fifteen months, whatever it was, after**
22  **the actual termination of the individual that**
23  **HMMA was informed that there was even a case.**

Page 256

1    Q.    That's not my question.  I'm going to
2  move to strike as nonresponsive.
3    **A.    Okay.**
4    Q.    I'll be blunt.  HMMA represented to
5  the Court earlier in this case that it did not
6  know about Ms. Key's charge until it was sued.
7  What I'm hearing from you is to the extent
8  HMMA -- and it's okay if I'm --
9        MR. MILLER:  I'm going to go ahead
10  and object before she even finishes that
11  question.  To the extent that she's claiming that
12  any lawyer made a misrepresentation, I would --
13  you just need to think carefully.  I wasn't
14  involved in the case at that time, but you need
15  to be careful about how -- maybe you should
16  rephrase that for your own good.
17    Q.    You would agree that HMMA sometime in
18  2018 notified -- in 2018 Hyundai Motor
19  Manufacturing Alabama notified Hyundai
20  Engineering about Ms. Key's EEOC charge?
21        MR. MILLER:  Object to the form.
22    **A.    Okay.  So I'll answer it the same way**
23  **I did before, in that once we were notified, then**

Page 257

1  contacted -- Chris Whitehead or someone from
2  legal and compliance contacted Hyundai
3  Engineering to learn what actually -- or learn
4  about the charge, what happened, who -- so that's
5  all I can say.  That's when that contact took
6  place.
7      Q.   Did HMMA provide a copy of Ms. Key's
8  EEOC charge to HEA?
9      A.   That, I did not discuss with Mr.
10  Whitehead, so I cannot answer that.
11     Q.   How could we find that out?
12         MR. MIDDLEBROOKS:  You could ask
13  HMMA.
14         MS. LEONARD:  Or we could ask Mr.
15  Whitehead.  I'm trying to avoid having to do
16  that, which is why I was trying to do a 30(b)(6).
17         MR. MIDDLEBROOKS:  Well, there is an
18  e-mail that we produced.
19         MR. WHITEHEAD:  Heather, if I had a
20  memory off the top of my head, I would tell you.
21  I don't remember off the top of my head, but we
22  don't have any objection to looking to see if
23  that was done.

Page 258

1         MS. LEONARD:  I would really rather
2  avoid taking another lawyer's deposition.
3         MR. WHITEHEAD:  I understand.  And I
4  would not go silently into the night if someone
5  noticed me either.
6         MS. LEONARD:  If you guys are
7  agreeable, I can send an interrogatory that says
8  what information was provided by HMMA to HEA from
9  the period of, you know, for the period leading
10  up to HEA --
11         MR. WHITEHEAD:  I honestly don't
12  think I sent a copy of the actual charge -- and
13  we're talking about Cassandra Williams is who
14  we're talking about, and I honestly don't think I
15  sent a copy of the charge over to her.
16         MS. LEONARD:  And I'm not limiting it
17  just to you if it could have been Chris, anybody
18  in legal.
19         MR. WHITEHEAD:  It would be Chris.
20         MR. MIDDLEBROOKS:  It would be Chris
21  Smith.
22         MR. MILLER:  On behalf of HEA, I'm
23  going to object to this line of questioning.  I

Page 259

1  think it's outside of the scope of this case.
2         MS. LEONARD:  You can, but going back
3  to the motions to dismiss, if one of the
4  representations is if HEA actually knew about
5  this, I think it changes how the Court may have
6  viewed the motion to dismiss, and we may want to
7  revisit the issue with the Court.  So that's part
8  of why I'm proceeding down this line of
9  questioning.
10         MR. MILLER:  Is that a question?
11         MS. LEONARD:  No.  I'm letting you
12  know that's where this is going, why I'm going
13  down this line.
14         MR. MILLER:  And I'm objecting,
15  because that issue is no longer in the case.
16         MS. LEONARD:  It might be, though.
17     Q.   (BY MS. LEONARD:)  Do you know if
18  HMMA shared a copy of Ms. Key's EEOC charge with
19  anyone outside of HMMA, whether it's HEA,
20  Dynamic, or anybody else?
21     A.   I don't have any knowledge.
22         MR. MIDDLEBROOKS:  They did me.
23         MS. LEONARD:  You don't count.

Page 260

1  You're in the bubble.
2         MR. MIDDLEBROOKS:  That's where I
3  want to be.
4     Q.   (BY MS. LEONARD:)  Exhibit 14 is
5  HMMA's submission to the EEOC in response to Ms.
6  Key's EEOC charge, and it's Bates Numbers Key 67
7  through 72.
8         (Whereupon, Plaintiff's Exhibit 14
9  was marked for identification and a copy of same
10  is attached hereto.)
11     Q.   Was Mr. Middlebrooks somebody who was
12  authorized to draft and sign this document on
13  behalf of HMMA?
14     A.   Yes.
15     Q.   And HMMA authorized him to speak to
16  the matters raised in Ms. Key's EEOC charge?
17     A.   Yes.
18     Q.   I want to take a step back.  Do you
19  know if HMMA communicated with Dynamic Security
20  about Ms. Key's EEOC charge?
21     A.   I do not know.
22     Q.   Do you have any knowledge who at HMMA
23  would have provided information to assist counsel

Page 261

1  in preparing Exhibit 14?

2  **A.   Legal and compliance department.**

3      MR. WHITEHEAD:  She's referencing the

4  position statement, right?

5      THE WITNESS:  Yes.

6      MS. LEONARD:  I'm just asking who

7  would have helped him.

8  Q.   (BY MS. LEONARD)  Did you

9  participate in the preparation of Exhibit 14?

10  **A.   I did not.**

11  Q.   Exhibit 15 is Bates Number Key 62,

12  and it's a letter from EEOC to counsel for HMMA.

13      (Whereupon, Plaintiff's Exhibit 15

14  was marked for identification and a copy of same

15  is attached hereto.)

16  Q.   Have you seen this document before?

17  **A.   I have seen this document.**

18  Q.   When did you first see this document?

19  **A.   I saw this document yesterday.**

20  Q.   On May 2nd, 2019, the EEOC wrote

21  HMMA's representative that the evidence indicates

22  that charging party was discharged in retaliation

23  for engaging in a protected activity.

Page 262

1      Who outside of HMMA, if anyone, did

2  HMMA notify that the EEOC had made this

3  conclusion?

4  **A.   To my knowledge, no one else except**

5  **counsel.**

6  Q.   Do you know if HMMA took any action

7  in response to Exhibit 15 to change anything

8  about how it did business or with whom it did

9  business?

10  **A.   Say that very first part again.**

11  Q.   Sure.  After HMMA got Exhibit 15, did

12  it do anything in terms of how it followed its

13  policies?  Did it change anything?

14  **A.   No.**

15  Q.   After getting Exhibit 15, did it

16  change anything about with whom it did business?

17  **A.   No.**

18  Q.   Did the information from the EEOC

19  that it was -- or that the investigator was going

20  to recommend that a reasonable cause be issued,

21  that Ms. Key had been discharged in retaliation

22  for engaging in protected activity, did HMMA

23  change anything about how it operated or did

Page 263

1  business in response to this letter?

2  **A.   No.**

3  Q.   I want to look next to Exhibit 16,

4  which is Bates Numbers Key 64 to 66, which is a

5  letter dated May 9th, 2019 from counsel for HMMA

6  to the EEOC.

7      (Whereupon, Plaintiff's Exhibit 16

8  was marked for identification and a copy of same

9  is attached hereto.)

10  Q.   Have you seen this document before?

11  **A.   Yes, I quickly glanced at it**

12  **yesterday.**

13  Q.   Okay.  And was Mr. Middlebrooks

14  authorized by HMMA to speak on its behalf about

15  this matter?

16  **A.   Yes, he was.**

17  Q.   And when this letter was submitted to

18  the EEOC, was it done so by HMMA's agent?

19  **A.   When you say agent --**

20  Q.   Yeah, was he somebody that -- was Mr.

21  Middlebrooks somebody that HMMA had retained to

22  speak on its behalf about Ms. Key's claims?

23  **A.   He's -- yeah, he's representing HMMA**

Page 264

1  **on behalf of this claim, Mr. Middlebrooks is.**

2  Q.   And does Exhibit 16 contain the

3  reasons that HMMA was asking the EEOC to

4  reconsider its decision?

5  **A.   It does outline several reasons.  I**

6  **see here the errors, and there are a total of**

7  **seven bullets or seven different items outlined**

8  **in this letter, yes.**

9  Q.   And HMMA would have provided the EEOC

10  with all of its reasons that it needed to

11  reconsider its decision in this letter?

12      MR. MIDDLEBROOKS:  Object to the

13  form.

14  **A.   It looks like Mr. Middlebrooks**

15  **provided seven reasons for this -- the error for**

16  **the charge against HMMA.**

17  Q.   There wouldn't be a reason for HMMA

18  to withhold any other reasons it might want a

19  reconsideration for inclusion in this letter, is

20  there?

21      MR. MIDDLEBROOKS:  Object to the

22  form.

23  **A.   Just based on the information I'm**

Page 265

1  reading here, Mr. Middlebrooks representing HMMA
2  provided the information to say that the charge
3  against HMMA was in error.
4      Q.   And if there was another reason that
5  HMMA wanted the EEOC to reconsider, it would be
6  included in Exhibit 16?
7          MR. MIDDLEBROOKS:  Object to the
8  form.
9      A.   I believe based on the seven items
10 that he's outlined in this letter, that
11 determined why HMMA was not -- should not be
12 charged.
13         MR. MIDDLEBROOKS:  As of the date of
14 the letter.
15     A.   As of the date of the letter.
16     Q.   And I want to look at Exhibit 17
17 next, which is Key 41 through 42.
18         (Whereupon, Plaintiff's Exhibit 17
19 was marked for identification and a copy of same
20 is attached hereto.)
21     Q.   Have you seen this determination
22 issued by the EEOC before?
23     A.   I glanced at it yesterday, yes.

Page 266

1      Q.   When did you first become aware that
2  the EEOC had found that HMMA had engaged in
3  retaliation towards Ms. Key?
4          MR. MIDDLEBROOKS:  Excuse me, and
5  what?
6      Q.   Sure.  How did you -- when did you
7  first learn that the EEOC had made a
8  determination adverse to HMMA?
9      A.   I don't remember the exact date, but
10 to be more general -- and that's what I have to
11 be, because I don't have an exact -- it would
12 have been before this deposition.  I just can't
13 recall an exact date.  I just -- five, six months
14 or more.  I really don't recall, but I was
15 definitely made aware of it X number of months
16 ago.  I don't know an exact date.
17     Q.   And you were in your VP human
18 resources role in June of 2019, correct?
19     A.   Yes.
20     Q.   But despite being VP of human
21 resources in June of 2019 when this determination
22 was issued, you weren't made aware of it until
23 sometime this year in 2022?

Page 267

1      A.   Again, I was speculating on exactly
2  when, but the important point is this does not
3  involve an HMMA team member.
4      Q.   That's not my question.  You're the
5  senior vice-president --
6      A.   I'm giving you the response, because
7  that's why I wouldn't have been informed until it
8  was necessary to be involved with the case.  So I
9  would not have been informed, because it's not an
10 HMMA team member.
11     Q.   You would agree the determination by
12 the EEOC, though, is that HMMA's employment
13 practices, in their view, may be violating
14 statues?
15     A.   Based on the information provided by
16 the equal employment commission letter, maybe,
17 yeah.
18     Q.   And going back to the beginning of
19 your deposition, you said it's their
20 determination that would determine if a complaint
21 was valid, correct?
22         MR. MIDDLEBROOKS:  Excuse me?
23     A.   Yeah, I recall saying something

Page 268

1  whether or not -- the EEO would determine whether
2  or not we were at fault, and then we have a right
3  to defend that, which Mr. Middlebrooks' letter
4  that points out the seven different items that
5  show they were in error.
6      Q.   In your role as vice-president of
7  human resources, should you have been made aware
8  that the EEOC had made a finding adverse to HMMA?
9      A.   If it involved a team member, yes.
10     Q.   What does the EEOC do?  What's your
11 understanding of what they do?
12     A.   They investigate and/or --
13         MR. MIDDLEBROOKS:  That's beyond the
14 30(b)(6), but go ahead.
15     Q.   You can answer.
16     A.   My general understanding is review
17 equal employment opportunity issues.  I'll leave
18 it at that.  Broadly, issues that may come up.
19     Q.   And what laws do you understand the
20 EEOC investigates violations of?
21     A.   I'm not an expert, so I don't know
22 the details.
23         MR. MIDDLEBROOKS:  I object.  It's

Page 269

1  beyond the scope.

2      Q.   (BY MS. LEONARD:)  It's okay.  You

3  can answer.

4      **A.   My only answer is I don't have that**

5  **degree of knowledge to look at all the nuances of**

6  **EEO commission.**

7      Q.   Isn't part of your job to make sure

8  that HMMA complies with federal laws that deal

9  with employment like Title VII?

10     **A.   It is the responsibility of the**

11 **entire organization to make sure we're in**

12 **compliance with Title VII, not just myself.**

13     Q.   As the -- are you senior

14 vice-president of HR or vice-president of HR?

15     **A.   I'm vice-president and chief**

16 **administrative officer.**

17     Q.   In that role, do you have any

18 responsibility for knowing to whom Title VII

19 applies?

20     **A.   In general terms, yes, I do know,**

21 **yeah.**

22     Q.   And to whom does Title VII apply?

23     **A.   All of our team members.**

Page 270

1      Q.   Does it also apply to HMMA?

2      **A.   I just said our team members, which**

3  **is HMMA.**

4      Q.   Okay.  And did the EEOC make a

5  determination about whether there was an

6  employer/employee relationship between HMMA and

7  Ms. Key?

8      **A.   I don't know that it specifies that.**

9  **I would have to reread the letter.**

10     Q.   Well, let's go down to the fourth --

11     **A.   Oh, I see it right here.  I just saw**

12 **it.**

13     Q.   And they write:  Examination of the

14 evidence reveals that there is an

15 employee/employer relationship between charging

16 party and respondent.

17     **A.   Yep, I see it.**

18     Q.   And charging party is a covered

19 employee under the anti-discrimination statutes.

20          MR. MIDDLEBROOKS:  We object.  That's

21 a legal conclusion on the part of the EEOC, and

22 it's not a competent person making that

23 conclusion.

Page 271

1      Q.   And you would agree with me that

2  despite you being vice-president of human

3  resources, HMMA did not make you aware of this

4  determination until sometime in 2022?

5      **A.   No, I said --**

6          MR. MILLER:  Object to the form.

7          MR. WHITEHEAD:  That's not what he

8  said at all.  Go ahead.

9      **A.   I'm just -- no.  I said I wasn't**

10 **clear exactly when.  This was five or six months**

11 **ago, and we're sitting here in June, so it could**

12 **have been 2021.**

13     **But the fact of the matter is I**

14 **became aware of it when that occurred.  I don't**

15 **know exact date, but I was made aware of it**

16 **before this deposition.**

17     Q.   Well, this lawsuit was filed in 2019.

18 When did you first learn Ms. Key had filed a

19 lawsuit against HMMA?

20     **A.   Again, I don't recall exact dates,**

21 **because this does not involve an HMMA team**

22 **member.  That's where my area of responsibility**

23 **is.**

Page 272

1      Q.   That's not my question.

2      **A.   It's not security, Dynamic Security.**

3  **It's not legal and compliance.**

4      Q.   All right.  Are you done?

5      **A.   Okay.**

6      Q.   And I'm not saying that to be snippy.

7  I don't want to cut you off.  I've cut you off a

8  few times.

9      **A.   I'm good.**

10     Q.   But you would agree with me that the

11 earliest that you, the vice-president of human

12 resources, may have learned that the EEOC entered

13 a determination adverse to HMMA was December of

14 2021?  That's the earliest you can recall?

15     **A.   Again, you're trying to --**

16          MR. MIDDLEBROOKS:  Object to the

17 form.

18     **A.   That's why I was saying I cannot be**

19 **specific, because I don't remember the exact**

20 **date.  Was I made aware, yes.  That's the answer**

21 **to your question.**

22     Q.   When?

23     **A.   I can't be clear, because I don't**

Page 273

1  remember the date.
2      Q.   What's your best estimate?
3      A.   Again, prior to this deposition, best
4  estimate.
5      Q.   And you said a few times five or six
6  months.  Is that your best memory?
7      A.   If you want to pick a date, we're
8  going to have an argument.  There's no point,
9  because I don't remember the exact date, because
10  it does not involve an HMMA team member.
11     Q.   Are you made aware of the EEOC
12  findings for HMMA team members?
13     A.   I'm sorry.  What?
14     Q.   Are you made aware of EEOC --
15     A.   Absolutely, I'm made aware of those.
16     Q.   Are there any other determinations
17  that have been issued by the EEOC against HMMA in
18  favor of team members?
19     A.   Again, that's not what this is about.
20  This is about this particular case, and I'm not
21  going to disclose what information relative to
22  any EEOC claims were against HMMA team members.
23  I'm not going to do it.

Page 274

1      Q.   Have you been made aware of any
2  determinations that HMMA -- because I want to go
3  back.  We were talking at the beginning of your
4  deposition about the effectiveness of the
5  policies, and if there had been valid complaints,
6  and you said the EEOC is the determiner if there
7  is a valid complaint.
8          Has the EEOC determined HMMA team
9  members have brought valid complaints to their
10  attention?  Have there been determinations
11  brought to your attention?
12     A.   Again, if it were and we had examples
13  that actually were -- we had a few examples that
14  were presented.  I was made aware of those when
15  they were brought forth.
16     Q.   I'm not privy to those examples.
17  What are they?
18     A.   The ones we just got through
19  reviewing.  Elrick Harris, did you forget those
20  ones we reviewed?  Those were presented by the
21  EEOC just like the one with Ms. Key's.
22     Q.   The examples that we looked at we
23  didn't get to see the EEOC's determinations.

Page 275

1      A.   I understand what you're saying --
2      Q.   That wasn't produced to us.
3      A.   -- but then I would have been made
4  aware.  Those documents represent what was
5  presented to HMMA, and then I would have been
6  made aware, because they're team members.
7      Q.   I think we're getting off, and you're
8  not following my question.  A determination by
9  the EEOC is where the EEOC said we have
10  reasonable cause to believe that one or more of
11  the federal statutes that we enforce have been
12  violated.  So, in other words, a determination is
13  them saying we think the company may have done
14  something wrong.
15         What I'm asking is if you've been
16  made aware of an EEOC determination.  Have you
17  been made aware of an EEOC determination where
18  the EEOC said we think Hyundai may have done
19  something wrong?
20         MR. MIDDLEBROOKS:  He's testified he
21  was made aware of all determinations by the EEOC
22  if it involves a team member.
23     A.   Yes.  I mean, I've already answered

Page 276

1  that.
2      Q.   How many of those have there been
3  since 2017?
4      A.   I'm not going to tell you how many,
5  because that's not relevant to this case.
6      Q.   Actually, it is.
7      A.   I'm not going to answer the question.
8      Q.   HMMA --
9      A.   I'm not going to answer the question.
10     Q.   Then we're going to call the judge.
11     A.   Okay.
12         MR. MIDDLEBROOKS:  The guidelines say
13  don't call the judge in the course of the
14  deposition.
15         MS. LEONARD:  I would ask that you
16  instruct -- because we're almost done.  I would
17  ask that you instruct him to answer the question.
18         MR. MIDDLEBROOKS:  I don't know
19  that -- show me where it's in your 30(b)(6)
20  notice.
21         MR. WHITEHEAD:  Take a break for a
22  second, if that's okay.
23         MS. LEONARD:  Okay.  I'll tell you

Page 277

1  where it is in the notice.  We asked about facts
2  supporting defenses -- it relates to your
3  defenses against punitive damages, and that's in
4  the notice.
5          (Whereupon, a brief recess was
6  taken.)
7          MR. MIDDLEBROOKS:  One thing that
8  might help us here, in the past five years, going
9  all the way back before Ms. Key was -- has been
10  working for Dynamic Security, hers has been the
11  only cause finding by the EEOC.  So anything else
12  before Davita would be a no cause finding.
13          MS. LEONARD:  So I want to get his
14  testimony clear on this.
15          MR. MIDDLEBROOKS:  Excuse me?
16          MS. LEONARD:  Since you're not under
17  oath, I need to ask him the question if he's
18  aware.
19          MR. MIDDLEBROOKS:  Yeah.
20          MS. LEONARD:  And he can answer
21  consistent with that.
22      Q.   (BY MS. LEONARD:)  So are you aware
23  of any determinations against HMMA in the last

Page 278

1  five years?
2          MR. WHITEHEAD:  By the EEOC.
3          MR. MIDDLEBROOKS:  By the EEOC.
4      A.   No, I'm not aware of any cause
5  determinations by the EEOC in the last five
6  years.
7          MR. MIDDLEBROOKS:  Other than Key's.
8      A.   Other than Key's.  Sorry.  Yes.
9      Q.   HMMA served as per the document
10  called Initial Disclosures, and it's sort of like
11  a preliminary witness and exhibit list where you
12  say here are the witness I may rely on in the
13  case, and this is what I think they know, and
14  it's to give people an opportunity to determine
15  if we want to depose people.
16          You were on that list, and HMMA
17  identified you as having access to HMMA's
18  employment records and is believed to have
19  knowledge about whether HMMA ever employed
20  plaintiff Cassandra Williams, Gloria Robinson,
21  Maurice Chambliss, or Tunya Howell.  He has
22  access to certain contractual arrangements
23  between Hyundai and third parties to provide

Page 279

1  certain services to HMMA.
2          Is that an accurate statement of the
3  knowledge that you have as it would relate to
4  this action?
5      A.   That is an accurate statement.
6      Q.   Is there any knowledge that you have
7  that is not included in what HMMA identified in
8  its initial disclosures?
9          MR. MIDDLEBROOKS:  Other than what
10  he's told you today.
11      A.   Yeah, that -- no, I don't have any
12  additional information, no.
13      Q.   What employment records do you have
14  access to?
15      A.   His -- the HR department has access
16  to all team member employment records up to the
17  record retention policy, which I can't recall if
18  it's five or seven years, but something like
19  that.
20      Q.   Did HMMA ever employ Ms. Key?
21      A.   No.
22      Q.   What is your basis for saying that --
23  let me rephrase that.  What's your source of

Page 280

1  knowledge?
2      A.   In preparation for this, did I do any
3  research, no, but there's nothing that I'm aware
4  of that says she was ever a team member for HMMA.
5      Q.   Same question for Cassandra Williams?
6      A.   And the same response.  Maybe a
7  slightly different response in that Cassandra
8  Williams has been an employee of some version of
9  Hyundai AMOCO or Engineering for as long as I can
10  remember, which would be in the '8 -- 2008, 2009
11  realm, something like that.  I could be wrong
12  about that tenure, but definitely been an
13  employee of that group for some time.
14      Q.   Where does she keep an office?
15      A.   At the security building on HMMA's --
16  Gate 3 entrance of HMMA.
17      Q.   So Ms. Williams keeps an office on
18  HMMA's campus?
19      A.   That's correct.  That's where the
20  security building is located.
21      Q.   What is your knowledge about whether
22  HMMA ever employed Ms. Gloria Robinson?
23      A.   I don't even recognize the name, but

Page 281

1 I -- to my knowledge, never been employed by
2 HMMA.
3     Q.   And what's the basis of your
4 knowledge?
5     A.   Again, just no formal research, just
6 general awareness.
7     Q.   And where do you get that general
8 awareness?  Are you basically saying you haven't
9 seen her working there?
10    A.   Yeah, I just haven't, just no
11 interaction at all.
12    Q.   What is your knowledge about whether
13 Maurice Chambliss worked for HMMA?
14    A.   Same.  That name is vaguely familiar,
15 but I don't have much interaction with him at
16 all, so that's probably another reason why I
17 don't recognize it.
18    Q.   Same question for Tunya Howell.
19    A.   No, no interaction, not employed by
20 HMMA to the best of my knowledge.
21    Q.   What access do you have to certain
22 contractual arrangements between Hyundai and
23 third parties to provide certain services to

Page 282

1 HMMA?
2     A.   Only if needed.  I don't really -- I
3 don't sign the contracts per se unless it's
4 something related to my role or function at HMMA.
5     Q.   Other than what you've already
6 testified to, do you have any other knowledge
7 about the contractual arrangements between HMMA
8 and anyone else to provide security services?
9     A.   No.  I've learned a lot during this
10 process.
11    Q.   Well, and I'm not asking that to be
12 difficult.  It's just I don't want to be
13 surprised later with something you might say, and
14 we didn't have a chance to cover it today.
15    A.   Understood.
16    Q.   Are you aware of anyone at HMMA
17 telling Ms. Key that her employer was either
18 Dynamic or HEA?  In other words -- let me
19 rephrase it.
20         Did anyone at HMMA tell Ms. Key that
21 she was working through a contract held by HEA?
22    A.   Not that I'm aware of, no.
23    Q.   Are you aware of anybody at HMMA

Page 283

1 informing Ms. Key that HEA was even a company
2 that existed?
3     A.   I don't have any knowledge.
4     Q.   Are you aware of HMMA providing
5 anything to Ms. Key with HEA's name on it?
6     A.   I, again, didn't even know the
7 individual, so no, I don't know anything about
8 that.
9     Q.   I'm going to show you Exhibit 20.
10        MR. MIDDLEBROOKS:  20?
11        MS. LEONARD:  20.
12    Q.   (MS. LEONARD:)  These are just a few
13 things I just want to see if you have any
14 knowledge of.
15        MR. MIDDLEBROOKS:  You're jumping
16 from 17 to 20?
17        MS. LEONARD:  We did 18 and 19.
18        MR. MIDDLEBROOKS:  Oh, we did?  Okay.
19    Q.   (BY MS. LEONARD:)  20 is HEA 194
20 through 195.
21        (Whereupon, Plaintiff's Exhibit 20
22 was marked for identification and a copy of same
23 is attached hereto.)

Page 284

1     Q.   Plaintiff's Exhibit 20 is a document
2 that's been identified or that bears the title
3 HMMA Mailroom Duties and Responsibilities.  Have
4 you seen this document before?
5     A.   Maybe yesterday.  I was really trying
6 to remember this one, but I'm looking at it now.
7 How about that?
8     Q.   A lot of these you may not know, but
9 if I don't ask some of these questions, sometimes
10 I can't find out who knows.
11        At the bottom you see it says there's
12 a 1 and a line and the word "page," and then 2, a
13 line and page.  Do you know the source of this
14 document?
15    A.   I do not know the source of the
16 document for sure.
17    Q.   Do you know what company prepared
18 this document entitled HMMA Mailroom Duties and
19 Responsibilities?
20    A.   No, I do not.  There's nothing on the
21 document reflects -- would give me any indication
22 who prepared it.
23    Q.   On the last page of the document

Page 285

1  where it says HMM -- where it's talking about
2  duties and responsibilities, it says:  Other
3  duties as required by HMMA general affairs
4  department.
5       Does the HMMA general affairs
6  department get to direct what the duties of the
7  HMMA mailroom staff are?
8  **A.   As we've talked about, general**
9  **affairs is the one that has the interaction with**
10 **Hyundai Engineering.  And this looks like it's**
11 **saying that the general affairs department would**
12 **direct Hyundai Engineering to ask the mailroom**
13 **individual to do other duties as required.**
14 Q.   Where is there any reference to
15 Hyundai Engineering in Plaintiff's Exhibit 20
16 other than its initials on the Bates numbers?
17 **A.   Only because of past practice that**
18 **we've had interaction to have made requests to**
19 **the mailroom or other security personnel through**
20 **Hyundai Engineering.  That's what I base my**
21 **statement on, past practice.**
22 Q.   You would agree that nothing in
23 Plaintiff's Exhibit 20 other than the

Page 286

1  Bates-stamped number references HEA?
2  **A.   Yes, that is an accurate statement.**
3  Q.   And you would agree that the last
4  entry under the section Duties and
5  Responsibilities says:  Other duties as required
6  by HMMA general affairs department?
7  **A.   That is what it says.**
8  Q.   Would you agree then that this
9  document at least communicates to people working
10 in the mailroom that they may have other duties
11 to perform beyond what's in this document, and
12 that those duties may be things that are
13 communicated to them through the HMMA general
14 affairs department?
15 **A.   I agree the general affairs**
16 **department would communicate other duties through**
17 **Hyundai Engineering, because that's our past**
18 **practice, and that's what my comment is based on.**
19 Q.   But you would agree nothing in this
20 document indicates that HMMA's general affairs
21 department would go through HEA to communicate to
22 the mailroom staff their duties and
23 responsibilities?

Page 287

1  **A.   That's correct.**
2  Q.   Exhibit 21 are Bates Numbers HEA 168
3  to 172.
4       (Whereupon, Plaintiff's Exhibit 21
5  was marked for identification and a copy of same
6  is attached hereto.)
7  Q.   Have you seen this document before?
8  And if not, take your time to look at it.
9  **A.   I'm going take my time to read it.**
10 **It looks like this page is the same one we looked**
11 **at before.  (Witness reviewing document.)**
12     Okay.  I've had a chance to look this
13 over, Exhibit 21.
14 Q.   Okay.  I want to look in the middle
15 of the first page of the document, which is on
16 HEA 168, and we had talked earlier about some
17 e-mail addresses and the e-mail server for HMMA.
18 **A.   Yes.**
19 Q.   So would the HMMA mail server have on
20 it all of the e-mails that are sent to or
21 received from any e-mail addresses that contain
22 the @HMMAUSA.com e-mail address?
23 **A.   So the server would have what again?**

Page 288

1  Q.   Sure.  If somebody has an
2  @HMMAUSA.com e-mail address, HMMA's mail server
3  should have the e-mails that are sent to or
4  received from -- sent from or received on that
5  e-mail address?
6       MR. MIDDLEBROOKS:  Object to the
7  form.
8  **A.   I -- the server would have e-mail**
9  **from Microsoft Outlook for whatever undetermined**
10 **amount of time, but yeah, there would be e-mails**
11 **in the Outlook -- Microsoft Outlook on our server**
12 **if it had HMMAUSA.com.**
13 Q.   And that's because that domain,
14 HMMAUSA.com is owned by and maintained by Hyundai
15 or HMMA?
16 **A.   This is maintained by AutoEver, our**
17 **IT provider.**
18 Q.   At any time, did anyone from Dynamic
19 Security -- let me take a step back.
20     Looking at the middle of the page, we
21 see that Cassandra Williams' e-mail address is
22 what?
23 **A.   It looks like CWilliams@HMMAUSA.com.**

Page 289

1    Q.   And we see Gloria Robinson's e-mail
2  address is what?
3    A.   G -- GloriaRobinson@HMMAUSA.com.
4    Q.   Did anyone from HEA reach out to HMMA
5  and ask them either to preserve e-mails sent to
6  or received -- sent by -- did anybody reach out
7  and say, Hey, preserve Ms. Williams' e-mails on
8  your server?
9    A.   Did anyone from HEA?
10   Q.   Yes.
11   A.   I can't speak for HEA.  I don't know.
12   Q.   Are you aware of HMMA ever receiving
13  any requests from either -- from HEA or anyone
14  acting on its behalf to preserve Ms. Williams'
15  e-mails as they may relate to Ms. Key?
16   A.   I don't know for certainty, no, but
17  the past protocol, I would say the odds are good,
18  but I can't definitively say.
19       MR. MIDDLEBROOKS:  Odds are good is
20  not what she's asking.
21       THE WITNESS:  Sorry.
22       MR. WHITEHEAD:  Do you know?
23       THE WITNESS:  I don't know.  I don't

Page 290

1  know.
2    Q.   (BY MS. LEONARD:)  If --
3    A.   I don't.
4    Q.   To the extent HEA sent any direction
5  to HMMA to preserve Ms. Robinson's e-mails that
6  may relate to Ms. Key, does HMMA still have any
7  documents that would reflect when it received
8  that communication?
9        MR. MIDDLEBROOKS:  Object to the
10  form.
11   A.   I don't have any knowledge.  I cannot
12  speak on behalf of Hyundai Engineering.
13   Q.   Is that something that HMMA would be
14  able to locate if it exists?
15   A.   I do not know.
16   Q.   Did anyone from Dynamic at any time
17  reach out to HMMA and ask HMMA to preserve Gloria
18  Robinson's e-mails that may relate to Ms. Key?
19   A.   I can't speak on behalf of Dynamic
20  Security.
21   Q.   And that's not my question.  My
22  question is:  Did HMMA receive a request?
23  Because you can speak on behalf of HMMA.

Page 291

1    A.   I have no knowledge of that taking
2  place.
3        MR. MIDDLEBROOKS:  I'll tell you
4  we'll stipulate when it comes to Chris Whitehead,
5  he didn't get any such e-mail.
6        MS. LEONARD:  I'm not limiting it to
7  e-mails.  This goes back to figure out who knew
8  what and when.
9        MR. MIDDLEBROOKS:  Any communication.
10       MS. LEONARD:  So HMMA's position is
11  it didn't receive any communications from Dynamic
12  or HEA to preserve e-mails that may have been
13  sent through its server?
14       MR. WHITEHEAD:  Correct.
15       MS. LEONARD:  Okay.
16   Q.   (BY MS. LEONARD:)  If we go down to
17  the bottom of that same e-mail that Ms. Williams
18  was sending on August 1st, 2017 and her signature
19  line, what is her title?
20   A.   Oh, Cassandra Williams?
21   Q.   Yes.
22   A.   Okay.  Manager of security services.
23  That's the line you're referring to?

Page 292

1    Q.   Yes.  And then what business is
2  identified below that?
3    A.   Hyundai ENG America, Inc.
4    Q.   And what business is identified below
5  that?
6    A.   Hyundai Motor Manufacturing Alabama,
7  LLC.
8    Q.   Do you have any knowledge as to why
9  HMMA's name is contained in Ms. Williams'
10  signature for her e-mail?
11   A.   Because that is the template that is
12  set up by AutoEver.  And any individual with an
13  e-mail that has that template, it would
14  automatically populate that, and then the area
15  above that would be populated by the individual.
16       But everything else on Outlook's
17  server would have a template that represents
18  this.  It just basically fills in the blank.
19   Q.   Knowing that Ms. Robinson is sending
20  e-mails through the Outlook server for HMMA
21  e-mail, if we turn to the second page, we don't
22  see that information in her signature line on the
23  e-mail in the top of Page HEA 169.

Page 293

1   A.   So, again, if the individual went in
2   and made that change from the template, then that
3   would be true.  She must have made that change,
4   because there is a template, because this -- that
5   example, my e-mail would reflect this very same
6   thing.
7   Q.   Isn't it true then that for the words
8   Hyundai ENG America, Inc. to be in Ms. Williams'
9   signature line and for her job title to be in
10  there, she would have to go in and modify the
11  template?
12  A.   No.  That's what I'm saying.  The
13  individual has the ability to put that
14  information above that, name, title, at that
15  time.  So that's what I understand, because
16  there's a template.
17  Q.   Can the template be modified?
18  A.   By the individual, if they have
19  administration rights to do so, yeah.
20  Apparently, Ms. Robinson was able to make a
21  change.
22  Q.   Do you know if Ms. Williams had that
23  ability?

Page 294

1   A.   Quite possibly, but I don't know for
2   fact.
3   Q.   Did HMMA know that Ms. Williams'
4   signature line in her e-mails contained the
5   identifier Hyundai Motor Manufacturing Alabama,
6   LLC in her signature?
7   A.   Anyone that may have been receiving
8   e-mails from her would have seen that.
9   Q.   Is that identifier for HMMA still in
10  Ms. Williams' signature?
11  A.   I do not know what it looks like
12  today, no.
13  Q.   Why would HMMA permit its name at the
14  company to be in her signature if she is not an
15  HMMA employee?
16  A.   All I know is there was a template,
17  and that's all I can refer to.  I know because
18  mine looks very, very similar, if not exactly,
19  like that.
20  Q.   Exhibit 22 is Bates Numbers HEA 173
21  through 176.  And this is an e-mail strain that
22  was sent on or around November 13th, 2018.
23       (Whereupon, Plaintiff's Exhibit 22

Page 295

1   was marked for identification and a copy of same
2   is attached hereto.)
3   Q.   Have you seen this e-mail exchange?
4   A.   I reviewed this yesterday.  (Witness
5   reviewing document.)  Okay.
6   Q.   Okay.  Looking at this e-mail
7   starting at the top, when we look at the To line,
8   Chris Whitehead.  Is that Mr. Whitehead who's
9   sitting in this room today?
10  A.   Yes.
11  Q.   The next person says
12  ScDuke@Hec.co.kr.  Who is that?
13  A.   I have no idea who that is.
14  Q.   There's somebody, when we look at the
15  salutation of the e-mail, that says Mr. Yu.  Do
16  you know who that may be?
17  A.   No.
18  Q.   And then going back up to the To
19  line, the third recipient of the e-mail is Inkyu,
20  I-n-k-y-u, Kwak, K-w-a-k.  Who is Mr. Kwak?
21  A.   I do not know.  I don't know.
22  Q.   Attached to this document, it says
23  Position Statement, and then it's got some

Page 296

1   identifiers, then dot PDF, and a semi-colon EEOC
2   Form 5 Key, Davita.  Do you know what the two
3   attachments were to this document?
4   A.   No, because unless there were some
5   other document you presented, I don't know what
6   they are, no.
7   Q.   Okay.  Do you know how Ms. Williams
8   had in her possession as of November 13th, 2018 a
9   copy of the EEOC complaint filed by Ms. Key so
10  that she could forward it to Dynamic Security?
11  A.   I don't know how she -- what chain of
12  command or process where she would come in
13  possession of that, no, I don't.
14  Q.   If Ms. Williams had no employment
15  relationship with HMMA, why would she have a copy
16  of the EEOC complaint that Ms. -- that the EEOC
17  filed on Ms. Key's behalf against HMMA?
18  A.   Again, I don't know who provided her
19  the documents.  So it's hard for me to answer
20  your question.
21  Q.   Are you aware of Ms. Williams being
22  provided with any other EEOC filings that have
23  been made against HMMA?

Page 297

1    A.   No.

2    Q.   Have you had any interaction with

3 Kristin or Kristal Riddle at Dynamic Security?

4    A.   No, I have not.

5    Q.   Do you know if in this e-mail Ms.

6 Williams was forwarding to HMMA on November 13th,

7 2018 a copy of the EEOC charge that had been

8 filed against Dynamic Security?

9    A.   No, I did not know she was forwarding

10 anything.

11   Q.   Do you know when HMMA first saw a

12 copy of the EEOC charge that Ms. Key filed

13 against Dynamic Security?

14   A.   I suspect it's the same date as

15 wherever that document is that was received by

16 Chris Smith.

17   Q.   And the document that was received by

18 Chris Smith was Ms. Key's complaint against HMMA?

19   A.   Uh-huh (positive response).

20   Q.   When did HMMA first see the complaint

21 Ms. Key filed against Dynamic Security?

22   A.   That, I don't know.

23       MR. MIDDLEBROOKS:  Heather, in this

Page 298

1 e-mail November 13th, that was a copy of the

2 position statement of Dynamic Security and the

3 charge that was shared with Cassandra Williams

4 and eventually came to legal.

5       MS. LEONARD:  Okay.  So on November

6 13th, Ms. Williams is sending to HMMA a copy of

7 the Dynamic response?

8       MR. MIDDLEBROOKS:  And the charge.

9    Q.   (BY MS. LEONARD:)  And back to you,

10 Mr. Burns.

11   A.   Yes.

12   Q.   You don't know, though, whether this

13 was the first time that HMMA learned of Ms. Key's

14 EEOC charge against Dynamic?

15   A.   No.  That was fifteen or whatever

16 months later.

17   Q.   Do you know if this e-mail chain that

18 we're looking at, Plaintiff's Exhibit 22, still

19 lives on HMMA's e-mail server so that we could

20 look at this e-mail and the family of e-mails

21 associated with it?

22   A.   No, I don't have any certainty that

23 it's available, because not knowing how long

Page 299

1 Hyundai -- the AutoEver -- AutoEver, the IT

2 group, retains that Outlook database, I guess

3 we'll call it.  I don't know.

4    Q.   Do you know whether this e-mail was

5 forwarded to anyone else at HMMA?

6    A.   I'm not aware of anybody else getting

7 the e-mail.

8    Q.   Exhibit 23 to your deposition is HEA

9 215 through 216.

10       (Whereupon, Plaintiff's Exhibit 23

11 was marked for identification and a copy of same

12 is attached hereto.)

13   Q.   Have you seen Plaintiff's Exhibit 23

14 before?

15   A.   Yes, I reviewed this briefly

16 yesterday.

17   Q.   Okay.  And when we look at the e-mail

18 at the top of Plaintiff's Exhibit 23, it's an

19 e-mail sent from Chris Whitehead in HMMA's legal

20 compliance department to Kristal Riddle at

21 Dynamic Security and copying Cassandra Williams

22 at HEA, correct?

23   A.   Yes.

Page 300

1    Q.   And what does the subject matter of

2 this e-mail concern?

3    A.   I'm reading it.  Chris says:  We just

4 got a letter from EEOC indicating they intend to

5 recommend a for cause determination against HMMA

6 on the Davita Key charge.  Have you heard

7 anything back regarding the charge submitted

8 against Dynamic Security?

9    Q.   Other than this e-mail exchange, are

10 there any other communications among the three

11 defendants to this lawsuit about Ms. Key's

12 pending EEOC claims?

13   A.   I have no knowledge of any other

14 information being exchanged or e-mails.

15   Q.   Are there any other e-mails in this

16 family of e-mails?

17   A.   I have no knowledge of any other

18 e-mails.

19   Q.   If they are, would they exist on

20 HMMA's server since at least two of the parties

21 to this e-mail exchange have @HMMAUSA.com e-mail

22 addresses?

23   A.   As I stated before, I don't know

Robert Burns

Case 2:19-cv-00767-ECM-SMD    Document 68-2    Filed 10/12/22    Page 78 of 227
USCA11 Case: 24-11126    Document: 58-1    Date Filed: 02/14/2025    Page: 276 of 425

6/22/2022
76 (301 - 304)

Page 301

1  AutoEver IT group's record retention on e-mails.
2  So it's hard to say if there would be any record
3  of these extensive e-mails that you're looking
4  for. I have no knowledge.
5      Q.   The last few things I want to look at
6  are two sets of invoices.  And I apologize.  I
7  did not print off copies for everyone, so when I
8  mark Exhibits 24 and 25, I want you to give
9  counsel next to you an opportunity to look at
10  them, and he may need to pass them down to Mr.
11  Miller to look at as well.
12      But these are Bates Numbers --
13  Exhibit 24 is Bates Numbers HEA 219 through 224.
14      (Whereupon, Plaintiff's Exhibit 24
15  was marked for identification and a copy of same
16  is attached hereto.)
17      Q.   And Exhibit 25 is Bates Number HEA
18  225 through 230.
19      (Whereupon, Plaintiff's Exhibit 25
20  was marked for identification and a copy of same
21  is attached hereto.)
22      Q.   If you can pass those to your lawyer
23  and let him look at that.

Page 302

1      (Whereupon, a discussion off the
2  record was held.)
3      A.   Again, I've had a chance to look at
4  this as well yesterday.
5      Q.   All right.  Looking at Plaintiff's
6  Exhibit 24 and 25, what are they?  Oh, I'm sorry.
7  They're still looking at it.
8      MR. WHITEHEAD:  I've seen it.
9      A.   Okay.  So, anyway, it looks like this
10  is the invoices submitted to Hyundai Motor
11  Manufacturing Alabama by Hyundai Engineering for
12  the security services provided to HMMA.
13      Q.   Okay.  How does this invoice process
14  work, if you know?
15      A.   In general terms, yes, the Hyundai
16  Engineering would submit invoices with, as we can
17  see on the second page of the document, detailing
18  the positions that -- for the services being paid
19  by Hyundai Engineering, that ultimately are
20  billed to HMMA; supervisor, security and
21  administration support, mail, Officer I, Officer
22  II.
23      The person receiving the information

Page 303

1  would review the invoice, confirm that it's
2  accurate, ask questions if they needed to.  But
3  after they validated the invoice, then it would
4  be processed for payment to Hyundai Engineering
5  America.
6      (Whereupon, a discussion off the
7  record was held.)
8      Q.   (BY MS. LEONARD:)  Are the entire
9  packets that we see in Exhibits 24 and 25 what
10  are submitted to HMMA?
11      A.   Say that again.
12      Q.   Sure.  Are the entire packets that we
13  see like in Exhibit 24, is that what's sent to
14  HMMA?
15      A.   To process the invoice for payment?
16      Q.   Right.
17      A.   On a monthly basis, that seems to be
18  an accurate representation, like Exhibit --
19      MR. MIDDLEBROOKS:  Would everything
20  in there, though, be sent to you, not just the --
21  look at all pages.
22      A.   That's why I'm looking through them.
23  I'm flipping through them, because I just look at

Page 304

1  Exhibit 24 for the month of July 1 through July
2  31, each page represents the charges, and then
3  they have supporting documentation behind it to
4  validate the --
5      MR. MIDDLEBROOK:  From who?
6      A.   From Hyundai Engineering -- that's
7  what I was about to say -- and Dynamic Security
8  who's providing the service to Hyundai
9  Engineering.
10      Q.   If you'll look at Exhibit 24 on Page
11  223 and Exhibit 25 on Page 229, we see something
12  that looks like it may be an invoice that is sent
13  to Cassandra Williams.
14      A.   Okay.  I see it on 23, and I see it
15  on 29 now.
16      Q.   Basically, the last two pages of each
17  of these are invoices that look like from
18  Dynamic.  So these are also submitted to HMMA by
19  HEA?
20      A.   So, again, this is supporting
21  documentation for review by the person that's
22  going to process the invoice to pay Hyundai
23  Engineering for the services provided to Hyundai

Page 305

1  Engineering by Dynamic Security at this point in
2  time.
3      Q.  Do you know if either HEA or Dynamic
4  paid Ms. Key with funds that would have been
5  received as a result related to any of these
6  invoices?
7      A.  As I said earlier, in her deposition,
8  as you can see, the details are not there, so I
9  cannot answer whether she was paid for the
10 services rendered during her employment.
11     Q.  Today I've been taking your
12 deposition pursuant to Rule 30(b)(6), which is
13 what allows me to depose a company or entity,
14 because obviously you can't put a building under
15 oath.
16         You're somebody who HMMA has also
17 identified as an individual witness.  If I were
18 to have deposed you today in your individual
19 capacity, would your answers have been any
20 different?
21     A.  No.
22     Q.  And I ask that so I don't have to
23 depose you in your individual capacity.

Page 306

1      MR. MIDDLEBROOKS:  It would have
2  probably been a lot less stuff.
3      Q.  But if I were to take your deposition
4  again, would you give me any answers that were
5  different than what we got today?
6      A.  I would not.
7      MS. LEONARD:  If you can give me just
8  a second to step outside and talk to Ms. Palmer,
9  I may be finished.  I just need to check with
10 her.
11         (Whereupon, a brief recess was
12 taken.)
13     MS. LEONARD:  I don't have any
14 further questions.
15     MR. MIDDLEBROOKS:  Now my turn.  Oh
16 your turn.
17     MR. MILLER:  I don't have any
18 questions.
19     MR. MIDDLEBROOKS:  I don't either.
20     (Whereupon, a discussion off the
21 record was held.)
22     THE REPORTER:  Mr. Redmond, do you
23 need a copy?

Page 307

1      MR. REDMOND:  Yes, just an electronic
2  copy.
3      THE REPORTER:  Do you need a copy?
4      MR. MILLER:  Yes.
5      MR. MIDDLEBROOKS:  We do.
6
7
8
9      (Whereupon, the deposition was
10 concluded at 4:33 p.m.)
11
12     FURTHER DEPONENT SAITH NOT
13
14
15
16
17
18
19
20
21
22
23

Page 308

1         C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5
6      I HEREBY CERTIFY that the above
7  and foregoing transcript was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness.
13     I FURTHER CERTIFY that I am
14 neither of counsel, nor of any relation to the
15 parties to the action, nor am I anywise
16 interested in the result of said cause.
17
18     /s/Tanya D. Cornelius
19     /s/Tanya D. Cornelius
20     TANYA D. CORNELIUS
21     CCR No. 378
22     Notary Expires 9/13/22
23

### WORD INDEX

**< 0 >**
**0**  169:*20*
**000013**
 39:*23*
**00003**
 148:*15*
**00043**
 139:*7*
**07**  139:*21*

**< 1 >**
**1**  6:*12*
 23:*20*  24:*4,*
*6*  25:*13*
 26:*14*
 28:*15*
 55:*10, 18*
 62:*2, 8, 18*
 66:*5*  71:*18*
 87:*2*
 125:*10*
 144:*17*
 169:*16, 18*
 176:*12*
 177:*1*
 178:*18*
 179:*3*
 190:*21*
 231:*19*
 242:*16*
 284:*12*
 304:*1*
**10**  6:*21*
 26:*14*
 85:*17*
 86:*14, 16*
 87:*5*  90:*21*
 91:*10, 17*
 92:*6, 22*

 159:*8*
 232:*14, 17*
**10.1**  94:*3*
**10.2**  87:*20*
**10.3**  87:*21*
**10.4**  88:*8*
**10/07**
 139:*19*
 170:*2*
**100**  4:*12*
**104**  4:*12*
**11**  6:*22*
 95:*2, 4*
 234:*18, 22*
 235:*22*
 238:*3*
**11:30**  117:*2*
**111**  4:*7*
 5:*5*
**11246**
 87:*10*  89:*3*
**11375**
 87:*10*  89:*3*
**11945**  4:*20*
**12**  6:*23*
 87:*10*
 248:*12, 14,*
*21*  249:*14*
 250:*18*
 251:*1, 11*
**12:30**
 143:*22*
 164:*10*
**13**  7:*3*
 40:*5*
 252:*20, 21*
 253:*3*
 254:*8*
**13(a)(vii**
 81:*16*
**134**  216:*6*
**135**  164:*23*

**13C**  218:*3*
 220:*8*
**13th**
 294:*22*
 296:*8*
 297:*6*
 298:*1, 6*
**14**  7:*4, 8*
 49:*22*
 260:*4, 8*
 261:*1, 9*
**144**  6:*14*
**15**  7:*5*
 100:*21*
 261:*11, 13*
 262:*7, 11,*
*15*
**155**  6:*15*
**16**  7:*6*
 18:*13, 16*
 53:*8*
 136:*21*
 263:*3, 7*
 264:*2*
 265:*6*
**164**  6:*16*
**167**  28:*16*
**168**  287:*2,*
*16*
**169**  292:*23*
**17**  7:*7*
 67:*4*  148:*8*
 214:*9*
 265:*16, 18*
 283:*16*
**172**  287:*3*
**173**  28:*17*
 294:*20*
**174**  28:*17*
**176**  6:*18*
 294:*21*

**18**  7:*8*
 14:*2, 3, 6, 7*
 18:*12, 13*
 25:*15*
 68:*11*
 101:*12*
 283:*17*
**1819**  5:*11*
**18th**  102:*4*
**19**  7:*9*
 26:*8, 11*
 78:*7*  81:*12*
 214:*9*
 283:*17*
**194**  283:*19*
**195**  283:*20*
**1964**  89:*16*
 92:*11*
**1E**  117:*18*
**1st**  118:*16*
 248:*8*
 291:*18*

**< 2 >**
**2**  6:*13*
 25:*19*
 39:*20*  40:*2,*
*8, 18, 21, 22*
 41:*13*
 42:*13, 16*
 46:*21*  47:*2,*
*12*  48:*8, 21,*
*22*  57:*19*
 58:*10, 13,*
*17*  119:*8*
 123:*11*
 125:*10*
 127:*18*
 155:*1*
 164:*8, 9*
 172:*20*
 176:*13*

 177:*2, 3, 12*
 178:*18, 22*
 179:*2, 3*
 189:*19*
 284:*12*
**2:00**
 115:*17, 18*
**2:19-CV-**
**767-ECM-**
**SMD**  1:*5*
**2:30**
 115:*17, 18*
**2:45**  115:*9,*
*13*
**20**  7:*10*
 95:*8*  283:*9,*
*10, 11, 16,*
*19, 21*
 284:*1*
 285:*15, 23*
**2000**  47:*22*
**2007**  10:*22*
 14:*19*
 170:*2*
**2008**
 280:*10*
**2009**
 280:*10*
**2010**
 101:*12*
 102:*4, 6*
 113:*6, 7, 10*
 119:*23*
 120:*12, 17*
 122:*22*
 135:*13*
 139:*22*
 170:*2*
**2012**
 195:*19*
**2012ish**
 195:*13*

**2013** 41:2, 10 85:1
121:3
228:22
**2015** 41:11, 16
**2016** 42:18
**2017** 12:4
15:7 17:22
21:11
41:14
42:20
43:15 44:9, 13, 16 45:2, 10, 14 46:8, 10, 18
57:18 58:2, 7, 18, 23
59:3 61:20
62:4, 14
69:11, 12
72:13, 23
75:2, 3, 5
77:10, 18
82:2
107:23
108:19
109:16, 17
111:7
112:12
118:16
135:13, 23
148:5, 7, 22
149:15
150:12, 20
157:2, 12
163:11
178:12
191:5, 14, 22 192:2
194:4, 20
200:1

207:5
209:13, 22
210:6, 13, 19 214:3, 21 220:1, 9
221:16
223:6, 17
226:12
228:21
234:14
236:14
242:6, 19
248:9
276:3
291:18
**2018** 11:9, 23 248:22
255:16
256:18
294:22
296:8
297:7
**2019**
255:13
261:20
263:5
266:18, 21
271:17
**2021** 11:6
15:5
271:12
272:14
**2022** 1:20
2:3, 15
8:10
266:23
271:4
**205** 28:18
131:1
**21** 7:11
85:16
287:2, 4, 13

**2105** 4:7
5:5
**215** 28:18
299:9
**216** 6:17
28:18
299:9
**217** 28:19
**218** 28:19
**219** 28:19
301:13
**22** 1:20
2:3, 15
7:12 8:10
294:20, 23
298:18
**220** 28:19
**221** 28:20
**223** 304:11
**224** 301:13
**225** 301:18
**228** 6:19
**229** 304:11
**23** 7:13
95:3 299:8, 10, 13, 18
304:14
**230** 301:18
**231** 6:20
**232** 6:21
**234** 6:22
28:20
**235** 164:23
**23rd** 4:12
**24** 6:12
7:14 301:8, 13, 14
302:6
303:9, 13
304:1, 10
**248** 6:23

**24th**
248:22
250:16
255:16
**25** 7:15
301:8, 17, 19 302:6
303:9
304:11
**252** 7:3
**26** 7:9
51:4
**260** 7:4
**261** 7:5
**263** 7:6
**265** 7:7
**27** 100:22
**28** 101:3, 7, 8
**283** 7:10
**287** 7:11
**29** 304:15
**294** 7:12
**299** 7:13
**2nd** 261:20

**< 3 >**
**3** 6:14
28:15
123:12, 13
125:10, 13
144:2, 10, 13, 14, 16
146:17
177:3
213:10, 11
228:13
231:19
237:2, 3
242:15
244:19, 20

280:16
**3:20** 234:14
**30** 103:8, 9
109:4, 16
**30(b)(6**
24:5 27:3, 7, 8 56:22
87:3
218:10
221:5
226:23
242:16
244:6, 17
257:16
268:14
276:19
305:12
**301** 7:14, 15
**31** 116:23
119:10
304:2
**31st**
118:16
233:3
234:14
**32** 123:12
**33** 125:11
126:19
**34** 128:6
130:20, 21
**35202** 4:21
**35203** 5:12
**35233** 4:13
**35243** 4:8
5:6
**378** 308:21
**39** 136:16, 22 137:19
**3C** 125:10
**3rd** 41:11,

*16*

**< 4 >**
**4**  6:*15*
41:*9*  53:*6,*
*7*  148:*1*
155:*19, 21*
156:*5, 14,*
*23*  157:*6*
**4.2**  138:*20*
**4:30**  115:*16*
**4:33**  307:*10*
**4:45**
115:*22*
160:*20*
**40**  6:*13*
**405**  2:*5, 15*
8:*8*
**41**  265:*17*
**42**  265:*17*
**43**  140:*20*
141:*15*
142:*8*
**44**  140:*20*
**445**  2:*4, 14*
8:*7*
**47**  253:*3*
**4th**  41:*2, 10*

**< 5 >**
**5**  6:*16*
67:*4, 5*
123:*13*
129:*11*
130:*15, 18*
132:*6*
164:*22*
165:*1*
171:*10, 23*
172:*7, 12,*
*22*  175:*5,*

**12**  176:*4*
296:*2*
**52**  232:*16*
233:*21*
**53**  234:*21*
235:*22*
**54**  237:*5*
238:*22*
239:*3*
**56**  234:*21*
**57**  248:*13*
**58**  251:*1*
**59**  251:*11*
**5th**  5:*11*

**< 6 >**
**6**  6:*17*
68:*10, 12*
124:*16*
128:*6, 8*
130:*22*
135:*5*
144:*22*
145:*2*
176:*18, 19*
216:*5, 9, 16,*
*19*  218:*4*
**6.4**  68:*14,*
*19*  69:*12*
**6.5**  69:*17*
71:*5, 11, 19*
72:*11*
**6:00**  115:*15*
**6:30**  115:*8,*
*13*
**60**  252:*8*
**61**  248:*13*
**62**  261:*11*
**64**  263:*4*
**66**  263:*4*
**67**  260:*6*

**< 7 >**
**7**  6:*18*
78:*6, 7, 10,*
*21*  79:*5, 14,*
*16*  81:*4*
150:*9*
176:*12, 14,*
*17, 18, 21*
177:*22*
178:*11*
180:*15, 16,*
*17*  190:*21*
196:*7*
202:*1*
**7.1**  78:*13*
**700**  9:*23*
99:*9*  100:*1*
**72**  260:*7*
**76**  40:*1, 6*
**77**  155:*20*
**78**  216:*5*

**< 8 >**
**8**  6:*19*
177:*3*
228:*12, 14*
229:*19, 20*
280:*10*
**8:00**
115:*22*
160:*19*

**< 9 >**
**9**  6:*5, 20*
81:*11*
85:*13, 15*
159:*7, 8*
177:*3*
183:*10*
231:*17, 20*

232:*8, 12*
**9.1**  81:*14*
**9/13/22**
308:*22*
**9:33**  1:*21*
2:*4, 16*  8:*9*
**9th**  263:*5*

**< A >**
**A**  2:*8*  4:*1,*
*11*  8:*1, 2*
9:*4, 5, 10,*
*12, 16, 19,*
*23*  10:*4, 6,*
*10, 13, 16,*
*22*  11:*1, 5,*
*9, 12, 16, 18,*
*22*  12:*5, 7,*
*10, 14, 22*
13:*5, 7, 14,*
*17, 18, 19*
14:*1, 4, 10,*
*12, 14, 17,*
*20*  15:*1, 5,*
*8, 9, 10, 13,*
*18, 22*  16:*2,*
*5, 7, 13, 16,*
*23*  17:*4, 10,*
*17, 23*  18:*2,*
*7, 13, 21, 23*
*19:4, 7, 10,*
*14, 18*  20:*1,*
*4, 7, 11, 16,*
*21*  21:*2, 5,*
*10, 14, 18,*
*22*  22:*2, 8,*
*9, 13, 17, 21*
*23:4, 7, 8, 9,*
*14, 16, 21*
*24:3, 4, 7,*
*10*  25:*3, 8,*
*12, 18, 21*

26:*2, 3, 5,*
*10, 12, 19,*
*22*  27:*2, 15,*
*16*  28:*1, 16,*
*17*  29:*1, 3,*
*5, 10, 14, 17,*
*19, 21, 23*
30:*4, 7, 8,*
*11, 13, 17,*
*19, 22*  31:*4,*
*8, 14, 18, 22,*
*23*  32:*3, 8,*
*12, 17, 20*
33:*1, 4, 6, 7,*
*11, 12, 19,*
*20, 22*  34:*1,*
*2, 9, 13, 16,*
*19, 22*  35:*3,*
*10, 12, 13,*
*16*  36:*2, 6,*
*8, 10, 11, 13,*
*16, 18, 21*
37:*9, 10, 21,*
*23*  38:*4, 5,*
*7, 8, 9, 11,*
*15, 17, 20*
39:*2, 9, 14,*
*18*  40:*3, 10,*
*16, 20, 22*
41:*5, 15, 19,*
*23*  42:*4, 9,*
*14*  43:*3, 16*
44:*3, 10, 17*
45:*4, 15, 19*
46:*5, 11, 19*
47:*1, 3, 7,*
*13, 17, 23*
48:*6, 9, 13,*
*18*  49:*1, 2,*
*4, 7, 17*
50:*3, 7, 11,*
*14, 17, 23*

51:2, 6, 7, 11, 13, 18, 21, 22  52:1, 3, 19  53:4, 5, 9, 12, 20  54:5, 10, 14, 20  55:6, 16, 23  56:7, 13, 17, 20  57:3, 15, 20  58:4, 11, 12, 13, 16, 19  59:4, 14, 21  60:1  62:5, 12, 17  63:2, 4, 5, 14, 22  64:1, 13, 17  65:6, 17, 20  66:1, 2, 10, 14, 17, 19, 22  67:1, 7, 12, 14, 21  68:4, 12  69:7, 15  70:1, 3, 5, 8, 12, 19, 20, 22  71:2, 7, 13, 15  72:1, 3, 12, 15, 22  73:4, 8, 12, 17, 23  74:3, 7, 11, 13, 19, 20, 21  75:3, 4, 7, 10, 17, 21  76:2, 6, 8, 10, 14, 17, 20, 21, 23  77:2, 5, 7, 11, 15, 16, 20  78:3, 9, 13  79:9, 10, 15, 20  80:3, 15, 23  81:3,

5, 9, 13, 21  82:3, 5, 10  83:6, 7, 11, 12, 14, 17, 22  84:1, 7, 12, 18  85:14  86:10, 11, 16  87:7, 19  88:6, 13  89:4, 7, 11, 15  90:23  91:6, 8, 11, 12, 18, 22  92:7, 12, 16, 17, 20  93:1, 4, 12, 13, 17, 18, 19, 23  94:10, 12, 15  95:1, 4, 11, 14, 19, 22, 23  96:1, 4, 5, 6, 7, 12, 16, 18, 21  97:5, 9  98:1, 8, 13, 18, 22  99:6, 8, 19, 20, 22  100:2, 5, 6, 7, 10, 14, 19, 22, 23  101:2, 8, 11, 12, 14, 23  102:7, 9, 10, 15, 22  103:1, 9, 10, 11, 13, 14, 16, 17  104:2, 12, 15, 18, 22  105:2, 5, 8, 10, 11, 18,

22  106:1, 5, 6, 16, 22  107:7, 13, 17, 20  108:1, 5, 10, 22  109:5, 8, 18  110:2, 8, 22  111:10, 16, 21  112:7, 17  113:2, 7, 12, 16, 22  114:2, 4, 5, 9, 20, 22  115:2, 3, 5, 14, 16, 21, 23  116:6, 12, 15, 21  117:4, 7, 10, 15, 22  118:6, 11, 17, 20, 23  119:7, 17  120:1, 8, 12, 14, 18, 20, 21  121:1, 4, 5, 13  122:7, 11, 13, 23  123:4, 5, 7, 10, 13, 18  124:1, 8, 13, 15  125:12, 20  126:2, 5, 8, 13, 18  127:3, 10, 15, 20, 23  128:8, 10, 16, 20  129:1, 5, 9  130:3, 5, 14  131:1, 2, 3, 6, 7, 9, 13,

19  132:2, 3, 6, 20  133:2, 4, 5, 9, 13, 15, 17, 19, 23  134:3, 6, 7, 14, 16, 17, 18, 22  135:2, 8, 10, 14, 15, 17  136:2, 4, 6, 14, 19  137:8, 13, 20  138:5, 8, 14  139:5, 11, 18, 20  140:3, 6, 13, 16  141:2, 13, 19, 20, 23  142:2, 7, 9, 14, 17, 19, 21, 23  143:8, 13, 15, 20, 21  144:4, 8, 9, 11, 14, 19, 21  145:2, 7, 14, 17, 19, 23  146:2, 4, 15  147:12, 16, 18, 22  148:8, 12, 15, 17, 23  149:3, 6, 12, 17, 19  150:5, 8, 14, 16, 18, 22  151:4, 11, 20  152:3, 5, 7, 9, 12, 16, 23  153:6, 7, 15, 18, 22  154:2, 6, 8,

11, 15, 18, 20, 22  155:4, 7, 10, 14, 20, 22  156:1, 8, 15, 20, 23  157:3, 21  158:1, 4, 10, 12, 13, 14, 22  159:6, 9, 21  160:4, 5, 6, 10, 16, 19, 22  161:5, 7, 10, 16, 18  162:1, 4, 6, 11, 17, 20, 22  163:8, 13, 17, 19, 20, 22  164:2, 6, 9, 14, 16, 18  165:2, 4, 7, 10, 15, 18  166:5, 10, 19  167:13, 18  168:2, 6, 8, 18  169:1, 7, 11, 17  170:1, 5, 6, 14, 16, 19, 23  171:2, 12, 16, 21  172:2, 9, 13, 23  173:7, 13, 15, 18, 22  174:6, 10, 16, 23  175:6, 8, 13, 16, 18, 20  176:2, 7, 15, 21, 23  177:5, 9, 11,

13, 18, 23
178:1, 3, 5,
11, 13, 22
179:1, 13,
19  180:8,
11, 19, 20,
22, 23
181:5, 15,
20  182:1, 8,
9, 12, 18
183:1, 4, 9,
12, 13, 15,
18, 21
184:1, 7, 11,
16, 23
185:7, 16,
18, 23
186:21
187:8, 12,
16, 18
188:10, 17,
23  189:7,
11, 20
190:10, 16,
22  191:7,
10, 20
192:2, 14,
18, 21, 23
193:6, 9, 12,
15, 16, 17,
20, 22, 23
194:5, 7, 8,
18, 22
195:3, 4, 7,
10, 14, 15,
21, 22
196:4, 12,
15, 20, 22
197:1, 2, 6,
13, 21, 23
198:6, 12,
19  199:2, 5,

9, 11, 14, 18,
21, 23
200:1, 5, 11,
13, 15, 23
201:2, 6, 12,
15, 17, 18,
20, 21
202:2, 9, 13,
14, 17, 23
203:1, 4, 7,
15, 20
204:9, 12
205:9, 15,
22  206:7, 8,
21, 22
207:9, 10,
16, 21
208:4, 8, 12,
14, 18, 20,
21  209:3, 9,
10, 14, 19,
21  210:2, 5,
13, 15, 20,
22  211:2, 5,
10, 14, 16,
20, 23
212:2, 7, 13,
16, 19, 21,
23  213:4, 5,
10, 21
214:7, 10,
14  215:1, 3,
7, 11, 13, 16,
19, 23
216:1, 4, 10,
15, 20, 23
217:4, 8, 10,
13, 15, 17,
20, 23
218:9, 19
219:1, 4, 5,
13, 14

220:6, 13,
14, 15, 20
221:1, 5, 18,
20  222:2, 6,
8, 11, 14, 17,
18  223:9,
21  224:6, 9,
12, 18, 20,
21  225:1, 3,
7, 8, 17, 18,
23  226:1, 4,
5, 11  227:3,
8, 14, 17, 21
228:2, 5, 11,
15, 17, 19,
22  229:4, 8,
12, 13, 18,
20  230:4, 6,
7, 8, 14, 16,
23  231:4, 6,
11, 14, 15,
17, 21
232:5, 9, 13,
18  233:4,
22  234:9,
15, 23
235:5, 8, 9,
14, 19, 20
236:2, 5, 7,
9, 11, 14, 15,
17, 18, 21
237:1, 9, 10,
18  238:7,
10, 15, 20
239:1, 8, 10,
15, 22
240:2, 11,
13, 20
241:2, 4, 5,
10, 13
242:2, 5, 8,
10, 20, 23

243:4, 11,
20  244:1, 4,
8, 9, 14
245:7, 11,
16, 19
246:5, 10,
11, 14, 17,
23  247:3, 6
248:5, 10,
15, 18, 21
249:3, 6, 11,
15  250:1, 3,
11, 17, 21
251:2, 9, 12,
18  252:2, 6,
9, 10, 16, 22
253:4, 13,
18, 23
254:2, 9, 16,
17  255:11,
14, 19, 23
256:3, 12,
22  257:7, 9,
16, 19
258:12, 15
259:10, 18,
21  260:9,
14, 17, 18,
21  261:2,
10, 12, 14,
17, 19, 23
262:4, 10,
14, 17, 20
263:2, 4, 8,
11, 16, 19,
23  264:5, 6,
14, 17, 18,
23  265:9,
15, 19, 23
266:7, 9, 19
267:1, 6, 15,
20, 23

268:2, 8, 9,
12, 16, 21
269:4, 10,
15, 20, 23
270:2, 4, 8,
11, 17, 18,
21, 22
271:5, 9, 18,
20  272:2, 5,
7, 9, 13, 15,
18, 23
273:3, 5, 7,
13, 15, 19
274:7, 12,
13, 18
275:1, 3, 8,
12, 22, 23
276:4, 7, 9,
11, 21
277:5, 12
278:4, 8, 11
279:5, 11,
15, 21
280:2, 4, 6,
15, 19, 23
281:5, 10,
14, 19
282:2, 9, 14,
15, 21, 22
283:1, 3, 6,
12, 22
284:1, 5, 8,
12, 15, 20
285:8, 17
286:2, 7, 15
287:1, 5, 9,
12, 18, 23
288:8, 16,
19, 23
289:3, 9, 11,
16  290:3,
11, 15, 19,

22   291:1, 20, 22
292:3, 6, 11, 17   293:1, 4, 12, 16, 18, 20   294:1, 7, 11, 16
295:1, 4, 10, 13, 17, 21
296:1, 4, 8, 11, 15, 18
297:1, 4, 7, 9, 11, 14, 19, 22   298:1, 6, 11, 15, 22
299:6, 11, 15, 23
300:3, 4, 5, 13, 17, 23
301:15, 20
302:1, 3, 9, 15   303:6, 11, 15, 17, 22   304:6, 14, 20
305:5, 7, 13, 14, 21
306:2, 6, 8, 11, 20, 23
307:3
308:1, 11
**A.M**   1:21
2:4, 16   8:9
115:15
160:19
**abide**
183:22
**ability**   69:4
293:13, 23
**able**   20:15
23:14
42:15

45:22
49:10
52:20
66:18   71:9
82:6   84:2, 7   124:11
179:23
187:7
209:5
220:8
223:16
226:4
236:12
242:11
290:14
293:20
**absence**
33:15
**absolute**
38:2
**Absolutely**
273:15
**acceptable**
129:8
134:20
135:4, 7, 15, 23   136:12
148:21
149:15
182:3, 13
183:12
184:5, 14
185:2
**access**
44:3   49:8, 11   70:3
114:4
161:20
210:18
278:17, 22
279:14, 15
281:21

**accessible**
157:8
**account**
150:16, 17
152:10

**accountable**
65:8
**accounts**
154:21
**accurate**
14:15
18:10
117:15
137:10
156:23
157:5
158:10, 11
279:2, 5
286:2
303:2, 18
**accurately**
117:12
156:5
**accused**
93:10
242:8, 19
**acknowledge**   50:20
184:18
186:13
**acknowledged**   254:19
**acknowledging**   103:5
**acres**
10:17
53:15
**Act**   89:16
92:11
213:17

**acting**   8:3
228:6
289:14
**action**
32:6   60:12
91:5   216:8
226:16
231:18
243:17
262:6
279:4
308:15
**actions**
191:5
**active**   32:1
41:4   46:4
**activities**
19:21, 23
78:4
100:14, 16
118:1, 3, 5
171:16
**activity**
184:4
261:23
262:22
**acts**   64:8, 23
**actual**
57:14
87:16
110:10
222:14
255:22
258:12
**actuality**
83:21
**added**
159:6
**addition**
132:8

**additional**
28:18
101:16
204:19
279:12
**address**
12:23
125:6, 18
126:6
153:17
154:1
184:9, 20
185:3
186:14
189:5
223:13
224:2
251:5
287:22
288:2, 5, 21
289:2
**addressed**
182:21, 22
224:14
225:4
**addresses**
10:2
148:13
154:4
287:17, 21
300:22
**addressing**
181:16
**adequately**
29:15, 17
**adhere**
91:2
171:16
**adhered**
71:8   72:14
191:16

adjacent
237:2
admin
18:4
143:16
administrati
on   11:2, 8,
11, 14, 19
12:3, 9, 15
13:4, 12
156:3, 16
158:17
160:23
161:2
229:14
293:19
302:21
administrati
ve   11:1, 5
12:13
13:11
17:13
96:10
115:21
269:16
advantage
248:8
adverse
266:8
268:8
272:13
advising
37:2
affairs
12:17
17:18
94:17
159:14
188:18
189:6, 8, 22
190:15
250:5, 8

285:3, 5, 9,
11   286:6,
14, 15, 20
affect
105:16
affiliation
17:2   73:3
affixed
131:10, 11
African-
American
75:23
77:15
African-
American-
owned   77:9
African-
Americans
77:15
afternoon
115:16, 18
232:2
age   31:12,
14
agent
252:11
263:18, 19
ago   85:2
168:8
185:18
210:15
266:16
271:11
agree   10:9
37:15   61:7
62:8
106:10, 23
110:15
112:22
156:22
238:18
255:15

256:17
267:11
271:1
272:10
285:22
286:3, 8, 15,
19
agreeable
258:7
AGREED
2:9, 17, 23
3:8   43:23
120:4, 9
135:8
141:6
240:5, 8, 18
agreement
44:15
46:22   58:7,
9, 22   59:2,
6   60:17, 20,
21   78:17
88:4
113:10
138:16
174:21
agrees
68:22
87:13
88:19
226:22
ahead
188:9
200:10
226:9
253:12
256:9
268:14
271:8
ALABAMA
1:2, 10   2:5,
13, 15   4:8,

13, 21   5:6,
12, 17   8:3,
8   9:12, 17,
23   10:3, 11,
12   12:16
16:8, 14
35:8   39:22
41:1   53:16,
21   57:22
72:4   76:10
77:3   97:2
98:16, 19
99:10, 23
108:3
123:3
131:20
132:1, 3
138:17
141:23
142:18
156:16
166:6, 13
167:4, 12,
21   256:19
292:6
294:5
302:11
308:3
allegation
251:15
allege
30:20   31:6
34:7
alleges
66:9
allow   201:8
allowed
152:2
allows
105:13
168:17

221:9
305:13
AMCO
39:22
amend
203:8
amended
62:20   63:4
146:21
amendment
62:23
AMERICA
1:11   10:8
16:12
39:23   41:1
48:11, 12,
13, 17
56:14
57:21
60:14   61:8
102:8
167:15
168:4
292:3
293:8
303:5
American
9:20
AMOCO
41:1   48:11,
12, 13, 17
56:1, 14
57:21
60:15   61:8
82:4   96:8
97:2   98:8
99:1   102:8
113:4
119:19
120:8
124:8
137:14

138:*9*
141:*9*
280:*9*
**AMOCO's**
61:*15*
62:*12*
**amount**
137:*9, 13*
288:*10*
**an** 9:*19*
16:*3* 28:*15*
30:*13* 38:*2*
41:*11*
42:*18*
44:*14*
50:*14* 53:*3*
58:*7* 60:*4*
62:*23* 65:*7,*
*19* 66:*11*
67:*14, 23*
74:*2, 14*
77:*12, 14*
87:*4* 91:*21*
93:*4* 96:*1,*
*11, 12, 13,*
*14* 101:*16,*
*19* 102:*1*
105:*6, 12*
117:*15*
136:*4*
137:*20*
138:*12*
143:*17*
151:*8*
152:*11, 16*
160:*16*
165:*11*
167:*20, 23*
168:*1*
169:*23*
174:*20*
179:*7*

183:*15*
184:*21*
185:*5, 20*
186:*23*
192:*9*
193:*4, 12*
194:*1*
200:*10*
204:*3*
206:*7, 21,*
*22, 23*
207:*15*
209:*7, 23*
211:*5, 15*
212:*18*
215:*20*
216:*13, 18*
217:*14, 16*
222:*14, 17*
223:*1, 9, 18*
225:*22*
231:*7*
232:*2, 5, 20*
233:*2*
240:*12, 13,*
*16, 23*
242:*2*
247:*14*
249:*7*
250:*20*
251:*3, 5*
252:*11*
253:*16*
257:*17*
258:*7*
266:*11, 13,*
*16* 267:*3, 9*
268:*21*
270:*5, 14*
271:*21*
273:*8, 10*
275:*16, 17*

278:*14*
279:*2, 5*
280:*8, 12,*
*14, 17*
286:*2*
288:*1*
292:*12*
294:*14, 21*
299:*18*
301:*9*
303:*18*
304:*12*
305:*17*
307:*1*
**analysis**
66:*17*
96:*16*
**and** 1:*11*
2:*9, 13, 17,*
*18, 20, 21,*
*23* 3:*4, 5, 8*
8:*2, 6, 17,*
*22* 9:*13, 14*
10:*7, 12*
11:*1, 2, 17*
12:*3, 19, 20*
13:*6, 9, 11,*
*21* 14:*4, 10,*
*14, 15* 15:*7,*
*10, 15, 20*
16:*1, 11*
17:*2, 4, 8,*
*13, 19, 22*
18:*1, 4, 20*
19:*8, 11, 12,*
*16, 19, 20,*
*22* 20:*13,*
*18* 21:*6, 7,*
*8, 13, 20*
23:*9, 11, 12,*
*20, 22* 24:*7,*
*11* 25:*5, 9*

26:*12, 21*
28:*15, 17,*
*19* 29:*12*
30:*18, 20*
31:*20* 32:*4,*
*5, 10, 15*
34:*2, 4*
35:*4, 7, 8,*
*11, 17, 23*
37:*1, 2, 3,*
*17, 23* 38:*1,*
*13* 39:*8, 22*
40:*3, 11*
41:*1, 14*
42:*12, 19*
43:*13*
44:*18* 45:*1,*
*6, 8, 16*
46:*1, 14, 22*
47:*15* 48:*4,*
*8, 11* 49:*2,*
*6, 11* 50:*4,*
*19* 51:*6, 8*
52:*11, 19,*
*23* 53:*12*
54:*2, 12*
55:*2, 14, 18*
56:*19* 57:*2,*
*21* 58:*9, 22*
59:*2, 5, 8,*
*16* 60:*7, 12,*
*18, 21* 61:*1,*
*9, 10, 13, 15*
62:*14* 63:*9*
64:*5* 65:*11*
66:*1, 13, 17*
68:*15, 17*
69:*4, 10, 19*
70:*1, 7, 17*
71:*19, 22*
72:*2, 6, 18,*
*20* 73:*2, 21*

74:*1* 75:*12,*
*17* 76:*12*
77:*14* 78:*2,*
*6, 18* 79:*23*
80:*5, 7, 8, 9*
81:*1, 5, 7,*
*11, 15* 83:*4,*
*13* 84:*8, 13,*
*20* 85:*1*
86:*15* 87:*1,*
*8, 9, 12, 13,*
*14, 15, 19,*
*21, 23* 88:*2,*
*3, 5, 13, 17,*
*18, 21, 23*
89:*3* 90:*12*
91:*20* 94:*4,*
*5* 96:*1, 10,*
*12, 14, 16,*
*20* 97:*2, 3,*
*11* 98:*14*
99:*15, 20*
100:*2, 11*
101:*2, 6, 18*
102:*18, 19*
103:*2, 10,*
*11, 20*
104:*6, 9, 13,*
*17, 19*
105:*3, 14,*
*19* 106:*2,*
*10, 13, 15,*
*19, 20*
107:*3, 10,*
*20* 108:*8,*
*18* 109:*7*
110:*12, 22*
111:*2, 12,*
*23* 112:*5,*
*12* 113:*6, 9,*
*11, 22*
114:*9, 23*

115:4, 7, 8, 15  116:7, 9, 23  117:2, 20, 23  118:10, 14, 16  119:1, 9, 18, 20  120:6, 8, 15, 20, 22  121:21  122:12, 20  123:1  124:2, 3, 5, 17, 19, 20  125:2, 3, 10  127:21  128:11, 12, 14  129:9, 16  130:16  131:1, 3, 9, 21, 23  132:10, 12, 14, 22  133:8, 12, 22, 23  134:19  135:3, 6  136:7  137:2  138:4, 18  139:9, 14  140:8, 9, 20  141:4, 5, 12, 16, 18  142:1, 12, 15, 20  144:11  145:3, 4  146:6, 19, 22  147:1, 7, 20, 23  148:5, 18

150:20  151:6, 13, 20  152:7, 15  153:23  154:4, 14  155:3, 22  156:13, 23  157:7, 16  158:7, 13, 23  159:10, 11, 12, 14, 23  160:11  161:9, 18, 21  162:18, 22  163:11  164:7, 21  165:2, 4, 5, 10, 11, 12, 21  166:1, 7  167:2, 5, 7, 8, 11, 20, 22  168:8, 11  169:15, 22  170:7  171:4, 10, 14, 15  172:6, 9  173:3  174:20, 21  175:1, 9, 11, 12, 22  176:15, 23  177:3  178:19  180:2, 11  181:22  182:11, 19, 20, 21  183:9, 11, 22  184:5, 8, 14, 20  185:3, 10,

15, 19, 23  186:3, 5, 14  187:6, 15  188:13  189:4, 14, 23  190:7, 9, 14, 23  191:16, 21, 22  192:6, 11  193:13  194:15, 20  195:15, 17, 18, 20, 22  196:1, 9  198:3, 12, 19, 23  199:5, 8, 12  200:17  201:1, 9, 15, 18, 21, 23  202:4, 5, 10, 22  203:1, 3, 6, 16  204:19, 20  205:9, 13, 16, 19  206:2, 4, 5, 11, 17  207:2, 17, 18  208:5, 7, 21  209:1, 2, 20  210:13  211:22  212:11  213:12, 13, 15, 16, 22  214:2, 4, 5, 11  215:6, 15  216:3, 7, 10, 20  217:6, 8, 9, 10, 20

219:6, 16  220:15, 16  221:7  222:19  223:3, 11, 15  224:4  225:5, 13, 16  226:6, 9, 11, 16, 17, 20  227:3, 4, 17, 20, 22  228:2, 4, 15, 17, 18, 23  229:1, 10  230:3, 8, 15  231:3, 9, 18, 21, 23  232:18, 20, 21  233:6, 18  234:6, 20, 23  237:9, 21  238:22  239:9  240:4, 5, 18  241:18  243:1  245:3  246:19  247:9, 15  248:15  249:15, 18, 22  250:13  251:4, 5  252:3, 6, 9, 16, 22  253:19, 22  254:3, 6, 15  255:2  256:8, 10  257:2  258:3, 12,

14, 16  259:6, 14  260:6, 9, 12, 15  261:2, 12, 14  263:8, 13, 17  264:2, 6, 9  265:4, 16, 19  266:4, 10, 17  267:18  268:2, 19  269:15, 22  270:4, 6, 13, 16, 18, 21  271:1, 11  272:3, 6  273:5, 20  274:5, 6, 12  275:5, 7  277:3, 20  278:10, 11, 13, 16, 18, 23  280:6  281:3, 7, 22  282:8, 11, 13  283:17, 22  284:3, 12, 13, 18  285:2, 10  286:3, 4, 11, 18, 22  287:5, 8, 16, 17  288:13, 14  289:1, 5, 7  290:17, 21  291:8, 18  292:1, 4, 12, 14  293:2, 9, 10  294:17, 21  295:1, 18,

23  296:*1*
297:*17*
298:*2, 4, 8,
9, 20*
299:*11, 17,
21*  300:*1*
301:*6, 8, 10,
15, 17, 20,
23*  302:*6,
20*  303:*9*
304:*2, 7, 11,
14*  305:*22*
306:*8*
308:*7, 8, 10,
11*
**and/or**
20:*12, 13,
21*  43:*19*
44:*15*
74:*16*
91:*16*
123:*16*
163:*16*
171:*15*
228:*9*
268:*12*
**angry**  9:*6*
**annual**
126:*21*
127:*14, 16*
**answer**
38:*19, 21,
23*  39:*12*
42:*1*  43:*2*
57:*23*
61:*21*
72:*23*
82:*21*  83:*4*
95:*7*  96:*17*
97:*19, 22,
23*  110:*21*
112:*6, 16*

144:*19*
145:*16*
148:*5*
177:*19*
191:*20*
195:*9*
221:*10, 13*
224:*21*
225:*11, 16,
22*  231:*1*
241:*20*
242:*1*
245:*21*
247:*23*
253:*11*
256:*22*
257:*10*
268:*15*
269:*3, 4*
272:*20*
276:*7, 9, 17*
277:*20*
296:*19*
305:*9*
**answered**
82:*20*  83:*2*
84:*18, 19*
111:*10*
112:*5*
121:*13*
130:*9*
138:*4*
224:*9, 16,
20*  241:*18*
244:*23*
275:*23*
**answering**
38:*16*
166:*14*
**answers**
144:*23*
146:*18, 23*

305:*19*
306:*4*
308:*8*
**ANTHONY**
1:*17*  2:*1,
11*  6:*4*
8:*10, 15*
9:*10*
**anti-
discriminati
on**  92:*15*
93:*8*  94:*6*
127:*19*
214:*6*
270:*19*
**anti-
harassment**
201:*23*
202:*4*
205:*14, 20*
207:*8, 19*
212:*21*
222:*5, 10*
**anybody**
69:*5*  92:*4,
8*  124:*6*
134:*21*
147:*8*
150:*6*
163:*21*
167:*10*
188:*1*
189:*17*
243:*6*
244:*3*
258:*17*
259:*20*
282:*23*
289:*6*
299:*6*
**anymore**
185:*15*

**anyway**
11:*13*
33:*16*
52:*21*
60:*15*
103:*2*
112:*17*
159:*6, 9*
302:*9*
**anywise**
308:*15*
**apologize**
11:*22*  19:*4*
28:*2*  82:*23*
110:*12*
122:*14*
133:*18*
212:*8*
242:*10*
301:*6*
**Apparently**
293:*20*
**appear**
25:*4*  50:*4,
13*  117:*15*
204:*15*

**Appearance**
6:*20*  28:*13*
128:*15, 16,
19, 23*
129:*2, 4, 8,
18, 20*
130:*1, 7, 18,
22*  134:*21*
135:*4, 15,
23*  136:*12*
143:*4, 12*
148:*22*
177:*8*
229:*16*

247:*2*
250:*21*
**APPEARAN
CES**  5:*1*

**APPEARING**
4:*4, 16*
**appears**
51:*7*  114:*6*
119:*17*
130:*3*
141:*4*
155:*20*
232:*20*
233:*2*
251:*2, 4*
**applicable**
45:*1*  94:*4*
179:*20*
181:*3*

**applications**
150:*11*
**applied**
32:*10*
46:*10*
48:*22*
241:*3*
**applies**
178:*14*
229:*4*
241:*14*
246:*21*
269:*19*
**apply**
41:*17*
61:*19*
78:*12*  82:*1*
89:*17*  90:*8*
143:*11*
175:*5, 12*
180:*13, 16*

181:*17*
191:*8*
229:*3*
230:*21*
231:*2, 7, 16*
238:*16*
269:*22*
270:*1*
**appropriate**
60:*8* 91:*5*
132:*10, 11*
135:*10*
163:*16*
**approval**
101:*19*
**approve**
31:*23*
**approved**
32:*4* 154:*6*
183:*16*
**approximate**
**ly** 2:*4, 16*
8:*9* 29:*4, 7*
53:*14*
174:*3, 8, 10*
**April** 10:*22*
**ARANT** 5:*9*
**archive**
152:*4*
**area** 15:*14*
71:*23*
81:*16*
105:*12*
115:*6*
156:*6*
174:*2*
229:*11, 12,*
*17* 242:*15*
243:*3*
244:*19*
271:*22*
292:*14*

**areas**
55:*10*
71:*17* 87:*2*
114:*1*
143:*16*
148:*10*
153:*8*
162:*3*
218:*2*
220:*7*
229:*5, 7, 22*
231:*5*
238:*17*
**argue**
56:*20*
**arguing**
186:*3*
**argument**
273:*8*
**arises**
64:*15*
**arising**
64:*7* 87:*15*
**arrangemen**
**ts** 278:*22*
281:*22*
282:*7*
**arrival**
125:*3*
**arrived**
163:*18*
**asked**
112:*5*
122:*7*
138:*4*
146:*19*
179:*17*
185:*4*
187:*23*
200:*3*
212:*19*
218:*16*

**areas**
222:*13*
241:*18*
277:*1*
**asking**
54:*14*
57:*11* 76:*2*
140:*2*
185:*11*
187:*23*
189:*23*
190:*9*
210:*14*
218:*5*
222:*11*
223:*3*
251:*6*
261:*6*
264:*3*
275:*15*
282:*11*
289:*20*
**asks** 25:*19*
150:*10*
218:*3*
**aspects**
104:*8*
**assembling**
231:*6*
**assembly**
9:*19* 115:*7*
229:*9*
**asserted**
87:*16*
**assign** 3:*5*
15:*21*
**assigned**
15:*18, 21*
31:*22*
156:*7, 8*
163:*12*
242:*5, 17*

**assignment**
39:*16*
186:*5*
255:*1*
**assist**
37:*14*
260:*23*
**assistance**
192:*12*
**assistant**
147:*21*
199:*4*
**assisting**
37:*19*
**associated**
65:*8*
166:*12*
298:*21*
**assume**
21:*22*
30:*23* 50:*8,*
*10* 101:*2,*
*21* 102:*12,*
*22, 23*
103:*1*
114:*10, 11*
121:*7, 18,*
*21, 22*
122:*2, 5*
181:*19*
**assuming**
101:*19*
122:*19*
139:*13*
**assumption**
50:*15, 16*
102:*2*
**assumption**
**s** 90:*16*
122:*5*
**attach** 24:*1*

**attached**
14:*5* 24:*8*
26:*13* 40:*4*
68:*19*
90:*12, 14*
144:*12*
155:*23*
165:*3*
176:*16*
216:*11*
228:*16*
231:*22*
232:*19*
235:*1*
248:*16*
252:*23*
260:*10*
261:*15*
263:*9*
265:*20*
283:*23*
287:*6*
295:*2, 22*
299:*12*
301:*16, 21*
**Attachment**
68:*19*
138:*15*
140:*22*
251:*4*

**attachments**
296:*3*
**attempted**
72:*14*
**attendance**
35:*17*
**attendant**
155:*17*
156:*9*
**attendees**
23:*14*

**attention**
133:*17*
134:*9*
201:*11*
274:*10, 11*
**attire**
135:*10*
**attorney**
151:*20*
**attorney/clie
nt**   39:*5*
**Auburn**
35:*13*
**August**
12:*4*   15:*7*
17:*22*
41:*14*
46:*18*
108:*18*
109:*17*
111:*7*
112:*12*
118:*16*
163:*10*
228:*21*
248:*8*
291:*18*
**authentic**
156:*23*
**authenticate**
158:*8*
**authenticity**
157:*16*
**authority**
69:*4*
**authorizatio
n**   142:*5, 11*
**authorized**
260:*12, 15*
263:*14*
**Auto**   48:*15*

**AutoEver**
154:*2*
158:*23*
288:*16*
292:*12*
299:*1*
301:*1*
**automaticall
y**   60:*5*
292:*14*
**automotive**
9:*19*   115:*7*
**available**
246:*9, 12*
298:*23*
**Avenue**
2:*5, 14*
5:*11*   8:*8*
**avoid**
231:*10*
257:*15*
258:*2*
**avoiding**
20:*9*   127:*8*
**aware**
44:*10*
46:*19*   47:*1*
63:*2, 5*
67:*1*   73:*6,
8, 9*   74:*17*
78:*3*   85:*14*
91:*18, 22*
92:*4, 7, 12,
16*   116:*10*
117:*22*
128:*1*
129:*1*
136:*11, 14*
143:*10*
145:*10, 14*
147:*8*
148:*23*

150:*6*
151:*23*
152:*5*
154:*15*
155:*4*
167:*10*
169:*4*
183:*18*
191:*14, 22*
192:*14*
214:*3*
216:*18*
221:*14, 22*
222:*3*
227:*14, 18,
22*   232:*8*
233:*9*
242:*7, 23*
243:*2, 8, 15*
246:*14*
248:*6*
249:*17, 23*
266:*1, 15,
22*   268:*7*
271:*3, 14,
15*   272:*20*
273:*11, 14,
15*   274:*1,
14*   275:*4, 6,
16, 17, 21*
277:*18, 22*
278:*4*
280:*3*
282:*16, 22,
23*   283:*4*
289:*12*
296:*21*
299:*6*
**awareness**
281:*6, 8*

**< B >**

**B**   136:*15*
137:*18*
**back**   33:*11*
34:*9*   36:*3*
47:*22*   48:*2*
55:*6*   62:*2*
78:*19*
119:*21*
123:*10*
130:*3*
140:*13*
143:*19*
145:*10*
164:*21*
171:*18*
176:*19*
180:*10*
182:*20*
191:*21*
195:*6*
207:*9*
220:*13*
226:*21*
227:*1*
237:*20*
244:*10*
247:*9*
259:*2*
260:*18*
267:*18*
274:*3*
277:*9*
288:*19*
291:*7*
295:*18*
298:*9*
300:*7*

**background**
68:*16*
**backwards**
36:*2*

**badge**
68:*18*
161:*5, 7, 9*
162:*5, 9, 11,
21*   163:*7, 8*
**badgering**
241:*21*
**badges**
49:*10*
161:*12, 14,
15*   162:*3,
13, 14, 15,
17*   231:*2*
**balls**
207:*17*
**bank**
154:*21*
**bar**   165:*16*
**barcoded**
162:*3*
**barking**
210:*9*
**bars**
165:*10*
**base**   110:*2*
187:*13*
285:*20*
**based**   16:*9*
25:*3*   43:*3*
44:*17*
45:*20*   47:*7,
14*   57:*20*
66:*1*   87:*16*
101:*11*
103:*2*
106:*2*
108:*10*
109:*13*
121:*15*
131:*6*
138:*5*
141:*2*

150:*18*
153:*7, 16*
160:*2*
161:*20*
164:*2*
170:*14*
181:*5*
195:*23*
198:*13*
205:*18*
206:*16, 19*
207:*12*
211:*5*
228:*22*
230:*1*
243:*4*
249:*15*
264:*23*
265:*9*
267:*15*
286:*18*
**baseline**
109:*6, 12,
15, 22*
110:*4*
**basically**
54:*15*
96:*22*
110:*16*
139:*11*
185:*13*
191:*1*
231:*10*
281:*8*
292:*18*
304:*16*
**basis**
31:*11*
57:*16*
61:*16*  91:*6*
116:*13*
184:*8*

195:*22*
214:*10*
279:*22*
281:*3*
303:*17*
**Bates**  27:*4*
37:*18*
39:*23*
49:*21*  51:*3*
53:*7*  67:*4*
68:*10*  78:*6*
81:*12*
85:*16*  95:*3*
100:*21*
101:*7*
109:*4, 15*
116:*23*
123:*11*
125:*11*
126:*19*
137:*19*
138:*19*
140:*20*
141:*15*
142:*8*
155:*19*
164:*22*
177:*1*
178:*18*
179:*3*
216:*5*
228:*13*
231:*18*
233:*21*
234:*20*
235:*22*
248:*13*
251:*1*
253:*3*
260:*6*
261:*11*
263:*4*

285:*16*
287:*2*
294:*20*
301:*12, 13,
17*
**Bates-
stamped**
286:*1*
**bathroom**
38:*7*
**Bear**
101:*14*
251:*5*
**bears**
177:*2*
284:*2*
**beginning**
18:*15*
36:*19*
109:*17*
196:*3*
267:*18*
274:*3*
**begins**
248:*21*
**BEHALF**
4:*4, 16*
25:*6, 10*
51:*17*
88:*14*  92:*8,
13*  99:*1*
145:*5, 8*
177:*21*
223:*16*
228:*6*
258:*22*
260:*13*
263:*14, 22*
264:*1*
289:*14*
290:*12, 19,
23*  296:*17*

**believe**
15:*5*  21:*10*
27:*9*  29:*23*
30:*13, 14,
22*  31:*8, 14*
32:*20*  33:*1,
7, 12, 14*
41:*5*  49:*12*
70:*8, 16*
74:*19, 20*
81:*9*  129:*9,
10, 17*
168:*8*
169:*23*
215:*19*
241:*5*
242:*2*
252:*16*
265:*9*
275:*10*
**believed**
278:*18*
**believes**
93:*19*
**benchmark**
71:*15*
215:*13, 17*
**benefit**
97:*13*  98:*7,
9, 11, 20*
99:*3*  100:*3*
107:*1*
**benefited**
98:*14*
99:*13*
107:*10*
**benefiting**
107:*8*
**benefits**
19:*20*
**best**  37:*21*
43:*16*  72:*3*

77:*16*
165:*23*
187:*13*
206:*10*
273:*2, 3, 6*
281:*20*
**better**  71:*3*
187:*8*
208:*20*
**beyond**
149:*10*
244:*5, 17*
268:*13*
269:*1*
286:*11*
**big**  49:*12*
89:*1*  167:*6*
**billed**  44:*5*
45:*6*
302:*20*
**billing**
138:*2*
**Binder**
145:*22, 23*
146:*5*

**Birmingham**
4:*8, 13, 21*
5:*6, 12*
**bit**  9:*4*
33:*20*
34:*10*  60:*1*
66:*17*
140:*16*
143:*20*
158:*14*
197:*2*
253:*13*
**blank**
292:*18*
**blue**  167:*6*
**blunt**  256:*4*

**BMS**
170:*18*
171:*3*
**boilerplate**
170:*16, 19*
171:*8*
**book**   177:*4*
**bottom**
49:*23*  64:*4*
102:*18*
119:*9*
120:*2*
177:*3*
233:*1, 7*
240:*3*
284:*11*
291:*17*
**Boulevard**
10:*1*  99:*9*
100:*1*
**BOULT**   5:*9*
**Box**   4:*20*
152:*1*
166:*3*
**boy**   30:*8*
**BRADLEY**
5:*9*
**brand**
167:*11, 17,*
*18, 23*
**branding**
168:*23*
**breach**
91:*16*
**breaching**
91:*9*
**break**   38:*4,*
*7, 11, 20*
52:*21*  53:*4*
60:*2*  86:*10*
123:*4, 10*
143:*22*

164:*14*
194:*8*
195:*3, 7*
225:*23*
276:*21*
**breath**
88:*10*
**breather**
225:*17*
**brief**   59:*21*
123:*7*
195:*4*
200:*5*
226:*1*
277:*5*
306:*11*
**Briefly**
232:*5, 6, 14*
299:*15*
**bring**
13:*16*
25:*15*
26:*15*
160:*14*
199:*3*
226:*4*
**broad**
87:*19*
204:*14*
**broader**
214:*13, 14*
**Broadly**
268:*18*
**broken**
116:*2*
**brought**
30:*16*
160:*12, 14*
201:*10, 17*
220:*14*
221:*23*

274:*9, 11,*
*15*
**BSI**   188:*6*
**bubble**
260:*1*
**build**   54:*7*
**building**
34:*20*  49:*9*
100:*6, 7*
115:*21*
133:*22*
134:*4*
143:*17*
156:*3, 4, 6,*
*12, 13, 16*
157:*2*
158:*18, 20*
159:*12, 13*
160:*9*
161:*3, 6, 8,*
*17*  167:*1, 2,*
*6*  229:*14*
237:*1*
280:*15, 20*
305:*14*
**buildings**
100:*8, 9*
**building's**
160:*23*
**built**   54:*22*
55:*1, 4, 8,*
*17*
**bullet**
240:*4*
**bullets**
264:*7*
**burden**
201:*8*
**burdensom**
**e**  221:*3*
**BURNS**
1:*17*  2:*2,*

12   6:*4*
8:*10, 15*
9:*3, 10*
57:*17*
298:*10*
**B-u-r-n-s**
153:*22*
**business**
17:*1*  63:*11*
69:*19, 20*
70:*2, 4, 5, 6,*
*13, 14, 17,*
*18*  71:*21,*
*22*  72:*6, 7*
73:*4, 21*
74:*21*
75:*15, 19*
76:*5, 19, 22*
77:*6*  88:*15,*
*21*  106:*3*
155:*2, 5, 8,*
*10*  165:*20*
170:*14*
202:*3*
262:*8, 9, 16*
263:*1*
292:*1, 4*
**businesses**
70:*20, 23*
74:*3, 8, 12*
77:*9, 19, 22,*
*23*  168:*12*

**< C >**
**cafeteria**
12:*18*
**call**   108:*12*
141:*18*
142:*6, 12,*
*13, 14, 20*
148:*17*
149:*20*

155:*15*
163:*17*
229:*23*
236:*5, 7, 10,*
*16, 20, 23*
254:*17*
276:*10, 13*
299:*3*
**called**
278:*10*
**calling**
107:*20*
**calls**   66:*16*
95:*14*  96:*3,*
*16*  111:*14*
207:*17*
**campus**
10:*14, 16*
167:*2, 4*
181:*12, 14*
183:*1*
280:*18*
**capacity**
305:*19, 23*
**car**   74:*11*
231:*6*
**card**
162:*12*
**cards**
162:*2*
**care**   187:*20*
**careful**
256:*15*
**carefully**
256:*13*
**carrier**
160:*12*
**carry**
81:*20*
103:*21*
128:*11*

carrying
81:23
cars  54:19
CASE  1:4
20:17  27:2
30:12, 13
32:19  33:5,
9  34:18, 22
35:1  36:6,
8, 11  37:2,
4  49:5
52:11
60:11  65:9
96:23
133:9
145:13
147:3
166:5
168:2
169:18
180:18
186:4
200:19
205:6
219:12, 14
232:2
249:3, 17
251:20
255:23
256:5, 14
259:1, 15
267:8
273:20
276:5
278:13
case-by-
case  91:6
184:8
cases  34:2
209:9
Cassandra
147:8

258:13
278:20
280:5, 7
288:21
291:20
298:3
299:21
304:13
catching
88:10
category
70:15
206:1
244:2
caught
231:11
cause  8:11
262:20
275:10
277:11, 12
278:4
300:5
308:16
cautioned
121:20
CCR  2:2,
13  308:21
certain
21:15
74:19
105:13
151:4
152:3
161:18
162:3
194:5
208:18
278:22
279:1
281:21, 23

certainly
46:12
205:23
certainty
170:5
177:21, 23
289:16
298:22
certificate
82:6, 8, 11,
18  83:9, 14,
22  84:8
85:9
Certified
8:1
certify  8:4
308:6, 13
cetera
63:18
67:17  91:3
101:5
104:5
106:8
108:4
125:7, 19
126:7
129:21
171:5
172:16
175:10
176:9
181:8
182:11
191:4, 11,
12  195:18
198:14
223:23
chain
296:11
298:17
challenging
34:22

Chambliss
278:21
281:13
chance
194:8
235:20
282:14
287:12
302:3
change
45:17, 18
106:2, 9
107:22
108:1
109:8
116:16
135:12
174:22
262:7, 13,
16, 23
293:2, 3, 21
changed
46:14
changes
60:21
109:1, 3
172:3
259:5
characteriza
tion  200:8

characterize
184:7
Charge  7:3
82:13
92:21  93:2,
14, 18
216:18
217:1, 16
222:14
223:1
234:20

249:7
251:2, 18
252:20
253:2, 7, 17,
21  254:12,
15  255:9,
17  256:6,
20  257:4, 8
258:12, 15
259:18
260:6, 16,
20  264:16
265:2
297:7, 12
298:3, 8, 14
300:6, 7
charged
265:12
Charges
6:17  203:3
216:6, 19
217:19
219:2, 17
246:2, 4
304:2
charging
261:22
270:15, 18
chart
28:16
107:13, 21
108:1, 5, 8
109:4
110:15
113:18
116:5, 20
charts
108:15
cheat  13:14
check
18:17  25:1
63:15

108:*23*
110:*9*
111:*11, 17*
306:*9*
**checking**
50:*18*
63:*15*
169:*12*
**checks**
68:*16*
**chief**  11:*1,*
*5*  12:*12*
13:*11*
17:*13*
96:*10*
269:*15*
**Choi**  86:*2,*
*6*
**C-h-o-i**
86:*7*
**chose**
49:*14, 19*
179:*15*
**Chris**  5:*15*
21:*22*
159:*6*
217:*5, 12*
245:*23*
248:*22*
250:*3*
254:*2*
257:*1*
258:*17, 19,*
*20*  291:*4*
295:*8*
297:*16, 18*
299:*19*
300:*3*
**chronologic**
**al**  13:*20*
**Circle**  4:*7*
5:*5*

**circumstanc**
**es**  36:*14*
223:*5*
**Civil**  8:*5*
89:*15*
92:*10*
**claim**
219:*5*
264:*1*
**claimed**
31:*11*
**claiming**
256:*11*
**claims**
87:*14*
145:*12*
252:*1*
263:*22*
273:*22*
300:*12*
**clarified**
56:*4*
**clarify**
109:*5*
157:*3*
171:*19*
185:*11*
195:*9*
200:*8*
238:*1*
243:*12*
**clarifying**
46:*17*
**clarity**
48:*3*  56:*18*
177:*5*
188:*10*
210:*21*
**class**  76:*21*
**classify**
75:*22*

**clause**
53:*11, 22*
54:*4*  55:*13*
66:*2*
**clear**  17:*10*
26:*10*  37:*5*
38:*22*
39:*13*
49:*10*
54:*13*
59:*15*
137:*12*
191:*20*
205:*7*
224:*17*
245:*2*
247:*17, 19*
255:*19*
271:*10*
272:*23*
277:*14*
**clearly**
40:*13*
**clerk**  156:*9*
**clerks**
241:*14*
**Clevenger**
210:*15*
**client**  37:*3*
59:*20*  60:*8*
61:*22*
203:*20*
237:*20*
238:*2, 4*
**client's**
236:*3*
237:*19*
238:*20*
239:*1*
**close**
104:*10*

**134:*9***
226:*5*
**closed**
211:*20*
**closes**
211:*23*
212:*10*
**cloth**
131:*13*
**cloud-**
**based**
150:*17*
**clue**  51:*2*
174:*6*
**co-counsel**
35:*12*
**Code**  6:*19*
143:*5, 13*
158:*4*
227:*12*
228:*18*
229:*2, 15*
230:*20, 23*
231:*2, 8*
**codes**  94:*5*
**collected**
198:*1, 8*
**color**
129:*16, 20*
136:*7*
198:*13*

**combination**
20:*21*
**come**  13:*1*
39:*3*  42:*20*
132:*22*
143:*19*
163:*18*
174:*21*
177:*4, 7*
208:*3*

215:*12*
225:*16*
226:*21*
227:*1*
254:*5*
268:*18*
296:*12*
**comes**
39:*8*
237:*20*
291:*4*

**comfortable**
175:*3*
**coming**
99:*15*
176:*19*
**command**
296:*12*
**commencin**
**g**  2:*3, 16*
8:*9*
**comment**
163:*9*
286:*18*
**commission**
93:*17, 19*
267:*16*
269:*6*
**Commissio**
**ner**  3:*10*
8:*4*

**commitment**
71:*20*
73:*20*  78:*1*
**committed**
69:*18*
72:*18*
**committee**
208:*3, 4, 11,*

12, 17
209:6, 8, 12,
16   210:1, 4,
12, 19, 21,
23   211:9,
13   212:3, 6,
12, 19
223:11
**common**
52:8
154:13
**commonly**
156:17
**communicat**
**e**   40:12
111:18
184:13
188:23
204:12
215:14
286:16, 21
**communicat**
**ed**   58:21
116:18
185:13
204:16
237:14
239:22
260:19
286:13
**communicat**
**es**   286:9
**communicat**
**ing**   110:14
193:10
**communicat**
**ion**   37:5
150:12
186:18, 22,
23   189:5,
10   254:18,

21   290:8
291:9
**communicat**
**ions**   190:4
254:14
291:11
300:10
**companies**
16:16
76:18
166:11
169:6
**company**
12:23
15:22   16:1,
3, 5, 6, 9, 11
17:3, 9
25:11   38:1
48:14
72:13   76:9,
11, 12, 17
77:12
98:10
131:23
132:2, 3
133:7
162:20
163:6
166:8
168:5, 21
191:1, 16
205:16
248:3
275:13
283:1
284:17
294:14
305:13
**company's**
97:12   98:6
237:11, 15

239:11
242:21
**comparative**
**s**   244:19
**comparator**
203:17
**compared**
181:12
182:7
**competent**
270:22
**competition**
71:2
**complain**
222:21
**complained**
31:2   249:1

**complaining**
222:22
**complaint**
146:22
182:18, 20
199:7
200:13
201:19, 22
207:10, 12,
15, 22
209:7
217:14, 15,
21   220:14
222:14
223:18
249:6, 14
267:20
274:7
296:9, 16
297:18, 20
**complaints**
197:17, 23
198:4, 20
199:1, 9, 20

201:9, 17
202:11, 16
203:2, 5, 22
215:12, 16
218:3, 6
220:2, 9, 19
221:15
222:1, 4, 9
223:4, 6
224:8, 19
227:11, 18
250:10, 15
254:23
274:5, 9
**complete**
124:10
**completed**
207:23
211:15
**completene**
**ss**   180:2
**compliance**
2:21   63:9
85:12
86:14
87:18   91:4
92:2   93:7
124:9
159:10
198:3
213:2, 7, 12,
22   216:20
217:7, 8, 9,
10, 20
220:16
249:16, 22
250:13
252:3, 7, 16
253:20
254:3, 6
257:2
261:2

269:12
272:3
299:20
**complies**
269:8
**comply**
68:17   71:5,
11, 15, 19
72:11   87:8,
22   88:3, 14,
20   94:4
128:12
130:19
183:22
206:6
213:14
214:1
237:8
**complying**
94:8
**component**
99:22
**computer-**
**aided**   308:9
**computer-**
**based**
20:20
**conceding**
203:19
204:1
**concern**
13:1
142:19
199:2
300:2
**concerned**
39:4
**concluded**
307:10
**conclusion**
96:4, 17
201:1

262:3
270:21, 23
**conditions**
41:18
42:19
109:14
**conduct**
20:10
124:17
125:5, 17,
21  126:5
128:7, 8
129:6
130:21, 22
135:5
181:4, 10,
13  182:2, 4,
10, 12
183:2, 7, 14,
23  184:4,
15  186:11,
13  189:3
197:19
205:21
207:6, 7
212:20
**conducting**
72:7  209:4
**confer**
38:4  39:11
204:20
205:3, 10
226:18
**confidential**
79:11  80:7,
13
**confidentiali
ty**  78:8, 14,
22  79:6, 7,
10, 15, 17
80:2, 20, 21

**confirm**
35:21
67:22
172:13
177:6
250:22
303:1
**confused**
55:23
112:17
152:17
222:11, 19
225:11
233:23
253:13
**confusing**
65:12
255:11
**conjunction**
113:3
161:11
198:2
**connection**
54:1, 17
55:3  78:17
80:15
168:16
251:20
**consider**
72:5
**considered**
45:22
128:23
129:23
130:7
143:6, 13
149:14
184:5, 19
229:6, 12

**Considering**
72:17  93:6

94:2
102:10
250:4

**consistency**
165:21
**consistent**
160:22
161:1
185:17
214:1, 5
228:9
229:1, 8
277:21

**consistently**
192:2
**constitutes**
196:10
**constructio
n**  173:8
**Contact**
151:20
187:18
188:14
250:5, 14
257:5
**contacted**
249:19
253:20, 23
254:4, 6, 19
257:1, 2
**contain**
264:2
287:21
**contained**
46:21
122:22
172:7
197:5, 11
214:12
216:14, 15,

*19*  292:9
294:4
**contains**
25:13
162:10
**contend**
45:13
56:12
61:18
65:22
**content**
21:6  32:3
50:18, 20
59:11
103:5
117:22
181:6
195:22
232:11
**contents**
117:21
118:9
176:3
197:4
**contest**
37:10
**context**
193:9
**continue**
43:23
44:20
45:23
178:1
**Continued**
5:1  41:17
44:19
52:12
60:17, 20
61:1
**Continuing**
7:1  45:5

**continuousl
y**  61:2
**Contract**
6:13  16:15
39:21
40:22  41:3,
18, 19, 21
42:2, 4, 7,
12, 17, 20
43:14, 19,
22  44:2, 9,
21  45:1, 3,
9, 13  46:4,
8, 10, 17
47:11
48:10  49:2,
4, 15  51:23
53:7  54:10
55:19
56:21
57:13, 14,
15  58:3, 14
59:7  61:11,
18  62:11,
14  63:22
64:4  65:23
67:5, 12
68:10
69:10, 23
70:1  71:6,
12, 19  72:2,
19  73:17
74:1, 2, 21
75:3, 4, 16
76:3, 4
77:5, 22
78:18
81:19  82:5
83:12, 13,
18, 19  84:3,
4, 7  85:1,
16  86:13,

18, 19   87:6
89:16
90:13, 14,
22   91:12,
14   92:1, 6
93:6   94:2
95:3, 18, 20
96:2, 7, 21
97:1   98:10
101:1
103:23
104:8, 14,
16   106:11,
16, 19
111:5
117:14
118:15, 23
119:13
120:7, 10
121:3, 10
123:3, 21
124:9
127:17, 22
128:3, 12
129:5
130:2
131:17
134:13, 17
137:5
138:10
140:5, 7, 14
141:3
146:19
155:1, 16
164:7
169:23
172:19
173:13, 18,
19   175:7,
13   176:2
177:11
182:8

183:1, 20,
22   184:1,
11   187:20
188:16
189:18
203:12
242:5
250:6
282:21
**contracted**
54:9   74:18
75:1
102:11
107:10
**contracting**
102:5
**contractor**
16:13   51:5
53:23   54:2,
9, 16   62:21
63:8   64:5,
9, 21   65:1,
16   68:14,
21, 22
74:22
78:15   80:6,
15   81:6
82:4   83:12
87:7, 13, 17,
21   88:3, 13,
14, 19   94:8
95:9, 10, 22
96:1, 7, 12,
13, 23   97:9
99:1
102:14, 16,
17   103:20
104:3, 19
107:15
112:15
117:18
124:16, 20

125:5, 14
126:5, 20
127:6, 18
128:10, 21
129:6
132:8, 15
133:10
134:22
135:16, 19
136:8
137:5
138:17
139:9
141:11
142:20, 22
143:3
165:5, 12
169:9
170:17
175:20
182:12, 19
183:13, 15
184:17, 20,
21   185:1,
22   187:1
188:1
189:4
203:21
**contractors**
69:5   71:9
72:5   88:2
89:18   90:9
91:1   99:21
100:19
126:17
129:12
161:12
171:13
172:11, 15,
21   173:1, 5,
6, 8, 9, 11
174:1, 4, 12,

17   179:20
181:4, 13,
17   183:5
186:10

**contractor's**
88:22
**contracts**
70:2   77:10,
19   94:19
173:23
282:3
**contractual**
278:22
281:22
282:7
**contrary**
197:19

**contribution**
119:22
**control**
49:8
151:12
170:15
182:17
186:4
190:5, 8
**controlled**
170:11
171:4
172:2
**controls**
202:17
**conversatio
ns**   43:3
188:19
249:15

**coordinated**
20:12

**coordinatin
g**   20:4, 5, 6
**coordinator**
101:18
**copies**
23:20   89:5
90:1   301:7
**copy**   14:4
24:7   26:12
40:3   51:19,
22   52:19
58:17   80:8
82:11
144:7, 8, 11
146:4
155:22
165:2
176:15
193:15, 20
216:10
228:15
231:21
232:18
234:23
235:8, 9
236:18
237:10
239:10
248:15
252:22
257:7
258:12, 15
259:18
260:9
261:14
263:8
265:19
283:22
287:5
295:1
296:9, 15
297:7, 12

298:1, 6
299:11
301:15, 20
306:23
307:2, 3
**copying**
299:21
**Cornelius**
2:2, 12   8:1
23:23
308:19, 20
**corner**
49:23
50:19
102:18
120:2
121:16
166:2
**corporate**
167:19, 22
**correct**
10:13   25:7,
8   36:13
46:4, 5, 11
69:14, 15
76:9, 13, 14
84:15   88:6
100:9, 10
104:14
105:2
113:6
120:13
121:19
171:20, 21
201:11, 20
202:1, 6
231:14
266:18
267:21
280:19
287:1
291:14

299:22
308:11
**corrected**
195:13
**correcting**
163:4
**corrective**
243:17
**correctly**
104:11, 12
**cost**  88:23
**costs**  87:15
**counsel**
2:11   3:2, 4
5:15   8:7
21:12, 21
27:1   28:23
29:2, 6
38:18, 21,
23   43:4
56:6   75:8
89:11
216:23
217:4
232:1
242:10
246:1
260:23
261:12
262:5
263:5
301:9
308:14
**count**
259:23
**counts**
219:7
**COUNTY**
308:4
**couple**
23:10
27:17

28:16
36:21   84:1
158:14
**course**
86:5   87:18
226:11, 12
276:13
**COURT**
1:1   2:22
8:2   19:6
33:6, 23
37:3
153:21
204:7, 23
205:4
226:7, 22
227:8
256:5
259:5, 7
**cover**
192:20
282:14
**coverage**
107:14, 19,
20, 22
108:1
145:13
**covered**
118:15
127:11, 14,
16   192:19
270:18
**covers**
49:12
**craft**
190:10
**create**
157:13
**created**
112:23
119:23
120:12, 22

135:13
157:7, 9
172:10
178:8
**creates**
71:2, 3
**creating**
39:9
**creed**
206:12, 15,
19
**CUMMINGS**
5:9
**cure**  57:12
**Cureton**
232:21
233:3, 11
234:7, 8, 13
**current**
10:23
14:22   15:1
17:12
42:12
133:9
157:13
195:23
**currently**
42:3   48:14
**Curry**
21:19
**custodians**
190:12
**Customs**
105:13
**cut**  272:7
**CV**  7:8
13:18
**CWilliams@
HMMAUSA.
com**  288:23

< D >

**D**  2:2, 12
6:1   8:1
117:10
126:19
308:19, 20
**daily**
115:23
117:19, 23
118:1, 13
119:5
182:11
**damages**
64:6, 14
65:8   66:11,
22   277:3
**data**  43:10
78:16
79:12
125:1
150:19
151:15
**database**
299:2
**date**  8:4
24:23
41:20, 23
101:12
170:1
228:22
249:9
265:13, 15
266:9, 13,
16   271:15
272:20
273:1, 7, 9
297:14
**Dated**  41:2
44:22   85:1
102:4
248:21
263:5

**dates**
10:*20*
11:*20*  12:*1*
41:*3, 9*
46:*4*
118:*15*
271:*20*
**Dave**  15:*13*
**David**  4:*19*
52:*15*
88:*12*
202:*22*
**DAVITA**
1:*7*  39:*16*
64:*16*  65:*5,*
*6, 20*  66:*8*
82:*13*
94:*23*
119:*4*
228:*7*
245:*5*
249:*1*
253:*16*
277:*12*
296:*2*
300:*6*
**day**  109:*10*
112:*19*
113:*21*
114:*7*
115:*23*
116:*2*
132:*23*
174:*19, 22*
191:*9*
**days**
113:*19, 20,*
*23*  114:*2, 5*
**deal**  269:*8*
**dealings**
155:*2, 5, 9,*
*10*

**deals**  67:*5*
78:*7*
**dealt**  34:*22*
178:*21*
244:*19*
**December**
18:*13, 15*
272:*13*
**decide**
223:*1*
**decided**
237:*6*
**decision**
32:*1, 6*
35:*22*
148:*3*
182:*14*
208:*8*
212:*3, 11,*
*22*  240:*21*
245:*5, 10,*
*14, 17*
264:*4, 11*
**decision-**
**making**
49:*18*
**defend**
169:*2*
268:*3*
**defendant**
147:*2*
150:*10*
**Defendants**
1:*13*  4:*16*
60:*12*
144:*2*
148:*4*
300:*11*
**defense**
203:*15*

**defenses**
146:*22*
277:*2, 3*
**defer**
22:*17*
210:*5*
252:*2, 6*

**deficiencies**
125:*6, 18,*
*22*  126:*7*
**define**
55:*19*  62:*3*
103:*19*
152:*12*
**defined**
16:*15*  80:*3*
116:*4*
140:*6*
**defines**
77:*5*
102:*10*
104:*13*
**definitely**
192:*19*
214:*9*
266:*15*
280:*12*
**definition**
95:*14*
**definitively**
209:*1*
289:*18*
**degree**
44:*20*
269:*5*
**Delaware**
16:*4, 6, 8*
**Delecia**
209:*21*
**delete**
152:*2*

**delineates**
136:*11*
**deliver**
62:*9, 15*
**delivered**
99:*8, 23*
100:*18*
251:*10*
**delivering**
163:*15*
**demographi**
**cs**  197:*9*
198:*10, 15*
**denials**
146:*22*
**denied**
204:*3*
**department**
17:*17, 21*
18:*5, 7*
20:*13*  21:*5,*
*7, 13*  22:*3,*
*5, 7, 17*
23:*11*  47:*3,*
*8, 13, 16, 18*
82:*10*
143:*2*
151:*4, 12*
153:*7, 16*
154:*7, 8*
163:*17*
172:*5, 8, 10*
188:*19*
192:*12*
194:*13, 17*
198:*2, 3, 8,*
*20*  200:*12,*
*14*  201:*13*
202:*17, 20*
207:*12, 22,*
*23*  208:*5*
212:*13*

213:*8, 22*
214:*7*
216:*20*
217:*7, 8, 9,*
*10, 11, 20*
252:*17*
261:*2*
279:*15*
285:*4, 6, 11*
286:*6, 14,*
*16, 21*
299:*20*
**department**
**s**  13:*7*
158:*17*
**depending**
18:*14*
94:*11*
108:*2, 4*
174:*19*
192:*6*
199:*6*
207:*14*
208:*1*
**depends**
91:*5, 13*
94:*15*
189:*11*
**DEPONENT**
307:*12*
**depose**
278:*15*
305:*13, 23*
**deposed**
305:*18*
**deposing**
56:*22*
**DEPOSITIO**
**N**  1:*16*
2:*1, 11, 19*
3:*6, 9*  6:*12*
13:*17, 23*

Robert Burns                                                     6/22/2022
                                                                     100

14:*9*  24:*1,
5*  25:*16*
26:*9, 16, 18*
27:*14*
28:*23*
29:*19*  30:*7*
32:*5, 9, 13,
14, 19*  33:*8,
9, 22*  34:*18*
36:*1, 20*
37:*13*  38:*1,
3*  40:*9, 19*
46:*1*  47:*9,
19, 21*  59:*6*
81:*16*
145:*16*
166:*23*
188:*18*
196:*3, 5*
204:*15, 18*
205:*9*
216:*12*
228:*12*
232:*4, 16*
248:*12*
250:*7*
258:*2*
266:*12*
267:*19*
271:*16*
273:*3*
274:*4*
276:*14*
299:*8*
305:*7, 12*
306:*3*
307:*9*
**depositions**
2:*22*  30:*2*
**derivative**
58:*11, 12*

**derived**
98:*11*
**derives**
107:*1*
**described**
19:*14*
62:*10, 16*
85:*8*  132:*9*
159:*2*
250:*1*
**Description**
7:*9*  25:*22*
26:*4*
103:*11*
104:*15*

**descriptions**
101:*4*
152:*14*
**designated**
105:*12*
**designation**
105:*16*
**desires**
53:*23*  54:*2*
**despite**
44:*1*  45:*2*
266:*20*
271:*2*
**detail**  230:*4*
**detailed**
67:*22*
130:*17*
**detailing**
302:*17*
**details**
63:*19*
101:*4*
116:*6*
130:*15*
137:*8*
177:*14*

207:*13*
268:*22*
305:*8*
**Determinati
on**  7:*7*
63:*12*
64:*13*
66:*20*  67:*1*
81:*3, 8*
91:*15*  94:*7*
212:*20*
216:*1*
222:*8*
223:*12*
224:*6*
265:*21*
266:*8, 21*
267:*11, 20*
270:*5*
271:*4*
272:*13*
275:*8, 12,
16, 17*
300:*5*
**determinati
ons**  213:*6*
273:*16*
274:*2, 10,
23*  275:*21*
277:*23*
278:*5*
**determine**
63:*22*
93:*13*
99:*19*
100:*17*
112:*9*
124:*1*
135:*9*
137:*10*
138:*7*
180:*19*

214:*4*
223:*5, 7*
249:*13*
250:*13*
267:*20*
268:*1*
278:*14*
**determined**
63:*19*  65:*2*
91:*19*
113:*3*
116:*8*
120:*3*
122:*11*
129:*4*
222:*18*
223:*10, 19,
22*  224:*1,
13, 21*
228:*7*
265:*11*
274:*8*
**determiner**
274:*6*
**determines**
93:*16*
128:*18*

**determining**
207:*6*
215:*20*
**detrimental**
80:*10, 17*
**developed**
101:*20*
109:*7*
121:*14*
141:*14*
**developmen
t**  19:*20, 22*
20:*5*  74:*16,*

22*  159:*1,
23*
**Devereux**
4:*7*  5:*5*
**Dexter**  2:*4,
5, 14*  8:*7, 8*
**DHL**  160:*13*
**Diagram**
6:*15*
155:*20*
156:*1*
160:*3*
**diagrams**
157:*8*
**dictates**
202:*18*
**difference**
56:*8*  95:*23*
96:*12*
115:*3*
227:*21*
**differences**
115:*5*
181:*10*
**different**
17:*22*  42:*4,
12*  57:*15*
66:*15*
106:*6*
115:*12, 20*
139:*20, 22*
152:*13*
157:*12*
161:*15*
174:*1*
182:*2, 6*
207:*16*
208:*23*
264:*7*
268:*4*
280:*7*

305:*20*
306:*5*
**differently**
207:*3*
**difficult**
19:*5*  59:*17*
84:*22*
225:*12*
282:*12*
**difficulty**
208:*23*
**direct**
17:*14, 16*
69:*12, 13*
142:*13*
155:*10*
184:*16*
188:*19*
201:*15, 16*
207:*15*
285:*6, 12*
**directed**
202:*19*
207:*22*
220:*15*
**direction**
184:*2*
186:*9, 18*
189:*2*
205:*13*
252:*9*
290:*4*
**directions**
184:*12*
**directive**
62:*21*  63:*4*
252:*17*
**directly**
49:*16*
98:*18*
166:*12*
182:*7*

183:*8*
243:*23*
**director**
18:*7*
**directs**
94:*2*
200:*12, 15*
**disability**
31:*12*
206:*8, 10,
19*  207:*2, 4*
**discharge**
30:*23*  31:*3,
7*  34:*8, 23*
**discharged**
31:*5*  34:*6*
261:*22*
262:*21*
**disciplinary**
175:*15, 17,
18*
**discipline**
243:*9, 17*
**disciplined**
243:*22*
**disclose**
79:*21*  80:*9,
13, 16*
273:*21*
**disclosures**
147:*5, 6*
278:*10*
279:*8*
**discoverabl
e**  201:*2*
226:*6, 22*
**discovery**
221:*3*
**discretion**
41:*12*  69:*7*
184:*23*

**discriminate**
222:*23*
**Discriminati
ng**  206:*7, 9,
14*
**discriminati
on**  22:*12*
31:*11*
32:*11*
89:*14*
92:*21*  93:*2,
11*  127:*8*
191:*3, 10*
195:*17*
197:*18*
201:*10*
202:*12, 13*
203:*16*
206:*2, 3, 19*
214:*22*
215:*6*
216:*2*
217:*14, 15*
219:*5*
220:*3, 4, 10,
11*  221:*15,
16*  223:*8,
19, 20, 23*
224:*7, 18*
226:*15*
249:*2*
251:*3, 16*
253:*7*
255:*1*
**discriminato
ry**  20:*10*
31:*7, 9*
34:*8*  207:*6*
227:*13*

**discuss**
215:*11*
257:*9*
**discussed**
29:*13, 14*
**discussing**
220:*14*
**discussion**
164:*16*
189:*21*
302:*1*
303:*6*
306:*20*


**discussions**
141:*3*
**dismiss**
259:*3, 6*
**disparate**
206:*22*
**dispute**
68:*2, 4*
134:*8*
226:*5*
**disputing**
134:*7*
186:*3*
**disqualified**
246:*8*
**disqualify**
248:*4*
**distinction**
247:*23*
**distribution**
170:*23*
**DISTRICT**
1:*1, 2*
**diversity**
70:*8, 11*
197:*7*
**DIVISION**

1:*3*  18:*4*
**doc**  208:*2*
**dock**  160:*5,
10*
**doctrine**
180:*1*
**document**
14:*11, 12*
22:*22*  24:*9,
20*  25:*4, 14*
31:*19, 21,
23*  32:*4*
37:*17*
41:*10, 15*
42:*15*
44:*17*
45:*21*
47:*14*
49:*21*  50:*2,
6, 13, 19, 20*
51:*16, 19*
53:*7*  55:*11*
57:*20*  62:*7*
101:*15*
102:*2, 4*
103:*16, 23*
104:*21*
105:*8*
107:*17*
109:*7*
111:*1*
113:*8*
119:*22*
120:*17*
122:*18, 21*
123:*1*
131:*1*
135:*9, 13*
136:*10*
139:*5, 17*
140:*8, 12*
141:*1*

144:*17*
146:*3, 8*
148:*16*
151:*11*
164:*2, 4*
165:*4, 17*
169:*14, 21*
170:*7, 10,
15, 17, 18*
171:*1, 3, 12*
172:*3, 9*
177:*1*
179:*4, 13*
183:*10*
199:*12, 13,
14, 19, 21*
200:*9, 16*
201:*6, 12*
202:*14, 18*
203:*7*
210:*17, 22*
211:*16, 20,
23* 212:*1, 2,
10, 22*
228:*17, 20,
23* 229:*3*
231:*17*
232:*3, 15*
235:*2, 9, 11,
19, 20*
236:*12*
238:*13, 18*
239:*6, 9*
241:*5*
248:*18*
250:*21*
253:*10, 15*
260:*12*
261:*16, 17,
18, 19*
263:*10*
278:*9*

284:*1, 4, 14,
16, 18, 21,
23* 286:*9,
11, 20*
287:*7, 11,
15* 295:*5,
22* 296:*3, 5*
297:*15, 17*
302:*17*
**documentati
on** 126:*9*
127:*1*
187:*16*
304:*3, 21*
**Documents**
6:*23* 13:*16*
25:*16*
26:*17, 19,
21, 22* 27:*6,
13, 17, 19*
29:*10, 12,
14* 37:*12,
14* 43:*21*
44:*8* 46:*16*
47:*9, 18*
58:*20* 59:*1,
5, 12, 13*
60:*10*
62:*22* 73:*5,
6, 8* 84:*14*
102:*21*
109:*2*
116:*10*
148:*20*
149:*10, 13*
151:*14, 15*
165:*19, 21*
171:*8*
186:*17*
211:*8, 12*
213:*3*
216:*13, 15*

233:*15*
248:*17*
251:*14*
254:*14*
275:*4*
290:*7*
296:*19*
**doing** 22:*3*
70:*6* 86:*10*
134:*21*
145:*5*
175:*7*
235:*17*
251:*17*
**domain**
154:*9*
288:*13*
**door** 162:*7,
8*
**dot** 296:*1*
**double**
18:*16* 25:*1*
50:*18*
63:*14, 15*
**draft**
260:*12*
**drafted**
101:*10, 13*
122:*22*
141:*11*
**drawings**
78:*16*
79:*12*
**dreadlocks**
241:*3*
242:*22*
**dreads**
237:*8*
**Dress** 6:*19*
143:*5, 12*
150:*3*
227:*12*

228:*18*
229:*2, 15*
230:*20, 23*
231:*1, 8*
**driving**
134:*16*
**drop**
163:*14*
**DSI** 133:*10,
11*
**duly** 8:*16*
**Duties**
7:*10* 19:*12*
105:*14*
128:*11*
129:*15*
163:*11*
182:*11*
230:*3, 13*
284:*3, 18*
285:*2, 3, 6,
13* 286:*4, 5,
10, 12, 16,
22*
**DYNAMIC**
1:*11* 32:*15*
79:*19*
80:*22*
91:*16* 92:*5,
9, 14, 23*
93:*9*
106:*12*
107:*2*
108:*9, 17,
23* 110:*3, 9*
111:*11, 19*
112:*2, 11,
14* 116:*9,
11, 14, 18*
123:*17, 23*
124:*7*
125:*17*

126:*1, 10*
155:*6, 9*
185:*4, 14*
188:*6*
234:*18*
237:*5*
238:*3, 12*
239:*23*
240:*4, 5, 9,
16, 18, 23*
241:*16*
242:*6, 18*
245:*8*
249:*5, 6*
250:*9*
252:*5*
259:*20*
260:*19*
272:*2*
277:*10*
282:*18*
288:*18*
290:*16, 19*
291:*11*
296:*10*
297:*3, 8, 13,
21* 298:*2, 7,
14* 299:*21*
300:*8*
304:*7, 18*
305:*1, 3*
**Dynamic's**
241:*9*

**< E >**
**E** 4:*1* 6:*1*
117:*17*
308:*1*
**E3** 152:*11,
12*
**E5** 152:*11,
12*

**earlier**
83:*11*
87:*12*
101:*4*
102:*22*
107:*7*
108:*4*
120:*1*
121:*19*
156:*20*
164:*3, 5*
169:*22, 23*
172:*20*
180:*10*
186:*12*
188:*17*
194:*18*
214:*18*
220:*14*
245:*23*
253:*18*
256:*5*
287:*16*
305:*7*
**earliest**
272:*11, 14*
**early** *196:4*
**earrings**
150:*4*
231:*12*
**easier**
13:*15*
179:*12*
**east**
159:*12, 22*
**EEO** *30:13*
93:*17, 19*
191:*6, 17*
192:*1, 5, 9,
17* *193:5*
194:*12*
195:*15*

196:*7, 9, 17*
197:*12, 20*
198:*5, 11,
22* *201:23*
202:*4*
205:*19*
207:*7, 18*
208:*3, 11,
12* *209:7*
210:*19, 23*
211:*9, 12*
212:*3, 5, 18,
21* *215:15*
222:*4, 9, 18*
223:*11, 22*
224:*13*
228:*9*
253:*14*
268:*1*
269:*6*
**EEOC** *6:17,
22* *7:3*
82:*13*
92:*21*
203:*3*
205:*13*
216:*6, 18,
19* *217:16,
19* *219:16*
220:*5, 12*
223:*1*
234:*19, 20*
237:*6*
240:*5, 17*
241:*1, 10,
17* *246:2, 4*
248:*22*
249:*7*
252:*15, 18,
20* *253:2,
17* *254:15*
255:*9, 17*

256:*20*
257:*8*
259:*18*
260:*5, 6, 16,
20* *261:12,
20* *262:2,
18* *263:6,
18* *264:3, 9*
265:*5, 22*
266:*2, 7*
267:*12*
268:*8, 10,
20* *270:4,
21* *272:12*
273:*11, 14,
17, 22*
274:*6, 8, 21*
275:*9, 16,
17, 18, 21*
277:*11*
278:*2, 3, 5*
296:*1, 9, 16,
22* *297:7,
12* *298:14*
300:*4, 12*
**EEOC's**
274:*23*
**effect** *2:20*
41:*13* *44:9*
45:*10, 14*
92:*22*
148:*4, 7*
**effective**
216:*3*
**effectively**
124:*11*
**effectivenes
s** *215:5*
274:*4*
**effort** *70:3*
72:*15* *74:2,
15* *250:7*

**efforts**
71:*4, 5, 11,
18* *72:9, 10*
73:*10*
153:*9*
194:*15*
196:*9, 18*
197:*12, 16*
198:*5, 6, 11*
250:*12*
**egregious**
92:*1*
**eight**
114:*10*
**eight-hour**
115:*17*
116:*3*
**either** *17:2*
32:*22* *37:7,
11* *43:22*
50:*8* *73:3*
108:*16*
146:*21*
163:*14*
168:*21*
170:*2*
249:*6*
258:*5*
282:*17*
289:*5, 13*
305:*3*
306:*19*
**Electrical**
168:*13*
173:*7*
**electronic**
194:*1*
307:*1*
**electronicall
y** *170:12*
171:*2*

211:*1*
250:*20*
**elevate**
222:*13*
**elevated**
220:*4, 12*
**eligible**
246:*13, 15,
18*
**Elijah**
131:*3*
**Elrick**
217:*22*
219:*4*
274:*19*
**E-mail**
6:*21* *7:11,
12, 13* *28:8,
11* *150:7*
152:*1, 20*
153:*3, 17,
19, 23*
154:*4, 7*
232:*20*
233:*2, 12,
21* *234:13*
250:*20*
251:*5, 7*
257:*18*
287:*17, 21,
22* *288:2, 5,
8, 21* *289:1*
291:*5, 17*
292:*10, 13,
21, 23*
293:*5*
294:*21*
295:*3, 6, 15,
19* *297:5*
298:*1, 17,
19, 20*
299:*4, 7, 17,*

*19* 300:*2, 9, 21*
**e-mailed** 23:*20*
151:*14, 15* 231:*23*
**e-mails** 28:*17, 18* 150:*1, 20, 23* 151:*6, 17* 152:*1, 2, 6, 22, 23* 153:*4, 13* 190:*12* 233:*16* 287:*20* 288:*3, 10* 289:*5, 7, 15* 290:*5, 18* 291:*7, 12* 292:*20* 294:*4, 8* 298:*20* 300:*14, 15, 16, 18* 301:*1, 3*
**embroidered** 132:*10, 12*
**emergency** 141:*16, 17*
**emphasize** 15:*10*
**employ** 68:*23* 279:*20*
**employed** 16:*13* 74:*7* 78:*23* 98:*19* 147:*13, 18* 171:*19*

181:*16, 18* 183:*8* 242:*5, 17* 247:*8* 248:*4* 278:*19* 280:*22* 281:*1, 19*
**employee** 63:*22* 65:*7* 66:*12* 93:*4* 96:*1, 13, 14* 134:*17* 138:*1* 179:*7* 183:*15* 185:*5, 8, 9* 186:*23* 187:*15* 188:*2, 4* 222:*23* 230:*22* 270:*19* 280:*8, 13* 294:*15*
**employee/employer** 270:*6*
**employees** 63:*8, 13* 64:*9* 65:*1* 68:*16, 20, 23* 105:*17* 161:*4* 173:*16* 174:*9, 11, 15* 181:*11, 21* 183:*3, 23* 184:*1* 188:*3, 6* 198:*16*

203:*12* 243:*21*
**employer** 9:*11* 14:*21* 129:*7* 184:*3, 12, 13, 21* 186:*14* 282:*17*
**employer/employee** 270:*6*
**employers** 52:*8*

**employment** 10:*21* 36:*9* 81:*17, 20, 23* 89:*14* 177:*11* 178:*20* 179:*1* 190:*20* 194:*14* 197:*15* 198:*18* 213:*16* 214:*2* 246:*15* 248:*3* 267:*12, 16* 268:*17* 269:*9* 278:*18* 279:*13, 16* 296:*14* 305:*10*
**employs** 182:*7*
**encompasses** 137:*9*

**enforce** 90:*21* 191:*6, 7, 23* 275:*11*
**enforcement** 249:*18*
**enforcing** 190:*20* 191:*2*
**ENG** 292:*3* 293:*8*
**engage** 53:*23* 183:*1, 6, 16*
**engaged** 129:*14* 266:*2*
**engaging** 76:*18* 261:*23* 262:*22*
**engine** 115:*14* 229:*10*
**ENGINEERING** 1:*11* 16:*12* 17:*5* 42:*6* 48:*15* 60:*14* 94:*18* 97:*5, 7, 8* 98:*9, 13* 99:*2* 107:*8* 113:*4* 116:*9* 119:*19* 120:*9* 125:*21* 126:*3* 128:*20* 137:*14* 138:*9*

141:*10* 161:*10* 166:*20* 187:*14* 188:*20* 237:*20* 238:*2* 245:*7* 249:*20* 253:*20, 23* 254:*7, 20* 256:*20* 257:*3* 280:*9* 285:*10, 12, 15, 20* 286:*17* 290:*12* 302:*11, 16, 19* 303:*4* 304:*6, 9, 23* 305:*1*

**Engineering's** 107:*12*
**English** 86:*23*
**EnovaPremiere** 74:*20* 75:*5* 77:*12, 14*
**ensure** 85:*11* 106:*14, 20* 128:*10* 180:*2* 191:*15*
**enter** 82:*4* 83:*12, 18* 84:*7* 230:*12, 14, 18*

**entered**
174:*20*
272:*12*
**entering**
229:*4, 21*
**enterprise**
76:*5*  77:*6*
**enterprises**
69:*19, 20*
70:*4, 5, 13,*
*14, 17, 18*
71:*21, 22*
72:*6, 7*
73:*21, 22*
75:*15, 19*
76:*19*
**entire**
191:*1*
235:*20*
269:*11*
303:*8, 12*
**entities**
60:*12*
159:*3*
167:*14*
168:*19*
**entitled**
203:*14*
205:*7*
221:*7*
284:*18*
**entity**
56:*13*
57:*15*
61:*13*
167:*20, 23*
168:*1*
181:*18*
305:*13*
**Entrance**
237:*2*
280:*16*

**entry**
125:*1*
286:*4*
**environmen
t** 12:*20*
17:*18*
147:*23*
159:*11*
**environmen
tal** 141:*18*
**equal**
174:*14*
176:*3*
190:*20*
194:*14*
197:*15*
198:*17*
267:*16*
268:*17*
**equally**
175:*6, 12*
**equipment**
100:*11*
104:*4*
148:*18*
229:*23*
230:*1*
**equivalent**
54:*6*
151:*10*
**Ernie**  15:*2,
3*
**error**
264:*15*
265:*3*
268:*5*
**errors**  64:*8,
23*  264:*6*
**Esq**  4:*6,
11, 19*  5:*4,
10*

**essentially**
62:*8*
190:*23*
**established**
41:*19, 22*
121:*8*

**establishing**
154:*6*
**estimate**
273:*2, 4*
**et**  63:*18*
67:*17*  91:*3*
101:*5*
104:*4*
106:*8*
108:*4*
125:*6, 18*
126:*7*
129:*21*
171:*4*
172:*16*
175:*10*
176:*9*
181:*8*
182:*11*
191:*4, 11,
12*  195:*17*
198:*14*
223:*23*
**ethnicity**
206:*12, 15,
20*
**evaluate**
92:*10*
94:*20*
215:*4*
**evaluated**
92:*9, 14*
94:*21*
228:*7*

**evaluates**
94:*10*
**evaluating**
37:*2*  92:*5*
215:*7, 8*
222:*9*
**evaluation**
91:*21*
**event**  187:*4*
**events**  82:*1*
**eventually**
298:*4*
**everybody**
59:*20*
143:*22*
176:*1*
**evidence**
3:*7*  37:*4*
158:*2*
186:*7, 9*
261:*21*
270:*14*
**exact**
11:*23*
33:*16*
192:*18*
208:*15*
266:*9, 11,
13, 16*
271:*15, 20*
272:*19*
273:*9*
**exactly**
11:*22*
21:*15*  28:*3*
48:*5*  49:*19*
50:*7*  84:*3*
97:*6*
100:*17*
102:*2*
127:*11*
133:*19*

162:*4*
187:*3*
193:*23*
220:*18*
254:*4, 21*
267:*1*
271:*10*
294:*18*
**EXAMINATI
ON**  6:*3*
8:*11*  9:*1*
270:*13*
**examined**
8:*16*
**example**
77:*12*
118:*6*
143:*17*
183:*9*
185:*20*
230:*6*
293:*5*
**examples**
128:*13*
187:*7*
274:*12, 13,
16, 22*
**exception**
38:*17*
**excessive**
33:*14*
**exchange**
232:*21*
295:*3*
300:*9, 21*
**exchanged**
60:*10*
300:*14*
**exclusive**
168:*22*
**exclusively**
171:*23*

**Excuse**
266:*4*
267:*22*
277:*15*
**execute**
83:*13*
**executive**
60:*4*  87:*9*
89:*2, 10*
90:*2, 5, 8,
16*  159:*15*
194:*15*
196:*10, 11*
**exert**  190:*5*
**EXHIBIT**
6:*10, 11*
14:*2, 3*
18:*12*
23:*19, 22*
24:*4, 6*
25:*13, 15*
26:*8, 11, 14*
39:*20*  40:*2,
8, 10, 18, 21,
22*  41:*13*
42:*13, 16*
44:*22*
46:*21*  47:*2,
12*  48:*7, 21,
22*  55:*10*
57:*19*
58:*10, 13,
17*  71:*18*
87:*2*
100:*22, 23*
102:*10*
120:*20*
121:*4*
123:*11*
127:*18*
136:*15*
137:*18*

144:*1, 10,
13, 14*
146:*17*
155:*1, 19,
21*  156:*5,
14, 23*
157:*6*
164:*8, 9, 22*
165:*1*
171:*10, 23*
172:*7, 12,
20, 22*
175:*5, 12*
176:*4, 12,
14, 21*
177:*22*
178:*11*
180:*15, 16,
17*  189:*19*
190:*21*
196:*7*
202:*1*
216:*5, 9, 14,
16, 19*
218:*4*
228:*12, 14*
229:*19, 20*
231:*17, 20*
232:*8, 12,
14, 17*
234:*18, 22*
235:*22*
238:*3*
242:*16*
248:*12, 14,
21*  249:*14*
250:*18*
251:*1, 11*
252:*20, 21*
253:*2*
254:*7*
260:*4, 8*

261:*1, 9, 11,
13*  262:*7,
11, 15*
263:*3, 7*
264:*2*
265:*6, 16,
18*  278:*11*
283:*9, 21*
284:*1*
285:*15, 23*
287:*2, 4, 13*
294:*20, 23*
298:*18*
299:*8, 10,
13, 18*
301:*13, 14,
17, 19*
302:*6*
303:*13, 18*
304:*1, 10,
11*
**EXHIBITS**
7:*1*  13:*23*
233:*17*
242:*13*
301:*8*
303:*9*
**exist**  58:*20*
190:*8*
300:*19*
**existed**
46:*18*
58:*23*  59:*3*
232:*8*
283:*2*
**existence**
73:*6*
**exists**
16:*11*
17:*21*  73:*9*
190:*8*

201:*7*
290:*14*
**expect**
181:*9*
**expectation**
175:*8, 19*
176:*7*
**expectation
s**  181:*10*
182:*3, 6, 9*
**expected**
62:*3, 15*
102:*17*
181:*4, 12*
183:*22*
184:*11, 14*
239:*23*
**expecting**
220:*20*
**expense**
88:*23*
**expenses**
87:*15*
**experience**
65:*17*
175:*14*

**experienced**
66:*8*
251:*16*
255:*1*
**expert**
152:*16*
268:*21*
**expiration**
44:*1*  45:*2*
**expire**
42:*17*
**Expires**
308:*22*
**explain**
79:*23*

**explained**
192:*5, 16*
193:*4*
**explaining**
192:*17*
**explicit**
44:*1*
**explore**
32:*14*
**expressly**
183:*2*
**extended**
43:*22*
**extensive**
218:*10, 12*
301:*3*
**extent**
65:*19*
134:*15*
180:*14*
226:*21*
230:*17*
256:*7, 11*
290:*4*
**external**
217:*14*

**< F >**
**F**  308:*1*
**facilities**
12:*17*
236:*20*
**facility**
10:*6, 15*
43:*17, 18*
49:*8, 11*
53:*14*
74:*10*
105:*15, 19*
106:*6*
108:*13, 14*
143:*9*

190:*7*
247:*21*
**fact** 44:*12,*
*18* 121:*19*
134:*3*
168:*15*
177:*9*
197:*2*
201:*16*
203:*19*
238:*11*
271:*13*
294:*2*
**factors**
52:*7*
**facts** 35:*17*
146:*21*
208:*6, 7*
277:*1*
**fail** 88:*20*
**failed** 248:*7*
**fair** 56:*17*
75:*17*
99:*14*
121:*7*
243:*7*
245:*12*
254:*22*
255:*8*
**fall** 70:*14*
143:*6*
206:*1*
**familiar**
23:*8* 89:*21*
105:*11*
215:*1*
281:*14*
**familiarity**
36:*17*
**family**
298:*20*

300:*16*
**fan** 35:*13*
**far** 205:*1*
221:*3*
**fast** 175:*1*
**fault** 268:*2*
**favor**
273:*18*
**February**
41:*2, 10, 11,*
*16*
**Federal**
8:*5* 33:*23*
87:*8* 89:*18*
90:*9, 16, 19*
92:*15* 93:*7,*
*10* 94:*4, 6*
105:*10*
127:*19*
213:*15*
214:*2, 6*
228:*10*
269:*8*
275:*11*
**Fee** 136:*22*
137:*13, 18*
138:*8*
**feel** 29:*15,*
*17* 175:*3*
189:*21*
**feels** 60:*8*
**feet** 10:*18*
**fell** 244:*9*
**felt** 31:*4, 6*
34:*7* 70:*19*
**fifteen**
255:*21*
298:*15*
**fight** 190:*1*
**fighting**
225:*14*

**figure**
92:*18*
213:*8*
215:*9*
225:*6*
291:*7*
**file** 223:*1*
**filed** 33:*23*
82:*14*
153:*21*
199:*9*
245:*21*
249:*7*
253:*16*
255:*3, 8, 13*
271:*17, 18*
296:*9, 17*
297:*8, 12,*
*21*
**filing** 3:*9*
92:*20*
**filings**
296:*22*
**fills** 292:*18*
**final** 212:*22*
**finally**
37:*23*
**finance**
159:*10*
**find** 36:*22*
75:*6* 89:*9,*
*11* 109:*21*
111:*3*
129:*10*
151:*16*
153:*9*
185:*23*
187:*7*
257:*11*
284:*10*
**finding**
224:*18*

268:*8*
277:*11, 12*
**findings**
273:*12*
**finds** 182:*3*
**fine** 38:*12*
39:*13* 53:*5*
59:*18*
117:*4*
212:*9*
**fingernail**
231:*12*
**finish** 19:*2*
38:*16*
**finished**
135:*20*
242:*14*
306:*9*
**finishes**
256:*10*
**Fire**
138:*18*
139:*10, 14*
141:*8, 12,*
*17* 158:*4*
165:*5*
171:*11, 14*
173:*3*
175:*9, 22*
**fired**
243:*22*
**firm** 33:*3,*
*4* 41:*23*
107:*9*
124:*10*
**first** 8:*16*
32:*21* 35:*9,*
*23* 36:*22*
51:*13*
53:*11*
68:*13*
69:*17*

105:*23*
114:*17, 20,*
*22, 23*
115:*3, 4, 8,*
*11, 12, 14,*
*19* 128:*14*
140:*17*
143:*21*
156:*2, 19,*
*20, 21*
157:*1*
169:*17, 19*
170:*3, 9*
189:*13*
222:*13*
235:*11, 21*
238:*21*
249:*13*
251:*4, 13*
255:*12*
261:*18*
262:*10*
266:*1, 7*
271:*18*
287:*15*
297:*11, 20*
298:*13*
**fitters**
173:*8*
**five** 131:*6*
132:*7, 9*
210:*15*
226:*11*
266:*13*
271:*10*
273:*5*
277:*8*
278:*1, 5*
279:*18*
**flesh** 186:*8*
**flexible**
38:*10*

**flipping**
303:*23*
**floor**  156:*2,
19, 20, 21*
157:*1*
159:*2, 3, 6,
9, 12, 13, 22*
230:*13, 15,
18*
**fluctuate**
109:*13*
**focus**  34:*4*
**focused**
143:*16*
181:*7*
**folder**
26:*20*
27:*12*
37:*11*
**follow**
35:*14*
89:*15*
135:*3*
141:*7*
171:*16*
173:*2*
175:*8, 21*
182:*19*
184:*2, 12*
206:*18*
252:*17*
**followed**
35:*6*  111:*6*
191:*16*
202:*5*
262:*12*
**following**
8:*12*  35:*4,
7, 21*  192:*1*
193:*11*
215:*15*

244:*14*
275:*8*
**follows**
8:*17*
**force**  2:*20*
**FORD**  5:*3*
**foregoing**
8:*6*  308:*7,
10*
**foreign**
105:*10, 11*
**forget**
171:*18*
274:*19*
**form**  3:*3*
16:*18, 20*
42:*23*
48:*19*
55:*21*
56:*10*  57:*4,
10*  71:*15*
82:*16, 20*
83:*2*  84:*11,
17*  93:*22*
96:*4, 16*
97:*15, 19,
22*  99:*5, 18*
103:*23*
107:*6*
108:*21*
110:*1, 7*
111:*9, 15*
112:*5*
121:*12*
122:*6*
132:*19*
135:*1*
138:*4*
139:*17*
140:*16*
151:*3, 19*
173:*21*

174:*20*
176:*6*
186:*20, 22*
187:*11*
190:*18*
193:*16*
196:*21*
200:*3*
206:*1, 2, 10*
207:*2*
237:*17*
238:*6*
254:*16*
255:*4, 6, 10,
18*  256:*21*
264:*13, 22*
265:*8*
271:*6*
272:*17*
288:*7*
290:*10*
296:*2*
**formal**
13:*19*
38:*10*
281:*5*
**format**
165:*19*
**formed**
16:*3*  60:*22*
**forth**  2:*6*
119:*18*
201:*17*
220:*15*
274:*15*
**forty-four**
53:*15*
**forward**
210:*19*
215:*12*
296:*10*

**forwarded**
299:*5*
**forwarding**
297:*6, 9*
**found**
65:*21*
148:*21*
186:*11*
189:*3*
222:*3*
226:*15*
266:*2*
**four**  15:*19*
64:*3*
224:*20*
**fourteen**
255:*21*
**fourth**  41:*6*
270:*10*
**free**  112:*2,
11*
**frequency**
211:*3*
**fresh**  38:*12*
**front**  41:*23*
44:*18*
57:*20*  59:*4,
8*  101:*11*
108:*10*
109:*20*
112:*8, 21*
113:*7*
133:*23*
134:*4*
138:*6*
139:*6*
144:*15*
156:*1*
170:*8*
176:*21*
219:*1*
228:*19, 23*

**fulfill**
104:*8, 14*
**fulfilling**
141:*8*
**full**  2:*20*
9:*8, 10*
237:*5*
**fully**  62:*8*
68:*17*
83:*13*
**function**
12:*22*
20:*17*
282:*4*
**functions**
12:*15*  13:*6,
8*  21:*7*
**funds**
305:*4*
**furnished**
79:*13*
**furnishing**
144:*18*
**FURTHER**
2:*17, 23*
3:*8*  29:*10*
55:*5*  121:*4*
306:*14*
307:*12*
308:*13*
**future**
26:*10*

**< G >**
**G**  51:*14*
289:*3*
**gamut**  20:*7*
**Gappa**
51:*8, 10*
122:*12, 16*
141:*4*

G-a-p-p-a
51:*8*

**gate**
124:*23*
133:*1*
171:*17*
280:*16*

**gates** 49:*8*
98:*12*

**gender**
31:*12*
202:*13*
220:*3, 10*
221:*15*

**General**
5:*15* 12:*16*
17:*18* 74:*9,
16* 87:*7*
90:*23*
94:*17*
99:*22*
103:*3*
124:*19*
125:*23*
126:*2*
142:*2, 5, 12*
159:*1, 14,
23* 160:*19*
163:*19*
171:*12*
188:*18*
189:*6, 8, 22*
190:*14*
216:*23*
217:*4*
229:*9*
230:*5*
246:*1*
250:*4, 8*
266:*10*
268:*16*
269:*20*

281:*6, 7*
285:*3, 5, 8,
11* 286:*6,
13, 15, 20*
302:*15*

**generally**
99:*15*

**generate**
108:*8*

**generated**
197:*3*

**generating**
189:*9*

**getting**
130:*19*
136:*19*
212:*8*
262:*15*
275:*7*
299:*6*

**give** 23:*22*
26:*9* 29:*8*
33:*10* 51:*2*
59:*14* 60:*1*
92:*17*
144:*6*
157:*15*
174:*23*
220:*20*
242:*11*
278:*14*
284:*21*
301:*8*
306:*4, 7*

**given**
29:*19* 30:*2*
33:*22*
36:*15*
84:*15* 87:*4*
163:*7*
174:*3*
186:*10*

193:*13*
199:*10*
200:*1*
202:*13*
218:*13*
308:*12*

**gives**
128:*12*
142:*20*
252:*9*

**giving**
25:*10* 33:*8*
190:*1*
267:*6*

**glad** 228:*2*
**glance** 25:*3*
**glanced**
263:*11*
265:*23*

**glasses**
230:*6, 16,
19*

**Gloria**
232:*21*
233:*3*
278:*20*
280:*22*
289:*1*
290:*17*

**GloriaRobin
son@HMMA
USA.com**
289:*3*

**go** 32:*2*
34:*1* 36:*18,
19* 38:*7*
39:*1* 49:*19*
52:*7* 62:*1,
18* 64:*3*
68:*9* 95:*2*
117:*3*
119:*20*

132:*22*
138:*23*
140:*13*
143:*20*
145:*10*
146:*11*
157:*23*
162:*7, 8*
163:*13*
171:*18*
175:*3*
180:*10*
185:*12*
187:*6*
188:*9*
189:*5*
190:*11*
191:*7, 21*
192:*4*
193:*20*
200:*10*
203:*4*
226:*9*
240:*3*
247:*9*
253:*12*
256:*9*
258:*4*
268:*14*
270:*10*
271:*8*
274:*2*
286:*21*
291:*16*
293:*10*

**goal** 106:*19*
**goes** 48:*2*
80:*7* 94:*5*
119:*14*
170:*16*
192:*10*
195:*14*

220:*13*
291:*7*

**going** 9:*4*
10:*7* 13:*22*
14:*1, 2*
15:*9* 21:*22*
23:*18, 23*
33:*11* 34:*9*
36:*2, 3*
37:*1* 39:*6*
45:*20*
47:*13* 48:*4*
50:*23* 53:*2,
3* 55:*2, 6*
56:*12, 15,
20* 58:*4*
61:*6, 18*
64:*17, 21*
65:*3, 10, 12,
15* 66:*13*
81:*15*
86:*12*
88:*12*
99:*15*
100:*3*
103:*10, 19*
104:*7*
110:*17*
123:*22*
129:*11*
130:*23*
134:*8*
136:*6*
137:*10, 23*
138:*22*
140:*13*
141:*2, 10*
143:*19*
144:*5*
146:*11*
148:*15*
153:*19*

155:*18*
157:*3, 7, 15, 23*  158:*6*
164:*11*
166:*22*
172:*17*
179:*23*
180:*4, 5*
181:*22*
185:*16*
186:*3, 8*
196:*8*
200:*17*
202:*22*
203:*4*
204:*4, 22*
207:*9*
218:*15*
221:*13*
222:*6*
225:*12, 14, 16, 21*
226:*4*
235:*5*
244:*10*
245:*2*
248:*11*
256:*1, 9*
258:*23*
259:*2, 12*
262:*19*
267:*18*
273:*8, 21, 23*  276:*4, 7, 9, 10*  277:*8*
283:*9*
287:*9*
295:*18*
304:*22*
**golf**   131:*2, 4, 7, 15*
132:*7, 9*

**good**
24:*18*  39:*1*
51:*11*  53:*3*
86:*10, 11*
117:*3, 5*
164:*11, 15*
183:*9*
256:*16*
272:*9*
289:*17, 19*
**goodness**
158:*22*
**goods**
99:*11, 12*
105:*19*
**G-o-r-d-i-e**
19:*9*
**Gordy**
18:*18*
194:*23*
209:*14, 23*
**G-o-r-d-y**
19:*10*
**Gordy's**
18:*20*  19:*8*
**gotten**
122:*18*
**governance**
151:*9*
152:*8*
**government al**  90:*4, 8*
**granted**
219:*7*
**gray**  15:*13*
131:*2*
**great**  15:*9*
**greater**
174:*13*
**grief**
157:*16*

**grooming**
143:*5, 13*
148:*4, 6*
149:*15, 19, 20, 22*
227:*12, 19*
236:*3, 9, 15, 18*  237:*11, 15, 19*
238:*8, 9, 13, 19, 21, 23*
239:*2, 5, 11, 23*  241:*1, 2, 11*  242:*9, 21*
**grounds**
3:*5*
**group**  18:*5*
19:*18, 19*
20:*14*
77:*15*
94:*15, 19*
168:*5*
280:*13*
299:*2*
**group's**
301:*1*
**guarantee**
84:*4*
218:*13*
**guard**
133:*4*
**guarding**
98:*21*
**guards**
133:*1, 2, 3*
189:*15, 16, 21*
**guess**  16:*2*
27:*2*  28:*1*
34:*15*
35:*18*

40:*13*  47:*3, 4*  49:*9*
54:*12, 13*
75:*7*  93:*13, 14, 17*
104:*18*
132:*14*
137:*22*
139:*21*
143:*1*
157:*7*
162:*5, 18*
163:*1, 2*
166:*22*
176:*8*
198:*1*
199:*18*
234:*8*
243:*4*
299:*2*
**guessing**
231:*9*
**guidelines**
129:*1*
135:*3*
139:*12*
141:*7*
171:*15*
175:*10*
176:*9*
181:*20*
213:*13*
214:*5*
229:*16*
276:*12*
**guides**
45:*22*
**guys**  52:*13*
56:*18, 20*
75:*13*
89:*23*
179:*18, 23*

203:*15, 19, 21*  204:*5*
258:*6*

**< H >**
**H**  165:*11*
166:*1, 7, 17*
167:*7, 8, 10*
**hair**  150:*2*
231:*12*
233:*5, 7*
237:*22*
239:*18*
241:*7*
243:*9*
244:*3*
**hairstyle**
143:*13*
241:*11*
242:*8, 20*
243:*19, 23*
247:*5*
**half**  117:*6*
226:*11*
**hand**  165:*8*
**Handbook**
6:*16, 18*
138:*18*
139:*6, 10*
140:*4, 22*
141:*5, 12, 14*  165:*6, 12*  169:*9*
170:*4, 18*
171:*11*
173:*2*
175:*10*
176:*9*
177:*9, 10, 13, 15, 17*
178:*1, 4, 6, 8, 11, 16*

179:*7, 9, 12, 21*  180:*1, 21*  181:*1, 2, 15, 20*
190:*23*
193:*1, 9, 15, 18, 21*
195:*14*
213:*14*
214:*12, 17*
**handbooks**
26:*23*
**handle**
125:*2*
**handouts**
23:*3, 13*
**hands**
193:*21*
**handwriting**
140:*9, 10*
**handwritten**
49:*22*
140:*23*
**happened**
224:*5*
257:*4*
**happens**
54:*22*
212:*12*
**happily**
138:*23*
**harassment**
191:*3, 11*
195:*17*
197:*19*
205:*22, 23*
223:*8*
**hard**  72:*23*
84:*21*
99:*19*
100:*17*
137:*10*

174:*23*
175:*1*
177:*7*
193:*15, 20*
230:*7*
296:*19*
301:*2*
**harmless**
66:*2*  87:*13*
**Harris**
169:*10, 11*
171:*19*
172:*5*
217:*22*
219:*4*
274:*19*
**HARRISON**
5:*3*
**hat**  230:*7*
244:*9, 11*
**hazards**
230:*2*
**HEA**  16:*12, 13, 16*  17:*2, 8*  27:*17, 18*
28:*14, 15, 16, 17, 18, 20*  32:*15*
42:*19*
43:*13*
44:*15*
46:*14, 23*
48:*17, 20, 23*  51:*7, 17*
52:*19*  55:*3, 20, 22*  56:*8, 12*  57:*2, 14, 18*  58:*2, 7, 17, 21*  59:*2*
60:*13, 15*
61:*2, 8, 11, 18*  62:*3, 15*

64:*13*  65:*2, 16, 18, 22*
66:*5, 20*
67:*11, 13*
69:*5, 11, 12, 13*  71:*5, 11, 18*  72:*9, 10, 20*  73:*10*
78:*23*  79:*7, 18*  80:*12*
81:*19, 22*
82:*4*  83:*9, 16, 22*  84:*8*
85:*9*  89:*6, 8*  91:*16, 21*
92:*5, 9, 14, 23*  93:*9*
97:*12*  98:*5, 20*  99:*3*
106:*12*
107:*3*
108:*8, 17*
113:*10, 13*
116:*11, 14, 18*  119:*21*
120:*15*
123:*16, 23*
124:*7, 8*
125:*16*
126:*1, 10*
131:*1*
154:*14*
155:*3*
166:*16*
185:*4, 13, 21*  186:*10*
187:*20*
188:*1, 16*
231:*18, 19*
232:*1, 16*
233:*21, 22*
234:*20*

235:*22*
238:*4*
242:*6, 18*
249:*5*
250:*9*
252:*5*
254:*15, 22*
255:*2, 9, 16*
257:*8*
258:*8, 10, 22*  259:*4, 19*  282:*18, 21*  283:*1, 19*  286:*1, 21*  287:*2, 16*  289:*4, 9, 11, 13*
290:*4*
291:*12*
292:*23*
294:*20*
299:*8, 22*
301:*13, 17*
304:*19*
305:*3*
**head**  12:*10*
18:*5, 18*
188:*18*
194:*13, 16*
196:*8*
197:*1, 16*
257:*20, 21*
**heads**  13:*7*
17:*17*  18:*6*
35:*10*
**health**
12:*20*
17:*19*
147:*23*
159:*11*
**hear**  40:*12*
82:*22*  83:*5*

85:*21*
97:*17*
**heard**  9:*7*
245:*19*
248:*23*
249:*3*
300:*6*
**hearing**
256:*7*
**HEA's**  61:*6*
62:*9*  85:*11*
239:*2*
283:*5*
**Heather**
2:*3*  4:*5, 6*
9:*3*  59:*14, 23*  185:*7*
187:*22*
257:*19*
297:*23*
**held**  12:*8*
13:*10*
14:*16*  65:*7*
164:*17*
282:*21*
302:*2*
303:*7*
306:*21*
**help**  20:*14*
51:*3*  55:*4*
57:*1*  277:*8*
**helped**
261:*7*
**helps**  61:*4*
179:*6*
**hereto**
14:*5*  24:*8*
26:*13*  40:*4*
68:*19*
144:*12*
155:*23*
165:*3*

176:*16*
216:*11*
228:*16*
231:*22*
232:*19*
235:*1*
248:*16*
252:*23*
260:*10*
261:*15*
263:*9*
265:*20*
283:*23*
287:*6*
295:*2*
299:*12*
301:*16, 21*
**hereunder**
80:*16*
**Hey**
190:*11*
193:*4*
244:*10*
253:*16*
289:*7*
**higher**
175:*2*
**hire**  54:*16*
198:*12*
215:*3*
**hired**
198:*17*
246:*22*
**hiring**
19:*18*
49:*15*
192:*4*
**history**
175:*15, 17,*
*18*  176:*1*
**hit**  143:*21*
**HMM**  285:*1*

**HMMA**
9:*18, 19*
10:*9, 12, 14,*
*21*  13:*13*
14:*16, 19,*
*21*  15:*2, 4,*
*6, 18, 21*
16:*1, 2*
17:*2, 4*
22:*10, 14*
25:*6, 10*
30:*3, 5, 20*
32:*10, 15*
35:*20*  36:*4,*
*23*  37:*23*
39:*17, 23*
42:*19*
43:*12, 13*
44:*15*  45:*6,*
*12*  47:*23*
48:*7, 10*
49:*14, 22*
51:*8, 16, 22*
53:*8, 12, 21,*
*23*  54:*15*
55:*20*  57:*2*
58:*3, 16, 23*
59:*2*  60:*4,*
*19*  62:*3, 11,*
*15, 16, 21*
63:*21*  64:*7,*
*12, 22*  65:*2,*
*7, 15, 19, 21,*
*22*  66:*6, 7,*
*10, 12, 19,*
*22*  67:*4*
68:*11, 15*
69:*2, 3, 13,*
*18*  70:*2, 6,*
*7, 16*  71:*10,*
*20*  72:*7, 9,*
*10, 17, 19*

73:*2, 10, 19*
74:*1, 5, 7,*
*18, 21*  75:*1*
76:*3*  78:*1,*
*6, 18, 20*
79:*1, 8, 13*
80:*11, 18*
81:*5, 8, 12,*
*23*  82:*5, 8,*
*13*  83:*10,*
*13, 23*  84:*7,*
*9, 13, 15, 21*
85:*11, 16*
86:*18, 23*
87:*13, 23*
88:*1, 15*
90:*21*
91:*15, 19*
92:*4, 8, 13*
93:*1, 5, 8*
94:*7, 10*
95:*9*  97:*12*
98:*5*
100:*13*
101:*13*
102:*5, 11,*
*13*  103:*7, 9,*
*19*  104:*13,*
*17, 19*
106:*3, 15,*
*21*  107:*4,*
*10, 14*
108:*7, 16,*
*18*  110:*4,*
*16*  111:*4*
113:*1, 11,*
*20*  114:*17,*
*21, 22*
116:*9, 17*
117:*20*
118:*18*
119:*1, 6, 9,*

*11, 18*
120:*7, 8, 22*
121:*7*
123:*17, 23*
124:*5, 20*
125:*3, 4, 7,*
*14, 16, 19,*
*20*  126:*1, 2,*
*4, 7, 10, 16*
127:*2, 4*
128:*6, 22*
129:*3, 22*
130:*6*
133:*16*
134:*11, 16,*
*19*  135:*6, 8*
136:*11, 16,*
*21*  137:*5*
139:*6, 7*
141:*10, 18*
142:*1, 14*
145:*6, 8*
146:*19, 22*
147:*6, 10,*
*14, 19*
148:*15, 21*
149:*22*
150:*6, 19*
151:*8, 16*
152:*7*
153:*3, 11*
154:*3, 8, 9,*
*14*  155:*2, 5,*
*8, 13, 20*
156:*3, 22*
161:*16*
163:*5, 20*
164:*23*
166:*9*
168:*20*
169:*11*
171:*19*

172:*1, 21*
173:*4, 6, 13,*
*18*  174:*9,*
*11, 13*
175:*6, 14,*
*21*  176:*3,*
*12*  177:*1,*
*21*  178:*4*
179:*3*
181:*1, 9, 11,*
*14, 16*
182:*3, 5, 10*
183:*1, 2, 8,*
*15, 23*
184:*3, 13,*
*15*  185:*4,*
*11, 13*
186:*4, 10,*
*12*  187:*16,*
*19*  188:*15*
189:*3, 10*
190:*5, 11,*
*19, 21, 22*
191:*6, 14,*
*23*  192:*3, 5*
194:*13*
198:*5, 11*
202:*5, 10*
210:*17*
213:*13*
214:*21*
215:*4*
216:*1, 5, 8,*
*17*  217:*10,*
*13, 20*
222:*3, 8, 21*
223:*4, 16,*
*18*  227:*11,*
*18*  228:*6, 8,*
*12*  229:*5, 7*
232:*11, 23*
233:*5, 8, 10,*

11 234:12
236:6, 18
237:2, 3, 8,
11, 13, 21
238:7
239:11, 22
240:4, 6, 8,
18, 21
241:2, 6, 10
242:5, 17,
18 243:10,
18, 22
244:2
245:8, 16
246:1, 8, 13,
16, 22
247:1, 4, 8,
13, 14, 16,
21 248:1, 6,
20, 23
249:5
250:14, 19
251:7, 13,
19, 23
252:4, 13
253:1, 6, 14,
15 254:7,
15 255:2, 8,
16, 23
256:4, 8, 17
257:7, 13
258:8
259:18, 19
260:13, 15,
19, 22
261:12
262:1, 2, 6,
11, 22
263:5, 14,
21, 23
264:3, 9, 16,
17 265:1, 3,

5, 11 266:2,
8 267:3, 10
268:8
269:8
270:1, 3, 6
271:3, 19,
21 272:13
273:10, 12,
17, 22
274:2, 8
275:5
276:8
277:23
278:9, 16,
19 279:1, 7,
20 280:4,
16, 22
281:2, 13,
20 282:1, 4,
7, 16, 20, 23
283:4
284:3, 18
285:3, 5, 7
286:6, 13
287:17, 19
288:15
289:4, 12
290:5, 6, 13,
17, 22, 23
292:20
294:3, 9, 13,
15 296:15,
17, 23
297:6, 11,
18, 20
298:6, 13
299:5
300:5
302:12, 20
303:10, 14
304:18
305:16

**HMMA's**
41:12
44:23
47:15, 17
48:21
56:22
57:18 58:1,
6 63:9, 10
64:7 67:9,
20 68:18
69:1, 6
88:5 93:3
98:21 99:4,
16 100:4, 9
126:12
172:7
174:4
180:16
181:10, 15
183:6, 17,
20, 21
185:5
186:6
194:14, 15,
16 196:10
201:10
212:18
222:18
223:11, 22
228:9
238:9, 13,
19 241:1,
15 245:6,
12, 15
249:13
251:17
260:5
261:21
263:18
267:12
278:17
280:15, 18

286:20
288:2
291:10
292:9
298:19
299:19
300:20
**HMMAUSA.
com**
153:22
154:10
287:22
288:2, 12,
14 300:21
**HOD** 21:13,
17 101:18
**hold** 65:15
66:2
251:22
252:5
**home**
29:11
237:12
**honestly**
258:11, 14
**hope**
159:16
166:14
**hopefully**
153:18
226:3, 7
**hour** 53:3
117:6, 8
**hourly**
46:13
136:16, 23
137:2, 17,
20, 23
138:1, 12
**hours** 29:5,
7 114:8, 10,
16, 23

115:10, 12,
20 116:4,
11, 14, 19
124:18
160:18, 19,
21, 23
161:2
**housed**
158:17
**Howell**
278:21
281:18
**HPT** 16:17
**HR** 11:2, 8,
11, 18 12:3,
9, 16 17:13
18:4, 15, 18
19:13, 17
20:9, 13, 16
21:7 196:8
197:1
208:20
209:1, 8, 10,
11, 15, 19,
23 269:14
279:15
**HR-AL-EHS-
SF-External**
165:13
**human**
13:4 17:19,
20 18:23
19:15 96:9
159:14
194:13, 16,
19 197:16
198:8
266:17, 20
268:7
271:2
272:11

**humans**
13:*12*
**hundred**
10:*17*
53:*15*
158:*10*
**hundreds**
175:*4*
**hung**
114:*12*
**hygiene**
230:*21*
231:*3, 9*
**HYUNDAI**
1:*10, 11*
5:*16*  9:*12,
14, 15, 16,
23*  10:*5, 8,
10*  12:*15*
13:*21*
15:*22*  16:*1,
5, 7, 8, 11,
14, 17*  17:*3,
4, 8*  32:*10*
39:*21, 22*
40:*23*  41:*1*
42:*6*  45:*9*
46:*22*
48:*11, 12,
13, 15, 17*
53:*20*  56:*1,
14*  57:*21,
22*  60:*14,
15*  61:*7*
62:*12*
65:*17*  72:*4*
76:*10, 11*
77:*10, 18,
21*  82:*4*
90:*6*  94:*18*
96:*8*  97:*1,
2, 5, 7, 8*

98:*8, 9, 12,
13, 15, 19*
99:*1, 2, 9,
23*  100:*1*
102:*8*
107:*7, 11*
108:*3*
111:*18*
113:*4*
116:*9*
119:*19*
120:*8*
123:*2*
124:*8*
125:*21*
126:*3*
128:*20*
131:*19, 23*
132:*3*
137:*14*
138:*8, 9, 16*
141:*9, 13,
23*  142:*17*
153:*2*
156:*15*
161:*10*
165:*11*
166:*2, 5, 8,
10, 11, 13,
17, 19, 21*
167:*1, 3, 7,
8, 11, 12, 14,
15, 18, 20,
23*  168:*1, 2,
3, 4, 5, 6, 10,
13, 14, 16,
22*  169:*5*
180:*15*
187:*13*
188:*20*
237:*20*
238:*2*

245:*7*
249:*20*
253:*20, 23*
254:*7, 19*
256:*18, 19*
257:*2*
275:*18*
278:*23*
280:*9*
281:*22*
285:*10, 12,
15, 20*
286:*17*
288:*14*
290:*12*
292:*3, 6*
293:*8*
294:*5*
299:*1*
302:*10, 11,
15, 19*
303:*4*
304:*6, 8, 22,
23*
**Hyundais**
10:*7*
**Hyundai's**
58:*6*

**< I >**
**I**  2:*8*  6:*1*
8:*1*  9:*6, 7,
13*  11:*1, 22,
23*  12:*10,
11*  13:*5, 6*
14:*12, 20*
15:*1, 5, 8,
10, 12*  16:*2,
16*  17:*10*
18:*7, 16*
19:*4*  21:*10,
14*  22:*8, 13,*

*17, 18, 22,
23*  23:*4, 16,
17, 20, 22*
24:*17, 21*
25:*4, 12, 18,
23*  26:*1, 2,
5, 6, 9*  27:*2,
9, 16*  28:*1,
2, 4*  29:*1,
10, 17, 21,
23*  30:*13,
17, 22, 23*
31:*8, 14, 18*
32:*3, 20*
33:*1, 7, 11,
12, 13, 14,
21*  34:*1, 3,
11, 14, 16,
19*  35:*3, 5,
12, 18*
36:*17, 19*
37:*9, 13, 21*
38:*5, 14, 20,
21*  39:*6, 11,
12, 18, 19*
40:*20*  41:*5,
6, 7, 8, 23*
42:*1, 9, 14,
15*  43:*17*
44:*3*  45:*8,
15*  46:*13*
47:*3, 7, 23*
48:*14*  49:*9,
12, 18*  50:*7,
8, 14, 23*
51:*11, 18*
52:*1, 2, 4, 6,
9, 10, 17, 18*
54:*5, 12, 13,
20*  55:*6, 9,
16*  56:*9, 11*
57:*2, 4, 8, 9,*

*11, 12*
58:*19*  59:*4,
8, 10, 12*
60:*3*  61:*7,
9, 10, 21*
66:*1, 5, 17*
67:*2, 7, 22*
68:*4, 6, 13*
70:*12*  71:*7,
13*  72:*1, 13*
73:*8, 12, 17*
74:*13, 14,
19*  75:*6, 7,
13, 21*  76:*6,
20*  77:*11,
13, 20*  78:*9*
79:*9, 10, 13,
20*  80:*18,
23*  81:*9, 10,
13*  82:*3, 22*
83:*1, 5, 6,
11, 20*  84:*2,
3, 4*  85:*2,
16, 18, 20*
86:*5, 12*
87:*12*  89:*4,
7, 9, 19, 20*
90:*9, 11, 15*
91:*8, 22*
92:*3, 17, 18*
93:*12, 14,
17, 23*
94:*15, 19*
95:*6, 13, 21*
96:*5, 18*
97:*16, 18,
21, 22*
99:*22*
101:*2, 3, 8,
14, 15, 17,
23*  102:*1, 7,
9, 15, 22*

103:*1, 3, 12, 13, 15*
104:*10, 18, 22*   105:*2, 15, 20, 23*
107:*7, 18*
108:*3, 16, 22*   109:*18, 21*   110:*12, 22*   111:*1, 3, 23*   112:*7, 18*   113:*2, 12, 16*
114:*10, 12, 20*   116:*6, 15*   117:*22*
118:*7, 8, 11, 17, 20*
119:*7*
120:*18*
121:*1, 5, 21, 23*   122:*4, 5, 7, 8, 13, 14*
123:*11, 18*
124:*1*
125:*20*
126:*2, 8, 13, 18*   127:*3, 10, 15, 20*
128:*6, 8*
129:*9, 10, 17*   130:*14*
131:*6*
132:*14, 20, 21*   133:*10, 17, 18, 20*
134:*2, 3, 8*
135:*14, 20*
137:*8, 22*
138:*6, 22*
139:*3, 5, 11, 13, 21*

140:*1, 3, 21*
141:*2, 13, 20*   142:*2, 9*
143:*1, 20*
144:*1, 14*
145:*7, 9, 19, 20*   146:*2, 4, 7, 11, 15*
148:*15*
149:*6, 12*
150:*22, 23*
151:*16, 17*
152:*16, 17, 23*   153:*15, 18*   154:*11, 12*   156:*1, 20*   157:*3, 7, 19, 21, 23*
159:*2, 7, 16, 21*   161:*18*
162:*4, 5, 17*
163:*9*
164:*12, 21*
165:*7, 15, 18, 23*
166:*14, 22*
168:*8, 11, 18*   169:*1, 7, 23*   170:*5*
171:*6, 18*
172:*13, 23*
173:*22*
174:*6, 16*
175:*1, 2, 18*   176:*7, 8, 11, 21*   177:*5, 12, 19*
178:*1, 5*
179:*8, 11, 12*   180:*3, 9, 20, 21*
181:*19*

184:*6*
185:*10, 16, 18*   186:*16, 22*   187:*2, 4, 5, 9, 12, 17, 21, 22*
188:*8, 10, 12, 17*
189:*20, 21*
190:*3, 7*
191:*7, 20*
192:*18*
193:*10*
194:*6, 18*
195:*8, 10, 11, 12, 20*
196:*4, 6, 15*
197:*23*
199:*14, 18, 22*   200:*19*
202:*10*
204:*7, 11*
205:*5, 15, 16, 22*
206:*11, 21*
207:*3*
208:*14, 22*
210:*5, 8, 13, 17, 20*
211:*14*
212:*4, 7, 8*
214:*7*
215:*19*
216:*15*
217:*23*
218:*13, 14, 19*   219:*1*
220:*22*
221:*20*
223:*11*
224:*4, 9, 12, 15, 20*

225:*5, 8, 9, 10, 15, 19, 22*   226:*8, 22*   227:*1, 3, 4, 5, 17*
228:*4, 19*
231:*1, 5, 14, 23*   232:*5, 9, 13, 14, 15, 22*   233:*13, 14, 17, 19, 20, 22*
234:*8, 15, 17*   235:*5, 6, 9, 11*   236:*2, 11, 17*
237:*18*
238:*1*
239:*15*
241:*4, 5, 13*
242:*2, 10, 11, 12*
243:*4, 12*
244:*7*
245:*1, 3, 9*
246:*5, 9, 17*
247:*19, 23*
248:*10, 18*
250:*1*
251:*5, 6, 9*
252:*2, 6, 16, 19*   253:*11, 14, 18*
254:*3, 16, 17, 20*
256:*12, 13, 23*   257:*5, 9, 10, 16, 19, 20, 21*
258:*1, 3, 7, 11, 12, 14, 23*   259:*5,*

*21*   260:*2, 18, 21*
261:*10, 17, 19*   263:*3, 11*   264:*5*
265:*9, 16, 23*   266:*9, 10, 11, 12, 13, 14, 16*
267:*1, 7, 8, 23*   268:*21, 23*   269:*4, 20*   270:*2, 8, 9, 11, 17*
271:*5, 9, 13, 14, 15, 20*
272:*7, 18, 19, 20, 23*
273:*9*
274:*2, 14*
275:*1, 3, 5, 7, 23*
276:*15, 16, 18*   277:*13, 17*   278:*12, 13*   279:*11, 17*   280:*2, 9, 11, 23*
281:*1, 10, 15, 16*
282:*2, 12*
283:*3, 6, 7, 13*   284:*5, 9, 10, 15, 20*
285:*20*
286:*15*
287:*14*
288:*8*
289:*11, 16, 17, 18, 23*
290:*3, 11, 15, 19*

291:1
293:15
294:1, 11, 16, 17
295:4, 13, 21  296:5, 11, 13, 18
297:4, 9, 14, 22  298:22
299:2, 3, 15
300:13, 17, 23  301:4, 5, 6, 7, 8
302:21
303:23
304:7, 14
305:7, 8, 17, 22  306:3, 6, 9, 13, 17, 19
308:1, 6, 13, 15
**I-65**  167:9
**idea**
135:14
163:19
221:21
234:15
295:13
**identificatio n**  14:4
24:7  26:12
40:3  88:17
144:11
155:22
165:2
176:15
216:10
228:15
231:21
232:18
234:23
248:15

252:22
260:9
261:14
263:8
265:19
283:22
287:5
295:1
299:11
301:15, 20
**identified**
27:7  28:8, 11  48:20
54:4  55:11, 13  87:2
113:19
114:7
116:19
125:9
130:1
144:18
147:3, 7
165:4
203:5, 7
218:4
220:8
228:17
278:17
279:7
284:2
292:2, 4
305:17
**identifier**
52:4  294:5, 9
**identifiers**
296:1
**identifies**
173:4
**identify**
55:12
146:19

148:2
150:10
166:4, 17
201:9
202:11
205:21
227:4
233:22
238:3, 7, 8, 23  239:4
**identifying**
202:15
**identity**
167:19
**ignore**
237:7
**II**  302:22
**imagine**
52:18  60:3

**immediately**
89:14
**implemente d**  88:1
111:6
202:5
**imply**
65:14
79:13
238:10
**implying**
239:1
**importance**
215:15
**important**
37:4  48:3
52:6  56:12
200:11
204:8
267:2
**impression**
80:18

**improper**
57:8
**inbound**
125:3
**include**
20:9  75:20
76:17
100:15
189:18
**included**
31:19  46:9
62:20, 23
67:23  68:3
69:22  70:1
148:3
265:6
279:7
**includes**
12:16
63:16
75:21
208:4
223:23
**including**
49:7  68:19
72:20
75:12
88:16
203:2
213:16
**inclusion**
69:18
71:21
72:18
73:20  78:2
264:19

**inconsistent**
242:8, 20
**incorporate d**  16:6, 8

87:10
**incur**  64:15

**independent**
95:8, 10
96:13  99:1, 21
**INDEX**  6:3, 10
**indicate**
120:2
178:14
**indicates**
252:10
261:21
286:20
**indicating**
26:20
300:4
**indication**
284:21
**indicative**
190:4
**individual**
35:20
67:22
122:12
131:21
136:4
138:7
141:5
156:10
161:20, 22
162:7, 8, 17
181:21
192:7
193:12, 18
199:7
206:7, 22, 23  207:14
208:2
223:9

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 118 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 316 of 425

Robert Burns                                                    6/22/2022
                                                                    117

224:*15*
231:*7*
239:*16*
255:*22*
283:*7*
285:*13*
292:*12, 15*
293:*1, 13,
18*  305:*17,
18, 23*
**individuals**
21:*6*  49:*10*
50:*17*  69:*8*
98:*6*  120:*3*
183:*19, 20*
184:*10*
190:*12*
193:*2*
198:*21*
223:*13*
224:*2*
229:*21*
**individual's**
35:*17*
**inform**
185:*2*
**information**
14:*14*
26:*23*
36:*23*  37:*2*
39:*9*  42:*10*
44:*4*  45:*19,
21*  47:*7*
60:*1*  73:*13*
78:*14*
79:*11*  80:*7,
14*  101:*11*
103:*2*
112:*8*
126:*14*
127:*20*
138:*6*

142:*6, 12*
144:*18*
145:*4*
146:*20*
151:*8, 21*
152:*8*
153:*9*
178:*2, 15*
181:*3*
190:*13*
201:*3*
202:*15*
209:*6*
217:*23*
218:*19*
219:*1*
221:*7*
226:*6*
241:*16*
243:*5*
249:*19*
250:*8*
251:*14*
253:*21*
254:*10*
258:*8*
260:*23*
262:*18*
264:*23*
265:*2*
267:*15*
273:*21*
279:*12*
292:*22*
293:*14*
300:*14*
302:*23*
**informed**
249:*5, 16*
255:*23*
267:*7, 9*

**informing**
283:*1*
**initial**  51:*9*
147:*4, 6*
207:*12*
278:*10*
279:*8*
**initialling**
103:*5*
**initials**
49:*23*  50:*4,
5, 13, 22*
120:*2*
121:*15, 17*
122:*10, 11,
22*  285:*16*
**injury**
64:*22*  65:*4,
16, 20*  66:*7*
**Inkyu**
295:*19*
**I-n-k-y-u**
295:*20*
**input**
113:*14*
128:*22*
129:*3*
130:*6*
232:*11*
**in-service**
124:*3, 5, 12,
14*  125:*8*
**inside**
171:*17*
175:*10*
237:*1*
**instruct**
276:*16, 17*

**instructions**
63:*9*

124:*19*
237:*7*
**insurance**
81:*11, 18,
20*  82:*1, 6,
9, 11*  83:*14,
22*  84:*9*
85:*10, 12*
145:*11, 13*
146:*3, 4, 14,
16*
**intend**
300:*4*
**interaction**
281:*11, 15,
19*  285:*9,
18*  297:*2*
**interactions**
155:*2*
**interest**
80:*10, 18*
**interested**
200:*9*
308:*16*
**interfere**
63:*10*
**internal**
90:*18*
201:*9, 19*
202:*11, 16*
203:*2, 5*
220:*2, 9*
223:*4, 18*
226:*15*
**internally**
197:*18*
221:*17*
222:*21*
**interpret**
54:*20*
76:*20*
95:*21*  96:*6*

139:*20*
239:*16*
**interpretatio
n**  76:*6*
81:*1*  96:*19*
190:*2*
**interpretatio
ns**  213:*2,
19*
**interpreted**
32:*10*
213:*14*
**Interrogatori
es**  6:*14*
144:*3, 19*
145:*5*
**Interrogator
y**  144:*17,
23*  146:*18*
148:*1*
150:*9*
258:*7*
**investigate**
185:*22*
201:*16*
268:*12*

**investigated**
199:*5*
202:*19*
220:*16*
222:*15*

**investigates**
268:*20*
**investigatio
n**  207:*15*
208:*2*
209:*5*
211:*6, 15,
21*  212:*1,
11, 18*

222:17
223:10, 21
224:3, 8
226:16
**investigatio
ns** 200:13,
15 202:18
215:12
226:13
**investigator**
262:19
**invitees**
88:15, 21
**invoice**
67:14, 23
68:3, 8
302:13
303:1, 3, 15
304:12, 22
**Invoices**
7:14, 15
28:20 44:4
61:1 67:6,
10, 19
301:6
302:10, 16
304:17
305:6
**invoke** 35:9
**invoked**
145:11
**involve**
267:3
271:21
273:10
**involved**
152:21
223:14
224:3
256:14
267:8
268:9

**involvement**
31:16 32:1
39:15
**involves**
275:22
**issue** 91:3
94:11
146:21
180:8
184:9, 20
189:12
200:10
201:1
204:6
226:4
238:9, 14
247:14
259:7, 15
**issued**
136:7
262:20
265:22
266:22
273:17
**issues**
12:23
161:11
186:2
203:17, 18
268:17, 18
**Italian** 76:1
**italicized**
236:1
**item** 67:14,
21 78:13
103:17
130:18, 19,
22 160:16
170:16, 19
171:8

**Items** 49:7
78:19
264:7
265:9
268:4
**its** 16:22
32:10 44:1
45:1, 2
61:12 64:9,
22 65:1, 15,
16, 23 69:5,
21 71:20
73:19
76:12 78:1
113:10
120:16
124:7
126:16
133:6
134:13, 22
135:11
139:16
146:23
147:4
153:3
168:20
169:6, 19
181:11
182:3, 5
190:6
212:20
215:5
216:2
222:4, 9
227:11
236:20
262:12
263:14, 22
264:4, 10,
11 279:8
285:16
289:14

291:13
294:13

**< J >**
**J** 4:19
**Jaehong**
86:2
**J-a-e-h-o-n-
g** 86:6
**January**
15:5
**JEFFERSO
N** 308:4
**Jerry**
219:11
**JH** 50:4
52:23
102:20
140:10
**Jin** 15:10,
12
**J-i-n** 15:12
**Job** 7:9
10:23
25:21 26:3,
10 40:12
101:4
175:7
176:1
230:3, 8, 10
231:4, 15
246:10, 11,
20 248:6
269:7
293:9
**jobs** 63:18
246:9
**joined**
192:7
205:16
**joint** 52:8

**Jointly**
104:18, 23
135:8
**JS** 230:10
**judge**
276:10, 13
**judgment**
219:6
**judgments**
87:15
**Julian**
32:22
**July** 11:6
12:3 15:6
17:22
41:14
46:18
107:23
108:18
109:16
111:7
112:11
118:16
139:22
163:10
170:2
228:20
233:3
234:14
304:1
**jump** 90:11
**jumping**
283:15
**JUNE** 1:20
2:3, 15 8:9
101:12
102:4
266:18, 21
271:11
**justified**
35:19

Robert Burns

**< K >**

**keep**  23:14 38:11  53:3 55:6  56:19 80:6  103:1 136:20 152:3 164:11 280:14

**keeping** 79:11 152:1

**keeps** 280:17

**Keller** 30:19, 20 31:17  32:7

**Keller's** 33:9

**kept**  151:17

**KEY**  1:7 53:18 64:16  65:5, 6, 20  66:8 67:9, 20 94:23 119:4 125:2 132:17, 20 147:7 152:21 153:1, 5, 14 155:12 156:7, 8 163:7 180:13, 17 195:11 228:8 237:6, 12, 14  238:16 240:6, 9, 19,

21  245:5, 14  246:7 248:2, 7, 13 249:1, 6, 7 251:1 252:8 253:3, 16 255:2, 7 260:6 261:11 262:21 263:4 265:17 266:3 270:7 271:18 277:9 279:20 282:17, 20 283:1, 5 289:15 290:6, 18 296:2, 9 297:12, 21 300:6 305:4

**Key's** 39:16 82:13 145:12 146:21 147:9 163:8 166:23 186:5 234:20 240:1 241:3, 11 247:2, 5 249:13 250:10, 15 251:15

252:1, 20 253:2 254:15, 23 255:9, 13, 17  256:6, 20  257:7 259:18 260:6, 16, 20  263:22 274:21 278:7, 8 296:17 297:18 298:13 300:11

**Kim**  15:2, 3, 13

**kind**  13:19 15:11  20:6 52:12  64:6 89:1 166:20 173:1, 9 184:4 195:10 253:8

**knew**  41:8 46:2  145:7 218:15 259:4 291:7

**know** 11:20, 23 12:8, 10 16:16 21:12  22:6, 18, 22, 23 23:2, 5, 13, 16, 17  26:5 34:3, 4 35:5  37:7, 18  38:4, 5,

13  40:17 42:7, 11 43:17  44:7 46:6, 13 47:10 49:14, 18 50:5, 7, 8, 21  51:9, 15 52:1, 2, 5 57:11  63:3 66:17, 19 67:8  72:10 74:13, 14 75:1, 13 77:20 82:12, 17 83:8, 15 84:3  85:23 86:12  89:4, 5, 13, 19, 20 93:22, 23 96:17 102:4, 7, 9, 20  104:20, 23  105:2, 6, 15  108:21, 22  111:12 112:1, 18 113:9 114:15, 20 116:3, 17 118:9, 13, 20  119:3, 7, 21  120:11, 15, 20 121:2, 23 122:9, 20 123:15, 20 132:4, 16, 20, 21 133:10 136:17

137:17 138:11 139:19 140:3, 10, 19, 23 143:4 146:3, 7 150:16, 22, 23  151:1 152:17 153:2, 11 157:6, 11, 22  162:4, 9 163:17 164:1 168:20 169:3 170:12, 20 171:6 172:13 174:17 175:18 177:15 178:17, 21 180:3 184:6, 21 186:22 187:2, 8 189:12 192:18 194:3 197:22 199:16 203:14 208:15 209:12, 17 210:3, 13, 16, 20 212:14 214:7 215:11 216:21

220:*22*
224:*23*
226:*8*
233:*14, 19*
235:*12*
236:*11, 14,
17  237:18*
239:*13*
245:*3, 9, 13,
16  246:17*
250:*12, 18*
252:*2*
253:*22*
254:*4, 13,
16, 20*
256:*6*
258:*9*
259:*12, 17*
260:*19, 21*
262:*6*
266:*16*
268:*21*
269:*20*
270:*8*
271:*15*
276:*18*
278:*13*
283:*6, 7*
284:*8, 13,
15, 17*
289:*11, 16,
22, 23*
290:*1, 15*
293:*22*
294:*1, 3, 11,
16, 17*
295:*16, 21*
296:*2, 5, 7,
11, 18*
297:*5, 9, 11,
22  298:12,
17  299:3, 4*

300:*23*
302:*14*
305:*3*
**knowing**
34:*21*  46:*9*
269:*18*
292:*19*
298:*23*
**knowledge**
17:*6, 10*
43:*16*
58:*19*
59:*10, 12*
71:*7, 10, 14*
72:*13, 23*
73:*13, 16*
77:*16*  89:*7*
95:*1*  103:*3*
109:*18*
113:*13, 16*
116:*15*
120:*19*
121:*1, 5*
123:*18*
125:*20, 23*
126:*2, 4, 13,
18*  127:*3,
10, 13, 15*
146:*20*
147:*9*
163:*6*
166:*16*
169:*1, 7*
173:*22*
178:*5, 9*
185:*17*
187:*5*
188:*11, 12*
192:*3*
221:*11*
232:*10, 13*
233:*10*

234:*12*
239:*21*
246:*3, 5*
248:*10*
250:*15*
251:*9*
259:*21*
260:*22*
262:*4*
269:*5*
278:*19*
279:*3, 6*
280:*1, 21*
281:*1, 4, 12,
20  282:6*
283:*3, 14*
290:*11*
291:*1*
292:*8*
300:*13, 17*
301:*4*
**known**
182:*18*
**knows**
187:*3*
221:*13*
284:*10*
**Korea**  16:*9*
76:*13, 15,
23*
**Korean**
75:*12, 23*
76:*17*
168:*7*
**Korean-
owned**
76:*8, 17*
**Koreans**
76:*23*
**Kristal**
297:*3*
299:*20*

**Kristin**
297:*3*
**Kwak**
295:*20*
**K-w-a-k**
295:*20*

**< L >**
**L**  2:*8*
**labeled**
156:*12*
**labor**
104:*4*
213:*16, 17*
214:*2*
**lack**  204:*4*
**laid**  233:*17*
**land**  10:*17*
53:*16*
**landscape**
139:*17*
**language**
42:*16*  44:*2*
45:*2*  64:*12*
65:*14, 23*
66:*5*  75:*14*
80:*6*
**lanyard**
231:*2*
**Large**  2:*14*
8:*3*
**larger**  16:*3*
49:*12*
**Larry**  21:*19*
**late**  42:*17*
**LAW**  4:*10*
33:*3*  94:*7*
195:*23*
205:*6*
**laws**  2:*21*
86:*15*  87:*8*
92:*15*  93:*8,*

**11**  94:*9*
127:*19*
213:*16*
214:*2, 6*
228:*10*
268:*19*
269:*8*
**lawsuit**
30:*16*
33:*22*  58:*2*
65:*4*  66:*9,
23*  217:*15*
219:*6*
220:*5, 12*
245:*21*
248:*2*
255:*3, 8, 13*
271:*17, 19*
300:*11*
**Lawsuits**
6:*17*  203:*3*
216:*7*
**lawyer**
32:*19*
37:*23*  48:*3*
121:*20*
180:*16*
256:*12*
301:*22*
**lawyers**
23:*21*
190:*1*
200:*20*
227:*21*
232:*1*
**lawyer's**
258:*2*
**lead**  13:*8*
**leading**
3:*3*  191:*15,
22*  194:*4*
258:*9*

Robert Burns

6/22/2022

121

**learn**
249:*20*
253:*20*
254:*5, 20*
257:*3*
266:*7*
271:*18*
**learned**
248:*1*
272:*12*
282:*9*
298:*13*
**learning**
19:*20, 22*
20:*20*
**leave**
163:*4*
226:*23*
268:*17*
**left**  139:*17*
159:*19*
160:*4*
**left-hand**
131:*20*
140:*9*
**legal**  20:*12*
21:*5, 6, 12,
20*  22:*3, 4,
6, 17*  23:*10*
39:*10*  47:*3,
8, 13, 15, 17*
66:*17*  81:*7,
9*  82:*10*
89:*11*
95:*14*  96:*4,
16*  153:*6,
15*  159:*10*
192:*11*
198:*3, 20,
23*  199:*8*
200:*12, 14*
201:*1, 13*

202:*17*
207:*12, 22*
208:*5, 21*
209:*1*
210:*3*
212:*13, 14*
213:*2, 7, 8,
12, 22*
214:*7, 11*
216:*20, 22*
217:*6, 8, 9,
10, 20, 21*
220:*16*
249:*15, 22*
250:*13*
252:*3, 6, 16*
253:*19*
254:*3, 6*
257:*2*
258:*18*
261:*2*
270:*21*
272:*3*
298:*4*
299:*19*
**legs**  38:*11*
**LEHR**  4:*17*
**length**
151:*6*
175:*23*
237:*22*
239:*18*
241:*7*
**lengths**
173:*23*
**Leonard**
2:*3*  4:*5, 6*
6:*5*  8:*23*
9:*2, 4*  14:*7,
10*  16:*21,
23*  25:*5*
26:*1, 3*

27:*5, 11*
28:*6, 10, 21,
22*  40:*6, 7*
43:*12*
47:*10*  52:*6,
17*  53:*2*
56:*2, 7, 11,
17*  57:*7, 11,
17*  58:*9, 16*
59:*16*  61:*5,
17, 23*  62:*1*
75:*13, 17*
79:*4, 5*
83:*4*  85:*7*
86:*3, 8, 9*
88:*11*
89:*19, 23*
90:*4, 15, 20*
95:*15, 16*
98:*4*  102:*3*
114:*16*
119:*20*
122:*2, 9*
123:*6, 9*
130:*11*
134:*2, 11*
135:*20, 22*
138:*22*
139:*3, 8*
146:*11, 13*
157:*15, 23*
158:*6, 16,
21*  163:*5*
164:*10, 20*
176:*18, 23*
179:*8, 11,
17, 22*
180:*5, 9, 14*
181:*22*
182:*1*
185:*9, 10*
188:*4, 13*

194:*9, 11*
195:*2, 6*
200:*17, 23*
201:*5*
202:*22*
203:*13*
204:*2, 11,
17*  205:*2, 6,
11, 12*
218:*12, 22*
219:*8, 11,
16, 19, 22*
220:*1*
221:*6, 14*
225:*19*
226:*17, 20*
227:*9, 10*
233:*16*
234:*11*
235:*21*
241:*23*
242:*1*
244:*18, 21*
245:*1, 4*
247:*9, 15,
19*  248:*1*
249:*10, 12*
257:*14*
258:*1, 6, 16*
259:*2, 11,
16, 17, 23*
260:*4*
261:*6, 8*
269:*2*
276:*15, 23*
277:*13, 16,
20, 22*
283:*11, 12,
17, 19*
290:*2*
291:*6, 10,
15, 16*

298:*5, 9*
303:*8*
306:*7, 13*
**Leslie**  4:*11*
**lets**  34:*4*
**Letter**  7:*5,
6*  103:*11*
180:*11*
204:*10, 13*
248:*21*
249:*17*
251:*23*
261:*12*
263:*1, 5, 17*
264:*8, 11,
19*  265:*10,
14, 15*
267:*16*
268:*3*
270:*9*
300:*4*
**letters**
102:*19*
140:*11, 20,
23*
**letting**
259:*11*
**level**
152:*10*
169:*13, 16,
18, 20*
196:*12*
207:*14*
208:*1*
220:*5, 12*
222:*14*
**levels**
152:*13*
**Lewis**
32:*23*
**liabilities**
87:*14*

Robert Burns                                                          6/22/2022

122

**liability**
81:*17, 20*
82:*1*  146:*2*
**liable**  64:*5,*
*14, 21*
65:*22*  66:*6,*
*10*
**liaison**
12:*23*
**licensed**
169:*5*
**liens**  87:*14*
**light**  45:*20*
**likes**  70:*2,*
*7*
**limit**  161:*20*
**limited**
138:*5*
189:*20*
213:*17*
**limiting**
258:*16*
291:*6*
**line**  57:*1*
62:*19*
67:*14, 21*
142:*20, 22*
143:*3*
158:*1*
171:*17*
214:*16*
233:*7*
258:*23*
259:*8, 13*
284:*12, 13*
291:*19, 23*
292:*22*
293:*9*
294:*4*
295:*7, 19*
**lines**  64:*3*

**list**  63:*16*
233:*20*
278:*11, 16*
**listed**  95:*6*
124:*1*
128:*14*
**lists**
141:*19*
142:*15*
**literally**
193:*15, 17*
**litigation**
157:*14*
219:*17*
245:*20*
251:*22*
252:*5*
**little**  9:*4*
14:*1*  33:*20*
34:*10*
35:*13*
66:*14*
143:*20*
158:*14*
182:*2*
197:*2*
207:*16*
230:*4*
233:*22*
253:*13*
**live**  20:*19,*
*21*  22:*1, 3,*
*7, 20*  23:*5*
**lives**
298:*19*
**living**
199:*21*
**LLC**  1:*10*
4:*10*  5:*17*
16:*3*  39:*22*
41:*1*  123:*3*
168:*3*

292:*7*
294:*6*
**LLP**  5:*9*
**loading**
160:*5, 10*
**local**  87:*8*
94:*5*
**locate**
290:*14*
**located**
9:*22*  76:*12,*
*14*  143:*18*
157:*20*
236:*23*
247:*13*
280:*20*
**location**
34:*19*
53:*18*
55:*17*
105:*4, 5, 9*
142:*3*
158:*12*
160:*17*
**locations**
62:*10, 16*
**log**  125:*2*
202:*23*
203:*8*
**logged**
198:*21*
199:*20*
**logo**  9:*14*
131:*3*
132:*10, 12*
133:*23*
165:*11*
166:*1, 11,*
*17, 19*
167:*19*
**long**  11:*3,*
*7*  12:*8*

15:*3*  29:*4*
38:*19*
39:*10, 12*
135:*2*
151:*16*
160:*5, 6*
208:*16*
231:*11, 12*
247:*17*
280:*9*
298:*23*
**longer**
12:*6*  60:*2*
147:*11*
173:*14*
259:*15*
**long-term**
173:*16, 17*
**look**  18:*9*
24:*12*  34:*1,*
*5*  39:*19*
67:*5*  68:*13*
69:*16*  78:*5*
85:*6, 16*
86:*13*
101:*15*
105:*3, 23*
123:*11*
125:*13*
127:*22*
128:*6, 9*
137:*2*
138:*15*
139:*16*
140:*8*
144:*1, 7*
149:*6, 9, 23*
157:*4*
160:*3*
164:*21*
190:*11*
193:*5*

194:*11*
197:*6*
201:*8*
213:*11*
232:*3, 5, 14*
233:*1*
234:*17*
238:*22*
244:*8*
247:*9*
252:*19*
263:*3*
265:*16*
269:*5*
287:*8, 12,*
*14*  295:*7,*
*14*  298:*20*
299:*17*
301:*5, 9, 11,*
*23*  302:*3*
303:*21, 23*
304:*10, 17*
**looked**
55:*10*
91:*20*
127:*7, 23*
149:*1, 4*
152:*19*
154:*23*
157:*2*
164:*3*
170:*1*
172:*19*
199:*23*
274:*22*
287:*10*
**looking**
18:*11*
24:*19*
37:*17*  53:*9*
86:*12*
103:*18*

113:*17*
114:*9*
117:*10*
120:*12, 21*
122:*21*
123:*10*
124:*15*
130:*14*
131:*15*
136:*15, 21*
142:*7, 9*
169:*22*
186:*8*
231:*8*
233:*9*
242:*15*
251:*6*
257:*22*
284:*6*
288:*20*
295:*6*
298:*18*
301:*3*
302:*5, 7*
303:*22*
**looks**
101:*12*
124:*3*
131:*7*
133:*4*
156:*2*
160:*3*
177:*23*
178:*15, 18*
197:*14*
228:*23*
264:*14*
285:*10*
287:*10*
288:*23*
294:*11, 18*

302:*9*
304:*12*
**losses**
87:*15*
**lot**  10:*7*
16:*16*  34:*2*
35:*10*
36:*18*
201:*2*
218:*19*
245:*19*
282:*9*
284:*8*
306:*2*
**loud**  193:*3*
**louder**
40:*14*
**loudly**  9:*4*
**lower**
121:*15*
175:*2*
**lunch**
143:*22*
164:*13, 18, 21*

**< M >**
**M**  1:*7*
**machine**
231:*11*
**magistrate**
219:*15*
**mail**  99:*6, 8, 12, 15, 16*
100:*18*
155:*15, 16*
160:*11*
163:*14, 15*
241:*14*
250:*19*
251:*7*
287:*19*

288:*2*
302:*21*
**Mailroom**
7:*10*  49:*11*
67:*17*  99:*4, 13, 16*
136:*1, 3, 5, 8, 13*  137:*2, 4, 6, 15*
143:*12, 17*
155:*16*
156:*8, 12*
157:*20*
158:*13, 15*
160:*4, 15, 18, 19*
161:*4, 15*
162:*16, 17*
163:*12, 13, 21*  164:*1*
229:*11*
230:*12, 18*
239:*19*
243:*15*
284:*3, 18*
285:*7, 12, 19*  286:*10, 22*
**maintained**
170:*12*
288:*14, 16*
**maintains**
129:*7*
**maintenanc e**  106:*8*
**makeup**
197:*14*
**making**
32:*1*  35:*22*
50:*14*
126:*1, 3, 5*
129:*7*

150:*7*
154:*7*
169:*12*
191:*2*
199:*7*
207:*15*
213:*1, 19*
240:*16*
270:*22*
**manage**
13:*6, 9*
181:*20*
**managed**
192:*11*
**managemen t**  12:*17*
104:*3*
165:*20*
170:*15*
194:*16*
196:*10, 11*
240:*6, 8, 18*
**manager**
18:*23*
19:*13, 15, 17*  51:*15*
60:*3, 5*
85:*19, 23*
117:*20*
120:*4*
122:*13, 15*
132:*7, 9*
135:*11*
147:*21, 22*
194:*19*
196:*12*
199:*4*
209:*10, 11, 14, 19*
291:*22*
**managers**
119:*1*

**manages**
213:*21*
**managing**
188:*15*
**manner**
80:*10, 17*
**manpower**
49:*7*  106:*2*
**manufactur e**  100:*13*
**MANUFACT URING**
1:*10*  5:*16*
9:*12, 17*
10:*8, 10*
12:*16*  16:*7, 14*  39:*22*
40:*23*
46:*22*
53:*13, 21*
57:*22*  72:*4*
76:*10*  97:*1*
98:*16, 19*
99:*10, 23*
100:*15*
108:*3*
123:*2*
138:*17*
141:*14, 23*
142:*18*
156:*15*
166:*6, 13*
167:*4, 12, 21*  168:*3*
256:*19*
292:*6*
294:*5*
302:*11*
**mark**  14:*2*
169:*2*
219:*9*
301:*8*

**marked**
14:*4*  23:*19*
24:*7*  26:*12*
39:*20*  40:*3*
144:*11*
155:*19, 22*
165:*2*
176:*12, 15*
216:*10*
228:*15*
231:*21*
232:*18*
234:*23*
248:*12, 15*
252:*22*
260:*9*
261:*14*
263:*8*
265:*19*
283:*22*
287:*5*
295:*1*
299:*11*
301:*15, 20*
**market**
9:*21*
**marking**
177:*6*
**markings**
177:*18*
178:*13*
**markup**
138:*8*
**married**
81:*15*
**mask**  9:*5*
**materials**
22:*14, 19*
23:*13*
26:*15*
27:*12*
125:*3*

126:*16*
214:*19, 21*
**Matrix**
6:*19*
148:*17*
149:*7*
189:*19*
228:*18*
229:*9, 16*
**Matt**  60:*7*
**matter**
36:*9*  51:*6*
201:*18, 21*
204:*2*
263:*15*
271:*13*
300:*1*
**matters**
260:*16*
**Matthew**
5:*10*
**Maurice**
278:*21*
281:*13*
**MBE**  69:*19*
71:*9*  72:*15*
78:*2*
**MBEs**
72:*18, 20*
73:*11*
74:*17*
**McIntyre**
209:*21, 23*
**McPhillips**
32:*22*  33:*3*
**mean**
31:*22*
35:*15*
55:*22*
71:*14*  76:*4*
79:*23*  80:*1*
91:*19*

94:*16*  95:*9*
97:*4, 7*
98:*17*
106:*4*
114:*18*
121:*18*
132:*20*
135:*18*
168:*9*
169:*10, 16*
170:*21*
174:*16*
192:*22*
193:*8*
205:*22*
206:*13, 18*
215:*8*
231:*5*
244:*8*
247:*8*
250:*1*
253:*14*
275:*23*
**meaning**
106:*7*
129:*20*
168:*7*
**means**
35:*16*
95:*17*
168:*10*
169:*18*
170:*13*
203:*21*
308:*9*
**meant**
15:*16*
85:*18*
92:*19*
152:*17*
**mediation**
219:*14, 20*

**medical**
117:*20*
119:*2*
141:*17*
**meet**  28:*22*
29:*2*  121:*9*
133:*1*
204:*6, 20*
205:*9*
210:*23*
211:*2, 3, 7*
226:*17*
**meeting**
29:*6*  135:*4*
**meets**
211:*9, 13*
**member**
33:*13, 18*
34:*6, 22*
169:*11*
178:*1, 3, 6,
16*  180:*21*
181:*1, 2, 7*
183:*12*
190:*23*
197:*6, 14*
199:*2*
200:*14*
201:*17*
207:*10*
208:*20, 21*
213:*14*
220:*15*
267:*3, 10*
268:*9*
271:*22*
273:*10*
275:*22*
279:*16*
280:*4*
**members**
13:*1*  20:*2,*

14  23:*11*
106:*15, 20*
107:*3*
180:*22*
181:*16*
191:*4, 12*
192:*10*
202:*2, 8, 9*
203:*12*
208:*21*
210:*21*
215:*14*
227:*19*
269:*23*
270:*2*
273:*12, 18,
22*  274:*9*
275:*6*
**memory**
31:*10*
37:*10*
257:*20*
273:*6*
**mentioned**
13:*6*  18:*3*
77:*13*
87:*12*
194:*18*
**Microsoft**
150:*13*
151:*5, 13*
288:*9, 11*
**MIDDLE**
1:*2*  178:*19*
287:*14*
288:*20*
**MIDDLEBR
OOK**  304:*5*
**MIDDLEBR
OOKS**
4:*17, 19*
8:*21*  14:*6,*

8 16:19 19:2, 5 24:12, 16, 22 25:21 27:3, 9, 16, 21 28:4, 7, 13 38:6 39:11 40:5 42:22 43:6, 9 46:12 47:4, 20 50:9 52:2 58:5, 11 59:18, 23 66:16 75:11 79:2 82:15, 19 83:1 84:10, 16 85:6, 18, 22 86:20 88:8 89:17, 21 90:2, 7, 19 93:21 95:13 96:3, 15 97:14, 18, 21 99:17 101:21 102:23 103:22 107:5, 16 108:20 109:23 110:6, 19 111:8, 14 112:4, 14 114:11, 14, 18 117:5 119:14 121:11, 23 122:4 127:21

128:3 130:9, 12 132:18 134:1, 5, 23 135:18 138:3, 20 139:2 140:15 144:5 145:18, 22 146:1, 9 147:15 148:13 151:2, 18 156:18 157:11, 18 158:19 159:18 162:13 163:2 164:4, 12 167:3, 16 173:20 176:5, 17, 20 179:6, 10, 14, 19 180:3, 7, 12 186:19 187:10 190:17 191:18 194:7 195:8 199:15 200:2, 7, 21 201:4 202:7 203:10, 23 204:9, 14 205:8 211:18 217:2

218:7, 17, 20 221:4, 12 224:23 226:3, 19 227:6, 23 233:13, 19 234:5 235:3, 8, 10, 15 237:16 238:5 239:6 241:18, 21 242:12 244:5, 16, 20, 22 245:19 247:7, 11, 22 249:8 253:8 255:5 257:12, 17 258:20 259:22 260:2, 11 263:13, 21 264:1, 12, 14, 21 265:1, 7, 13 266:4 267:22 268:3, 13, 23 270:20 272:16 275:20 276:12, 18 277:7, 15, 19 278:3, 7 279:9 283:10, 15, 18 288:6 289:19 290:9

291:3, 9 297:23 298:8 303:19 306:1, 15, 19 307:5

**Mike** 30:19

**Miller** 5:10 16:18 46:14 48:19 55:21 56:1, 5, 9, 15 57:4, 9, 13 61:7, 21 99:5 255:4, 10, 18 256:9, 21 258:22 259:10, 14 271:6 301:11 306:17 307:4

**million** 10:18

**mind** 38:12 86:3 179:9

**mine** 253:11 294:18

**minimum** 107:14, 21 108:12, 17 109:3 110:17 111:13 119:8, 10, 17 120:5 121:8, 9, 14 230:16

**minority** 76:21 77:1

**minority-owned** 69:19 70:4, 13, 17 71:21 72:5 73:3, 20 74:2, 8, 20 75:14, 19, 22 76:5, 19, 22 77:5, 22

**minute** 54:14 203:4

**mischaracterization** 140:16

**misinterpretation** 241:6

**misinterpreted** 195:10

**misinterpreting** 98:1

**misrepresentation** 256:12

**misrepresented** 48:1

**missing** 46:20

**Mississippi** 36:7

**mixed** 130:20

**mixing** 255:11

**Modern** 168:9, 10

**modified** 293:17

modify
171:*6*
293:*10*
moment
103:*14*
117:*4*
157:*4*
185:*18*
Monday
133:*21*
166:*23*
232:2
233:2
monitor
196:*9*
monitored
198:*1*
monitoring
187:*19*
196:*17*
197:*11*
monitors
194:*14*
Montgomer
y *2:5, 15*
8:*8* 9:*23*
10:*3, 6*
53:*16* 77:*3*
month
112:*19*
304:*1*
monthly
117:*19*
118:*10, 14*
119:*5*
124:*17*
303:*17*
months
126:*23*
173:*14*
255:*21*
266:*13, 15*

271:*10*
273:*6*
298:*16*
Montiel
219:*9*
morning
27:*20*
232:*6, 7*
235:*4, 6, 10*
motion
259:*6*
motions
259:*3*
MOTOR
1:*10* 5:*16*
9:*12, 16*
10:*8, 10*
12:*15*
15:*22* 16:*1,
5, 7, 8, 11,
14* 17:*3, 8*
39:*22*
40:*23*
46:*22*
53:*13, 21*
57:*22* 72:*4*
76:*10, 11*
97:*1* 98:*15,
19* 99:*10,
23* 108:*3*
123:2
138:*16*
141:*13, 23*
142:*17*
156:*15*
166:*6, 13*
167:*3, 12,
15, 20*
168:*2, 3*
256:*18*
292:*6*

294:*5*
302:*10*
move
181:*23*
226:*9*
242:*13*
256:2
moved
157:*21*
158:*13*
movement
105:*19*
moving
105:*14*
multiple
214:*15*
Myron
219:*7*

< N >
N *2:8* 4:*1*
6:*1*
name *9:3,
8, 10* 11:*15*
19:*8* 21:*9*
30:*15, 18*
32:*18, 21*
33:*17*
34:*11*
48:*21* 51:*5,
7, 13, 20, 23*
52:*4, 13*
60:2 67:*16,
17* 68:*7*
74:*12* 76:*1*
85:*19, 22*
100:*1*
101:*16*
131:*3, 14,
21* 132:*11,
12, 16, 21*
133:*6*

146:*3*
162:*18, 20*
163:*6*
166:*11*
168:*17*
169:*5, 15*
209:*20*
212:*8*
280:*23*
281:*14*
283:*5*
292:*9*
293:*14*
294:*13*
names
73:2 74:*14*
101:*17*
210:*20*
221:*22*
national
31:*12*
213:*17*
nature
60:*22* 64:*7*
108:*16*
196:*23*
231:*13*
nay *133:20*
Neal *11:12*
18:*3*
N-e-a-l
11:*16*
necessarily
67:*15*
100:*7*
151:*12*
166:*12*
200:*18*
necessary
3:*1* 104:*7,
13* 125:*1*
205:*3*

226:*7*
267:*8*
need *38:3,
11, 18, 20*
39:*11*
52:*23* 53:*4*
70:*9* 86:*10*
99:*22*
108:*9*
110:*17*
111:*16, 20*
112:*16*
144:*13*
171:*15*
186:*16*
204:*23*
205:2
225:*15*
256:*13, 14*
277:*17*
301:*10*
306:*9, 23*
307:*3*
needed
18:*16*
264:*10*
282:2
303:2
needs *38:6*
60:*9* 106:*3*
110:*5*
200:*7*
204:*15*
negligence
64:*9, 23*
negotiated
121:*4, 6*
negotiating
120:*16*
negotiation
120:*22*

neither
 308:*14*
never
 118:*11*
 202:*23*
 225:*10*
 236:*13*
 281:*1*
new  41:*19*,
*21*  42:*2*
 215:*3*
Nick  35:*9*
night
 29:*11*
 258:*4*
nine  85:*2, 3*
ninety-nine
 158:*10*
noncomplia
nt  128:*13*
nonemerge
ncy  142:*16*
non-
negotiable
 233:*6*
nonrespons
ive  65:*11*
 181:*23*
 256:*2*
noon  117:*8*
Nope
 116:*21*
 154:*16*
 155:*11*
 215:*23*
normal
 115:*22*
 160:*23*
 202:*3*
 251:*18*
North  5:*11*
 9:*20*

NORTHERN
1:*3*
Notary
 2:*13*  8:*2*
 308:*22*
notice  3:*9*
 6:*12*  9:*13*
 24:*5*  25:*7*
 27:*4, 7, 8*
 36:*23*
 81:*17*  87:*3*
 138:*23*
 145:*12*
 218:*10*
 227:*3*
 242:*16*
 245:*3*
 249:*4, 13*
 250:*9*
 251:*2*
 254:*23*
 255:*2*
 276:*20*
 277:*1, 4*
noticed
 258:*5*
notification
 253:*19*
notified
 93:*15*
 146:*6, 7*
 217:*13*
 253:*14*
 255:*9, 16*
 256:*18, 19,
23*
notify  93:*1,
9*  253:*1, 6*
 262:*2*
November
 294:*22*
 296:*8*

297:*6*
 298:*1, 5*
nuances
 269:*5*
NUMBER
 1:*4*  24:*4*
 25:*19*
 37:*18*  41:*9*
 49:*22*  51:*4*
 53:*8*  62:*2*
 67:*4*  68:*10*
 78:*6*  81:*12*
 85:*16*  89:*2*
 95:*3*  99:*20*
 100:*22*
 101:*7*
 109:*4, 16*
 112:*12*
 116:*23*
 123:*12*
 124:*16*
 125:*11, 13*
 126:*19*
 137:*19*
 141:*15, 19,
22*  142:*8,
15, 16, 21*
 144:*2*
 150:*9*
 155:*20*
 166:*10*
 167:*13*
 174:*12, 14*
 178:*18*
 179:*3*
 197:*17*
 199:*9*
 208:*15*
 216:*5*
 218:*4*
 220:*21*
 233:*21*

235:*22*
 251:*1*
 253:*3*
 261:*11*
 266:*15*
 286:*1*
 301:*17*
numbers
 27:*4*  39:*23*
 125:*10*
 138:*19*
 139:*18*
 140:*20*
 141:*16*
 164:*22*
 177:*1, 2*
 227:*4*
 231:*19*
 234:*20*
 248:*13*
 260:*6*
 263:*4*
 285:*16*
 287:*2*
 294:*20*
 301:*12, 13*
numerous
 241:*19*

< O >
O  2:*8*
oath  36:*12,
15*  134:*1, 3*
 277:*17*
 305:*15*
Object
 16:*18, 19*
 42:*22*
 48:*19*
 55:*21*
 56:*10*  57:*4,
10*  65:*10*

66:*13*
 82:*15, 19*
 83:*1*  84:*10,
16, 23*
 93:*21*
 95:*13*  96:*4,
15*  97:*14,
18, 22*  99:*5,
17*  103:*22*
 107:*5*
 108:*20*
 109:*23*
 110:*6*
 111:*8, 15*
 112:*4*
 121:*11*
 122:*6*
 132:*18*
 134:*23*
 138:*3*
 140:*15*
 151:*2, 18*
 157:*16*
 158:*7*
 173:*20*
 176:*5*
 181:*22*
 186:*19*
 187:*10*
 190:*17*
 200:*2, 17*
 221:*6*
 237:*16*
 238:*5*
 247:*1, 4*
 255:*4, 5, 10,
18*  256:*10,
21*  258:*23*
 264:*12, 21*
 265:*7*
 268:*23*
 270:*20*

271:*6*
272:*16*
288:*6*
290:*9*
**objected**
61:*10*  69:*2*
203:*11*
221:*2, 4*
**objecting**
259:*14*
**objection**
57:*12, 16*
61:*16*
221:*8, 9*
257:*22*
**objections**
3:*2, 5*
147:*1*
**obligated**
93:*1*
**obligation**
66:*21*
206:*5, 17*
**obligations**
78:*22*  79:*7,*
*18*  80:*21*
**observe**
185:*1*
**observes**
184:*3*
**obtain**
250:*7*
**obtaining**
200:*10*
**obvious**
166:*20*
**obviously**
51:*12*
91:*23*
254:*17*
305:*14*

**occasions**
226:*14*
**occur**
66:*11*
**occurred**
178:*7*
184:*18*
185:*21*
186:*14*
187:*4*
189:*12*
214:*9*
271:*14*
**occurs**
214:*10*
**October**
11:*9, 23*
139:*21*
170:*2*
248:*22*
250:*16*
255:*16*
**odds**
51:*11*
289:*17, 19*
**offer**  46:*15*
**offered**  3:*7*
**offhand**
23:*1*  33:*19*
**office**
74:*11*
142:*3*
159:*15*
163:*14*
280:*14, 17*
**officer**
11:*1, 5*
12:*13*
13:*11*
17:*14*
96:*10*
129:*14*

130:*16, 17*
135:*10*
137:*16*
151:*9*
152:*8*
236:*4, 5, 7,*
*10, 15, 20,*
*22*  252:*11*
269:*16*
302:*21*
**officers**
52:*8*
124:*21, 23*
126:*22*
128:*11*
**officer's**
128:*17*
133:*5*
**oh**  15:*9*
18:*11*  26:*3*
27:*23*  30:*8*
47:*23*
142:*9*
157:*18*
158:*22*
160:*6*
179:*1*
187:*6*
190:*22*
218:*19*
222:*21*
233:*21*
253:*11, 18*
270:*11*
283:*18*
291:*20*
302:*6*
306:*15*
**Okay**
10:*16*
16:*10*
23:*18*  24:*3*

26:*7*  27:*5*
28:*6*  29:*15*
30:*15*  33:*8*
34:*12, 21*
36:*5, 11*
37:*10*  38:*8*
40:*16, 21*
48:*2*  50:*3,*
*17*  52:*17*
53:*9, 10*
55:*18*  57:*7*
59:*16*  67:*8,*
*16*  68:*9, 12,*
*13*  69:*16*
71:*4*  75:*9*
76:*8*  77:*8*
78:*10*
79:*16*
80:*20*
81:*10*  83:*3,*
*11*  86:*16,*
*17*  88:*7*
89:*23*  95:*5*
97:*20*
101:*8, 9*
103:*7, 16*
105:*8, 23*
106:*10*
112:*2*
114:*2*
115:*10*
117:*9*
120:*6*
122:*20*
125:*13*
128:*18*
136:*4, 21*
139:*7*
140:*4, 13,*
*19*  141:*13,*
*15, 21*
142:*1*

143:*4*
144:*4, 14*
145:*9*
151:*22*
154:*9*
158:*16, 22*
160:*6*
162:*6, 9*
163:*3*
166:*16*
170:*9*
176:*20, 21*
179:*1*
180:*9*
188:*22*
195:*1, 6*
196:*16*
202:*21*
205:*11*
207:*21*
211:*22*
213:*21*
214:*18*
215:*22*
216:*17*
217:*12*
221:*19*
225:*19, 22*
228:*5*
232:*7*
234:*3*
235:*7, 14,*
*19*  243:*7*
244:*22*
245:*18*
248:*20*
250:*4*
251:*11*
253:*18*
255:*14*
256:*3, 8, 22*
263:*13*

269:2
270:4
272:5
276:11, 22, 23   283:18
287:12, 14
291:15, 22
295:5, 6
296:7
298:5
299:17
302:9, 13
304:14
**omissions**
64:8, 23
**once**   171:5
198:17
246:3
249:17, 18
251:18
253:18
254:7
256:23
**ones**   75:14
173:18
209:4
274:18, 20
**on-site**
100:20
173:10
174:1, 18
238:17
**open**
113:20
114:2
227:1
**operate**
41:18
43:23
60:20
108:13

115:12
172:17
**operated**
58:15
262:23
**operates**
53:12
**operating**
42:19
43:14
60:17, 23
69:11
106:6
109:13
160:23
161:2
**operation**
70:10   74:4
88:18
115:23
116:1
**operational**
108:2
**operations**
63:11
70:21   71:1
202:4
**opportunitie
s** 248:7
**opportunity**
87:4   105:7
190:20
194:14
197:16
198:18
204:3
216:13
232:3, 5
268:17
278:14
301:9

**opposed**
97:8
**option**
41:15
**optional**
41:11
**oral**   8:11
**orally**
196:18
**order**
13:20   14:1
82:3   83:12,
17, 18
121:10
161:5
186:8
227:8
**Orders**
87:9   89:2,
10   90:3, 5,
8, 17
124:19
**org**   168:4

**organization**
73:23
74:15
196:13
212:15
215:21
269:11
**organization
al** 28:15
**organization
s** 59:8
**organized**
136:20
**orientation**
192:4, 15,
17   193:13
195:12, 19
215:3

**origin**
31:13
**original**
169:21
**originally**
178:8
**origination**
169:19
**Orlando**
169:10, 11
171:19
172:5
**OSHA**
87:19   91:2
**outcomes**
218:21
**outline**
264:5
**outlined**
104:9
111:21
124:4
148:16
264:7
265:10
**Outlook**
150:13, 16,
21   151:5,
13, 14
152:10
288:9, 11
292:20
299:2
**Outlook's**
292:16
**outside**
95:5   160:8
167:9
200:4
245:3
259:1, 19

262:1
306:8
**overall**
54:18
168:5
**oversee**
13:5
**oversees**
94:17
**owned**
76:11
77:14
172:9
288:14
**owner**
169:10
171:4
**owners**
154:14
**owner's**
88:19, 21
**ownership**
17:1, 7
**owns**
16:16, 17
53:12

**< P >**
**P**   2:8   4:1
**P.C**   4:5, 18
**p.m**   160:20
234:14
307:10
**P.O**   4:20
**package**
163:18
**packages**
99:12
163:16
**packets**
303:9, 12

**page** 24:13
25:13
26:14 41:6,
9 49:21
50:1 53:6,
7, 9 67:3, 4
68:9, 10, 12
78:5, 6
81:12
85:15 95:2,
4 100:21
101:6, 7
103:7, 9
116:23
119:9, 15
123:13
124:16
128:5
130:20
136:16, 21
139:6, 16
140:17
142:4
144:16, 22
145:2
170:9
177:2, 12
178:18, 22
179:2, 3
183:10
213:10, 11
227:4
233:2
235:21
237:4, 5
238:22
239:3
240:3
250:23
251:4, 11,
12 252:8
284:12, 13,

23 287:10,
15 288:20
292:21, 23
302:17
304:2, 10,
11
**Pages**
6:18 24:17
50:1, 5
51:4
102:19
130:20
140:23
165:10
177:4, 16,
22 178:10
181:7
303:21
304:16
**page's**
103:5
**paid** 67:12
134:9
137:1, 4
302:18
305:4, 9
**paint** 229:9
**PALMER**
4:10, 11
306:8
**paragraph**
64:4
103:14
105:7
178:20
194:12
233:4, 6
235:23
237:5, 9
**paralegal**
60:4

**parameters**
161:18
**parent**
76:12
168:20
**parked**
133:22
134:4
**parking**
88:18
118:7
**parse**
227:20
**Part** 33:21
34:4 49:17
70:5 74:15
76:18, 20
82:7 84:5,
6 96:7
99:22
100:2, 5, 23
120:16, 21,
23 130:5
135:4
140:4, 6
145:20
164:6
171:16
172:5
175:16
195:11, 19
198:7
202:3
205:17
215:3
229:13
230:13
244:18
259:7
262:10
269:7
270:21

**participate**
20:15
261:9
**participatio
n** 22:22
**particular**
54:10
94:16
96:23
112:19
169:14
187:4
198:7
273:20
**parties**
2:10 3:4
33:6, 7
43:23
47:11
60:18
79:22 80:3,
9, 13, 17, 22
103:3
121:15, 16
122:17
147:3
186:2
278:23
281:23
300:20
308:15
**partners**
70:3
**parts** 74:9,
11, 16, 21,
22 75:2
105:14
125:3
159:1, 23
**party**
47:11
56:21

107:1
207:14
208:1
261:22
270:16, 18
**pass**
301:10, 22
**patch**
131:9, 11,
17 132:5,
23 133:5, 8
**patches**
129:21
131:13
**pay** 60:21
66:21 68:5
133:17
304:22
**paycheck**
161:16
163:20
**paying**
98:22
**payment**
303:4, 15
**payroll**
19:19
**pays** 137:5
141:21
142:16, 18
**PDF** 296:1
**penalty**
91:9
**pending**
38:15
300:12
**people**
35:8, 10
49:16
78:22 79:7
97:12 98:4,
20 99:3

Robert Burns

6/22/2022

131

103:20
107:2
111:19
112:3, 13
116:19
119:11
123:17, 22
126:12
139:22
143:11
146:20
147:2, 7
150:2
151:12
161:14, 16
163:12, 23
172:18
173:4, 12,
17  175:6,
13  182:4, 6
189:19
190:6
191:23
193:4
208:10, 13
221:23
229:17
240:1
247:12, 16
278:14, 15
286:9
**percent**
158:10, 11
**perfectly**
38:12
**perform**
54:1, 2, 9,
16  68:16
78:23
85:10
119:12
121:10

155:12
172:21
173:1
176:10
185:14
286:11
**performanc
e**  64:10
72:21
80:16
129:15
**performed**
53:18  63:7
67:9, 19
98:6, 8
102:12
118:2, 4
174:20
228:8
230:9
**performing**
57:18  58:2
174:4, 13
175:13, 20
181:13
182:5, 8, 11,
23  183:6,
16, 19, 21
184:11
203:20
215:20
231:4, 6, 15
245:5, 14
**period**
152:3
163:10
173:13
199:10
202:14
242:6, 18
258:9

**permit**
142:5, 11
294:13
**permitted**
169:6
**person**
144:18
185:12, 14
211:1, 2, 4
242:4, 17
246:2, 20
270:22
295:11
302:23
304:21
**personal**
39:15  52:3
145:23
148:17
152:1
229:23
230:21
231:9
**personally**
31:18
71:13
118:8
152:19
163:13
**Personnel**
28:14  49:9
106:13
239:20
243:12, 14,
16  285:19
**persons**
148:2
182:23
**person's**
30:18
**perspective**
46:15

**pertaining**
88:16
**phone**
141:16, 19,
21  142:16,
18, 21
254:17
**photo**
131:19
**physically**
231:5
247:13
**pick**
163:14, 18
273:7
**picked**
177:12
**picking**
208:23
**picks**
140:21
**picture**
28:17
34:19  89:1
131:2
133:20
162:18, 23
**pipe**  173:8
**placard**
158:4
**place**  42:3,
5, 8  54:7
58:14
78:21
79:17
109:16, 19
187:7
188:11
189:13
195:16, 18
222:17
254:21

257:6
291:2
**placed**
69:5, 14
79:8  93:3
97:12  98:5
107:2
119:12
123:17, 22
124:7
126:12
190:6
**placement**
147:10
**places**
191:3
**plain**  86:23
**Plaintiff**
1:8  4:4
30:16
278:20
**Plaintiff's**
6:11  14:2,
3  23:19
24:4, 6
25:15
26:11
39:20  40:2,
8, 18, 21, 22
41:13
42:13
46:21  47:2,
12  48:7, 21,
22  57:19
58:10, 13,
17  71:18
123:11
144:1, 3, 10
155:19, 21
156:5, 14,
22  157:6
164:22

165:*1*
171:*10, 23*
172:*12*
175:*5*
176:*14*
216:*9*
228:*14*
231:*20*
232:*17*
234:*17, 22*
248:*14*
249:*14*
250:*18*
252:*21*
260:*8*
261:*13*
263:*7*
265:*18*
283:*21*
284:*1*
285:*15, 23*
287:*4*
294:*23*
298:*18*
299:*10, 13,
18*  301:*14,
19*  302:*5*
**plant**  9:*19*
88:*16*
106:*18*
114:*2, 4*
167:*9*
178:*7*
**played**
196:*1*
**please**  9:*8*
98:*2*
**plus**
137:*13*
138:*8*
**point**  38:*3,
9*  45:*15, 16*

56:*21*  80:*1*
93:*14*
122:*19*
187:*6, 18*
188:*14*
192:*7*
200:*1, 11*
222:*20*
226:*10*
247:*11, 12*
248:*23*
250:*5*
267:*2*
273:*8*
305:*1*
**pointed**
121:*20*
193:*22*
**points**
240:*4*
250:*14*
268:*4*
**police**
133:*5*
**policies**
13:*2*  26:*23*
32:*11*
87:*23*  91:*3*
145:*11*
148:*6, 8*
149:*20*
151:*22*
154:*17, 19*
172:*6*
175:*11*
177:*10*
179:*17*
181:*8*
201:*23*
213:*12, 22,
23*  214:*4, 8,
11, 15*

215:*5, 9*
216:*2*
227:*11*
229:*1*
262:*13*
274:*5*
**policy**
68:*18*
148:*4, 6, 11*
150:*22*
179:*20*
190:*20*
191:*6, 17*
192:*1, 5, 16,
17, 21*
193:*3, 5, 19*
194:*12*
195:*15*
196:*7, 17*
197:*20*
201:*19, 22*
202:*5*
205:*13, 14,
20, 21*
206:*5, 6, 17*
207:*8, 18,
19*  208:*4, 9,
11, 12*
210:*19, 23*
211:*9, 12*
212:*3, 5, 19,
21*  215:*15,
17*  222:*5,
10, 19*
223:*11, 22*
224:*14, 15*
227:*19*
228:*9*
236:*4, 9, 15,
19*  237:*8,
11, 13, 19,
21, 23*

238:*9, 13,
19, 21, 23*
239:*2, 5, 11,
13, 17, 18,
23*  241:*2, 6,
7, 11*
279:*17*
**ponytail**
244:*9*
**populate**
292:*14*
**populated**
292:*15*
**population**
197:*7, 8, 14*
**portion**
226:*23*
**portions**
230:*20*
**Position**
7:*4*  44:*23*
45:*17*
57:*18*  58:*1,
6, 12*  60:*16,
19*  61:*6*
179:*22*
180:*6, 15*
199:*7*
208:*19*
241:*15*
245:*13*
252:*9, 10*
261:*4*
291:*10*
295:*23*
298:*2*
**positions**
13:*20*
14:*15*
208:*20, 23*
302:*18*

**positive**
81:*13*
165:*7*
297:*19*
**possession**
149:*11, 16*
296:*8, 13*
**possible**
46:*13*  75:*4*
149:*13*
153:*6*
173:*15*
189:*7*
**possibly**
44:*4*  60:*21*
71:*3*
137:*13*
141:*5*
142:*23*
294:*1*
**post**
124:*19*
163:*14*
**postal**
160:*13*
**posted**
236:*4, 9, 13,
15, 19*
**post-
pandemic**
30:*10*
**potential**
203:*16*
230:*2*
**Power**
16:*17*
168:*14*
**PowerPoint**
23:*7*
**PPE**
228:*18*

Robert Burns                                                                                6/22/2022

229:*1*
230:*1, 5, 19*
**practical**
204:*2*
**practice**
57:*6*  71:*8*
72:*3*
172:*14, 23*
201:*18, 21*
251:*18*
285:*17, 21*
286:*18*
**practices**
81:*17, 20,
23*  151:*23*
267:*13*

**predecessor**
11:*10*
60:*13*  61:*8,
13, 15*
**predecessor
s**  113:*11*
120:*16*
**predict**
171:*7*
**pregnancy**
202:*12*
**preliminary**
278:*11*
**premises**
88:*15, 20*
134:*22*
247:*13*
**pre-
numbered**
13:*23*
**pre-
pandemic**
30:*9, 11*
**preparation**
46:*8*

145:*20*
254:*9*
261:*9*
280:*2*
**prepare**
26:*16, 17*
27:*14*
28:*23*  29:*8*
37:*12*  40:*8,
19*  71:*23*
87:*4*
**prepared**
14:*11, 12*
20:*12*  21:*5*
23:*9, 10*
27:*1*  29:*16,
17*  47:*2, 8,
11, 14, 18,
22*  48:*7*
59:*5*
101:*17, 18*
102:*1, 2*
104:*18, 20*
105:*1*
107:*18*
113:*5*
145:*15*
201:*12*
218:*7*
227:*15, 17*
243:*2*
284:*17, 22*
**preparing**
46:*1, 6*
216:*12*
232:*4*
250:*6*
261:*1*
**preplaceme
nt**  124:*2*
**presence**
69:*1*

**PRESENT**
5:*15*  10:*22*
14:*19*
22:*15*
185:*23*
214:*4, 22*
220:*2, 10*
221:*17*
223:*7, 17*
242:*7, 19*
**presentatio
n**  23:*6*
193:*16, 22*
**presentatio
ns**  20:*22,
23*  21:*4*
**presented**
21:*3*  22:*1,
7, 11*  23:*9,
11*  25:*14*
46:*3*  47:*7*
120:*23*
165:*22*
208:*6*
219:*2*
234:*19*
251:*19*
274:*14, 20*
275:*5*
296:*5*
**preservatio
n**  251:*12*
**preserve**
251:*14, 21*
289:*5, 7, 14*
290:*5, 17*
291:*12*
**president**
15:*2, 4, 6,
15*

**pretty**
205:*7*
218:*9*
**previously**
23:*19*
176:*12*
**primarily**
13:*5*  20:*1*
21:*6*
143:*15*
**primary**
229:*20*
**print**  41:*7*
170:*10*
301:*7*
**printed**
170:*11, 22*
171:*5*
**prior**  3:*7*
13:*21*  30:*1*
33:*8*  58:*17*
248:*20, 23*
249:*4, 8*
250:*16*
273:*3*
**privately**
219:*22*
**privilege**
39:*5*  201:*1*
202:*23*
203:*8*
**privileged**
43:*9*
200:*15*
201:*7, 12,
14*
**privy**
274:*16*
**pro**  219:*13*
**probably**
21:*13*
36:*19*  41:*6*

54:*14*
59:*15*  60:*5*
81:*5*  109:*6,
12*  113:*3*
130:*18*
132:*2*
168:*9*
187:*13*
203:*10*
208:*21*
210:*13*
211:*16, 18*
216:*23*
217:*2*
281:*16*
306:*2*
**problem**
37:*13*  39:*9,
10*  201:*8*
**Procedure**
8:*6*  143:*14*
**procedures**
13:*2*  125:*6,
18, 22*
126:*6*
139:*12*
143:*7*
172:*6*
175:*11*
177:*10*
181:*8*
213:*13*
214:*5*
**proceed**
219:*17*
**proceeding**
259:*8*

**proceedings**
8:*12*
**proceeds**
178:*18*

**process**
35:*4, 6, 8,*
*14, 21*
38:*10*
49:*18*  82:*7*
84:*6*  85:*8*
101:*19*
246:*6*
282:*10*
296:*12*
302:*13*
303:*15*
304:*22*
**processed**
303:*4*
**processes**
13:*9*
**produce**
227:*2, 7*
**produced**
28:*14, 16*
60:*9*  131:*1*
146:*1*
216:*7*
231:*18*
257:*18*
275:*2*
**produces**
9:*20*
**producing**
106:*7*
227:*7*
**production**
25:*20*
54:*18*
100:*4*
113:*19, 22,*
*23*  114:*19*
115:*2, 4, 5*
143:*16*
148:*10, 19*
153:*10, 12*

157:*10*
229:*5, 6, 12,*
*22*  230:*12,*
*14, 18*
231:*5*
238:*17*
**products**
100:*18*

**professional**
124:*21*
**programs**
87:*23*
150:*11*
**prohibited**
183:*2, 7, 15*
**prohibiting**
32:*11*
215:*5*
216:*2*
**prohibits**
191:*3, 10*
**project**
51:*15*
53:*14*  54:*1,*
*3, 6, 8, 17,*
*18, 23*  55:*4,*
*12, 15*  60:*2*
69:*21*
85:*19, 23*
120:*4*
122:*13*
**Projected**
105:*21*
108:*12*
109:*5*
110:*23*
111:*2, 3, 4,*
*22*  112:*9,*
*20, 22*
*113:14, 17*

**promise**
225:*22*
**prompted**
28:*8, 12*
**promptly**
88:*19*
125:*4, 14*
**proof**  81:*22*
**proper**
125:*1*
229:*22*
**properly**
125:*2*
182:*21, 22*
**property**
64:*7, 22*
67:*9, 20*
69:*1, 6, 8,*
*14*  78:*18*
93:*3*  98:*21*
100:*9, 12*
106:*15, 21*
107:*3, 11*
124:*7*
126:*12*
133:*13*
174:*5, 13,*
*15*  175:*21*
182:*5, 10,*
*15*  183:*6,*
*17, 21*
184:*15*
185:*6*
186:*6*
236:*6*
243:*10*
245:*6, 15*
251:*17*
**protected**
39:*5*
107:*11*

261:*23*
262:*22*
**protection**
88:*17*
106:*12, 14,*
*20*  138:*18*
139:*10, 15*
141:*8, 12*
165:*5*
171:*11, 14*
173:*3*
175:*9, 22*
**protective**
148:*18*
229:*23*
230:*7*
**protocol**
143:*14*
237:*22*
238:*16*
239:*18*
289:*17*
**protocols**
139:*12*
143:*9, 15*
148:*9, 18*
149:*7, 21*
171:*14*
172:*16*
175:*22*
241:*8*
244:*15*
**provide**
16:*14*  39:*8*
44:*16, 21*
45:*23*
49:*16*  58:*8,*
*16*  62:*4, 11*
70:*21, 23*
71:*9*  80:*21*
81:*22*  82:*5*
83:*14, 17,*

*19, 22*
84:*21, 22*
85:*9*  97:*9*
102:*17*
103:*20*
104:*3, 7, 8*
106:*12, 13,*
*18*  107:*15*
108:*8, 14*
117:*19*
124:*11*
126:*20*
127:*6, 18*
129:*13*
132:*8*
141:*10*
151:*21*
153:*18*
163:*20*
172:*14*
191:*2*
209:*5*
257:*7*
278:*23*
281:*23*
282:*8*
**provided**
43:*20*
44:*13, 19*
45:*6, 21*
55:*3, 20*
61:*4, 20*
64:*1*  68:*6*
69:*11*
70:*20*  73:*2*
82:*12, 18*
83:*9*  84:*5,*
*8*  89:*6, 8*
94:*3*  98:*12,*
*14, 23*  99:*6*
107:*2, 9*
117:*13, 16*

123:16, 19, 21  126:10, 11, 14
127:1, 4
130:4, 5
132:17
134:12
137:15, 21
146:4
153:23
154:3
171:13
172:19
193:18
217:1, 4
241:16
243:5
258:8
260:23
264:9, 15
265:2
267:15
296:18, 22
302:12
304:23
**provider**
158:23
288:17
**provides**
42:17
139:12
161:9
196:8
202:14
**providing**
38:23
54:21  55:7, 16  106:11
145:4, 7
283:4
304:8

**provision**
64:19  69:3
78:12
80:21
85:12
129:5
**provisions**
213:15
214:1
**proximity**
162:2
**Public**
2:13  8:2
12:19
33:23
158:22
**punitive**
277:3
**purchasing**
74:16
122:15
159:1
160:1
**purely**
105:18
**purpose**
124:18
139:9
171:9
229:19, 20
**pursuant**
2:6  8:5
58:3  64:12
66:4  67:11
118:15
119:12
172:19
173:12, 18
175:13
189:17
196:16

201:22
305:12
**pursue**
223:2
**pursuing**
56:23
**purview**
143:6
**put**  27:2
79:6  120:7, 9  145:11
165:23
193:21
204:9, 12
206:11
221:8
225:1
244:10
293:13
305:14
**puts**  72:19

< Q >
**Q**  9:3, 11, 13, 18, 22
10:2, 5, 12, 14, 20, 23
11:3, 7, 10, 15, 17, 20
12:2, 6, 8, 12, 21  13:3, 10, 15, 22
14:10, 14, 18, 22  15:3, 6, 15, 20, 23
16:5, 10, 16, 23  17:6, 12, 20  18:1, 11, 20, 22  19:8, 11, 16, 22
20:3, 8, 18, 23  21:3, 9,

17, 20  22:1, 6, 10, 14, 19
23:2, 5, 12, 18  24:4, 9, 11  25:5, 9, 13, 19  26:3, 8, 14, 21
27:11, 18
28:22  29:2, 4, 6, 12, 15, 19, 22  30:1, 6, 9, 12, 15, 18, 20  31:1, 6, 10, 16, 20
32:5, 9, 14, 18, 22  33:2, 5, 8, 17, 21
34:12, 14, 17, 21  35:7, 23  36:5, 8, 11, 14, 17
37:10, 23
38:9  39:3, 15, 19  40:7, 11, 17, 21
41:3, 13, 21
42:2, 7, 11, 16  43:12, 21  44:7, 12, 23  45:8, 16
46:1, 6, 16, 20  47:2, 10, 15  48:2, 7, 10, 16, 20
49:2, 6, 14, 20  50:4, 12, 16, 21  51:3, 15, 19, 22
53:2, 6, 10, 22  54:8, 12
55:2, 9, 18
57:17, 23

58:16, 20
62:1, 7, 14, 18  63:3, 6, 21  64:3, 19
65:10  66:4, 13, 19  67:3, 8, 18  68:2, 9, 13  69:10, 16  70:7, 11, 16, 22  71:4, 10, 17  72:8, 17  73:5, 9, 15, 19  74:5, 12, 17  75:1, 6, 9, 17
76:2, 8, 12, 16, 23  77:4, 8, 14, 18, 21
78:5, 10, 21
79:5, 14, 16, 23  80:5, 20
81:3, 7, 10, 15, 22  82:8, 12, 17, 21
83:4, 8, 15, 20  84:8, 13, 20  85:7, 15
86:9, 12, 17, 23  88:5, 7
89:2, 5, 9, 13  90:20
91:7, 9, 15, 19  92:4, 8, 13, 17  93:6, 16, 18  94:2, 14, 21  95:2, 5, 16, 23
96:9, 20
97:3, 6, 11
98:4, 11, 17, 20  99:3, 7, 14  100:2, 8,

11, 21
101:6, 9, 13
102:3, 8, 10,
18   103:7,
10, 14, 18
104:6, 13,
17, 20, 23
105:3, 6, 10,
16, 20, 23
106:10, 19,
23   107:13,
19   108:5,
15   109:1,
15, 21
110:4, 12,
21   111:2,
12, 18
112:2, 6, 11,
16, 22
113:6, 9, 13,
17   114:2, 6,
16, 20, 23
115:3, 10,
19   116:2,
10, 13, 17,
22   117:9,
12, 17
118:3, 9, 13,
18, 22
119:3, 8, 20
120:6, 11,
15, 20
121:2, 7, 17
122:9, 20
123:1, 9, 15,
20   124:5,
12, 14
125:8, 13,
23   126:4, 9,
15, 19
127:5, 13,
17   128:5, 9,

18, 22
129:3, 22
130:6, 23
131:9, 15,
23   132:4,
16, 22
133:8, 12,
16, 21
134:11, 15,
19   135:6,
12, 15, 22
136:3, 10,
15, 23
137:17, 22
138:11, 15
139:8, 16
140:1, 4, 8,
19   141:11,
15, 21
142:1, 4, 8,
11, 15, 19
143:4, 10,
19   144:7,
13, 16, 22
145:3, 9, 15
146:13, 17
147:13, 17,
20   148:1,
11, 20
149:1, 4, 9,
13, 18, 23
150:6, 9, 15,
19   151:1, 8,
16, 22
152:7, 10,
13, 19
153:2, 8, 17,
20, 23
154:4, 9, 13,
17, 19, 21,
23   155:5, 8,
12, 18

156:5, 13,
22   157:6
158:16
160:2, 11,
18, 21
161:4, 9, 14,
23   162:2, 9,
15, 20
163:5, 10,
20, 23
164:8, 20
165:4, 9, 16
166:1, 7, 16,
22   167:5,
22   168:6,
11, 20
169:4, 9, 15,
22   170:9,
20   171:1, 9,
18, 22
172:6, 11,
18   173:4,
11, 16
174:3, 8, 12
175:5, 11,
17, 23
176:11, 23
177:15, 20
178:3, 9, 17,
23   179:3
180:14
181:2, 9
182:1, 23
183:5, 14,
19   184:10,
21   185:4,
10   186:2
187:8, 18
188:13, 22
189:2, 8, 17,
23   190:19
191:5, 13,

20   192:13,
15, 20, 22
193:2, 7, 10,
20   194:3,
11, 20
195:1, 6
196:1, 7, 14,
16, 22
197:4, 9, 15,
22   198:4, 9,
15, 23
199:8, 12,
21   201:5,
14, 18, 21
202:3, 10,
21   205:12,
18   206:3,
13   207:5,
16   208:10,
13, 16
209:2, 8, 12,
17, 20, 22
210:3, 11,
16, 23
211:3, 8, 11,
22   212:10,
14, 17
213:1, 5, 11
214:3, 11,
18   215:4, 9,
16, 22
216:1, 5, 12,
17, 21
217:6, 12,
18, 21
218:2, 22
220:1, 7, 18,
22   221:14,
19, 22
222:3, 8, 16,
20   223:15
224:4, 11,

17   225:5,
11   227:10,
15, 20
228:4, 6, 12,
17, 20
229:3, 6, 11,
15, 19
230:11, 17
231:8, 17,
23   232:7,
10, 14, 20
234:11, 17
235:2, 7, 12,
21   236:3, 9,
14, 18, 22
237:4
238:1, 8, 12,
18, 22
239:3, 9, 13,
21   240:3,
12, 16, 23
241:9, 15,
20   242:1, 4,
15   243:1, 7,
14, 21
244:2
245:4, 9, 12,
18, 23
246:7, 15,
19   247:1, 4
248:1, 6, 11,
17, 20
249:5, 12,
22   250:2, 4,
12, 18, 23
251:11, 22
252:4, 8, 19
253:1, 6, 11,
15, 22
254:1, 5, 13,
22   255:7,
13, 15

256:1, 4, 17
257:7, 11
259:17
260:4, 11, 15, 18, 22
261:8, 11, 16, 18, 20
262:6, 11, 15, 18
263:3, 10, 13, 17, 20
264:2, 9, 17
265:4, 16, 21  266:1, 6, 17, 20
267:4, 11, 18  268:6, 10, 15, 19
269:2, 7, 13, 17, 22
270:1, 4, 10, 13, 18
271:1, 17
272:1, 4, 6, 10, 22
273:2, 5, 11, 14, 16
274:1, 16, 22  275:2, 7
276:2, 6, 8, 10  277:22
278:9
279:6, 13, 20, 22
280:5, 14, 17, 21
281:3, 7, 12, 18, 21
282:5, 11, 16, 23
283:4, 9, 12, 19  284:1, 8,

17, 23
285:14, 22
286:3, 8, 19
287:2, 7, 14, 19  288:1, 13, 18
289:1, 4, 10, 12  290:2, 4, 13, 16, 21
291:16, 21
292:1, 4, 8, 19  293:7, 17, 22
294:3, 9, 13, 20  295:3, 6, 11, 14, 18, 22  296:7, 14, 21
297:2, 5, 11, 17, 20
298:9, 12, 17  299:4, 8, 13, 17
300:1, 9, 15, 19  301:5, 17, 22
302:5, 13
303:8, 12, 16  304:10, 16  305:3, 11, 22
306:3

qualification
246:11
qualifications 119:10
121:8
qualified
63:7, 13, 20, 22  76:21
246:10, 20

qualify
135:9
Quality
159:20, 22
question
15:9  19:3
38:15, 17, 21  39:12
42:1  48:4
54:3  55:15
56:17  57:3, 8, 23  58:1
61:10, 18
65:11, 12
66:14  73:1
75:7, 18
79:3  83:6, 7, 21  98:2
112:5
121:13
129:22
130:10
135:21
166:14
177:19
182:1
187:23
188:8, 13
194:10
200:3
207:16
213:18
221:10
223:15
224:5, 9
225:6, 22
231:1
234:10
239:3
244:23
247:10
253:9

255:20
256:1, 11
259:10
267:4
272:1, 21
275:8
276:7, 9, 17
277:17
280:5
281:18
290:21, 22
296:20
questioning
57:1
258:23
259:9
questions
3:3, 4  37:7
46:2  95:6
103:15
158:1
160:2
218:14
227:1, 5
235:13
284:9
303:2
306:14, 18
308:8
quick  25:3
quickly
263:11
Quite  294:1
quote
104:7, 10

< R >
R  4:1
308:1
rabid  35:13
race  31:12
198:13

202:12
206:12, 15, 21, 23
219:5
220:2, 10
221:15
223:23
raised
146:22
147:1
182:20
200:13
203:15
207:10
217:22
247:14
260:16
raises
199:2
ranging
26:22
rate
136:17, 23
137:2, 20
138:1, 7, 8, 11, 13
rates
46:13
60:21
137:17
rationale
171:7
Ray
232:21
233:3
234:7
RBurns
153:22
reach
289:4, 6
290:17

Case 2:19-cv-00767-ECM-SMD   Document 68-2   Filed 10/12/22   Page 139 of 227
USCA11 Case: 24-11126   Document: 58-1   Date Filed: 02/14/2025   Page: 337 of 425
Robert Burns

6/22/2022
138

**read** 8:22
66:5  86:21
88:8  92:18
95:11, 19
101:17
103:14
104:10, 12
178:2
180:20
193:2, 3
233:14, 23
234:2, 5, 9
235:15
287:9
**reading**
2:18  54:5
66:1  78:13
81:1, 2
104:2
118:23
183:10
234:3
235:17
265:1
300:3
**reads**
53:11, 22
62:19  63:6
64:5  68:14
69:17
213:12
237:10
**ready**
139:7
235:12
**realized**
233:14
**really**
15:19
93:23
133:17
161:1

204:22
250:22
258:1
266:14
282:2
284:5
**realm**
280:11
**reason**
33:21  45:8,
12  51:5
55:9  56:23
61:10
168:11
232:22
246:7, 12,
21  264:17
265:4
281:16
**reasonable**
70:3  71:8
72:15
102:12
262:20
275:10
**reasonably**
248:8
**reasons**
36:21
246:11
264:3, 5, 10,
15, 18
**recall** 22:8
34:11  35:4
133:19
266:13, 14
267:23
271:20
272:14
279:17
**recalling**
28:2

**receive**
49:10
161:16
172:11, 22
196:14, 15
246:2
252:4
290:22
291:11
**received**
93:1
118:14
150:21
153:13
197:18
202:11
205:12, 19
215:16
216:18
223:18
227:11
243:8, 16
249:17, 19
250:9, 19
253:2, 7, 19
254:7, 11
255:12
287:21
288:4
289:6
290:7
297:15, 17
305:5
**receives**
118:22
196:11
246:4
**receiving**
99:11
248:20
289:12

294:7
302:23
**recertify**
126:21
**recess**
59:21
123:7
164:18
195:4
200:5
226:1
277:5
306:11
**recipient**
295:19
**recognize**
280:23
281:17
**recollection**
31:1  181:6
251:8
**recommend**
182:14
185:21
262:20
300:5
**reconsider**
264:4, 11
265:5
**reconsidera
tion** 264:19
**record** 9:9
34:1  37:17,
18  38:20,
22  39:13
56:16  57:5
61:22
86:21
110:19
151:11
152:6
164:17

221:8
225:13
279:17
301:1, 2
302:2
303:7
306:21
**recorded**
21:1, 2
**records**
47:14
61:14
211:8, 11
251:12, 21
278:18
279:13, 16
**rectangle**
160:5
**rectangles**
160:6
**redact**
153:20
**redacted**
51:6, 23
52:3, 18
60:3  86:1
**Redmond**
5:4  306:22
307:1
**refer** 9:15
38:20
42:15
113:22
115:6
131:13
132:1
166:8
191:21
196:4
294:17
**reference**
10:8  23:15

26:10
37:16  51:1
79:9, 10, 20
80:12
89:15  94:5
111:1
153:4
170:11
232:23
233:4
238:19, 20
239:17
285:14
**referenced**
90:13
153:14
251:3
**references**
119:4
180:21
239:14
286:1
**referencing**
261:3
**referred**
18:14
48:14
131:4
147:4
156:17
172:3
**referring**
37:14
73:12  80:5
109:11
115:2
129:18
132:2
133:3
151:13
154:8
164:8

168:1
233:11
234:13, 16
238:15
239:16
243:11, 13
291:23
**refers**  9:16
241:7
**reflect**
37:19
43:21  44:8
46:17  62:5,
22  67:19
102:15
117:13
118:3
148:21
149:14
186:17
198:4, 6, 10,
16  211:9,
12  212:1, 2
254:14
290:7
293:5
**reflected**
67:10
125:10
148:8
150:1
**reflecting**
212:22
**reflective**
68:5
**reflects**
102:13
212:11
284:21
**refresher**
124:3, 6
126:21

127:11, 14,
16  192:9
195:21
205:17
215:2
**refuse**
88:20
221:10
**regarding**
141:3
237:11
239:11
300:7
**Regardless**
170:17
175:7, 14,
23  183:12
192:8
244:2
**regular**
161:2
195:22
214:10
**regularly**
194:15
196:9
213:23
**regulations**
87:23  88:4
143:7
**relate**
22:11
89:13
127:8
130:8
152:14
251:15
279:3
289:15
290:6, 18
**related**
30:2, 4

31:15, 21
32:6  35:17
36:3, 6, 8
39:16
55:11
73:17
94:22
105:18
141:7
145:13
148:9
149:19, 21
150:23
152:6, 23
165:19
181:8
189:14
195:16
198:21
206:11
282:4
305:5
**relates**
52:8  135:7
151:23
203:16
229:16
237:22
277:2
**relating**
2:22  64:8,
22  79:6, 16
152:22
206:14
214:22
227:12
241:11
251:23
**relation**
308:14
**relations**
12:19, 21

17:18
20:13
21:14, 17
158:23
159:10
192:12
198:2, 19,
23  199:3, 6,
8  201:16
202:20
207:11, 13,
23  209:2, 3
210:11
213:17, 21
**relationship**
15:23
16:10  17:1,
8, 11  32:15
57:2  58:15
60:18, 23
61:15
270:6, 15
296:15
**relative**
105:14
188:20
195:17
273:21
**released**
33:13, 14
35:20
**relevance**
175:19
180:17
**relevant**
184:6
276:5
**religion**
31:12
198:13
**rely**  37:1
45:10  46:7

Robert Burns

| | | | |
|---|---|---|---|
| 147:*2* | **rendered** | 118:*5* | 199:*4, 6* |
| 278:*12* | 67:*15, 16* | 197:*22* | 208:*5* |
| **relying** | 305:*10* | **Reporter** | 252:*11* |
| 225:*13* | **rep** 207:*11* | 8:*2, 19* | 261:*21* |
| **remain** | **repair** | 19:*6* 28:*9* | |
| 78:*17* | 100:*5, 6* | 85:*20* | **represented** |
| **remained** | **repeat** | 306:*22* | 56:*3, 6* |
| 44:*9* | 64:*17* | 307:*3* | 156:*13* |
| **remaining** | 70:*12* | **reporting** | 219:*9* |
| 219:*16* | 130:*13* | 18:*19* | 240:*17* |
| **remedy** | 222:*6* | 197:*9, 15* | 256:*4* |
| 185:*23* | **repeating** | 198:*9, 15* | **representin** |
| **remember** | 110:*22* | **reports** | **g** 37:*3* |
| 27:*18* | **rephrase** | 17:*16* | 59:*19* |
| 30:*15* | 37:*8* 57:*8* | 117:*19, 21* | 132:*14* |
| 32:*18* | 65:*13* 66:*4* | 118:*10, 12,* | 263:*23* |
| 33:*16, 17,* | 81:*18* | *14, 18, 21,* | 265:*1* |
| *20* 34:*14,* | 82:*17* | *22* 119:*4* | **represents** |
| *17* 35:*1* | 95:*15* | 194:*15* | 10:*16* |
| 159:*5* | 108:*6* | 196:*16, 18* | 51:*12* |
| 210:*14* | 150:*15* | 197:*3* | 68:*15* |
| 218:*8, 10,* | 255:*7* | **represent** | 105:*12* |
| *18* 257:*21* | 256:*16* | 38:*1* 51:*10* | 133:*6* |
| 266:*9* | 279:*23* | 120:*4* | 138:*12* |
| 272:*19* | 282:*19* | 122:*13* | 139:*19* |
| 273:*1, 9* | **replace** | 136:*17, 23* | 166:*5* |
| 280:*10* | 88:*22* | 137:*3, 7, 18* | 292:*17* |
| 284:*6* | **replaced** | 156:*6* | 304:*2* |
| **remove** | 209:*18* | 165:*16* | 308:*10* |
| 69:*4, 13* | **report** | 166:*3* | **reprimand** |
| 88:*19* | 14:*22* 15:*1* | 275:*4* | 91:*11* |
| 185:*5* | 60:*11* | **representati** | **reproduce** |
| 188:*1* | 117:*23* | **on** 14:*15* | 80:*8* |
| 240:*21* | 118:*1, 8* | 117:*16* | **Request** |
| **removed** | 141:*17* | 157:*1* | 25:*19* |
| 69:*8* | 196:*9, 11,* | 241:*10* | 26:*15* 27:*1* |
| 182:*15* | *14, 15, 22* | 242:*3* | 72:*4* 93:*9,* |
| 240:*6, 9, 19* | 197:*4, 11,* | 303:*18* | *12* 108:*16* |
| 243:*18* | *17, 21* | **representati** | 125:*4, 14* |
| 251:*16* | **reported** | **ons** 259:*4* | 126:*1, 3, 5* |
| | 18:*5, 15* | **representati** | 153:*7, 10,* |
| | | **ve** 131:*16* | *12, 16* |

| |
|---|
| 154:*7* |
| 180:*8, 10* |
| 187:*16* |
| 190:*10* |
| 197:*3* |
| 199:*22* |
| 203:*1, 6* |
| 210:*17* |
| 290:*22* |
| **requested** |
| 13:*16* 26:*6* |
| 108:*18* |
| 179:*16* |
| 243:*17* |
| **requesting** |
| 125:*21* |
| **requests** |
| 25:*14, 17* |
| 63:*9* |
| 125:*16* |
| 285:*18* |
| 289:*13* |
| **require** |
| 81:*19* 87:*1* |
| 124:*5, 9* |
| 127:*18* |
| 251:*19* |
| **required** |
| 22:*4* 62:*6* |
| 82:*7* 85:*9* |
| 86:*17* 87:*5,* |
| *22* 104:*16,* |
| *17* 123:*21* |
| 126:*15, 18,* |
| *20* 127:*6* |
| 131:*16* |
| 151:*7* |
| 152:*3* |
| 184:*2* |
| 213:*2, 19* |
| 230:*12, 15* |
| 252:*14* |

285:*3, 13*
286:*5*

**requirement**
62:*12*
107:*22*
109:*10*
251:*13*
**Requiremen
ts**  105:*21*
108:*13*
109:*6*
110:*23*
111:*3, 4, 13,
22*  112:*21,
23*  113:*15,
18*  148:*9*
149:*22*
**requires**
93:*7* 158:*4*
**requiring**
86:*19*
107:*15*
**reread**
270:*9*
**research**
280:*3*
281:*5*
**resolution**
218:*6*
**resolved**
33:*6*
217:*22*
218:*1*
219:*12, 14,
20*
**resources**
13:*4, 12*
17:*19, 21*
19:*1, 15*
96:*10*
159:*14*

194:*13, 17,
19*  197:*17*
198:*8*
266:*18, 21*
268:*7*
271:*3*
272:*12*
**respect**
23:*12*
53:*17*
78:*10*
92:*20*
146:*17*
212:*17*
217:*21*
230:*2*
242:*4, 16*
**respective**
2:*10*
**respond**
27:*1*
**responded**
148:*2*
**respondent**
252:*12*
270:*16*
**responding**
217:*18*
252:*14*
**Response**
6:*22*  25:*6*
65:*10*
81:*13*
144:*17*
150:*9, 12,
14*  153:*11*
165:*7*
222:*4*
224:*19*
234:*18, 19*
260:*5*
262:*7*

263:*1*
267:*6*
280:*6, 7*
297:*19*
298:*7*
**Responses**
6:*14*  144:*2*
203:*9*
**responsibilit
ies**  19:*12*
20:*8*
161:*21*
163:*11*
172:*16*
284:*3, 19*
285:*2*
286:*5, 23*
**responsibilit
y**  17:*15*
62:*9*  66:*21*
142:*23*
143:*1*
174:*2*
187:*14*
188:*15*
269:*10, 18*
271:*22*
**responsible**
12:*14*  13:*8*
18:*4*  19:*18,
19*  64:*6, 14*
65:*3, 16*
66:*6*  129:*6*
142:*21*
151:*5*
163:*15*
169:*12*
187:*19*
190:*19*
191:*1*
207:*5*

213:*1, 18*
217:*18*
**responsive**
25:*16*
153:*10*
180:*10*
203:*6*
**restaurant**
12:*18*
**restrooms**
12:*18*
**restyle**
237:*7*
**result**  65:*4,
17, 20*  66:*8,
22*  305:*5*
308:*16*
**resume**
13:*17, 19*
18:*9*
**retain**  85:*3*
151:*7*
212:*15*
**retained**
212:*13*
263:*21*
**retains**
212:*14*
299:*2*
**retaliation**
127:*9*
191:*4, 11*
202:*13*
206:*1*
214:*23*
215:*6*
216:*3*
220:*3*
221:*16*
223:*8, 19,
20*  224:*7*
249:*2*

261:*22*
262:*21*
266:*3*
**retaliatory**
31:*7*  34:*8*
**retention**
150:*22*
151:*5, 11*
152:*6, 15*
279:*17*
301:*1*
**retired**
12:*7*
209:*17*
**returned**
78:*19*
**reveal**  43:*7*
**reveals**
270:*14*
**review**
40:*7, 18*
105:*7*
192:*21*
208:*4, 6*
213:*23*
214:*3*
216:*13, 15*
235:*20*
248:*18*
268:*16*
303:*1*
304:*21*
**reviewed**
24:*21*  25:*4*
27:*14*
29:*10*  32:*3,
12*  35:*16*
37:*12*
40:*18*  72:*1*
103:*4, 17*
105:*9*
141:*5*

164:*2, 5*
193:*6, 8, 14*
208:*7*
214:*15*
235:*9*
274:*20*
295:*4*
299:*15*
**reviewing**
124:*18*
140:*14*
209:*7*
230:*23*
237:*10*
239:*10*
274:*19*
287:*11*
295:*5*
**reviews**
103:*16*
105:*8*
193:*18*
214:*8, 12*
235:*19*
**revision**
169:*13, 16,
18, 19, 20*
228:*22*
**revisions**
171:*22*
178:*6*
**revisit**
259:*7*
**Rick**  11:*12*
18:*3*
**rid**  185:*12*
**Riddle**
297:*3*
299:*20*
**ride**  133:*12*
**right**  13:*10*
15:*12*

19:*11*  23:*1*
24:*14*
25:*19*
26:*19*
27:*11*
28:*21*  33:*1,
19*  34:*3*
35:*22, 23*
36:*20*  38:*2*
39:*14*  41:*6,
8*  49:*20*
61:*5, 23*
77:*4*  81:*2*
86:*9*
102:*18*
105:*5, 22*
112:*21*
116:*22*
117:*2, 12*
120:*21*
121:*22*
123:*9*
129:*18, 19*
130:*21*
138:*14, 21*
139:*5*
140:*10*
142:*4, 7, 8*
143:*19*
144:*6, 9, 14*
152:*22*
154:*13*
156:*9*
159:*21*
160:*1*
161:*23*
164:*10, 20*
165:*9*
166:*2, 15*
167:*5*
169:*15*
171:*9*

178:*22*
179:*3*
182:*13, 18*
183:*10*
189:*15*
195:*2*
208:*19*
220:*16*
222:*16, 22*
227:*9*
235:*23*
252:*19*
261:*4*
268:*2*
270:*11*
272:*4*
302:*5*
303:*16*
**right-hand**
49:*23*
120:*2*
121:*15*
131:*22*
**Rights**
89:*16*
92:*11*
293:*19*
**Rob**  210:*15*
**ROBERT**
1:*17*  2:*1,
11*  6:*4*
8:*10, 15*
9:*10*  163:*1*
**Robinson**
232:*21*
233:*3*
278:*20*
280:*22*
292:*19*
293:*20*

**Robinson's**
289:*1*
290:*5, 18*
**role**  11:*6,
21*  12:*6, 8*
15:*1, 15*
17:*12*  18:*8,
15*  19:*16*
68:*6*  84:*2*
132:*14*
209:*23*
240:*1*
266:*18*
268:*6*
269:*17*
282:*4*
**roles**  11:*4*
13:*11*
14:*23*
17:*13*
161:*21*
172:*16*
208:*18*
**roll**  236:*4,
5, 7, 10, 15,
20, 22*
**roof**  10:*18*
**room**
208:*14*
210:*5*
236:*5, 6, 8,
10, 12, 16,
20, 23*
295:*9*
**rosters**
22:*21*
**rotate**  15:*8*
**rotates**
15:*16*
**route**  49:*19*
**rover**
137:*16*

**RSA**  2:*4,
14*  8:*7*
**rule**
143:*14*
305:*12*
**rules**  2:*21*
8:*5*  36:*18*
86:*15*
87:*22*  88:*3,
5, 15, 21*
92:*2*  176:*9*
183:*23*
**run**  15:*11*
113:*19, 23*
115:*15, 20*
**runs**  115:*1*
**rushing**
88:*11*

**< S >**
**S**  2:*8*  4:*1*
**s/Tanya**
308:*19*
**Saban**
35:*10*
**safety**
12:*20*
17:*19*  20:*4,
5*  87:*22*
88:*16*  91:*2*
117:*20*
119:*1*
138:*17*
139:*9, 14*
141:*7, 11,
17*  142:*19,
20, 22*
143:*2, 3, 6,
8, 14, 15*
147:*21, 23*
148:*9, 18*
149:*7, 21*

159:*11*
165:*5*
171:*10, 14*
172:*4, 5, 8,*
*10*  173:*2*
175:*9, 21,*
*22*  229:*22*
230:*2, 5, 16,*
*19*  237:*22*
238:*15*
239:*18*
241:*8*
244:*15*
**SAITH**
307:*12*
**salutation**
295:*15*
**sat**  209:*12*
**save**  23:*21*
87:*13*
**saw**  27:*19*
133:*21*
134:*3, 6*
170:*1*
189:*19*
235:*3, 6, 11*
261:*19*
270:*11*
297:*11*
**saying**
47:*5*  50:*19*
55:*22*
77:*21*  85:*4*
103:*18*
110:*13, 16*
111:*16*
112:*18*
116:*13*
117:*7*
134:*10*
175:*3*
178:*22*

185:*13*
188:*11*
193:*7, 11*
195:*11, 20*
267:*23*
272:*6, 18*
275:*1, 13*
279:*22*
281:*8*
285:*11*
293:*12*
**says**  9:*14*
41:*15*
48:*10*
53:*10*
54:*12, 15*
57:*15*  62:*9*
64:*21*
79:*21*  80:*6,*
*8, 9*  103:*11*
104:*2, 6, 15*
110:*16*
114:*10*
125:*14*
128:*10*
131:*10, 19*
133:*15*
134:*16*
138:*12*
141:*16*
142:*11, 19*
143:*2*
148:*2*
162:*6*
165:*12*
168:*5*
169:*10*
170:*10*
177:*9*
194:*13*
207:*18*
213:*11*

236:*3*
237:*18, 21*
239:*10*
241:*4*
244:*22*
258:*7*
280:*4*
284:*11*
285:*1, 2*
286:*5, 7*
295:*11, 15,*
*22*  300:*3*
**say-so**
134:*20*
**scan**  125:*2*
ScDuke@He
c.co.kr
295:*12*
**schedule**
106:*2*
107:*19, 21*
124:*17*
136:*15, 22*
137:*18, 19*
**schedules**
115:*6*
116:*16*
**scheduling**
20:*16, 17,*
*18*
**scope**
49:*13*
55:*19*
62:*19, 23*
63:*3, 14, 16*
64:*1*
100:*22, 23*
101:*9*
108:*10*
110:*8*
111:*21*
113:*5*

120:*9*
124:*4*
164:*7*
244:*6, 17*
259:*1*
269:*1*
**Scott**
18:*18, 20*
194:*23*
209:*14*
**screen**
130:*23*
**se**  219:*13*
282:*3*
**search**
44:*8, 10*
150:*7*
153:*3, 7, 16*
**searchable**
152:*15*
**second**
26:*14*
49:*21*
59:*15*
92:*17*
123:*5*
146:*18*
159:*2, 3, 22*
225:*18*
233:*4*
235:*18, 23*
237:*5*
250:*23*
276:*22*
292:*21*
302:*17*
306:*8*
**secondarily**
98:*15, 17*
**Secondly**
60:*7*

**secretary**
60:*11*
61:*14*
**secrets**
39:*6, 7*
**section**
53:*10*
55:*18*  62:*2,*
*8, 18*  64:*20*
66:*5*  67:*5,*
*11*  68:*14*
69:*12, 17*
71:*5, 11, 19*
72:*1, 11*
78:*7, 10, 21*
79:*5, 14, 16*
81:*4, 10, 14*
85:*13, 17*
86:*14, 16,*
*18, 19*  87:*5,*
*20*  90:*21*
91:*10, 14,*
*17*  92:*6, 22*
94:*13, 22*
95:*8, 12*
105:*3, 20*
107:*13*
117:*17*
119:*8*
120:*12*
123:*12, 13*
125:*10*
126:*19*
128:*6, 8, 9*
129:*11*
130:*15*
131:*5, 10*
132:*6*
135:*5*
178:*17*
213:*3, 5, 7,*
*20*  286:*4*

**sections**
86:*13*  92:*2*
127:*7*
230:*21*
**secured**
107:*4*
**SECURITY**
1:*12*  28:*14*
32:*16*
34:*20*  42:*5*
43:*19*
44:*13, 16*
49:*4, 6, 9*
54:*11*  58:*8*
61:*2*  62:*5,*
*11*  67:*17*
79:*19*
88:*17*
98:*12*
102:*5*
104:*9*
106:*13, 17*
107:*9*
108:*23*
110:*3, 10*
111:*11*
116:*8*
117:*20*
118:*2*
119:*1*
123:*3*
124:*10, 21,*
*23*  128:*11,*
*16, 20*
129:*14*
130:*16, 17*
133:*1, 2, 3,*
*4, 15, 16, 22*
134:*4, 12,*
*13, 17*
135:*10, 19*
138:*18*

139:*9, 14*
141:*8, 12,*
*18*  142:*1, 3,*
*14*  143:*11*
155:*6, 9*
161:*11*
165:*5*
167:*1*
171:*10, 14*
173:*2, 5, 13,*
*19*  175:*9,*
*21*  185:*5, 8,*
*12*  188:*2, 4,*
*5, 8, 20*
189:*15, 16,*
*18, 21*
234:*19*
236:*4, 5, 7,*
*10, 15, 19,*
*22*  237:*1*
239:*19*
243:*12, 14,*
*15*  245:*8*
250:*6*
260:*19*
272:*2*
277:*10*
280:*15, 20*
282:*8*
285:*19*
288:*19*
290:*20*
291:*22*
296:*10*
297:*3, 8, 13,*
*21*  298:*2*
299:*21*
300:*8*
302:*12, 20*
304:*7*
305:*1*

**see**  35:*9,*
*11*  38:*18*
39:*12*  41:*5*
50:*1, 23*
52:*22, 23*
55:*16*
60:*13*  67:*7*
73:*10*  78:*9*
79:*9, 10, 20*
81:*13*
101:*14, 16*
102:*19*
103:*10, 12,*
*13*  107:*20*
109:*15*
113:*17*
116:*2*
117:*17, 18*
118:*7, 8*
119:*8*
126:*16, 20*
127:*20*
128:*8*
129:*13*
131:*20*
132:*7*
139:*18*
140:*9, 11,*
*17, 18*
141:*15, 20*
142:*5*
149:*9, 23*
151:*20*
153:*4, 12*
156:*1*
160:*4*
165:*10, 13,*
*15*  166:*1*
167:*7, 9*
169:*16*
172:*7*
180:*1, 20,*

*21*  182:*21*
190:*3, 7, 8,*
*13, 21*
201:*23*
210:*18*
216:*19*
230:*9*
233:*20*
236:*1, 2, 12*
257:*22*
261:*18*
264:*6*
270:*11, 17*
274:*23*
283:*13*
284:*11*
288:*21*
289:*1*
292:*22*
297:*20*
302:*17*
303:*9, 13*
304:*11, 14*
305:*8*
**Seeing**
102:*3*
132:*11*
140:*19*
**seek**
246:*15*
248:*3*
**seeking**
87:*1*
**seen**  24:*9*
73:*5*  76:*16*
89:*20*
118:*11, 20*
146:*8*
163:*8*
166:*19*
233:*23*
235:*2, 18*

236:*13*
248:*17*
261:*16, 17*
263:*10*
265:*21*
281:*9*
284:*4*
287:*7*
294:*8*
295:*3*
299:*13*
302:*8*
**sees**  184:*3*
**self-serving**
76:*16*
**semi-colon**
296:*1*
**send**  90:*1*
112:*2, 12*
153:*19*
180:*11*
190:*11*
227:*3*
258:*7*
**sending**
291:*18*
292:*19*
298:*6*
**senior**
11:*13, 18*
12:*2, 9*
18:*23*
19:*13, 15,*
*17*  147:*22*
194:*19*
196:*12*
209:*9, 11,*
*14*  267:*5*
269:*13*
**sense**
191:*8*

197:*7*
255:*20*
**sent**  37:*1*
100:*19*
118:*19*
119:*5*
150:*1, 20*
153:*13*
185:*14*
232:*15*
233:*2, 15,*
*17*  234:*13*
237:*12*
251:*7, 23*
258:*12, 15*
287:*20*
288:*3, 4*
289:*5, 6*
290:*4*
291:*13*
294:*22*
299:*19*
303:*13, 20*
304:*12*
**sentence**
63:*6*  69:*17*
178:*19*
**Seoul**  16:*9*
76:*13, 14,*
*23*
**separate**
58:*13*
134:*12*
**serve**
208:*10, 13,*
*16, 22*
212:*7*
**served**
209:*23*
210:*18*
278:*9*

**server**
150:*16, 18,*
*19*  153:*3*
287:*17, 19,*
*23*  288:*2, 8,*
*11*  289:*8*
291:*13*
292:*17, 20*
298:*19*
300:*20*
**serves**
12:*22*
210:*3, 11*
**service**
44:*18*
64:*10*  69:*4*
100:*22, 23*
130:*5*
142:*18*
154:*3*
158:*23*
160:*13*
161:*11*
176:*1*
304:*8*
**services**
16:*15*
39:*21*
40:*23*  42:*5*
43:*19*  44:*6,*
*13, 16, 21*
45:*5, 23*
49:*2, 3, 5, 6,*
*11, 13, 15*
54:*1, 2, 11,*
*16, 21*  55:*2,*
*7, 16, 19*
57:*19*  58:*2,*
*8*  61:*3, 19*
62:*3, 6, 11,*
*20*  63:*1, 7,*
*17*  64:*20*

67:*9, 15, 16,*
*19*  68:*5*
70:*9, 21, 23*
71:*3*  72:*21*
94:*3*  97:*10,*
*11*  98:*12,*
*14, 23*  99:*6,*
*13*  101:*10*
102:*6, 16*
104:*9*
106:*11, 17*
107:*2, 8*
108:*14*
117:*1, 11,*
*13, 16*
118:*2*
123:*3*
124:*11*
133:*15*
134:*13*
137:*15, 21*
141:*9*
176:*10*
188:*21*
250:*6*
279:*1*
281:*23*
282:*8*
291:*22*
302:*12, 18*
304:*23*
305:*10*
**sessions**
124:*17, 20*
125:*5, 17,*
*22*  126:*6*
**set**  2:*6*
60:*17*
107:*14*
110:*4*
111:*22*
116:*11, 14*

119:*11, 18*
154:*2*
160:*21*
172:*7*
211:*6*
292:*12*
**sets**  109:*6*
110:*16*
161:*1*
301:*6*
**seven**
53:*15*
113:*18, 19,*
*23*  114:*2, 4*
264:*7, 15*
265:*9*
268:*4*
279:*18*
**seventeen**
10:*17*
**seventy-six**
137:*3*
**severity**
91:*13*
94:*11*
**sex**  198:*13*
**sexual**
205:*22*
**share**
73:*13*
**shared**
78:*15*
154:*17, 18,*
*21*  259:*18*
298:*3*
**sheet**  13:*14*
**shelters**
160:*8, 9*
**shield**
201:*2*
**shift**  114:*8,*
*10, 17, 20,*

*22*  115:*1, 4,*
*8, 14, 17, 23*
116:*16, 19*
137:*15*
**shifts**
114:*7*
115:*11, 12,*
*19*  116:*3, 4*
**Shinbaum**
32:*20, 23*
33:*3*
**shirt**  9:*13*
131:*2, 4, 8,*
*10, 12, 15*
132:*5*
**shirts**
131:*7*
132:*7, 10*
**shoot**
117:*7*
**shop**
115:*14*
230:*8, 9*
**shops**
148:*19*
149:*8*
229:*10*
230:*2*
231:*16*
**short**  60:*14*
**shoulder**
133:*6*
**show**
23:*18*  24:*1*
27:*16*  44:*5*
58:*21*  59:*2*
61:*14*
71:*20*  73:*6,*
*10, 19*  78:*1*
84:*14*
108:*17*
109:*2*

130:23
150:20
155:18
176:11
248:11
268:5
276:19
283:9
**showed**
149:7
**showing**
126:11
215:13
**shown**
67:14  68:7
145:21
215:2
**showroom**
159:18
**shows**
44:14
118:1
137:2
148:17
186:9
197:13
198:12
219:2
**shut**  106:8
**shutdown**
109:8
**shutdowns**
108:4
**side**
131:21, 22
133:14, 23
139:17
140:9, 10
142:4, 8
156:11
159:11, 13, 22

**sign**  8:22
84:3
260:12
282:3
**signature**
2:18  51:4
145:1, 2
291:18
292:10, 22
293:9
294:4, 6, 10, 14
**signed**
31:18, 20, 23  50:19
51:16
121:3
122:18
252:11
**signing**
145:4
**silently**
258:4
**similar**
73:23  74:1
195:21
227:3
294:18
**simple**
91:11
118:6
230:6
**simply**
31:22
237:7
**sir**  24:15
**sit**  208:14
223:12
**site**  53:16, 17, 20  54:6, 21, 23  55:7
99:9, 12, 21

100:15
106:18
132:7, 9
135:11
171:17
172:17
173:2
176:10
188:1, 2, 3
240:7, 10, 19, 22
243:18
**site-wide**
163:16
**sits**  193:12
209:8
**Sitting**
72:8
177:20
271:11
295:9
**situation**
35:19  91:6
185:22
186:15
189:11
223:13
249:21
**six**  113:23
173:14
266:13
271:10
273:5
**sixteen**
137:3
**size**  10:5, 14
**skills**  125:1
**skip**  81:10
237:9

**skipped**
145:9
176:18
**skipping**
138:21
**sleeve**
230:7
**slightly**
280:7
**slip**  24:17
**slower**
40:15
**small**  41:7
170:9
**Smith**
217:5, 12
246:1
248:22
258:21
297:16, 18
**snapshot**
199:23
**snippy**
272:6
**software**
150:11
**sole**  78:18
88:23
**somebody**
33:2  52:23
69:13  93:2
108:7
121:9
134:16
135:23
137:1
162:15
183:7
208:16
222:20, 22
230:17
244:8

**skipped**  247:20
260:11
263:20, 21
288:1
295:14
305:16

**somebody's**
80:23
186:11
**sorry**  10:6
12:18  28:9
33:12
34:11
40:10, 11
43:1, 8
47:23
59:11
85:20
94:18
97:16, 20
98:1  99:11
106:17
114:12
124:13
130:19, 21
142:9
143:1
146:2
149:3
164:6
181:19
185:7
188:9
212:7
217:3
273:13
278:8
289:21
302:6
**sort**  278:10

sought
  56:*18*
sounds
  204:*22*
source
  177:*4*
  178:*10*
  179:*4*
  187:*2, 9, 17*
  189:*9*
  249:*1*
  250:*10*
  279:*23*
  284:*13, 15*
sources
  190:*10*
sourcing
  70:*9, 11*
South  4:*12*
space
  156:*11*
spam
  153:*19*
Spanish
  76:*1*
speak  9:*4*
  32:*9*  38:*2,*
  *18*  40:*14*
  60:*7*
  260:*15*
  263:*14, 22*
  289:*11*
  290:*12, 19,*
  *23*
speaking
  72:*8*
  177:*20*
  223:*16*
  247:*15*
speaks
  86:*20*
  103:*23*

110:*19*
128:*4*
239:*7*
specific
  44:*3, 10*
  67:*15*  71:*7*
  72:*13, 22*
  74:*14, 17*
  78:*3*  95:*6*
  109:*18*
  113:*16*
  116:*6*
  118:*4*
  120:*18*
  121:*1*
  123:*18*
  125:*6, 18,*
  *20*  126:*6*
  128:*2*
  129:*19*
  132:*13*
  148:*19*
  151:*13*
  152:*5, 7*
  161:*19*
  168:*7*
  169:*1*
  173:*23*
  178:*5*
  185:*17*
  187:*5, 7, 16,*
  *18*  205:*23*
  207:*2*
  218:*13*
  230:*8, 10*
  251:*9*
  272:*19*
specifically
  68:*7*  74:*5*
  115:*7*
  122:*6*
  129:*12*

133:*3*
157:*9*
181:*15*
191:*13*
203:*1*
216:*21*
specificatio
ns  63:*17*
  78:*16*
  79:*12*
  117:*18*
specified
  63:*21*
  104:*10*
  110:*11*
  125:*7, 19*
  126:*7*
specifies
  49:*4*  132:*6*
  270:*8*
specify
  136:*5, 8*
speculating
  267:*1*
speculation
  111:*15*
  174:*17*
spell  11:*15*
  19:*8*
spelled
  86:*6*
spelling
  86:*3*
spells  62:*7*
spent
  192:*16*
spoken
  38:*23*

spreadsheet
  199:*19, 21*

square
  10:*18*
staff  172:*4*
  285:*7*
  286:*22*
Staffing
  105:*21*
  108:*9, 12,*
  *18*  109:*3, 6,*
  *9*  110:*10,*
  *23*  111:*3, 4,*
  *13, 22*
  112:*9, 18,*
  *20, 23*
  113:*14, 18*
  116:*8*
stamping
  229:*9*
standalone
  168:*18*
Standard
  28:*14*
  165:*19*
  167:*19*
  170:*19*
  178:*15*
  239:*12*
Standards
  6:*20*  91:*2*
  119:*9, 18*
  120:*5, 6*
  121:*9, 14*
  170:*15*
  171:*15*
  233:*5, 8, 10,*
  *11*  234:*12,*
  *15*  237:*12,*
  *15*  242:*9,*
  *21*
standing
  247:*21*

stands
  133:*11*
  230:*1*
start  116:*7*
  243:*14*
started
  178:*7*
  196:*6*
starting
  115:*8*
  295:*7*
starts
  51:*13*
  115:*14*
  178:*19*
State  2:*13*
  8:*3*  9:*8*
  35:*11*  36:*6*
  60:*11*
  61:*14*
  65:*14*  87:*8*
  94:*4*
  213:*15*
  214:*2*
  238:*12*
  308:*3*
stated
  72:*2*  83:*11*
  84:*1, 6*
  91:*1*
  102:*22*
  108:*11*
  135:*2*
  188:*17*
  300:*23*
Statement
  7:*4*  102:*13*
  103:*4*
  106:*1*
  123:*2*
  137:*11*
  144:*20, 21*

177:*12*
178:*20*
179:*1*
240:*12, 14, 17, 23*
252:*9, 10*
261:*4*
279:2, *5*
285:*21*
286:*2*
295:*23*
298:*2*
**state-of-the-art** 53:*13*
**STATES**
1:*1* 72:*17*
77:*3* 96:*21*
129:*12*
**statues**
267:*14*
**status**
108:*2*
**statutes**
270:*19*
275:*11*
**stenotype**
308:*8*
**Step** 200:*4*
204:*19*
260:*18*
288:*19*
306:*8*
**steps**
168:*21*
251:*13*
**Steve**
147:*15*
**Steven**
147:*13, 18*
148:*5*
**stipulate**
58:*5* 134:*5*

179:*7*
226:*10*
291:*4*
**STIPULATED** 2:*9, 17, 23* 3:*8*
**stipulates**
106:*16*
**stipulation**
8:*6*
**stipulations**
2:*6* 8:*20*
**stop** 38:*13*
187:*21*
245:*14*
**straight**
115:*16*
**straightforward** 57:*3*
**strain**
294:*21*
**strategies**
13:*9*
**Street** 4:*12*
**stretch**
38:*11*
**strike**
181:*23*
256:*2*
**strikes**
207:*17*
**structure**
17:*20*
**structured**
18:*1*
**struggling**
34:*10*
**stuff**
225:*15*
306:*2*
**style**
129:*16, 20*

131:*7, 8*
136:*7*

**subcontract**
68:*23*
**subcontractor** 63:*23*
65:*15*
67:*13* 80:*4*
95:*22* 96:*1, 6, 14, 22*
98:*23*
107:*12*
131:*14*
134:*22*
**subcontractors** 63:*8*
64:*10* 65:*2*
68:*17, 20*
69:*1, 21*
72:*16, 21*
73:*2* 75:*12*
79:*18, 21*
91:*2* 99:*20*
100:*20*
161:*13*
184:*17*
**subject**
106:*2*
176:*3*
300:*1*
**submission**
260:*5*
**submit**
302:*16*
**submitted**
67:*11*
263:*17*
300:*7*
302:*10*
303:*10*
304:*18*

**substance**
125:*8*
**successor**
56:*13*
**sued** 256:*6*
**suffered**
64:*22*
66:*22*
**suffers**
65:*3, 19*
**sufficient**
106:*13*
**Suite** 2:*5, 14* 4:*7, 12*
5:*5* 8:*8*
**summary**
63:*17*
117:*1, 10*
219:*6*
**supervision**
104:*4*
106:*14*
**supervisor**
137:*16*
244:*10*
249:*18*
302:*20*
**supervisory**
17:*14*
**supplement**
204:*5*
**supplemented** 124:*21*
**supplier**
74:*23* 75:*2*
**supplier/contractor**
68:*18*
**supplies**
74:*9, 11*
**supply**
75:*10*

**support**
42:*5* 70:*9*
74:*4*
302:*21*
**supporting**
277:*2*
304:*3, 20*
**supposed**
19:*17*
83:*20*
130:*4, 16*
**supposedly**
245:*20*
**sure** 9:*7*
18:*10*
20:*14*
22:*18, 23*
23:*16*
24:*19, 20*
32:*12* 39:*8*
46:*14*
54:*13*
64:*19*
72:*20* 79:*4*
83:*8* 85:*2*
89:*11*
90:*23* 98:*4*
101:*15*
108:*22*
123:*6*
129:*7*
134:*2*
140:*1, 6*
158:*1*
159:*21*
169:*12*
178:*23*
183:*5*
184:*6*
187:*22*
191:*2, 9, 23*
193:*23*

194:2, 9
210:6, 7
211:11
213:5, 11, 23  214:9
215:7
218:22
220:7
222:8
229:21
231:1
234:11
244:9
245:2
253:6
262:11
266:6
269:7, 11
284:16
288:1
303:12
**surprised**
282:13
**suspect**
153:15
154:11
199:14, 15
297:14
**swear**
134:2
**sworn**
8:16  36:12
**symbol**
166:7
**system**
162:6
165:20, 22
170:15, 19
171:3

< T >

**T**  2:8  5:10
308:1
**table**  38:15
**take**  9:5
38:3, 7, 20
51:6  91:5
103:14
123:4
127:21
164:14
194:7
195:2, 16
204:6, 19, 23  205:3
225:17
226:7
246:6
248:8
251:13
260:18
276:21
287:8, 9
288:19
306:3
**taken**  2:2, 12  34:18
59:22
123:8
164:19
168:21
179:4
191:5
195:5
200:6
226:2, 16
247:20
277:6
306:12
308:7
**talk**  40:14, 15  52:15
53:1  56:5

57:6  88:12
105:20
146:14, 15
190:12
204:17, 21
306:8
**talked**  24:2
64:20
119:11
120:1
189:2
196:2
214:18, 20
285:8
287:16
**talking**
47:21
101:3
160:7
167:16
189:15, 16
220:17
223:6
240:14
242:10
258:13, 14
274:3
285:1
**talks**  81:11
86:14
128:7
162:6
213:6
**Tanya**  2:2, 12  8:1
308:20
**tattoos**
150:3
**taxes**  139:2
**team**  12:19, 21  13:1, 6
17:18  20:1,

13, 14
21:13, 17
23:11
33:12, 17
34:6, 22
81:7, 9
94:17
106:14, 20
107:3
113:4
159:10
169:11
178:1, 3, 6, 16  180:21, 22, 23
181:1, 2, 7, 16  183:12
189:22
190:23
191:4, 11
192:10, 12
197:6, 14
198:2, 19, 23  199:2, 3, 5, 8  200:14
201:16, 17
202:2, 7, 9, 20  203:11
207:10, 11, 13, 23
209:2, 3
210:11
213:13, 21
215:14
220:15
227:18
267:3, 10
268:9
269:23
270:2
271:21
273:10, 12,

18, 22
274:8
275:6, 22
279:16
280:4
**technical**
78:16
79:12
**technically**
61:12
**tell**  28:4
34:17
40:14
52:13
85:18
101:23
157:19
177:18
199:16
200:22
203:21
218:1, 20
223:17
251:6
253:16
257:20
276:4, 23
282:20
291:3
**telling**
200:20
201:6
225:8
245:2
282:17
**tells**  59:6
185:11
**template**
292:11, 13, 17  293:2, 4, 11, 16, 17
294:16

tenure
280:12
term  54:5
63:21
75:18  76:2,
4  87:19
95:8, 9, 17
96:2  142:2
156:9
165:18
termed
30:22  31:8
terminate
32:7
terminated
78:19
91:23
244:13
terminating
41:10
91:12
termination
31:17, 19,
21  255:22
terms  17:1
31:2  35:1
43:14  44:1
45:1, 13
46:6, 7, 9,
17  58:21,
22  69:10
78:11  80:2
87:7
104:14
110:18
129:5
149:20
150:3
152:2
171:12
182:2
184:14

198:10, 16,
17  212:15
262:12
269:20
302:15
testified
8:17  35:2
186:12
191:19
245:23
275:20
282:6
testify
25:6  29:16,
18  56:15
57:5  66:18
90:12
114:14
210:9
218:5
220:9
227:16, 17
testimony
25:9  29:9
36:12, 15
37:15, 20
134:19
277:14
308:11
Thank
19:7  24:14
43:11  47:5,
17  86:8
101:22
119:16
163:3
199:17
211:19
thereto  3:7
308:8
thing  35:3,
9  38:14

39:19
40:11
59:15
105:23
110:13
128:1, 14
145:9, 19
160:8
192:23
195:11
211:14
212:4
277:7
293:6
things
28:7, 11
52:9  60:22
98:2  122:6
125:9
128:13
143:5, 21
191:13
203:13
210:14
220:11
225:13
231:10, 12
283:13
286:12
301:5
think
15:12  18:7
21:11
22:13
24:17  26:9
32:21
33:12, 13
35:12
38:17  39:6
45:12
48:14
51:11  52:6,

19  54:20
56:11  57:2
61:9  66:1
77:11  90:9
91:8  94:19
110:12, 17
111:19
122:14
133:10
140:21
159:7, 16
168:18
176:7
179:12
180:9
187:17
189:20
193:10
195:8
200:19
204:7
205:20
233:13
235:6
247:19, 23
256:13
258:12, 14
259:1, 5
275:7, 13,
18  278:13
thinking
190:14
third  41:11,
15  62:19
79:21  80:3,
9, 13, 17, 22
139:18
159:6, 9, 12,
13  278:23
281:23
295:19

thirty-two
10:18

THOMPSON
4:18  219:7
thought
122:7, 8
thousand
53:15
174:9, 11
threat
185:20
threats
183:11
three
15:19  29:5,
7, 23  30:1
36:14  64:3
114:6
116:3
147:7
174:8, 10
224:10, 16
300:10
tie  130:3
tied  143:8
time  3:5, 6
18:2, 6, 19
21:11, 16
22:3, 15
23:16  30:6
33:11  36:2
38:9  43:18
53:5  56:19
58:14
62:13
63:10  67:2
68:1  73:12,
15  88:1
92:3  106:6
107:16, 17
109:19

110:*10*, *23*
111:*23*
112:*10*
113:*5*
116:*7*
121:*3*, *19*
124:*13*
127:*21*
135:*8*
138:*9*
143:*22*
149:*3*
150:*15*
151:*6*
152:*4*
157:*4*
164:*15*
170:*7*
174:*3*, *7*, *18*
183:*4*
188:*7*
192:*3*, *7*, *16*
193:*14*, *17*
194:*2*, *22*
196:*22*
199:*10*
200:*1*
202:*14*
209:*11*, *15*
211:*6*, *10*
212:*17*
213:*4*
219:*3*
225:*7*
235:*18*
248:*23*
253:*4*, *5*
256:*14*
280:*13*
287:*8*, *9*
288:*10*, *18*
290:*16*

293:*15*
298:*13*
305:*2*
**timeframe**
18:*14*
178:*14*
192:*18*
**timeline**
196:*5*
**times**
29:*22*, *23*
34:*3*  35:*5*
84:*2*
129:*14*
163:*17*
180:*22*
224:*10*, *16*, *20*  241:*19*
272:*8*
273:*5*
**timing**
192:*6*
254:*11*
**tip**  142:*20*, *22*  143:*3*
**title**  10:*23*
11:*17*
18:*22*  87:*9*
89:*15*
92:*10*
122:*14*, *15*
123:*1*
176:*1*
217:*9*
269:*9*, *12*, *18*, *22*
284:*2*
291:*19*
293:*9*, *14*
**titled**  79:*14*
**today**
17:*21*  18:*1*

25:*6*, *10*
29:*9*, *16*, *18*, *23*  36:*21*
46:*2*  47:*9*, *19*, *21*  65:*9*
72:*8*
158:*15*
170:*8*
177:*20*
227:*16*
229:*2*
279:*10*
282:*14*
294:*12*
295:*9*
305:*11*, *18*
306:*5*
**today's**
59:*5*
**told**  122:*5*, *8*  175:*1*
200:*21*
279:*10*
**top**  12:*10*
78:*7*
103:*10*
165:*9*
166:*2*
251:*12*
253:*9*
257:*20*, *21*
292:*23*
295:*7*
299:*18*
**topic**
32:*12*  55:*9*
71:*17*, *23*
81:*16*  87:*1*
153:*8*
218:*2*, *3*
220:*7*
227:*5*

242:*15*
243:*2*
244:*19*
**topics**
36:*23*
195:*16*
**Tornado**
160:*8*, *9*
**total**  137:*9*
264:*6*
**touch**
110:*2*
187:*13*
**TR**  21:*8*
209:*1*, *2*
**track**  51:*9*
199:*1*, *8*
**tracks**
198:*20*
199:*19*
**trade**  39:*6*, *7*  105:*10*, *12*
**trademark**
168:*21*
**trained**
125:*1*
**Training**
20:*1*, *3*, *5*, *6*, *8*, *9*, *11*, *15*, *16*, *19*  22:*1*, *4*, *7*, *16*, *20*
23:*5*  104:*4*
123:*12*, *14*, *16*, *19*, *20*
124:*2*, *3*, *6*, *10*, *12*, *14*, *17*, *22*
125:*5*, *9*, *17*, *22*  126:*6*, *11*, *16*, *21*, *22*  127:*5*, *8*,

*12*, *14*, *16*, *19*  192:*9*
195:*21*
196:*2*
205:*13*, *17*, *18*  206:*4*, *16*  214:*19*, *20*  215:*3*
**trainings**
125:*15*
**transcribed**
308:*9*
**TRANSCRIPT**  1:*16*
308:*7*, *11*
**transcription**  308:*10*
**Transformers**  16:*17*
168:*14*

**transitioned**
195:*13*
**transmitted**
84:*15*
**treated**
65:*5*, *21*
94:*23*
105:*17*
198:*16*
206:*21*
207:*3*
228:*8*
**treatment**
64:*15*  66:*7*
105:*13*
147:*10*
**tree**  210:*10*
**trees**  23:*21*
**trial**  3:*6*
158:*7*

**triggered**
189:*13*
**true**  14:*14*
72:2  94:*1*
144:*19, 21*
156:*23*
168:*9*
243:*4*
293:*3, 7*
308:*11*
**truth**
200:*22*
**try**  10:*7*
34:*4*  39:*2*
77:22
157:*17*
158:*7*
198:*12*
**trying**
21:*10*
32:21
33:*15, 20*
59:*17*  61:*9*
92:*18*
101:*16*
136:*19*
159:5
162:22
191:*9*
213:*7*
225:*6, 12*
227:20
228:*4*
231:*10*
242:12
257:*15, 16*
272:15
284:5
**Tunnell**
147:*13, 16,
17, 18*
148:5

**T-u-n-n-e-l-l**
147:*20*
**Tunya**
278:21
281:*18*
**turn**  49:*20*
51:*3*  53:*6*
67:*3*  85:*15*
100:*21*
101:*6*
103:*7*
116:22
128:5
144:*16, 22*
237:*4*
250:*23*
292:21
306:*15, 16*
**turns**
195:*12*
**twelve**
126:*23*
**twice**  83:*6*
**two**  59:*7*
64:*3*  120:*3*
121:*14, 16*
122:*17*
124:*18*
139:*20*
152:*13*
160:*6*
164:*3*
192:*8*
195:21
204:*16*
205:*16*
214:8
215:2
296:2
300:*20*
301:*6*
304:*16*

**two-page**
177:*1*
**two-year**
214:*16*
**type**  17:*7*
23:*6*  30:*12*
36:*9*  39:*10*
126:*9*
145:*13*
150:*7, 10*
186:*17, 22*
190:5
199:*13*
207:*7*
210:*16*
229:*15*
243:*16*
251:22
252:*4*
**types**
118:*4*
125:*15*
**Typically**
163:*23*

**< U >**
**U**  2:*8*
**U.S**  105:*13*
**Uh-huh**
81:*13*
165:*7*
297:*19*
**ultimate**
107:*1*
129:22
**ultimately**
55:*14*
61:*17*
64:*20*
100:*3, 12*
207:*17*
219:5

223:*3, 15*
302:*19*
**unacceptabl
e**  128:*14,
19, 23*
129:2, *4, 23*
130:*7, 22*
184:*15, 19,
22*  186:*11,
13*  187:*2*
189:*4*
**Uncontrolle
d**  170:*10,
22*  171:*1*
**underneath**
122:*16*
**understand**
25:9, *12*
35:*12*  37:*6*
52:9, *22*
57:*1*  83:*20*
96:2  106:*4*
137:*22, 23*
145:*3*
171:*13*
172:*15*
175:*1*
176:*8*
187:22
188:*8*
205:5
206:*4*
225:5
241:4
245:*9*
246:*9*
252:*13*
258:*3*
268:*19*
275:*1*
293:*15*

**understandi
ng**  24:*11*
41:*17*
42:*18, 21*
43:*13*
44:*20*  45:*4,
7*  48:*16, 18,
22*  50:*12*
56:*3*  67:*18*
95:*17*
96:*11*
106:5
155:*14*
205:*19*
206:*5, 17*
268:*11, 16*
**understood**
48:*4*
282:*15*
**undetermin
ed**  288:*9*
**uniform**
104:*9*
128:*17*
129:*15, 19*
131:5
132:*17, 23*
133:*4, 5*
135:*17*
136:*7, 9*
**Uniforms**
129:*11, 13*
130:*4, 8, 15*
132:*6, 8*
135:*3*
136:5
**UNITED**
1:*1*  77:*3*
**unknown**
180:23
**unloaded**
160:*17*

Robert Burns                                                    6/22/2022
                                                                      153

**unredacted**
51:*20*
**untrue**
240:*12, 13,*
*15, 16, 20,*
*23* 241:*12,*
*16* 242:*2*
**updated**
171:*4*
195:*22*
**UPS** 160:*13*
**upset**
139:*4*
**use** 10:*7*
23:*14*
26:*17*
60:*13*
80:*17*
139:*13*
157:*17*
158:*2, 7*
166:*11, 16,*
*20* 167:*14*
168:*22*
169:*6*
179:*23*
180:*4*
181:*19*
228:*20*
**uses** 95:*8*
**usual** 8:*19*
**usually**
36:*18* 52:*3*
169:*17*
197:*13*
**utilized**
68:*20*
**utilizing**
73:*11*

**< V >**
**V** 1:*9*

**vaguely**
281:*14*
**valid** 93:*13,*
*15, 16, 18*
267:*21*
274:*5, 7, 9*
**validate**
304:*4*
**validated**
303:*3*
**varied**
162:*1*
**varies**
15:*19*
**variety**
13:*7* 20:*7,*
*11* 26:*22*
70:*20, 22*
71:*2* 74:*3*
100:*14, 19*
177:*14*
195:*15*
**various**
16:*15*
**vary**
161:*19*
174:*18*
**vehicle**
53:*13*
100:*7*
133:*13, 14*
134:*3, 6, 16*
**vehicles**
9:*20* 54:*7,*
*22* 55:*1, 4,*
*8, 17* 88:*18*
100:*4, 13,*
*16* 106:*7, 8*
133:*18*
**verification**
144:*23*

**version**
170:*3, 6, 8,*
*11* 177:*15,*
*19* 180:*22,*
*23* 194:*1, 4*
280:*8*
**versions**
178:*3*
**versus**
90:*17*
101:*19*
122:*19*
206:*22*
222:*14*
**vice-**
**president**
11:*2, 8, 13,*
*18* 12:*3, 9*
13:*3, 12*
96:*9* 267:*5*
268:*6*
269:*14, 15*
271:*2*
272:*11*
**video**
20:*22, 23*
21:*3, 15, 21*
23:*8, 9, 12*
195:*14, 18*
196:*1, 2, 4*
215:*1*
**videos**
22:*10*
124:*22*
214:*19*
**view**
267:*13*
**viewed**
259:*6*
**VII** 87:*9*
89:*15*
92:*10*

269:*9, 12,*
*18, 22*
**violate**
92:*10, 15*
**violated**
81:*4* 92:*5*
94:*22*
208:*9*
212:*20*
222:*5, 10*
223:*10, 22*
224:*15*
275:*12*
**violates**
205:*21*
207:*7, 18,*
*19*
**violating**
93:*10*
267:*13*
**violation**
91:*13, 20*
92:*2* 94:*12*
118:*7*
222:*18*
224:*13, 22*
225:*2*
**violations**
87:*16*
268:*20*
**violence**
183:*11*
185:*20*
**virtually**
211:*1*
**visible**
150:*3*
162:*11*
**visual** 23:*6*
**voice**
25:*11* 72:*9,*
*12*

**vomited**
35:*12*
**VP** 11:*10*
17:*13*
266:*17, 20*
**VREELAND**
4:*17*

**< W >**
**W** 51:*13*
**W-2** 174:*14*
**wait** 18:*11*
**waived**
2:*19* 3:*10*
**Walk** 15:*16*
167:*2*
**walked**
167:*5*
**walking**
244:*8*
**wall**
157:*21*
158:*5*
167:*6*
**walls**
158:*14*
**want** 9:*6*
34:*15*
39:*19* 45:*9*
54:*13*
61:*21*
68:*13*
70:*22*
75:*22*
81:*10*
85:*16*
86:*22*
90:*11, 15*
102:*1*
103:*15*
105:*20, 23*
116:*18*

121:*21*
122:2
123:*11*
128:*6*
130:*12*
139:*3, 13*
143:*20*
144:*1*
146:*9, 13,
15*  150:*2*
151:*21*
164:*21*
171:*18*
174:*16*
176:*11*
185:*10, 15*
187:*22*
190:*3, 7*
191:*20, 21*
194:*6*
210:*8, 14*
225:*18*
226:*5, 23*
232:*14*
234:*17*
238:*1*
243:*12*
245:*1*
252:*19*
259:*6*
260:*3, 18*
263:*3*
264:*18*
265:*16*
272:*7*
273:*7*
274:*2*
277:*13*
278:*15*
282:*12*
283:*13*

287:*14*
301:*5, 8*
**wanted**
85:*23*
102:*13*
112:*3, 13*
143:*23*
145:*10*
151:*16*
195:*8*
265:*5*
**wants**
54:*15*
**warrants**
68:*15*
**Warren**
51:*7, 10*
122:*12, 16*
141:*4*
**wasting**
56:*19*
**way**  27:*2*
36:*3*  47:*22*
52:*20*
54:*15, 20*
56:*9*  65:*5,
20*  80:*15*
94:*22*
105:*16, 17*
139:*18*
154:*12*
160:*3*
165:*21, 23*
175:*12*
176:*3*
206:*11, 22*
215:*19*
218:*14*
228:*7*
242:*13*
243:*9*
250:*22*

251:*8*
256:*22*
277:*9*
**ways**  74:*4*
139:*21, 23*
**WBE**  69:*20*
71:*9*  72:*15*
78:*2*
**WBEs**
72:*18, 20*
73:*11*
74:*18*
**wear**
130:*16*
132:*17*
135:*17*
136:*6*
150:*2*
230:*16*
**wearing**
9:*5*  130:*17*
131:*2*
230:*19*
**wears**
133:*4*
**website**
16:*22*
**week**
108:*2*
109:*10*
113:*21*
114:*3, 5*
**weekly**
117:*19*
118:*10, 14*
119:*5*
**welcome**
110:*2*
144:*7*
**weld**  229:*9*
**Well**  10:*10*
16:*21*  18:*6*

19:*20*  21:*7*
27:*21*  43:*6*
45:*9*  47:*3*
56:*2, 11*
61:*3*  62:*1*
65:*6*  66:*3,
16*  71:*8*
74:*7*  75:*21*
84:*23*  88:*2,
4*  90:*23*
91:*11*
95:*11*
98:*16*
100:*16*
109:*1*
111:*18*
114:*9*
120:*11*
122:*13*
131:*15*
139:*6*
141:*6*
144:*9*
145:*18*
152:*20*
153:*18*
160:*7*
170:*14*
177:*10*
180:*7*
181:*15*
187:*6*
191:*7*
197:*1*
200:*23*
204:*11*
205:*2, 15*
208:*14, 18*
215:*11, 13,
20*  218:*17*
221:*5*
225:*8, 19*

232:*1*
233:*19*
237:*19*
238:*12*
245:*9*
247:*11, 20*
255:*19*
257:*17*
270:*10*
271:*17*
282:*11*
301:*11*
302:*4*
**went**  41:*6,
8*  42:*8*
166:*23*
194:*1*
255:*12*
293:*1*
**we're**
33:*11*  35:*8*
36:*2*  37:*1*
39:*1, 13*
73:*12*  77:*2*
88:*12*
110:*12, 15,
17*  117:*2*
120:*11, 21*
122:*21*
123:*10*
130:*23*
133:*2*
140:*19*
143:*19*
160:*7*
164:*10*
167:*20*
176:*19*
178:*22*
180:*4*
186:*7*
189:*15, 16*

193:*10*
203:*4, 14, 19, 23*
204:*4, 22*
220:*17*
221:*7*
223:*6*
225:*14, 23*
226:*3, 10*
231:*8*
243:*11*
247:*17*
258:*13, 14*
269:*11*
271:*11*
273:*7*
275:*7*
276:*10, 16*
298:*18*
**Wesley**   5:*4*
**west**
156:*11*
159:*11*
**West's**
219:*11*
**we've**
29:*13, 14*
53:*2*   85:*4*
91:*23*
108:*11*
120:*3*
122:*11*
127:*7*
154:*23*
197:*1*
204:*3*
221:*4*
245:*19*
285:*8, 18*
**WG**   50:*4*
51:*9*

102:*19*
140:*9, 18*
**whatever@ HMMAUSA. com**   154:*5*
**whatsoever**
134:*20*
**whichever**
107:*9*
**white**
162:*12*
**Whitehead**
5:*15*   21:*23*
43:*2*   52:*15*
59:*14, 19*
84:*23*   86:*2, 5*   90:*11*
123:*4*
157:*19*
158:*3, 9*
159:*7, 19*
163:*1*
185:*7*
187:*21*
188:*5*
200:*4*
204:*21*
205:*5*
210:*6, 8*
212:*4, 9*
213:*9*
218:*9*
219:*4, 10, 13, 18, 21, 23*   221:*2*
225:*17, 21*
244:*7*
250:*3, 15*
254:*2, 10, 18*   257:*1, 10, 15, 19*
258:*3, 11,*

*19*   261:*3*
271:*7*
276:*21*
278:*2*
289:*22*
291:*4, 14*
295:*8*
299:*19*
302:*8*
**wide**
100:*14*
195:*15*
**Williams**
147:*8*
258:*13*
278:*20*
280:*5, 8, 17*
288:*21*
289:*7, 14*
291:*17, 20*
292:*9*
293:*8, 22*
294:*3, 10*
296:*7, 14, 21*   297:*6*
298:*3, 6*
299:*21*
304:*13*
**window**
21:*18*
214:*16*
**withdrew**
52:*11*
**withhold**
264:*18*
**witness**
2:*19*   8:*10*
24:*14, 19*
25:*1, 23*
27:*20, 23*
43:*1, 8, 11*
47:*5*   53:*11*

82:*22*   83:*3*
88:*9*   97:*16, 20*   101:*22*
103:*16*
105:*8*
114:*12*
119:*16*
159:*5*
163:*3*
199:*17*
211:*19*
217:*3*
234:*3, 7*
235:*16, 19*
241:*22*
244:*12*
247:*17*
261:*5*
278:*11, 12*
287:*11*
289:*21, 23*
295:*4*
305:*17*
308:*12*
**witnesses**
146:*19*
**woman-owned**   73:*4*
**women**
75:*23*
**women-owned**
69:*20*   70:*5, 14, 18*
71:*22*   72:*6*
73:*21*   74:*3, 8*   77:*19, 23*
**word**
103:*2*
114:*13*
139:*14*
162:*4*

165:*11*
166:*2, 8, 17, 21*   167:*7, 8, 11, 14*
168:*6, 13, 15, 22*
181:*19*
191:*8*
208:*19*
284:*12*
**words**
17:*15*   59:*1*
65:*21*   75:*2*
92:*23*
113:*20*
115:*11*
133:*19*
227:*20*
236:*1*
275:*12*
282:*18*
293:*7*
**wore**   243:*9*
**work**   39:*17*
53:*19*
62:*19, 23*
63:*3, 14, 16*
64:*1*   76:*18*
78:*23*
83:*21*
85:*10*   88:*3, 5*   97:*6, 7*
98:*5, 7, 8*
99:*21*
102:*11, 13*
103:*4, 11, 19*   104:*15*
105:*4, 5, 9*
108:*10*
110:*9*
111:*21*
113:*5*

Robert Burns                                                           6/22/2022
                                                                           156

| | | | | |
|---|---|---|---|---|
| 115:*23* | **worked** | **worn** | 158:*6* | *23*  269:*21* |
| 116:*1* | 14:*18, 20* | 129:*14* | **yea**  133:*20* | 277:*19* |
| 119:*12* | 68:*1* | 162:*14* | **yeah**  10:*19* | 279:*11* |
| 120:*9* | 156:*11* | **write**  253:*9* | 18:*13, 19* | 281:*10* |
| 121:*10* | 230:*17* | 270:*13* | 25:*1*  28:*1* | 288:*10* |
| 123:*2* | 243:*22* | **writes** | 30:*13*  31:*9* | 293:*19* |
| 124:*4* | 281:*13* | 233:*7* | 32:*20*  33:*1,* | **year**  41:*11,* |
| 132:*22* | **workers** | 237:*6* | *4*  34:*13, 16* | *16*  193:*23* |
| 133:*7* | 62:*10, 15* | 240:*5* | 37:*22* | 266:*23* |
| 134:*21* | 88:*20* | **writing** | 46:*11*  69:*7* | **years** |
| 143:*11* | **workforce** | 92:*18* | 93:*23* | 15:*19* |
| 155:*12* | 197:*10* | 148:*11* | 101:*23* | 21:*14*  22:*9* |
| 156:*7* | 198:*10* | 162:*10, 11* | 104:*2* | 23:*10*  85:*2,* |
| 161:*4, 17* | **working** | 196:*19* | 106:*16* | *3*  168:*8* |
| 163:*12, 23* | 43:*18* | **written** | 115:*15* | 191:*15* |
| 164:*7* | 88:*13*  99:*4* | 22:*14, 19* | 117:*7* | 192:*8* |
| 172:*21* | 126:*22* | 58:*14* | 121:*21* | 195:*21* |
| 173:*1, 6, 9* | 136:*1, 4, 12* | 60:*20* | 127:*23* | 205:*17* |
| 174:*4, 13,* | 137:*1, 4, 6* | 62:*21*  63:*4* | 130:*21* | 210:*15* |
| *19, 21* | 173:*12, 17,* | 151:*14* | 132:*15* | 214:*8* |
| 175:*13, 14,* | *18*  174:*15* | 196:*21* | 143:*1* | 215:*2* |
| *20*  176:*1* | 175:*6* | **wrong** | 145:*23* | 226:*11, 12* |
| 181:*11, 13* | 182:*10* | 30:*21*  31:*2* | 146:*4* | 277:*8* |
| 182:*5, 8, 23* | 189:*17* | 77:*11* | 158:*12, 13,* | 278:*1, 6* |
| 183:*6, 17,* | 191:*16* | 196:*6* | *21*  164:*14* | 279:*18* |
| *19, 21* | 215:*10, 18* | 210:*9* | 165:*23* | **yelling**  9:*6* |
| 184:*11* | 246:*8* | 212:*8* | 172:*3* | **Yep**  48:*6* |
| 185:*15* | 277:*10* | 275:*14, 19* | 175:*8* | 123:*13* |
| 191:*2* | 281:*9* | 280:*11* | 187:*6* | 134:*2* |
| 203:*20* | 282:*21* | **wrongful** | 195:*10* | 138:*22* |
| 204:*3* | 286:*9* | 30:*23* | 196:*4, 21* | 160:*1* |
| 226:*8* | **workplace** | **wrote**  76:*3* | 218:*17, 19* | 190:*16* |
| 228:*8* | 183:*11* | 261:*20* | 219:*8* | 270:*17* |
| 229:*17* | 185:*20* | | 220:*22* | **yesterday** |
| 240:*7, 10,* | 191:*10* | **< X >** | 222:*21* | 27:*22, 23* |
| *19, 22* | **works** | **X**  6:*1* | 226:*19* | 29:*3, 7* |
| 245:*6, 14* | 94:*18* | 266:*15* | 235:*16* | 248:*19* |
| 246:*13* | 96:*22*  97:*3,* | | 239:*8* | 254:*10* |
| 247:*16* | *5*  163:*21* | **< Y >** | 244:*12, 14,* | 261:*19* |
| 251:*17* | 176:*2* | **y'all**  52:*21* | *21*  247:*18,* | 263:*12* |
| 302:*14* | 230:*11* | 157:*8, 15* | *22*  263:*20,* | 265:*23* |
| | | | *23*  267:*17,* | 284:*5* |

Robert Burns

295:*4*
299:*16*
302:*4*
**Yu**  295:*15*
**Yurie**
 52:*11*  56:*3*

**< Z >**
**zone**
 105:*10, 12*
**zoned**
 219:*6*
**Zoom**  5:*7*

# TRANSCRIPT ERRATA SHEET

Deposition of:    **Robert Burns**
Taken:            **June 22, 2022**
Court Reporter:   **Tanya D. Cornelius, CCR**

| Page #: | Line #: | Correction/Reason for change: |
|---------|---------|-------------------------------|
| 41 | 1 | "AMOCO" should be "AMCD" / misspelled word |
| | | Change needs to be made throughout transcript |
| 162 | 4 | "Word" should be "Works" / court reporter |
| | | misunderstood |
| 163 | 13 | "personally" should be "personel" / court |
| | | reporter misunderstood |
| 305 | 7 | "her" should be "this" / court reporter |
| | | misunderstood |

# WITNESS CERTIFICATION

I, _Robert A. Burns_, said witness, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

_Robert A. Burns_
Witness Signature above:

Printed name: _Robert A. Burns_

Sworn to and subscribed before me, this the 28 day of _July_, 2022.

_Nicole E. Esco_
Notary Public
My Commission expires: 3/10/2026

NICOLE E. ESCO
My Commission Expires
March 10, 2026

**CONTRACT FOR SERVICES**

(Security Services)

between

**HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC**

Hereinafter referred to as "HMMA"

and

**Hyundai AMCO America Inc.**

Hereinafter referred to as "Contractor"

February 4th, 2013

KEY V HMMA, HEA AND DYNAMIC
PLAINTIFF'S DEPOSITION EXHIBIT
**2**
2:19-CV-767-ECM-SMD

TABLE OF CONTENTS

| | |
|---|---|
| Section 1: | SERVICES |
| Section 2: | TERM/TERMINATION |
| Section 3: | COMPENSATION AND PAYMENT |
| Section 4: | TAXES |
| Section 5: | INVOICES |
| Section 6: | REPRESENTATIONS AND WARRANTIES |
| Section 7: | CONFIDENTIALITY |
| Section 8: | INDEMNITY AND CONTRACTOR'S LIABILITY FOR DAMAGES AND DOWNTIME |
| Section 9: | INSURANCE |
| Section 10: | COMPLIANCE WITH LAWS AND RULES |
| Section 11: | HAZARDOUS MATERIALS AND MATERIAL SAFETY DATA |
| Section 12: | PROPRIETARY PROTECTION |
| Section 13: | ACCOUNTING AND AUDIT |
| Section 14: | CLAIMS |
| Section 15: | LIMITATION OF LIABILITY |
| Section 16: | LIENS |
| Section 17: | PROTECTION OF WORK AND RISK OF LOSS |
| Section 18: | GOVERNING LAW AND VENUE |
| Section 19: | WAIVER OF JURY TRIAL |
| Section 20: | INDEPENDENT CONTRACTOR |
| Section 21: | FORCE MAJEURE |
| Section 22: | ASSIGNMENT |
| Section 23: | WAIVER |
| Section 24: | AMENDMENTS |
| Section 25: | ENTIRE AGREEMENT |
| Section 26: | SEVERABILITY |
| Section 27: | NOTICES |
| Section 28: | SUB-SUPPLIERS |
| Section 29: | GRATUITIES |
| Section 30: | SET-OFF AND RECOUPMENT |
| Section 31: | FOREIGN TRADE ZONE REGULATIONS |
| Section 32: | TIME |
| Section 33: | SURVIVAL OF OBLIGATIONS |
| Section 34: | COUNTERPARTS |

Exhibit A                SERVICES
Exhibit B                FEE SCHEDULE

Attachment 4.2           Alabama Department of Revenue Sales Tax Exemption Procedures
Attachment 6.4           Supplier/Contractor Badge Policy
Attachment 10.3(1)       Contractor Safety, Security and Fire Protection Handbook
Attachment 10.3(2)       HMMA's Drug and Alcohol Policy

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**                    **Documents Produced by HMMA**                    **HMMA000015**

This Contract for Services (herein the "Agreement"), is made and entered into as of the 4th day of February, 2013, by and between Hyundai Motor Manufacturing Alabama, LLC, a limited liability company ("HMMA"), and Hyundai AMCO America Inc, a corporation("Contractor").

WITNESSETH:

WHEREAS, HMMA owns and operates a state-of-the-art motor vehicle manufacturing facility (herein the "Project") on approximately 1,744 acres of land in Montgomery, Alabama (herein the "Site"); and

WHEREAS, HMMA desires to engage Contractor to perform services in connection with the Project, and Contractor desires to perform such services;

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the parties hereto agree as follows:

Section 1.      SERVICES:

Contractor agrees to furnish all necessary labor, materials, equipment, supplies and other items and to obtain all required permits and licenses to perform the services set forth on Exhibit A hereto (the "Services") at the location or locations designated by HMMA (a "Designated Location") in a professional, good and workmanlike manner.  The scope of work included within the Services may be amended only by written directive from HMMA to Contractor. The Services shall be performed by qualified employees or subcontractors of Contractor in compliance with HMMA's requests and instructions at such times so as to not interfere with HMMA's business operations.  The performance of the Services will be conducted so as to maintain the security of HMMA's property at all times. Contractor shall promptly correct all Services rejected by HMMA not in accord with this Agreement at its expense. Contractor shall be liable and responsible for all damages of every kind or nature to HMMA or HMMA's property arising from or relating to any acts, omissions, errors, or negligence of Contractor or its employees or subcontractors in the performance of the Services hereunder.  Contractor shall furnish HMMA with evidence of all permits and licenses required to perform the Services.

Section 2.      TERM/TERMINATION:

2.1      The term of this Agreement shall be for a period of two (2) years, commencing as of the February 4th, 2013 and terminating on February 3rd, 2015, with an optional third year at HMMA's discretion. HMMA may, however, terminate this Agreement or the Services at a particular Designated Location, in whole or in part, by providing thirty (30) days prior written notice, at any time and for any reason.   Contractor agrees and acknowledges that compensation in the event of a termination under this section shall be strictly limited to the payment for services performed and expressly waives and releases any additional claims including, but not limited to, additional anticipated profits or fees.

2.2      HMMA may terminate this Agreement, or the Services at a particular Designated Location, immediately on written notice at any time (and Contractor shall not be entitled to any further payment hereunder) if Contractor is in breach of any provision of this Agreement.

Section 3.      COMPENSATION AND PAYMENT:

Contractor shall perform the Services in accordance with the Fee Schedule for the Services attached hereto as Exhibit B (the "Fee Schedule").  The prices listed on the Fee Schedule shall include all costs to Contractor for every aspect of the Services including without limitation, materials, labor, equipment, testing, clean-up (including the disposal costs associated with packing and transport of materials), insurance, fees, taxes, travel, transportation, and import fees or duties.

Section 4.      TAXES:

4.1      Under no circumstances will sales, use or other tax be added to the Agreement price.  To the extent that Contractor, or any supplier of Contractor, is treated as a contractor under Alabama sales and use tax law with respect to this Agreement, HMMA will not pay or reimburse said Contractor, its Subcontractor and/or supplier, for any state

4

CONFIDENTIAL
Davita M. Key v. HMMA, et al

HMMA000016

or local sales, use and other taxes related to the Agreement.  In all other circumstances, pursuant to HMMA's direct pay permit authority (Permit #952), neither Contractor nor any Subcontractor or supplier of Contractor shall include any allowance or amount for State of Alabama or local sales and use tax payment in calculating any payments due, by application for payment, change order or otherwise in connection with the performance of this Agreement and/or the provision of materials or equipment.

4.2     HMMA has been issued a Form STE-1 Sales and Use Tax Certificate of Exemption (Project Number 2002175001) for the Project.  If the performance of the Services includes the purchase of tangible personal property that will be incorporated into the Project, then Contractor shall, and shall cause all if its suppliers to, submit an application for a Form STE-1 Sales and Use Tax Certificate of Exemption to the Alabama Department of Revenue, along with a written confirmation, to be provided by HMMA, stating that Contractor, and/or its suppliers, will be making purchases of tangible personal property to be incorporated into the Project.  See Attachment 4.2 to this Agreement for more specific information regarding the tax abatement procedure.

4.3     In addition to any information contained in the Attachments to this Agreement, Contractor, and its suppliers, shall have the responsibility to become knowledgeable of and adhere to the rules and regulations of the State of Alabama regarding abatement of sales and use taxes.

4.4     In the event that it is subsequently determined that the Project is not entitled to the abatement of non-educational sales and use taxes, HMMA will reimburse Contractor for State of Alabama, Montgomery County and City of Montgomery sales and use tax assessed and paid by Contractor on a cost incurred basis.

4.5     HMMA is required to obtain correct taxpayer identification numbers from all non-corporate payees who receive payment for services, rents, royalties or interest that would be subject to IRS Form 1099 reporting.  Twenty percent (20%) back-up tax withholding will be imposed on all Form 1099 reportable payments made to Contractor if Contractor fails to provide a correct taxpayer identification number.

4.6     Contractor shall defend, indemnify and hold HMMA harmless from and against all liability for all sales, use and other taxes which are imposed on or with respect to, or are measured by, the amounts expended by Contractor with respect to this Agreement, and the wages, salaries, and other remunerations paid to persons employed in connection with performance of this Agreement.

4.7     Subject to the provisions of this Agreement regarding the abatement of non-educational sales and use taxes granted to the Project, Contractor shall pay when due, all taxes (including, but not limited to local educational taxes), duties, fees and other assessments of whatever nature imposed by governmental authorities and applicable to the performance of this Agreement.

4.8     Contractor shall include in all of its contracts with its suppliers, a provision similar to this Section 4.

Section 5.     INVOICES:

5.1     Contractor shall submit an invoice to HMMA for the Services within thirty (30) days of the end of the calendar month in which the Services were provided.  All invoices shall include a summary of all Services performed at each Designated Location by Contractor's employees and subcontractors for the invoice period, with each invoice broken down by Designated Location, dates, tasks and hours of work.  With each invoice, Contractor shall furnish evidence satisfactory to HMMA to support each element of measurement and/or cost.  Contractor shall provide HMMA with any other documentation requested by HMMA to support the Services invoiced.  Contractor agrees to furnish, if and when requested by HMMA, affidavits that all bills for materials and labor have been paid, such affidavits to be supported by receipted bills, if required by HMMA.  Prior to final payment by HMMA, a release of liens and all claims is to be furnished to HMMA on forms satisfactory to HMMA together with any affidavits which may be required.  HMMA reserves the right to pay any outstanding past due obligation of Contractor arising from the Services by check made payable jointly to Contractor and its vendors and subcontractors.

5.2     HMMA shall pay all invoices within thirty (30) days of receipt of such invoice for Services completed unless HMMA has notified Contractor in writing of a good faith dispute regarding part or all of an invoiced amount.  In such case, HMMA and Contractor shall work together to resolve the dispute and HMMA shall pay Contractor the mutually agreed to amount upon resolution.  HMMA shall be entitled to deduct from payment any amounts which Contractor owes HMMA in connection with the Services or this Agreement from any amounts HMMA owes Contractor.

5

<u>Section 6.</u>        REPRESENTATIONS AND WARRANTIES:

6.1     Contractor represents and warrants the following to HMMA as an inducement to HMMA to execute this Agreement, which representations and warranties shall survive any termination of this Agreement, and the final completion of the Services: (i) that it is financially solvent, able to pay all debts as they mature, and possessed of sufficient working capital to complete the Services and perform all obligations hereunder; (ii) that its execution of this Agreement and its performance thereof is within its duly authorized powers; (iii) that it is duly licensed to perform the Services and has all necessary licenses and permits needed to perform the Services; (iv) that it is validly existing under the laws of the state in which it is organized and is qualified under applicable law to do business in the State of Alabama; and (v) that it possesses a high level of experience and expertise in providing services such as the Services and it will perform the Services with care, skill and diligence of a service provider with such experience and expertise.  Any Services not so performed or not in conformity herewith shall be corrected by Contractor at no cost to HMMA.  If such deficiencies are not immediately corrected, HMMA may cause the same to be corrected for the account of Contractor.  The above-described remedy is in addition to any other remedies, in law or equity, available to HMMA.

6.2     Contractor represents and warrants to HMMA that all financial reports and other information previously provided to HMMA in connection with the negotiation of this Agreement were true, complete and accurate when furnished and remain true, complete and accurate.  Upon written request from HMMA, Contractor will deliver to HMMA copies of its most recent income statements and balance sheets, which shall be prepared by an independent certified public accountant, together with any other information that HMMA may reasonably require regarding Contractor's financial condition.

6.3     Contractor expressly represents and warrants to HMMA that the Services performed by Contractor, and all materials and equipment used by Contractor in the performance of the Services, hereunder shall be free of silicone and silicone contamination.  THUS ALL SERVICES SHALL BE COMPLETELY FREE OF SILICONE AND ABSOLUTELY NO SILICONE OR SILICONE-CONTAINING EQUIPMENT, MATERIALS OR LUBRICANTS ARE TO BE USED BY CONTRACTOR IN ANY MANNER IN CONNECTION WITH CONTRACTOR'S SERVICES.

6.4     Contractor represents and warrants to HMMA that it will perform background checks on all of its employees and subcontractors and will comply fully with HMMA's Supplier/Contractor Badge Policy, which is attached hereto as Attachment 6.4, including all employees of any subcontractors utilized by Contractor.  Contractor agrees that it shall not employ any employees or subcontract to any subcontractors whose presence on HMMA's property is objected to by HMMA.

6.5     HMMA is committed to the inclusion of Minority-Owned Business Enterprises ("MBE") and Women-Owned Business Enterprises ("WBE") subcontractors on its Project.  Contractor agrees to include both MBE and WBE as subcontractors for the performance of the Services, to the extent reasonably practicable.  Contractor shall use its reasonable best efforts to have a minimum MBE participation equivalent to fifteen percent (15%) of the contract price, and a minimum WBE participation equivalent to five percent (5%) of the contract price.  If Contractor does not meet these minimum requirements, it shall demonstrate to HMMA the efforts that were made to achieve these minimum participation levels.  MBE and WBE who are subcontractors and suppliers shall be certified to by the National Minority Supplier Development Council (NMSDC) and its regional affiliate councils or some other certifying agency approved by HMMA.  HMMA shall have the right to approve any MBE or WBE.  If HMMA does not approve, Contractor shall provide a suitable replacement subcontractor or supplier without cost to HMMA.

6.6     Contractor represents and warrants to HMMA that local (Alabama) contractors and subcontractors, including suppliers of materials and services, and local (Alabama) labor forces will be utilized by Contractor in the performance of the Services to the maximum extent possible.  Contractor further represents and warrants that all employees assigned to work on the Project, including those of its subcontractors, shall have all legal, valid, and appropriate work documentation, including visas, required for the performance of the Services.  Contractor further agrees to utilize the E-Verify program provided by the federal government to ensure that all workers assigned to the Project are legally authorized to work in the United States.

6

Section 7.         CONFIDENTIALITY:

7.1       Contractor shall keep confidential all information, drawings, specifications and technical data furnished or supplied by HMMA in connection with this Agreement. All such information shall remain the sole property of HMMA, and shall not be copied or otherwise reproduced or used by Contractor in any way except in connection with performance hereunder, or disclosed to third parties or used in any manner detrimental to the interests of HMMA. Upon completion, termination, or cancellation of this Agreement, Contractor shall promptly return to HMMA, upon request, all information furnished by HMMA in connection with the performance of this Agreement.

7.2       Contractor shall not, without obtaining the prior written consent of HMMA, advertise or publish the fact that Contractor has contracted to provide the Services to HMMA.

Section 8.         INDEMNITY AND CONTRACTOR'S LIABILITY FOR DAMAGES AND DOWNTIME:

8.1       Except as otherwise prohibited by applicable law, Contractor shall indemnify, defend, and hold HMMA harmless from all claims, actions, causes of action, suits, damages, losses, costs, liabilities, and expenses of any kind or nature (including but not limited to attorneys' fees) relating to Contractor's or its employees', agents, invitees or subcontractors' breach of this Agreement, negligence, intentional misconduct, and/or performance or non-performance of the Services, including but not limited to damage to HMMA's property or the property of others and injuries to, or death of, persons.

8.2       Contractor shall be fully responsible for, and shall fully reimburse Owner for, all damages, costs and expenses of every kind or nature incurred by Owner, including, without limitation, direct, indirect, special, incidental and consequential damages, caused by Contractor or anyone working for or on behalf of Contractor, including, but not limited to, damages to equipment or property of Owner and damages resulting from production interruptions, slowdowns or stoppages caused by Contractor or anyone working for or on behalf of Contractor. Any damages, costs, losses or expenses in connection hereto shall be, in Owner's discretion either offset against any amounts otherwise due and owing to Contractor for its Services, or charged separately to Contractor, or both.

Section 9.         INSURANCE:

9.1       Insurance to be Provided by Contractor.

        9.1.1     Without limiting any of the other obligations or liabilities of the Contractor under this Agreement, Contractor will at all times until all its obligations hereunder have been fully discharged, carry and continuously maintain at its own expense, or cause to be carried and continuously maintained, at least the minimum insurance coverage set forth in this Section 9, in each case with insurance companies of recognized responsibility and with terms and conditions acceptable to HMMA.
        9.1.2     Insurance carried in accordance with this Section 9 shall, to the extent of the indemnities set forth in Section 8, be endorsed to provide that HMMA shall be included as an additional insured (except for Workers' Compensation and Employer's Liability insurance and, if applicable, Railroad Protective Liability and Professional Liability) with the understanding that any obligation imposed upon the insured (including the liability to pay premiums) shall be the sole obligation of Contractor and not that of HMMA. Inasmuch as such insurance is written to cover more than one insured, all terms, conditions, insuring agreements and endorsements, with the exceptions of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured.
        9.1.3     With respect to all insurance maintained by Contractor hereunder, (A) the interests of HMMA and Contractor shall not be invalidated by any action or inaction of any other person, and Contractor and HMMA shall be insured regardless of any breach or violation by the Contractor or any other person of any warranties, declarations or conditions contained in such policies; (B) all deductibles shall be in amounts acceptable to HMMA but shall be paid by Contractor; (C) the insurers thereunder shall waive all rights of subrogation against Contractor and HMMA, any right of set-off and counterclaim and any other right to deduction whether by attachment or otherwise; (D) such insurance shall be primary without right of contribution of any other insurance or self-insurance carried by or on behalf of Contractor or HMMA with respect to their interests in the Services or the Project; and (E) if such insurance is cancelled by the insurer for any reason whatsoever (including nonpayment of premium) or any substantial change is made in the coverage that affects the interests of Contractor and HMMA, such insurance shall nonetheless remain effective for thirty (30) days (including for nonpayment of premium) after receipt of written notice to HMMA sent by registered mail from such insurer of such cancellation or change.

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                              HMMA000019

9.1.4    During the life of this Agreement and for such additional time as may be required, Contractor will provide, pay for, and maintain the insurance outlined below covering Contractor's activities and those of any of Contractor's subcontractors or suppliers to whatever tier.

(1)    Workers' Compensation and Employer's Liability:

(a)    Workers' compensation insurance in accordance with applicable law providing statutory limits of coverage.

(b)    Employer's liability insurance with a minimum limit of $1,000,000 each accident for bodily injury by accident and $1,000,000 each employee for bodily injury by disease.

(c)    Voluntary Compensation endorsement

(2)    Commercial General Liability:    Commercial general liability insurance covering Contractor against claims for personal injury (including bodily injury and death) and property damage (including loss of use). Such insurance will identify HMMA as an additional insured, operate as primary insurance with no contribution from any insurance or self-insurance maintained by HMMA, and will have these minimum limits and coverage:

Minimum limits: $1,000,000 each occurrence
$2,000,000 general aggregate
$1,000,000 personal & advertising injury
$2,000,000 products and completed operations aggregate

Coverages:

1)    1986 (or later) ISO commercial general liability form (occurrence form)

2)    Products and completed operations coverage maintained for at least three (3) years following final acceptance of the Services by HMMA

3)    Explosion, collapse and underground coverage (included in 1993 ISO form)

4)    Broad Form Contractual

5)    Fellow Employee Coverage

6)    Broad Form Property Damage

(3)    Automobile Liability:    Business auto liability insurance covering liability arising out of any auto (including owned, hired, and non-owned autos) with a combined single limit of liability of $1,000,000 per occurrence for bodily injury and property damage. Such insurance will identify HMMA as an additional insured and operate as primary insurance with no contribution from any insurance or self-insurance maintained by HMMA.

(4)    Umbrella/Excess Liability:    Umbrella/excess liability insurance on an occurrence basis in excess of the underlying insurance described above in subsections (1) for employer's liability, (2) for commercial general liability and (3) for business auto liability. Such insurance will identify HMMA as an additional insured, provide blanket contractual liability coverage, and will operate as primary insurance with no contribution as respects any insurance or self-insurance maintained by HMMA. Minimum limits of liability will be $5,000,000 per occurrence and annual aggregate.

(5)    Railroad Protective Liability:    Railroad protective liability insurance when the Services to be performed are within fifty (50) feet of a railroad or affects any railroad property including but not limited to tracks, bridges, tunnels, and switches. The limit of coverage will not be less than $3,000,000 each occurrence/$6,000,000 aggregate.

(6)    Professional Liability:    If required by HMMA, Contractor will purchase and maintain professional liability insurance with terms and limits acceptable to HMMA for each claim and annual aggregate. Coverage will have a retroactive date prior to the beginning of the Services and will have an extended reporting period of thirty-six (36) months after final acceptance of the Services by HMMA.

9.1.5    Certificates of Insurance:  Before starting the Services, Contractor will give HMMA certificates of insurance satisfactory in form to HMMA evidencing that the above insurance is in effect and that no less than thirty (30) days advance written notice will be given to HMMA prior to any cancellation or restrictive modification of the coverage.

9.1.6    Waiver of Subrogation:  All insurance policies in any way related to the Services and secured and maintained by Contractor will waive all rights of recovery, under subrogation or otherwise, against HMMA, its design professionals, its construction manager, the project contractors and all tiers of consultants engaged by HMMA. **Contractor will require its suppliers, to whatever tier, by appropriate written agreements, to give similar waivers each in favor of all parties enumerated in this section.**

8

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                    HMMA000020

9.1.7    Cooperation:  Contractor agrees to fully cooperate and comply with all reasonable requirements and recommendations of the insurers and insurance brokers issuing or arranging for issuance of the insurance required here or performing certificate tracking, in all areas of safety, insurance program administration, claim reporting and investigation, and audit procedures.

9.2    Unless otherwise agreed by HMMA, the Contractor shall include in each subcontract and purchase agreement it enters into provisions and insurance requirements not less favorable to HMMA than those contained in this Section 9 except that "Contractor" will be substituted for "HMMA" and "subcontractor" or "supplier" will be substituted for "Contractor."  All such subcontractors and suppliers shall be required to provide certificates of insurance to HMMA evidencing such insurance requirements before being admitted on HMMA's Site.  Contractor agrees that if for any reason a lower tier subcontractor or supplier fails to procure and maintain insurance as required, all such required insurance shall be procured and maintained by the Contractor at the Contractor's expense.

Section 10.    COMPLIANCE WITH LAWS AND RULES:

10.1    All Services provided hereunder shall comply with all applicable federal, state and local codes, laws, regulations, standards, and ordinances, including without limitation all federal and state laws and regulations pertaining thereto regarding discrimination in employment, including Title VII of the Civil Rights Act of 1964, as amended, and Executive Orders No. 11246 and 11375 which are incorporated herein by reference, and Contractor agrees to save HMMA harmless from and against any and all liabilities, liens, claims, costs, losses, expenses, and judgments arising from or based on any actual or asserted violation by the Contractor.  Contractor shall hold HMMA harmless from all fines, costs of compliance and other costs resulting from noncompliance under this Section 10.

10.2    Contractor shall initiate and maintain such permits and programs as may be necessary to comply with requirements set forth by the Occupational Safety and Health Administration (OSHA) and any other local, state and federal regulations.  A copy of all permits shall be provided to HMMA prior to commencement of Services.  If OSHA permits are not required to perform the Services, a letter shall be submitted by Contractor to HMMA prior to commencement of Services stating that no permits are required.

10.3    Contractor shall comply with the safety rules, regulations, policies and programs of the HMMA as may be implemented from time to time by the HMMA, if any. Contractor shall comply with all work rules and regulations set forth in this Agreement and the accompanying documents including, without limitation, the Site Environmental Safety and Health Program Requirements attached hereto as Attachment 10.3(1) and HMMA's Drug and Alcohol Policy attached hereto as Attachment 10.3(2).

10.4    Contractor, and all those working for or on behalf of Contractor, shall comply with HMMA's rules for business invitees on the premises, including those pertaining to safety, plant protection, security, identification, and the operation and parking of vehicles. Contractor agrees to promptly remove from Owner's premises any workers who fail or refuse to comply with Owner's rules for business invitees and replace them at Contractor's sole cost and expense.

Section 11.    HAZARDOUS MATERIALS AND MATERIAL SAFETY DATA:

11.1    Contractor agrees to comply with all applicable Federal OSHA Hazard Communication Standards 29 CFR 1926.59 and 29 CFR 1910.1200, which require that manufacturers, importers and distributors properly label all containers of hazardous materials or components and furnish a Material Safety Data Sheet (MSDS) for each hazardous material supplied.

11.2    One (1) copy of the related MSDS must be provided with each shipment of any hazardous material.  Failure to provide the MSDS or proper labeling on the container(s) is a violation of Federal regulations and may result in the rejection of the shipment.  Contractor shall be responsible for all shipping charges related thereto.

11.3    Revised MSDSs must be submitted to HMMA or its designated agent when there is a change in composition or when significant new information concerning hazards or ways to protect against hazards becomes known.

11.4    All information spaces on the MSDS must be completed.  Do not use "N/A" in any block – use the terms "Not Applicable" or "No Information Available" if necessary.  Contractor's name, HMMA's contract and line item number must be entered at the top of the MSDS.

9

11.5    HMMA has the right to use, duplicate, and disclose the data on the MSDSs.

11.6    Neither the requirements of this clause nor any act by HMMA shall relieve the Contractor of any responsibility or liability for the safety of HMMA's personnel or property.

Section 12.    PROPRIETARY PROTECTION:

Contractor will, at its sole expense, indemnify, defend, and hold harmless HMMA from and against all claims, damages, costs and liabilities incurred by HMMA or awarded in any proceeding brought against HMMA, its employees, agents, or customers, in which it is claimed that the performance or use of any of the Services furnished by Contractor hereunder constitutes an infringement of any patent or other proprietary information right.

Section 13.    ACCOUNTING AND AUDIT:

Contractor shall maintain accurate and complete accounting records and vouchers in support of all costs billings to HMMA in accordance with generally accepted accounting principles and practices. HMMA, or its representative, shall have the right at the reasonable time to examine and audit the records, vouchers, and their source documents which serve as the basis for compensation, other than compensation which is a fixed amount, such as a fixed price or fixed fee. Said records shall be available for three years after delivery of the Services for HMMA's inspection and audit. Contractor shall furnish such reasonable breakdown of the price, as may be requested by HMMA to satisfy governmental auditing requirements.

Section 14.    CLAIMS:

Contractor shall give HMMA written notice within five (5) working days after the happening of any event which Contractor believes may give rise to a claim for an increase in the amount owed to Contractor or in the scheduled time for performance of the Services or any other relief with respect to the terms of the Agreement. Within ten (10) working days after the happening of such event, Contractor shall supply HMMA with a statement supporting its claim, which statement shall include Contractor's detailed estimate of the adjustment in the amount owed and/or scheduled time occasioned thereby and the circumstances requiring the adjustment requested in the claim necessitated by said condition or event. HMMA shall not be bound to any adjustments for Contractor's claim unless expressly agreed to by HMMA in writing. The parties shall negotiate in good faith to reach an agreement, but in no case shall Contractor stop performing the Services, except with HMMA's prior written consent. No claim hereunder by Contractor or its subcontractors related to Services performed at a Designated Location shall be allowed if asserted after final payment for that Designated Location under this Agreement. Contractor's remedies are limited to those expressly set forth in this Agreement.

Section 15.    LIMITATION OF LIABILITY:

To the extent permitted by applicable law, HMMA shall not be liable to Contractor in contract, tort or otherwise (including negligence, warranty or strict liability) for any incidental, indirect or consequential damages arising out of or in connection with or resulting from this Agreement and/or the Services.

Section 16.    LIENS:

To the full extent permitted by applicable law, Contractor hereby waives and releases any and all rights of mechanic's lien, materialmen's lien, laborer's lien and similar rights for payment for services, labor, equipment, or materials furnished by Contractor which Contractor may have against HMMA's premises or property belonging to HMMA or its agents. Contractor shall at all times promptly pay for all services, materials, equipment and labor used or furnished by it in the performance of the Services under this Agreement and shall at its expense keep all property belonging to HMMA free and clear of any and all laborers', mechanics', materialmens' or other liens and rights of lien. If Contractor fails to release and discharge any such claim of lien against HMMA's premises or the property of HMMA arising out of performance of the Services within five (5) working days after receipt of written notice from HMMA to remove such claim of lien, HMMA may, at its option, discharge or release the claim of lien or otherwise deal with the lien claimant, and Contractor shall pay HMMA any and all costs and expenses of HMMA in so doing, including reasonable attorney's fees incurred by HMMA. Contractor agrees to execute such affidavits,

10

lien waivers and similar documents as may be required by HMMA incident to the making of payments to Contractor under this Agreement.

<u>Section 17.</u>        PROTECTION OF WORK AND RISK OF LOSS:

Contractor shall at all times preserve and protect the material and equipment it uses in the performance of the Services from damage or loss. HMMA shall not be responsible for any loss suffered by Contractor or damage to the material and equipment utilized and provided by Contractor in the course of providing the Services or damage to materials, tools and equipment of Contractor or of any other contractor, and Contractor assumes responsibility for any such loss or damage and for any cost of repairing, making good, or replacing any such loss or damage. Contractor shall also, at its own expense, promptly repair, restore or replace any property of HMMA or any subcontractor, supplier or other contractors, which Contractor, or its subcontractors, may damage, destroy or lose.

<u>Section 18.</u>        GOVERNING LAW AND VENUE:

This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to the choice of law provisions therein. Contractor and HMMA consent and agree that any legal action or proceeding arising hereunder shall be brought in the Circuit Court of the State of Alabama in Montgomery County, or in the United States District Court for the Middle District of Alabama, and each assents and submits to the personal jurisdiction of any such courts in any such action or proceeding. HMMA, at its option, may also invoke binding and exclusive arbitration with respect to any dispute under this Agreement in Montgomery, Alabama under the American Arbitration Association's Commercial Arbitration Rules.

<u>Section 19.</u>        WAIVER OF JURY TRIAL:

EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL OR COURT ACTION COMMENCED BY ANY OF THE PARTIES HERETO TO ENFORCE, COLLECT, DEFEND, ENJOIN, OR THAT OTHERWISE RELATES TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS HEREIN DESCRIBED. LIKEWISE, EACH PARTY HERETO WAIVES ANY RIGHT TO HAVE A JURY TRIAL IN ANY SUCH LEGAL OR COURT ACTION FOR ANY DEFENSE, CLAIM OF SET-OFF, CLAIM OF RECOUPMENT, COUNTERCLAIM OR THIRD PARTY ACTION ASSERTED OR RAISED IN ANY SUCH LEGAL OR COURT ACTION. ANY LEGAL OR COURT ACTION RELATING TO THIS AGREEMENT OR THE TRANSACTIONS HEREIN DESCRIBED SHALL BE TRIED EXCLUSIVELY TO A COURT WITHOUT A JURY. CONTRACTOR AND HMMA SPECIFICALLY ACKNOWLEDGE THAT THEIR EXECUTION OF THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THEIR ENTERING INTO THIS AGREEMENT.

<u>Section 20.</u>        INDEPENDENT CONTRACTOR:

Neither Contractor nor its subcontractors, or the employees or agents of them, shall be deemed to be HMMA's employees or agents, it being understood that Contractor and its subcontractors are independent contractors for all purposes of this Agreement. Contractor shall be solely and wholly responsible for withholding or payment of all federal, state and local income and other payroll taxes with respect to its employees, including, contributions from them and required by law.

<u>Section 21.</u>        FORCE MAJEURE:

Except as otherwise specifically set forth herein, in the event either party is unable to perform its duties under this Agreement for reasons beyond its reasonable control, including acts of God, acts of government or military authority, epidemics, war, terrorism, riots, or other similar causes which the party could not have reasonably foreseen or provided against ("force majeure"), the party so affected shall give immediate written notice to the other party within three (3) days of such event, with a description and estimated duration of said force majeure occurrence. The effects of said force majeure shall, so far as possible, be remedied with all reasonable dispatch, and said party giving notice shall use its best efforts to eliminate and mitigate the consequences thereof. The time for performance may, in HMMA's sole discretion, be extended for a period equal to the time performance is delayed by

11

said force majeure. Under no circumstances shall a labor dispute, strike, lockout or other work stoppage constitute a force majeure event.

Section 22.       ASSIGNMENT:

The rights of Contractor under this Agreement may not be assigned and its obligations hereunder may not be delegated without the prior written consent of HMMA, which consent may be withheld for any reason. Notwithstanding the foregoing, this Agreement shall inure to the benefit of both HMMA's and Contractor's permitted successors and assigns.

Section 23.       NO IMPLIED WAIVER:

HMMA's failure at any time to enforce, or its delay in the enforcement of, any provision of this Agreement or any right with respect thereto, or its failure to exercise any option herein provided, shall in no way be construed as a waiver of such provision, right, or option or affect the validity of this Agreement.

Section 24.       AMENDMENTS:

No modification, amendment or waiver of any of the provisions of this Agreement shall be effective unless made in writing and signed by an authorized representative of both parties.

Section 25.       ENTIRE AGREEMENT:

This Agreement constitutes the entire agreement of the parties with respect to the subject matter written, and shall supersede any and all prior agreements, express or implied, relating to part or all of the Services.  No course of dealing, no usage of trade, and no course of performance shall supplement, explain, or amend any term, condition, or instruction of this Agreement.

Section 26.       SEVERABILITY:

If one or more provisions hereof shall for any reason be held to be invalid and/or unenforceable, such invalidity and/or unenforceability shall not affect any other provision of this Agreement, and the parties shall replace such provision with equivalent provisions, the commercial effect of which shall be as similar as possible to the invalid/unenforceable provisions.

Section 27.       NOTICES:

All notices, demands, requests or other communications given pursuant to this Agreement shall be given in writing and shall be deemed to have been given if delivered by hand, facsimile, certified mail or nationally recognized overnight delivery service, freight prepaid, effective upon receipt (or refusal to accept delivery) of such notice, demand, request or other communication.  Notices to HMMA required under this Agreement shall be given as follows:

> K.Y. Lee
> Director, Purchasing and Parts Development
> Hyundai Motor Manufacturing Alabama, LLC
> 700 Hyundai Boulevard
> Montgomery, AL  36105
> Facsimile:  (334) 387-8999

with a copy to:

> Richard E. Neal
> Vice President Administration & General Counsel
> Hyundai Motor Manufacturing Alabama, LLC
> 700 Hyundai Boulevard

12

Montgomery, AL 36105
Facsimile: (334) 387-8286

Notices to Contractor required under this Agreement shall be given as follows:

**Redacted**

Facsimile: (____)____-____

Either HMMA or Contractor may amend or supplement its addresses for notice from time to time in the manner set forth in this paragraph.

Section 28.     SUB-SUPPLIERS:

Nothing contained in this Agreement shall create any contractual relationship between the HMMA and any of Contractor's suppliers, nor shall the Agreement create any obligation on the part of HMMA to pay or see that payment is made of any sums to any of Contractor's suppliers.

Section 29.     GRATUITIES:

Contractor warrants that it has not offered or given and will not offer or give to any employee, agent, or representative of HMMA any gratuity or any kickback within the meaning of the Anti-Kickback Act of 1986, or any successor statutes, with a view toward securing any business from HMMA or influencing such person with respect to the terms, conditions, or performance of any Agreement with or purchase Agreement from HMMA. Any breach of this warranty shall be a material breach of each and every Agreement between HMMA and Contractor.

Section 30.     SET-OFF AND RECOUPMENT:

HMMA shall have the right to credit toward the payment of any monies that may become due Contractor hereunder, any amounts that may now or hereafter be owed to HMMA under this or any other Agreement or transaction between HMMA and Contractor.

Section 31.     FOREIGN TRADE ZONE REGULATIONS:

Contractor understands and agrees that the Project and the Site have been designated a Foreign Trade Subzone (an "FTZ"). As such, all vehicles and persons entering or departing the FTZ are subject to HMMA's inspection, and Contractor may be required to provide a general inventory of any and all tools, equipment, materials or merchandise passing in or out of the FTZ during the course of the performance of the Services, but in particular, those items or equipment of a material nature such as compressors, welders, generators, etc. Contractor further agrees to strictly comply with all requirements of the Foreign Trade Zones Act (19 U.S.C. § 81a et seq.) and all rules, regulations, or laws of any kind relating to the Foreign Trade Zones Act which are now or hereafter prescribed by governmental authority.

Section 32.     TIME:

Time is of the essence of this Agreement.

Section 33.     SURVIVAL OF OBLIGATIONS:

Notwithstanding termination of this Agreement or HMMA's acceptance of the Services, any duty or obligation of Contractor which has not been fully observed, performed and/or discharged and any right, unconditional or conditional, which has been created for the benefit of HMMA and which has not been fully enjoyed, enforced and/or satisfied (including the duties, obligations and rights, if any, with respect to secrecy) shall survive such termination or acceptance until such duty or obligation has been fully observed, performed and/or discharged and such right has

13

been fully enjoyed, enforced and/or satisfied, including without limitation, the Sections entitled "Confidentiality," and "Indemnity."

<u>Section 34.</u>     COUNTERPARTS:

This Agreement may be executed in counterparts by the parties, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

IN WITNESS HEREOF, HMMA and Contractor each cause this Agreement to be executed in their respective names by their duly authorized representatives, all as of the date first written above.

**Hyundai Motor Manufacturing Alabama, LLC**          **Contractor**

Signature: _Warren Gappa_                    Signature: [Redacted]

Name: _Warren Gappa_                        Name: [Redacted]

Title: _Purchasing Manager / HOD_            Title: _Project Manager_

14

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**          **Documents Produced by HMMA**          **HMMA000026**

Exhibit A

SCOPE OF SERVICES

15

| Prepared by | H.O.D. | Coordinator | Vice Pres. | President |
|---|---|---|---|---|
| DEPT & DATE | | | FOR REPORT OR APPROVAL | |

**Exhibit A**
**Scope of Services**

STATEMENT OF WORK

Hyundai Motor Manufacturing Alabama, LLC

"CONTRACT SECURITY SERVICES"

June 18, 2010

CONFIDENTIAL
Davita M. Key v. HMMA, et al

Documents Produced by HMMA

HMMA000028

SCOPE OF WORK

## TABLE OF CONTENTS

TABLE OF CONTENTS ------------------------------------------------------------------------------ 2

A.  DESCRIPTION OF WORK ------------------------------------------------------------------ 3

B.  LOCATION OF WORK ---------------------------------------------------------------------- 3

C.  PROJECTED STAFFING REQUIREMENTS ----------------------------------------------- 3

D.  SUMMARY OF SERVICES ---------------------------------------------------------------- 4

E.  SPECIFICATIONS ------------------------------------------------------------------------- 4

1.  GENERAL ----------------------------------------------------------------------------------- 4
2.  MINIMUM STANDARDS ------------------------------------------------------------------- 4
3.  TRAINING ---------------------------------------------------------------------------------- 5
4.  SUPERVISION ----------------------------------------------------------------------------- 6
5.  UNIFORMS --------------------------------------------------------------------------------- 7
6.  CONDUCT ---------------------------------------------------------------------------------- 7

F.  GENERAL DUTIES AND FUNCTIONS --------------------------------------------------- 8

1.  SECURITY OFFICER DUTIES ------------------------------------------------------------ 8
2.  MAILROOM DUTIES ----------------------------------------------------------------------- 9
3.  SHIFT SUPERVISOR DUTIES ------------------------------------------------------------ 9
4.  SITE DIRECTOR DUTIES ----------------------------------- ERROR! BOOKMARK NOT DEFINED.

G.  FURNISHED MATERIALS ---------------------------------------------------------------- 10

1.  HMMA SHALL FURNISH MATERIALS AS FOLLOWS: -------------------------------------- 10
2.  CONTRACTOR SHALL FURNISH MATERIALS AS FOLLOWS: ------------------------------- 10

H.  VALIDITY OF QUOTED PRICES AND PRICING -------------------------------------- 10

I.  PAYMENT --------------------------------------------------------------------------------- 11

Page of 11

CONFIDENTIAL
Davita M. Key v. HMMA, et al        Documents Produced by HMMA        HMMA000029

## A.  DESCRIPTION OF WORK

Except as otherwise expressly provided herein, Contractor shall supply all management, supervision, labor, training, equipment, consumable office supply materials, performance audits, and other services necessary or incidental to fulfill all aspects of the contract to provide uniformed security services as herein outlined and specified.

## B.  LOCATION OF WORK

Contractor shall provide security services for the entire property of the HMMA automotive manufacturing facility located in Montgomery County Alabama including other on site suppliers and contractors such as but not limited to GLOVIS Alabama and GLOVIS America.  The HMMA property is designated and operates as a Federal Foreign Trade Zone, subject to all regulations that might apply.

## C.  PROJECTED STAFFING REQUIREMENTS

Contractor shall provide sufficient security personnel and supervision to assure the protection of team members and property at HMMA. Schedule and manpower is subject change based on the business needs of HMMA.  At a minimum, coverage will include posts and hours described in the attached table below:

| Security Plan HMMA Position | Monday | | | Tuesday | | | Wednesday | | | Thursday | | | Friday | | | Saturday | | | Sunday | | | Hrs/Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | 1st | 2nd | 3rd | 1st | 2nd | 3rd | 1st | 2nd | 3rd | 1st | 2nd | 3rd | 1st | 2nd | 3rd | 1st | 2nd | 3rd | |
| Shift Supervisor | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Security Admin Assistant 1 | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | | 40 |
| Security Admin Assistant 2 | 4 | | | 4 | | | 4 | | | 4 | | | 4 | | | | | | | | | 20 |
| Security Admin Assistant 3 | | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | 40 |
| Security Admin Assistant 4 | | | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | 40 |
| Communication Officer 1 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Communication Officer 2 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Rover Officer 1 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Rover Officer 2 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Rover Officer 3 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | | 120 |
| Building and Relief Officer 1 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Building and Relief Officer 2 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Gate 2 Turnstile Officer | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Truck Gate 1 Officer | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | 8 | 128 |
| Truck Gate 3 Officer 1 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | 8 | 128 |
| Truck Gate 3 Officer 2 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Main Entrance Officer | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | 8 | | 8 | 144 |
| Entrance 4 Officer | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Admin Officer | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 168 |
| Admin Receptionist 1 | 8 | 4 | | 8 | 4 | | 8 | 4 | | 8 | 4 | | 8 | 4 | | | | | | | | 60 |
| Admin Receptionist 2 | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | | 40 |
| Training Center Officer | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | | 40 |
| Mail Room 1 | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | | 40 |
| Mail Room 2 | 8 | | | 8 | | | 8 | | | 8 | | | 8 | | | | | | | | | 40 |
| TOTALS | 21 | 17 | 16 | 21 | 17 | 16 | 21 | 17 | 16 | 21 | 17 | 16 | 21 | 17 | 16 | 12 | 11 | 11 | 12 | 11 | 14 | 2728 |

3

Page of 11

D.  **SUMMARY OF SERVICES**

Contractor shall provide the following services as specified in more detail at a later time.

1.  Continuous monitoring of designated posts.
2.  Perform scheduled and unscheduled security inspections.
3.  Direct and/or control access of product deliveries, motor carriers, service personnel, visitors, and HMMA employees.
4.  Monitor and respond to facility life safety, fire, and security systems alarms.
5.  Respond to emergency situations and render aid and assistance as specified and trained.
6.  Assist in the prevention of damage, loss, and theft of HMMA property.
7.  Enforcement of HMMA safety, fire, security, and logistics regulations and procedures.
8.  Other safety, fire, and security related services necessary or incidental to the aforementioned services.
9.  Retain officer training records and certifications consistent with HMMA Records Retention Policy.  Provide to HMMA copies and/or access to these records to support the Business Management System model.

E.  **SPECIFICATIONS**

**1.  *General***

a. All security officers assigned to HMMA shall be unarmed.
b. Contractor shall not use any security officer for more than 12 continuous hours, including those worked at another location, or with a turnaround of less than 10 hours.
c. Contractor shall prepare a HMMA Post Orders Manual on general information, code of conduct, contractor minimum standards, and  specific orders for the HMMA Posts for general and emergency procedures.
d. Contractor shall immediately replace any security officer HMMA, in its sole discretion, may request to be replaced.
e. Contractor shall provide daily, weekly, and monthly reports to HMMA Manager - Safety, Security, & Medical.

**2.  *Minimum Standards***

a.  Qualifications of Security Officers
  1. Security officers must possess a valid state issued driver's license.
  2. Security Officers must possess a valid, State of Alabama, Security Officer's license/certificate/credential.
  3. Security officers must be able to use an on-line computer based security monitoring and logistics scanning system.
  4. Security officers must have the ability to read, understand, and apply printed rules, detailed orders, instructions, and training materials in English.

4

Page of 11

WG   JH

        5. Security officers must maintain poise and self-control under stress.

        6. Security officers must be able to construct and write clear, concise, accurate, and detailed reports.

        7. Security officers must not have been convicted of a felony crime or any misdemeanor involving moral turpitude or violence.

        8. Contractor shall assign only security officers who are able to perform the essential functions of the job with or without reasonable accommodations.

        9. Security officers shall be certified as drug free as determined by a pre-placement urine drug analysis or other testing satisfactory to HMMA, and shall repeat such testing and certification periodically upon request by HMMA at contractors cost.

        10. Security officers must be bonded.

        11. Background check must be performed on all security officers.

    b.    Supervisory Staff

        1. Must be able to meet all of the above requirements in section 2.a. and;

        2. Prior law enforcement experience or equivalent work experience

        3. Prior supervisory experience

**3.**    ***Training***

    a.    The cost of training shall be borne by the Contractor unless any additional training required beyond the terms of this scope is requested by HMMA.

    b.    Pre-Placement

        1.    All security officers shall be trained and certified in basic first aid & CPR.

        2.    All security officers shall be trained, offered vaccinations, equipped, etc., as required by the OSHA Blood Borne Pathogens Standard for designated first aid responders.

        3.    All security officers shall be trained in incipient fire suppression.

        4.    All security officers shall be formally trained in accordance with the Contractor's standard training plan. Certification of satisfactory completion of the formal training of each security officer assigned to HMMA shall be furnished to HMMA prior to assignment.

        5.    All security officers shall be trained on the HMMA facilities layout, electronic security systems, patrol tour stations, post orders, emergency procedures, etc. New hires shall be assigned to work with the shift supervisor on the shift assigned a minimum of 40 hours to accomplish this training. It is the Contractor's responsibility for maintaining a staff that is fully trained to ensure compliance with all the service requirements of the contract.

        6.    All security officers shall be trained on HMMA Foreign Trade Zone operations and standards.

    c.    In-Service

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**        Documents Produced by HMMA        HMMA000032

1. Contractor shall schedule and conduct monthly training sessions (1-2 hours) for the purpose of reviewing general post orders and instructions of the Contractor and HMMA. Sessions should be supplemented with professional security officers training videos, etc.
2. All gate security officers shall be trained on the proper data entry skills necessary to log, key, scan, and otherwise properly handle inbound material and parts arrival at HMMA.
3. Promptly upon request of HMMA, Contractor shall also conduct training sessions to address specific procedures, deficiencies, etc., as specified by HMMA.

d. Annual Refresher - Contractor shall conduct annual refresher training and re-certify such training for all security officers who have been working on HMMA premises for 12 months or more.

e. Retain officer training records and certifications consistent with HMMA Records Retention Policy. Provide to HMMA copies and/or access to these records to support the Business Management System model.

4. *Supervision*

a. General - Area management, site and shift supervision shall be provided by the Contractor to ensure security officers are performing duties as described and are meeting other standards set forth by the Contractor and HMMA.

b. Site Director
   1. The Contractor shall designate a site director who shall have the responsibility to manage, train, schedule, and assign security personnel to HMMA posts in accordance with the contract requirements.
   2. The site director shall be equipped with a cell phone and accessible at all times.
   3. The site supervisor shall be present at the site 40 hours per week, Monday-Friday, and at such other times to effectively supervise complete and effective delivery of services.
   4. The site director will be present to support special activities, investigations, and other duties that may arise in the context of the security leadership role above and beyond the 40 hour per week norm.
   5. The site director will perform other duties as outlines in section F.

c. Shift Supervisors

6

Page of 11

    1.    The Contractor shall designate other shift supervisors for those shifts not directly supervised by the site supervisor, to ensure all post orders, instructions, etc., are followed.

  d.   Unannounced Post Inspections
      1.    The Contractor shall conduct unannounced post inspections primarily on the second and third shift as follows:
          Site Supervisor - weekly
          Area management - monthly

## 5.  *Uniforms*

  a.   General - Unless otherwise specified, uniforms shall be worn at all times, by security officers while engaged in the performance of their duties.

  b.   Uniforms shall be of the same color and style.

  c.   Cloth patches shall be affixed on shirts, jackets, etc., to clearly identify Contractor.

  d.   Name tags shall be issued to and worn by every employee of the Contractor assigned to HMMA.

  e.   Plain black steel toed safety shoes with matching heels and soles must be worn.

  f.   Cold weather uniforms to include individual jackets for all security officers shall be issued by the Contractor.  Rainwear shall be issued by the Contractor and kept for general use at the assigned posts.

  g.   In order to maintain appearance standards, a minimum of three complete uniforms are to be issued to all full time (40 hours) and two complete uniforms are to be issued to all part time security officers.

  h.   Approved safety equipment when in manufacturing areas (safety glasses, bump caps, ear plugs, etc.) as required in various areas of the plant.

  i.   Contractor shall provide, in addition to uniforms described above, for the Site Manager, 5 golf style shirts (with appropriate embroidered logos and name), and 5 Dockers style pants.  These are to be worn most often at HMMA, to promote the team image and casual appearance prevalent at HMMA.

## 6.  *Conduct*

  a.   General - The Contractor is responsible to ensure that all security officers carry out all duties that comply with Contract requirements.  Example of non-compliance would include but is not limited to the following:

      1.   Unacceptable appearance
      2.   Neglect of duty to include sleeping, loafing, delays or failure to carry out assigned tasks, conducting personal affairs during official times.

CONFIDENTIAL
Davita M. Key v. HMMA, et al          Documents Produced by HMMA          HMMA000034

3. Falsifying, concealing, removing, destroying, official documents and records and reports.
4. Disorderly conduct, use of abusive or offensive language, fighting, or any form of harassment.
5. Theft, vandalism, immoral conduct, or other criminal actions. (Intent to remove and unlawfully removing merchandise from the HMMA Foreign Trade Zone is also a federal crime carrying a fine or imprisonment or both.)
6. Selling, consuming, possession, or being under the influence of intoxicants, drugs, etc., while on duty.
7. Unauthorized use of HMMA equipment, unauthorized possession of weapons while on duty.
8. Leaving post without relief.

## F.   GENERAL DUTIES AND FUNCTIONS

### 1.   *Security Officer Duties*

a.   Gate

1. Controls access by screening incoming vehicles and persons to plant facilities (issuing badges and vehicles permits to those authorized for entrance.)
2. Monitors fire, life safety and security systems and dispatches patrol security for response.
3. Enforces HMMA safety and security regulations.
4. Answers incoming phone calls and transfers to the appropriate employees
5. Performs administrative functions such as receiving and controlling outgoing mail, express packages, etc.
6. Prepares and submits written reports for any and all events, situations outside of normal operating conditions.
7. Controls motor carriers to include the review of shipping documents necessary for the controlled entry to and exit from HMMA.
8. Log, scan, key, and otherwise properly handle inbound material and parts arrival to HMMA.
9. Operating truck scale to include the reconciling of actual motor carrier weight to the claimed weight.

b.   Patrol – Rover and Relief

1. Conduct hourly inspections of buildings, facilities, parking, etc.
2. Respond to and give aid and assistance in emergency situations to include securing the scene of an accident, putting out incipient fires, giving first aid, investigating alarms and suspicious circumstances, etc.

8                                                        Page of 11

WG   JH

3.  Initiate written reports for events, situations, and unusual conditions outside of normal operating conditions.
4.  Enforcing HMMA safety and security regulations.
5.  Issue Hot Work and Confined Space Permits
6.  Other security related activities as needed to include opening/closing buildings, parking control, raising/lowering flags, etc.

c.  Communication Officers:

1.  Monitors fire, life safety and security systems and dispatches appropriate units for response.
2.  Answers emergency and non-emergency calls and dispatched appropriate units for response
3.  Acts as the center communication for all emergency dispatching of the site.
4.  Sounds appropriate build evacuation and take shelter tones during such events
5.  Monitors sever weather conditions
6.  Monitors CCTV monitors
7.  Performs access control status updates for badges.
8.  Initiate written reports for events, situations, and unusual conditions outside of normal operating conditions.

2.  *Mailroom Duties*

a.  Coordinate pick-up and delivery of mail at USPS facilities
b.  Coordinate distribution of mail packages, and freight throughout the plant.
c.  Coordinate processing of outbound shipments and deliveries via UPS, DHL, Federal express, and USPS.
d.  Coordinate processing of freight shipments including weighing, packaging, processing paperwork, and scheduling.

3.  *Shift Supervisor Duties*
a.  Lead by example for personal conduct and appearance!
b.  Review and evaluate all written reports submitted by security officers to ensure reports are correctly and properly completed.
c.  Inventory reports, forms, and equipment and reports to the designated persons any needed materials or inoperable equipment.
d.  Ensure all orders and instructions are understood and followed by security officers.
e.  Perform all other security officer duties in accordance with the particular shift specifications and assignments.
f.  Perform rover duties as needed throughout the shift.

9

Page of 11

WJG    JH

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                    HMMA000036

g.   Respond to all emergency calls and support command structure as designed in the Emergency Response Plan

## G.   FURNISHED MATERIALS

**1.   HMMA shall furnish materials as follows:**

a.   Desk top computers.
b.   Guardhouses, offices, consoles, desks, and computer monitoring systems
c.   Utilities
d.   Telephones
e.   Building Keys
f.   Walkie-Talkie Radios
g.   Medical supplies for first aid response
h.   Fire extinguishers for incipient fire response
i.   Supervisor cell phones

**2.   Contractor shall furnish materials as follows:**

a.   Uniforms to include weather gear
b.   Flashlights and batteries
c.   1 Supervisor vehicle, 3 Patrol vehicles, 2 Relief golf carts, fuel, and maintenance.
  c.1 Vehicles must be of the Hyundai manufacture nameplate.
d.   Other materials necessary or incidental to carry out the services described herein.

## H.   VALIDITY OF QUOTED PRICES AND PRICING

1.   All prices quoted shall, at a minimum, be valid for **24 months** after acceptance of the bid or start of the work whichever is later.
2.   The contractor shall bear responsibility of payment of all wages, salaries, fringe benefits, and other forms of compensation or reimbursement and shall pay and report all payroll taxes payable as a result of work performed by its personnel.
3.   The contractor shall also bear full responsibility for all wages and salary deductions, including but not limited to workers' compensation, State Unemployment Tax, Social Security Withholding tax, uniform expense, and training program expenses.
4.   HMMA shall not be responsible for the payment of any overtime, vacation, or holiday pay.  All of Contractor's anticipated costs for overtime, vacation, and holiday pay are already accounted for in the base hourly billing rates to HMMA

10                                                          Page of 11

WG   JH

5.    Contractor shall not bill HMMA for benefits and/or taxes in addition to the hourly Base rates.  All of Contractor's anticipated costs for benefits and/or taxes are already accounted for in the base hourly billing rates to HMMA.

6.    Contractor will be responsible for conducting its own labor relations and notify HMMA of any potential issues that arise therein.

7.    The cost to repair any damages beyond normal wear and tear to any HMMA provided equipment shall be the responsibility of the Contractor, and invoices submitted will reflect a deduction of such amount.

## I.    PAYMENT

1.    Payment terms shall be Net 30.

2.    Contractor shall furnish HMMA's authorized representative a daily summary of hours listing all services provided in a format acceptable to HMMA.

3.    Contractor shall bill HMMA based on the monthly summary of services.

4.    HMMA may be offered relief for each of the following occurrences:

4.1    Failure to provide the number of security officers required for each post and each shift as specified in this statement of work.

4.2    Failure to assign trained substitute security officers as replacements.

4.3    Allowing a security officer to work in excess of twelve (12) hours in any twenty-four (24) hour period or more than forty-eight (48) hours in a work week without written consent of the HMMA authorized representative.

4.4    Failure to produce documentation concerning pre-employment medical screening and investigation prior to assignment.

4.5    Failure to assign a properly dressed security officer.

4.6    Failure to train contractor's personal by agreed upon dates.

4.7    Failure to keep any vehicle in service at all times.

4.8    Occurrence of billing discrepancy shortage that is not corrected within 7days.

4.9    Failure to perform any of the requirements in the statement of work or position descriptions

11

Page  of 11

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                    HMMA000038

Exhibit B

FEE SCHEDULE

| Description | Hourly Rate |
|---|---|
| Shift Supervisor | $30.60 |
| Communication Officer | $22.30 |
| Rover Officer | $23.95 |
| Building and Relief Officer | $15.06 |
| Gate 2 Turnstile Officer | $15.06 |
| Truck Gate 1 Officer | $15.06 |
| Truck Gate 3 Officer 1 | $15.06 |
| Truck Gate 3 Officer 2 | $15.06 |
| Main Entrance Officer | $18.43 |
| Entrance 4 Officer | $15.06 |
| Admin Door Officer | $16.76 |
| Admin Receptionist | $16.76 |
| Security & Admin Assistant | $20.11 |
| Training Center Officer | $15.06 |
| Mail Room | $16.76 |

16

**ATTACHMENT 4.2**

**Alabama Department of Revenue Sales Tax Exemption Procedures**

CONFIDENTIAL
Davita M. Key v. HMMA, et al

## Alabama Department of Revenue Sales Tax Exemption Procedures
## Hyundai Motor Manufacturing Alabama, LLC

1. **Each contractor will complete an Application For Sales and Use Tax Certificate of Exemption  (Form ST: EX-A2) and submit the completed application with their bid.**

2. Owner or its Construction Manager, as the prime contractor / Construction Manager, will issue a letter to the State of Alabama Department of Revenue confirming that the successful contractor will be making purchases of tangible personal property to be incorporated into the Hyundai Assembly Plant.  The letter will be forwarded to the state with the successful contractor's completed Application For Sales and Use Tax Certificate of Exemption  (Form ST: EX-A2).  A copy of the letter will be sent to the contractor.  All applications for the unsuccessful contractors will be returned to each respective contractor.

3. The Contractor must notify Owner or its Construction Manager  in writing immediately upon the award of each subcontract.  **Each subcontractor (that will be purchasing materials on an abated basis) must complete an Application For Sales and Use Tax Certificate of Exemption (Form ST: EX-A2).**

4. Owner or its Construction Manager  will issue a letter to the State of Alabama Department of Revenue confirming that the successful subcontractor will be making purchases of tangible personal property to be incorporated into the Hyundai Assembly Plant.  The letter will be forwarded to the subcontractor for submittal to the State with the completed application form.  A copy will be sent to the contractor.  **This process must be repeated for each subcontractor that will be making purchases of tangible personal property to be incorporated into the Hyundai Assembly Plant.   The Alabama Department of Revenue will only honor authorization letters from Owner or  its Construction Manager.   The contractor cannot issue the authorization letter to the Alabama Department of Revenue.**

5. Each contractor or subcontractor must present a signed copy of **their** uniquely numbered Form STE-2 exemption certificate to each vendor from whom they purchase personal property which will become a part of the Hyundai Assembly Plant project for which the sales and use tax abatement has been granted.

6. The burden of proof that a sale is entitled to an abatement is upon the person making the sale (the vendor) **unless** the seller (vendor) takes from the certificate holder a properly executed Form STE-2.  The vendor should reference the Project Number shown on the Form STE-2 on the invoice or billing to the certificate holder.

7. The sales tax exemption for the Hyundai project only applies to items that are delivered in the City of Montgomery.  The burden of proof is the delivery address shown on each invoice.  Certificate holders that purchase items outside of the City of Montgomery risk the complete or partial loss of the available state and local sales tax abatement.

8. The Form STE-2 exemption certificate is not authorized for use for purchases that do not qualify for the abatement.  The exemption does not apply to the following types of items:
   - office supplies and expenses
   - all rentals
   - consumable construction supplies
   - construction tools
   - Gas, oil, and grease for construction equipment

   (This list is not intended to be all inclusive of the items that do not qualify for the abatement.  It is provided to show the most common examples only.)

9. The administration of the holders of the Form STE-2 and interpretation of the applicable sales and use tax rate(s) are responsibilities of the contractor or subcontractor.  Owner or its Construction Manager accepts no responsibility for noncompliance, misuse, or incorrect interpretation on the part of the contractors or subcontractors.

10. The abatement covers ONLY the purchase of tangible personal property that is incorporated into the Hyundai Assembly Plant project for which the sales and use tax abatement has been granted.  If the contractor or subcontractor erroneously uses the certificate to make an unqualified purchase, the contractor

CONFIDENTIAL
Davita M. Key v. HMMA, et al                     Documents Produced by HMMA                                    HMMA000041

or subcontractor is required to report and pay the applicable state and local sales or use tax directly to the State of Alabama, Sales and Use Tax Division.

11. The exemption certificate does not cover local sales and use tax that is earmarked for educational purposes. These taxes are referred to as local education sales and use taxes. **We have been advised by the County and the City that currently there are NO local sales and use tax earmarked for educational purposes.**

12. The contractor/subcontractor (certificate holder) is required to maintain a list of all vendors to whom he furnishes copies of the exemption certificate. The list must be retained in the purchaser's records available for inspection by the Alabama Department of Revenue and/or Montgomery County and the City of Montgomery, and must provide the name, address, and type of business of each vendor to whom a copy of the certificate has been furnished. It is recommended that the list also include the purchase order(s) assigned to each vendor and all paid invoices include clear reference to indicate that the materials were used specifically for the Hyundai Assembly Plant.

13. **The certificate holder must return the original certificate to the Alabama Department of Revenue upon completion of the Hyundai Assembly Plant.**

Nothing in this document is intended to conflict with the official rules and instructions that each certificate holder will receive from the Alabama Department of Revenue.

Questions concerning the State of Alabama Abatement program should be directed to:

> Alabama Department of Revenue
> P.O. Box 327001
> Montgomery, AL 36132-7001
>
> Attention:   John Paridise
>              Abatement Program Director
>              Telephone (334) 242-1175

3

CONFIDENTIAL
Davita M. Key v. HMMA, et al                Documents Produced by HMMA                HMMA000042

For Permit Authorization,
or general information,
**Call HMMA Security**
**Non-Emergency (334) 387-8901**
**Have a safety concern?**
**Call the Contractor Safety Tip Line (334) 387- 8902**
NOTE: To call from a cellular phone,
or other phones not on the HMMA PBX System,
you must first dial 387, then the number.

i



**Hyundai Motor Manufacturing Alabama, LLC.**

**Contractor**
**Safety, Security and Fire Protection Handbook**

Montgomery, Alabama

10/07

# EMERGENCY PHONE NUMBERS

## *TO REPORT ANY EMERGENCY*

**FIRE**
**MEDICAL**
**SAFETY**
**SECURITY**
**ENVIRONMENTAL**
**CALL HMMA SECURITY**
**(334) 387- 8900**

CONFIDENTIAL
HMMA000043
Documents Produced by HMMA

Issuance of this information shall in no way be deemed or interpreted as the assumption of responsibility or liability by Hyundai Motor Manufacturing Alabama, LLC

**ORIENTATION PROCEDURES**

1.1.   All Contractors shall attend Safety Orientation before working on the site. Orientation is approximately 2 hours.

1.1.1.   Contractor must attend orientation annually. An applicant may be re-badged if it has been less than 12 months since he has attended orientation, and there are no other reasons to deny a badge.

1.2.   Safety, Security and Environmental Orientation will be conducted as follows:

1.2.1.   Orientation is given at the ADT Training Center – New Hire Orientation and located on Hyundai Blvd, Monday through Friday at 6:15 a.m. Anyone arriving after an orientation session starts will not be admitted. Personnel attending orientation shall be properly attired. Refer to Personal Protective Equipment Section of this manual.

1.2.2.   Contractors must be at the ADT Training Center before 6:15 a.m. for processing. Re-badge applicants should report at 7:30 a.m. at Gate 2 on HMMA Site.

1.2.3.   All Contractors shall provide Certificates of Insurance to prove appropriate coverage for Automobile Insurance and Worker's Compensation Insurance. Contractors not in the HMMA OCIP program shall also provide Certificates for General Liability and Worker's Compensation Insurance. Certificates of Insurance shall be provided to HMMA Safety before Contractors will be admitted to orientation. Contractors will not be allowed to work on HMMA property without the appropriate insurance coverage in place.

1.2.4.   A fully completed ID BADGE REQUEST FORM must be submitted before the Contractor will be issued a badge, whether for initial orientation, 12-month refresher, or re-badging. The Contractor Employer must provide a list of Contractors attending orientation before the beginning of orientation. If an individual is not on the contractor's list, they will not be admitted to orientation. Contractors shall then be issued a HMMA Safety and Security Contractor Handbook.

**CONTRACTORS' SAFETY RESPONSIBILITIES**

1.3   General/Prime Contractor

1.3.1 General/Prime Contractor(s) shall be responsible for the safety of their personnel and shall be responsible for compliance with all HMMA, Local, State, and Federal standards and requirements. General/Prime Contractor(s) must provide a full time onsite construction safety coordinator, on all shifts for their employees and any subcontractors with fewer than 15 employees, that is knowledgeable in safety and how it applies to construction. This knowledge may be demonstrated through experience and education such as:

1)   OSHA 30-hour certification in Construction Safety and Heath with experience in safety

2)   Safety related degree + safety experience
        or

3)   A proven prior record at HMMA in the construction safety field.

General/Prime Contractor shall submit a resume for this person to HMMA Safety for approval before the coordinator beginning on site. This safety person and all supervisory personnel must attend all HMMA Safety Classes within the first two weeks of their arrival on site. Additionally, Safety Coordinators must attend these

i

1

CONFIDENTIAL

- Possession of a firearm or other deadly weapon on HMMA property
- Possession, sale, or use of alcoholic beverages or controlled substances
- Insubordination or failure to surrender badge when asked, by a HMMA Safety/Security Official
- A Supervisor or foreman intentionally instructing employee(s) to work in an unsafe manner or not enforcing the HMMA safety policies.

1.8 FOR MAJOR VIOLATIONS, THE DISCIPLINARY PROCEDURE MAY BE PERMANENT DISMISSAL FROM HMMA PROPERTY ON THE FIRST OFFENSE.

1.9 When a major violation is committed; HMMA Safety shall contact HMMA Security, when security arrives, they will ask the Contractor for his/her badge and escort him/her to the gate.

1.10 Disciplinary procedure for using tobacco products outside of an authorized area is as follows:

1st Offense – 90 days dismissal from HMMA property.

2nd Offense – Permanent dismissal from HMMA property.

CONFLICT RESOLUTION

1.1. Problems regarding Site Safety Regulations, Procedures or Site Permits shall be brought to the attention of HMMA Safety immediately.

1.2. Joint meetings shall be held with the Contractor, Employee Representative, Project Engineer and HMMA Safety, and any additional personnel required, for final resolution.

JOB SAFETY ASSESSMENT

1. Contractors shall conduct Job Safety Assessments (JSA's) for all line item schedule activities being performed by the contractor on a particular project at HMMA. Line item schedule activities not included would be any activities not physically being performed on the project. HMMA reserves the right to request that a JSA be performed for specific activities not addressed in the project schedule.

2. Contractor(s) shall perform JSA's in regards to coordination of subcontractors in overlapping work areas, plans for maintaining adequate general conditions on the project and any items pertaining to Item 1 in this section.

3. To better inform contractor management about JSA's, HMMA Safety has set the following guidelines concerning JSA's:

- JSA's are to be performed by on site management personnel knowledgeable in the activity being planned and assessed.
- JSA's shall be site specific and of good quality. JSA's that are completed in a haphazard manner will not be accepted by HMMA Safety for review
- JSA's shall be updated if the scope of work changes for a particular activity and the new JSA submitted to HMMA Safety in a timely fashion

4

CONTRACTOR SAFETY TRAINING

All Contractors are required to provide specific safety training, as required by OSHA, to their employees. Contractors must conduct the training before their employees begins any work that specifically involves tasks covered by that particular training. The training shall be of the utmost quality and specifically cover the purpose for which it was intended.

Some examples of specific training that contractors should be performing are as follows:

- Fall protection and fall protection systems
- Fire extinguisher
- Confined Space
- Lock Out/Tag Out
- Ladders and Stairways
- Hazard Communication
- Mobile Equipment Operator
- Use of Personal Protective Equipment Including Respiratory Protection
- Use of Aerial and Scissors Type Lifts
- Powder Actuated Tools Use
- Laser Operators
- Job Safety Assessments
- Hot Work Permit System
- Supervisory Safety Training (minimum requirement being OSHA 10-hour Construction Outreach or equivalent).
- First Aid/CPR training

This list shall not be interpreted as the only training that is required by a particular law or OSHA standard. Copies of the training material and documentation shall be maintained by the contractor as required by law. Failure to provide training required by law or HMMA will be just cause for HMMA safety to shut down that particular portion of work until the requirements of this section have been met by the Contractor.

5

CONFIDENTIAL
David M. Key v. HMMA, et al

Documents Produced by HMMA

HMMA000045

3.3.5. The Contractor introduces a hazard into the space;

3.3.6. or identified by HMMA as Permit Required Confined Spaces.

3.4. Before ANY confined space entry, the Contractor shall provide a copy of their written confined space entry procedures to HMMA Safety and meet HMMA Confined Space Orientation requirements.

3.5. The Contractor shall provide a copy of current confined space training records for all Contractors who will be involved with the entry.

3.6. The Contractor shall then complete the HMMA Confined Space Entry Checklist. This form shall be signed by HMMA Safety before Contractors may proceed with the entry.

3.7. The Contractor shall ensure that all OSHA and HMMA requirements are satisfied before entering a confined space. The Contractor shall check the confined space for hazardous atmospheres. The Contractor shall conduct sampling WITHOUT ENTERING THE CONFINED SPACE and in the presence of a HMMA Safety Representative. Sampling shall consist of at least the following tests:

3.7.1. Oxygen $O_2$
3.7.2. Carbon Monoxide CO
3.7.3. Hydrogen Sulfide $H_2S$
3.7.4. Lower Explosive Limit LEL
3.7.5. Known Hazards PEL

3.7.5.1. If the space meets the criteria for a Non-Permit Required Confined Space, the Contractor may proceed with the entry.

3.7.5.2. If the space fails the criteria for a Non-Permit Required Confined Space, the Contractor must complete a HMMA Confined Space Entry Permit and HMMA Safety must authorize the Permit before Contractor may enter the space.

3.8. The Contractor shall provide appropriate safety equipment (including communications), attendant, ventilation equipment, 12-volt lighting or the equivalent, air monitoring device and appropriate rescue equipment. This equipment shall be in place before entering the confined space.

3.9. Contractor shall post permits (or checklists) in the work area where confined space entry work is done. Permits are valid for one shift only. In no case shall a permit be valid for more than 12 hours.

3.10. Contractor must return permits (or checklists) to HMMA Security at the completion of the work, or at the end of each shift.

4. CONSTRUCTION SITE REQUIREMENTS

4.1. DUST CONTROL

4.1.1. The Contractor shall develop and implement a dust control program to guarantee that the following conditions are eliminated on the project:

4.1.1.1. High levels of nuisance dusts, silica dusts, or any other dusts specified in 29 CFR 1926.55 that may jeopardize worker safety and health due to potential exposure.

8

4.1.1.2. Dusts or other foreign debris that may be generated that could adversely affect HMMA Production Operations.

4.1.2. The Contractor shall submit its Dust Control Program to HMMA Safety before beginning work on the site. At a minimum the Contractor shall guarantee HMMA as close to dust free conditions as possible both inside and outside of the buildings on the property.

4.2. HOUSEKEEPING

4.2.1. Contractors shall maintain good housekeeping in all work areas, at all times. Contractors shall provide covered trash receptacles for personal trash accumulating in area.

4.2.2. During construction, Contractors shall keep debris cleared from work areas, emergency equipment, passageways, and stairs and shall remove debris at regular intervals, at least daily. Contractor shall provide containers for collection and shall be disposed of at frequent and regular intervals.

4.2.3. Contractors shall adhere to 29 CFR 1926.25 and HMMA'S Housekeeping Guidelines as stated above.

4.3. ILLUMINATION

4.3.1. Contractors must illuminate all work areas to prevent accidents and injuries. The minimum requirement for any construction area is 5 foot candles.

4.3.2. Refer to 29 CFR 1926.26 for additional guidelines.

4.4. POTABLE WATER

4.4.1. The Contractor shall provide an adequate supply of potable water in all work areas. These containers shall be refilled as required or at least daily.

4.4.2. Potable containers, used to dispense drinking water, shall be capable of being tightly closed, and equipped with a tap. Water shall not be dipped from container.

4.4.3. The common drinking cup is prohibited. When Contractor provides single-use cups, it must provide a sanitary dispenser and a trash receptacle.

4.4.4. For additional regulations, consult 29 CFR 1926.51.

4.4 SANITATION

4.4.1 Contractors shall provide an adequate, HMMA Safety approved, method for hand washing.

4.4.2 Contractors shall provide toilets for their employees according to the following:

Table D - 1

| Number of employees | Minimum number of facilities |
| --- | --- |
| 20 or less | 1 |
| 20 or more | 1 toilet seat and 1 urinal per 40 workers |
| 200 or more | 1 toilet seat and 1 urinal per 50 workers |

4.5 SIGNS, SIGNALS AND BARRICADES

9

HMMA000046

CONFIDENTIAL
Davita M. Key v. HMMA, et al

Documents Produced by HMMA

HMMA000047

5.12    Guardrails, handholds, and steps shall be provided on cranes for easy access to the car or cab. Platforms and walkways shall have anti-skid surfaces.

5.13    Contractor must inspect all cranes before each use, and during use, to ensure it is in safe operating condition.

5.14    Contractor must repair any deficiencies, or replace any defective parts, before continued use of equipment.

5.15    Contractors shall take wire ropes out of service when any of the following conditions exist:

5.15.1    Six randomly distributed broken wires in one lay or three broken wires in one strand in one lay;

5.15.2    Wear of 1/3 the original diameter of outside individual wires. Kinking, crushing, bird caging, or any other damage resulting in distortion of the rope structure;

5.15.3    Evidence of any heat damage from any cause;

5.15.4    Reductions from nominal diameter of more than:

- 1/64 inch for diameters up to and including 5/16 inch.
- 1/32 inch for diameters 3/8 inch to and including 1/2 inch.
- 3/64 inch for diameters 9/16 inch to and including 3/4 inch
- 1/16 inch for diameters 7/8 inch to 1-1/8 inches inclusive
- 3/32 inch for diameters 1-1/4 inches to 1-1/2 inches inclusive

5.16    Contractor shall barricade accessible areas within the swing radius of the entire rotating superstructure of the crane in such a manner as to prevent an employee from being struck or crushed by the crane.

5.17    The contract employer or the operator must be able to present documentation to show that the operator is properly trained to operate the crane in a safe and competent manner.

5.18    Contractors shall prepare and submit to HMMA Safety a critical lift plan when the following picks are planned:

5.18.1    Tandem picks
5.18.2    Net weight of load exceeds 25 tons
5.18.3    Value of load exceeds $50,000
5.18.4    Replacement time for damage load exceeds two months
5.18.5    Gross load weight exceeds 85% of cranes rated capacity

# 6    ELECTRICAL SAFETY

## 6.1    OVERHEAD LINES

6.1.1    All overhead transmission and distribution lines shall be considered to be energized until proper clearance has been granted, the lines are confirmed de-energized, and they have been properly grounded.

6.1.2    Contractors shall maintain the following clearances between any vehicle or load and the line:

- For lines rated 50 kV or below, minimum clearance shall be 10 feet;
- For lines rated over 50 kV, minimum clearance shall be 10 feet plus 0.4 inch for each 1 kV over 50 kV or twice the length of the line insulator, but never less than 10 feet;
- In transit with no load and boom lowered, the equipment clearance shall be a minimum of 4 feet for voltages less than 50 kV; 10 feet for voltages over 50 kV, up to and including 345 kV; and 16 feet for voltages up to and including 750 kV.

6.1.3    Contractors must designate a person to observe clearance of the equipment and give timely warning for all operations where it is difficult for the operator to maintain the desired clearance by visual means.

## 6.2    GROUND FAULT CIRCUIT INTERRUPTERS

6.2.1    The Contractor shall use ground fault circuit interrupters on all 120 volt, single phase 15 and 20 ampere outlets, devices and tools used on the site.

6.2.2    Contractors shall test GFCIs monthly to ensure proper operation.

6.2.1    Tests shall be completed by the 10th of each month.

6.2.3    Contractors must maintain a written log of this test and be available for inspection by a HMMA Safety upon request.

## 6.3    TEMPORARY WIRING REQUIREMENTS

6.3.1    No open conductors, single conductors, triplex, quadraplex, etc. shall be permitted without prior written approval of HMMA Safety.

6.3.2    Temporary lighting shall be protected from accidental contact or breakage. Metal-case sockets shall be grounded.

6.3.3    Festoon lighting shall not be permitted without written approval from HMMA Safety.

6.3.4    Portable electric lighting used in wet and/or other conductive location, (example: drums, tanks, and vessels) shall be operated at 12 volts or less.

6.3.5    Extension cord sets used shall be of the three wire type and shall be designed for hard or extra-hard usage. Examples of these types of cords include types:  S, ST, SO, SJO, SJ, SJO, STT, and SJTO.

6.3.5.1 Extension cords of "flat" construction are strictly prohibited.

6.3.6 In general, if the electrical installation is made in accordance with the National Electrical Code Article 305, ANSI/NFPA 70-1999, exclusive of Formal Interpretations and Tentative Interim Amendments, it will be deemed to be in compliance with 29 CFR 1926.403 through 1926.408.

6.3   5.2    Exceptions include:

- 1926.404(b)(1) "Ground Fault Protection" and;
- 1926.405(a)(2)(ii)(E), (F), (G), Temporary Lighting, and;
- 1926.405(a)(2)(ii)(J).    Flexible cords and cables.

# 7    EMERGENCY ACTION PROCEDURES

## 7.1    EMERGENCY ACTION DRILLS

7.1.1    HMMA Safety conducts a severe weather sheltering drill in the spring and a fire evacuation drill in the fall.  All on-site Contractors and their personnel must participate in these drills.

## 7.2    SEVERE THUNDERSTORM & TORNADO PROCEDURES

7.2.1    In the event of a Severe Thunderstorm or Tornado alert, remember the following alert conditions:

7.2.1.1    A WATCH means that conditions are favorable for the formation of severe weather.  Be prepared to take action.

7.2.1.2    A WARNING means that severe weather has been confirmed by HMMA, authorities and/or radar.  Take appropriate actions

CONFIDENTIAL

Davis M. Key v. HMMA, et al

Documents Produced by HMMA

10.3 A ladder or other means of exiting the excavation shall be placed within 25 feet of the work area.

10.4 Contractors shall barricade all excavations for personnel and vehicle protection.

10.5 Contractors shall keep all areas around excavations clear of all tools, equipment or large clods of dirt that could fall in on Contractors.

10.6 Contractors may use spoiled dirt to barricade a side of the excavation as long as it is piled up no closer than 3 feet from the edge of excavation and at least 3 feet high.

10.7 Under no condition shall personnel enter an excavation while equipment is operating next to the edge.

10.8 Any excavation deeper than 20 foot shall have an excavation plan, designed by a certified soil-engineer. Contractor must present the plan to HMMA Safety before entering the excavation.

10.9 For additional regulations, consult 29 CFR 1926 Subpart P.

11 **FALL PROTECTION**

11.1 Contractors shall protect employee(s) from fall hazards of six feet, or more, by installing guardrails or using personal fall arrest systems, or other systems approved by HMMA Safety. This includes, but is not limited to the following:

- Falling more than six feet through holes (including skylights) by hole covers, guardrails or personal fall arrest systems. Working at least 6 feet away from a hole does not remove these requirements.
- On the face of formwork or reinforcing steel, Contractors must be protected from falling six feet or more by personal fall arrest systems, nets or positioning devices.
- On the edge of excavations deeper than six feet, Contractors must be protected from falling by guardrails, fences or barricades when excavations are not easily visible. (See APPENDIX A).
- Contractor must protect from fall hazards six feet or higher above dangerous equipment by installing guardrails, or using personal fall arrest systems or nets. Less than 6 feet above dangerous equipment must also be protected from falling into or onto the equipment by guardrails or equipment guards.
- Contractors must protect employees who are on walking/working surfaces six feet or higher from a lower level by installing guardrails, nets or personal fall arrest systems.

11.2 Full body harnesses, shock absorbing lanyards and a proper attachment point are the minimum requirements for a personal fall arrest system.

11.3 Lanyards and vertical lifelines must have a minimum breaking strength of 5,000 pounds.

11.4 Personal fall arrest systems must be rigged so that the worker can neither fall more than six feet nor contact any lower level.

11.5 Positioning devices must be rigged to prevent free falls more than two feet.

11.6 Warning lines must be erected around all sides of a roof work area.

11.7 Contractors must implement a full protection program that requires 100% fall protection at all times.

11.8 For additional regulations, consult 29 CFR 1926 Subpart M.

16

12 **FIRE PROTECTION AND PREVENTION**

12.1 Fire doors must not be blocked or locked to prevent emergency use when employees are within the buildings.

12.2 Exit routes from buildings must be clear and free of obstructions and properly marked with signs designating exits from the building.

12.3 Contractors must train its employees in the potential fire hazards of their jobs. Contractors must train all new or transferred employees in the fire prevention plan when beginning their job duties. Contractors must train their employees on any changes in the fire prevention plan.

12.4 In case of fire, Contractors may try to extinguish incipient (beginning) fires with a portable fire extinguisher only if they have been properly trained and it is safe to do so.

12.5 An audible alarm shall consist of either a slow whoop, a verbal message or short repetitive blasts on an air horn. UPON HEARING THIS SIGNAL ALL CONTRACTORS SHALL EVACUATE THE BUILDING using the pre-determined emergency exit routes.

12.6 Use of fire hydrants that are connected to the HMMA Fire Protection System will not be available for construction project water supply

12.7 For additional regulations, consult 29 CFR 1926 Subpart F.

13 **HAND AND POWER TOOL SAFETY**

13.1 The Contractor shall ensure that tools and equipment are maintained in safe working order and used for their intended purpose.

13.2 Proper guards must be installed on all power tools before being issued. Tools without proper guards in place or tools that have been modified (i.e., homemade handles or extensions) are not permitted.

13.3 Auxiliary handles on drills and grinders must be used for greater control. Removal of the handles without having demonstrable need will be considered a violation.

13.4 It is the Contractor's responsibility to inspect tools before they are issued. If tools are found defective, they shall be taken out of service until repairs have been made or tools replaced.

13.5 For additional regulations, consult 29 CFR 1926 Subpart I.

14 **HAZARD COMMUNICATION**

14.1 Information on chemicals used or handled at HMMA by Contractors is maintained by HMMA Safety. HMMA Safety maintains information on chemicals used or handled at Hyundai. This information includes descriptions, handling precautions, protective equipment, symptoms of exposure and first aid for each chemical used at Hyundai. The Contractor's responsibility is to be familiar with the information and to inform their employees who work in areas where any of the chemicals are used.

14.2 HMMA Safety and the Contractor shall review all chemicals used on and in close proximity to the construction site before Contractor may begin work in the area.

17

16.3.6   Lint-free clothing shall not be worn while conducting hot work or fire watch duties.

## 17   LOCKOUT / TAGOUT POLICY

17.1   Lockout shall be initiated only by trained and authorized personnel.

17.2   Each person working under a lockout shall apply his/her personal lockout lock and tag.

17.3   Locks designated for use as a lockout lock shall be used for no other purpose.   The Contractor shall be responsible for providing lockout locks and multi-locking hasps.

17.4   Locks used for lockout shall have one key only.   Each lock shall be individually keyed.   The key shall remain under the exclusive control of the Contractor installing the lock.   The body of the lock shall be red.

17.5   The Contract Employer will provide and utilize a lockout board to monitor the lockout status of its employees on each project.   Exceptions due to nature or scope must be approved by HMMA Safety.

17.6   Contractors shall completely fill out tags before installation.   Contractors may only use tags approved by HMMA Safety.

17.7   Contractors shall use multi-lock hasps to ensure additional locks can be applied by others.

17.7.1   Never fill the last available slot in an isolation point with your lockout lock and tag.   Use additional multi-lock hasps, if necessary.

17.7.2   SIMPLE LOCKOUT PROCEDURE – USED ONLY WHEN THERE IS ONLY ONE ISOLATION POINT AND ONLY ONE CONTRACT EMPLOYER

17.7.3   Contractors shall notify all affected employees in the area that a lockout is being performed.

17.7.4   The equipment being locked out should be shut down using normal shutdown procedures (i.e., operator's control station, stop button, etc.).

17.7.5   Contractor shall neutralize all equipment energy sources.
17.7.5.1   Electrical
17.7.5.2   Hydraulic
17.7.5.3   Pneumatic
17.7.5.4   Chemical
17.7.5.5   Water
17.7.5.6   Steam
17.7.5.7   Radiation – including Thermal
17.7.5.8   Springs
17.7.5.9   Gravity
17.7.5.10   Other energy sources as required.

17.7.6   Any residual energy shall be dissipated at this time.

17.7.7   Confirm the equipment to be at a ZERO ENERGY STATE.

17.7.8   A job control lock shall be applied by the supervisor from the Contract Employer involved in the lockout. This person must be HMMA Lockout/Tagout trained.

17.7.9   Verify the lockout by attempting to operate the equipment.

17.7.9.1   Return the controls to the neutral position.

17.7.10   Each Contractor working under the lockout shall place his/her personal lockout lock and tag on the energy isolation point isolated in step 17.9.3 (If more than two (2) isolation points are required to lockout the device, a GROUP LOCKOUT will be used).

17.7.11   Testing or Repositioning Machine or Equipment

17.7.11.1   Check around the area to ensure completeness of work.
17.7.11.2   All nonessential items shall be removed from the area.
17.7.11.3   Replace all safety guards.
17.7.11.4   Notify all affected employees that the machine is being tested/repositioned.
17.7.11.5   Remove the necessary lockout locks and devices to test/reposition the machine.
17.7.11.6   Follow steps 17.9.2 through 17.9.8. to reestablish the lockout of the machine.

17.8   Upon completion of the lockout, an authorized Contractor must check the area for completeness of work.   If the Contractor(s) who initiated the lockout is available, he/she should conduct this inspection

17.10.1   Remove all tools and nonessential items from the area.

17.10.2   Replace all guards.

17.10.3   Ensure all employees are clear of the machine.

17.10.4   Notify all affected employees in the area that the lockout device(s) are being removed.

17.10.5   Remove lockout device(s).

17.10.6   Restart the machine to ensure proper operation
17.11   GROUP LOCKOUT – USED WHEN THERE IS MORE THAN ONE ISOLATION POINT REQUIRED OR MORE THAN ONE EMPLOYER OR BOTH.

17.11.1   When multiple isolation points must be controlled during a lockout, or when multiple groups (employees) are involved, a group lockout must be used.

17.11.2   Follow the steps for a lockout as documented in steps 17.9.1—17.9.8. A GROUP LOCKOUT SYSTEM MASTER TAG shall be used with a single, GREEN, Isolation Lock on each isolation point.

17.11.3   Each key for the locks used shall be placed in a group lockout box.

CONFIDENTIAL
Davia M. Key v. HMMA, et al

Documents Produced by HMMA

HMMA000049

ωϭ

21.3 HMMA production equipment has the right of way at intersections. Pedestrians shall yield the right of way to all motorized equipment.

21.4 Contractors must wear seat belts whenever the vehicle is in motion.

21.5 Vehicles must operate with 4-way flasher lights on when inside a building. Headlights will be used outdoors.

21.6 All vehicles shall have prominently displayed the contractor's name and on site telephone number.

21.7 Riders are not permitted on industrial vehicles or truck decks/beds except when there is an approved passenger seat belt provided.

21.8 Vehicles shall not block any emergency exit, passageway, pedestrian aisles, fire hydrants, hose cabinets, Post Indicators Valves, and/or other Fire/Safety equipment.

21.9 Vehicles blocking emergency equipment may be towed at the owner's expense. Parking violations may result in the permanent revocation of the site vehicle.

21.9.1 A vehicle will be deemed unattended when the operator is out of sight of the vehicle or is more than 25 feet from the vehicle.

21.10 Only propane or electric equipment shall be used inside the building, unless prior written approval is obtained from HMMA Fire/Safety. Equipment shall be operated only by a qualified operator.

21.11 All mobile equipment shall be equipped with an operable horn, back-up alarm and headlights and a fire extinguisher with at least a 2 A – 10 B:C rating.

21.12 The following material handling equipment shall be equipped with a Rollover Protective Structure – ROPS, which meets the requirements of 29 CFR 1926.1001 and 1002:

* Rubber tired self propelled scrapers
* Rubber tired front end loaders
* Rubber tired dozers
* Wheel type agricultural and industrial tractors
* Crawler tractors
* Crawler type loaders
* Motor graders

21.13 Equipment manufactured before July 1, 1969 is  not covered by this requirement.

21.14 Contractors must use safety belts when operating construction equipment with a Rollover Protection Structure (ROPS).

21.15 Contractors may not use the existing structural framing or utility supports as lift points.

21.16 For additional regulations, consult 29 CFR 1926 Subpart O.

22 PERSONAL PROTECTIVE EQUIPMENT

22.1 All Contractors must wear hard hats in construction areas.  Hard hats must conform to ANSI Z89.1 B. "Cowboy type" hard hats are not approved for use on the HMMA site.

22.2 Contractors must wear safety glasses at all times. Safety glasses shall be equipped with rigid side shields and must conform to ANSI Z87.  Contractors who wear prescription

24

glasses may use an ANSI approved overlay.

22.3 The use of tinted Safety lens shall be prohibited inside of a building.  Shading for specific jobs such as burning goggles are an exception.

22.4 Contractors shall provide all personal protective equipment (i.e. hard hats, safety glasses, hearing protection, respiratory equipment safety harnesses with lanyards, protective sleeves in Stamping and Body Weld areas, lint free suits in Paint, etc.)

22.5 Contractors must wear Hard Hats with the welding shield attached when welding.  There shall be no soft cap welding.

22.6 Contractors must wear burning goggles when burning.

22.7 PERSONAL CLOTHING

22.7.1 Contractors must wear shirts at all times.  The minimal shirt is a T-shirt with 4 inch sleeves and a collar.  Tank tops and cut off shirts and mesh tops shall not be permitted.

22.7.2 Trousers or pants shall be ankle length.  No shorts allowed.

22.7.3 Steel-toed shoes that cover the ankles are recommended on the construction site. Loafers, sandals, or athletic type shoes shall not be permitted within the construction areas.

22.7.4 Access shall be denied to  anyone improperly clothed, until the violation is corrected.

22.7.5 Contractors shall provide any additional PPE deemed by HMMA as necessary to ensure the safety and health of the workforce.

22.8 For additional regulations, consult 29 CFR 1926 Subpart E.

23 POWERED PLATFORMS, MANLIFTS, AND VEHICLE MOUNTED WORK PLATFORMS

23.1 Contractor shall comply with the HMMA Fall Protection Standard when using an aerial lift device.

23.1.1 Contractors must wear a full body harness and a shock absorbing lanyard that is attached to the boom or basket when working from an aerial or scissors lift.

23.2 Aerial ladders shall be secured in the lower traveling position before the truck is moved for highway travel.

23.3 Contractors shall not move an aerial lift truck when the boom is elevated in a working position with men in the basket, except for equipment that is specifically designed for this type of operation.

23.4 Contractors must test lift controls each day before use to determine that such controls are in safe working condition.  This test must be documented and kept with the vehicle at all times.

25

HMMA000051

26.5.1 Tank Farm
26.5.2 Paint Mix
26.5.3 Liquid Tank Farm
26.5.4 Fuel Storage Areas
26.5.5 Within 25 feet of an entrance to a building
26.5.6 Cooling Towers
26.5.7 Roof tops (under construction or finished)

## 27 STAIRWAY/LADDER SAFETY

27.1 Portable ladders shall be constructed of fiberglass or wood or other approved non-conductive materials.

27.2 When setting up a straight or extension ladder, use the following procedures to avoid injury:

- Brace the base of ladder against a stationary object so it cannot slip. Get help if you need to;
- Grasp the top rung with both hands;
- Raise top end over your head and walk toward the base of the ladder, moving hands to grasp the rungs in the center to maintain stability;
- When the ladder is erect, move it to the desired location and lean it forward against the resting point;
- Footing should be firm and level. Precautions should be taken to secure ladder if slippery conditions exist;
- Extension or straight ladders used to reach an elevated platform or roof should extend at least 36 inches above the landing;
- A straight ladder should be placed so there is one foot at the base for every four feet of length to the top support;
- When adjusting an extension ladder, be sure the locking device is fully secured and hooked over the rungs before using the ladder.

27.3 All ladders should be tied, blocked, or otherwise secured to prevent movement. They should not be located in front of doors unless the door is blocked open, locked, or guarded.

27.4 Keep rungs and steps of ladders free from grease, oil, paint, ice, mud or other slippery surfaces.

27.5 Stepladders must be fully open and spreaders locked before using. Never climb higher than the step below the top of the stepladder. Never walk a stepladder while standing on it.

27.6 Both hands must be free when climbing or descending. Materials should be hoisted to the work level. Face ladders when going up or down.

27.7 Do not over-reach when on a straight or extension ladder. Move ladder if work is too far. Never stand on the top three rungs of a straight ladder.

27.8 Two or more persons should not work on a ladder unless the ladder is specifically designed for this use.

27.9 Ladders should never be used for braces, skids, or gangways.

27.10 Wood ladders should not be painted except the top step of step-ladders may be painted to indicate that it is not to be stepped on. Wood ladders should be treated regularly with

28

linseed oil or other preservative or they may be given several coats of spar varnish.

27.11 All portable manufactured wood ladders shall meet the specifications of ANSI A14.1 - 1968.

27.12 Ladders with missing rungs or steps, broken or split side rails, or other faulty or defective construction, shall be removed from the jobsite immediately.

27.13 On all structures, two or more floors (20 feet or over) in height, stairways, ladders, or ramps shall be provided for employees during the construction period.

27.14 Debris and other loose materials shall not be allowed on or under stairways. Slippery conditions on stairways shall be eliminated as soon as possible after they occur.

27.15 Contractors shall not be permitted to use metal panned stairs unless the pan has been filled completely with a suitable material.

27.16 For additional regulations, consult 29 CFR 1926 Subpart X.

## 28 STEEL ERECTION

28.1 Contractors must use fall protection when performing any work over 6 feet elevation.

28.2 Contractors must provide a positive means of access (i.e., scaffolding, ladders, etc.), to the work elevation.

28.3 Contractor shall provide, as erection continues, all Safety devices, (i.e., handrails, hole cover, etc.) necessary to keep the work area safe. Contractors may not remove these safety devices from the work area until they are no longer required.

28.4 Contractor shall establish a Controlled Access Zone, CAZ around the steel erection area. This zone shall have a radius of no less than 1.5 times the height of the tallest structural member being placed.

28.5 The Contractor shall furnish, install and maintain Safety Railing that is compliant with all applicable OSHA requirements around the outside perimeter of the building deck at every level change, around all roof openings and all locations where fall potential exists.

28.6 Contractors shall not perform any work in the steel erection during bad weather (rain, lighting or high winds), unless the work is being performed from a lift basket.

28.7 No Christmas Treeing of steel is allowed.

28.8 For additional regulations, consult 29 CFR 1926 Subpart R.

## 29 WALKING/WORKING SURFACES

29.1 Contractors must provide covers and/or guard rails to protect personnel from the hazards of open pits, tanks, vats, ditches, or any other such hazards.

29.2 All covers shall be secured when installed as to prevent accidental displacement by wind, equipment, or employees.

29.3 Contractors must guard every floor opening with a cover capable of supporting at least twice the weight of employees, equipment and materials that may be imposed on the cover at any one time.

29

CONFIDENTIAL
Darby M. Key v. HMMA, et al                                   Documents Produced by HMMA

HMMA000052

vehicles, high risk materials, and equipment.

2.2 Adherence to the plan is mandatory and will benefit each Contractor by reducing theft and loss of man hours resulting from theft.

## 3 CONTROL OF CONTRACTOR'S PERSONAL TOOLS:

3.1 Contractors providing their own tools and/or equipment shall be responsible for providing an inventory of these items to Security and their employer before or immediately upon arriving on Site. The Contractor must maintain a file to record such listing. Each Contractor must have a secure storage area for employee tools.

3.2 All tools and equipment shall bear distinguishing marks for identification purposes and serial numbers listed when available.

3.3 In the event numerous items are to be loaded onto large carriers for removal from HMMA property, Contractor must give Security a twenty-four hour notice before loading begins. A Security Officer shall arrange to be present during loading and shall ensure proper Material Gate Pass for exiting. Failure to comply with this requirement may result in off loading all material for inspection.

## 4 IDENTIFICATION OF CONTRACTORS:

4.1 Contractors shall be identified by company hard hats and properly displayed photo identification badges.

## 5 ISSUANCE AND USE OF PHOTO ID BADGES:

5.1 All Contractors shall be required to obtain an ID badge before entering HMMA property for work. These ID badges remain the property of HMMA and must be worn by the person at all times while on HMMA property. When requested to do so, the Contractor must present his/her ID to any member of HMMA Safety/Security.

5.2 There will be no charge for the first ID badge. Replacements for lost or stolen badges may require a $10.00 replacement fee.

5.3 Expelled Contractors will be required to return their ID immediately upon termination. Contractors shall be responsible for ensuring all ID badges are returned immediately at the time of termination. A fee may be assessed for all unreturned ID badges.

5.4 Contractors shall be required to wear their ID badge at or above the waist level so that it is plainly visible.

5.5 Security Officers have the authority to check the ID badge of all persons on HMMA property. Failure to produce an ID will be grounds to restrict that person from HMMA property.

5.6 Anyone considered to have committed a major violation of rules and regulations may be restricted from HMMA property by the direction of HMMA Security.

5.7 HMMA may refuse to issue ID badges to Contractors who have previously been expelled from the property. Contractors who intentionally falsify information to obtain an ID badge or who use or direct others to use another individual's badge for entry into the plant may be permanently banned from HMMA property.

33

---

30.13 For AC Welding under wet conditions or warm surroundings where perspiration is a factor, the use of reliable automatic controls for reducing no-load voltage is required to reduce the shock hazard. Some of the older AC machines do not have an automatic control and are on load all the time. It is easy to receive an electric shock when the equipment is not handled properly.

30.14 When arc welding is to be suspended for any substantial period of time, such as during lunch or overnight, all electrodes shall be removed from the holders and the holders carefully located so that accidental contact cannot occur and the machine disconnected from the power source.

30.15 For additional regulations, consult 29 CFR 1926 Subpart J.

## 31 GRATING REMOVAL POLICY

31.1 All grating shall be installed in booths to ensure a complete run from end to end.

31.2 Once grating is required to complete any installation of the associated equipment, the Grating Removal Policy shall be in effect.

31.3 Contact HMMA Safety for Grating Removal Checklist.

31.4 Complete precaution checklist prior to removal of grating

31.4.1 Protective devices: Barricades, fall protection
31.4.2 Warning signs posted
31.4.3 Names of persons performing work
31.4.4 Names of area management notified of impending work
31.4.5 Post completed checklist at work location
31.4.6 Complete Close of Work checklist upon completion.
31.4.7 Return completed checklist to HMMA Safety.

## 1 SECURITY/FIRE PROTECTION GENERAL REQUIREMENTS

GENERAL:

1.1 Contractor is responsible for establishing and enforcing their own Safety and Fire Protection programs, in compliance with this handbook. HMMA Safety/Security shall have input over the coordination, enforcement and administration of the overall site Security and Fire Protection programs.

1.2 All Contractors working on HMMA property, shall comply with all Federal, State, City, County, HMMA or other laws, rules and regulations which govern their operations at HMMA.

1.3 Contractors must comply with all HMMA requirements concerning entrance to and from the plant, parking areas, food service, break areas, non-smoking areas, rest rooms, etc.

## 2 SITE SECURITY:

2.1 HMMA has established a Security Plan for the Hyundai Facility which is designed to aid in the protection of persons and property located on the construction site. In brief, the methods employed shall include identification and control of persons,

32

- A Supervisor or foreman intentionally instructing employee(s) to work in an unsafe manner or not enforcing the HMMA site safety policies with their employees.
- Falsifying information to gain access or false use of a badge to gain access or misleading statements to gain access to plant property.
- Speeding or reckless driving on HMMA property is strictly prohibited.

## DEFINITIONS

**Affected Employee**
An employee whose job requires him/her to operate or use a machine or equipment on which service or maintenance is being performed under lockout, or whose job requires them to work in close proximity to the device under the lockout.

**All Clear**
A signal to indicate the end of an emergency event.

**Authorized Contractor**
A person who locks out machines or equipment in order to perform service or maintenance on a machine or equipment.

**ANSI**
American National Standards Institute. A non-profit organization that writes safety standards that OSHA adopts.

**CAZ**
See Controlled Access Zone

**CFR**
Code of Federal Regulations. The OSHA Standards are contained in 29 CFR 1910 – General Industry and 29 CFR 1926 – Construction.

**Competent Person**
Is one who is capable of identifying existing and predictable hazards in the surroundings, or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has the authorization to take prompt corrective measures to eliminate them.

**Confined Space**
A confined space is one that meets the following requirements: (1) Is large enough and so configured that an employee can bodily enter and perform assigned work; and (2) Has limited or restricted means for entry or exit (for example, tanks, vessels, silos, storage bins, hoppers, vaults, and pits are spaces that may have limited means of entry); and (3) Is not designed for continuous employee occupancy.

**Contractor**
For the purposes of this manual, the term Contractor shall be interchangeable with the term Contractor or Subcontractor, and shall include their directors, officers, agents or employees, unless otherwise specified.

**Controlled Access Zone**
An area in which certain work (e.g. steel erection, overhand bricklaying) takes place and access to the zone is restricted.

**Employer**
Means a person engaged in a business affecting commerce who has employees, but does not include the United States, or any State or political subdivision of a State.

36

**EPA**
Environmental Protection Agency.

**FTZ**
Foreign Trade Zone

**GFCI**
Ground Fault Circuit Interrupter. This device is designed to open the flow of electricity when a leakage of current to ground exceeds the preset limit. This limit, usually between 4 - 6 mA, is below the threshold to cause permanent injury to the employee who would have received an otherwise potentially lethal shock.

**Hazard Communication**
This standard is also known as the "Employee Right To Know Law". It is designed to inform employees of hazards, particularly chemical hazards, in the workplace.

**HAZCOM**
See Hazard Communication

**Job Control Lock**
A red lock that is placed on an isolation point, or a yellow lock if a group lockout box, by a trained contractor representative from each contracting firm involved in the lockout. The purpose of the lock is to prevent a lockbox from being unsecured during shift changes or other events. It is the first lock(s) applied to the group lockbox and the last to be removed.

**kV**
Kilovolt. A unit of measure of 1000 volts.

**MSDS**
Material Safety Data Sheet. These documents include several important pieces of information regarding the safe handling, first aid, required PPE, fire fighting, and chemical properties of a product.

**NFPA**
National Fire Protection Association. This non-profit organization writes standards that are adopted by OSHA, including the National Electrical Code.

**OCIP**
Owner Controlled Insurance Program.

**OSHA**
Occupational Safety and Health Administration. This agency, formed in 1970 by the Williams - Steiger Occupational Safety and Health Act, is charged with writing, adopting and enforcing standards to assure the safety of America's workers.

**Personal Fall Arrest System**
A system used to arrest an employee in a fall from a working level. As a minimum for the HMMA site, it consists of a full body harness, shock absorbing lanyard, and a proper connection point.

**Positioning Device**
A device that prevents an employee from encroaching upon a fall hazard. i.e. cable and body belt at the opening of a trash chute.

37

% Time _____ By: _____

☐ ☐ Water Reg (Required or ☐ Charged) Hose
☐ ☐ Sparks and/or slag controlled with blankets or other precautions
☐ ☐ Floor plates removed within 35 feet or ☐ protected

☐ ☐ Fume Exhaust System shut down
☐ ☐ HAZARDOMETERS:

The necessary precautions have been taken to provide a threadle environment.

Requesting Supervisor: _____

☐ Department Manager _____

HMMA Safety/Security: _____

Work Completed: _____ Signature _____

EMERGENCY PHONE NUMBER 397-8900
HMMA HOT WORK PERMIT

## HMMA GRATING REMOVAL PERMIT

| | Location / Equip: |
| Gen. Contractor: | |
| Subcontractor: | Specifications: (See Closure Instructions) |
| Work to be Performed: | |

HAZARDS AND PRECAUTIONS:

Lockout/Tagout required?   Confined Space?   ☐

Production Checklist Prior to Removal:
   a) Protective Devices too used
   b) Signs are posted
   c) Are other specific procedures required?
   (Described these Permit(s) if not attach a copy)
   d) Names of qualified (competent) person(s) to perform work:
   _____
   _____
   _____
   e) Persons notified within operating facility (Indicate Name)
   _____

PROVISIONS OF PERMIT ISSUING:

I guarantee that the above noted precautions and adopted specific procedures will be followed and work performed will meet all stipulated safety requirements to ensure the health and safety of all workers associated with the job.

Contractor Supervisor _____
   Date: _____   Time: _____   Valid to exit: _____

Please ensure that a copy of this certificate and the specific work procedure is available on site and understood/observed with workers. Work will cease once a worker noted above is not familiar with the permit.

Return this permit to the book for record retention upon work completion.

Closeout Work:
   a) Grating removed has been returned to place and is secure.
   b) Wire/Plastic ties has been installed to link adjacent pieces.
   c) Protective devices and signs have been removed.

40

WG

ATTACHMENT 10.3(1)

Site Environmental, Safety & Health Program Requirements

**"Site Environmental, Safety & Health Program Requirements"**

The requirements listed herein shall not relieve Contractor from complying with the Occupational Safety and Health Act (OSHA) or any other contractual requirements.

**1.0      DEFINITIONS**

Environmental Safety & Health (ES&H) PROGRAM - All of the elements which the company uses to protect the health and safety of the workers, the environment, and the public. This program includes the continuing identification of hazards or potential problems, the design of control measures, the implementation of controls, and the evaluation of the controls.

Environmental Safety & Health (ES&H) POLICIES & PROCEDURES – Requirement presented in the ES&H Policies and Procedures Manual which state Owner or its Construction Manager's method of complying with regulations promulgated by the Occupational Safety and Health Administration and the U.S. Environmental Protection Agency as well as those practices that are determined to be the "BEST WORK PRACTICES" by professionals in occupational and environmental health and safety.

Environmental Safety & Health (ES&H) PLAN - Those site specific Health, Environmental, and Safety Plans, Hazard Communication Programs, Respiratory Protection Programs, Confined Space Entry Programs, Fall Protection Programs, Bloodborne Pathogen Exposure Control Plans, etc. that describe how the requirements of the Rust Program and the ES&H Policies and Procedures Manual will be met at the Jobsite.

Environmental Safety & Health (ES&H) MANUAL - The book, binder, electronic media, or document that contains the ES&H Plan, ES&H Policies & Procedures, and other ES&H material.

**2.0      ENVIRONMENTAL SAFETY & HEALTH REQUIREMENTS**

Contractor's work shall be performed in accordance with this document, federal, state, local requirements, and other Contract Documents. Where these documents address the same subject, the most stringent requirement shall apply.

**2.1      ENVIRONMENTAL SAFETY & HEALTH PROGRAM**

Before starting work, each Contractor shall submit its written ES&H program (or adopt the Owner or it's Construction Manager ES&H program as its own) for the Construction Manager's review and comment. The submitted program shall contain the ES&H plans and meet the requirements of the Project Environmental Safety and Health Program. All Contractor's employees shall follow the plans outlined in their ES&H program while on the Site. Types of plans required shall include but not be limited to fall protection plans, confined space entry plans, blood borne pathogen plans, lock out/tag out, and respirator plans. The submitted plans are accepted for information only. The plans may be reviewed and comments returned, however any review will not waive the requirement to fully comply with Owner or its Construction Manager's safety requirements and all federal, state and local regulations.

**2.2      ENVIRONMENTAL SAFETY & HEALTH ORIENTATION**

Each Contractor, Subcontractor and Supplier employee shall attend a site-specific Environmental Safety & Health orientation approved by the Construction Manager before beginning work on the site. Orientation attendance shall be documented and furnished to Construction Manager upon request. Contractor shall comply with the following requirements:

On the first day of work, new or rehired employees attend a general orientation on Company ES&H policies.

Contractor's supervision team demonstrates accountability for safety by orientating new employees to crew and company specific safety procedures during tool box safety meetings. These special tool box

2

meetings should be conducted within the first three (3) weeks after an employee starts to work on the Project.

Construction Manager will supply a sticker to be worn on the hard hat of each new employee at the completion of the orientation.

Orientation attendance rosters and all other documents relating to new employee safety training and orientation shall be maintained at the Jobsite until project closeout.

**2.3      ENVIRONMENTAL SAFETY & HEALTH TRAINING**

ES&H training shall be conducted as described in 29 CFR 1926.21. All training required by OSHA, EPA, State, or Local agencies for the specific task being performed by the Contractor is mandatory. Examples of such training include, but are not limited to:

> New Hire Orientation
> Hazard Communication
> Lock/Tag/Try
> Equipment Inspections
> Competent Person Training
> Confined Space Entry Training
> Excavation Training
> Training for working with lead, arsenic and or cadmium (when applicable)
> Specific personal protective equipment (PPE) training

The Contractor's Jobsite supervisor shall ensure that ES&H training is started before personnel start work and continues throughout all phases of the Work. The Contractor shall inform each employee of his/her responsibility to work safely and prevent occupational injury and illnesses. The Contractor's Jobsite supervisor shall hold a safety meeting for its personnel each week. Meeting topics and attendance shall be documented and furnished to the Construction Manager.

**2.4      ENVIRONMENTAL SAFETY & HEALTH AUDITS**

Contractors shall comply with the provisions of 29 CFR 1926.20.

The Contractor's Jobsite supervisor shall participate with Construction Manager's Representative in a weekly field ES&H audit of all Contractor's work areas. A written report of the audit findings and their resolutions shall be submitted to the Construction Manager on a weekly basis. The Contractor shall also inspect its work daily and correct all unacceptable conditions.

**2.5      ENVIRONMENTAL SAFETY & HEALTH MEETINGS**

Contractors shall comply with the provisions of 29 CFR 1926.20.

The Contractor's Site supervisor and health and safety representative shall attend a meeting with Construction Manager's Representative each week to discuss ES&H matters.

**2.6      PERSONAL PROTECTIVE EQUIPMENT**

The Contractor employees shall wear all applicable personal protective equipment (PPE) as required in 29 CFR 1926.28, 1926.100, 1926.101, 1926.102, 1926.103, 1926.104, 1926.105, 1926.106.

This shall include but not be limited to:

- Hard hats (including welders).

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**                    Documents Produced by HMMA                    **HMMA000057**

- Industrial quality leather work boots. Boots shall be of solid leather construction with hard soles and shall extend above the ankle. Other non-leather types of fabrics used in the construction of the boot will not be allowed.

- Eye protection. All components (frames, lenses, and side shields) shall conform to ANSI Standard Z87.1. Slip-on, flexible plastic side shields are not permitted.

- Safety glasses shall be worn in all areas of the project except in offices, gang shacks, and vehicles. Visitor spectacles, conforming to ANSI Standard Z87.1, worn over prescription glasses will be permitted. Unless otherwise protected by means approved by the Construction Manager, Contractor shall require the use of leather or cut resistant gloves while handling sheet metal, rough or unfinished lumber, metal bands, and other materials likely to cause hand injuries.

- Other types of PPE, for example; respirators, hearing protection, chemical resistant gloves, suits, aprons, etc. will be required for the work activities they protect against.

## 2.7    BARRICADES/GUARDRAILS

All barricades and guard rails shall be erected and maintained as required in 29 CFR 1926.500, 1926.503, 1926.550 (a), 1926.202, 1926.203

The Contractor shall furnish, erect, maintain, and dismantle all barricades required for their work. The use of red barricade tape shall be at the discretion of the Construction Manager and Environmental Safety and Health Professional. The barricades shall be removed from the work area when they are no longer needed. All barricades shall be labeled with the Contractor's name.

Barricades shall be constructed and maintained as described below:

- Warning systems (tape and stand) - Tape shall be supported only by stands or posts acceptable to Construction Manager. Stands or posts subjected to wind shall be weighted or otherwise secured so they remain erect.

- Protective barricades (rigid) - Rigid barricades shall consist of guard rails and midrails meeting the OSHA definition of "standard railing" Section 1926.500(f)]. All rigid barricades are to be equipped with an entrance/exit "gate". Protective barricades are required as a minimum:

> Around unsloped excavations over 4 ft. in depth
> Around floor openings
> At floor and roof edges
> At elevated wall openings
> On scaffold platforms where required

## 2.8    CONSTRUCTION EQUIPMENT & VEHICLES

Construction equipment shall be operated, maintained and stored in accordance with the requirements of OSHA standards 29 CFR 1926.602, 1926.251, 1926.550

### 2.8.1    Crane Suspended Work Platforms

4

The use of crane suspended work platforms is discouraged and will be permitted only if per OSHA criteria and there is no other feasible method of access.

The Contractor shall submit a detailed plan of its proposed work platform and rigging method for Construction Manager's review before conducting any work from a platform suspended from a crane. Anti-two-block devices are required on all cranes.

Contractor shall comply with the following requirements for crane suspended work platforms, man lifts, or bucket trucks: Operator training shall be the Contractor's responsibility. Documentation of the training shall be furnished to Construction Manager upon request. Personnel shall use safety harness with the lanyard secured to the platform.

Personnel shall perform their work while standing on the platform floor. Standing on the top rail, mid rail, or toeboard will not be permitted.

Equipment will not be moved when the boom is elevated in a working position with workers in the basket or on the platform unless equipment was manufactured to perform functions as stated in writing by the manufacturer. Rigging from the platform or boom will not be permitted.

No one shall be permitted to operate a lifting device (material or personnel) unless they have been properly trained per the manufacturer's requirements. Documentation of the training shall be available to Construction Manager. The manufacturer's operating instructions shall accompany the device.

### 2.8.2    Rigging Plans

A rigging plan shall be submitted to the Construction Manager no later than 15 calendar days before any critical lift is scheduled to be made. A lift is considered critical when any of the following conditions exist:

1. The load exceeds 80% of the crane capacity in the configuration to be used during the lift.
2. Lifts involving more than one crane to handle a common load.
3. Any lift greater than 20 tons

   The rigging plan shall include:

   Manufacturer, model, and capacity of the crane(s)
   Capacity charts of the crane(s)
   Working radius of the crane(s)
   Boom length of the crane(s)
   Weight of the load including rigging
   How the weight of the lift was determined
   Size and capacity of all rigging hardware (slings, shackles, etc.)
   A plot plan showing crane location with pick, swing and set points.

   If requested by the Construction Manager, the Contractor shall submit a rigging plan no later than 7 calendar days before each non-critical lift is scheduled to be made.

### 2.8.3    Vehicles

Contractors shall comply with all of the requirements of 29 CFR 1926.600, and 1926.601.

5

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                    HMMA000059

In addition:

- All employees operating vehicles and the passengers in those vehicles are required to wear seat belts at all times. Vehicles must have a firmly attached seat for each passenger except for vehicles exempted by the Department of Transportation.
- Drivers must have a current, valid vehicle operator's license. Employees must be seated, with arms and legs inside of the vehicle. Employees may mount or dismount vehicles only when fully stopped. Only three people may ride in the front seat of a truck.
- When repair work or maintenance of any sort is performed on any vehicle, the parking brake shall be set and the wheels chocked to prevent movement of the vehicle.

All vehicles used on site shall be equipped in accordance with state and local laws and regulations. The Project requires the following equipment:

> Non-glare rear-view mirror
> Left-hand outside rear-view mirror
> Turn signals
> Two windshield wipers
> Snow tires and chains, where conditions warrant
> A back-up alarm audible above the surrounding noise levels is required on:
> All earth moving vehicles
> All other vehicles used in the work area in association with construction which have restricted                                                                    rear
> view through the rear window or do not have a rear window.

**Note:**   ON SITE FUEL STORAGE IS NOT ALLOWED ON THE JOBSITE.

PETROLEUM WASTE: Oil changes and similar maintenance activities are preferred to be done off-site.  If it is necessary to do this work on site, a qualified person must perform the work and ensure that proper protection is provided to avoid a spill.  The dispensing of fuel into equipment shall be performed only over something that will catch any spills.  All equipment shall be grounded prior to the fueling operation starting. The contractor is responsible for containing such waste. Waste shall be removed by the Contractor in accordance with all applicable Federal and State laws.

### 2.9   OBSTRUCTING ACCESS TO EQUIPMENT

Access to exit doors, electric or elevator panels, and fire extinguishers or other emergency equipment shall not be blocked at any time.

### 2.10   SCAFFOLDS

Scaffolds shall be erected, used, maintained and dismantled as described in 29 CFR 1926.451

In addition:

- The competent person will assess the structural integrity of scaffolding systems. All workers shall tie off with a safety harness when there is no (or an incomplete) handrail, when there are openings over 12 inches in the working platform, or when on suspended working platforms.

6

- A scaffold which is ready for use shall be tagged with either a green or a yellow tag.

    A green scaffold tag designates a complete scaffold as defined by the manufacturer.

    A yellow scaffold tag designates a scaffold which is not complete but which is altered to suit a specific job and may be used safely with 100% tie off.

    A red tag designates a scaffold is in the process of being erected, changed, or dismantled and shall be considered unsafe and shall not be used.

    A competent person shall determine whether a usable scaffold receives a yellow or a green tag.

    The scaffold tag shall be affixed to each scaffold access ladder 5 to 6 feet from its base.

    Weekly inspections shall be performed by a competent person to ensure that all tags are legible and in good condition and all scaffolds are safe.

    Any scaffold which must be specially adapted to the work place must be approved by a qualified supervisor and environmental, safety and health professional.

    Scaffold handrails shall be a minimum of 39 inches above the work platform.

## 2.11   FALL PREVENTION

The provisions of 29 CFR 1926.500, 1926.501, 1926.502, & 1926.503 concerning fall protection shall be adhered to at all times.

All employees exposed to a fall of 6 feet or more shall use 100% fall protection.
In addition, the Contractor shall provide a fall protection plan to the Construction Manager that identifies potential fall hazards and the method the Contractor shall use to prevent falls.

## 2.12   GROUND FAULT PROTECTION/ASSURED GROUNDING

The provisions of 29 CFR 1926.404 shall be followed concerning ground fault protection.

Contractor shall provide ground fault circuit interrupter protection for all cord sets, receptacles, and electrical tools and equipment connected by cord and plug which are used or available for use by employees. Use of permanent building receptacles require GFCI. GFCI shall be tested quarterly and the testing shall be documented.

A monthly assured grounding program is in place in addition to GFCI protection. Color coding of electrical hand tools and extension cords following inspection by competent persons shall be consistent with the project color coding scheme.

## 2.13   GAS CYLINDERS

Compressed gas cylinders shall be operated, maintained and stored as required in 29 CFR 1926.350.

7

In addition:

When compressed gas cylinders are used they shall be properly secured on two-wheel hand trucks designed for this use and brought into buildings only as needed and removed as soon as work is completed or tanks are emptied. Unless individual cylinders are equipped with regulating devices, they shall have the safety cap secured in place.

All cylinders shall be broken down with regulators removed and protective caps screwed down hand-tight at the end of each shift.

**2.14   TOOL INSPECTION**

All tools used or to be used by the Contractor shall be stored, used and maintained as described in 29 CFR 1926.951.

In addition:

- All Contractor-furnished portable tools and equipment are subject to Construction Manager inspection at any time while on the project site.

- The Construction Manager retains the right to prohibit or restrict the use of tools and equipment determined to be in unsafe working condition.

**2.15   PROJECTING MATERIALS/IMPALEMENT HAZARDS**

Projecting materials shall be protected or guarded as described in 29 CFR 192 & 701 (b).

Reinforcing steel or similar material projecting above horizontal surfaces shall be capped or otherwise protected to prevent the possibility of impaling personnel. Plastic caps are not approved for falls of six (6) feet or more above vertical projections. Use covers of wood or other approved material.

**2.16   LOCK-OUT/TAG-OUT PROCEDURES**

The Contractor shall follow the requirements mandated in 2 CFR 1926.417 concerning lock-out/tag-out.

In addition:

The Contractor shall follow the Site's lock, tag and try procedure before starting work on existing process or electrical systems and new systems which have been placed in commission. The Contractor shall provide all locks and tags required to comply with the site procedure.

CONFIDENTIAL
Davita M. Key v. HMMA, et al                    Documents Produced by HMMA                    HMMA000062

## 2.17    SAFETY VIOLATIONS

Employees who repeatedly violate health and safety requirements will be denied access to the Site.

In the event of health and safety violations or unsafe practices involving imminent danger to the Construction Manager or Contractor personnel, immediate action shall be taken to stop work and correct the hazardous situation. If violations continue or corrective actions are not taken after a reasonable period of time, the Construction Manager's option of terminating the contract in accordance with terms of the contract will be considered.

## 2.18    REPORTING INJURIES/ILLNESSES/INCIDENTS

The Contractor shall immediately notify the Construction Manager of any occupational injury/illness or potentially serious hazard to personnel on the site. Each OSHA recordable injury shall be investigated by the Contractor's site supervisor and by the Construction Manager's Safety & Health Committee. The Contractor shall submit a detailed report to the Construction Manager within 24 hours of the injury, illness or incident.

A monthly Safety Performance Report shall be submitted to the Construction Manager by the third Friday of each month.

## 2.19    HOUSEKEEPING/CLEAN UP

The Contractor shall clean up and remove all scrap materials and waste materials that accumulate from its operations on a daily basis. The scrap shall be placed in approved containers provided by the Owner.

Should the Contractor fail to keep its work areas clear of debris, the Construction Manager may remove the debris on a time-and material basis and back-charge Contractor.

The Contractor shall segregate the waste containers as needed.  Any containers that contain hazardous materials, hazardous waste or waste oil shall be labeled as required in 29 CFR 1926.59, 40 CFR Part 281 and 40 CFR Part 279 respectively.  The Contractor shall empty the containers at frequent and regular intervals, or as directed by the Construction Manager.

## 2.20    ALL CONTRACTOR BUILDINGS AND TRAILERS

Trailers shall be blocked up in their final position and tied down every 10 feet with over the trailer or frame straps according to all state and local requirements.

Buildings and trailers shall have a fire extinguisher rated 10 A:B:C or higher. Buildings and trailers shall be properly grounded if supplied with electricity. The main office building or trailer shall have a sign prominently posted, indicating the person's name and telephone number to contact in case of emergency at any time.

## 2.21    LADDERS

The Contractor shall follow the requirements mandated in 29 CFR 1926.951 concerning maintenance and work on/around ladders.

9

Only light, short-term work shall be performed from ladders. Ladders shall not be placed in front of doors that open toward the ladder unless the door is locked or otherwise guarded. If work is to be performed from a ladder, it must be secured at all times.

Straight ladders shall be secured to prevent displacement. When ascending or descending ladders, workers are to face the ladder.

Carrying material up or down ladders is not acceptable. Ladders shall be inspected before each use and monthly for deterioration and damage.

### 2.22   FIRE PROTECTION

The Contractor shall comply with all requirements of 29 CFR 1926.150 - 29 CFR 1926.155.

Contractor's employees will be oriented on the fire alarm and evacuation procedure.

Smoking will be permitted only in areas designated by the Construction Manager. The Contractor shall furnish a metal butt can and fire extinguisher in each designated smoking area.

Contractor shall furnish fire extinguishers as required by OSHA and the NFPA.

Dirty and oily rags shall be kept in labeled fireproof metal containers with self-closing lids and removed from work areas daily.

### 2.23   SANITATION/POTABLE WATER

**Contractors shall comply with the requirements of 29 CFR 1926.51**

Drinking water containers shall be cleaned and sanitized on a daily basis according to the following steps:

The individual assigned to the task of cleaning the containers shall wash his/her hands with soap and water and put on disposable or rubber gloves. The outside of the container shall be rinsed off prior to opening the container. Containers are to be washed with a detergent daily. Hot water shall be used when available. Dish washing liquid and a scrub brush or sponge shall be used to clean the containers. Containers are to be rinsed with clean water to remove all soap residue.

Containers are to be sanitized:

Rinse containers in a solution of 2 tablespoons of chlorine bleach in one gallon   of water.
Rinse containers in clean water.

### 3.0   PERMITS

**3.1**   Safe Work Permits will be required on a daily basis for cutting/burning activities which involve the Owner's facility or their structures. This includes close proximity to any flammable or combustible materials which cannot be moved at least 20 feet away from the work. Safe Work Permits are provided through the Construction Manager's safety office. The Contractor shall submit a completed Safe Work Permit request to the Construction Manager 1 work day (typically 24 hours) before work is scheduled to start.

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**          Documents Produced by HMMA                    **HMMA000064**

3.2    Safe Work Permits will be required for use of construction equipment within 15 feet of any overhead electric power line.

Vessel and Confined Space Entry Permits will be required daily for any work inside a vessel or other confined space (i.e., any area which must be entered through a restricted opening, such as tanks, vessels, ductwork, vessel skirts, manholes, etc.). Contractor shall fill out the necessary permit forms and submit them sufficiently (typically 24 hours) in advance to allow all required approvals to be obtained before work in the vessel or confined space is scheduled to start.

Continuous monitoring equipment shall have audible alarms. Contractor shall utilize personnel who have been trained in equipment operation and emergency retrieval procedures. Documentation of the training shall be furnished to Construction Manager. Contractor shall document all calibration of atmospheric testing equipment as well as the results of all atmospheric tests conducted. This documentation shall be available for
review by the Construction Manager. An excavation permit will be required to begin all digging operations using mechanical equipment or where digging is expected to interfere with traffic flows in the area. Continuations of previously authorized work without an additional permit shall be at Construction Managers discretion. The Contractor shall hand excavate when within five (5) feet of all identified underground services when mechanical excavating equipment is being used.

**The Contractor shall notify the Construction Manager if the excavation will interfere with or cross an existing facility roadway by checking the appropriate box on the permit.**

4.0    OCCUPATIONAL HEALTH/INDUSTRIAL HYGIENE PROGRAM

4.1    WORK AREA HAZARD ASSESSMENT

The Contractor shall assess the work area and determine the potential for exposure to chemicals and physical agents regulated by OSHA or The American Conference of Governmental Industrial Hygienists (ACGIH). Following the identification of potential hazards the Contractor shall monitor the work area to quantify employee exposure. All monitoring equipment shall be calibrated according to manufacturer specifications. Laboratory analysis shall be done by an American Industrial Hygiene Association (AIHA) or Environmental Protection Agency (EPA) accredited laboratory, whichever is applicable. Contractor shall adhere to all requirements of 29 CFR 1926.55. In addition, any chemical specific requirement must be followed, if applicable. Examples include but are not limited to:

    Lead
    Cadmium
    Asbestos
    Vinyl Chloride
    Benzene

4.2    RESPIRATORY PROTECTION PROGRAM

Before any employee uses respiratory protective equipment, Contractor shall furnish Construction Manager proof of compliance with OSHA Section 29 CFR 1926.103, including the following documentation:

    Written Respiratory Protection Plan

11

CONFIDENTIAL
Davita M. Key v. HMMA, et al

HMMA000065

Medical approval for each employee to use respiratory protective equipment.
Training records indicating each applicable employee and supervisor has been trained on the use, limitations, and storage of the particular respirator chosen.
Fit test records for each type of respirator the employee is qualified to use.

## 4.3    HAZARD COMMUNICATION

The Contractor shall comply with the requirements of OSHA's Hazard Communication Standard 1926.59 and all applicable state and local hazard communication requirements.

The Project considers hazardous materials and waste minimization efforts an essential element in reaching the project goal of zero environmental infractions and no injuries to employees.

Some key elements include:

- Developing and implementing a written hazard communication plan for the site.
- Employee training in handling hazardous materials.
- The development and maintenance of a list of hazardous chemicals used on the project.
- Obtaining and maintaining Material Safety Data Sheets (MSDSs) for all hazardous chemicals.
- Labeling the containers of hazardous materials.

The Contractor shall obtain Construction Manager's approval before introducing any hazardous materials onto project site.

**Note:**
- If a spill of a hazardous material (fuel, oil, antifreeze, etc.) occurs on the site, the material and any contaminated matter at least 6" of additional material from the sides and bottom (soil, vegetative material, etc.) must be collected, labeled, stored, removed and disposed of by the Contractor in accordance with all applicable State and Federal laws. All spills shall be reported immediately to the Construction Manager Safety Department. **Do Not** throw any hazardous materials in any dumpster or on the ground.
- All fueling operations from tankers shall have a person from the receiving contractor monitoring the operation to ensure correct procedures are used to prevent spills.
- All threading machines shall be used over a drip containment tray with absorbent materials and shall be under a roof. Contractors shall maintain an adequate supply of absorbent material on site to absorb any potential spill of their materials.

## 4.4    NOISE AND HEARING CONSERVATION

Contractors shall comply with the requirements of 29 CFR 1926.52 and 29 CFR 1926.101.

## 4.5    WORK WITH OR AROUND ASBESTOS-CONTAINING
MATERIALS

Contractors shall comply with the requirements of 29 CFR 1926.1101. If suspect asbestos containing materials are identified that might be disturbed the following actions shall be taken:

- Stop all work in the immediate area.

12

CONFIDENTIAL
Davita M. Key v. HMMA, et al              **Documents Produced by HMMA**              HMMA000066

- Isolate the area to prevent disturbance of the material.
- Contact the site ES&H professional.
- Prior to a demolition or renovation project, the facility or impacted area of the facility shall be inspected by an accredited inspector for asbestos containing materials.
- Ensure that proper notification(s) have been made prior to the start of any asbestos abatement activities.
- Pre-job submittals shall be obtained and reviewed before a notice to proceed is given to the asbestos abatement contractor.
- Personal and perimeter air sampling shall be performed daily during the asbestos abatement activities. The sampling shall be performed by a third party consulting firm, or a Construction Manager representative.
- Asbestos removal contractors shall maintain a current log of all persons who enter and exit the enclosure, and the time they enter and exit. Post-job submittals are required after the project is completed.

## 5.0    SAFETY REPRESENTATIVE

Contractors shall have a safety professional as a member of its organization at the Jobsite whose duty shall be monitoring Contractor's compliance with the requirements of this document and preventing unsafe conditions and accidents. Contractor shall submit the qualifications of all proposed safety professionals to the Construction Manager for his review and consent before mobilization to the Jobsite.

If, at any time, the Contractor's actual work force exceeds a total of one hundred (100) employees, Contractor shall assign an additional full time safety professional to the Jobsite.

13



**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**          Documents Produced by HMMA          HMMA000067

**ATTACHMENT 10.3(2)**

**Owner's Drug and Alcohol Policy**

**<u>Owner's Drug and Alcohol Policy</u>**

**Expectation of Contractor compliance with Hyundai Motor Manufacturing Alabama, LLC Drug and Alcohol Policy**

Hyundai Motor Manufacturing Alabama, LLC (HMMA) maintains a strong commitment to its clients, employees and contractors to provide a safe work place and to establish programs promoting high standards of safety. Consistent with the spirit and intent of this commitment, HMMA expects employees to report for work in proper condition to perform their duties. This intent of the HMMA Drug and Alcohol Policy attached hereto is to prevent the use and the presence of controlled substances and alcohol on this Project.

Contractors, their sub-tier contractors, and all employees working on this project will be expected to adhere to and abide by this policy. Violation of the policy may result in removal from the Site. HMMA expects the cooperation of its contractors and their sub-tier contractors in complying with this policy.

The Drug and Alcohol Policy permits, among other actions, searches of employees of contractors and sub-tier contractors and their personal property, including automobiles on Owner's property. Canine searches and supervisory observation are also included. Any employee, contractor employee or its sub-tier contractor employee assigned to this Project will be required to submit to chemical screening in order to remain assigned to this Site. Also, subsequent chemical screening may be required of any HMMA contractor employee or its sub-tier contractor employee for reasonable cause of suspicious behavior or activity, including accidents. Upon request, Contractor will certify to HMMA management that all of these requirements have been met for all its contractor and sub-tier contractor employees on this Site.

If Contractor lacks the facilities or expertise to provide chemical screening of its employees, Contractor shall inform HMMA and HMMA will provide these services for Contractor at Contractor's expense. This policy will be made a part of the Contract between HMMA and Contractor prior to commencement of the Work.

I, _____, a duly authorized representative of _____, have read and understand the above. I certify that my company and its employees and sub-tier contractors and their employees will adhere to and abide by HMMA's Drug and Alcohol Policy.

_____
Signature

_____
Date

2

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**                    Documents Produced by HMMA                    **HMMA000069**

"**Drug And Alcohol Policy**"

**STATEMENT**

In the interest of promoting a safer, healthier and more productive environment, the Owner has adopted a policy of only hiring employees who are drug free and continuously maintaining a drug free workforce.

Our policy is that all of our employees must be drug free in the workplace. That is, employees must be free from detectable amounts of controlled substances, or metabolites, without regard to impairment. We have also adopted the policy that all employees must not be impaired by alcohol in the workplace.

This policy must be adopted by all contractors/subcontractors while working on the project. At the request of Owner management, the contractors/subcontractors must demonstrate compliance with the agreed policy to a representative nominated by the Owner. The contractor/subcontractor must provide a signed copy of the Consent and Release Agreement for Substance Screens and Searches, or other agreed document, when requested to do so.

For the purpose of this policy, the term "controlled substance" means any drugs, the use or distribution of which is controlled by law and includes among others, marijuana, hashish, cocaine, hallucinogens, amphetamines, barbiturates, and heroin.

The only exceptions to this statement are drugs prescribed by a licensed medical practitioner and over the counter drugs, when used in the prescribed doses and where a licensed medical practitioner has certified that the drugs used do not constitute a safety risk in the circumstances of the occupation. The Owner reserves the right to have its own licensed medical practitioner make this determination. The decision of the Owner medical practitioner shall be final.

The Owner will not disseminate the results of any drug screens, administered pursuant to this policy, to any person who does not have a need to know and will hold the results in strict confidence.

Failure to comply with the policy will lead to the dismissal of our employees, and to the prohibition of entry to the jobsite for the employees of other companies.

**POLICY**

    A.    **POSSESSION OF DRUGS AND ALCOHOL ON OWNER PREMISES**

        1.    The use of a controlled substance by the employee at any time on Owner premises or off premises on Owner business, or prior to work time, during working hours, or during breaks or lunch periods is grounds for immediate termination of employment.

        2.    The sale or transfer of a controlled substance on Owner property, or while engaged on Owner business, is grounds for immediate termination of employment.

        3.    The possession of a controlled substance, including paraphernalia with the residue of a controlled substance on Owner property, either on the employee's person or in an employee's personal vehicle, locker, or other personal property, is grounds for immediate termination of employment.

        4.    No alcohol will be brought into, kept or consumed on Owner premises.

        5.    The possession of alcohol on Owner property, on the employee's person, in an employee's personal vehicle, locker, toolbox or other personal property, is grounds for immediate termination of employment.

3

CONFIDENTIAL
Davita M. Key v. HMMA, et al

HMMA000070

**B.   WORKING UNDER THE INFLUENCE OF DRUGS OR ALCOHOL**

1.   Working with a controlled substance in the system, except as prescribed by a physician and approved by the Owner, is grounds for immediate termination of employment.

2.   Working under the influence of alcohol above the limits prescribed is grounds for immediate termination of employment.

3.   An employee of a contractor/subcontractor who tests positive for drugs or where the blood count is over 0.100% by volume of alcohol, will be subject to immediate removal from the jobsite.

4.   Former project employees will be considered for re-employment only after the following three conditions have been met:

    a.   Sixty (60) days must have elapsed since the date of his/her initial test,
    b.   The employee must have received a negative result on the drug screening re-test, and
    c.   Management reserves the right to re-test the employee at any time within a one year period following his/her re-employment.

**C.   EXCEPTION**

1.   The only exception to this policy concerning the possession and use of drugs on Owner premises or working with a controlled substance in the system, are drugs prescribed by a licensed medical practitioner and over the counter drugs, when used in the prescribed doses and where a licensed medical practitioner has certified that the drugs used do not constitute a safety risk in the circumstances of the occupation. The Owner reserves the right to have its own licensed medical practitioner make this determination. The decision of the Owner medical practitioner shall be final.

<u>**PRE-EMPLOYMENT SCREENING POLICY**</u>

A.   Any employee of the Owner, other contractors/subcontractors, or vendors who expects to work on the project for at least three (3) consecutive days will be required to submit appropriate specimens (urine, blood, or other) for testing to ensure compliance with this Drug and Alcohol Policy. Submission to a pre-employment drug test is a condition of working on the project.

B.   The Owner may allow, at the discretion of the President, employees to commence work on a conditional basis pending the receipt of their test results. Such person's conditional authorization to work on the project premises, however, must be immediately revoked if their test results are positive (indicating the presence of a prohibited substance).

C.   Any Owner job applicant or contractor/subcontractor employee testing positive on the pre-employment test shall not be considered for employment and, if already working on a conditional basis, shall be immediately removed and denied continued access to the project.

D.   Anyone testing positive on the pre-employment screen will not be offered employment for sixty (60) days.

<u>**TESTING BASED UPON REASONABLE SUSPICION**</u>

Tests for the use of a controlled substance or alcohol will be administered if there is some reason to suspect that any employee of the Owner, other contractor/subcontractor, or vendor may be using illegal drugs or working under the influence of alcohol.

4

**CONFIDENTIAL**
Davita M. Key v. HMMA, et al                    **Documents Produced by HMMA**                    **HMMA000071**

As a condition of continued employment, any employee of the Owner, other contractor/subcontractor, or vendor must submit appropriate specimens (urine, blood, or other) for testing when management has reasonable suspicion that the person is under the influence of drugs, or that the person is impaired by alcohol such that the alcohol content in his/her blood is greater than 0.100% by volume.

If the project employee refuses to submit a sample for testing when asked to do so, he/she will be subject to immediate dismissal, or removal from the project.

The following conditions will be considered a basis for any employee of the Owner, other contractor/subcontractor, or vendor to be tested for use of a controlled substance:

A. Involvement in an avoidable accident which results in injury to the employee or a fellow employee or that causes property damage.

B. Involvement in a safety threatening situation that could cause injury or property damage.

C. Regular or recurrent violation of the applicable employer's attendance and tardiness control policies.

D. Conviction of the employee for violation of state or federal criminal laws prohibiting the possession, use or sale of controlled substances.

E. Circumstances which give rise to a reasonable suspicion that the employee:

  1. Is under the influence of controlled substances or alcohol while present on the Owner's premises, or during working hours;

  2. Has sold or transferred a controlled substance on Owner property; or

  3. Has possessed a controlled substance or alcohol on Owner property without proper authorization.

## RANDOM TESTING

To provide added assurance of a safe, drug-free workplace, all persons employed on the project, including any employee of the Owner, other contractor/subcontractor, or vendor will be required to submit appropriate samples for random testing, subject to applicable state and local laws. A testing organization and random selection procedure designated by the Owner will be employed to ensure the integrity of the results and the nondiscriminatory selection of persons tested.

Owner or other contractor/subcontractor or vendor employees who are unavailable for random testing, due to sick leave or other pre-scheduled events, will not be tested. Rather, the names and random selection of such persons shall be kept confidential, and they will be tested immediately upon returning to the project site. Random tests are unannounced and subject to be given as determined necessary.

## RIGHT OF SEARCH

A. As a condition of employment, any employee of the Owner, other contractor/subcontractor or vendor recognizes and agrees that entry into a controlled project site and presence on our property constitutes consent to the inspection of any employee's vehicle and personal effects while entering, leaving, or on the project site.

B. As a result of such search, any site employee who is in violation of the drug and alcohol policy will be subject to immediate dismissal.

C. Any employee refusing to permit such an inspection will also be subject to immediate dismissal.

5

D.   Non-Owner employees working on our job sites who, as a result of a search, are in violation of the drug and alcohol policy, or refuse to permit an inspection, will be asked to immediately leave the site and will be refused admittance to the site.

## DRUG PANELS AND LEVELS

| DRUG | SCREENING LIMIT | CONFIRMATION LIMIT |
|---|---|---|
| Amphetamines | 1000 ng/ml | 500 ng/ml |
| Barbiturates | 300 ng/ml | 300 ng/ml |
| Cocaine Metabolite | 300 ng/ml | 150 ng/ml |
| Opiates | 300 ng/ml | 300 ng/ml |
| Phencyclidine | 25 ng/ml | 25 ng/ml |
| THC | 20 ng/ml | 15 ng/ml |

6

CONFIDENTIAL
Davita M. Key v. HMMA, et al

Documents Produced by HMMA

HMMA000073

## CONSENT AND RELEASE AGREEMENT
## FOR SUBSTANCE SCREENS AND SEARCHES

In order to be eligible for employment on the Owner Project (or project of the Owner's subsidiary or affiliate), I understand that I must submit appropriate specimens (urine, blood, or other) for drug screening and pass such screening (indicating an absence of any prohibited substance). I further understand that, if employed by the Owner, other contractor, subcontractor or vendor, I may be required to submit to additional drug screens as a condition of continued employment.

I understand that, if employed on the project, I may be subjected to searches of my person and property (i.e., lunch box, vehicle, and toolbox), and agree to cooperate fully in any such search or investigation. By signing this form, I acknowledge my consent to submit to any requested substance screen or search, and to the release of the results of such screen or search to representatives of the Owner and other persons who have a legitimate need to know such information.

I agree to hold harmless and not to sue the Owner or its subsidiaries or affiliates, the owner or my employer for any and all claims or causes of action arising from the administration of any substance screen or search, and from the release of information regarding the screen or search results.

_____ (Name of
Applicant/Employee)

_____ (Signature of
Applicant/Employee)

(Social Security Number)

_____ (Date)
Witness:

_____
(Date/Time)

7

| | |
|---|---|
| STATE OF_____ ) | **AUTHORIZATION FOR THE PROCUREMENT       AND** |
| TESTING | **OF SPECIMEN(S) AND** |
| COUNTY OF _____ ) | **SEARCH(ES); CONSENT TO RELEASE OF MEDICAL INFORMATION; AND RELEASE** |
| | **OF ALL CLAIMS** |

I,_____, authorize such physicians, medical technicians, or other qualified persons who are appointed by the Owner, to obtain from me a suitable specimen(s) of vinous blood and/or urine for the purposes of chemical analysis to determine the presence and the amount of alcohol and/or any other drug or foreign substance. If necessary, I further authorize the reference of said specimen(s) to any licensed medical laboratory.

I authorize the Owner, or its subsidiaries or affiliates, and any of their appointed representatives to search my person and property (including lunch box, garments, car, etc.) for illegal or stolen goods.

I consent to the release of the results of this screen or search to the Owner or its subsidiaries and affiliates and any person who has a need for such information.

I hereby release, jointly and severally, the Owner (including its subsidiaries and affiliates), the Construction Manager, my employer (if contractor/subcontractor employee) and any other person mentioned above, and any and all of their agents or employees, from any and all claims or causes of action resulting from the administration of this test or search, and the release of the information regarding the results thereof.

Witness_____    Signed_____

Date_____Time_____    Date_____Time_____

8

### REASONABLE SUSPICION REFERRAL FORM

For the following stated reason(s), observation(s), or cause(s) the named individual is referred to the Owner Safety Office or office of a designated management person for observation and/or evaluation. We are fully aware that the individual will be tested for Drug and/or Alcohol Abuse in accordance with the Owner Substance Abuse Program and that the individual is subject to the provisions contained therein. We accept responsibility for referring the individual.

Individual's Name:_____ S.S. No.:_____

_____

**OBSERVATION/FOR CAUSE REASON**

_____
_____
_____
_____
_____

| Date and Time | Observed/Reported By | Witnessed By |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OBSERVATION/FOR CAUSE REASON**

_____
_____
_____
_____
_____

| Date and Time | Observed/Reported By | Witnessed By |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OBSERVATION/FOR CAUSE REASON**

_____
_____
_____

| Date and Time | Observed/Reported By | Witnessed By |

Approved:

_____        _____

                            Requesting Individual

Resident Manager    _____

_____

9

WK

**CONFIDENTIAL**
**Davita M. Key v. HMMA, et al**

HMMA000076

HYUNDAI MOTOR MANUFACTURING ALABAMA

policies and procedures in order to understand HMMA's responsibilities to the Team Members and the Team Members' responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market, there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their management team, a video, or other printed material to communicate such changes.

If Team Members have any questions concerning these policies and procedures, they should ask their management team. If Team Members are still unclear about the policies and procedures, they should contact their Team Relations Representatives for clarification.

## EMPLOYMENT STATEMENT

Every Team Member's employment with HMMA is voluntary and is subject to termination by the Team Member or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook, as well as HMMA policies or procedures, shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors (whichever is applicable).

This handbook, as well as any policies or procedures, is not a contract of employment.

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing equal employment opportunities and prohibiting discrimination, harassment, and retaliation against any of its Team Members, job applicants, or other individuals based on legally protected characteristics and activities.

It is the policy of HMMA to prohibit discrimination, harassment, and retaliation against any of its Team Members, job applicants, or other individuals based on race, color, religion, sex, pregnancy, marital status, age, national origin, disability, genetic family medical history, service in the uniformed services, filing for bankruptcy, [engag]ing in concerted protected activity, filing a workers' compensation claim, [exerci]sing rights under the Family and Medical Leave Act of 1993 ("FMLA") and/or [the Oc]cupational Safety and Health Act of 1970 ("OSHA"), or other legally protected [chara]cteristics or activities.

If a Team Member, job applicant, or other individual believes unlawful discrimination, harassment, or retaliation has occurred, or has questions concerning this policy, he/she should immediately notify a Team Relations Representative, a Team Relations Assistant Manager, the Team Relations Manager, or the Team Member's Assistant Manager, Senior Manager or Director. If the Team Member is not satisfied with the response to his/her report/questions, the Team Member should then immediately contact the Head of the Team Relations Department or the Head of the Human Resources Department.

It is the policy of HMMA to prohibit discrimination against individuals with disabilities. HMMA will provide reasonable accommodations to qualified individuals with disabilities when necessary to enable them to perform the job's essential functions and enjoy the job's benefits. The individual Team Member, job applicant, or other individual should identify themselves as an individual with a disability when seeking an accommodation, demonstrate how the disability impacts their job, and suggest an effective means of accommodation. Supporting medical documentation will be kept confidential.

The Head of HMMA's Human Resources Department monitors HMMA's equal employment opportunity efforts and reports regularly to HMMA's executive management.

## LEGAL COMPLIANCE

All policies, procedures, and guidelines in the HMMA Team Member Handbook will be interpreted to comply with the provisions of state and federal employment and labor laws, including, but not limited to, the National Labor Relations Act.

2

3

Davis M. Key v. Hyundai Motor Manufacturing Alabama, LLC, et al

KEY V HMMA, HEA AND DYNAMIC

PLAINTIFF'S DEPOSITION EXHIBIT

7

2:19-CV-767-ECM-SMD

## ANTI-HARASSMENT

HMMA strictly prohibits unlawful harassment in the workplace or in connection with work, whether engaged in by a fellow Team Member, a supervisor or manager, a vendor, a supplier, or someone else connected with HMMA. Unlawful harassment includes any unwelcomed conduct that shows hostility or aversion towards an individual because of his or her legally protected characteristics or activities and that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. All forms of unlawful harassment are completely unacceptable in the workplace and in any work-related activities outside the workplace, such as business trips and HMMA sponsored off-site events.

HMMA's strict prohibition against unlawful harassment includes sexual harassment. Sexual harassment can involve a hostile environment, which can occur when an individual is subjected to unwelcome, severe, or pervasive comments, innuendoes, touching, or other conduct based on an individual's sex that creates an intimidating or offensive place to work. Sexual harassment can also involve quid pro quo harassment. Quid pro quo harassment occurs when employment decisions (e.g., hiring, promotions, salary increases) are based on an individual's submission to or rejection of sexual advances, requests for sexual favors, or other behavior of a sexual nature.

HMMA also strictly prohibits retaliation against any individual who, in good faith, reports suspected unlawful harassment, participates in any investigation involving alleged unlawful harassment, or engages in other legally protected activities.

All Team Members have the responsibility of keeping the work environment free of unlawful harassment and retaliation. This is true regardless of the identity or job title of the perceived offender or victim. Any Team Member who becomes aware of an incident of unlawful harassment or retaliation (whether by being the purported victim, witnessing the incident, or being told of it) has the responsibility to immediately report the incident to a Team Relations Representative, a Team Relations Assistant Manager, the Team Relations Manager, the Head of the Team Relations Department, the Head of the Human Resources Department, or the Team Member's Assistant Manager, Manager, Senior Manager, or Director.

If a Team Member feels that he/she has experienced harassment or retaliation, the Team Member should immediately take the following steps:

• If the Team Member is capable, the Team Member should immediately and clearly explain to the person causing the harassment or the retaliation that the Team Member is uncomfortable with the behavior and request that the conduct cease immediately.

• The Team Member should thereafter immediately report the incident to a Team Relations Representative, a Team Relations Assistant Manager, the Team Relations Manager, or the Team Member's Assistant Manager, Manager, Senior Manager or Director. If the Team Member is not satisfied with the response to his/her report, the Team Member should then immediately report the matter

8

to the Head of the Team Relations Department or the Head of the Human Resources Department.

• It is necessary for a Team Member to immediately report the incident so that HMMA can take immediate and constructive action. Team Members who believe that they have experienced harassing or retaliatory conduct have an obligation to pursue this complaint procedure.

All reports will be promptly investigated with due regard for the privacy of everyone involved. Due to the sensitive nature of complaints of harassment and retaliation, HMMA will investigate the complaints with particular care, and, to the extent possible, keep them confidential. Anonymous claims usually cannot be investigated.

Any Team Member found to have harassed a fellow Team Member, a subordinate, or someone else connected with HMMA will be subject to severe corrective action or possible termination of employment. HMMA will also take any additional action necessary to correct the situation immediately.

## WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person who makes substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated. In other words, HMMA has zero tolerance for threats, threatening behavior, or acts of violence and is committed to maintaining a weapons-free workplace for all Team Members.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated.

Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property, which includes parking areas and Team Members' vehicles on HMMA property.

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to the following: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats of violence, threatening behavior or an actual incident or violations of this policy is required

9

HMMA000003

## HYUNDAI — Hyundai Motor Manufacturing Alabama

# PPE & Dress Code Matrix

HR-AL-SF-S-00028

Revision Date: 7/22/2013 | OWNER: Assistant Manager, Safety | REVISION LEVEL: 07

**PRODUCTION PPE REQUIREMENTS (MINIMUM PPE REQUIREMENTS FOR ENTERING THE WORK AREAS)**

| SAFETY RULES AND PPE REQUIRED IN PRODUCTION AREAS | STAMPING | WELD | PAINT | GENERAL ASSEMBLY | ENGINE |
|---|---|---|---|---|---|
| **PERSONAL PROTECTIVE EQUIPMENT** | | | | | |
| SAFETY GLASSES WITH SIDE SHIELDS (ANSI Z87.1) | X | X | X | X | X |
| SAFETY STEEL TOED SHOES (ANSI Z41) | X | X | JS | JS | X |
| BUMP CAPS | X | X | JS | JS | JS |
| HEARING PROTECTION REQUIRED IN AREAS >85 DECIBELS | X | X | JS | JS | JS |
| KEVLAR or CUT-RESISTANT GLOVES | X | X | | JS | JS |
| KEVLAR or CUT-RESISTANT SLEEVES | X | X | | JS | JS |
| PAINT COVERALLS/HEAD COVERS (LINT FREE) | | | X | JS | JS |
| RESPIRATOR (VOLUNTARY REQUESTS) | JS | JS | JS | JS | JS |
| PROTECTIVE APRON | JS | JS | JS | JS | JS |
| LONG SLEEVE COTTON SHIRT WITH SLEEVE PROTECTION | JS | JS | JS | JS | JS |
| STATIC DISSIPATIVE (SD) SAFETY BOOTS (ELECTRO-STATIC) | JS | JS | JS | JS | JS |
| HARD HATS | JS | JS | JS | JS | JS |
| TINTED SAFETY GLASSES FOR MIG/TIG WELDING | JS | JS | JS | JS | JS |
| WELDING HELMET WHEN WELDING (MIG/TIG) | JS | JS | JS | JS | JS |
| FACE SHIELD OR GOGGLES WHEN GRINDING | JS | JS | JS | JS | JS |
| LEATHER GLOVES | JS | JS | JS | JS | JS |
| CHEMICAL PROTECTIVE GLOVES | JS | JS | JS | JS | JS |
| FALL PROTECTION REQUIRED - POTENTIAL TO FALL 6 FEET OR GREATER | JS | JS | JS | JS | JS |
| **DRESS CODE REQUIREMENTS - JEWELRY, BELTS, and SHOES** | | | | | |
| NO EARRING LOOPS OR EARRINGS BELOW THE EAR LOBE | X | X | X | X | X |
| BODY PIERCING: STUDS OK/ NO LOOPS | X | X | X | X | X |
| NECK CHAINS WORN INSIDE SHIRT | X | X | X | X | X |
| RINGS OR BRACELETS MUST BE COVERED or NOT WORN: HIGH RISK | X | X | X | X | X |
| LANYARD FOR BADGES, SAFETY GLASSES, ETC - MUST BE BREAKAWAY | X | | X | X | JS |
| WRIST WATCHES/ BELT BUCKLES PROTECTIVE COVER | | | | X | |
| SHOES WITH METAL HOOK-TYPE EYELETS NOT PERMITTED IN QC ZONES | | | JS | X | |
| **PERSONAL HYGIENE** | | | | | |
| HAIR LONGER THAN COLLAR LENGTH - TIED BACK OR TUCKED IN HAT | X | X | X | X | X |
| FINGER NAIL LENGTH - END OF FINGER | X | X | X | X | X |

**LEGEND:**
X = AT ALL TIMES
JS = JOB SPECIFIC

NOTES:

IT SHOULD BE NOTED THAT THIS DOCUMENT IS AN OVERVIEW OF THE REQUIREMENTS IN EACH DEPARTMENT AND AREAS WHERE ADDITIONAL PPE MAY BE REQUIRED. ADDITIONAL REQUIREMENTS WILL BE SPECIFIED BY THE DEPARTMENT SENIOR MANAGER AND SAFETY DEPARTMENT.

TEAM MEMBERS SHOULD NOT ENTER WORK AREAS WITHOUT REQUIRED PPE.

TEAM MEMBERS/VISITORS THAT ENTER WITHIN ANY PRODUCTION WORK AREAS; MUST MEET THE "IN SYSTEM DAMAGE CONTROL ZONES" DRESS CODE REQUIREMENTS.

JOB SPECIFIC

...NTIAL

Key v. Hyundai Motor Manufacturing Alabama, LLC, et al

**Documents Produced by HMMA**

KEY V HMMA, HEA AND DYNAMIC
PLAINTIFF'S DEPOSITION EXHIBIT
8
2:19-CV-767-ECM-SMD