Appeal No. 24-11126
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

DAVITA KEY

Plaintiff/Appellant

v.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, et al.

Defendants/Appellees
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

CASE NO.: 2:19-cv-767-ECM

CHIEF JUDGE EMILY C. MARKS, PRESIDING
_____

APPENDIX TO APPELLEE DYNAMIC SECURITY INC.'S BRIEF
VOL. 1 OF 5
_____

Wesley C. Redmond
Susan W. Bullock
FORDHARRISION, LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
T (205) 244-5905/(205) 244-5904
F (205) 244-5901
Email: wredmond@fordharrison.com
Email: sbullock@fordharrison.com
*Counsel for Appellant Dynamic Security, Inc.*

Appellee Dynamic Security, Inc., by and through its undersigned counsel of record, hereby files its Appendix to Appellee's Brief comprised of 5 volumes containing the following contents in accordance with Rule 30(a)(1), Fed. R. App. P. and 11th Cir. Rules 30-1 and 30-2:

<u>INDEX OF APPENDIX</u>

| Volume | Description | Docket/Tab# |
|--------|-------------|-------------|
| 1 | Motion to Dismiss for Failure to State a Claim by Dynamic Security, Inc. (with Attachment A (13-1), B (13-2), and C (13-3) (1/30/2020) | 13 |
| | Dynamic Security's Motion for Summary Judgment as to All Counts (10/12/22) | 73 |
| | Dynamic Security's Memorandum of Law in Support of its Motion for Summary Judgment as to All Claims (10/12/22) | 74 |
| | Dynamic Security's Evidentiary Submissions in Support of Its Motion for Summary Judgment as to All Counts (10/12/22) | 75 - 75-8 |
| 2 | Dynamic Security's Evidentiary Submissions in Support of Its Motion for Summary Judgment as to All Counts (10/12/22) | 75-9 – 75-25 |
| 3 | Dynamic Security's Evidentiary Submissions in Support of Its Motion for Summary Judgment as to All Counts (10/12/22) | 75-26 - 75-28 |
| 4 | Dynamic Security's Evidentiary Submissions in Support of Its Motion for Summary Judgment as to All Counts (10/12/22) | 75-28 – 75-33 |
| 5 | Davita Key's Opposition to Defendants' Motions for Summary Judgment (11/03/22) | 82 |

| | Dynamic Security's Reply to Davita Key's Opposition to Defendants' Motion for Summary Judgment (11/14/22) | 87 |
|---|---|---|

## CERTIFICATE OF SERVICE

I certify that, on February 14, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. Counsel for all parties registered as CM/ECF users will be served with the foregoing document by the Court's CM/ECF system.

/s/Wesley C. Redmond
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:19-cv-767-ECM |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING | ) | |
| ALA., LLC, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS BY DEFENDANT DYNAMIC SECURITY, INC.

Pursuant to Federal Rules of Civil Procedure 8(a), 9(c), and 12(b)(6), Defendant Dynamic Security, Inc. ("Dynamic"), by and through undersigned counsel, respectfully moves this Court to dismiss Plaintiff Davita Key's ("Plaintiff") claims against it on grounds set forth below.

## I.     SUMMARY OF GROUNDS FOR DISMISSAL

Plaintiff's claims against Dynamic, all brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), must be dismissed because Plaintiff failed to plead satisfaction of conditions precedent with regard to Dynamic and because she failed to file a lawsuit against Dynamic within the statutory period prescribed by Title VII.   While Plaintiff pled generally that she satisfied administrative

prerequisites, she did not plead that she did so with regard to Dynamic (See Doc. 1, ¶¶ 3, 4). Further, while she had filed EEOC Charges against both Dynamic and Hyundai Motor Manufacturing of Alabama, LLC ("HMMA") and had received notices of right to sue from both, she attached to her Complaint only the Notice of Right to Sue with regard to the EEOC Charge against HMMA (See Doc. 1-1). Plaintiff omitted from her Complaint any reference to the Dismissal and Notice of Rights to Plaintiff with regard to her EEOC Charge against Dynamic.  Had Plaintiff attached the Notice of Rights against Dynamic, she would have revealed that she missed the filing deadline by over 100 days and that she could not in good faith have pled that she satisfied administrative prerequisites to filing suit under Title VII.  The EEOC mailed the Dismissal and Notice of Rights regarding Defendant Dynamic on March 1, 2019,[1] and she received the Dismissal and Notice of Rights on or before March 4, 2019.  In order to pursue Title VII claims in federal court, Title VII requires a plaintiff to file those claims on or before 90 days following receipt of the Notice of Rights, which in this case was June 3, 2019.  Plaintiff did not meet the June 3, 2019, deadline, waiting instead until October 10, 2019, to file any lawsuit against Dynamic, failing to satisfy administrative prerequisites. Plaintiff's claims against Defendant Dynamic must therefore be dismissed.

---

[1] See Exhibit C to this motion.

## II.  RELEVANT FACTUAL ALLEGATIONS[2]

1.     Plaintiff's Complaint alleges, "Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the commission of the unlawful employment practice alleged in this claim." (Doc. 1, ¶ 3)

2.     Plaintiff's EEOC Charge against HMMA, filed in October of 2018, is identified as Charge No. 420-2019-00128 and is attached to this Motion as Exhibit A (hereinafter referred to as the "HMMA Charge").[3]

3.     Plaintiff's EEOC Charge against Dynamic, filed on August 3, 2017, is identified as Charge No. 846-2017-32787 and is attached to this Motion as Exhibit B (hereinafter referred to as the "Dynamic Charge").[4]

---

[2] Defendant Dynamic does not admit Plaintiff's factual allegations as true; rather Defendant considers them as true only for purposes of this Rule 12(b)(6) motion. Defendant's act of filing this Rule 12(b)(6) motion does not waive any defenses to Plaintiff's Complaint.

[3] For purposes of a 12(b)(6) motion, consideration is limited to the four corners of the complaint, which encompasses the complaint, itself, and any documents referenced therein or attached thereto that are central to the Plaintiffs' claims. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009).  Because the EEOC Charge is referenced in Plaintiff's Complaint, it may be attached as an exhibit to a motion to dismiss without converting the motion to dismiss to a motion for summary judgment.  Plaintiff's EEOC Charge against HMMA is attached as Exhibit A to this Motion.

[4] Because Plaintiff referenced an EEOC Charge in the Complaint, filed the Complaint against two defendants, and did not specify that her reference to an EEOC Charge applied to one defendant, Defendants must assume she intended to reference Charges as to both defendants. Defendant Dynamic therefore attaches the Dynamic EEOC Charge as an exhibit to this motion to dismiss without converting the motion to dismiss to a motion for summary judgment. See Exhibit B.

4.     Plaintiff alleges she "received notification of the right-to-sue letter from the EEOC on or about July 15, 2019 and has filed this complaint within 90 days of receiving the EEOC's notice of the right to sue." (Doc. 1, ¶ 4)

5.     Plaintiff attached as an exhibit to her Complaint the Notice of Right to Sue as to the HMMA Charge ("HMMA Notice of Rights") (Doc. 1-1), and the mailing date stamped on that Notice is July 12, 2019.

6.     Plaintiff failed to attach as an exhibit the Dismissal and Notice of Right to Sue as to the Dynamic Charge ("Dynamic Notice of Rights"); therefore Defendant attaches that notice to this motion as Exhibit C.[5]

7.     The mailing date stamped on the Dynamic Notice of Rights is March 1, 2019 (Ex. C).

8.     Presuming three days for receipt after mailing by the EEOC, receipt of the Dynamic Notice of Rights is attributed to Plaintiff on March 4, 2019.

9.     Ninety days after March 4, 2019, is June 3, 2019.[6]

---

[5] Plaintiff's Complaint did not specifically reference a right-to-sue letter with regard to Defendant Dynamic; however, the Middle District of Alabama's Pro Se instructions for filing employment lawsuits instruct plaintiffs as follows: "[w]hen filing your complaint with the Clerk's Office, you must present the Right to Sue Notice which will be included as part of your case." www.almd.uscourts.gov/faq/there-special-information-about-employment-discrimination-cases. Plaintiff failed to attach the Right to Sue Notice with regard to her claims against Defendant Dynamic; therefore, Defendant Dynamic may attach it without converting the motion into a motion for summary judgment.

[6] June 2, 2019, was a Sunday, thus, the deadline for filing moved to Monday, June 3, 2019.

10.     Plaintiff filed the Complaint on October 10, 2019, which was well over 200 days after she presumptively received the Dynamic Notice of Rights and over 100 days after the limitations period expired.

## III.   LAW AND ARGUMENT

### A.   <u>Legal Standards</u>.

Federal Rule of Civil Procedure 8 requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P.* 8(a)(2). The Supreme Court elaborated on this standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), affirming that a plaintiff's complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Fed. R. Civ. P. 9(c) requires that a plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled."

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests whether a cognizable claim has been adequately stated in the complaint in compliance with Rule 8(a).  *See Twombly*, 550 U.S. at 555.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* at 679.  "All reasonable inferences are drawn in favor of the plaintiff; however, unsupported conclusions of law or of mixed fact and law have long been recognized

not to prevent a Rule 12(b)(6) dismissal." *Mims v. Monroe Cty. Bd. of Educ.*, No. 13-643-KD-M, 2014 U.S. Dist. LEXIS 76456, at *4-5 (S.D. Ala. May 20, 2014) (citing *Abraham v. Greater Birmingham Humane Soc'y, Inc.*, No. 2:11-CV-4358-SLB, 2014 U.S. Dist. LEXIS 34174, 2014 WL 1043230, *1 (N.D. Ala. Mar. 17, 2014) (*citing Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003)(citation omitted)).

The lack of any law upon which to base a claim against a defendant requires dismissal for failure to state a claim under *Fed. R. Civ. P.* 12(b)(6). *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).  Further, dismissal for failure to file a lawsuit within 90 days after receipt of the notice-of-right-to-sue letter from the EEOC is also grounds for dismissal pursuant to Rule 12(b)(6). *Roach v. AKAL Sec., Inc.,* 2008 U.S. Dist. LEXIS 81869, at *4 (M.D. Ala. Oct. 15, 2008); *Keith v. Talladega City Bd. of Educ.*, No. 1:18-CV-1311-KOB, 2019 U.S. Dist. LEXIS 66311, at *12 (N.D. Ala. Apr. 17, 2019) (where, upon a Rule 12(b)(6) motion to dismiss, a defendant contests that the plaintiff filed the complaint within 90 days of receiving the EEOC's right-to-sue letter, the plaintiff must show that the complaint was timely filed or face dismissal).

B.   <u>**Legal Analysis.**</u>[7]

1.   <u>Plaintiff's claims against Dynamic must be dismissed because Plaintiff failed to plead that she satisfied administrative prerequisites with regard to Defendant Dynamic</u>.

To proceed with her case, Plaintiff must plead and establish that she has met conditions precedent prior to filing this lawsuit. *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982) (citing Fed. R. Civ. P. 9(c) and noting that "a plaintiff must generally allege in his complaint that 'all conditions precedent to the institution of the lawsuit have been fulfilled.'") For a plaintiff to maintain an action under the Title VII, she must have alleged and established administrative prerequisites: that she filed the Complaint within ninety days of receiving the EEOC's Notice-of-Right-to-Sue letter. *Kerr v. McDonald's Corp.,* 333 F. Supp. 2d 1352, 1358 (N.D. Ga. 2004) (citing *Green v. Union Foundry Co.,* 281 F.3d 1229 (11th Cir.), *cert. denied*, 537 U.S. 953, 123 S. Ct. 422, 154 L. Ed. 2d 302 (2002)). Further, where there are multiple defendants, a plaintiff must establish that she has met administrative prerequisites with regard to each defendant. *Reguero v. Airport Terminal Serv.,* No. 2:13-cv-97-FtM-38DNF, 2013 U.S. Dist. LEXIS 84064, at *4

---

[7] At present, there may be various additional grounds for dismissal under Rule 12; however, Dynamic does not wish to unduly burden the Court or the parties by filing motions to dismiss claims that are not in fact asserted in the Complaint or are too vague for Defendant to respond. Defendant reserves the right to file any and all other required motions pursuant to Rule 12(b) after this Court rules on the instant motion. The filing of the instant motion should not be interpreted to, nor does it waive, Defendant's right to file additional motions under Rule 12(b) if necessary. Moreover, the absence of subject matter jurisdiction is never waived.

(M.D. Fla. June 14, 2013)(requiring plaintiff to attach supporting documentation showing that he received a notice-of-right-to-sue letter with regard to each defendant).

Here, Plaintiff failed to plead that "all conditions precedent to the institution of the lawsuit have been fulfilled" with regard to Defendant Dynamic. Her allegation that she satisfied administrative prerequisites referenced only the date she received the HMMA Notice of Rights, and thus her allegations were limited to Defendant HMMA. (Doc. 1, ¶ 4).  Plaintiff alleges that she received notification of the right-to-sue letter from the EEOC on or about July 15, 2019, and that she has filed this Complaint within 90 days of receiving the EEOC's notice of the right to sue (Doc. 1, ¶ 4). Plaintiff attached to her Complaint the HMMA Notice of Rights, and it is dated as having been mailed on July 12, 2019, which comports with the date Plaintiff alleges she received it (Doc. 1-1).  The HMMA Notice of Rights gave Plaintiff 90 days to file a Title VII lawsuit against HMMA seeking to remedy the allegations included in the HMMA EEOC Charge.

Plaintiff's Complaint is devoid of any reference to the Dynamic EEOC Charge or the Dynamic Notice of Rights. By omission, Plaintiff failed to plead that she satisfied administrative prerequisites for her claims against Dynamic, failed to plead the date she received the Dynamic Notice of Rights, and failed to attach the Dynamic Notice of Rights as an exhibit.  These pleading omissions alone require dismissal of

Dynamic as a defendant in this lawsuit.

2.  Plaintiff's claims against Dynamic must be dismissed because Plaintiff failed to file the Complaint within 90 days after receiving the Notice of Suit Rights as to the EEOC Charge against Dynamic.

The indisputable evidence shows that Plaintiff missed the filing deadline as to Dynamic by over 100 days, which is an additional and independent reason for this Court to dismiss Plaintiff's lawsuit against Defendant Dynamic.  When a defendant contests this issue, as Dynamic is doing here, the plaintiff bears the burden of establishing satisfaction of the ninety-day filing requirement. *Mims,* 2014 U.S. Dist. LEXIS 76456, at *6-7 (citing *Green*, 281 F.3d at 1234 (*citing Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982))). The determination of what constitutes "receipt" of a notice of right to sue must be decided based on "the individual characteristics of a given fact pattern." *Henderson v. NCO Fin. Sys.*, No. CA-09-769-CG-C, 2010 U.S. Dist. LEXIS 32462, 2010 WL 1382737, at *4 (S.D. Ala. Mar. 12, 2010); *see also Bell v. Eagle Motor Lines, Inc.*, 693 F.2d 1086 (11th Cir. 1982)(determination of when an EEOC letter is received is on a case-by-case basis and ninety day clock started running upon the arrival of the letter to the address provided by the would-be plaintiff).  Where there is no evidence to the contrary, the court will assume that the plaintiff received the right-to-sue letter three days after it was issued. *Kerr*, 427 F.3d at 953, n. 9; *Winsor v. Home Depot U.S.A., Inc.*, 743 F. App'x 335, 335-36 (11th Cir. 2018) (where the date of receipt by mail is in dispute,

the court presumes that the plaintiff received the right-to-sue-letter three days after it was issued, which meant that the plaintiff was deemed to have filed his complaint on the 98th day, making it untimely).

Here, the Dynamic Notice of Rights, attached to this motion as Exhibit C, forecloses any possibility for Plaintiff to establish satisfaction of the ninety-day filing requirement. The Dynamic Notice of Rights reflects that the EEOC mailed it to Plaintiff on March 1, 2019. Plaintiff's Complaint does not allege that she received the Dynamic Notice of Rights on a certain date. Therefore, the presumptive three-day rule applies, requiring this Court to presume that Plaintiff received the Notice on March 4, 2019.  Ninety days after March 4, 2019, was June 2, 2019, which was the last day Plaintiff could have filed a timely lawsuit arising out of her EEOC Charge against Dynamic.  Since Plaintiff did not file her Complaint until over 100 days later, on October 10, 2019 (Doc. 1), her lawsuit against Dynamic is untimely and must be dismissed.

WHEREFORE, for these reasons set forth above, this motion to dismiss all claims against Defendant Dynamic Security is due to be granted.

Respectfully submitted,

*/s/Susan W. Bullock*
Wesley C. Redmond
Susan W. Bullock
FordHarrison LLP

420 20th Street North, Suite 2560
Birmingham, AL  35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: 205-244-5905
        205-244-5904
Facsimile: 615-709-3139

Counsel for Defendant Dynamic Security,
Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on 28th day of January,

2020, he electronically filed a true and correct copy of the foregoing with the Clerk

of Court using the CM/ECF System, and a true and correct copy to the following by

U.S. Mail:

Davita M. Key (Pro Se)
6940 Wrangler Road, Apt. C
Montgomery, AL 36117
(334) 200-7078

Plaintiff, *pro se*

*/s Susan W. Bullock*
Of Counsel

WSACTIVELLP:11250071.1

11

Exhibit A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 420-2019-00128 |
| | | and EEOC |

| State or local Agency, if any | | |
|---|---|---|

| Name (indicate Mr. Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Davita M. Key | | 1985 |
| Street Address                          City, State and ZIP Code | | |

Named is the employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| HYUNDAI MOTOR MANUFACTURING ALABAMA | 500+ | (334) 387-8000 |
| Street Address                          City, State and ZIP Code | | |
| 700 Hyundai Blvd., Montgomery, AL 36105 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Street Address                          City, State and ZIP Code | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 08-01-2017   Latest 08-01-2017
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began employment with the above-named employer on or about July 31, 2017, through Dynamic Security, Inc., and I was last employed as a Mailroom Clerk. On or about July 19, 2017, I was interviewed by Gloria Robinson (Dynamic Security, Inc.) and Lt. Maurice Chambliss. Cassandra Williams (Hyundai Motor Manufacturing) also participated. On or about July 31, 2018, I showed up for my first day of work, and Ms. Williams asked me why I had not changed my hairstyle (dreadlocks) as she had instructed me to do during my job interview. Per my request, Ms. Williams showed me a grooming policy on her computer, for female uniformed officers. Subsequently, I was sent home for the day. Additionally, I received a phone call inquiring as to the due date for my pregnancy, as I had informed both my employers of my pregnancy that morning. On or about August 1, 2018, I returned to work with a hat that covered my hair completely, per Ms. Williams instructions. My co-worker and trainer in the mailroom, Tanya Howell, asked me why I had been sent home the day before; I explained to her the situation regarding the grooming policy and my dreadlocks. Subsequently, Tanya informed Ms. Williams that I said I was being discriminated against. After being questioned, I submitted an official written complaint of discrimination against Hyundai, Ms. Robinson and Ms. Williams on the basis of my dreadlocks and pregnancy. That same day, I was informed by Dynamic Security, Inc. that Ms. Williams did not want me to return to work.

I was informed that the reason I was discharged was because of my hair and something else.

I believe that I was discriminated against due to my race, African-American, my sex, female (pregnancy), and in retaliation for making a protected internal complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10-16-18         [signature]
Date         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

RECEIVED EEOC
Birmingham District Office

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 846-2017-32787 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Davita M. Key** | | **1985** |

| Street Address | City, State and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **DYNAMIC SECURITY INCORPORATED** | **500 or More** | **(334) 395-7722** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5510 Wares Ferry Road, Suite S, Montgomery, AL 36117** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **07-21-2017**   Latest **08-01-2017**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

My race is Black. I am a pregnant female. I was hired by the above-named employer on July 21, 2017, as a mail clerk assigned to the Hyundai Plant. I was interviewed on July 19, 2017, by Gloria Robinson and Maurice (last name unknown). On July 27, 2017, I participated in the required training and completed safety training at Hyundai.

On July 31, 2017, I informed Supervisor Maurice, in the presence of Ms. Robinson, of my pregnancy and presented a medical notice ensuring that I could perform my job without restrictions. Later that morning I was sent home, partially because of my hairstyle (dreadlocks) of which I was questioned and criticized by Robinson and Cassandra Williams, but mainly because I informed the employer that I was pregnant.

On August 1, 2017, I reported to training with Tonya (last name unknown) in the administrative building. Shortly thereafter I was summoned to the office and picked up by Maurice. Upon our arrival to the office I was confronted by Robinson in a hostile and aggressive manner about my conversation of feeling discriminated against with the trainer.

Further on August 1, 2017, I requested to file a formal complaint through Supervisor Maurice for the discriminatory treatment. After providing him with a written statement as requested, I was told I would have to file through Human Resources in Birmingham AL. I asked Supervisor Maurice if I go to file a complaint will I be allowed to return to work. He would not give me an answer without making a call, then he confirmed I could leave and return.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Aug 03, 2017** | AUG 3 2017 |
| Date       Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| | U.S. EEOC Birmingham District Office |

RECEIVED
AUG 3 2017

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 846-2017-32787 |

|  |  | and EEOC |
|---|---|---|
| | State or local Agency, if any | |

Later, August 1, 2017, I filed a complaint to District Manager Dr. Ray Cureton, in the presence of Nicole Scavello, to no avail. Cureton immediately asked me whether I said I was going to sue the company. He then listened to my complaint and responded to my allegations regarding pregnancy, that Ms. Robinson is not like that. Scavello commented that what I was complaining of was not discrimination and that she has been racially harassed before. Cureton finished by stating they said this was not why but that they don't want me to come back. He advised, "I'm just a fat White man and I don't know what you all go through."

I believe that I was discriminated against based on my race, sex (pregnancy) and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. RECEIVED<br>SIGNATURE OF COMPLAINANT |
| **Aug 03, 2017** _____<br>Date           Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE AUG 3 2017<br>(month, day, year)<br><br>U.S. EEOC<br>Birmingham District Office |

EEOC Form 161 (11/16)

Exhibit C

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: **Davita M. Key** | From: **Birmingham District Office** |
|---|---|
| | **Ridge Park Place** |
| | **1130 22nd Street** |
| | **Birmingham, AL 35205** |

| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **846-2017-32787** | **ALICIA E. MARTIN-SCHUTZ,** **Investigator** | **(205) 212-2072** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

~~FEB 2 7 2019~~

Enclosures(s)

**BRADLEY A. ANDERSON,** **District Director**

*(Date Mailed)*

MAR 1 - 2019

cc:
**Kristal Riddle** **Legal Affairs Coordinator** **DYNAMIC SECURITY INC.** **5510 Wares Ferry Road, Suite S** **Montgomery, AL 36117**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-767-ECM-SMD |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DYNAMIC SECURITY, INC.'S
## MOTION FOR SUMMARY JUDGMENT AS TO ALL COUNTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Dynamic Security, Inc. ("Dynamic") moves for summary judgment as to Plaintiff Davita Key's ("Key" or "Plaintiff") claims because there are no genuine issues of material fact as to any count set forth in her Amended Complaint.

Counts One, Two, and Four of Plaintiff's Amended Complaint claims against Defendant Dynamic, all brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), must be dismissed because Plaintiff failed to satisfy administrative prerequisites required to sustain termination claims against Dynamic. Plaintiff failed to file a lawsuit against Dynamic within the 90 day statutory period prescribed by Title VII and she failed to include in her EEOC Charge allegations that Dynamic

terminated her employment. These administrative failures require dismissal of all Title VII claims against Dynamic.[1]

Plaintiff's purported Title VII and 1981 race claims against Dynamic under Counts Two and Three must be dismissed as a matter of law because that are based only on the adverse action of termination, and she does not allege Dynamic terminated her employment. Similarly, Counts Four and Five must be dismissed because they allege only HMMA and HEA – not Dynamic – retaliated against her by terminating her employment.

Further, any race discrimination claim pursuant to Title VII or 1981 must be dismissed because Plaintiff was removed from HMMA due to wearing dreadlocks and not due to her race. The Eleventh Circuit has made clear that dreadlocks are an elective, mutable trait, and an employer's prohibition against dreadlock hairstyles is not racially discriminatory. Likewise, any claim arising out of Plaintiff's complaints about her hairstyle fails as a matter of law because complaints about acts that do not violate Title VII or §1981 are not protected activity that can satisfy a prima facie case of a retaliation claim under those statutes. Therefore, the undisputed evidence in insufficient to establish any claim against Dynamic under Title VII or 42 U.S.C.

---

[1] Counts Two and Four of Plaintiff's Amended Complaint, along with Counts Three and Five, do not, for the reasons stated herein, purport to assert any claim of discrimination or retaliation against Dynamic. In fact, while only Count One of Plaintiff's Amended Complaint appears to even attempt to bring any claim against Dynamic, out of an abundance of caution, Dynamic will address the myriad of reasons summary judgment is due on all counts of the Amended Complaint.

§ 1981, requiring the court to grant Dynamic's motion for summary judgment as to all counts. This motion is based upon the pleadings on file, Defendant's Memorandum in Support of Its Motion for Summary Judgment, and Defendant's Evidentiary Submission in Support of Its Motion for Summary Judgment.

Respectfully submitted,

*/s/Wesley C. Redmond*
WESLEY C. REDMOND
SUSAN W. BULLOCK
FORDHARRISON LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
Phone: (205) 244-5905
          (205) 244-5904
Email: wredmond@fordharrison.com
          sbullock@fordharrison.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on October 12, 2022, he electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to:

Heather Leonard
Heather Leonard, P.C.
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243

Leslie A. Palmer, LLC
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL  35233

*Counsel for Plaintiff*

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.
P.O. Box 11945
Birmingham, AL  35202

*Counsel for Hyundai Motor Manufacturing Alabama, LLC*

T. Matthew Miller
Bradley Arant Boult Cummings
One Federal Place
1819 5th Avenue N.
Birmingham, AL 35203

*Counsel for Hyundai ENG America, Inc.*

/s/Wesley C. Redmond
Wesley C. Redmond

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-767-ECM-SMD |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DYNAMIC SECURITY, INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS

Defendant Dynamic Security, Inc. ("Dynamic" or "Defendant") submits the

following memorandum of law in support of its motion for summary judgment filed

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.   INTRODUCTION AND SUMMARY OF GROUNDS FOR JUDGMENT
## AS A MATTER OF LAW AS TO ALL CLAIMS AGAINST DYNAMIC

Counts One, Two, and Four of Plaintiff's Amended Complaint claims against

Defendant Dynamic, all brought pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), must be dismissed because Plaintiff failed to satisfy administrative

prerequisites required to sustain termination claims against Dynamic. Plaintiff failed

to file a lawsuit against Dynamic within the 90 day statutory period prescribed by

Title VII and she failed to include in her EEOC Charge allegations that Dynamic

terminated her employment. These administrative failures require dismissal of all Title VII claims against Dynamic.[1]

Plaintiff's purported Title VII and 1981 race claims against Dynamic under Counts Two and Three must be dismissed as a matter of law because that are based only on the adverse action of termination, and she does not allege Dynamic terminated her employment. Similarly, Counts Four and Five must be dismissed because they allege only HMMA and HEA – not Dynamic – retaliated against her by terminating her employment.

Further, any race discrimination claim pursuant to Title VII or 1981 must be dismissed because Plaintiff was removed from HMMA due to wearing dreadlocks and not due to her race. The Eleventh Circuit has made clear that dreadlocks are an elective, mutable trait, and an employer's prohibition against dreadlock hairstyles is not racially discriminatory. Likewise, any claim arising out of Plaintiff's complaints about her hairstyle fails as a matter of law because complaints about acts that do not violate Title VII or §1981 are not protected activity that can satisfy a prima facie case of a retaliation claim under those statutes. Therefore, as supported in greater detail below, the undisputed evidence in insufficient to establish any claim against

---

[1] Counts Two and Four of Plaintiff's Amended Complaint, along with Counts Three and Five, do not, for the reasons stated herein, purport to assert any claim of discrimination or retaliation against Dynamic. In fact, while only Count One of Plaintiff's Amended Complaint appears to even attempt to bring any claim against Dynamic, out of an abundance of caution, Dynamic will address the myriad of reasons summary judgment is due on all counts of the Amended Complaint.

Dynamic under Title VII or 42 U.S.C. § 1981, requiring the court to grant Dynamic's motion for summary judgment as to all counts.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS.

### A.    The Parties.

1.    Hyundai Motor Manufacturing Alabama ("HMMA") is an automotive assembly plant located in Montgomery, Alabama, that produces vehicles for the North American market. (Ex. 28, Burns Depo., 9:19-23).[2]

2.    Dynamic places security officers with clients having need to monitor its perimeters or the safety of incoming or outgoing traffic, e.g., manufacturing facilities, retail businesses, hospitals, and gated communities. (Ex. 26, Riddle Depo., 13:22-14:7).

3.    Dynamic places both armed and unarmed officers pursuant to client request. (*Id.*, 13:8-17).

4.    Hyundai Engineering America ("HEA") provides services to HMMA, such as managing security contracts, janitorial contracts, landscaping contracts, and general construction contracts. (Ex. 24, Williams Depo., 14:6-19).

### B.    Plaintiff's Allegations against Dynamic and HMMA.

---

[2] Robert Burns is the current Chief Administrative Officer (since July 2021) and Vice-President of HR and Administration (since October 2018) and has been employed by HMMA since April 2007. (Ex. 28, Burns Depo., 10:20- 11:9).

5.     Plaintiff filed a Complaint on October 10, 2019, against Hyundai Motor Manufacturing Alabama, LLC; Hyundai Engineering America, Inc.; and Dynamic Security, Inc. (Doc. 1).

6.     The Complaint asserted three claims pursuant to Title VII: discrimination based on race (Count I), discrimination based on pregnancy (Count II), and retaliation for making an inquiry into Defendant HMMA's employment policies regarding pregnancy and hair grooming. (Count III). (Doc. 1, ¶¶ 29-32, 33-38, and 39-40, respectively).

7.     Plaintiff filed an Amended Complaint on June 1, 2020, against the same parties. (Doc. 28).

8.     The Amended Complaint asserted claims of pregnancy discrimination in termination (Count One, Title VII), race discrimination in termination based on hairstyle (Count Two, Title VII; Count Three, 42 U.S.C. § 1981), and retaliation for complaining of a racially disparate hair grooming policy (Count Four, Title VII; Count Five, § 1981). (Doc. 28, ¶¶ 96-108, 109-124, 125-138, 139-150, and 151-162, respectively).

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   <u>The Administrative Process for Plaintiff's Separate EEOC Charges against HMMA and Dynamic</u>.

9.     Plaintiff Davita Key ("Plaintiff" or "Key")  filed an EEOC Charge against Dynamic on August 3, 2017, identified as Charge No. 846-2017-32787

("Charge No. 846-2017-32787" or the "Dynamic Charge") (Doc. 13-2; Ex. 11, DX 14 to Plaintiff's Depo.).

10.    In the Dynamic Charge, Plaintiff "checked the boxes" for "race," "sex," and "retaliation" and alleged she was Black, female, and pregnant. (*Id.*).

11.    The only action Plaintiff alleges she experienced was getting "sent home," which she believes was because of criticism and questioning about her dreadlock hairstyle and because she just told her supervisor she was pregnant (without physical restrictions). (*Id.*).

12.    In the Dynamic Charge, she also states the same supervisor told her she could leave to make a complaint with Human Resources in Birmingham and could return to work. (*Id.*).

13.    Plaintiff's Dynamic Charge does not allege Dynamic terminated her employment or that she was terminated from the Hyundai facility. (*Id.*).

14.    On August 3, 2017, Plaintiff submitted an Intake Questionnaire to the EEOC stating she wanted to file an EEOC Charge against Hyundai. (Ex. 10, DX 13 to Plaintiff's Depo.; Doc. 28, ¶¶ 25-26).

15.    Plaintiff wrote in her Intake Questionnaire that she had "filed a complaint w/ Dynamic Security/the agency I was hired through . . . on Aug. 1, 2017." (Ex. 10, DX 13 to Plaintiff's Depo., p. 4; Doc. 28, ¶ 26).

16.     Plaintiff signed and filed a separate EEOC charge against HMMA dated October 16, 2018; and the EEOC opened an investigation under Charge No. 420-2019-00128 ("Charge No. 420-2019-00128" or the "HMMA Charge"). (Doc. 28, ¶ 28; Doc. 13-1; Ex. 12, DX 15 to Plaintiff's Depo.).

17.     Plaintiff testified she did not understand her August 3, 2017, EEOC Charge against Dynamic was different from the EEOC Charge she filed again HMMA on October 16, 2018, but "figured" they were the same and that the EEOC handled them together. (Ex. 1, Pl. Depo., 185:4-21, 193:5-13).

18.     However, Plaintiff admitted she signed and filed two separate charges – one against Dynamic as her employer and a second against HMMA as her employer – and that the charges each had a unique charge number. (*Id*., Pl. Depo., 185:19-21, 191:19-192:6; Ex. 18, DX 22 to Plaintiff's Depo; Ex. 21, DX 25 to Plaintiff's Depo.).

19.     Nobody at the EEOC told Plaintiff that she had only one EEOC charge against both Dynamic and HMMA together as opposed to separate charge against each. (Ex. 1, Pl. Depo., 193:5-13).

20.     On March 1, 2019, the EEOC's District Director sent Plaintiff and Dynamic Security a Notice of Right to Sue for the Dynamic Charge, ending the investigation against Dynamic with a finding of "no cause" for discrimination. (Doc. 13-3; Ex. 18, DX 22 to Pl. Depo.).

21.     On July 12, 2019, the EEOC's District Director mailed to Plaintiff and HMMA a "Notice of Right to Sue (Conciliation Failure)" for the HMMA Charge. (Doc. 28, ¶ 29; Doc. 1-1, 2-3; Ex. 21, DX 25 to Pl. Depo.).

22.     Plaintiff acknowledges she received at her Wrangler Road address a Dismissal and Notice of Rights for the Hyundai Charge that had a mailing date of July 10, 2019; she is not aware of any delay in receiving that document. (Ex. 1, Pl. Depo., 189:4-14; Ex. 19, DX 23 to Pl. Depo.).

23.     The Dynamic Notice of Right to Sue shows a mailing date of March 1, 2019, to Dynamic at its address and to Plaintiff Davita Key at the address of 6940 Wrangler Road, Apartment C, which Plaintiff confirmed was her correct address at that time. (Ex. 1, Pl. Depo., 188, 17-189:6; Ex. 18, DX 22 to Pl. Depo.).

24.     Plaintiff pled in her Amended Complaint that she never received the Dynamic Notice of Right to Sue and that she "believed and understood that her claims against Dynamic had been incorporated with the Hyundai Charge" and that when she "received the finding in her favor and Notice of Right to Sue relating to the Hyundai charge, she believed it applied to Dynamic." (Doc. 28, ¶¶ 31-33).

25.     However, the EEOC handled separately the Dynamic Charge and the HMMA Charge, making a "cause finding" only against HMMA and attempting conciliation with only HMMA. (Doc. 28, ¶ 29; Doc. 1-1).

26.     Plaintiff testified she received in the mail the determination letter for the HMMA Charge she filed. (Ex. 1, P. Depo., 188:13-189:6; Ex. 20, DX 24 to Pl. Depo.)

27.     Plaintiff acknowledged she remembered receiving by mail a letter from the EEOC telling her that conciliation efforts on her HMMA Charge had failed, which she understood to mean the EEOC would not bring a lawsuit against HMMA. (Ex. 1, Pl. Depo., 189:20-190:6; Ex. 20, DX 24 to Pl. Depo.)

28.     Plaintiff also testified she received in the mail the Notice of Right to Sue for HMMA and that she is not aware of any delay in her receipt of that letter, which was sent to the same correct Wrangler Road address. (Ex. 1, Pl. Depo., 190:11-191:5; Ex. 21, DX 25 to Pl. Depo.)

29.     Even though Plaintiff acknowledged that the three documents from the EEOC she had received by mail all related to her HMMA Charge, she still testified she thought "they were all the same thing" as the EEOC Charge she filed against Dynamic. (Ex. 1, Pl. Depo., 191:6-11).

30.     Nobody at the EEOC told Plaintiff the two EEOC Charges she signed, one against HMMA and one against Dynamic, were the same thing – she just figured that they were. (Ex. 1, Pl. Depo., 193:5-13).

31.     Plaintiff cannot explain why she did not receive the Dynamic Notice of Right to Sue and was not aware of any problems receiving mail at her Wrangler address during this time frame. (*Id*., 187:3-10, 188:6-10).

32.     During 2019, Plaintiff lived with her husband and three children, and she and her husband were the only ones who "got the mail" at her house. (*Id*., 187:14-188:5).

33.     Plaintiff told Dynamic's counsel he would have to "talk to the postal office." (*Id*., 188:6-10)

34.     Three days after March 1, 2019, the date the EEOC mailed the Dynamic Notice of Right to Sue, was March 4, 2019 ("Dynamic Right to Sue receipt date").

35.     Ninety days after the Dynamic Right to Sue receipt date was June 3, 2019.

36.     Plaintiff filed this lawsuit on October 10, 2019, which was 220 days after the March 4, 2019, Dynamic Right to Sue receipt date. (Doc. 1).

37.     After the EEOC dismissed the Dynamic Charge and issued a Notice of Right to Sue, Dynamic was no longer a Respondent, and the EEOC would not have referenced Dynamic in any further communications to Plaintiff.

38.     Plaintiff testified that she saw the Dynamic Notice of Right to Sue for the first time during her June 20, 2022, deposition. (Ex. 1, Pl. Depo., 185:23-186:5; Ex. 18, DX 22 to Pl. Depo.).

**B.** **Undisputed Material Facts Surrounding Plaintiff's Employment and Claims.**

39. Plaintiff applied through Indeed.com for employment with Dynamic Security working in the mail room. (Ex. 1, Pl. Depo., 19:10-24).

40. On or around July 19, 2017, Gloria Robinson of Dynamic interviewed Plaintiff for a mail room job, with Maurice Chambliss, also of Dynamic, sitting in on the interview. (*Id.*, 18:4-14, 15-24; 21:8-10).

41. Robinson offered Plaintiff the mail room job and told her she would work at the Hyundai facility. (*Id.,* 22:8-23).

42. LaTonya Howell, a Dynamic employee, trained Plaintiff to work in the mail room. (*Id.*, 23:4-13).

43. Plaintiff was an at-will employee. (*Id.*, 25:9-19; Ex. 2, DX 2 to Pl. Depo.).

44. Plaintiff's first day of work as mailroom clerk was July 31, 2017. (Ex. 1, Pl. Depo., 16:12-20).

45. HEA has a grooming policy for Security Contractors that applies to all security officers assigned post duties at HMMA, including those assigned to the mailroom. (Ex. 24, Williams Depo., 81:18-21; Ex. 5, HEA Appearance Standards for Security Personnel, p. 1; Ex. 29, HEA Appearance Standards for Security Contractors, p. 1).

46.     HEA Appearance Standards for Security Personnel provides, "Natural Dreads, Dreadlocks, Locs or similar such hairstyles are strictly prohibited. However, weaved or crocheted in type dreads are allowed." (Ex. 29, p. 1)

47.     Cassandra Williams, who is African American, has been employed by HEA since September 1, 2010, as facilities manager overseeing the security contract. (Ex. 24, Williams Depo., 40:3-11; Ex. 25, Cureton Depo., 19:12-14; Ex. 1, Pl. Depo., 37:16-17).

48.     Williams applied the grooming policy, including disallowing dreads or dreadlock hairstyles, to all security positions including those working in the mailroom. (Ex. 24, Williams Depo., 45:5-46:4).

49.     During the time Robinson was interviewing her, she brought in Cassandra Williams to examine Plaintiff's dreadlock hairstyle; and Williams objected to Plaintiff's dreadlock hairstyle as being against policy. (Ex. 24, Williams Depo., 77:11-81:2; Ex. 1, Pl. Depo., 51:4-52:10).

50.     Gloria Robinson tried to work with Plaintiff to make her hairstyle fit Hyundai's requirements, and Plaintiff showed Robinson and Williams a photograph of how she could style her dreads to look more professional, and Williams agreed the style in the photograph would be acceptable. (Ex. 24, Williams Depo., 84:1-19).

51.     However, when Plaintiff arrived to her first day of work, she had not done what she stated and still had the same dreadlock style that did not comply with

the policy. (Ex. 25, Cureton Depo., 54:12-23; Ex. 24, Williams Depo., 102:13-104:4).

52.   Cassandra Williams sent an email and also told Gloria Robinson asking that Plaintiff be removed from her assignment at HMMA. (Ex. 25, Cureton Depo., 52:22-53:3; Ex. 24, Williams Depo, 94:21-95:6).

53.   Williams asked Dynamic to remove Plaintiff from the Hyundai site because her hair did not meet Hyundai standards. (Ex. 25, Cureton Depo., 54:2-11).

54.   It was HMMA's decision to remove Plaintiff from the mailroom clerk position at the Hyundai site due to her non-compliant hairstyle, and instructed Dynamic to remove her, which it did. (Ex. 25, Cureton Depo., 55:1-7; 62:6-13; 82:5-9).

55.   Dynamic did not terminate her employment but simply removed her from the Hyundai site at Hyundai's instruction. (Ex. 25, Cureton Depo., 55:1-13, 62:12-13, 63:5-14).

56.   Dynamic offered Plaintiff other assignments, which she declined on grounds that they did not meet her desired schedule. (Ex. 25, Cureton Depo., 63:5-19; PX 28, Cureton Depo.)

57.   Plaintiff cannot present any evidence to show Dynamic terminated her employment.

## IV.   LAW AND ARGUMENT

### A.   <u>Standard of Review</u>.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the non-movant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324

(internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249‑50 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the non-movant "fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

"In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party,

the moving party is entitled to judgment as a matter of law." *Warren v. Coosa Cty. Bd. of Educ.,* No. 2:17-cv-01977-ACA, 2019 U.S. Dist. LEXIS 187039, at *14 (N.D. Ala. Oct. 29, 2019) (citing Fed. R. Civ. P. 56(a)). Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (genuine issue of material fact exists if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor.") (internal citations omitted) (citing Fed. R. Civ. P. 56)).

**B.** **Plaintiff's Title VII Claim (Race, Pregnancy, and Retaliation) against Defendant Dynamic Security Must Be Dismissed Because Plaintiff Failed to File Her Complaint within 90 Days after Receiving the EEOC Notice-of-Right-to-Sue.**

In order for a plaintiff to maintain an action under Title VII, she must file a complaint within ninety days of receiving the EEOC's Notice-of-Right-to-Sue letter. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (citing 29 U.S.C. § 626(e)). "Once a defendant contests the issue of whether the complaint was filed timely, the plaintiffs bear the burden of showing that they have met the requirement." *Kerr*, 333 F. Supp. 2d at 1358 (citing *Green v. Union Foundry Company*, 281 F.3d 1229, 1233–34 (11th Cir. 2002)). Where there is no evidence to the contrary, the court will assume that the plaintiff received the right-to-sue letter three days after it was issued. *Kerr*, 427 F.3d at 953, n. 9. "When the date of receipt

is in dispute, this court has applied a presumption of three days for receipt by mail, akin to the time period established in Fed.R.Civ.P. 6(e)." *Kerr*, 427 F.3d at 953, n. 9 (citing *Zillyette v. Capital One Financial Corp.*, 179 F.3d 1337, 1342 (11th Cir. 1999)); *Winsor v. Home Depot U.S.A., Inc.*, 743 F. App'x 335, 335-36 (11th Cir. 2018) (where the date of receipt by mail is in dispute, the court presumes that the plaintiff received the right-to-sue-letter three days after it was issued, which meant that the plaintiff was deemed to have filed his complaint on the 98th day, making it untimely).

Plaintiff testified she filed two EEOC Charges, one against Dynamic and one against HMMA. (Ex. 1, Pl. Depo., 185:19-21, 191:19-192:6; Ex. 18, DX 22 to Plaintiff's Depo; Ex. 21, DX 25 to Plaintiff's Depo.). She further testified she received three letters from the EEOC regarding a cause finding, conciliation, and the EEOC's decision not to file a lawsuit against HMMA on her behalf. (Ex. 1, Pl. Depo., 188:13-189:6, 189:20-190:6, 190:11-191:5; Ex. 20, DX 24; Ex. 21, DX 25; and Ex. 22, DX 26). In fact, Plaintiff attached to her Complaint the EEOC-issued Notice-of-Right-to-Sue letter regarding the HMMA Charge. (Doc. 1, ¶ 11, Doc. 1-1). The HMMA Charge letter from the EEOC that Plaintiff attached to her Complaint reflects a mailing date of July 12, 2019 (Doc. 1-1).

The EEOC mailed the Notice-of-Right-to-Sue letter as to the Dynamic charge on March 1, 2019, and Dynamic received that "no cause" Notice on or before March

20, 2019. (Ex. 30, PX 32 to Riddle Depo., an internal email dated March 20, 2019, attaching the Notice; and Ex. 31, PX54 to Riddle Depo., the envelope from the EEOC postmarked February 28, 2019, although it was delayed due to Dynamic's new forwarded address; Doc. 13-3). Plaintiff's claim to have not received the Dynamic Notice of Right to Sue is unreliable; on October 4, 2017, which was before she even filed an EEOC Charge against HMMA, she submitted to the EEOC a "rebuttal" letter responding to Dynamic's Statement of Position (Charge Number 846-2017-32787) (Ex. 22, DX 26 to Plaintiff's Depo.). Plaintiff's testimony is that she made assumptions that the Dynamic and HMMA Charges she filed were somehow combined, that she did not receive a Dynamic Notice of Right to Sue even though her address was correct, that she received multiple other mailings from the EEOC in the same time frame, that she and her husband were the only people who received mail at her house, and that she had intentionally submitted a rebuttal statement to the EEOC specific to her Dynamic Charge and allegations against Dynamic. Clearly, she fails to rebut the presumption that she timely received the Dynamic Notice of Right to Sue at her home address. Therefore, the presumptive three day rule applies, and this Court must find that Plaintiff received the Notice on March 4, 2019. Ninety days after March 4, 2019, was June 2, 2019, which was the last day Plaintiff could have filed a timely lawsuit arising out of her alleged EEOC Charge. Plaintiff did not file her Complaint until two months later, on October 10,

2019, making her Title VII claims untimely and due to be dismissed (Doc. 1) on this ground alone.

### C. **Plaintiff Failed to Satisfy Administrative Prerequisites with Regard to Any Termination Claim against Dynamic By Failing to Allege in Her EEOC Charge against Dynamic that Dynamic Terminated Her Employment.**

"Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999)). The first step is filing a timely charge of discrimination with the EEOC, which in a non-deferral state like Alabama is within 180 days after the last discriminatory act. *Wilkerson*, at 1317 (citing 42 U.S.C. § 2000e–5(b), and 5(e)(1) (1994)). Exhaustion also requires that, before a plaintiff can pursue a claim in federal court, the EEOC charge must have addressed that claim to permit the EEOC the opportunity to pursue remedial action against the Respondent. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002); 42 U.S.C. § 2000e-5. A plaintiff thus may not raise for the first time in judicial proceedings "allegations of new acts of discrimination." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). The Eleventh Circuit succinctly set forth the law on administrative prerequisites to bring a judicial Title VII claim as follows:

> "The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332

> (11th Cir. 2000). "No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Id*. "EEOC regulations provide that charges should contain, among other things,' 'a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." *Id*. "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id*. (internal quotation marks omitted.) Although we have stated that "the scope of an EEOC complaint should not be strictly interpreted," we have also been careful to "caution[] that allegations of new acts of discrimination are inappropriate." *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279-80 (11th Cir. 2004). We will consider judicial claims only if they "amplify, clarify, or more clearly focus the allegations in the EEOC complaint." *Id*. at 1279. We must ask, then, whether the claims pursued in the judicial proceeding are "like or related to, or grew out of, the allegations contained in [the employee's] EEOC charge." *Id*. at 1280.

*Minix v. JELD-WEN, Inc*., 237 F. App'x 578, 587 -- 88 (11th Cir. 2007); 2007 U.S. App. LEXIS 15463. ** 26-27; 101 Fair Empl. Prac. Cas. (BNA) 367 (court dismissed claim because Plaintiff failed to include it in EEOC Charge and it did not arise out of allegations of hostile work environment claim). *See also Newman v. Career Consultants, Inc.*, 470 F. Supp. 2d 1333, 1343 (M.D. Ala. 2007) (granting summary judgment in favor of employer as to employee's failure to promote and hostile environment claims as those claims could not reasonably be expected to grow out of employee's EEOC charge based upon employer's discriminatory discharge and failure to train); *Williams v. Hager Hinge Co*., 916 F. Supp. 1163, 1174 (M.D. Ala. 1995) ("Courts have found that a charge based on [ ] discrimination does not encompass all potential claims for denial of promotions, pay raises, transfers, and

overtime.").

"EEOC regulations provide that charges should contain, among other things, '[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices.'" *Swindle v. Hale*, 2:09-CV-1458-SLB, 2012 WL 4725579 at *20 (N.D. Ala. Sept. 30, 2012), appeal dismissed (Feb. 4, 2013) (quoting *A.M. Alexander v. Fulton County, Ga*., 207 F.3d 1303, 1332 (11th Cir. 2000) (internal citations omitted) overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n. 52 (11th Cir. 2003)). Consequently, "[t]he selection of the type of discrimination alleged, i.e., the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged." *Id*. Indeed, "checking the correct box alone is not sufficient to satisfy the filing requirement when no factual particulars relating to the claim are disclosed to the EEOC." *Id*. (citing *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000)); *see also Cox v. Colsa Corp.*, 2014 WL 3889495, at *4 (N.D. Ala. Aug. 6, 2014) (dismissing a retaliation claim in spite of the fact that the plaintiff checked the charge's "RETALIATION" box because the charge was devoid of factual averments that would prompt the EEOC to investigate retaliation). "[T]he crucial element of a charge of discrimination is the factual statement contained therein." *Houston v. Army Fleet Servs., L.L.C*., 509 F. Supp. 2d 1033, 1042-43 (M.D. Ala. 2007); *see also Vinson v. Koch Foods of Ala., LLC*, 2013 WL 5441969, at *10 (M.D. Ala. Sept. 27,

2013) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970)).

Plaintiff's EEOC Charge against Dynamic, which she filed on August 3, 2017, "checked the boxes" for "race," "sex," and "retaliation." (Ex. X, DX 14, 000046-47). Her Charge alleges she is Black and female and was pregnant at the time. (*Id*). It alleges she was sent home, which she feels was because of her dreadlock hairstyle and she had informed her supervisor she was pregnant but had no medical restrictions. (*Id*.). She also alleges she was told by a Dynamic supervisor that she could leave to make a complaint and could return. (*Id*.). Plaintiff does not allege Dynamic terminated her employment or that she was terminated from the Hyundai facility. (*Id*.).

Count One of Plaintiff's Amended Complaint, "Title VII – Pregnancy Discrimination" alleges "Defendants [without specifying Dynamic, HMMA or HEA] terminated Key's employment from the Hyundai Plant August 2, 2017," that "Defendant Dynamic did not assign Key to any other assignments upon her Hyundai termination," and that "Defendants terminated Plaintiff because of her pregnancy." (Doc. 28, ¶¶ 102-104). Count Two of Plaintiff's Amended Complaint, "Title VII Race Discrimination" alleges "Defendant Dynamic was aware of Hyundai's alleged concern [about her dreadlocks] and allowed Hyundai to prevent Key from working." (Doc. 28, ¶ 115). Count Four of Plaintiff's Amended Complaint, "Title VII Race Retaliation" alleges "Defendants discriminated against Plaintiff in retaliation for

engaging in protected activity in violation of Title VII . . . by terminating Plaintiff's employment when she complained of discrimination on the basis of a racially protected trait and a racially disparate grooming policy." (Doc. 28, ¶ 140).

Plaintiff is barred from pursuing any claim against Dynamic based on any purported adverse action of termination from employment because she failed to allege in her EEOC Charge that Dynamic terminated her employment or that Dynamic removed her from assignment at the Hyundai plant. Plaintiff's EEOC Charge alleges only that she was sent home and that, the next day, she was told she could leave work to make a complaint to Human Resources in Birmingham and could then return to work. A plaintiff is not permitted to allege in her lawsuit new acts of discrimination. *See Price v. M & H Valve Co.*, 177 F. App'x 1, 13–14 (11th Cir. 2006) (disparate impact claim barred because not alleged in EEOC charge) (citing *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d at 1280; and *Wu v. Thomas*, 863 F.2d at 1547 (a plaintiff may not raise "allegations of new acts of discrimination" in the judicial proceedings)). Because Plaintiff did not allege in her EEOC Charge against Dynamic that Dynamic terminated her employment or removed her from the Hyundai facility, she cannot pursue Title VII claims against Dynamic in federal court arising out of any such purported adverse employment action. Summary judgment is therefore due to be granted, dismissing Counts One, Two, and Four as against Dynamic.

**D.** **Plaintiff's Amended Complaint Does Not Assert a Title VII Race Discrimination Claim against Dynamic.**

Plaintiff's Amended Complaint contains a Count Two entitled "Title VII Race Discrimination." The basis for that claim is that Plaintiff was terminated because of her race. That claim, however, is only asserted against HMMA and HEA. Count Two specifically alleges:

1) "Without allowing Plaintiff time to change her hairstyle, Defendants HMMA and HEA terminated Plaintiff's employment from the Hyundai Plant August 2, 2017." (Doc. 28 at 17, ¶ 116);

2) "Defendants HMMA and HEA terminated Plaintiff because of her race." (*Id.*, ¶ 119);

3) "Race was a motivating factor in HMMA and HEA's decision. (*Id.*, ¶ 120).

Count Two includes no allegation that Dynamic terminated Plaintiff's employment or took any action due to Plaintiff's race. The only allegations are that "Dynamic was aware of Hyundai's concerns around Key's hair and allowed Hyundai to prevent Key from working" (*Id.*, ¶ 115), which appears to relate to the allegation that HMMA and HEA sent Plaintiff home from her shift – rather than to an allegation that Dynamic terminated her employment. (*Id.*, ¶ 113). The specific allegations against HMMA and HEA and the lack of any allegations against Dynamic clearly demonstrate that Plaintiff has not asserted a race discrimination claim relating to Plaintiff's termination. *See Lennon v. Alabama Telecasters*, CIVIL ACT. NO. 2:18-cv-967-ECM, 2021 WL 1554892 *3 and n.4 (M.D. Ala. April 20, 2021) (although

23

complaint factually mentioned acts of alleged harassment, it did not specifically assert a claim for inappropriate workplace behavior, which eliminated any potential claim of harassment against defendant). The only claim asserted in Count Two is based on the act of termination of employment, and Plaintiff does not make that allegation against Dynamic, which requires summary judgment in favor of Dynamic on Count Two.

### E.   Plaintiff's Amended Complaint Does Not Assert a 42 U.S.C. § 1981 Race Discrimination Claim against Dynamic.

For similar reasons, Count Three of Plaintiff's Amended Complaint does not assert a § 1981 claim against Dynamic. Count Three contains the same allegations against HMMA and HEA set forth in Count Two. (Doc. 28 at 20, ¶¶ 130-34). Again, Plaintiff fails to allege Dynamic terminated Plaintiff or took any actions against Plaintiff due to her race. In fact, Count Three does not allege Dynamic took any act against her. The only reference to Dynamic is the allegation that "Plaintiff verified with Defendant Dynamic that her hairstyle was appropriate under the policy and notified Dynamic of Hyundai's issue." (*Id.*, ¶ 113). The only redressible action Plaintiff alleges in Count Three is her termination from employment, and she does not allege Dynamic terminated her employment, Dynamic's motion for summary judgment on Count Three is due to be granted.

**F.**   **Counts Four and Five Allege HMMA and HEA – And Not Dynamic - Retaliated against Plaintiff by Terminating Her Employment in Violation of Title VII and § 1981.**

Counts Four and Five of Plaintiff's Amended Complaint do not assert Dynamic retaliated against her in violation of Title VII or § 1981. Counts Four and Five both allege Plaintiff complained of race discrimination based on her dreadlock hairstyle and that she suffered retaliation in the form of termination from employment. (Doc. 28 at 22, 24, ¶¶ 140, 152). Again, neither Count Four nor Count Five alleges *Dynamic* terminated her employment. And again, both Counts include the identical allegation Plaintiff asserted in Counts Two and Three, which do not amount to an act of retaliation – that "Defendant Dynamic made statements demeaning or undermining Plaintiff's complaint and discouraging her from filing a formal complaint." (*Id*. at 22, ¶146 and 25, ¶158). Yet Counts Four and Five both specifically state that "Defendants *HMMA and HEA* terminated Key's employment from the Hyundai Plant August 2, 2017, after she left to file a complaint." (*Id.* at 22, ¶ 145 and 25, ¶ 157) (emphasis added). Termination is the only employment action Plaintiff challenges in Counts Four and Five and she asserts only that HMMA and HEA - and not Dynamic.

Further, Plaintiff's conclusory statements in Counts Four and Five that "Defendants terminated Plaintiff because she complained of race discrimination" and "Defendants terminated Plaintiff because she complained of race discrimination

and a racially disparate policy" (id. at 23, 25, ¶¶ 147, 159) does not state a valid claim against Dynamic, particularly in light of the specific allegations against Dynamic and the other individual defendants. *See Milner v. Team Health,* Case No. 2:19-cv-2041-GMB, 2020 WL 5658903 *5 (M.D. Ala. September 23, 2020) (lumping all defendants together does not give fair notice); *McCall v, Bank of America*, Case No. 2:16-CV-184-WKW, 2016 WL 5402748 *2 (M.D. Ala. September 26, 2016) ("mere reference to 'Defendants' does not give fair notice"); *see also Beaty v. Dunn,* CIVIL ACT. NO. 2:20CV279-ECM, 2022 WL 1721249 *7 (M.D. Ala. May 27, 2022); *Scanz Technologies v. Jewmon Enterprises*, Civil Action No. 20-22957-Civ-Scola, 2021 WL 65466 *4 (S.D. Fla. Jan, 7, 2021) (conclusory reference to "all Defendants" insufficient to allege that individual defendant entered into an agreement); *State Farm Automobile Insurance Co. v. Performance Orthopedics & Neurosurgery*, 278 F. Supp. 3d 1307, 1321 (S.D. Fla. 2017) (no well-pleaded allegations since "all references to the Individual Defendants are conclusory"). Since Counts Four and Five allege only that HMMA and HEA retaliated against Plaintiff by terminating her employment, Dynamic's motion for summary judgment on Counts Four and Five is due to be granted.

### G.  Summary Judgment Is Due to Be Granted as to Any Race Discrimination Claim Based on Plaintiff's Wearing of Dreadlocks.

Plaintiff alleges she was discriminated against because of her dreadlocks, which she claims amounted to racial discrimination in violation of Title VII and 42

U.S.C. § 1981.[3] However, the Eleventh Circuit has made clear that dreadlocks are

an elective, mutable hairstyle and that an employer's prohibition against dreadlocks

is therefore not racially discriminatory. *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d

1018, 1030, 1032-33 (11th Cir. 2016) (citing *Cooper v. Am. Airlines, Inc.*, 149 F.3d

1167, 1998 WL 276235, at *1 (4th Cir. May 26, 1998) (upholding district court's

12(b)(6) dismissal of claims based on a grooming policy requiring that braided

hairstyles be secured to the head or at the nape of the neck); *Campbell v. Alabama*

*Dep't of Corr.*, No. 2:13–CV–00106–RDP, 2013 WL 2248086, at *2 (N.D. Ala. May

20, 2013) ("A dreadlock hairstyle, like hair length, is not an immutable

characteristic."); *Pitts v. Wild Adventures, Inc.*, No. CIV.A.7:06–CV–62–HL, 2008

WL 1899306, at *5–6 (M.D. Ga. Apr. 25, 2008) (a grooming policy which

prohibited dreadlocks and cornrows did not discriminate on the basis of immutable

characteristics and thus was outside the scope of federal employment discrimination

statutes); *Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 259–67 (S.D.N.Y.

2002) (an employer's policy prohibiting "unconventional" hairstyles,

including dreadlocks, braids, and cornrows, was not racially discriminatory in

violation of Title VII); *McBride v. Lawstaf, Inc.*, No. CIV. A.1:96–CV–0196C, 1996

---

[3] Defendant Dynamic adopts and incorporates herein all grounds and arguments for summary judgment made by Defendants HMMA and HEA in their respective motions and briefs filed today for dismissal of Plaintiff's race discrimination claims based on her dreadlock hairstyle or retaliation claims based on complaints about her hairstyle.

WL 755779, at *2 (N.D. Ga. Sept. 19, 1996) (grooming policy prohibiting braided hairstyles does not violate Title VII); *Rogers v. Am. Airlines, Inc.*, 527 F. Supp. 229, 232 (S.D.N.Y. 1981)(holding that a grooming policy prohibiting an all-braided hairstyle did not constitute racial discrimination, and distinguishing policies that prohibit Afros, because braids are not an immutable characteristic but rather "the product of ... artifice"); *Carswell v. Peachford Hosp.*, No. C80–222A, 1981 WL 224, at *2 (N.D. Ga. May 26, 1981) ("There is no evidence, and this court cannot conclude, that the wearing of beads in one's hair is an immutable characteristic, such as national origin, race, or sex. Further, this court cannot conclude that the prohibition of beads in the hair by an employer is a subterfuge for discrimination."); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 470 (N.D. Cal. 1978) (the "even-handed application of reasonable grooming regulations has uniformly been held not to constitute discrimination on the basis of race") (internal citations omitted); *Thomas v. Firestone Tire & Rubber Co.*, 392 F. Supp. 373, 375 (N.D. Tex. 1975) (grooming policy regulating hair length and facial hair applied even-handedly to employees of all races did not violate Title VII or 42 U.S.C. § 1981))).  As such, even if the Complaint were construed to contain a claim of racial discrimination, that count would be due to be dismissed for failing to state a viable legal theory.

**H.**  **Plaintiff Also Has No Retaliation Claim Under Title VII or § 1981 Based On Complaints Related To Her Hairstyle.**

Just as Plaintiff has no claim under Title VII or § 1981 based on her hairstyle, Plaintiff also has no retaliation claim under those statutes based on complaints about any treatment due to her hairstyle or about any hairstyle policy. To plead a prima facie retaliation claim under Title VII and § 1981, Plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action, and (3) there is a causal relationship between the participation in the protected activity and the adverse action. *Litman v. Sec'y, of the Navy*, 703 F. App'x 766, 770 (11th Cir. 2017) "Statutorily protected activities include opposing an unlawful employment practice, and making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing related to an unlawful employment practice." *Wright v. Carter & Carter Constr., LLC,* No. 3:16-CV-977-KS-TFM, 2017 WL 2346840, at *1 (M.D. Ala. May 30, 2017) (citing 42 U.S.C. § 2000e-3(a) (2017)). Here, Plaintiff's retaliation claim is based on protesting treatment she received due to her hairstyle.

To satisfy the first element of a prima facie case, Plaintiff must demonstrate she held a good faith, reasonable belief that the acts she complained about violated Title VII and § 1981. *Wright*, at *1 (quoting *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)); *see* Doc. 31, ¶ 67. This burden has a subjective and objective component. *Little v. United Technologies, Carrier*

*Transicold Div.*, 103 F.3d 956, 960 (11ᵗʰ Cir. 1997). Thus, a plaintiff must show she subjectively and in good faith believed her employer committed an unlawful employment practice and also that her belief was objectively reasonable. *Id*. A sincere, though mistaken, belief that her employer violated Title VII and § 1981 is not enough. *Id.*

Since Plaintiff's hairstyle is not an immutable trait protected by Title VII or § 1981, Plaintiff could not have objectively believed her complaints about treatment due to her hairstyle violated existing Title VII or § 1981 law and thus could not have amounted to protected activity. The Court is required to "measure 'against existing substantive law' the objective reasonableness of [a plaintiff's] belief that [her employer] engaged in an unlawful employment practice." *Nickson v. Jackson Hospital & Clinic Inc*., No. 2:15CV00953-SRW, 2017 WL 4366735, at *8 (M.D. Ala. Sept. 29, 2017) (finding subjective belief of racially disparate treatment was not objectively reasonable) (quoting *Tatt v. Atlanta Gas Light Co*., 138 Fed. Appx. 145, 147 (11ᵗʰ Cir. 2005)) (internal citations omitted)). To constitute protected activity, Plaintiff must have adduced facts that are objectively "close enough" to what would be the basis of a successful discrimination claim. *Brown v. Florida Atlantic University*, No. 16-cv-80251-MIDDLEBROOKS/BRAN, 2016 U.S. Dist. LEXIS 146853, at *35 (S.D. Fla. Oct. 24, 2016) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also Howard v. Walgreen Co.*, 605 F.3d

1239, 1244-45 (11th Cir. 2010) (element of Plaintiff's prima facie case is that she must show she had a good faith, reasonable belief the employer engaged in an unlawful employment practice); and *Little*, 103 F.3d at 960.

Plaintiff must not only show that she had a good faith belief that the employer was engaged in unlawful employment practices, but also "that [her] belief was *objectively* reasonable in light of the facts and record presented." *Butler v. Alabama Dept. of Transportation*, 536 F.3d 1209, 1213 (11th Cir. 2008) (emphasis in original). Moreover, "where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer [. . .] an employee's contrary belief that the practice is unlawful is unreasonable." *See Id.* at 1214 (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 and n.2 (11th Cir. 1998)). The recent Eleventh Circuit decision in *Butler v. Alabama Dept. of Transportation* demonstrates that Plaintiff's retaliation claim should be dismissed. The *Butler* Court found that the plaintiff's "retaliation claim fails as a matter of law" because her belief that a co-worker's racial epithets was an unlawful employment practice by the defendant was "not objectively reasonable." *Id.* at 1213-1214 and n.2. In *Butler*, the plaintiff (a black employee) and a white co-worker were involved in an automobile accident during a lunch break. Immediately after the accident, the co-worker twice used a racial epithet in the presence of the plaintiff. The plaintiff complained about these statements to her supervisor, and the plaintiff alleged she was subsequently retaliated

against because of these complaints. In ordering that judgment should be entered for the employer on the retaliation claim, the Eleventh Circuit held that the incident "is nowhere near enough to create a racially hostile environment," and, therefore, the plaintiff's belief that the statements was an unlawful employment practice by the defendant "is not even close" to being objectively reasonable. *Id.* at 1213-14.

In *Clover v. Total System Services, Inc.*, the Eleventh Circuit noted that although it was undisputed that plaintiff had a good faith belief that her employer engaged in unlawful sexual harassment, because the conduct opposed by plaintiff was not severe or pervasive, plaintiff did not hold an *objectively reasonable* belief she was opposing an unlawful employment practice and therefore, did not engage in statutorily protected conduct. 176 F.3d 1346 (11th Cir. 1999). Here, Plaintiff alleges she protested conduct that violated Title VII and § 1981, yet a reasonable person in her position would have believed the alleged treatment due to her hairstyle violated existing Title VII or § 1981 legal precedent. Thus, Plaintiff's complaints cannot amount to protected activity as defined by Title VII and § 1981, and her retaliation claim fails as a matter of law.

## V.    CONCLUSION

For these reasons set forth above, Defendant's Motion for Summary Judgment is due to be granted on all claims against Dynamic Security, Inc.

Respectfully submitted,

*/s/Wesley C. Redmond*
WESLEY C. REDMOND
SUSAN W. BULLOCK
FORDHARRISON LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
Phone: (205) 244-5905
        (205) 244-5904
Email: wredmond@fordharrison.com
        sbullock@fordharrison.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on October 12, 2022, he electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to:

Heather Leonard
Heather Leonard, P.C.
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243

Leslie A. Palmer, LLC
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL  35233

*Counsel for Plaintiff*

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.
P.O. Box 11945
Birmingham, AL  35202

*Counsel for Hyundai Motor Manufacturing Alabama, LLC*

T. Matthew Miller
Bradley Arant Boult Cummings
One Federal Place
1819 5th Avenue N.
Birmingham, AL 35203

*Counsel for Hyundai ENG America, Inc.*

*/s/Wesley C. Redmond*
Wesley C. Redmond

WSACTIVELLP:13247108.1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-767-ECM-SMD |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT DYNAMIC SECURITY INC.'S EVIDENTIARY
SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AS TO ALL COUNTS**

Defendant Dynamic Security, Inc. submits the following evidentiary material

in support of its motion for summary judgment filed contemporaneously herewith.

| Ex. | Description | Bates Nos. |
|---|---|---|
| 1 | Deposition Transcript of Plaintiff Davita Key | N/A |
| 2 | Dynamic Pre-Employment Screening form completed and submitted by Plaintiff (DX 2 to Plaintiff's Deposition) | Dynamic-Key 000028 and Key 000013 |
| 3 | Plaintiff's check stub from Dynamic totaling 2.25 hours on July 31, 2017, and August 1, 2017) (DX 3 to Plaintiff's Deposition) | Key 000001 |
| 4 | July 21, 2017, email from Gloria Robinson to Plaintiff regarding Mailroom Clerk position (DX 4 to Plaintiff's Deposition). | Key 000254 - 000255 |
| 5 | HEA Appearance Standards for Security Personnel (DX 8 to Plaintiff's Deposition/PX 9 to Williams' Deposition) | HEA 0001-0003 |
| 6 | HMMA PPE and Dress Code Matrix (DX 9 to Plaintiff's Deposition) | HMMA 0000003 |

| 7 | Dynamic Acknowledgement and Receipt of Employee Handbook signed by Plaintiff July 21, 2017; Harassment policy; Security Officer's Handbook (DX 10 to Plaintiff's Deposition) | Dynamic-Key 000041-000042 Key 000332-000382 |
|---|---|---|
| 8 | Hyundai Engineering America, Inc. Employee Handbook cover and table of contents (DX 11 to Plaintiff's Deposition) | HEA 0004-0005 |
| 9 | HMMA Contractor Safety, Security, and Fire Protection Handbook (DX 12 to Plaintiff's Deposition) | Key 000277-000331 |
| 10 | EEOC Intake Questionnaire dated August 2, 2017, against Hyundai (DX13 to Plaintiff's Deposition) | Key 000049-000056 |
| 11 | EEOC Charge Number 846-2017-32787 dated August 3, 2017, against Dynamic Security (DX 14 to Plaintiff's Depo.) | Dynamic - Key 000046-000047 |
| 12 | EEOC Charge Number 420-2019-00128 filed October 16, 2018 against HMMA (DX 15 to Plaintiff's Depo.) | Key 000047 |
| 13 | Handwritten letter from Plaintiff dated August 8, 2017, to EEOC refuting items in statement of Gloria Robinson "concerning my discharge from HMMA." (DX 17 to Plaintiff Deposition). | Dynamic – Key 000058-000063 |
| 14 | Plaintiff's "official complaint of discrimination against Hyundai, Ms. Cassandra Williams, and Ms. Gloria Robinson" (DX 18 to Plaintiff's Deposition) | Dynamic-Key 000063 |
| 15 | Signed acknowledgement of Dynamic's Security Officer's Manual dated July 21, 2017 (DX 19 to Plaintiff's Deposition) | Dynamic-Key 000040 |
| 16 | Signed acknowledgement of Dynamic's Harassment Policy dated July 21, 2017 (DX 20 to Plaintiff's Deposition) | Dynamic-Key 000042 |
| 17 | Signed acknowledgement of Dynamic's Rules and Regulations dated July 21, 2017 (DX 21 to Plaintiff's Deposition) | Dynamic-Key 000038 -000039 |
| 18 | "Dismissal and Notice of Rights" (EEOC Charge No. 846-2017-32787) finding no reasonable cause for discrimination by Dynamic mailed by the EEOC to Plaintiff and Dynamic on March 1, 2019. (DX 22 to Plaintiff's Deposition) | N/A 2 pages |
| 19 | Letter of Determination mailed by the EEOC (EEOC Charge No. 420-2019-00128) to Plaintiff and HMMA on | N/A 2 pages |

| | June 10, 2019, reporting a finding of reasonable cause to conclude Respondent HMMA violated Title VII (DX 23 to Plaintiff's Deposition) | |
|---|---|---|
| 20 | Letter mailed by the EEOC (EEOC Charge No. 420-2019-099128) to Plaintiff and HMMA on July 12, 2019, reporting unsuccessful conciliation efforts (DX 24 to Plaintiff's Deposition) | N/A<br>1 page |
| 21 | Notice of Right to Sue/Conciliation Failure (EEOC Charge No. 420-2019-099128) mailed by the EEOC to Plaintiff and Respondent HMMA on July 12, 2019 (DX 25 to Plaintiff's deposition). | N/A<br>2 pages |
| 22 | "Rebuttal" letter from Plaintiff to EEOC dated "October 4, 2017" responding to Dynamic's Statement of Position (Charge Number 846-2017-32787) (DX 26 to Plaintiff's Deposition) | N/A<br>4 pages |
| 23 | Letter from Plaintiff dated October 4, 2017, to Alabama Department of Labor asserting she was wrongfully terminated and was not offered other employment by Dynamic (Exhibit 29 to Plaintiff's Deposition) | N/A<br>2 pages |
| 24 | Deposition Transcript for Cassandra Williams | N/A |
| 25 | Deposition Transcript for Ray Cureton | N/A |
| 26 | Deposition Transcript for Rule 30(b)(6) Deposition of Dynamic Security (Kristal Riddle) | N/A |
| 27 | Deposition Transcript for Rule 30(b)(6) Deposition of Dynamic Security (Sherry Spires) | N/A |
| 28 | Deposition Transcript for Rule 30(b)(6) Deposition of HMMA (Robert Burns) | N/A |
| 29 | HEA Appearance Standards for Security Contractors (PX 63 to Williams Depo.) | HEA 0163-0166 |
| 30 | Internal email dated March 20, 2019, establishing Dynamic's receipt of Dismissal and Notice of Right to Sue on or before March 20, 2019 (PX 32 to Riddle Depo.) | Dynamic-Key 000043-000048 |
| 31 | Envelope from EEOC to Dynamic Security that contained Dynamic's copy of Notice of Right to Sue, postmarked February 28, 2019 (PX54 to Riddle Depo.) | Dynamic-Key 000285 |
| 32 | Exhibits to Deposition Transcript for Ray Cureton, Part 1 of 2 | |
| 33 | Exhibits to Deposition Transcript for Ray Cureton, Part 2 of 2 | |

Respectfully submitted,

*/s/Susan W. Bullock*
Wesley C. Redmond
Susan W. Bullock
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: 205-244-5905/205-244-5904
Facsimile: 205-244-5901

*Counsel for Defendant Dynamic Security,*
*Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the 12th day of October,

2022, she electronically filed a true and correct copy of the foregoing with the Clerk

of Court using the CM/ECF System, which provides notice to all counsel of record:

Heather Leonard
Heather Leonard, P.C.
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243

Leslie A. Palmer, LLC
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL  35233

*Counsel for Plaintiff*

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.

P.O. Box 11945
Birmingham, AL  35202

*Counsel for Hyundai Motor Manufacturing Alabama, LLC*

T. Matthew Miller
Bradley Arant Boult Cummings
One Federal Place
1819 5th Avenue N.
Birmingham, AL 35203

*Counsel for Hyundai ENG America, Inc.*

/s/ Susan W. Bullock
Of Counsel

WSACTIVELLP:13486712.1

# Exhibit 1

# Deposition Transcript of Davita Key

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5        CASE NUMBER:  2:19-CV-767-ECM

6

7    DAVITA M. KEY,

8            Plaintiff,

9    v.

10   HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC;

11   HYUNDAI ENG, AMERICA, INC.; and DYNAMIC

12   SECURITY, INC.,

13           Defendants.

14

15               DEPOSITION OF

16               DAVITA M. KEY

17               June 20, 2022

18               9:27 a.m.

19

20       The deposition of DAVITA M. KEY was

21   taken before Sabrina Lewis, CCR, RDR, CRR, on

22   June 20, 2022, by the defendants, commencing at

23   approximately 9:27 a.m., at Hyundai Motor

24   Manufacturing, Montgomery, Alabama, pursuant to

25   the stipulations set forth herein.

**Page 2**

1          S T I P U L A T I O N S

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel that the deposition of DAVITA M. KEY may

6    be taken before Sabrina Lewis, Certified Court

7    Reporter, Notary Public, State of Alabama at

8    Large, at the law offices of Hyundai Motor

9    Manufacturing, Montgomery, Alabama, on June 20,

10   2022, at 9:27 a.m.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and reading of the

13   deposition by the witness is not waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws

16   and rules of court relating to the taking of

17   depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any

20   objections to be made by counsel to any

21   questions, except as to form or leading

22   questions, and that counsel for the parties may

23   make objections and assign grounds at the time

24   of trial, or at the time said deposition is

25   offered in evidence, or prior thereto.

**Page 3**

1        IT IS FURTHER STIPULATED AND AGREED

2    that notice of filing of the deposition by the

3    Commissioner is waived.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1          A P P E A R A N C E S

2

3    APPEARING ON BEHALF OF THE PLAINTIFF:

4        Leslie Ann Palmer, Esq.

5        Palmer Law, LLC

6        104 23rd Street South, Suite 100

7        Birmingham, Alabama 35233

8        205-285-3050

9        leslie@palmerlegalservices.com

10

11       Heather Newsom Leonard, Esq.

12       Heather Leonard P.C.

13       2105 Devereux Circle, Suite 111

14       Birmingham, Alabama 35243

15       205-977-5421

16       heather@heatherleonardpc.com

17

18   APPEARING ON BEHALF OF THE DEFENDANT, HYUNDAI

19   MOTOR MANUFACTURING ALABAMA, LLC:

20       David J. Middlebrooks, Esq.

21       Lehr Middlebrooks Vreeland & Thompson, P.C.

22       P.O. Box 11945

23       Birmingham, Alabama 35202-1945

24       205-326-3002

25       dmiddlebrooks@lehrmiddlebrooks.com



Page 5

```
1        A P P E A R A N C E S (continued)

2

3   APPEARING ON BEHALF OF THE DEFENDANT,

4   HYUNDAI ENG, AMERICA, INC.:

5       T. Matthew Miller, Esq.

6       Bradley Arant Boult Cummings LLP

7       One Federal Place

8       1819 Fifth Avenue North

9       Birmingham, Alabama 35203-2119

10      205-521-8000

11      mmiller@bradley.com

12

13  APPEARING ON BEHALF OF THE DEFENDANT, DYNAMIC

14  SECURITY, INC.:

15      Wesley C. Redmond, Esq.

16      Ford Harrison LLP

17      420 20th Street North, Suite 2560

18      Birmingham, Alabama 35203

19      205-244-5905

20      wredmond@fordharrison.com

21

22  OTHERS PRESENT:

23      Chris Whitehead, Esq.

24      In-house Counsel, Hyundai Motor

25      Manufacturing, Alabama, Inc.
```

Page 6

```
1        E X A M I N A T I O N
2   WITNESS:  DAVITA M. KEY              PAGE
3   BY MR. MIDDLEBROOKS                   11
    BY MR. REDMOND                        84
4   BY MR. MILLER                        230
    BY MS. PALMER                        280
5   BY MR. MIDDLEBROOKS                  285
6
7        E X H I B I T S
8   Defendants' Exhibits                 PAGE
9   Exhibit Number 1                      17
    First Amended Complaint
10
    Exhibit Number 2                      23
11  Pre-Application Screening Form, Bates
    Dynamic-Key 000028 and Key 000013
12
    Exhibit Number 3                      27
13  Paycheck and stub to Key from Dynamic
    Security, Inc., Bates Key 000001
14
    Exhibit Number 4                      28
15  7/21/21 email to Key from Robinson re:
    Mailroom Position, Bates Key 000254 through
16  000255
17  Exhibit Number 5                      32
    Plaintiff's Amended Initial Disclosures
18
    Exhibit Number 6                      41
19  Diagram of the first floor of the
    Administration Building
20
    Exhibit Number 7                      44
21  Decision on Unemployment Compensation
    Claim, Bates Key 000129 through 000130
22
    Exhibit Number 8                      51
23  "Appearance Standards for Security
    Personnel," Bates HEA 0001 through 003
24
25
```

Page 7

```
1        E X H I B I T S
2   Defendants' Exhibits                 PAGE
3   Exhibit Number 9                      52
    Hyundai Motor Manufacturing, Alabama PPE &
4   Dress Code Matrix, Bates HMMA 0000003
5   Exhibit Number 10                     53
    Dynamic Security, Inc., Acknowledgment and
6   Receipt of Employee Handbook, Bates
    Dynamic-Key 000041 through 000042; Dynamic
7   Security Officer's Handbook, Bates
    Key 000332 through 000382
8
    Exhibit Number 11                     56
9   CONFIDENTIAL; Hyundai Engineering
    America, Inc., Employee Handbook, Bates
10  HEA0004 through 0005
11  Exhibit Number 12                     56
    Hyundai Motor Manufacturing, Alabama
12  Safety, Security and Fire Protection
    Handbook, Bates 000277 through 000331
13
    Exhibit Number 13                     60
14  U.S. Equal Employment Opportunity
    Commission Intake Questionnaire, Bates
15  Key 000049 through 000056
16  Exhibit Number 14                     67
    EEOC Charge of Discrimination, Bates
17  Dynamic-Key 000046 through 000047
18  Exhibit Number 15                     69
    EEOC Charge of discrimination Bates
19  Key 000047
20  Exhibit Number 16                     72
    Plaintiff's Response to Defendant HMMA's
21  Interrogatories and Plaintiff's Response to
    Defendant HMMA's Request for Production of
22  Documents
23  Exhibit Number 17                     82
    8/8/17 handwritten notes by Key, Bates
24  Dynamic-Key 000058 through 000063
25
```

Page 8

```
1        E X H I B I T S
2   Defendants' Exhibits                 PAGE
3   Exhibit Number 18                    170
    8/1/17 handwritten note by Key
4
    Exhibit Number 19                    179
5   7/21/17 signed document re: Dynamic
    Security security officer's manual, Bates
6   Dynamic-Key 000040
7   Exhibit Number 20                    180
    7/21/17 signed document re: Dynamic
8   Security's harassment policy, Bates
    Dynamic-Key 000042
9
    Exhibit Number 21                    180
10  7/21/17 signed document re: Dynamic
    Security rules and regulations, Bates
11  Dynamic-Key 000038 through 000039
12  Exhibit Number 22                    185
    U.S. Equal Employment Opportunity
13  Commission Dismissal and Notice of Rights
14  Exhibit Number 23                    188
    U.S. Equal Employment Opportunity
15  Commission determination letter mailed
    6/10/19
16
    Exhibit Number 24                    189
17  U.S. Equal Employment Opportunity
    Commission letter mailed 7/12/19
18
    Exhibit Number 25                    190
19  U.S. Equal Employment Opportunity
    Commission Notice of Right to Sue
20  (Conciliation Failure)
21  Exhibit Number 26                    219
    10/4/17 Key rebuttal to EEOC charge
22
23  Exhibit Number 27                    228
    Photos
24
25
```



Page 9

1          E X H I B I T S
2   Defendants' Exhibits                    PAGE
3   Exhibit Number 28                       229
    10/4/17 letter to Board of Appeals, Alabama
4   Department of Labor, from Key, re: Case
    Number 07549-AT-17
5
    Exhibit Number 29                       229
6   State Board of Appeals, Alabama Department
    of Labor, Disallowance of Application for
7   Leave to Appeal to the Board of Appeals
8   Exhibit Number 30                       232
    Plaintiff's Response to Defendant HEA's
9   First Discovery Requests
10  Exhibit Number 31                       250
    Photos, Bates Key 000271 through 000276
11
    Exhibit Number 32                       255
12  Key résumé
13  Exhibit Number 33                       270
    2/24/20 email to Cohen from Key re: Your
14  ATL Column, Bates Key000257 through 258
15
16
17
18
19
20
21
22
23
24
25

Page 10

1        I, Sabrina Lewis, CCR, a Certified
2   Court Reporter and a Notary Public for the State
3   of Alabama at Large, acting as Commissioner,
4   certify that on this date, pursuant to the
5   Alabama Rules of Civil Procedure and the
6   foregoing stipulation of counsel, there came
7   before me at Hyundai Motor Manufacturing,
8   Montgomery, Alabama, on June 20, 2022,
9   commencing at 9:27 a.m., DAVITA M. KEY, witness
10  in the above cause, for oral examination,
11  whereupon the following proceedings were had:
12        THE COURT REPORTER:  Are there any
13  stipulations?
14        MR. MIDDLEBROOKS:  Usual stipulations?
15        MS. PALMER:  Read and sign.
16        MR. MILLER:  That's fine.
17        MS. LEONARD:  We will read and sign.
18        (Witness sworn.)
19        MR. MIDDLEBROOKS:  Because we have
20  three defendants here and counsel for each of
21  the three defendants and plaintiff's got two
22  counsel, why don't we have everybody state their
23  name for the record and tell you who they
24  represent and anything else that you want to
25  say.

Page 11

1        Would you state your full name,
2   Ms. Key.
3        THE WITNESS:  Davita Key.
4        MS. PALMER:  Leslie Palmer for Davita
5   Key.
6        MS. LEONARD:  Heather Leonard for
7   Davita Key.
8        MR. REDMOND:  Wesley Redmond for
9   Dynamic Security, Inc.
10       MR. MILLER:  Matt Miller for
11  Hyundai ENG, America.
12       MR. WHITEHEAD:  Chris Whitehead.  I'm
13  in-house counsel for HMMA.
14       MR. MIDDLEBROOKS:  And David
15  Middlebrooks.  I'm representing HMMA, which is
16  Hyundai Motor Manufacturing, Alabama.
17            DAVITA M. KEY,
18  Being first duly sworn, was examined and
19  testified as follows:
20            EXAMINATION
21  BY MR. MIDDLEBROOKS:
22       Q.  Ms. Key, have you ever been known by
23  any other name?
24       A.  Davita Cade.
25       Q.  Any other name beyond that?

Page 12

1        A.  No.
2        Q.  And you've heard me say my name is
3   David Middlebrooks.  I represent Hyundai Motor
4   Manufacturing, Alabama.  I might use the word
5   HMMA.  You understand I'm talking about Hyundai
6   Motor Manufacturing, Alabama?
7        A.  Yes.
8        Q.  Anytime I use the word Dynamic, I'm
9   referring to the client of Wes Redmond, Dynamic
10  Security, Inc.  You understand that?
11       A.  Yes.
12       Q.  And anytime I use the term HEA, I'm
13  referring to Hyundai ENG, America, Inc.  You
14  understand that?
15       A.  Yes.
16       Q.  I understand that that company was
17  previously known as AMCO America, Inc., which
18  appeared in the intake questionnaire.  So you're
19  aware of that name, prior name?
20       A.  Can you repeat?
21       Q.  According to your intake questionnaire,
22  which we'll look at in a bit, you referred to
23  AMCO America, A-M-C-O, America, Inc., which is
24  now HEA.  You understand that?
25       A.  I don't remember it saying that.



Page 13

1    Q.   Okay.  I'll show it to you.
2         Since we've got three defendants, I'm
3    going to try to be specific when I'm referring
4    to one of the companies, and I'd ask that you do
5    the same thing if you would.  Fair enough?
6    A.   Okay.
7    Q.   You understand you're under oath today
8    just as you would be at trial?
9    A.   Yes.
10   Q.   If you don't understand any of my
11   questions, if you ask me to repeat them or
12   rephrase them, I'll be glad to do so.  But if
13   you don't ask me to repeat or rephrase a
14   question, I'm going to assume you understood the
15   question and you're responding to the question.
16   Is that fair?
17   A.   Yes.
18   Q.   Is there any way that you're impaired
19   today that would affect your ability to testify?
20   A.   No.
21   Q.   Are you taking any medication today
22   that would affect your ability to testify?
23   A.   No.
24   Q.   How are you feeling today?
25   A.   Fine.

Page 14

1    Q.   Good.  You can comfortably read or
2    write?
3    A.   Yes.
4    Q.   If you need to take a break at any
5    point, just let me know.  We can do so.  I do
6    ask, if I have a question for you, if you would
7    answer the question before we take a break.  Is
8    that fair?
9    A.   Yes.
10   Q.   And again, we're not going to hopefully
11   take too many breaks because we'd like to get
12   the deposition moving along, but I don't want
13   you to be uncomfortable.  So if you do need a
14   break, as I say, just speak up.
15   A.   Okay.
16   Q.   What documents did you review to
17   prepare for this deposition?
18   A.   I reviewed the complaint that I
19   submitted to the EEOC.
20   Q.   The complaint to the EEOC or the
21   complaint that's filed in this action?
22   A.   The complaint that's filed in this
23   action.
24   Q.   Okay.  That's the only document you
25   reviewed?

Page 15

1    A.   The full -- I reviewed the complaint
2    that's filed in this action and also the
3    information as far as just the things that I've
4    submitted to my attorneys as far as like the
5    supporting documents.
6    Q.   And other than what you reviewed to
7    prepare for your deposition, have you reviewed
8    any documents related to this case in the past
9    month?
10   A.   No.
11   Q.   Now, as I understand it, you're suing
12   for pregnancy discrimination, race
13   discrimination, and retaliation; is that
14   correct?
15   A.   Yes.
16   Q.   And the termination of your assignment
17   to the mail room at HMMA in August 2017, is that
18   the only event about which you complained in
19   this litigation?
20   A.   Can you like -- when you say -- can you
21   rephrase?  What do you mean the only event as
22   far as --
23   Q.   Well, you're suing three defendants.
24   A.   Okay.
25   Q.   You say you were terminated; is that

Page 16

1    correct?
2    A.   Yes.
3    Q.   You're suing about the termination?
4    A.   Yes.
5    Q.   And you say you were terminated because
6    of your race, your pregnancy, and in
7    retaliation?
8    A.   Yes.
9    Q.   Are you suing about any event other
10   than your termination?
11   A.   No.
12   Q.   Now, according to your complaint, your
13   assignment to the mail clerk position at HMMA
14   began about July 31, 2017?
15   A.   Yes.
16   Q.   And your assignment ended on or about
17   Tuesday, August 2nd, 2017?
18   A.   No.
19   Q.   When did it end?
20   A.   August 1st.
21   Q.   So in your complaint at paragraph 102,
22   it references August 2, 2017, as the end date of
23   your assignment.  Do you know why that's in your
24   complaint?
25   A.   No.



DAVITA M. KEY
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING

June 20, 2022
17–20

Page 17

1    Can I see it?  Do you have it?
2    Q.  Yeah, I'll give it to you.  I'll go
3  ahead and give it to you.
4        MR. MIDDLEBROOKS:  We'll mark this as
5  Defendants' Exhibit Number 1.
6        (Defendants' Exhibit 1 was marked
7          for identification.)
8    Q.  So just look at paragraph 102, page 14.
9    A.  Yeah, I saw it.
10    Q.  Do you know why it states August 2nd
11  was the end point as opposed to August 1?
12    A.  I don't know why.  I don't know why it
13  says that.  But they -- on August 1st, they told
14  me they were not going to -- they didn't want me
15  here.
16    Q.  Okay.
17        The court reporter will get this.
18    A.  Oh.
19    Q.  We may refer to that again.
20    A.  Okay.  I'll just leave it right here.
21    Q.  So how many days did you actually go
22  out to the HMMA plant?
23    A.  Two.
24    Q.  And that was on the 31st of July and
25  the 1st of August?

Page 18

1    A.  Yes.
2    Q.  You had never been to the plant before
3  July 31?
4    A.  No.  I came here July -- I don't know.
5  I think it was the 19th, for my interview.
6    Q.  Okay.  And you came to this building
7  we're in right now?
8    A.  Yes.
9    Q.  Okay.  For the record, we're in the
10  Security Building.  Is that your understanding,
11  this is the Security Building?
12    A.  Yes.
13    Q.  This is where you came and interviewed?
14    A.  Yes.
15    Q.  Who did you interview with?
16    A.  Gloria Robinson.
17    Q.  Anybody else?
18    A.  Maurice Chambliss was sitting in on the
19  interview.
20    Q.  Who did they work for, if you know?
21    A.  Gloria Robinson said that she worked
22  for Dynamic Security.
23    Q.  How about Mr. Chambliss?
24    A.  Dynamic Security.
25    Q.  Okay.  And after July 31 -- excuse me.

Page 19

1    After August 1, you never came back out
2  to this plant again?
3    A.  No.
4    Q.  Okay.
5    A.  Today.
6    Q.  Today.
7    I want to go through the process you
8  went through, sort of redundant, but the process
9  of becoming employed by Dynamic Security.
10    First, how did you learn of the
11  opportunity?
12    A.  Indeed.com.
13    Q.  And Indeed is an online tool that you
14  can apply for jobs through?
15    A.  Yes.
16    Q.  And what job did Indeed state that you
17  were applying for?
18    A.  It said -- I'm not sure.  I don't -- I
19  mean, I'm not sure.
20    Q.  Okay.  Did you know that the job was
21  Dynamic Security?
22    A.  Yes.
23    Q.  Did you know it was a mail room job?
24    A.  Yes.
25    Q.  Is the mail room job what you wanted?

Page 20

1    A.  Yes.
2    Q.  And why did you want that particular
3  job?
4    A.  There's -- I mean, there's no like -- I
5  just wanted a job.  And that was a job that I
6  knew that I had experience in.
7    Q.  What were your goals in coming to work
8  for Dynamic Security?
9    A.  To -- you mean as far as like career
10  goals or --
11    Q.  Yeah, what did you want to do with
12  Dynamic Security?  Just stay a mail room clerk
13  or was there something else you hoped to do?
14    A.  I wanted to reach my full potential.
15    Q.  And what kind of assignments with
16  Dynamic Security would you want to have that
17  would help you reach your full potential?
18    A.  I don't -- I think that because with --
19  I mean, with any job, you -- I mean, advancement
20  can be in different places and different areas.
21  So I don't think that I can say one way or the
22  other because with -- like, you know, as the
23  years progress, you don't know what
24  opportunities may arise, so.
25    Q.  Okay.  Did Ms. Robinson ever tell you



Page 21

1  you would have a chance to advance?
2      A.  Yes.
3      Q.  Did she say you were likely to advance
4  frequently?
5      A.  Yes.
6      Q.  Did she tell you to what jobs?
7      A.  No.
8      Q.  So you interviewed with Ms. Robinson
9  and Mr. Chambliss sometime around July 19?
10     A.  Yes.
11     Q.  And they later -- who made you an
12  offer?
13     A.  Gloria Robinson.
14     Q.  Did you speak to anybody else about the
15  opportunity?
16     A.  When you say -- I mean, what -- when
17  you say did I speak to anybody else -- about
18  working for Dynamic?  Like working with the job?
19  Or did anybody else offer me --
20     Q.  Well, other than Mr. Chambliss and
21  Ms. Robinson, did you speak to anybody else
22  before you accepted the job?
23     A.  No.
24     Q.  And did they tell you what your pay
25  would be?

Page 22

1      A.  Yes.
2      Q.  Did they tell you what your benefits
3  would be?
4      A.  They gave me a paper, like the benefits
5  sheet from the -- so yes, they did.
6      Q.  What benefits did Dynamic provide you?
7      A.  Medical, like health insurance.
8      Q.  Okay.  And did they tell you where you
9  would be working physically?
10     A.  Yes.
11     Q.  And where would that be?
12     A.  The mail room.
13     Q.  Where is that located?
14     A.  The address they gave me was
15  700 Hyundai Boulevard.
16     Q.  Did you ever go to the mail room?
17     A.  Yes.
18     Q.  And relative to the Security Building
19  where we are, where would it be, the best you
20  can describe it?
21     A.  I mean, probably like a ten-minute ride
22  from here.  I don't really remember because that
23  was a long time ago.
24     Q.  Did you ever go anyplace at the HMMA
25  plant other than the Security Building and the

Page 23

1  mail room area?
2      A.  Yes.
3      Q.  Where?
4      A.  My trainer, she took me to -- just to
5  like different buildings on the first day within
6  the first 30 minutes I was with her.
7      Q.  Would those be buildings you would take
8  mail to?
9      A.  Yes.
10     Q.  Who trained you?
11     A.  LaTonya Howell.
12     Q.  Who did she work for?  If you know.
13     A.  I -- Dynamic Security.
14          (Defendants' Exhibit 2 was marked
15          for identification.)
16     Q.  Let me show you what we'll mark as
17  Defendants' Exhibit Number 2.  And it says it's
18  a Pre-Application Screening Form.  And I've got
19  a second page which I think is actually a
20  page from the application.
21          The Pre-Application Screening Form is
22  Bates-numbered Dynamic-Key 28.  And the second
23  page is a document produced by your counsel
24  Bates-numbered Key 13.
25          Let me show it to you and ask you if

Page 24

1  you recognize it.
2      A.  Yes.
3      Q.  And is it your writing on both of these
4  pages?
5      A.  Yes.
6      Q.  Did anybody tell you what to write?
7      A.  No.
8      Q.  On the first page, it says "position
9  applied for."  You see it says "mail room
10  clerk"?
11     A.  Yes.
12     Q.  And, again, why did you pick that
13  position?
14     A.  Because I had experience in it.
15     Q.  And you say in the next sentence "How
16  did you hear of Dynamic Security?"  You put down
17  "indeed.com."  Had you known anything about
18  Dynamic Security other than from Indeed?
19     A.  No.
20     Q.  Then on the next page, what is that
21  document?
22     A.  It's part of the employment
23  application.
24     Q.  And that's your writing on the top part
25  of the page?



DAVITA M. KEY                                                June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING              25—28

Page 25

1    A.  Yes.
2    Q.  And your signature at the bottom of the
3  page?
4    A.  Yes.
5    Q.  And everything you put in the
6  application you filled out -- again, we don't
7  have the first page of it, but -- was accurate?
8    A.  Yes.
9    Q.  Now, if you would, look at the third
10  paragraph above your signature.  It says "I
11  understand that compliance with the company's
12  policies and procedures is a condition of my
13  employment."  Did you read that when you signed
14  this?
15    A.  Yes.
16    Q.  It also indicates in the last paragraph
17  that you are hired at will.  Did you read that
18  when you signed it?
19    A.  Yes.
20    Q.  This shows a date of July 21, 2017.  Is
21  that correct?
22    A.  Yes.
23    Q.  Had you already interviewed with
24  Ms. Robinson?  Or could this be the date you
25  interviewed?

Page 26

1    A.  I had already interviewed with her.
2    Q.  Did you ever fill out a job application
3  for HEA, America -- ENG, America?
4    A.  Not that I recall.
5    Q.  Did you ever fill out an application
6  for HMMA?
7    A.  Not that I recall.
8    Q.  During the interview process with
9  Ms. Robinson and Mr. Chambliss -- Mr. Chambliss,
10  was he in a uniform when you interviewed?
11    A.  I don't remember.
12    Q.  Was Ms. Robinson in a uniform?
13    A.  She had on pants and a polo shirt.
14    Q.  During the interview, were you given
15  any documents by Mr. Chambliss or Ms. Robinson?
16    A.  No.
17    Q.  And Ms. Robinson is the one who made
18  the offer to you?
19    A.  Yes.
20    Q.  Did you ever speak to anyone else
21  before you were made the offer?
22    A.  No.
23    Q.  The interview took place, I think you
24  already answered, in this building, Security
25  Building?

Page 27

1    A.  Yes.
2    Q.  Who told you what hours you would work?
3    A.  Ms. Robinson.
4    Q.  Did anyone else?
5    A.  Not that I recall.
6    Q.  Were there any other particulars of the
7  offer you can remember other than what you've
8  told me?
9    A.  No.
10        (Defendants' Exhibit 3 was marked
11        for identification.)
12    Q.  I show you what has been marked as
13  Defendants' Exhibit Number 3.  And you recognize
14  this as a check and a pay stub?
15    A.  Yes.
16    Q.  And who's this check from?
17    A.  It says Dynamic Security.
18    Q.  Ms. Robinson had already told you that
19  you would be paid by Dynamic Security, didn't
20  she?
21    A.  Yes.
22    Q.  And it shows that you worked on July 31
23  and August 1.  And that's consistent with your
24  testimony?
25    A.  Yes.

Page 28

1    Q.  Did you ever get a check from anyone
2  else associated with your assignment to the mail
3  room?
4    A.  No.
5        (Defendants' Exhibit 4 was marked
6        for identification.)
7    Q.  Let me show you what we'll mark as
8  Defendants' Exhibit Number 4.  Do you recognize
9  this two-page document that's Bates-numbered Key
10  254-255?
11    A.  Yes.
12    Q.  And when I refer to Bates numbers, I'm
13  talking about these little numbers in the bottom
14  right-hand corner.
15    A.  Okay.
16    Q.  They're numbers that attorneys label
17  documents so that we can keep up with them.
18    A.  Okay.
19    Q.  Okay.
20        This is dated July 21, 2017.  So that's
21  the date she made you the offer?
22    A.  Yes.
23    Q.  And was anything in your offer of
24  employment other than what is stated in this
25  email?

DAVITA M. KEY                                                    June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                     29–32

Page 29

1    A.   Can you -- I can't hear what you said.
2    Q.   I'm sorry.  And please speak up if you
3  can --
4    A.   Okay.
5    Q.   -- because we've got a purifier going
6  and we're wearing masks and all these kind of
7  things.
8        Is there anything -- any terms of your
9  offer that were made to you that's not included
10  in this email?  Other than the benefits
11  statement you said they gave you?
12   A.   I mean, this doesn't offer me anything.
13  It just says what I'm supposed to do.
14   Q.   Okay.
15   A.   So yes.
16   Q.   And what else did you get besides the
17  benefits statement that was part of your offer?
18   A.   My pay.
19   Q.   Okay.
20        Now, you had to go to Hyundai or HMMA
21  training center for a safety class before you
22  could begin work; is that correct?
23   A.   Yes.
24   Q.   Did you do that?
25   A.   Yes.

Page 30

1    Q.   And do you remember who taught the
2  class?
3    A.   No.
4    Q.   How many people were there?
5    A.   I don't remember.
6    Q.   And did you obtain a badge at some
7  point?
8    A.   Yes.
9    Q.   And where did you go to obtain the
10  badge?
11   A.   At the security office.
12   Q.   Where we are now?
13   A.   Yes.
14   Q.   When you come in the door of the
15  Security Building, there's somebody sitting in a
16  cubicle.  Is that where you went and they took
17  your picture?
18   A.   Yes.
19   Q.   What did the badge say?
20   A.   Hyundai.
21   Q.   Did it say anything else?
22   A.   I don't remember what else it said.  It
23  had my name on it and Hyundai.
24   Q.   Were you told anything other than
25  what's in the exhibit that you spoke about,

Page 31

1  Exhibit 4, about reporting to the HMMA facility
2  for your assignment?
3    A.   You said was I told anything?
4    Q.   Anything other than what's in that
5  email about your HMMA assignment.
6    A.   Yes.
7    Q.   What were you told?
8    A.   Gloria Robinson emailed me about the
9  start date.
10   Q.   Okay.  And who was to be your
11  supervisor when you went to work?
12   A.   My immediate supervisor was Maurice
13  Chambliss.
14   Q.   And who was his supervisor, if you
15  know?
16   A.   I don't know who his supervisor was.
17   Q.   Did you report to anybody other than
18  Mr. Chambliss?
19   A.   I never reported to him.
20   Q.   Did you report to anybody?
21   A.   Gloria Robinson.
22   Q.   Was she the only one?
23   A.   Yes.
24        (Defendants' Exhibit 5 was marked
25         for identification.)

Page 32

1    Q.   I want to show you what's marked as
2  Defendants' Exhibit Number 5.  And this is a
3  document titled Plaintiff's Amended Initial
4  Disclosures.  And you understand you're the
5  plaintiff?
6    A.   Yes.
7    Q.   And it is something I received from
8  your attorneys, as noted on page 4.  Have you
9  ever seen this document before today?
10   A.   No.
11   Q.   Take a moment to look at it.  I've got
12  a few questions to ask about it.
13        (Pause.)
14   Q.   Have you finished looking at it?
15   A.   Yes.
16   Q.   There are seven people named in this
17  document; is that correct?  Other than your
18  counsel.
19   A.   Yes.
20   Q.   With respect to your assignment out at
21  HMMA in the mail room, did you ever talk to
22  anybody other than those persons listed in
23  Exhibit Number 5?
24   A.   No.
25   Q.   If you look on the second page, it says



Page 33

1  Ray Cureton.  And who is he?
2      A.  He worked at Dynamic Security.
3      Q.  And what was his job, if you know?
4      A.  I don't know.
5      Q.  And what was your reason for talking
6  with him?
7      A.  Because I asked to speak to human
8  resources.
9      Q.  And he was human resources?  Or that's
10  who they sent you to?
11      A.  I was told he was human resources.
12      Q.  Who told you that?
13      A.  Gloria Robinson.
14      Q.  And where did you speak to Mr. Cureton?
15      A.  At the Dynamic Security office.
16      Q.  Which is where?
17      A.  On Wares Ferry Road.
18      Q.  And what did you speak to him about?
19      A.  The events that transpired concerning
20  my employment.
21      Q.  And did you consider yourself as making
22  a complaint?
23      A.  Yes.
24      Q.  And did you make a written complaint?
25      A.  Yes.

Page 34

1      Q.  Do you know who he shared that with, if
2  anyone?
3      A.  No, I don't.
4      Q.  And then Number 6, Tonya LNU -- that
5  stands for Last Name Unknown -- who is that
6  person?
7      A.  My trainer.
8      Q.  Okay.  She showed you those different
9  buildings and so forth?
10      A.  Yes.
11      Q.  Where you would deliver mail.  And who
12  did she work for?
13      A.  Dynamic Security.
14      Q.  She wasn't your supervisor, was she?
15      A.  No.
16      Q.  Did you ever see her other than on
17  those two days that you were out here on
18  assignment?
19      A.  No.
20      Q.  And I say "out here" because we're
21  sitting at the HMMA plant.  You understand that?
22      A.  Yes.
23      Q.  Then Nicole Scavella, S-C-A-V-E-L-L-A,
24  who is she?
25      A.  She worked at the Dynamic Security

Page 35

1  office.
2      Q.  And what was your reason to talk with
3  her or have interaction with her?
4      A.  She sat in when I spoke with Mr. Ray
5  Cureton.
6      Q.  Do you know what her position was?
7      A.  The office manager.
8      Q.  And she just listened to your
9  complaint?  Do you know if she did anything else
10  with it?
11      A.  Told me not to file it.
12      Q.  And why did she tell you not to file it
13  if she told you a reason?
14      A.  Because I had not been discriminated
15  against.
16      Q.  Okay.  Did she say why she thought
17  that?
18      A.  Because she told me they didn't call me
19  a nigger.
20      Q.  What race is Ms. Scavella?
21      A.  African American.
22      Q.  What race is Mr. Cureton?
23      A.  White.
24      Q.  What race is Tonya?
25      A.  African American.

Page 36

1      Q.  And Cassandra Williams, who does she
2  work for?
3      A.  I don't know.
4      Q.  And why were you interacting with her?
5      A.  Gloria Robinson interacted with her,
6  asked her a question concerning me.
7      Q.  And what was that question?
8      A.  About my hair.
9      Q.  Did you ever speak to Ms. -- you
10  actually spoke to Ms. Williams about your hair?
11      A.  Yes.
12      Q.  Did you speak to Ms. Williams about
13  anything other than your hair?
14      A.  No.
15      Q.  And who was present when you spoke to
16  Ms. Williams?
17      A.  Gloria Robinson.
18      Q.  And on how many occasions did you speak
19  to Mr. Maurice Chambliss?
20      A.  I talked to him once.  No.  I talked to
21  him twice.
22      Q.  Was the first time the interview?
23      A.  No, because he didn't say anything.
24      Q.  Okay.  What were the two occasions
25  where you talked with him?



Page 37

1    A.  My first day at work and on August 1st.
2    Q.  And what were the reasons you were
3  speaking to him on those occasions?
4    A.  On my first day of work, to give him a
5  note from my doctor.  And on August 1st, to tell
6  him I would like to speak with human resources.
7    Q.  And did he send you to Ray Cureton?
8    A.  No.
9    Q.  What did he do?
10    A.  Called Gloria Robinson.
11    Q.  And she sent you to Ray Cureton?
12    A.  She told him to -- that I could go,
13  yes.
14    Q.  What race is Mr. Chambliss?
15    A.  African American.
16    Q.  And what race is Ms. Williams?
17    A.  African American.
18    Q.  Gloria Robinson, we've already talked
19  about her.  And you said she worked for Dynamic?
20    A.  Yes.
21    Q.  Who all did you share the information
22  with that you were pregnant?  Out here.  Not
23  personally.
24    A.  I told Gloria Robinson and Maurice and
25  then my trainer.

Page 38

1    Q.  Trainer being Tonya?
2    A.  Yes, Tonya.
3    Q.  Now, let me ask you.  Ms. Cassandra
4  Williams, what race is she?
5    A.  African American.
6    Q.  So you told Gloria Robinson, Maurice
7  Chambliss, and Tonya that you were pregnant.  Do
8  you know if they told anyone else?
9    A.  Gloria Robinson told Cassandra
10  Williams.
11    Q.  And how did you know that?
12    A.  Because she said it to me.
13    Q.  "She" being Gloria?
14    A.  Yes.
15    Q.  What did she say, specifically?
16    A.  She called me and asked me when my
17  child was due.  And she was in the office with
18  Ms. Williams.
19    Q.  And so you understood Ms. Williams
20  overheard that conversation?
21    A.  Yes.
22    Q.  Do you know for a fact Ms. Williams
23  overheard the conversation?
24    A.  Yes.
25    Q.  And how do you know that?

Page 39

1    A.  Because I told Ms. Robinson that I was
2  pregnant, and Ms. Robinson took my note and came
3  back to her office shared with Ms. Williams to
4  give Ms. Williams the note.
5    Q.  And do you know if Ms. Williams ever
6  shared that information with anybody else?
7    A.  I don't know.
8    Q.  So to your knowledge, the only folks
9  physically working out here at the HMMA facility
10  that you told you were pregnant was Tonya,
11  Gloria Robinson, Maurice Chambliss; and, in
12  turn, Ms. Williams was told?
13    A.  The only people I told was Gloria
14  Robinson, Maurice Chambliss, and Tonya.
15    Q.  And do you know if anybody else was
16  told about it other than Ms. Williams?
17    A.  I don't know.
18    Q.  In the course of your two days that you
19  were out here at the HMMA plant, is there
20  anybody else you can recall speaking to at all
21  other than what's on this Defendants' Exhibit 5?
22    A.  When you say speaking to, what do you
23  mean?
24    Q.  If you spoke to anybody else that you
25  can recall.

Page 40

1    A.  I said good morning to the person who
2  took my ID picture.
3    Q.  All right.  Anything else?
4    A.  No.
5    Q.  Did you ever see any organizational
6  charts at any time during your assignment out at
7  Hyundai Motor Manufacturing, Alabama?
8    A.  What do you mean by organizational
9  charts?
10    Q.  Something that shows who reports to
11  whom and things of that nature?
12    A.  No.
13    Q.  Can you name anybody that you know for
14  a fact was actually employed directly by Hyundai
15  Motor Manufacturing, Alabama?
16    A.  I don't -- I don't know who was
17  employed with them.
18    Q.  To your understanding, who selected you
19  to be assigned to the mail room?
20    A.  You say do I understand who selected
21  me?
22    Q.  Who assigned you that -- gave you that
23  assignment?
24    A.  Do you mean person or company?
25    Q.  Person.



Page 41

1    A.  Yes.
2    Q.  Who was that?
3    A.  Gloria Robinson.
4    Q.  Do you know what company assigned you?
5  Ms. Robinson worked for Dynamic; right?
6    A.  Yes.
7    Q.  So were you assigned by Dynamic?
8    A.  Yes.
9        (Defendants' Exhibit 6 was marked
10         for identification.)
11    Q.  I'll show you what's marked as
12  Defendants' Exhibit Number 6.
13        So I'm showing you what's marked as
14  Defendants' Exhibit Number 6.  I represent that
15  this is a diagram of the first floor of the
16  Administration Building.  And you see in the
17  lower left-hand corner, near the lower left-hand
18  corner, it says "mail room"?
19    A.  Yes.
20    Q.  Is that, in your recollection, is that
21  where the mail room was in this building, if you
22  remember?
23    A.  I don't remember.
24    Q.  When did you first learn that your
25  assignment to the mail room position at Hyundai

Page 42

1  Motor Manufacturing, Alabama would end?
2    A.  August 1st.
3    Q.  And how did you learn that?
4    A.  Ray Cureton.
5    Q.  And what specifically did he tell you?
6    A.  "They don't want you out there."
7    Q.  Did he say who "they" were?
8    A.  Gloria Robinson.
9    Q.  Anyone else?
10    A.  He just said her by name.
11    Q.  And did he say why she didn't want you
12  out there?
13    A.  Because of my hair and something else.
14    Q.  Did he say what something else was?
15    A.  He said he didn't want to get into it.
16    Q.  And that's the extent of what he said
17  about the reason?
18    A.  Yes.
19    Q.  Did anyone else give you a reason why
20  your assignment was ending?
21    A.  No.
22    Q.  Did you speak to anyone else at Dynamic
23  about that?
24    A.  No.
25    Q.  How about at HEA?

Page 43

1    A.  No.
2    Q.  How about HMMA?
3    A.  No.
4    Q.  Now, Dynamic told you they would try to
5  send you out to some other jobs; is that
6  correct?
7    A.  Yes.
8    Q.  And you knew when you went to work for
9  Dynamic, they can end one assignment, send you
10  on a different one?
11    A.  Yes.
12    Q.  Did Dynamic ever send you on any other
13  jobs?
14    A.  No.
15    Q.  Did you ever talk to anybody about
16  that?
17    A.  Yes.
18    Q.  Who did you speak to?
19    A.  Ray Cureton and Nicole.
20    Q.  And, again, Nicole, you said what was
21  her job?  Office manager?
22    A.  She's the office manager.
23    Q.  And what did they tell you?
24    A.  They would let me know when something
25  was available.

Page 44

1    Q.  Did anyone ever get back in touch with
2  you?
3    A.  No.
4    Q.  Do you know what came of your complaint
5  that you provided to Mr. Cureton?
6    A.  No.
7    Q.  Now, you applied for unemployment
8  compensation after this, didn't you?
9    A.  Yes.
10    Q.  And you identified Dynamic as your
11  employer to the State of Alabama?
12    A.  Yes.
13    Q.  And the outcome of that filing for
14  unemployment compensation is you were denied?
15    A.  I was approved.  They contested it.
16    Q.  And then it was denied?
17    A.  Yes.
18        (Defendants' Exhibit 7 was marked
19         for identification.)
20    Q.  I'm going to show you what's marked as
21  Defendants' Exhibit Number 7, Bates number Key
22  129 and 130.  So this was produced to me by your
23  counsel.  Do you recognize Defendants' Exhibit
24  Number 7?
25    A.  Yes.



DAVITA M. KEY                                                           June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                           45–48

Page 45

1    Q.  And what is it?
2    A.  Yes.  It's the hearing for my
3  unemployment.
4    Q.  It says "Appearances at the hearing:
5  claimant and employer representative."  You were
6  the claimant.  Who was the employer
7  representative?
8    A.  Ray Cureton.
9    Q.  And up above it says "Employer."  It
10  identifies "Dynamic Security, Inc."?
11    A.  Yes.
12    Q.  So you were denied -- the outcome of
13  this is you were denied unemployment
14  compensation?
15    A.  Yes.
16    Q.  Did you appeal at this stage?
17    A.  This is not --
18    MR. REDMOND:  David, I've got a copy of
19  that if you want it.  If you're fine with what
20  you've got, that's fine.
21    MR. MIDDLEBROOKS:  We can look at it
22  during a break and substitute.
23    A.  Is there a second paper?  Because this
24  doesn't say I was -- oh, yeah, I see.
25    Q.  Excuse me?  Doesn't say what?

Page 46

1    A.  I was -- I'm sorry.
2    Q.  Well, it says "appeal rights" down at
3  the bottom.
4    A.  Yeah, I'm -- yeah.
5    Q.  I mean, this was the paper I got --
6    A.  So, yes, this said that I was denied.
7  Yes.
8    Q.  This was the paper that your counsel
9  had given me, so that's why I was using it.
10    A.  Yes.
11    Q.  So was LaTonya the only other person
12  working in the mail room when you were there?
13    A.  Yes.
14    Q.  When you were working for Dynamic at
15  the HMMA facility, did you ever see any policies
16  concerning pregnancy?  Anybody's policies?  Any
17  company's policies?
18    A.  Dynamic Security about they don't
19  discriminate.
20    Q.  And so the only policy you saw was
21  Dynamic Security's?
22    A.  Yes.
23    Q.  And where did you see that policy?
24    A.  In the employee handbook they -- well,
25  the -- it's not a handbook but the papers they

Page 47

1  give you that go with your -- that you have to
2  sign to say that you're going to adhere to the
3  rules for the position.
4    Q.  You recall receiving a handbook from
5  Dynamic?
6    A.  Yes.
7    Q.  Do you recall getting a handbook from
8  HEA?
9    A.  No.
10    Q.  Do you recall getting a handbook from
11  HMMA, Hyundai Motor Manufacturing, Alabama?
12    A.  A safety handbook.
13    Q.  So the only handbook you got from
14  Hyundai Motor Manufacturing, Alabama was a
15  safety handbook?
16    A.  Yes.
17    Q.  And who gave that to you?
18    A.  I got it when I went to my safety
19  training class.
20    Q.  To your knowledge, did everyone who
21  go -- went to that class get a copy?
22    A.  Yes.
23    Q.  And how many people were in that class?
24    A.  I don't know.
25    Q.  Do you know who their employers were?

Page 48

1    A.  No.
2    Q.  Did you speak to anybody at that class?
3    A.  I said good morning.
4    Q.  That's it?
5    A.  Yes.
6    Q.  So to your knowledge, what persons at
7  Dynamic knew you were pregnant?
8    A.  Gloria Robinson, LaTonya -- or Tonya --
9  and Maurice Chambliss.
10    Q.  To your knowledge, what persons at HEA
11  knew you were pregnant?
12    A.  I don't know who worked for HEA.
13    Q.  But you said Ms. Roberts -- excuse
14  me -- Ms. Williams --
15    A.  I don't know who she worked for.
16    Q.  Okay.  Do you have any knowledge of
17  anybody who worked for Hyundai Motor
18  Manufacturing, Alabama knowing you were
19  pregnant?
20    A.  I don't know who works for them.
21    Q.  You've told me all the people you've
22  talked to about your pregnancy?
23    A.  Yes.
24    Q.  While you were out at the Hyundai Motor
25  Manufacturing, Alabama facility, what grooming



Page 49

1  policies did you ever see regarding your
2  employment, employment by Dynamic or your
3  assignment at the facility out here?
4      A.  Dynamic policy just was to be neatly --
5  your appearance had to be neat.
6      Q.  And tell me the circumstances of you
7  seeing that policy.
8      A.  It was in the handbook they provided
9  me.
10     Q.  Did you ever see any other policy of
11  Dynamic about grooming?
12     A.  No.
13     Q.  Did you ever see any policies about
14  grooming from HEA ENG, America?
15     A.  Who worked for HEA?
16     Q.  Well, I can tell you one person that
17  did, but --
18     A.  Okay.
19     Q.  -- I'm not testifying.  So I don't know
20  if I --
21         MS. PALMER:  Just answer the questions
22  as best you can.
23     A.  Okay.  Can you repeat the question?
24         MR. MIDDLEBROOKS:  What was the
25  question?

Page 50

1         (Record read as follows:)
2         "Question:  Did you ever see any
3  policies about grooming from HEA, ENG America?"
4      Q.  (BY MR. MIDDLEBROOKS:)  You answered.
5         Let me ask you.  Did you ever see any
6  grooming policies that were provided to you by
7  Cassandra Williams?
8      A.  Yes.
9      Q.  And did you get a copy of that?
10     A.  No.
11     Q.  What were the circumstances of you
12  seeing that?
13     A.  I asked to see it.
14     Q.  And did she show it to you?
15     A.  Reluctantly.
16     Q.  Well --
17     A.  Yeah, she showed it to me.
18     Q.  Okay.  And what do you recall seeing
19  when you looked at it?
20     A.  It was a document on her computer in
21  Microsoft Word that said uniformed officers,
22  females.
23     Q.  And what do you recall it said?
24     A.  Females could not wear dreadlocks.
25     Q.  And it was on her computer?

Page 51

1      A.  Yes.
2      Q.  It was never printed out?
3      A.  No.
4         (Defendants' Exhibit 8 was marked
5         for identification.)
6      Q.  Exhibit 8.  This document says
7  "Appearance Standards for Security Personnel,"
8  three pages long and Bates numbers HEA 1, 2, and
9  3.
10        Have you ever seen this document
11  before?
12     A.  This is what was on the computer, the
13  first page.
14     Q.  Just the first page?
15     A.  That's the only page I saw.
16     Q.  Well, it says, okay, under "Female
17  Officers, Hair," drop way down to the end of
18  that section, "Braids are permitted, but must be
19  well groomed and kept.  Dreads or dreadlocks
20  hairstyle are prohibited."  That's what you saw?
21     A.  Yes.
22     Q.  She didn't show you the second page?
23     A.  No.
24     Q.  Look at the second page.  Do you see
25  where it says "Male Officers"?  "Male Uniform

Page 52

1  Officers"?
2      A.  Yes.
3      Q.  Drop down about halfway in that
4  section, you'll see "Braids and/or dreads not
5  permitted."  Did I read that correctly?
6      A.  Yes.
7      Q.  So for male officers, according to this
8  policy, dreadlocks were not permitted for them
9  either?
10     A.  Yes, according to this policy.
11        (Defendants' Exhibit 9 was marked
12        for identification.)
13     Q.  I'll show you what we're going to mark
14  as Defendants' Exhibit Number 9.  And it's
15  Bates-numbered HMMA 0003.
16        (Pause.)
17     Q.  I show you what's been marked as
18  Defendants' Exhibit Number 9, Bates-numbered,
19  again, HMMA 3.  And it's entitled "Hyundai Motor
20  Manufacturing, Alabama PPE & Dress Code Matrix."
21        Ms. Key, have you ever seen Defendants'
22  Exhibit 9 before?
23     A.  I don't know.  I don't know if I've
24  seen this.  I don't...
25        I don't -- I don't know.  I don't



Page 53

1   remember it.
2      Q.   You don't remember one way or the
3   other?
4      A.   Yeah, I don't remember.
5      Q.   Well, it says, the application, if you
6   look at the top, "Requirements for Entering the
7   Work Areas," and identifies "PPE required in
8   production areas."  You didn't work in the
9   production area, did you?
10     A.   No.
11     Q.   Okay.  It doesn't say anything about
12  folks who were in security, does it?
13     A.   No.
14     Q.   But down under "Personal Hygiene" at
15  the bottom, it does have one entry there about
16  hair.  The only thing it says, "Hair longer than
17  collar length -- tied back or tucked in hat."
18  That's all it says, isn't it?
19     A.   Yes.
20     Q.   There's no mention one way or the other
21  about dreadlocks, is there?
22     A.   Not on this paper, no.
23         (Defendants' Exhibit 10 was marked
24           for identification.)
25     Q.   I show you what's marked as Defendants'

Page 54

1   Exhibit Number 10.  Ms. Key, this is
2   Bates-numbered Dynamic-Key D41 through -- on the
3   first page, which is an acknowledgment.  And
4   then on the next page, it's also Dynamic-Key
5   Bates number 42.  Then the third page starts
6   with Bates numbers Key 332 through 382.
7         Now, this appears to be an
8   acknowledgment for your receipt of Dynamic
9   Security's employee handbook; is that correct?
10     A.   Yes.
11     Q.   That's your signature at the bottom?
12     A.   Yes.
13     Q.   And did you read it before you signed
14  it, the acknowledgment?
15     A.   Yes.
16     Q.   And the second page, which is
17  Dynamic-Key Bates number 42, that's your
18  signature as well?
19     A.   Yes.
20     Q.   And after that is the Dynamic handbook
21  you were provided by Dynamic?
22     A.   Yes.
23     Q.   Did you read their handbook?
24     A.   Yes.
25     Q.   So look at page Key 334.  Are you

Page 55

1   there?
2         If you would, read the last paragraph
3   out loud.
4      A.   "Your employment can be terminated or
5   suspended without cause and without notice at
6   any time at the option of Dynamic
7   Security, Inc., referred to in the handbook as
8   Dynamic Security."
9      Q.   Thank you.
10         Look, if you would, at Key number 373.
11  And it's the policy, "Waiver of Trial by Jury
12  Policy."  Did you read that policy?
13     A.   Yes.
14     Q.   What was your understanding as to what
15  it meant?
16     A.   Waiver of trial by jury.
17         May I say something?
18     Q.   Yes.
19     A.   For the last question you asked.
20     Q.   Yes.
21     A.   With the waiver of trial by jury, it
22  also says "whenever is possible, in a fair and
23  expeditious manner reflecting the interest of
24  the concerned parties."
25     Q.   Okay.

Page 56

1         (Defendants' Exhibit 11 was marked
2           for identification.)
3      Q.   I show you what's marked as Defendants'
4   Exhibit Number 11.  This is a one-page -- more
5   than one page.  It's actually two pages.  And on
6   the front it says "Hyundai Engineering
7   America, Inc., Employee Handbook."  And then the
8   next page is a Table of Contents.
9         Do you recall receiving that?  Or is
10  that the handbook you received from HEA?
11     A.   No.
12     Q.   You never saw this before?
13     A.   No.
14         (Defendants' Exhibit 12 was marked
15           for identification.)
16     Q.   I show you what's marked as Defendants'
17  Exhibit Number 12.  Ms. Key, do you recognize
18  this document entitled "Hyundai Motor
19  Manufacturing, Alabama Safety, Security and Fire
20  Protection Handbook"?
21     A.   Yes.
22     Q.   Is that the document you received when
23  you went to safety training?
24     A.   Yes.
25     Q.   It's Bates-numbered Key 277 through



Page 57

1  Key 331.  And this is the only document you were
2  given by Hyundai?
3     A.  Yes.
4     Q.  Look, if you would, to page Key 279.
5  Look at the bottom right-hand corner, if you
6  would.
7     A.  Uh-huh.
8     Q.  Would you read the first two sentences
9  of that section out loud.
10    A.  That starts with "welcome"?
11    Q.  Yeah.
12    A.  "Welcome to Hyundai Motor
13 Manufacturing, Alabama, LLC.  Our goal is to
14 provide a safe and hazard-free workplace for all
15 visitors, contractors, team members, and other
16 individuals."
17    Q.  "Here at Hyundai."  Next page.  End of
18 the sentence.
19    A.  Oh.  "Here at Hyundai."
20    Q.  If you would, under HMMA safety policy,
21 read the first sentence of that policy.
22    A.  Starting with "as"?
23    Q.  Yes.
24    A.  "As a safety-focused automotive
25 manufacturer, one of our core values at Hyundai

Page 58

1  Motor Manufacturing, Alabama, LLC (HMMA), is
2  providing a safe and healthy environment for
3  team members, contractors, and visitors."
4     Q.  Then if you look at the -- on the same
5  page but the second column, column over to the
6  right, in that first paragraph up there, it says
7  "all contractors."  Do you see that?
8     A.  Yes.
9     Q.  Would you read that sentence.
10    A.  "All contractors must attend safety
11 orientation before starting work on the site.
12 Badges will" -- oh, you said just the first
13 sentence?
14    Q.  Yeah, that's --
15    A.  Okay.
16    Q.  So you never saw any other type of
17 handbook for HMMA, did you?
18    A.  No.
19    Q.  Since August 1 or 2 of 2017, have you
20 had any contact with any present or former
21 employee of Dynamic Security?
22    A.  I spoke with Ray Cureton and Nicole.
23    Q.  Have you had any contact since August 1
24 or 2 of 2017 with anybody who worked for HEA?
25    A.  I don't know who worked for them.

Page 59

1     Q.  To your knowledge, have you had any
2  contact with anybody who worked for HMMA after
3  August 1 or 2 of 2017?
4     A.  I don't know who worked for them.
5     Q.  When you filed or provided Mr. Cureton
6  with the written complaint, you included in
7  there a claim you were discriminated against?
8     A.  Yes.
9     Q.  Do you know of anybody who was employed
10 by HMMA -- Hyundai Motor Manufacturing,
11 Alabama -- who knew you claimed to be
12 discriminated against back at that time?
13    A.  I'm sorry.  Can you repeat?  You
14 said --
15    MR. MIDDLEBROOKS:  Could you read that
16 back.
17       (Record read as follows:)
18       "Question:  Do you know of anybody
19       who was employed by HMMA who knew
20       you claimed to be discriminated
21       against back at that time?"
22    A.  I don't know.
23    Q.  Did anybody ever explain to you the
24 relationship between Hyundai Motor
25 Manufacturing, Alabama and HEA?

Page 60

1     A.  Gloria Robinson just said that like
2  we -- I would work out here at the site.  Like
3  this would be my home site.
4     Q.  Okay.  Ms. Robinson worked for Dynamic
5  Security; correct?
6     A.  Yes.
7     Q.  Do you know -- did anybody ever explain
8  to you the relationship between Hyundai Motor
9  Manufacturing, Alabama and HEA ENG?
10    A.  No.
11    Q.  Are you aware of Dynamic Security
12 providing manpower and staffing for companies
13 other than out here?
14    A.  Yes.
15    Q.  How do you know that?
16    A.  Because they told me they could place
17 me another place.
18    Q.  Did you ever ask Dynamic to place you
19 at some other assignment?
20    A.  I was told that they would place me
21 somewhere else.  I inquired after they said
22 that.  So yes.
23       (Defendants' Exhibit 13 was marked
24        for identification.)
25    Q.  I show you what's been marked as



Page 61

1  Defendants' Exhibit Number 13.  And it's the
2  intake questionnaire.  It says "U.S. Equal
3  Employment Opportunity Commission Intake
4  Questionnaire."  Do you recognize this document?
5     A.  Yes.
6     Q.  And to your understanding, what is it?
7     A.  The U.S. Equal Employment Opportunity
8  Commission Intake Questionnaire.
9     Q.  And where did you get that?
10    A.  I can't hear -- I don't -- I didn't
11 hear what you said.
12    Q.  I said where did you get that?
13    A.  At the EEOC office.
14    Q.  Office in what city?  Birmingham?
15    A.  Yes.
16    Q.  Had you ever filed an EEOC charge
17 before?
18    A.  No.
19    Q.  Have you filed one since those you
20 filed against HMMA and Dynamic?
21    A.  No.
22    Q.  You never filed a charge against HEA,
23 did you?
24       MS. PALMER:  Object to form.
25       You can answer.  I'm sorry.

Page 62

1     A.  No.
2     Q.  (BY MR. MIDDLEBROOKS:)  All right.
3  Let's look down this document.  First page is
4  Bates Key 49.  Last page is Bates Key 56.  And
5  under item 2, midway down the page, "I believe I
6  was discriminated against by the following
7  organizations:  (Check those that apply)."  And
8  you checked "Employer" and "Other."  And there
9  you write "Ms. Gloria Robinson and Ms. Cassandra
10 Williams."  Do you see that?
11    A.  Yes.
12    Q.  And why did you choose to name those
13 two people?
14    A.  Because those were the two people who I
15 felt discriminated against me.
16    Q.  Anyone else?
17    A.  Their employers.
18    Q.  Then it says "Organization Name:"  You
19 just have "Hyundai."  Do you see that?
20    A.  Yes.
21    Q.  You realize that there are numerous
22 organizations that have the name Hyundai in it?
23    A.  Yes, it's possible.  I specified by
24 putting the address.
25    Q.  Okay.  It says "Name and title of

Page 63

1  immediate supervisor" down toward the bottom,
2  and that's Maurice -- you identified "Maurice
3  Chambliss"?
4     A.  Yes.
5     Q.  Then go to the next page.  "Name and
6  titles of persons responsible," midway down the
7  page under A.  Do you see that?
8     A.  You say under A, the letter A?
9     Q.  Yeah.
10    A.  Yes.  Okay.  Yes.
11    Q.  You say "Ms. Cassandra Williams" --
12 that's where I see "AMCO."  You see that?
13    A.  Yes, I see that.
14    Q.  And do you remember why you put AMCO?
15    A.  I don't remember why.
16    Q.  And "Ms. Gloria Robinson."  So you've
17 already answered those are the two people you
18 consider responsible?
19    A.  And their employers.
20    Q.  It says, "What reasons were given to
21 you for the acts you consider discriminatory"
22 and "By whom?"  Do you see Number 7?
23    A.  Yes.
24    Q.  It says, "No reasons were given except
25 I was told the Koreans who own the company

Page 64

1  didn't want BLKS" -- Blacks?  Does that stand
2  for blacks?
3     A.  Yes.
4     Q.  -- "wearing their hair a certain way."
5  Who told you that?
6     A.  Gloria Robinson.
7     Q.  Did anybody else tell you that?
8     A.  No.
9     Q.  Did she say where she knew that from?
10    A.  She said they send memos.
11    Q.  Did you see any memos?
12    A.  I can only go by what she told me.
13    Q.  You haven't seen any memos?
14    A.  No.
15    Q.  And she said "They send memos."  Did
16 she say who "they" is?
17    A.  You'd have to ask her that.
18    Q.  Okay.  I mean, when you say Koreans --
19    A.  She said Koreans.  So you would have --
20    Q.  I mean, Koreans are like any
21 nationality.  There's any number of Koreans, all
22 types of Koreans.
23    A.  She said Koreans who owned the company.
24    Q.  Which company?
25    A.  You would have to ask her that



Page 65

1  question.
2      Q.  Okay.  And on page 52, item 16, where
3  you reference filing "a complaint with Dynamic
4  Security, the agency I was hired through with
5  Dr. Ray Cureton on August 1, 2017," that's the
6  complaint you've already told me about; right?
7      A.  Yes.
8      Q.  And then you signed this at the
9  bottom -- toward the bottom of that page on
10  August 2nd, 2017?
11      A.  Yes.
12      Q.  Let's go to Key Number 53.  And that's
13  a typed narrative, single space, that goes from
14  53 to 56.  Is that a document you provided EEOC?
15      A.  You say is the one that was provided to
16  them?
17      Q.  Is that the one you provided them?
18      A.  Yes.
19      Q.  Are these your words?
20      A.  Yes.
21      Q.  Did anybody have input into this
22  document?
23      A.  No.
24      Q.  Did you type it yourself?
25      A.  Yes.

Page 66

1      Q.  Is everything in here, to your
2  knowledge, truthful and accurate?
3      A.  Yes.
4      Q.  If you were writing this today, would
5  you change anything in any way?  You can
6  certainly take time to read it if you want to.
7          (Pause.)
8      Q.  Have you finished rereading the letter?
9      A.  Yes.
10      Q.  Is everything, sitting here today, you
11  consider to be truthful and accurate?
12      A.  Yes.
13      Q.  Is there anything you would change?
14      A.  No.
15      Q.  Look, if you would, on page Key 55.
16  Midway down the page.  This is going back to
17  Ms. Robinson talking about Koreans sending
18  memos, okay?  Did you find that?
19      A.  Yes, I see it.
20      Q.  It says "Ms. Robinson went on to inform
21  me that Koreans were a different breed of
22  animals"?  Is that what she said?  "A different
23  breed of animals"?
24      A.  Yes.
25      Q.  What's your understanding as to what

Page 67

1  she meant by that?
2      A.  You would have to ask her what she
3  meant.
4      Q.  "And they send little memos."  Did she
5  explain what she meant by little memos?
6      A.  You will have to ask her what she meant
7  by that.
8      Q.  But you never saw any such memos like
9  that?
10      A.  No.
11          (Defendants' Exhibit 14 was marked
12          for identification.)
13      Q.  I'm going to show you what's marked as
14  Defendants' Exhibit Number 14.  And this is the
15  EEOC charge, Ms. Key, that you filed against
16  Dynamic Security, Bates number Dynamic-Key 46
17  and 47.
18          Is this indeed the charge you filed
19  against Dynamic Security?
20      A.  Yes.  That's what it says, yes.
21      Q.  And looking at this today, is this a
22  truthful and accurate statement?
23      A.  Yes.
24      Q.  Okay.  So it says on here, on the
25  right-hand side, midway down, "Dates

Page 68

1  discrimination took place, earliest and latest."
2  So that's an accurate statement of the dates?
3      A.  July 31st and August 1st.
4      Q.  That should be July 31st?  Okay.  And
5  August 1st.
6          In the second paragraph in the
7  narrative, it says "Later that morning, I was
8  sent home partially because of my hairstyle
9  (dreadlocks) of which I was questioned and
10  criticized by Robinson and Cassandra Williams
11  but mainly because I informed the employer that
12  I was pregnant."
13          So you thought it was more about your
14  pregnancy?
15      A.  I think it was both.
16      Q.  But it says "mainly."  Why do you say
17  that?
18      A.  I think it was both.
19      Q.  But why do you say "mainly"?
20      A.  I think they both played a part in it.
21      Q.  I understand that.  But apparently one
22  of them you felt was more main than the other.
23  I'm just asking why.
24      A.  I just think they both played a part.
25      Q.  So you have no further explanation



Page 69

1  about the use of the word "mainly"?
2  A.  No.
3  Q.  Dr. Cureton, what type of doctor is he,
4  do you know?
5  A.  No.
6  Q.  All right.  The date you signed this
7  charge was August 3, 2017?
8  A.  That's what it says, yes.
9  Q.  Is that accurate?
10  A.  Yes.
11     (Defendants' Exhibit 15 was marked
12       for identification.)
13  Q.  I show you what we marked as
14  Defendants' Exhibit Number 15 entitled "Charge
15  of Discrimination" Bates number Key 47, charge
16  of discrimination against Hyundai Motor
17  Manufacturing, Alabama.  Do you recognize this
18  charge?
19  A.  Yes.
20  Q.  Now, here it shows dates the
21  discrimination took place, it shows August 1 is
22  the earliest, 2017, and the latest was August 1,
23  2017.  So that's correct?
24  A.  It should say July 31st to August 1st.
25  Q.  What discrimination took place on

Page 70

1  July 31st?
2  A.  They sent me home.
3  Q.  On July --
4  A.  31st.
5  Q.  -- 31st.
6     What's the date that you signed this
7  charge?
8  A.  It says October 16, 2018.
9  Q.  Well, do you agree that's the date you
10  signed it?
11  A.  Yes, because I -- yes, I signed it that
12  date.
13  Q.  Why was this charge signed or filed
14  with the EEOC some 14 or so months after you
15  filed the one with the EEOC about Dynamic?
16  A.  The -- this is the investigator sent me
17  this document that was assigned to my case.
18  Q.  Why is it being filed now?
19  A.  You would have to ask the investigator.
20  Q.  What's her name?  Alicia Martin-Schutz?
21  A.  Yes.
22  Q.  So I'd need to ask her?  Because you
23  don't know?
24  A.  She was assigned my case.
25  Q.  I know.  But you don't know why she

Page 71

1  waited 14 months to get you to do this charge?
2  A.  I filed the charge in August of 2017.
3  And she was assigned my case.  So you would have
4  to ask her why she --
5  Q.  Waited 14 months?
6  A.  -- did it.  Yes.
7  Q.  Okay.  She never gave you an
8  explanation why?
9  A.  She was assigned my case at that time.
10  Q.  Was she somebody different than you had
11  originally?
12  A.  Yes.
13  Q.  Who had it originally?
14  A.  Her name was Gloria.  I don't remember
15  her last name.
16  Q.  Okay.
17  A.  Or Glenda.
18  Q.  Look in the narrative midway down.  It
19  says, "Additionally, I received a phone call
20  inquiring as to the due date for my pregnancy,
21  as I had informed both my employers of my
22  pregnancy that morning."  Do you see that?
23  A.  Yes.
24  Q.  That morning, you had told Ms. Robinson
25  and Maurice Chambliss?

Page 72

1  A.  Yes.
2  Q.  Did you tell anybody else that morning?
3  A.  I told -- and Tonya.
4  Q.  Okay.
5     Excuse me?  Who is that last name?
6  A.  Tonya.
7  Q.  Oh, Tonya.
8     Now, who made this phone call to you
9  that day?
10  A.  Gloria Robinson.
11  Q.  So she already knew you were pregnant,
12  but she wanted to know the due date?
13  A.  Yes.
14     MR. MIDDLEBROOKS:  We've been doing
15  this about an hour and a half.  You want to take
16  a break?
17     THE WITNESS:  I'm fine.
18     MR. MIDDLEBROOKS:  Okay.
19     Everybody else okay?
20        (Defendants' Exhibit 16 was marked
21          for identification.)
22  Q.  I show you what's marked as Defendants'
23  Exhibit 16.  These are your answers to
24  interrogatories.  Attached to it also is your
25  request for production.



DAVITA M. KEY                                          June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          73–76

Page 73
1    MS. PALMER:  David, there were several
2  like amendments and supplementations that went
3  back and forth.  Do you know --
4    MR. MIDDLEBROOKS:  I'm aware of that.
5    MS. PALMER:  Okay.
6    Q.  (BY MR. MIDDLEBROOKS:)  Do you
7  recognize these interrogatory responses?
8    A.  Yes.
9    Q.  And the request for production
10  responses?
11    A.  Yes.
12    Q.  Look, if you would, on the
13  interrogatories page 17 and verify for me if
14  that's your signature.
15    A.  Yes.
16    Q.  And you signed it under oath; you
17  understood that?
18    A.  Yes.
19    Q.  And so these answers -- at that time.
20  I understand you did supplement them -- are
21  truthful and accurate?
22    A.  Yes.
23    Q.  Look, if you would, on page 5.  Are you
24  there?
25    A.  Uh-huh.

Page 74
1    Q.  Go down five sentences.  It says
2  "without waiving this objection, plaintiff
3  states she interviewed at the Hyundai plant with
4  Gloria Robinson, Lieutenant Maurice Chambliss,
5  and Cassandra Williams on July 19th, 2017."  Do
6  you see that?
7    A.  Uh-huh.
8    Q.  Is that yes?
9    A.  Oh, I'm sorry.
10    Q.  Yeah, that's all right.
11    A.  Yes.
12    Q.  Actually, we all do it.
13    A.  Yes, I see that.
14    Q.  Now, maybe my recollection is wrong.
15  Earlier you said you interviewed with Gloria
16  Robinson and Lieutenant Maurice Chambliss.  But
17  on your initial interview, did you interview
18  with Cassandra Williams also?
19    A.  No.  She -- Gloria Robinson asked her a
20  question pertaining to my interview.
21    Q.  Okay.  So that was the extent of
22  Cassandra Williams's involvement in the
23  interview?
24    A.  Yes.
25    Q.  Okay.

Page 75
1    Look at Interrogatory Number 11.
2  Midway down, your answer to Number 11 says
3  "Plaintiff states Gloria Robinson, Cassandra,
4  Williams, Ray Cureton, LaTonya Howell, Maurice
5  Chambliss, and Nicole Scavella were all involved
6  in the termination decision and subject to the
7  control and the policy of Hyundai."
8    Was anybody else involved in that
9  termination decision other than those you named
10  there?
11    A.  I don't -- I don't know.
12    Q.  You don't know of anybody you could
13  name?
14    A.  I don't know if anybody else was
15  involved.
16    Q.  Now, you say "subject to control or
17  policy of HMMA."  Is that your words or somebody
18  else's?
19    A.  I worked with my attorney.
20    Q.  Anyone else?
21    A.  No.
22    Q.  So that language is not solely your
23  language?
24    A.  I mean, I worked with my attorneys to
25  prepare it, so.

Page 76
1    Q.  You had input?
2    A.  Of my attorneys.
3    Q.  Okay.  So what controls was HMMA
4  exerting that you know of?
5    A.  You said what?
6    Q.  It says "subject to control or policy
7  of HMMA."  I want to know what controls HMMA
8  were exerting.
9    A.  Which question are you -- I mean, which
10  number are you at?
11    Q.  Eleven.
12    A.  Carry out?
13    Q.  Excuse me?
14    A.  I would say to carry out the policies.
15    Q.  Okay.  What policy were they carrying
16  out?
17    A.  Of HMMA.
18    Q.  But what policy of HMMA?
19    A.  Concerning my appearance.
20    Q.  Your hairstyle?
21    A.  Yes.
22    Q.  Is that the only policy?
23    A.  I don't know.
24    Q.  You don't know of any other policy you
25  referred to?



Page 77

1    A.  I don't know if that was the only
2  policy.
3    Q.  But you don't know of any other policy
4  you're referring to?
5    A.  I don't know if that was the only
6  policy.
7    Q.  I understand that.
8    A.  That's my answer.
9    Q.  All right.
10   A.  Because I don't know of any other
11  policy.
12   Q.  Okay.  Now, I think I asked about all
13  these others, but Ray Cureton, what race is he?
14   A.  White.
15   Q.  So of those listed, he's the only white
16  person?
17   A.  Yes.
18   Q.  Look back at Defendants' Exhibit
19  Number 1, the complaint, if you would.  And look
20  at paragraph 82, if you would.  Are you with me
21  on that?
22   A.  Yes.
23   Q.  All right.  And we've already talked
24  about these Koreans and Ms. Robinson saying they
25  were a different breed of animals and they send

Page 78

1  little memos.  But one thing differs from your
2  statement you gave the EEOC.  Here it says
3  "Robinson told Key the Koreans (HMMA and HEA)."
4      Now, you didn't put that in your
5  narrative that was attached to your EEOC charge.
6  Why do you have it here?
7    A.  To identify the company they worked
8  for.
9    Q.  Okay.  So that's who you're referring
10  to or she's referring to, to your understanding,
11  when she talks about the Koreans?
12   A.  You would have to ask her, but --
13   Q.  So this is an assumption, the
14  parenthetical?
15   A.  I was here at the Hyundai site, and I
16  don't think she would say Koreans that's in
17  South Korea or North Korea.  So I would think --
18   Q.  Well, you say, "I don't think."  Do you
19  know?
20   A.  Yes.  That's who she was referring to.
21   Q.  HMMA and HEA?
22   A.  Yes.
23   Q.  How do you know that?
24   A.  Because she said that she even had to
25  have her supervisor talk to the Koreans here

Page 79

1  because they wouldn't talk to her directly
2  because she was a female.
3    Q.  And did she say which Koreans those
4  were?
5    A.  She did not identify them by name.
6    Q.  Just Koreans?
7    A.  Yes.
8    Q.  Were they also a different breed of
9  animal?
10   A.  You'd have to ask her.
11   Q.  Look at paragraph 92.
12   A.  Which --
13   Q.  In your complaint.
14   A.  The first exhibit?
15   Q.  Yeah.  Are you with me?
16   A.  Yes.
17   Q.  All right.  Paragraph 92 says "Key
18  received a paycheck from Dynamic for her two
19  partial days of work listing HMMA under the
20  'Customer ID.'"  And they do list -- I think it
21  does indeed list customer ID as HMMA.
22      What's the significance of that?
23   A.  I don't know.
24   Q.  In 94, paragraph 94 says, "HMMA
25  exercised control over Dynamic staff at the

Page 80

1  Hyundai plant including dress code, work hours,
2  hiring/firing from that location, safety
3  training, issuance of Hyundai badges."
4      Now, dress code, we haven't seen today
5  a Hyundai dress code for security personnel,
6  have we?
7    A.  You say have we seen the --
8    Q.  Yeah, have we seen one today?
9    A.  For Hyundai?
10   Q.  For Hyundai --
11   A.  No.
12   Q.  -- Motor Manufacturing.  No.  All
13  right.
14      Work hours, Dynamic set your work
15  hours; right?  Told you when to be there, when
16  to go home?
17      MS. PALMER:  Object to form.
18      You can answer.
19   A.  According to the hours for the Hyundai
20  site, correct.
21   Q.  (BY MR. MIDDLEBROOKS:)  Well, but who
22  told you what hours to report to work and what
23  time you could go home?
24   A.  Dynamic did, according to the hours set
25  for the Hyundai site.



Page 81

1    Q.  How do you know that latter part?
2    A.  Because they couldn't tell me to come
3  to work from midnight to 6:00 a.m. if the mail
4  room at this site was not open.  So Hyundai says
5  these are the hours, and Dynamic Security places
6  people there for those hours.
7    Q.  How do you know Hyundai said these are
8  the hours?
9    A.  Because I was told by Gloria Robinson.
10   Q.  By Gloria Robinson?
11   A.  Yes.
12   Q.  Okay.  And who hired you?
13   A.  Gloria Robinson offered me the
14  employment.
15   Q.  And who told you not to come back to
16  that assignment?
17   A.  Ray Cureton told me they did not want
18  me back at the assignment.
19   Q.  We talked about safety training.
20       Where did you get your Hyundai badge,
21  what you described as the Hyundai badge?
22   A.  I got it here.
23   Q.  In the Security Building?
24   A.  At the security office.
25   Q.  Now, why do you say Hyundai controlled

Page 82

1  the issuance of those badges?
2    A.  Because they had Hyundai on the badge.
3    Q.  Okay.  Have you seen badges of any
4  other contractors out here?
5    A.  No.
6        (Defendants' Exhibit 17 was marked
7          for identification.)
8  Q.  I'll show you what we'll mark as
9  Defendants' Exhibit Number 17.  And this is
10  Dynamic-Key 58 through Dynamic-Key 63.
11  Defendants' Exhibit 17.
12       Do you recognize this handwriting on
13  this exhibit?
14   A.  Yes.
15   Q.  Is that your handwriting?
16   A.  Yes.
17   Q.  Did anyone help you write that in any
18  way?
19   A.  No.
20   Q.  Why were you writing this?
21   A.  As a response to the complaint I wrote.
22   Q.  Response to what?
23   A.  The complaint that I wrote with Ray
24  Cureton.
25   Q.  Oh, okay.

Page 83

1        Did you give this to Ray Cureton?
2    A.  Yes.
3    Q.  Did you give it to anybody else?
4  Including your attorneys?
5    A.  Yes, my attorneys.
6    Q.  Okay.
7        MR. REDMOND:  Is that dated August 8?
8        MR. MIDDLEBROOKS:  Yes.  I'm sorry.
9  August 8.
10       Can we take a break?
11       MS. PALMER:  Yeah, that's fine.
12       (Break.)
13   Q.  (MR. MIDDLEBROOKS:)  Well, Ms. Key, I
14  have questioned you for about two hours, and I
15  appreciate your answering my questions.  Are
16  there any answers you want to revisit or change
17  in any way?
18   A.  Just with Exhibit 17.
19   Q.  Okay.  Those are the handwritten notes?
20   A.  Yes.
21       I know before I said that I gave these
22  to my attorneys.  But when I signed -- I mean,
23  when I filled this out and I asked for a copy of
24  it, Ray Cureton said I could not have a copy.
25  So --

Page 84

1    Q.  Oh, Ray Cureton wouldn't give you a
2  copy?
3    A.  No.  I just want to -- so I did not
4  give a copy of this to my attorneys.  I just
5  want to clarify that.
6    Q.  Yeah.  That's a Dynamic -- yeah,
7  Dynamic produced that so --
8    A.  Yes.
9    Q.  Okay.  Anything else you want to modify
10  or change?  You just shook your head "no."  She
11  can't hear you.
12   A.  I'm sorry.  No.
13   Q.  She can hear my head rattle but not
14  yours.
15   A.  It's force of habit.  I'm sorry.
16   Q.  All right.  Thank you for answering my
17  questions.  I'm going to yield the floor to Wes
18  Redmond.  Let me pick up my stuff, and I'll move
19  to that end of the table.  It's been a pleasure
20  meeting you though.
21       EXAMINATION
22  BY MR. REDMOND:
23   Q.  All right.  Ms. Key, we met earlier
24  this morning.  I'm Wesley Redmond.  I represent
25  Dynamic Security, Inc., in this case that you



Page 85

1  have filed.
2        Let me ask a few background questions
3  first.
4        Where are you originally from?
5     A.  Alabama.
6     Q.  What part?  What city?  What city or
7  part of the state did you grow up in?
8     A.  Tuskegee.
9     Q.  Have you attended any college?
10    A.  Yes.
11    Q.  Tell me what college you have, college
12  education you have?
13    A.  I attended Auburn University,
14  Montgomery where I got my bachelor's degree, and
15  Troy University where I got my master's.
16    Q.  And what's your bachelor's degree in at
17  AUM?
18    A.  Humanities and social sciences.
19    Q.  What year was that?
20    A.  2011.
21    Q.  And I'm sure I have this somewhere in
22  my file.  What's your date of birth?
23    A.  12/10/85.
24    Q.  All right.  And what was your master's
25  degree at Troy in?

Page 86

1     A.  Troy University.
2     Q.  Yeah.  What was your master's in?
3     A.  Social sciences.
4     Q.  And when did you get it?
5     A.  2017.
6     Q.  This was before you went to work for
7  Dynamic Security; right?
8     A.  Yes.
9     Q.  I think I saw your tax returns that --
10  well, are you married?
11    A.  Yes.
12    Q.  What's your husband's name?
13    A.  Quartez Key.  Q-U-A-R-T-E-Z.
14    Q.  And what does he do for a living?
15    A.  He drives trucks.
16    Q.  For whom?
17    A.  UPS.
18    Q.  How long has he been doing that?
19    A.  Since 2013.
20    Q.  Are your children under the age of 18?
21    A.  Yes.
22    Q.  Both of your children live with you?
23    A.  All three of them.
24    Q.  Oh, there's three of them?  Okay.
25    A.  Yes.

Page 87

1     Q.  What are their ages?  I don't need
2  their names.  In fact, don't give it to me
3  because I don't want to have to take it out of
4  the transcript.  But if you could just tell me
5  what their ages are.
6     A.  8, 7, and 4.
7     Q.  Do you have any relatives in the State
8  of Alabama other than your husband?
9     A.  Yes.
10    Q.  All right.  Tell me what relatives you
11  have that are in or around the Montgomery area.
12    A.  None.
13    Q.  Okay.  Your parents live in Alabama?
14    A.  Yes.
15    Q.  Where?
16    A.  My mom lives in Tuskegee.
17       MR. REDMOND:  Okay.  Anyone know if
18  Tuskegee is in the Middle District?
19       MS. PALMER:  It is.
20       MR. REDMOND:  It is?  Thank you.
21    Q.  All right.  What's your mom's name?
22    A.  Bertha Clark.
23    Q.  Is that where most of your relatives
24  are, in Tuskegee?
25    A.  No.

Page 88

1     Q.  Your father alive still?
2     A.  Yes.
3     Q.  What's his name?
4     A.  Nageeullah Hassan, N-A-G-E-E-U-L-L-A-H.
5  Last name is Hassan.
6     Q.  Where does he live?
7     A.  Auburn.
8     Q.  Grandparents living still?
9     A.  My grandmother.
10    Q.  All right.  Does she live in the State
11  of Alabama?
12    A.  Yeah.
13    Q.  What city is she in?
14    A.  Tuskegee.
15    Q.  All right.  What's her name?
16    A.  Susie James Mindingall,
17  M-I-N-D-I-N-G-A-L-L.
18    Q.  All right.  Do you have any aunts and
19  uncles in the State of Alabama?
20    A.  Yes.
21    Q.  Where?  What cities are they in?
22    A.  Tuskegee.
23    Q.  Okay.  So tell me what their names are.
24    A.  Johanna James, Carol Carlis, and Mary
25  Cade.



Page 89

1    Q.  Do you have any cousins that live in
2  Tuskegee who have a different last name than the
3  ones you just gave me?
4    A.  No.  The other aunt is Mary Cade.
5    Q.  I'm sorry.  What's that name?
6    A.  Cade, C-A-D-E.
7        MR. MILLER:  You can go off the record.
8        (Off-the-record discussion.)
9    Q.  (BY MR. REDMOND:)  Do your in-laws live
10  in the State of Alabama?
11   A.  No.
12   Q.  Do you know, does your husband have any
13  relatives in the State of Alabama?
14   A.  I'm not sure of all his relatives.
15   Q.  Okay.  All I can ask you is what you
16  know.  Do you know if he has any relatives in
17  the State of Alabama?
18   A.  His grandmother.
19   Q.  What's her name?
20   A.  Mary Woods.
21   Q.  And where does she live?
22   A.  Hardaway.
23   Q.  Can you tell me where that is?  What's
24  it close to?
25   A.  Shorter, Alabama.

Page 90

1        MS. PALMER:  Shorter.  That's Middle
2  District.
3        MR. REDMOND:  It is middle?  Okay.
4        MS. PALMER:  Yes.
5    A.  He has an aunt who lives in Tuskegee.
6    Q.  (BY MR. REDMOND:)  Okay.  What's her
7  name?
8    A.  Glenda Williams.
9    Q.  Do you and your husband belong to any
10  churches or social groups?
11   A.  We attend church in Tuskegee.
12   Q.  Okay.  What's the name of the church in
13  Tuskegee?
14   A.  Apostolic Faith Mission.
15   Q.  And what's your current home address?
16   A.  160 Stone Park Boulevard, Apartment
17  2009, Pike Road, Alabama 36064.
18   Q.  So the name of the city is Pike Road?
19   A.  Yes.
20   Q.  How long have you lived at that
21  address?
22   A.  For two years.
23   Q.  Where did you live before that?
24   A.  Montgomery, Alabama.
25   Q.  What was your address in Montgomery?

Page 91

1    A.  6940 Wrangler Road.
2    Q.  Wrangler with a W?
3    A.  Yes.
4    Q.  Okay.
5    A.  Apartment C.  That was Montgomery,
6  Alabama.
7    Q.  How long did you live there?
8    A.  Since 2017.
9    Q.  Is that where you were living during
10  the time that you worked for Dynamic Security?
11   A.  Yes.
12   Q.  So in putting the math together, you
13  would have lived there from 2017 to
14  approximately 2019?  Or --
15   A.  2020.
16   Q.  2020?
17       The couple of days that you worked for
18  Dynamic at the Hyundai facility, how did you get
19  to and from work?
20   A.  I drove.
21   Q.  Did you know any of your co-workers
22  from Dynamic socially, outside of work?
23   A.  No.
24   Q.  I want to ask you about your employment
25  history.  And we'll start with once you -- after

Page 92

1  you graduated from AUM, can you tell me what
2  your first job was?
3    A.  After I -- in 2011?
4    Q.  Yes.
5    A.  I worked at AUM as a graduate student.
6    Q.  All right.  Was that a paying job?
7    A.  Yes.
8    Q.  You got a W-2 from AUM?
9    A.  Yes.
10   Q.  What exactly did you do?
11   A.  I was a residence life coordinator.
12   Q.  Was that involving taking care of one
13  of the dormitories?
14   A.  Yes.
15   Q.  How long did you work for AUM?
16   A.  Until 2014.
17   Q.  Where did you go to work next?
18   A.  For the post office, United States Post
19  Office.
20   Q.  What was your job at the post office?
21   A.  A city carrier assistant.
22   Q.  The name may tell us, but can you tell
23  me what a city carrier assistant does?
24   A.  Deliver mail to the -- within the city
25  limits where you're assigned.



Case 2:19-cv-00767-ECM-SMD   Document 75-1   Filed 10/12/22   Page 25 of 74
USCA11 Case: 24-11126   Document: 60-1   Date Filed: 02/14/2025   Page: 86 of 206

DAVITA M. KEY                                                   June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING              93—96

Page 93

1    Q.   Would you go out by yourself or with
2 someone?
3    A.   By myself.
4    Q.   And you had to take a civil service
5 exam to get that?
6    A.   Yes.
7    Q.   Did you resign from AUM or were you
8 terminated from there?
9    A.   I resigned.
10   Q.   What was your reason for resigning from
11 AUM?
12   A.   Because I no longer attended school
13 there.
14   Q.   Well, as I understand it, you graduated
15 from AUM in 2011?
16   A.   And I took graduate courses until 2014.
17   Q.   Got you.  Okay.  How long did you work
18 for the post office?
19   A.   Until 2016.
20   Q.   And who was your supervisor or
21 supervisors there at the post office?
22   A.   Janet Simpson.
23   Q.   So did this involve delivering mail in
24 Montgomery?
25   A.   Tuskegee.

Page 94

1    Q.   Okay, you were in Tuskegee.  Why did
2 you leave that job?
3    A.   Just the commute and working six days a
4 week and having to commute 50 miles a day one
5 way.
6    Q.   Did you get a job somewhere else?
7    A.   After I left there?
8    Q.   Yes.
9    A.   Yes, I did a contract position.
10   Q.   Okay.  Who was that with?
11   A.   PremaCorp.
12   Q.   Is that one word?
13   A.   Yes.  P-R-E-M-A.
14   Q.   Okay.  What type of job was that?
15   A.   To make sure that the businesses in the
16 city of Montgomery were compliant with the
17 business license.
18   Q.   Oh.  Were you the people that go around
19 and look at -- in the office buildings and see
20 if people have their license?
21   A.   Yes.
22   Q.   Yeah, we had one show up at ours.  It's
23 a smaller office.
24        All right.  Who did you report to?
25   A.   Patrick Howell.

Page 95

1    Q.   And was he another PremaCorp employee
2 or was he with the city of Montgomery?
3    A.   He was another PremaCorp employee.
4    Q.   How were you paid for that?  I'm not
5 going to ask you how much.
6    A.   The rate?
7    Q.   Were you paid by the hour?
8    A.   Yes, by the hour and mileage.
9    Q.   Next I guess I probably should ask
10 that.  How much were you making per hour?
11   A.   I don't -- I think it was like $16 an
12 hour.  I don't remember exactly.
13   Q.   And when did you start that job?
14   A.   July.
15   Q.   July of 2016?
16   A.   Yes.
17   Q.   How long did you work?
18   A.   It was just contract until the end of
19 the year, so till December.
20   Q.   And so the job ended at the end of
21 December?
22   A.   Yes.
23   Q.   What was your next employment?
24   A.   Dynamic Security.
25   Q.   So you had no employment from

Page 96

1 January 1, 2017, until July 31 of 2017?  Seven
2 months?
3    A.   Not that I can remember, no.
4    Q.   Well, do you think you would remember
5 if you had a job during that time period?
6    A.   Yes and no.
7    Q.   Do you know if you were looking for
8 work during that time period?
9    A.   Yes, I was looking for work.
10   Q.   But did you have any other job offers
11 during that time period?
12   A.   I don't remember.
13   Q.   Do you remember the kind of jobs you
14 were looking for?
15   A.   Just a variety.  It wasn't a specific
16 job type.
17   Q.   All right.  And then I think we
18 established this morning that you worked for
19 Dynamic Security for two days, July 31 and
20 August 1?
21   A.   Yes.
22   Q.   And then you filed your EEOC charge
23 against Dynamic Security on August 3?
24   A.   Yes.
25   Q.   As of August 3, had you already reached



Page 97

1  some determination about whether or not Dynamic
2  Security was going to give you another position
3  or not?
4     A.  No.
5     Q.  All right.  Well, so when did you start
6  looking for another job after August 1?
7     A.  The month of August.
8     Q.  Do you remember -- can you tell me
9  anymore?  Do you remember when in the month of
10  August?
11    A.  I don't remember.
12    Q.  I'll come back to this.
13       So what was the next job that you had
14  after leaving Dynamic Security?
15    A.  The next job I had was I worked for a
16  cleaners, Jim Massey's Cleaners.
17    Q.  Where is it?
18    A.  It's in Montgomery.
19    Q.  Do you know when you went to work
20  there?
21    A.  It was in 2018.
22    Q.  And were you paid hourly there?
23    A.  Yes.
24    Q.  How much per hour?
25    A.  $7.75.

Page 98

1     Q.  And how many hours a week were you
2  working?
3     A.  I don't remember.  I would say between
4  20 and 30.
5     Q.  And what was your job duties?
6     A.  A customer service rep.
7     Q.  And who was your supervisor there?
8     A.  I don't remember what her name is.
9     Q.  How long did you work for Jim Massey's
10  Cleaners?
11    A.  About six weeks.
12    Q.  What happened at the end of six weeks?
13    A.  I was offered another job.
14    Q.  What was the other job you were
15  offered?
16    A.  At a daycare.
17    Q.  And what's the name of the daycare?
18    A.  By His Grace.
19    Q.  Was this connected with a particular
20  church?
21    A.  No.
22    Q.  What city was it in?
23    A.  Montgomery.
24    Q.  And what was your job there?
25    A.  The manager for the daycare.

Page 99

1     Q.  Salary or hourly?
2     A.  Salaried.
3     Q.  How much was the salary they paid you?
4     A.  I don't know.  Around, I would say,
5  like $1,200 a month.
6     Q.  Do you know if that's more or less than
7  you had expected to make at Dynamic Security?
8     A.  Less.
9     Q.  Were your children able to go to the
10  daycare free?
11    A.  Yes.
12    Q.  Were you paying for daycare before
13  that?
14    A.  No.
15    Q.  What were they doing in lieu of going
16  to daycare before that?
17    A.  They were with me.
18    Q.  So -- well, when you were working for
19  Jim Mass --
20    A.  Jim Massey's.
21    Q.  -- Jim -- yeah.  How -- did the kids
22  come to work with you at the cleaners?
23    A.  They would be with my husband.
24    Q.  I think I saw somewhere your husband
25  normally works third shift?

Page 100

1     A.  At -- his shifts vary.
2     Q.  All right.  Do you know during the time
3  when you were working at the cleaners, was he
4  working third shift so he was able to watch them
5  during the day while you were at work?
6     A.  Yes.
7     Q.  All right.  How long did you work at
8  the daycare?
9     A.  Probably like a -- just a -- maybe like
10  five to six weeks.
11    Q.  And what happened at the end of that
12  five to six weeks?
13    A.  I started looking for a job in the
14  education field and was offered a job at Kelly
15  Services.
16    Q.  Kelly Services, is that the
17  temporary --
18    A.  Uh-huh.
19    Q.  -- placement service?
20    A.  Yes.
21    Q.  They were able to find you a job in the
22  educational field?
23    A.  Yes.
24    Q.  Okay.  We'll talk about that in just a
25  minute.



Page 101

1          Was there a break in your employment at
2   the daycare and going to work for Kelly
3   Services?
4       A.  Yes.
5       Q.  How much time?
6       A.  Maybe like two months.
7       Q.  So did you quit -- you quit your job at
8   the By His Grace daycare?
9       A.  Yes.
10      Q.  And at the time that you quit, you did
11  not have another job lined up yet, did you?
12      A.  For the -- not at that exact time, no.
13      Q.  All right.  What is the job that Kelly
14  Services got for you?
15      A.  Paraprofessional.
16      Q.  Let me ask you first when.  When did
17  Kelly Services find you a position?
18      A.  September.
19      Q.  Of what year are we in?
20      A.  2018.
21      Q.  What is a peer professional job?
22      A.  A paraprofessional is basically an
23  interventionist for special education students
24  within the school system.  So you're an aide.
25      Q.  Are you saying peer professional or

Page 102

1   para?
2       A.  Para.
3       Q.  P-A-R-A?
4       A.  P-A-R-A, yes.
5       Q.  Okay.
6          Was there a particular school that you
7   were placed at?
8       A.  Pike Road Elementary School.
9       Q.  And that's in?
10      A.  Pike Road, Alabama.
11      Q.  Where is Pike Road, Alabama, in
12  relation to Montgomery?
13      A.  Like literally they're next door to
14  each other.
15      Q.  Because there is a Pike Road in
16  Montgomery, isn't there?
17      A.  No.  They're two different -- it's a
18  different city.
19      Q.  Okay.
20          All right.  How were you paid for that
21  job?
22      A.  Hourly.
23      Q.  And how much hourly were you making?
24      A.  $12.50.
25      Q.  And how many hours a week were you

Page 103

1   working?
2       A.  Forty.
3       Q.  Was your position with Dynamic going to
4   be -- let me ask this.  How many hours a week
5   was your position at Dynamic going to be?
6       A.  Forty.
7       Q.  All right.  How long did you work doing
8   this paraprofessional job at Kelly Services?
9       A.  Until May of 2021.
10      Q.  And did your paychecks actually come
11  from Kelly Services?
12      A.  Yes.
13      Q.  And during that entire time, your
14  paychecks came from Kelly Services?
15      A.  Yes.
16      Q.  All right.  What happened in May of
17  2021?
18      A.  I interviewed and got hired by the
19  school district.
20      Q.  So were you doing the same job as
21  before?
22      A.  No.  I was working as an auxiliary
23  teacher.
24      Q.  What does an auxiliary teacher do?
25      A.  Just like a -- it's the -- I worked in

Page 104

1   a pre-K classroom as the teacher's assistant.
2       Q.  And were you paid hourly or salary?
3       A.  Salary.
4       Q.  What was your salary?
5       A.  $20,815.
6       Q.  How many hours a week were you working?
7       A.  Forty.
8       Q.  Now, at this time in May of 2021,
9   you've got your bachelor's degree and your
10  master's degree?
11      A.  Yes.
12      Q.  All right.  How long did you work as a
13  teacher's -- and this was for what school
14  district?  Sorry.
15      A.  Pike Road.
16      Q.  All right.  And how long did you stay
17  at this job?
18      A.  I'm still currently -- well, I -- my
19  last day was June 1st.
20      Q.  And so --
21      A.  2022.
22      Q.  Have you resigned?
23      A.  Yes.
24      Q.  Was there a reason that you resigned
25  from it?

Page 105

1    A.  I got a better position.
2    Q.  Okay.  What's the better position that
3  you got?
4    A.  I got a job with Phalen Leadership
5  Academy as a kindergarten teacher.
6    Q.  Where is that located?
7    A.  Montgomery, Alabama.
8    Q.  Salary?
9    A.  Yes.
10   Q.  And what's the salary?
11   A.  $44,000.
12   Q.  And when did you begin that job?
13   A.  I begin in August of this year.
14   Q.  The position that you had with Pike
15  Road, was there an opportunity to keep working
16  during the summer, or did it end and your pay
17  end when the school year ended?
18   A.  You're talking about the job that I
19  just had?
20   Q.  Yes.
21   A.  No, I get paid through the summer.
22   Q.  Okay.  But you're currently not getting
23  a paycheck from anybody?
24   A.  From Pike Road Elementary School.
25   Q.  You are getting one from Pike Road?

Page 106

1    A.  Yes.
2    Q.  But are you performing any services for
3  Pike Road?
4    A.  I did.
5    Q.  Yeah, I know how the teachers are.
6  They'll pay them for twelve months although
7  they'll only work nine or ten.  Is that how it
8  works?
9    A.  Yes.
10   Q.  All right.  Any other jobs you've had
11  since leaving Dynamic Security that you haven't
12  told me about?
13   A.  I've done DoorDash, Spark Delivery,
14  Shipt, but not like on a consistent basis.
15   Q.  The first two I'm aware of.  Spark
16  Delivery?
17   A.  It's Walmart delivery service.
18   Q.  Oh, okay.
19      Let me ask you this.  Had you done any
20  of these before going to work for Dynamic?
21   A.  No.
22   Q.  Were you doing any of these during the
23  two days that you were working for Dynamic
24  Security?
25   A.  No.

Page 107

1    Q.  So let me take each of these.
2    DoorDash.  When did you start doing
3  DoorDash?
4    A.  I don't remember.  Because I -- I don't
5  remember the exact year.
6    Q.  How long of a time period did you do
7  DoorDash?
8    A.  I mean, periodically, so.
9    Q.  Are you still --
10   A.  I don't do it now.
11   Q.  I don't know what the term is, but are
12  you still registered for it?
13   A.  I mean, if I wanted to do it, I could,
14  but I don't do it.
15   Q.  When was the last time that you
16  remember doing DoorDash?
17   A.  Maybe sometime at the beginning of this
18  year.
19   Q.  You don't remember when you started or
20  how long you --
21   A.  No.
22   Q.  -- were doing it?
23      Can you give me any estimate of how
24  much money you made doing DoorDash?
25   A.  Around $1,700.

Page 108

1    Q.  Do you receive a 1099 from DoorDash?
2    A.  Yes.
3    Q.  Okay.  And have you been reporting it
4  on your income taxes?
5    A.  Yes.
6    Q.  So we have your income taxes, we could
7  see which years you were doing DoorDash?
8    A.  Yes.
9    Q.  How about Shipt?  Let me ask you.  Do
10  you know when you started doing Shipt?
11   A.  This year.
12   Q.  Okay.  How often -- are you still doing
13  Shipt?
14   A.  Periodically.
15   Q.  How often would you say that you're
16  doing Shipt?
17   A.  Maybe three times out the week.
18   Q.  Are you able to tell us for the year of
19  2022 how much you believe you've earned doing
20  Shipt?
21   A.  I would have to look because I don't
22  know.
23   Q.  So have you consistently through 2022
24  been doing it three times a week?
25   A.  No.



Page 109

1    Q.  During what time periods do you think
2    you were doing it as much as three times a week?
3    A.  Since I've been out of school.
4    Q.  And if you do it three times a week,
5    how much do you normally make a week?
6    A.  It depends.
7    Q.  It varies that much?
8    A.  It depends on how much -- it's a
9    delivery service.  So it depends on how much the
10   delivery is worth.  So it's not a set rate.  So
11   it just depends on how much the delivery is
12   worth.  So, yeah, it varies.
13   Q.  Is there a typical --
14   A.  No.
15   Q.  -- pay?
16       All right.  Tell me, if you can, to
17   your recollection, what's the highest day that
18   you've had and the lowest day?
19   A.  Lowest $25.  Highest $50.
20   Q.  And your Shipt registration or
21   whatever, is it active still?
22   A.  Yes.
23   Q.  When's the last time that you did it?
24   A.  Maybe Wednesday or Thursday.
25   Q.  All right.  Spark Delivery.  When did

Page 110

1    you do that?
2    A.  Last year.
3    Q.  How often would you do that during a
4    week?
5    A.  Probably about the same amount.  I
6    don't do that anymore though.
7    Q.  Is there a reason why you don't do
8    Spark and you do Shipt instead?
9    A.  I mean, just -- I just -- it's not a
10   reason.  I just don't do it.
11   Q.  How much money do you think you made
12   doing Spark last year?
13   A.  I don't -- I would have to look.
14   Q.  Can you give me an estimate at all?
15   $10,000?  $1,000?
16   A.  I don't know.  I -- I don't know.
17   Q.  Can you tell me what month you started
18   doing Spark?
19   A.  No.  I'm sorry.  I --
20   Q.  Can you tell me what month you stopped
21   doing Spark?
22   A.  This month.  June.
23   Q.  All right.  So have we now covered all
24   of your employment since you left Dynamic
25   Security?

Page 111

1    A.  Yes.  To my knowledge, yes.
2    Q.  Okay.  And did we cover earlier, to
3    your knowledge, all the places that you worked
4    before going to work for Dynamic Security?
5    A.  Yes.
6    Q.  During the couple of days you were
7    working for Dynamic, did you have any other jobs
8    at the time?
9    A.  No.
10   Q.  I think you told -- you testified
11   earlier that you initially interviewed with
12   Gloria Robinson and Maurice Chambliss; right?
13   A.  Yes.
14   Q.  What did you understand your job duties
15   were going to be?
16   A.  Working in the mail room.
17   Q.  Okay.  But specifically, did you know
18   what your job was going to be, what you would be
19   doing on a --
20   A.  Delivering mail to the different
21   departments.
22   Q.  Would it involve going to the post
23   office?
24   A.  If needed.
25   Q.  Well, did they tell whether that would

Page 112

1    be part of your job duties?
2    A.  I didn't get that far into training.
3    Q.  But during the interview, they --
4    A.  I don't recall her saying that.
5    Q.  Tell me what you do recall Gloria
6    Robinson or Mr. Chambliss saying during the
7    interview about what your job duties were going
8    to be.
9    A.  That I would be doing the same thing
10   that I did when I worked for the United States
11   Post Office.  And she said that I would be
12   delivering mail throughout the Hyundai site.
13   Q.  Were you told how that is done?  I
14   mean, are you walking?  Are you taking a golf
15   cart?  Do you get in a car to go to some of the
16   sites?
17   A.  My trainer showed me in a car, but I
18   never got into -- I only -- I never got into any
19   real training.  I got 30 minutes of training,
20   and that was it.
21   Q.  And your trainer is Ms. Howell?
22   A.  Yes.
23   Q.  In fact, during the two days that you
24   worked for Dynamic here at this facility, did
25   you deliver any mail to anybody?



DAVITA M. KEY                                        June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          113–116

Page 113

1    A.   She took some mail to one of the
2  buildings, and I went with her to see how it was
3  done.
4    Q.   But you never did any -- you never did
5  any of the job duties on your own during those
6  two days?
7    A.   No, I was training.  I was being
8  trained.
9    Q.   How long did you understand your
10 training was going to last?
11   A.   I don't know because it was never
12 specified.
13   Q.   But it would be accurate to say that
14 during the two days that you were working here
15 at the Hyundai facility that you were in
16 training the entire time you were here?
17   A.   No.
18   Q.   You were not in training the entire
19 time?
20   A.   No.
21   Q.   All right.  What else did you do if you
22 were not in training?
23   A.   Sat in that chair and meet with Gloria
24 Robinson.
25   Q.   Okay.  Let me ask you about the time

Page 114

1  period.  On July 31, how many hours were you at
2  the facility?
3    A.   Less than two hours.
4    Q.   And how about on August 1; how many
5  hours were you here?
6    A.   Less than two hours.
7    Q.   So your total time working was less
8  than four hours?
9    A.   Yes.
10   Q.   And you may have already covered some
11 of this, but I want to make sure we're talking
12 about the same thing.  When you said besides
13 being trained, you also sat in a chair and
14 talked with Gloria Robinson --
15   A.   Yes.
16   Q.   -- tell me about that conversation.
17   A.   It was just about she wanted to know
18 about me being pregnant and about my hair.
19   Q.   What did she ask you about -- well,
20 tell me what the conversation that you had about
21 being pregnant -- strike that.
22       Let me ask that.  Is this the
23 conversation where you informed her that you
24 were pregnant?
25   A.   One of them, yes.

Page 115

1    Q.   Okay.  All right.  And before beginning
2  work on July 31st, you had not told Dynamic that
3  you were pregnant; right?
4    A.   No.
5    Q.   Okay.  Is that because at the time of
6  your interview, did you know that you --
7    A.   Yes.
8    Q.   -- were pregnant?
9    A.   Yes.
10   Q.   Okay.  I was thinking for some reason
11 that you didn't find out until you went to the
12 doctor on July the 28th or something.  That's
13 wrong?
14   A.   That's incorrect.
15   Q.   Okay.  So at your interview, you knew
16 that you were pregnant?
17   A.   Yes.
18   Q.   Okay.  So tell me about the
19 conversation you had where you were talking with
20 Gloria Robinson about your being pregnant.
21   A.   I just pulled her to the side and gave
22 her my doctor's note letting her know, and
23 Maurice, that I was -- that even though that I
24 was pregnant, that my doctor said that I'm able
25 to perform all the duties of the job.

Page 116

1    Q.   All right.  Anything else said about
2  your pregnancy during that conversation?
3    A.   She said I didn't need to talk to her
4  about that.
5    Q.   Did not need to talk to her?
6    A.   Because she wasn't my immediate
7  supervisor.
8    Q.   So was she indicating to you that that
9  was an issue to be talked about with
10 Mr. Chambliss?  Or with someone at Hyundai?
11   A.   With Mr. Chambliss, but he was standing
12 right there with her.
13   Q.   Anything else said about the pregnancy?
14   A.   Not at that conversation.
15   Q.   Okay.  And from what you told me
16 earlier, was there also something said at that
17 same time about your hair?
18   A.   Afterwards, yes, it was.
19   Q.   What do you mean by afterwards?
20   A.   After she went back in her office, I
21 was confronted by Cassandra Williams.
22   Q.   Okay.  And when you say after "she,"
23 that's Gloria Robinson that you are talking
24 about?
25   A.   Yes.



Page 117

1   Q.   How long was it before Cassandra
2   Williams said something to you?
3   A.   Maybe between 10 and 20 minutes.
4   Q.   And what did Ms. Williams say to you?
5   A.   "What's wrong with your hair?"
6   Q.   Do you know what she meant by that?
7   Well, let me ask you.   Did she tell you what she
8   meant by that?
9   A.   No.
10   Q.   Anything else that she said about your
11   hair?
12   A.   No.   She said what's wrong with it, and
13   then she went back in her office.
14   Q.   Now, did somebody send you home early
15   on that -- well, these conversations that you're
16   telling me about where you told Gloria Robinson
17   you were pregnant and then Cassandra Williams
18   came out later, were these on the 31st or the
19   1st?
20   A.   31st.
21   Q.   Did someone send you home early on the
22   31st?
23   A.   Yes.
24   Q.   Who told you to go home?
25   A.   Gloria Robinson.

Page 118

1   Q.   What did she tell you when she told you
2   to go home?
3   A.   To go home.
4   Q.   Well, did she tell you was there
5   something that you were supposed to do before
6   you came back or did she tell you why she was
7   sending you home?
8   A.   No.   She said that I needed to go home.
9   Q.   Do you know why she sent you home?
10   A.   She didn't tell me -- I mean, she
11   didn't say, "You're going -- you need to go home
12   because of this."
13        She said that Cassandra Williams said
14   that I was in violation with my hair.   And I
15   said, "What do you want me to do?"
16        Cassandra Williams said that, "You
17   would have to wear a hat."
18        I said, "I have a hat at my house.   I
19   can go get it."
20        She said -- then Gloria Robinson said,
21   "No.   How about you just go home."
22   Q.   So this conversation where you were
23   sent home, this was you, Cassandra Williams, and
24   Gloria Robinson all together?
25   A.   And whoever else was sitting in the

Page 119

1   cubicles in their office.
2   Q.   Do you know who else that --
3   A.   No.
4   Q.   -- would have been?   So you're saying
5   there are other people who may have overheard
6   what was being said?
7   A.   It's possible.
8   Q.   All right.   I think you told me were
9   there other conversations that you had with
10   Ms. Robinson about your pregnancy?
11   A.   Yes.
12   Q.   All right.   Tell me about those.
13   A.   She brought me into the office and she
14   asked me was I going to act this way until --
15   and she pointed to my stomach.
16   Q.   When did that happen?
17   A.   August 1st.
18   Q.   Do you know what she was referring to
19   when she said "act this way"?
20   A.   No.   And she called me after I -- she
21   sent me home on July 31st and asked me when was
22   my baby due and if my doctor was aware of my job
23   requirements.
24   Q.   This was she called you the -- she
25   called you on July 31st after she sent you home;

Page 120

1   right?
2   A.   Yes.
3   Q.   Did you tell her when the baby was due?
4   A.   Yes.
5   Q.   Which was when?
6   A.   January.
7   Q.   Did your job responsibilities require
8   you to do lifting?
9   A.   Yes.
10   Q.   Do you know what the heaviest items
11   would have been that you would have to lift?
12   A.   No.
13   Q.   All right.   So when she called -- the
14   conversation you told us about when she called
15   you on the telephone, that was before she said
16   to you on August 1, "Are you going to act this
17   way"?
18   A.   Yes.
19   Q.   Tell me was anything else said in that
20   conversation on August 1?
21   A.   I asked her was this about my hair.
22   And she said, "This -- we not talking about
23   that."
24   Q.   And by "that," you understood -- when
25   she used the word "that," you understood that



Page 121

1   the reference was to your hair; correct?
2       A.   Yes.
3       Q.   What else was said in that
4   conversation?
5       A.   She asked me if I had felt
6   discriminated against.
7       Q.   And this is all part of the same
8   conversation?
9       A.   Yes.
10      Q.   And what did you tell her?
11      A.   I said, "No comment."
12      Q.   Is there a reason why you wouldn't tell
13  her anything other than, "No comment"?
14      A.   Because of her demeanor towards me.
15      Q.   Describe her demeanor for us.
16      A.   She was sitting on the edge of her
17  chair.  Her legs were spread and she was leaning
18  forward and talking in a very aggravated and
19  agitated voice and pointing her finger at me.
20      Q.   Anything else said during that
21  conversation?
22      A.   No.  I just kept asking her was this --
23  you know, "I wore a hat as complied; you know,
24  as you guys asked me to," and she said, "This
25  not about that.  This is going to be a problem."

Page 122

1       Q.   And what did you understand Gloria
2   Robinson was referring to?
3       A.   I don't know.  You'll have to ask her.
4       Q.   Did she say it was going to be a
5   problem with her or it was going to be a problem
6   with someone else?
7       A.   She just said it's going to be a
8   problem.
9       Q.   Anything else said in that
10  conversation?
11      A.   Not that I recall.
12      Q.   All right.  How about, did you have any
13  other conversations with her about your hair?
14      A.   No.  Not after that, no.
15      Q.   So is the only conversation you had
16  with her about your hair on July 31st?
17      A.   And August 1st.
18      Q.   Okay.  Well, what was discussed on
19  August 1st about your hair?
20      A.   When she brought me in for the meeting
21  and I asked her, you know, was this about my
22  hair.
23      Q.   Okay.
24      A.   And I asked to see the policy.  She
25  told me I did not have a right to see it.

Page 123

1       Q.   Is this all part of that same
2   conversation when she asked you if you felt that
3   you had been discriminated against?
4       A.   Yeah.
5       Q.   Did you have any more conversations
6   with Gloria Robinson that day other than what
7   you've told me about now?
8       A.   No.
9       Q.   But you were sent home less than two
10  hours after you started; right?
11      A.   Yes.
12      Q.   Who told you that you were going home?
13      A.   Ray Cureton.
14      Q.   And what did Mr. Cureton tell you?
15      A.   "They don't want you back out there."
16      Q.   Anything else he said?
17      A.   Can you be more specific?
18      Q.   Well, number one, did he say who "they"
19  were?
20      A.   Gloria Robinson.
21      Q.   That's what Mr. Cureton told you?
22      A.   Yes.
23      Q.   Tell me as best you can recall what
24  exactly he said about that.
25      A.   He asked for my badge, and he said,

Page 124

1   "Well, Gloria Robinson is not like that, but
2   they don't want you back at that site."  And I
3   was like, "Who?"  He said, "Gloria Robinson."
4   So I gave him my badge.
5       Q.   Do you have the exhibits in front of
6   you from earlier?
7       A.   Yes.  Which one --
8       Q.   Look -- let me see.
9            Do you know who made the decision that
10  you were going to be removed from the job
11  assignment at Hyundai?
12      A.   No.
13      Q.   Let me show you what's previously been
14  marked as Defendants' Exhibit 15.  That's your
15  EEOC charge filed against HMMA.  Do you see
16  that?
17      A.   Uh-huh.
18      Q.   And you signed this; right?
19      A.   Yes.
20      Q.   And you believe everything that is
21  written here is accurate?
22      A.   To the best of my knowledge.  It was
23  prepared by one of the investigators.
24      Q.   At the time you filed your EEOC charge,
25  did you have counsel at the time?



Page 125

1    A.   No.
2    Q.   Look, if you would, at the end of the
3   first paragraph.
4    A.   Uh-huh.
5    Q.   It says -- you can feel free to read
6   all of it.  It says "That same day, I was
7   informed by Dynamic Security, Inc., that
8   Ms. Williams did not want me to return to work."
9         Did I read that accurately?
10   A.   That's -- yes.
11   Q.   Okay.  What is that referring to?
12   A.   Me working at Hyundai, the site.
13   Q.   Okay.  When you said "I was informed by
14  Dynamic Security, Inc.," are you referring to
15  Ray Cureton here?
16   A.   Ray Cureton and Gloria Robinson.
17   Q.   Okay.  Well, did Ms. Robinson tell you
18  that you were not going to be allowed to
19  continue to work at the site?
20   A.   Through Ray Cureton.
21   Q.   Through -- but Ms. Robinson didn't tell
22  you that you weren't going to be allowed to
23  continue to work at the site, did she?
24   A.   She told Ray Cureton.
25   Q.   She told Ray Cureton, who told you;

Page 126

1   right?
2    A.   Yes.
3    Q.   Okay.  But this says "Ms. Williams did
4   not want me to return to work."  Ms. Williams,
5   that's Cassandra Williams?
6    A.   Yes.
7    Q.   And she's a Hyundai Engineering
8   employee; right?
9         MS. PALMER:  Object to form.
10   A.   I mean, I don't know who she works for.
11   Q.   (BY MR. REDMOND:)  Okay.  But she's not
12  a Dynamic Security employee, was she?
13   A.   No.
14   Q.   She worked for some Hyundai entity;
15  correct?
16        MR. MIDDLEBROOKS:  Object to form.
17   A.   I don't know who Cassandra Williams
18  worked for.
19   Q.   (BY MR. REDMOND:)  Am I reading what
20  you're saying here right?  Ms. Williams was the
21  one that did not want you to return to work?
22   A.   That's what it says, yes.
23   Q.   Okay.  And do you believe that's
24  accurate today?
25   A.   Yes.

Page 127

1    Q.   Your initial interview was on July 19;
2   correct?
3    A.   Yes.
4    Q.   Now, earlier you had testified that you
5   were interviewed by Gloria Robinson and Maurice
6   Chambliss.  And then you have here Cassandra
7   Williams also participated.  You see that in the
8   first few sentences of this paragraph?
9    A.   Yes.
10   Q.   What was Ms. Williams's participation
11  in the interview?
12   A.   Gloria Robinson asked her a question
13  pertaining to me and working at the Hyundai
14  site.
15   Q.   And it was about your hair; right?
16   A.   Yes.
17   Q.   It was a question whether or not your
18  hair was appropriate; right?
19   A.   Yes.
20   Q.   And you were told -- were you told
21  during that interview process that your hair was
22  not acceptable as it was?
23   A.   No.
24   Q.   What --
25   A.   I was told that they did not know.  And

Page 128

1   check Dynamic's -- what does Dynamic say
2   about -- their handbook say.
3    Q.   Did someone at some point tell you that
4   your hair was in violation of Hyundai's policy?
5         MR. MIDDLEBROOKS:  Clarify when you say
6   "Hyundai."  Object to form.
7    A.   They -- I'm sorry.
8    Q.   (BY MR. REDMOND:)  I'll rephrase it.
9         Were you at some point told that your
10  hair was in violation of the policy of some
11  Hyundai entity?
12        MR. MIDDLEBROOKS:  Object to form.
13   A.   When I came to work, yes.
14   Q.   (BY MR. REDMOND:)  Who told you that
15  and what did they say?
16   A.   Gloria Robinson and Cassandra Williams.
17   Q.   What did they tell you about it?
18   A.   That I couldn't wear my hair like this.
19   Q.   And was there some discussion about how
20  you could wear it?
21   A.   During my interview, I showed Gloria
22  Robinson a picture of an up-do hairstyle that I
23  had and she said, "Oh, well," she said, you
24  know, "Could you get it styled like that?"  I
25  said, "I'll have to call my stylist, but yes."



Page 129

1    Q.   And did you get that done before you
2   came to work the first day?
3    A.   No.
4    Q.   Why not?
5    A.   Because during my training at Dynamic
6   Security, I asked the office manager Nicole was
7   there an issue with my hair and she asked me
8   why, and I told her that I was told by Gloria
9   Robinson that it was.  And she said, "No,
10  there's not an issue with your hair.  It seems
11  to comply with our grooming policy."
12   Q.   So the reason why you thought your hair
13  was okay when you came to work on July 31st was
14  because the Dynamic office manager had told you
15  that it was?
16   A.   The Dynamic handbook as well.
17   Q.   And that's the reason why you did not
18  put your hair in the style that was talked about
19  the day of your --
20   A.   I mean, the handbook stated that --
21   Q.   I understand.
22   A.   Okay.
23   Q.   I'm just saying from what you saw in
24  the handbook and from what Nicole told you, the
25  office manager, that's why you didn't style your

Page 130

1   hair like you and Ms. Robinson and Ms. Williams
2   had discussed?
3    A.   Yes.  And then I wasn't able to get an
4   appointment as well with my stylist.
5    Q.   Okay.  So your interview was on
6   July 19th.  When did you attempt to get your
7   hair styled?
8    A.   Prior to starting work.
9    Q.   But do you remember when between
10  July the 19th and July 31st you tried to call
11  your stylist?  I mean, did you call him that day
12  as you were leaving?  Was it a day, a week
13  before you called your stylist?
14   A.   I don't recall because -- I mean, I
15  don't remember the day I called her or contacted
16  her, no, I don't.
17   Q.   Where is your stylist located?
18   A.   She lives in Birmingham, but she works
19  out of Auburn.
20   Q.   Okay.  All right.  Did you call your
21  stylist after your interview and before
22  beginning work?
23   A.   Yes.
24   Q.   Okay.  And tell me as best you can
25  recall what you told your stylist and what she

Page 131

1   told you.
2    A.   Just that, "Were you available?"  She
3   only worked on the weekends.  "Were you
4   available to do my hair?"
5    Q.   And what did she say?
6    A.   "I'll have to check my schedule."
7    Q.   Okay.  And did she ever get back to
8   you?
9    A.   No.  Not at that immediate moment, no.
10   Q.   Did you ever go back to her and say --
11  did you ever call her back and say, "Have you
12  checked your schedule?  Can you do my hair?"
13   A.   After I started work on the 31st, yes.
14   Q.   Okay.  You called her back on the 31st?
15   A.   After I started work, yes.
16   Q.   All right.  And what did she say on the
17  31st when you talked to her?
18   A.   She could do it that weekend.
19   Q.   Do you remember the 31st, what day of
20  the week was it?
21   A.   I don't remember.
22   Q.   We can look it up on the calendar.
23       All right.  Back to the interview.
24  Tell me again, what was the conversation that
25  you -- well, the conversations about your hair,

Page 132

1   was that you, Gloria Robinson, and Cassandra
2   Williams together?
3    A.   Yes and no.  Yes and no.
4    Q.   Okay.  All right.  Yes and no.  Okay.
5    A.   Because some of the conversations were
6   with me and Gloria Robinson, me and Cassandra
7   Williams, and then the three of us.
8    Q.   All right.  So tell me in that first
9   interview what conversations just you and Gloria
10  Robinson had together.
11   A.   About my hair?
12   Q.   Yes.
13   A.   At the end of the interview she said,
14  "Oh, your hair might be a problem."
15   Q.   That's all the conversations?
16   A.   She said, "Can you do -- can you take
17  them apart?"  And I said, "If I cut all my hair
18  off, I can."
19   Q.   And you didn't want to do that?
20   A.   No.
21   Q.   All right.  What conversations did
22  you -- just you and Cassandra Williams have?
23   A.   When -- on July 31st when she asked --
24   Q.   No, no, no.  I'm talking about the
25  interview.



Page 133

1    A.   Oh, for the interview?
2    Q.   Yes.
3    A.   She just turned -- looked at me, turned
4  her nose up, and said, "Well, what does
5  Dynamic's policy say?"  And at that time, I
6  didn't have the Dynamic policy.  So she asked
7  Gloria Robinson, and Gloria Robinson said, "I
8  don't know."
9    Q.   Was there any discussion about what the
10 policy was at the Hyundai plant where you were
11 going to work?
12   A.   No.
13   Q.   How did y'all -- well, all right.
14        So I was asking you about a
15 conversation just you and Cassandra Williams
16 had.  Was that the one between you and Cassandra
17 Williams you were just telling me about when she
18 said, "What's Dynamic's policy?"  Or was that
19 you, her, and Gloria Robinson?
20   A.   The three of us.
21   Q.   Were there any conversations that just
22 you and Ms. Williams had?
23   A.   During the interview process?
24   Q.   Yes.
25   A.   No.

Page 134

1    Q.   Okay.
2         All right.  What did the three of you
3  talk about your hair during the interview
4  process?
5    A.   Just that they weren't sure if I could
6  wear my hair like this and me showing them the
7  picture on my phone.
8    Q.   Anything else?
9    A.   No.
10   Q.   But as I understand from what you told
11 me earlier, they said if you could wear your
12 hair like the picture was on the phone, that
13 that would be appropriate.  And did they
14 indicate to you that they thought that would be
15 fine for you to wear your hair like that?
16   A.   Yes.
17   Q.   All right.  So then you show up at work
18 on July 31st; right?
19   A.   Yes.
20   Q.   What was the first thing that you did
21 on July 31st?
22   A.   Took my ID picture.
23   Q.   You were shown some Hyundai -- I
24 mean -- sorry -- some Dynamic policies this
25 morning.  When did you get those?

Page 135

1    A.   July 21st.
2    Q.   Okay.  So you interviewed on July 19th.
3  You went to the Dynamic facility on July the
4  21st?
5    A.   Yes.
6    Q.   Was that for orientation?
7    A.   Yes.
8    Q.   And how long were you at the Dynamic
9  facility?
10   A.   I don't remember.
11   Q.   I mean, was it all day?  A couple
12 hours?
13   A.   I mean, I don't remember.
14   Q.   Who did you meet with at the Dynamic
15 facility on that day?
16   A.   I mean, the person who was in charge of
17 the training.  I don't know their name.
18   Q.   And that's when you were given copy of
19 the handbooks and other policies?
20   A.   Yes.
21   Q.   Is that also the day that you asked the
22 office manager about your hair?
23   A.   Yes.
24   Q.   Was the office manager part of your
25 orientation?

Page 136

1    A.   She directed us to like the rooms we
2  were supposed to go in.  And she was answering
3  questions from other people.
4    Q.   What was the specific question that you
5  asked the office manager about your hair?
6    A.   I asked her, I said, "Is there
7  something wrong with the way my hair is?"  And
8  she said, "No.  Why would you -- like, why did
9  you ask me that?"  And I told her what Gloria
10 Robinson said as far as it wasn't acceptable,
11 and she said, "No."  She was like, "It complies
12 with like what our policy is."  She said,
13 "There's nothing wrong with it."
14   Q.   Okay.  Back to your first day at work.
15 Did you have a uniform you had to wear?
16   A.   Just -- yes.
17   Q.   What was the uniform you had to wear?
18   A.   A polo shirt and just like some
19 dark-colored khaki pants.
20   Q.   Was it a polo shirt that Dynamic had
21 given you?
22   A.   No.
23   Q.   Just a generic --
24   A.   Plain -- yes.
25   Q.   Polo shirt?



Page 137

1   A.  Yes.
2   Q.  Did it have to be a particular color?
3   A.  I don't remember what color it was.  I
4   don't remember.  Because they didn't issue me
5   any like logo type of thing.
6   Q.  All right.  And the first thing you
7   did, you got into the -- you went -- did you
8   come to this building we're in first?
9   A.  Yes.
10  Q.  And you got your picture made; right?
11  A.  Yes.
12  Q.  You got your badge done?
13  A.  Yes.
14  Q.  What was the next thing that you did?
15  A.  I sat in one of the chairs out there
16  and just waited for them to tell me what to do
17  next.
18  Q.  All right.  And who told you what to do
19  next?
20  A.  Gloria Robinson.  She came in.  She
21  spoke -- you know, we said good morning.  And
22  she said that my trainer was going to come and,
23  you know, get me.
24  Q.  Okay.  And so you sat out there until
25  your trainer came and got you?

Page 138

1   A.  Yes.
2   Q.  What time did you report that morning?
3   A.  I don't remember the time.  I think I
4   had to be here around -- between 7:00 and 730.
5   Q.  Do you remember what time it was that
6   your trainer came and got you?
7   A.  No.
8   Q.  But eventually the trainer got you?
9   A.  Yes.
10  Q.  Do you know how long you sat out there
11  before she came and got you?
12  A.  No.
13  Q.  I apologize if I've asked that already.
14      And your trainer was Ms. Howell; right?
15  A.  Yes.
16  Q.  So what did you and Ms. Howell do next?
17  A.  We went to -- she -- we went to the
18  mail room.  She showed me where the mail room
19  was.
20  Q.  And the mail room is somewhere on this
21  floor?
22  A.  I don't know.  I mean, I don't know
23  where it is.  I don't remember.
24  Q.  But is it in the --
25  A.  It's not in this building, no.

Page 139

1   Q.  Okay.  The mail room's in another
2   building?
3   A.  Yes.
4   Q.  Did you walk there or drive?
5   A.  Drive.
6   Q.  Okay.  And she showed you around the
7   mail room?
8   A.  Yes.
9   Q.  Okay.  What else did she do as part of
10  your training?
11  A.  She just showed me -- she showed me
12  where we would -- one of the buildings we would
13  take mail to.  That's it.
14  Q.  And how long did that take?
15  A.  I probably was with her maybe 30 to 45
16  minutes.
17  Q.  What happened at the end of that 30 to
18  45 minutes?
19  A.  Maurice came and said Gloria wanted to
20  see me.
21  Q.  And by Maurice, you're talking about
22  Maurice Chambliss; right?
23  A.  Yes.
24  Q.  At this point in time, when Maurice
25  Chambliss came to see you, did you feel as if

Page 140

1   you had been discriminated against or treated
2   unfairly in any way?
3   A.  I felt like they were kind of hostile
4   towards me as far as -- yeah, I just felt like
5   they were kind of hostile towards me.
6   Q.  All right.  And who is "they"?
7   A.  Gloria Robinson and Cassandra Williams.
8   Q.  All right.  Well, at this point, you
9   haven't even told me that you've interacted with
10  Cassandra Williams that morning.  Had you
11  interacted with Cassandra Williams that morning?
12  A.  Earlier I was telling you that when I
13  was sitting out there and she came out there to
14  ask me about my hair, but you told me to specify
15  it to my interview.
16  Q.  Okay.  All right.  So all right.  So
17  we're walking through what happened your first
18  day.  And while you were out there waiting for
19  the trainer to come, Cassandra Williams said
20  something to you about your hair?
21  A.  I let Gloria Robinson and Maurice
22  Chambliss know that I was pregnant.  Maurice --
23  I mean, Gloria Robinson came back into this
24  shared office with Cassandra Williams.
25  Cassandra Williams came out there and she looked



DAVITA M. KEY                                                June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING               141–144

Page 141

1  at me and she said, "What's wrong with your
2  hair?"  And she said, "Why is it like that?"
3       And I said, "You know, the Dynamic
4  policy says, you know, as long as it's neat."
5       She said, "I don't care what their
6  policy says.  They can send you somewhere else."
7  And then she came back into this office, and
8  then my trainer came and got me.
9    Q.  Okay.  So this all happened before the
10 trainer came and got you and y'all went around
11 to the mail room and the building?
12   A.  Yes.
13   Q.  Did you tell the trainer that you felt
14 that you had been discriminated against?
15   A.  No.
16   Q.  Did you at any time tell the trainer
17 you thought you had been discriminated against?
18   A.  I -- no, I didn't -- I told her that --
19 she asked me why they sent me home on the 31st.
20 And I told her why, and I said I didn't think
21 that was fair.
22   Q.  This would have been a conversation the
23 next day though, right, on August 1st?
24   A.  Yes.
25   Q.  Okay.  So staying with what happened on

Page 142

1  July the 31st.  So you come to work.  You've
2  gotten your picture made.  You were waiting out
3  there for your trainer; right?
4    A.  Uh-huh.
5    Q.  While you were waiting for your trainer
6  is when you told Gloria Robinson and Maurice
7  that you were pregnant; right?
8    A.  Yes.
9    Q.  Is there a reason why you told them
10 that you were pregnant but didn't tell them at
11 the interview?
12   A.  No, it's not a specific reason.
13   Q.  All right.  Did Gloria Robinson say
14 anything to you that you thought was hostile on
15 the 31st after you told her that you were
16 pregnant?
17   A.  She -- she made a face and made a sound
18 like (INDICATING) and then she came in the
19 office.  And then when she walked back out, she
20 was just -- she seemed very agitated and she
21 went outside and smoked a cigarette.  And then
22 she came back in, looked at me, and went back
23 into her shared office with Cassandra Williams.
24   Q.  And that's when Cassandra Williams came
25 out and made her comment to you about, "What's

Page 143

1  wrong with your hair?"
2    A.  Cassandra Williams came out the first
3  time Gloria Robinson went in the office.  But,
4  yes.
5    Q.  So after -- so did Cassandra Williams
6  come out before Gloria Robinson went out and
7  smoked her cigarette?
8    A.  She came -- so while Gloria Robinson --
9  so Gloria Robinson comes in.  Then she comes out
10 and goes and Cassandra Williams -- yeah.  So
11 while Gloria Robinson was outside, Cassandra
12 Williams was interacting with me.
13   Q.  Before the trainer came and got you,
14 did Gloria Robinson say anything about your
15 hair?
16   A.  No.
17   Q.  Okay.  But Cassandra Williams did;
18 right?
19   A.  Yes.
20   Q.  Have you told me every way that you
21 thought Gloria Robinson was being hostile to you
22 by her demeanor, her attitude, her facial
23 actions, and all that?
24   A.  From before I went to training or from
25 that day?

Page 144

1    Q.  Yes, from before the trainer came and
2  got you?
3    A.  Yes.
4    Q.  All right.  So the trainer comes and
5  gets you.  You and the trainer go and do what
6  you were telling us about.  And then someone
7  tells you you need to go to Gloria Robinson's
8  office; right?
9    A.  Maurice came to the mail room.
10   Q.  Okay.  All right.  How long had you
11 been at work at that point?
12   A.  Maybe an hour.  I don't know.  Maybe an
13 hour.
14   Q.  All right.  Tell us about the
15 conversation.  So I assume you went straight to
16 Gloria Robinson's office?
17   A.  Yes.  He brought me to the shared
18 office with her and Cassandra Williams.
19   Q.  Did y'all ride -- did you go by car?
20   A.  Yes.
21   Q.  Did you and Mr. Chambliss have any
22 conversation while you were in the car?
23   A.  I just asked him, you know, what did
24 she need me for, and he told me he did not know.
25   Q.  That's all that you and Mr. Chambliss



Page 145

1 had talked about in the car ride?
2    A.  Yes.
3    Q.  Okay.  All right.  Tell me about the
4 conversation you had with Gloria Robinson.
5    A.  So he brings me here.  So she asked
6 about, you know, my hair.  And I was -- you
7 know, I told her, I said, "Well, you know, I
8 looked in Dynamic's handbook and it says that,
9 you know, you just have to have it neat and it
10 has to be groomed."
11       And then she said, "Well, that's not
12 how -- like you can't have it like this."
13       And I said -- she said, "You can't have
14 it like this at Hyundai."
15       I said, "Well, can I see the policy?"
16       And I was directing my questions --
17 because Cassandra Williams was saying no, and I
18 said, "Well, may I see the policy?"
19       And then Cassandra Williams said, "I
20 don't have to show you anything."
21       And Gloria Robinson said, "How dare you
22 ask my supervisor that question?"
23       And I said, "Well, by law, you have to
24 show me the policy."
25       And she said, "I don't have to show you

Page 146

1 anything."
2       And then it was silent.  And then
3 finally they showed me on the -- her computer,
4 the document pulled up on her computer.
5    Q.  Okay.  Let me back up and ask you some
6 questions about that.
7       When Maurice Chambliss drove you to
8 Gloria Robinson's office, were Gloria Robinson
9 and Cassandra Williams together?
10    A.  Yes.
11    Q.  Okay.  So during that entire
12 conversation, the two of them were together;
13 right?
14    A.  Yes.
15    Q.  What's the first thing one of them said
16 about why the meeting was happening?
17    A.  Gloria Robinson said, "What's wrong
18 with your hair?"
19    Q.  Okay.  And I'm just going to stop you.
20 Is that the exact same words you told us that
21 Cassandra Williams said earlier in the day?
22    A.  Yes.
23    Q.  Okay.  Both of them said the exact same
24 thing is your testimony?
25    A.  Yes.  They -- yes.

Page 147

1    Q.  Okay.  What did you say when -- did she
2 say anything else about your hair other than,
3 "What's wrong with your hair?"
4    A.  That I couldn't have it like this.
5    Q.  And what you understood by that is that
6 dreadlocks were not going to be allowed?
7    A.  That's what they told me, yes.
8    Q.  All right.  Anything else you can
9 recall their having said during that
10 conversation about what was wrong with your
11 having the dreadlocks?
12    A.  No.
13    Q.  And eventually they showed you the
14 policy that was on someone's computer; right?
15    A.  On Cassandra Williams's computer, yes.
16    Q.  And that's the policy we looked at this
17 morning that said you could not have the
18 dreadlocks?
19    A.  Yes.
20    Q.  So did you leave that meeting
21 understanding that your hair was not supposed to
22 be in dreadlocks?
23    A.  They told me in that meeting that I --
24 that the only way that I could wear my hair like
25 this is I wore a hat and my whole head was

Page 148

1 covered.
2    Q.  And who told you that?
3    A.  Cassandra Williams.
4    Q.  Otherwise, unless you were able to wear
5 a hat and cover your whole head, you understood
6 that you could not have the dreadlocks; right?
7    A.  If I had it down like this, I could
8 not, no.
9    Q.  But you did not -- is it your testimony
10 that you did not understand that during the
11 interview you had back on July the 19th?
12    A.  The -- during the interview, the
13 question that was asked by Cassandra Williams
14 was, "What does Dynamic's policy say?"  And so
15 when I reviewed Dynamic's policy and their
16 policy did not state I could not wear my hair
17 like this and I told her that, she said, "Well,
18 no, I don't care what they say."
19    Q.  That's what happened on the interview
20 on the 19th?
21    A.  On the 19th, she said, "What was
22 Dynamic's policy?"  And when I reviewed their
23 policy -- because that's the question she had
24 for Gloria Robinson, "Well, what does Dynamic's
25 policy say?"



DAVITA M. KEY                                                        June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                        149–152

Page 149

1    So when I get the policy and I see the
2  handbook and I review the policy, when I come to
3  work on the 31st and I say, "Well, Dynamic's
4  policy says this," because that's the question
5  she asked during the interview, she said, "I
6  don't care what their policy says."
7    Q.  Yeah, again, what I'm trying to find
8  out is when she said, "I don't care what
9  Dynamic's policy is," was that on the 19th?
10   A.  That was on the 31st.
11   Q.  Okay.  That's what I thought you told
12 me earlier.
13   A.  Okay, yes.
14   Q.  Yeah.  My question was, getting back to
15 it, did you not understand on July the 19th
16 after your interview that you could not wear
17 your hair in dreadlocks?
18   A.  No, I did not understand.
19   Q.  And it's your testimony that it wasn't
20 until July 31st that you understood that
21 dreadlocks were prohibited?
22   A.  According to the document on her
23 computer, yes.
24   Q.  And but someone told you there was an
25 alternative to getting rid of the dreadlocks?

Page 150

1    A.  Cassandra Williams.
2    Q.  And what did Ms. Williams say the
3  alternative was?
4    A.  If I wore a hat all day every day.
5    Q.  And how did that conversation end?
6    A.  I said -- Gloria Robinson said she did
7  I have a hat.  I said, "I do have a hat."
8    And she said, "Well, where is it?"
9    I said, "It's at my house.  I can go
10 get it."
11   And she said, "Well, how far do you
12 stay?"
13   I said, "It's about 30 minutes."
14   She said -- she didn't say anything.
15 And they were just standing there.
16   And I asked Cassandra Williams, "What
17 do you want me to do?"
18   And she said, "I'm not telling you to
19 do anything."
20   And then I said, "Well, you know, I
21 would like to just go back with my trainer."
22   She said, "No."
23   I said, "Well, what do you want me to
24 do?"
25   And Gloria Robinson said, "Just go

Page 151

1  home."
2    Q.  And what did you do after she said
3  that?
4    A.  I gathered my stuff and I went home.
5    Q.  Did you clock out?
6    A.  No.  I didn't clock in either.
7    Q.  All right.  Did you talk with anyone
8  else at the Hyundai facility that day before you
9  got in your car and left?
10   A.  No.
11   Q.  Did you talk with anyone from either a
12 Hyundai entity or Dynamic that afternoon?
13   MR. MIDDLEBROOKS:  Object to form.
14   A.  Gloria Robinson called me after she
15 sent me home.
16   Q.  (BY MR. REDMOND:)  And that's the
17 conversation where she asked when you were due?
18   A.  Yes.
19   Q.  Any other conversations you had with
20 anybody from Dynamic that afternoon?
21   A.  No.
22   Q.  Had you even met Ray Cureton as of that
23 day?
24   A.  Nope.  Uh-uh.
25   Q.  All right.  So let's -- the next day,

Page 152

1  August 1 -- which I understand was the last day
2  you worked at the Hyundai facility.
3    A.  Yes.
4    Q.  Correct?  What time did you show up at
5  work that day?
6    A.  Around the same time.  Around between
7  7:00 and 7:30.  I don't know the exact time.
8    Q.  Did you clock in on that day?
9    A.  I don't remember clocking in, no.
10   Q.  So you didn't clock in for either day?
11   A.  I don't remember clocking in, no.
12   Q.  Okay.  What happened first?  What did
13 you do first?
14   A.  I just sat in the same chair that I sat
15 in the day before and just waited for my
16 trainer.
17   Q.  And how long did you wait for?
18   A.  Maybe 20, 30 minutes.
19   Q.  Do you know, at some point did your
20 trainer tell Gloria Robinson or someone else
21 that you had some complaints about what had
22 happened to you at the facility with the
23 Hyundai --
24   A.  My trainer told Gloria Robinson that I
25 felt like that they were being unfair to me.



Page 153

1    Q.   And when did that happen?  Was that the
2  day before on the 31st?
3    A.   On August 1st.
4    Q.   Oh, this was on August 1st?
5        All right.  So you wait about 30
6  minutes and your trainer shows up; right?
7    A.   Yes.
8    Q.   All right.  And where did you and the
9  trainer go?
10   A.   To the mail room.
11   Q.   And are you still being trained at this
12 point?
13   A.   Yes.  We're in the -- yeah, she was
14 just showing me some things in the mail room.
15   Q.   And was it during this time that you
16 told your trainer that you thought you were
17 being treated unfairly?
18   A.   She asked me on the ride to the mail
19 room why did I go home.
20   Q.   And what did you tell her?
21   A.   That they said it was something wrong
22 with my hair.
23   Q.   All right.  And you told the trainer
24 that you thought you were being treated unfairly
25 because of your hair?

Page 154

1    A.   Yes, I told her I didn't think it was
2  fair, yes.
3    Q.   And what is it that you thought was
4  unfair about it?
5    A.   That I couldn't be here because of my
6  hair.
7    Q.   And what was it that you thought was
8  unfair about that?
9    A.   Because it's my hair.  I mean --
10   Q.   Well, at that time, did you know if
11 there were other employees who weren't required
12 to comply with the hair standards?
13   A.   I don't know.
14   Q.   Sitting here today, do you know of any
15 other employees who were not required to conform
16 to Hyundai's hair standards?
17       MR. MIDDLEBROOKS:  Object to form.
18   A.   Um --
19   Q.   (BY MR. REDMOND:)  He's right.  That's
20 probably a bad question.  Let me ask it this
21 way.
22       Do you know if there's other employees
23 who were not required to comply with the hair
24 standard that you were shown earlier today?
25   A.   I don't know.

Page 155

1    Q.   Did you think it was unfair -- I mean,
2  I heard -- I hear what you're telling me.  You
3  think it's unfair because it's your hair.  You
4  think you should be able to wear your hair as
5  you want; right?
6    A.   I mean, I'm wearing it in its natural
7  state.
8    Q.   Well, are the dreadlocks in its natural
9  state?
10   A.   Yes.  For African Americans, yes.
11   Q.   I mean, it -- I might be showing my --
12 well.  It's -- your hair naturally appears in
13 dreadlocks?
14   A.   Yes.
15   Q.   Okay.  So that's not something that
16 you've chosen as some symbol of your heritage,
17 but that's how it naturally is worn?
18   A.   Yes.  My hair is worn naturally like
19 this.
20   Q.   Okay.  All right.  Anything else other
21 than the fact that that's how your hair
22 naturally is that you thought was being unfair
23 about how you were being treated?
24   A.   At that moment, no.
25   Q.   All right.  And you told that to your

Page 156

1  trainer; right?
2    A.   Yes.
3    Q.   And you later found out that your
4  trainer told that to somebody else and it made
5  its way to Gloria Robinson?
6    A.   She told it directly to Gloria
7  Robinson.
8    Q.   Did you confront your trainer about
9  having said that to Gloria?
10   A.   I just asked her if she told Gloria
11 Robinson.
12   Q.   Tell me about that conversation.
13   A.   I just asked -- I said, "Did you" -- I
14 said, "What did you tell Ms. Robinson," and then
15 she told me.  That was the conversation.
16   Q.   All right.  So getting back to what's
17 happening on August 1st, you and the -- you and
18 your trainer are in the mailroom?
19   A.   Uh-huh.
20   Q.   She's showing you some things in the
21 mail room.  On the way over, you had had that
22 conversation where you told her that you thought
23 you were being treated unfairly?
24   A.   Yes.
25   Q.   Do you know at what point is Ms. Howell



Page 157

1  away from you enough so that she can communicate
2  that to Gloria Robinson?  Or did she do it while
3  the two of you were together?
4      A.  I don't know.  I don't know.
5      Q.  How long did you and your trainer stay
6  in the mail room?
7      A.  I don't -- I mean, I don't know.  I
8  don't know.
9      Q.  What did you do next?  What did the two
10  of you do next after you left the mail room?
11      A.  We didn't leave the mail room.
12      Q.  Okay.  You at some point left the mail
13  room; right?
14      A.  Yes.
15      Q.  Right.  What happened that caused you
16  to leave the mail room?
17      A.  Maurice Chambliss told me that Gloria
18  Robinson wanted to see me.
19      Q.  Okay.  So you've been working for the
20  company for two days, and this is your second
21  time to -- that Maurice has come and told you
22  that Gloria Robinson wants to talk to you?
23      A.  Yes.
24      Q.  You and Maurice ride over again in the
25  truck?  Or the car?

Page 158

1      A.  Yes.
2      Q.  What conversations did you and Maurice
3  have?
4      A.  I asked him what did she want, and he
5  said he didn't know.
6      Q.  Do you think he was being truthful with
7  you?  Or do you know?
8      A.  I don't know.
9      Q.  All right.  Did you speak with anyone
10  else before you talked to Ms. Robinson?
11      A.  No.
12      Q.  All right.  Was Ms. Robinson by herself
13  or was Cassandra Williams with her during this
14  conversation?
15      A.  She was by herself.
16      Q.  Okay.  Tell me what happened during
17  this conversation.
18      A.  She asked me had I felt discriminated
19  against, and I didn't respond to her question.
20  And then she asked me.  I said, "No comment."
21          And she said that, you know, I
22  shouldn't have asked Cassandra Williams to see
23  the policy; that she understood why I did it but
24  I shouldn't have and that the Koreans were a
25  different breed of animals and that they send

Page 159

1  little memos and they don't want African
2  Americans, you know, wearing their hair like
3  this because of the clientele they have.
4          And she specifically named Mayor Todd
5  Strange, who was the mayor at that time; that he
6  may not want to see me with my hair like this.
7          And she said that she has to have her
8  male counterparts at times speak with the Korean
9  higher-ups because they won't talk to her
10  because she's a female.
11      Q.  And what had you done about your hair
12  on August 1?
13      A.  I wore a hat and I -- that completely
14  covered my head.
15      Q.  Do you have a picture -- do you happen
16  to have a picture of --
17      A.  Of --
18      Q.  -- of the hat that day with you --
19      A.  No.
20      Q.  -- wearing it?  Do you still have the
21  hat?
22      A.  I do.
23      Q.  If you'd hold on to it.
24          All right.  Anything else you can
25  recall her saying during that conversation?

Page 160

1      A.  I asked her -- I -- you know, I said,
2  "Well, I wore a hat, you know, as you guys said
3  I should," and she said, "This is not about
4  that."
5          And she said, "Are you going to be this
6  way until" -- and she pointed to my stomach.
7          And then I -- she said -- like she
8  started inching forward towards me.  She was
9  sitting in the chair I'm currently sitting in,
10  and I was sitting in the chair where the court
11  reporter's sitting in --
12      Q.  Y'all were in this room?
13      A.  Yes.
14      Q.  Okay.
15      A.  And she said, "Have you been
16  discriminated against," in like a loud, hostile
17  voice.  And I said, "I wore a hat, you know, as
18  you guys asked me to."
19          She said, "This is not about that.
20  This is going to be a problem."
21      Q.  Was it your understanding that she was
22  referring to your pregnancy?
23      A.  Yes.
24      Q.  And I know you were asked some
25  questions and you were shown, I think it was in



Page 161

1  the Dynamic charge, where you thought that what
2  happened to you, you had stated in your charge
3  you thought mainly was because of your
4  pregnancy.
5       Do you contend now that your eventually
6  being removed from that assignment was because
7  of your hair or because of your pregnancy?
8     A.  Because of both.
9     Q.  And again, that's -- I know that's what
10  you said this morning.  I want to give you a
11  chance again to tell us.  Do you think that it
12  was equally because of both?
13    A.  Yes.
14    Q.  All right.  Did Cassandra Williams
15  participate in that conversations at all --
16    A.  No.
17    Q.  -- that day?  Did you see Cassandra
18  Williams at all on the 1st?
19    A.  I saw her.  We brought some mail here,
20  and I saw her and, you know, I said good
21  morning.  But other than that, I didn't see her.
22    Q.  Okay.  Did she say anything back to
23  you?
24    A.  No.
25    Q.  Anything else that Gloria Robinson said

Page 162

1  during that conversation after she says, "This
2  is going to be a -- it's not about your hair,
3  but this is going to be a problem"?
4     A.  No.  She dismissed me, and Maurice took
5  me back to the mail room.
6     Q.  Okay.  So you're back in the mail room.
7  Was Ms. Howell --
8     A.  Yes.
9     Q.  -- still there?
10    A.  Yes.
11    Q.  So did you resume your training?
12    A.  Yes.
13    Q.  Did you and Mr. Chambliss discuss
14  anything on the way back to the mail room?
15    A.  No.
16    Q.  Was Mr. Chambliss in there when you
17  were talking to Gloria Robinson?
18    A.  I don't remember if he was -- I don't
19  remember exactly where he was.
20    Q.  All right.  So what did you and
21  Ms. Howell do as part of your training next?
22    A.  She just was showing me the same thing
23  she was showing me.  I think she was filling out
24  some paperwork.
25    Q.  What kind of paperwork --

Page 163

1     A.  I don't know.
2     Q.  -- does the mail room have to fill out?
3     A.  I don't know.
4     Q.  Did y'all go and deliver any mail?
5     A.  No.
6     Q.  Did you at some point leave the mail
7  room?
8     A.  I stepped outside.
9     Q.  Okay.  And what did you do when you
10  stepped outside?
11    A.  Just get some fresh air.
12    Q.  All right.  So did you come back in the
13  mail room after you stepped outside?
14    A.  Yes.
15    Q.  And what did you and Ms. Howell do?
16    A.  Nothing.
17    Q.  I mean, were y'all working?  Were y'all
18  doing stuff in the mail room?
19    A.  No.  We were -- no, we weren't doing
20  anything.  I mean, we weren't -- she was -- had
21  some papers and she was kind of like organizing
22  them.  But other than that, we weren't doing
23  like any type of training or anything.
24    Q.  And how long did that go on with you --
25  how long -- after you returned from the meeting

Page 164

1  with Ms. Robinson, how long did you continue to
2  work in the mail room with Ms. Howell?
3     A.  Maybe like 10 to 15 minutes.
4     Q.  As I understand it, so I think you told
5  me you worked less than two hours the first
6  day -- the second day?
7     A.  Uh-huh.
8     Q.  So you spent 30 minutes waiting for
9  her.  Then you went to the mail room.  Then you
10  went to Gloria Robinson.  Then you went back in
11  the mail room for 10 or 15 minutes.  I assume
12  you've been here around an hour or so by this
13  time?
14    A.  Yeah, probably like that or something.
15    Q.  Okay.  What did you and Ms. Howell do
16  next?
17    A.  Well, Mr. Chambliss came into the mail
18  room.
19    Q.  Okay.  Do you know why he was there?
20    A.  No.
21    Q.  Okay.  And what did you say to him?
22    A.  That I would like to speak with someone
23  in human resources.
24    Q.  All right.  Did anyone else hear that
25  conversation?



DAVITA M. KEY                                                    June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          165—168

Page 165

1    A.  Ms. Howell.
2    Q.  And what was Mr. Chambliss's response
3  to that?
4    A.  "You can speak to Gloria Robinson or
5  Cassandra Williams."
6    Q.  But did you talk to them?
7    A.  No.  I -- no, I didn't.
8    Q.  Okay.  Who did you talk to?
9    A.  Ray Cureton.
10    Q.  How did you know Mr. Cureton's name?
11  How did you know to speak to Mr. Cureton?
12    A.  Because that's who Gloria Robinson told
13  Maurice Chambliss to have -- for me to go speak
14  to.
15    Q.  And was this on the 1st?
16    A.  Yes.
17    Q.  Where in this timeline of events does
18  Gloria Robinson tell Mr. Chambliss that you need
19  to speak to Ray Cureton?
20    A.  He called her.
21    Q.  Okay.  So after you tell Mr. Chambliss,
22  "I want to talk to someone in human
23  resources" -- did you tell him why you wanted to
24  speak to someone in HR?
25    A.  No.  I just said, "I want to speak with

Page 166

1  someone in human resources."
2    Q.  All right.  Mr. Chambliss then calls
3  Gloria Robinson?
4    A.  Yes.
5    Q.  In front of you?
6    A.  He stepped like away from the desk
7  area.
8    Q.  And then he told you what?
9    A.  He said, "You can go talk to Ray
10  Cureton."
11    Q.  Did you have to ask, "Well, who is that
12  and where do I" --
13    A.  Yes.
14    Q.  And what were you told?
15    A.  You can go to -- he gave me the address
16  for the Dynamic Security office.  He didn't say
17  what his title was or anything like that.
18    Q.  Okay.  Before I leave that, at this
19  point, had you said something to Ms. Howell
20  about her having told Ms. Robinson --
21    A.  I just asked her when I got back, I
22  mean, I just asked her, you know, what did she
23  say.  And she told me, and that was the -- that
24  was the exchange for that.
25    Q.  Okay.  Anything else said during that?

Page 167

1    A.  No.
2    Q.  Were you angry at her?
3    A.  No.
4    Q.  If she was to testify that you seemed
5  agitated and angry with her, would that be
6  inaccurate?
7    A.  That is incorrect, yes.
8    Q.  All right.  So Mr. Chambliss gives you
9  Ray Cureton's address; right?
10    A.  Yes.
11    Q.  To the Dynamic Security office in
12  Montgomery?
13    A.  Yes.
14    Q.  And so you get in your car and drive
15  there?
16    A.  I asked Mr. Chambliss, I said, "Am I
17  allowed to go speak with him?  May I come back,"
18  you know, "come back to the site?"  And he said,
19  "I can't tell you that."
20    Q.  Couldn't tell you either one, whether
21  you could go there or whether you could come
22  back?
23    A.  Yes.
24    Q.  So what did you do?
25    A.  I asked him again, I said, "Well, could

Page 168

1  I wait till I like get off at 5:00 or can I go
2  talk with him now?  If I leave, will I be able
3  to come back?"  He said, "You can come back."
4    Q.  Okay.  So you got -- so after he said
5  that, you got in the car and left?
6    A.  Yes.
7    Q.  And Mr. Cureton was at the facility?
8    A.  Yes.
9    Q.  Did he know you were coming?
10    A.  Yes.
11    Q.  All right.  Tell me about the
12  conversation you had with Mr. Cureton.
13    A.  I got there, and first thing he asked
14  me was, "Are you going to sue us?"
15    Q.  And what did you tell him?
16    A.  I said, "I want to talk to somebody in
17  human resources."
18    Q.  Okay.  What happened?  Tell me what
19  y'all talked about.
20    A.  I just told him what happened.
21    Q.  Tell me as best you can recall what you
22  told him.
23    A.  The events that transpired on the 31st
24  of July and August 1st.
25    Q.  Well, and I realize this may be a



Page 169

1  little bit redundant, but I need you to tell me
2  as best you can recall what you told him.
3      A.  Can I read what I wrote?  Because
4  that's just --
5      Q.  Sure.  Whatever you need to help you
6  answer the question is fine.
7          MS. PALMER:  What are you looking for?
8          THE WITNESS:  The complaint that I
9  wrote.
10         MS. PALMER:  The original complaint?
11         THE WITNESS:  Yes.
12         MR. REDMOND:  Is this the one that you
13 are talking about?
14         THE WITNESS:  No.
15         MR. REDMOND:  The longer version?
16         THE WITNESS:  Yes.
17         MR. REDMOND:  Yeah, it was an exhibit.
18 I forget which number it was.
19         MS. PALMER:  The last one, Number 17.
20         MR. REDMOND:  Is that what it was?
21         THE WITNESS:  It was the one that
22 Mr. Middleton -- it was attached to --
23         MS. PALMER:  The EEOC charge?
24         MR. REDMOND:  The one that's attached
25 to the intake questionnaire, is that the one

Page 170

1  that you're speaking of?
2          MS. PALMER:  Yeah, I think so.
3          THE WITNESS:  Yes, this right here.
4          MS. PALMER:  You're looking at
5  Exhibit --
6          MR. MIDDLEBROOKS:  For the record,
7  she's reading from what exhibit?
8          MS. PALMER:  Exhibit 13.
9      Q.  (BY MR. REDMOND:)  All right.  Now,
10 what you're reading from, this is not what was
11 given to Mr. Cureton, was it?
12     A.  No.
13     Q.  Okay.  This is what you gave to the
14 EEOC when you went to file the charge; right?
15     A.  Yes.  What I gave to Mr. Cureton, he
16 wouldn't give me a copy of it.  So --
17     Q.  Well, before you read that, let me
18 mark -- I guess this would be Defendants'
19 Exhibit 18.
20         (Defendants' Exhibit 18 was marked
21          for identification.)
22     Q.  I'm showing you what's marked as
23 Defendants' 18.  Is that what you gave to
24 Mr. Cureton on August 1st?
25     A.  Yes.

Page 171

1      Q.  Okay.  That's the document that you say
2  you gave to him but you were not allowed to take
3  a copy back?
4      A.  No.  I -- he had me write up something.
5  And when I wanted to take -- I was going to take
6  a picture of it on my phone.  And he said I
7  couldn't have a copy of it.
8      Q.  Is that it, Defendants' Exhibit 18?
9      A.  No, this is not what I --
10     Q.  Oh.  Well, then tell us -- well, let me
11 ask you.  Do you recognize Defendants'
12 Exhibit 18?
13     A.  Yes.  This is what I -- I gave this to
14 him.
15     Q.  Okay.
16     A.  I wrote that and gave it to him.  So --
17     Q.  Wait a minute.  I'm still trying to
18 figure out what Defendants' Exhibit 18 is.  You
19 wrote Defendants' Exhibit 18; correct?
20     A.  Yes.
21     Q.  And that's your signature at the
22 bottom?
23     A.  Yes.
24     Q.  And that's what you gave to Mr. Cureton
25 on August 1?

Page 172

1      A.  Yes.
2      Q.  Okay.  Was there another document that
3  you wrote up and gave to him on August 1?
4      A.  No, it wasn't.
5      Q.  Okay.  So that's the one that you
6  wanted to take the picture of and he wouldn't
7  let you --
8      A.  No.  No.
9      Q.  Okay.  We'll get to that --
10     A.  Okay.
11     Q.  -- I assume.
12         All right.  So my question is, what I
13 was going to ask, what did you tell Mr. Cureton?
14     A.  So, you know, I walked to the building,
15 and when he first sees me, he asked me, "Are you
16 going to sue us?"  And I just kind of looked at
17 him.  And I just detailed what happened on the
18 31st.
19         And he had Nicole sit in, in the lobby
20 area, because that's where we were meeting,
21 where her desk was.  And so I told him just how,
22 you know, Gloria Robinson was talking to me and
23 how, you know, I told him that I let her and
24 Maurice Chambliss know that I was pregnant and
25 how they sent me home because they said I

Page 173

1  couldn't wear my hair like that, like it was,
2  and that I, you know, told them about Dynamic's
3  policy and, you know, Dynamic says long as it's
4  groomed.
5       And he interjected and said, "Well,
6  I've known her for a very long time, and she's
7  not like that."
8       And, you know, I told him, I said,
9  "Well, she was just talking to me in just a very
10  demeaning and hostile way."
11       And he said, "Well, you know, what do I
12  know?  I'm just a big fat white man."
13       And Nicole walked me to the car, and
14  she said, "You haven't really been discriminated
15  against.  You're fighting a losing battle."
16       And she said that she has been called
17  the N-word and that's real discrimination and
18  like, "You just don't want to do this."  And I
19  just looked at her.
20   Q.   So I guess I should ask you, has anyone
21  used any racial slurs towards you?
22   A.   No.
23   Q.   I'm sorry.  That's a terrible question.
24       What I mean is has anyone employed with
25  Dynamic used any racial slurs towards you?

Page 174

1   A.   No.
2   Q.   Anyone employed with Dynamic made any
3  comments that indicate that they don't like
4  having pregnant women in the workplace?
5   A.   Not to my knowledge, no.
6   Q.   All right.  So how did you leave it
7  with Mr. Cureton?
8   A.   He said that he would follow up with, I
9  guess, his home office and he would get back
10  with me.
11   Q.   And so you were going to return to the
12  office -- return to the Hyundai facility?
13   A.   No, he told me that -- he asked for my
14  badge and he said that, you know, "They don't
15  want you out there."  And I said, okay, and I,
16  you know, gave him my badge.
17   Q.   And we may have talked about this
18  before.  Did he ever say anything more about who
19  didn't want you out there?
20   A.   He said Gloria Robinson didn't want me
21  out there.  And when I asked him why, he said
22  because of my hair and something else.
23   Q.   But he never told you what the
24  something else was?
25   A.   He said he didn't want to get into it.

Page 175

1   Q.   So you did not return to the
2  facility --
3   A.   No.
4   Q.   -- that day?
5   A.   Never returned to the facility until
6  today.
7   Q.   Do you know what, if anything, Dynamic
8  did to investigate your claim?
9   A.   No.
10   Q.   What specifically did you tell him that
11  Dynamic was doing to discriminate against you?
12   A.   I told him because of my hair and
13  because I was pregnant.
14   Q.   All right.  Were there discussions held
15  that day about other assignments for you?
16   A.   He said that he would let me know when
17  an assignment became available.
18   Q.   And did you ever hear from Dynamic
19  again?
20   A.   No.  I called them.  I never heard
21  anything -- they didn't initiate contact with
22  me, no.
23   Q.   Do you know what days you called?
24   A.   I don't remember the exact days I
25  called there.

Page 176

1   Q.   Somewhere, and I think we'll look at
2  it.  I think I have an exhibit here.  Did you
3  say that you -- do you have phone records of
4  when you called Dynamic?
5   A.   I mean, from my cell phone provider at
6  the time, I'm pretty sure they -- I don't know
7  how long they keep their records.
8   Q.   I mean, you don't have anything in your
9  possession right now, either here, at home, or
10  that you've given to your lawyers that shows
11  when you called Dynamic, do you?
12   A.   No.
13   Q.   What discussions have you and Dynamic
14  had about what either assignments or shifts you
15  were going to take?
16   A.   Just when I spoke with Mr. Cureton on
17  the 1st, he said he'll let me know if something
18  became available.  And then when I called to
19  inquire and I talked to Nicole, she said that he
20  was unavailable and that she would let me
21  know -- she would let him know that I called and
22  she would let me know if any shifts -- like if
23  any jobs became available.
24       And he asked me in the -- when I first
25  talked to him on the 1st, he said, "Well, I

Page 177
1   might not have any first shifts."  I said,
2   "That's fine."  I said, "I'll just take whatever
3   you have."
4       Q.   When you were initially interviewed,
5   was there any discussion about what shifts you
6   were available to work?
7       A.   They just ask your preference.
8       Q.   Because your application we looked at
9   today, your application says, doesn't it, that
10  you'll work any shift.  Any job, any shift;
11  right?
12      A.   Yes, and I would have worked any job,
13  any shift.
14      Q.   Did you express a preference to Dynamic
15  about what shift you wanted to work?
16      A.   I told him that if he had first shift
17  but I would take any shift.
18      Q.   And this conversation was on
19  August 1st?
20      A.   This conversation was when I did my
21  training at the site.
22      Q.   Okay.  Who's --
23      A.   I don't remember the people I spoke
24  with.  It was a lot of different people there.
25  But I let them know that I would -- my

Page 178
1   preference would be first shift but I would take
2   any shift available.
3           And I reiterated that on the 1st with
4   Mr. Cureton.  I said -- because he said he may
5   have like some third shift things available, and
6   I said, you know, "Just let me know."  I said --
7   I think I said, "Beggars can't be choosers.
8   I'll take what you have that's available."
9       Q.   Why did you have a preference for third
10  shift?  I mean -- I'm sorry.  For first shift?
11      A.   It was just my preference.
12      Q.   Somewhere in here I saw something that
13  says that you wanted first shift because your
14  husband was working third shift at the time?
15      A.   He did work third shift at that time,
16  yes.
17      Q.   Okay.  And so he -- if you got first
18  shift, he could watch the kids while you're
19  working and you could watch the kids while he's
20  working?  Is that the reason why you wanted
21  first shift?
22      A.   I just preferred first shift.  But, I
23  mean, whatever shift I worked, I would have
24  child care.  So that wasn't an issue.
25      Q.   You would have to pay for child care

Page 179
1   which --
2       A.   My children would have been taken care
3   of.  It wasn't an issue about --
4       Q.   Well, when you said they would have
5   been taken care of, do you mean there are family
6   members who would have watched them or would you
7   have had to pay for daycare?
8       A.   It just -- it depends on what the
9   schedule -- my schedule would have been.
10      Q.   If both you and your husband had to
11  work third shift, is there a nighttime daycare
12  that's available that they would have had to go
13  to and you would have had to pay for?
14      A.   I don't know.
15      Q.   What's the last conversation you had
16  with anyone at Dynamic?
17      A.   August 8th would be the last
18  conversation.
19      Q.   And that's the one with Nicole?
20      A.   That was with Ray Cureton and Nicole.
21          (Defendants' Exhibit 19 was marked
22           for identification.)
23      Q.   I'm showing you what's marked as
24  Defendants' Exhibit 19.  Do you remember
25  receiving a copy of that?

Page 180
1       A.   Yes.
2       Q.   All right.  And that's your signature
3   on there?  And that's one of the documents that
4   would have been signed on 7/21?
5       A.   Yes.
6          (Defendants' Exhibit 20 was marked
7           for identification.)
8       Q.   Showing you what's marked as
9   Defendants' Exhibit 20.  Do you recognize that
10  as another of the Dynamic documents you were
11  given on 7/21?
12      A.   Yes.
13      Q.   And that has your signature on it?
14      A.   Yes.
15          (Defendants' Exhibit 21 was marked
16           for identification.)
17      Q.   All right, Ms. Key.  I'm showing you
18  what's marked as Defendants' Exhibit 21, ask if
19  you recognize that.
20      A.   Yes.
21      Q.   And that's your signature on there?
22      A.   Yes.
23      Q.   Okay.  Give it to me.
24          All right.  So as of August 3 when you
25  went to the -- well, when did you first contact



Page 181

1    someone at the EEOC?
2        A.   August 2nd.
3        Q.   And what's the reason why you went to
4    the EEOC on August 2nd?
5        A.   Because in my conversation with Ray
6    Cureton, he didn't take it seriously.
7        Q.   Okay.  Any other -- what was it that
8    made you think that he did not take your
9    complaint seriously?
10       A.   One, we met in the lobby of the
11   building.  So anybody could have walked in and
12   heard the conversation.  He didn't take any
13   notes.  And he defended Gloria Robinson and his
14   comment saying, "I'm just a big fat white man.
15   What do I know about anything."
16       Q.   Do you know what Mr. Cureton's title
17   was?
18       A.   I learned it to be district manager.
19       Q.   And who did you first speak with at the
20   EEOC, do you remember?
21       A.   No.
22       Q.   Now, your initial charge was filed
23   against Dynamic Security; right?
24           MS. PALMER:  Object to form.
25           You can answer.

Page 182

1        A.   I -- yes.
2        Q.   (BY MR. REDMOND:)  Okay.  The one you
3    filed on August 3 was filed against Dynamic
4    Security.
5            MR. REDMOND:  Anyone remember what
6    those numbers were for the two charges?
7            MS. LEONARD:  13 and 14.
8            MR. REDMOND:  13 and 14?  Here.  Let me
9    pull those out.
10           MS. LEONARD:  Actually, 14 and 15.
11           MR. MIDDLEBROOKS:  Once you get a
12   chance, can we take a break?
13           MR. REDMOND:  This would be a good
14   time.  And if anyone needs lunch, say so.  I'm
15   fine, but if Ms. Key needs it or the court
16   reporter needs it.
17           (Break.)
18       Q.   (BY MR. REDMOND:)  You understand
19   you're still under oath, Ms. Key?
20       A.   Yes.
21       Q.   I show you earlier what was marked as
22   Defendants' Exhibit 14.  This is your charge of
23   discrimination that was filed.  It lists as the
24   name of who it's against, it says Dynamic
25   Security, Inc.  Do you see that?

Page 183

1        A.   Uh-huh.
2        Q.   And I think we looked earlier at the
3    intake questionnaire that you filled out when
4    you filed that charge?
5        A.   Yes.
6        Q.   Okay.  Anything else you did as part of
7    the process other than go to the EEOC, fill out
8    the intake questionnaire, and then I assume
9    someone prepared that and gave it to you to
10   sign?
11       A.   Yes.
12       Q.   Anything else that you did as part of
13   the process?
14       A.   No, I just went and filled out the
15   intake and followed the instructions that were
16   given to me by the people.
17       Q.   Where did you go to have that done?
18       A.   To the EEOC office.
19       Q.   Which one?
20       A.   In Birmingham.
21       Q.   And then you also were shown
22   Defendants' Exhibit 15, which is a separate
23   charge against Hyundai Motor Manufacturing,
24   Alabama?
25       A.   Uh-huh.

Page 184

1        Q.   What's the process that you went
2    through to fill out this, Defendants'
3    Exhibit 15?
4        A.   I -- I mean, I did the intake, and then
5    the investigator compiled the information
6    together and gave it to me to sign.
7        Q.   When you filled out Defendants'
8    Exhibit 15, were you represented by counsel at
9    the time?
10       A.   No.
11       Q.   Did someone call and tell you that you
12   needed to -- why you needed to do Defendants'
13   Exhibit 15 in addition to Exhibit 14?
14       A.   The investigator who was assigned to me
15   just said that I needed -- that she had some
16   documents that she needed me to sign.
17       Q.   Okay.  And that was one of them?
18       A.   Yes.
19       Q.   Do you know what the other documents
20   were that she gave you to sign?
21       A.   This one right here.
22       Q.   Okay.  But anything besides that?  You
23   said documents plural, which is what I was
24   wondering.
25       A.   I apologize.  Document.



Page 185

1    Q.   You did not fill out another intake
2  questionnaire, did you?
3    A.   No.
4    Q.   But did you understand that it was a
5  separate charge against Dynamic against the one
6  versus Hyundai?
7    A.   No.
8        MS. PALMER:  Object to form.
9    Q.   (BY MR. REDMOND:)  You didn't
10 understand that?  What did you think that they
11 were?
12   A.   Together.
13   Q.   And what made you think that they were
14 together?
15   A.   Because I was with both -- I mean, both
16 companies were -- I worked for Dynamic and I
17 worked at the Hyundai site.  So I just figured
18 that they were together.
19   Q.   But do you see that they have two
20 separate charge numbers?  If you'll --
21   A.   Yes, I see that, yes.
22        (Defendants' Exhibit 22 was marked
23          for identification.)
24   Q.   All right, Ms. Key.  I'm showing you
25 what's marked as Defendants' Exhibit 22.  Do you

Page 186

1  recognize that document?
2    A.   No.
3    Q.   Had you ever seen that document before
4  today?
5    A.   No.
6    Q.   Okay.  I'm going to represent to you
7  that it's the notice of dismissal of your charge
8  and of your right to sue relating to the charge
9  you filed against Dynamic Security.  And it's
10 your testimony that you've never seen this
11 before?
12   A.   No.
13        MR. MIDDLEBROOKS:  Following the suit?
14   Q.   (BY MR. REDMOND:)  Well, have you seen
15 it since the lawsuit has been filed?
16        MR. MIDDLEBROOKS:  Hyundai Motor
17 Manufacturing, Alabama?
18        MR. REDMOND:  Dynamic.
19        MR. MIDDLEBROOKS:  Dynamic.
20   Q.   (BY MR. REDMOND:)  Have you seen it
21 since the lawsuit has been filed?
22   A.   I don't -- I don't remember.  I don't
23 remember.
24   Q.   This indicates that it was mailed to
25 you around March 1, 2019.  Is that your right

Page 187

1  address as of that date?
2    A.   Yes.
3    Q.   Do you have any -- did you have any
4  issues around that time with respect to
5  receiving your mail, that you know of?
6    A.   I don't remember.
7    Q.   Do you know of any other mail that you
8  did not receive during that time period, the
9  first week or so of March 2019?
10   A.   I don't know.
11   Q.   Who normally gets the mail at your
12 house?
13   A.   It just depends.
14   Q.   I mean, I assume is it either you or
15 your husband?
16   A.   Yes.
17   Q.   Is there anyone else who gets the mail?
18   A.   No.
19   Q.   Any other family members that live with
20 you other than you and your husband and your
21 three children?  I guess it would have been
22 two -- well, it was two at the time?
23   A.   What year?
24   Q.   2019.  It would have been three.
25   A.   Yeah.

Page 188

1    Q.   Other than you and your husband and
2  your three children, anyone else live with you?
3    A.   No.
4    Q.   Anyone else get your mail for you?
5    A.   No.
6    Q.   Do you have any explanation why, if
7  this was mailed to you, why you did not receive
8  it?
9    A.   You'd have to talk to the postal
10 service.  I don't know.
11        (Defendants' Exhibit 23 was marked
12          for identification.)
13   Q.   Let me show you next what's marked as
14 Defendants' Exhibit 23, ask do you recognize
15 that document?
16   A.   Yes.
17   Q.   Okay.  Tell us for the record what that
18 document is.
19   A.   A determination letter.
20   Q.   Okay.  And what address was that sent
21 to?
22   A.   My address.
23   Q.   And for the record, can you tell us
24 what that is?
25   A.   6940 Wrangler Road, Apartment C.



DAVITA M. KEY                                               June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING              189—192

Page 189

1    Q.  Is that the same one as what we looked
2  at earlier?
3    A.  Yes.
4    Q.  And did you receive this determination
5  in the mail?
6    A.  Yes.
7    Q.  At what point in time, and just tell me
8  the year.  Don't want to know what you talked
9  about.  But at what point in time did you retain
10  counsel?
11    A.  2020.
12    Q.  And this says that it was mailed out on
13  or around June 10th of 2019.  Do you know if you
14  would have received it around that same time?
15    A.  I don't know.
16       (Defendants' Exhibit 24 was marked
17        for identification.)
18    Q.  I show you next what we'll mark as
19  Defendants' Exhibit 24.
20       I'm going to show you what's marked as
21  Defendants' Exhibit 24, ask if you recognize
22  that document?
23    A.  Yes.
24    Q.  That's the letter from the EEOC telling
25  you that conciliation efforts on your charge had

Page 190

1  failed?  Is that an accurate description?
2    A.  It just says that they won't bring a
3  lawsuit against the respondent.
4    Q.  Okay.  But do you remember receiving
5  that letter in the mail?
6    A.  Yes.
7    Q.  Did you have any issue with receiving
8  that?  Or was it delayed of any sort that you
9  know after the date it looks like it was mailed?
10    A.  I don't remember.
11    Q.  But that did come in the mail; right?
12    A.  Yes.
13       (Defendants' Exhibit 25 was marked
14        for identification.)
15    Q.  Let me show you what's marked as
16  Defendants' Exhibit 25.  Do you recognize that
17  document?
18    A.  Yes.
19    Q.  Tell us what that is.
20    A.  A Notice of Right to Sue.
21    Q.  And you received that in the mail from
22  the EEOC?
23    A.  Yes.
24    Q.  And do you know if there was any delay
25  in receiving that?

Page 191

1    A.  I don't know.
2    Q.  And it's sent to the same Wrangler Road
3  address as the other documents we have been
4  looking at?
5    A.  Yes.
6    Q.  Well, what did you understand these
7  last three documents that we were looking at,
8  what impact, if any, did you think they had on
9  the original charge you had filed against
10  Dynamic Security?
11    A.  That they were all the same thing.
12    Q.  And other than the fact that, you know,
13  you were working for Dynamic at the Hyundai
14  facility, is there a reason why you thought that
15  they were all combined into one?
16    A.  I just figure, I mean, with the
17  information I gave, they just put everything
18  together.  I don't...
19    Q.  But you knew that you had filed two
20  separate charges; right?
21    A.  When I filed my charge, I didn't -- I
22  filed -- no, I didn't know there were two
23  separate charges.  I figured they were all the
24  same thing.
25    Q.  But when we looked at 14 -- at

Page 192

1  Exhibits 14 and 15 earlier, there were two
2  separate charges filed; right?  One that lists
3  Dynamic as the employer and one that lists HMMA
4  as the employer; right?  We can get them back
5  out again if you want us to.
6    A.  Yeah, but I didn't know that they were
7  two -- like I've never done this.  So when I
8  went to do the charges, I'm thinking that
9  everything is together.
10    Q.  When you filed your second charge, the
11  one that lists HMMA as the employer, what did
12  the EEOC investigator tell you about that charge
13  and why you needed to file that charge?
14       MR. MIDDLEBROOKS:  Form.
15    A.  Because it's a document I needed to
16  sign.
17    Q.  (BY MR. REDMOND:)  I mean, I think
18  that's what you told me earlier.  She just told
19  you, "Here's some documents that you need to
20  sign"; right?
21    A.  Yes.
22    Q.  She didn't give you any explanation as
23  to why?
24    A.  You would have to ask her the reason
25  she had me sign them.



Case 2:19-cv-00767-ECM-SMD   Document 75-1   Filed 10/12/22   Page 50 of 74
USCA11 Case: 24-11126   Document: 60-1   Date Filed: 02/14/2025   Page: 111 of 206

DAVITA M. KEY                                                June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          193—196

Page 193

1        MR. MIDDLEBROOKS:  What was that
2  answer?  We'd have to ask her?
3        THE WITNESS:  Yes.
4        MR. MIDDLEBROOKS:  Okay.  Thank you.
5     Q.  (BY MR. REDMOND:)  Is there anything
6  anyone from the EEOC said that led you to
7  believe that the two were combined into one
8  charge?
9     A.  I don't think it's any -- I don't know.
10  I know that when I went there to do the charge
11  and with -- that they just -- I just figured
12  that it was all just the same thing.  I didn't
13  know that it was separate.
14     Q.  Anything anyone from Dynamic Security
15  ever said to you that made you think they were
16  just one charge as opposed to two separate
17  charges?
18     A.  I haven't spoken with anyone from
19  Dynamic Security.
20     Q.  And as I understand the claims you've
21  talked about today against Dynamic Security, you
22  think they discriminated against you because of
23  your hairstyle; right?
24     A.  And my pregnancy.
25     Q.  And your pregnancy and retaliated

Page 194

1  against you because you made complaints --
2     A.  Yes.
3     Q.  -- about those; correct?
4     A.  Yes.
5     Q.  Can you tell me how have you been
6  damaged by the acts that you say happened by
7  Dynamic Security?
8     A.  Can you define damaged?
9     Q.  Well, sure.  So there could be -- we'll
10  start economically.  Have you done any
11  calculations into how much you think you're
12  damaged economically?
13     A.  I'm leaving all that to my attorneys.
14     Q.  I think your attorneys may have done
15  that for us.  So there's back pay loss; right?
16     A.  Are you asking me that question?
17     Q.  Yes.  I'm asking you.  There's back pay
18  loss?
19     A.  Yeah, I believe it's one of the
20  exhibits that outlines what they prepared.
21     Q.  Okay.  Yeah.  And so is there any other
22  economic loss other than back pay?
23     A.  I would have to just -- I'm leaving all
24  of that part up to my attorneys.
25     Q.  Understanding they've done a good job

Page 195

1  explaining all that.  I'm just making sure that
2  I'm not missing anything.
3        For instance, are there any medical
4  bills that you've had -- well, did you have
5  insurance through Dynamic?
6     A.  No.
7     Q.  Okay.  Your husband had insurance
8  through UPS?
9     A.  Yes.
10     Q.  Okay.  So, for instance, there's no
11  medical bills that you had to pay out of pocket
12  that you claim Dynamic would have paid for?
13     A.  If I worked there long enough, I would
14  have had insurance.  But I worked less than four
15  hours, so...  I filled out the paperwork to get
16  insurance.
17     Q.  Really?  Was Dynamic's insurance better
18  than UPS?  Because I understand UPS has pretty
19  good --
20     A.  I don't think that really matters --
21     Q.  -- benefits.
22     A.  -- whether the insurance is better if
23  it's available and I can utilize it.
24     Q.  Okay.  Well, then I'll go back to my
25  question, then.  If you had been able to stay at

Page 196

1  Dynamic long enough to get insurance, are there
2  any medical bills that you had to pay out of
3  pocket that you think that insurance would have
4  paid for?
5     A.  I mean, if I had doctor appointments.
6  I wear glasses.  Vision.  Dental.  I don't think
7  I can specify certain ones because you don't
8  know what could have happened during the time
9  medical-wise.
10     Q.  Do you not have -- do you have dental
11  through your husband?
12     A.  Currently, yes.
13     Q.  Right.  Well, did you have -- how long
14  has your husband been working for UPS?
15     A.  Since 2013.
16     Q.  And is it right what I'm saying?
17  Doesn't UPS have pretty good insurance plans?
18     A.  I don't know compared to Dynamic
19  Security's plans.
20     Q.  Fair enough.  But you have dental, you
21  have health, you have vision insurance all
22  through UPS?
23     A.  Yes.
24     Q.  Is there any of those that you can
25  specify for us today that you think would have



Page 197

1  been paid for if you had stayed at Dynamic long
2  enough and you became eligible for it?
3      A.  All of them.
4      Q.  All right.  So how much -- do you have
5  a number of how much you think you're out?
6      A.  No, I can't give you an exact number.
7      Q.  I mean, can you give me a ballpark as
8  to how much you think you would have had to pay
9  that you think Dynamic's insurance might have
10  paid for some day?
11      A.  No.
12      Q.  Any other way that you think you have
13  been damaged noneconomic?
14      A.  Can you be more specific by
15  noneconomic?
16      Q.  Well, you know, noneconomic means not
17  in monetary ways but other ways.
18      A.  Such as?
19      Q.  Well, I'm asking you.  Do you think
20  there's any ways that you have been damaged
21  other than economically?
22      A.  I would like -- I mean -- so I can
23  answer your question specifically, so like I
24  would like for you to say or ask me noneconomic
25  as in --

Page 198

1      Q.  Let me ask you --
2      A.  Okay.
3      Q.  Let me ask you this since you're having
4  some trouble with this question.
5      A.  Okay.
6      Q.  Have you been to seek any mental health
7  counseling because of what happened at Dynamic?
8      A.  I do see a therapist, yes.
9      Q.  Okay.  How long have you been seeing
10  the therapist?
11      A.  For about a little bit over a year.
12      Q.  And who is it that you're seeing?
13      A.  Her name is Lillian.
14      Q.  Where is she located?
15      A.  It's virtual.
16      Q.  Do you know her first name?
17      A.  Lillian.
18      Q.  I'm sorry.  Do you know her last name?
19      A.  Sanchez.
20      Q.  And I assume you pay for that?
21      A.  Yes.
22      Q.  Can you give me the date when you first
23  started seeing Ms. Sanchez?
24      A.  I don't remember the exact date.
25      Q.  Was there an event or events that led

Page 199

1  you to go see Ms. Sanchez?
2      A.  No.
3      Q.  Correct me if I'm wrong, but I'm going
4  to assume it was not your lifelong dream to work
5  in the mail room for Dynamic Security, was it?
6          Listen.  All jobs have a value.  I
7  understand that.  Everything you do to help your
8  family out has honor to it.  But I'm going to
9  assume you didn't get your master's degree so
10  you could work in the mail room?
11      A.  At that moment, it was a -- it was my
12  job and I wanted to see where it could go.
13      Q.  Okay.  You needed a job, and is it your
14  testimony that the job at Dynamic was the best
15  job you could find for you and your family?
16      A.  It was a job that I wanted to see where
17  I could go within that job.
18      Q.  Have you talked to Ms. Sanchez any
19  about what happened at Dynamic Security?
20      A.  Yes.
21      Q.  Okay.  Tell me what you have told her.
22      A.  What happened.
23      Q.  And have you talked about other things
24  that have occurred in your life?
25      A.  Yes.

Page 200

1      Q.  What other events or circumstances in
2  your life do you and Mrs. Sanchez talk about?
3      A.  Just jobs.
4      Q.  So is it mostly work-related stuff that
5  you're talking to her about?
6      A.  Yes.
7      Q.  How did you find Ms. Sanchez?
8      A.  Through my doctor.
9      Q.  And what's the doctor?
10      A.  Brooke Robinson.
11      Q.  And is that a female?
12      A.  Yes.
13      Q.  Where is -- we'll just call her
14  Dr. Robinson.  Where is Dr. Robinson's office?
15      A.  In Montgomery.
16      Q.  Do you know what group or practice
17  she's with?
18      A.  Jackson.
19      Q.  She's at Jackson Hospital?  Or is that
20  the name of the group?
21      A.  It's -- the group is Jack -- I don't
22  know the -- it's Jackson -- I think it is with
23  Jackson Hospital.
24      Q.  And do you know what it was that led
25  her to have you talk with Ms. Sanchez?



Page 201

1    A.   I just -- I just asked her did she know
2  of any therapist.
3    Q.   Has Brooke Robinson diagnosed you with
4  any mental diseases or issues of any sort,
5  depression, anything of that sort?
6    A.   No.
7    Q.   Have you ever been treated for -- a
8  doctor for depression?
9    A.   No.
10    Q.   Have you ever taken any medication for
11  depression?
12    A.   I -- yes, I have.
13    Q.   All right.  What have you taken and
14  when did you start taking it?
15    A.   I don't remember the name of it, but it
16  was -- I don't take it anymore and I took it
17  briefly.  And I don't even -- I can't tell you
18  the exact date.
19    Q.   Was it before or after you went to work
20  for Dynamic?
21    A.   After.
22    Q.   Did a doctor prescribe that for you?
23    A.   Yes.
24    Q.   Do you know what doctor?
25    A.   Robinson.

Page 202

1    Q.   Have you in the last, I'll say last ten
2  years, seen any other mental health
3  professionals?
4    A.   No.
5    Q.   Have you sought counseling from your
6  pastor or anyone else over what happened at
7  Dynamic?
8    A.   No.
9    Q.   Any other way?  Maybe you're sort of
10  getting the gist of what I'm -- any other ways
11  noneconomically -- like emotionally, socially --
12  how what happened at Dynamic has impacted your
13  life?
14    A.   Emotionally.
15    Q.   Okay.  Tell me how it's impacted you
16  emotionally.
17    A.   By making me feel less than as a woman
18  and as a black woman.
19    Q.   And how does what happened there make
20  you feel less than you are as a black woman?
21    A.   As if my appearance is not good enough.
22    Q.   All right.  Other than feeling bad
23  about that, is there any way that's manifested
24  itself?
25    A.   What do you mean?

Page 203

1    Q.   I mean, if I was -- if I had been
2  following you around 24 hours a day since you
3  stopped working at Dynamic, what would I have
4  seen that would have indicated that you were
5  feeling emotionally upset about what happened?
6    A.   Questioning if I was good enough.
7    Q.   Okay.  And I understand, but what would
8  I have seen?  What would be an outward
9  appearance of that?
10    A.   I don't think I can really describe
11  what -- describe it.
12    Q.   Yeah, and I'm not asking you to
13  describe your feelings.  I'm just asking you
14  what me or anyone else would have seen.
15    A.   I don't know because I -- I don't know
16  you seeing me what you would perceive, because
17  your perception of how I may be can be --
18  another person can have a different perception,
19  so it won't be the same.  That's what I'm
20  saying, feeling less than --
21    Q.   What I'm asking you, you tell me your
22  perception of changes that have occurred in your
23  life other than just your feelings that you
24  relate to what happened at Dynamic.
25    A.   I mean, feeling less than.  It affects

Page 204

1  how you view yourself.
2    Q.   Okay.  But is there any way that
3  manifests itself other than you just feeling
4  that way?  Which is fine.  I'm just asking if
5  there's any way that's manifested.  I mean, have
6  you -- you know, have you gained 50 pounds, lost
7  50 pounds, become an alcoholic, things I've
8  heard over the years.
9    Anything along -- any major changes in
10  your life that you attribute to what happened at
11  Dynamic?
12    A.   Just like my interactions with people
13  sometimes, with my children.
14    Q.   Are you harsher toward them because of
15  it?
16    A.   No.
17    Q.   Is there any activities that you used
18  to engage in -- hobbies, things of that sort --
19  that you no longer do that you attribute to what
20  happened at Dynamic?
21    A.   I used to write a lot.  I don't do
22  that.
23    Q.   I'm sorry.  You used to what?
24    A.   Write.
25    Q.   Like what kind of things did you write?



Page 205

1    A.   Just stories.  Just like, you know,
2  stuff like that.
3    Q.   Did you sell them to magazines?
4    A.   No.
5    Q.   Have you ever tried to sell any of
6  those?
7    A.   No.
8    Q.   How often would you write?
9    A.   I mean, just whenever I was -- felt
10  like writing.  I mean, every day, every other
11  day.
12    Q.   And when is the last time that you
13  wrote?
14    A.   I don't remember.
15    Q.   And you attribute the fact that you
16  don't write anymore to what happened at Dynamic?
17    A.   I just really question my -- like
18  who -- my place in the world of who I was as far
19  as being a woman and being with child and being
20  an African American woman and how -- I just
21  question things like that.
22    Q.   And I understand that.  But my
23  questions were a little more specific.  Are you
24  attributing to the fact you no longer write to
25  what happened to you at Dynamic Security?

Page 206

1    A.   Yes and no.
2    Q.   Can you explain the yes and no?
3    A.   I mean, like I don't think the --
4  because it makes you -- it made me question who
5  I was as a person and how I was viewed by the
6  world.  And so it made me not be so interested
7  in things that I normally, such as writing,
8  would be interested in.
9    Q.   Okay.  All right.  Anything else?
10  Anything else that you were interested in or
11  would be interested in that you're not because
12  of what you allege happened at Dynamic Security?
13    A.   No.
14        MS. PALMER:  Can we take a short break?
15        MR. REDMOND:  Yes, we may.
16        (Break.)
17    Q.   (BY MR. REDMOND:)  Ms. Key, you
18  understand you're still under oath?
19    A.   Yes.
20    Q.   Your interrogatory responses refer to
21  something called Sabree Therapeutical Services?
22    A.   Yes.
23    Q.   Is that Lillian's company?
24    A.   Yes.
25    Q.   Did you at some point go through a

Page 207

1  union hiring hall trying to find work?
2    A.   No.
3    Q.   Okay.  Somewhere I had a note that
4  something about a union hiring hall.  I may be
5  confusing two cases.
6        Is it accurate to say that, except for
7  maybe a two-month time period, that you have
8  been pretty much continually employed since you
9  started working for the cleaners in 2018?
10    A.   Yes.
11    Q.   And I think you told me that you
12  started looking for work the month of August of
13  2017; right?
14    A.   I believe so, yes.
15    Q.   Did you tell me -- could you remember
16  when you went to work for the cleaners in
17  Montgomery in 2018?
18    A.   I don't remember the exact date.
19    Q.   Was it the first half of the year,
20  second half?
21    A.   First half.
22    Q.   What did you do to try and find work
23  prior to finding that position with the
24  cleaners?
25    A.   Look on jobsites such as Indeed.  Just

Page 208

1  go to different -- you know, just go to like
2  maybe like I went to like different colleges to
3  see what they were hiring for.  Just research
4  different job agencies.
5    Q.   Were you offered any positions prior to
6  the cleaners job that you turned down?
7    A.   I don't remember.
8    Q.   Did you actually submit any
9  applications anywhere?
10    A.   For employment?
11    Q.   Yes.
12    A.   Yes.
13    Q.   How many would you say?
14    A.   Hundreds.
15    Q.   Was there particular industries or jobs
16  you were looking for?
17    A.   No.
18    Q.   Did you go on any interviews before
19  having the job at the cleaners?
20    A.   I don't remember.
21    Q.   Do you remember if there were any
22  prospective employers that you felt pretty good
23  about that you wanted to get that job?
24    A.   No.
25    Q.   Take a look at, if you would,



DAVITA M. KEY                                                                June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                                209—212

Page 209

1   Exhibit 17.  It's this handwritten complaint of
2   yours.  Here.  I think it's Exhibit 17.
3          Before I ask you that, let me be sure I
4   understand this.  The statement that we looked
5   at earlier, the one-page statement, you gave
6   that to Mr. Cureton; right?
7   A.  Yes.
8   Q.  The first sentence on this says "I
9   refute some of the claims Ms. Gloria Robinson
10  has said in her statement concerning my
11  discharge from HMMA."
12         What are you referring to by "her
13  statement"?  Is that a written statement?
14  A.  Yes.
15  Q.  How did you see the written statement?
16  A.  Ray Cureton showed it to me.
17  Q.  When did he show it to you?
18  A.  On August 8th.
19  Q.  So on August -- I think you told me
20  August 8th is the last day you had any
21  discussion with anyone at Dynamic; right?
22  A.  Yes.
23  Q.  So did you go to the Dynamic facility
24  on the 8th?
25  A.  Yes.

Page 210

1   Q.  What was your purpose in going to the
2   Dynamic facility on the 8th?
3   A.  I don't remember exactly why I went
4   there.
5   Q.  Okay.  Did you speak with anyone else
6   besides Mr. Cureton?
7   A.  Nicole.
8   Q.  Tell me first what did you and Nicole
9   talk about.
10  A.  I don't remember.
11  Q.  You don't remember anything at all?
12  A.  No.
13  Q.  What did you and Mr. Cureton talk
14  about?
15  A.  He showed me a statement from
16  Ms. Gloria Robinson, and I asked him could I
17  write a response to it.
18  Q.  Did he tell you whether he had
19  permission to show you that?
20  A.  I don't remember.
21  Q.  Anything else you and Mr. Cureton
22  talked about?
23  A.  I asked him could I get a copy of it
24  and a copy of this statement, and he told me I
25  could not.

Page 211

1   Q.  The next paragraph says "On my arrival
2   for my first day at work, both Ms. Williams and
3   Ms. Robinson saw me, spoke with me and saw my
4   hair.  It was the same as in my initial
5   interview.  Neither of them said anything."
6          Were the two of them together or was
7   that seeing them separately?
8   A.  Separately.
9   Q.  Page -- if you'll look at page 3.  This
10  is not a big deal.  I'm trying to make sure I
11  have this date right.
12         You said, the first full paragraph,
13  says "I did ask Nicole, who I later was told was
14  the office manager, was there a problem with my
15  hair on Thursday, July 27, 2017."
16         Wasn't that July 21?  Wasn't the
17  testimony today consistent that was July 21 that
18  you --
19  A.  I don't remember.  It was whatever date
20  I went there for training.
21  Q.  And whatever date you signed all these
22  policies?  So if these policies are all dated
23  July 21?
24  A.  I mean, it's whatever day I went there
25  for training.  They could have had the training

Page 212

1   on a different day.  I don't remember.
2   Q.  But it's also the same day that you
3   signed those policies; right?
4   A.  It may not be.
5   Q.  Okay.  So you could have signed the --
6   okay.  Because I thought your testimony had been
7   pretty clear that you went over there for one
8   day for training.
9          So let me go back and ask you this.
10  When you went there the day you signed the
11  policies, there all day July the 21st, what else
12  do you recall happening that day?
13  A.  Honestly, I do not remember.
14  Q.  But there was a day of training?  You
15  did go to the Dynamic facility for training?
16  A.  Yes.  They had some videos to watch.
17  Q.  And who handled that?
18  A.  I don't -- I mean, I don't know who the
19  person was.  He did it in groups.
20  Q.  And what were the videos about that you
21  watched?
22  A.  I don't remember.
23  Q.  Do you recall what other training you
24  might have had other than watching some videos?
25  A.  No.



Case 2:19-cv-00767-ECM-SMD   Document 75-1   Filed 10/12/22   Page 55 of 74
USCA11 Case: 24-11126   Document: 60-1   Date Filed: 02/14/2025   Page: 116 of 206

DAVITA M. KEY                                                    June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                    213–216

Page 213

1   Q.   Now, this says on here you "asked
2   Nicole, who I later was told was the office
3   manager."  So who told you that Nicole was the
4   office manager?
5       A.   I don't remember exactly who told me
6   that.
7       Q.   Do you know when you found that out?
8       A.   No.
9       Q.   So am I right that when you asked
10  Nicole whether there was a problem on your hair,
11  you didn't know she was the office manager at
12  the time?
13      A.   No.
14      Q.   Okay.  And you don't know when you
15  found out that she was the office manager;
16  right?
17      A.   I mean, it had to be prior to
18  July 31st.
19      Q.   Why do you say that?  I mean, this is
20  dated August 8, so how do you know it had to be
21  before July the 31st?
22      A.   Because it's dated August 8th, so I'm
23  responding to something that Ms. Gloria Robinson
24  said.  So it had to be prior to my first day at
25  work.

Page 214

1       Q.   Well, I'm just asking.  I don't see the
2   connection there, if you can help me.  What is
3   it that that makes you think --
4       A.   This is only dated August 8th because
5   that's when I was shown what Gloria Robinson
6   wrote.
7       Q.   Right.  Right.
8       A.   So anything that I'm writing in this is
9   going to happen prior to August 8th.  And I
10  was -- prior to me being dismissed from
11  Hyundai's site, I knew that Nicole was the
12  office manager.
13      Q.   Okay.  Page 4, about at the end of the
14  paragraph that starts at -- you say that you
15  think it's highly unprofessional and unethical.
16  What is it that you think is unethical --
17  yeah -- for Ms. Robinson to have called you
18  after work to ask you some questions about your
19  pregnancy?
20      A.   Because she had a discussion with other
21  people about my pregnancy.
22      Q.   How do you know that?
23      A.   Because Tonya Howell told me.
24      Q.   What did Tonya tell you?
25      A.   "She told me that you were pregnant."

Page 215

1   I had already told Tonya, but Tonya said that
2   Gloria Robinson had told her also.
3       Q.   Okay.  So what you think is unethical,
4   not that she called you after you left the
5   building but that she was talking to others
6   about you?
7       A.   That.  And, also, why would you call
8   and ask me when my baby was due.
9       Q.   Okay.  Those are the two things you
10  think are unethical?
11      A.   I mean, I think it's many factors.
12      Q.   Well, I was just curious about it
13  because the statement you wrote says "I find it
14  highly unprofessional for a conversation
15  concerning my pregnancy to be held about me
16  after I had left and unethical."
17          So I didn't know.  Are you referring to
18  her calling you?  Are you referring to her
19  telling Tonya Howell?
20      A.   Her calling me and her telling -- her
21  talking about it openly with other people.  When
22  I was there, she could have asked me all these
23  questions, but she chose until after I left to
24  have this discussion about me.  So, yes, I think
25  that is very unprofessional.

Page 216

1       Q.   Earlier you said something about the
2   law requires them to show you the hair policy.
3   Do you remember telling me that?
4       A.   Requires you to show me the policies as
5   far as the rules and regulations.
6       Q.   What do you base it on that the law
7   requires you to be shown this?
8       A.   Because how do you -- if you have
9   paralegals who work for you and you have a
10  certain policy, wouldn't you want them to be
11  informed?
12      Q.   Oh, yeah, but that's a big difference
13  between saying the law requires it.  I'm just
14  asking what's your basis for saying that the law
15  requires them to show you a copy of the hair
16  policy.
17      A.   Because you have to sign for your
18  employee handbook.  So, legally, I have to say
19  that I received and I'm aware of it, so,
20  legally, they have a right to show me something
21  that I have to adhere by.
22      Q.   I mean, you don't have any --
23      A.   I'm not an attorney, so --
24      Q.   -- legal training, do you?  Do you have
25  any legal training?



Page 217

1    A.   No, I don't.
2    Q.   I mean, have you gone and researched
3 this about what a company is required to show
4 you?
5    A.   I have done research to see if I'm
6 obligated to see a policy concerning my -- the
7 rules and regulations for where I'm employed.
8    Q.   All right.  And what did you find?
9    A.   That I should be shown policy.
10   Q.   So is that what you base that on, what
11 you found doing your own legal research?  I'm
12 just trying to find out what the basis was for
13 your testimony earlier today that the law
14 requires them to show you the policy.
15   A.   Yes.
16   Q.   And, in fact, your testimony has been
17 that at some point they did; right?
18   A.   Reluctantly.
19   Q.   Yeah, I was going ask.  I had a note to
20 ask you that question.
21       Why did you say Ms. Williams was
22 reluctant to show you the policy?
23   A.   Because she told me she didn't have to
24 show it to me.
25   Q.   Anything else other than her telling

Page 218

1 you that?
2    A.   Gloria Robinson said how dare I ask her
3 to show it to me.
4    Q.   This was after the fact; right?
5    A.   After I asked to see the policy.
6    Q.   Was this during the conversation
7 between you, Ms. Robinson, and Ms. Williams?
8    A.   This was right there in that office
9 right there on July 31st.
10   Q.   Anything else other than those that
11 makes you think she was reluctant to show you
12 the policy?
13   A.   Yeah, because she didn't want to -- she
14 told me she didn't want to show it to me.  So,
15 yeah.
16   Q.   Other than that?  Anything else?
17 Anything about her body language, for instance,
18 that showed that she was reluctant?
19   A.   She was yelling.
20   Q.   Ms. Williams was?
21   A.   Yep.
22   Q.   The solution that you had on day two of
23 your employment, which was to wear a cap --
24   A.   Yes.
25   Q.   -- was that a possible -- to your

Page 219

1 understanding, was that a possible permanent
2 solution to the problem?
3    A.   I'm not sure.  I was just told that I
4 would have to wear a hat all day every day.  And
5 my intentions were to go that weekend and get my
6 hair styled to their liking.
7    Q.   Did you ever tell anybody at Dynamic
8 that, that you were going this weekend to get
9 your hair --
10   A.   Yes, I told Gloria Robinson.
11   Q.   When?
12   A.   When I came back to work on the 1st and
13 I asked her was this about my hair.  And I told
14 her that my stylist did not work on Tuesdays and
15 that I would get a weekend appointment.
16   Q.   And that's when she led you to believe
17 it was something else?
18   A.   Yes.  No, she told me it was something
19 else.  She didn't lead me to believe.
20   Q.   Okay.  Fair enough.
21       MR. REDMOND:  This will be marked as
22 Exhibit 26.
23       (Defendants' Exhibit 26 was marked
24           for identification.)
25       MR. REDMOND:  Leslie, I'm going to need

Page 220

1 you to look on with her because my other one is
2 marked up.
3       MS. PALMER:  What is it?
4       MR. REDMOND:  It's her rebuttal to the
5 EEOC charge.
6       What number is this?
7       THE COURT REPORTER:  26.
8       MR. REDMOND:  26.
9    Q.   All right.  Take as much time as you
10 need to read this and tell me when you're ready.
11       (Pause.)
12   A.   Okay.
13   Q.   You recognize this document?
14   A.   Yes.
15   Q.   This was -- well, you tell us.  What is
16 this document?
17   A.   A rebuttal.
18   Q.   Had you received something in the mail
19 from the EEOC that told you that they were going
20 to find against you on your charge against
21 Dynamic?
22   A.   Had I what?
23   Q.   Let me ask it this way.  What led you
24 to send this?
25   A.   It's a rebuttal to the EEOC charge.  So



Page 221

1  Dynamic got the charge and they issued their
2  statements and I rebuttaled to what they said.
3       Q.   Did someone show you a copy of
4  Dynamic's position statement?
5       A.   I mean, I got -- I received it in the
6  mail.
7       Q.   Okay.  How many pieces of
8  correspondence did you receive in the mail from
9  the EEOC related to the Dynamic charge?
10       A.   I don't know.
11       Q.   So you go into Birmingham on the 2nd,
12  right, and fill out the intake questionnaire in
13  person there; correct?
14       A.   I believe it was the 3rd.  It was the
15  2nd or the 3rd.
16       Q.   All right.  And then your charge is
17  dated August 3; right?  We can look at it.  It's
18  going to be Defendants' Exhibit either 14 or 15.
19       A.   August 3rd.
20       Q.   Okay.  So did you have to go back in a
21  second time?  Or did they mail you a copy of the
22  charge?
23       A.   They mailed me a copy.
24       Q.   Okay.  So the charge that you signed,
25  the EEOC mailed to you; is that right?

Page 222

1       A.   What do you mean?
2       Q.   I mean, the EEOC sent you first-class
3  mail at your home address on Wrangler Road?
4       A.   The intake, I signed that at the EEOC
5  office.
6       Q.   Right, right.  But they mailed the
7  other one to you?
8       A.   This one?
9       Q.   To sign?
10       A.   They emailed it to me.
11       Q.   Emailed, okay.  Emailed it to you.
12  Okay.
13            All right.  And did they subsequently
14  send you by mail or by email a letter saying
15  that they were about to find against you?
16  Here's Dynamic's position statement.  Would you
17  like to offer a rebuttal?
18       A.   Yes.
19       Q.   That's what happened?
20       A.   Yes.
21       Q.   How did they send that to you?
22       A.   By mail.
23       Q.   Okay.  Regular U.S. postage mail?
24       A.   Yeah.
25       Q.   And that one got to you no problem?

Page 223

1       A.   Yes.
2       Q.   All right.  Had you received anything
3  else in the mail from the EEOC prior to that
4  point?
5       A.   Prior to October 4th?  I don't
6  remember.  I would have to look.
7       Q.   Did you receive anything from the EEOC
8  after October 4th in the mail relating to the
9  Dynamic charge?
10       A.   I don't remember.  I know I received my
11  entire case thing when they gave me the right to
12  sue letter and I requested for my entire case
13  thing.  But other than that, I don't know.
14       Q.   And the position statement they sent
15  you, that was drafted by someone at Dynamic;
16  right?
17       A.   What do you mean, the position
18  statement?
19       Q.   Didn't the EEOC send you a copy of
20  Dynamic's position on the charge?
21       A.   Yes.
22       Q.   All right.  And that was drafted by
23  someone at Dynamic; right?
24       A.   I don't know.
25       Q.   Okay.  But you understood what they

Page 224

1  were sending you was Dynamic's position; right?
2       A.   Yes.
3       Q.   Okay.  And this, at that point, had
4  nothing to do with any Hyundai entity; right?
5  This was just a charge against Dynamic?
6       A.   I don't know because, like I said
7  earlier, I'm thinking that everything is
8  together.  So I'm not -- it's not fully
9  explained to me.  Even though that Dynamic
10  Security and Hyundai are two separate, I'm
11  thinking they work together.  So that had not
12  been explained.
13       Q.   The position statement that was sent to
14  you to review, did it have anything that
15  indicated it was on behalf of Hyundai?
16       A.   I don't remember.  I would have to look
17  at it.
18       Q.   Second paragraph here.  This is where I
19  saw the part that says I can produce the phone
20  records.  And we talked about that.
21            But this says you visited the office on
22  August 8th in reference to working assignments.
23  Does that refresh your recollection as to why
24  you were at the office on August 8th?
25       A.   Yes.



Page 225

1  Q.  You were asked some questions this
2  morning about what documents you reviewed to
3  prepare for your deposition today.  And I think
4  all I wrote down was the things that you had
5  given to my attorneys.
6      Are you able to give us any better
7  detail about what you looked at to prepare for
8  your deposition today?
9  A.  The complaint that was filed.
10  Q.  Okay.  All right.  And I stand
11  corrected.  You did say that you looked at the
12  complaint.  And then when you were asked if you
13  looked at anything else, you said, "Well, I
14  looked at the information that I gave to my
15  attorneys."
16      Are there any documents other than the
17  complaint -- which is kind of long -- but was
18  there anything else other than the complaint
19  that you looked at to prepare for your
20  deposition today?
21  A.  I mean, I looked at the complaint that
22  was filed.  I reviewed the handbook that I was
23  given by Dynamic Security.
24  Q.  Okay.  That's what I'm talking about,
25  okay.  Any --

Page 226

1  A.  What I had written initially with
2  the -- and submitted to the EEOC.
3  Q.  I need to put -- I heard you use the
4  word -- the N-word this morning.  That was
5  Nicole who told you you haven't been
6  discriminated against because they haven't used
7  that word against you?
8  A.  She said that, "You haven't really been
9  discriminated against."  She said, "I've been
10  called," and she said, "the N-word."  She said,
11  "You haven't been called that.  They didn't call
12  you that."
13  Q.  And she's an African American also;
14  right?
15  A.  Yes.
16  Q.  When Ray Cureton told you they did not
17  want you at the facility anymore, did he
18  specifically mention Gloria Robinson by name?
19  A.  That's who the -- when we were talking
20  and I was talking with him, that's who the
21  conversation was about.  He was saying like,
22  "Oh, I've known her," and, "She's not like
23  that," and, you know, "They don't want you
24  there."
25      And he said like -- and I was like,

Page 227

1  "Who?"  And he said, "Gloria Robinson."  And
2  then I asked him, "Why?"  He said, "Because of
3  your hair and something else."
4  Q.  That's the only name he mentioned?
5  A.  I don't remember exactly.  I know he
6  mentioned her name.
7  Q.  You testified that Ray Cureton -- that
8  you talked to Ray Cureton and Nicole about other
9  jobs, and they said they would let you know when
10  something was available.  Were the two of them
11  together when that was said?
12  A.  Every time I spoke with one, I --
13  except for the time when I asked Nicole about my
14  hair, he would have her there with him.
15  Q.  Take a look at, if you would, at
16  Defendants' Exhibit 10, the handbook that was
17  given to you.
18      You said something after the break,
19  when Mr. Middlebrooks asked you if you had
20  anything to add, you added something about the
21  jury trial waiver.  And I couldn't hear it very
22  well.  Do you remember what it was that you --
23  A.  I just -- it just -- I just said that
24  "It is the desire of Dynamic Security to resolve
25  disputes whenever possible in a fair and

Page 228

1  expeditious manner reflecting the interests of
2  the concerned parties."
3  Q.  All right.  And you read that part of
4  the handbook when you were hired?
5  A.  I read the entire handbook.
6      MR. WHITEHEAD:  Wes, can we take a very
7  quick, like 30-second break?
8      MR. REDMOND:  Yeah.
9      (Break.)
10      (Defendants' Exhibit 27 was marked
11      for identification.)
12  Q.  I show you what's marked as Defendants'
13  Exhibit 27 and ask you, are you able to identify
14  what that is for us?
15  A.  A picture of my hair.
16  Q.  Okay.  Is that -- what's that supposed
17  to be a picture of?
18  A.  How my hair was styled.
19  Q.  Normally that's how it's styled?  Or is
20  that how it was styled when they said it would
21  be acceptable?  Is that the picture you showed
22  them about -- that they said was acceptable?
23  A.  No.
24  Q.  That's how it was that day that you --
25  A.  And in my interview.



Page 229

1    Q.  Okay.  You were asked --
2        Let me mark this as Exhibit 28.
3        (Defendants' Exhibit 28 was marked
4        for identification.)
5    Q.  You were asked some questions about
6    your unemployment and your appeal, and I don't
7    think we ever got an answer for it.
8        Do you recognize that as the appeal you
9    filed --
10   A.  Yes.
11   Q.  -- for unemployment?
12   A.  Yes.
13       (Defendants' Exhibit 29 was marked
14       for identification.)
15   Q.  (BY MR. REDMOND:)  Let me show you next
16   what is marked as Exhibit 29.  I'm not going to
17   make it to 30.
18       And this is what you received telling
19   you that your appeal had -- or your request to
20   appeal had been denied?
21   A.  Yes.
22   Q.  And did you receive that in the mail?
23   A.  Yes.
24   Q.  Did you have any problems receiving
25   that?

Page 230

1    A.  I received it in the mail, sir.
2    Q.  So of all the documents we looked at
3    today, is the only one that you had problems and
4    you say that you never got in the mail the
5    notice of your right to sue of the Dynamic
6    Security charge?
7    A.  I never received that.
8    Q.  And that's the only document that you
9    know of that you didn't get?
10   A.  I don't know.  Because if I didn't get
11   it, I don't know what it --
12   Q.  Fair enough.
13   A.  -- what else is supposed to --
14   Q.  You can't identify any other documents
15   that you have not received that were sent to you
16   by mail?
17   A.  I don't know.
18   Q.  And we looked at several today that
19   were sent to you by mail that did appear to go
20   to you either from the EEOC or from the
21   Department of Labor; correct?
22   A.  Yes.
23       MR. REDMOND:  I'm done.
24              EXAMINATION
25   BY MR. MILLER:

Page 231

1    Q.  Good afternoon, Ms. Key.
2    A.  Good afternoon.
3    Q.  I'm Matt Miller.  I represent
4    Hyundai ENG, America, Inc., in this case.
5        You understand you're still under oath?
6    A.  Yes.
7    Q.  Same ground rules apply to my questions
8    as applied to the prior two sets of questions.
9    You understand that?
10   A.  Yes.
11   Q.  If I ask you a question and you don't
12   understand it, please let me know and I'll try
13   to rephrase it, okay?
14   A.  Okay.
15   Q.  If you answer my question, I will
16   assume that you understood it; is that fair?
17   A.  Yes.
18   Q.  And I'll assume if you answer my
19   question that you've given me a complete
20   response, everything that you can think of in
21   response to the question; is that fair?
22   A.  Yes.
23   Q.  You went through a list earlier today
24   with Mr. Middlebrooks of everyone you've
25   interacted with at the Hyundai facility here in

Page 232

1    Montgomery.  Do you remember that?
2    A.  Yes.
3    Q.  The one we're in today and the
4    surrounding areas; right?
5    A.  Yes.
6    Q.  Is there anybody else that you can
7    think of here at the end of the day that you
8    interacted with and haven't talked about today?
9    A.  No.
10   Q.  Any discussions you had with anybody,
11   regardless of who they were employed with, while
12   you were assigned here at this facility that we
13   haven't gone over today?
14   A.  No.
15   Q.  As part of this case, we sent you --
16   when I say "we", I mean HEA -- sent you some --
17   sent your attorney some requests for -- asking
18   you some questions called interrogatories and
19   asking you for -- to produce documents which we
20   call requests for production.
21       And I want to make that an exhibit,
22   exhibit whatever the next one is.
23       (Defendants' Exhibit 30 was marked
24       for identification.)
25   Q.  (BY MR. REDMOND:)  If you will look

Page 233

1   with me on page 13 of these.  Is that your
2   signature?
3       A.  Yes.
4       Q.  And did you review your responses
5   before you signed this document?
6       A.  Yes.
7       Q.  And do you believe everything in your
8   responses is truthful and accurate?
9       A.  Yes.
10      Q.  And complete?
11      A.  Yes.
12      Q.  In responding to our request for
13  documents, your lawyers have produced some
14  documents.  What I want to ask you is are there
15  any documents that you have that you believe
16  support your claims that you have not given to
17  your lawyers?
18      A.  No.
19      Q.  Any documents, whether they go -- that
20  might go against your claims in this case that
21  you've not given to your lawyers?
22      A.  No.
23      Q.  In your responses, if you would look
24  with me at request Number 9 on page 11, document
25  request Number 9 on page 11.  And in that

Page 234

1   request, we ask for diaries and calendars or
2   journals that refer or relate to HEA in any way
3   from January 1, 2017, to the present.  Do you
4   see that?
5       A.  Yes.
6       Q.  And in the response, there's an
7   objection.  And then it says "Subject to and
8   without waiving this objection, plaintiff will
9   produce journal entries."  Do you see that?
10      A.  Yes.
11      Q.  Do you have some journal entries that
12  relate to HEA?
13      A.  Yes.
14      Q.  That refer to HEA?
15      A.  It refers to the -- I just want to be
16  clear.  Okay.  HEA, is that -- when you say HEA,
17  do you mean this entire case or you mean
18  specifically HEA?
19      Q.  I mean specifically Hyundai
20  Engineering, America, Inc.  Do you have any
21  journal entries that refer to that entity or
22  HEA, entity named -- with the initials HEA?
23      A.  I don't know.  I don't know.  I would
24  have to -- I don't know.
25      Q.  Okay.  Do you have any -- because this

Page 235

1   response says that you'll produce journal
2   entries --
3       A.  Yes.
4       Q.  -- okay, that suggests to me that you
5   must have some journal entries that are
6   responsive to this request.
7       A.  To this case.  I have to look at them,
8   to read them to see.
9       Q.  So you have some journal entries that
10  relate to this case?
11      A.  Yes.
12      Q.  And your claims in this case?
13      A.  Yes.
14      Q.  And they may relate to claims against
15  other defendants; is that what you're telling
16  me?  You're just not sure if they relate
17  specifically to HEA or other entities?
18      A.  Yes.
19      Q.  Okay.  Have you provided those journal
20  entries to your lawyers?
21      A.  Yes.
22      Q.  Okay.  Because I don't believe I have
23  those.  I may be missing them.
24          MS. PALMER:  Is this the phone?
25          THE WITNESS:  Yeah.

Page 236

1           MS. PALMER:  This is the phone.  Were
2   you part of that conversation?  We have a phone
3   that is a busted phone --
4           MR. MILLER:  Okay.  I'll ask her about
5   it.
6       Q.  Okay.  So do you have any journal
7   entries that are not contained on a cell phone?
8       A.  No.
9       Q.  Okay.  So when you're referring to
10  journal entries, you're referring to something
11  typed into your phone or dictated into your
12  phone?
13      A.  Yes.
14      Q.  And what program were those put into?
15      A.  My Notes on my phone.
16      Q.  Okay.  What kind of phone did you have?
17      A.  iPhone.
18      Q.  So iPhone is like the Apple Notes?
19      A.  Yes.
20      Q.  And you went into the Apple Notes and
21  you made some journal entries?
22      A.  Yes.
23      Q.  When did you make those journal
24  entries?
25      A.  I don't know the exact day.



DAVITA M. KEY                                          June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          237–240

Page 237

1    Q.   Did you make the journal entries when
2  you were still working for Dynamic Security?
3    A.   No.
4    Q.   Did you make those journal entries --
5  so those journal entries were made after your
6  assignment, after your work with Dynamic?
7    A.   Yes.
8    Q.   Do you know what year they were made?
9    A.   I don't know the exact year.  I don't
10 know because of the phone, so I can't see -- I
11 know they started in 2017.  So I don't know the
12 length of time that they are.  I have to...
13   Q.   What are the journal entries about?
14   A.   About the -- just my feelings, how I
15 felt about what was happening.
16   Q.   But they were made after the fact?
17   A.   Okay.
18   Q.   Is that correct?
19   A.   Yes.
20   Q.   I mean, I think you told me they were
21 not made while you were working at Dynamic?
22   A.   That still doesn't mean that they
23 can't -- I can't express how I felt during that
24 time.
25   Q.   Okay.  But what I'm asking you is the

Page 238

1  journal entries were made sometime after you
2  stopped working at Dynamic; correct?
3    A.   Yes.
4    Q.   And they express how you felt when you
5  were working at Dynamic?
6    A.   When I was working with Dynamic, the
7  aftermath of me not working for Dynamic.  So
8  yes.
9    Q.   And the journal entries, were they made
10 in multiple days or just in one day?
11   A.   Multiple days.
12   Q.   Over how long of a period of time?
13   A.   I don't know.  I don't know how long of
14 a period.
15   Q.   Did you ever print them out?
16   A.   No.
17   Q.   Email them to anybody else?
18   A.   No.
19   Q.   Text them to anybody else?
20   A.   No.
21   Q.   Show them to anybody else?
22   A.   No.
23   Q.   Your husband never saw them?
24   A.   No.
25   Q.   Lawyers have not seen them?

Page 239

1    A.   No.
2    Q.   So we've got some journal entries that
3  relate to this case, correct, that nobody's ever
4  seen except for you?
5    A.   Yes.
6    Q.   And you haven't seen them since when?
7    A.   Since -- I don't remember the last time
8  I had that phone.  I mean --
9    Q.   Did you have that phone when you filed
10 your EEOC charge against Dynamic?
11   A.   Yes.
12   Q.   And was it working at that time?
13   A.   Yes.
14   Q.   Did you have that phone when you filed
15 your EEOC charge against HMMA?
16   A.   I've had the -- I had the phone in 2017
17 for the remainder of the time.  And then -- so I
18 would say I've had the phone -- I had that
19 particular phone from 2017 till maybe 2018.
20   Q.   And what happened to it?
21   A.   The screen cracked, so I got a new
22 phone.
23   Q.   And you still have -- I believe --
24 we've had some discussions with your lawyer, but
25 I just want to ask you about.  You still have

Page 240

1  this phone somewhere?
2    A.   Yes.
3    Q.   Did you give it to your lawyers?  They
4  have it or do you have it?
5    A.   They have it.
6    Q.   Has anybody else had possession of this
7  phone other than you and your lawyers since
8  2017?
9    A.   No.
10   Q.   And when did you first give it to your
11 lawyers?
12   A.   I don't remember the exact date.
13   Q.   Is there anything else relating to this
14 case on that phone other than these journal
15 entries?
16   A.   I don't know.  I would have to look at
17 it.  I mean --
18   Q.   Is there a copy of the photograph or
19 the image that you say you showed to Cassandra
20 and Ms. Robinson about the hairstyle that would
21 be acceptable, an up-do style I think is how you
22 put it?
23   A.   I don't think so because that image was
24 on my Facebook, and I don't have -- I haven't
25 had Facebook since 2017.  I pulled it up on my



Page 241

1  Facebook.  So I don't know if it's on that
2  phone.  I showed them through my Face -- on my
3  Facebook page.
4      Q.   Where did you find that style on your
5  Facebook -- how did you find it on the Facebook
6  page?  Was it your style, a style that you --
7      A.   It was a picture of me that I posted to
8  Facebook that I showed them.
9      Q.   And when did you post that picture?
10     A.   I don't -- I mean, I don't know.
11     Q.   Was it in 2017?
12     A.   I -- I don't know.
13     Q.   So we know that before you had this
14  conversation with Cassandra and Ms. Robinson,
15  that at some point you must have worn your hair in a
16  different style than you were wearing it in the
17  interview; correct?
18     A.   Yes.
19     Q.   And you had worn it in what you called
20  an up-do style?
21     A.   Yes.
22     Q.   And was that a more -- would you
23  consider that a more conservative style?  A
24  neater style?  How would you describe it?
25     A.   Just a different hairstyle.

Page 242

1      Q.   Describe it for me because I don't have
2  the image.
3      A.   Just like if your wife wore her hair in
4  a bun instead of wearing it down.
5      Q.   If my wife had dreadlocks and wore her
6  hair in a bun?
7      A.   If your wife wore her hair how she has
8  it now in a bun.
9      Q.   Okay.  You couldn't see the dreadlocks
10  at all?
11     A.   Yes, you could see him.  So your
12  wife -- I mean, I don't know.  I just -- because
13  you're married; I saw your ring.  But if your
14  wife has curly hair and she puts it in a bun,
15  that's my hair.  You can see it.  You can still
16  tell that I had dreadlocks.  It's just up in a
17  bun.
18     Q.   And you don't remember -- how long did
19  you wear your hair in that style?
20     A.   I don't -- I mean, I don't know.  It
21  wasn't -- it probably was just -- I just put it
22  up.  It wasn't -- I don't know how long I wore
23  it.
24     Q.   Let me ask you.  I don't want to
25  sound -- I don't want this to come across in the

Page 243

1  wrong way.  But when you were born, did you have
2  dreadlocks?
3      A.   I didn't have hair when I was born.
4      Q.   Okay.  Well, when you were an infant,
5  did you have dreadlocks?
6      A.   No.
7      Q.   When did you first start wearing your
8  hair in dreadlock style?
9      A.   When I was 18.
10     Q.   And how did you get your hair to get
11  into a dreadlock style?  Did you apply any kind
12  of creams?  Or did you go to a stylist to get it
13  started?  How did you get the dreads started?
14     A.   I twisted it and let it just take its
15  natural form.
16     Q.   Okay.  So did you twist individual
17  hairs -- each individual hair into a --
18     A.   Yes.
19     Q.   And tight -- wove it and then you left
20  it --
21     A.   Yes.
22     Q.   -- for an extended period of time and
23  it formed tighter locks?  Is that how it worked?
24     A.   Yes.
25     Q.   How long did it take you to get it in

Page 244

1  that style?
2      A.   When I twisted it, it came that style.
3  What do you mean?  I don't understand the
4  question.
5      Q.   How long did you get it before you
6  could call it truly dreadlocks?  Was it
7  immediate?
8      A.   Yes.
9      Q.   How long did it take you to put your
10  hair up in the bun style?  From the dreadlocks
11  into the bun style?
12     A.   Probably a few years.
13     Q.   It took you a few years to get your
14  hair into a bun?
15     A.   Because it had to grow.
16     Q.   Okay.  Well, once you had dreadlocks,
17  correct, you then put it up into a bun?
18     A.   No.
19     Q.   When did you put it up into a bun?
20     A.   When it was long enough for me to put
21  into a bun.
22     Q.   In 2017 when you're interviewing with
23  Dynamic, was it long enough for you to put into
24  a bun?
25     A.   Yes.



DAVITA M. KEY                                                 June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                 245–248

Page 245

1    Q.   How long would it have taken you to put
2    the hair into a bun?
3    A.   Not long.
4    Q.   Is that something you could do
5    yourself?
6    A.   Yes.
7    Q.   So the style that you showed on your
8    phone to them in the bun style is something you
9    could have --
10   A.   Well, not that style because it was how
11   my stylist did it.
12   Q.   A similar style?  Similar --
13   A.   It wouldn't have looked the same, no.
14   Q.   How long would it take your stylist to
15   put your hair up in the style that you showed to
16   Ms. Williams and to Ms. Robinson?
17   A.   My appointments usually last two to two
18   and a half hours.
19   Q.   And after that, you could have had your
20   hair in that style?
21   A.   Yes.
22   Q.   Is this particular hair stylist that
23   you go to the only person who can do that for
24   you?
25   A.   She's my hair stylist.

Page 246

1    Q.   Okay.  I understand.  I go to one
2    person usually to get my hair cut.  But if
3    they're not there and I really need something
4    done -- like this week, if you look at my
5    hair -- I sometimes go to somebody else.
6    A.   She's the only person I could go to.
7    Q.   Nobody else could put your hair in that
8    bun?
9    A.   She's the only person who does my hair,
10   who I could go to, yes.
11   Q.   That's your choice.  She's not the only
12   personal who's capable of doing it.  It's the
13   only person you want to do it; is that accurate?
14   A.   I'm sorry.  Oh, you asking me a
15   question?
16   Q.   Yeah, she's the person who did my hair,
17   A.   Yeah, she's the person who did my hair,
18   yes.
19   Q.   She's the one you wanted to do it.
20   She's not the only person who could do it?
21   A.   Yes.
22   Q.   And wearing your hair in dreadlock
23   style, that's something you chose to do?
24   A.   I'm wearing my hair in its natural
25   state.

Page 247

1    Q.   Well, it wasn't like that when you were
2    18, was it?
3    A.   Was your hair like that when you were
4    18?
5    Q.   No.  I parted it a little different.
6    A.   Okay.
7    Q.   But --
8    A.   I feel like that --
9    Q.   I'm just asking you.
10   A.   And I feel like it's making a mockery
11   of who I am.
12   Q.   Well, I'm not trying to make a mockery
13   of you.  I'm addressing your claims, okay?  I
14   have to represent my client and I have to ask
15   questions.  Nothing personal.
16        The -- I'm just asking you, you chose
17   when you were 18 to twist your hair up and put
18   it in a dreadlock style; correct?
19   A.   To wear my hair in its natural state,
20   yeah.  I wear my hair in its natural state.
21   Q.   I'm just asking -- I'm not asking about
22   natural state.  I'm --
23   A.   That's how that's --
24   Q.   Let's take that term out.  I'm just
25   asking you when you were 18, you chose to twist

Page 248

1    your hair up into dreadlocks?
2    A.   To wear it in its natural state is what
3    I chose to do at the age of 18, yes.
4    Q.   And natural state is different than the
5    natural state it was in before you twisted it?
6    A.   It just was not twisted.  It was still
7    in its natural state.
8    Q.   It wasn't in dreadlocks, was it?
9    A.   No.
10   Q.   Okay.
11        You filed an amended -- well, let me
12   ask you one more question about your documents.
13        You said that you've given all your
14   documents to your lawyers.  Do you have any
15   audio or video recordings of anything that went
16   on early in this case?
17   A.   No.
18   Q.   You want to take a break?
19   A.   No, I'm fine.
20   Q.   Okay.  I just want to make sure I have
21   everything, you know, that you might rely upon
22   that I have a chance to see while I'm asking
23   about this.  But there's nothing else you can
24   think of that you haven't provided to your
25   lawyers relating to this case?



Page 249

1    A.  No.
2    Q.  Do you have any other phones other than
3  the one that's cracked that have any type of
4  journals or photos or entries related to this
5  case?
6    A.  No.
7    Q.  And it's your understanding sitting
8  hearing today that the photo or the image of the
9  up-do hairstyle that you showed to Cassandra and
10  Ms. Robinson would not be available on your
11  phone if we could have -- if you did access it;
12  is that correct?
13    A.  Yes.  I don't know if it's on there.  I
14  was -- I don't know.
15    Q.  What have you done to try to access
16  what's on that phone?
17    A.  Just tried to, you know, turn it on and
18  tried to touch the screen.
19    Q.  Okay.  It didn't come on?
20    A.  It's -- I mean, the screen is cracked,
21  so you can't -- it's a touch screen phone, so
22  you can't utilize it.
23    Q.  And it's been like that since 2018?
24    A.  Since whenever the last time I used it.
25    Q.  Do you remember when that was?

Page 250

1    A.  No.
2    Q.  Let me show you some pictures.  We
3  looked at some pictures earlier.  These are just
4  in-color photographs that I believe were
5  produced to us by your lawyers.  I think -- it
6  says Key on it; is that right?
7    MS. PALMER:  Yeah.  271, -72, -73, -74,
8  -75, and -76.
9    MR. MILLER:  Thank you.
10    Q.  If you'll look through these photos and
11  tell me, is this the style your hair was in when
12  you interviewed with Dynamic?
13    A.  Yes.
14    Q.  And is this the style your hair was in
15  when your employment ended at Dynamic?
16    A.  Yes.
17    Q.  Were there any changes in between the
18  interview and when your employment ended in your
19  hairstyle?
20    A.  No.
21        (Defendants' Exhibit 31 was marked
22         for identification.)
23    MR. MILLER:  So the hairstyle pictures
24  are Exhibit 31.  We've marked them for the
25  record.

Page 251

1    MR. MIDDLEBROOKS:  31?
2    MR. MILLER:  Yes.
3    MS. PALMER:  And while we're here,
4  Matt, I think we have a 30 and gave her an
5  unmarked one, which is the interrogatories.
6    Q.  (BY MR. MILLER:)  When did you take
7  these photos?
8    A.  When they sent me home on August 1st.
9    Q.  Of 2017?
10    A.  Yes.
11    Q.  And what phone did you use to take
12  these photos?
13    A.  The phone that I had at that time.
14    Q.  Is that the one that's now cracked?
15    A.  Yes.
16    Q.  And has the journal on it?
17    A.  Yes.
18    Q.  Did you print these out?  How did we
19  get these images?
20    A.  I -- I think I emailed them with my
21  EEOC case or something like that.
22    Q.  To who?  To the EEOC?
23    A.  Yes.  I don't remember exactly.  I
24  didn't print them out.  I know they were sent
25  via email.  Or maybe -- I think I did print them

Page 252

1  out.  I think I had to print them out for either
2  the EEOC or for my unemployment hearing.  I just
3  don't remember which one exactly.
4    Q.  So you printed out or emailed these
5  images of your hair; correct?
6    A.  Yes.
7    Q.  But you didn't print out or email the
8  journal entries; correct?
9    A.  Yes.
10    Q.  And didn't print out or email the image
11  of the photo of your hair that you said you were
12  told would be acceptable; correct?
13    A.  Yes.
14    Q.  And these photos that we're looking at,
15  Exhibit 31, they show your hair in dreadlocks?
16    A.  Yes.
17    Q.  Is it pretty much the same style you
18  have your hair in today?
19    A.  Yes.
20    Q.  Have you done anything to change it
21  since 2017?
22    A.  No.
23    Q.  Between 2017 and now, at any point have
24  you worn your hair up in a bun?
25    A.  I don't -- yes.



DAVITA M. KEY                                          June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING          253–256

Page 253

1    Q.   Okay.  When was that?
2    A.   I don't know.
3    Q.   Who put it up in a bun for you?
4    A.   My stylist.
5    Q.   And then you took it back down out of
6    the bun later?
7    A.   Yes.
8    Q.   Because that's -- what?  You just
9    wanted a change or --
10   A.   Because I -- just like if someone
11   wanted to put their hair in a ponytail and take
12   it down and wear it down, it's the same thing.
13   Q.   Did you have any employers that have
14   told you you need to wear your hair in a bun?
15   A.   No.
16   Q.   Or change your hairstyle?
17   A.   No.
18   Q.   Are you aware of any laws that say an
19   employer cannot have a policy against
20   dreadlocks?
21   A.   The Crown Act.
22   Q.   Okay.  Well, I'll just tell you, that's
23   not an Alabama law.  It doesn't apply in
24   Alabama.
25   A.   You asked me if I was aware of any.

Page 254

1    Q.   No, you answered correctly.  You
2    answered fairly.  So I'm just going to ask you a
3    follow-up question.
4         Are you aware of any laws that apply in
5    Alabama that prohibit an employer from having a
6    policy against dreadlocks?
7    A.   No.
8    Q.   Have you ever been aware of any laws
9    that apply in Alabama that prohibit an employer
10   from having a policy that prohibits dreadlocks?
11   A.   No.
12   Q.   The people who are not African American
13   can wear their hair in dreadlocks, can't they?
14   A.   I mean -- you mean at this jobsite or
15   you mean in general?
16   Q.   In general.  White people can wear
17   dreadlocks?
18   A.   If that's what they choose to do.
19   Q.   It's not just a hairstyle for people
20   who are black; correct?
21   A.   If -- I mean, no, if they choose to
22   wear their hair like that.
23   Q.   Is that correct?  I mean, you're saying
24   yes?
25   A.   Yes.

Page 255

1         (Defendants' Exhibit 32 was marked
2         for identification.)
3    Q.   I show you what I have marked as
4    Defendant HEA's -- just Defendants' Exhibit 32
5    since we're going in sequence.
6         Do you recognize that document?
7    A.   Yes.
8    Q.   What is that?
9    A.   My résumé.
10   Q.   When was that created?
11   A.   Prior to August 2021.  Or maybe at
12   August 2021.  I don't know the exact date.
13   Q.   Okay.  Well, it's got -- the last thing
14   on -- it says "Work Experience" on the top.  And
15   after that, it says "Pre-K auxiliary teacher,
16   Pike Road Elementary School, August 2021 to
17   present."  You see that?
18   A.   Yes.
19   Q.   That suggests to me that it was created
20   sometime after August 2021.  Is that a --
21   A.   Yeah.
22   Q.   -- fair assumption?
23   A.   It could have been prior because I knew
24   I had the job before August 2021.  That was just
25   my start date.

Page 256

1    Q.   Okay.  Do you know -- do you know when
2    it was created?
3    A.   No.
4    Q.   It would have to be -- well, when did
5    you get the job?
6    A.   June of 2021.
7    Q.   So that was the first time you knew you
8    were going to have that job; correct?
9    A.   Yes.
10   Q.   So it was created sometime after
11   June 2021?
12   A.   Yes.
13   Q.   Do you have any more updated versions?
14   A.   No.
15   Q.   Did you create any résumés before this
16   one?
17   A.   Yes.
18   Q.   When did you create résumés before
19   this?  And let me just ask.  Between August of
20   2017 and when you created this résumé, were
21   there other résumés that you created?
22   A.   Yes.
23   Q.   How many others?
24   A.   I don't know.  I mean, I don't know how
25   many.



Page 257

1    Q.  What did you do with those résumés?
2  What did you use them for?
3    A.  To seek employment.
4    Q.  Did you submit them to prospective
5  employers?
6    A.  Yes.
7    Q.  Did you put them on websites or the
8  online places you can submit an application?
9    A.  Yes.
10   Q.  Is this résumé the same as you would
11 have submitted to other employers, just updated?
12   A.  Yes.
13   Q.  Any other changes you can think of on
14 it?
15   A.  I mean, I no longer work at Pike Road
16 Elementary School, so that would not say through
17 present.
18   Q.  Right.  It was updated to show the most
19 recent; is that correct?
20   A.  I haven't updated it.  This is the most
21 recent one.
22   Q.  Okay.  Since Pike Road?
23   A.  Yes.
24   Q.  Can you look -- why is there no
25 reference to you working for Dynamic Security?

Page 258

1  Or at least I don't see it.  Do you see a
2  reference to Dynamic Security on here anywhere?
3    A.  No.
4    Q.  Do you see a reference to HMMA?
5    A.  No.
6    Q.  Or HEA?
7    A.  No.
8    Q.  Or anything with the name Hyundai in
9  it?
10   A.  No.
11   Q.  Why not?
12   A.  I just didn't put it on there.
13   Q.  Why not?
14   A.  One, because I know that we were going
15 through this legal thing.  And then just -- I
16 just didn't put it on there.
17   Q.  And you were submitting this to
18 prospective employers?
19   A.  Yes.
20   Q.  So the information you were submitting
21 to them wasn't accurate, was it?
22   A.  It was accurate.
23   Q.  It was missing one of your employers;
24 correct?
25   A.  I mean, I used to babysit when I was 15

Page 259

1  and that's not on here either.  So that doesn't
2  mean it's inaccurate.  That just means I didn't
3  put it on there.
4    Q.  You just chose not to put it on there?
5    A.  Yes.
6    Q.  And submitted this as if this was your
7  complete résumé to employers?
8    A.  It is.  I worked all these jobs.
9    Q.  Is there any -- babysitting when you
10 were younger is one thing than working for a
11 company.  Is there any reason you didn't -- you
12 decided not to put Dynamic Security or any
13 company with the name Hyundai in it on this
14 résumé?
15   A.  We're going through legal proceedings.
16 So I put this on there and they ask me about it,
17 I can't disclose what I'm going through these
18 legal proceedings.
19   Q.  You can't disclose that you worked
20 there?  That you worked for Dynamic?
21   A.  I just didn't put it on there.
22   Q.  You chose not to put it on there?
23   A.  Yes.
24   Q.  Any other companies that you worked for
25 that you chose not to put on there because you

Page 260

1  didn't want to have to talk about them?
2    A.  Well, when I was in high school, I
3  stamped the books at my high school.  So I
4  didn't put that on there either.  Or I did co-op
5  in high school.  I didn't put that on there
6  either.
7    Q.  Anything else?
8    A.  I said babysitting already, so no.
9    Q.  So you talked earlier about when you
10 showed up to interview and you interviewed with
11 Ms. Robinson and Maurice Chambliss here at this
12 location, I believe; correct?
13   A.  Yes.
14   Q.  And on that date, your hair was in
15 dreadlocks?
16   A.  Yes.
17   Q.  In the style that we just looked at in
18 these photographs that are marked as Exhibit 31;
19 correct?
20   A.  Yes.
21   Q.  And you continued to wear your hair in
22 that same style throughout the time that you
23 were assigned to work at this facility?
24   A.  Yes.
25   Q.  Correct?



DAVITA M. KEY                                                    June 20, 2022
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING                    261-264

Page 261

1    A.  On August 1st, I wore a hat, though, as
2  I was instructed.
3    Q.  But you had the same hairstyle?
4    A.  Well, they couldn't see it because it
5  was covered, as she instructed me to.
6    Q.  Okay.
7    A.  Cassandra Williams.
8    Q.  Okay.  But you had the same hairstyle?
9    A.  Underneath my hat I did, yes.
10   Q.  And you said after your interview with
11  Ms. Robinson and Mr. Chambliss, Ms. Robinson
12  called in Cassandra Williams and asked her about
13  your hairstyle?
14   A.  Yes.
15   Q.  And I believe you said that
16  Ms. Williams turned up her nose at your
17  hairstyle?
18   A.  Yes.
19   Q.  What do you mean by that?
20   A.  She turned her nose up.
21   Q.  What is that?  Like did she say
22  anything?
23   A.  Like if you see something you don't
24  like --
25   Q.  Uh-huh.

Page 262

1    A.  You turn -- that's what she did.
2    Q.  And she asked if you could take it
3  down?
4    A.  Yes.
5    Q.  And she asked if you could get it cut?
6    A.  Nope.  She asked me could I take it
7  down, and I told her I would have to cut all of
8  my hair off.
9    Q.  Okay.  So on that date, July 19th, she
10  turned up her nose, asked if you could change
11  your hairstyle, put it up; correct?
12   A.  She asked if I could take it down.
13   Q.  Take it down.  And in one of your
14  earlier statements, you said, and as you
15  testified today, I believe, in response to that,
16  you showed her on your phone an alternate
17  hairstyle?
18   A.  Yes.
19   Q.  With your hair up in a bun?
20   A.  Yes.
21   Q.  But we don't have that image, as we've
22  talked about earlier today, because it's on that
23  phone maybe?
24   A.  Yes.
25   Q.  But it may not be; correct?

Page 263

1    A.  Correct.
2    Q.  So we may never know exactly what that
3  style looked like?
4    A.  Not that particular style.  But if you
5  want to google dreadlock styles in a bun, that's
6  how it was.
7    Q.  That's what I would google?  Is that
8  what you did to pull it up?  Or you said you
9  pulled it off your Facebook?
10   A.  Yes.
11   Q.  And your Facebook account, did you
12  delete that?
13   A.  In -- yes, I don't have Facebook
14  anymore.
15   Q.  When did you delete -- did you delete
16  everything that was on your account?
17   A.  Yes.
18   Q.  When did you do that?
19   A.  In 2018.
20   Q.  After you filed your EEOC charge?
21   A.  I did it after January 2018.
22   Q.  And what else did you delete on social
23  media?
24   A.  Nothing.
25   Q.  LinkedIn?

Page 264

1    A.  I -- it served no purpose.  LinkedIn is
2  not social media.  It's a job networking site.
3    Q.  Did you have a LinkedIn account?
4    A.  I did at one time, yes.
5    Q.  Did you delete it?
6    A.  I did.
7    Q.  When did you delete that?
8    A.  I don't remember.
9    Q.  Was it after you worked at Dynamic?
10   A.  I don't remember.  I mean, I don't
11  remember.  It probably -- I don't remember.  I
12  don't remember.
13   Q.  Any other either social media or job
14  networking or networking sites that you were on
15  that you've deleted?
16   A.  I don't remember all the job networking
17  sites I joined, and I don't remember if -- I
18  mean, I don't -- I don't remember which ones
19  I've joined because I've joined a lot of them,
20  so.
21   Q.  Do you remember deleting any others?
22   A.  I don't know.
23   Q.  You don't know one way or the other?
24   A.  No, I don't.
25   Q.  Do you know if there's anything



Page 265

1  relating to this case on any of those sites?
2    A.  There is not.
3    Q.  Other than the Facebook site which had
4  the image which you say you showed to Cassandra
5  Williams; correct?
6    A.  There's nothing related to this case on
7  any other sites and there never was.  I showed
8  her a picture of a hairstyle that I had.
9    Q.  On your Facebook account?
10   A.  Yes.
11   Q.  Which is now deleted?
12   A.  If I was a white woman, would you be
13  questioning my hair?
14   Q.  Which is now deleted; is that correct?
15       You want to take a break?
16   A.  Nope.
17   Q.  Let's take a break.
18   A.  No, I don't.  I want you to feel my
19  pain.
20   Q.  I need you to answer my questions.
21   A.  I no longer have Facebook; that is
22  correct.
23   Q.  So Ms. Williams and Ms. Robinson, you
24  showed them the picture on Facebook of a
25  hairstyle that was up, an up-do style, and they

Page 266

1  told you that was acceptable; that that would be
2  okay?
3    A.  Yes.
4    Q.  And that was on July 19th?
5    A.  Yes.
6    Q.  And then you went to the Dynamic
7  Security site for sometime after that for
8  training; correct?
9    A.  Yes.
10   Q.  And that was either on July 21st or
11  27th?  Is that what we've decided today?
12   A.  Yes.
13   Q.  When you went to the Dynamic Security
14  site for training, had you put your hair into
15  that up-do style?
16   A.  No.
17   Q.  When you came back to this facility on
18  July 31st, had you put your hair in that up-do
19  style?
20   A.  No.
21   Q.  On August 1st, had you put your hair in
22  that up-do style?
23   A.  I wore a hat, as I was instructed, on
24  August 1st.
25   Q.  Had you put your hair in that up-do

Page 267

1  style on August 1st?
2    A.  I was told on July 31st that I could
3  return if I wore a hat to completely cover my
4  head.  So I complied with that, and I let them
5  know that I would get my hair done that weekend.
6    Q.  Okay.  I appreciate that.  But my
7  question --
8    A.  No, I didn't.
9    Q.  Okay.
10       At any point while you worked for
11  Dynamic, did you put your hair in the up-do
12  style that was similar to the picture that you
13  showed to Cassandra and Ms. Robinson?
14   A.  No.
15   Q.  And we can go back and look at -- let's
16  see.  It's Exhibit 15, I believe.
17       Okay.  This was your EEOC charge
18  against HMMA; correct?
19   A.  Yes.
20   Q.  All right.  Read for me beginning "On
21  or about July 31st."
22   A.  "On or about July 31st" -- the date is
23  wrong.  It should be 2017 -- "I showed up for my
24  first day at work and Ms. Williams asked me why
25  I had not changed my hairstyle (dreadlocks) as

Page 268

1  she had instructed me to during my job
2  interview."
3        Do you want me to read the rest of
4  the --
5    Q.  No, that's all I'm asking.
6    A.  Okay.
7    Q.  Thank you.
8        So when you came back the first time to
9  start work on July 31st, Ms. Williams asked you
10  why you had not changed your hairstyle as she'd
11  instructed you; correct?
12   A.  Yes.
13   Q.  And what was your response to her?
14   A.  I told her that when I went to my
15  training, I asked Nicole if my hair was okay,
16  and she said there was nothing wrong with it.
17  And I said also that the Dynamic handbook
18  doesn't have -- doesn't say anything against me
19  wearing my hair like this.
20   Q.  Anything else?
21   A.  That's all that I said.
22   Q.  Ms. Williams had told you on July 19th
23  that you needed to change it?
24   A.  She said that she didn't know what
25  Dynamic's policy was.



Page 269

1    Q.   And she asked you on the 31st why you
2  had not changed it as instructed though;
3  correct?
4    A.   Yes.
5    Q.   And did you tell her, "You never told
6  me that"?
7    A.   No, I told her that --
8    Q.   That somebody --
9    A.   -- per Dynamic -- per the handbook,
10  which you have exhibits for, it didn't -- it
11  said that -- it didn't say that I could not wear
12  my hair like that.  Because the first thing she
13  asked when she was -- Gloria Robinson asked her
14  about my hair was, "What does Dynamic's policy
15  say?"  So I referred to Dynamic's policy.  And
16  their policy was not against me wearing my hair
17  like this.
18    Q.   And Ms. Williams showed you the
19  grooming policy that we looked at, which I
20  believe is Exhibit Number 8, on her computer;
21  correct?
22    A.   Yes.  Reluctantly.
23    Q.   And that policy said that dreadlocks
24  were not permitted?
25    A.   For female officers; correct.

Page 270

1    Q.   Were they permitted for males?
2    A.   I didn't see the male policy until
3  today.  And according to what I saw today, no.
4    Q.   Did anybody tell you that dreadlocks
5  were not -- were only prohibited for females?
6    A.   I don't remember.
7    Q.   Would you remember that if somebody had
8  said it?
9    A.   I don't know.  I know I was told that I
10  could wear my hair like that and that females
11  could wear braids.
12    Q.   Did you ever see any males wearing
13  dreadlocks at the facility?
14    A.   I wasn't here long enough to really see
15  anybody.
16    Q.   Did you ever see any males wearing
17  dreadlocks at the facility?
18       MR. MILLER:  Mark this as 33.
19       (Defendants' Exhibit 33 was marked
20          for identification.)
21    Q.   You can answer.  Did you ever see any
22  males wearing dreadlocks at the facility?
23    A.   No.
24    Q.   Did you ever see any white people
25  wearing dreadlocks at the facility?

Page 271

1    A.   I did not see any males or any white
2  people.  That does not mean that they did not
3  have them.
4    Q.   This is -- this document, 33, what is
5  this?
6    A.   An email.
7    Q.   It was sent from you?
8    A.   Yes.
9    Q.   On February 24, 2020, to Richard Cohen?
10    A.   Yes.
11    Q.   Is that the same Richard Cohen that was
12  at Southern Poverty Law Center at one time?
13    A.   I'm not sure.
14    Q.   And you sent this -- a very similar
15  email, almost identical, to a number of sources,
16  didn't you?
17    A.   Yes.
18    Q.   In it, in the, I guess the third
19  paragraph, you say "I was told that I had no
20  right to see the policy and that they did not
21  have to show it to me.  This individual then
22  went on to say that males could wear their hair
23  in the dreadlock style but females were only
24  allowed to wear their hair in braids.  I
25  contested this as I felt it was discriminatory

Page 272

1  and I was told females can wear braids because
2  one is able to see their scalp with that
3  hairstyle."
4       Did anybody that you can recall tell
5  you that males could wear their hair in a
6  dreadlock style?
7    A.   Cassandra Williams showed me the
8  policy, so she would be the one who had made
9  this comment.
10    Q.   Did she actually say this?
11    A.   Reading it, I recall, yes, she did.
12    Q.   So you're saying today that she told
13  you that males could wear dreadlocks but females
14  couldn't?
15    A.   She said they just had started that.
16    Q.   They just had started what?
17    A.   I guess letting the males wear their
18  hair in a dreadlock style.
19    Q.   Why is none of that mentioned in any of
20  your EEOC charges, in your lawsuit, anywhere
21  else other than this email?
22    A.   I don't know.
23    Q.   So the dreadlock policy -- so males --
24  she told you and what you understood was that
25  males, regardless of what their race was,



Page 273

1  regardless what their national origin was,
2  whatever, could wear their hair in dreadlocks
3  but women couldn't; is that right?
4      A.  Yes.
5      Q.  You also state in a couple of different
6  documents we can look at, I believe, that your
7  hairstyle you thought became a problem only
8  after you told Gloria Robinson that you were
9  pregnant; is that accurate?
10     A.  I think that it -- I think that it was
11  focused on more.
12     Q.  Focused on what more?
13     A.  My hair.
14     Q.  In your opinion, do you believe that
15  you would have been removed from this location
16  at Hyundai if you had not disclosed your
17  pregnancy?
18     A.  I don't know.
19     Q.  In your disclosures that
20  Mr. Middlebrooks went over earlier, there's some
21  people listed, and he went through each person.
22  Do you remember that?  Like individuals' names
23  and asked you about them and who they worked
24  for?
25     A.  Yes.

Page 274

1      Q.  Okay.  Other than that document and who
2  we've talked about today, are there any other
3  people who you think would be witnesses in your
4  case or might be witnesses in your case?
5      A.  I don't know.
6      Q.  Well, anybody you can think of?  This
7  is my last chance to ask you, why I'm --
8      A.  I mean, I don't know.  She spoke with
9  me in her office cubicle.  I mean, I don't know
10  who was there.  Ray Cureton spoke with me in the
11  lobby of his office building.  So I don't know
12  anybody heard or did not hear, so I don't -- I
13  can't answer that because I don't know.
14     Q.  That's fair.  I'm asking you is there
15  anybody you can identify who you think would be
16  a witness in your case you've not talked about
17  today?
18     A.  No.
19     Q.  What about your family members?  Have
20  you talked to any of them about this case?
21     A.  I talked to my husband.
22     Q.  Have you talked to any family members
23  about your termination or your resignation,
24  whatever you want to call it, from Dynamic?
25     A.  My mom and my grandmother and an aunt.

Page 275

1      Q.  So your husband about the case.  Your
2  mom, grandmother, aunt, and husband about the
3  end of your employment?
4      A.  Yes.
5      Q.  Do you remember any of those
6  conversations?
7      A.  Just how I felt about it.
8      Q.  And how did you feel?
9      A.  Like I was telling Mr. Wes, just less
10  than a woman, a black woman.
11          "Black woman."  You just said "less
12  than a woman."  I want you --
13     Q.  Sure.  Well, my handwriting --
14     A.  Oh, okay.
15     Q.  All right.  Is there anything else you
16  talked with them about?
17     A.  Just with my husband about was I making
18  the right decision in having a child.
19     Q.  What did that have to do with this
20  case?
21     A.  Because I feel like that I was fired
22  because I was pregnant and I had dreadlocks.  So
23  it made me question had I made the right
24  decision being pregnant.
25     Q.  Did it make you question that you made

Page 276

1  the right decision about not changing your
2  hairstyle?
3      A.  That too, yes.  It made me feel less
4  than as who I was in my identity.
5      Q.  If you could go back in time to when
6  you were working at Dynamic, is there anything
7  you would do differently?
8      A.  No.
9      Q.  Have you ever had any type of criminal
10  convictions?
11     A.  No.
12     Q.  Is there anything about your case that
13  you think is important that you haven't been
14  asked today by this multitude of lawyers?
15     A.  I don't know.  That would take me some
16  time to really like -- that's a -- I'd have to
17  really think about that question.  It's kind
18  of --
19     Q.  Sitting here right now -- you can take
20  all the time you want.
21          Sitting here today, is there anything
22  else that you can think about that's important?
23          MR. MIDDLEBROOKS:  You want to take a
24  break while she thinks about it?
25          MR. MILLER:  Yeah, this would be good.



Page 277

1    Well, actually, can we finish that
2  question?
3       MR. MIDDLEBROOKS:  Okay.
4    A.  Can you repeat it so I can just... Can
5  you repeat the question?  I'm sorry.
6       MR. MILLER:  That's okay.  Let's --
7  we'll strike that question for now and we'll
8  take a break.
9       (Break.)
10   Q.  (BY MR. MILLER:)  Before we went on our
11  break, I asked you is there anything else that
12  you think is important about your claims that we
13  haven't talked about today.  Have you thought of
14  anything else?
15   A.  I mean, just to basically have who I am
16  questioned, my identity questioned.
17   Q.  Anything else?
18   A.  My role, my motherhood questioned.
19   Q.  Anything else?
20   A.  That's what I can think of right now.
21   Q.  When did you first learn you were
22  pregnant?
23   A.  In May of 2017.
24   Q.  May of 2017?
25   A.  Yes.

Page 278

1    Q.  So a couple of months before you
2  applied out at Dynamic?
3    A.  Yes.
4    Q.  About three months?  About two and a
5  half months?
6    A.  Yes.
7    Q.  Cassandra Williams, she is an African
8  American female?
9    A.  Yes.
10   Q.  Did she ever say anything negative to
11  you about your race?
12   A.  She just looked -- turned up her nose
13  in disgust about my hair.
14   Q.  Did she ever say anything negative
15  about your race?
16   A.  That's about my race, my hair.
17   Q.  Anything else?
18   A.  No.
19   Q.  We've already talked about that.
20       What about did you have any discussions
21  with Cassandra at all about the fact that you
22  were pregnant?
23   A.  I didn't directly tell her, no.
24   Q.  She didn't make any negative comments
25  about you being pregnant because you didn't talk

Page 279

1  to her about it at all; correct?
2    A.  No, she didn't make any -- not to me
3  she didn't make any comments.
4    Q.  Let me just check over real quick.  I
5  may be done.
6       You had testified earlier that
7  Ms. Robinson was maybe raising her voice when
8  she was talking to you about your hairstyle?
9       MR. REDMOND:  Object to the form.
10   Q.  (BY MR. MILLER:)  Did you say that?
11   A.  Yes.
12   Q.  And that Ms. Williams had raised her
13  voice?
14   A.  Yes.
15   Q.  Is it fair to say that they were both
16  upset with you about the fact that you had
17  challenged your hairstyle?  Is that what you're
18  saying?
19   A.  Yes.
20       MR. MILLER:  I think that's all I have.
21  Thank you.
22       MR. MIDDLEBROOKS:  Two questions.
23       MS. PALMER:  You want me to go first?
24  Or do you want to go first?
25       MR. MIDDLEBROOKS:  I might have three

Page 280

1  after that.
2       MS. PALMER:  Okay.
3               EXAMINATION
4  BY MS. PALMER:
5    Q.  Flip for me, if you would, in those
6  exhibits to what was Defendants' Exhibit 13.
7  And I'm going to point you to all three of them,
8  okay?  So we've got Defendants' 13,
9  Defendants' 14, and Defendants' 15.  Is that
10  your questionnaire and two EEOC charges?
11   A.  Yes.
12   Q.  Tell me how the process worked for you
13  to file an EEOC charge.
14   A.  I called, and they told me where they
15  were located.  And then when I went there, I met
16  with an investigator.  And, you know, she asked
17  me what happened, and I told her.  And then she
18  typed up a charge and I signed it.
19   Q.  Okay.  So when you say she typed up a
20  charge, are you talking about Defendants' 14?
21  Is that what she typed up?
22   A.  Yes.
23   Q.  Okay.  So she didn't type in the
24  information in these boxes on Defendants'
25  Exhibit 14?

Page 281

1    A.   No.
2    Q.   Did you type in the information on the
3  boxes on Defendants' Exhibit 15?
4    A.   No.
5    Q.   Did you fill out the information that's
6  handwritten on Defendants' Exhibit 13?
7    A.   Yes.
8    Q.   And when you did that and you listed
9  Hyundai, why did you list Hyundai?
10   A.   Because that's where I was working.
11   Q.   Okay.  Did you have any understanding
12  that there might be HMMA and HEA and any other
13  number of Hyundai entities as we've heard today?
14   A.   No.
15   Q.   When you did your onboarding and
16  training with Dynamic and then your safety
17  training with Hyundai, did anybody tell you at
18  that point that there were different Hyundai
19  entities?
20   A.   No.
21   Q.   Did anybody tell you at that point that
22  you weren't working for a global Hyundai?
23   A.   No.
24   Q.   We are taking your deposition today
25  here at the Hyundai plant, which is where you

Page 282

1  were assigned to work; right?
2    A.   Yes.
3    Q.   And we're actually in the Security
4  Building where you spent some of your time;
5  right?
6    A.   Yes.
7    Q.   Have you noticed any signage in this
8  building, any documents posted on the walls or
9  logos up on the walls?
10   A.   Yes.
11   Q.   And what do they all say?
12   A.   Hyundai.
13   Q.   Do they say anything else?
14   A.   Some of like the papers that's set up
15  flyers say like HMMA.
16   Q.   And do you recall when we were outside
17  earlier this morning that a vehicle drove up and
18  parked out front?
19   A.   Yes.
20   Q.   Do you remember it had badging on the
21  side of the vehicle?
22   A.   Yes.
23   Q.   Do you remember what that badging said?
24   A.   HMMA Security.
25   Q.   HMMA Security?

Page 283

1    A.   Yes.
2    Q.   You went through an unemployment
3  hearing after your unemployment was denied;
4  right?
5    A.   Yes.
6    Q.   Can you tell me about that hearing?
7  Who was there?
8    A.   Donna, I think it's Foshee, was over
9  it, and then it was myself and Ray Cureton.
10   Q.   And can you tell me what happened at
11  that hearing, what was said during that hearing?
12   A.   She just listened to both of our sides.
13  And, you know, she asked Mr. Cureton like why
14  were they contesting my unemployment.  And he
15  said -- he was saying like that I wouldn't
16  accept, you know, certain jobs.  And then when
17  I -- when it was my turn to speak, I -- you
18  know, I spoke with him and then her and I said I
19  didn't say that.  And he said, "That is correct;
20  she didn't say that.  She just said she
21  preferred a first shift job but that she would
22  accept anything."
23   Q.   And that was Ray Cureton?
24   A.   Yes.
25   Q.   And just to clarify, flip for me to

Page 284

1  Exhibit 22 and Exhibit 25.  And I may be
2  misstating this, but I think I heard it earlier
3  so I just want to clarify.
4       You said -- you testified earlier that
5  when you got your file from the EEOC, you did
6  that after you got the right to sue.  Is that
7  what you said?
8    A.   Yes.
9    Q.   Okay.  Which right to sue are you
10  talking about?  Is that Exhibit 22 or
11  Exhibit 25?
12   A.   25.
13   Q.   Exhibit 25?
14   A.   Yes.
15   Q.   Did you get Exhibit 22 directly from
16  the EEOC?
17       MR. REDMOND:  Object to leading.
18   A.   I don't remember.  I requested for my
19  complete file, and they sent me whatever they
20  had.
21   Q.   (BY MS. PALMER:)  Did you have any
22  communications by email with the investigator at
23  the EEOC?
24   A.   Yes.
25   Q.   And in any of those communications, did



Case 2:19-cv-00767-ECM-SMD   Document 75-1   Filed 10/12/22   Page 73 of 74
USCA11 Case: 24-11126   Document: 60-1   Date Filed: 02/14/2025   Page: 134 of 206
DAVITA M. KEY
DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING
June 20, 2022
285—288

Page 285

1  they tell you that they had dismissed the charge
2  against Dynamic Security?
3     A.  No.
4        MS. PALMER:  That's all I have.
5        FURTHER EXAMINATION
6  BY MR. MIDDLEBROOKS:
7     Q.  Ms. Key, you had talked about there
8  being some files in your -- journal entries on
9  your cell phone.  Do you recall any specific
10  journal entries relating to Hyundai Motor
11  Manufacturing, Alabama?
12     A.  I don't know.  I'd have to look at what
13  I wrote because it was about how the whole --
14  what was going on, so I don't know exactly what
15  it says in the -- what the journal entries say.
16     Q.  You don't know what they say?
17     A.  No.
18     Q.  You answered questions from Mr. Redmond
19  about damages, both monetary and nonmonetary.
20  If I asked you the same question as related to
21  Hyundai Motor Manufacturing, Alabama, would your
22  answer be any different than those you gave
23  Mr. Redmond?
24     A.  No.
25        MR. MIDDLEBROOKS:  That's all.

Page 286

1        MR. REDMOND:  Nothing further.
2        MR. MILLER:  Nothing further.
3        THE COURT REPORTER:  Does anybody want
4  a transcript?
5        MS. LEONARD:  Yes.
6        MR. MIDDLEBROOKS:  Yes.
7        MR. REDMOND:  Electronic.
8        MR. MILLER:  Electronic.
9        THE COURT REPORTER:  Ms. Leonard, do
10  you want a paper copy or electronic only?
11        MS. LEONARD:  Electronic is fine.
12        (The deposition was concluded at
13        4:21 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 287

1        C E R T I F I C A T E
2
3
   STATE OF ALABAMA
4  AT LARGE
5
6        I hereby certify that the above and
   foregoing deposition of DAVITA M. KEY was taken
7  down by me in stenotype and the questions and
   answers thereto were transcribed by means of
8  computer-aided transcription, and that the
   foregoing represents a true and correct
9  transcript of the testimony given by said
   witness upon said hearing.
10
        I further certify that I am neither of
11  counsel, nor of kin to the parties to the
   action, nor am I in anywise interested in the
12  result of said cause.
13        I further certify that I am duly
   licensed by the Alabama Board of Court Reporting
14  as a Certified Court Reporter as evidenced by
   the ACCR number following my name found below.
15
16
   So certified on this date, July 5, 2022
17
18
19
20
21        /s/Sabrina Lewis
22
23        /s/Sabrina Lewis, CCR, RDR, CRR
   ACCR #165, Expires 9/30/22
24  Commissioner for the State of
   Alabama at Large
25  My commission expires 5/17/23

Page 288

1  Reference No.: 8044773
2
3  Case:  DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING
4
   DECLARATION UNDER PENALTY OF PERJURY
5
        I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11        _____
12        Davita M. Key
13
14        NOTARIZATION OF CHANGES
15        (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)            Notary Public,
24
25  in and for the State of _____



Page 289

```
 1   Reference No.: 8044773

     Case:  DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING

 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Davita M. Key
```

Page 290

```
 1   Reference No.: 8044773

     Case:  DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING

 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Davita M. Key
```



# Exhibit 2

# Dynamic Pre-Employment Screening Form

# DYNAMIC SECURITY, INC.

Employment Application

Pre-Application Screening Form

Completed: Date 7/21/14

## Personal Data:

Name: Key Davita M
Last: Key   First: Davita   Middle: M

Social Security #: ████████

Present Address: ████████
City ████   State ████   Zip ████

Home Phone #: ████
Pager/Cell/Other Contact #: (334)200-7078
Emergency #: ████

Are you 21 years old or older? Yes ☑   No

Have you ever worked under another name? Yes If yes, list names. Davita Cade

Will you work any day of the week? yes   If no, what days will you work? _____

Date Available for Work: 7-24-17   Can you work any shift? yes   If no, what shift can you work? _____

Position Applied for: Mailroom Clerk   ☑ Full Time ☐ Part Time ☐ Temporary

How did you hear of Dynamic Security? indeed.com

If hired can you provide written proof that you are authorized to work in the U.S.? ☑ Yes ☐ No

Have you ever applied with or worked for Dynamic Security or Dynamic Staffing? NO

If so, when and where? _____

Is there any reason that would cause you to be unable to work on a regular basis if offered a position? NO

Do you intend to continue any other type of employment if offered a position? If yes, what are the shifts/hours of that job? NO

Driver's License Number: ████   State Licensed: AL

Have you ever pled guilty or been convicted of any law violation (except minor traffic violations)? NO (A "yes" answer does not automatically disqualify you from employment) If yes, give details.

Have you ever served time in jail? NO If yes, give details.

Have you ever been fired from a job? NO If so, please explain.

## Education and Training:

| School | Location | # of years Completed | Did you Graduate? | | Course of Study |
|---|---|---|---|---|---|
| | | | Yes | No | |
| High School BTW | Tuskegee, AL | 5 | ✓ | | H.S. Diploma |
| College AUM | Montgomery, AL | 4 | ✓ | | BLA |
| Trade School | | | | | |

Other Certifications:

What experience do you have with a computer? Fluent in microsoft office

What other equipment are you trained to operate?

**AN EQUAL OPPORTUNITY EMPLOYER**

Dynamic - Key 000028
Initial Disclosures

## Employment History:

List names of employers in consecutive order with most recent employer listed first. Account for all periods of time including military service and any periods of unemployment. If self-employed, give firm name and supply business references.

| Dates Employed | Name/Address of Company | Supervisor | Position | Salary | Reason for Leaving |
|---|---|---|---|---|---|
| From 7/2014 To 12/2016 | Prema Corp Montgomery, AL | Ashley Oliver | Revenue Specialist | Starting 14/hr Final 14/hr | temp position |
| From 11/2014 To 02/2016 | United States post office Tuskegee, AL | Janice Simpson | City Carrier Asst. | Starting 15.30 Final 15.360 | Work Schedule |
| From 07/2012 To 07/2013 | Auburn Univ Montgomery | Iyisha Hampton | Residence Life Coordinator | Starting 7.25/hr Final 7.25/hr | Student position |
| From 09/2009 To 07/2014 | Auburn Univ Montgomery | Rachael Mann | Day Coordinator Technical | Starting 6.40/hr Final 10.12/hr | Student position |

**Military Service:**

| Branch of Service | Dates of Service | Type of Service/Rank | Type of Discharge |
|---|---|---|---|
| | | | |

**Residential History:** List all addresses for the past five years.

| | Address | City | State | Zip |
|---|---|---|---|---|
| 1. | 7046 Taylor Crossing Dr Apt G | Montgomery | AL | 36117 |
| 2. | 4940 Paddock Club Circle Apt E | Montgomery | AL | 36116 |
| 3. | 1007 Chris Circle | Tuskegee | AL | 36083 |
| 4. | | | | |
| 5. | | | | |

I certify that all information provided in this employment application is true and complete. I understand that any false information or omission may disqualify me from further consideration for employment and may result in my dismissal if discovered at a later date.

I authorize and agree to cooperate in a thorough investigation of all statements made herein and other matters relating to my background and qualifications. I understand that any investigation conducted may include a request from employment and educational history, credit reports, consumer reports, investigative reports, driving records and criminal history. I authorize any person, school, current and former employer, consumer reporting agency, and any other organization or agency to provide information relevant to such investigation and I hereby release all persons and corporations requesting or supplying information pursuant to such investigation from all liability or responsibility to me for doing so. I understand that I have a right to make a written request within a reasonable period of time for complete disclosure of the nature and scope of the investigation. I further authorize any physician or hospital to release any information which may be necessary to determine my ability to perform the job for which I am being considered or any future job in the event I am hired.

I understand that compliance with the Company's Policies and Procedures is a condition of my employment. I understand that I may be required to successfully pass a drug-screening examination. I hereby consent to a pre- and/or post-employment drug screen as a condition of my employment, if required.

I UNDERSTAND THIS APPLICATION OR SUBSEQUENT EMPLOYMENT DOES NOT CREATE A CONTRACT OF EMPLOYMENT NOR GUARANTEE EMPLOYMENT FOR ANY DEFINITE PERIOD OF TIME. IF EMPLOYED, I UNDERSTAND THAT I HAVE BEEN HIRED AT WILL OF THE EMPLOYER AND MY EMPLOYMENT MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT A CAUSE.

Signature of Applicant: _____   Date: 7-21-17

AN EQUAL OPPORTUNITY EMPLOYER

Key 000013

# Exhibit 3

# Plaintiff's Check stub from Dynamic

**Dynamic Security, Inc**
PO Box 451
Tuscumbia, AL 35674
(256) 383-5798

Check #: 0000494396
Check Date: 08/22/2017
Pay Frequency: Bi-Weekly
Check Dist: C

Employee Id: KEY

DAVITA M KEY

| WeekEnd | Customer Id | Pay Unit | Pay Rate | Pay Amount | Ded Description | Ded Amount | Year-to-Date |
|---------|-------------|----------|----------|------------|-----------------|------------|--------------|
| 07/31/2017 | HMMA | 1.25 RG | 7.2500 | 9.06 | Federal | 10.00 | 10.00 |
| 08/01/2017 | HMMA | 2.00 RG | 7.2500 | 14.50 | Social Security | 1.46 | 1.46 |
| | Pay Description | Pay Unit | Pay Amount | Year-to-Date | Medicare | 0.34 | 0.34 |
| | R: Hourly | 3.25 RG | 23.56 | 23.56 | AL: State | 10.00 | 10.00 |

| | Reg Hours | Ovt Hours | Dbl Hours | Gross Pay | Non Tax Ded | Tax Ded | Net Pay |
|---|-----------|-----------|-----------|-----------|-------------|---------|---------|
| This Check: | 3.25 | 0.00 | 0.00 | 23.56 | 0.00 | 21.80 | 1.76 |
| Year-to-Date: | 3.25 | 0.00 | 0.00 | 23.56 | 0.00 | 21.80 | 1.76 |

THE KEY TO DOCUMENT SECURITY • HEAT ACTIVATED THUMB PRINT • ADDITIONAL SECURITY FEATURES INCLUDED • SEE BACK FOR DETAILS

**Dynamic Security, Inc**
PO Box 451
Tuscumbia, AL 35674
(256) 383-5798

BBVA COMPASS
FLORENCE, AL
61-590/622

0000494396

| DATE | AMOUNT |
|------|--------|
| 08/22/2017 | $1.76 |

PAY ***ONE AND 76/100 DOLLARS***

TO THE
ORDER
OF

DAVITA M KEY

⑆00000494396⑆ ⑈062205908⑈ 00168297491⑈

Key 000001

# Exhibit 4

# July 21, 2017, email from G. Robinson to Plaintiff



From: **Robinson, Gloria A - Dynamic Security** <gloriarobinson@hmmausa.com>
Date: Fri, Jul 21, 2017 at 10:07 AM
Subject: Mailroom Position
To: Davita Key <dmkey825@gmail.com>
Cc: Nicole Scavella <nscavella@dynamicsecurity.org>

Good morning Ms. Key,

Congratulations!

   You have the position you and I talked about for the mailroom.  These are the next steps I will need you to take:

1.  Go to DMV and obtain a updated **DMV record**.

2.  In that same building (you may have to ask the personnel in DMV) please obtain your **background check** and **fingerprints**.  With the background check, you will have to give them a $25.00 money order.

3.  Go to 5510 Wares Ferry road, Dynamic security office (it is in the little strip mall all the way in the back—you will see the Dynamic security sign on the building)  and fill out the initial application, and Ms. Nicole will give you a form to take your drug screen on Vaughn Road.

4.  While you are in the office, please find out when the next Security license training will be.  That is normally when you will fill out the rest of the paperwork and watch several videos for your security license.  Be prepared to stay that day---from 0900-3pm or so.

5.  Once all of that is complete, I will call you to take the HMMA safety class, out here at Hyundai training center.  That class is every day from 0700-0800—I always suggest you arrive around 0650—because at 0701 you will not be able to get in.  Once you



finish that class, you will come to the building where you and I talked and obtain your badge.

6. If you take the safety class on a Wednesday, you will most likely start on the following Monday.


**Ms. Nicole**: When Ms. Key comes to the office to fill out the application, I will need that **application-drug screen, DMV record and the background check** that she gives to you. You will not have to run a background check.


Any questions, please call


Thank you

*G. Robinson*

*Dynamic Security*

*Cell: (334) 328-2852*

*Desk: (334) 387-8909*

**Win Safetyquality awards...**
**SQuality Innovate Safetyquality through proactive improvements**


NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addres
sees and may contain information that is proprietary, privileged, confidential or oth
erwise legally exempt from disclosure under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination,
distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mai
l and delete the original message and the reply from your system.  Thank you.

# Exhibit 5

# HEA Appearance Standards for Security Personnel

# Appearance Standards for Security Personnel

## Female Officers (Uniform Officers):

**Hair-**
- Must be clean, well-groomed and neat-
- Hair should not exceed more 3 inches below the collar-
- No exaggerated or inappropriate hairstyles are permitted. Hairstyles must present a professional appearance-
- The security issued ball cap and/or PPE head gear must be able to fit properly over any hairstyle worn-
- Color, highlights or streaks added to hair must be look natural, be in good taste and compliment appearance-
- Braids are permitted, but must be well groomed and kept-
- Dreads or dreadlocks hairstyle are prohibited-
- Hair ribbons are not permissible-

**Make-up**
- Make-up must be in good taste and compliment appearance-
- No loud eye shadow or lipstick. Eye shadow and lipstick must compliment appearance-
- No excessive or large eye lash extensions-
- No loud or inappropriate nail polish (i.e. green, black, blue, orange, yellow, pink, etc.). Nail polish must compliment appearance-
- Color, streaks or highlights in eyebrows are not permitted-

**Jewelry-**
- Must be conservative and not present a safety concern-
- Excessive jewelry is prohibited- (i.e. multiple bracelets; 3 or more rings on one hand; 2 or more necklaces, etc. on)
- Earrings with very large hoop are prohibited-
- No additional piercings such as nose, facial, tongue, eyebrow, excessive ear piercings w/earrings, etc.-



DEFENDANT'S
EXHIBIT
Katie
Kay
6-20-22    SC

1 | Page

HEA0001

**Tattoo-**
- Excessive exposed tattoos are prohibited-
- No facial tattoos-
- No offensive or derogatory tattoos-

## Male Officers (Uniform Officers):

**Hair-**
- Must be clean, well-groomed and neat-
- No exaggerated or inappropriate hairstyles are permitted. Hairstyles must present a professional appearance-
- Carvings, designs, etc. in hair are prohibited-
- Hair should not touch collar-
- Braids and/or dreads are not permitted-
- Ponytails are not permitted-
- Tapered appearance on both sides and back of head-
- The security issued ball cap and/or PPE head gear must be able to fit properly over any hairstyle worn-
- Color, highlights or streaks added to hair must be look natural, be in good taste and compliment appearance-

**Facial Hair**
- Male officers must be clean shaven.
- A mustache is permissible, but must not exceed pass the corner of the mouth and/or be bushy-
- Sideburns must be neatly trimmed and tapered in the same manner as the haircut. Sideburns will be straight and of even width (not flared) and end in a clean –shaven horizontal line. Sideburns will not extend below the lowest part of the exterior ear opening-
- Color, streaks or highlights in eyebrows, or mustaches are permitted-
- Beards are prohibited-
- Goatees re prohibited-
- Any officer claiming to have an issue with shaving must present security management with a medical shaving profile-

**Jewelry-**
- Excessive jewelry is prohibited- (i.e. bracelets; more 1 ring on one hand; 2 or more necklaces; etc.)

2 | Page

CONFIDENTIAL

- Earrings are not permitted-
- Piercings such as nose, facial, tongue, eyebrow, excessive ear piercings w/earrings, etc. are not permissible-

**Tattoos-**

- Excessive exposed tattoos are prohibited-
- No facial tattoos-
- No offensive or derogatory tattoos-

HPA0003

# Exhibit 6

# HMMA PPE and
# Dress Code Matrix

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | **PPE & Dress Code Matrix** | HR-ALSF-s-00028 |
|---|---|---|
| Revision Date: 7/22/2013 | OWNER: Assistant Manager, Safety | REVISION LEVEL: 07 |

## PRODUCTION PPE REQUIREMENTS (MINIMUM PPE REQUIREMENTS FOR ENTERING THE WORK AREAS)

| SAFETY RULES AND PPE REQUIRED IN PRODUCTION AREAS | STAMPING | WELD | PAINT | GENERAL ASSEMBLY | ENGINE |
|---|---|---|---|---|---|
| **PERSONAL PROTECTIVE EQUIPMENT** | | | | | |
| SAFETY GLASSES WITH SIDE SHIELDS (ANSI Z87.1) | X | X | X | X | X |
| SAFETY STEEL TOED SHOES (ANSI Z41) | X | X | JS | JS | X |
| BUMP CAPS | X | X | JS | JS | JS |
| HEARING PROTECTION REQUIRED IN AREAS >85 DECIBELS | X | X | JS | JS | JS |
| KEVLAR or CUT-RESISTANT GLOVES | X | X | JS | JS | JS |
| KEVLAR or CUT-RESISTANT SLEEVES | X | X | | JS | JS |
| PAINT COVERALLS/HEAD COVERS (LINT FREE) | | | X | JS | |
| RESPIRATOR (VOLUNTARY REQUESTS) | JS | JS | JS | JS | JS |
| PROTECTIVE APRON | JS | JS | JS | JS | JS |
| LONG SLEEVE COTTON SHIRT WITH SLEEVE PROTECTION | JS | JS | JS | JS | JS |
| STATIC DISSIPATIVE (SD) SAFETY BOOTS (ELECTRO-STATIC) | JS | JS | JS | JS | JS |
| HARD HATS | JS | JS | JS | JS | JS |
| TINTED SAFETY GLASSES FOR MIG/TIG WELDING | JS | JS | JS | JS | JS |
| WELDING HELMET WHEN WELDING (MIG/TIG) | JS | JS | JS | JS | JS |
| FACE SHIELD OR GOGGLES WHEN GRINDING | JS | JS | JS | JS | JS |
| LEATHER GLOVES | JS | JS | JS | JS | JS |
| CHEMICAL PROTECTIVE GLOVES | JS | JS | JS | JS | JS |
| FALL PROTECTION REQUIRED - POTENTIAL TO FALL 6 FEET OR GREATER | JS | JS | JS | JS | JS |
| **DRESS CODE REQUIREMENTS - JEWELRY, BELTS, and SHOES** | | | | | |
| NO EARRING LOOPS OR EARRINGS BELOW THE EAR LOBE | X | X | X | X | X |
| BODY PIERCING: STUDS OK/ NO LOOPS | X | X | X | X | X |
| NECK CHAINS WORN INSIDE SHIRT | X | X | X | X | X |
| RINGS OR BRACELETS MUST BE COVERED or NOT WORN; HIGH RISK | X | X | X | X | X |
| LANYARD FOR BADGES, SAFETY GLASSES, ETC - MUST BE BREAKAWAY | X | X | X | X | X |
| WRIST WATCHES/ BELT BUCKLES PROTECTIVE COVER | | | X | X | JS |
| SHOES WITH METAL HOOK-TYPE EYELETS NOT PERMITTED IN QC ZONES | | | JS | X | |
| **PERSONAL HYGIENE** | | | | | |
| HAIR LONGER THAN COLLAR LENGTH - TIED BACK OR TUCKED IN HAT | X | X | X | X | X |
| FINGER NAIL LENGTH - END OF FINGER | X | X | X | X | X |

**LEGEND:**
**X = AT ALL TIMES**
**JS = JOB SPECIFIC**

NOTES:

1. IT SHOULD BE NOTED THAT THIS DOCUMENT IS AN OVERVIEW OF THE REQUIREMENTS IN EACH DEPARTMENT AND AREAS WHERE ADDITIONAL PPE MAY BE REQUIRED. ADDITIONAL REQUIREMENTS WILL BE SPECIFIED BY THE DEPARTMENT SENIOR MANAGER AND SAFETY DEPARTMENT.

2. TEAM MEMBERS SHOULD NOT ENTER WORK AREAS WITHOUT REQUIRED PPE.

3. TEAM MEMBERS/VISITORS THAT ENTER WITHIN ANY PRODUCTION WORK AREAS; MUST MEET THE "IN SYSTEM DAMAGE CONTROL ZONES" DRESS CODE REQUIREMENTS.

JS = JOB SPECIFIC

# Exhibit 7

# Dynamic Acknowledgement and Receipt of Employee Handbook

# DYNAMIC SECURITY, INC

### *Acknowledgement and Receipt of Employee Handbook*

I have received a copy of the Dynamic Security, Inc. Officer's Handbook published Ocotber 2001. I understand that it is my responsibility to read this handbook and become familiar with the contents. If I have questions, I understand that I should ask my Supervisor, the Operations manager, Branch Manager, or the Coordinator of Human Resources.

Further I acknowledge and understand that:

I am bound by, and will abide by, the rules, regulations, and policies set forth in this handbook, and this handbook supersedes all previous employee handbooks. I also understand that I am expected to carry this handbook with me at all times while on duty.

This handbook is not intended to nor does it create promises or representations of continued employment. Every employee has an at-will relationship with Dynamic Security. This means that Dynamic Security is free to terminate my employment, for any reason, with or without cause of the use of progressive discipline, at any time with or without notice.

This handbook represents a summary of the more important company guidelines at the time of publication, and is not intended to be all-inclusive. Dynamic Security's employment practices are governed by applicable state and federal laws, regulations, and constitutional provisions and the Company at all times will abide by those legal requirements. Apart from each employee's status as an at-will employee and those employment practices, terms and conditions required by law, Dynamic Security may change its policies or procedures at any time without prior notice.

I understand that $5 will be deducted from my paycheck for each duplicate handbook requested. Further, I also understand that this document will become a part of my personnel file.

_____          _____
Employee Name (Please Print)         Location\Branch

_____          7-21-17
Employee Signature                    Date

DEFENDANT'S
EXHIBIT
KEY 10
6-20-22

Dynamic - Key 000041



# DYNAMIC SECURITY, INC.

Form 1500-1, March 2001
Revised March 2003

**Purpose**

To set forth the Company's policy regarding all forms of harassment in the workplace.

**Background**

It has always been the Company's policy and practice to comply with applicable laws. This commitment is particularly reflected in the field of human relations.

**Policy**

It is the policy of the Company to maintain a work environment that permits an employee to be free from sexual harassment, harassment based upon race, age, gender, religion, national origin, ethnic origin, disability, pregnancy, military status, and other forms of unlawful harassment by any co-worker, supervisor, or other person. It is unacceptable for any employee to engage in conduct that represents unwelcome sexual advances, requests for sexual favors, or other harassing verbal or physical action. The following conduct is specifically prohibited and unlawful:

a. Quid-pro-quo promises by a supervisor (promise of job/promotion/benefits/loss of job)

c. Any conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or which creates an intimidating, hostile, or offensive working environment.

d. Offensive touching

e. Inappropriate/lewd pictures or inappropriate/lewd written materials in the workplace

f. Verbal Harassment in the form of comments, jokes, references or questions.

Prohibited harassment is an infringement on an employee's right to work in an environment free from unlawful discrimination. The Company will not tolerate harassment of any kind amongst any of its employees and any employee engaging in such conduct will be subject to appropriate disciplinary action up to and including termination of employment.

**Instructions**

A. Any employee who believes he or she has been subjected to unlawful harassment is required to report the activity to his or her supervisor immediately. If your complaint involves a supervisor, you should notify the Policy Compliance Officer, in writing, at P.O. Box 451, Tuscumbia AL 35674. You should not be concerned, or fearful of retaliation for making a report pursuant to this policy.

B. Any supervisor to whom a report of alleged harassment is made will immediately notify their manager and conduct a full and detailed investigation. A written report will then be issued to the Vice President of the Company with a copy to the President. A decision will then be made and the appropriate action will be taken.

**Acknowledgment**

By signing below, you acknowledge that you have read and understand this policy and agree to comply with its provisions.

Employee Signature: _____   Date: _____

Dynamic - Key 000042



# DYNAMIC

# Security Officer's Handbook

Key 000332

# SECURITY OFFICER'S HANDBOOK

Published by Dynamic Security, Inc.
Copyright 2001 by Dynamic Security, Inc.
1102 Woodward Avenue
Muscle Shoals, AL 35661
Produced by: BevART, Knoxville, TN

This handbook must be returned to
Dynamic Security upon termination of employment.
An Equal Opportunity Employer

Key 000333

# INTRODUCTION

This Handbook has been prepared to assist Security Officers by providing a definition of their general duties and responsibilities. The information is general since it would be impossible to include instructions relating to every situation. Any questions or lack of understanding of the contents of this manual should be directed to your supervisor.

This is issued with the understanding that the Officers will read and adhere to the rules and regulations discussed herein. Not doing so, could lead to disciplinary actions; and when you accept employment, it is assumed that you accept these rules and regulations.

Your employment can be terminated or suspended without cause and without notice at any time, at the option of Dynamic Security, Inc. (referred to in the Handbook as Dynamic Security).

Key 000334

# CONTENTS

| | | |
|---|---|---|
| Section 1 | General Duties | 1 |
| Section 2 | Training | 4 |
| Section 3 | Job Assignments | 6 |
| Section 4 | Limits of Authority | 7 |
| Section 5 | Uniforms | 8 |
| Section 6 | Personal Appearance | 11 |
| Section 7 | General Safety | 14 |
| Section 8 | Report Writing | 16 |
| Section 9 | Weapons Regulations | 17 |
| Section 10 | Weapons Safety | 20 |
| Section 11 | Public Relations | 22 |
| Section 12 | Security Patrols | 24 |
| Section 13 | Fire & Fire Detection | 25 |

i

Key 000335

Section 14   Post Telephone Instructions   26

Section 15   Trespassers   27

Section 16   Handling the American Flag   28

Section 17   Disciplinary Actions   29

Section 18   Wage and hour Plan   33

Section 19   Policies   34

Physical Examination   34

Workers' Compensation   35

Waiver of Trial by Jury   37

Substance Abuse   39

Negligence and Damage   40

Medical Records Release
and Drug/Alcohol Screening   41

Harrassment in the Workplace   43

ii

Key 000336

# Section 1

# GENERAL DUTIES

A Security Officer's primary duty, when protecting a client's property, is to observe and report any unusual events or circumstances. Every security post will have a unique set of instructions on how to accomplish this task. Post Orders and instructions are provided at each job site. These Orders explain the Client's expectations for our security services.

In the absence of Post Orders, the Officer should consult his or her immediate supervisor for site specific instructions and follow the common duties written in this handbook. If the Officer is requested by the Client to deviate from the written orders, or to take on entirely new duties, then the Officer should heed the Client's request and notify his or her supervisor immediately.

Never take an assignment without expressed permission from the Dynamic Security supervisor. If emergency circumstances dictate an immediate deviation from accepted procedures, call the supervisor at the earliest possible time.

1

Key 000337

Dependability is a valued trait in a Security Officer. It is vitally important that each Officer arrive on time; and in many cases, relieve the Officer who has worked the previous shift. Both the Client and previous shift Officer depend on the relieving Officer's timely arrival. Dynamic Security and the Client rely on each Officer to remain at his/her post until properly relieved. However, Officers should not be on the job site more than 15 minutes before the start of their shift, nor should they be at the job site later than 15 minutes after the shift ends. Security Officers may not be on the job site when off duty. If an Officer's personal life takes him/her to the job site, then he/she should not be in uniform.

Security Officers are required to report for duty in full uniform, as scheduled  However, if an Officer discovers that he/she will not be able to work the assigned shift due to illness, he/she must inform the supervisor, not the job site, at least four hours prior to the start of the shift. The phone number of the branch Office/Supervisor is operational 24 hours a day.

If the supervisor is given less than four hours notice, the Officer may be asked to stand at the post until relief can be arranged. When a Security Officer does not give four hours notice, he/she is subject to

2

Key 000338

disciplinary action. If an Officer does not call in to report, and does not report, at the scheduled shift position, he/she can be terminated immediately.

No Security Officer may leave the post without being properly relieved by another Dynamic Security Officer, who is in complete uniform. If an Officer who is unfit for duty attempts to relieve a post, then DO NOT leave the post, but call the supervisor immediately to request instructions. Leaving a post unattended is grounds for immediate termination.

An Officer's acceptance of employment does not constitute an employment contract with Dynamic Security for any specific period of time. Continued employment is contingent upon compliance with all Rules and Regulations, the availability of assignment, and other factors. Employment may be terminate at any time without cause.

3

Key 000339

# Section 2

# TRAINING

In addition to any state requirements; that differ from state to state, Security Officers are required to complete a comprehensive eight hour, pre-assignment training and testing program. The 12-part basic training program consists of a series of videotaped programs, student handouts, and test material. After the Officer views each module he/she will be tested on the material. The passing grade for each test is 70%. If an applicant or Officer does not receive a passing grade, he/she may view the module again and retake the test after three business days. The Officer will be paid minimum wage while in the testing program.

Before an Officer can be assigned to a post, he/she must have completed Modules 1 and 2. The remaining 10 modules MUST be viewed and tested within 30 days of hire or the Officer will be removed from the post.

4

Key 000340

## The topics covered are as follows:

- Introduction to security
- Importance of the Security Officer
- Legal Issues I
- Human and Public Relations
- Communications
- Patrol
- General Duties
- Report Writing
- Fire Prevention and Control
- Emergency Situations
- Safety

5

Key 000341

# Section 3

# JOB ASSIGNMENTS

Job assignments are given on merit, experience, qualifications, job knowledge, and needs of the Client and Dynamic Security. Priority is placed on those needs. Dynamic Security makes no promise or commitment to assign an employee to a specific job site, shift, or time period. No Dynamic Security employee is authorized to make promises or commitments of this kind. Job assignments are subject to change without prior notice.

6

Key 000342

# Section 4

# LIMITS OF AUTHORITY

**A Security Officer does not have any authority beyond that of an ordinary citizen. Security Officers do not have the power to arrest anyone.** Unless the Post Orders at the assignment authorize Security Officers to detain someone under special circumstances, they CANNOT detain anyone against their will. Security Officers MAY NOT use any force in performing their duties except to protect themselves or others from a clear and immediate threat of serious bodily harm.

Doing any of the above listed actions may result in the Security Officer being held personally liable in a civil court and criminal prosecution. Security Officers are accountable for their actions.

Dynamic Security will not tolerate any threats, intimidation (both verbal and physical), violence, or threats of violence to any person or property at any time by their Security Officers. Any Officer who performs such acts, whether on or off duty, will be subject to immediate termination. This policy does not intend to prohibit legitimate actions to be taken to protect the property and interest of employees, Clients, or Dynamic Security.

7

Key 000343

# Section 5

# UNIFORMS

The Dynamic Security uniform is the first means by which our Security Officers are identified. It is extremely important that each Officer wear the entire uniform while on duty. Each uniform will consist of the following items:

- **Uniform Shirt** (white or blue) -
  Shall be the correct size and worn tucked into the trousers. The only visible under garment shall be a white tee shirt.
- **Trousers** (French blue) -
  Shall be the correct size. When in the standing position the hem of the trousers shall not be long enough to touch the floor or short enough to expose the ankle area. The trousers shall be straight legged WITHOUT cuffs.
- **Tie** (French blue) -
  Shall be worn with the long sleeve shirt at all times. The tie is not required while wearing the short sleeve shirt.

8

Key 000344

- **<u>Dynamic Security Badge</u>** -
  Shall be worn on the outer garment above the left
  breast pocket.
- **<u>Rank Insignia</u>** (when applicable) -
  Shall be of the correct rank and shall be worn
  centered on both collars of the uniform shirt.
  The insignia shall be positioned approximately
  one inch from the point of the collar.
- **<u>Footwear</u>** -
  Can be either Oxford shoes or boots.  Oxford
  shoes must be black in color and can be leather
  or patent leather.  Boots shall be black in color
  and may be leather or a combination of leather
  and fabric. Shoes and boots must have a plain
  toe, black soles, laced diagonally with black shoe
  laces, tied in the front, and be clean and polished.
  Black socks must be worn with footwear.
- **<u>Black Belt</u>** -
  Shall be of the correct size, black in color,
  leather, and must be worn within the belt loops
  of the trousers.
- **<u>Uniform Cap</u>** (optional) -
  If issued, may be worn in summer or winter.  The
  cap shall NOT be worn backwards, or in any
  other manner which is inappropriate.  Officers
  are NOT to wear the cap when off duty.

9

Key 000345

- **<u>Black Gloves</u>** (optional) -
  May be worn in colder temperatures. Gloves worn for other than cold weather protection are not permissible.
- **<u>Windbreakers/Bomber Jackets</u>** (optional) -
  If issued, the jacket must be zipped  or buttoned when  worn  and the badge  attached to the upper left side of the jacket. Officers are NOT  to wear the jacket while off duty.

These items must be worn properly in order for the uniform to be complete and acceptable.  It is important to mention again - **Officers must be in complete uniform when reporting for duty or face disciplinary action.**  Additionally, uniforms must be clean and pressed so that they present the best Company image possible.  The uniform displays a great deal about our standards.  If the uniform becomes worn and tattered, the supervisor should be informed of the need to replace the faulty items.

Uniforms must be returned within seven days of termination.

10

Key 000346

# Section 6

# PERSONAL APPEARANCE

Security Officers shall be neat and clean in appearance and shall adhere to the following standards:

**Female Officers**

- Shall maintain a neat hairstyle that keeps long hair away from the face and the hair should not extend more than two inches below the top of the collar. If hair extends more than two inches below collar, then it must be worn up when on duty.
- Hair accessories must be worn inconspicuously and be transparent or similar to the color of the Officer's hair.
- Cosmetics shall be applied conservatively and in good taste.
- Are limited to one stud earring per ear lobe.
- Are prohibited from wearing dangling jewelry over their uniform.

11

Key 000347

## Male Officers

- Hair shall be cut above the collar and above the ears. It shall be neatly combed at all times.
- Are expressly prohibited from wearing any hair accessories.
- Neck hair and sideburns shall be neatly trimmed. Sideburns shall not extend below the bottom of the earlobe.
- Faces shall be clean shaven with the exception of neatly trimmed mustaches; which shall not extend below the corners of the mouth. Handlebar mustaches, goatees, and beards are NOT acceptable.
- Are prohibited from wearing earrings.
- Are prohibited from wearing dangling jewelry over their uniform.

## All Officers

- Are expected to practice good hygiene. This in cludes; but not limited to; clean and trimmed fingernails, daily bathing and use of deodorants, and daily brushing and flossing of teeth.
- Officers may wear a wristwatch, medical identification bracelet and only one ring per hand.

12

Key 000348

- Necklaces or other items of jewelry may be worn, provided they are not visible.
- Pens and pencils must be carried in the designed slot on the uniform shirt; or concealed.
- Prescription glasses, contact lenses, or sunglasses can be worn.  Sunglasses are to be worn outside during daylight hours.  Faddish and mirror lens sunglasses are not authorized.  No eyeglasses, cases, and related items are to be hung from any part of the uniform.
- Pagers worn with the uniform must be black in color.

A Security Officer who reports to work in violation of any of the above standards is subject to disciplinary action.

13

Key 000349

# Section 7

# GENERAL SAFETY

Dynamic Security makes every effort to provide working conditions that are as safe and healthy as possible. All employees are expected to be concerned about workplace safety, including improper working methods, reporting potential hazards, and avoiding known hazards. Unsafe working conditions should be reported immediately to a supervisor.

**If an employee is injured in connection with employment, regardless of severity of the injury, the supervisor must be notified immediately. Failure to report an injury within 24 hours could void Worker's Compensation benefits.**

**NOTICE: In the event of the death of a Dynamic employee from a work-related incident, or the hospitalization of three or more employees. Call 800-321-OSHA or 205-731-1534 within the first 8 hours.**

We have listed some of the most common accidents and their causes. This list is provided so that Officers may look for and avoid some of the causes they may face when going about their daily duties.

14

Key 000350

- **Strains** -
  Improper technique or lifting excessive weight.*
- **Falling or Moving Objects** -
  Improper storage of equipment or articles
- **Striking against Dangerous Object** -
  Drawers left open, improper disposal or storage
  of equipment or articles
- **Electrical Shock** -
  Frayed Cords and Plugs or Water on Floor
- **Vehicle Based Injury** -
  Seat Belts not in use, Excessive Speed,
  Signalling, etc.
- **Chemical Injury** -
  Improper Knowledge of Safety Procedures,
  Improper Protective Equipment, etc.

Each Officer should inspect their work area
frequently to eliminate these unsafe conditions.

*NOTE: Officers are not permitted to lift any
objects in excess of 25 pounds, unless specific site
specifications dictate the exception.  If a Client requests
an Officer to lift or move any object in excess of 25
pounds, the Officer should immediately call his/her
supervisor or Branch Office to secure permission.  If an
Officer voluntarily exceeds this limit then he/she is
subject to disciplinary action.

15

Key 000351

# Section 8

# REPORT WRITING

The duty of the Security Officer to observe and report is the most vital part of the job. Therefore, making certain the daily report is completed accurately is important. The top portion of the report will establish <u>where and when</u> the Officer was on duty. Under the section "DETAILS", include all normal activities during the tour of duty. All unusual events (fire, theft, disorderly conduct, etc.) should be written in the report. Items that should be included (but not limited to):

**Who was involved**
**What was affected**
**Where it took place**
**When it occurred**
**Any other helpful information**

If there is not enough room under the "DETAILS" Section, then continue on the back of the report. If the incident calls for a more lengthy response, utilize the Incident Report. If an Incident Report is used, an entry should be made in the Daily Report. If the Officer has questions concerning how to complete such reports, then the Post Orders or the supervisor should be consulted. Security Officers are required to report ALL incidents that occur while on duty. Failure to submit reports or to submit a false report is grounds for dismissal.

16

Key 000352

# Section 9

# WEAPONS REGULATIONS

Weapons are not required on every post and in fact are forbidden by many Clients. Some find it necessary for the protection of the Officer, the employees and the visitors to the site. The authority to carry a deadly weapon gives only the right to defend the imminent threat to human life. The unauthorized carrying of a weapon on the job site is grounds for immediate dismissal!

A Security Officer shall be held accountable for the unwarranted use of a deadly weapon and is personally liable for the wrongful or negligent use of such. This does not mean that undo risks should be taken just because the Officer is armed. Judgement should be used before resorting to the use of a lethal weapon. **Again, deadly force is permissible only in defense of life, against an armed assailant, or if the assailant is intent on doing bodily harm to the armed Officer or his protectorate. An Officer will NEVER use a warning shot in an effort to apprehend a perpetrator!** Armed Security Officers will only carry weapons while on an assignment requiring the weapon or traveling to and from the assignment.

17

Key 000353

While on duty, weapons must be securely stored in a holster, with a safety strap, on the Officer's belt. No weapon is ever allowed to set on a desk or other furniture, or left unattended while on the Client site. Under no circumstances will a weapon be cleaned while on the Client site. Any Officer required to carry a weapon must possess a working knowledge of their weapon and additionally possess a valid state license and registration for the area in which he/she works.

Each Dynamic Security Officer, that is issued a firearm, must be trained in the safe use and handling of the weapon. This should entail a four hour training course given by an N.R.A. Certified Security Firearms Inspector or an active or retired member of a police department that is conversant with firearms inspection, before being assigned to the site requiring the carrying of a weapon. The training curriculum shall include an item by item review of the instructions for Form 600-4, Employee Weapon Instructions and Receipt. Each employee requiring a weapon MUST complete the standard qualifications for weapons at least once annually.

18

There will be no restrictions as to the model of the weapon; however, there will be a restriction on the caliber to be used. All Officers shall carry either a .38 caliber revolver or a semi-automatic .9 mm caliber weapon. The type of ammunition will be restricted to the use of factory loaded ammuntion only. If a security offcier does not own a personal weapon that complies with Dynamic Security Inc. firearms policies and procedures, a .38 caliber revolver will be issued on Form 600-4.

19

Key 000355

# Section 10

# WEAPONS SAFETY

**Observe these safety rules:**

- Weapons must be handled with extreme care and always treated as if they are loaded.
- Do not remove a weapon from its holster unless it is to be fired or cleaned or presented for inspection.
- Never carry a revolver with the hammer cocked.
- Never point a gun at anyone unless it is intended to be used.
- Never indulge in horseplay with a weapon.
- Never carry or handle a weapon if you have been drinking.
- Never put your finger inside trigger guard until ready to fire.
- Never practice sighting or aiming in the presence of anyone other than a range officer or instructor.

20

Key 000356

- Never discharge a firearm while running. Always stop, cock the hammer, and take careful aim. Remember: upon striking a hard surface, bullets are likely to ricochet and could cause serious injury or death to an innocent person.
- Never pick up a weapon without opening it to make sure that it is unloaded.
- Always unload a gun when it is to be handled for any purpose other than to fire.
- When unloading a revolver, go to an isolated spot, remove and count the cartridges, and check the chambers to make sure that each cylinder is empty.

21

Key 000357

# Section 11

# PUBLIC RELATIONS

A Security Officer should strive to present a positive, helpful attitude to the Client, its employees, and guests. When on post, the Security Officer represents both Dynamic Security and the Client. With this in mind, the Officer must be courteous and polite, though firm, when speaking with others on the Client's property. Security Officers learn a great deal about the facilities they protect. If an Officer is asked about the facility or its employees, the Officer should refer the person to an accepted Client representative. NEVER give out information about the Client or the employees without expressed permission. Each Officer should be helpful in directing visitors with appointments by giving them directions to the appropriate Client area.

Unauthorized disclosure of Client or Dynamic Security information or official records will result in dismissal. Security Officers may NOT discuss with the Client, its representatives, or the media, the business of Dynamic Security. This includes, but not limited to, job assignments, payroll, and disciplinary situations. Equally, the same privilege applies to the Client's business.

22

Key 000358

Each Officer must remember that he/she is on duty to protect the Client from within as well as without. Treat the employees of the Client with respect and congeniality, but do not become overly friendly. The employees must understand that the Officers intend to apply all security procedures evenly and without prejudice. Disciplinary action could be dealt for over fraternization with the Client or other Officers. Officers may not accept bribes, tips, gifts, or gratuities of any kind in the course of performing their duties.

23

Key 000359

# Section 12

# SECURITY PATROLS

The most important objective of a Security Officer is to observe and report. This is most often accomplished by security patrols. When a patrol is conducted an Officer should inspect EVERYTHING (doors, windows, gates, fences, parking areas, building perimeters, non-restricted building interiors, machinery for leakage, malfunctions, etc.). Use every sense available to detect circumstances which are out of the ordinary. Listen for strange sounds and smells (gas leaks, etc.) and evidence of safety problems. Rounds procedures are established in Post Orders.

Report every item or occurrence on the Daily Report or on the appropriate Client report. If a patrol is made and all is well - report it as such. Mention specifics about the patrol so that the Client will be aware of the observations.

24

# Section 13

# FIRE & FIRE DETECTION

If the Security Officer or someone else discovers a fire, the Officer should **first call the Fire Department** and instruct all personnel to evacuate the building.  If the fire is manageable in size or type, the Officer should employ a fire extinguisher and attempt to put out the blaze.  If ANY threat to an Officer exists, he/she should evacuate the building as well and await the arrival of the Fire Department.  Upon their arrival, the Officer should assist the firemen in finding easy access to the fire area.

25

Key 000361

# Section 14

# POST TELEPHONE INSTRUCTIONS

If an Officer is assigned to a post where he/she will be responsible for answering the telephone on behalf of the Client, he/she should answer incoming calls promptly and cordially. Answer by stating "(Company Name), Security Officer (Officer's Name), How may I help you?" Always maintain a professional attitude and tone of voice.

Keep a pencil and paper available to take notes in the event the person called is not in. Always include:

- the caller's name
- the time and date of the call
- the person with whom they wish to speak
- the caller's number
- and the message he/she would like to leave

Personal calls are NOT permitted except in the event of an emergency. Unauthorized use of a Client telephone could result in disciplinary action and financial penalties.

26

Key 000362

# Section 15

# TRESPASSERS

When unidentified individuals are observed on the property or attempting to enter the property, the Officer should make a polite inquiry as to their business at the Client's facility.  If the individual's actions show intent to make unauthorized entry, he/she should be intercepted immediately and asked to leave.  If any resistance is offered, call the Police without delay. Enter all evidence of trespass in the Daily Report.  The Clients of Dynamic Security depend on the Security Officer to secure the perimeter of their facility from trespassers.

27

Key 000363

# Section 16

# HANDLING THE AMERICAN FLAG

On many of the posts to which an Officer may be assigned, there are duties that involve handling the American flag. Security Officers should take special care to fold the American flag as it is being lowered and to hold it appropriately when it is being raised. The flag should NEVER touch the ground. Dynamic Security follows this long tradition of displaying respect toward the symbols of the United States. Times for the raising and lowering of the flag, if required, should be noted in the post orders.

28

Key 000364

# Section 17

# DISCIPLINARY ACTIONS

Officers should be aware of the consequences of violating Security Officers Handbook rules and regulations, verbal orders, and post orders. When an Officer knows what is expected, he/she can act accordingly. Dynamic Security seeks to resolve conduct and performance problems in the most informal and positive manner possible. Methods may include counseling, additional training and supervision, and verbal warnings, etc. When a disciplinary action is necessary to correct a problem, Dynamic Security will follow pre-established procedures. Following are some areas that represent unacceptable conduct (this list is not all-inclusive) and the corresponding disciplinary action:

29

Key 000365

Key 000366

| | Probation | Suspension | Termination |
|---|---|---|---|
| **Attendance** | | | |
| --Excessive tardiness | X | X | X |
| --Absent without authorized leave | X | X | X |
| --Switching shifts without authorization | X | X | |
| | | | |
| **Behavior** | | | |
| --Failure to carry out a direct order | X | X | |
| --Sleeping on duty | | | X |
| --Possessing radios & recorders on duty | X | X | |
| --Possessing reading material on duty | X | X | |
| --Fighting or gambling | | | X |
| --Discourteous treatment of the public | | X | X |
| --Discourteous treatment of employees | X | X | |
| | | | |
| --Harassing, coercing, threatening others | | X | X |
| --Violations of safety rules | | X | X |
| --Destruction of client or company property | | X | X |
| --Making racial, ethnic, sexual demeaning comments | | X | X |
| --Discriminatory acts, harassment, and conduct | | X | X |
| --Allowing unauthorized visitors on post | | X | X |
| --Making false statements about other employees | | X | X |

Key 000367

**Performance**

| | Probation | Suspension | Termination |
|---|---|---|---|
| --Negligence in job performance | X | X | X |
| --Missed rounds, hits, or keys | X | X | X |
| --Refusal to accept reasonable assignment | X | X | X |
| --Under the influence of drugs or alcohol | | | X |
| --Using Client or Company time or equipment for personal use | X | X | X |
| --Negligent use of funds, time, & equipment | X | X | X |
| --Unauthorized release of confidential info | X | X | X |

Other than the infractions whose disciplinary actions are outlined previously, there are certain rules and regulations that not only carry severe penalties, but might reflect on outside law enforcement. Some of which are as follows, but not limited to:

- Any employee who is arrested, summoned, or indicted for a crime or offense must report such offense to his/her supervisor immediately. Dynamic Security is licensed by the States in which it operates; failure on the part of the employee to make a timely report of an arrest can result in the employee being barred from employment by all other such licensed security firms.

- Further infractions while on probation can result in suspension and termination.

- Any involvement in theft or a cover-up of a theft is grounds for immediate termination.

- Any three disciplinary actions in a 90-day period is grounds for immediate termination.

32

Key 000368

# Section 18

# WAGE & HOUR PLAN

The work week for Dynamic Security begins at 12:01 am Saturday and ends at midnight on Friday. Dynamic Security and the Client have established a wage plan that assigns each post a particular pay scale. Note then that different assignments may carry different pay scales.

All Security Officers are eligible to receive overtime pay at the rate of 1 and 1/2 times their regular rate of pay for the hours worked in excess of 40 hours per work week. All overtime hours to be worked must have advance approval of the supervisor. Payday is every other Tuesday. Payday schedules are available at local Branch Offices. Payroll checks may be picked up at the Branch Office, the job site, or mailed to the Officer.

Company policy requires Officers to provide a 14 day written notice prior to voluntarily ending employment. If an Officer fails to give such notice, then all hours worked and not yet paid will be paid at minimum wage.

33

Key 000369

# Section 19

# POLICIES

Following are select relevant Company Policies that are taken from the Policy manual. To view other Policies, check with your supervisor or the Branch Office.

# PHYSICAL EXAMINATION POLICY

Security Officers agree to take a physical examination (including a blood and urinalysis test) by a doctor, medical center, hospital, laboratory or medically qualified personnel. Officers authorize the release of the results of tests and examinations to Dynamic Security or its representatives.

By this authorization, Security Officers release any doctor, medical center, hospital, laboratory, or medically qualified person or their representatives from liability for release of the information gained from these tests and examinations.

34

Dynamic Security requires a drug and alcohol test anytime you request to see a doctor as a result of an alleged accident or on-the-job injury. Any employee may be asked to submit to a drug and alcohol test if in the opinion of management there is a probable cause for testing. Test results which are positive, or a refusal or failure to submit to testing, may be grounds for dismissal for "willful misconduct" and or "endangering the safety of others."

# WORKERS' COMPENSATION ADVISEMENT POLICY

All Security Officers are advised that under Workers' Compensation laws, misrepresentation of pre-existing physical or mental conditions may be grounds to void your workmen's compensation benefits.

Other grounds for denial have been further expanded. The definition of "willful misconduct" now includes intoxication from the use of alcohol or being impaired by illegal drugs. The act designated the drug testing standards set forth by the US Department of Transportation (DOT) as an acceptable form of testing

35

Key 000371

and a conclusive presumption of impairment. Should an employee refuse to submit to or cooperate with a blood or urine test after an accident, the employee will not receive benefits if he/she was warned in writing that such a refusal would forfeit an employee's rights to recover benefits. This manual satisfies that warning.

Dynamic Security's Workers' Compensation Insurance carriers make spot inspections for safety violations. When required, all safety gear MUST be worn. Each employee has a duty to himself/herself and to his/her fellow employee to protect each other and to enforce the use of safety equipment and work habits. If you are warned about repeated safety violations, you can be terminated and you will not be allowed to draw unemployment compensation.

**If you are injured at work, you MUST report the injury immediately to your supervisor.** If the injured person refuses to comply with any reasonable request for examination, or refuses to accept the medical service which Dynamic Security elects to furnish, the employee's rights to compensation shall be suspended and no compensation shall be payable for the period of refusal. No compensation shall be allowed for the first three days of disability in accordance with state law.

36

Key 000372

These conditions must exist to entitle an injured employee to benefit under worker's compensation:

1.  The injury must result from an accident. (Accident is defined as an event happening suddenly and violently and producing, at the time, injury to the physical structure of the body by accidental means.)
2.  The accident must have happened as a result of carrying out a function of your duties.

# WAIVER OF TRIAL BY JURY POLICY

It is the desire of Dynamic Security to resolve disputes, whenever possible, in a fair and expeditious manner reflecting the interest of the concerned parties. Although there is no outstanding dispute at this time between the parties, it is recognized that as in any relationship, differences may arise which are not resolved and result in litigation.

In consideration of Dynamic Security offering employment and the acceptance of employment, said

37

Key 000373

employee and Dynamic Security each agree that in the
event either party (or its successors or assigns) brings an
action against the other relating to recruitment,
employment, or termination of employment from
Dynamic Security, the plaintiff in such action agrees to
waive their rights to a trial by jury. It is further agreed
that no demand or request or motion will be made for a
trial by jury.

**The waiver of trial by jury will cover:**

1. All actions, claims, and demands directly or
   indirectly  related to recruitment, employment or
   termination from Dynamic Security.
2. All issues and causes of action brought in any law
   suit in which an employment relate claim is made.
3. Initial, subsequent, and future proceeding related
   to (1) and (2) above.

By waiving the right to a jury trial an employee is
not limiting their rights to trial by judge. However, the
right to a jury is of value. Security Officers  may wish
to consult an attorney prior to accepting this
agreement. If so, the Officer may take this handbook
with him/her; however, employment will not be offered
until this is agreed upon; and in the event that the

38

Key 000374

individual does not agree to the Rules and Regulations
outlined in this handbook, the handbook must be
returned immediately.

# SUBSTANCE ABUSE POLICY

Dynamic Security is committed to providing a
safe work environment and the well being and health
of its employees.  The commitment is jeopardized
when any Dynamic Security employee abuses alcohol
or a controlled substance (drugs) on the job, comes to
work under the influence, or works under the
influence, or possesses, distributes, or sells drugs in the
work place.  Dynamic Security has established the
following policy:

- It is a violation for employees to possess, sell,
  trade, or offer for sale illegal use drugs on the
  job.
- It is a violation for anyone to  report to work
  under the influence of alcohol or illegal drugs.
- It is a violation for anyone to use prescription
  drugs illegally.
- Violations are subject to disciplinary action,
  including termination.

39

Key 000375

As a condition of employment, employees must abide by the terms above and must notify Dynamic Security in writing of any convictions for violation of any city, state, or federal statue whether it be on or off duty.

# NEGLIGENCE AND DAMAGE POLICY

Security Officers will be financially liable in the event that they are willfully and/or purposely negligent in duties while representing Dynamic Security or our clients. Should any damages be incurred which are caused by any negligent act performed during work or in representing Dynamic Security, or its Clients, then Dynamic Security will  deduct the cost of the damages from the Officer's future paychecks. A payment schedule and the amount of money due the damages will be decided at this time.

Security Officers who do not remain employed with Dynamic Security after the damages are incurred, will have all necessary amounts deducted from their final paycheck. In the event the paycheck will not cover the financial loss inflicted, Dynamic Security or

40

Key 000376

the Client will take legal measures to reclaim any balance due and legal fees incurred due to the Officer's negligence.

# MEDICAL RECORDS RELEASE & DRUG/ALCOHOL SCREENING POLICY

When an applicant files an application with Dynamic Security, he/she authorizes every medical doctor, person, firm, officer, corporation, association, organization or institution having control of any documents, or other relevant information to release to said company or representatives. Dynamic Security or its representatives are permitted to inspect and make copies of any such documents, records, or other information. Such information includes; but is not limited to; all medical records, employment records, X-rays, clinical abstracts, or transcriptions of scholastic records which may have been or prepared pursuant to, or in connection with, any examination, consultation, text, personal opinion, or evaluation of the undersigned. Applicants release and exonerate every medical doctor, school official, and every other person, firm, officer, corporation, association, organization, or institution which shall comply with the authorization and requests made herein from any and every liability of every nature and kind.

41

Key 000377

It is understood that when an application for employment is accepted, the effective date of acceptance and date of employment shall be the date work is actually to commence. Security Officers agree to comply with and be bound by the safety and work rules and other regulations of Dynamic Security.

Dynamic Security has a drug screening program which includes a urinalysis test. Also, alcohol abuse testing is required as a part of the employment process and that, in order to be considered for employment, the result of the tests must be negative. Officers agree to participate in this drug/alcohol testing which includes the urinalysis test. If they refuse to submit to this test or fail this program, their employment will be terminated. If required, Security Officers must submit to a pre-hiring medical exam and urinalysis test thereafter as permitted by law.

Security Officers fully release Dynamic Security, all employees, agents, and affiliated subsidiaries from all liability in connection with such testing and from any decision by Dynamic Security and affiliated subsidiaries concerning their application. Security Offices may be fingerprinted and photographed as required. Security Officers understand that misrepresentation or omission of requested facts on the application is cause for rejection of the application or for subsequent dismissal from employment. Officers or applicants

42

Key 000378

may review the application and consult with legal counsel prior to signing.

If a Security Officer is required to drive during his/her employment, he/she must notify the Company of any driving violations, accident, or license suspensions. A copy of the citation may be requested by Dynamic Security.

# HARASSMENT IN THE WORKPLACE POLICY

It has always been the Company policy and practice to comply with applicable laws. This commitment is particularly reflected in the field of human relations. It is the policy of the Company to maintain a work environment that permits an employee to be free from sexual, racial, and other harassment by any co-worker, supervisor, or other person. It is unacceptable for any employee to engage in conduct that represents unwelcome sexual advances, requests for sexual favors or other harassing verbal or physical action.

Any employee who believes that he/she has been subjected to harassment is required to report the activity to his/her supervisor immediately. If your complaint

43

Key 000379

involves a supervisor, you should notify the office of the Policy Compliance Officer, at 256-383-5798. You should not be concerned, threatened, or fearful of retaliation for making a report pursuant to this policy. Any supervisor to whom a report of alleged harassment is made, should immediately notify their manager and conduct a full and detailed investigation. A written report should then be issued to the appropriate Vice President of the Company, with a copy to the President. A decision will then be made and the appropriate action will be taken.

44

Key 000380

# USEFUL COMPANY PHONE NUMBERS

**Branch Manager's Office**

_____

**Area Supervisor**

_____

**Shift Supervisor**

_____


Notes:_____

_____

_____

_____

_____

Key 000381

Notes:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# Exhibit 8

# Hyundai Engineering America, Inc.'s Employee Handbook

CONFIDENTIAL

# HYUNDAI ENGINERINEERING AMERICA, INC.

# EMPLOYEE HANDBOOK





i

CONFIDENTIAL

# TABLE OF CONTENTS

INTRODUCTION...............................................................................................................1
EMPLOYMENT ................................................................................................................2
    EMPLOYMENT AT WILL...........................................................................................2
    MUTUAL/BILATERAL ARBITRATION OF DISPUTES.........................................2
EQUAL EMPLOYMENT OPPORTUNITY POLICY .......................................................3
    POLICY AGAINST HARASSMENT...........................................................................4
    IMMIGRATION LAW COMPLIANCE........................................................................5
    EMPLOYEE RELATIONS............................................................................................6
APPOINTMENT AND PROBATIONARY PERIODS.......................................................7
    TYPE OF APPOINTMENTS........................................................................................7
    PROBATIONARY PERIOD .........................................................................................9
EMPLOYMENT CLASSIFICATIONS AND COMPENSATION ...................................10
    EMPLOYMENT CLASSIFICATIONS ......................................................................10
    HOURS OF WORK AND OVERTIME ......................................................................11
    PAY PRACTICES .......................................................................................................12
    WAGE POLICY...........................................................................................................13
    PERFORMANCE REVIEWS .....................................................................................14
    STATE UNEMPLOYMENT AND DISABILITY INSURANCE .................................15
BENEFIT PROGRAMS ..................................................................................................16
    WORKER'S COMPENSATION INSURANCE ..........................................................16
    GROUP HEALTH INSURANCE................................................................................16
    VACATION PAY.........................................................................................................17
    HOLIDAY PAY...........................................................................................................18
ATTENDANCE AND LEAVE ........................................................................................19
    ATTENDANCE & PUNCTUALITY..........................................................................19
    SICK LEAVE ..............................................................................................................20
    BEREAVEMENT LEAVE...........................................................................................21
    OTHER LEAVES OF ABSENCE................................................................................22
OTHER EMPLOYMENT POLICES ...............................................................................23
    SMOKING POLICY....................................................................................................23
    PARKING FACILITIES ..............................................................................................24
    BUSINESS ATTIRE ....................................................................................................25
    SAFETY ......................................................................................................................27
    HUMAN RESOURCES RECORDS ............................................................................28
    EMPLOYEE CONDUCT ............................................................................................29
    GRIEVANCES ............................................................................................................31
    EMPLOYMENT TERMINATION..............................................................................32
    OUTSIDE EMPLOYMENT .......................................................................................33
    EMPLOYMENT OF RELATIVES/NEPOTISM.........................................................34
    DRUG AND ALCOHOL POLICY..............................................................................35
    SOLICITATIONS........................................................................................................36
    TECHNOLOGY USE ..................................................................................................37
    CONFIDENTIALITY ..................................................................................................41
A FEW CLOSING WORDS ............................................................................................42

HEA0005