No. 24-11126-GG

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

DAVITA KEY,

*Appellant,*

*v.*

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC
HYUNDAI ENG AMERICA, INC., AND
DYNAMIC SECURITY, INC.,

*Appellees.*

_____

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:19-cv-0767-ECM

_____

## SUPPLEMENTAL APPENDIX OF
## APPELLEE HYUNDAI ENG AMERICA, INC.
## CORRECTED VOLUME 3

_____

T. Matthew Miller                    Scott Burnett Smith
Sarahanne Vaughan                    Schyler B. Burney
BRADLEY ARANT BOULT CUMMINGS LLP     BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place                    200 Clinton Avenue West, Suite 900
1819 Fifth Avenue North              Huntsville, Alabama 35801
Birmingham, AL 35203                 (256) 517-5198
(205) 521-8000                       ssmith@bradley.com
mmiller@bradley.com                  sburney@bradley.com
svaughan@bradley.com

*Attorneys for Appellee Hyundai ENG America, Inc.*

## INDEX

<u>Required Documents</u>                                              <u>Docket/Tab #</u>

**Volume 1**

    Hyundai ENG America, Inc.'s Evidentiary Submission in Support of its Motion for Summary Judgment (Part 1) ................................... 71–71-6

**Volume 2**

    Hyundai ENG America, Inc.'s Evidentiary Submission in Support of its Motion for Summary Judgment (Part 2) .......... 71-6 (continued)–71-14

**Volume 3**

    Key's Evidentiary Materials Submitted in Opposition to Defendants' Motions for Summary Judgment............................................ 81–81-20

    Certificate of Service

# Tab 81

Plaintiff's Evidentiary Materials Submitted in Opposition to
Defendants' Motions for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff and files the following evidentiary materials in opposition to the Defendants' pending motions for summary judgment:

| Exhibit No. | Exhibit |
|---|---|
| 1 | HMMA's Initial Disclosures |
| 2 | HMMA's Interrogatory Responses |
| 3 | HMMA's Responses to Requests for Production of Documents |

1

| **Exhibit No.** | **Exhibit** |
|---|---|
| 4 | Email Composite Concerning Depositions |
| 5 | Latunya Howell Statement |
| 6 | HEA 30(b)(6) Deposition Notice |
| 7 | Gloria Robinson Memo to Ray Cureton dated August 1, 2017 |
| 8 | Cassandra Williams Email to Ray Cureton dated August 1, 2017 |
| 9 | HMMA Safety Handbook |
| 10 | Email from Gloria Robinson to Davita Key dated July 17, 2017 |
| 11 | Transcript of the Unemployment Compensation Hearing Held September 19, 2017 |
| 12 | HEA Invoice to HMMA for Dynamic Services |
| 13 | Dynamic's EEOC Position Statement |
| 14 | Notice of Charge of Discrimination to HMMA |
| 15 | HMMA Mailroom Duties |
| 16 | Cassandra Williams November 13, 2018, Email Concerning EEOC Filings against Dynamic and HMMA |
| 17 | Email from HMMA's General Counsel Concerning EEOC Cause Finding |
| 18 | Email Concerning Davita Key's Unemployment (Email Signature of Gloria Robinson) |

| **Exhibit No.** | **Exhibit** |
| --- | --- |
| 19 | Davita Key Declaration |
| 20 | Email from Tracy Peoples to Chris Hargrove on July 31, 2017 |

Respectfully submitted,
Attorneys for Plaintiff

*/s/ Heather Newsom Leonard*

OF COUNSEL:
Heather Leonard P.C.
2105 Deveraux Cir., Suite 111
Birmingham, AL 35243
(205) 977-5421
heather@heatherleonardpc.com

*/s/ Leslie A. Palmer.*

OF COUNSEL:
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205) 285-3050
leslie@palmerlegalservices.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed the foregoing on the Court's CM/ECF electronic filing system which will provide notice to all counsel of record on this the 3rd day of November, 2022.

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, PC
P.O. Box 11945
Birmingham, AL 35202-1945
dmiddlebrooks@lehrmiddlebrooks.com
wbrown@lehrmiddlebrooks.com
Phone (205) 326-3002
Counsel for Hyundai Motor Manufacturing Alabama, LLC

Wesley C. Redmond
Susan W. Bullock
Ford Harrison, LLC
420 20th Street North, Suite 2560
Birmingham, AL 35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: (205) 244-5905
Counsel for Dynamic Security, Inc.

T. Matthew Miller
Cortlin L. Bond
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, AL 35203
mmiller@bradley.com
cbond@bradley.com
Counsel for Hyundai ENG America, Inc.

/s Leslie A. Palmer
OF COUNSEL

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 1 – HMMA's Initial Disclosures**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:19-cv-00767-ECM-SMD** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, HYUNDAI** | ) | |
| **ENGINEERING AMERICA, INC. and** | ) | |
| **DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S RULE 26 MANDATORY DISCLOSURES

Hyundai Motor Manufacturing Alabama, LLC ("Defendant" or "HMMA") submits the following disclosures in accordance with Fed. R. Civ. P. 26(a):

### Preliminary Statement

Defendant has made diligent efforts to identify all information and documents in its possession, custody and control that are within the categories of such information and documents set forth in Rule 26(a)(1)(A). This initial disclosure represents Defendant's good faith effort, without the benefit of discovery, to comply with Rule 26(a)(1), and is not intended, and should not be construed, as Defendant's opinion or belief as to whether any witnesses identified actually have discoverable information that the Defendant may use to support its claims or defenses in the case. If additional documents or witnesses are revealed through discovery, Defendant will identify them pursuant to the applicable provisions of the Federal Rules of Civil Procedure and any order of this Court.

<u>**Disclosures**</u>

With respect to Rule 26(a)(1)(A), Defendant believes that the persons listed below may have discoverable information that Defendant may use to support its defenses.  The listing of an individual's name below does not in any way imply consent by Defendant to *ex parte* contact of any witness by opposing counsel whom opposing counsel would not be entitled to contact under Professional Rule of Conduct 4.2\*.  *See **RentClub, Inc. v. Transamerica Rental Finance Corp.***, 811 F. Supp. 651 (M.D. Fla. 1992), *aff'd*, 43 F.3d 1439 (11th Cir. 1995)[1]:

A.     The following persons are likely to have discoverable information that the Defendant may use to support its claims or defenses, unless solely for impeachment:

1.     Plaintiff
c/o Plaintiff's Counsel

Plaintiff may have knowledge regarding: her claims of law and fact made in this Complaint and any prior administrative or law enforcement proceedings; her employment at Dynamic Security; her alleged damages; her search for other employment.

2.     Robert Burns, effective October 2019 – Vice President of Human Resources and Administration for HMMA.  From December 2016-October 2018, Director of Team Relations, Public Relations, General Affairs and Human Resources for HMMA.
c/o HMMA's counsel.

Mr. Burns has access to HMMA's employment records and is believed to have knowledge about whether HMMA ever employed Plaintiff, Cassandra Williams, Gloria Robinson, Maurice Chambliss or Tonya Howell.  Mr. Burns has access to certain contractual arrangements between Hyundai and third parties to provide certain services to HMMA.

3.     Cassandra Williams
c/o counsel for HEA

Ms. Williams is believed to be employed by Hyundai Engineering America, Inc. ("HEA") and was so employed in July and August 2017.  She is believed to have discoverable knowledge of the services HEA provided HMMA and her interaction with HMMA.

---

[1] Counsel should be aware that federal standards, not simply Alabama standards, govern this issue.

B.      HMMA will make available at a mutually convenient time and place copies of all documents in its possession, custody or control that it may use to support its claims or defenses, unless solely for impeachment.

C.      At this time, HMMA is not claiming any damages in this case, other than its reasonable attorneys' fees and expenses.

D.      There may be insurance coverage under which an insurer may be liable to satisfy part or all of a judgment that may be entered against HMMA in this action.

Defendant reserves the right to supplement these disclosures in accordance with Fed. R. Civ. P. 26(e) and Local Rule 26.1.

Respectfully Submitted,

s/ David J. Middlebrooks
David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
        wbrown@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2021, I have served a copy of the foregoing on the following counsel of record via electronic transmission:

Heather Newsom Leonard, Esq.
Heather Leonard, P.C.
2105 Devereux Circle, Suite 1111
Birmingham, AL 35243

Wesley C. Redmond, Esq.
Susan W. Bullock, Esq.
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL 35203

Yurie Yeoul Bae, Esq.
Richard L. DeWeese, Jr., Esq.
DeWeese & Bae, LLC
8191 Seaton Place
Montgomery, AL 36116

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

s/ David J. Middlebrooks
OF COUNSEL

718021.docx

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 2 – HMMA's Interrogatory Responses**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVITA M. KEY,                              )
                                           )
            Plaintiff,                      )
                                           )        CIVIL ACTION NUMBER:
v.                                          )        2:19-cv-00767-ECM-SMD
                                           )
HYUNDAI MOTOR MANUFACTURING                 )
ALABAMA, LLC, HYUNDAI                        )
ENGINEERING AMERICA, INC. and               )
DYNAMIC SECURITY, INC.                       )
                                           )
            Defendants.                      )

## DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

COMES NOW, Hyundai Motor Manufacturing Alabama, LLC, one of the Defendants in the above-styled action (hereinafter "Defendant" or "HMMA"), and responds to Plaintiff's Interrogatories directed to it as follows[1]:

## I. GENERAL OBJECTIONS

Defendant and its attorneys object to each and every Interrogatory on each and all of the following grounds:

1.      Defendant's objections to Plaintiff's Interrogatories are made without waiver of, or prejudice to, any additional objections Defendant may make.

2.      All such objections are hereby expressly preserved as is the right to move for a protective order.

3.      Defendant reserves all objections as to the admissibility at trial of any information provided.

---

[1] HMMA is not responding for or on behalf of the other two named Defendants in this case.

4.      The supplying of any information does not constitute an admission by Defendant that such information is relevant in this lawsuit. All information provided by Defendant is for use in this litigation only and for no other purpose.

5.      Defendant and its attorneys object to each and every Interrogatory to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial and Plaintiff has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Defendant and its attorneys further object to each and every Interrogatory to the extent that the information called for, if any, is privileged and is not discoverable under Rule 26(b)(3), Federal Rules of Civil Procedure, and *Hickman v. Taylor*, 329 U.S. 495 (1947).

6.      Defendant and its attorneys object to each and every Interrogatory to the extent that the information called for, if any, is protected from discovery by the attorney/client privilege.

7.      Defendant and its attorneys object to each and every Interrogatory to the extent that it seeks to vary the obligations imposed upon Defendant under the Federal Rules of Civil Procedure.

8.      Defendant and its attorneys object to each and every Interrogatory to the extent that it seeks information that is equally available to Plaintiff and the burden on Plaintiff to obtain the requested information is no greater than the burden on Defendant.

9.      Defendant and its attorneys object to each and every Interrogatory to the extent that it is overly broad, oppressive, unduly burdensome and expansive and beyond the permissible scope of discovery under the Federal Rules of Civil Procedure.

10.    Defendant and its attorneys object to each and every Interrogatory to the extent

that it seeks an answer involving an opinion or contention that relates to fact or the application of

law to fact before discovery has been completed or a pre-trial conference has been conducted.

## II. SPECIFIC OBJECTIONS AND RESPONSES

Without waiving the General Objections and specifically asserting each General

Objection as to each and every Interrogatory propounded by Plaintiff, HMMA and its attorneys

further respond as set forth below:

**INTERROGATORY:**

**1.    Rule 33(b)(1)(B) of the Federal Rules of Civil Procedure directs that when a party is a public or private corporation, a partnership, or a governmental agency, interrogatories must be answered by any officer or agent. Please identify by name and title with each Defendant the person(s) furnishing the information available to the party/parties to answer these interrogatories.**

**RESPONSE:**

The first sentence of the interrogatory does not require a response. The person furnishing

information to HMMA to answer these interrogatories is Robert Burns.

**INTERROGATORY:**

**2.    Please identify by name, address, phone number, and e-mail address, the persons Defendants believe to have knowledge of the facts alleged in Plaintiff's Amended Complaint, and/or this Defendant's defenses and denials.**

**RESPONSE:**

See HMMA's initial disclosures. With respect to email addresses, however, HMMA

objects to providing the email address of Robert Burns because he is a member of management

and may not be contacted directly by Plaintiff or her attorneys. HMMA does not know the

correct email address of Plaintiff. Plaintiff should rely upon Dynamic Security, Inc. and/or

Hyundai Engineering America, Inc. for the name, address, phone number, and email address of

their current or former employees who might have knowledge of the facts alleged in Plaintiff's

amended Complaint and/or HMMA's defenses and denials.

**INTERROGATORY:**

    **3.**    **Did anyone employed by this Defendant make any decision in 2017 that related to the Plaintiff performing work for and/or on the premises of any of the Defendants? If yes, please identify the person and decision.**

**RESPONSE:**

    No

**INTERROGATORY:**

    **4.**    **Please identify the person(s) who made the decision(s) as to what would be included in this Defendant's grooming policy that was in effect in 2017.**

**RESPONSE:**

    See HMMA 000003, maintained under the direction of the Assistant Manager of Safety.

In 2017 that person was Stephen Tunnell.

**INTERROGATORY:**

    **5.**    **Please identify any expert witnesses contacted or retained by this Defendant for this matter.**

**RESPONSE:**

    None at this time but HMMA will abide by the Scheduling Order with respect to

disclosure of any expert witness.

**INTERROGATORY:**

    **6. For the years 2017 to the present, please identify the software used by the Defendant to manage personnel information, including but not limited to attendance, payroll, discipline, employee status, and personnel files.**

**RESPONSE:**

    For HMMA, SAP, Hyundai Autoever – Administrator. Electronic Legal Management

(ELM) managed by the Legal Department of HMMA. Some of the documents itemized above

are not maintained on a software system including, but are not limited to, disciplinary and personnel files.

**INTERROGATORY:**

7.  For the years 2017 to the present, please identify the software, programs, and/or applications used by the Defendant for communication about employee discipline, employee attendance, employee status, and/or other business-related communications. This request includes, but is not limited to e-mail, text messaging, instant messaging, and voice messaging.

**RESPONSE:**

For HMMA, Microsoft Outlook, plus see response to Interrogatory #6 above. Voice messaging is not maintained on any software.

**INTERROGATORY:**

8.  For each year from 2017 to the present, please state the total number of persons employed by this Defendant.

**RESPONSE:**

The approximate number of persons were employed by HMMA on the following dates:

January 1, 2017: 2,825; January 1, 2018: 2,743; January 1, 2019: 2,751; January 1, 2020: 3,028; January 1, 2021: 3,230.

**INTERROGATORY:**

9. Identify the person or persons who replaced Plaintiff in her duties for this Defendant including each individual's race and sex.

**RESPONSE:**

HMMA has no knowledge who replaced Plaintiff in her duties for which she was employed by Dynamic Security, Inc., a contractor to Hyundai Engineering America, Inc.

## VERIFICATION

STATE OF ALABAMA

COUNTY OF Montgomery

Robert Burns, being first duly sworn upon his oath deposes and says that he is authorized by Hyundai Motor Manufacturing Alabama, LLC to make this verification on its behalf, that he has read the foregoing Defendant's Objections and Responses to Plaintiff's Interrogatories and knows the contents thereof: that there is no single person employed by or otherwise connected with Hyundai Motor Manufacturing Alabama, LLC who has personal knowledge of all the facts and information requested herein; that the Responses are based on, and therefore, necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of these Responses; that the Responses are thus based upon corporate knowledge and that subject to these limitations set forth above, the Responses are true to the best of his knowledge, information and belief.

Hyundai Motor Manufacturing Alabama, LLC

Robert Burns
Chief Administrative Officer

Sworn to and subscribed before me this, the 7 day of Dec, 2021.

NICOLE E ESCO
My Commission Expires
March 20, 2022

Notary Public
My Commission Expires: 3/20/22

6

Respectfully Submitted,

David J. Middlebrooks ASB-8553-D58D
Whitney R. Brown ASB-4431-H71B

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
          wbrown@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2021, I have served a copy of the foregoing on the following counsel of record via electronic transmission:

Heather Newsom Leonard, Esq.
Heather Leonard, P.C.
2105 Devereux Circle, Suite 1111
Birmingham, AL 35243

Wesley C. Redmond, Esq.
Susan W. Bullock, Esq.
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL 35203

Yurie Yeoul Bae, Esq.
Richard L. DeWeese, Jr., Esq.
DeWeese & Bae, LLC
8191 Seaton Place
Montgomery, AL 36116

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

OF COUNSEL

720350

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**Exhibit 3 – HMMA's Responses to Requests for Production of Documents**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

DAVITA M. KEY,                          )
                                        )
  Plaintiff,                  )
                                        )
        )  **CIVIL ACTION NUMBER:**
v.                                      )  **2:19-cv-00767-ECM-SMD**
                                        )
**HYUNDAI MOTOR MANUFACTURING**         )
**ALABAMA, LLC, HYUNDAI**               )
**ENGINEERING AMERICA, INC. and**       )
**DYNAMIC SECURITY, INC.**              )
                                        )
  **Defendants.**              )

## DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION

  COMES NOW, Hyundai Motor Manufacturing Alabama, LLC, one of the Defendants in the above-styled action (hereinafter "Defendant" or "HMMA"), and objects to Plaintiff's Request for Production directed to it as follows[1]:

## I. GENERAL OBJECTIONS

  Defendant and its attorneys object to each and every Request for Production on each and all of the following grounds:

  1. Defendant's objections to Plaintiff's Requests for Production are made without waiver of, or prejudice to, any additional objections Defendant may make.

  2. All such objections are hereby expressly preserved as is the right to move for a protective order.

  3. Defendant reserves all objections as to the admissibility at trial of any information provided.

---

[1] HMMA is not responding for or on behalf of the other two named Defendants in this case.

4.     The supplying of any information does not constitute an admission by Defendant that such information is relevant in this lawsuit. All information provided by Defendant is for use in this litigation only and for no other purpose.

5.     Defendant and its attorneys object to each and every Request for Production to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial and Plaintiff has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Defendant and its attorneys further object to each and every Request for Production to the extent that the information called for, if any, is privileged and is not discoverable under Rule 26(b)(3), Federal Rules of Civil Procedure, and *Hickman v. Taylor*, 329 U.S. 495 (1947).

6.     Defendant and its attorneys object to each and every Request for Production to the extent that the information called for, if any, is protected from discovery by the attorney/client privilege.

7.     Defendant and its attorneys object to each and every Request for Production to the extent that it seeks to vary the obligations imposed upon Defendant under the Federal Rules of Civil Procedure.

8.     Defendant and its attorneys object to each and every Request for Production to the extent that it seeks information that is equally available to Plaintiff and the burden on Plaintiff to obtain the requested information is no greater than the burden on Defendant.

9.     Defendant and its attorneys object to each and every Request for Production to the extent that it is overly broad, oppressive, unduly burdensome and expansive and beyond the permissible scope of discovery under the Federal Rules of Civil Procedure.

## II. SPECIFIC OBJECTIONS AND RESPONSES

Without waiving the General Objections and specifically asserting each General Objection as to each and every Request for Production propounded by Plaintiff, HMMA and its attorneys further respond as set forth below:

**REQUEST:**

**1.      Please produce the documents in this Defendant's possession and control that reference and/or relate to the Plaintiff.**

**RESPONSE:**

HMMA responds consistent with the agreement set forth in Paragraph 4(iv) on Page 8 of the Report of Parties' Planning Conference (Doc. 46) that the Parties' Request for Production does not apply to any post EEOC Charge communications between any party and its counsel relating to Plaintiff's legal claims. HMMA's response is none other than a declaration of Cassandra Williams, which Plaintiff already has.

**REQUEST:**

**2.      Please produce any contracts and/or agreements between and/or among this Defendant and any other Defendant to this action which (a) relates to the Plaintiff, and/or (b) was in effect in 2017.**

**RESPONSE:**

The only such document is the contract for services between HMMA and Hyundai AMCO America, Inc., dated February 4, 2013, which is still followed by HMMA. Note, per the Alabama Secretary of State on October 16, 2019, Hyundai AMCO America, Inc. had a name change to Hyundai Engineering America, Inc. This document will be produced.

**REQUEST:**

**3.      Please produce a copy of any document this Defendant may use as evidence in this action**

**RESPONSE:**

Other than what HMMA produced as its initial disclosures, and the contract referenced in response to Request for Production #2, HMMA does not know what documents it may use as evidence in this action.

**REQUEST:**

**4.     Produce all documents relating to Plaintiff and her employment with any Defendant, including, but not limited to, her complete personnel files, job duties, contracts, agreements, performance reviews, disciplinary documents, achievements and awards, promotion records, payroll records, earnings records, time records, training records, work schedules, benefits, complaint and investigation records, separations from employment of any kind (temporary or otherwise), and decisions by Defendant related to returning or not returning Plaintiff to work in 2017.**

**RESPONSE:**

HMMA has no such documents.

**REQUEST:**

**5.     Produce all documents and organizational charts that identify or describe the reporting structure above and below the Plaintiff in 2017.**

**RESPONSE:**

HMMA has no such documents.

**REQUEST:**

**6.     All documents and diagrams which reflect the floorplan, map, and/or layout of the location where the Plaintiff worked in 2017.**

**RESPONSE:**

Defendant will produce a copy of the floor plan for the mail room in the Security Department where Plaintiff claims she was assigned.

**REQUEST:**

**7.     All of this Defendant's employment manuals; personnel and policy manuals; handbooks; performance standards; progressive discipline policies; job descriptions; job responsibilities; compensation plans and other documents relating to policies, procedures,**

practices, or methods of compensating employees; and all other documents that constitute or reflect Defendant's rules and policies for the period from January 1, 2017 to present, which were or would have been applicable to Plaintiff in her employment or assignment with this Defendant.

**RESPONSE:**

HMMA did not employ Plaintiff nor did HMMA assign Plaintiff. Further, HMMA responds, none, other than the safety policies applicable to all contractors and vendors who come on the premises. Said safety materials will be produced.

**REQUEST:**

8.     All documents relating to any reports, grievances, allegations, charges, judicial proceedings, or administrative investigations involving allegations that Defendant may have engaged in sexually discriminatory, racially discriminatory and/or retaliatory conduct. This request is limited to the last five (5) years.

**RESPONSE:**

Defendant and its attorneys object to this Request to the extent that it calls for the production of privileged documents or communications between counsel for Defendant and Defendant with respect to a charge or complaint of discrimination or it calls for attorney work product. Defendant and its attorneys further object to the extent the Request is overly burdensome and too broad. It calls for the production of information that is not relevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. Plus, the Request is not proportional to the needs of the case and the burden on Defendant by the proposed discovery outweighs its likely benefit.

Without waiving any of these objections, Defendant will produce a copy of all charges or complaints of sex discrimination, race discrimination, and/or alleged retaliatory conduct related to sex or race discrimination subject to the redaction of the names of the charging parties from charges being produced except when charge relates to a complaint of sex or race discrimination

and/or retaliation being filed. With respect to any pleadings associated with any complaints,

Plaintiff can access those documents in the court's records.

**REQUEST:**

**9.      All communications and/or messages, sent to or by Defendant, or any
employee, independent contractor, or agent of this Defendant, from 2017 to present,
relating to the Plaintiff.**

**RESPONSE:**

HMMA adopts this Answer to Request for Production #1 as its response.

**REQUEST:**

**10.     Any training materials used to educate persons working on this Defendant's
premises and/or this Defendant's employees on:**

> **a.      Appearance**
> **b.      Grooming**
> **c.      Documentation of reasons for discipline**
> **d.      Documentation of reasons for an employee's separation**
> **e.      Discrimination, including retaliation**
> **f.      Investigation of complaints of discrimination**

**RESPONSE:**

Defendant and its attorneys object to the extent that this Request calls for the production

of documents unrelated to Plaintiff's allegations. Plaintiff's Request No. 10 requests documents

associated with training materials used to educate persons working on this Defendant's premises

and/or this Defendant's employees on certain identified topics. Plaintiff's discovery Request sets

out that when it refers to "this Defendant," it is referring to Hyundai Motor Manufacturing

Alabama, LLC. The training materials in question would not have been used by this Defendant

with respect to training Plaintiff. As such, Defendant and its attorneys object to this Request to

the extent it is too burdensome and overly broad and that it calls for the production of

information that is not relevant to Plaintiff's claims, and is not reasonably calculated to lead to

the discovery of admissible evidence. Further, the Request is not proportional to the needs of the

case and the burden on Defendant outweighs its likely benefit.

**REQUEST:**

**11.    All statements of witnesses, potential witnesses, or persons interviewed in connection with this case, and any communications to these witnesses relating to such statements by Defendants, or any employee, independent contract, or agent of Defendants.**

**RESPONSE:**

HMMA can answer only for itself and the answer is none, with the exception of the

Declaration of Cassandra Williams, which Plaintiff already has.

Respectfully Submitted,

David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
        wbrown@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2021, I have served a copy of the foregoing on the following counsel of record via electronic transmission:

Heather Newsom Leonard, Esq.            Wesley C. Redmond, Esq.
Heather Leonard, P.C.                   Susan W. Bullock, Esq.
2105 Devereux Circle, Suite 1111        FordHarrison LLP
Birmingham, AL 35243                    420 20th Street North, Suite 2560
                                        Birmingham, AL 35203

Yurie Yeoul Bae, Esq.
Richard L. DeWeese, Jr., Esq.
DeWeese & Bae, LLC
8191 Seaton Place
Montgomery, AL 36116

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

OF COUNSEL

720351

8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**Exhibit 4 – Composite of Emails Concerning Deposition Scheduling**

| | |
|---|---|
| From: | Heather Leonard |
| To: | dmiddlebrooks@lehrmiddlebrooks.com; wbrown@lehrmiddlebrooks.com; mmiller@bradley.com; sbullock@fordharrison.com; Wesley Redmond |
| Cc: | leslie@palmerlegalservices.com; Bond, Cortlin |
| Subject: | Key v HMMA, HEA, and Dynamic - deposition scheduling call summary |
| Date: | Tuesday, August 9, 2022 11:54:07 AM |

All:

Thank you for your time today for our Teams video conference call to discuss scheduling the remaining deposition. This is my understanding of the conference (please correct me if I am wrong):

1. Dynamic Depositions
   a. Dynamic is putting up Crystal R. and Sherry on Aug 19 in response to the 30(b)(6) deposition notice. We will depose them in the 30(b)(6) and individual capacities on that day at Leslie's office.
   b. Ray Curenton's deposition is set for 2:00 on August 23 at Leslie's office. Wes is going to confirm whether we should serve his subpoena and witness check on Wes or use a process server to serve the witness directly. If we need a process server, Wes will give us the best contact information for the witness so the process server can coordinate with him to serve him conveniently.
   c. Wes indicated he had attempted contact the other witnesses on Dynamic's initial disclosures but has not received a response. Plaintiff communicated that if Dynamic uses any of these witnesses at summary judgment, we would want to depose them (even if it means doing so out of time). Wes indicated that wouldn't be a problem. David said HMMA would object.
2. HEA Deposition
   a. Cassandra is going to be the 30(b)(6), so when we do this we will depose her in both the 30(b)(6) and individual capacities. Matt indicated she is currently out of the office, but likely would not be available until September. We have a September 2 discovery deadline, so we discussed the possibility of doing it on September 6 and filing a motion to take her deposition out of time. Matt is going to try to confirm with her this week that the date works (or another date that week) and whether the deposition will be in Birmingham at Leslie's office or at Matt's office in Montgomery. Wes proposed the possibility of a joint motion seeking to extend discovery by one week. The Defendants are going to discuss this among themselves. If they all agree, the motion to take the deposition out of time will be modified to be a joint motion among the parties to extend the discovery deadline by a week.
3. EEOC Depositions
   a. HMMA has issued a subpoena for these depositions for August 26. So far nobody from the EEOC has filed anything, but if they do, we will all work on making sure scheduling is not a problem.

Thank you again for your time.

Heather

Heather Leonard
Heather Leonard, P.C.
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
(205) 977-5421 - phone
(205) 278-1400 - facsimile

This transmission is intended ONLY for the addressee. It may contain information that is privileged, confidential, sensitive or otherwise protected from disclosure. Any review, dissemination, or other use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by phone (205) 977-5421 or send an e-mail to Jim@HeatherLeonardPC.com. VIRUS DISCLAIMER: Although our Firm attempts to scan e-mail attachments for viruses, it does not guarantee that either is virus-free and accepts no liability for any damage sustained as a result of viruses.

| | |
|---|---|
| **From:** | Heather Leonard |
| **To:** | "Wesley Redmond" |
| **Cc:** | Miller, Matt; David J. Middlebrooks; Leslie Palmer; Susan Bullock; Cecilia McCloyn; Whitney R. Brown; Bond, Cortlin |
| **Subject:** | RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338] |
| **Date:** | Monday, August 8, 2022 5:02:37 PM |
| **Attachments:** | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |

I'll send out a Teams invite

**From:** Wesley Redmond <WRedmond@fordharrison.com>
**Sent:** Monday, August 8, 2022 5:01 PM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Cc:** Miller, Matt <mmiller@bradley.com>; David J. Middlebrooks
<dmiddlebrooks@lehrmiddlebrooks.com>; Leslie Palmer <leslie@palmerlegalservices.com>; Susan
Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>; Whitney R.
Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** Re: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

Yes that works

Sent from my iPhone

On Aug 8, 2022, at 4:09 PM, Heather Leonard <Heather@heatherleonardpc.com> wrote:

I can make 11:15 work on our end, and that falls with David/Whitney's window.  Wes –
does that work for you?

Heather

**From:** Miller, Matt <mmiller@bradley.com>
**Sent:** Monday, August 8, 2022 4:02 PM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>; David J. Middlebrooks
<dmiddlebrooks@lehrmiddlebrooks.com>; Leslie Palmer
<Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>;
Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn
<CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin
<cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-
WSACTIVELLP.FID1997338]

I have eeoc witness interviews starting at 9:30 and I don't know if they will be over by
10:30.  I think 11:15  is a safer bet

**T. Matthew Miller**

Partner | Bradley
mmiller@bradley.com
d: 205.521.8243

---

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Monday, August 8, 2022 3:59 PM
**To:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Miller, Matt <mmiller@bradley.com>; Leslie Palmer <Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

| CAUTION - EXTERNAL EMAIL |
|---|

How about 10:30 – that works on our end.  Wes/Susan and Matt/Cortlin – does that work for y'all?

Heather

---

**From:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Sent:** Monday, August 8, 2022 3:49 PM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>; Miller, Matt <mmiller@bradley.com>; Leslie Palmer <Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

Whitney and I are available for a call tomorrow between 9:30 and 2:30.

David J. Middlebrooks
205.323.9262

---

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Monday, August 8, 2022 3:39 PM
**To:** Miller, Matt <mmiller@bradley.com>; David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Leslie Palmer <Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin

<cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

Lets all try to talk tomorrow, but in advance, Wes and Matt, can you please provide the rest of us all the available dates you and your clients/deponents have for the depositions we've been trying to get scheduled?  It may be easier to work off that list tomorrow. Without proposed dates, it is going to be hard for us to get much accomplished in terms of scheduling.

Heather

---

**From:** Miller, Matt <mmiller@bradley.com>
**Sent:** Monday, August 8, 2022 3:32 PM
**To:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Leslie Palmer <Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Heather Leonard <Heather@HeatherLeonardPC.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

We have a similar issue.  Ms. Williams is now out until August 15th which makes the 16th unworkable.  As I noted in a prior email, I am out of town for a work matter on the 17th and can't move it.  It sounds like we just need to regroup and figure out some dates that will work.

**T. Matthew Miller**
Partner | Bradley
mmiller@bradley.com
d: 205.521.8243

---

**From:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Sent:** Monday, August 8, 2022 3:27 PM
**To:** Leslie Palmer <Leslie@palmerlegalservices.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Heather Leonard <Heather@HeatherLeonardPC.com>; Miller, Matt <mmiller@bradley.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

| CAUTION - EXTERNAL EMAIL |
| --- |

Leslie, presently we have a conflict with August 16th. This date was excluded from Heather's list of dates set out in her July 22, 2022 email to the parties. Relying on Heather's email we agreed on depositions in another case that has an earlier discovery cut-off than in Key. I am willing to see if the depositions in the other case can be moved but there is no guarantee. As such, at present we can't agree to proceed with this date in Key.

David J. Middlebrooks
205.323.9262

---

**From:** Leslie Palmer <Leslie@palmerlegalservices.com>
**Sent:** Monday, August 8, 2022 3:15 PM
**To:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Wesley Redmond <WRedmond@FordHarrison.com>; Heather Leonard <Heather@HeatherLeonardPC.com>; Miller, Matt <mmiller@bradley.com>; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Bond, Cortlin <cbond@bradley.com>
**Subject:** Re: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

All,
Updated 30(b)(6) depo notices attached for HEA and Dynamic.
-Leslie

Leslie Palmer
104 23rd Street South, Suite 100
Birmingham, AL 35233
Phone: (205) 285-3050
E-Mail: leslie@palmerlegalservices.com
Rate me on Google

Pronouns: She/Her
See why I list my pronouns

Confidentiality Notice: This email and any attachments thereto may contain privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any disclosures, copying, distribution, or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

---

**From:** Leslie Palmer <Leslie@palmerlegalservices.com>
**Date:** Friday, July 29, 2022 at 4:42 PM
**To:** "David J. Middlebrooks" <dmiddlebrooks@lehrmiddlebrooks.com>, Wesley Redmond <WRedmond@FordHarrison.com>, Heather Leonard <heather@heatherleonardpc.com>, "Miller, Matt" <mmiller@bradley.com>, Susan Bullock <sbullock@fordharrison.com>, Cecilia McCloyn

<CMcCloyn@fordharrison.com>
**Cc:** "Whitney R. Brown" <wbrown@lehrmiddlebrooks.com>, "Bond, Cortlin"
<cbond@bradley.com>
**Subject:** Re: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

To the best of my knowledge, no one said they were unavailable on the 17th. Heather is out of town today so I'll wait for her to chime in for sure but let's pencil in Dynamic's reps on that date, so we don't lose it.  Wes, will your folks appear in Birmingham, or do we need to go to Montgomery? I can get updated notices out once we have location and Heather's OK on the date.

Matt, what say you about your rep's other availability? We are willing to work around her and utilize a weekend if necessary but as stated previously, you selected the two dates Heather had already stated she was unavailable due to case conflicts. I believe you've identified Ms. Williams as your rep – who is a current employee – we can do it at Hyundai again if necessary to work around her work schedule.

Wes, will you be making available any of the other 5 or so people you've identified that we stated we needed depositions of? When we talked about this months ago you stated you were going to reach out to all of them and get back with us.

Perhaps we could a jump on a call early next week to hash some of this out instead of trying to hit everyone's mailbox on the off chance they will be responding at that very moment. Things are getting fairly time sensitive.

-Leslie


Leslie Palmer
104 23rd Street South, Suite 100
Birmingham, AL 35233
Phone: (205) 285-3050
E-Mail: leslie@palmerlegalservices.com
Rate me on Google

Pronouns: She/Her
See why I list my pronouns

Confidentiality Notice:  This email and any attachments thereto may contain privileged information.  If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies.  Any disclosures, copying, distribution, or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

--

**From:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Date:** Friday, July 29, 2022 at 3:50 PM
**To:** Wesley Redmond <WRedmond@fordharrison.com>, Heather Leonard <heather@heatherleonardpc.com>, Miller, Matt <mmiller@bradley.com>, Leslie Palmer <Leslie@palmerlegalservices.com>, Susan Bullock <sbullock@fordharrison.com>, Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

And, as I previously reported, both Whitney and I are not available August 24th.

David J. Middlebrooks
205.323.9262

---

**From:** Wesley Redmond <WRedmond@fordharrison.com>
**Sent:** Friday, July 29, 2022 3:45 PM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>; Miller, Matt <mmiller@bradley.com>; leslie@palmerlegalservices.com; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown <wbrown@lehrmiddlebrooks.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

My reps are available on August 17, but I recall someone may be out of town traveling on that date.  I know August 24-26 are definitely out as the witness will be out of town those days.

image001.jpg



**Wesley C. Redmond** - *Attorney at Law*

**FordHarrison LLP - Ius Laboris USA** | **Global HR Lawyers**
420 20th Street, Suite 2560 | Birmingham, AL 35203
WRedmond@fordharrison.com | P: 205-244-5905

---

**LTC4 Certified Legal Professional** | *FHPromise* | Subscribe

---

**From:** Wesley Redmond
**Sent:** Friday, July 22, 2022 3:59 PM

**To:** 'Heather Leonard' <Heather@HeatherLeonardPC.com>; Miller, Matt <mmiller@bradley.com>; leslie@palmerlegalservices.com; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown <wbrown@lehrmiddlebrooks.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates [IWOV-WSACTIVELLP.FID1997338]

Heather:

I asked my people to look at August 10 (we likely will have two representatives) but if we want to do all in one week I will see about these other dates.



**Wesley C. Redmond** - *Attorney at Law*

**FordHarrison LLP - Ius Laboris USA** | **Global HR Lawyers**
420 20th Street, Suite 2560 | Birmingham, AL 35203
WRedmond@fordharrison.com | P: 205-244-5905

**LTC4 Certified Legal Professional** | *FHPromise* | Subscribe

**From:** Heather Leonard [mailto:Heather@HeatherLeonardPC.com]
**Sent:** Friday, July 22, 2022 3:43 PM
**To:** Miller, Matt <mmiller@bradley.com>; Wesley Redmond <WRedmond@fordharrison.com>; leslie@palmerlegalservices.com; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown <wbrown@lehrmiddlebrooks.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates

Matt:

Let's talk on Monday.  Per my initial email, I am available

1. August 10
2. August 17
3. August 18
4. August 19
5. August 24
6. August 25

7. August 26

8.

I am not available on August 15 or 16 due to conflicts in other cases that cannot be moved. Would Ms. Williams be available on a weekend for us to look at doing her deposition in August before the discovery deadline?

Heather

---

**From:** Miller, Matt <mmiller@bradley.com>
**Sent:** Friday, July 22, 2022 3:40 PM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>; Wesley Redmond <WRedmond@fordharrison.com>; leslie@palmerlegalservices.com; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown <wbrown@lehrmiddlebrooks.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates

Heather,
I checked with Cassandra Williams and she has very limited availability in August. After comparing calendars, Cassandra and I (and Wes and David I believe) are all available on August 16th. Cassandra will be the 30b6 so you can take her 30b6 followed by any personal deposition questions you have that same day. I think everyone could also make the 15th work as a backup, but those seem to be the only two days for her in August. Let me know if that works.

Matt

**T. Matthew Miller**
Partner | Bradley
mmiller@bradley.com
d: 205.521.8243

---

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Friday, July 22, 2022 3:32 PM
**To:** Wesley Redmond <WRedmond@fordharrison.com>; leslie@palmerlegalservices.com; Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn <CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; Miller, Matt <mmiller@bradley.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - Deposition Dates

| CAUTION - EXTERNAL EMAIL |
| --- |

Matt and Wes:

Following up on our request for dates.

Heather

---

**From:** Heather Leonard
**Sent:** Wednesday, July 20, 2022 8:07 AM
**To:** Wesley Redmond <WRedmond@fordharrison.com>; leslie@palmerlegalservices.com;
Susan Bullock <sbullock@fordharrison.com>; Cecilia McCloyn
<CMcCloyn@fordharrison.com>
**Cc:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R. Brown
<wbrown@lehrmiddlebrooks.com>; Matt Miller <mmiller@bradley.com>
**Subject:** Key v HMMA, HEA and Dynamic - Deposition Dates

Matt and Wes:

I am following up on Leslie's and my requests for deposition dates. We have less than 45
days left in discovery, so it is a priority to get these scheduled. In the past y'all had said you
would check on dates for your people and get back to us. I may have missed your response,
but I don't see where y'all proposed any dates. Based on the length of the HMMA 30(b)(6)
deposition, I anticipate we will need four days to complete the following depositions:

1. 30(b)(6) for Dynamic – day 1
2. 30(b)(6) for HEA – day 2
3. Robert Burns – day 3
4. Cassandra Williams – day 3
5. Gloria Robinson – day 4
6. Maurice Chambliss – day 3
7. Nicole Scavella – day 4
8. Ray Cureton – day 3
9. Latunya Howell – day 4

I am available on the following days for these depositions:

9. August 10
10. August 17
11. August 18
12. August 19
13. August 24
14. August 25
15. August 26* (I have a pretrial conference before Judge Watkins at 10:30 but am
    otherwise available that day)

Leslie may have additional dates where she is available, but I am not to open up more
flexibility to scheduling. Please let us know by Friday when we can schedule these
depositions.

Heather

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

*ATTORNEY WORK PRODUCT - PRIVILEGED & CONFIDENTIAL*



The information contained in this message from Ford & Harrison LLP and any attachments are privileged and confidential and intended only for the named recipient(s). If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information. Please contact the sender immediately by return email and delete the original message and attachments. In the absence of an executed engagement letter or fee contract, no attorney client relationship is established by this communication.

| | |
|---|---|
| From: | David J. Middlebrooks |
| To: | Heather Leonard; Miller, Matt; Wesley Redmond; Whitney R. Brown |
| Cc: | Whitney R. Brown; sbullock@fordharrison.com; Wesley Redmond; Bond, Cortlin; leslie@palmerlegalservices.com |
| Subject: | Re: Key v HMMA, HEA and Dynamic - follow up on deposition scheduling |
| Date: | Thursday, May 12, 2022 11:49:20 AM |

I am opposed to pushing keys depo-to June 20. For that matter I am opposed to moving off the May 17th date for her deposition.

Get Outlook for Android

---

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Thursday, May 12, 2022 11:42:57 AM
**To:** Miller, Matt <mmiller@bradley.com>; David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; sbullock@fordharrison.com <sbullock@fordharrison.com>; Wesley Redmond <WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>; leslie@palmerlegalservices.com <leslie@palmerlegalservices.com>
**Subject:** RE: Key v HMMA, HEA and Dynamic - follow up on deposition scheduling

On that note – lets find a time to talk.

We need to push back Ms. Key's deposition. She started a contract job on May 11 that lasts through May 25 and is unable to get off work. I am getting the details (name of employer and address) from her to supplement her interrogatory answers. I do not yet have the name of the employer, but she is earning $16 working Monday-Friday, 5:30pm-9:30pm.

What is a good time on Monday for everyone to look at the week of June 20 to do her deposition as well as the depositions the Plaintiff has been seeking?  Leslie is still in trial in the Circuit Court of Lauderdale County, and I will need her to be part of the scheduling call.  I am not sure when her trial will finish; I know they are hearing testimony from both the Plaintiff's expert and Defense expert today, so it is unlikely she will be back tomorrow. Fingers crossed she will be back Monday.

Heather

---

**From:** Miller, Matt <mmiller@bradley.com>
**Sent:** Thursday, May 12, 2022 11:35 AM
**To:** Heather Leonard <Heather@HeatherLeonardPC.com>; David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; sbullock@fordharrison.com; Wesley Redmond <WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>; leslie@palmerlegalservices.com
**Subject:** RE: Key v HMMA, HEA and Dynamic - follow up on deposition scheduling

Heather,
I hope you are doing well.

I think Cortlin noted this in a prior email, but I just wanted to follow up and confirm that I have a conflict with the defendant deposition potential dates the week of May 23 because of a group of depositions that week in another case.

I checked with David and Wes and we are all available for defendant depositions the week of June 20 and I am blocking that week pending confirmation from you.

We can work to pin down the details and all look at our calendars next Tuesday (May 17)  during a break in plaintiff's deposition in Montgomery.

Regards
Matt

**T. Matthew Miller**

Partner | Bradley
mmiller@bradley.com
205.521.8243

---

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Monday, April 4, 2022 12:45 PM
**To:** Miller, Matt <mmiller@bradley.com>; David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; sbullock@fordharrison.com; Wesley Redmond <WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>; leslie@palmerlegalservices.com
**Subject:** RE: Key v HMMA, HEA and Dynamic - follow up on deposition scheduling

| CAUTION - EXTERNAL EMAIL |
|---|

---

All:

I wanted to follow up on our call from last week on Wednesday, March 30, about scheduling depositions. We agreed to a date for the Plaintiff's Deposition (May 17) and agreed to hold the weeks of May 23 and June 20 for the Plaintiff to schedule the following depositions:

- 30(b)(6) for HMMA
- 30(b)(6) for Dynamic
- 30(b)(6) for HEA
- Robert Burns
- Cassandra Williams
- Gloria Robinson (she now lives in North Carolina/likely will do this deposition by Zoom unless someone wants to be present where she is for the deposition)
- Maurice Chambliss
- Nicole Scavella
- Ray Cureton
- Latunya Howell

- Sherry Spires
- Kristal Riddle

It was my understanding you were going to confer with your clients and witnesses for whom you have control/can produce without a subpoena, and get back to us about dates.  I would like to get these locked down by the end of the week so I can start attempting service on non-party witnesses requiring a subpoena.  What are your thoughts on the following schedule:

Tuesday, May 24          30(b)(6) for HEA in the morning and 30(b)(6) for HMMA and Robert Burns in the afternoon
Wednesday, May 25        30(b)(6) for Dynamic in the morning and Sherry Spires and Kristal Riddle in the afternoon
Thursday, May 26         Ray Cureton, Cassandra Williams, and Maurice Chambliss
Friday, May 27           Gloria Robinson, Nicole Scavella, and Latunya Howell

We will notice the depositions for the Montgomery location for either Cite Court Reporting or Alabama Court Reporting          unless there is a strong objection otherwise with a start time at 10:00 to make it easier to drive to Montgomery and avoid rush hour traffic.  Robinson's deposition will be set via Zoom so we can always move it to another date depending on her schedule.

Heather

---

**From:** Heather Leonard
**Sent:** Monday, March 28, 2022 8:50 AM
**To:** 'Miller, Matt' <mmiller@bradley.com>; David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Cc:** Whitney R. Brown <wbrown@lehrmiddlebrooks.com>; sbullock@fordharrison.com; Wesley Redmond <WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>; leslie@palmerlegalservices.com
**Subject:** RE: Key v HMMA, HEA and Dynamic - Plaintiff's motion to amend the scheduling order and request for time to discuss discovery issues/depositions

Matt and Wes:

Wes needs a later time and Matt needs an earlier time on the 30th.  Could either of you make the other proposed time work (i.e. Matt could someone from your side do 4, or Wes could you or Susan do 3:00)?

Heather

---

**From:** Miller, Matt <mmiller@bradley.com>
**Sent:** Monday, March 28, 2022 8:40 AM
**To:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>
**Cc:** Heather Leonard <Heather@HeatherLeonardPC.com>; Whitney R. Brown

<wbrown@lehrmiddlebrooks.com>; sbullock@fordharrison.com; Wesley Redmond
<WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>;
leslie@palmerlegalservices.com
**Subject:** Re: Key v HMMA, HEA and Dynamic - Plaintiff's motion to amend the scheduling order and
request for time to discuss discovery issues/depositions

I could do either Tuesday or Wednesday 3 PM is better than four

**T. Matthew Miller**
Partner | Bradley
mmiller@bradley.com
205.521.8243

On Mar 28, 2022, at 8:36 AM, David J. Middlebrooks
<dmiddlebrooks@lehrmiddlebrooks.com> wrote:

| CAUTION - EXTERNAL EMAIL |
|---|

Heather, those call times are fine with Whitney and me. djm

David J. Middlebrooks
205.323.9262

**From:** Heather Leonard <Heather@HeatherLeonardPC.com>
**Sent:** Monday, March 28, 2022 8:29 AM
**To:** David J. Middlebrooks <dmiddlebrooks@lehrmiddlebrooks.com>; Whitney R.
Brown <wbrown@lehrmiddlebrooks.com>; mmiller@bradley.com;
sbullock@fordharrison.com; Wesley Redmond <WRedmond@fordharrison.com>;
Bond, Cortlin <cbond@bradley.com>
**Cc:** leslie@palmerlegalservices.com
**Subject:** RE: Key v HMMA, HEA and Dynamic - Plaintiff's motion to amend the
scheduling order and request for time to discuss discovery issues/depositions

Counsel:

I am writing to follow up on my request to schedule a time for a call for us to discuss
the following:

- Deposition scheduling.  Specifically, we will need to discuss dates for:
  - Defendants' deposition of the Plaintiff
  - The following depositions the Plaintiff seeks (I expect we will need 3 days
    to compete these):
    - 30(b)(6) for HMMA

- 30(b)(6) for Dynamic
- 30(b)(6) for HEA
- Robert Burns
- Cassandra Williams
- Gloria Robinson
- Maurice Chambliss
- Nicole Scavella
- Ray Cureton
- Latunya Howell
- Sherry Spires
- Kristal Riddle
  - Confirming the depositions the Defendants are seeking:
    - As of right now, it appears that the only non-party deposition Defendants are seeking is of the EEOC investigator on April 25

- An ESI issue.  Ms. Key has produced to Leslie and me her smart phone that has some information on it that is responsive to discovery requests. However, the screen of the phone has been broken such that the touch functions do not work. In order to access the information, we will need, at a minimum, to have the screen repaired but there could be a risk that data could be lost in the repair process. Before we proceeded with that step, we wanted to discuss among the parties the repair/retrieval of the information to avoid any potential spoliation issues.

Please let Leslie and me know when is good for everyone to have this call, and I will set up a conference call bridge.  I would suggest the following days/times:

- March 28 at 3:00 or 4:00
- March 29 at 3:00 or 4:00
- March 30 at 3:00 or 4:00

Heather

---

**From:** Heather Leonard
**Sent:** Friday, March 25, 2022 12:09 PM
**To:** dmiddlebrooks@lehrmiddlebrooks.com; wbrown@lehrmiddlebrooks.com; mmiller@bradley.com; sbullock@fordharrison.com; Wesley Redmond <WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>
**Cc:** leslie@palmerlegalservices.com
**Subject:** Key v HMMA, HEA and Dynamic - Plaintiff's motion to amend the scheduling order and request for time to discuss discovery issues/depositions

Counsel:

Attached is the motion to amend the scheduling order the Plaintiff plans on filing on

Monday. We are not able to put up Ms. Key for deposition on April 4 due to conflicts in other cases and the outstanding discovery issues to be resolved with Defendants HEA and Dynamic. Because there are a number of depositions the Plaintiff will need to take as well once those issues are resolved, we will need additional time to complete discovery.  This is the reason we will be filing the attached motion. Please advise whether your client opposes or does not oppose the motion.

Also, I wanted to see if everyone would be available for a call for us to discuss the following:

- Deposition scheduling.  Specifically, we will need to discuss dates for:
    - Defendants' deposition of the Plaintiff
    - The following depositions the Plaintiff seeks (I expect we will need 3 days to compete these):
        - 30(b)(6) for HMMA
        - 30(b)(6) for Dynamic
        - 30(b)(6) for HEA
        - Robert Burns
        - Cassandra Williams
        - Gloria Robinson
        - Maurice Chambliss
        - Nicole Scavella
        - Ray Cureton
        - Latunya Howell
    - Confirming the depositions the Defendants are seeking:
        - As of right now, it appears that the only non-party deposition Defendants are seeking is of the EEOC investigator on April 25

- An ESI issue.  Ms. Key has produced to Leslie and me her smart phone that has some information on it that is responsive to discovery requests. However, the screen of the phone has been broken such that the touch functions do not work. In order to access the information, we will need, at a minimum, to have the screen repaired but there could be a risk that data could be lost in the repair process. Before we proceeded with that step, we wanted to discuss among the parties the repair/retrieval of the information to avoid any potential spoliation issues.

Please let Leslie and me know when is good for everyone to have this call, and I will set up a conference call bridge.  I would suggest the following days/times:

- March 28 at 3:00 or 4:00
- March 29 at 3:00 or 4:00
- March 30 at 3:00 or 4:00

Thank you,

Heather

Heather Leonard
Heather Leonard, P.C.
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
(205) 977-5421 - phone
(205) 278-1400 - facsimile

This transmission is intended ONLY for the addressee. It may contain information that is privileged, confidential, sensitive or otherwise protected from disclosure. Any review, dissemination, or other use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by phone (205) 977-5421 or send an e-mail to Jim@HeatherLeonardPC.com. VIRUS DISCLAIMER: Although our Firm attempts to scan e-mail attachments for viruses, it does not guarantee that either is virus-free and accepts no liability for any damage sustained as a result of viruses.

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

| | |
|---|---|
| **From:** | Heather Leonard |
| **To:** | "dmiddlebrooks@lehrmiddlebrooks.com"; "wbrown@lehrmiddlebrooks.com"; "mmiller@bradley.com"; "sbullock@fordharrison.com"; "Wesley Redmond"; "Bond, Cortlin" |
| **Cc:** | "leslie@palmerlegalservices.com" |
| **Subject:** | RE: Key v HMMA, HEA and Dynamic - Plaintiff"s motion to amend the scheduling order and request for time to discuss discovery issues/depositions |
| **Date:** | Monday, March 28, 2022 8:29:23 AM |

Counsel:

I am writing to follow up on my request to schedule a time for a call for us to discuss the following:

- Deposition scheduling.  Specifically, we will need to discuss dates for:
  - Defendants' deposition of the Plaintiff
  - The following depositions the Plaintiff seeks (I expect we will need 3 days to compete these):
    - 30(b)(6) for HMMA
    - 30(b)(6) for Dynamic
    - 30(b)(6) for HEA
    - Robert Burns
    - Cassandra Williams
    - Gloria Robinson
    - Maurice Chambliss
    - Nicole Scavella
    - Ray Cureton
    - Latunya Howell
    - Sherry Spires
    - Kristal Riddle
  - Confirming the depositions the Defendants are seeking:
    - As of right now, it appears that the only non-party deposition Defendants are seeking is of the EEOC investigator on April 25

- An ESI issue.  Ms. Key has produced to Leslie and me her smart phone that has some information on it that is responsive to discovery requests. However, the screen of the phone has been broken such that the touch functions do not work. In order to access the information, we will need, at a minimum, to have the screen repaired but there could be a risk that data could be lost in the repair process. Before we proceeded with that step, we wanted to discuss among the parties the repair/retrieval of the information to avoid any potential spoliation issues.

Please let Leslie and me know when is good for everyone to have this call, and I will set up a conference call bridge.  I would suggest the following days/times:

- March 28 at 3:00 or 4:00
- March 29 at 3:00 or 4:00
- March 30 at 3:00 or 4:00

Heather

---

**From:** Heather Leonard
**Sent:** Friday, March 25, 2022 12:09 PM
**To:** dmiddlebrooks@lehrmiddlebrooks.com; wbrown@lehrmiddlebrooks.com;
mmiller@bradley.com; sbullock@fordharrison.com; Wesley Redmond
<WRedmond@fordharrison.com>; Bond, Cortlin <cbond@bradley.com>
**Cc:** leslie@palmerlegalservices.com
**Subject:** Key v HMMA, HEA and Dynamic - Plaintiff's motion to amend the scheduling order and
request for time to discuss discovery issues/depositions

Counsel:

Attached is the motion to amend the scheduling order the Plaintiff plans on filing on Monday. We
are not able to put up Ms. Key for deposition on April 4 due to conflicts in other cases and the
outstanding discovery issues to be resolved with Defendants HEA and Dynamic. Because there are a
number of depositions the Plaintiff will need to take as well once those issues are resolved, we will
need additional time to complete discovery.  This is the reason we will be filing the attached motion.
Please advise whether your client opposes or does not oppose the motion.

Also, I wanted to see if everyone would be available for a call for us to discuss the following:

- Deposition scheduling.  Specifically, we will need to discuss dates for:
  - Defendants' deposition of the Plaintiff
  - The following depositions the Plaintiff seeks (I expect we will need 3 days to compete
    these):
    - 30(b)(6) for HMMA
    - 30(b)(6) for Dynamic
    - 30(b)(6) for HEA
    - Robert Burns
    - Cassandra Williams
    - Gloria Robinson
    - Maurice Chambliss
    - Nicole Scavella
    - Ray Cureton
    - Latunya Howell
  - Confirming the depositions the Defendants are seeking:
    - As of right now, it appears that the only non-party deposition Defendants are
      seeking is of the EEOC investigator on April 25

- An ESI issue.  Ms. Key has produced to Leslie and me her smart phone that has some
  information on it that is responsive to discovery requests. However, the screen of the phone
  has been broken such that the touch functions do not work. In order to access the
  information, we will need, at a minimum, to have the screen repaired but there could be a risk
  that data could be lost in the repair process. Before we proceeded with that step, we wanted

to discuss among the parties the repair/retrieval of the information to avoid any potential spoliation issues.

Please let Leslie and me know when is good for everyone to have this call, and I will set up a conference call bridge.  I would suggest the following days/times:

- March 28 at 3:00 or 4:00
- March 29 at 3:00 or 4:00
- March 30 at 3:00 or 4:00

Thank you,

Heather

Heather Leonard
Heather Leonard, P.C.
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
(205) 977-5421 - phone
(205) 278-1400 - facsimile

This transmission is intended ONLY for the addressee. It may contain information that is privileged, confidential, sensitive or otherwise protected from disclosure. Any review, dissemination, or other use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by phone (205) 977-5421 or send an e-mail to Jim@HeatherLeonardPC.com. VIRUS DISCLAIMER: Although our Firm attempts to scan e-mail attachments for viruses, it does not guarantee that either is virus-free and accepts no liability for any damage sustained as a result of viruses.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 5 – Handwritten Statement of Latunya Howell**

## HMMA SECURITY

Statement Form

### Employee Statement

(To be completed by the employee.  Please Print Legibly. Use additional sheets if needed.)

Name: Latunya Howell _____ TM Number, if applicable _____

Employer: Dynamic Security _____ Assigned Shop: _____

Contact Number: _____ Date of Statement: 8-1-17

On 8-1-17 Davita Keys stated that
she felt that Ms. Gloria Robinson +
Ms. Cassandra Williams was discriminating
against her. I called Ms. Cassandra
+ told her that Davita said that she
felt like she was being discriminated against.
Ms. Cassandra stated that she would send
Chambliss down to the mailroom so that he
could bring her to security. So when Davita
came back to the mailroom, she said "did
you tell them that i felt like i was being discriminated
against" and I replied "yes cause that's what
you told me." So then Davita stated that she
needed to step outside to make a phone call.

END OF STATEMENT

Employee Signature: Latunya Howell

Security Supervisor Name: Ma. Chambliss

Created 12.31.2016

**Dynamic - Key 000067**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 6 – 30(b)(6) Deposition Notice to HEA**

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY,<br>      Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 2:19-cv-767-ECM-SMD |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, | ) | |
| LLC, HYUNDAI ENGINEERING | ) | |
| AMERICA, INC., AND DYNAMIC | ) | |
| SECURITY, INC., | ) | |
|      Defendants. | ) | |

## NOTICE OF RULE 30(b)(6) DEPOSITION
## HYUNDAI ENGINEERING AMERICA, INC.

Please take notice that at the time, place and date indicated below, Plaintiff

will complete the testimony by deposition upon oral examination of that party

named below, pursuant to the Federal Rules of Civil Procedure 30(b) before a

Notary Public or other officer authorized by law to administer oaths by audio,

video, and stenographic means. Such deposition conducted by audio, video and/or

stenographic means shall be taken for the purpose of discovery or for use as

evidence in this action, and will continue from time to time until completed, at

which time and place you are notified to appear and take such part in the

examination as shall be fit and proper.

PLAINTIFF'S
EXHIBIT
6/
Williams

DATE AND TIME:        September 6, 2022 at 9:30 am

PLACE:                Bradley Arant
                      445 Dexter Avenue, Suite 9075
                      Montgomery, AL 36104

DEPONENT:             The person designated by the defendant as having
                      the most knowledge concerning the following
                      matters:

    1.    To assist Plaintiff in pursuing effective discovery, please produce for deposition the person or persons who are most knowledgeable of:

    a.    The email program(s) used by Defendant from 2017 to the present.

    b.    The name of the software used during the events relevant to this lawsuit by Defendant to manage information relating to employees (i.e. HRIS software) from 2017 to the present.

    c.    Whether in 2017, Defendant used text messaging to communication among employees and/or supervisors.

    d.    If text messaging was used during the events relevant to this lawsuit for communication among employees and/or supervisors, whether Defendant or the employee/supervisor was responsible for the phone bill. If the employer was responsible for the bill, then the deponent should also know for each person on this Defendant's Rule 26 disclosures to whom it provided a phone the (a) provider for the service, (b) the name(s) in which the account(s) were held, and (d) the account number(s).

    e.    Whether Defendant's phone system during the events relevant to this lawsuit was a traditional or voice over IP phone system.

    f.    Whether during the events relevant to this lawsuit there is a record of incoming and outgoing calls made to Defendant's Human Resources Department ("HR Department").

    g.    Whether it is Defendant's practice and/or policy during the events relevant to this lawsuit to record calls made from or to Defendant's

HR Department. If any recordings were made, deponent should also know the retention policy and/or practice applicable to the recordings.

h.    Defendant's policy and/or practice with respect to retaining voice mail messages during the events relevant to this lawsuit.

i.    The policy and/or practice during the events relevant to this lawsuit applicable to persons working in Defendant's HR Department for documenting incoming calls and/or messages from employees.

j.    How information about job openings and vacancies for Defendant in during the events relevant to this lawsuit is stored, organized, and maintained.

k.    How information about employee complaints of discrimination is stored, organized, and maintained.

2.    With respect to the Defendant's, policies, procedures, practices, and training for the period of 2017 to the present, please produce for deposition the person or persons who are most knowledgeable of:

a.    The duties and responsibilities of the person(s) assigned to work in the mail room through HMMA's contract with HEA.

b.    Race Discrimination

c.    Gender Discrimination, including Pregnancy Discrimination

d.    Retaliation

e.    Dress Code, Grooming, and Appearance

f.    Discipline for alleged violations of any policies, procedures, and/or practices relating to dress code, grooming, and/or appearance

g.    Reasons for Termination of a Work Assignment

h.    Receipt and response to Charges of Discrimination filed with the Equal Employment Opportunity Commission

   i.  The effectiveness of the Defendant's anti-discrimination policies.

3.  With respect to Plaintiff's assignment to perform work for HEA on HMMA's property, please produce for deposition the person or persons who are most knowledgeable of:

  a.  Plaintiff's dates of assignment

  b.  Who, if anyone, at HMMA and/or HEA objected to the Plaintiff's appearance, hair style, grooming, and/or presentation of her physical self

    i.   The identity of the person(s)
    ii.   The substance of their objection(s)
    iii.  The date(s) of their objection(s)
    iv.  To whom the objection was made
    v.   The response, if any, to the objection
    vi.  Whether any documentation exists relating to the objection

  c.  The reason(s) Plaintiff is no longer assigned to work at HEA

  d.  The position(s) in which the Plaintiff was assigned to work at HEA

  e.  The person(s) and businesses who had supervisory authority over the Plaintiff

  f.  The business(es) that set the Plaintiff's work schedule

  g.  The business(es) that had policies and procedures applicable to the Plaintiff during her assignment to HEA at HMMA's property

4.  When this Defendant learned the Plaintiff had filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission, how the Defendant learned of the Charge of Discrimination, the source(s) from whom the Defendant learned of the Plaintiff's Charge of Discrimination, and what documents (including electronic information) exist relating to this Defendant learning of the Plaintiff's Charge of Discrimination.

5.     With respect to any person employed by HEA and/or assigned to work at HMMA through HEA and/or Dynamic Security for the temporal period of discovery permitted by the Court who has been accused of having a hairstyle that is not consistent with the grooming standards and/or having dreadlocks, please produce for deposition the person or persons who are most knowledgeable of:

      a.     The name of the person

      b.     The position(s) held by the person

      c.     The person's employer

      d.     The date of accusation

      e.     The resolution of the accusation

      f.     The decision-makers for HMMA on the resolution

6.     Knowledge of and most familiar with training materials used in training and/or counseling all employees on employment discrimination in the workplace, seminars or meetings held in which employment discrimination and/or retaliation were topics and/or classes held discussing employment discrimination and retaliation for the last five (5) years.

7.     Knowledge of and most familiar with any and all insurance policies that have been invoked or put on notice or that are providing any type of coverage as a result of any or all of Plaintiff's claims referenced in her complaint.

8.     Knowledge of the factual basis and/or documents in Defendant's possession or control which support this Defendant's responses to the factual allegations in the Plaintiff's Amended Complaint.

9.     Knowledge of the factual basis and/or documents supporing the affirmative defenses and/or denials plead by this Defendant.

10.     Knowledge of the Defendant's answers to the Plaintiff's requests for admission and interrogatories to Defendant.

11.     Knowledge of the efforts made by Defendant to locate documents responsive to the Plaintiff's request for production of documents.

12.  With respect to the relationship between HMMA and HEA as it existed in 2017:

     a. What documents exist defining and clarifying that relationship
     b. The nature and purpose of the relationship
     c. Whether there were common owners
     d. Whether there were common policies
     e. Whether there were common sources of income and/or funding
     f. What control, if any, did HMMA exercise over employees of HEA

13.  With respect to the documents produced by the Defendant:

Bates Nos. HEA 0001-3

    The source of the document

    What application, if any, the document had to the Plaintiff

    The purpose of the document

    The contents and application of the document

    The identity of persons employed by the Defendant accused of violating the Appearance Standards for Security Personnel.

    For what purpose(s) this Defendant may use this document in the litigation.

Bates HEA004-48

    The source of the document

    What application, if any, the document had to the Plaintiff

    The purpose of the document

    The contents and application of the document

6

For what purpose(s) this Defendant may use this document in the litigation.

Bates HEA0049-50

Who employed by the Defendant was made aware of this document, when they were made aware, by whom, in what way were they made aware, and why.

What response, if any, HEA took in response to this document.

What was done with this document when it was received, and why is there a "copy" stamp on page HEA0050.

When the paper copy of the document was printed, why it was printed, and by whom.

For what purpose(s) this Defendant may use this document in the litigation.

Bates HEA0051

Who employed by the Defendant was made aware of this document, when they were made aware, by whom, in what way were they made aware, and why.

What response, if any, HEA took in response to this document.

What was done with this document when it was received, and why is there a "copy" stamp on it.

Whether there are additional pages to this document.

When the paper copy of the document was printed, why it was printed, and by whom.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0052

Who employed by the Defendant was made aware of this document, when they were made aware, by whom, in what way were they made aware, and why.

What response, if any, HEA took in response to this document.

What was done with this document when it was received, and why is there a "copy" stamp on it.

Whether there are additional pages to this document.

When the paper copy of the document was printed, why it was printed, and by whom.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0053-56

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0057

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA 0058-59

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0060

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0061

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0062-64

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0065

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0066

When this Defendant received a copy of this document.

From whom this Defendant received a copy of this document.

What other documents and/or communications accompanied this document when it was received by the Defendant.

Why this Defendant received this document.

What this Defendant did with this document after it was received.

For what purpose(s) this Defendant may use this document in the litigation.

HEA0064-162

When any notice was sent to Travelers of Plaintiff's claims against Defendant.

The form of the notice (letter, email, call, online portal, etc.)

Who on behalf of the Defendant provided Travelers of notice of the claim.

Whether this Defendant and/or anyone acting on its behalf used the Employment Practices Liability Hotline with respect to issues concerning the Plaintiff, her claim, pregnancy discrimination, race

11

discrimination, retaliation, and/or appearance/grooming policies.  If so, the details concerning who made the call, when it was made, why it was made, and the response to the call will also be covered in the deposition.  Further, the deponent should know who on behalf of the Defendant would have decided whether or not to place a call to the hotline.

The amount of coverage applicable to this matter.

Whether this policy applies to actions of any other Defendant.

The hourly rate(s) this insurer has approved for paralegal and attorney time billed to this matter.

Prompt written notification to the undersigned is requested, providing the name, address, telephone number, position and job title of the person(s) designated and the matters on which the person(s) will testify no later than ten (10) days prior to the scheduled deposition. Deponent is requested to produce all documents requested in the attached Schedule A such that counsel for the Plaintiff may inspect and to copy the documents prior to the deposition commencing.

Respectfully submitted,

/s/ Heather Newsom Leonard
Heather Newsom Leonard
Attorney for Plaintiff

**OF COUNSEL:**

**HEATHER LEONARD, P.C.**
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
Phone:  (205) 977-5421
Fax:  (205) 278-1400

E-mail:  Heather@HeatherLeonardPC.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing has been served upon the following via electronic mail on this the 22nd day of August, 2022.

Wesley C. Redmond
Susan W. Bullock
FordHarrison LLC
420 20th Street North, Suite 2560
Birmingham, AL 35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: (205) 244-5905
Counsel for Dynamic Security, Inc.

David J. Middlebrooks
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, P.C.
PO Box 11945
Birmingham, AL 35202
dmiddlebrooks@lehrmiddlebrooks.com
wbrown@lehrmiddlebrooks.com
Phone: (205) 326-3002
Counsel for Hyundai Motor Manufacturing Alabama, LLC

T. Matthew Miller
Cortlin L. Bond
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, AL 35203
mmiller@bradley.com
cbond@bradley.com
Counsel for Hyundai ENG America, Inc.

s/ Heather Newsom Leonard
OF COUNSEL

13

## SCHEDULE A

Defendant's representative, as identified pursuant to Plaintiff's 30(b)(6) deposition notice, is requested to provide the following documents at the time of deposition:

1.   The deponent's current resume and job description.

2.   The deponent is requested to bring and permit Plaintiff to inspect and to copy the documents or materials used at any time by the deponent to prepare for the deposition.

3.   Any documents which the deponent needs to assist with his or her testimony.

4.   The native formats (including family documents) for HEA 0049-52. IT appears these documents were read and/or printed using Microsoft Outlook, so the Plaintiff requests the .pst files, including attachments and other family documents for these emails.

14

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 7 – Robinson August 1, 2017 Memo to Cureton**

1

## Removal from Hyundai Motor Manufacturing

From: Gloria Robinson- Account Manager

To: Dr. Ray Cureton

Date: August 1, 2017

This is concerning the removal of Davita Key from HMMA site.

On Wednesday July 19, 2017 @ 10am Ms. Key arrived to be interviewed for the Mailroom position at HMMA.  The interviewers consisted of Lt. Maurice Chambliss and I.

   Once I had determined Ms. Key met the criteria for the Mailroom position, I had only one concern as far as dress and appearance was concerned- that was her hair.

   I asked Ms. C. Williams (HEA) to step into the conference room as a second opinion.  Her initial reaction was that Ms. Key could not have the hairstyle she was wearing as a HMMA security officer, even working in the capacity of the mailroom.

   Ms. Key asked what style she could wear.  She was informed her hair had to be in a neat appearance as a minimum, and dreads could not be worn at HMMA for security officers.  She stated that her hair dresser had her hair in a bun and wanted to show a picture of her with that style to see if it was acceptable.

   The picture she showed us was acceptable and she agreed to obtain that style.

   Monday, July 31 2017 @ 0730 hours (her first day of work), Ms. Key asked to speak with me on a personal matter.  I called Lt. Chambliss into the room and informed Ms. Key that any matters that she needed a supervisor for would go through Lt. Chambliss.  It was at this time she stated she found out July 28, 2017 that she was pregnant; however she had a doctor's excuse stating that she could return to work with no restrictions.  Ms. Key was not working at HMMA July 28, 2017.

   A little while later, maybe five minutes or so, Ms. Williams come into the back office and asked me why Ms. Key still had the same hairstyle she was wearing on July 19.  Ms. Key had departed the building, however she was summoned back to answer the question.

**Dynamic - Key 000034**

**Initial Disclosures**

2

Ms. Key stated that during her training at Dynamic Security office, she asked the office manager was there anything wrong with her hair.  Ms. Key claims that the office manager told her there was nothing wrong with as far as she can see.  Ms. Key stated at that point she felt she was given the go ahead to wear her hair the way it was.  Ms. Williams asked Ms. Key if she could wear a non-descriptive hat, she said she could.  She asked Ms. Williams to see a policy on hairstyles, Ms. Williams showed it to her from her computer, and again explained that HMMA has a personal appearance policy for the security officers that work with the security company.  I asked her if she could make an appointment with her hairdresser, she claimed that it takes a while to get an appointment.  I asked her to call her hairdresser and to call me back to let me know if she was able to schedule an appointment and we will go from there.  Ms. Key was released for the day.  Ms. Howell entered the security office and asked if we knew when Ms. Key was due.  I just assumed it would be 9 months from now if she just found out July 28.  Ms. Howell said no, Ms. Key told her January.  I did call her and ask when she was due, she stated January.

Monday July 31 I contacted the office manager (Ms. Nicole) and asked her if she remembered having a conversation with Ms. Key about her hair.  Ms. Nicole stated she did and thought it was a strange question but told her 'in my opinion I do not see anything wrong with it.'  Ms. Nicole was taking the conversation as a general question, not one that concerned appearance standards at any site.  Ms. Nicole stated that she did not know the background of why Ms. Key would ask this question.

Today, August 1, 2017 Ms. Key came to work and started working with Ms. LaTonya Howell (Mailroom employee and trainer).  They both came into the back office, Ms. Howell spoke and I did not know Ms. Key was with her (my head was down doing paperwork) until she stood in front of my desk cubicle.  It was at this time I saw Ms. Key wearing a grey hat.  If she spoke when she came in, I did not hear her.

A little while later, Ms. Howell telephoned Ms. Williams and stated that Ms. Key felt she was being discriminated against.  When asked concerning what, Ms. Howell said because of her pregnancy.  Lt. Chambliss was asked to go to the mailroom and bring Ms. Key back to the security building.  Lt. Chambliss and I spoke with Ms. Key in the security building conference room.  I asked her about the comment she made to Ms. Howell.  Ms. Key asked if she had been recorded or if I had proof that she said that.  I went on to explain to her that it was my job, once I learn a employee fells that they are being discriminated or harassed in any

Dynamic - Key 000035
Initial Disclosures

3

way I must look into it and come to some type of resolution.  I asked her again if she felt she was being discriminated against, she said no comment.  Then she went on to talk about her being able to wear her hat.  I said I did not bring that up I wanted to know how she was being discriminated against since she made a comment to a fellow co-worker.  I also said that there are only two of you and I didn't want any hostile work environment for anyone, we are all here to try and get along.  I also reminded her of the July 19 interview when she said she could get her styled a certain way.  It was then she said the office told that her hair was in standards to include the length and there was nothing wrong with her hair.  I recounted the conversation I had with the office manager that disputed what she (Ms. Key) was currently saying.  She further went on to state that by law she could ask to see a policy concerning appearance.  I again asked her if she felt she was being discriminated against and she again bought up that she was told she could wear a hat.  I felt this conversation was going nowhere and informed Lt. Chambliss to take her back to the mailroom.  When she returned to the mailroom she asked Ms. Howell if she told them that she felt she was being discriminated against, Ms. Howell stated yes, because that is what you said.

   I was on my way to the Dynamic Security office on Wares Ferry when Lt. Chambliss called me and said Ms. Key wanted to file a complaint against Ms. Williams and I because of her hair and who she could talk to.  I told him have Ms. Key depart the site and report to Ray Cureton with her complaint.


Cc: Ray Cureton-District Manager
Gloria Robinson
Dynamic Security
Account Manager

Dynamic - Key 000036
Initial Disclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 8 – Williams August 1, 2017 Email to Cureton**

8/1/2017                                                Print

Subject:   Fw: Mailroom new hire - further information
From:      Ray Cureton (rcureton@dynamicsecurity.org)
To:        sspires@dynamicsecurity.org;
Cc:        tpeoples@dynamicsecurity.org;
Date:      Tuesday, August 1, 2017 12:14 PM

Sherry,

This email chain shows the order of events out at Hyundai concerning Ms. Key whose statement I sent you earlier. Just thought you might want a fuller picture of what happened.

Thanks!

Dr. Ray H. Cureton
*District Manager,*
Dynamic Security, Inc.

5510 Wares Ferry Rd,
Montgomery, AL 36117
Office - (334) 395-7722
Cell (334) 324-8117

----- Forwarded Message -----
**From:** "Williams, Cassandra - Hyundai ENG America" <CWilliams@hmmausa.com>
**To:** "Robinson, Gloria A - Dynamic Security" <gloriarobinson@hmmausa.com>; Ray Cureton <rcureton@dynamicsecurity.org>; "chargrove@dynamicsecurity.org"
<chargrove@dynamicsecurity.org>
**Sent:** Tuesday, August 1, 2017 8:50 AM
**Subject:** RE: Mailroom new hire

Good morning Ray and Chris,

The new mailroom hire is absolutely not going to work out. After the issue with her hair yesterday she returns this morning with a hat, not necessarily what I thought was appropriate, but I was willing to look pass it. Plus, she didn't bother to speak when she entered our office, but I was willing to let that go as well…she could have been feeling some sort of why this early in the morning.

Then we hear from our mailroom employee Latunya Howell that she is already stating that she can't lift boxes; she's asking to see a HMMA handbook and that the issue is not about her hair, she is being discriminated against because she is pregnant. Let me explain, I/we had no idea she was pregnant when I called into the interview to look at her hairstyle (dreads, locs whatever it is). At that time I informed her that the style she was wearing was not allowed. She stated that she could have her stylist pull it up, twist it and make it look neat and not have the appearance of dreads. She then showed me a photo of how she once wore it which was acceptable to me. Then of course Monday she arrives with it in the same style she was wearing it on the date of the interview and pointing out what your office manager advised her. Additionally, she even asked to see a copy of our policy regarding dreads. I showed it to her and at the same time explained that I was not obligated to do so.

I foresee an issue down the road with this person. Rather than let it fester I'm asking that she be moved to another site.
Thanks



Cassandra Williams
Manager of Security Services
Hyundai ENG America, Inc.
Hyundai Motor Manufacturing Alabama, LLC
T (334) 387-8913  E CWilliams@hmmausa.com
F (334) 387-8949
C (706) 590-8773

**Win Safetyquality awards...**
**SQuality Innovate Safetyquality through proactive improvements**

NOTICE: This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law. If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited. If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system. Thank you.

**From:** Robinson, Gloria A - Dynamic Security
**Sent:** Tuesday, August 01, 2017 6:06 AM
**To:** Ray Cureton; chargrove@dynamicsecurity.org
**Cc:** Williams, Cassandra - Hyundai ENG America
**Subject:** RE: Mailroom new hire

Thanks Ray,
I will see when and if she calls me back, and go from there

about:blank

Dynamic - Key 000085

8/1/2017                                                    Print

**G. Robinson**
**Dynamic Security**
*Cell: (334) 328-2852*
*Desk: (334) 387-8909*
**Win Safetyquality awards...**
**SQuality Innovate Safetyquality through proactive improvements**

NOTICE: This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law. If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited. If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system. Thank you.

**From:** Ray Cureton [mailto:rcureton@dynamicsecurity.org]
**Sent:** Monday, July 31, 2017 3:20 PM
**To:** Robinson, Gloria A - Dynamic Security; chargrove@dynamicsecurity.org
**Cc:** Williams, Cassandra - Hyundai ENG America
**Subject:** Re: Mailroom new hire

Hey Gloria,

Obviously we are not going to let someone go for being pregnant. That's not one of the questions we can ask at an interview.

However, the hair standards at HMMA are non-negotiable, and if Ms. Key will not abide by them, then she will not be welcome to work at Hyundai.

I have instructed Ms. Nicole concerning the hair standards for Dynamic in general, and the particular standards at Hyundai, so that she will not be taken by surprise in the future by that question.

Whether or not you use Ms. Key in the mail-room is your decision. Since she is a licensed security officer, you may use her wherever you need her, and it is up to her to either accept or reject the position.

Bottom line, if her hair is not up to HMMA standards, you have every right to send her to us either for termination, or an assignment elsewhere.

Dr. Ray H. Cureton
*District Manager,*
Dynamic Security, Inc.

5510 Wares Ferry Rd,
Montgomery, AL 36117
Office - (334) 395-7722
Cell (334) 324-8117

**From:** "Robinson, Gloria A - Dynamic Security" <gloriarobinson@hmmausa.com>
**To:** "chargrove@dynamicsecurity.org" <chargrove@dynamicsecurity.org>
**Cc:** Ray Cureton <rcureton@dynamicsecurity.org>; "Williams, Cassandra - Hyundai ENG America" <CWilliams@hmmausa.com>
**Sent:** Monday, July 31, 2017 1:11 PM
**Subject:** Mailroom new hire

Good morning,
    Ms. Davita Key was hired on as the new mailroom person.
During the interview, prior to hire—I had contacted Ms. Williams in reference to Ms. Key's hairstyle. They would be considered dreads or locks, if you will. Either way, they are not allowed for the security officers here at HMMA. Ms. Key showed Ms. Williams and I a picture of how she could have her hairstylist change the appearance of them, to make them look a bit neater.

Fast forward to today—Monday July 31, 2017 @ 0730 hours.
Ms. Key asked to talk to Lt. Chambliss and I in private and at that time told us that she just found out she was pregnant. Keep in mind that she was hired for the mailroom—and although neither male or female are allowed to lift more than 50 pounds. I take issue with her working in the mailroom. To top this off, she had a doctor's note (see attached) stating that she could return to work with no restrictions---not sure where the 'return to work' came from, today was her first day. Apparently she informed her trainer, Ms. Howell, that she is due in January. This means she was with child during the interview with me---but did not disclose this. Although she stated that she 'just found out July 28.

2nd topic—her hair. Apparently while she was in the security video training on Thursday, she asked Ms. Nicole if she thought anything was wrong with her hair. Unbeknownst to Ms. Nicole why Ms. Key would ask her that question, Ms. Nicole said no, she didn't have a problem with it.

So, at this point, I believe Ms. Key figured since Ms. Nicole was the officer manager, she (Key) would just take it upon herself to NOT change her hairstyle. Ms. Williams reminded her of the conversation the three of us had prior to being hired, but  Ms. Key seemed to want more explanation---such as asking to see the policy---which she was shown.  I informed Ms. Key that HMMA has a different set of standards for security officers. Either way—Ms. Williams asked her if she could have her stylist change her hair --Ms. Key stated that the lady does not work on a Tuesday, and is normally booked up. She was also given the option to wear a hat that would contain her hair, of course she lives 30 minutes away. At this point, I just told her to go home and to call me when she is able to get an appointment and we will go from there.

After she left I did call her and ask her if she informed her doctor what type of work she would be doing, she said yes---sounded rather shaky, but she went on to say that when she worked in the post office, she was pregnant and was delivering 100 pds. of mail

**Dynamic - Key 000086**

8/1/2017                                    Print

a day and worked up until two days prior to delivery.

I am asking for some assistance here---what recourse do I have with her? As of this e-mail she has not called back to let me know if she has a hair appointment.
If she is due in five (5) months, unless I cannot count (which I can't) she is already four (4) months---and didn't know it?

**G. Robinson**
**Dynamic Security**
**Cell: (334) 328-2852**
**Desk: (334) 387-8909**
**Win Safetyquality awards...**
**SQuality Innovate Safetyquality through proactive improvements**

NOTICE: This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law. If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited. If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system. Thank you.

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged,

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system.

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged,

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system.

**Attachments**

- image002.jpg (3.25KB)

**Dynamic - Key 000087**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 9 – HMMA Safety Handbook**



HYUNDAI MOTOR MANUFACTURING ALABAMA



HMMA SAFETY

Prevention
Awareness
Responsibility

Contractor

# Safety, Security and Fire Protection Handbook

Montgomery

© 2017 Hyundai Motor Manufacturing Alabama, LLC

Key 000277

EMERGENCY PHONE NUMBERS
TO REPORT AN EMERGENCY

FIRE MEDICAL SAFETY SECURITY ENVIRONMENTAL
CALL HMMA SECURITY
(334) 387-8900

For Permit Authorization, or general information,
Call HMMA Security
Non-Emergency (334) 387-8901

## IMMIGRATION LAW COMPLIANCE

1   Contractor will comply with all federal and state
    immigration laws regulating the employment
    verification process and the employment of aliens,
    including, the Beason-Hammon Alabama Taxpayer and
    Citizen Protection Act (as amended).

2   Contractor is properly enrolled in and uses E-Verify.

3   Contractor does not unlawfully discriminate.

4   Anyone with knowledge of an unauthorized alien(s)
    providing services, or a party's failure to comply with
    11.1, 11.2, 11.3, must immediately notify HMMA's
    General Counsel. Reports of potential violations may
    also be made anonymously by leaving a voicemail
    message on HMMA's Compliance Hotline at 1-844-LGL-
    CPLY (1-844-545-2758), or by email at
    compliance@hmmausa.com.

5   HMMA will comply with immigration laws and immigration law
    related investigations.

6   If requested, Contractor will provide HMMA with copies
    of employment eligibility, authority, and work
    authorization compliance documentation.

## TABLE OF CONTENTS

| | |
|---|---|
| WELCOME TO HYUNDAI | 6 |
| HMMA SAFETY POLICY | 6 |
| ORIENTATION PROCEDURES | 8 |
| SAFETY RESPONSIBILITIES | 9 |
| INCIDENT REPORTING | 12 |
| DISCIPLINARY PROCEDURES | 14 |
| CONFLICT RESOLUTION | 17 |
| JOB SAFETY ASSESSMENT | 18 |
| CONTRACTOR SAFETY TRAINING | 19 |
| CONTRACTOR SAFETY SUBMITTAL REQUIREMENTS | 20 |
| SAFETY RULES: | |
| COMPRESSED AIR | 21 |
| COMPRESSED GAS CYLINDERS | 22 |
| CONFINED SPACE ENTRY PROCEDURE | 24 |
| CONSTRUCTION SITE REQUIREMENTS | 27 |
| DUST CONTROL | 27 |
| HOUSEKEEPING | 28 |
| ILLUMINATION | 29 |
| POTABLE WATER | 29 |
| SANITATION | 30 |
| SIGNS, SIGNALS AND  BARRICADES | 30 |
| MONITORING OF CONSTRUCTION SITE | 33 |

Key 000278

CRANES, DERRICKS, HOISTS, ELEVATORS & CONVEYORS  34
ELECTRICAL SAFETY  38
OVERHEAD LINES  38
GROUND FAULT CIRCUIT INTERRUPTERS  39
TEMPORARY WIRING REQUIREMENTS  40
EMERGENCY ACTION PROCEDURES  42
ENVIRONMENTAL  44
ERGONOMICS  46
EXCAVATIONS AND TRENCHING  48
FALL PROTECTION  50
FIRE PROTECTION AND PREVENTION  52
HAND AND POWER TOOL SAFETY  53
HAZARD COMMUNICATION  54
HELICOPTER LIFT PROCEDURES  56
HOT WORK PERMITS  58
CONTROL OF HAZARDOUS ENERGY POLICY  60
MACHINE GUARDING  69
MARINE OPERATIONS  69
MATERIAL HANDLING  70
BATTERY POWERED VEHICLES/MECHANIZED EQUIPMENT  71
PERSONAL PROTECTIVE EQUIPMENT  74
POWERED PLATFORMS, MANLIFTS, AND VEHICLE MOUNTED WORK PLATFORMS  76
POWDER ACTUATED TOOLS  78
SCAFFOLDING  79
SMOKING/TOBACCO USE POLICY  81
STAIRWAY/LADDER SAFETY  82
STEEL ERECTION  85
WALKING/WORKING SURFACES  86
WELDING/CUTTING/BRAZING  89
FLOOR OPENING PROCEDURE  93

SECURITY/ FIRE PROTECTION GENERAL REQUIREMENTS
GENERAL  94
SITE SECURITY  95
CONTROL OF CONTRACTOR'S PERSONAL TOOLS  96
IDENTIFICATION OF CONTRACTORS  96
ISSUANCE AND USE OF PHOTO IDENTIFICATION BADGES  96
VEHICLE CONTROL  98
CRIMINAL PROSECUTION  99
FIRE PREVENTION/REPORTING  99
SITE SECURITY RULES  101
CELLPHONES  104
ADDITIONAL INFORMATION
DEFINITIONS  105
BARRICADES AND FALL PROTECTION  109
JOB SAFETY ASSESSMENT  110

Welcome to Hyundai Motor Manufacturing Alabama, LLC. Our goal is to provide a safe and hazard-free workplace for all visitors, contractors, team members and other individuals

Key 000279

here at Hyundai.  Preventing accidents in our facility, and proper attention to safe practices by all of us will help achieve and maintain the goal.  Remember, safety is our number one priority here at Hyundai.

## HMMA SAFETY POLICY

*As a safety focused automotive manufacturer, one of our core values at Hyundai Motor Manufacturing Alabama, LLC (HMMA) is providing a safe and healthy environment for Team Members, contractors and visitors. Top Management is committed to the effective implementation of OHSAS 18001:2007 to ensure the adequate control of safety and health risks arising from work activities.  The Safety Policy statement is appropriate to the nature and scale of risk in the HMMA work place and our adherence to applicable legal and regulatory requirements. We conduct audits as a means of determining our conformance to requirements and identifying areas for improvement.*

*The primary focus of our safety program is the involvement of Team Members in the prevention of an accident, injury and illness. HMMA Management is responsible for implementation of the safety program. Team Members and contractors are trained on the Safety Policy and safe work procedures and their adherence to them is required.  ALL Team Members are responsible for complying with safety rules and procedures. Together, we will be successful in achieving our goal of a safe and healthful work place. The Safety Policy is communicated to Team Members and*

*available on the HMMA MD-1 policy and procedures intranet site. It is made available to interested parties.*

All Contractors must attend Safety Orientation before starting working on the site.  Badges will be issued only to Contractors who have successfully completed the Safety Orientation.

This handbook is a reference to assist you in making your job and the job of your fellow Team Members safe from accidents and injury.  The rules and statements here provide broad coverage for safe practices.  You are to interpret each line, statement or phrase in this handbook as basic guidelines.  The term basic should also be considered to mean minimum.  You are encouraged to think about details surrounding any circumstance that indicates the need for further detailed actions.  When you have questions concerning safety practices, policies or procedures, do not hesitate to call HMMA Safety.  In addition to site rules, many areas of our facility have specific safety rules, methods and procedures with which you must comply.  Be certain you know and understand these before beginning any work.  (For further information contact HMMA Safety.)

Contractors doing work here at HMMA are governed by the regulations of **29 CFR 1926 – OSHA Regulations for the Construction Industry** and **29 CFR 1910 – OSHA Regulations for General Industry.**  HMMA Team Members will be working under the standards for **General Industry, 29 CFR 1910** and under **29 CFR 1926**  when in construction areas.

6

7

Key 000280

Remember that your employer has primary responsibility for your safety and shall be responsible for compliance with all HMMA, Local, State, and Federal standards and requirements (OSHA, NFPA, ANSI, EPA).

Issuance of this information shall in no way be deemed or interpreted as the assumption of responsibility or liability by Hyundai Motor Manufacturing Alabama, LLC

## ORIENTATION PROCEDURES

1.1.  All Contractors shall attend Safety Orientation before working on the site. Orientation is approximately 1 hour.

  1.1.1.  Contractor must attend orientation annually. An applicant may be re-badged if it has been less than 12 months since he/she has attended orientation, and there are no other reasons to deny a badge.

1.2.  Safety, Security and Environmental Orientation will be conducted as follows:

  1.2.1.  Orientation is given at the HMMA Training Center located on Hyundai Blvd., Monday through Friday at 7:00 a.m.  Anyone arriving after an orientation session starts will not be admitted.  Personnel attending orientation shall be properly attired.  Refer to Personal Protective Equipment Section of this manual.

  1.2.2.  Contractors must be at the HMMA Training Center before 7:00 a.m. for processing. Re-badge applicants should also report at 7:00 am.

  1.2.3.  All Contractors shall provide Certificates of Insurance to prove appropriate coverage for Automobile Insurance and Worker's Compensation Insurance. Contractors not in the HMMA OCIP program shall also provide Certificates for General Liability and Worker's Compensation Insurance. Certificates of Insurance shall be provided to HMMA Safety before Contractors will be admitted to orientation. Contractors will not be allowed to work on HMMA property without the appropriate insurance coverage in place.

  1.2.4.  A fully completed ID BADGE REQUEST FORM must be submitted before the Contractor will be issued a badge. This applies to initial orientation, 12-month refresher, or re-badging. Contractors shall then be issued a HMMA Safety and Security Contractor Handbook.

## CONTRACTORS' SAFETY RESPONSIBILITIES

1.3  General/Prime Contractor

8

9

1.3.1 General/Prime Contractor(s) shall be responsible for the safety of their personnel and shall be responsible for compliance with all HMMA, Local, State, and Federal standards and requirements. General/Prime Contractor(s) must provide a full time onsite construction safety coordinator, on all shifts for their employees and any subcontractors with fewer than 15 employees. The Safety coordinator must be knowledgeable in Construction Safety and all applicable OSHA standards. This knowledge may be demonstrated through experience and education such as:

    1)  OSHA 30-hour certification in Construction Safety and Heath with experience in safety

    2)  Safety related degree + safety experience
        or

    3)  A proven prior record at HMMA in the construction safety field.

General/Prime Contractor shall submit a resume for this person to HMMA Safety for review before beginning on site. This safety person and all supervisory personnel must attend all HMMA

10

Safety Classes within the first two weeks of their arrival on site. Additionally, Safety Coordinators must attend these classes quarterly as a review. Contractors shall not release the Site Safety Specialist without prior approval of HMMA Safety.

1.4  Subcontractors

1.4.1 Subcontractors shall be responsible for the safety of their personnel and compliance with all HMMA, Local, State, and Federal laws and regulations, including but not limited to the Occupational Safety and Health Act. Subcontractor(s) must provide a competent On-Site, Full Time, Safety Coordinator, when their estimated manpower count is to reach 15 or more, who shall be responsible for compliance with HMMA Site Safety Rules and Regulations. This person shall be knowledgeable in 29 CFR 1926 and those parts of 29 CFR 1910 that are applicable to construction. Having this person in no way absolves a foreman or supervisor of responsibility in planning his/her work safely and the enforcement of all safety rules on the project. General Contractor(s) shall have the responsibility of approving competent subcontractor safety personnel.

1.5  General Contractors shall submit a written Site Specific Safety Program that demonstrates a level of control by the General Contractor over their

11

Key 000282

subcontractors and addresses all items listed in this document. This Program shall be submitted to HMMA Safety one week before the Contractor begins work on the project. HMMA Safety reserves the right to reject any portion of the General Contractor's Site Specific Safety Program.

## INCIDENT REPORTING

1.1.   The procedure for accessing Medical Treatment shall be as follows:

    1.1.1.   To report a serious accident or serious injury, contact Security, 387-8900, identify yourself as a Contractor. Give the location using the column location, building number, type of suspected injury and the number of people involved. Security will dispatch and escort an ambulance to the injured Contractor if necessary.

    1.1.2.   Wait for instructions. If calling by phone, DO NOT hang up until you are told to by the person to whom you are speaking. All accidents, injuries and injury-free incidents must be reported immediately to your supervisor and the Construction Safety Department. This preliminary report must be in writing.

12

Additionally, any non-emergency incident during non-regular work hours must be reported to HMMA Security at 387-8901.

1.2.   A copy of the Incident Report, complete with sketches and countermeasures shall be completed and submitted to HMMA Safety within 24 hours of the incident.

    1.2.1.   Contractors shall also submit any additional reports as required by HMMA.

1.3.   Contractors must maintain their own OSHA 300 Log.

1.4.   HMMA's Medical Center Facility may be used by Contractors for emergency medical treatment only if a designated medical facility for contractors (medical trailer) is not available.

1.5.   Contractors shall maintain First Aid Kits and supplies at the Contractor sites. HMMA shall have no liability for the use or administration of supplies from Contractor First Aid Kits.

## DISCIPLINARY PROCEDURES FOR SAFETY VIOLATIONS

1.1.   HMMA may notify the Contractor's Safety Representative if it becomes aware of any violation

13

Key 000283

of Site Rules or Procedures committed by the
Contractor.

1.2. Each Contractor will immediately notify HMMA Safety
if its employee has violated any Site Rules or
Procedures.

1.3. Contractors will take adequate corrective or
disciplinary action whenever necessary to prevent
site violations. Contractor will inform HMMA Safety
of actions taken regarding safety and security
matters.

1.4. There are two types of Violations requiring
disciplinary action:
- Minor Violations
- Major Violations

1.5 Examples of Minor Violations include, but are not
limited to, the following:
- Failure to wear hardhat, safety glasses or
other PPE where required.
- Failure to abide by posted safety signs or
warnings.
- Failure to report an injury, accident, or
injury-free incident.

1.6 When a minor violation is observed, Contractor will:

1.6.1 Advise HMMA Safety
1.6.2 Obtain the employee's badge.
1.6.3 Advise HMMA and Security that the Contractor
has been cited for a violation.
1.6.4 Contractor shall impose the following for Minor
violations:

**1st Offense** – Contractor may finish his/her shift, depending
upon the nature of the violation, but must
attend Safety Orientation before beginning the
next shift. The Contractor's badge shall be
reactivated after the Contractor completes the
orientation session. Discipline may also include
suspension of up to 29 days.

**2nd Offense** – If committed within a twelve-month period
from the first offense, the Contractor shall be
expelled from HMMA property for a period of
up to 30 days. If the Contractor does not
commit another violation within 12 months of
the first violation, his/her safety record shall
be cleared.

**3rd Offense** – If committed within a twelve-month period
from the second offense, the Contractor may
be permanently expelled from HMMA property.

1.7 Examples of MAJOR Violations of HMMA Safety Rules:
- Intentionally disabling a safety device

14

15

_ON THE FIRST OFFENSE._

Intentional violation of HMMA Fall
Protection Rules

- Fighting on HMMA property
- Assaulting another person
- Sexual misconduct, sexual or other form of harassment, or public indecency
- Arson
- Intentional property damage
- Intentional violation of Hot Work, Confined Space, or LOTO Policy
- Robbery or burglary
- Perform work in standing water
- Criminal trespass
- Disorderly conduct
- Possession of a firearm or other deadly weapon on HMMA property
- Possession, sale, or use of alcoholic beverages or controlled substances
- Insubordination or failure to surrender badge when asked, by a HMMA Safety/Security Official
- A Supervisor or foreman intentionally instructing employee(s) to work in an unsafe manner or not enforcing the HMMA site safety policies.

1.8 _FOR MAJOR VIOLATIONS, THE DISCIPLINARY PROCEDU[...] MAY BE PERMANENT DISMISSAL FROM HMMA PROPE[...]_

16

1.9 When a major violation is committed; HMMA Safety shall contact HMMA Security, when security arrives, they will ask the Contractor for his/her badge and escort him/her to the gate.

1.10 Disciplinary procedure for using tobacco products outside of an authorized area is as follows:

   **1st Offense** – 90 days dismissal from HMMA property.
   **2nd Offense** – Permanent dismissal from HMMA property.

## CONFLICT RESOLUTION

1.1. Problems regarding Site Safety Regulations, Procedures or Site Permits shall be brought to the attention of HMMA Safety immediately.

1.2. Joint meetings shall be held with the Contractor, Employee Representative, Project Engineer and HMMA Safety, and any additional personnel required, for final resolution.

## JOB SAFETY ASSESSMENT

1. Contractors shall conduct an overall Job Safety Assessments (JSA's) for all line item scheduled activities being performed by the contractor on a particular project at HMMA. Line item scheduled

17

Key 000285

activities not included would be any activities not physically being performed on the project. HMMA requires that a JSA be performed for each specific activity not addressed in the project schedule.

2. Contractor(s) shall perform JSA's in regards to coordination of subcontractors in overlapping work areas, plans for maintaining adequate general conditions on the project and any items pertaining to Item 1 in this section.

3. To better inform contractor management about JSA's, HMMA Safety has set the following guidelines concerning JSA's:

- JSA's are to be performed by on site management personnel knowledgeable in the activity being planned and assessed.
- JSA's shall be site specific and of good quality. JSA's that are completed in a haphazard manner will not be accepted by HMMA Safety for review.
- JSA's shall be updated if the scope of work changes for a particular activity and the new JSA submitted to HMMA Safety in a timely fashion.

using JSA's also to be completed before beginning work and remain on site with the contractor until job is completed.

## CONTRACTOR SAFETY TRAINING

All Contractors are required to provide specific safety training, as required by OSHA, to their employees. Contractors must conduct the training before their employees begin any work that specifically involves tasks covered by that particular training. The training shall be of the utmost quality and specifically cover the purpose for which it was intended.

Some examples of specific training that contractors should be performing are as follows:

1. Fall protection and fall protection systems
2. Fire extinguisher
3. Confined Space
4. Lock Out/Tag Out
5. Ladders and Stairways
6. Hazard Communication
7. Mobile Equipment Operator
8. Use of Personal Protective Equipment Including Respiratory Protection
9. Use of Aerial and Scissors Type Lifts

18

19

Key 000286

16.   Powder Actuated Tools Use

17.   Laser Operations

12.   Job Safety Assessments

13.   Hot Work Permit System

14.   Supervisory Safety Training (minimum requirement being OSHA 10-hour Construction Outreach or equivalent).

15.   First Aid/CPR training

This list shall not be interpreted as the only training that is required by a particular law or OSHA standard. Copies of the training material and documentation shall be maintained by the contractor as required by law. Failure to provide training required by law or HMMA will be just cause for HMMA safety to shut down that particular portion of work until the requirements of this section have been met by the Contractor.

### CONTRACTOR SAFETY SUBMITTAL REQUIREMENTS

Contractors must submit the following items to HMMA Safety:

- Contractor Safety Questionnaire  (5 days before Contractors attend orientation)
- Job Safety Assessments  (Two (2) weeks before start of an activity)
- General Contractor Site Specific Safety Programs (5 days before start)
- Incident Reports (Within 24 hours of Incident)
- Crane critical lift plans  (Two (2) weeks before lift)
- Helicopter Lift Plans  (Three (3) weeks before start)
- Tool Box Safety Meetings  (Weekly Basis)
- Crane Annual Inspections  (Before being used on the site)
- Material Safety Data Sheets  (one (1) week before chemical arriving on site)
- Confined Space Entry Program  (two (2) weeks before anticipated activity)
- Hot Work to be performed in High Hazard Area (two (2) days)
- Training Records when requested
- Daily JSA's

HMMA reserves the right to amend this list to include other pertinent items that may become necessary. Contractors will be notified of amended items two weeks before information is required.

### CONTRACTORS' SAFETY RULES

### 1. COMPRESSED AIR

1.1.   Compressed air shall not be used for cleaning purposes except where reduced to less than 30 p.s.i. and then only with effective chip guarding and personal protective equipment which meets the requirements of 29 CFR 1926.302.

1.2.   Compressed air shall not be used to remove dust, debris or other foreign material from an employee or

20

21

Key 000287

his/her clothing.

2.    COMPRESSED GAS CYLINDERS

2.1.   Compressed gas cylinders shall be moved by tilting and rolling them on their bottom edges or with carts designed for such purpose. Compressed gas cylinders shall not be intentionally dropped, struck, or permitted to strike each other.

2.2.   When cylinders are hoisted, they shall be secured on a cradle, slingboard, or pallet. They shall not be hoisted or transported by means of magnets or choker slings.

2.3.   Cylinders shall never be taken inside tanks, vessels, or confined spaces in which work is being done. Oil or grease shall not be used on regulators or fittings.

2.4.   Wrenches shall be left in place for emergencies.

2.5.   Pressure must not be left on regulators during extended periods of shutdown (meal times, job completion, etc.) Caps must be on cylinders when being stored. Regulators must be removed and the protective caps placed back on a cylinder when not in use.

2.6.   Oxygen cylinders in storage shall be separated from fuel-gas cylinders or combustible materials (especially oil or grease) a minimum distance of 25 feet or by a noncombustible barrier at least 5 feet high having a fire resistive rating of at least one hour if stored in mobile carts. Cylinder should never be stored next to flame, steam pipes, or heat source of any type.

2.7.   Cylinders (full or empty) must be secured by chain, straps, wire or suitable rack. Empty cylinders shall not accumulate in work areas. Cylinders will be secured at all times during storage and transportation

2.8.   In-plant handling, storage, and utilization of all compressed gases in cylinders, portable tanks, rail tank cars, or motor vehicle cargo tanks shall be in accordance with the Compressed Gas Assn. Pamphlet P-1-1965.

2.9.   For additional regulations, consult 29 CFR 1910 Subpart H.

3.   CONFINED SPACE ENTRY PROCEDURE

3.1.   Confined spaces at HMMA fall into two categories.

22

23

3.1.1. Non-Permit Required Confined Space

3.1.2. Permit Required Confined Space

3.2. Non-Permit Required Confined Spaces are those that meet the following criteria:

3.2.1. A confined space that does not contain or, with respect to atmospheric hazards, have the potential to contain any hazard capable of causing death or serious physical harm;

3.2.2. Contractor will not introduce any hazards into the space; and

3.2.3. Meets or exceeds ALL of the conditions of the Confined Space Checklist.

3.3. Permit Required Confined Spaces are those that meet one or more of the following criteria:

3.3.1. Contains a hazardous atmosphere;

3.3.2. Contains a material that has the potential for engulfing an entrant;

3.3.3. Has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes downward and tapers to a smaller cross-section;

3.3.4. Contains any other recognized serious safety or health hazard;

3.3.5. The Contractor introduces a hazard into the space;

3.3.6. Identified by HMMA as Permit Required Confined Space.

3.4. Before ANY confined space entry, the Contractor shall provide a copy of their written confined space entry procedures to HMMA Safety and meet HMMA Confined Space Orientation requirements.

3.5. The Contractor shall provide a copy of current confined space training records for all Contractors who will be involved with the entry.

3.6. The Contractor shall then complete the HMMA Confined Space Entry Checklist. This form shall be signed by HMMA Safety/ERT before Contractors may proceed with the entry.

3.7. The Contractor shall ensure that all OSHA and HMMA requirements are satisfied before entering a confined space. The Contractor shall check the

24

25

confined space for hazardous atmospheres. The
Contractor shall conduct sampling **WITHOUT**
**ENTERING THE CONFINED SPACE** and in the
presence of a HMMA Safety/ERT Representative.
Sampling shall consist of at least the following tests:

| 3.7.1. | Oxygen | $O_2$ |
| 3.7.2. | Carbon Monoxide | CO |
| 3.7.3. | Hydrogen Sulfide | $H_2S$ |
| 3.7.4. | Lower Explosive Limit | LEL |
| 3.7.5. | Known Hazards | PEL |

3.7.5.1. If the space meets the criteria for a Non-Permit Required Confined Space, the Contractor may proceed with the entry.

3.7.5.2. If the space fails the criteria for a Non-Permit Required Confined Space, the Contractor must complete a HMMA Confined Space Entry Permit and HMMA Safety/ERT must authorize the Permit before Contractor may enter the space.

3.8. The Contractor shall provide appropriate safety equipment (including communications), attendant, ventilation equipment, fall protection, 12-volt lighting or the equivalent, air monitoring device, body harnesses, and appropriate rescue equipment. This equipment shall be in place before entering the

26

3.9. Contractor shall post permits (or checklists) in the work area where confined space entry work is done. Permits are valid for one shift only. In no case shall a permit be valid for more than 12 hours.

3.10. Contractor must return permits (or checklists) to HMMA Security at the completion of the work, or at the end of each shift.

## I. CONSTRUCTION SITE REQUIREMENTS

4.1. DUST CONTROL

4.1.1. The Contractor shall develop and implement a dust control program to guarantee that the following conditions are eliminated on the project:

4.1.1.1. High levels of nuisance dusts, SILICA dusts, or any other dusts specified in 29 CFR 1926.55 that may jeopardize worker safety and health due to potential exposure.

4.1.1.2. Dusts or other foreign debris that may be generated that could adversely affect

27

Key 000290

4.1.2. The Contractor shall submit its Dust Control Program to HMMA Safety before beginning work on the site. At a minimum the Contractor shall guarantee HMMA as close to dust free conditions as possible both inside and outside of the buildings on the property.

4.2. HOUSEKEEPING

4.2.1. Contractors shall maintain good housekeeping in all work areas, at all times. Contractors shall provide covered trash receptacles for personal trash accumulating in area.

4.2.2. During construction, Contractors shall keep debris cleared from work areas, emergency equipment, passageways, and stairs and shall remove debris at regular intervals, at least daily. Contractor shall provide containers for collection and shall be disposed of at frequent and regular intervals.

4.2.3. Contractors shall adhere to 29 CFR 1926.25 and HMMA'S Housekeeping Guidelines as stated above.

4.3. ILLUMINATION

4.3.1. Contractors must illuminate all work areas to prevent accidents and injuries. The minimum requirement for any construction area is 5 foot candles.

4.3.2. Refer to 29 CFR 1926.26 for additional guidelines.

4.4. POTABLE WATER

4.4.1. The Contractor shall provide an adequate supply of potable water in all work areas. These containers shall be refilled as required or at least daily.

4.4.2. Potable containers, used to dispense drinking water, shall be capable of being tightly closed, and equipped with a tap. Water shall not be dipped from container.

4.4.3. The common drinking cup is prohibited. When Contractor provides single-use cups, it must provide a sanitary dispenser and a trash receptacle.

4.4.4. For additional regulations, consult 29 CFR 1926.51.

4.4 SANITATION

28

29

4.4.1    Contractors shall provide an adequate, HMMA Safety approved, method for hand washing.

4.4.2    Contractors shall provide toilets for their employees according to the following:

### Table D – 1

| Number of employees | Minimum number of facilities |
|---|---|
| 20 or less | 1 |
| 20 or more | 1 toilet seat and 1 urinal per 40 workers |
| 200 or more | 1 toilet seat and 1 urinal per 50 workers |

## 4.5    SIGNS, SIGNALS AND BARRICADES

4.5.1    Contractors' signs must meet the requirements of the American National Standards Institute (ANSI). Signs must be durable, visible and safe. Specific requirements on the finish, color and lettering have been established to ensure they are effective and uniform.

4.5.2    A comprehensive list of requirements for signs, tags, and marking physical hazards can be found in:
- USAS (ANSI) Z35.1–1968 Specs for Accident Prevention Signs
- USAS (ANSI) Z35.2–1968 Specs for Accident Prevention Tags
- ANSI Z53.1–1979 Safety Color Code For Marking Physical Hazards

4.5.3    Construction work areas shall be posted with appropriate signs.
4.5.3.1    For additional guidelines consult 29 CFR 1926.200

4.5.4    Safety  Tape
4.5.4.1    **Yellow Caution Tape** – Contractors may not cross areas surrounded by yellow caution tape unless it is absolutely necessary, and only after first determining it is safe to do so.

4.5.4.2    **Red Danger Tape** – Contractors not directly involved with the work in progress inside this area shall not enter under any circumstance.

4.5.4.3    **Red/White Commissioning Tape** – Only personnel directly involved in the commissioning activities may enter these areas.

4.5.5    Contractors must supply OSHA–required barricades or guardrails, around excavations, openings in floors or roof areas, edges of platforms or roof and overhead work.  Entrance

30

31

Key 000292

or opening shall be left where practical. No
material will be stored less than 10 feet from
edges of pits or on top of hole covers.

4.5.5.1   Barricades shall comply with ANSI D6.1–1971.

4.5.5.2   Guardrails used for the prevention of falls
shall comply with 29 CFR 1926.502.

4.5.5.3   Barricades will include signs designating the
type of work requiring the barricade

4.5.5.4   All work inside of barricade will require
hardhats

4.5.5.5   Barricade will include entire area in which
overhead work is being performed.

4.5.5.6   Long-term projects (over 30 days) and
immediately hazardous sites shall have
substantial barriers that are not easily
moved. (penthouse penetrations, droplifter
pits, pits with depth greater than 5 feet)
Contractor shall submit barricade proposals
to HMMA Safety before the project begins.

4.6   MONITORING OF CONSTRUCTION SITE

4.6.1   The Contractor Safety Representative shall
conduct Daily Safety Inspections to ensure
compliance with Safety Rules and Regulations and
to maintain good housekeeping of their
construction sites.  These inspections must be

documented in writing.

4.6.2   All Contractor Safety Representatives or other
designated person from each Contract Employer
and Subcontractor shall collectively attend weekly
Safety Meetings to discuss safety violations
found in the work areas, updates on changing
safety standards, incident review, and other
pertinent information.

4.6.3   The Contractor's Safety Representative shall
conduct Weekly Tool Box Safety Meetings with
their Contractors to discuss safety awareness and
special Safety topics. Contractors must maintain
minutes of Weekly Tool Box Safety Meetings
onsite.

4.6.4   Each prime or general contractor must
provide and conspicuously post a Job Control
Board at all times. The following items shall
be posted on the board
• Accident Reporting Procedures
• Evacuation Routes
• Emergency Phone Numbers
• SDS Locations
• All required Federal, State, Local
and HMMA information.

32

33

Key 000293

4.6.4.1  Contractors may not post any additional information on the Job Control Board without prior approval of HMMA Safety.

4.6.5  No portable or temporary offices, trailers, etc. may be set up inside the building or within 35 ft. of exterior walls unless approved by the HMMA Safety Manager or Assistant Manager.

## 5.  CRANES, DERRICKS, HOISTS, ELEVATORS & CONVEYORS

5.1  Contractor shall provide a copy of the current annual inspection to HMMA Safety before placing any crane, derrick, hoist, elevator, personnel lift, or conveyor into service at Hyundai.

5.1.1  After a crane is allowed onsite, assembled, and before being put into use, the Contractor Safety Representative and HMMA Safety shall jointly inspect the rig.

5.1.2  Cranes are to be inspected yearly and immediately before any critical lifts.

5.1.3  Before the disassembly of the crane, HMMA Safety and the contractor shall designate an area for disassembly.

5.2  Contractor must comply with the manufacturer's specifications and limitations applicable to the operation of any and all cranes.

5.3  Rated load capacities and recommended operating speeds, special hazard warnings, or instruction shall be conspicuously posted on all equipment.

5.4  Instructions or warnings shall be visible to the operator while he/she is at his/her control station.

5.5  Hand signals to crane operators shall be those prescribed by the applicable ANSI standard for the type of crane in use.  An illustration of the signals shall be posted at the job site.

5.6  One person should be designated to give signals to the operator. Radio communications can be used where necessary or deemed safer than visible signals.

5.7  All windows in cabs shall be of safety glass, or equivalent, that introduces no visible distortion that will interfere with the safe operation of the machine.

5.8  All cranes must be equipped with anti-two-block devices which will disable the functions that are capable of allowing the machine to pull its own line in two. Exceptions must be approved by HMMA Safety.

5.9  All load hooks must be equipped with functional safety latches.

5.10  Rigging used for lifts must be certified and have load capacity tags or placards attached.

5.11  Rigging above the hook is prohibited.

Key 000294

5.12  Guardrails, handholds, and steps shall be provided on cranes for easy access to the car or cab. Platforms and walkways shall have anti-skid surfaces.

5.13  Contractor must inspect all cranes before each use, and during use, to ensure it is in safe operating condition.

5.14  Contractor must repair any deficiencies, or replace any defective parts, before continued use of equipment.

5.15  Contractors shall take wire ropes out of service when any of the following conditions exist:

5. 15.1  Six randomly distributed broken wires in one lay or three broken wires in one strand in one lay;

5. 15.2  Wear of 1/3 the original diameter of outside individual wires. Kinking, crushing, bird caging, or any other damage resulting in distortion of the rope structure;

5. 15.3  Evidence of any heat damage from any cause;

5. 15.4  Reductions from nominal diameter of more than:

- 1/64 inch for diameters up to and including 5/16 inch
- 1/32 inch for diameters 3/8 inch to and including ½ inch
- 3/64 inch for diameters 9/16 inch to and including ¾ inch
- 1/16 inch for diameters 7/8 inch to 1-1/8 inches inclusive
- 3/32 inch for diameters 1-1/4 inches to 1-1/2 inches inclusive

5.16  Contractor shall barricade accessible areas within the swing radius of the entire rotating superstructure of the crane in such a manner as to prevent an employee from being struck or crushed by the crane.

5.17  The contract employer or the operator must be able to present documentation to show that the operator is properly trained to operate the crane in a safe and competent manner.

5.18  Contractors shall prepare and submit to HMMA Safety a critical lift plan when the following picks are planned:

5. 18.1  Tandem picks

5. 18.2  Net weight of load exceeds 25 tons

5. 18.3  Value of load exceeds $50,000

5. 18.4  Replacement time for damage load exceeds two months

5. 18.5  Gross load weight exceeds 85% of cranes rated capacity

6   ELECTRICAL SAFETY

6.1  OVERHEAD LINES

36

37

Key 000295

6.1.1 All overhead transmission and distribution lines shall be considered to be energized until proper clearance has been granted, the lines are confirmed de-energized, and they have been properly grounded.

6.1.2 Contractors shall maintain the following clearances between any vehicle or load and the line:

- For lines rated 50 kV or below, minimum clearance shall be 10 feet;
- For lines rated over 50 kV, minimum clearance shall be 10 feet plus 0.4 inch for each 1 kV over 50 kV or twice the length of the line insulator, but never less than 10 feet;
- In transit with no load and boom lowered, the equipment clearance shall be a minimum of 4 feet for voltages less than 50 kV; 10 feet for voltages over 50 kV, up to and including 345 kV; and 16 feet for voltages up to and including 750 kV.

6.1.3 Contractors must designate a person to observe clearance of the equipment and give timely warning for all operations where it is difficult for the operator to maintain the desired clearance by visual means.

## 6.2    GROUND FAULT CIRCUIT INTERRUPTERS

38

6.2.1 Contractor shall use ground fault circuit interrupters on all 120 volt, single phase 15 and 20 ampere outlets, devices and tools used on the site.

6.2.2 Contractors shall test GFCIs monthly to ensure proper operation.

6.2.3 Contractors must maintain a written log of this test which will be available for inspection by a HMMA Safety upon request.

## 6.3    TEMPORARY WIRING REQUIREMENTS

6.3.1 No open conductors, single conductors, triplex, quadraplex, etc. shall be permitted without prior written approval of HMMA Safety.

6.3.2 Temporary lighting shall be protected from accidental contact or breakage. Metal-case sockets shall be grounded.

6.3.3 Festoon lighting shall not be permitted without written approval from HMMA Safety.

6.3.4 Portable electric lighting used in wet and/or other conductive location, (example: drums, tanks, and vessels) shall be operated at 12 volts or less.

6.3.5 Extension cord sets used shall be of the three wire type and shall be designed for hard or extra-hard usage. Examples of these types of cords include types: S, ST, SO, SJO, SJ, SJO, SJT, and SJTO.

39

Key 000296

6. 3. 5.1 Extension cords of "flat
construction are strictly prohibited.

6. 3. 5.2 Exceptions include:

- 1926.404(b)(1) "Ground Fault
  Protection" and
- 1926.405(a)(2)(ii)(E), (F), (G).
  Temporary Lighting   and
- 1926.405(a)(2)(ii)(J).Flexible cords
  and cables.

6. 3. 5.3 All electrical cords will be inspected
quarterly and will be marked (see table
below) and documented.

### Table D – 2

| Month | Color/s |
|---|---|
| January | White. |
| February | White/Yellow |
| March | White/Blue |
| April | Green |
| May | Green/Yellow |
| June | Green/Blue |
| July | Red |
| August | Red/Yellow |
| September | Red/Blue |
| October | Orange |
| November | Orange/Yellow |
| December | Orange/Blue |

6.3.6 In general, if the electrical installation is made in
accordance with the National Electrical Code

40

Article 305, ANSI/NFPA 70-1999, exclusive of
Formal Interpretations and Tentative Interim
Amendments, it will be deemed to be in
compliance with 29 CFR 1926.403 through
1926.408.

## 7   EMERGENCY ACTION PROCEDURES

### 7.1   EMERGENCY ACTION DRILLS

7. 1.1 HMMA Safety conducts a severe weather
sheltering drill in the spring and a fire
evacuation drill in the fall.  All on-site
Contractors and their personnel must
participate in these drills.

### 7.2   SEVERE THUNDERSTORM & TORNADO PROCEDURES

7. 2.1 In the event of a Severe Thunderstorm or
Tornado alert, remember the following alert
conditions:

7. 2. 1.1  A WATCH means that conditions
are favorable for the formation of
severe weather.  Be prepared to
take action.

41

7.2.1.2 A WARNING means that severe weather has been confirmed by HMMA, authorities and/or radar. Take appropriate actions immediately.

7.2.2 HMMA uses the following system in the event of severe weather:

7.2.2.1 WATCH: HMMA Safety will notify personnel and continue to monitor conditions.

7.2.2.2 WARNING: HMMA Safety will notify personnel of the Warning. This shall be done either by a constant tone on the alarm system, a verbal notification or by a series of long blast on an air horn. HMMA Safety shall continue to monitor weather conditions for further developments. All Contractors should take cover at a pre-discussed specific job site area or evacuate the building and take cover outside in a ditch or other protected low area.

7.2.2.3 ALL CLEAR: In all cases Contractors in the affected areas will wait for instructions from their supervisors before returning to work. The ALL CLEAR signal consists of a series of chimes from both the internal speaker system and the roof mounted siren / speaker. Notification will also be given by radio and verbally to each Contractor. The Contractor will notify their employees and their subcontractors.

# 8   ENVIRONMENTAL

8.1 All Contractors shall abide by all applicable HMMA environmental policies, including Best Management Practices and Spill Prevention Control and Countermeasure (SPCC) Plan, as well as Local, State, and Federal Environmental laws.

8.2 Secondary containment and storm water pollution prevention (i.e. stored under roof or tarp, etc.) shall be provided for the following:

8.2.1   Chemicals

8.2.2   Fuels, Oils & other Petroleum-based products

42

43

Key 000298

8.2.3   Liquid and solid Industrial/Hazardous Wastes

8.3   HMMA must approve containment areas.

8.4   Containment areas must have a capacity of at least 110% of the volume of the largest container in the containment area.

8.5   In the event of a spill, contain the spill and then immediately notify HMMA Security at 8900. The contractor is responsible for all cleanup costs. The disposal method must be pre-approved by HMMA Environmental. Contractors shall maintain spill kits in their chemical storage/usage area(s). All spills must be handled in accordance with HMMA's SPCC Plan.

8.6   Contractors must properly label all chemical containers and waste drums and must notify HMMA Environmental of the locations, types, and amounts onsite for approval.

8.7   Contractors shall not release any materials into the HMMA Storm Sewer System without written approval of Hyundai.

8.8   Contractors shall not burn any waste onsite.

44

8.9   There shall be no burying or dumping of solid waste or trash onsite, without written approval from HMMA.

9   ERGONOMICS

9.1   Ergonomics involve designing and arranging the work environment or the job to allow employees to work more effectively and safely.  This involves adapting the job and the work environment to the worker by designing tasks, work stations, safety devices, tools, lighting, and equipment to fit the worker's physical capabilities and limitations.

9.2   In order to help reduce stress and eliminate the onset of ergonomic disorders, injuries to the muscles, bones, and nerves which often occur in the arms, legs, and the back, the goal is to adapt the job to fit the worker.

9.3   Ergonomic injuries are caused or aggravated by many common activities in the workplace. Activities that often lead to ergonomic injuries include activities that require the same motion to be repeated over and over, or require a great deal of force to complete. Ergonomic injuries are also associated with activities involving vibration, awkward positioning, or compression of the hand,

45

Key 000299

wrist, arm, back, neck, shoulder, leg, or other
body parts over an extended period of time.

9.4 Typical workplace hazards leading to ergonomic
problems include:

9.4.1 Excessive repetition such as with painters,
welders, assembly line workers, and
computer operators.

9.4.2 Prolonged activities including sitting and
standing in constant positions as is required
by sales personnel, video display terminal
users, and assembly-line workers.

9.4.3 Forceful exertions, usually with the hands,
required of machine operators and others.

9.4.4 Excessive bending or twisting of the wrist
such as when using knives, screwdrivers,
pliers, or other tools.

9.4.5 Continual physical contact with the edges
of machines or other work surfaces.

9.4.6 Use of inappropriate tools or tools which do
not fit the worker, or use of hand tools with
gloves requiring excessive grip strength to
properly operate.

9.4.7 Vibration from power tools, trucks, or other
equipment or machinery.

9.4.8 Lifting variable weight objects as required
of loaders; excessive bending or reaching in
combination with lifting. Lifting heavy
objects as required.

9.5 Workstation analysis allows the identification of
existing or potential hazards and conditions in your
workplace. Through a workstation analysis, it can be
determined what tasks and workstations are the
source of the greatest problems.

## 10 EXCAVATIONS AND TRENCHING

10.1 Before any excavation, the Project Engineer and
Contractor must survey the area to determine the
relative location of underground lines (pipe,
electrical, or otherwise). Should buried concrete
be encountered, all excavations should stop until
the situation is cleared by the General Contractor.
Contractors must obtain a Permit from
Environmental Operations for any excavations of
any vertical depth.

10.2 Excavations over 5 feet in depth shall have sides
at the proper angle or shored depending on soil
conditions.

10.3 A ladder or other means of exiting the excavation
shall be placed within 25 feet of the work area.

10.4 Contractors shall barricade all excavations for
personnel and vehicle protection. Barricades will

46

47

be maintained by the Contractor until the excavation is concluded.

10.5    Contractors shall keep all areas around excavations clear of all tools, equipment or large clods of dirt that could fall in on Contractors.

10.6    Contractors may use spoiled dirt to barricade a side of the excavation as long as it is piled up no closer than 3 feet from the edge of excavation and at least 3 feet high.

10.7    Under no condition shall personnel enter an excavation while equipment is operating next to the edge.

10.8    Any excavation deeper than 20 feet shall have an excavation plan designed by a certified soil-engineer.  Contractor must present the plan to HMMA Safety before entering the excavation.

10.9    For additional regulations, consult 29 CFR 1926 Subpart P.

11    FALL PROTECTION

48

11.1    Contractors shall protect employee(s) from fall hazards of six feet, or more, by installing guardrails or using personal fall arrest systems, or other systems approved by HMMA Safety.  This includes, but is not limited to the following:

11.1.1    Falling more than six feet through holes (including skylights) by hole covers guardrails or personal fall arrest systems. Working at least 6 ft away from a hole does not remove these requirements.

11.1.2    On the face of formwork or reinforcing steel, Contractors must be protected from falling six feet or more by personal fall arrest systems, nets or positioning devices.

11.1.3    On the edge of excavations deeper than six feet, Contractors must be protected from falling by guardrails, fences or barricades when excavations are not easily visible.   (See APPENDIX A).

11.1.4    Contractor must protect from fall hazards six feet or higher above dangerous equipment by installing guardrails, or using personal fall arrest systems or nets.  Less

49

Key 000301

than 6 feet above dangerous equipment must also be protected from falling into or onto the equipment by guardrails or equipment guards.

11.1.5 Contractors must protect employees who are on walking/working surfaces six feet or higher from a lower level by installing guardrails, nets or personal fall arrest systems.

11.2 Full body harnesses, shock absorbing lanyards and a proper attachment point are the minimum requirements for a personal fall arrest system.

11.3 Lanyards and vertical lifelines must have a minimum breaking strength of 5,000 pounds.

11.4 Personal fall arrest systems must be rigged so that the worker can neither fall more than six feet nor contact any lower level.

11.5 Positioning devices must be rigged to prevent free falls more than two feet.

11.6 Warning lines must be erected around all sides of a roof work area.

11.7 Contractors must implement a fall protection program that requires 100% fall protection at all times.

11.8 For additional regulations, consult 29 CFR 1926 Subpart M.

## 12   FIRE PROTECTION AND PREVENTION

12.1 Fire doors must not be blocked or locked to prevent emergency use when employees are within the buildings.

12.2 Exit routes from buildings must be clear and free of obstructions and properly marked with signs designating exits from the building.

12.3 Contractors must train its employees in the potential fire hazards of their jobs. Contractors must train all new or transferred employees in the fire prevention plan when beginning their job duties. Contractors must train their employees on any changes in the fire prevention plan.

12.4 In case of fire, Contractors may try to extinguish incipient (beginning) fires with a portable fire extinguisher only if they have been properly trained and it is safe to do so.

12.5 An audible alarm shall consist of a slow whoop, a verbal message or short repetitive blasts on an air horn. UPON HEARING THIS SIGNAL ALL

Key 000302

Case 2:19-cv-00767-ECM-SMD  Document 81-9  Filed 11/03/22  Page 38 of 56  replaced.

USCA11 Case: 24-11126    Document: 62    Date Filed: 02/17/2025    Page: 105 of 217

CONTRACTORS SHALL EVACUATE THE BUILDING using the pre-determined emergency exit routes.

12.6  Use of fire hydrants that are connected to the HMMA Fire Protection System will not be available for construction project water supply

12.7  For additional regulations, consult 29 CFR 1926 Subpart F.

13    HAND AND POWER TOOL SAFETY

13.1  The Contractor shall ensure that tools and equipment are maintained in safe working order and used for their intended purpose.

13.2  Proper guards must be installed on all power tools before being issued.  Tools without proper guards in place or tools that have been modified (i.e., homemade handles or extensions) are not permitted.

13.3  Auxiliary handles on drills and grinders must be used for greater control.  Removal of the handles without having demonstrable need will be considered a violation.

13.4  It is the Contractor's responsibility to inspect tools before they are issued.  If tools are found defective, they shall be taken out of service until repairs have

52

13.5  For additional regulations, consult 29 CFR 1926 Subpart I.

14    HAZARD COMMUNICATION

14.1  Information on chemicals used or handled at HMMA by Contractors is maintained by HMMA Safety. HMMA Safety maintains information on chemicals used or handled at Hyundai. This information includes descriptions, handling precautions, protective equipment, symptoms of exposure and first aid for each chemical used at Hyundai.  The Contractor's responsibility is to be familiar with the information and to inform their employees who work in areas where any of the chemicals are used.

14.2  HMMA Safety and the Contractor shall review all chemicals used on and in close proximity to the construction site before Contractor may begin work in the area.

14.3  The General Contractor shall provide HMMA Safety with two (2) copies of Safety Data Sheets (SDS) for all chemicals to be utilized on their construction project.  No chemical shall be brought on site without first obtaining approval from HMMA.

53

Key 000303

14.4 The General Contractor shall maintain the SDS files for all approved chemicals used and the documentation of employee training on the hazards and use of these chemicals.

14.5 This SDS file shall be readily available for inspection. The location of the SDS file shall be posted on the job control board.

14.6 Contractors must properly label and store all hazardous materials in accordance with OSHA and EPA regulations. This includes labeling all containers one gallon or larger.

14.7 The Contractor shall furnish all PPE as required for safe handling of chemicals used by their employees.

14.8 Contractors shall store flammable and combustible liquids in well-ventilated areas, within maximum allowable quantities as outlined by OSHA. Storage areas shall be conspicuously posted. Storage areas must comply with HMMA Fire/Safety Requirements, Factory Mutual Research, and the Alabama Fire Code.

14.9 The Contractor shall dispose of all hazardous waste in accordance with HMMA Environmental Standards.

14.10 For additional regulations, consult 29 CFR 1926.59.

54

## 15  HELICOPTER LIFT PROCEDURES

15.1 When the need of a helicopter service has been established, a pre-lift meeting shall be held a minimum of two (2) weeks before the actual lift date.

15.2 Pre-Lift meeting shall confirm the following:

- The date and time of the lift(s), with an alternate schedule in case of bad weather.
- The lay down yard area.
- The helicopter flight path.
- Arrangements for physical barricading of the assigned flight path to assure no admittance into the area.
- Personnel assigned at strategic points to secure the area and assure that no one enters the assigned flight path or the hoisting and setting areas at all levels.
- HMMA will notify the closest medical facility, fire department and emergency response team that a helicopter lift will be taking place on a given day and given time. .

15.3 HMMA Safety will notify HMMA Management and all Contractors and Subcontractors that a helicopter lift will be taking place on a given time.

55

15.4  Helicopter cranes shall be expected to comply with any applicable regulations of the Federal Aviation Administration.

15.5  On the morning of the lift (within 1 hour before the starting of the lifts) all necessary personnel shall meet to set forth the plan of operation for the pilot and the ground personnel both at the lifting and setting points.  Contractor shall:

- Provide monogoggles for all employees rigging and receiving the load and anyone subject to the rotor downwash.
- Secure or remove all loose gear within 200 feet of the staging area and departure area susceptible to the rotor downwash.
- Provide a warning barricade for the assigned flight path to keep out unauthorized personnel.
- Post observers with radios to assure no one enters the area of the lift, set point or flight path at all levels.
- Notify the medical facility of the start time and the finish time of the lifting operations.

15.6  The lift shall not be made if the helicopter operator believes that the lift cannot be made safely.

15.7  For additional regulations consult 29 CFR 1926.551.

# 16    HOT WORK PERMITS

16.1  Contractors must obtain a signed Hot Work Permit before performing any cutting, welding, and/or spark-producing work.  (See sample at end of handbook.)  The Contractor and HMMA Safety Representative/ERT must sign the Permits.  HMMA Fire/Safety Team offers Hot Work Permit orientation once per week. (Tuesday)

16.2  HMMA ERT/Safety shall issue a permit only after all parties signing the permit have made a personal inspection of the area and the following basic precautions have been ensured:

16.2.1  Automatic fire protection systems are in service, when applicable.

16.2.2  Fire watch is assigned by Contractor, with fire watch's name written on the permit.

16.2.3  Area is clear of all combustibles, debris or trash within 35 feet of welding/cutting area.

16.2.4  No flammable/combustible liquids are stored in the area.

16.2.5  Combustibles that cannot be removed are protected by fire blankets.

56

57

Key 000305

16. 2.6   Process exhaust ducts in the area are shutdown.

16. 2.7   Contractor representative must first sign the permit and before requesting issuance, he/she must complete HMMA's Hot Work Orientation.

16. 2.8   Dry chemical extinguishers will not be authorized for Hot Work usage in the Paint Building.

16.3   The fire watch must:

16. 3.1   Successfully complete Hot Work/Fire Watch Orientation given by HMMA Fire/ Safety Team.

16. 3.2   Know the locations of the nearest manual fire alarm box and/or phone.

16. 3.3   Have a fully charged portable fire extinguisher of the proper type and be familiar with its use. (Contractor must provide fire extinguishers of at min. 10lb type.)  Be capable of operating any specialized fire equipment required for the job.

16. 3.4   Constantly inspect the work area for fires during the job.  Thoroughly inspect the area for smoldering fires during the hot work. This includes break times, during meal breaks and for 30 minutes after the completion of the hot work.

58

16. 3.5   The fire watch shall have no additional duties unless approved in writing, on the permit, by HMMA Safety.

16. 3.6   Lint-free clothing shall not be worn while conducting hot work or fire watch duties.

17   CONTROL OF HAZARDOUS ENERGY PROCEDURE

17.1   Lockout shall be initiated only by trained and authorized personnel.

17.2   Contractors will provide HMMA with a copy of their Lockout procedure and training prior to performing any lockout work at HMMA

17.3   Authorized Personnel must attend HMMA Control of Hazardous Energy Orientation and receive an AUTHORIZED tag before initiating any lockout at HMMA.

17.4   Each person working under a lockout shall apply his/her personal lockout lock and tag.

17.5   Locks designated for use as a lockout lock shall be used for no other purpose.  The Contractor shall be responsible for providing lockout locks and multi-locking hasps.

59

17.6.1 Locks used for lockout shall have one key only. Each lock shall be individually keyed. The key shall remain under the exclusive control of the Contractor installing the lock. The body of the lock shall be red.

17.7 The Contract Employer will provide and utilize a lockout board to monitor the lockout status of its employees on each project. Exceptions due to nature or scope must be approved by HMMA Safety.

17.8 Contractors shall completely fill out tags before installation. Contractors may only use tags approved by HMMA Safety.

17.9 Contractors shall use multi-lock hasps to ensure additional locks can be applied by others.

17.9.1 Never fill the last available slot in an isolation point with your lockout lock and tag. Use additional multi-lock hasps, if necessary.

17.9 SIMPLE LOCKOUT PROCEDURE— USED ONLY WHEN THERE IS ONLY ONE ISOLATION POINT AND ONLY ONE CONTRACT EMPLOYER

60

17.9.1 Contractors shall notify all affected employees in the area that a lockout is being performed.

17.9.2 The equipment being locked out should be shut down using normal shutdown procedures (i.e., operator's control station, stop button, etc.).

17.9.3 Contractor shall neutralize all equipment energy sources.

- Electrical
- Hydraulic
- Pneumatic
- Chemical
- Water
- Steam
- Radiation — including Thermal
- Springs
- Gravity
- Other energy sources as required.

17.9.4 Any residual energy shall be dissipated at this time.

17.9.5 Confirm the equipment to be at a ZERO ENERGY STATE.

61

Key 000307

17.9.6   A personal lock shall be applied by the Authorized employee from the Contract Employer involved in the lockout.

17.9.7   Verify the lockout by attempting to operate the equipment.

17.9.8   Return the controls to the neutral position

17.9.9   Each Contractor working under the lockout shall place his/her personal lockout lock and tag on the energy isolation point isolated In step 17.11.3 (If more than two (2) isolation points are required to lockout the device, a GROUP LOCKOUT will be used).

17.10  Testing or Repositioning Machine or Equipment

17.10.1   Check around the area to ensure completeness of work.
17.10.2   All nonessential items shall be removed from the area.
17.10.3   Replace all safety guards.
17.10.4   Notify all affected employees that the machine is being tested or repositioned.
17.10.5   Remove the necessary lockout locks and devices to test/reposition the machine.

62

17.10.6   Follow steps 17.11.1 through 17.11.6. to reestablish the lockout of the machine.

17.11  Upon completion of the lockout, an authorized Contractor must check the area for completeness of work.  If the Contractor(s) who initiated the lockout is available, he/she should conduct this inspection

17.11.1   Remove all tools and nonessential items from the area.

17.11.2   Replace all guards.

17.11.3   Ensure all employees are clear of the machine.

17.11.4   Notify all affected employees in the area that the lockout device(s) are being removed.

17.11.5   Remove lockout device(s).

17.11.6   Restart the machine to ensure proper operation

17.12  GROUP LOCKOUT – USED WHEN THERE IS MORE THAN ONE ISOLATION POINT REQUIRED OR MORE

63

THAN ONE EMPLOYER OR BOTH, work has been completed.

17.12.1  When multiple isolation points must be controlled during a lockout, or when multiple groups (employers) are involved, a group lockout must be used.

17.12.2  Follow the steps for a lockout as documented in steps 17.9.1—17.9.9.  A GROUP LOCKOUT shall use a single, GREEN LOCK and tag on each isolation point.

17.12.3  Each key for the locks used shall be placed in a group lockout box.

17.12.3.1  The group lockbox shall be kept in view of the work being performed when practical.

17.12.3.2  The group lockbox should be constructed such that the keys inside are clearly visible for verification of the locks placed on each isolation point.

17.12.4  A Job Control Lock (yellow lock and yellow tag) shall be installed on the group lockbox by each contractor involved in the lockout. This lock shall remain in place until the

17.12.5  Each employee covered by the lockout shall apply his/her personal lockout lock and tag on the group lockout box.

17.12.6  Each employee shall remove their own lock when their portion of the work is completed or at the end of each shift.

17.12.7  Upon completion of the work, Contractor shall inspect the work area for completeness.

17.12.8  Contractor must conduct field verification that down stream devices are ready to accept energy before release of energy.

17.12.9  When all of the conditions of the lockout termination procedures have been satisfied, the Job Control Lock(s) shall be removed from the group lockbox.

17.13  EMERGENCY LOCK REMOVAL

17.13.1  If a Contractor leaves the facility without removing his/her lockout lock and tag, an effort shall be made to notify the Contractor that the supervisor-in-charge

64

65

Key 000309

will authorize the removal of their lock. It must be deemed necessary that removal of the lock is required by at least two supervisory personnel, but only after confirming beyond any doubt it is safe to do so.

17.13.2  Verify the Contractor has left the site.

    17.13.2.1  Check with co-workers or

    17.13.2.2  Check the Contractor's time card or

    17.13.2.3  Verify Contractor's status with Security or

    17.13.2.4  Call Contractor's home.

17.13.3  Visually confirm the completeness of work and that the employee is not present.

17.13.4  Complete the Emergency Lockout Removal Form.

17.13.5  Contractor shall advise Security of the situation and Security will deactivate the Contractor's badge.

17.13.6  A HMMA ERT, under the direct supervision of a HMMA Safety Specialist, Assistant Manager, or

Manager and in the presence of the contractor representative shall remove the lock with bolt cutters.

17.13.7  Upon return to the site, before returning to work, the Contractor involved must sign the Emergency Lockout Removal Form. Safety will review the incident to determine any disciplinary action necessary.

## 18   MACHINE GUARDING

18.1  Belts, gears, shafts, pulleys, sprockets, spindles, drums, fly wheels, chains, or other reciprocating, rotating, or other moving parts or equipment shall be guarded if such parts are exposed to contact by employees, or otherwise create a hazard.

18.2  All guards shall be in place before a tool or machine can be operated.

18.3  All exhaust pipes shall be guarded or insulated in areas where contact by employees is possible in the performance of normal duties.

66                                                                                   67

18.4 For additional regulations, consult 29 CFR 1910 Subpart O.

## 19   MARINE OPERATIONS

19.1   Contractor shall require all employees working over or near water, liquids or other materials, where the danger of drowning exists, to wear U.S. Coast Guard approved life jackets or buoyant work vests or other safety equipment/devices as approved by HMMA Safety.

19.2   Ring buoys will be available with at least 90 feet of line for emergency rescue operations.  Distance between ring buoys available shall not exceed 200 feet.

## 20   MATERIAL STORAGE & HANDLING

20.1   Contractors shall ensure that all material stored in tiers shall be stacked, racked, blocked, interlocked, or otherwise secured to prevent sliding, falling or collapse.

20.2   Contractors will not store materials on scaffolds or runways in excess of supplies needed for immediate operations.

20.3   Contractors must withdraw all nails from used lumber before stacking.

20.4   Contractors must visually inspect all slings, chokers and other similar devices before each usage.

20.5   Slings, chokers and other similar devices shall have a permanently affixed tag listing the maximum load rating of the device.

20.6   For additional regulations, consult 29 CFR 1926 Subpart H.

## 21   BATTERY POWERED—MECHANIZED EQUIPMENT

21.1   Contractors must inspect battery powered vehicles and mechanized equipment before the beginning of the shift.  The inspection must be documented in writing.  Inspection forms must be available for review on site for a minimum of 90 days.

21.2   All battery powered vehicles will have a current usage permit issued by HMMA.

21.3   All operators will have a permit to operate the vehicle to which they are assigned.

21.4   Speed limit on Site shall be as follows:

21.4.1   The In-Plant speed limit is 5 MPH.
21.4.2   Inside fenced area is 15 MPH.
21.4.3   All other access roads as posted.

68

69

21.5   HMMA production equipment has the right of way at intersections. Pedestrians shall yield the right of way to all motorized equipment.

21.6   Contractors must wear seat belts whenever the vehicle is in motion.

21.7   Vehicles must operate with 4-way flasher lights on when inside a building. Headlights will be used outdoors.

21.8   All vehicles shall have prominently displayed the contractor's name and on site telephone number.

21.9   Riders are not permitted on industrial vehicles or truck decks/beds except when there is an approved passenger seat belt provided.

21.10   Vehicles shall not block any emergency exit, passageway, pedestrian aisles, fire hydrants, hose cabinets, Post Indicators Valves, and/or other Fire/Safety equipment.

21.11   Vehicles blocking emergency equipment may be towed at the owner's expense. Parking violations may result in the permanent revocation of the site vehicle.

70

21.11.1 A vehicle will be deemed unattended when the operator is out of sight of the vehicle or is more than 25 feet from the vehicle.

21.12   Only propane or electric equipment shall be used inside the building, unless prior written approval is obtained from HMMA Fire/Safety. Equipment shall be operated only by a qualified operator.

21.13   All mobile equipment shall be equipped with an operable horn, back-up alarm and headlights and a fire extinguisher with at least a 2 A – 10 B:C rating.

21.14   The following material handling equipment shall be equipped with a Rollover Protective Structure – ROPS, which meets the requirements of 29 CFR 1926.1001 and 1002:

- Rubber tired self propelled scrapers
- Rubber tired front end loaders
- Rubber tired dozers
- Wheel type agricultural and industrial tractors
- Crawler tractors
- Crawler type loaders
- Motor graders

21.15   Equipment manufactured before July 1, 1969 is not covered by this requirement.

71

Key 000312

21.16 Contractors must use safety belts when operating construction equipment with a Rollover Protection Structure (ROPS).

21.17 Contractors may not use the existing structural framing or utility supports as lift points.

21.18 For additional regulations, consult 29 CFR 1926 Subpart O.

## 22   PERSONAL PROTECTIVE EQUIPMENT

22.1 All Contractors must wear hard hats in construction areas. Hard hats must conform to ANSI Z89.1 B. "Cowboy type" hard hats are not approved for use on the HMMA site.

22.2 Contractors must wear safety glasses at all times. Safety glasses shall be equipped with rigid side shields and must conform to ANSI Z87. Contractors who wear prescription glasses may use an ANSI approved overlay.

22.3 The use of tinted Safety lens shall be prohibited inside of a building. Shading for specific jobs such as burning goggles are an exception.

22.4 Contractors shall provide all personal protective equipment (i.e. hard hats, safety glasses, hearing protection, respiratory equipment safety harnesses with

72

lanyards, protective sleeves in Stamping and Body Weld areas, lint free suits in Paint, etc.)

22.5 Contractors must wear Hard Hats with the welding shield attached when welding. There shall be no soft cap welding.

22.6 Contractors must wear burning goggles when burning.

22.7 PERSONAL CLOTHING

22.7.1 Contractors must wear shirts at all times. The minimal shirt is a T-shirt with 4 inch sleeves and a collar. Tank tops and cut off shirts and mesh tops shall not be permitted.

22.7.2 Trousers or pants shall be ankle length and secured at the waist. No baggy or tight fitting pants are permitted. Trousers with holes will not be permitted. No shorts allowed.

22.7.3 Steel-toed shoes that cover the ankles are recommended on the construction site. Loafers, sandals, or athletic type shoes shall not be permitted within the construction areas.

73

Key 000313

22.7.4 Access shall be denied to anyone improperly clothed, until the violation is corrected.

22.7.5 Contractors shall provide any additional PPE deemed by HMMA as necessary to ensure the safety and health of the workforce.

22.8 For additional regulations, consult 29 CFR 1926 Subpart E.

## 23 POWERED PLATFORMS, MANLIFTS, AND VEHICLE MOUNTED WORK PLATFORMS

23.1 Contractor shall comply with the HMMA Fall Protection Standard when using an aerial lift device.

23.1.1.1 Contractors must wear a full body harness and a shock absorbing lanyard that is attached to the boom or basket when working from an aerial or scissors lift.

23.2 Aerial ladders shall be secured in the lower traveling position before the truck is moved for highway travel.

23.3 Contractors shall not move an aerial lift truck when the boom is elevated in a working position with men in the basket, except for equipment that is specifically designed for this type of operation.

23.4 Contractors must test lift controls each day before use to determine that such controls are in safe working condition and there are no leaks. This test must be documented and kept with the vehicle at all times.

23.5 ONLY AUTHORIZED PERSONS SHALL OPERATE AN AERIAL LIFT. PERSONNEL MUST HAVE A VALID LICENSE DURING OPERATION.

23.6 Contractors shall not tie off to an adjacent pole, structure, or equipment while working from an aerial lift.

23.7 Contractors shall always stand firmly on the floor of the basket, and shall not sit or climb on the handrails, midrails, toeboards, or use planks, ladders, or other devices for a work position.

23.8 Articulating boom and extendible boom platforms, primarily designed as personnel carriers, shall have both platform (upper) and lower controls.

23.9 Upper controls shall be in or beside the platform within easy reach of the operator.

23.10 Lower controls shall provide for overriding the upper controls.

23.11 Controls shall be plainly marked as to their function.

74

75

23.12 Contractors shall not operate lower level controls unless permission has been obtained from the employee in the lift, except in case of emergency.

23.13 Contractors shall not wear climbers while performing work from an aerial lift.

23.14 For additional regulations, consult 29 CFR 1926.556, 1910 Subpart F, manufacturer's guidelines and plant shop policies

## 24   POWDER ACTUATED TOOLS

24.1   Powder actuated hand tools used on the construction site must comply with the following:

24.1.1   Operator must have license issued by manufacturer.

24.1.2   Only Contractors trained in the operation of the particular tool to be used shall be permitted to use it.

24.1.3   All powder actuated hand tools being used at the site shall comply with all applicable Safety requirements and shall be maintained in a safe and proper working condition.

24.1.4   All shot casing must be of a low velocity type.

24.1.5   All shot casing shall be disposed of by placing in a trash receptacle.

24.1.6   The use of powder-actuated tools in a hazardous atmosphere area shall require a Hot Work permit.

24.2  For additional regulations, consult 29 CFR 1926.302.

## 25   SCAFFOLDING

25.1  Must comply with all applicable requirements of 29 CFR 1926.451.

25.2  Scaffolding must have a Scaffold Status Tag attached at all times.

25.2.1   This multi-part tag shall indicate whether or not it is safe to use the scaffold.  A competent person shall complete this tag.

25.2.2   Any Scaffold tagged with a yellow tag will require 100% fall protection

25.3  Before starting work on a scaffold, contractors must inspect the scaffold to determine that:

- Handrails, toeboards, and decking are in place;
- All wheels are locked on movable scaffolds; and

Key 000315

Locking pins are in place at each joint.

25.4 Fall protection equipment is required on any scaffold platform that is 6 ft. or more above ground and not equipped with standard handrails, midrails, or completes deck.

25.5 Remove or secure all tools and material on the deck before moving.

25.6 Do not climb on, or work from, any scaffold handrail, midrail, or brace member.  Use a ladder, or other approved means, to get onto the scaffold.

25.7 Metal Scaffolding parts and sections made by one manufacturer are not to be interchanged with another manufacturer.

25.8 Where persons are required to work or pass under the scaffold, Contractors must provide a screen between the toeboard and the guardrail, consisting of #18 gauge wire ½ inch mesh, or the equivalent.

25.9 Scaffolds shall be capable of supporting at least 4 times the maximum intended load.

25.10 Contractors shall eliminate slippery conditions on scaffolds as soon as possible.

25.11 Although OSHA allows employees to ride on manually propelled scaffolds under certain conditions, HMMA does not allow any employee to ride on a manually propelled scaffold while it is being moved, unless prior written approval has been granted by HMMA Safety.

25.12 For additional regulations, consult 29 CFR 1926 Subpart L.

26   SMOKING/TOBACCO PRODUCTS POLICY

26.1 Smoking, and the use of other tobacco products, in plant is restricted to those areas that have been identified as "Authorized Smoking Areas".  Smoking areas shall be designated by HMMA Safety.

26.2 "Strike Anywhere" matches shall not be permitted inside this plant.

26.3 Disposable lighters (i.e. butane lighters) shall not be permitted on HMMA property.

26.4 There is to be NO SMOKING outside of the authorized smoking areas while inside the Plant buildings.  Anyone caught smoking outside of an approved area will be subject to disciplinary action.

26.5 There shall be NO SMOKING in the following outside areas:

78

79

Key 000316

26.5.1   Tank Farm

26.5.2   Paint Mix

26.5.3   Liquid Tank Farm

26.5.4   Fuel Storage Areas

26.5.5   Within 25 feet of an entrance to a building

26.5.6   Cooling Towers

26.5.7   Roof tops (under construction or finished)

27   **STAIRWAY/LADDER SAFETY**

27.1 Portable ladders shall be constructed of fiberglass only.

27.2 When setting up a straight or extension ladder, use the following procedures to avoid injury:

- Brace the base of ladder against a stationary object so it cannot slip. Get help if you need to;
- Grasp the top rung with both hands;
- Raise top end over your head and walk toward the base of the ladder, moving hands to grasp the rungs in the center to maintain stability;
- When the ladder is erect, move it to the desired location and lean it forward against the resting point;
- Footing should be firm and level. Precautions should be taken to secure ladder if slippery conditions exist;

- Extension or straight ladders used to reach an elevated platform or roof should extend at least 36 inches above the landing;

- A straight ladder should be placed so there is one foot at the base for every four feet of length to the top support;

- When adjusting an extension ladder, be sure the locking device is fully secured and hooked over the rungs before using the ladder.

27.3 All ladders should be tied, blocked, or otherwise secured to prevent movement. They should not be located in front of doors unless the door is blocked open, locked, or guarded.

27.4 Keep rungs and steps of ladders free from grease, oil, paint, ice, mud or other slippery surfaces.

27.5 Stepladders must be fully open and spreaders locked before using. Never climb higher than the step below the top of the stepladder. Never walk a stepladder while standing on it.

27.6 Both hands must be free when climbing or descending. Materials should be hoisted to the work level. Face

80

81

Key 000317

ladders when going up or down.

27.7 Do not over-reach when on a straight or extension ladder. Move ladder if work is too far. Never stand on the top three rungs of a straight ladder.

27.8 Two or more persons should not work on a ladder unless the ladder is specifically designed for this use.

27.9 Ladders should never be used for braces, skids, or gangways.

27.10 Ladders with missing rungs or steps, broken or split side rails, or other faulty or defective construction, shall be removed from the jobsite immediately and this will be noted in the Monthly Inspection Log.

27.11 On all structures, two or more floors (20 feet or over) in height, stairways, ladders, or ramps shall be provided for employees during the construction period.

27.12 Debris and other loose materials shall not be allowed on or under stairways. Slippery conditions on stairways shall be eliminated as soon as possible after they occur.

27.13 Contractors shall not be permitted to use metal panned stairs unless the pan has been filled completely with a

82

suitable material.

27.14 For additional regulations, consult 29 CFR 1926 Subpart X.

## 28   STEEL ERECTION

28.1 Contractors must use fall protection when performing any work over 6 feet elevation.

28.2 Contractors must provide a positive means of access (i.e., scaffolding, ladders, etc.), to the work elevation.

28.3 Contractor shall provide, as erection continues, all Safety devices, (i.e., handrails, hole cover, etc.) necessary to keep the work area safe. Contractors may not remove these safety devices from the work area until they are no longer required.

28.4 Contractor shall establish a Controlled Access Zone, CAZ around the steel erection area. This zone shall have a radius of no less than 1.5 times the height of the tallest structural member being placed.

28.5 The Contractor shall furnish, install and maintain Safety Railing that is compliant with all applicable OSHA requirements around the outside perimeter of the building deck at every level change, around all roof openings and all locations where fall potential exists.

83

Key 000318

28.6    Contractors shall not perform any work in the steel erection during bad weather (rain, lighting or high winds), unless the work is being performed from a lift basket.

28.7    No Christmas Treeing of steel is allowed.

28.8    For additional regulations, consult 29 CFR 1926 Subpart R.

## 29    WALKING/WORKING SURFACES

29.1    Contractors must provide covers and/or guard rails to protect personnel from the hazards of open pits, tanks, vats, ditches, or any other such hazards.

29.2    All covers shall be secured when installed as to prevent accidental displacement by wind, equipment, or employees.

29.3    Contractors must guard every floor opening with a cover capable of supporting at least twice the weight of employees, equipment and materials that may be imposed on the cover at any one time.

29.4    The cover must be marked with the word "Hole" or "Cover".

29.5    When cover is not in place, the Contractor must assign someone to attend the opening or protect the opening on all sides by installing removable standard railings.

29.6    Open-sided floors or platforms 4 feet or more above adjacent floor or ground level must be guarded with a standard railing and toe board beneath the open sides wherever persons can pass; there is moving machinery; or there is equipment from which falling materials could create a hazard.

29.7    Standard railing, consisting of top rail, intermediate rail, and posts must be provided when an elevated open-sided surface is greater than 4 feet above the ground. Standard 4-inch toeboard should also be provided when elevated surface is greater than 4 feet above the ground.

29.8    All floor surfaces should be kept free from protruding nails, splinters, loose boards, holes, or projections.

29.9    Where wet processes are used, Contractor shall maintain drainage and provide false floors, platforms, mats, or other dry standing places where practicable.

29.10    Contractors shall post maximum safe floor loads near building floors used for mercantile, business, industrial, or storage purposes.

84

85

Key 000319

Case 2:19-cv-00767-ECM-SMD   Document 81-9   Filed 11/03/22   Page 45 of 56
USCA11 Case: 24-11126   Document: 62   Date Filed: 02/17/2025   Page 122 of 217

30  WELDING/CUTTING/BRAZING

29.11  Contractors should allow sufficient safe clearances between machinery and adjacent aisles or passageways.  Permanent aisles and passageways should be clearly marked.

29.12  Keep all indoor floor areas that are adjacent to machinery in a clean and dry condition.

29.13  Do not walk with your hands in your pockets.  This will hamper your ability to use your hands to avoid hazards or to protect yourself during a fall.

29.14  Ice and other hazardous walking surface contaminants should be removed or treated as soon as possible.

29.15  Weather conditions must be acceptable before any roof work is done at HMMA.(ex. Excessive winds, Rain, Ice, Lightning, etc....).

29.16  All work done on the roof of any building shall be approved by Safety before work begins daily.

29.17  HMMA Safety may establish new fall protection requirements at any time without previous notice or consent of all parties.

29.18  For additional regulations, consult 29 CFR 1910 Subpart D or 29 CFR 1926 Subpart M.

86

30.1  When welding or cutting is being performed in any confined space, the gas cylinders and welding machines shall be left on the outside.

30.2  Where welders must enter a confined space through a manhole or other small opening, a Confined Space Entry Permit must be completed.  Refer to the Confined Space Section of this handbook for additional information.

30.3  In order to eliminate the possibility of gas escaping through leaks of improperly closed valves, when gas welding or cutting, the torch valves shall be closed and the fuel-gas and oxygen supply to the torch positively shut off at some point outside the confined area whenever the torch is not to be used for a substantial period of time, such as during lunch or overnight.  Where practicable, the torch and hose shall also be removed from the confined space.

30.4  Torch sets shall be equipped with flashback arrestors on both the oxygen and fuel (i.e. acetylene) sides of the torch system.

30.5  Mechanical ventilation is required when welding or cutting is done with materials not specifically mentioned in this section.  These materials – fluorine compounds, zinc, lead, beryllium, cadmium, mercury, cleaning

87

Key 000320

compounds and stainless steel are particularly hazardous and have specific control requirements.

30.6 Under no conditions shall acetylene be generated, piped (except in approved cylinder manifolds), or utilized at a pressure in excess of 15 PSIG (pounds per square inch gauge) or 30 PSIA (pounds per square inch absolute). The 30 PSIA limit is intended to prevent unsafe use of acetylene in pressurized chambers such as caissons, underground excavations or tunnel construction. (Absolute pressure is equal to gauge pressure plus atmospheric pressure, which at sea level averages 14.7 p.s.i. Thus, at sea level, a gauge pressure reading of 15 p.s.i. is equal to an absolute pressure of 29.7 p.s.i.) This requirement is not intended to apply to storage of acetylene dissolved in a suitable solvent in cylinders manufactured and maintained according to U.S. Department of Transportation requirements, or to acetylene – for chemical use.

30.7 Using acetylene at pressures in excess of 15 p.s.i. gauge pressure (or about 30 p.s.i. absolute pressure) is a hazardous practice. Free gaseous acetylene is potentially unstable at pressures above 15 PSIG and could decompose with explosive violence.  Experience indicates that 15 PSIG is generally acceptable as a safe upper pressure limit.

30.8 The frame or case of the welding machine (except engine driven machines) shall be grounded under the conditions and according to the methods prescribed in Subpart S, Electrical.

30.9 Pipelines containing gases or flammable liquids, or conduits containing electrical conductors shall not be used for completing a work-lead circuit.  Pipelines shall not be used as a permanent part of a work-lead circuit, but may be used during construction, extension or repair providing current is not carried through threaded joints, flanged bolted joints, or caulked joints and that special precautions are used to avoid sparking at connection of the work-lead cable.

30.10 Before starting operations, all connections to the machine shall be checked to make certain that they are properly made. The work lead shall be firmly attached to the work, magnetic work clamps shall be freed from adherent metal particles of spatter on contact surfaces. Coiled welding cable shall be spread out before use to avoid serious overheating and damage to insulation.

30.11 Cables with splices within 10 feet (3m) of the holder shall not be used. Welders should not coil or loop welding electrode cable around parts of their body.

Key 000321

30.12 Contractors shall replace cables with damaged insulation or exposed bare conductors. Joining lengths of work and electrode cables shall be done by the use of connecting means specifically intended for the purpose. The connecting means shall have insulation adequate for the service conditions.

30.12.1 The following limits shall not be exceeded:

| Alternating Current (AC) | Direct Current (DC) |
|---|---|
| Manual  80 Volts | 100 Volts |
| Automatic 100 Volts | 100  Volts |

30.13 For AC Welding under wet conditions or warm surroundings where perspiration is a factor, the use of reliable automatic controls for reducing no-load voltage is required to reduce the shock hazard. Some of the older AC machines do not have an automatic control and are on load all the time. It is easy to receive an electric shock when the equipment is not handled properly.

30.14 When arc welding is to be suspended for any substantial period of time, such as during lunch or overnight, all electrodes shall be removed from the holders and the holders carefully located so that accidental contact cannot occur and the machine disconnected from the power source.

90

30.15     For additional regulations, consult 29 CFR 1926 Subpart J.

31   FLOOR OPENING PROCEDURE

31.1 All grating shall be installed in booths to ensure a complete run from end to end.

31.2 Once grating is required to complete any installation of the associated equipment, the Floor Opening Procedure shall be in effect.

31.3 Contact HMMA Management for Floor Opening Checklist.

31.4 Complete precaution checklist prior to removal of grating

31.4.1   Protective devices:  Barricades, fall protection
31.4.2   Warning signs posted
31.4.3   Names of persons performing work
31.4.4   Names of area management notified of impending work
31.4.5   Post completed checklist at work location
31.4.6   Complete Close of Work checklist upon completion.
31.4.7   Retain completed checklist at Job Site.

91

Key 000322

vehicles, high risk materials, tools, and equipment.

## SECURITY/FIRE PROTECTION GENERAL REQUIREMENTS

1   **GENERAL:**

1.1   Contractor is responsible for establishing and enforcing their own Safety and Fire Protection programs, in compliance with this handbook. HMMA Safety/Security shall have input over the coordination, enforcement and administration of the overall site Security and Fire Protection programs.

1.2   All Contractors working on HMMA property shall comply with all Federal, State, City, County, HMMA or other laws, rules and regulations which govern their operations at HMMA.

1.3   Contractors must comply with all HMMA requirements concerning entrance to and from the plant, parking areas, food service, break areas, non-smoking areas, rest rooms, etc.

2   **SITE SECURITY:**

2.1   HMMA has established a Security Plan for the Hyundai Facility which is designed to aid in the protection of persons and property located on the HMMA site. In brief, the methods employed shall include identification and control of persons,

2.2   Adherence to the plan is mandatory and will benefit each Contractor by reducing theft and loss of man hours resulting from theft.

3.   **CONTROL OF CONTRACTOR'S PERSONAL TOOLS:**

3.1   Contractors providing their own tools and/or equipment shall be responsible for providing an inventory of these items to Security and their employer before or immediately upon arriving on Site. The Contractor must maintain a file to record such listing. Each Contractor must have a secure storage area for employee tools.

3.2   All tools and equipment shall bear distinguishing marks for identification purposes and serial numbers listed when available.

3.3   A Material removal form must be presented to security to remove any property from HMMA that is not on the contractor's inventory list.

4.   **IDENTIFICATION OF CONTRACTORS:**

4.1   Contractors shall be identified by company hard hats and properly displayed photo identification badges or by company clothing.

92

93

Key 000323

5.1 All Contractors shall be required to obtain an ID badge before entering HMMA property for work. These ID badges remain the property of HMMA and must be worn by the person at all times while on HMMA property. When requested to do so, the Contractor must present his/her ID to any member of HMMA Safety/Security.

5.2 There will be no charge for the first ID badge. Replacements for lost or stolen badges may require a $5.00 replacement fee.

5.3 Expelled Contractors will be required to return their ID immediately upon termination. Contractors shall be responsible for ensuring ID badges are returned immediately at the time of termination. A fee may be assessed for all unreturned ID badges.

5.4 Contractors shall be required to wear their ID badge at or above the waist level so that it is plainly visible.

5.5 Security Officers have the authority to check the ID badge of all persons on HMMA property. Failure to produce an ID will be grounds to restrict that person from HMMA property.

5.6 Anyone considered to have committed a major violation of rules and regulations may be restricted from HMMA property by the direction of HMMA Security.

5.7 HMMA may refuse to issue ID badges to Contractors who have previously been expelled from the property. Contractors who intentionally falsify information to obtain an ID badge or who use or direct others to use another individual's badge for entry into the plant may be permanently banned from HMMA property.

6   VEHICLE CONTROL:

6.1 Vehicle traffic within the fenced plant area is strictly prohibited except in cases of need to perform specific job tasks. Should a Contractor require a vehicle on Site, an application must be completed monthly. If justification is proven, a Vehicle Site Pass will be issued for a limited time required to complete the specific job task. These passes must be limited due to interference with other work operations on Site. All vehicles shall have prominently displayed the contractor's name on both sides of the vehicle.

Key 000324

6.2  Vehicles shall not block any emergency exit, passageway, pedestrian aisles, safety equipment, fire hydrant and/or other safety/security equipment.  Vehicles in violation may be towed at owner's expense.

6.3  All vehicles and packages, lunch pails, tool boxes or any container regardless of size entering or exiting HMMA property are subject to being searched.

6.4  Vehicles **MUST STOP** at Security Checkpoints before entering or exiting the plant area to be searched and recorded on the Security Gate Log.

6.5  Heavy-duty trucks, such as concrete trucks, dump trucks, and tractor-trailer trucks, are subject to all Site Security Procedures. All Drivers and Passengers making deliveries will have hard hats and safety glasses before entering site.

6.6  Contractor vehicles entering the site thru a vehicle gate may not exceed the recommended passenger limits for that vehicle

7  CRIMINAL PROSECUTION:

7.1  HMMA will comply with Local, State, and Federal laws regarding the pursuit of criminal prosecution.

96

8  FIRE PREVENTION/REPORTING

8.1  To report a fire, contact HMMA Security, 8900. Give the location (inside plant use column location.)  All fires, regardless of size or disposition shall be reported immediately to Security.

8.2  Flammable liquids brought on site shall be in an approved safety can or original container.  A safety can has a spring-closing lid, flashback arrestor screen, spout cover, and is so designed that it will relieve internal pressure.  No plastic gas cans are allowed on site.

8.3  All flammable liquids such as gasoline, paint thinner, etc. shall be stored outside the building in an area approved by HMMA Safety.

8.4  Handling flammable/combustible liquids requires extreme caution.  Do not smoke around flammable or combustible materials.  Do not put such materials in direct sunlight, hot places, near open flames, sparks or other heat sources.

8.5  The quantity of flammable and combustible liquid located outside of approved storage areas shall not exceed the minimum required for a one-day operation.  All flammable and combustible liquid

97

Key 000325

containers shall be grounded. Where applicable, the containers shall be bonded together and grounded.

8.6  In case of a spill, notify Security, 8900.

8.7  Gasoline-powered equipment is not allowed in or within 35 feet of the Manufacturing Plant without prior written consent of HMMA Safety.  Under certain conditions, petroleum fuel equipment is allowed inside the Plant buildings but only with the attachment of a catalytic converter on the exhaust system.

8.8  "Tar Pots" are covered by the Hot Work Permit Policy.  They shall be attended at all times. "Tar Pots" shall not be located closer than 35 feet to any structure and/or combustible storage, without prior approval from HMMA Safety.

8.9  Open fires are not permitted on Site.

8.10  Refueling vehicles shall comply with all bonding/grounding requirements for transferring flammable materials.

## 9   SITE SECURITY RULES:

- Obey all site signs

98

- comply with instructions from site security officers
- Comply with search procedures and requests
- No camping on site
- No solicitation of any type is allowed while on HMMA property
- No personal vehicles allowed in controlled areas without proper authorization from Security Manager
- Park in designated parking areas only
- Do not block roadways, work areas or emergency access routes with vehicles
- Mark all personal tools with name and number
- Wear identification badge visible at or above waist level
- Stay in designated work area only
- Access assigned work areas only by approved routes

9.1  Failure to comply with the above Security rules is a Minor Violation.  Refer to the Disciplinary Procedures Section of this handbook for additional information.  Parking or traffic violations may include towing of the vehicle at the contractors expense and/or a permanent ban operating a vehicle on HMMA property.

99

Key 000326

9.2   MAJOR VIOLATIONS

- Intentionally disabling a safety device
- Intentionally violating the HMMA Fall Protection, LOTO or Hot Work rules
- Fighting on HMMA property
- Assaulting another person
- Sexual misconduct, sexual harassment, or public indecency
- Arson
- Intentional property damage
- Robbery or Burglary
- Criminal trespass
- Disorderly conduct
- Possession of a firearm or other lethal weapon on HMMA property
- Possession, sale, or use of alcoholic beverages, marijuana, unauthorized drugs or narcotics.
- Insubordination or failure to surrender badge when asked by a member of HMMA Fire/Safety/Security.
- A Supervisor or foreman intentionally instructing employee(s) to work in an unsafe manner or not enforcing the HMMA site safety policies with their employees.
- Falsifying information to gain access or false use of a badge to gain access or

100

misleading statements to gain access to plant property.

- Speeding or reckless driving on HMMA property is strictly prohibited.

## 10   CELLPHONE POLICY

10.1 Cellphones are not permitted in any production area.

10.2 Phones will be used only in break areas designated by signs throughout HMMA and in the Cafeterias

10.3 Cellphones are not to be used during the operation of any mobile equipment at HMMA, including Company Trucks.

10.4 Bluetooth devices are not permitted in any production area.

10.5 Photography by contractors with cellphones at HMMA is prohibited.

101

Key 000327

## DEFINITIONS

**Affected Employee** An employee whose job requires him/her to operate or use a machine or equipment on which service or maintenance is being performed under lockout, or whose job requires them to work in close proximity to the device under the lockout.

**All Clear** A signal to indicate the end of an emergency event.

**Authorized Contractor** A person who locks out machines or equipment in order to perform service or maintenance on a machine or equipment.

**ANSI** American National Standards Institute. A non-profit organization that writes safety standards that OSHA adopts..

**CAZ** See Controlled Access Zone

**CFR** Code of Federal Regulations. The OSHA Standards are contained in 29 CFR 1910 – General Industry and 29 CFR 1926 –– Construction.

**Competent Person** One who is capable of identifying existing and predictable hazards in the surroundings, or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has the authorization to take prompt corrective measures to eliminate them.

**Confined Space** A confined space (1) Is large enough and so configured that an employee can bodily enter and perform assigned work (2) Has limited or restricted means for entry or exit (for example, tanks, vessels, silos, storage bins, hoppers, vaults, and pits are spaces that may have limited means of entry); and (3) Is not designed for continuous employee occupancy.

**Contractor** For the purposes of this manual, the term Contractor shall be interchangeable with the term Subcontractor, and shall include their directors, officers, agents or employees, unless otherwise specified.

**Controlled Access Zone** An area in which certain work (e.g. steel erection, overhand bricklaying) takes place and access to the zone is restricted.

**Employer** Means a person engaged in a business affecting commerce that has employees, but does not include the United States, or any State or political subdivision of a State.

**EPA** Environmental Protection Agency.

**FTZ** Foreign Trade Zone

**GFCI** Ground Fault Circuit Interrupter. This device is designed to open the flow of electricity when a leakage of current to ground exceeds the preset limit. This limit, usually between 4 – 6 mA, is below the threshold to cause permanent injury to the employee who would have received an otherwise potentially lethal shock.

102

103

Key 000328

Hazard Communication. This standard is also known as the "Employee Right to Know Law". It is designed to inform employees of hazards, particularly chemical hazards, in the workplace.

**HAZCOM** See Hazard Communication

**Job Control Lock** A red lock that is placed on an isolation point, or a yellow lock if a group lockout box, by a trained contractor representative from each contracting firm involved in the lockout. The purpose of the lock is to prevent a lockbox from being unsecured during shift changes or other events. It is the first lock(s) applied to the group lockbox and the last to be removed.

**kV** Kilovolt. A unit of measure of 1000 volts.

**NFPA** National Fire Protection Association. This non-profit organization writes standards that are adopted by OSHA, including the National Electrical Code.

**OCIP** Owner Controlled Insurance Program.

**OSHA** Occupational Safety and Health Administration. This agency, formed in 1970 by the Williams – Steiger Occupational Safety and Health Act, is charged with writing, adopting and enforcing standards to ensure the safety of America's workers.

**Personal Fall Arrest System** A system used to arrest an employee in a fall from a working level. As a minimum for the HMMA site, it consists of a full body harness, shock absorbing lanyard, and a proper connection point.

104

**Positioning Device** A device that prevents an employee from encroaching upon a fall hazard. i.e. cable and body belt at the opening of a trash chute.

**p.s.i.** A unit of measure of pressure. Pounds per Square Inch.

**Residual Energy** Also known as stored energy or potential energy. Sources of residual energy can include, but are not limited to: electrical capacitors, hydraulic accumulators, springs, and gravity.

**ROPS** Rollover Protective Structure. This device prevents an employee from crushing injuries involved in a machine rollover.

**Shall** This indicates that compliance with a standard, regulation, or directive is mandatory.

**SDS** Safety Data Sheet. These documents include several important pieces of information regarding the safe handing, first aid, required PPE, fire fighting, and chemical properties of a product.

**Hyundai (HMMA)** Hyundai Motor Manufacturing Alabama, LLC.

**Tobacco Products** includes such items as: cigarettes, cigars, pipes, chewing tobacco, and snuff.

**Watch** This is a severe weather alert condition. It means conditions are favorable for the formation of bad weather.

**Warning** This is a severe weather alert condition. It means that severe weather has been confirmed, by authorities or radar. Take appropriate action immediately.

105

Key 000329

**Warning Lines**

A barrier erected on a roof to warn employees that they are approaching an unprotected roof side or edge, and which designates an area in which roofing work may take place without the use of guardrails, personal fall arrest devices, or safety net systems to protect employees in the area.

## APPENDIX A BARRICADE (SPECIAL)

Minimum height of top rail must be 39" with 200 lbs of downward force applied midway between supports.



| Hand Rails / Guard Rails (Wire Rope Indicated) |
| --- |

106

### Job Safety Assessment

| Contractor | Date | Building/Area |
| --- | --- | --- |

| Job Scope | | Required Permits or Procedures | |
| --- | --- | --- | --- |
| | | Grating Removal | Hot Work |
| | | Excavation | Confined Space |
| | | Line Opening | LOTO |
| | | | |

| Potential Hazards | | | |
| --- | --- | --- | --- |
| Pinch Points | Overhead work | Confined Space | Weather |
| Fall potential | Robots/moving machinery | Congested Area | Repetitive Motion |
| Overhead Obstructions | High Noise Area | Chemicals | Ladders/Stairs |
| Slip/Trip | High Traffic Area | Electrical | Power Tools |
| Uneven surfaces | Open Holes | Sharp edges | Improper lighting |
| Additional hazards List | | | |

| Required PPE | | | |
| --- | --- | --- | --- |
| Safety Glasses | Cut resistant Sleeves | Respirator/dust mask | List Additional PPE |
| Hard Hat/Bump Cap | Safety Harness | Paint suit | |
| Ear Plugs | Gloves | Steel Toed Shoes | |

| Crew Member Signatures | | | |
| --- | --- | --- | --- |
| | | | |
| | | | |

**Housekeeping**

This area is free of tools, equipment, excess materials, and garbage generated throughout the duration of this job.

Signature/Job Foreman or Above

| Additional Signatures | | | |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |

| Special Circumstances to STOP work | | | |
| --- | --- | --- | --- |
| Situation | | | |
| | | | |
| Notified | | | |
| | | | |
| | | | |

107



Key 000331

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**Exhibit 10 – Email from Robinson to Key dated July 17, 2017**

---------- Forwarded message ---------
From: **Dynamic Security, Inc.** <dynamicjobs5_s2h@indeedemail.com>
Date: Mon, Jul 17, 2017 at 6:46 AM
Subject: Mailroom position
To: Davita Key <dmkey825@gmail.com>


Hello,
My name is Gloria Robinson; I am the Security Account Manager at Hyundai Motor Manufacturing Alabama located in Montgomery. I'm responsible for managing and overseeing security at the Hyundai plant.
The current security service provider at Hyundai is Dynamic Security Services (DSS). Dynamic is seeking to fill openings for Mailroom Clerk in Hyundai's Security Building. A copy of your resume was retrieved from Indeed website; it was felt that you were a possible viable candidate for the above referenced positions. Based on your resume you possess some of the education, experience, skills and/or training required.
If you are perhaps interested in applying for the Mailroom position, please respond back to this correspondence to accept an invitation to meet with security supervisors and I starting Wednesday morning July 19, 2017 and ending Friday July 21, 2017 in the Security Building at Hyundai. During this briefing you will obtain information about the position and how and where to apply. If you are interested, but are unavailable on the noted date and/or time, please contact me at (334) 387-8909 Monday – Friday between 0700 hours to 1400 hours. If I am not at my desk, please leave a message or email me at gloriarobinson@hmmausa.com.
Please be sure to bring the below described documents with you.
   Current Resume-
   Valid Driver License- NOTE: A VALID DRIVER LICENSE IS REQUIRED FOR EMPLOYMENT CONSIDERATION-

Thank you

HMMA MAILROOM DUTIES AND RESPONSIBILITIES
The mailroom is staffed with two (2) employees Monday-Friday and is opened from 7:30am - 5pm hours daily. On Wednesdays the mailroom is opened until 6pm. The mailroom is closed on all holidays recognized by HMMA. The pay is $13.00 per hour.
REQUIREMENTS:
High School Diploma or GED
Valid Driver License-
Must Pass a Drug Screen
Criminal History background Check-
Must provide a Motor Vehicle Driver History Report-
Ability to lift up to 50 pounds-
Computer Experience (i.e. Word, Excel, Power point, etc.)-
Prior mailroom or package delivery experience is highly preferred-
Good organizational and communication skills-
The ability to multi-task-
Duties and Responsibilities:
Sort, deliver and/or pick up interdepartmental and other mail within the facility-
Weigh and attach proper postage to outgoing mail using a mailing meter machine and deliver to the local US Postal Service-
Receive, sign for, deliver and ship packages from such services as UPS, USPS, FedEx, DHL, etc.
Assist employees with completing the required forms and arrange/coordinate package pick up with UPS, FedEx and DHL services-
Weigh and attach proper shipping and handling fees and labels to packages to be shipped out. Review all required shipping documentations during processing to verify all HMMA removal procedures have been met-
Receive and sign for deliveries from local courier services-
Process, sort and deliver packages within the facility-

Periodically review and check the record postage meter machine readings each day to ensure ample postage for the processing of routine outgoing mail-

Inventory mailing and office supplies to ensure adequate shipping and mailing supplies, etc. are on hand-

Ensure that needed shipping supplies from the USPS, UPS, DHL and FedEx are on hand-

Review and reconcile shipping invoices-

Process bulk copy requests from other departments-

Other duties as required by HMMA General Affairs Department-

By replying or using an indeedemail.com email address, you agree that this email will be processed and analyzed according to the Indeed Cookie Policy, Privacy Policy, and Terms of Service.

Indeed | 6433 Champion Grandview Way, Building 1, Austin, TX 78750

K   !" " #" &"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 11 – Transcript of the Unemployment Compensation Hearing Held
September 23, 2017**

# **Unemployment Hearing**

## September 23, 2022

## State of Alabama Hearings and Appeals Unit



866.993.0207
info@citedepos.com
www.citedepos.com

**Page 1**

TRANSCRIPTION OF

RECORDED UNEMPLOYMENT HEARING

BEFORE DONNA FOSHEE BUDLONG

STATE OF ALABAMA HEARINGS AND APPEALS UNIT

September 19, 2017

Transcribed from prerecorded audio

Deborah B. Braden, CCR

September 22, 2022

**Page 2**

1  MS. BUDLONG:  Donna Foshee Budlong,
2  State of Alabama Hearings and Appeals Unit.  Who am I
3  speaking with, please?
4      MR. CURETON:  This is Ray Cureton
5  with Dynamic Security.
6      MS. BUDLONG:  Spell your last name,
7  sir.
8      MR. CURETON:  C-U-R-E-T-O-N.
9      MS. BUDLONG:  Mr. Cureton, what
10 would be a good phone number to call you back on if we
11 were disconnected during this call?
12     MR. CURETON:  ▉▉▉▉▉▉▉
13     MS. BUDLONG:  Do you plan on having
14 anyone else on the call with you today?
15     MR. CURETON:  I do not.
16     MS. BUDLONG:  And I show the mailing
17 address for the company, sir, is P.O. Box 451,
18 Tuscumbia, Alabama  35674.
19     MR. CURETON:  That is correct.
20     MS. BUDLONG:  Thank you, sir.  I'm
21 going to place you on hold one moment and see if
22 Ms. Key is on the other line --
23     MR. CURETON:  Okay.

**Page 3**

1      MS. BUDLONG:  -- if you'll hold one
2  moment, please.
3      MR. CURETON:  Thank you.
4      MS. BUDLONG:  Okay.  Mr. Cureton,
5  can you hear me?
6      MR. CURETON:  I can.
7      MS. BUDLONG:  Ms. Key, can you hear
8  me?
9      MS. KEY:  Yes.
10     MS. BUDLONG:  Great.  At this time,
11 we will begin the hearing.  This is a telephone
12 hearing for Case Number 07549-AT-17.  Today is
13 September the 19th, 2017.  I am Donna Foshee Budlong,
14 the administrative hearing officer.  The parties
15 present today, I have the claimant on the line,
16 Ms. Key.  The employer, Dynamic Security, is the
17 appellant in this case and is being represented by
18 Mr. Cureton.
19     Now, the reason we are here today, the
20 claimant was allowed benefits under an examiner's
21 determination.  The claimant -- I apologize.  The
22 employer disagreed with that and filed an appeal.
23     The section of law involved today, we do

**Page 4**

1  have two sections of law.  The first is 25-4-78(3) --
2  (3)(c) of the law, which provides for a
3  disqualification if an individual -- strike that for
4  one moment and let me just get back to -- hang on one
5  second for me here.
6      Okay.  The actual -- we still do have two
7  sections of law, but the actual correct separating
8  section of law that should be on the record right now
9  is going to be 25-4-78(2) Code of Alabama 1975,
10 whether the claimant voluntarily left most recent bona
11 fide work voluntarily without good cause connected
12 with the work.
13     So in the hearing today, I would need to
14 determine did the claimant leave their job
15 voluntarily.  If so, was it for a work-connected
16 reason, and was it for a good work-connected reason.
17 And the other section of law would be 25-4-77(a)(3),
18 Code of Alabama, 1975, whether the claimant is able,
19 available, and seeking suitable, full-time work and
20 available for all hours and shifts in her normal trade
21 or occupation.
22     So for that section of law, I would need
23 to determine is there any reason the claimant cannot

Page 5

1   accept suitable, full-time work and will take
2   testimony on if there are any barriers to the claimant
3   accepting suitable, full-time work.
4           Now, before I get you each under oath and
5   get your testimony in this case, do either of you have
6   a question about anything I've said so far?
7           MR. CURETON:  No, ma'am.
8           MS. BUDLONG:  Any questions from
9   you, Ms. Key?
10          MS. KEY:  No.
11          MS. BUDLONG:  All right.  Thank you.
12  The procedures, then, that we will follow, I will
13  place you both under oath.  I'm going to start with
14  Mr. Cureton's testimony, and, Ms. Key, you could have
15  questions of his testimony.  We would then get your
16  testimony, Ms. Key.  Then Mr. Cureton could have
17  questions of your testimony.  I could have questions
18  of either of you throughout the hearing today.  Any
19  questions about those procedures?
20          MR. CURETON:  No, ma'am.
21          MS. KEY:  No.
22          MS. BUDLONG:  Okay.  Thank you.
23  Let's go ahead, then, and get each of you under oath.

Page 6

1   Do you solemnly swear or affirm the testimony that you
2   will give in this case will be the whole truth and
3   nothing but the truth.
4           Ms. Key?
5           MS. KEY:  Yes.
6           MS. BUDLONG:  Mr. Cureton?
7           MR. CURETON:  Yes.
8           MS. BUDLONG:  All right.  Thank you.
9           EXAMINATION OF MR. CURETON
10  BY MS. BUDLONG:
11      Q.   Okay.  Sir, for the record, what is your
12  job title?
13      A.   I'm a district manager for Dynamic
14  Security, Montgomery office.
15      Q.   And what was Ms. Key's job title?
16      A.   She worked at the mailroom in Hyundai
17  as -- as -- well, a mailroom attendant.
18      Q.   And what was her hire date?
19      A.   Hire date was -- let me see here.  Sorry
20  for this.
21      Q.   No problem.  Take your time, sir.
22      A.   The information is usually on top of the
23  folder, but it's not.  So let me -- let me find it

Page 7

1   here.
2       Q.   No problem, sir.  I've got that she
3   worked there a couple of days, and it was July 31 of
4   '17 to August 1 of '17.  Does that sound about
5   correct, Mr. Cureton?
6       A.   That is correct.  Those are the two days.
7       Q.   Okay.  And what happened?  Why -- why
8   didn't she -- why -- why was it only two days?  What
9   happened?
10      A.   Well, the situation was this:  There was
11  an issue with the standards for appearance out at
12  Hyundai, which are very rigid, where there was some
13  dreadlocks.  And the -- the account -- the -- our
14  account manager, Gloria Robinson, and also Cassandra
15  Williams, who is our client contact at Hyundai, talked
16  with Ms. Key and informed her that dreadlocks were not
17  allowed.  And, eventually, it got to the point where
18  Ms. Williams asked her -- ask could she be removed
19  from the site because of the appearance standards not
20  being met.
21          At that time, when she was removed from the
22  site, we brought her into the office and tried to find
23  some other place.  She was not discharged from our

Page 8

1   company at all.  She was -- we attempted to find some
2   other places for her to work.  I didn't have any full-
3   time positions available at the time, so I offered her
4   some part-time positions.  She said she had to think
5   about it, which we -- she was looking -- during that
6   week that we were looking for a position for her, it
7   came back to us that she was looking for first shift
8   only.  And I didn't have any first shifts at that
9   time.  And --
10      Q.   How did -- how was it determined she was
11  available for first shift only?
12      A.   She -- she stated that she was available
13  for first shift but not for any -- any of the other
14  shifts.  Excuse me.  I'm sorry.  The -- the initial
15  conversation, she was going to think about it, whether
16  she was available for other shifts or not.  And,
17  eventually, it was determined that she was not
18  available for first [sic] shift, but she told to -- I
19  think it's an exhibit in the -- in the paperwork.  She
20  told that specifically to our office manager.  And we
21  tried to find -- you know, offer her another position
22  at a -- at second or third shift.  I just didn't have
23  any first shifts available.

Page 9

1    Q.    Yes, sir.  Okay.  Now -- so when she was
2  first placed at this assignment, were you not aware
3  that her dreadlocks were going to be a problem,
4  Mr. Cureton?
5        A.    Well, the way the system works at
6  Hyundai, what we do is we send potential applicants to
7  the site, and our account manager out there, Gloria
8  Robinson, interviews them and explains all of those
9  kinds of things to them as she interviews them.  And
10  if they're willing to abide by the -- you know, by the
11  standards that -- that are out there, then that's
12  dealt with and, you know -- with -- with the applicant
13  and arrangements are made for that to take place.
14        And I -- you know, so I -- I didn't actually
15  see her initially.  That was done through the --
16  through Gloria Robinson at the site.  So this came
17  back to me after she was asked to leave the site and
18  removed by the -- by our client --
19        Q.    Okay.
20        A.    -- their (indiscernible).
21        Q.    So are you saying somewhere upon -- in
22  the -- in the hiring process, Ms. Key would have had
23  to have agreed to -- to do something about her

Page 10

1  dreadlocks?
2        A.    That is correct.
3        Q.    Okay.  All right.  I -- to -- and do you
4  know who that she may have spoke with regarding that?
5        A.    Yes.  It would have been Gloria Robinson
6  and Cassandra Williams.  Gloria Robinson is our
7  account manager.  Cassandra Williams is the client
8  representative that works for Hyundai.
9        Q.    Okay.  And did you speak to either one of
10  them prior to this hearing, sir, regarding, you know,
11  this -- this situation?
12        A.    Yes, ma'am.  I've spoken with both of
13  them at length on this situation.
14        Q.    Okay.  And did they say that during her
15  interview process, that they did discuss the -- the --
16  the strict appearance standards with her?
17        A.    They did.  They did, yes.
18        Q.    And what was -- what did they say to you
19  that -- that Ms. Key said to them about -- about
20  her -- you know, her willingness to conform to
21  Hyundai's strict appearance standards?
22        A.    That there was a question about that --
23  that -- whether or not she should be willing.  They --

Page 11

1  Ms. Robinson specifically told me that those issues
2  were discussed, and that she had agreed to make those
3  changes.  But when she came in the next day, they
4  weren't made.  And that's part of what happened.
5  That's what -- that's --
6        Q.    Okay.
7        A.    Now, I also understand that she had said
8  she was willing to do so but that it would take her
9  some time to get that done.  And --
10        Q.    Uh-huh.
11        A.    So it -- it just de-escalated, really,
12  from there.  There was a -- there was a dispute about
13  that between --
14        Q.    Okay.
15        A.    -- all the parties involved, and it got
16  sent to my desk.
17        Q.    Okay.  Then did you interview Ms. Key
18  regarding this situation, Mr. Cureton?
19        A.    I did.
20        Q.    And kind of take me through what happened
21  with that.
22        A.    Well, she -- as far as I can recall, she
23  stated that she was willing to change her -- her hair

Page 12

1  appearance.  However, that did not happen.  As -- and
2  by that time, once a client requests an officer be
3  removed from the site, we're obligated to do so, you
4  know, by contract.
5        And so what I did is we did not terminate her
6  from Dynamic Security.  In fact, she said to me at the
7  time she had no problem with Dynamic Security.  The
8  problem was with what was going on at Hyundai.  And so
9  I said, Well, let me find you something else.  And we
10  attempted to -- to find other positions, but we
11  couldn't -- we couldn't come to an agreement on where
12  she could go to work at what times.  Didn't have any
13  full-time positions then, and I did not have a first
14  shift available, which is where we ended up.
15        Q.    Okay.
16        A.    So --
17        Q.    Okay.  So the -- the biggest issue, then,
18  sir, you have with -- with Ms. -- with Ms. Key is that
19  she was not making herself available for the normal
20  shifts and hours of -- of -- of a security officer?
21        A.    That's correct.  And -- and, like I said,
22  we did not -- we did not discharge her and wasn't much
23  time given for us to find a position until, you

Page 13

1 know, we heard about this unemployment claim and other

2 things. So --

3    Q.   Okay.

4    A.   That's where we ended up.

5    Q.   Okay. Now, the -- the claim was not

6 filed until -- and let me get this exact date in front

7 of me here just to make sure. The unemployment claim

8 was filed on August 17th. So you attempted about two

9 weeks to try to find her something, but, like you

10 said, during that time, she had alerted you that she

11 was only available for first-shift work. Is that

12 correct, Mr. Cureton?

13    A.   That is correct. That -- I think there

14 was an exhibit there from Nicole Scavella stating that

15 the last time she talked to her about this was on the

16 11th of August, and -- and told her that we -- you

17 know, we were still looking. And we still --

18    Q.   Okay.

19    A.   -- were. We still were. We were, you

20 know, trying to --

21    Q.   Right.

22    A.   -- to deal with this --

23    Q.   Yes, sir.

Page 14

1    A.   -- but --

2    Q.   Yes, sir. Okay. All right. And is

3 there anything else you want -- or str ke that.

4       Do you know what day she was interviewed for

5 the position, Mr. Cureton?

6    A.   That would -- I think -- I think it would

7 have been around July 21st, thereabouts.

8    Q.   Okay.

9    A.   The last time. Maybe a little --

10    Q.   Okay.

11    A.   -- maybe a little -- few days before.

12    Q.   Okay. Just somewhere around July 21st?

13 That's fine.

14    A.   Yes.

15    Q.   Okay. And then she actually began the

16 assignment on July 31st?

17    A.   Correct.

18    Q.   Okay. And then she was sent home from

19 Hyundai on August 1st?

20    A.   Right.

21    Q.   Or sent back to you for --

22    A.   That sounds correct.

23    Q.   -- for her reassignment.

Page 15

1    A.   For reassignment, yes.

2    Q.   Her reassignment. Okay.

3    A.   And that was at the request of Cassandra

4 Williams, the, you know --

5    Q.   Okay.

6    A.   -- client contact.

7    Q.   Right. Okay. All right. Anything

8 further right now, Mr. Cureton?

9    A.   Well, I -- you know, I like Ms. Key. I

10 didn't have a problem with her at all. I still don't.

11 I -- you know, I -- I would love to have had her

12 working for us and finding a position. But, at the

13 same time, it got to the point to where, you know, we

14 didn't hear from her -- hear back from her until this,

15 you know, employment claim.

16       So, you know, it's -- it's just -- it's

17 unfortunate and I hate this kind of thing, but it is

18 what it is. And I'm -- you know, she worked for us

19 for three and a half hours, three hours, and -- three

20 and a quarter hours, I think, is what the -- what the

21 paperwork says. And we just didn't think that an

22 unemployment claim was appropriate at this point.

23    Q.   Yes, sir. Yes, sir. I understand.

Page 16

1       MS. BUDLONG: Now, Ms. Key, I'm not

2 quite ready for your -- your testimony just yet,

3 ma'am, but is there a question, a direct question,

4 you'd l ke to ask Mr. Cureton at this time?

5       MS. KEY: No.

6       MS. BUDLONG: Okay, ma'am.

7       EXAMINATION OF MS. KEY

8 BY MS. BUDLONG:

9    Q.   So, first of all, Ms. Key, do you agree

10 that the -- the two days that you actually were at the

11 Hyundai facility was July the 31st of '17 and August

12 1st of '17?

13    A.   Yes.

14    Q.   Okay. And that you were brought in as a

15 mailroom attendant?

16    A.   Yes.

17    Q.   Have you worked anywhere since August the

18 1st, ma'am?

19    A.   No.

20    Q.   Okay. Thank you.

21       Now, Ms. Key, if you would, tell me a little

22 bit about the hiring conversation that you had, your

23 interview with Ms. Robinson and Ms. Cassandra. When

Page 17

1  you were interviewed and -- what did they tell you
2  about the, you know, very specific or very strict
3  rules of Hyundai when it comes to appearance, ma'am?
4      A.    Okay.  I was interviewed on July 19th,
5  and I interviewed with Gloria Robinson and Maurice
6  Chambliss.  Ms. Cassandra Williams wasn't a part of
7  the interview.
8      Q.    Okay.
9      A.    And in that interview, Ms. Gloria
10 Robinson emphasized throughout the entire interview
11 that I was to go by the rules and regulations of
12 Dynamic Security, because that's who I essentially
13 worked for.  And, in her words, that's who signed my
14 paycheck.  And so she -- at the end of the interview,
15 she said that she was not sure if I could wear my hair
16 as it was, and she asked me could I take it down.  And
17 I said, well, I couldn't, because it's my natural hair
18 and I would have to cut it off.
19     So she asked Ms. Cassandra Williams, which she
20 said was her supervisor, to come into the room.  And
21 the first thing Ms. Cassandra Williams said was, What
22 is Dynamic's policy?  Like, deferred to Dynamic
23 Security's policy.  And Ms. Robinson said that she

Page 18

1  thought Dynamic's policy said that I could not wear my
2  hair in its natural state.  And I submitted an exhibit
3  which shows you there on page 6 of the Dynamic
4  handbook, it simply says that a female officer's hair
5  has to be neat.
6      And when I went to my training on July 27th at
7  the Dynamic office, I talked to Nicole, who's the
8  office manager, and I asked her was my hair okay for
9  the position.  And she said that it was nothing wrong
10 with my hair, and that it fit -- she looked in the
11 handbook, and she said it fit what it said.  It was
12 away from my face, and she said the length was okay.
13     And so when I went to work on the 31st,
14 Ms. Williams and Ms. Robinson saw me on more than one
15 occasion, and they didn't say anything about my hair.
16 When -- you know, and Ms. -- Ms. Robinson was, you
17 know, telling me what to do and things like that and
18 letting me know my trainer was going to come and get
19 me.  And, I mean, this was 30, 45 minutes into me
20 being there.  And neither one of them said anything
21 about my hair.
22     I pulled Ms. Robinson aside and informed her
23 that I was pregnant, and after that is when

Page 19

1  Ms. Williams approached me and talked -- like, said
2  that I was inappropriate with my hair.  And I asked
3  Ms. Williams could I see the policy, and she told me
4  that she was not -- like, she did not have to show me
5  the policy.  And Ms. Robinson said that I was out of
6  line for even questioning her and asking to see the
7  policy.  Because I had never got anything in writing
8  saying that that was the rule.  Like, I never got
9  anything.  I was told to defer to the handbook for
10 Dynamic Security.
11     And then after that, Ms. Robin- -- Ms. Williams
12 said that if I wore a hat, that I could -- like, I had
13 to have all my hair covered up.  I offered to go home
14 to get a hat, and that's when Ms. Robinson sent me
15 home.
16     Then on the 1st is when I returned and I wore a
17 hat where all my hair was covered.  And Ms. Robinson
18 and Ms. Williams saw me during the morning, and they
19 didn't say anything to me.  Maybe 30 minutes after
20 they saw me, they sent for me to come to the office,
21 and that is when it was, like -- began to be, like, an
22 issue.
23     So I asked could I go -- I felt like they were

Page 20

1  just -- because I informed them that I was pregnant, I
2  felt like they were just trying to basically harass me
3  about something that was not really -- that wasn't an
4  issue before they found out I was pregnant.  So I
5  asked if I could go speak with someone in their human
6  resources to file a complaint, because I felt that's
7  what it was.
8      Q.    Uh-huh.
9      A.    And they sent -- they sent me -- they
10 said, Well, you can go speak to Ray Cureton, which I
11 thought was a human resource person.  But I found out
12 he was the district manager.
13     Q.    Right.
14     A.    And I went and spoke with him.  And by
15 the time I got there and I spoke with him -- I mean, I
16 guess between the time I had transported there, they
17 told him they didn't want me back at the site.
18     Q.    Okay.  Okay.  All right.  Now, let's see
19 here.  I've got a copy of the -- the the policy
20 here in front of me, Ms. Key, for the  -- for Dynamic
21 Security.  And I just want to make sure if this is
22 Dynamic or if this is Hyundai.  So let me check with
23 Mr. Cureton before I read this.

Page 21

1    MS. BUDLONG:  Now, sir, I've got an
2  email here, Mr. Cureton, from -- from Ms. Robinson to
3  you and a few other people on --
4          MR. CURETON:  Yes.  I'm familiar
5  with it.
6          MS. BUDLONG:  -- Wednesday, August
7  2nd.
8          MR. CURETON:  Yes.
9          MS. BUDLONG:  And it says here, you
10  know, about where it says dreads are not allowed.
11  Now, is that -- whose policy is that?
12          MR. CURETON:  That is a quote from
13  Hyundai's policy --
14          MS. BUDLONG:  Okay.
15          MR. CURETON:  -- for personnel
16  working out there.
17          MS. BUDLONG:  Okay.  So that's
18  Hyundai's policy.  I just wanted to make sure before
19  I -- I quoted this.  And was this policy ever -- to
20  your knowledge, Mr. Cureton, was this policy made
21  aware to Ms. Key?
22          MR. CURETON:  Cassandra Williams
23  told me that she showed her the policy.

Page 22

1          MS. BUDLONG:  Okay.  Okay.  And --
2  and that was sometime during the two days that she was
3  on site?
4          MR. CURETON:  Yes, ma'am.
5          MS. BUDLONG:  Okay.
6  BY MS. BUDLONG:
7     Q.    All right.  Ms. Key, now, this -- I ke I
8  said, this is a policy that is -- it says here it's
9  posted on the board in the roll call room.  Are you
10  familiar with where the roll call room was while you
11  were there for those first couple of days?
12     A.    No.
13     Q.    Okay.  It says here that females -- it
14  says here, It -- it has been approved for female
15  personnel to wear braids.  Only microbraids, tree
16  braids, and whatever the size that is a tad longer
17  than micros are acceptable.  The kinky twist-style,
18  bob braids, cornrows, and dreads are not allowed.
19  Were you ever showed that policy, Ms. Key?
20     A.    I was showed this policy after I was
21  approached about my hair on two -- on -- on the 31st.
22  But prior to that, I'd never seen it.  And then -- and
23  I -- and I wasn't -- I was only shown it because I

Page 23

1  asked to see it.  If I had not asked, I was not going
2  to be shown, because when I asked, Ms. Williams said
3  twice that she didn't have to show it to me.
4     Q.    Okay.  All right.  Thank you.
5          Now, so when you -- all right.  So you went
6  back, and you sat down and talked to Mr. Cureton.  Was
7  that on August the 1st, Ms. Key?
8     A.    Yes.
9     Q.    All right.  Kind of take me through that
10  meeting, if you would, ma'am.
11     A.    I went to the meeting because -- you
12  know, I told Mr. Cureton that I wanted to file a
13  complaint because I felt that -- well, I told him I
14  was -- you know, when I went to work on Monday
15  morning, both Ms. Williams and Ms. Robinson saw me.
16  And they saw --
17     Q.    Uh-huh.
18     A.    -- my hair was the same as it was when I
19  had my initial interview.  And neither one of them
20  said anything to me about my hair.
21     Q.    Yes, ma'am.
22     A.    As soon as I informed Ms. Robinson that I
23  was pregnant --

Page 24

1     Q.    Yes, ma'am.  And you -- and you've
2  been --
3          (Simultaneous conversation.)
4  BY MS. BUDLONG:
5     Q.    And you've -- and you've told me that
6  already.  I've got that.
7     A.    Well, I'm --
8     Q.    Okay.
9     A.    I'm saying this is what I told
10  Mr. Cureton.
11     Q.    Oh, okay.  I apologize.  Go ahead, ma'am.
12     A.    This is what I told Mr. Cureton.  I said,
13  As soon as I presented her with a doctor's note, that
14  is when Ms. -- she went to their office, because her
15  and Ms. Williams shared an office.  And I told him, I
16  said, that is when Ms. Williams came out and
17  approached me about my hair.  And --
18     Q.    Well, what did the doctor's note say?
19     A.    It just said that I was cleared to do
20  work; that I had no restrictions to work.
21     Q.    Oh, okay.  All right.  Go ahead.  All
22  right.  Thank you, ma'am.
23     A.    And so after that, maybe like 45 minutes

Page 25

1  had passed before I -- I told him, I said, you
2  know, my trainer came and got me and probably, like,
3  45 minutes passed before Ms. Williams or Ms. Robinson
4  spoke with me after that.  And that's when they
5  brought me into the office, and that's when
6  Ms. Williams was like, I couldn't have my hair like it
7  was, and I -- she said that that's not Dynamic's
8  policy.
9         And I said, Well, they -- and I told her that I
10  spoke with Nicole.  Like, this is what I was telling
11  him.  I said, I spoke with Nicole, and I asked her
12  about my hair.  She said that it was okay.  It met --
13  meets the policy according to the handbook.
14        And Ms. Williams said, Well, Dynamic can place
15  you somewhere else, like -- they -- they don't have
16  to -- like, you don't have to work here.  And that's
17  when I told him I asked Ms. Williams could I see the
18  policy for myself.  And I told him that's when she
19  told me, I don't have to show you anything.
20     Q.   Yes, ma'am.
21     A.   And then I told -- and then he
22  interjected and told me that maybe, like, it could --
23  it could appear that they only approached after I told

Page 26

1  them I was pregnant, but he's known Ms. Robinson for
2  years, and she wouldn't do anything like that.
3     Q.   Right.  Uh-huh.
4     A.   And then I told him that -- I told him --
5  I told him that I offered to go home and get a hat,
6  but they sent me home instead, and that on -- I told
7  him that I came back the next day with a hat to
8  comply --
9     Q.   Uh-huh.
10     A.   -- and all my hair was covered.  And they
11  didn't say anything to me again when they first saw
12  me, but maybe 20 minutes after they saw me, they sent
13  for me.  And Ms. Robinson was -- because another
14  employee had said something to her, and she was
15  approaching me, asking did I -- like, in a threatening
16  way, did I feel discriminated against or, like, I --
17  was telling me I was going to be a problem.  And this
18  is everything I was telling Mr. Cureton.
19        And I asked --
20     Q.   Okay.
21     A.   That's when I asked her -- I went back
22  and asked could I go speak with the human resource --
23     Q.   Yes.

Page 27

1     A.   -- and that's when I spoke with him.
2     Q.   Okay.
3     A.   And, I mean, that's basically --
4     Q.   Okay.
5     A.   -- everything.
6     Q.   So when -- so did you -- in that meeting,
7  did you tell Mr. Cureton that you could really only
8  work first shift?
9     A.   No.  I told Mr. Cureton that I would
10  prefer to work a first shift, but that I was available
11  for anything because -- and my -- my exact words were,
12  beggars can't be choosers.  And I said I was available
13  for anything.  But he told me that he didn't have
14  anything that was available and that he would let me
15  know when something became available.
16     Q.   Okay.  So when's the first -- so when did
17  he have something available he talked to you about?
18     A.   I mean, he just -- he didn't give me
19  exact dates.  He just said, like, We'll have something
20  coming soon.  And then Nicole, the office manager, she
21  said, Well, will you go to Selma?  Like, will you
22  drive to Selma?
23        And I said, Yes, I'll drive to Selma.

Page 28

1        She said, Well, that's not going to be
2  available for another few weeks.
3        They never gave me an exact date.  They just
4  said, We're going to have something available in a few
5  days or a few weeks.  But they never -- I mean, I -- I
6  never was informed on the date or called afterwards to
7  say, Well, something is going to be available on this
8  date.
9     Q.   So you're saying that you were never
10  offered another position, ma'am?
11     A.   No.  I never was.  I was just told the
12  jobs that would be coming open.  Like, they would be
13  coming open, but I never was -- it was never, like,
14  okay, you can get this position, because the -- and
15  Mr. Cureton was saying it wasn't immediately
16  available.  So he wasn't offering.  He was just
17  telling me, Well, we'll have this available or we're
18  going to have this available, but it's not available
19  right now.
20     Q.   Uh-huh.  Okay.  All right, ma'am.  So
21  since -- since August 1st, how many job applications
22  are you trying to put in on a weekly basis, ma'am?
23     A.   Have I tried to put in?

Page 29

1    Q.   No.  No.  Yeah.  How many -- how many
2  do -- do you put in on a weekly basis?
3    A.   At least five to seven.
4    Q.   Okay.  And tell me a couple of places,
5  you know, that -- that you've put in for.  Where all
6  have you put in applications?
7    A.   I applied at the Hilton Inn hotel.  I
8  applied at Children's Place.  I applied at Carter's,
9  Walmart, Target.  I've applied for an Amazon position.
10  I've applied at the By His Grace Daycare.
11    Q.   Uh-huh.
12    A.   I've applied at the -- the blood -- I
13  can't remember -- it's a blood donor --
14    Q.   Okay.
15    A.   -- center.  It's in Opelika, Alabama.
16    Q.   Okay.
17    A.   So, I mean, that's just some of them.
18    Q.   Okay.  Now -- so right now, then -- so
19  can -- are there any -- any reasons you could not
20  accept, you know, full-time work right now?
21    A.   No.
22    Q.   Okay.  Have you told any of these
23  employers that you have -- you can only work certain

Page 30

1  hours or certain days?
2    A.   No.  I -- the only thing I said was that
3  I would prefer to work the first shift.  But, like, on
4  my applications, it's the same.  I put I'm available
5  any day at any time, and that still stands true to
6  today.
7    Q.   Okay.  Okay.  Have you checked back with
8  Dynamic to see if they had anything come available,
9  ma'am?
10    A.   Yes.  I called Dynamic on August 2nd, but
11  I was informed by Nicole they were closed, and I
12  called on August 3rd and August 4th.  And I went up
13  there on -- I believe it was either the -- the Monday
14  after that.  So I guess it was the 7th -- it was the
15  8th.  I think I went up there on the 8th, and I went
16  up there on the -- on the 11th, I went up there on an
17  unrelated matter.  And that is when Nicole told me --
18  she was, like, Oh, yeah.  Ray told me to tell you that
19  he has some jobs coming up in -- in a couple of weeks,
20  and he's going to give you a call when they become
21  available.
22    But I have yet to receive that phone call.
23    Q.   Okay.  Is that when you decided to file

Page 31

1  your unemployment claim?
2    A.   I actually filed my claim on August 6th,
3  but I don't know what happened.  They didn't process
4  it until the 17th.
5    Q.   Okay.  I've got that, you know, your --
6  your claim was filed -- I mean, I don't -- I don't
7  know what -- my system shows it was actually, you
8  know, put in on August the -- the 17th.  But you're
9  saying that -- that you filed one prior to then,
10  ma'am?
11    A.   I filed on August 6th, and I -- when I
12  called to check on it, they said that something
13  happened with the system.  Because on the paper I
14  have, it says the claim date was August 6th.
15    Q.   I do see that now.  Yeah.  It did fall
16  out of the system.  Okay.  I'm looking at the notes
17  screen.  Yeah.  For whatever reason, yeah, it was --
18  yeah.  The claim was actually filed on August the 7th,
19  yes, and -- or August 6th.  I'm sorry.  It was filed
20  on August 6th.  It fell out of the system on August
21  7th, and that's why they backdated it to August 6th.
22  Okay.  So that -- that is -- I do see documentation of
23  that now, Ms. Key.  So you did actually file the claim

Page 32

1  on August the 6th after not -- after -- you know,
2  after speaking with Dynamic those -- those first few
3  days after your assignment had ended.
4    A.   Yes.
5    Q.   Okay.  Okay.  All right.  Filed.
6    MS. BUDLONG:  Okay.  Now,
7  Mr. Cureton, do you have a question you want to ask
8  Ms. Key at this time?
9    MR. CURETON:  I do not.
10    EXAMINATION OF MR. CURETON (continued)
11  BY MS. BUDLONG:
12    Q.   Now -- all right, sir.  So since
13  August -- since this -- this assignment, you know,
14  ended, sir, what -- what positions, if any, have been
15  offered to Ms. Key?
16    A.   Well, here's what happened:  We did not
17  have full-time positions.  And this is what the
18  discussion on August 1st was about, having another
19  full-time position available.  It was mentioned that
20  there are always part-time positions available on the
21  weekend, which, you know, as far as -- at the time, we
22  had no first shifts available at that time, and that's
23  the -- the thing she wanted to think about was whether

Unemployment Hearing

Case 2:19-cv-00767-ECM-SMD   Document 81-11   Filed 11/03/22   Page 11 of 26
USCA11 Case: 24-11126   Document: 62   Date Filed: 02/17/2025   Page: 147 of 217
9/23/2022
9 (33 - 36)

Page 33

1 or not to -- you know, to take those -- one of those
2 weekend positions at a lesser pay rate. So those
3 things were mentioned again on August 8th by Nicole
4 when she called her and talked to her about it. And
5 just nothing else ever came of it at that point.
6    Q.    Okay. Okay.
7    A.    The one -- can I clarify something that
8 you said as --
9    Q.    Please. Please. Go right ahead, sir.
10 No. Please.
11    A.    Yeah.
12    Q.    Anything you want to add, sir, please.
13    A.    Well, the -- the statement about Nicole
14 saying her hair was fine, Nicole -- I've spoken to her
15 about this repeatedly, and she was not stating it was
16 fine as reference to Dynamic Security policy. She was
17 just stating that, Oh, it looks fine to me. She'd
18 been in that position for, like, three weeks, you
19 know, at the most at that point. So she didn't -- I
20 mean, she was not speaking to the issue that Ms. Key
21 thought she was -- was asking her about. So that --
22 that -- that is not something that was -- Dynamic
23 Security was not telling her at that point that her

Page 34

1 hair was fine. That was just a person-to-person
2 thing, "that looks good to me" kind of thing. So I
3 just want to make sure that's clear. It wasn't --
4    Q.    Okay.
5    A.    Yeah.
6    Q.    All right, sir. Now, a moment ago, there
7 was -- there was testimony given that on August the
8 1st, Ms. -- on -- on August 1st, Ms. Key went in
9 wearing a hat. Okay. And then there -- there was
10 some discussion about if she was actually going to be
11 able to stay on that position, and while a discussion
12 was going on, Ms. Williams chose to have her not come
13 back. Did I understand that, sir?
14    A.    That is correct. That is correct.
15    Q.    Okay. Okay. So do you know why -- if
16 there was still ongoing discussion, do you know why
17 Ms. Williams chose just to end the assignment without
18 further discussion?
19    A.    Well, as far as I've been told, it was
20 simply a matter of didn't -- didn't believe that
21 Ms. Key was going to change the hairstyle as had been
22 requested. And based on the conversation --
23    Q.    Okay. No -- no matter what had -- was --

Page 35

1 no matter what had happened, Ms. Williams --
2    A.    Right.
3    Q.    -- just didn't feel as though that Ms. --
4 Ms. Key was going to go through with that?
5    A.    That's correct. That's correct.
6    Q.    Okay. Okay. And just told her -- you
7 know, sent her back for reassignment. Okay. And then
8 when she -- when she was sent back for reassignment,
9 she expressed to your agency, Mr. Cureton, that she
10 was only interested in full-time, first-shift jobs?
11    A.    Well, she -- she was only interested
12 in -- well, not only. She was interested in first
13 time -- would prefer -- in full-time, would prefer a
14 first shift, which I didn't have full-time or first
15 shift at that point.
16    Q.    Oh, okay.
17    A.    And I told her that --
18    Q.    Okay.
19    A.    -- you know, she -- at that initial --
20 the initial conversation we had, she did not say to me
21 that she only wanted first shift. She said --
22    Q.    Okay.
23    A.    I agree with her on that. She preferred

Page 36

1 first shift and would -- but would want -- and would
2 want full-time, but she would take something else if
3 it was available, which I said, Well, we have part-
4 time available. And -- and that was, you know, not
5 acceptable.
6      I understand. If you need a full-time job,
7 part-time is not acceptable at that point. But we had
8 those part-time positions on second and third shift,
9 which she had to think about some more, which I
10 understand that too.
11      The other things that she did when she came in
12 here that day and told me -- I think I mentioned
13 before she said that there wasn't a problem with
14 Dynamic Security, but she was -- she told me then she
15 was going to file an EEOC complaint against Hyundai
16 for discrimination because she was pregnant. And I
17 told her --
18    Q.    Uh-huh.
19    A.    -- I didn't think that was -- you
20 know, that that was valid. At least I know from our
21 perspective, it wasn't a valid thing. We never asked
22 her about being pregnant or any of that sort of thing.
23 And we've had plenty of pregnant folks working for us.

Page 37

1  So it doesn't -- that doesn't correspond to what --
2  you know, to what our policies are at all.
3      Q.   Yes, sir. Okay. All right. So -- all
4  right. Let me just go -- so she was offered, then,
5  two positions on August the 1st when she was sent back
6  for reassignment to your office?
7      A.   We talked about the possibility of
8  working at either Koch or Mobis on a part-time basis
9  on a second or third shift, and she wanted to think
10 about it. And those positions were still available
11 every time she called and also on the 8th when Nicole
12 spoke with her and stated that she could only work
13 first shift because her -- because of her husband's
14 schedule, I believe, is what the -- what the final
15 determination was.
16     Q.   Okay. Okay. All right, sir. Anything
17 further right now, Mr. Cureton?
18     A.   No, ma'am. I think that pretty much
19 covers it.
20     Q.   Okay.
21        EXAMINATION OF MS. KEY (continued)
22 BY MS. BUDLONG:
23     Q.   Now, Ms. Key, when -- when you went in to

Page 38

1  the office on August 1st, you did -- you went in to
2  the office, correct? Is that correct, Ms. Key?
3      A.   Yes. Yes.
4      Q.   So these two job offers here for the --
5  the Koch Foods and the Mobis -- all right -- so what
6  did you not like about those two jobs, ma'am?
7      A.   There was -- I wasn't offered those jobs.
8  So it was --
9      Q.   So Mr. Cureton didn't say, Hey, here's a
10 couple -- we've got a couple of -- of, you know, part-
11 time jobs here, you know, that -- that -- would you be
12 interested in those? He didn't say that to you?
13     A.   No. He never told -- he never said what
14 the jobs were. He just said that he -- the only thing
15 that he said was that they weren't -- I would not be
16 making the $13 an hour, which I was okay with, but he
17 never said that they're at this location or at this,
18 like, location. He just said that he did not have any
19 jobs immediately, and he would let me know. So I
20 don't --
21     Q.   Okay.
22     A.   I mean, with the assignment refusal form,
23 I've never -- this is my first time seeing them. I've

Page 39

1  never --
2      Q.   Okay.
3      A.   -- seen them or anything.
4      And may I just clarify something, please?
5      Q.   Sure. Go right ahead, ma'am.
6      A.   I never told Mr. Cureton I was filing a
7  complaint with the EEOC. I didn't make that
8  determination until after I left from speaking with
9  him and not feeling that he took my complaint
10 seriously, because he didn't take any notes and just
11 having his -- the office manager, how she just
12 interjected and kind of like said, basically, to me
13 that she didn't feel like I had been discriminated
14 against. I never said to him, Oh, Mr. Cureton, I'm
15 going to go file an EEOC. I never -- because I didn't
16 even make that determination that I was going to do
17 that at that point.
18     Q.   Yes, ma'am.
19     A.   Because I just wanted to work.
20     Q.   Yes, ma'am. Okay.
21     A.   And then may I say one more thing?
22     Q.   Sure.
23     A.   Also, in the statement that Nicole sent

Page 40

1  in, it -- just to point out the conflict, because
2  according to Ms. -- Ms. Shonty (phonetic), the human
3  resource manager, she said that on August 1st is when
4  they considered that I voluntarily quit because it was
5  unavailable positions. But Ms. Scavella's statement
6  contradicts that, because she says that the positions
7  weren't offered to me until August 8th, which was the
8  week afterwards.
9      Q.   What -- now, where are you getting that
10 from, ma'am?
11     A.   On her statement, she says, Ms. Key was
12 offered positions on all currently available pools but
13 said that she could only work first shift. These
14 conversations occurred on August 8th, 2017.
15     Q.   What -- what are you reading from,
16 though, Ms. Key?
17     A.   Oh, I'm sorry. Ms. -- Ms. Scavella's
18 statement form.
19     Q.   Okay. You're talk -- All right. Yeah.
20 I see that now, and that she signed that on August
21 14th. But Mr. -- but Mr. Cureton said that he
22 personally offered you these positions on August 1st
23 and that they were constantly available through August

Page 41

1 the 8th. So that's why the August 8 is in her
2 statement. You know, she just -- but that's -- but
3 Mr. Cureton said that they were available, as well, on
4 August the 1st is what his statement is, ma'am.
5      And I understand that y'all are not going to
6 agree. Okay? I know this. But that is why I do take
7 independent sworn testimony from all parties and make
8 a decision based on that sworn testimony.
9      A.    Okay.
10          MR. CURETON: Can I clarify on --
11          MS. BUDLONG: Yeah. As long as
12 she's finished here. Hang on one --
13 BY MS. BUDLONG:
14     Q.    Anything further right now, Ms. Key?
15     A.    Also, in the rebuttal, the -- Ms. Spires
16 says that claimant told Nicole Scavella, Dynamic
17 Security's office manager in our Montgomery office,
18 that she could only work first shift because her
19 husband works third shift. Never mind. That's --
20 okay. Never mind. That's irrelevant. I'm sorry
21 about that.
22     Q.    That's okay. No problem.
23     A.    So can you strike --

Page 42

1      Q.    Okay.
2      A.    I don't know if I can say "strike," but
3 strike that.
4      Q.    Okay.
5      A.    But Mr. Cureton, he did not tell me the
6 exact positions.
7      Q.    Yes, ma'am. And --
8      A.    He said --
9      Q.    And anything that you -- anything you've
10 already told me, you do not have to tell me again.
11     A.    Oh, okay.
12     Q.    I've got it on the record. Okay?
13     A.    Okay.
14     Q.    All right. Thank you.
15          EXAMINATION OF MR. CURETON (continued)
16 BY MS. BUDLONG:
17     Q.    Now, go ahead, Mr. Cureton.
18     A.    Yeah. I really want to speak to that,
19 because it's -- it's appropriate, and I want to be
20 absolutely fair to Ms. Key on this, as well. When we
21 had that conversation on August 1st, I told her about
22 positions available on the weekends, and I never
23 actually specifically said to her, Will you take the

Page 43

1 third -- the third shift at Koch Foods or the second
2 shift at Mobis? I will be, you know, honest about
3 that as much as I can be.
4      Now, I did tell her there was second and third
5 shifts available at these various sites, including
6 Mobis and Koch. But if you want to say did I give her
7 a piece of paper and say, Will you take this position
8 at that -- this time, I did not. I just told --
9      Q.    Yes, sir. But you -- but you made her
10 aware of that.
11     A.    Yes.
12     Q.    That you made her aware --
13          (Simultaneous conversation.)
14     A.    -- that there were --
15     A.    Right.
16     A.    -- positions available.
17     Q.    Got it.
18     A.    But I will say I did not say, Here, will
19 you take this position or will you take that position?
20     Q.    But you put it out there and expected
21 her --
22     A.    Oh, yes.
23     Q.    -- to say "Yes" and "Where are they?"

Page 44

1 That was --
2      A.    Correct.
3      Q.    Is that correct?
4      A.    Correct.
5      Q.    Okay. Okay. Because I'm looking at the
6 assignment refusal form that's signed by you, sir --
7      A.    Uh-huh.
8      Q.    -- on those two different ones.
9      A.    Yes.
10     Q.    And so that -- that's what I was going
11 by.
12     A.    That's correct.
13     Q.    Okay.
14     A.    I just wanted to make sure to clarify
15 that, because I don't want --
16     Q.    Okay.
17     A.    -- to -- you know, this has been enough
18 of a crazy situation. Because I don't -- I don't --
19 you know, anyway. That's enough said.
20     Q.    Okay. All right. Thank you,
21 Mr. Cureton.
22          MS. BUDLONG: All right. Now
23 anything further from the employer, sir?

Page 45

1        MR. CURETON:  No, ma'am.  Thank you.

2        MS. BUDLONG:  You're welcome.

3        Ms. Key, at this point, is there any

4  additional information you wish to add, ma'am, that

5  you haven't already told me, that I don't already have

6  on the record?

7        MS. KEY:  No.  No, ma'am.  No.

8        MS. BUDLONG:  Okay.

9        MS. KEY:  You have everything.  I

10  would be just reiterating what I've already said.

11  So --

12        MS. BUDLONG:  Okay.  And I -- and I

13  have everything that you -- you -- both of you have

14  said, you know, recorded, and I can play it back and

15  it's on the record.  Yes, ma'am.  Yes, sir.

16        So what's going to happen now is that I

17  will close this hearing.  I will issue a decision in

18  writing.  Whoever disagrees with my decision, there

19  will be additional appeal rights listed on the

20  decision form itself.

21        I do appreciate everyone's time today.

22  Thank you all for being available for me.  And please

23  do have a good day, everyone.  Thank you.

Page 46

1        MR. CURETON:  Thank you very much.

2        MS. KEY:  Thank -- thank you.

3        MS. BUDLONG:  Uh-huh.  Uh-huh.

4        MR. CURETON:  Bye-bye.

5        MS. BUDLONG:  Bye-bye.

6

7        (END OF RECORDING.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## WORD INDEX

**< $ >**
**$13** 38:*16*

**< 0 >**
**07549-AT-17** 3:*12*

**< 1 >**
**1** 7:*4*
**11th** 13:*16*
30:*16*
**14th** 40:*21*
**17** 7:*4*
16:*11, 12*
**17th** 13:*8*
31:*4, 8*
**19** 1:*10*
**1975** 4:*9,*
*18*
**19th** 3:*13*
17:*4*
**1st** 14:*19*
16:*12, 18*
19:*16* 23:*7*
28:*21*
32:*18* 34:*8*
37:*5* 38:*1*
40:*3, 22*
41:*4* 42:*21*

**< 2 >**
**20** 26:*12*
**2017** 1:*10*
3:*13* 40:*14*
**2022** 1:*19*
**21st** 14:*7,*
*12*
**22** 1:*19*

**25-4-77(a)(3** 4:*17*
**25-4-78(2** 4:*9*
**25-4-78(3** 4:*1*
**27th** 18:*6*
**2nd** 21:*7*
30:*10*

**< 3 >**
**3)(c** 4:*2*
**30** 18:*19*
19:*19*
**31** 7:*3*
**31st** 14:*16*
16:*11*
18:*13*
22:*21*
**334)395-7722** 2:*12*
**35674** 2:*18*
**3rd** 30:*12*

**< 4 >**
**45** 18:*19*
24:*23* 25:*3*
**451** 2:*17*
**4th** 30:*12*

**< 6 >**
**6** 18:*3*
**6th** 31:*2,*
*11, 14, 19,*
*20, 21* 32:*1*

**< 7 >**
**7th** 30:*14*
31:*18, 21*

**< 8 >**
**8** 41:*1*

**8th** 30:*15*
33:*3* 37:*11*
40:*7, 14*
41:*1*

**< A >**
**a** 2:*10*
3:*11* 4:*2,*
*15, 16* 5:*6*
6:*13, 16, 17,*
*19, 22* 7:*3,*
*6, 10* 8:*6,*
*12, 22* 9:*3,*
*5, 20* 10:*2,*
*5, 12, 17, 22*
11:*7, 11, 12,*
*15, 19, 22*
12:*2, 13, 16,*
*20, 21, 23*
13:*4, 13, 19,*
*22* 14:*1, 6,*
*9, 11, 14, 17,*
*20, 22* 15:*1,*
*3, 6, 9, 10,*
*12, 19, 20*
16:*3, 13, 14,*
*16, 19, 21*
17:*4, 6, 9*
18:*4* 19:*12,*
*14, 16* 20:*6,*
*9, 11, 14, 19*
21:*3, 12*
22:*8, 12, 16,*
*20* 23:*8, 11,*
*12, 18, 22*
24:*7, 9, 12,*
*13, 19, 23*
25:*21* 26:*4,*
*5, 7, 10, 15,*
*17, 21* 27:*1,*
*3, 5, 9, 10,*
*18* 28:*4, 5,*

*11, 22, 23*
29:*2, 3, 4, 7,*
*12, 13, 15,*
*17, 21* 30:*2,*
*10, 19, 20*
31:*2, 11*
32:*4, 7, 16*
33:*2, 7, 11,*
*13* 34:*1, 5,*
*6, 9, 11, 14,*
*19, 20* 35:*2,*
*5, 11, 13, 17,*
*19, 23* 36:*6,*
*13, 19, 21*
37:*7, 8, 9,*
*18* 38:*3, 7,*
*9, 10, 13, 22*
39:*3, 6, 19,*
*21, 23*
40:*11, 17*
41:*8, 9, 15,*
*23* 42:*2, 5,*
*8, 11, 13, 18*
43:*7, 11, 14,*
*16, 18, 22*
44:*2, 4, 7, 9,*
*12, 14, 17,*
*18* 45:*17,*
*23*
**abide** 9:*10*
**able** 4:*18*
34:*11*
**absolutely**
42:*20*
**accept** 5:*1*
29:*20*
**acceptable**
22:*17* 36:*5,*
*7*
**accepting**
5:*3*

**account**
7:*13, 14*
9:*7* 10:*7*
**actual** 4:*6,*
*7*
**add** 33:*12*
45:*4*
**additional**
45:*4, 19*
**address**
2:*17*
**administrati**
**ve** 3:*14*
**affirm** 6:*1*
**agency**
35:*9*
**ago** 34:*6*
**agree** 16:*9*
35:*23* 41:*6*
**agreed**
9:*23* 11:*2*
**agreement**
12:*11*
**ahead** 5:*23*
24:*11, 21*
33:*9* 39:*5*
42:*17*
**ALABAMA**
1:*9* 2:*2, 18*
4:*9, 18*
29:*15*
**alerted**
13:*10*
**allowed**
3:*20* 7:*17*
21:*10*
22:*18*
**Amazon**
29:*9*
**an** 3:*20, 22*
4:*3* 7:*11*
8:*19* 12:*2,*

11  13:*14*
15:*21*  18:*2*
19:*21*  20:*3*
21:*1*  24:*15*
28:*3*  29:*9*
30:*16*
36:*15*
38:*16*
39:*15*
**AND**  1:*9*
2:*2, 16, 21*
3:*17, 22*
4:*4, 16, 17,*
*19, 20*  5:*1,*
*4, 14, 23*
6:*2, 15, 18*
7:*3, 7, 13,*
*14, 16, 17,*
*22*  8:*8, 9,*
*16, 20*  9:*7,*
*8, 9, 12, 13,*
*14, 17*  10:*3,*
*6, 9, 14, 18*
11:*2, 4, 9,*
*15, 20*  12:*1,*
*5, 8, 9, 13,*
*20, 21, 22*
13:*1, 6, 16,*
*17*  14:*2, 15,*
*18*  15:*3, 12,*
*17, 18, 19,*
*20, 21*
16:*11, 14,*
*23*  17:*1, 5,*
*9, 11, 13, 14,*
*16, 18, 20,*
*23*  18:*2, 6,*
*8, 9, 10, 11,*
*12, 13, 14,*
*15, 16, 17,*
*18, 19, 20,*
*22, 23*  19:*1,*

2, 3, 5, 6, 11,
14, 16, 17,
18, 21  20:*9,*
*14, 15, 21*
21:*3, 9, 19*
22:*1, 2, 16,*
*18, 22, 23*
23:*6, 15, 16,*
*19*  24:*1, 5,*
*15, 16, 17,*
*23*  25:*2, 4,*
*5, 7, 9, 11,*
*14, 16, 18,*
*21, 22*  26:*2,*
*4, 5, 6, 10,*
*13, 14, 17,*
*19, 22*  27:*1,*
*3, 11, 12, 14,*
*20, 23*
28:*14*  29:*4*
30:*5, 11, 12,*
*15, 17, 20*
31:*11, 19,*
*21*  32:*17,*
*22*  33:*4, 15*
34:*9, 11, 22*
35:*6, 7, 17*
36:*1, 4, 8,*
*12, 16, 23*
37:*9, 10, 11,*
*12*  38:*5, 19*
39:*4, 9, 10,*
*12, 21*
40:*20, 23*
41:*5, 7*
42:*7, 9, 19,*
*22*  43:*4, 6,*
*7, 20, 23*
44:*10*
45:*12, 14,*
*22*

**anyway**
44:*19*
**apologize**
3:*21*  24:*11*
**appeal**
3:*22*  45:*19*
**APPEALS**
1:*9*  2:*2*
**appear**
25:*23*
**appearance**
7:*11, 19*
10:*16, 21*
12:*1*  17:*3*
**appellant**
3:*17*
**applicant**
9:*12*
**applicants**
9:*6*

**applications**
28:*21*  29:*6*
30:*4*
**applied**
29:*7, 8, 9,*
*10, 12*
**appreciate**
45:*21*
**approached**
19:*1*  22:*21*
24:*17*
25:*23*
**approachin
g**  26:*15*
**appropriate**
15:*22*
42:*19*
**approved**
22:*14*
**arrangemen**

ts  9:*13*
**aside**  18:*22*
**asked**  7:*18*
9:*17*  17:*16,*
*19*  18:*8*
19:*2, 23*
20:*5*  23:*1,*
*2*  25:*11, 17*
26:*19, 21,*
*22*  36:*21*
**asking**
19:*6*  26:*15*
33:*21*
**assignment**
9:*2*  14:*16*
32:*3, 13*
34:*17*
38:*22*  44:*6*
**attempted**
8:*1*  12:*10*
13:*8*
**attendant**
6:*17*  16:*15*
**audio**  1:*17*
**August**  7:*4*
13:*8, 16*
14:*19*
16:*11, 17*
21:*6*  23:*7*
28:*21*
30:*10, 12*
31:*2, 8, 11,*
*14, 18, 19,*
*20, 21*  32:*1,*
*13, 18*  33:*3*
34:*7, 8*
37:*5*  38:*1*
40:*3, 7, 14,*
*20, 22, 23*
41:*1, 4*
42:*21*

**available**
4:*19, 20*
8:*3, 11, 12,*
*16, 18, 23*
12:*14, 19*
13:*11*
27:*10, 12,*
*14, 15, 17*
28:*2, 4, 7,*
*16, 17, 18*
30:*4, 8, 21*
32:*19, 20,*
*22*  36:*3, 4*
37:*10*
40:*12, 23*
41:*3*  42:*22*
43:*5, 16*
45:*22*
**aware**  9:*2*
21:*21*
43:*10, 12*

**< B >**
**B**  1:*18*
**back**  2:*10*
4:*4*  8:*7*
9:*17*  14:*21*
15:*14*
20:*17*  23:*6*
26:*7, 21*
30:*7*  34:*13*
35:*7, 8*
37:*5*  45:*14*
**backdated**
31:*21*
**barriers**  5:*2*
**based**
34:*22*  41:*8*
**basically**
20:*2*  27:*3*
39:*12*

basis
28:22  29:2
37:8
began
14:15
19:21
beggars
27:12
believe
30:13
34:20
37:14
benefits
3:20
biggest
12:17
bit  16:22
blood
29:12, 13
board  22:9
bob  22:18
bona  4:10
Box  2:17
Braden
1:18
braids
22:15, 16,
18
brought
7:22  16:14
25:5
BUDLONG
1:8  2:1, 6,
9, 13, 16, 20
3:1, 4, 7, 10,
13  5:8, 11,
22  6:6, 8,
10  16:1, 6,
8  21:1, 6, 9,
14, 17  22:1,
5, 6  24:4
32:6, 11

37:22
41:11, 13
42:16
44:22  45:2,
8, 12  46:3,
5
Bye-bye
46:4, 5

< C >
call  2:10,
11, 14  22:9,
10  30:20,
22
called  28:6
30:10, 12
31:12  33:4
37:11
Carter's
29:8
Case  3:12,
17  5:5  6:2
Cassandra
7:14  10:6,
7  15:3
16:23  17:6,
19, 21
21:22
cause  4:11
CCR  1:18
center
29:15
certain
29:23  30:1
Chambliss
17:6
change
11:23
34:21
changes
11:3

check
20:22
31:12
checked
30:7
Children's
29:8
choosers
27:12
chose
34:12, 17
claim  13:1,
5, 7  15:15,
22  31:1, 2,
6, 14, 18, 23
claimant
3:15, 20, 21
4:10, 14, 18,
23  5:2
41:16
clarify
33:7  39:4
41:10
44:14
clear  34:3
cleared
24:19
client  7:15
9:18  10:7
12:2  15:6
close  45:17
closed
30:11
Code  4:9,
18
come
12:11
17:20
18:18
19:20  30:8
34:12
comes  17:3

coming
27:20
28:12, 13
30:19
company
2:17  8:1
complaint
20:6  23:13
36:15  39:7,
9
comply
26:8
conflict
40:1
conform
10:20
connected
4:11
considered
40:4
constantly
40:23
contact
7:15  15:6
continued
32:10
37:21
42:15
contract
12:4
contradicts
40:6
conversatio
n  8:15
16:22  24:3
34:22
35:20
42:21
43:13
conversatio
ns  40:14
copy  20:19

cornrows
22:18
correct
2:19  4:7
7:5, 6  10:2
12:21
13:12, 13
14:17, 22
34:14  35:5
38:2  44:2,
3, 4, 12
correspond
37:1
couple  7:3
22:11  29:4
30:19
38:10
covered
19:13, 17
26:10
covers
37:19
crazy  44:18
CURETON
2:4, 8, 9, 12,
15, 19, 23
3:3, 4, 6, 18
5:7, 16, 20
6:6, 7, 9
7:5  9:4
11:18
13:12  14:5
15:8  16:4
20:10, 23
21:2, 4, 8,
12, 15, 20,
22  22:4
23:6, 12
24:10, 12
26:18  27:7,
9  28:15
32:7, 9, 10

35:*9*  37:*17*
38:*9*  39:*6,*
*14*  40:*21*
41:*3, 10*
42:*5, 15, 17*
44:*21*  45:*1*
46:*1, 4*
**C-U-R-E-T-**
**O-N**  2:*8*
**Cureton's**
5:*14*
**currently**
40:*12*
**cut**  17:*18*

**< D >**
**date**  6:*18,*
*19*  13:*6*
28:*3, 6, 8*
31:*14*
**dates**  27:*19*
**day**  11:*3*
14:*4*  26:*7*
30:*5*  36:*12*
45:*23*
**Daycare**
29:*10*
**days**  7:*3, 6,*
*8*  14:*11*
16:*10*  22:*2,*
*11*  28:*5*
30:*1*  32:*3*
**deal**  13:*22*
**dealt**  9:*12*
**Deborah**
1:*18*
**decided**
30:*23*
**decision**
41:*8*  45:*17,*
*18, 20*

**de-**
**escalated**
11:*11*
**defer**  19:*9*
**deferred**
17:*22*
**desk**  11:*16*
**determinati**
**on**  3:*21*
37:*15*  39:*8,*
*16*
**determine**
4:*14, 23*
**determined**
8:*10, 17*
**different**
44:*8*
**direct**  16:*3*
**disagreed**
3:*22*
**disagrees**
45:*18*
**discharge**
12:*22*
**discharged**
7:*23*
**disconnecte**
**d**  2:*11*
**discriminate**
**d**  26:*16*
39:*13*
**discriminati**
**on**  36:*16*
**discuss**
10:*15*
**discussed**
11:*2*
**discussion**
32:*18*
34:*10, 11,*
*16, 18*

**dispute**
11:*12*
**disqualificat**
**ion**  4:*3*
**district**
6:*13*  20:*12*
**doctor's**
24:*13, 18*
**documentati**
**on**  31:*22*
**DONNA**
1:*8*  2:*1*
3:*13*
**donor**
29:*13*
**dreadlocks**
7:*13, 16*
9:*3*  10:*1*
**dreads**
21:*10*
22:*18*
**drive**
27:*22, 23*
**Dynamic**
2:*5*  3:*16*
6:*13*  12:*6,*
*7*  17:*12, 22*
18:*3, 7*
19:*10*
20:*20, 22*
25:*14*  30:*8,*
*10*  32:*2*
33:*16, 22*
36:*14*
41:*16*
**Dynamic's**
17:*22*  18:*1*
25:*7*

**< E >**

**EEOC**
36:*15*  39:*7,*
*15*
**either**  5:*5,*
*18*  10:*9*
30:*13*  37:*8*
**email**  21:*2*

**emphasized**
17:*10*
**employee**
26:*14*
**employer**
3:*16, 22*
44:*23*
**employers**
29:*23*

**employment**
15:*15*
**ended**
12:*14*  13:*4*
32:*3, 14*
**entire**
17:*10*
**essentially**
17:*12*
**eventually**
7:*17*  8:*17*
**everyone's**
45:*21*
**exact**  13:*6*
27:*11, 19*
28:*3*  42:*6*
**EXAMINATI**
**ON**  6:*9*
16:*7*  32:*10*
37:*21*
42:*15*
**examiner's**
3:*20*

**Excuse**
8:*14*
**exhibit**
8:*19*  13:*14*
18:*2*
**expected**
43:*20*
**explains**
9:*8*
**expressed**
35:*9*

**< F >**
**face**  18:*12*
**facility**
16:*11*
**fact**  12:*6*
**fair**  42:*20*
**fall**  31:*15*
**familiar**
21:*4*  22:*10*
**far**  5:*6*
11:*22*
32:*21*
34:*19*
**feel**  26:*16*
35:*3*  39:*13*
**feeling**
39:*9*
**fell**  31:*20*
**felt**  19:*23*
20:*2, 6*
23:*13*
**female**
18:*4*  22:*14*
**females**
22:*13*
**fide**  4:*11*
**file**  20:*6*
23:*12*
30:*23*
31:*23*

**filed** 3:22
13:6, 8
31:2, 6, 9,
11, 18, 19
32:5
**filing** 39:6
**final** 37:14
**find** 6:23
7:22 8:1,
21 12:9, 10,
23 13:9
**finding**
15:12
**fine** 14:13
33:14, 16,
17 34:1
**finished**
41:12
**first** 4:1
8:7, 8, 11,
13, 18, 23
9:2 12:13
16:9 17:21
22:11
26:11 27:8,
10, 16 30:3
32:2, 22
35:12, 14,
21 36:1
37:13
38:23
40:13
41:18
**first-shift**
13:11
35:10
**fit** 18:10, 11
**five** 29:3
**folder** 6:23

**folks** 36:23
**follow** 5:12
**Foods**
38:5 43:1
**form** 38:22
40:18 44:6
45:20
**FOSHEE**
1:8 2:1
3:13
**found** 20:4,
11
**front** 13:6
20:20
**full** 8:2
**full-time**
4:19 5:1, 3
12:13
29:20
32:17, 19
35:10, 13,
14 36:2, 6
**further**
15:8 34:18
37:17
41:14
44:23

< G >
**getting**
40:9
**give** 6:2
27:18
30:20 43:6
**given**
12:23 34:7
**Gloria** 7:14
9:7, 16
10:5, 6
17:5, 9
**go** 5:23
12:12

17:11
19:13, 23
20:5, 10
24:11, 21
26:5, 22
27:21 33:9
35:4 37:4
39:5, 15
42:17
**going** 2:21
4:9 5:13
8:15 9:3
12:8 18:18
23:1 26:17
28:1, 4, 7,
18 30:20
34:10, 12,
21 35:4
36:15
39:15, 16
41:5 44:10
45:16
**good** 2:10
4:11, 16
34:2 45:23
**Grace**
29:10
**Great** 3:10
**guess**
20:16
30:14

< H >
**hair** 11:23
17:15, 17
18:2, 4, 8,
10, 15, 21
19:2, 13, 17
22:21
23:18, 20
24:17 25:6,

12 26:10
33:14 34:1
**hairstyle**
34:21
**half** 15:19
**handbook**
18:4, 11
19:9 25:13
**hang** 4:4
41:12
**happen**
12:1 45:16
**happened**
7:7, 9 11:4,
20 31:3, 13
32:16 35:1
**harass**
20:2
**hat** 19:12,
14, 17 26:5,
7 34:9
**hate** 15:17
**hear** 3:5, 7
15:14
**heard** 13:1
**HEARING**
1:7 3:11,
12, 14 4:13
5:18 10:10
45:17
**HEARINGS**
1:9 2:2
**Hey** 38:9
**Hilton** 29:7
**hire** 6:18,
19
**hiring** 9:22
16:22
**hold** 2:21
3:1
**home**
14:18

19:13, 15
26:5, 6
**honest**
43:2
**hotel** 29:7
**hour** 38:16
**hours** 4:20
12:20
15:19, 20
30:1
**human**
20:5, 11
26:22 40:2
**husband**
41:19
**husband's**
37:13
**Hyundai**
6:16 7:12,
15 9:6
10:8 12:8
14:19
16:11 17:3
20:22
36:15
**Hyundai's**
10:21
21:13, 18

< I >
**I** 2:2, 15,
16 3:6, 13,
15, 21 4:13,
22 5:4, 12,
17 8:2, 3, 8,
18, 22 9:14
10:3 11:7,
19, 22 12:5,
9, 13, 21
13:13 14:6
15:9, 10, 11,
17, 20, 23

17:*4, 5, 11,*
*12, 15, 16,*
*17, 18* 18:*1,*
*2, 6, 7, 8, 13,*
*19, 22, 23*
19:*2, 3, 5, 7,*
*8, 9, 12, 13,*
*16, 23* 20:*1,*
*4, 5, 6, 10,*
*11, 14, 15,*
*16, 21, 23*
21:*18, 19*
22:*7, 20, 23*
23:*1, 2, 11,*
*12, 13, 14,*
*18, 22* 24:*9,*
*11, 12, 13,*
*15, 19, 20*
25:*1, 6, 7, 9,*
*10, 11, 17,*
*18, 19, 21,*
*23* 26:*1, 4,*
*5, 6, 7, 15,*
*16, 17, 18,*
*19, 21, 22*
27:*1, 3, 9,*
*10, 12, 18,*
*23* 28:*5, 11,*
*13, 23* 29:*7,*
*8, 12, 17*
30:*2, 3, 4,*
*10, 11, 12,*
*13, 14, 15,*
*16, 22* 31:*2,*
*3, 6, 11, 13,*
*15, 22* 32:*9*
33:*7, 19*
34:*2, 13*
35:*14, 17,*
*23* 36:*3, 6,*
*9, 12, 16, 19,*
*20* 37:*14,*

18  38:*7, 15,*
*16, 19, 22*
39:*4, 6, 7, 8,*
*13, 14, 15,*
*16, 19, 21*
40:*4, 20*
41:*5, 6, 10*
42:*2, 18, 19,*
*21, 22* 43:*2,*
*3, 4, 6, 8, 18*
44:*10, 14,*
*15, 18* 45:*5,*
*9, 12, 14, 16,*
*17, 21*

**immediately**
28:*15*
38:*19*
**inappropriat**
**e** 19:*2*
**including**
43:*5*

**independent**
41:*7*
**indiscernibl**
**e** 9:*20*
**individual**
4:*3*
**information**
6:*22* 45:*4*
**informed**
7:*16* 18:*22*
20:*1* 23:*22*
28:*6* 30:*11*
**initial** 8:*14*
23:*19*
35:*19, 20*
**initially**
9:*15*
**Inn** 29:*7*

**interested**
35:*10, 11,*
*12* 38:*12*
**interjected**
25:*22*
39:*12*
**interview**
10:*15*
11:*17*
16:*23* 17:*7,*
*9, 10, 14*
23:*19*
**interviewed**
14:*4* 17:*1,*
*4, 5*
**interviews**
9:*8, 9*
**involved**
3:*23* 11:*15*
**irrelevant**
41:*20*
**issue** 7:*11*
12:*17*
19:*22* 20:*4*
33:*20*
45:*17*
**issues** 11:*1*
**its** 18:*2*

**< J >**
**job** 4:*14*
6:*12, 15*
28:*21* 36:*6*
38:*4*
**jobs** 28:*12*
30:*19*
35:*10* 38:*6,*
*7, 11, 14, 19*
**July** 7:*3*
14:*7, 12, 16*
16:*11* 17:*4*

18:*6*

**< K >**
**Key** 2:*22*
3:*7, 9, 16*
5:*9, 10, 14,*
*16, 21* 6:*4,*
*5* 7:*16*
9:*22* 10:*19*
11:*17*
12:*18* 15:*9*
16:*1, 5, 7, 9,*
*21* 20:*20*
21:*21* 22:*7,*
*19* 23:*7*
31:*23* 32:*8,*
*15* 33:*20*
34:*8, 21*
35:*4* 37:*21,*
*23* 38:*2*
40:*11, 16*
41:*14*
42:*20* 45:*3,*
*7, 9* 46:*2*
**Key's** 6:*15*
**kind** 11:*20*
15:*17* 23:*9*
34:*2* 39:*12*
**kinds** 9:*9*
**kinky** 22:*17*
**know** 8:*21*
9:*10, 12, 14*
10:*4, 10, 20*
12:*4* 13:*1,*
*17, 20* 14:*4*
15:*4, 9, 11,*
*13, 15, 16,*
*18* 17:*2*
18:*16, 17,*
*18* 21:*10*
23:*12, 14*
25:*2* 27:*15*

29:*5, 20*
31:*3, 5, 7, 8*
32:*1, 13, 21*
33:*1, 19*
34:*15, 16*
35:*7, 19*
36:*4, 20*
37:*2* 38:*10,*
*11, 19* 41:*2,*
*6* 42:*2*
43:*2* 44:*17,*
*19* 45:*14*
**knowledge**
21:*20*
**known** 26:*1*
**Koch** 37:*8*
38:*5* 43:*1,*
*6*

**< L >**
**law** 3:*23*
4:*1, 2, 7, 8,*
*17, 22*
**leave** 4:*14*
9:*17*
**left** 4:*10*
39:*8*
**length**
10:*13*
18:*12*
**lesser** 33:*2*
**letting**
18:*18*
**line** 2:*22*
3:*15* 19:*6*
**listed** 45:*19*
**little** 14:*9,*
*11* 16:*21*
**location**
38:*17, 18*
**long** 41:*11*

longer
22:*16*
looked
18:*10*
looking
8:*5, 6, 7*
13:*17*
31:*16* 44:*5*
looks
33:*17* 34:*2*
love   15:*11*

< M >
ma'am   5:*7,
20*   10:*12*
16:*3, 6, 18*
17:*3* 22:*4*
23:*10, 21*
24:*1, 11, 22*
25:*20*
28:*10, 20,
22* 30:*9*
31:*10*
37:*18* 38:*6*
39:*5, 18, 20*
40:*10* 41:*4*
42:*7* 45:*1,
4, 7, 15*
mailing
2:*16*
mailroom
6:*16, 17*
16:*15*
making
12:*19*
38:*16*
manager
6:*13* 7:*14*
8:*20* 9:*7*
10:*7* 18:*8*
20:*12*
27:*20*

39:*11* 40:*3*
41:*17*
matter
30:*17*
34:*20, 23*
35:*1*
Maurice
17:*5*
mean
18:*19*
20:*15* 27:*3,
18* 28:*5*
29:*17* 31:*6*
33:*20*
38:*22*
meeting
23:*10, 11*
27:*6*
meets
25:*13*
mentioned
32:*19* 33:*3*
36:*12*
met   7:*20*
25:*12*

microbraids
22:*15*
micros
22:*17*
mind
41:*19, 20*
minutes
18:*19*
19:*19*
24:*23* 25:*3*
26:*12*
Mobis   37:*8*
38:*5* 43:*2,
6*

moment
2:*21* 3:*2*
4:*4* 34:*6*
Monday
23:*14*
30:*13*
Montgomer
y   6:*14*
41:*17*
morning
19:*18*
23:*15*

< N >
name   2:*6*
natural
17:*17* 18:*2*
neat   18:*5*
need   4:*13,
22* 36:*6*
neither
18:*20*
23:*19*
never   19:*7,
8* 22:*22*
28:*3, 5, 6, 9,
11, 13*
36:*21*
38:*13, 17,
23* 39:*1, 6,
14, 15*
41:*19, 20*
42:*22*
Nicole
13:*14* 18:*7*
25:*10, 11*
27:*20*
30:*11, 17*
33:*3, 13, 14*
37:*11*
39:*23*
41:*16*

normal
4:*20* 12:*19*
note   24:*13,
18*
notes
31:*16*
39:*10*
number
2:*10* 3:*12*

< O >
oath   5:*4,
13, 23*
obligated
12:*3*
occasion
18:*15*
occupation
4:*21*
occurred
40:*14*
offer   8:*21*
offered   8:*3*
19:*13* 26:*5*
28:*10*
32:*15* 37:*4*
38:*7* 40:*7,
12, 22*
offering
28:*16*
offers   38:*4*
office   6:*14*
7:*22* 8:*20*
18:*7, 8*
19:*20*
24:*14, 15*
25:*5* 27:*20*
37:*6* 38:*1,
2* 39:*11*
41:*17*

officer
3:*14* 12:*2,
20*
officer's
18:*4*
Oh   24:*11,
21* 30:*18*
33:*17*
35:*16*
39:*14*
40:*17*
42:*11*
43:*22*
Okay   2:*23*
3:*4* 4:*6*
5:*22* 6:*11*
7:*7* 9:*1, 19*
10:*3, 9, 14*
11:*6, 14, 17*
12:*15, 17*
13:*3, 5, 18*
14:*2, 8, 10,
12, 15, 18*
15:*2, 5, 7*
16:*6, 14, 20*
17:*4, 8*
18:*8, 12*
20:*18*
21:*14, 17*
22:*1, 5, 13*
23:*4* 24:*8,
11, 21*
25:*12*
26:*20* 27:*2,
4, 16* 28:*14,
20* 29:*4, 14,
16, 18, 22*
30:*7, 23*
31:*5, 16, 22*
32:*5, 6*
33:*6* 34:*4,
9, 15, 23*

35:*6, 7, 16,
18, 22* 37:*3,
16, 20*
38:*16, 21*
39:*2, 20*
40:*19* 41:*6,
9, 20, 22*
42:*1, 4, 11,
12, 13* 44:*5,
13, 16, 20*
45:*8, 12*
**once**  12:*2*
**ones**  44:*8*
**ongoing**
34:*16*
**Opelika**
29:*15*
**open**
28:*12, 13*

**< P >**
**P.O**  2:*17*
**page**  18:*3*
**paper**
31:*13* 43:*7*
**paperwork**
8:*19*  15:*21*
**part**  11:*4*
17:*6* 36:*3*
38:*10*
**parties**
3:*14*  11:*15*
41:*7*
**part-time**
8:*4* 32:*20*
36:*7, 8*
37:*8*
**passed**
25:*1, 3*
**pay**  33:*2*
**paycheck**
17:*14*

**people**
21:*3*
**person**
20:*11*
**personally**
40:*22*
**personnel**
21:*15*
22:*15*
**person-to-
person**
34:*1*
**perspective**
36:*21*
**phone**
2:*10*  30:*22*
**phonetic**
40:*2*
**piece**  43:*7*
**place**  2:*21*
5:*13*  7:*23*
9:*13*  25:*14*
29:*8*
**placed**  9:*2*
**places**  8:*2*
29:*4*
**plan**  2:*13*
**play**  45:*14*
**please**  2:*3*
3:*2*  33:*9,
10, 12*  39:*4*
45:*22*
**plenty**
36:*23*
**point**  7:*17*
15:*13, 22*
33:*5, 19, 23*
35:*15*  36:*7*
39:*17*  40:*1*
45:*3*
**policies**
37:*2*

**policy**
17:*22, 23*
18:*1*  19:*3,
5, 7*  20:*19*
21:*11, 13,
18, 19, 20,
23*  22:*8, 19,
20*  25:*8, 13,
18*  33:*16*
**pools**
40:*12*
**position**
8:*6, 21*
12:*23*  14:*5*
15:*12*  18:*9*
28:*10, 14*
29:*9*  32:*19*
33:*18*
34:*11*  43:*7,
19*
**positions**
8:*3, 4*
12:*10, 13*
32:*14, 17,
20*  33:*2*
36:*8*  37:*5,
10*  40:*5, 6,
12, 22*  42:*6,
22*  43:*16*
**possibility**
37:*7*
**posted**
22:*9*
**potential**
9:*6*
**prefer**
27:*10*  30:*3*
35:*13*
**preferred**
35:*23*
**pregnant**
18:*23*  20:*1,*

*4*  23:*23*
26:*1*  36:*16,
22, 23*

**prerecorded**
1:*17*
**present**
3:*15*
**presented**
24:*13*
**pretty**
37:*18*
**prior**  10:*10*
22:*22*  31:*9*
**probably**
25:*2*
**problem**
6:*21*  7:*2*
9:*3*  12:*7, 8*
15:*10*
26:*17*
36:*13*
41:*22*
**procedures**
5:*12, 19*
**process**
9:*22*  10:*15*
31:*3*
**provides**
4:*2*
**pulled**
18:*22*
**put**  28:*22,
23*  29:*2, 5,
6*  30:*4*
31:*8*  43:*20*

**< Q >**
**Q**  6:*11, 15,
18, 21*  7:*2,
7*  8:*10*  9:*1,
19, 21*  10:*3,*

*9, 14, 18*
11:*6, 10, 14,
17, 20*
12:*15, 17*
13:*3, 5, 18,
21, 23*  14:*2,
8, 10, 12, 15,
18, 21, 23*
15:*2, 5, 7,
23*  16:*9, 14,
17, 20*  17:*8*
20:*8, 13, 18*
22:*7, 13*
23:*4, 9, 17,
21*  24:*1, 5,
8, 11, 18, 21*
25:*20*  26:*3,
9, 20, 23*
27:*2, 4, 6,
16*  28:*9, 20*
29:*1, 4, 11,
14, 16, 18,
22*  30:*7, 23*
31:*5, 15*
32:*5, 12*
33:*6, 9, 12*
34:*4, 6, 15,
23*  35:*3, 6,
16, 18, 22*
36:*18*  37:*3,
16, 20, 23*
38:*4, 9, 21*
39:*2, 5, 18,
20, 22*  40:*9,
15, 19*
41:*14, 22*
42:*1, 4, 7, 9,
12, 14, 17*
43:*9, 12, 15,
17, 20, 23*
44:*3, 5, 8,*

*10*, *13*, *16*, *20*

**quarter** 15:*20*

**question** 5:*6* 10:*22* 16:*3* 32:*7*

**questioning** 19:*6*

**questions** 5:*8*, *15*, *17*, *19*

**quit** 40:*4*

**quite** 16:*2*

**quote** 21:*12*

**quoted** 21:*19*

**< R >**
**rate** 33:*2*
**Ray** 2:*4* 20:*10* 30:*18*
**read** 20:*23*
**reading** 40:*15*
**ready** 16:*2*
**really** 11:*11* 20:*3* 27:*7* 42:*18*
**reason** 3:*19* 4:*16*, *23* 31:*17*
**reasons** 29:*19*
**reassignme nt** 14:*23* 15:*1*, *2* 35:*7*, *8* 37:*6*

**rebuttal** 41:*15*
**recall** 11:*22*
**receive** 30:*22*
**record** 4:*8* 6:*11* 42:*12* 45:*6*, *15*

**RECORDED** 1:*7* 45:*14*
**RECORDIN G** 46:*7*
**reference** 33:*16*
**refusal** 38:*22* 44:*6*
**regarding** 10:*4*, *10* 11:*18*
**regulations** 17:*11*
**reiterating** 45:*10*
**remember** 29:*13*
**removed** 7:*18*, *21* 9:*18* 12:*3*
**repeatedly** 33:*15*
**representati ve** 10:*8*

**represented** 3:*17*
**request** 15:*3*
**requested** 34:*22*
**requests** 12:*2*

**resource** 20:*11* 26:*22* 40:*3*
**resources** 20:*6*
**restrictions** 24:*20*
**returned** 19:*16*
**right** 4:*8* 5:*11* 6:*8* 10:*3* 13:*21* 14:*2*, *20* 15:*7*, *8* 20:*13*, *18* 22:*7* 23:*4*, *5*, *9* 24:*21*, *22* 26:*3* 28:*19*, *20* 29:*18*, *20* 32:*5*, *12* 33:*9* 34:*6* 35:*2* 37:*3*, *4*, *16*, *17* 38:*5* 39:*5* 40:*19* 41:*14* 42:*14* 43:*15* 44:*20*, *22*
**rights** 45:*19*
**rigid** 7:*12*
**Robin** 19:*11*
**Robinson** 7:*14* 9:*8*, *16* 10:*5*, *6* 11:*1* 16:*23* 17:*5*, *10*, *23* 18:*14*, *16*, *22* 19:*5*, *14*,

*17* 21:*2* 23:*15*, *22* 25:*3* 26:*1*, *13*
**roll** 22:*9*, *10*
**room** 17:*20* 22:*9*, *10*
**rule** 19:*8*
**rules** 17:*3*, *11*

**< S >**
**sat** 23:*6*
**saw** 18:*14* 19:*18*, *20* 23:*15*, *16* 26:*11*, *12*
**saying** 9:*21* 19:*8* 24:*9* 28:*9*, *15* 31:*9* 33:*14*
**says** 15:*21* 18:*4* 21:*9*, *10* 22:*8*, *13*, *14* 31:*14* 40:*6*, *11* 41:*16*
**Scavella** 13:*14* 41:*16*
**Scavella's** 40:*5*, *17*
**schedule** 37:*14*
**screen** 31:*17*
**second** 4:*5* 8:*22*

36:*8* 37:*9* 43:*1*, *4*
**section** 3:*23* 4:*8*, *17*, *22*
**sections** 4:*1*, *7*
**Security** 2:*5* 3:*16* 6:*14* 12:*6*, *7*, *20* 17:*12* 19:*10* 20:*21* 33:*16*, *23* 36:*14*
**Security's** 17:*23* 41:*17*
**see** 2:*21* 6:*19* 9:*15* 19:*3*, *6* 20:*18* 23:*1* 25:*17* 30:*8* 31:*15*, *22* 40:*20*
**seeing** 38:*23*
**seeking** 4:*19*
**seen** 22:*22* 39:*3*
**Selma** 27:*21*, *22*, *23*
**send** 9:*6*
**sent** 11:*16* 14:*18*, *21* 19:*14*, *20* 20:*9* 26:*6*, *12* 35:*7*, *8* 37:*5* 39:*23*

separating 4:*7*

**September** 1:*10, 19* 3:*13*

seriously 39:*10*

seven 29:*3*

shared 24:*15*

**She'd** 33:*17*

shift 8:*7, 11, 13, 18, 22* 12:*14* 27:*8, 10* 30:*3* 35:*14, 15, 21* 36:*1, 8* 37:*9, 13* 40:*13* 41:*18, 19* 43:*1, 2*

shifts 4:*20* 8:*8, 14, 16, 23* 12:*20* 32:*22* 43:*5*

**Shonty** 40:*2*

show 2:*16* 19:*4* 23:*3* 25:*19*

showed 21:*23* 22:*19, 20*

shown 22:*23* 23:*2*

shows 18:*3* 31:*7*

sic 8:*18*

signed 17:*13* 40:*20* 44:*6*

simply 18:*4* 34:*20*

**Simultaneo us** 24:*3* 43:*13*

sir 2:*7, 17, 20* 6:*11, 21* 7:*2* 9:*1* 10:*10* 12:*18* 13:*23* 14:*2* 15:*23* 21:*1* 32:*12, 14* 33:*9, 12* 34:*6, 13* 37:*3, 16* 43:*9* 44:*6, 23* 45:*15*

site 7:*19, 22* 9:*7, 16, 17* 12:*3* 20:*17* 22:*3*

sites 43:*5*

situation 7:*10* 10:*11, 13* 11:*18* 44:*18*

size 22:*16*

solemnly 6:*1*

soon 23:*22* 24:*13* 27:*20*

**Sorry** 6:*19* 8:*14* 31:*19* 40:*17* 41:*20*

sort 36:*22*

sound 7:*4*

sounds 14:*22*

speak 10:*9* 20:*5, 10* 26:*22* 42:*18*

speaking 2:*3* 32:*2* 33:*20* 39:*8*

specific 17:*2*

specifically 8:*20* 11:*1* 42:*23*

**Spell** 2:*6*

**Spires** 41:*15*

spoke 10:*4* 20:*14, 15* 25:*4, 10, 11* 27:*1* 37:*12*

spoken 10:*12* 33:*14*

standards 7:*11, 19* 9:*11* 10:*16, 21*

stands 30:*5*

start 5:*13*

**STATE** 1:*9* 2:*2* 18:*2*

stated 8:*12* 11:*23* 37:*12*

statement 33:*13* 39:*23* 40:*5, 11, 18* 41:*2, 4*

stating 13:*14*

33:*15, 17*

stay 34:*11*

strict 10:*16, 21* 17:*2*

strike 4:*3* 14:*3* 41:*23* 42:*2, 3*

submitted 18:*2*

suitable 4:*19* 5:*1, 3*

supervisor 17:*20*

sure 13:*7* 17:*15* 20:*21* 21:*18* 34:*3* 39:*5, 22* 44:*14*

swear 6:*1*

sworn 41:*7, 8*

system 9:*5* 31:*7, 13, 16, 20*

**< T >**

tad 22:*16*

take 5:*1* 6:*21* 9:*13* 11:*8, 20* 17:*16* 23:*9* 33:*1* 36:*2* 39:*10* 41:*6* 42:*23* 43:*7, 19*

talk 40:*19*

talked 7:*15* 13:*15* 18:*7* 19:*1* 23:*6*

27:*17* 33:*4* 37:*7*

**Target** 29:*9*

telephone 3:*11*

tell 16:*21* 17:*1* 27:*7* 29:*4* 30:*18* 42:*5, 10* 43:*4*

telling 18:*17* 25:*10* 26:*17, 18* 28:*17* 33:*23*

terminate 12:*5*

testimony 5:*2, 5, 14, 15, 16, 17* 6:*1* 16:*2* 34:*7* 41:*7, 8*

**Thank** 2:*20* 3:*3* 5:*11, 22* 6:*8* 16:*20* 23:*4* 24:*22* 42:*14* 44:*20* 45:*1, 22, 23* 46:*1, 2*

thereabouts 14:*7*

thing 15:*17* 17:*21* 30:*2* 32:*23* 34:*2* 36:*21, 22*

Case 2:19-cv-00767-ECM-SMD   Document 81-11   Filed 11/03/22   Page 25 of 26
USCA11 Case: 24-11126   Document: 62   Date Filed: 02/17/2025   Page: 161 of 217
Unemployment Hearing

9/23/2022
24

38:*14*
39:*21*
**things**  9:*9*
13:2  18:*17*
33:*3*  36:*11*
**think**  8:*4,*
*15, 19*
13:*13*  14:*6*
15:*20, 21*
30:*15*
32:*23*  36:*9,*
*12, 19*  37:*9,*
*18*
**third**  8:*22*
36:*8*  37:*9*
41:*19*  43:*1,*
*4*
**thought**
18:*1*  20:*11*
33:*21*
**threatening**
26:*15*
**three**
15:*19*
33:*18*
**time**  3:*10*
6:*21*  7:*21*
8:*3, 9*  11:*9*
12:2, *7, 23*
13:*10, 15*
14:*9*  15:*13*
16:*4*  20:*15,*
*16*  30:*5*
32:*8, 21, 22*
35:*13*  36:*4*
37:*11*
38:*11, 23*
43:*8*  45:*21*
**times**  12:*12*
**title**  6:*12,*
*15*

**today**  2:*14*
3:*12, 15, 19,*
*23*  4:*13*
5:*18*  30:*6*
45:*21*
**told**  8:*18,*
*20*  11:*1*
13:*16*  19:*3,*
*9*  20:*17*
21:*23*
23:*12, 13*
24:5, *9, 12,*
*15*  25:*1, 9,*
*17, 18, 19,*
*21, 22, 23*
26:*4, 5, 6*
27:*9, 13*
28:*11*
29:*22*
30:*17, 18*
34:*19*  35:*6,*
*17*  36:*12,*
*14, 17*
38:*13*  39:*6*
41:*16*
42:*10, 21*
43:*8*  45:*5*
**top**  6:*22*
**trade**  4:*20*
**trainer**
18:*18*  25:*2*
**training**
18:*6*

**Transcribed**
1:*17*
**TRANSCRIP**
**TION**  1:*6*
**transported**
20:*16*
**tree**  22:*15*

**tried**  7:*22*
8:*21*  28:*23*
**true**  30:*5*
**truth**  6:2, *3*
**try**  13:*9*
**trying**
13:*20*  20:*2*
28:*22*
**Tuscumbia**
2:*18*
**twice**  23:*3*
**twist-style**
22:*17*
**two**  4:*1, 6*
7:*6, 8*  13:*8*
16:*10*  22:*2,*
*21*  37:*5*
38:*4, 6*
44:*8*

**< U >**
**Uh-huh**
11:*10*  20:*8*
23:*17*  26:*3,*
*9*  28:*20*
29:*11*
36:*18*  44:*7*
46:*3*
**unavailable**
40:*5*
**understand**
11:*7*  15:*23*
34:*13*  36:*6,*
*10*  41:*5*
**UNEMPLOY**
**MENT**  1:*7*
13:*1, 7*
15:*22*  31:*1*
**unfortunate**
15:*17*
**UNIT**  1:*9*
2:*2*

**unrelated**
30:*17*
**usually**
6:*22*

**< V >**
**valid**  36:*20,*
*21*
**various**
43:*5*
**voluntarily**
4:*10, 11, 15*
40:*4*

**< W >**
**Walmart**
29:*9*
**want**  14:*3*
20:*17, 21*
32:7  33:*12*
34:3  36:*1,*
*2*  42:*18, 19*
43:6  44:*15*
**wanted**
21:*18*
23:*12*
32:*23*
35:*21*  37:*9*
39:*19*
44:*14*
**way**  9:*5*
26:*16*
**wear**  17:*15*
18:*1*  22:*15*
**wearing**
34:*9*
**Wednesday**
21:*6*
**week**  8:*6*
40:*8*
**weekend**
32:*21*  33:*2*

**weekends**
42:*22*
**weekly**
28:*22*  29:*2*
**weeks**
13:*9*  28:*2,*
*5*  30:*19*
33:*18*
**welcome**
45:*2*
**well**  6:*17*
7:*10*  9:*5*
11:*22*  12:*9*
15:*9*  17:*17*
20:*10*
23:*13*  24:*7,*
*18*  25:*9, 14*
27:*21*  28:*1,*
*7, 17*  32:*16*
33:*13*
34:*19*
35:*11, 12*
36:3  41:*3*
42:*20*
**went**  18:*6,*
*13*  20:*14*
23:*5, 11, 14*
24:*14*
26:*21*
30:*12, 15,*
*16*  34:*8*
37:*23*  38:*1*
**we're**  12:*3*
28:*4, 17*
**we've**
36:*23*
38:*10*
**when's**
27:*16*
**Williams**
7:*15, 18*
10:*6, 7*

15:*4*  17:*6,
19, 21*
18:*14*  19:*1,
3, 11, 18*
21:*22*  23:*2,
15*  24:*15,
16*  25:*3, 6,
14, 17*
34:*12, 17*
35:*1*
**willing**
9:*10*  10:*23*
11:*8, 23*
**willingness**
10:*20*
**wish**  45:*4*
**words**
17:*13*
27:*11*
**wore**  19:*12,
16*
**work**  4:*11,
12, 19*  5:*1,
3*  8:*2*
12:*12*
13:*11*
18:*13*
23:*14*
24:*20*
25:*16*  27:*8,
10*  29:*20,
23*  30:*3*
37:*12*
39:*19*
40:*13*
41:*18*
**work-
connected**
4:*15, 16*
**worked**
6:*16*  7:*3*
15:*18*

16:*17*
17:*13*
**working**
15:*12*
21:*16*
36:*23*  37:*8*
**works**  9:*5*
10:*8*  41:*19*
**writing**
19:*7*  45:*18*
**wrong**  18:*9*

**< Y >**
**y'all**  41:*5*
**Yeah**  29:*1*
30:*18*
31:*15, 17,
18*  33:*11*
34:*5*  40:*19*
41:*11*
42:*18*
**years**  26:*2*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 12 – HEA Invoice to HMMA for Dynamic's Services**



HYUNDAI ENG AMERICA, INC.
CA Office : 111 PETERS CANYON IRVINE, CA 92606

8/2/2017

REF. NO.: LET-30-HMMA FM-SEC-IN-30

**HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC**

**700 Hyundai Blvd. Montgomery AL 36105**

**Attention: Jeffery Mattox/ Assistant Manager**

Subject: Monthly Payment No.30 (JULY 2017) for HYUNDAI ENG AMERICA, INC., for SECURITY SERVICE for HMMA

Dear Sir,

First of all, we would like to express our sincere appreciation of the cooperation and assistance to us.

Referring to the above subject, you are kindly requested to pay the Monthly Payment for service that has been carried

out by HYUNDAI ENG AMERICA, INC., as follows:

    **1. Contract :**          **Security Service for HMMA**

    **2. This Month Amount :**    **US$     197,531.69**

We desire you to approve the above amount after examination in accordance with the contract, and we are herewith

enclosing the invoice of No. HMMA-FM-SEC- 30.

We look forward to your timely review and discreet decision.

Sincerely yours,

**JIN KWANG KIM / Project Manager**

PLAINTIFF'S EXHIBIT

24



## INVOICE for SECURITY SERVICE for HMMA

INVOICE NO: HMMA-FM-SEC-30

INVOICE DATE: JULY.31.2017 / DUE DATE: SEPTEMBER.2.2017.

APP/PAYMENT: JULY.01.2017 - JULY.31.2017

AMOUNT DUE :                 $197,531.69

CLIENT : HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC.

CONTRACTOR: HYUNDAI ENG AMERICA, INC.

| | | SECURITY SERVICE FOR JULY | | QTY (HR) | AMOUNT ($) | QTY (HR) | AMOUNT ($) | QTY (HR) | AMOUNT ($) |
|---|---|---|---|---|---|---|---|---|---|
| 1) | | SUPERVISOR | 29.89 | 720.00 | $21,520.80 | 744.00 | $22,238.16 | 5,087.00 | $152,050.43 |
| 2) | | SECURITY & ADMIN SUPPORT | 18.62 | 668.00 | $12,438.16 | 415.00 | $7,727.30 | 4,018.75 | $74,829.13 |
| 3) | | MAILROOM | 21.23 | 212.50 | $4,511.38 | 165.50 | $3,513.57 | 1,911.00 | $40,570.53 |
| 4) | | OFFICER I | 16.24 | 4952.50 | $80,428.60 | 4186.00 | $67,980.64 | 34,374.75 | $558,245.94 |
| 5) | | OFFICER II | 23.82 | 4505.25 | $107,315.06 | 4033.25 | $96,072.02 | 30,795.50 | $733,548.81 |
| 6) | | | | | | | | | |
| 7) | | | | | | | | | |
| | | | | | | | | 76,187.00 | $1,559,244.89 |

APPROVED BY:

_____     _____
Contract Administrator                        Date

CERTIFIED BY CONTRACTOR :

_____     _____
Project Manager                                   Date

◼ REMIT TO : HYUNDAI ENG AMERICA, INC.
   111 PETERS CANYON ROAD, IRVINE, CA 92606

# HYUNDAI
ENGINEERING CO., LTD.

## BILLING APPROVAL REQUEST

| FOR APPROVAL | | | PLN CTL | PJT.MGR | PRESIDENT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | ADM DEPT. |
| | | | | FNC DEPT. |

| INVOICE DATE | JULY.31.2017 | INVOICE NO | HMMA-FM-SEC-30 | DUE DATE | SEPTEMBER.2.2017 |
|---|---|---|---|---|---|
| PROJECT | SECURITY SERVICE FOR HMMA | PJT CODE | | | HYUNDAI ENG AMERICA, INC |
| CLIENT | | ORIGINAL CONTRACT | | | |
| SCOPE OF WORKS | SECURITY SERVICE | REVISED CONTRACT | | | |
| CONTRACT PERIOD | FEBRUARY.01.2013 - JANUARY.31.2017 | AP-BOND AMT/EXPIRY | N/A | | |

( Currency : USD )

| DESCRIPTION | | | UP TO PREVIOUS BILL | THIS BILL | UP TO THIS BILL | REMARKS |
|---|---|---|---|---|---|---|
| PAYMENT RECEIVED IN ADVANCE | | ① | | | | |
| WORKS DONE | WORK DONE | | 226,214.00 | 197,631.69 | 1,559,244.89 | |
| | V/O, C/O | | | | | |
| | OTHERS | | | | | |
| | GROSS AMOUNT | ② | 226,214.00 | 197,631.69 | 1,559,244.89 | |
| ADV. REPAYMENT | | ③ | | | | |
| RETENTION | | ④ | | | | |
| CONTRA CHARGES | MATERIALS | | | | | |
| | LABOUR CHG | | | | | |
| | EQUIPMENT | | | | | |
| | OTHERS | | | | | |
| | SUB-TOTAL | ⑤ | | | | |
| NET AMOUNT | | ⑥=①+②-③-④-⑤ | 226,214.00 | 197,631.69 | 1,559,244.89 | |
| TAXES | | ⑦ | | | | |
| | WITHHOLDING (less) | ⑧ | | | | |
| NET RECEIPT | | ⑨=⑥+⑦-⑧ | 226,214.00 | 197,631.69 | 1,559,244.89 | |

# HYUNDAI
ENGINEERING CO., LTD.
## Subcontract Payment Request

**FOR APPROVAL**

| PLN CTL | PJT.MGR | PRESIDENT |
|---|---|---|
| | | |

| ADM DEPT. | FNC DEPT. |
|---|---|
| | |

| INVOICE DATE | JULY.31.2017 |
|---|---|

| INVOICE NO | 30 (Invoice #7170) |
|---|---|

| DUE DATE | SEPTEMBER.2.2017 |
|---|---|

| PROJECT | SECURITY SERVICE FOR HMMA | PJT CODE |  |
|---|---|---|---|
| CLIENT | | | HYUNDAI ENG.AMERICA, INC |
| SCOPE OF WORKS | SECURITY SERVICE | ORIGINAL CONTRACT / REVISED CONTRACT | |
| CONTRACT PERIOD | FEBRUARY.01.2016 - JANUARY.31.2017 | AP-BOND AMT/EXPIRY | N/A |

(Currency : USD)

| DESCRIPTION | | UP TO PREVIOUS BILL | THIS BILL | UPTO THIS BILL | REMARKS |
|---|---|---|---|---|---|
| ADVANCE PAYMENT | ① | | | | |
| WORKS DONE — WORK DONE | | 196,683.50 | 171,745.47 | 1,355,698.04 | |
| VIO, C/O | | | | | |
| OTHERS | | | | | |
| GROSS AMOUNT | ② | 196,683.50 | 171,745.47 | 1,355,698.04 | |
| ADV. REPAYMENT | ③ | | | | |
| RETENTION | ④ | | | | |
| CONTRA CHARGES — MATERIALS | | | | | |
| LABOUR CHG | | | | | |
| EQUIPMENT | | | | | |
| OTHERS | | | | | |
| SUB-TOTAL | ⑤ | | | | |
| NET AMOUNT | ②-①+③-④-⑤ | 196,683.50 | 171,745.47 | 1,355,698.04 | |
| TAXES — WITH-HOLDING (less) | ⑦ | | | | |
| OTHERS | ⑧ | | | | |
| NET PAYMENT | ②-③+⑦-⑧ | 196,683.50 | 171,745.47 | 1,355,698.04 | |

HEA0222 - CONFIDENTIAL

# DYNAMIC SECURITY SERVICES

*Over 50 Years of Quality Protective Services*
P.O. Box 451   Tuscumbia, AL 35674

| Invoice Date: | Invoice Number |
|---|---|
| 8/1/2017 | 7170 |

Cassandra Williams
Hyundai ENG America, Inc. / Manager
c/o 700 Hyundai Blvd
Hyundai Motor Manufacturing Alabama
Montgomery, Alabama 36105

Cust ID:  HMMA
PO#:

| | Description | Hours | Rate | Total |
|---|---|---|---|---|
| | Security Services for the month of July 2017 Hyundai | | | $   171,745.47 |

Remit to address
Dynamic Security, Inc.
MSC # 601
PO Box 830810
Birmingham, AL 35283-0810

**TOTAL INVOICE**    $   171,745.47

HEA0223 - CONFIDENTIAL

# DYNAMIC SECURITY SERVICES

*Over 50 Years of Quality Protective Service*

P.O. Box 451  Tuscumbia, AL 35674

| **Invoice Date:** | **Invoice Number** |
|---|---|
| 8/1/2017 | 7170 |

Cassandra Williams
Hyundai ENG America, Inc. / Manager
c/o 700 Hyundai Blvd
Hyundai Motor Manufacturing Alabama
Montgomery, Alabama 36105

**Cust ID: HMMA**
**PO#:**

| Description | Hours | Rate | Total |
|---|---|---|---|
| **Security Services for the month of July 2017 Hyundai** | | | |
| Supervisor | 744.00 | 25.99 | 19,336.56 |
| Admin Assts | 415.00 | 16.19 | 6,718.85 |
| Mailroom Staff | 165.50 | 18.46 | 3,055.13 |
| Officer 1 | 4,186.00 | 14.12 | 59,106.32 |
| Officer 2 | 4,033.25 | 20.71 | 83,528.61 |

Remit to address:
Dynamic Security, Inc.
MSC # 601
PO Box 830810
Birmingham, AL  35283-0810

**TOTAL INVOICE**                    $    171,745.47



HYUNDAI ENG AMERICA, INC.
CA Office: 111 PETERS CANYON IRVINE, CA. 92606

2017-09-12

REF. NO.: LET-31-HMMA FM-SEC-IN-31

**HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC**
**700 Hyundai Blvd. Montgomery AL 36105**
**Attention: Jeffery Mattox / Assistant Manager**

Subject: Monthly Payment No.31 (AUGUST 2017) for HYUNDAI ENG AMERICA, INC., for SECURITY SERVICE for HMMA

Dear Sir,

First of all, we would like to express our sincere appreciation of the cooperation and assistance to us. Referring to the above subject, you are kindly requested to pay the Monthly Payment for service that has been carried out by HYUNDAI ENG AMERICA, INC., as follows:

    1. Contract :         Security Service for HMMA
    2. This Month Amount :   US$     235,633.29

We desire you to approve the above amount after examination in accordance with the contract, and we are herewith enclosing the Invoice of No. HMMA-FM-SEC-31.

We look forward to your timely review and discreet decision.

Sincerely yours,

JIN KWANG KIM / Project Manager

FILE

PLAINTIFF'S
EXHIBIT
25

## INVOICE for SECURITY SERVICE for HMMA

INVOICE NO: HMMA-FM-SEC-31

INVOICE DATE: AUGUST.31.2017 / DUE DATE: OCTOBER.12.2017

APPP.^'MENT: AUGUST.01.2017 - AUGUST.31.2017

AMOUNT DUE :   2(        $235,833.29

CLIEN I : HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC.

CONTRACTOR: HYUNDAI ENG AMERICA, INC.

| ITEM NO. | PERIOD | DESCRIPTION | FEE SCHEDULE | PREVIOUS PERIOD | | THIS PERIOD (AUGUST, 2017) | | TO DATE | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | QTY (HR) | AMOUNT ($) | QTY (HR) | AMOUNT ($) | QTY (HR) | AMOUNT ($) |
| | | SECURITY SERVICE FOR AUGUST | | | | | | | |
| 1) | | SUPERVISOR | 29.89 | 744.00 | $22,236.16 | 744.00 | $22,236.16 | 5,831.08 | $ 74,288 |
| 2) | | SECURITY & ADMIN SUPPORT | 18.62 | 415.00 | $7,727.30 | 666.75 | $12,414.89 | 4,685.50 | $57,219 |
| 3) | | MAILROOM | 21.23 | 165.50 | $3,513.57 | 223.50 | $4,744.91 | 2,134.50 | $45,315 |
| 4) | | OFFICER I | 16.24 | 4166.00 | $67,960.84 | 5123.00 | $83,197.52 | 39,497.75 | $641,443 |
| 5) | | OFFICER II | 23.82 | 4033.25 | $96,072.02 | 4745.50 | $113,037.81 | 35,541.00 | $846,586 |
| 6) | | | | | | | | | |
| 7) | | | | | | | | | |
| | | GRAND TOTAL | | 9543.75 | $197,524.89 | 11502.75 | $235,833.29 | 87,689.75 | $1,94,878 |

APPROVED BY:

Contract Administrator                    Date

CERTIFIED BY CONTRACTOR :

Project Manager                           Date

REMIT TO : HYUNDAI ENG AMERICA, INC.
111 PETERS CANYON ROAD, IRVINE, CA 92606

# HYUNDAI
ENGINEERING CO., LTD.

## BILLING APPROVAL REQUEST

| | | | | |
|---|---|---|---|---|
| | PLN CTL | P.JT.MGR | ADM DEPT. | PRESIDENT |
| FOR APPROVAL | | | | |
| | CDU/HS | (sign) 2017-06-12 | | |
| | | FNC DEPT. | | |

| | | | |
|---|---|---|---|
| INVOICE DATE | AUGUST.31.2017 | INVOICE NO | HMMA-FM-SEC-31 |
| PROJECT | SECURITY SERVICE FOR HMMA | PJT CODE | |
| CLIENT | HMMA | ORIGINAL CONTRACT | |
| SCOPE OF WORKS | SECURITY SERVICE | REVISED CONTRACT | |
| CONTRACT PERIOD | FEBRUARY.01.2013 - JANUARY.31.2017 | AP-BOND.AMT/EXPIRY | N/A |

DUE DATE   OCTOBER.1/2.2017   HYUNDAI ENG.AMERICA.INC

(Currency : USD)

| DESCRIPTION | | UP TO PREVIOUS BILL | THIS BILL | UP TO THIS BILL | REMARKS |
|---|---|---|---|---|---|
| PAYMENT RECEIVED IN ADVANCE | ⓐ | | | | |
| WORKS DONE | WORK DONE | 197,531.69 | 235,833.29 | 1,794,878.18 | |
| | V/O, C/O | | | | |
| | OTHERS | | | | |
| | GROSS AMOUNT ② | 197,531.69 | 235,833.29 | 1,794,878.18 | |
| ADV. REPAYMENT | ⓑ | | | | |
| RETENTION | ⓒ | | | | |
| CONTRA CHARGES | MATERIALS | | | | |
| | LABOUR CHG | | | | |
| | EQUIPMENT | | | | |
| | OTHERS | | | | |
| | SUB-TOTAL ⓓ | | | | |
| NET AMOUNT ⓔ=②-ⓐ-ⓑ-ⓒ-ⓓ | WITHHOLDING (less) | 197,531.69 | 235,833.29 | 1,794,878.18 | |
| TAXES | ⓕ | | | | |
| NET RECEIPT ⓖ=ⓔ-ⓕ | | 197,531.69 | 235,833.29 | 1,794,878.18 | |

# HYUNDAI
### ENGINEERING CO., LTD.

## Subcontract Payment Request

| | | | | PLN-CTL | P/T-MGR | PRESIDENT |
|---|---|---|---|---|---|---|
| FOR APPROVAL | | | | | | |

| INVOICE DATE | AUGUST.31.2017 | | INVOICE NO | 31 (Invoice #6170) | | DUE DATE | OCTOBER.12.2017 | ADM.DEPT. |
|---|---|---|---|---|---|---|---|---|
| PROJECT | SECURITY SERVICE FOR HMMA | | | P/J. CODE | | | HYUNDAI ENG AMERICA, INC | |
| CLIENT | DYNAMIC SECURITY, INC. | | | ORIGINAL CONTRACT | | | | FNG.DEPT. |
| SCOPE OF WORKS | SECURITY SERVICE | | | REVISED CONTRACT | | | N/A | |
| CONTRACT PERIOD | FEBRUARY.01.2015 – JANUARY.31.2017 | | | AP-BOND AMT/EXPIRY | | | | |

8/12/2017

ewus

(Currency : USD)

| DESCRIPTION | | UP TO PREVIOUS BILL | THIS BILL | UP TO THIS BILL | REMARKS |
|---|---|---|---|---|---|
| ADVANCE PAYMENT | | ① | | | |
| WORKS DONE | WORK DONE | 171,745.47 | 204,873.12 | 1,560,571.16 | |
| | V/O, C/O | | | | |
| | OTHERS | | | | |
| | GROSS AMOUNT ② | 171,745.47 | 204,873.12 | 1,560,571.16 | |
| ADV. REPAYMENT | ③ | | | | |
| RETENTION | ④ | | | | |
| CONTRA CHARGES: | MATERIALS | | | | |
| | LABOUR CHG | | | | |
| | EQUIPMENT | | | | |
| | OTHERS | | | | |
| | SUB-TOTAL ⑤=①+②-③-④-⑤ | | | | |
| NET AMOUNT ⑥=②-③-④-⑤ | | 171,745.47 | 204,873.12 | 1,560,571.16 | |
| TAXES | TAX(MATERIAL ONLY) ⑦ | | | | |
| | WITHHOLDING (fees) ⑧ | | | | |
| NET PAYMENT ⑨=⑥-⑦-⑧ | | 171,745.47 | 204,873.12 | 1,560,571.16 | |

# DYNAMIC SECURITY SERVICES

Over 50 Years of Quality Protective Service
P.O. Box 451  Tuscumbia, AL  35674

| Invoice Date: | Invoice Number |
|---|---|
| 9/11/2017 | 8170 |

Cassandra Williams                          Cust ID:  HMMA
Hyundai ENG America, Inc. / Manager         PO#:
c/o 700 Hyundai Blvd
Hyundai Motor Manufacturing Alabama
Montgomery, Alabama 36105

| Description | Hours | Rate | Total |
|---|---|---|---|
| Security Services for the month of August 2017 Hyundai | | | $   204,873.12 |

Remit to address
Dynamic Security, Inc.
MSC # 601
PO Box 830810
Birmingham, AL  35283-0810

**TOTAL INVOICE**                           $   204,873.12

# DYNAMIC SECURITY SERVICES

Over 50 Years of Quality Proactive Service
P.O. Box 451  Tuscumbia, AL 35674

**Invoice Date:**
9/11/2017

**Invoice Number**
8170

**Cassandra Williams**
Hyundai ENG America, Inc. / Manager
c/o 700 Hyundai Blvd
Hyundai Motor Manufacturing Alabama
Montgomery, Alabama 36105

**Cust ID:  HMMA**
**PO#:**

| Description | Hours | Rate | Total |
|---|---|---|---|
| Security Services for the month of August 2017 Hyundai | | | |
| Supervisor | 744.00 | 25.99 | 19,336.56 |
| Admin Assts | 666.75 | 16.19 | 10,794.68 |
| Mailroom Staff | 223.50 | 18.46 | 4,125.81 |
| Officer 1 | 5,123.00 | 14.12 | 72,336.76 |
| Officer 2 | 4,745.50 | 20.71 | 98,279.31 |

*Remit to address:*
*Dynamic Security, Inc.*
*MSC # 601*
*PO Box 830810*
*Birmingham, AL  35283-0810*

**TOTAL INVOICE**                    $   204,873.12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 13–Dynamic's Services EEOC Position Statement**

CONFIDENTIAL

**DYNAMIC** SECURITY, INC.

*Over 65 Years of Quality Protective Services*

September 1, 2017

RE: *Davita Key v Dynamic Security, EEOC Charge No. 846-2017-32787*

In response to the agency's request for a position statement, Dynamic Security, Inc. states that it did not discriminate or retaliate in any way against the complainant on the basis of her race, her sex, or on any other basis.

While the respondent does not have to have any reason to remove the charging party under state or federal law in that she does not have any property right in her job with the respondent, Dynamic Security, Inc. states that it does not desire to lose employees who can provide the work ethic and services required by the respondent's clients.

Ms. Key was initially interviewed and hired for a position with a client who enforces a very strict grooming policy. She was made aware of this during her interview. When Ms. Key refused to comply with those standards, she was removed from the site. Efforts to assign her to another client have been made extremely difficult due to restrictions she has placed on her availability, despite having indicated on her original application she could work any shift.

Management's attempts to reassign Ms. Key has been stymied by a lack of Monday-Friday first shift availability—the only shift Ms. Key states she can/will work. Attempts to assign her to part time weekend first shift spots were rejected. Further complicating the matter is that Dynamic has only five (5) clients in the Montgomery area with a schedule structure that includes first shift. Our management continues to monitor the staffing needs in order to offer an appropriate assignment to her.

To address Ms. Key's removal from her original assignment:

The client's grooming policy is posted in the security officer roll call room. The section pertinent to this claim reads thusly:
*It has been approved for female personnel to wear braids. Only Micro Braids, Tree Braids and whatever the size that is a tad larger than micros are acceptable. The Kinky Twist style, Bob Braids, Cornrows and Dreads are not allowed. They must ensure that will be able to wear their ball cap if necessary with whatever approved braid style they select. The braids and other hair styles can be worn down to the shoulder but not beyond.*

During the interview process on 19 July 2017, Ms. Key was made aware that her current hairstyle (dreadlocks) was not acceptable per the client's policy by both Gloria Robinson (Dynamic Security, Inc., B/F) and Cassandra Williams (HMMA, B/F). Ms. Key provided a picture to Ms. Robinson and Ms. Williams of a style where the hair was twisted in a manner which concealed the dreads and gave a neater appearance. The style in the picture was approved and Ms. Key was instructed to report to work with her hair in that arrangement on her start date of 31 July 2017.

1102 Woodward Ave. • Muscle Shoals, AL 35661 • Phone (256) 383-5798 • Fax (256) 383-6307

KEY V HMMA, HEA AND DYNAMIC

PLAINTIFF'S DEPOSITION EXHIBIT

**11**

2:19-CV-767-ECM-SMD

Upon arrival for her first shift on 31 July, Ms. Williams approached Ms. Robinson and questioned her as to why Ms. Key had not changed her hairstyle as she had been instructed on 19 July.

When questioned, Ms. Key stated she had spoken with Dynamic Security, Inc. Office Manager Nicole Scavella while completing state mandated training at the Dynamic office prior to reporting to HMMA. According to Ms. Key, Ms. Scavella said she saw nothing wrong with her hair. Ms. Key had then decided she could simply ignore the instructions to restyle her dreads to comply with HMMA policy.

While Dynamic Security, Inc. does not have a policy disallowing dreadlocks, the client site does. In cases where the client policy is stricter than our company's policy, we always defer to the client's position. Therefore, Ms. Scavella's opinion of Ms. Key's hairstyle had no bearing whatsoever on the situation, and Ms. Key was expected to abide by the client's policy as she had been informed during her interview.

After reviewing a copy of the HMMA policy regarding the company's grooming standards, Ms. Key was sent home without completing her shift with instructions to return with a style which would be in compliance with the company policy.

On 1 August 2017, Ms. Key reported to work with her hair tucked into a hat. Shortly after, Ms. Williams received a report from mailroom clerk Latunya Howell stating Ms. Key had complained to her that she was being discriminated against by Gloria Robinson and Cassandra Williams. Ms. Williams sent for Ms. Key to be transported to the security office, where Ms. Robinson and Mr. Chambliss spoke to her regarding the statement by her coworker. Ms. Key refused to comment, and reportedly only spoke of her hair during their conversation and attempted to defend herself by repeating her assertion that Ms. Scavella had said she saw nothing wrong with her current style. Ms. Robinson left to report the situation to her supervisor, and Mr. Chambliss returned Ms. Key back to the mailroom. Upon arrival, she confronted her coworker over having reported her statement to Ms. Williams.

To summarize, in the course of less than three (3) hours across two (2) days spent at the facility Ms. Key had:
- Failed to adhere to the client grooming policy as instructed
- Become argumentative with the client Manager of Security Services
- Become argumentative with the Dynamic Security Program Manager
- Become argumentative with her mailroom coworker.

It was agreed by Dynamic and HMMA management that Ms. Key should be removed from the worksite. Dynamic management chose to retain Ms. Key for reassignment.

Ms. Key questioned Supervisor Chambliss regarding filing a complaint against Ms. Williams and Ms. Robinson regarding discrimination based upon her current hairstyle and her pregnancy. She was informed she should report to the Montgomery office and meet with District Manager Dr. Ray Cureton.

Once there, she was advised that she would not be returning to that site, but would be reassigned to another Dynamic client, in accordance with Dynamic policy: *At Dynamic Security, Inc. job assignments are given on merit, experience, qualifications, job knowledge, and needs of the Client and Dynamic Security. Priority is placed on those needs. Dynamic Security makes no promise or commitment to assign an employee to a specific job site, shift, or time period. No Dynamic Security employee is authorized to make promises or commitments of this kind. Job assignments are subject to change without prior notice.*
.

At this point, Ms. Key was offered other positions, but informed the DM she would only work first shift. He informed her he had no available full time first shift positions available, but would try to assign her to one when an opening occurred. In the meantime, Ms. Key has refused work which was and is available. That it is not at a time or site to her liking does not negate that the work exists and that we are open to her acceptance of those shifts.

Dr. Cureton denies Ms. Key's allegation he "asked [her] whether [she] was going to sue the company." He states he counseled her that her removal from her assignment was the result of her refusal to follow the rules put forth by the client for security officers stationed at their facility, not by her announcement of her pregnancy.

Dynamic Security, Inc. states again that we have not discriminated or retaliated in any way against Ms. Key on the basis of her sex or her race. Ms. Key was removed from her original assignment for refusing to comply with the company's written grooming policy and presentation of a poor attitude to management and coworkers. Ms. Key was not terminated by Dynamic Security, Inc. Ms. Key has rejected reassignment to other clients. However, Dynamic remains open to Ms. Key becoming a productive employee of our team of security officers in the Montgomery area.

The correct name and address of the facility named in the charge is the following:

Dynamic Security, Inc.
5510 Wares Ferry Road, Suite S
Montgomery, AL 36117

The business of this corporate respondent is providing security services to its clients. The state of incorporation is Alabama. This facility did not have any federal contracts and has not been the subject of a compliance review by the OFCCP at any time in the past two years.

Employees are made aware of policies, procedures, and expectations in writing at the time of hire via both the initial hire packet and through the Dynamic Security, Inc. Employee Handbook, a pocket-sized guide which security officers are required to carry with them while on duty.

The total number of employees at the facility as of the most recent payroll date is 219.

CONFIDENTIAL

Sincerely,

Kristal L. Riddle
Legal Affairs Coordinator
Dynamic Security, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**Exhibit 14–Notice of Charge to HMMA**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Birmingham Direct Dial: (205) 212-2100
FAX (205) 212-2105
Website: www.eeoc.gov

October 24, 2018

HMMA HYUNDAI
c/o Chris Smith, General Counsel
700 Hyundai Blvd.
Montgomery, AL 36105

Re:     Davita M. Key v. Hyundai
        Charge Number 420-2019-00128

Dear Mr. Smith:

This letter is written to provide clarification regarding the attached Notice of Charge of Discrimination, which was served today. This clarification is deemed necessary because the Commission's procedural regulations require that notice be provided to the employer within ten days of receipt of an intake questionnaire that meets the *Federal Express Corp. v. Holowecki et. al., 552 U.S. 389 (2008)*, requirements. Charging Party's initial correspondence, which met the definition of a Charge under *Holowecki*, was received by the Commission on August 3, 2017, two (2) days after the alleged date of violation.

Due to administrative error, our staff failed to serve the Notice on Hyundai within ten days. We received Charging Party's intake questionnaire on August 3, 2017. On the intake questionnaire, she indicated her intention to file a Charge of Discrimination against Hyundai. Consequently, the original filing date will reflect as the date of the Commission's receipt of her original communication, the intake questionnaire. Within ten days of that date, we should have sent you the Notice, informing you of Charging Party's intention to file a Charge and informing you that a signed Charge of Discrimination would be forwarded to you at a later date. Although the Notice was delayed through administrative error, the Commission cannot deny the Charging Party due process required by law.

We apologize for the administrative error; however, we assure you that your position will not be prejudiced by the delay.  Please provide a substantive response to the allegations in Charging Party's Charge, including any supporting documentation, no later than **Friday, November 23, 2018**. Should you have any questions, please contact me at sheri.guenster@eeoc.gov or (205) 212-2059.

Sincerely,

Sheri Guenster
Enforcement Supervisor

Attachment: Notice of Charge of Discrimination

KEY V HMMA, HEA AND DYNAMIC
PLAINTIFF'S DEPOSITION EXHIBIT
**12**
2:19-CV-767-ECM-SMD

Key 000057



**U.S. Equal Employment Opportunity Commission**
**Birmingham District Office**
Ridge Park Place
1130 22nd Street
Birmingham, AL 35205

## NOTICE OF CHARGE OF DISCRIMINATION

(This Notice replaces EEOC FORM 131)

### DIGITAL CHARGE SYSTEM

October 24, 2018

**To:** Chris Smith
General Counsel
HMMA HYUNDAI
chrissmith@hmmausa.com

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Davita M. Key, under: Title VII of the Civil Rights Act (Title VII). The circumstances of the alleged discrimination are based on Retaliation, Race, and Sex, and involve issues of Discharge that are alleged to have occurred on or about Aug 01, 2017.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system: **https://nxg.eeoc.gov/rsp/login.jsf**
2. Enter this EEOC Charge No.: **420-2019-00128**
3. Enter this temporary password: (b) (7)(C) 1 Line Redacted

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to birmintake@eeoc.gov.

### Preservation of Records Requirement

EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

### Non-Retaliation Requirements

The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

### Legal Representation

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

Please retain this notice for your records.



## U.S. Equal Employment Opportunity Commission

### FEDERAL INVESTIGATION:
### REQUEST FOR POSITION STATEMENT
### AND SUPPORTING DOCUMENTARY EVIDENCE

EEOC hereby requests that your organization submit within 30 days a Position Statement setting forth all facts which pertain to the allegations in the charge of discrimination under investigation, as well as any other facts which you deem relevant for EEOC's consideration.

We recommend you review EEOC's resource guide on "Effective Position Statements" as you prepare your response to this request.

Fact-Based Position Statement
This is your opportunity to raise any and all defenses, legal or factual, in response to each of the allegations of the charge.  The position statement should set forth all of the facts relevant to respond to the allegations in the charge, as well as any other facts the Respondent deems pertinent to EEOC's consideration. The position statement should only refer to, but not identify, information that the Respondent asserts is sensitive medical information, or confidential commercial or financial information.

EEOC also requests that you submit all documentary evidence you believe is responsive to the allegations of the charge. If you submit only an advocacy statement, unsupported by documentary evidence, EEOC may conclude that Respondent has no evidence to support its defense to the allegations of the charge.

EEOC may release your position statement and non-confidential attachments to the Charging Party and her representative and allow them to respond to enable the EEOC to assess the credibility of the information provided by both parties. It is in the Respondent's interest to provide an effective position statement that focuses on the facts. EEOC will not release the Charging Party's response, if any, to the Respondent.

If no response is received to this request, EEOC may proceed directly to a determination on the merits of the charge based on the information at its disposal.

Signed by an Authorized Representative
The Position Statement should be signed by an officer, agent, or representative of Respondent authorized to speak officially on its behalf in this federal investigation.

Segregate Confidential Information into Separately Designated Attachments
If you rely on confidential medical or commercial information in the position statement, you should provide such information in separate attachments to the position statement labeled "Sensitive Medical Information," "Confidential Commercial or Financial Information," or "Trade Secret Information" as applicable. Provide an explanation justifying the confidential nature of the information contained in the attachments. Medical information about the

Charging Party is not sensitive or confidential medical information in relation to EEOC's investigation.

Segregate the following information into separate attachments and designate them as follows:

a. Sensitive medical information (except for the Charging Party's medical information).
b. Social Security Numbers
c. Confidential commercial or financial information.
d. Trade secrets information.
e. Non-relevant personally identifiable information of witnesses, comparators or third parties, for example, social security numbers, dates of birth in non-age cases, home addresses, personal phone numbers and email addresses, etc.
f. Any reference to charges filed against the Respondent by other charging parties.

### Requests for an Extension

If Respondent believes it requires additional time to respond, it must, at the *earliest possible time* in advance of the due date, make a written request for extension, explain why an extension is necessary, and specify the amount of additional time needed to reply. Submitting a written request for extension of time does not automatically extend the deadline for providing the position statement.

### Upload the Position Statement and Attachments into the Respondent Portal

You can upload your position statement and attachments into the Respondent Portal using the **+ Upload Documents** button. Select the "Position Statement" Document Type and click the **Save Upload** button to send the Position Statement and attachments to EEOC. Once the Position Statement has been submitted, you will not be able to retract it via the Portal.

Key 000061

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 15–Notice of Charge to HMMA**

# HMMA MAILROOM DUTIES AND RESPONSIBILITIES

The mailroom is staffed with two (2) employees Monday-Friday and is opened from 7:30am - 5pm daily. On Wednesdays the mailroom is opened until 6pm. The mailroom is closed on all holidays recognized by HMMA. The pay is $13.00 per hour.

**REQUIREMENTS:**

High School Diploma or GED

Valid Driver License-

Must Pass a Drug Screen

Criminal History background Check-

Must provide a Motor Vehicle Driver History Report-

Ability to lift up to 50 pounds-

Computer Experience (i.e. Word, Excel, Power point, etc.)-

Prior mailroom or package delivery experience is highly preferred-

Good organizational and communication skills-

The ability to multi-task-



PLAINTIFF'S EXHIBIT
20

**Duties and Responsibilities:**

Sort, deliver and/or pick up interdepartmental and other mail within the facility-

Weigh and attach proper postage to outgoing mail using a mailing meter machine and deliver to the local US Postal Service-

Receive, sign for, deliver and ship packages from such services as UPS, USPS, FedEx, DHL, etc.

Assist employees with completing the required forms and arrange/coordinate package pick up with UPS, FedEx and DHL services-

Weigh and attach proper shipping and handling fees and labels to packages to be shipped out. Review all required shipping documentations during processing to verify all HMMA removal procedures have been met-

Receive and sign for deliveries from local courier services-

1 | Page

Process, sort and deliver packages within the facility-

Periodically review and check the record postage meter machine readings each day to ensure ample postage for the processing of routine outgoing mail-

Inventory mailing and office supplies to ensure adequate shipping and mailing supplies, etc. are on hand-

Ensure that needed shipping supplies from the USPS, UPS, DHL and FedEx are on hand-

Review and reconcile shipping invoices-

Process bulk copy requests from other departments-

Other duties as required by HMMA General Affairs Department-

HEA0195 - CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DAVITA KEY, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | **Case No. 2:19-CV-767-ECM-SMD** |
| ) | |
| HYUNDAI MOTOR ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, ) | |
| LLC, *et al.,* ) | |
| ) | |
|     Defendants. ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 16–Cassandra Williams November 13, 2018 Email Concerning EEOC
Filings against Dynamic and HMMA**

| From: | Williams, Cassandra - Hyundai ENG America <CWilliams@hmmausa.com> |
|---|---|
| Sent: | Tuesday, November 13, 2018 6:37 PM |
| To: | Whitehead, Chris HMMA/Legal; scduke@hec.co.kr; Inkyu Kwak |
| Subject: | FW: EEOC COMPLAINT |
| Attachments: | Position Statement  846-2017-32787.pdf; EEOC Form 5 Key Davita.pdf |

Chris, Mr. Yu, and Mr. Kwak

This afternoon (Tuesday November 13, 2018) I forwarded a copy of the EEOC Complaint filed by Davita Key to Dynamic Security Corporate office. I was informed that Kristal Riddle with Dynamic Security handles all EEOC Complaints. Kristal reviewed the complaint HMMA received and responded back attaching a written statement and complaint that they received in September 2017 regarding Davita Key' allegations (see below email and attachments).


Thanks



Cassandra Williams
Manager of Security Services
Hyundai ENG America, Inc.
Hyundai Motor Manufacturing Alabama, LLC
T (334) 387-8913   E CWilliams@hmmausa.com
F (334) 387-8949
C (706) 590-8773


**Win Safetyquality awards...**
**SQuality** Innovate Safetyquality through proactive improvements


**From:** Kristal Riddle [mailto:klriddle@dynamicsecurity.org]
**Sent:** Tuesday, November 13, 2018 4:11 PM
**To:** Sherry Spires
**Cc:** Williams, Cassandra - Hyundai ENG America; Williams, Malinda
**Subject:** Re: EEOC COMPLAINT

Ms. Key filed against Dynamic Security for Title VII violations regarding discrimination based upon race, sex (pregnancy) and retaliation. As you can see from the attached EEOC Form 5, the allegations are similar enough but with distinct differences based on her whether her accusations fall against Dynamic vs Hyundai.

**PLAINTIFF'S EXHIBIT**

22

Cassandra, please feel free to pass along the attached Form 5 and the Position Statement which I submitted on behalf of Dynamic Security on September 1, 2017 to whomever would be in the position to respond to the EEOC's letter. I will be happy to share any of our files which I feel can be helpful to Hyundai.

If counsel would like to reach out to me to discuss the Dynamic position statement, please pass along my email address to whomever that might be.

Thank you,

Kristal Riddle
Legal Affairs Coordinator

**From:** Sherry Spires <sspires@dynamicsecurity.org>
**To:** Kristal Riddle <klriddle@dynamicsecurity.org>
**Cc:** Williams Cassandra - Hyundai ENG America <cwilliams@hmmausa.com>; Malinda Williams <malinda.williams@hmmausa.com>
**Sent:** Tuesday, November 13, 2018 2:32 PM
**Subject:** Fw: EEOC COMPLAINT

Cassandra and Malinda:  I'm forwarding this email to Kristal Riddle, as she handles our EEOC Charges.

Kristal:  This name is familiar to me.  I know I have a file and/or an unemployment file on her.  I'll forward to you as soon as I can find it.

Sherry

----- Forwarded Message -----
**From:** "Williams, Cassandra - Hyundai ENG America" <CWilliams@hmmausa.com>
**To:** Tracy Peoples <peoplestracy06@yahoo.com>; "sspires@dynamicsecurity.org" <sspires@dynamicsecurity.org>
**Cc:** "MARTRISE REED (TREED@DYNAMICSECURITY.ORG)" <TREED@DYNAMICSECURITY.ORG>; Greg Carter <gcarter@dynamicsecurity.org>; "Williams, Malinda" <Malinda.Williams@hmmausa.com>
**Sent:** Tuesday, November 13, 2018 2:20 PM
**Subject:** EEOC COMPLAINT

2

Tracy and Sherry,

Please see attached copy of an EEOC Complaint filed by Davita Key that was hired for the Mailroom last year. You may have already received a copy of it. I can tell you most of the allegations stated are fabricated and/or embellished.

Thanks



Cassandra Williams
Manager of Security Services
Hyundai ENG America, Inc.
Hyundai Motor Manufacturing Alabama, LLC
T (334) 387-8913   E CWilliams@hmmausa.com
F (334) 387-8949
C (706) 590-8773

**Win Safetyquality awards...**
**SQuality** Innovate Safetyquality through proactive improvements

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system. Thank you.

HEA0175 - CONFIDENTIAL

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system.  Thank you.

4

HEA0176 - CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 17 – Email from HMMA's General Counsel Concerning the EEOC's
Cause Finding**

Message

| | |
|---|---|
| **From:** | Whitehead, Chris HMMA/Legal & Compliance [ChrisWhitehead@hmmausa.com] |
| **Sent:** | 5/2/2019 2:31:35 PM |
| **To:** | 'Kristal Riddle' [klriddle@dynamicsecurity.org] |
| **CC:** | Williams, Cassandra - Hyundai ENG America [CWilliams@hmmausa.com] |
| **Subject:** | RE: Davita Key v. Hyundai Motor Manufacturing Alabama, LLC |
| **Flag:** | Follow up |

Hi Kristal. Hope you're doing well. We just got a letter from the EEOC indicating they intend to recommend a for cause determination against HMMA on the Davita Key charge. Have you guys ever heard anything back regarding the charge submitted against Dynamic Security?



Chris Whitehead
(LG) Legal Dept | Manager, Corporate Counsel
Hyundai Motor Manufacturing Alabama, LLC

T (334) 387-8045   E ChrisWhitehead@hmmausa.com

## Win Safetyquality awards...
**SQuality Innovate Safetyquality through proactive improvements**

**From:** Kristal Riddle [mailto:klriddle@dynamicsecurity.org]
**Sent:** Thursday, December 06, 2018 2:19 PM
**To:** Whitehead, Chris HMMA/Legal
**Cc:** Williams, Cassandra - Hyundai ENG America
**Subject:** Re: Davita Key v. Hyundai Motor Manufacturing Alabama, LLC

Chris,

I'm happy to be helpful however I can. So far, EEOC has not issued a determination on her charge against Dynamic.

Thanks,
Kristal

---

**From:** "Whitehead, Chris HMMA/Legal" <ChrisWhitehead@hmmausa.com>
**To:** "'klriddle@dynamicsecurity.org'" <klriddle@dynamicsecurity.org>
**Cc:** "Williams, Cassandra - Hyundai ENG America" <CWilliams@hmmausa.com>
**Sent:** Thursday, December 6, 2018 11:20 AM
**Subject:** Davita Key v. Hyundai Motor Manufacturing Alabama, LLC

Kristal, thanks so much for passing on the documentation related to the EEOC charge filed by Davita Key. Did the EEOC issue a no cause determination on her charge? If so, can you let me know the date it was issued by the EEOC?

Chris Whitehead
(LG) Legal Dept | Manager, Corporate Counsel
Hyundai Motor Manufacturing Alabama, LLC



PLAINTIFF'S
EXHIBIT
23

HEA0215 - CONFIDENTIAL



**Team Built.
Team Strong.**

T (334) 387-8045   E ChrisWhitehead@hmmausa.com

## Win Safetyquality awards...
## SQuality Innovate Safetyquality through proactive improvements

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees
and may contain information that is proprietary, privileged, confidential or otherwise
legally exempt from disclosure under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination,
distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail
and delete the original message and the reply from your system.  Thank you.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 18 – Email Re Key's Unemployment**

3/18/22, 9:46 AM                                    Yahoo Mail - Key's Unemployment Rebutal

Key's Unemployment Rebutal

From:  Ray Cureton (rcureton@dynamicsecurity.org)

To:     sspires@dynamicsecurity.org

Cc:     klriddle@dynamicsecurity.org

Date:  Tuesday, August 29, 2017, 02:27 PM CDT

Sherry,

I have attached the paperwork you asked for, and here are the answers to your questions:

1. We did NOT discharge her. We offered her part time weekend shifts at either MOBIS or KOCH, neither of
which had a first shift opening.

2. I included a copy of a previous e-mail from Gloria that states the policy at HMMA as found on the bulletin
board at the facility.

3. Ms. Key worked 1.5 hrs on July 31, and 2 hrs on August 1.

4. I have included the refusal of assignment forms, but as I stated as requested.

5. The first page of her application is included where she states that she is available for any shift. If you need more
of the application, let me know. We do not have an interview sheet on Ms. Keys

FYI - I also included a copy of Ms. Key's original complaint where she makes a formal complaint of
discrimination against HMMA, Ms. Williams, and Gloria Robinson.

If you need anything else, please let me know!

Dr. Ray H. Cureton
*District Manager,*
Dynamic Security, Inc.

5510 Wares Ferry Rd,
Montgomery, AL 36117
Office - (334) 395-7722
Cell (334) 324-8117

----- Forwarded Message -----
**From:** Ray Cureton <rcureton@dynamicsecurity.org>
**To:** Ray Cureton <rcureton@dynamicsecurity.org>
**Sent:** Tuesday, August 29, 2017 2:15 PM
**Subject:** Message from "RNP002673A95134"

This E-mail was sent from "RNP002673A95134" (MP C4503).

Scan Date: 08.29.2017 14:18:56 (-0400)
Queries to: richard@absofficesystems.com



PLAINTIFF'S
EXHIBIT
66
Williams

1/2

Dynamic - Key 000140

3/18/22, 9:46 AM                                    Yahoo Mail - Key's Unemployment Rebutal

 20170829141856245.pdf
299kB

Dynamic - Key 000141

3/18/22, 9:47 AM                                    Yahoo Mail - Re: Davita Key

Re: Davita Key

From:  Sherry Spires (sspires@dynamicsecurity.org)

To:    klriddle@dynamicsecurity.org; rcureton@dynamicsecurity.org

Date:  Monday, August 28, 2017, 03:01 PM CDT

## Kristal,

## I see now that's all I got too.  I'll defer to Ray.

## Sherry

---

**From:** Kristal Riddle <klriddle@dynamicsecurity.org>
**To:** Ray Cureton <rcureton@dynamicsecurity.org>; Sherry Spires <sspires@dynamicsecurity.org>
**Sent:** Monday, August 28, 2017 2:52 PM
**Subject:** Davita Key

Could you guys look through your paperwork and send me another copy of Gloria Robinson's Memo of August 1, 2017, please? I find that I have pages 1 and 3, but not 2.

Thanks!
Kristal

1/1

Dynamic - Key 000142

Fw: Statements

From:  Ray Cureton (rcureton@dynamicsecurity.org)

To:     sspires@dynamicsecurity.org; tpeoples@dynamicsecurity.org

Date:  Tuesday, August 1, 2017, 11:09 AM CDT


Sherry,

This morning I received the attached documents concerning Ms. Dvita Key, a recent hire in the mail room at
Hyundai, who wants to file an official complaint for discrimination against Hyundai, Cassandra Williams, and
Gloria Robinson. I have interviewed Ms. Keys and she has repeatedly stated that she has no issues with Dynamic
Security, other than what she feels is a demeaning attitude on the part of Gloria Robinson.

Ms. Williams has asked that Ms. Key not return to the site, and I have removed her from HMMA, but I have NOT
terminated Ms. Key from Dynamic Security at this point.

There is also a statement included here from a co-worker who reported to Ms Williams that Ms Key felt
discriminated against.

I can attempt to reassign Ms. Key to a different site, but I don't think that is advisable at this time, especially if she
is to carry through with the stated "official complaint" of discrimination against Hyundai, Ms Williams, and Ms
Robinson.

Any guidance or thoughts?

THANKS!

Dr. Ray H. Cureton
*District Manager,*
Dynamic Security, Inc.

5510 Wares Ferry Rd,
Montgomery, AL 36117
Office - (334) 395-7722
Cell (334) 324-8117


----- Forwarded Message -----
**From:** "Chambliss, Maurice A - Dynamic Security" <Maurice.Chambliss@hmmausa.com>
**To:** Ray Cureton <rcureton@dynamicsecurity.org>
**Cc:** "Robinson, Gloria A - Dynamic Security" <gloriarobinson@hmmausa.com>
**Sent:** Tuesday, August 1, 2017 10:02 AM
**Subject:** Statements



NOTICE:
This e-mail message, together with any attachments, is for the sole use of the
addressees and may contain information that is proprietary, privileged,

Dynamic - Key 000143

3/18/22, 9:48 AM                                   Yahoo Mail - Fw: Statements

confidential or otherwise legally exempt from disclosure under applicable law.

If you are not the intended recipient, be aware that any review, use,
dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-
mail and delete the original message and the reply from your system.  Thank you.

 DOC080117-003.pdf
53.2kB

 DOC080117-002.pdf
32.6kB

Dynamic - Key 000144

From: Michael Keller [mailto:mkeller@dynamicsecurity.org]
Sent: Thursday, February 16, 2017 10:19 AM
To: Robinson, Gloria A - Dynamic Security; Ray Cureton
Cc: Williams, Cassandra - Hyundai ENG America; croberts@dynamicsecurity.org
Subject: Re: Vacation

Gloria,

Please provide me with a total number of days and/or weeks that HMMA is shut down that will affect our admin personnel. Once we have that information, corporate will adjust the vacation threshold they reach in order to account for the shortened weeks. Once you provide that information, I'll let you know what the new threshold will be.

Thanks.

**Michael Keller**
*Regional Manager*
*Dynamic Security, Inc.*

*224 Aquarius Dr. #112*
*Birmingham AL 35209*
*(P)205-942-0405*
*(F)205-942-0467*

On Thursday, February 16, 2017 9:13 AM, "Robinson, Gloria A - Dynamic Security" <grobinson@hmmausa.com> wrote:

Good morning,
    I have run into a problem that will cause this company to lose possible employees, mainly speaking of the Administration Ladies and Mailroom personnel.

    As you know, the vacation hours are a set at 1560 hours. Also, there are times when HMMA will shut down leaving the Admin ladies and mailroom personnel short of the tot This came up because Rhonda Jenkins needed to take two days to recover from a illness and she is 70 hours short, due to circumstances beyond her control—HMMA shutd

    As I am understanding this, none of the six (6) personnel will be able to take vacation—ever, because they will always be short hours when there is a shutdown with no way up hours like the security officers.

    Prior to me informing these six personnel that they cannot take vacation---at all--- will we be able to come up with some type of solution.

I seriously cannot fill these positions as easily as a security officer.

Thank you


Gloria Robinson
Non-Employee |
Hyundai Motor Manufacturing Alabama, LLC
T (334) 387-8900   E grobinson@hmmausa.com

awards...
**SQuality Innovate Safetyquality through proactive improvements**

NOTICE: This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure under applicable law. If you are not the intended recipient, be aware that any review, use, distribution or copying of this message is strictly prohibited. If you received this communication in error, please notify the sender by return e-mail and the reply from your system. Thank you.

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt from under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system.  Thank you.

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise legally exempt fro under applicable law.

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited.

If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system.  Thank you.

Virus-free. www.avast.com

Dynamic - Key 000145

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 19 – Davita Key Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-CV-767-ECM-SMD |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## **DECLARATION OF DAVITA KEY**

I, Davita Key, do declare and state as follows:

1. My name is Davita Key, I am over the age of 21, and a resident of the State of Alabama. I have personal knowledge of the contents of this declaration. I am competent to testify to the matters herein and do so of my own free will.

2. I visited the security building on the HMMA campus in July of 2017 for an interview, on on July 31, 2017 and August 1, 2017 for work, and on June 20, 2022 for my deposition. The security building is where I went on my first day of work to obtain my employee badge. When I visited the building for my deposition this year, there were signs and logos showing "Hyundai" or "HMMA" throughout. There was a security vehicle outside that had a marker on the door that said "HMMA Security." I did not see anything in the building that identified HEA. I do not recall seeing anything in the building that identified HEA in 2017. I interviewed with Gloria Robinson, who had e-mailed me the "HMMA Mailroom Duties and Responsibilities."

3. When I interviewed for and accepted the mailroom clerk position in 2017, I understood that my paycheck would come from Dynamic Security, but I would be working at HMMA, for the benefit of HMMA.

4. I met Cassandra Williams at the end of my interview in July 2017. Williams did not identify herself as working for HEA and when we spoke, she referred only to "Hyundai." I understood that she worked for HMMA.

5. Robinson said Williams was her supervisor and anytime Robinson spoke about the company she said "Hyundai" or "HMMA."

6. Williams and Robinson had concerns whether my naturally dreadlocked hair was appropriate for HMMA. I do not chemically treat my hair and wear it in natural but neat dreadlocks. I showed them a style where my dreadlocks were pulled into a bun, and they agreed that was appropriate but ultimately said it was whatever Dynamic Security's policy was.

7. I verified my hair was within Dynamic Security's policy and did not re-style it because I believed that complied with what I was told by Williams and Robinson.

8. In July of 2017, I was four months pregnant. Before starting the job at HMMA I went to the doctor to get a note saying I did not have any work restrictions related to my pregnancy. I wanted to make sure my supervisors knew I did not have any restriction and were aware of my upcoming appointments in the event I needed to miss work.

9. On the morning of my first day, both Williams and Robinson saw me with my hair in dreadlocks and did not raise any concern.

10. Before beginning my training for the day, but after seeing both Robinson and Williams, I told Robinson about my pregnancy and provided her and another supervisor, Maurice

Chambliss, my doctor's note showing I did not have any restrictions. Robinson took the note into the office she shared with Williams.

11. Within minutes Williams came out and asked me what was "wrong" with my hair. I told her it was within Dynamic Security's guidelines, and she said that what mattered was her, not Dynamic Security. Williams walked off and Robinson walked by me without speaking. I left with my trainer to begin working.

12. After 30 to 45 minutes Chambliss came to get me and said Robinson wanted to talk to me. I returned to the security building with him, and Williams and Robinson were in the office together. Robinson then asked me just like Williams did what was "wrong" with my hair.

13. Because I was unclear why my hair was an issue when Dynamic Security had said it was not, I asked to see the policy. Williams and Robinson were aggravated at my request, but Williams eventually showed me a document on her computer screen. I never received any written policy and was not told (even during this confrontation) that the policy was posted anywhere on site.

14. They ultimately sent me home and told me I could return the next day with a hat on if it did not have a logo and covered all my hair.

15. A few minutes after I left, Robinson called me and asked when my baby was due and if my doctor knew how much I would be lifting. I told her January and that my doctor was aware of the requirements of the job. I also told her I had worked as a postal work up until I was 9 months pregnant with no restrictions.

16. When I returned the next day and was with my trainer, she asked me why I was sent home. I told her that they were acting like they had a problem with my hair, and it was unfair but that I still wanted to work there.

17. Robinson called me back to the security building where she questioned me about whether I felt discriminated against. When I tried to tell her I had complied with their requirement to wear a hat, she kept saying things like "this isn't about your hair", "this is going to be a problem", and "are you going to be like this until" while pointing to my stomach.

18. When I got back with my trainer, I asked her if she told them I felt discriminated against. She said that she did and that was the end of the conversation. There was no confrontation, no hostility, and no issue between me and my trainer. She was training me.

19. A few minutes after I got back to the mailroom Chambliss walked in and I asked him if could speak to someone in human resources.  I thought he would send me to talk to someone onsite with HMMA. Instead, he said I could talk to Robinson and Williams. After he called them, he told me I could go to Dynamic Security's Montgomery office instead and speak with Ray Cureton.

20. When I got to Dynamic Security's office Cureton asked me if I was going to sue Dynamic Security. I told him I wanted to make a complaint. We had a discussion, and I made my complaint against Williams, Robinson, and Hyundai.

21. Cureton told me not to go back to Hyundai because "they" didn't want me there. He said they had a problem with my hair and "something else" but that he didn't want to get into that right now. I worked at the Hyundai plant for less than 4 hours total.

22. Because Cureton did not take my complaint seriously, I went to Birmingham the next day to file an EEOC charge.

23. When I told the EEOC employee why I was there, I was given an intake questionnaire to complete. I had never filed an EEOC charge before and was relying on the EEOC to explain and handle the process. At that time, I did not know that Dynamic Security was not going to reassign me to another position.

24. I tried for several days without any success to contact them. I even visited the office and filed a formal rebuttal to Robinson's statement about my removal. Cureton never offered me another position after removing me from HMMA. I had told Dynamic Security I was even willing to drive to Selma and they said they would call me in a couple of weeks when some positions were available.

25. The EEOC had me sign some more forms that restated the same information I had already provided.

26. After I filed my EEOC charge, Dynamic Security never called me again.

27. I filed for unemployment and Dynamic Security contested it saying I was only available first shift and had refused work. I never told them I could only work first shift and said I would take anything. During my unemployment hearing Cureton admitted that I never told him I could only work first shift. He told unemployment he did not have any full-time positions available. I told the EEOC in a written rebuttal in October of 2017 that Dynamic Security had fired.

28. I stayed in contact regularly checking with the EEOC about the status of my charge using the charge number assigned on my intake questionnaire. In November of 2018, the EEOC had me sign more papers where they specifically named HMMA. I was not aware that this was a separate "charge" and did not ask the EEOC to file multiple "charges." When I filed my complaint with the EEOC through the questionnaire I believed they were filing a

charge against Hyundai, Robinson, Williams, and their employers because that's what I asked for. No one from the EEOC explained the process to me.

29. I never received the Dismissal and Notice of Rights by mail or e-mail from the EEOC on the Dynamic Security charge and did not see it until it was presented during this lawsuit. No one from the EEOC ever told me when I was checking the status that it had been issued.

30. The treatment I endured from HMMA, HEA, and Dynamic Security made me feel devalued as a pregnant, black, woman. It made me feel as though I was not good enough, I was less than a woman, and my pregnancy was damaging my family.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE UNITED STATES OF AMERICA, THAT THE FOREGOING INS TRUE AND CORRECT.

Executed on this the 2nd say of November, 2022.

_____

Davita Key

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-767-ECM-SMD** |
| | ) | |
| HYUNDAI MOTOR | ) | ORAL ARGUMENT REQUESTED |
| MANUFACTURING ALABAMA, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT**

**Exhibit 20 – Email from Tracy Peoples to Chris Hargrove on July 31, 2017**

KEY V HMMA HEA AND DYNAM C

PEA NT FF S DEPOS T ON EXH B T

39

2:19-CV-767-ECM-SMD

8/1/2017                    Print

Subject:  Re: Fwd: Mailroom new hire

From:  Tracy Peoples (tpeoples@dynamicsecurity.org)

To:  chargrove@dynamicsecurity.org;

Cc:  sspires@dynamicsecurity.org;

Date:  Monday, July 31, 2017 4:19 PM

Chris, If the officer they hired is not a fit (because she was pregnant) when they hired her the only way I can see her being removed is if she does not comply with rules and regs regarding hair.

Sherry, any thoughts on the below email?

V/R
Tracy

*Tracy R. Peoples*
*Vice President of Operations*
*Dynamic Security INC.*
*1102 Woodward Ave.*
*Muscle Shoals, AL 35661*
*Office: (256) 383-5798 Ext 211*
*Cell: (901) 827-0335*
*Fax: (256)810-5242*
*Email: tpeoples@dynamicsecurity.org*

**From:** Chris Hargrove <chargrove@dynamicsecurity.org>
**To:** Tracy Peoples <tpeoples@dynamicsecurity.org>
**Sent:** Monday, July 31, 2017 1:34 PM
**Subject:** Fwd: Mailroom new hire

FYI.

Sent from my iPhone

Begin forwarded message:

> **From:** "Robinson, Gloria A - Dynamic Security" <gloriarobinson@hmmausa.com>
> **Date:** July 31, 2017 at 2:10:47 PM EDT
> **To:** "chargrove@dynamicsecurity.org" <chargrove@dynamicsecurity.org>
> **Cc:** Ray Cureton <rcureton@dynamicsecurity.org>, "Williams, Cassandra - Hyundai ENG America" <CWilliams@hmmausa.com>
> **Subject:** Mailroom new hire
>
> Good morning,
> Ms. Davita Key was hired on as the new mailroom person.
> During the interview, prior to hire—I had contacted Ms. Williams in reference to Ms. Key's hairstyle. They would be considered dreads or locks, if you will. Either way, they are not allowed for the security officers here at HMMA. Ms. Key showed Ms. Williams and I a picture of how she could have her hairstylist change the appearance of them, to make them look a bit neater.
>
> Fast forward to today—Monday July 31, 2017 @ 0730 hours.
> Ms. Key asked to talk to Lt. Chambliss and I in private and at that time told us that she just found out she was pregnant. Keep in mind that she was hired for the mailroom—and although neither male or female are allowed to lift more than 50 pounds. I take issue with her working in the mailroom. To top this off, she had a doctor's note (see attached) stating that she could return to work with no restrictions---not sure where the 'return to work' came from, today was her first day. Apparently she informed her trainer, Ms. Howell, that she is due in January. This means she was with child during the interview with me—but did not disclose this. Although she stated that she 'just found out July 28.
>
> 2nd topic—her hair. Apparently while she was in the security video training on Thursday, she asked Ms. Nicole if she thought anything was wrong with her hair. Unbeknownst to Ms. Nicole why Ms. Key would ask her that question, Ms. Nicole said no, she didn't have a problem with it.
>
> So, at this point, I believe Ms. Key figured since Ms. Nicole was the officer manager, she (Key) would just take it upon herself to NOT change her hairstyle. Ms. Williams reminded her of the conversation the three of us had prior to being hired, but Ms. Key seemed to want more explanation---such as asking to see the policy---which she was shown. I informed Ms. Key that HMMA has a different set of standards for security officers. Either way—Ms. Williams asked her if she could have her stylist change her hair –Ms. Key stated that the lady does not work on a Tuesday, and is normally booked up. She was also given the option to wear a hat that would contain her hair, of course she lives 30 minutes away. At this point, I just told her to go home and to call me when she is able to get an appointment and we will go from there.

about:blank                                                             1/2

**Dynamic - Key 000078**

8/1/2017                                                                  Print

After she left I did call her and ask her if she informed her doctor what type of work she would be doing, she said yes---sounded rather shaky, but she went on to say that when she worked in the post office, she was pregnant and was delivering 100 pds. of mail a day and worked up until two days prior to delivery.

I am asking for some assistance here---what recourse do I have with her? As of this e-mail she has not called back to let me know if she has a hair appointment.
If she is due in five (5) months, unless I cannot count (which I can't) she is already four (4) months---and didn't know it?

**G. Robinson**
**Dynamic Security**
**Cell: (334) 328-2852**
**Desk: (334) 387-8909**
**Win Safetyquality awards...**
**SQuality Innovate Safetyquality through proactive improvements**

NOTICE: This e-mail message, together with any attachments is for the sole use of the addressees and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this message is strictly prohibited. If you received this communication in error, please notify the sender by return e-mail and delete the original message and the reply from your system. Thank you.

NOTICE:
This e-mail message, together with any attachments, is for the sole use of the addressees and may contain information tha

If you are not the intended recipient, be aware that any review, use, dissemination, distribution or copying of this mess

If you received this communication in error, please notify the sender by return e-mail and delete the original message an

 Virus-free. www.avast.com

**Attachments**

- DOC073117-005.pdf (45.29KB)

about:blank                                                              2/2

**Dynamic - Key 000079**

Jackson Clinic • 1758 Park Place, MONTGOMERY AL 36106-1137

**KEY, DAVITA (id #101538, dob: 12/10/1985)**

# THE JACKSON CLINIC

### Return to Work / School

Patient: KEY, DAVITA                                   Date: 07/28/2017
DOB: ████ 985                                          Patient ID: 101538
Address: ████
MONTGOMERY, AL ████

Note to Patient:

___ Was Seen in my office on: *07/28/17*

___ Please excuse from work/school for: _____ days

___ May return to work/school on: _____

___ May Not return to work/school on: _____

___ Work limitations: *No restrictions  Release to full duty*

___ May Not participate in physical education: _____

___ May return to physical education: _____

___ Limitations for physical education: _____

___ May Not participate in jury duty: _____

Sincerely,

Dynamic - Key 000080

## AL - Jackson Hospital

Jackson Obstetrics and Gynecology
1758 Park Place Suite 301
MONTGOMERY, AL 36106-1137.
Phone: (334) 284-1500 Fax:(334) 288-7763

DAVITA KEY
DOB: ███ 1985
Patient ID: 101538

Upcoming Appointments

| Date | Time | Appointment | Dept./Address | Phone |
|------|------|-------------|---------------|-------|
| 08/24/2017 | 03:15 PM | Follow-Up OB LATOYA CLARK, MD | Jackson Obstetrics and Gynecology 1758 Park Place Suite 301 MONTGOMERY, AL 36106-1137. | (334) 284-1500 |

### CERTIFICATE OF SERVICE

I certify that, on February 17, 2025, the foregoing was filed using the CM/ECF system, which will serve notice on all counsel of record.

*s/ Scott Burnett Smith*

Of Counsel